**Nos. 24-6256, 24-6274**

IN THE UNITED STATES COURT OF AP-
PEALS FOR THE NINTH CIRCUIT

—————————————

EPIC GAMES, INC.,

*Plaintiff-Appel-*

*lee, v.*

GOOGLE LLC, *et al.*,

*Defendants-Appellants*

—————————————

On Appeal from an Order of the United States Dis-
trict Court for the Northern District of California

—————————————

United States District Judge James Donato
Case No. 3:20-cv-05671-JD, 3:21-md-02981-JD

**BRIEF OF ACT | THE APP ASSOCIATION SUPPORTING
DEFENDANT-PETITIONER**

Brian Scarpelli
ACT | THE APP ASSOCIATION
1401 K St NW (Ste 501)
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org

# CORPORATE DISCLOSURE STATEMENT

No. 24-6256

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE, LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,

*Defendants-Appellants.*

Under Federal Rule of Appellate Procedure 26.1, ACT | The App Association certifies that it has no parent corporation, and that no publicly held company owns 10% or more of its stock.

*/s/ Brian Scarpelli*
Brian Scarpelli
*Counsel for ACT | The App Association*

i

# TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................................i

Table of Contents ............................................................................................ ii

Table of Authorities ....................................................................................... iii

Interest of Amicus Curiae ................................................................................1

Introduction ......................................................................................................4

Argument ..........................................................................................................6

    I.   Developers and platforms' roles in supporting the modern app economy. ............................................................................................6

    II.  The injunction upends the dynamics of today's ecosystem. ..............9

    III. Today's ecosystem must be maintained until the legal process concludes. ...................................................................................12

Conclusion.......................................................................................................13

Certificate of Service .....................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 987, 1024-25 (N.D. Cal. 2021), *aff'd on this ground, rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023) ..............................................8

*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1224 (D.C. Cir. 2004) ..........12

*NCAA v. Alston*, 594 U.S. 69, 106 (2021) ......................................9, 12

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013).................13

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam)...................................................................3

**Other Authorities**

Anne Freer, *Google block 1.43 million policy-violating apps on Play Store*, Business of Apps (2023), https://tinyurl.com/29vuah76 ..................9

*Boosting developer success on Google Play*, Android Developers Blog (2021), (hereinafter *"Boosting success on Google Play"*), https://tinyurl.com/2eez9zmx ...............................................8

*Comments of ACT | The App Association to the Federal Trade Commission on Competition and Consumer Protection in the 21st Century (Question 3)* (Aug. 20, 2018) at 3–4, (hereinafter "*App Association FTC Comments*"), https://tinyurl.com/bdncf8bh ..................2, 3

*Gross revenue generated by Epic Games worldwide from 2018 to 2026*, Statista (2023), https://tinyurl.com/2v5haej5.................................4

*Grow your audience*, Google, https://tinyurl.com/mt7ysst2 (last visited Oct. 22, 2024)...................................................8

Inj., ECF 702.............................................................. 10, 11

*Mobile App Download and Usage Statistics*, buildfire (2024), (hereinafter *"Mobile App Statistics"*), https://tinyurl.com/4a952te7....................................................2, 6

*State of the U.S. App Economy: 2022*, ACT|The App Association (8th ed. 2022), https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf .............................................1, 6

Testimony of Morgan Reed, President ACT | The App Association,
    Before the U.S. House of Representatives Judiciary Committee,
    Subcommittee on Antitrust, Commercial and Administrative
    Law (2019), at 3-6 (hereinafter "Reed Testimony"),
    https://tinyurl.com/2ynpvx4s..........................................................................2

## INTEREST OF AMICUS CURIAE

Founded in 1998, ACT | The App Association ("App Association") is an international not-for-profit grassroots advocacy and education organization representing the small business technology developer community.[1] Our members are entrepreneurs, innovators, and independent developers within the global app ecosystem that engage with verticals across every industry. We work with and for our members to promote a policy environment that rewards and inspires innovation while providing resources that help them raise capital, create jobs, and continue to build incredible technology. Today, the ecosystem the App Association represents is valued at approximately $1.8 trillion and is responsible for 6.1 million American jobs.[2]

As the App Association has explained in comments filed with the FTC and in testimony before Congress, mobile platforms solve many of the

---

[1] The App Association represents that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than the App Association and its counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E). The App Association files this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2).

