**Nos. 24-6256, 24-6274**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC, *et al.*,

*Defendants-Appellants*

---

On Appeal from an Order of the United States
District Court for the Northern District of California

---

United States District Judge James Donato
Case No. 3:20-cv-05671-JD, 3:21-md-02981-JD

---

**BRIEF OF *AMICUS CURIAE* INTERNATIONAL CENTER FOR LAW & ECONOMICS IN SUPPORT OF APPELLANTS' EMERGENCY MOTION FOR PARTIAL STAY OF PERMANENT INJUNCTION PENDING APPEAL**

---

WILLKIE FARR & GALLAGHER LLP
Matthew Freimuth
mfreimuth@willkie.com
787 Seventh Avenue
New York, NY
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

WILLKIE FARR & GALLAGHER LLP
Jonathan A. Patchen
JPatchen@willkie.com
333 Bush Street
San Francisco, CA 94104
Telephone: (415) 858-7400
Facsimile: (415) 858-7599

*Counsel for Amicus Curiae International Center for Law and Economics*

October 23, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus International Center for Law & Economics states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Date: October 23, 2024

By: /s/ Jonathan A. Patchen
Jonathan A. Patchen
Willkie Farr & Gallagher LLP
JPatchen@willkie.com
333 Bush Street
San Francisco, CA 94104
Telephone: (415) 858-7400
Facsimile: (415) 858-7599

*Counsel for Amicus Curiae International Center for Law and Economics*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

STATEMENT OF INTEREST ................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT .............................................................................................................3

    I.     GOOGLE IS LIKELY TO WIN ITS APPEAL ON THE MERITS .................................................................................................3

         A.     Google Play And Apple's App Store Compete In the Same Product Market .............................................................3

         B.     Google's Conduct Has Significant Pro-Competitive Justifications ....................................................................4

    II.    ANTITRUST GENERALLY REPUDIATES A DUTY TO DEAL, IN CONTRAST WITH THE DECISION AND INJUNCTION BELOW ......................................................................7

CONCLUSION ........................................................................................................11

CERTIFICATE OF COMPLIANCE ......................................................................12

CERTIFICATE OF SERVICE ................................................................................13

i

# TABLE OF AUTHORITIES

**CASES**

*Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*,
　592 F.3d 991 (9th Cir. 2010) ..................................................................10

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
　472 U. S. 585 (1985).................................................................................7

*Associated Press v. United States*,
　326 U.S. 1 (1945).....................................................................................9

*Epic Games, Inc. v. Apple Inc.*,
　559 F. Supp. 3d 898 (N.D. Cal. 2021)......................................................2

*Epic Games, Inc. v. Apple Inc.*,
　67 F.4th 946 (9th Cir. 2023) .................................................................2, 3

*In re Google Play Store Antitrust Litig.*,
　3:20-cv-05671-JD, Dkt. No. 850 (N.D. Cal. Dec. 6, 2023) .....................4

*In re Google Play Store Antitrust Litigation*,
　3:20-cv-05671-JD, Dkt. No. 701 (N.D. Cal. Oct. 7, 2024) .....................8

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
　551 U.S. 877 (2007).................................................................................5

*Levia-Perez v. Holder*,
　640 F.3d 962 (9th Cir. 2011) ...................................................................3

*MetroNet Servs. Corp. v. Qwest Corp.*,
　383 F.3d 1124 (9th Cir. 2004) .................................................................9

*Ohio v. Am. Express Co.*,
　585 U.S. 529 (2018).................................................................................4

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,
　20 F.4th 466 (9th Cir. 2021) ....................................................................8

*United States* v. *Colgate & Co.*,
　250 U.S. 300 (1919).................................................................................7

*Verizon Communications Inc. v. Law Offices of Curtis Trinko*,
　540 U.S. 398 (2004)............................................................................7, 10

**OTHER AUTHORITIES**

Wright, J. (2004) *One-sided Logic in Two-sided Markets*.
     Review of Network Economics, Vol. 3 (Issue 1) ............................................. 5

Ronald H. Coase, Lecture to the Memory of Alfred Nobel, Dec. 9, 1991,
     https://www.nobelprize.org/prizes/economic-
     sciences/1991/coase/lecture/ ....................................................................... 10

University. of Iowa Legal Studies Research Paper No. 08-31, Jul. 14, 2008),
     http://bit.ly/33Q5fIM ..................................................................................... 9

## STATEMENT OF INTEREST

The International Center for Law & Economics ("ICLE") is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has longstanding expertise evaluating antitrust law and policy.

