# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | MDL Case No.  21-md-02981-JD |
| | Member Case No. 20-cv-05671-JD |
| | **ORDER RE UCL CLAIM AND INJUNCTIVE RELIEF** |

This order gives the reasons for the permanent injunction to be entered in *Epic Games, Inc. v. Google LLC et al.*, Member Case No. 20-cv-05671-JD.  It also resolves Epic's equitable claims against Google under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

**BACKGROUND**

In the order denying Google's post-verdict motion for judgment as a matter of law or a new trial, Dkt. No. 984 (JMOL Order),[1] the Court discussed in detail the jury's unanimous verdict against Google and the trial evidence that supported the verdict.  In summary, after testimony by forty-five witnesses about Google's Play Store practices presented over fifteen days of trial, the jury found in favor of Epic on: (1) monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; and (3) tying under Section 1 of the Sherman Act and the Cartwright Act.  *Id.* at 3-4; Dkt. No. 866 (Jury Verdict).  Epic's

---

[1] Unless otherwise noted, all docket number references are to the ECF docket for *In re Google Play Store Antitrust Litigation*, Case No. 21-md-02981-JD.

1    equitable claim under the California Unfair Competition Law is for the Court to decide.[2]

2      Epic seeks an injunction as the remedy on the jury verdict.  To help determine an

3    appropriate injunction, the Court held extensive post-verdict hearings on what an injunction

4    should seek to accomplish, and where it should refrain from acting.  Epic kicked off the

5    proceedings by filing a proposed injunction.  Dkt. No. 952.  Google responded with more than 90

6    pages of objections.  Dkt. No. 958.  To ensure a fully developed record on the remedy, the Court

7    invited each side's experts to present their views in concurrent expert evidentiary hearings.  One

8    hearing involved testimony by four economists, two for each side of the case.  Dkt. No. 978.  A

9    second hearing involved technology experts sponsored by Epic, and three Google engineers.  Dkt.

10   No. 1001.  In each hearing, the witnesses were directed to focus their comments on issues specific

11   to the jury verdict and the facts in evidence at trial.  *See* Dkt. Nos. 977, 1000.  In conjunction with

12   the hearings, the parties filed statements by the economists, Dkt. Nos. 952, 957, and the

13   technology experts and engineers.  Dkt. Nos. 981, 985.  The Federal Trade Commission filed an

14   amicus brief, which the Court accepted.  Case No. 20-cv-05671-JD, Dkt. No. 686-1.  After the

15   evidentiary hearings concluded, the Court heard closing arguments from the parties on the issue of

16   the remedy.  Dkt. No. 1000 at 95:18-155:1.

17     Overall, each side had a virtually unlimited opportunity to present its views about the

18   scope and content of an injunction.  Google's request for even more discussion is not well taken.

19   *See*, *e.g.*, Dkt. No. 958 at 11.  Google took full advantage of the Court's open-ended procedures,

20   as the voluminous post-verdict docket entries readily attest.  As the Court noted in the JMOL

21   Order, it bears mention that Google has, on several occasions, fired a blunderbuss of comments

22   and complaints that are underdeveloped and consequently unhelpful in deciding the issues.  *See*

23   Dkt. No. 984 at 4.  More of the same is not warranted at this closing stage of the case.

**DISCUSSION**

25   **I. THE UCL CLAIM**

26     Before turning to the injunction, Epic's final claim under the California Unfair

27   

---

28   [2] The Court is advised that the parties have resolved Google's breach of contract counterclaim and there are no remaining counterclaims or defenses for resolution.  Dkt. No. 1002.

1    Competition Law (UCL) must be resolved.  The UCL prohibits "any [1] unlawful, [2] unfair or

2    [3] fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Epic has alleged that

3    Google violated the unlawful and unfair prongs of the UCL.  Dkt. No. 378 ¶¶ 295-96.  These are

4    equitable claims entrusted to the Court's sound discretion.  *See Nationwide Biweekly Admin., Inc.*

5    *v. Superior Court of Alameda Cnty.*, 9 Cal. 5th 279, 292 (2020) ("the causes of action established

6    by the UCL . . . are equitable in nature and are properly tried by the court rather than a jury").

7        The disposition of the unlawful prong is straightforward.  The jury concluded that

8    Google's Play Store conduct violated the Sherman Act and Cartwright Act.  *See* Dkt. No. 866.  As

9    Google has rightly said, this means that Google necessarily violated the unlawful prong of the

10   UCL.  *See* Dkt. No. 1000 at 152:2-21; *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,

11   20 Cal. 4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, 'section 17200

12   "borrows" violations of other laws and treats them as unlawful practices' that the unfair

13   competition law makes independently actionable.") (citation omitted).

14       The unfair prong is more nuanced because it is "intentionally framed in . . . broad,

15   sweeping language, precisely to enable judicial tribunals to deal with the innumerable new

16   schemes which the fertility of man's invention would contrive."  *Epic Games, Inc. v. Apple, Inc.,*

17   67 F.4th 946, 1000 (9th Cir. 2023) (internal quotations and citations omitted).  California state

18   courts have formulated two tests relevant here.  To support "any finding of unfairness to

19   competitors," the Court decides whether the defendant's conduct "threatens an incipient violation

20   of an antitrust law, or violates the policy or spirit of one of those laws because its effects are

21   comparable to or the same as a violation of the law, or otherwise significantly threatens or harms

22   competition."  *Cel-Tech*, 20 Cal. 4th at 186-87.  To support a finding of unfairness to consumers,

23   the Court balances "the utility of the defendant's conduct against the gravity of the harm to the

24   alleged victim."  *Progressive W. Ins. Co. v. Yolo Cnty. Superior Court*, 135 Cal. App. 4th 263,

25   285-86 (2005) (citation omitted).  The inquiries are not "mutually exclusive" and will have some

26

27

28

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1    substantive overlap. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007)

2    (citing *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144 (2000)).[3]

3        Whether Epic is characterized as a competitor (such as the provider of a competing in-app

4    billing service) or a customer (such as a developer and distributor of Android apps, including for a

5    time on the Google Play Store), the unfairness prong has been violated. The jury found that

6    Google's conduct violated the antitrust laws and substantially harmed competition in the relevant

7    markets, and directly injured Epic. The jury rejected Google's proffered procompetitive

8    justifications for its conduct. Consequently, the Court concludes that Epic has prevailed on the

9    UCL claim against Google under the unlawful and unfair prongs. Judgment will be entered in

10   favor of Epic.

11   **II.     THE INJUNCTION**

12       **A.     Legal Standards**

13           **1.     The Federal Antitrust Laws**

14       An injunction on the federal antitrust verdict is governed by Section 16 of the Clayton Act,

15   15 U.S.C. § 26. Under Section 16, "[a]ny person, firm, corporation, or association" is entitled to

16   "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws, . . . ,

17   when and under the same conditions and principles as injunctive relief against threatened conduct

18   that will cause loss or damage is granted by courts of equity." To warrant an injunction, a plaintiff

19   "need only demonstrate a significant threat of injury from an impending violation of the antitrust

20   laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v.*

21   *Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). Injunctive relief is "wholly proper" when

22   there is "nothing indicating that" a clear violation of the antitrust laws that has already been found

23

24   _____

     [3] In *Lozano*, our circuit acknowledged that the question of "how to define 'unfair'" in the consumer

25   action context after *Cel-Tech*" has not been completely settled by the California courts. 504 F.3d
     at 736 (emphasis omitted). More recently, our circuit stated that "[u]nder the UCL's unfairness

26   prong, courts consider either: (1) whether the challenged conduct is 'tethered to any underlying
     constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an

27   antitrust law, or violates the policy or spirit of an antitrust law,'; (2) whether the practice is
     'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,'; or

28   (3) whether the practice's impact on the victim outweighs 'the reasons, justifications and motives
     of the alleged wrongdoer.'" *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020)
     (internal citations omitted).

1   "had terminated or that the threat to [plaintiff] inherent in the conduct would cease in the

2   foreseeable future." *Id.* at 131-32.

3          The plain words of Section 16 must be read with the purpose of the antitrust laws in mind.

4   "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free

5   enterprise.  They are as important to the preservation of economic freedom and our free-enterprise

6   system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United*

7   *States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also North Carolina State Bd. of*

8   *Dental Examiners v. F.T.C.*, 574 U.S. 494, 502 (2015) ("Federal antitrust law is a central

9   safeguard for the Nation's free market structures.") (citing *Topco*, 405 U.S. at 610).  The question

10  has been asked whether our tech-based economy has outgrown the federal antitrust laws, which

11  date back to 1890 when the Sherman Act was signed into law.  In the Court's view, it has not.

12  The broad provisions of the Sherman Act provide all of the tools needed to address the issues

13  presented in this case, as they have for over a century in a constantly changing national economy.

14  Google has not suggested otherwise.

15         The tools available for a remedy are powerful.  As the Supreme Court has emphasized,

16  injunctive relief under Section 16 is meant to restore economic freedom in the relevant markets

17  and break the shackles of anticompetitive conduct.  "In exercising its equitable jurisdiction, a

18  federal court has broad power to restrain acts which are of the same type or class as unlawful acts

19  which the court has found to have been committed or whose commission in the future unless

20  enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith*, 395 U.S. at

21  132 (cleaned up); *see also United States v. Loew's, Inc.*, 371 U.S. 38, 52 (1962) (relief should be

22  "adequate to prevent the recurrence of the illegality which brought on the given litigation.").  "The

23  relief in an antitrust case must be effective to redress the violations and to restore competition.

24  The District Court is clothed with large discretion to fit the decree to the special needs of the

25  individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quotations and

26  citations omitted).  "Antitrust relief should unfetter a market from anticompetitive conduct and

27  'pry open to competition a market that has been closed by defendants' illegal restraints.'" *Id.* at

28  577-78 (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    2001) ("remedies decree in an antitrust case must seek to unfetter a market from anticompetitive

2    conduct, to terminate the illegal monopoly, deny to the defendant the fruits of its statutory

3    violation, and ensure that there remain no practices likely to result in monopolization in the

4    future.") (quotations and citations omitted).

5          To these ends, the Court is charged with making "a reasonable judgment on the means

6    needed to restore and encourage the competition adversely affected by" the anticompetitive

7    conduct. *Ford Motor*, 405 U.S. at 578; *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435

8    U.S. 679, 697 (1978) (district court is "empowered to fashion appropriate restraints on the

9    [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its

10   consequences."). A remedy is not limited simply to prohibiting conduct found to be

11   anticompetitive. Rather, the Court has discretion to fashion a remedy directed to the effect of the

12   anticompetitive conduct. *See Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1209 (D.C. Cir. 2004). As

13   our circuit has concluded, "[i]f the jury finds that monopolization or attempted monopolization has

14   occurred, the available injunctive relief is broad, including to terminate the illegal monopoly, deny

15   to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely

16   to result in monopolization in the future." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,

17   20 F.4th 466, 486 (9th Cir. 2021) (quotations and citation omitted).[4]

18         **2.**    **UCL**

19         The UCL provides an independent state-law basis for an injunction. "Any person who

20   engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of

21   competent jurisdiction." Cal. Bus. & Prof. Code § 17203. For Google's UCL violations, the

22   Court may make "such orders . . . as may be necessary to prevent the use or employment by any

23   person of any practice which constitutes unfair competition." *Id.* To be sure, "[e]ven where the

24   UCL authorizes injunctive relief pursuant to state law, a federal court must also ensure that the

25

26      [4] The California Cartwright Act also provides for an antitrust injunction. *See* Cal. Bus. & Prof.

27   Code Section 16750(a). The parties have treated Epic's Cartwright Act claims as being
     coterminous with the Sherman Act claims for purposes of both liability and remedy, and so no
28   additional discussion of the Cartwright Act is needed here.

relief comports with 'the traditional principles governing equitable remedies in federal courts.' To issue an injunction, the court must find: '(1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. Injunctive relief should be no 'more burdensome to the defendant than necessary to provide complete relief to the plaintiff[].'" *Epic Games*, 67 F.4th at 1002 (citations omitted).

