Nos. 24-6256 & 24-6274

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

**BRIEF OF MICROSOFT CORP. AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE EPIC GAMES, INC.'S
OPPOSITION TO EMERGENCY MOTION FOR PARTIAL STAY**

Aaron M. Panner
Alex A. Parkinson
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*

November 1, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Microsoft Corporation states that it does not have a parent corporation and that no publicly held corporation holds 10 percent or more of its stock.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................i

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICUS CURIAE* ..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ............................................................................................................4

I.  GOOGLE'S ARGUMENTS DISTRACT FROM THE NARROW SCOPE OF THE INJUNCTIVE RELIEF SCHEDULED TO TAKE EFFECT IN THE NEAR TERM ..........................4

II. GOOGLE'S RESTRICTIVE PLAY STORE POLICIES DEGRADE MOBILE GAMING — AND THE INJUNCTION WOULD IMMEDIATELY BENEFIT CONSUMERS .................................6

III. USE OF ALTERNATIVE IN-APP PURCHASE METHODS POSES NO NEW SECURITY OR PRIVACY RISK ................................11

CONCLUSION .......................................................................................................13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046
    (9th Cir. 2009) ................................................................................. 10-11

*Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ........................10

**RULE**

Fed. R. App. P. 29(a)(4)(E) ..................................................................................1

**OTHER MATERIALS**

Google, *Offering an alternative billing system for users in the European
    Economic Area (EEA)*, *available at* https://support.google.com/
    googleplay/android-developer/answer/12348241?hl=en ............................... 12

The Verge, *Xbox will sell games directly in the Android app next month*,
    *available at* https://www.theverge.com/2024/10/10/24267339/
    microsoft-xbox-android-purchase-games-us-court-ruling................................ 9

iii

## INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer hardware, software, and security features. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing. It invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic technology markets.

This case presents important antitrust issues arising from the explosion in mobile computing. The present motion, in particular, addresses the extent to which Google LLC ("Google") must implement an injunction ordered by the United States District Court for the Northern District of California (Donato, J.) in favor of Epic Games, Inc. ("Epic") following a jury's determination that Google's conduct — which remains ongoing today because of an administrative stay — violates federal and state antitrust law.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this *Amicus* Brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this Brief. All parties consented to its filing.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues that Google raises in its motion. In part of its business, Microsoft sells hardware devices and one of the leading operating systems for personal computers. Microsoft also provides online stores for applications that run on its consumer operating systems. In other parts of its business, Microsoft sells applications and services that run on operating systems and devices built by other companies, like Google. It offers products that compete with Google and, like Epic, it offers games — including for distribution on the Android mobile operating system. Microsoft also is a global leader in digital security, protecting a significant amount of critical internet and computing infrastructure throughout the United States and the world.

Microsoft has an interest in ensuring both that antitrust law prevents a dominant firm's improper foreclosure of competition and that market-correcting measures take effect without undue delay to enable innovation, pro-competitive investment, and beneficial technological integration.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On October 7, 2024, ten months after a jury found Google liable for violating federal and state antitrust law — including for having "unlawfully tied the use of the Google Play Store to the use of Google Play Billing" — the district court imposed an injunction preventing Google from continuing to force app

2

developers and consumers to use its costly and restrictive mobile in-app payment processing system (Google Play Billing) for digital transactions. In response to the court's injunction, Microsoft has undertaken significant work to swiftly prepare new consumer offerings. Later this month, Microsoft will be ready to launch an updated Xbox app for Android that enables cross-device gaming and in-game purchases, significantly improving the mobile gaming experience. But Microsoft can launch this app only if certain provisions of the court's injunction take effect.

In its opposition to Google's request for stay, Epic has explained why Google has failed to make the showing required to justify a stay of the injunction. The purpose of this brief is to explain how certain Google policies that are the subject of the injunction have prevented Microsoft from offering mobile gaming experiences customers want, and why staying the injunction will cause immediate harm by blocking an innovative app that Microsoft will be ready to launch in weeks. As the jury and the district court concluded, Google's policies have no valid security or privacy justification. Delaying the effective date of the injunction would harm competition and the public interest by allowing Google to continue to prevent Microsoft (and many other developers) from introducing new, innovative, and consumer-benefiting products, with no justification. The public-interest benefits of enhanced competition and greater innovation sharply tip the balance of equities against a stay.