[2] *State of the U.S. App Economy: 2022*, ACT | The App Association (8th ed. 2022), (hereinafter *"App Economy Report"*), https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

1

problems that developers faced in the early Internet economy.[3] Before mobile platforms, app developers were effectively required to pay publishers and other intermediaries and engage in time-consuming marketing campaigns to make it onto store shelves in order to reach users.[4] These costs imposed formidable barriers to entry, resulting in higher prices and fewer choices for consumers.[5] Software platforms, which provide one-stop shops where developers and consumers transact directly, lower these barriers to entry and thus free up substantial amounts of capital that startups can use to grow their businesses.[6] There are now several hundred thousand companies active in the mobile app market in the United States and nearly three million apps available on major app platforms.[7]

---

[3] *See Comments of ACT | The App Association to the Federal Trade Commission on Competition and Consumer Protection in the 21st Century (Question 3)* (Aug. 20, 2018) at 3–4, (hereinafter "*App Association FTC Comments*"), https://tinyurl.com/bdncf8bh. *See also* Testimony of Morgan Reed, President ACT | The App Association, Before the U.S. House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law (2019), at 3-6 (hereinafter "Reed Testimony"), https://tinyurl.com/2ynpvx4s.

[4] *See id.*, at 3–4.

[5] *Id.*

[6] *Id.*

[7] *Mobile App Download and Usage Statistics*, buildfire (2024), (hereinafter "*Mobile App Statistics*"), https://tinyurl.com/4a952te7.

2

Today, developers overwhelmingly use software platforms—such as Google Play—to distribute their applications. A mutually beneficial relationship has flourished between developers and platform companies.[8] Small developers provide useful and enjoyable digital content and services, which draw consumers to the platform, while the platform provides developers with low overhead costs, simplified market entry, consumer trust, dispute resolution, data analytics, flexible marketing and pricing models, and strengthened IP protections.[9]

The App Association has a keen interest in the legal rules governing software platforms where apps are downloaded by users and monetized by developers. In fact, one of the first *amicus* briefs the App Association ever filed was in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam), which involved an effort to break up a company that provided a "platform[] for software applications." *Id.* at 53. The App Association provides this brief to highlight how small and midsized developers in particular benefit from their symbiotic relationship with companies like Google and to explain how the district court's injunction would upend the Android app ecosystem writ large to the detriment of these

---

[8] *See App Association FTC Comments*, *supra* n.2, at 2, https://ti-nyurl.com/bdncf8bh.

[9] *Id.*

developers, and should therefore be stayed pending the exhaustion of appeals.

## INTRODUCTION

The district court in this case issued a permanent injunction that upends the nature of the Android app ecosystem, directing Google Inc. ("Google") to undertake a number of actions intended promote competition in the android app distribution market, including by requiring the Google Play store to distribute competitor app stores and providing them with Google Play's entire catalog of apps.

Epic Games, Inc.'s ("Epic") revenue, which is in the billions of dollars[10] is starkly different from most developers, including App Association members. Small and midsized developers were not parties to the litigation, and nothing in the district court's reasoning indicates that it sufficiently examines how the injunction would affect them. Nor were these developers adequately represented by Epic, as its interests are not aligned with those of the thousands of small and midsized developers that use Google Play. Epic did not seek class certification or demonstrate that the remedies it sought would benefit anyone other than itself. It is vital that the court keep in mind the impacts on the wider small business developer community that heavily relies on Google Play to compete and innovate.

---

[10] *Gross revenue generated by Epic Games worldwide from 2018 to 2026*, Statista (2023), https://tinyurl.com/2v5haej5.

Further, the changes to Google Play that the injunction requires would lead to significant challenges for the thousands of small and midsized developers that use the Google Play Store who would be suddenly put in a quasi-contractual relationship with an unknown number of third-party app stores with which they have had no prior contact. They would be forced to spend scarce time and resources determining the answers to a range of difficult questions about their new judicially mandated business partners. Moreover, though litigation in this case is ongoing and likely to face several levels of appeal, the district court's injunction requires that these changes be made in only eight months after the injunction becomes effective. Not only does this timeline limit the ability of all implicated parties to mitigate security, data stewardship, and other issues unforeseen by the district court, it also fails to anticipate the challenges that could result if further litigation leads to different results. If the ultimate disposition is to overturn this injunction, it would be very difficult if not impossible to revert these changes and put the Android app marketplace back to its current state. Competitor app stores would already have the Google Play app catalog, and app developers would already have devoted significant resources toward adapting to the new landscape.

Therefore, we urge the Court to stay the district court's injunction pending appeal.