ICLE has an interest in ensuring that antitrust law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. That includes advising against far-reaching injunctions that could deteriorate the quality of mobile ecosystems, thereby harming the interests of consumers and app developers.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court issued an injunction that would alter agreements between Google and over 500,000 non-party U.S. app developers and require redesign of Google's app store, Google Play. It has purportedly done so to remediate the antitrust claims of a single competitor, Epic Games, which has no apps on Google Play; and it has done so notwithstanding that Epic lost a parallel antitrust challenge to Apple

---

[1] ICLE represents that no party's counsel authored this brief in whole in in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than ICLE and its counsel—contributed money that was intended to fund preparing or submitting the brief. ICLE files this brief with the consent of all parties.

1

following a bench trial, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), a decision affirmed by this Court. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023). The injunction poses risks to the safety, security, and reputation of Google Play—risks highly likely to harm competition between Google Play and its leading competitor, Apple's App Store. That harm to competition would, in turn, harm consumers on both sides of the Google Play platform: end-consumers of the apps available on the platform and the app developers who depend on the platform to reach those end-consumers.

A stay of the district court's injunction pending appeal should be granted because, *inter alia*, there is a substantial likelihood that Google will win its appeal on the merits and because the terms of the injunction are inconsistent with established case law.

First, the injunction is predicated on an erroneous market definition that excludes Apple from the relevant market. That error obscures the nature of competition at issue in the case, and it supports a false ascription of market power to Google Play. Having improperly permitted the jury to exclude Apple from the relevant market, the district court did not permit proper consideration of the pro-competitive justifications for Google's conduct, which are significant in a two-sided transaction market like the one in which Google competes. Compounding the

2

problem, the injunction threatens to undermine many of the pro-competitive benefits of Google's conduct.

Second, the injunction would impose a duty to deal that is generally repudiated under the antitrust laws. While a narrow duty to deal may be imposed as a remedy under special circumstances, the injunction issued below exceeds the bounds of established exceptions to the general rule.

Given the significant risks posed by the district court's injunction, and the likelihood of Google's ultimate success in its appeal on the merits, ICLE urges the Court to grant Google's motion and issue a stay of the district court's injunction pending appeal.

## ARGUMENT

### I. GOOGLE IS LIKELY TO WIN ITS APPEAL ON THE MERITS.

Google "has made a strong showing that [it] is likely to succeed on the merits"—a key factor for courts deciding whether to issue a stay pending appeal. *Levia-Perez v. Holder*, 640 F.3d 962, 964 (9th Cir. 2011) (*per curiam*).

#### A. Google Play And Apple's App Store Compete In the Same Product Market.

This Court has already recognized parallels between Epic's antitrust and state law challenges to Google Play's policies and Apple's App Store policies. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 969 n.3 (9th Cir. 2023), and it has rightly rejected Epic's assertion of a single-brand market. *Id.* at 980–81. The finding of a

3

multi-brand market in *Epic v. Apple* was correct and should apply here. Ignoring the competition between Apple's App Store and Google Play creates a false sense of Google's market share, as Google and Apple compete for apps and, importantly, to have app developers develop apps for their platforms first.

### B.  Google's Conduct Has Significant Pro-Competitive Justifications.

The district court correctly recognized that "the Google Play Store is a "two-sided platform market" that "offers products or services to two different groups who both depend on the platform to intermediate between them." *In re Google Play Store Antitrust Litig.*, 3:20-cv-05671-JD, Dkt. No. 850, at ECF p. 22 (N.D. Cal. Dec. 6, 2023) (Final Jury Instructions, Instruction No. 18). For Google Play, "developers who wish to sell their apps" are on one side of the market and "consumers that wish to buy those apps" are on the other. *Id.*

Firms in two-sided markets commonly use vertical restrictions like those challenged by Epic—including anti-steering provisions—to serve legitimate aims. These legitimate aims include allowing for the recoupment of investments, and to provide tangible procompetitive benefits such as increased privacy, security, and market-wide output. Given this, the Supreme Court, in *Ohio v. Am. Express Co.*, 585 U.S. at 544–45 ("Amex"), ruled that "there is nothing inherently anticompetitive about . . . antisteering provisions." *Id.* at 551. Such vertical provisions can, among other things, prevent merchants from free-riding, thereby

4

increasing the availability of "'tangible or intangible services or promotional efforts' that enhance competition and consumer welfare." *Id.* at 2290 (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007)).