Epic did not need to spell out this four-factor test in post-verdict briefing, for good reason. All of the elements were thoroughly established by the jury verdict and the evidence at trial. In pertinent part, Epic established that it suffered an irreparable injury. It was, in the language of the UCL, illegally and unfairly foreclosed from using its own in-app billing services while distributing its Fortnite app through the Google Play Store because of Google's anticompetitive practices. Epic was also illegally and unfairly foreclosed from competing in the market for Android in-app billing services for digital goods and services transactions, again because of Google's anticompetitive conduct. These harms are ongoing and cannot be made right simply by Google writing Epic a large check. Considering the balance of hardships between Epic and Google, a remedy in equity is warranted, and the public interest, which is perfectly aligned with the restoration of free and unfettered competition, would be well served by a permanent injunction.

Consequently, injunctive relief on the UCL claim is warranted, and the scope of that relief is coterminous with the injunction for the violations of the antitrust statutes. In setting the scope of the injunction, the Court has been mindful that Google must not be unduly inhibited in its ability to compete in legitimate ways by, for example, improving its products or its pricing.

### B.    Geographic Scope

The initial question for the injunction is where it will apply geographically. The jury found a relevant geographic market of worldwide except for China for both of the product markets, which was a conclusion that was amply supported by the evidence at trial. *See* JMOL Order at 14-15. Even so, the permanent injunction is limited to the United States.

United States District Court
Northern District of California

7

1  This is due mainly to principles of comity and deference to the rights of other countries to

2 address anticompetitive conduct under their own laws and regulations. The record indicates that

3 enforcement agencies around the world are investigating Google's conduct with respect to the

4 Play Store. *See*, *e.g.*, Dkt. No. 700 at 3 (granting Google's motion in limine to "exclude evidence

5 or argument re foreign proceedings and investigations"); Dkt. No. 644-2 at ECF pp. 61-68

6 (discussing foreign investigations and regulatory reports); *see also* Dkt. No. 958 (Google's

7 Objections) at 87-89 (describing extensive legal, investigative, regulatory, and other informal

8 proceedings underway in foreign jurisdictions). It is neither the right nor the duty of a United

9 States court to preempt the enforcement powers of other nations by imposing an injunction that

10 would operate within their borders. Consequently, the Court elects, as a prudential matter, not to

11 interfere in the administration of antitrust laws outside the United States. *See Mujica v. AirScan*

12 *Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("International comity is a doctrine of prudential

13 abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate

14 claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction

15 under principles of international law.'") (citation omitted).

16  **C.**  **Specific Provisions On Anticompetitive Conduct**

17  "When it comes to fashioning an antitrust remedy, we acknowledge that caution is key."

18 *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021). Epic's proposed injunction

19 made many good points, as did its economists in the post-verdict proceedings. But Epic's

20 proposal also threatened a degree of judicial oversight that would amount to micromanagement of

21 Google's business. It is not for the Court to decide the day-to-day business issues of Android app

22 distribution and in-app billing. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

23 *LLP*, 540 U.S. 398, 415 (2004) (Court should not "assume the day-to-day controls characteristic of

24 a regulatory agency") (quotations and citation omitted). Consequently, the Court declines to

25 impose several of the injunction terms urged by Epic.

26  Even so, important remedial measures can be imposed that do not demand excessive

27 judicial oversight. The trial made this determination a straightforward task. For example, in light

28 of the jury verdict and supporting evidence, it is perfectly appropriate that Google be enjoined

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1  from sharing Play Store revenues with current or potential Android app store rivals, and from

2  imposing contractual terms that condition benefits on promises intended to guarantee Play Store

3  exclusivity.  Google itself agreed with these conduct remedies.  *See* Dkt. No. 1000 at 120:16-19

4  (Google's counsel agreeing that "the two prohibitions . . . that Dr. Bernheim discussed, those can

5  be a part of the injunction with certain modifications"); *id*. at 98:21-105:9 (Epic's counsel

6  discussing Dr. Bernheim's two prohibitions).  The prohibitions along these lines are stated in

7  paragraphs 4 through 8 of the injunction, and they closely track the evidence of anticompetitive

8  conduct at trial as summarized in the JMOL Order.  *See* Dkt. No. 984 at 17-20.

9       The revenue share and contractual prohibitions will be in effect for a period of three years.

10  This is because the provisions are designed to level the playing field for the entry and growth of

11  rivals, without burdening Google excessively.  *See Mass. v. Microsoft*, 373 F.3d at 1231-32

12  (Court's task is to redress the harm done to competition "by restoring conditions in which the

13  competitive process is revived and any number of competitors may flourish (or not) based upon

14  the merits of their offerings.").  As competition comes into play and the network effects that

15  Google Play unfairly enjoys are abated, Google should not be unduly constrained as a competitor.

16  Some of the prohibited conduct might be legitimate when done by a company without monopoly

17  power.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (Scalia, J.,

18  dissenting) ("Where a defendant maintains substantial market power, his activities are examined

19  through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or

20  that might even be viewed as procompetitive -- can take on exclusionary connotations when

21  practiced by a monopolist.") (citation omitted); *see also McWane, Inc., v. F.T.C.*, 783 F.3d 814,

22  836-37 (11th Cir. 2015) (same).

23       The injunction also includes provisions to remediate the anticompetitive "consequences"

24  of Google's illegal conduct.  *See Prof'l Eng'rs*, 435 U.S. at 697; *see also Optronic Techs*., 20

25  F.4th at 486 (Court may order relief that represents a "reasonable method of eliminating the

26  consequences of the illegal conduct."); *U.S. v. Microsoft*, 253 F.3d at 103 (injunction should "deny

27  to the defendant the fruits of its statutory violation.").

28

The consequences to be remediated are intertwined with the network effects of Google's dominant position in the relevant markets. The Court instructed the jury, without objection by either side, that the Google Play Store is a "two-sided platform market" that "offers products or services to two different groups who both depend on the platform to intermediate between them." Dkt. No. 850 (Final Jury Instructions) at ECF p. 22 (No. 18). For the Play Store, "developers who wish to sell their apps" are on one side of the market and "consumers that wish to buy those apps" are on the other. *Id.* "Network effects" in this context means that the greater the number of developers, the greater the number of users, and vice versa. As Google put it in an internal slide that was introduced at trial, Google understood that "Users come to Play because we have by far the most compelling catalog of apps/games," and "Developers come to Play because that's where the users are." Trial Tr. at 1211:23-1212:1.

Senior Google executive Jamie Rosenberg testified about network effects in connection with the slide deck entitled, "Amazon competitor deep dive," which was presented to Rosenberg's team in 2017. Trial Tr. at 1207:13-22; Dkt. No. 886-50 (Trial Ex. 682). The slides discussed the threat posed by the Amazon app store, a potential competitor of the Google Play Store. Trial Tr. at 1207:24-1208:1. Under the heading, "Good News," Google said that "Amazon is yet to establish critical mass" and noted that "Play benefits from network effects." *Id.* at 1211:7-22. As Google acknowledged in the slides, "Amazon will struggle to break those network effects": "Users won't go to Amazon because their catalog of apps/games is very limited"; and "Developers won't focus on Amazon because they don't have users." Trial Tr. at 1212:5-9. Other evidence along these lines was also presented to the jury.

The picture drawn by this evidence is telling. Even a corporate behemoth like Amazon could not compete with the Google Play Store due to network effects. Consequently, the injunction must overcome the effects by providing access to the catalog of Play Store apps for a period of time sufficient to give rival stores a fair opportunity to establish themselves. This will be three years on the terms stated in the injunction.

Google's main objection to catalog access is that the anticompetitive conduct found by the jury was not proven to be a significant cause of these network effects. *See* Dkt. No. 1000 at 122:9-

10

1    11.  Google says that any network effects in the relevant market are attributable to its role as a first

2    mover in the markets, and so are not subject to remediation.

3          The point is not well taken.  The network effects presented during trial are a feature of any

4    two-sided market such as the Google Play Store.  Although Google may legitimately claim some

5    early mover advantage, it was not entitled to maintain and magnify network effects, and thereby

6    entrench its dominant position, through the anticompetitive conduct found by the jury.  It bears

7    emphasis that Rosenberg's testimony and the Amazon slides concerned events in 2017, well after

8    the original launch of the Play Store and the start of the relevant time period in August 2016.

9    Eight months into the time period in which Google engaged in anticompetitive conduct, it was

10   well aware that "to get more developers, Amazon needs more users." *Id*. at 1213:18-20.  This

11   frank admission was made precisely while Google was erecting barriers to insulate the Play Store

12   from competition.

13         Consequently, the salient question is not whether Google's anticompetitive conduct caused

14   the network effects.  Rather, the question is whether Google engaged in anticompetitive conduct

15   that had the consequence of entrenching and maintaining its monopoly power in a two-sided

16   market.  The jury answered that question in the affirmative.  In effect, Google unfairly enhanced

17   its network effects in a way that would not have happened but for its anticompetitive conduct.

18         This is why the injunction must not only prohibit the specific anticompetitive conduct that

19   Google engaged in, but also undo the consequence of Google's ill-gotten gains.  As the FTC aptly

20   said in an amicus brief, "[n]etwork effects can confer a powerful incumbency advantage to

21   dominant digital platforms, creating barriers to entry and to competition.  . . . The incumbent

22   platform operator -- which had been motivated to attract both users and developers by offering

23   innovative, low-cost services before establishing dominance -- may become less incentivized to

24   compete after it achieves market power and builds a moat insulating itself from competition."

25   Dkt. No. 686-1 at 9.  The injunction must bridge the moat.

26         Even so, the catalog access provision is narrowly tailored to remediate the unfairly

27   enhanced network effects Google reaped without unfairly penalizing its success as a first mover.

28   To that end, if a rival app store does not have a relationship with a developer and so cannot fulfill

11

United States District Court
Northern District of California

1    a download request by a user, the rival will direct the download request to the Google Play Store.

2    In that case, the Google Play Store will fulfill the download request and keep the associated

3    revenue, if any, and the download will be made pursuant to the Google Play Store's policies. All

4    that the catalog access does is level the playing field for a discrete period of time so that rival app

5    stores have a fighting chance of getting off the ground despite network effects and the

6    disadvantage of offering a "catalog of app/games" that is too "limited" to attract users and

7    developers in a two-sided market. Trial Tr. at 1212:6-7.

8        So too for the injunction provision that prevents Google from excluding rival app stores

9    from the Play Store. Witness Rosenberg testified that another barrier faced by the Amazon app

10   store was a "significant hurdle to switching to Amazon APK." Trial Tr. at 1214:18. This referred

11   to the fact that, to get the Amazon store on their Android device, a user would need to "sideload"

12   it (*i.e.*, download it from a website or platform other than the Play Store), which subjected the user

13   to a "quite complex" process imposed by Google that "involve[d] 14 steps." *Id.* at 1214:21-

14   1216:22. Rosenberg agreed that "Google recognized at the time that as a result of the unknown

15   source warning [resulting in at least 14 steps], the hurdles [to download] were too high for most

16   users." *Id.* at 1216:23-1217:2. Rosenberg also agreed that, because the "Google Play Store is

17   preloaded on the home screen of virtually every Android phone through the MADA," and rival

18   stores were excluded, a user trying to download a rival app store outside the Play Store would

19   almost always face the barrier of the "unknown sources install flow." *Id.* at 1206:9-22. Other

20   witnesses at trial including other Google executives testified that the "friction" Google built into

21   acquiring apps outside the Play Store was highly effective in discouraging users from even trying.

22   *See*, *e.g.*, Trial Tr. at 762:20-763:2, 1361:11-13. So for a limited period of time, the injunction

23   will lower the barriers for rival app stores to get onto users' phones by enjoining Google from

24   prohibiting the presence of rival app stores in the Google Play Store.

25       As Google has suggested, there are potential security and technical risks involved in

26   making third-party apps available, including rival app stores. The Court is in no position to

27   anticipate what those might be, or how to solve them. Consequently, Google will have room to

28   engage in its normal security and safety processes. To the extent Google imposes requirements

12

1  along these lines on rival app stores, it will be bear the burden when challenged of establishing

2  that the requirements were strictly necessary to achieve safety and security for users and

3  developers.