3

# ARGUMENT

## I. GOOGLE'S ARGUMENTS DISTRACT FROM THE NARROW SCOPE OF THE INJUNCTIVE RELIEF SCHEDULED TO TAKE EFFECT IN THE NEAR TERM

The arguments of Google and its *amici* — which focus on remedial provisions not scheduled to take effect for many months (by which time the Court will have already heard merits argument) — obscure the immediate question before this Court: whether to halt those parts of the injunction that simply require Google to stop enforcing contracts and policies that the jury found to have blocked competition without any legitimate pro-competitive justifications.

None of those provisions of the injunction fundamentally changes, from a technical point of view, the nature of what customers can do with their Android smartphones. Today, thousands of apps sold through the Play Store can already use whatever in-app payment mechanism they choose — *unless* they sell digital goods for consumption within the app, in which case Google requires the use of Google Play Billing with its exorbitant commission rates.

Today, consumers can download Android native apps directly from websites — in those rare cases where developers make such apps available (having been denied or given up access to Google's Play Store) and consumers succeed in

4

navigating the additional discoverability hurdles that Google puts in the way.[2] And, today, alternative app stores likewise exist (e.g., the Samsung Galaxy Store, the Amazon Appstore, and others) — though Google's restrictive contracts and practices hobble nearly all of these alternatives.

Google now argues that a stay is necessary to prevent security and privacy harms that the district court's remedies would supposedly invite. But if there were significant security and privacy risks associated with these distribution methods, then Google has had every reason to address them *already* — and it has. *See* 11 Tr. 2111-2164 (Nov. 21, 2023) (testimony of Epic's security expert). If those risks have not manifested to date, that strongly supports the conclusion that such risks are manageable.

In all events, the time for Google to introduce evidence to support its claims was in the district court; the jury heard evidence when considering Google's supposed privacy and security justifications for its restrictive practices, and the court evaluated similar evidence when considering Epic's proposed injunction. No one takes cybersecurity more seriously than Microsoft — it is fundamental to everything Microsoft does. And the idea that Google's restrictive practices are necessary to address such risks is untenable.

---

[2] Paragraph 10 of the injunction makes this process easier by permitting link-outs. *See* Permanent Injunction ¶ 10, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD, Dkt. 1017 (Oct. 7, 2024) ("Permanent Injunction").

5

## II. GOOGLE'S RESTRICTIVE PLAY STORE POLICIES DEGRADE MOBILE GAMING — AND THE INJUNCTION WOULD IMMEDIATELY BENEFIT CONSUMERS

**A.** **Mobile Gaming on Android Today:** Mobile gaming has become the fastest growing segment of the massive gaming industry. Consumers increasingly demand console-quality gaming experiences on mobile devices so that they can play the same games with the same features from home or while waiting at the bus stop. Part of Microsoft's effort to attract and retain gamers is to offer those console-quality gaming experiences on the go and seamlessly integrate that mobile gameplay with console or PC gaming through "cross-play" — allowing consumers to play an Xbox game on a console, a PC, or a mobile device, against or with other players. In short, Microsoft's competitive strategy seeks to allow customers to play the games they buy on any device that plays games.

But Google's conduct impedes that aim. Through the Play Store, Microsoft currently can offer consumers only two ways to play Xbox games on an Android device: *first*, a consumer can use the native Android Xbox app to remote stream gameplay from the consumer's Xbox console to a mobile device to play games the consumer purchased using a valid Microsoft or Xbox account; *second*, a consumer can use the native Android Game Pass app to stream a library of games over the cloud supported by Microsoft's data and cloud-storage centers. Google's current restrictive Play Store policies significantly degrade these experiences. It requires

6

the use of Google Play Billing in apps distributed on the Play Store for the purchase of digital goods and prohibits providing links from those apps to non-Google alternatives for in-app purchases. And it bars app developers from including in their apps links that would allow users to access websites where alternative purchase options would be available.