ARGUMENT

## I. Developers and platforms' roles in supporting the modern app economy.

Experiencing exponential growth alongside the rise of the smartphones and other connected devices, App Association members drive a global app economy valued at more than $1.8 trillion and supporting 6.1 million American jobs, ranging from including developers, engineers, marketing and sales experts.[11] Software apps are now central players in how Americans work and play, with the average smartphone owner using ten apps per day and thirty apps per month, and one in two Americans opening an app over eleven times each day.[12]

But before the development of today's ecosystem, consumers were tasked with the challenge of locating and then travelling to a brick-and-mortar store that happened to sell software. Once internet connectivity became a standard feature, consumers began to download applications without having to step foot in a physical store. Building on this development, the size and scale of the mobile app revolution has far surpassed the personal computer (PC) software era, as software developers transitioned into app developers.

---

[11] *App Economy Report*, *supra* n.1.

[12] *Mobile App Statistics*, *supra* n.6.

6

In the PC software era software companies had to cobble together a distribution plan, including creating consumer trust, from the ground up. This forced small app companies' staff to wear many hats to develop, market, and benefit from the sale of their products. App companies were not only required to write code for their products, but they were also responsible for:

1. Managing their public websites;
2. Hiring third parties to handle financial transactions;
3. Employing legal teams to protect their intellectual property; and
4. Contracting with distributors to promote and secure consumer trust in their product.

The skillsets required to manage the overhead of online software distribution were often not core competencies of small development companies, and each additional step cost app developers valuable time and money, with little tangible benefit. Costs could easily exceed $100,000 before a single box of software was sold. Further, software developers had to hand over their products to companies with a significant reputation to break through the trust barrier and ensure consumers felt confident installing software and sharing personal information.

Now, with the emergence of curated platforms or app stores, such as the Google Play Store, the experience of these innovative small businesses has shifted positively due to a symbiotic relationship between software platforms and developers. Trusted app stores serve as a vital foundation for the growing uses of apps across industries and enterprises. Three key

attributes have emerged that have led to the revolution in software distribution:

1. The provision of a bundle of services that reduces overhead costs;

2. Instantaneous and cost-effective consumer trust mechanisms; and

3. Cost-effective access to a global market.

The Google Play store features around 2.4 million apps and is part of a broader ecosystem of platforms that compete for consumer and developers. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 987, 1024-25 (N.D. Cal. 2021), *aff'd on this ground, rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023) (finding that the Apple App Store competes with other platforms for consumers and developers). Today, every successful platform for mobile, desktop, gaming, and even cloud computing must provide these features or risk failing in the marketplace. Platforms need to continuously improve because they know that, while platforms provide infrastructure and support, developers bring smart devices to life. And increased competition amongst platforms has provided an unprecedented avenue for entrepreneurship, with Google Play being no exception. Google sets itself apart by providing marketing support[13] and data insights.[14]

---

[13] *Grow your audience*, Google, https://tinyurl.com/mt7ysst2 (last visited Oct. 22, 2024).

[14] *Boosting developer success on Google Play*, Android Developers Blog (2021), (hereinafter *"Boosting success on Google Play"*), https://tinyurl.com/2eez9zmx.

Through its enforcement of its terms of service, Google Play sustains end user and developer trust, preventing $2 billion in fraudulent and abusive transactions in 2022 alone.[15] The Google Play store is an important means for opportunity and empowerment for the small business software developer community.

## II. The injunction upends the dynamics of today's ecosystem.

With an existing market that already provides for robust competition among developers and significant benefits for consumers, courts must be especially careful not to impose changes that will upset existing dynamics and lead to worse outcomes. Indeed, the Supreme Court has repeatedly and recently held that when developing antitrust remedies, "…caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). Antitrust injunctions are particularly vulnerable to creating situations that "wind up impairing rather than enhancing competition." *Id.* At 102.

Unfortunately, the district court's injunction does not heed these warnings. Instead of carefully focusing on ways to remediate behavior that arguably unfairly hinder competition, the district court orders Google to undertake unprecedented efforts to promote the products and services of their competitors in ways that could create significant challenges for app developers. Of particular concern is the element of the injunction that requires

---

[15] Anne Freer, *Google block 1.43 million policy-violating apps on Play Store*, Business of Apps (2023), https://tinyurl.com/29vuah76.

9

Google to give competing app stores access to the entire Google Play Store catalog of apps. Inj. at 2-3, ECF 702.

In today's ecosystem, app stores like the Google Play Store do not function like big box retailers, buying products from suppliers to stock their shelves. Instead, the relationship between an app store and each individual app represents a contractual agreement between two businesses. As discussed above, these relationships are symbiotic, with the app store providing useful services in exchange for the right to distribute each app.