The benefits of these provisions are conspicuous when app stores are correctly assessed holistically, as two-sided transaction markets; conversely, they are obscured if one applies "one sided logic to two sided markets." Wright, J. (2004) *One-sided Logic in Two-sided Markets*. Review of Network Economics, Vol. 3 (Issue 1). Just as in *Amex*, there are procompetitive reasons for the provisions at issue.

First, as indicated above, the contractual provisions help prevent free-riding, which, if left untreated, would undermine Google's incentives to maintain and improve Google Play, thereby leading to diminished product quality and reduced output. The problem of free-riding is front and center in the district court's injunction. Google owns valuable resources that it has created and steadily improved. These include Google Play, which provides users in the Android ecosystem with a convenient and secure means of acquiring the applications (Tr. 1141:2–17) that are "essential components of smartphones" (Tr. 2456:18–20). Among other things, the injunction would require Google to make its catalog of two-plus-million apps appear in competitors' app stores and to distribute rival app stores. Epic would also like *free* access to Android users and, specifically, Google Play.

5

None of these parties would be in position to maintain the Android ecosystem in the same way Google does. Given this, reducing the fees Epic pays to Google may benefit Epic while harming consumers, as Google would have less incentive to invest in its ecosystem.

Second, steering consumers to other payment systems, together with catalog sharing and third-party app store distribution, could expose Google Play users to privacy, security, and safety issues, among others. These are moving targets online, but the injunction would limit Google's efforts to serve these critical consumer interests, as Google would have to prove that any measures it takes with respect to third-party app stores and their apps "are strictly necessary and narrowly tailored."

In brief, the injunction undercuts the procompetitive rationale recognized by the Supreme Court in *Amex* and by this Court in *Epic v. Apple*. Absent intervention by this Court, Google will have to comply with a nationwide injunction that undercuts these benefits. That is directly relevant to the merits of the remedies decision below, as there is no credible argument that the broad sweep of the injunction—across all of Google's agreements with all app developers who do, or will, market their apps via Google Play—is necessary to remedy the alleged harm to the sole plaintiff in this case. It also is relevant to the question of liability where the district court's jury instructions precluded the jury's consideration of precisely the cross-market effects contemplated in *Amex*.

6

## II. ANTITRUST GENERALLY REPUDIATES A DUTY TO DEAL, IN CONTRAST WITH THE DECISION AND INJUNCTION BELOW

Antitrust law largely repudiates the notion that firms have a "duty to deal." As the Supreme Court has observed, "as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Communications Inc. v. Law Offices of Curtis Trinko*, 540 U.S. 398, 408 (2004) (quoting *United States* v. *Colgate & Co.*, 250 U.S. 300, 307 (1919)). That general antitrust principle is "not unqualified*." Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U. S. 585, 601 (1985). However, as the *Trinko* Court made clear*, Aspen Skiing* "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. At that outer boundary, to terminate dealing with an established customer, when that decision makes no economic sense but for its anticompetitive effects, may be anticompetitive. *Id.*

The district court correctly observed this general principle in Jury Instruction No. 24: "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. . . . It is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way."

7

Nonetheless, the district court has issued an injunction that would, *inter alia*, require Google to make its catalog of apps available in competitors' app stores and to distribute rival app stores through the Google Play Store. The district court reasoned that, "[i]if the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization." *In re Google Play Store Antitrust Litigation*, 3:20-cv-05671-JD, Dkt. No. 701, at 6 (N.D. Cal. Oct. 7, 2024) (quoting *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 486 (9th Cir. 2021)).