4        Google has said on many occasions that catalog access and hosting rival store apps amount

5  to forcing it to do business with rivals, in contradiction of "the general rule" that "even

6  monopolists 'are free to choose the parties with whom they will deal, as well as the prices, terms,

7  and conditions of that dealing.'" *Viamedia, Inc., v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir.

8  2020) (quoting *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)). Not

9  so. The Court has fully agreed for the duration of this case that a refusal to deal with a potential

10  rival may not be the basis of antitrust liability. The jury was expressly instructed on that point.

11  Dkt. No. 850 at ECF p. 33 (No. 24). Nothing in the verdict or the evidence at trial condemned

12  Google for not extending a helping hand to a rival.

13        The problem for Google is that the case is now in the remedy phase, not the liability phase.

14  The question at hand is not whether Google violated the antitrust laws by failing to aid rivals, but

15  what measures are necessary to restore fair competition in the face of the barriers found by the

16  jury. The jury heard abundant evidence that Google used a variety of means to ensure that the

17  Play Store was the only fully developed Android app marketplace for users and developers. This

18  evidence included the MADA and RSA agreements and Google's conditioning of access by

19  OEMs to Google's Android services on preinstallation of the Google Play Store on the home

20  screen of Android devices. The use of burdensome "scare screens" to discourage sideloading of

21  apps is another example of evidence heard by the jury. Requiring Google to allow other app stores

22  to be distributed through the Play Store for a discrete period is a modest step to correct the

23  consequence of unlawfully preventing rival stores from reaching users and developers.

24        In this context, Google's frequent mentions of *Trinko* are misplaced. The Supreme Court

25  affirmed the district court's dismissal of a complaint alleging monopolization under Section 2

26  against Verizon for not sharing access to its telephone network with competitors as required by

27  Congress in the Telecommunications Act of 1996. *Trinko*, 540 U.S. at 401-02. The Supreme

28  Court declined to extend the reach of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

United States District Court
Northern District of California

13

585 (1985), with the famous remark that "*Aspen Skiing* is at or near the outer boundary of § 2

liability." *Trinko*, 540 U.S. at 409.  But the Court also re-affirmed the holding of *Aspen Skiing*

that "[t]he high value that we have placed on the right to refuse to deal with other firms does not

mean that the right is unqualified." *Id*. at 408 (quoting *Aspen Skiing*, 472 U.S. at 601).  The Court

added that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute

anticompetitive conduct and violate § 2." *Id*.

  The Court ultimately determined that the situation in *Trinko* did not rise to that level based

on the specific characteristics of the telecom industry.  As the Court instructed, "[a]ntitrust

analysis must always be attuned to the particular structure and circumstances of the industry at

issue." *Id*. at 411.  A factor of "particular importance" was that Congress had already created a

regulatory structure in the Telecommunications Act "designed to deter and remedy

anticompetitive harm." *Id*. at 412.  The protective hand of such regulation meant that any

additional benefit of antitrust enforcement would be "small," and that the "'regulation

significantly diminishes the likelihood of major antitrust harm.'" *Id*. (quoting *Concord v. Boston

Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990)).  The Court also noted that the complaint did not

allege facts indicating that Verizon's conduct was prompted by "anticompetitive malice" or

"dreams of monopoly." *Id*. at 409.

  None of this has anything to do with the injunction here.  As discussed, this is not a case in

which a refusal to deal with a rival was the basis of Section 2 liability.  The facts, markets, and

regulatory environment here are also starkly different.  Google seems to find a "vibe" in *Trinko* to

the effect that the remedy for a monopolist's anticompetitive conduct cannot involve affirmative

conduct with respect to a rival.  *Trinko* says nothing of the sort, and Google's frequent mention of

the case is simply a red herring.

  Google also overlooks the fact that an antitrust remedy may trump what might be deemed

traditional boundaries of property rights.  "Even constitutionally protected property rights such as

patents may not be used as levers for obtaining objectives proscribed by the antitrust laws." *Ford

Motor*, 405 U.S. at 576 n.11.  Section 16 "states no restrictions or exceptions to the forms of

injunctive relief a private plaintiff may seek, or that a court may order.  Rather, the statutory

United States District Court
Northern District of California

language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." *California v. American Stores Co.*, 495 U.S. 271, 281 (1990) (cleaned up). Consequently, the "purpose of relief in an antitrust case is 'so far as practicable, (to) cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.' Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (U.S. 1973) (citations omitted). The Court may "consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations. [¶] The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 697-98. It is "entirely appropriate" for an injunction to "go[] beyond a simple proscription against the precise conduct previously pursued." *Id*. at 698. If a well-grounded fear arises that the injunction is too broad, "the burden is upon the proved transgressor to bring any proper claims for relief to the court's attention." *Id*. (quotations omitted).

Our circuit's conclusions in *Optronic Technologies* further undermine Google's position. There, the jury "properly found that Orion had been forced to pay inflated prices as a result of the market power exerted by Sunny and Synta following the unlawful Meade acquisition," and so ordering Sunny to supply Orion on non-discriminatory terms was a "reasonable method of remedying the harm to [Orion]." *Optronic Techs.*, 20 F.4th at 486. This was true because the district court "can order conduct to 'avoid a recurrence of the [antitrust] violation and to eliminate its consequences.'" *Id*. (quoting *Prof'l Eng'rs*, 435 U.S. at 698). The same goes here.

During closing arguments on the remedy, Google also relied on *Image Technical Services, Inc. v. Eastman Kodak Co*., 125 F.3d 1195 (9th Cir. 1997), stating that "in that case, the Ninth Circuit said that the district court had erred when it ordered Kodak to sell parts that were manufactured by someone else." Dkt. No. 1000 at 127:21-25. In Google's view, "it's the same thing here. It's legal error to order Play to have to distribute someone else's app store. Same reasoning as in *Kodak*." *Id*. at 128:1-3.

15

United States District Court
Northern District of California

1   This is an odd position to take. The circuit's reasoning in *Kodak* had nothing to do with

2   Kodak's freedom not to deal with its rivals. The circuit modified the portion of the district court's

3   injunction that "require[d] Kodak to sell all parts for Kodak equipment, whether or not Kodak

4   manufactures those parts." *Kodak*, 125 F.3d at 1225. The circuit believed that the "'all parts'

5   requirement creates barriers for non-Kodak original-equipment manufacturers by requiring them

6   to price replacement parts at levels necessary to attract ISOs away from Kodak's parts counter. It

7   also unnecessarily entrenches Kodak as the only parts supplier to ISOs." *Id*. As was the case with

8   Google's reliance on *Trinko*, none of this bears on the facts and issues in this case.

9   As discussed, the Court has no intention of running Google's business as a "central

10  planner." *Trinko*, 540 U.S. at 408; *see also* Dkt. No. 1000 at 127:8-10 ("I have no intention of

11  having a highly detailed decree that ends up impairing competition or micromanaging as a central

12  planner."). The terms of the injunction are plainly worded and largely self-executing, and will not

13  embroil the Court in day-to-day business operations. To the extent technical issues about security

14  and the like come up, the injunction establishes a Technical Committee made up of one person

15  selected by each side, plus a third person to be selected by the parties' two nominees, to resolve

16  the issue in the first instance. The Court will act only as needed to resolve issues that cannot be

17  resolved by the committee.

18      **D.      Tying**

19  Overall, the injunction breaks the illegal tie by prohibiting Google from requiring that

20  developers use Google Play Billing in apps distributed on the Google Play Store. Epic asked the

21  Court to also prohibit what it called an "economic" tie, *see*, *e.g.*, Dkt. No. 977 at 92:23-93:1,

22  which would have ensnared the Court in a detailed rate-setting exercise beyond its proper role.

23  *See Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990). There is no

24  need for the Court to take on that task because the remedy for the monopoly violation under

25  Section 2 will also resolve the tying violation found by the jury. The restoration of free

26  competition in the relevant markets is the best medicine for correcting fees and prices.

27  The Court has addressed Google's main contentions with respect to the injunction. As

28  noted, Google's modus operandi in this case has been to deluge the Court in an ocean of

16

comments, many of which were cursory and undeveloped.  The Court declines to take up Google's objections that were not fully developed in their presentation to the Court.

## CONCLUSION

A permanent injunction will be entered against Google for Epic's Sherman Act, Cartwright Act, and UCL claims.  The effective date of the injunction is November 1, 2024, to give Google time to bring its current agreements and practices into compliance.  After Epic's attorney's fees and costs are awarded, *see* 15 U.S.C. § 26, judgment will be entered for Epic on the Sherman Act, Cartwright Act, and UCL claims, and this MDL member case, *Epic Games, Inc. v. Google LLC et al.*, No. 20-cv-05671-JD, will be closed.

**IT IS SO ORDERED.**

Dated:  October 7, 2024

_____
JAMES DONATO
United States District Judge

# EXHIBIT B

1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7   IN RE GOOGLE PLAY STORE              MDL Case No.  21-md-02981-JD
    ANTITRUST LITIGATION
8                                        Member Case No. 20-cv-05671-JD

9                                        **ORDER RE GOOGLE'S RENEWED**
                                         **MOTION FOR JUDGMENT AS**
10                                       **MATTER OF LAW OR FOR NEW**
                                         **TRIAL IN *EPIC* CASE**
11

12

13          After 15 days of trial, a jury found in favor of plaintiff Epic Games Inc. on its antitrust

14   claims against Google.  *See* Dkt. No. 866.[1]  Google had moved for judgment as a matter of law at

15   an appropriate stage of the trial, which the Court denied.  Dkt. Nos. 825, 831.  Google renewed the

16   motion post-verdict under Federal Rule of Civil Procedure 50(b), with a motion in the alternative

17   for a new trial under Rule 59.  Dkt. No. 925.  The Court denied both motions.  Dkt. No. 951.  This

18   order provides a detailed explanation for that decision.

19                                       **BACKGROUND**

20          The Court presented the background of this multidistrict antitrust litigation in other orders.

21   *See*, *e.g.*, Dkt. Nos. 383, 588.  In pertinent part, Epic is a well-known video game and software

22   developer, and its apps include Fortnite, a popular online game.  Fortnite can be played on a

23   variety of consoles and devices, including smartphones running the Android mobile operating

24   system.

25          Epic distributed a Fortnite Android app through the Google Play Store for a handful of

26   months starting in April 2020, until Epic's relationship with Google broke down in August 2020.

27   _____

28   [1] All docket number references are to the ECF docket for *In re Google Play Store Antitrust
    Litigation*, Case No. 21-md-02981-JD.

*United States District Court*
*Northern District of California*

1   A particular sticking point was Epic's objection to Google's requirement that Epic use Google's

2   billing system and pay Google a 30% fee on all in-app purchases made by Fortnite users.  Epic

3   wanted to use its own in-app payment solution and not pay Google a 30% cut, which Google

4   refused to allow.  Epic then deployed a "hotfix," which was in effect a covert app update that

5   allowed Fortnite users to use Epic's payment system.  Google responded by removing Fortnite

6   from the Google Play Store.

7        On the day that Fortnite was removed from the Google Play Store, Epic filed this lawsuit

8   against Google LLC and certain of its affiliates alleging that Google had engaged in

9   anticompetitive conduct in violation of the antitrust laws in connection with the Google Play

10  Store.  Dkt. No. 1.  As alleged in its second amended complaint (SAC), Epic presented claims

11  under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the California Cartwright Act, Cal.