The financial impact of these restrictions is obvious: Google generally extracts 30 percent of all transactions that take place using Google Play Billing. Microsoft *already has* a billing relationship with Xbox customers, using trusted and secure Microsoft sign-in accounts and Microsoft's own commerce system for in-app purchases. Microsoft does not need or want to use Google Play Billing; requiring use of that unwanted and exorbitantly expensive service makes it uneconomic to offer many products and services to users.

What may be less obvious is that Microsoft *cannot* use Google Play Billing for many gaming transactions, in particular those that involve in-game purchases in Xbox console games during gameplay. The games that Microsoft's Xbox and Game Pass apps enable consumers to play are engineered — at the code level — for non-Google in-game payment mechanisms. It would be highly impractical, and take years, for Microsoft to rewrite the code for the first-party titles available on Xbox to embed Google Play Billing for in-game purchases. And many of the most popular Xbox games are third-party titles that Microsoft cannot rewrite

7

because it does not develop those games. Further, because Microsoft streams these Xbox games to the user's mobile device — using hardware and software for which Google does not offer software support — there is no Google software that Microsoft could use to integrate Google Play Billing into Xbox console games.

As a result of Google's in-app payment restrictions that the jury found unlawful[3] — and that the district court enjoined pending the administrative stay[4] — Android mobile gaming experiences are significantly limited today:

- Consumers cannot use a Microsoft sign-in account or Xbox account to purchase and play games within these Android apps.

- Microsoft must disable in-game purchases for both remote and cloud-streaming gameplay — on the Android Xbox app and Android Game Pass app, respectively — preventing consumers from paying to unlock new levels or avatar outfits (sometimes called "skins") or upgraded features and more.

- Microsoft cannot include in its Android apps links that direct consumers to Microsoft's websites where they can play games (via streaming) and make game-based purchases using their Microsoft account.

---

[3] *See* Jury Verdict at 6, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD, Dkt. 866 (Dec. 11, 2023).

[4] *See* Permanent Injunction ¶ 9.

8

B.  **The Effect of the Injunction:**  Relying on the injunction — and in response to consumers' inquiries about how that injunction could help improve Xbox gaming on Android — Microsoft announced publicly that it would provide an updated Android Xbox app for launch in or around November,[5] assuring customers that they could access this app just before the holiday season, which is critical for game developers and platform operators.  Microsoft has invested significant resources to be ready to launch this updated Android Xbox app in or around November.

This app will enable new functionalities to improve the mobile gaming experience and make Microsoft more competitive with its gaming rivals:

- Customers will be able to buy Xbox games in the app and then click a link from that Android native app to a website (Xbox.com/Play) to stream the game play (both from Microsoft's data and cloud-storage centers and via remote access to the user's console) — just as if they had purchased the game on an Xbox console.

- That linked website will allow customers to make additional purchases, including in-game purchases — new levels, tools, upgrades, and more — for

---

[5] *See* The Verge, *Xbox will sell games directly in the Android app next month*, *available at* https://www.theverge.com/2024/10/10/24267339/microsoft-xbox-android-purchase-games-us-court-ruling.

9

immediate use without disrupting game flow, just as in-game purchases work on an Xbox console or PC.

All of these transactions will take place using Microsoft's trusted and secure commerce system, which Microsoft customers use today when making purchases on an Xbox console, on a PC, on the web, and even, in some circumstances, on Android (albeit only on the Samsung Galaxy Store but not through the Play Store). These innovative updates will enable cross-play; gaming on Android mobile will provide the same experiences as gaming on an Xbox console, enabling customers to start a game on an Xbox console or PC and then continue the same gaming experience on the go with the updated Android Xbox app or vice versa.