The district court's injunction, however, misunderstands this relationship and threatens to create significant challenges for app developers. The injunction's requirement for Google to share the Play Store's entire app library with competing third-party app stores creates a presumption that those stores can sell and distribute developers' products, services, and intellectual property unless a developer opts out on a case by case basis. As issued by the district court, this provision of the injunction leaves a wide array of questions unanswered, some of which may have existential consequences for small and medium sized app developers.

For example, if a third-party app store begins selling an app through its own payment system, how can the app's developer collect their share of the payment? The developer would have an existing relationship with Google and the infrastructure in place to accept payment through Google Play Billing, but the injunction expressly prohibits Google from requiring third-party app stores to use that payment system.  Inj. at 2, ECF 702. How will an app's

developer know whether each third-party store hosting their app is distributing software feature or security updates appropriately? What customer data do these stores collect and what privacy policies do they have? How are they receiving and disposing of customer service inquiries? Do they have adequate redress procedures in place for dealing with copycat apps or other types of intellectual property theft? Are they hosted in countries that respect the rules of the digital economy?

The injunction does not provide for an adequate mechanism for app developers to answer these questions. Instead, they will have to devote time and resources, both of which are in short supply for small developers and startups, to sort through the unknown number of new storefronts that may be displaying their wares. While the injunction allows app developers to remove themselves from third-party stores on an individual basis, Inj. at 3, ECF 702, that system will only reinforce the need for developers to spend time and resources determining whether to remove their offerings from a specific store. This is particularly ironic in light of the Federal Trade Commission's recent final Negative Option Rule, 16 CFR Part 425, which takes the opposite position of the district court on the acceptability of presuming ongoing contractual relationships subject to an individual opt-out.

While the district court appears to believe that any negative effects will be temporary, granting Google eight months to engineer technical processes to carry out the new requirements and then only mandating that they be in effect for a further three years, Inj. at 2-3, ECF 702, the court does not seem

to appreciate that, by putting app developers in what would ordinarily be a contractual relationship with potentially innumerable third-party app stores with which they have had no prior interaction, in three years the damage to small businesses  may not be so easily undone.

## III. Today's ecosystem must be maintained until the legal process concludes.

Given the transformative effects of the district court's injunction on the Android app ecosystem and the potential they hold for harm to small developers and, ultimately, consumers, this Court should stay the injunction while the full appellate process plays out due to injunction's substantial effects on the app distribution market, and small developers in particular.

The Supreme Court has repeatedly warned against the use of the "heavy hand of judicial power" in "fashioning antitrust remed[ies]" and instead advising that "caution is key" so as not to harm "consumer welfare." *NCAA v. Alston, 594 U.S. at 106*. Complex and rapidly evolving marketplaces, particularly those built on constantly innovating technology, may be even more difficult than most marketplaces for courts to perceive the possible consequences of broad judicial mandates on certain actors. Remedies that are not precisely tailored to specific competitive harms and that instead seek to re-shape an entire market create a "danger of imposing restrictions that prevent the defendant from forging new routes to serve consumers." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1224 (D.C. Cir. 2004).

The specific nature of this injunction – that it requires Google to work directly with its competitors to help them catch up to Google's market leadership – raises special concerns. Indeed, courts have frequently refused to impose remedies that "[force] firms to help one another" so as to avoid "judicial complicity in collusion and dampened price competition." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013).

Most importantly for small app developers, however, are the costs that will be incurred in changing processes to match the new state of the Android ecosystem created by the district court's injunction. Small businesses choose how to allocate scarce time and resources to engage in the marketplace, and unpredictable changes in the overall landscape can be especially costly. If they are required to invest in a landscape created by the district court's injunction which is later overruled, app developers will face significant harm.

## CONCLUSION

This Court should stay the injunction pending appeal.

Dated: October 23, 2024                    Respectfully submitted,

*/s/ Brian Scarpelli*
Brian Scarpelli
ACT | THE APP ASSOCIATION
1401 K St NW (Ste 501)
Washington, DC 20005
(517) 507-1446
bscarpelli@actonline.org

*Counsel for Amici Curiae ACT | The App Association*

13

14

### CERTIFICATE OF SERVICE

On October 23, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Brian Scarpelli*
Brian Scarpelli

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 24-6256**

I am the attorney or self-represented party.

**This brief contains** __2,734__ **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties;

    [  ] a party or parties are filing a single brief in response to multiple briefs; or

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  _/s/ Brian Scarpelli_     **Date** _10/23/2024_