The case law does not, however, suggest that any and all remedies are warranted given a finding of antitrust liability. First, "relief must be based on a 'clear indication of a significant causal connection between the conduct enjoined or mandated and the violation.'" *Optronic*, 20 F.4th at 486 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001)). In *Microsoft*, the causal connection between conduct and harm was merely inferred, not proven. At the remedy phase, that was deemed insufficient to sustain a remedy allegedly aimed at correcting anticompetitive harm. Here, however, the connection between the conduct to be remedied and the alleged harm is not even *alleged* (let alone inferred). Indeed, it was specifically *disclaimed* by the court in Jury Instruction No. 24.

8

Also, in *Optronic*, this court sought to remediate *discriminatory* contract terms, providing that all similarly situated customers be provided access on similar terms. Analogous remedies may be a feasible in circumstances where the antitrust harm alleged stems from discriminatory treatment. *See also, e.g.*, *Associated Press v. United States*, 326 U.S. 1 (1945).

Imposing a duty to deal with new firms, on new terms, is a different matter entirely. In *Associated Press*, for example, "[t]he Court did not reach the question whether AP was obliged to admit any newcomers at all. Although Justice Frankfurter's concurring opinion agreed with the divided lower court that a business clothed in a public interest must deal with all, the Court expressly disclaimed any such 'public utility concept.'" Herbert Hovenkamp, Unilateral Refusals to Deal, Vertical Integration, and the Essential Facility Doctrine 10 (University. of Iowa Legal Studies Research Paper No. 08-31, Jul. 14, 2008), http://bit.ly/33Q5fIM. And in *MetroNet* this court recognized that *Trinko* does not require a defendant to provide access to a competitor if it isn't already providing access elsewhere. *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004).

A remedy mandating the distribution of app stores is equivalent to a determination that the failure to distribute constitutes a violation of the law— contradicting both the jury instruction and settled case law. Imposing a duty to deal without a showing of anticompetitive effect imposes liability by inference: in effect,

9

it circumvents rule of reason analysis and assumes anticompetitive harm. *See Id.* at 28 ("[Unilateral refusal to deal under Sec. 2] comes dangerously close to being a form of 'no-fault' monopolization[.]").

As noted above, privacy, security, and platform management challenges are ubiquitous, moving targets from both technical and business standpoints, and the injunction would limit Google's ongoing efforts to serve critical consumer interests, as Google would have to prove that any measures it takes with respect to third-party app stores and their apps "are strictly necessary and narrowly tailored." That requirement is at odds with basic antitrust principles, as it assigns to an untested, court-created committee countless management decisions about both Google Play and the Android operating system. That is tantamount to central planning. Economics has, with increasing rigor and empirical evidence, documented the disadvantages of central planning since Adam Smith's The Wealth of Nations. *See* Ronald H. Coase, Lecture to the Memory of Alfred Nobel, Dec. 9, 1991, https://www.nobelprize.org/prizes/economic-sciences/1991/coase/lecture/. Courts, too, have long recognized that they are ill-suited to balancing the "benefits of an improved product design against the resulting injuries to competitors." *See Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 991, 1000 (9th Cir. 2010); *see also Trinko LLP*, 540 U.S. at 408.

10

## CONCLUSION

For the foregoing reasons, we urge the Court to stay the district court's injunction pending Google's appeal on the merits.

WILLKIE FARR & GALLAGHER LLP

| | |
|---|---|
| WILLKIE FARR & GALLAGHER LLP | By: /s/ Jonathan A. Patchen |
| Matthew Freimuth | Jonathan A. Patchen |
| mfreimuth@willkie.com | JPatchen@willkie.com |
| 787 Seventh Avenue | 333 Bush Street |
| New York, NY | San Francisco, CA 94104 |
| Telephone: (212) 728-8000 | Telephone: (415) 858-7400 |
| Facsimile: (212) 728-8111 | Facsimile: (415) 858-7599 |

*Counsel for Amicus Curiae International Center for Law and Economics*

11

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-6256, 24-6274

I am the attorney or self-represented party.

**This brief contains 2,361 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[XX] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Jonathan A. Patchen    **Date** October 23, 2024

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of October 2024, the foregoing brief was filed using the Court's ACMS system. All participants in the case are registered ACMS users and will be served electronically via that system.

| | |
|---|---|
| Dated: October 23, 2024 | <u>/s/ Jonathan A. Patchen</u><br>Jonathan A. Patchen |

13