12  Bus. & Prof. Code § 16700 et seq.; and the California Unfair Competition Law (UCL), Cal. Bus.

13  & Prof. Code § 17200 et seq.  Dkt. No. 378.  Epic sought injunctive relief only, and no monetary

14  damages.  *Id.*  Google filed counterclaims against Epic, including for breach of the Google Play

15  Developer Distribution Agreement (DDA).  Dkt. No. 386.

16        Epic's lawsuit was consolidated into a multidistrict litigation action along with similar

17  antitrust complaints filed by Google Play Store users and developers, and the attorneys general of

18  many states.  A substantial period of litigation ensued for all of the member cases, and several

19  important issues were resolved in the pretrial stage.  One was a determination that Google had

20  willfully failed to preserve relevant, substantive business communications that were made by

21  employees on the Google Chat system.  This determination required an extensive inquiry by the

22  Court that culminated in an evidentiary hearing featuring witness testimony and documents, and

23  extensive findings of fact.  *See* Dkt. No. 469.  Testimony at trial adduced even more troubling

24  evidence of improper assertions of the attorney-client privilege by Google's employees, including

25  its CEO, to keep communications secret, and a widespread understanding within the company that

26  discussions of sensitive topics should be done in a way that evaded preservation.  *See*, *e.g.*, Trial

27

28

United States District Court
Northern District of California

2

1    Tr. at 964:21-23, 991:16-992:8, 1075:20-1076:12, 1321:17-24.[2]  Another important pretrial

2    determination was whether Google could evade a jury altogether by asking for a bench trial at the

3    very last moment.  The Court concluded, based on Google's own conduct, that it had consented to

4    a jury trial.  *See id.* at 6:13-7:16.

5        In time, the other cases went into settlement proceedings.  Epic's case was tried by a jury

6    of nine citizens in November and December 2023.  The parties put on forty-five witnesses,

7    including nine expert witnesses, over the course of fifteen days of testimony.  More than three

8    hundred documents were admitted into evidence.  *See* Dkt. Nos. 622, 623, 624.  The final jury

9    instructions totaled fifty-five pages.  Dkt. No. 850.  The instructions were based on extensive

10   discussions with, and submissions by, the parties.  *See, e.g.*, Dkt. Nos. 487, 528, 554, 564, 847,

11   848, 849.

12       At the conclusion of deliberations, the jury returned a unanimous verdict in favor of Epic.

13   Dkt. No. 866.  For the monopolization claim under Section 2 of the Sherman Act, the jury found

14   that Epic had proved two relevant product markets:  a market for the distribution of Android apps,

15   and for Android in-app billing services for digital goods and services transactions.  The jury also

16   found that Epic had proved for both of these markets that the geographic scope was worldwide

17   excluding China.  The jury further concluded that Epic had proved that Google willfully acquired

18   or maintained monopoly power by engaging in anticompetitive conduct in each of the product

19   markets, and that Epic had proved it was injured as a result of Google's violation of the antitrust

20   laws.  *Id*. at 1-4.  For the unlawful restraint of trade claim under Section 1 of the Sherman Act and

21   California state law, the jury found that Epic had proved that Google entered into one or more

22   agreements that unreasonably restrained trade in the same two product markets as for the

23

24   _____
     [2] "Trial Tr." references are to the trial transcript, which consists of 17 volumes with 3,442 total
25   pages that are consecutively numbered.  The transcript can be found at Dkt. No. 834 (Vol. 1; pages
     1-116); Dkt. No. 835 (Vol. 2; pages 117-322); Dkt. No. 836 (Vol. 3; pages 323-578); Dkt. No. 837
26   (Vol. 4; pages 579-788); Dkt. No. 838 (Vol. 5; pages 789-1036); Dkt. No. 839 (Vol. 6; pages
     1037-1302); Dkt. No. 840 (Vol. 7; pages 1303-1539); Dkt. No. 841 (Vol. 8; pages 1540-1785);
27   Dkt. No. 842 (Vol. 9; pages 1786-1866); Dkt. No. 843 (Vol. 10; pages 1867-2103); Dkt. No. 844
     (Vol. 11; pages 2104-2291); Dkt. No. 845 (Vol. 12; pages 2292-2518); Dkt. No. 846 (Vol. 13;
28   pages 2519-2763); Dkt. No. 847 (Vol. 14; pages 2764-2854); Dkt. No. 848 (Vol. 15; pages 2855-
     3065); Dkt. No. 849 (Vol. 16; pages 3066-3293); and Dkt. No. 867 (Vol. 17; pages 3294-3442).

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   monopolization claim.  The jury determined that the illegal agreements were Google's DDA

2   agreements; agreements with alleged competitors or potential competitors under Project Hug and

3   the Games Velocity Program; and agreements with original equipment manufacturers (OEMs) that

4   sell mobile devices, including the MADA and RSA agreements.  Epic was found to have proved

5   antitrust injury from these violations.  *Id*. at 5-6.  For the tying claim under Section 1 of the

6   Sherman Act and California law, the jury determined that Epic had proved that Google unlawfully

7   tied the use of the Google Play Store to the use of Google Play Billing, and that Epic again had

8   been injured by this conduct.  *Id*. at 7.

9       Epic's UCL claim was not presented to the jury and was reserved for the Court's decision.

10   Google's breach of contract counterclaim also was not presented to the jury pursuant to the

11   parties' agreement, and the Court will decide Epic's illegality defense, with the parties' stipulated

12   facts to be treated as proved.  *See* Dkt. No. 850 at 1.  Also reserved for the Court's decision is the

13   issue of an injunctive remedy under the Sherman Act and Cartwright Act in light of the jury's

14   verdict.  The remedy proceedings are currently underway.  *See* Dkt. No. 978.

15       Google has fired a barrage of objections and allegations of error in an effort to escape the

16   judgment of the jury.  This approach has been Google's modus operandi throughout the case, and

17   often results in headline-style arguments that lack useful development.  The 90 pages of objections

18   that Google filed to Epic's proposed injunction in the remedy proceedings are the latest

19   manifestation of this problem.  *See* Dkt. No. 958.  In the ensuing discussion, the Court addresses

20   Google's attacks on the verdict even when Google's argument was little more than a passing

21   comment or two.

22       As the Supreme Court has observed, the "[d]etermination of whether a new trial should be

23   granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the

24   judge who saw and heard the witnesses and has the feel of the case which no appellate printed

25   transcript can impart."  *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216 (1947)

26   (citation omitted).  It is on this basis, and the trial record as a whole, that the Court concludes

27   Google is not entitled to undo the jury's verdict under Rule 50(b) or Rule 59.

28

4

**LEGAL STANDARDS**

Under Rule 50(b), a party that has previously made a motion for judgment as a matter of law during a jury trial, as Google did, may "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Judgment as a matter of law is appropriate when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (citation omitted); *see also Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009) ("JMOL is . . . appropriate when the jury could have relied only on speculation to reach its verdict."). The "district court must uphold the jury's award if there was any 'legally sufficient basis' to support it." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (citation omitted); *see also Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017) ("A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible.") (citation omitted). In making this determination, the Court is to "consider[] all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party," and it "may not make any credibility determinations or reweigh the evidence." *Experience Hendrix*, 762 F.3d at 842. Put more plainly, the Court must "draw all inferences in favor of the verdict." *Id*. at 845.

Rule 59 permits the Court to grant a new trial on all or some of the issues, and to any party, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although for a Rule 59 motion, the Court is "not required to view the trial evidence in the light most favorable to the verdict," *Experience Hendrix*, 762 F.3d at 842, the Court "may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). Our circuit has stated that "[a] trial court may grant a new trial only if the verdict is against the clear weight of the evidence." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) (citing *Silver Sage*, 251 F.3d at 818-19).

1    Google presented its JMOL and new trial arguments in a single, interwoven fashion.  *See*

2    Dkt. No. 925.  The Court will follow suit, while being mindful of the different standards that

3    govern each rule.

**DISCUSSION**

## I.     ANDROID-ONLY RELEVANT MARKETS

6    For the monopolization claim, the jury found that Epic had proved the existence of two

7    relevant product markets:  (1) an "Android app distribution market," and (2) a market for

8    "Android in-app billing services for digital goods and services transactions."  Dkt. No. 866 at 3

9    (Question No. 2).  The jury found the same two relevant product markets for Epic's unlawful

10   restraint of trade claim.  *See id.* at 6 (Question No. 8).  Google proposes two reasons why, in its

11   view, Epic should not have been permitted to argue for these relevant markets that were "limited

12   to Android devices."  Dkt. No. 925 at 1-7.

### A.     Issue Preclusion

14   To start, Google says that it is entitled to judgment as a matter of law on all claims

15   submitted to the jury because of the preclusive effect of *Epic Games, Inc. v. Apple Inc.* ("*Apple*

16   *I*"), 559 F. Supp. 3d 898 (N.D. Cal. 2021), and *Epic Games Inc. v. Apple Inc.* ("*Apple II*"), 67

17   F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 682 (2024).  *Apple II* affirmed in part and

18   reversed in part *Apple I*.  Google says that the *Apple I* court found a "market for mobile game

19   transactions in which both Google and Apple competed," which was a market definition the circuit

20   affirmed.  Dkt. No. 925 at 2-3.  Consequently, in Google's view, Epic had "already litigated and

21   lost" the issue of "competition between Apple's App Store and Google Play."  *Id.*  Because Epic

22   did not propose at trial a market that included Apple, Google contends that Epic failed to prove a

23   valid relevant market at all, which necessarily doomed all of its antitrust claims.  *Id.* at 4.

24   This is not the first time Google has tried to make this point.  It is in effect a re-do of the

25   same argument that the Court rejected in prior proceedings because Google had failed to establish

26   the elements of preclusion.  Dkt. No. 700 at 2.  Nothing has happened since to change the Court's

27   conclusion.

28

United States District Court
Northern District of California

6

1      "Issue preclusion, which bars the relitigation of issues actually adjudicated in previous

2   litigation, applies where four conditions are met:  (1) the issue at stake was identical in both

3   proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was

4   a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the

5   merits." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (cleaned up).

6      The market definition issues that were litigated in *Apple I* and *Apple II* were plainly not the

7   same as the issues litigated here.  In the case against Apple, Epic "proposed two single-brand

8   markets: the aftermarkets for iOS app distribution and iOS in-app payment solutions, derived from

9   a foremarket for smartphone operating systems." *Apple II*, 67 F.4th at 970 (emphasis omitted).

10   The district court rejected Epic's proposed single-brand markets mainly because there was a

11   "failure of proof." *Id*.  Epic "presented no evidence regarding whether consumers unknowingly

12   lock themselves into Apple's app-distribution and IAP restrictions when they buy iOS devices."

13   *Id*.  On appeal, the circuit court determined that the district court "did not clearly err in rejecting

14   Epic's proposed relevant markets"; "[i]n particular, Epic failed to produce any evidence showing

15   -- as our precedent requires -- that consumers are generally unaware of Apple's app-distribution

16   and IAP restrictions when they purchase iOS devices." *Id*. at 973.

17      Epic took a very different approach to the markets in this case.  It did not, for obvious

18   reasons in a case that did not include Apple, advocate for "aftermarkets for iOS app distribution

19   and iOS in-app payment solutions, derived from a foremarket for" iOS devices. *Id*. at 970

20   (emphasis omitted).  Nor did it argue for aftermarkets for Android app distribution and Android

21   in-app payment solutions, derived from a foremarket for Android devices.  It took a wholly

22   different approach for the antitrust claims against Google, and offered wholly different evidence

23   about relevant markets than that offered in the case against Apple.  The holdings in *Apple I* and

24   *Apple II* about Epic's proposed foremarket/aftermarkets for Apple products, and Epic's deficient

25   evidentiary support for those markets, have no preclusive effect here.

26      Consequently, Epic was perfectly free at trial to argue for Android-only relevant markets,

27   just as Google was free to argue for a different result.  Each side took maximum advantage of this

28   freedom to hotly dispute the definition of the product markets for Epic's antitrust claims.  The jury

7

was presented with evidence sponsored by each side, including witness testimony, documents, and expert witness opinions, on the question of the relevant product markets. Google took every opportunity to tell the jury that Google and Apple compete, and so should be considered to be in the same relevant market. If there was one theme Google pressed relentlessly to the jury, it was this one. Epic presented substantial evidence showing that the Android-only product markets made factual and economic sense for this case. For example, Epic's economics expert, Professor Douglas Bernheim, testified that the fact that Apple and Android compete in the market for smartphones does not mean that they are in the same market for app distribution. Trial Tr. at 2423:23-2424:1. The jury also heard from Dr. Bernheim that, based on a SSNIP test and other widely accepted analytical tools, his conclusion was that the Apple App Store does not compete in the same relevant market as the Google Play Store. *Id*. at 2424:17-2427:16, 2462:2-16.