Providing customers a full and trusted Xbox gaming and purchase experience on any device is critical to Microsoft's competitiveness in the gaming space — it is one way Microsoft differentiates from other gaming platforms. *See Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1023-24 (9th Cir. 2016) (recognizing that "competition" itself is "vital to the public interest") (emphasis omitted). Failing to launch in or around November not only will cost Microsoft lost revenue and wasted resources, but also will cause it to miss the holiday season and jeopardize goodwill with customers who rely on Microsoft's announcements about new product launches. *Cf. American Trucking Ass'ns, Inc. v. City of Los*

10

*Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009) (recognizing loss of "customer goodwill" as a potentially irreparable harm).

But this new app cannot launch if those parts of the injunction addressing in-app payments are stayed pending appeal. Google has used its policies to force Microsoft to degrade the mobile gaming experience it provides to customers through the Play Store. As long as these crucial provisions remain stayed, Google will continue to block Microsoft from offering consumers the products and features they want. Moreover, Microsoft is just one developer among thousands that are undoubtedly making plans, in reliance on the injunction, to add product features and expand consumer choice. Further delay thus would harm millions of American consumers — and would allow Google to continue to benefit from its anticompetitive conduct.

### III. USE OF ALTERNATIVE IN-APP PURCHASE METHODS POSES NO NEW SECURITY OR PRIVACY RISK

Google's claim that its Google Play Billing requirements are necessary to user security and privacy — which the jury rejected in reaching its verdict, as did the district court in denying Google judgment as a matter of law — is pretextual.

Google already allows thousands of app developers and millions of consumers to use non-Google commerce systems for in-app purchases of non-digital goods and services, e.g., buying clothes from Nordstrom, groceries from DoorDash, books from Amazon, or rides from Uber. Google and its *amici* are

11

silent in their submissions before this Court about why allowing customers to use the same non-Google commerce systems for purchasing digital goods and services — a new video game or a new feature within a game — would expose Android users to any incremental security or privacy risk. And for good reason: Google *already* allows customers to purchase digital services using non-Google commerce systems so long as those purchases are made over the web and outside a native app, e.g., customers can purchase a new game from the Xbox website on an Android mobile web app using Microsoft's commerce system. In fact, Google also allows customers to purchase digital content using non-Google commerce systems in a native app — but *only* if the content is not consumed in the app, e.g., a customer can use Sony's PlayStation app to purchase (but not to play) digital games. And regulatory intervention has forced Google to drop even that pretense in Europe, where Google has long made available non-Google in-app payment methods for non-gaming apps that users download from the Play Store[6] — all without a security or privacy catastrophe.

The distinctions Google imposes do not plausibly protect consumers or the Android operating system; in fact, the in-app and in-game purchases that Microsoft would make available in its updated Android Xbox app would not entail

---

[6] *See* Google, *Offering an alternative billing system for users in the European Economic Area (EEA)*, *available at* https://support.google.com/googleplay/android-developer/answer/12348241?hl=en.

12

downloading any new app or feature to the user's smartphone. Google is instead simply introducing friction for transactions that don't use its commerce system — allowing play and allowing payments (without Google Play Billing), but only separately in different apps and not as part of a single experience — which is precisely the conduct that a jury found to violate antitrust law. Microsoft has a trusted and secure digital commerce system that customers use when creating an Xbox account and making purchases on a console, a PC, or even a mobile device via web browser. Allowing Google to continue to introduce friction in these existing customer relationships — wherein Microsoft has made and fulfilled commitments to its customers' security, safety, and privacy — furthers no pro-competitive purpose.

## CONCLUSION

For the foregoing reasons, Microsoft respectfully requests that the Court deny Google's motion for stay.

13

Respectfully submitted,

/s/ *Aaron M. Panner*

Aaron M. Panner
Alex A. Parkinson
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*

November 1, 2024

14

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-6256, 24-6274

I am the attorney or self-represented party.

**This brief contains 2,799 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
 [ ] it is a joint brief submitted by separately represented parties;
 [ ] a party or parties are filing a single brief in response to multiple briefs; or
 [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Aaron M. Panner    **Date** November 1, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on November 1, 2024, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Aaron M. Panner*
Aaron M. Panner