In the end, the jury did precisely what it was called upon to do by resolving the hotly disputed evidence to define the product markets as stated in the verdict. The possibility that the jury might have come out differently is no basis for judgment as a matter of law in Google's favor. *See White*, 312 F.3d at 1010. Google also has not demonstrated that the product market verdicts were clearly contrary to the weight of the evidence.

## B.    Aftermarket Theory

Despite the plain record of what happened at trial, Google says that Epic was actually proposing a "'single-brand aftermarket' theory of market definition" that it failed to prove. Dkt. No. 925 at 5. This is a rather odd argument because Epic never presented or even mentioned a "single-brand aftermarket" in this case, and Google's suggestion to the contrary is utterly bereft of any evidence.

To start, there was no "single brand" in play here. As the parties stipulated in the final jury instructions, Android is a mobile operating system; it is not a brand. *See* Dkt. No. 850 at ECF p. 16 (Instruction No. 12 (Stipulations of Fact)) ¶ 15. The undisputed evidence showed at trial that Android devices are manufactured by many companies, including Google, Samsung, Motorola, OnePlus, Xiaomi, and other OEMs. This is in sharp contrast to iOS devices, which are manufactured by Apple alone. *See Apple II*, 67 F.4th at 966. Epic expressly argued for a single-

8

United States District Court
Northern District of California

1    brand aftermarket in the Apple case for iOS devices, and the circuit stated that, "in some instances

2    one brand of a product can constitute a separate market." *Id*. at 976 (cleaned up). That

3    observation, and the discussion that followed it, are not relevant here because Epic never proposed

4    or argued for a market consisting of only "one brand of a product" with respect to Google. *Id*.

5         Google says that it doesn't matter that there are multiple brands of Android devices

6    because "Google generates significant revenue from Android devices." Dkt. No. 945 at 2. Even

7    taking that as true for discussion purposes, it hardly explains why many different and competing

8    OEM brands should be treated as a single brand. Google certainly did not present any evidence,

9    or case law or other authority, in support of that proposition. There simply is no evidentiary or

10   legal reason to treat Epic as though it had pursued a foremarket/aftermarket theory that it did not

11   propose, or to penalize it for not proving that theory at trial.

12        This case also differs from the Apple case in that the Apple App Store is the only app store

13   for iOS devices, which is not true for Android devices. Substantial evidence was presented at trial

14   that multiple Android app stores can be, and on occasion have been, available to consumers.

15   Google's efforts to suppress rival app stores was another key theme at trial. To that end, an

16   internal Google document asked the "existential question": "How do we continue to keep Play as

17   the preeminent distribution platform for Android?" Trial Tr. at 920:24-921:14. Other documents

18   referred to a "market" consisting of Android app developers only, *see id*. at 922:13-923:18, and

19   spoke of "store rivals" that were Android app stores. *Id*. at 952:3-13. Google's CEO, Sundar

20   Pichai, testified that each Android OEM "had the potential to have an app store" which "would

21   compete with Google Play." *Id*. at 1343:1-5.

22        Overall, the evidence at trial demonstrated that the markets for Android app distribution

23   and in-app payment systems are different from the markets for Apple/iOS app distribution and in-

24   app payment systems that were at issue in *Apple II*. Epic did not pursue a "single-brand

25   aftermarket" here.

26   **II.    JURY INSTRUCTIONS RE RULE OF REASON**

27        Google requests a new trial because of alleged legal errors in the jury instructions relating

28   to the Rule of Reason. Dkt. No. 925 at 7-11. Its arguments are not well taken.

## A.      Step One

On Step 1 of the Rule of Reason, Google says the jury was impermissibly allowed to "conclude that individually lawful acts are unlawful in the aggregate." Dkt. No. 925 at 10.

The record demonstrates otherwise. Before trial, the Court granted summary judgment for Google on "'plaintiffs' claims that Google unlawfully prohibits the distribution of other app stores on Google Play.'" Dkt. No. 700 at 1 (quoting Dkt. No. 483 at 6). Because governing case law makes clear that Google had no duty to deal, the Court stated that plaintiffs could reference § 4.5 of the Developer Distribution Agreement by way of background and context only, but they could not "argue or suggest that § 4.5 is unlawful either on its own *or in combination with other alleged practices.*" *Id*. (emphasis added) (citing *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398 (2004)).

The same guidance was stated in the jury instructions. The jury was instructed that "[i]t is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way." Dkt. No. 850 at ECF p. 33 (Instruction No. 24). For the anticompetitive conduct required for Epic's Section 2 claim, the jury was instructed that, "[i]n determining whether Google's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether *the conduct* is consistent with competition on the merits, whether *the conduct* provides benefits to consumers, and whether *the conduct* would make business sense apart from any effect it has on excluding competition or harming competitors." *Id*. at ECF p. 30 (Instruction No. 23) (emphases added). Nothing in the instructions invited the jury to consider Google's alleged conduct in the aggregate, or gave them permission to consider whether independently legitimate conduct may have combined to create an anticompetitive effect.

The verdict form underscored this by directing the jury to consider each type of conduct separately. For Epic's Section 1 claim, the jury was called upon to answer separately for three types of agreements -- (1) DDA agreements; (2) agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program; and (3) agreements with

1    OEMs that sell mobile devices (including MADA and RSA agreements) -- whether each type of

2    agreement was an "unreasonable restraint(s) of trade." Dkt. No. 866 at 5 (Question No. 7).

3         As the record established, and contrary to Google's argument, the jury was in fact "guided

4    . . . to consider each category of conduct individually." Dkt. No. 925 at 10.

5         **B.    Step Two**

6         Google says that on Step 2 of the Rule of Reason analysis, "[t]he jury should have been

7    instructed to consider cross-market justifications," *i.e.*, procompetitive benefits not limited to the

8    relevant product markets at issue. Dkt. No. 925 at 7-8. But in *Apple II*, our circuit expressly took

9    up the issue of the "cognizability of cross-market rationales." 67 F.4th at 989. There, Epic had

10   argued that, "even if Apple's security and privacy restrictions are procompetitive, they increase

11   competition in a *different market* than the district court defined and in which Epic showed step-

12   one anticompetitive effects, and thus are not legally cognizable at step two." *Id*. (emphasis in

13   original).

14        Our circuit noted that the "Supreme Court's precedent on this issue is not clear," even

15   though on occasion it "has considered cross-market rationales in Rule of Reason and

16   monopolization cases." *Id*. The circuit "decline[d] to decide this issue here." *Id*. The circuit also

17   determined that Apple's procompetitive justifications related to the relevant market. *Id*. at 990.

18        Consequently, there was no legal mandate to expressly require the jury to consider cross-

19   market justifications, such as "Google's competition with Apple in smartphones," Dkt. No. 925 at

20   9, as Google urges. Contrary to Google's argument, this is not at all a situation where the circuit

21   has not yet "stated 'explicitly' a legal point that 'was implicit in [its] past decisions.'" Dkt.

22   No. 945 at 4 (citing *Dang v. Cross*, 422 F.3d 800, 807-08 (9th Cir. 2005)). It also bears repeating

23   that Google spared no opportunity at trial to tell the jury of its views about competition with

24   Apple.

25        **C.    Step Three**

26        Google makes another argument contrary to circuit law for Step 3 of the Rule of Reason

27   analysis by stating that the Court improperly invited the jury to balance competitive effects. Dkt.

28   No. 925 at 11. But as Google acknowledges, *Apple II* expressly "held that Ninth Circuit precedent

1 requires balancing." *Id.*; *see Apple II*, 67 F.4th at 994 ("where a plaintiff's case comes up short at

2 step three, the district court must proceed to step four and balance the restriction's anticompetitive

3 harms against its procompetitive benefits."). There was no error in the Court's balancing

4 instruction to the jury.

5 **III. SUFFICIENCY OF EVIDENCE SUPPORTING JURY VERDICT**

6   Google's primary claim for judgment as a matter of law or a new trial is that the verdict is

7 "unsupported by legally sufficient evidence." Dkt. No. 925 at 11-27. True to form, Google

8 objects to just about everything adduced at trial that impugned Google's conduct. The Court has

9 undertaken the laborious task of reviewing the record in light of Google's many complaints, as the

10 ensuing discussion details. Some prefatory observations are in order. The true crux of Google's

11 argument isn't that the verdict was not based on substantial evidence, but rather that the jury didn't

12 see the evidence in the way Google wanted. This is not a situation where the verdict was based on

13 speculation or where the evidence would allow only one conclusion that is contrary to what the

14 jury decided.

15   Another problem is that Google ignores in practice the standards for granting JMOL or a

16 new trial. For Rule 50, as discussed, all reasonable inferences are made in favor of the verdict and

17 Epic, as the nonmoving party. *See Experience Hendrix*, 762 F.3d at 842, 845. This is so

18 irrespective of whether the evidence might have supported a different result. *See Pavao*, 307 F.3d

19 at 918 ("A jury's verdict must be upheld if it is supported by substantial evidence, which is

20 evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary

21 conclusion."). Google subverts this by asking in effect that all inferences be drawn for its benefit.

22 For Rule 59, where the review is free of inferences for either side, the jury verdict will stand

23 unless it is "against the clear weight of the evidence." *Silver Sage*, 251 F.3d at 819. Google

24 slights this by insisting that a new trial is warranted simply because some evidence was disputed

25 and the jury might have decided differently.

26 **A. Relevant Market**

27   **1. Limitation to Android In-App Payments**

28   The jury found a market consisting of "Android in-app billing services for digital goods

United States District Court<br>Northern District of California

12

and services transactions." Dkt. No. 866 at 3, 6 (Question Nos. 2, 8). Google says that "[t]he evidence does not support the jury's decision to exclude out-of-app payment systems from the relevant product market," highlighting websites in particular as a "reasonable substitute" that should have been included in the relevant market. Dkt. No. 925 at 11-12.

Not so. Epic's economics expert, Dr. Steven Tadelis, testified that the relevant product market was properly limited to "any product that could do what Google Play Billing does," *i.e.*, "any payment solution provider for digital content on Androids." Trial Tr. at 2553:1-4. He further testified that "web purchases are not a viable substitute for in-app purchases" because of "friction" -- whereas in-app purchases can be completed in two to three steps by the user, web store purchases required at least eight steps. *Id*. at 2554:4-2556:15. This increased friction was likely to lead to increased dropoff along the process, where users do not complete the purchase. *Id*. at 2556:19-2557:10. Google executive Purnima Kochikar was taken through the 18 steps a user would have had to go through "to have the Amazon App Store show up on the Home Page of their Android device." *Id*. at 746:3-752:8. Kochikar called the sideloading experience "abysmal," *id*. at 753:22-755:5, and agreed that "the number of steps makes for a bad user experience," and "where there's friction, people [often] fall out and don't complete purchases." *Id*. at 762:20-763:2. Witness Eric Chu testified that YouTube engineers worked to "reduce the number of clicks," asking themselves, "[f]rom the moment the user wants to buy something[,] what can we do to reduce [the] number of clicks and make it easier for them to purchase something[?]" *Id*. at 1441:2-1442:11; Dkt. No. 915-1 at ECF p. 85. The "[r]eason for that is obvious that the more friction there is[,] the more likely we lose users along the buy flow." *Id*.

The jury was instructed, without objection by Google, that "[i]n determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view." Dkt. No. 850 at ECF p. 22 (Instruction No. 18). This means "they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other." *Id*. The jury reasonably relied on the testimony summarized

13

United States District Court
Northern District of California

1   above, and similar evidence at trial, to conclude that from the developers' and users' points of

2   view, out-of-app payment systems were not reasonable substitutes for in-app payment systems.

3        Google's citation to *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th

4   Cir. 2001), is misdirected. Google cites it for the proposition that consumers' personal preferences

5   are not relevant. But *Tanaka* involved a highly unique personal preference -- literally the

6   preference of just plaintiff Tanaka, a "star high school soccer player" who wanted to "remain in

7   the Los Angeles area" so she could "be close to her family." 252 F.3d at 1061, 1063. Tanaka

8   challenged an intercollegiate athletic association rule that discouraged intra-conference transfers,

9   and although the association was national in scope, she alleged that the "relevant geographic

10   market is Los Angeles and the relevant product market is the 'UCLA women's soccer program,'"

11   based purely on her personal desires. *Id*. at 1063. The circuit concluded that Tanaka's personal

12   preference to be near her family could not be a proper basis for defining the "'area of effective

13   competition' for student-athletes competing for positions in women's intercollegiate soccer

14   programs." *Id*.

15        The facts here could not be more different. This is not a case of one person trying to define

16   a purely personal market. Substantial evidence was presented at trial to the effect that an out-of-

17   app payment solution would not meet a developer's or user's needs as well as an in-app payment

18   solution. The evidence showed that this was not a matter of mere preference or taste, but a

19   product of design and function. Out-of-app payment solutions are a cumbersome mechanism for

20   sales, and so are not likely to be viewed by developers or users as reasonable substitutes for in-app

21   payment systems. The jury's finding of an Android in-app payment solutions product market was

22   not against the great weight of the evidence.

23           **2.    Geographic Scope**

24        Substantial evidence supported the jury's finding that the relevant geographic market was

25   "worldwide excluding China." Dkt. No. 866 at 3, 6 (Question Nos. 2, 8). The jury was instructed

26   that the "relevant geographic market is the area in which Google faces competition from other

27   firms that compete in the relevant product markets and to which customers can reasonably turn for

28   purchases." Dkt. No. 850 at ECF p. 23 (Instruction No. 19). The jury was further instructed that

"[w]hen analyzing the relevant geographic market, you should consider whether changes in prices or product quality in one geographic area have substantial effects on price or sales in another geographic area, which would tend to show that both areas are in the same relevant geographic market." *Id*. Contrary to Google's argument, there is no absolute "legal test" of "'consumer substitution.'" Dkt. No. 945 at 6.

Epic's economics expert, Dr. Douglas Bernheim, testified that the appropriate geographic boundary for the relevant market was "global, excluding China." Trial Tr. at 2445:16-24. This was because "competitive conditions" in different countries "are largely similar," and Google's challenged conduct in this case was "global, excluding China." *Id*. at 2446:1-11. It was appropriate to carve out China because China was "very dissimilar" in that Google Android, Google Play, and Google's challenged conduct, were "not in China." *Id*. at 2446:18-23. Dr. Tadelis agreed with Dr. Bernheim's analysis, and also concluded that the geographic market was "global excluding China." *Id*. at 2560:10-16.

Other witnesses at trial also testified to these facts. For example, Google witness James Kolotouros testified that Google Play is not permitted in China and is not preinstalled on smartphones distributed there. *See id*. at 1070:7-17. On the flip side, "every Android smartphone outside of China comes preinstalled with Google Play." *Id*. at 1070:18-21. Kolotouros also testified that Google faced competition from companies such as Samsung, Xiaomi, Oplus, and Vivo, which "had the potential to have app stores that competed with Google Play in markets outside of China." *Id*. at 1079:16-1080:24; *see also id*. at 1207:13-1210:11 (Google witness Jamie Rosenberg's testimony re internal Google document discussing Amazon App Store's growing popularity in Japan, and Google's concern that Amazon might "scal[e] up and go[] global," becoming a more global threat to Google Play). Similarly, for in-app payment solutions, there was trial testimony that Google Play Billing is "not offered in China," and Google faces competition from companies such as PayPal, Square, and Braintree outside of the United States. *Id*. at 2586:21-2588:25. The jury's geographic market findings were supported by adequate evidence and were not against the great weight of the evidence.

United States District Court
Northern District of California

15

## B. Anticompetitive Effect of Google's Conduct

For Epic's monopolization claim, the jury was instructed that "[a]nticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). For Epic's restraint of trade claim, the jury was instructed that "[a] harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality." *Id*. at ECF p. 37 (Instruction No. 28). The jury was further instructed to consider the following factors: "(1) the effect of the challenged restraint on prices, output, product quality, and service; (2) the purpose and nature of the challenged restraint; (3) the nature and structure of the relevant market; (4) the number of competitors in the relevant market and the level of competition among them, both before and after the challenged restraint was imposed; and (5) whether Google possesses market power." *Id*.

After considering the evidence in light of these instructions, the jury found that Google "willfully acquired or maintained monopoly power by engaging in anticompetitive conduct." Dkt. No. 866 at 3 (Question No. 3). The jury also found each of these agreements to have been unreasonable restraints of trade (and so impliedly to have had anticompetitive effects): (1) "DDA agreements"; (2) "Agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program"; and (3) "Agreements with OEMs that sell mobile devices (including MADA and RSA agreements)." *Id*. at 5 (Question No. 7).

Each of these findings was supported by substantial evidence, and was not against the great weight of the evidence. There was substantial evidence at trial that Google had engaged in conduct, "other than competition on the merits, that ha[d] the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). It bears mention that Google does not contest that Epic presented sufficient evidence on Google's market power or the barriers to entry that existed in both of the relevant markets found by the jury. *See* Dkt. No. 932 at 15, n.11; *compare with* Dkt. No. 945.

16

1    The jury heard a great deal of testimony about Google's agreements with existing or

2    potential competitors in connection with Project Hug.[3]  Activision Blizzard King (ABK) was a

3    developer that signed a Project Hug deal.  The developer of mobile games such as Candy Crush

4    and Call of Duty, ABK "had the highest estimated spend by users of all of the Project Hug

5    developers."  Trial Tr. at 445:5-13.  ABK had been "quite vocal [in] complaining about Google

6    Play's 30 percent fee," and Google witness Koh testified that it had been communicated to Google

7    that ABK was considering the option of starting its own Android app store.  *Id*. at 445:14-22,

8    463:5-8.  Google estimated that it faced a risk of losing $243 million per year if ABK were to pull

9    its content from the Google Play Store.  *Id*. at 463:24-464:9.  Google internally discussed this risk,

10   as well as the possible "contagion risk" if ABK were to launch its own store and "attract[] more

11   content from other developers."  *Id*. at 463:5-464:24.[4]  Google then offered ABK a Project Hug

12   deal for $360 million.  *Id*. at 465:3-466:8.  Google witness Kochikar testified about Google's

13   concern that ABK might launch its own Android app store, and Google's hope that a Project Hug

14   deal would prevent that.  *See id*. at 804:7-807:12.  Riot Games was another developer that was

15   offered and took a Project Hug deal.  An internal Google document stated, "A year ago, we pulled

16   all the stops, promised them $10 million co-marketing for before they signed GVP, for example,

17   to get Riot Games to stop their in-house app store effort."  *Id*. at 811:6-812:12.

18   In exchange for significant payments from Google, developers who signed a Project Hug

19   agreement "could not launch [an app] either first or exclusively on any competing Android

20   distribution platform."  Trial Tr. at 442:23-443:2.  Developers who agreed to Project Hug also

21   could not "launch a materially different version of the game that it had on Google Play on a

22   competing Android app distribution platform."  *Id*. at 444:10-15.  Epic's expert, Dr. Bernheim,

23   testified to the anticompetitive effects of these provisions.  In his view, these provisions

24

---

25   [3] The Games Velocity Program was a continuation of Project Hug.  *See* Trial Tr. at 491:13-14; *id*.
26   at 410:13-15 (Google witness Lawrence Koh affirming that "Project Hug was later renamed the
     Games Velocity Program").

27   [4] Witness Koh testified that the "contagion risk" had to do with Google's concern that "once top
28   developers took their gaming content off of Google Play, that other developers would potentially
     follow suit."  Trial Tr. at 422:14-16.

United States District Court
Northern District of California

"prevent[ed] any significant differentiation," disincentivized developers from creating valuable content, and would also have discouraged Project Hug developers from entering the app store market themselves.  *Id*. at 2403:7-2410:7.

There was also substantial evidence of the anticompetitive effects of Google's agreements with OEMs, specifically the Mobile Application Distribution Agreement (MADA) and Revenue Share Agreements (RSA).  The MADA is an agreement that Google enters into with Android OEMs.  Pursuant to the MADA, OEMs must place Google Play on the default home screen of their Android devices.  Trial Tr. at 1351:14-21.  Virtually all OEMs that manufacture Android smartphones have entered into a MADA, and so Google Play is preinstalled on the default home screen of nearly all Android smartphones.  *Id*. at 1351:22-1352:8.  Google's CEO, Sundar Pichai, acknowledged that "[t]ypically," placement on the default home screen tends to lead to more usage of an app.  *Id*. at 1352:9-12.  Preinstallation of Google Play on the default home screen is a precondition for an OEM to have access to other key Google GMS apps and Android APIs without which many Android applications cannot function.  *Id*. at 1355:1-1356:4.  Restrictions like these made it difficult for competitors like Amazon to obtain "premium placement" for apps such as its own app store, Dkt. No. 915-1 at ECF p. 107, and so it was difficult for alternative app stores to get off the ground.

The terms of the Google Revenue Share Agreements with OEMs were even more aggressive.  The RSA 3.0 agreements are the third iteration of that contract, and they offer OEMs the opportunity to enroll their devices in three different tiers.  Trial Tr. at 1053:1-9.  For the "premier tier," which offers the highest revenue share, an OEM "may not install any app store on their device other than Google Play."  *Id*. at 1053:7-24.  Epic's expert, Dr. Bernheim, testified that this kind of profit-sharing with a competitor disincentivizes competition, and so is anticompetitive.  *Id*. at 3189:22-3190:14.

There was additional trial testimony to the same effect.  Google witness Kolotouros testified that, with the exception of Samsung, most of Google's major Android OEM partners executed RSA 3.0 agreements.  *Id*. at 1092:4-6.  OnePlus was one such OEM, and outside of China and India, OnePlus enrolled the vast majority of its devices in the premier tier.  *Id*. at

United States District Court
Northern District of California

United States District Court
Northern District of California

1094:3-17.  Although OnePlus wanted to enter into a partnership with Epic Games whereby the

Epic Games Store app would be preloaded onto OnePlus devices, Google declined to grant a

waiver to the premier tier restrictions.  After that, OnePlus decided to "take Google's revenue

share payments and keep nearly all of its devices outside of India in the premier tier instead of

preinstalling the Epic Game Store app."  *Id*. at 1094:18-25, 1098:24-1099:13.

The jury heard more evidence from which it could reasonably conclude that the RSA 3.0

agreements were anticompetitive.  This included an internal Google document in which Google

employees discussed how "Google cannot stop OEMs from preloading the Amazon App Store due

to anticompetitive concerns on the MADA 2.0 only," but "[w]e can do this through revenue share

deals."  Trial Tr. at 1074:8-17.  The employees agreed that having "stricter placement restrictions

through revenue share" was something that would "help stem the tide of emerging app stores."  *Id*.

at 1074:22-1075:19.  In the course of this discussion, another Google executive inquired about

why Google "doesn't put everything in the MADA" and asked, "Is it anticompetitive concerns or

something more than that?"  Witness Kolotouros responded, "This might be better discussed in

person as opposed to writing."  *Id*. at 1075:20-1076:12.  This and much other evidence supported a

verdict against Google on the "purpose and nature of the challenged restraint," namely the RSA

3.0 agreements.

There was additional evidence at trial that Google worked to suppress competition by

actively impeding users from "sideloading" competing app stores through increased "friction" and

"scare screens."  "Sideloading" referred to a direct installation process whereby a user "find[s] an

app via a mechanism that is not billing itself purely as an app store."  Trial Tr. at 2128:4-6.

"Friction" meant "the screens, the dialogues, the warnings that an operating system is going to put

up and show to users and sort of force the user to click through or interact with before the user can

actually accomplish the intended task."  *Id*. at 2113:21-25.  Google's CEO, Sundar Pichai,

acknowledged that "the more friction there is, the less likely the user completes that flow," *id*. at

1361:11-13, and there was evidence that Google viewed friction as a means of impeding users

from sideloading third-party app stores.  For example, a Google internal document titled,

"Amazon competitor deep dive," noted that "Amazon [was] emerging as a major challenge to Play

in gaming globally." Dkt. No. 886-50 (Trial Ex. 682) at ECF pp. 1-2. Another slide was titled,
"Amazon strongly promoting its 15%+ discount on IAPs available via Play, but for now switching
hurdle too high for most users." *Id*. at ECF p. 11. Under the heading, "Significant hurdle to
switching to Amazon apk," the Google document stated, "Process is quite complex, involves 14
steps (but motivated users will follow walkthroughs like this on YT)." *Id*.

For the DDA agreements, Google says that "Epic failed to prove, and no reasonable jury
could have found, that the anti-steering restrictions in the DDA were anticompetitive because they
merely prevent developers who choose to use valuable Google services and intellectual property in
the Play store from depriving Google of compensation for that value." Dkt. No. 925 at 22. But
this objection ignores the trial evidence about the anticompetitive nature of these anti-steering
restrictions and the DDA in general. For example, there was testimony that Paddle, a company
that offers to developers in-app payment solutions, was prevented from more effectively entering
the in-app payment services market because "Google Play's terms of services for developers [*i.e.*,
the DDA] expressly prohibit the usage of a third-party payment method." Trial Tr. at 653:3-11.

This and similar trial evidence demonstrate that the jury's findings on Google's
anticompetitive conduct were well supported. There was sufficient evidence for the jury to agree
with Dr. Bernheim that Google "impairs competition without preventing it entirely," Trial Tr. at
3181:1-3185:12, thereby satisfying the requirement that Google's conduct "frustrat[ed] the efforts
of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF
p. 30 (Instruction No. 23). Because the evidence discussed above is adequate to support the jury's
verdict, the Court declines to address Google's other arguments on the anticompetitive effect
element of Epic's antitrust claims.

**C.      Tying**

Substantial evidence supported the jury's finding in favor of Epic on its tying claim,
namely that "Google unlawfully tied the use of the Google Play Store to the use of Google Play
Billing." Dkt. No. 866 at 7 (Question No. 10).

The jury heard evidence that the Google Play Store and Google Play Billing are separate
products. It was not necessary for Epic to prove that there was separate demand for Google Play

20

Billing as a standalone product; rather, it was enough for Epic to prove that there was demand for in-app billing services separate from the demand for app distribution services. *See Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984) (a "tying arrangement cannot exist unless two separate product markets have been linked"; "in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services"). Epic presented substantial evidence on this element. Epic witness Steven Allison testified, for example, that in the case of the Epic Game Store, developers can use Epic Direct Pay, which is Epic's in-app payment solution, or "they can bring their own if they've set their game up to do so." Trial Tr. at 227:5-12. Down Dog's CEO, Benjamin Simon, testified that he would prefer Stripe or PayPal over Google Play Billing, and if he "had the ability at Down Dog to use PayPal or Stripe on [Down Dog's] Android app," he would do so. *Id.* at 303:2-10.

There was substantial evidence that Google coerced its customer -- here, developers -- to buy the tied product (Google Play Billing) in order to obtain the tying product (Google Play Store). Numerous witnesses testified that developers whose apps are on the Google Play Store are required through the DDA to use only Google Play Billing to sell any digital content that is to be used inside of the app. *See, e.g.*, Trial Tr. at 887:7-13, 889:9-21, 1185:18-21.

The jury had an ample evidentiary basis for rejecting Google's business justification defense as pretextual, and finding that Epic had successfully proven the existence of less restrictive alternatives. The trial testimony established, for example, that developers who sold digital content for use outside of the app were exempted from the requirement to use Google Play Billing, which weakened Google's business justification argument. *See* Trial Tr. at 1185:22-25. Similarly, developers who sold physical goods were also exempted. *See* Dkt. No. 886-94 (Trial Ex. 1436); *see also* Trial Tr. at 936:3-9.

Epic also adduced evidence that the Google Play Store was so profitable that Google did not need to tax developers a 30% fee through Google Play Billing to be fully compensated for its IP and other costs for the Google Play Store. For example, the jury saw an internal Google document showing that some developers paid "more than a hundred million dollars per year more than the value that they have obtained from Google"; and for the 100 most negative developers

United States District Court
Northern District of California

1   (whose payments to Google exceeded the estimated value they received from Google), Google

2   internally estimated that on average, they "receiv[ed] a value equivalent to 19 percent," but "still

3   were required to pay Google a 30 percent revenue share."  Trial Tr. at 608:6-611:22.  Based on

4   Google Play's revenue numbers, this worked out to $1.43 billion per year that the top 100 most

5   negative developers were overpaying to Google.  *See id.* at 612:3-613:11.  There was additional

6   evidence at trial that Google was concerned about public criticism calling out "Google's 30

7   percent fee on in-app purchases made on apps distributed through Google Play" as "highway

8   robbery."  *Id.* at 417:17-418:24; *see also*, *e.g.*, *id.* at 708:18-21 (internal Google document stating

9   that "the team estimates that if you compare the value of nonSearch-driven discovery versus

10  revenue share paid, Tinder is now deriving only 10 percent of the revenue share value versus the

11  30 percent share they pay.").  Overall, the jury had more than enough evidence at the balancing

12  step to conclude that any benefit from Google's tie was outweighed by its competitive harms.

13      It was not improper for the jury to consider the DDA as an unreasonable restraint of trade

14  and to additionally consider Epic's tying claim.  The tying claim focused on Google's coercive tie

15  of Google Play Billing to the Google Play Store, while Epic's challenge to the DDA also

16  encompassed the DDA's anti-steering provisions.  Multiple legal claims may be based on the same

17  underlying conduct, and Google has not presented any authority to the contrary.

18          **D.      Substantially Less Restrictive Alternatives**

19      Google challenges the jury's implicit finding in favor of Epic on Step 3 of the Rule of

20  Reason, and says that no reasonable jury could find that Epic satisfied its burden to identify

21  substantially less restrictive alternatives that would be virtually as effective in serving Google's

22  objectives without significantly increased cost.  Dkt. No. 925 at 24-27.

23      Google overlooks the fact that the jury might simply have rejected Google's proffered

24  justifications.  The jury had ample evidence to do so.  There was evidence at trial, for example, to

25  support Epic's theory that the exclusionary provisions in the MADA and RSA agreements were

26  put into those agreements for anti-competitive reasons, rather than any legitimate business reasons.

27  *See*, *e.g.*, Trial Tr. at 2920:19-2921:7 (Google witness Gennai testifying that RSA 3.0 premier tier

28  was developed "to respond to increasing app store competition from OEMs and large platforms

United States District Court
Northern District of California

United States District Court
Northern District of California

1    like Epic"); *id*. at 1078:3-1079:19 (changes to RSA proposed "to protect Google from key

2    strategic risks," including risks of revenue loss due to "Chinese OEMs and Samsung . . . actively

3    investing in creating own app and services ecosystems"); *id*. at 1073:6-1076:12 (internal Google

4    document stating that "Google cannot stop OEMs from preloading the Amazon App Store due to

5    anticompetitive concerns on the MADA 2.0 only," but could "prevent OEMs from preloading

6    competitive app stores" through "revenue share deals").

7        For the sideloading warnings, there was evidence at trial that the increased friction built in

8    by Google were not related to Google's assessment of the security risk posed by the material the

9    user was trying to sideload.  Google CEO Pichai agreed that "[s]ome websites, such as those from

10   reputable developers, actually present very low security risks," and yet "Google's unknown

11   sources flow does not distinguish between those trusted developers and every other website."

12   Trial Tr. at 1365:2-8; *see also id*. at 1693:11-1695:21 (sideloading / "unknown source" install

13   flows of 14 or 17 steps applied equally to apps from companies such as Microsoft or Adobe,

14   which are known to Google).  Epic's mobile security expert, Dr. James Mickens, testified that any

15   legitimate benefit of increased security protections for users could have been accomplished

16   through less restrictive means such as fewer screens, or a notarization process that differentiated

17   among the types of security risks presented by different apps or companies.  *See id*. at 2149:2-7,

18   2151:6-8, 2152:4-6, 2157:2-24.  His overall opinion, which the jury could reasonably have

19   credited and believed, was that the friction Google imposes is unwarranted and disproportionate,

20   and that Google could reduce the amount of friction while preserving the status quo on security.

21       For the parity provisions in Project Hug and the anti-steering provisions in the DDA, as

22   discussed above in Section III.B. *supra*, sufficient trial evidence supported a conclusion by the

23   jury that those were motivated by anticompetitive reasons, rather than legitimate business ones.

24   **IV.    EVIDENTIARY RULINGS AND ADVERSE INFERENCE INSTRUCTION**

25       Google says that three evidentiary rulings entitle it to a new trial.  Dkt. No. 925 at 27-29.

26   The record demonstrates otherwise.

27       **A.    Google Employees' Use of Attorney-Client Privilege**

28       To start, Google says the Court "permitted Epic to question witnesses about markings

23

1   related to attorney-client privilege on produced documents." Dkt. No. 925 at 27.  Google also

2   claims, quite brazenly and wrongly in light of its willful conduct to hide material evidence, that it

3   had not "improperly withheld any document on the basis of privilege" and so "Epic's questioning

4   of Google witnesses regarding privilege markings on documents gave the jury the incorrect

5   impression that Google had improperly asserted the attorney-client privilege."  *Id*.

6       Google's remarks are ill made.  After the Court's findings of fact against Google for

7   willfully failing to preserve Google Chat evidence, *see* Dkt. No. 469, more evidence emerged at

8   trial of a frankly astonishing abuse of the attorney-client privilege designation to suppress

9   discovery.  CEO Pichai testified that there were occasions when he "marked e-mails privileged,

10  not because [he was] seeking legal advice but just to indicate that they were confidential," as he

11  put it.  Trial Tr. at 1321:17-24.  He knew this was a misuse of the privilege.  *Id*. at 1323:5-17.

12  Emily Garber, a Google in-house attorney, testified that there was a practice at Google of

13  "loop[ing] in" a lawyer based on a "misapprehension about the rules of privilege," and that Google

14  employees "believed that including [an in-house lawyer] would make it more likely that the email

15  would be considered privileged."  *Id*. at 964:21-966:5.  Garber called this "fake privilege," a

16  practice that she appears to have found amusing rather than something a lawyer should have put an

17  immediate and full stop to.  *Id*. at 964:21-23; Dkt. No. 887-86 (Trial Ex. 6487) at EXHIBIT

18  pp. 012-013.

19      On this record, there was no error in the Court's evidentiary ruling that Epic could "present

20  fake privilege" and make arguments to the jury about it.  *Id*. at 785:5-6.  The Court was crystal

21  clear that Epic could not "do anything else with privilege," and it commended the parties for not

22  saying "anything about" documents that had been "branded privileged" even though it should not

23  have been subject to an assertion of privilege.  *Id*. at 785:8-12.

24      **B.      Preclusion of Outcome of *Epic v. Apple***

25      Google repackages the prior preclusion argument as an ostensible evidentiary objection to

26  say:  "the Google Play store's primary competitor is free to use the same basic service fee model

27  explains why it is important for Google to use that same model.  The Court erred by preventing

28  Google from introducing evidence that Apple was unlikely to change its existing model in light of

United States District Court
Northern District of California

1    the outcome of *Epic v. Apple* -- a market fact that supports Google's procompetitive justifications

2    for that model and the alleged tie."  Dkt. No. 925 at 28.

3         The point fares no better as an evidentiary objection than it did in the prior version.  *See*

4    Section I.A., *supra*.  In addition, for the same reason that there was no error in the jury's decision

5    to exclude Apple from the relevant product markets it found, these outside facts about Apple are

6    not nearly as relevant and important as Google urges.

7        **C.**      **Adverse Inference Instruction**

8         Google's comments on the permissive inference instruction are even more poorly taken

9    that those about the attorney-client privilege.  The Court determined after an evidentiary hearing

10    held before trial that Google had willfully failed to preserve relevant Google Chat

11    communications, and allowed employees at all levels to hide material evidence.  Dkt. No. 469.

12    The evidence presented at trial added more fuel to this fire.  As discussed, Google in-house

13    attorney Garber testified about the company practice of asserting a fake privilege to shield

14    documents and communications from discovery.  Other witnesses also amplified the seriousness

15    and pervasiveness of Google's preservation abuses.  For example, Google employee Margaret

16    Lam, who worked on RSA issues, said in a Chat message that she didn't have a specific document

17    because "competition legal might not want us to have a doc like that at all :)."  Trial Tr. at 991:16-

18    992:8 (smiley face emoji in original).  She was a party to other Chats where, in a discussion about

19    MADA, she asked to turn history off because of "legal sensitivity"; she requested to turn history

20    off in a different conversation about RSAs, so there would be no "trail of us talking about waivers,

21    etc."  Dkt. No. 887-83 (Trial Ex. 6464), Dkt. No. 888-23 (Trial Ex. 8020).  Witness Lam also

22    testified that the decision of which Chats to preserve had been left in her hands, but she had "no

23    idea" what was or was not relevant.  Trial Tr. at 1012:6-1014:9.

24         Overall, there was an abundance of pretrial and trial evidence demonstrating "an ingrained

25    systemic culture of suppression of relevant evidence within Google."  *Id.* at 1044:15-17.  The

26    Court had advised the parties before trial that an appropriate sanction might include a permissive

27    inference instruction to the jury.  Dkt. No. 700 at 3-4.  After the additional evidence of

28    malfeasance emerged during trial, the Court raised the question of whether a mandatory adverse

United States District Court<br>Northern District of California

1 inference instruction would be more fitting. Trial Tr. at 1044:4-22. Even then, despite the

2 mountain of evidence against Google, the Court held an evidentiary hearing on the question

3 outside of the presence of the jury.

4  The results of this hearing were disappointing. Google's chief legal officer, Kent Walker,

5 was the main witness. Despite the seriousness of these issues, and the likelihood that they could

6 affect other litigation matters where Google is a party, Walker showed little awareness of the

7 problems and had not investigated them in any way. Trial Tr. at 1834:18-1835:17. Much of his

8 testimony was in direct opposition to the facts established at the prior Google Chat hearing. *See*,

9 *e.g.*, *id*. at 1829:16-1830:3. Overall, Walker did nothing to assuage the Court's concerns.

10  In these circumstances, the salient question was not whether an adverse inference

11 instruction should be given at all, but whether the inference should be permissive or mandatory.

12 The Court would have been well within its discretion to order a mandatory inference, given the

13 volume of evidence of Google's misconduct. Even so, the Court took the conservative approach

14 of permitting the jury to make an adverse inference rather than requiring it to. The parties had a

15 fair and balanced opportunity during trial to present evidence and arguments about Google Chat

16 preservation and Google's conduct, and both sides took full advantage of that. The jury was free

17 to make or decline an inference as it saw fit. To further ensure fairness, the Court instructed Epic

18 that it could not make arguments about Google's conduct predating August 2020. *See* Trial Tr. at

19 3237:4-8. If Epic opened that door, Google would have been permitted to respond, *see id.*, but

20 Epic followed that instruction in its closing argument. *See id*. at 3352:3-3386:14, 3430:19-3435:7.

21  In light of this record, Google's complaints about the inference instruction are wholly

22 misdirected. It has not provided anything close to a good reason to conclude otherwise.

23 **V. ADVISORY JURY**

24  Google says, rather disingenuously, that the Court has not clarified "whether it was going

25 to treat the jury's verdict as binding or advisory," and requests that the Court treat the verdict as

26 advisory. Dkt. No. 925 at 29. It argues further that it "did not consent to a jury trial," and even if

27 it did, it withdrew that consent. *Id*. at 29-30.

28

United States District Court
Northern District of California

1    Google again ignores that it already made these arguments to the Court prior to the start of

2    trial, and lost, for good reason.  The Court expressly denied Google's request to "abandon a jury

3    trial" on the eve of trial.  Trial Tr. at 6:13-7:16.  Google is in effect seeking reconsideration of that

4    ruling, for no good reason.

5    To summarize the prior proceedings on this issue, under Federal Rule of Civil Procedure

6    39(c)(2), "[i]n an action not triable of right by a jury, the court, on motion or on its own:  . . .

7    (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a

8    jury trial had been a matter of right, unless the action is against the United States and a federal

9    statute provides for a nonjury trial."  Google consented to a jury trial of Epic's antitrust claims

10   against it.  A party's consent under Rule 39(c)(2) can be express or implied.  *See*, *e.g.*, *Bereda v.*

11   *Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989); *Thompson v. Parkes*, 963 F.2d

12   885, 889 (6th Cir. 1992) (en banc); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96

13   (9th Cir. 1999); *Broadnax v. City of New Haven*, 415 F.3d 265, 271-72 (2d Cir. 2005); *Pals v.*

14   *Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000).

15   Google gave unambiguous express and implied consent to a jury trial.  The express consent

16   can be found in documents such as the parties' Joint Submission re Trial Proposal, which stated,

17   for "Issues Triable to a Jury":  "The parties agree that all claims by all Plaintiffs are triable to a

18   jury, with the exception of the claims brought under California's Unfair Competition Law, . . . ,

19   and claims that the States have brought under the laws of 38 states other than California."  Dkt.

20   No. 505 at 3.  The record also shows that the Court and the parties contemplated a jury trial for

21   Epic's antitrust claims for years, without objection by Google and with its active participation in

22   the filing and discussion of jury instructions, proposed voir dire, and motions in limine.

23   Google's filing on November 1, 2023, one day before jury selection and two court days

24   before the start of trial, was the first time it said it was "withdraw[ing] that consent."  *See* Dkt. No.

25   730 at 7.  That was far too late.  *See Bereda*, 865 F.2d at 55 ("Rule 39(c) does not permit the

26   district court to withdraw its prior consent to the litigants' request for a nonadvisory jury.");

27   *Thompson*, 963 F.2d at 889 ("Even if the court was correct that no jury trial right existed in this

28   case, F.R.Civ.Pro. 39(c) permits both sides to stipulate to a jury trial.  To be sure, a district court

United States District Court
Northern District of California

27

1   does not have to go along with the stipulation, but once that occurs, it does not have unbridled

2   discretion to change its mind."); *see also AMF Tuboscope, Inc. v. Cunningham*, 352 F.2d 150, 155

3   (10th Cir. 1965) (where parties had stipulated to a jury trial that was set to begin on March 1,

4   abuse of discretion for district court to vacate the jury trial on February 28 and re-set the case for a

5   bench trial, based on court's conclusion that the parties were not entitled to a jury trial as of right).

6          Allowing Google to withdraw its consent two court days before trial would have caused

7   immense prejudice to Epic, which had been awaiting its day before a factfinder since filing its case

8   years prior, and which had spent many months preparing for a jury trial. A jury trial was proper,

9   and the jury's verdict is properly treated as binding.

                                        **CONCLUSION**

11         Google's motion did not present good grounds for judgment as a matter of law or for a new

12  trial.

13         **IT IS SO ORDERED.**

14  Dated: July 3, 2024

                                        _____

                                        JAMES DONATO
                                        United States District Judge

# EXHIBIT C

1
2
3          UNITED STATES DISTRICT COURT
4          NORTHERN DISTRICT OF CALIFORNIA
5

6  IN RE GOOGLE PLAY STORE              MDL Case No. 21-md-02981-JD
   ANTITRUST LITIGATION
7                                        Member Case No. 20-cv-05671-JD

8                                        **PERMANENT INJUNCTION**
9
10

11        This permanent injunction is entered in MDL member case *Epic Games, Inc. v. Google*

12 *LLC et al.*, Case No. 20-cv-05671-JD, on the jury verdict against Google under Sherman Act

13 Sections 1 and 2, 15 U.S.C. §§ 1, 2, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et

14 seq., and the Court's finding that Google violated the California Unfair Competition Law, Cal.

15 Bus. & Prof. Code §§ 17200 et seq.

16        1.       This injunction applies to Google LLC and each of its parent, affiliated, and

17 subsidiary entities, officers, agents, employees, and any person in active concert or participation

18 with them, who receive actual notice of this order by personal service or otherwise (together,

19 Google).

20        2.       Unless otherwise stated, the effective date of the injunction is November 1, 2024.

21        3.       The geographic scope of the injunction is the United States of America.

22        4.       For a period of three years ending on November 1, 2027, Google may not share

23 revenue generated by the Google Play Store with any person or entity that distributes Android

24 apps, or has stated that it will launch or is considering launching an Android app distribution

25 platform or store.

26        5.       For a period of three years ending on November 1, 2027, Google may not condition

27 a payment, revenue share, or access to any Google product or service, on an agreement by an app

28 developer to launch an app first or exclusively in the Google Play Store.

6. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer not to launch on a third-party Android app distribution platform or store a version of an app that includes features not available in, or is otherwise different from, the version of the app offered on the Google Play Store.

7. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an original equipment manufacturer (OEM) or carrier to preinstall the Google Play Store on any specific location on an Android device.

8. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an OEM or carrier not to preinstall an Android app distribution platform or store other than the Google Play Store.

9. For a period of three years ending on November 1, 2027, Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing. Google may not require a developer to set a price based on whether Google Play Billing is used.

10. For a period of three years ending on November 1, 2027, Google may not prohibit a developer from communicating with users about the availability or pricing of an app outside the Google Play Store, and may not prohibit a developer from providing a link to download the app outside the Google Play Store.

11. For a period of three years, Google will permit third-party Android app stores to access the Google Play Store's catalog of apps so that they may offer the Play Store apps to users. For apps available only in the Google Play Store (*i.e.*, that are not independently available through the third-party Android app store), Google will permit users to complete the download of the app through the Google Play Store on the same terms as any other download that is made directly

United States District Court
Northern District of California

through the Google Play Store. Google may keep all revenues associated with such downloads. Google will provide developers with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store. Google will have up to eight months from the date of this order to implement the technology necessary to comply with this provision, and the three-year time period will start once the technology is fully functional.

12.     For a period of three years, Google may not prohibit the distribution of third-party Android app distribution platforms or stores through the Google Play Store. Google is entitled to take reasonable measures to ensure that the platforms or stores, and the apps they offer, are safe from a computer systems and security standpoint, and do not offer illegal goods or services under federal or state law within the United States, or violate Google's content standards. The review measures must be comparable to the measures Google is currently taking for apps proposed to be listed in the Google Play Store. If challenged, Google will bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored. Google may require app developers and app store owners to pay a reasonable fee for these services, which must be based on Google's actual costs. Google will have up to eight months from the date of this order to implement the technology and procedures necessary to comply with this provision, and the three-year time period will start once the technology and procedures are fully functional. For the duration of this time period, the Technical Committee described in paragraph 13 below will in the first instance decide challenges to Google's review decisions, with the Court serving as the final word when necessary.

13.     Within thirty days of the date of this order, the parties will recommend to the Court a three-person Technical Committee. Epic and Google will each select one member of the Technical Committee, and those two members will select the third member. After appointment by the Court, the Technical Committee will review disputes or issues relating to the technology and processes required by the preceding provisions. If the Technical Committee cannot resolve a dispute or issue, a party may ask the Court for a resolution. The Technical Committee may not extend any deadline set in this order, but may recommend that the Court accept or deny a request to extend. Each party will bear the cost of compensating their respective party-designated

3

committee member for their work on the committee.  The third member's fees will be paid by the parties in equal share.

14.    The Court will retain jurisdiction over the injunction for all purposes.  Google or Epic may request a modification of the injunction for good cause.

**IT IS SO ORDERED.**

Dated:  October 7, 2024

_____
JAMES DONATO
United States District Judge

United States District Court
Northern District of California

4