Nos. 24-6256, 24-6274

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

---

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, *et al*.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

---

## APPELLANTS' OPENING BRIEF

---

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
Natalie Salmanowitz
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

November 27, 2024

*Counsel for Defendants-Appellants*

---

*(Additional Counsel Listed on Signature Page)*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies the following:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Commerce Ltd. is an indirect subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Ireland Ltd. is an indirect subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Asia Pacific Pte. Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Date: November 27, 2024

/s/ Neal Kumar Katyal
Neal Kumar Katyal

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ........................................................................vi

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................6

STATEMENT OF THE ISSUES FOR REVIEW ........................................6

STATUTORY PROVISIONS INVOLVED ..................................................7

STATEMENT OF THE CASE ......................................................................7

    I.      Factual Background ..........................................................................7

          A.     Google Develops Android As An Open Alternative
                    To Compete Against Apple ........................................................7

          B.     Epic Games Seeks To Gain Billions Through A
                    "Highly Choreographed Attack on Apple and Google" ...............11

    II.     Procedural Background ..................................................................12

          A.     Epic's Lawsuit Against Apple ..................................................13

          B.     Epic's Lawsuit Against Google ................................................15

          C.     Jury Trial ....................................................................................17

          D.     Remedial Proceedings ..............................................................22

SUMMARY OF ARGUMENT ....................................................................27

STANDARD OF REVIEW ..........................................................................22

ARGUMENT ................................................................................................31

    I.      The Liability Verdict Should Be Reversed ...............................31

# TABLE OF CONTENTS—Continued

Page

A. *Epic v. Apple* Established That Apple And Google Compete, And Issue Preclusion Prevented Epic From Relitigating That Finding ................................................. 31

1. The *Apple* Court's Finding That Google And Apple Compete Was Preclusive .......................................... 31

2. The District Court Wrongly Permitted Epic To Avoid Preclusion ................................................................. 37

B. The District Court Erred By Refusing To Instruct The Jury On The Legal Requirements For A Single-Brand Aftermarket ........................................................................ 40

C. The District Court Improperly Instructed the Jury On The Rule of Reason Framework ..................................... 46

1. The Court Improperly Blocked The Jury From Considering Procompetitive Benefits In Related Product Markets ................................................................. 47

2. The Court Improperly Permitted The Jury To Engage In A Free-For-All Balancing ................................ 52

D. The District Court Erred By Holding A Jury Trial On Purely Equitable Claims .................................................. 52

E. The UCL Verdict Must Be Vacated Because It Is Based On The Flawed Jury Verdict ................................. 58

II. The Injunction Should Be Vacated ............................................ 58

A. The Catalog-Access and App-Store-Distribution Remedies Should Be Struck From The Injunction ........ 58

1. The District Court Exceeded Its Authority By Requiring Google To Create And Offer New Services For Its Competitors ................................................ 59

iv

## TABLE OF CONTENTS—Continued

Page

    2.    The District Court Violated *Optronic* By Imposing Duty-To-Deal Remedies Without Finding A Causal Connection To The Anticompetitive Conduct ..................................................... 64

    3.    The District Court Erred By Engaging In Direct Price Regulation ................................................................. 68

    4.    The District Court Erred By Failing To Provide Specific Guidance Regarding The Duty-To-Deal Remedies .................................................................... 69

  B.    The District Court Failed To Make Findings Sufficient To Support Its Injunction ............................................. 74

    1.    The District Court Did Not Explain Why Less Burdensome Contractual Restrictions Would Not Suffice ........................................................................ 75

    2.    The District Court Impermissibly Refused To Consider the State Settlement ............................................. 79

    3.    The District Court Failed To Reckon With The Serious Security Interests of Non-Parties ........................... 82

    4.    The District Court Failed To Address the Intellectual Property Interests of Non-Parties .................... 86

  C.    Epic Failed To Prove That It Has Article III Standing To Seek A Nationwide Injunction ................................. 87

CONCLUSION ....................................................................................... 93

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Aerotec Int'l v. Honeywell Int'l,*
836 F.3d 1171 (9th Cir. 2016) ..................................................60

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
166 F.3d 772 (5th Cir. 1999) ...................................................41

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
458 U.S. 592 (1982) .................................................................80

*Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP,*
592 F.3d 991 (9th Cir. 2010) ..............................................71, 72

*Avaya Inc., RP v. Telecom Labs, Inc.,*
838 F.3d 354 (3d Cir. 2016) ....................................................41

*Bd. of Trade of the City of Chi. v. United States,*
246 U.S. 231 (1918) .................................................................49

*Beacon Theatres, Inc. v. Westover,*
359 U.S. 500 (1959) ............................................................53, 55

*Bernhardt v. Los Angeles County,*
339 F.3d 920 (9th Cir. 2003) ...................................................82

*Boyle v. United Techs. Corp.,*
487 U.S. 500 (1988) .................................................................45

*Burton v. Armontrout,*
975 F.2d 543 (8th Cir. 1992) ...................................................74

*California v. Trump,*
963 F.3d 926 (9th Cir. 2020) ...................................................88

*Chuman v. Wright,*
76 F.3d 292 (9th Cir. 1996) .....................................................46

v

## TABLE OF AUTHORITIES—Continued

Page(s)

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).............................................................88

*Clements v. Airport Auth. of Washoe Cnty.,*
69 F.3d 321 (9th Cir. 1995) ................................................38

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ......................................74, 75, 78, 81

*Coronavirus Reporter v. Apple, Inc.,*
85 F.4th 948 (9th Cir. 2023) ........................................39, 42

*Del Webb Communities, Inc. v. Partington,*
652 F.3d 1145 (9th Cir. 2011) ......................................69, 70

*Dunmore v. United States,*
358 F.3d 1107 (9th Cir. 2004) .....................................54, 55

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992)............................................................40

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)....................................................75, 80

*Epic Games, Inc. v. Apple Inc.,*
559 F. Supp. 3d 898 (N.D. Cal. 2021).......................*passim*

*Epic Games, Inc. v. Apple Inc.,*
67 F.4th 946 (9th Cir. 2023) .....................................*passim*

*Far Out Prods., Inc. v. Oskar,*
247 F.3d 986 (9th Cir. 2001) .............................................31

*FN Herstal SA v. Clyde Armory Inc.,*
838 F.3d 1071 (11th Cir. 2016) ...................................55, 56

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000)............................................................91

vi

**TABLE OF AUTHORITIES—Continued**

<u>Page(s)</u>

*Frost v. BNSF Ry. Co.*,
   914 F.3d 1189 (9th Cir. 2019) .........................................................46

*FTC v. Enforma Natural Prods., Inc.*,
   362 F.3d 1204 (9th Cir. 2004) .........................................................73

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .............................................38, 39, 49

*Galvez v. Jaddou*,
   52 F.4th 821 (9th Cir. 2022) ............................................................87

*Gardner v. Nike, Inc.*,
   279 F.3d 774 (9th Cir. 2002) ...........................................................86

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) .........................................................................71

*Hendricks v. Bank of Am., N.A.*,
   408 F.3d 1127 (9th Cir. 2005) ...........................................................6

*Howard v. City of Coos Bay*,
   871 F.3d 1032 (9th Cir. 2017) .........................................................33

*Hunter v. County of Sacramento*,
   652 F.3d 1225 (9th Cir. 2011) .........................................................51

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ....................................29, 63, 64, 68

*In re Marshall*,
   600 F.3d 1037 (9th Cir. 2010) .........................................................39

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
   958 F.3d 1239 (9th Cir. 2020) .........................................................48

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
   937 F.3d 1359 (Fed. Cir. 2019) .......................................................38

## TABLE OF AUTHORITIES—Continued

Page(s)

*Jenkins v. Union Pac. R.R. Co.*,
  22 F.3d 206 (9th Cir. 1994) ....................................................43, 51

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ............................................58

*Kramer v. Banc of Am. Sec., LLC*,
  355 F.3d 961 (7th Cir. 2004) ..............................................56

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
  762 F.3d 867 (9th Cir. 2014) ......................................74, 75

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...................................................47, 49

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) ......................................75, 78

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...........................................................89

*Massachusetts v. Microsoft*,
  373 F.3d 1199 (D.C. Cir. 2004).........................60, 62, 65, 89

*McCarthy v. Fuller*,
  810 F.3d 456 (7th Cir. 2015) .............................................74

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ...........................................64

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006) .............................................86

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
  833 F.2d 1342 (9th Cir. 1987) ...........................................48

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024)...............................................*passim*

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*,
　462 P.3d 461 (Cal. 2020)...................................................................52

*NCAA v. Alston*,
　594 U.S. 69 (2021)......................................................................*passim*

*NCAA v. Bd. of Regents of Univ. of Okla.*,
　468 U.S. 85 (1984)................................................................47, 49

*Newcal Indus., Inc. v. Ikon Office Sol'n*,
　513 F.3d 1038 (9th Cir. 2008) ...........................................41

*Novell, Inc. v. Microsoft Corp.*,
　731 F.3d 1064 (10th Cir. 2013) ...........................................60, 62, 72

*O'Bannon v. NCAA*,
　802 F.3d 1049 (9th Cir. 2015) ...........................................46, 47, 48

*Ohio v. Am. Express Co.*,
　585 U.S. 529 (2018)...................................................34, 39, 52

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
　20 F.4th 466 (9th Cir. 2021) ...........................................29, 63, 64

*O'Shea v. Littleton*,
　414 U.S. 488 (1974)..................................................30, 91

*Pac. Bell Tel. Co. v. linkLine Commc'ns Inc.*,
　555 U.S. 438 (2009)...................................................60, 63, 72

*Parklane Hosiery Co. v. Shore*,
　439 U.S. 322 (1979)...................................................32

*Peralta v. Dillard*,
　744 F.3d 1076 (9th Cir. 2014) (en banc) ...........................................40

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
　104 F.3d 811 (6th Cir. 1997) ...........................................41

## TABLE OF AUTHORITIES—Continued

Page(s)

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)...........................................................................69

*SEC v. Jensen*,
   835 F.3d 1100 (9th Cir. 2016) ...................................................52, 53

*SEC v. Stein*,
   906 F.3d 823 (9th Cir. 2018) ...........................................................31

*Skillsky v. Lucky Stores, Inc.*,
   893 F.2d 1088 (9th Cir. 1990) .........................................................17

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
   188 F.3d 11 (1st Cir. 1999)...............................................................41

*Snoqualmie Indian Tribe v. Washington*,
   8 F.4th 853 (9th Cir. 2021) ..............................................................32

*Standard Oil Co. of Cal. v. Arizona*,
   738 F.2d 1021 (9th Cir. 1984) .........................................................52

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)..............................................................................49

*Stern v. Marshall*,
   564 U.S. 462 (2011)..........................................................................40

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ..........................................75, 82, 87

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)..........................................................................91

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..........................................................................91

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) .........................................................46

## TABLE OF AUTHORITIES—Continued

Page(s)

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)...................................................................53

*Union Pac. R.R. Co. v. Mower*,
219 F.3d 1069 (9th Cir. 2000) ..................................................70

*United States v. $11,500.00 in U.S. Currency*,
710 F.3d 1006 (9th Cir. 2013) ..................................................82

*United States v. First Nat'l Bank of Circle*,
732 F.2d 1444 (9th Cir. 1984) ..................................................85

*United States v. Glaxo Grp. Ltd.*,
410 U.S. 52 (1997).............................................................63, 69

*United States v. Holtzman*,
762 F.2d 720 (9th Cir. 1985) ..............................................69, 73

*United States v. Lewis*,
67 F.3d 225 (9th Cir. 1995) ......................................................50

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc).....................................64

*United States v. Philadelphia Nat'l Bank*,
374 U.S. 321 (1963)..................................................................48

*U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*,
89 F.4th 1126 (9th Cir. 2023) .......................................68, 74, 85

*Verizon Commc'ns Inc v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)..........................................................*passim*

*Yowell v. Abbey*,
532 F. App'x 708 (9th Cir. 2013) ................................74, 75, 76

**STATUTES:**

15 U.S.C. § 18 ...............................................................................48

## TABLE OF AUTHORITIES—Continued

Page(s)

28 U.S.C. § 157(e) ................................................................55

28 U.S.C. § 1292(a)(1) ...........................................................6

28 U.S.C. § 1331 ....................................................................6

28 U.S.C. § 1367 ....................................................................6

**RULES:**

Fed. R. Civ. P. 53(a)(2) .........................................................73

Fed. R. Civ. P. 65(d)(1)....................................................69, 74

**OTHER AUTHORITIES:**

Patrick E. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex. L. Rev. 47 (1977) ...........................57

David McGowan, *Innovation, Uncertainty, and Stability in Antitrust Law*, 16 Berk. Tech. L.J. 729 (2001) ................................65

18 Moore's Federal Practice – Civil § 132.01[3] ...................32

Restatement (Second) of Judgments (1982)
§ 27 cmt. c.........................................................................33
§ 27 cmt. d.........................................................................37

## INTRODUCTION

This case involves an extraordinary attempt by a lone competitor to use the federal judiciary to restructure the day-to-day operations of Google's app store, Google Play, and to unilaterally reshape markets with consequences for millions of non-parties. If not reversed, the injunction and the flawed liability ruling underlying it will directly undercut Google's efforts to compete against Apple and the iPhone, a competitive dynamic that has spurred innovation and brought concrete benefits to consumers around the world.

Play operates on Google's mobile operating system, Android, which launched in 2008. From the beginning, Google offered Android as an open alternative to Apple's closed operating system, iOS. While Apple refuses to license iOS, Google makes Android available to device manufacturers for free. While Apple requires that downloads of apps go through its own App Store, Google empowers users to download apps through any store they choose or even directly from a web browser.

Android's open philosophy offers users and developers wider choices but comes with major tradeoffs. Google has less control over the Android ecosystem, limiting Google's ability to directly protect users from encountering malware and security threats when they download apps. Google has designed and operated Play to ensure that Android users have a secure, trusted environment to obtain apps and

1

in-app content, which is an essential component of consumer satisfaction with a mobile device and key to keeping Android as a robust competitor against Apple.

Today, the Play store hosts over 500,000 app developers. The plaintiff in this case, Epic Games, used to be one of those developers. In 2020, Epic launched its popular game *Fortnite* on the Play store. As part of that launch, Epic gained access to hundreds of millions of Play users globally and received all the services available to Play-hosted apps, including protection against malware and other malicious or inappropriate content, customer support services, secure payment processing, options for building, testing, and gathering pre-release feedback for apps, tools to manage updates and distribution, and game performance insights.

Epic was happy to reap the benefits of Play's user base and services but thought that Google should distribute Epic's apps for free, and that Apple's App Store should do the same. So Epic took matters into its own hands. It embedded secret code in the versions of *Fortnite* on Play and the App Store to bypass the stores' billing systems, which it activated in a highly publicized campaign it called "Project Liberty." Google and Apple promptly removed *Fortnite* from their respective stores for Epic's intentional noncompliance with applicable terms of service.

Epic responded by filing antitrust suits against Google and Apple on the same day. But Epic had a major problem: Because Google and Apple compete so fiercely, Epic could not prevail on its antitrust claims if both companies' app stores were in

2

the same market.  So Epic tried to divide and conquer, alleging that each company monopolized app distribution and in-app payment markets on its own operating systems.  In both cases, Epic sought exclusively injunctive relief.

Epic's case against Apple proceeded to trial first.  After a bench trial, the *Apple* court issued a comprehensive opinion finding Apple not liable for any antitrust violations—in large measure because the App Store competed against Play for gaming transactions.  *Epic Games, Inc. v. Apple Inc.* (*Apple I*), 559 F. Supp. 3d 898, 935 (N.D. Cal. 2021).  This Court affirmed in relevant part.  67 F.4th 946 (9th Cir. 2023) (*Apple II*).

This case took a different turn from *Epic v. Apple* at every step.  The District Court here insisted on holding a jury trial on Epic's injunctive-relief claims.  It refused to treat as preclusive the finding that Apple and Google compete—even after this Court affirmed that finding—and allowed Epic to relitigate that question on a blank slate.  And, when the time came to instruct the jury, the District Court omitted the very elements of Epic's burden of proof on which its case against Apple foundered—even though this Court had already affirmed that the *Apple* court got the law right.  The result of these successive legal errors was a jury verdict against Google for conduct that—in Epic's words—was "very similar" to Apple's conduct that a separate district judge and this Court both found lawful.  Allowing inconsistent results across Epic's two cases would mean that Google—which has fostered an

3

open ecosystem—would be hamstrung in its ability to compete, while Apple continues to press the full advantages of its entirely closed ecosystem.

At the remedies phase, things went from bad to worse. The Supreme Court has emphasized that, when remedying antitrust violations, "caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). Here, the District Court threw caution to the wind. At the request of Epic—a single, self-interested competitor—the court adopted a sweeping, nationwide injunction fundamentally altering Google's relationships with Play's users, developers, and other partners throughout the United States.

The court imposed on Google unprecedented and legally unfounded duties to deal directly with competing app stores: Google must develop, build, and offer for three years new services and functionality *designed specifically for rivals' Android app stores*. Google must act as a marketer for its competitors by directly distributing their stores through the Play store itself. Google must stock its competitors' stores by making Play's catalog of apps—built over a decade-plus of investment—appear in their stores. And Google must then serve as a back-end administrator for their stores, providing downloads to their users on demand.

This injunction violates foundational limits on an antitrust court's authority. The Supreme Court has repeatedly instructed district courts not to appoint themselves as central planners overseeing product design choices. And this Court

4

has instructed that courts may not eliminate competitive advantages without finding a significant causal connection to anticompetitive conduct. The District Court dismissed this causation inquiry as irrelevant, but it plays a crucial role in antitrust remedies: Without it, a court could deprive a defendant of advantages derived *largely or entirely through legitimate competition*. This Court should firmly reject that startling expansion of antitrust liability.

Google also extensively explained below that the injunction would harm millions of users by creating new security threats and would infringe on the intellectual property rights of hundreds of thousands of non-party app developers, whose apps would suddenly appear in potentially hundreds of unknown stores with whom they have no relationship and through which they may have no desire to distribute. The District Court analyzed none of this before issuing the injunction.

The District Court's eagerness to impose this injunction in Epic's case is even more alarming because, before trial, Google agreed to make significant changes to the very conduct Epic was challenging in a settlement with all 50 States, the District of Columbia, and two territories acting as *parens patriae*. Although that settlement was entered into on behalf of every Android user in the country, the District Court opted to give preferential treatment to the wishlist of a single competitor—while refusing to review the States' settlement for nearly a year (and counting). There is no finding that the terms of the States' settlement do not fully redress any injury Epic

claims, which was rooted in the same challenged conduct. Remarkably, the District Court did not even *analyze* whether Epic had Article III standing to seek injunctive relief.

It is time for this Court to step in. The jury verdict rests on an impermissible foundation given the District Court's series of independent reversible legal errors before and during the trial. And the resulting injunction is independently unprecedented, unreasoned, and unlawful. This Court should reverse.

## JURISDICTIONAL STATEMENT

Statutory subject-matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1367, but certain aspects of the injunction lack an Article III foundation because Epic failed to prove its standing to seek prospective relief. *See infra* pp. 87-93. After entry of a permanent injunction on October 7, 2024, 1-ER-3-6, Google timely appealed, 7-ER-1793; 8-ER-2016. Appellate jurisdiction exists under 28 U.S.C. § 1292(a)(1); *see Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1134 (9th Cir. 2005).

## STATEMENT OF THE ISSUES FOR REVIEW

1.      Whether the jury verdict finding Google liable for antitrust violations is legally defective because the District Court allowed Epic to relitigate preclusive findings from *Epic v. Apple*; omitted a critical aspect of Epic's burden of proving that the relevant markets excluded Apple; misinstructed the jury regarding the Rule

6

of Reason framework; and insisted on holding a jury trial for claims seeking purely injunctive relief.

2.     Whether the injunction is legally defective because the District Court required Google to create and offer brand new services specifically for its competitors without finding a causal link to anticompetitive conduct; made no findings of fact on critical, disputed issues that were highly relevant to its decision to grant injunctive relief; and awarded Epic a nationwide injunction without finding that Epic had Article III standing to seek such relief.

## STATUTORY PROVISIONS INVOLVED

Relevant statutory provisions are reprinted in the addendum to this brief.

## STATEMENT OF THE CASE

### I.     Factual Background

#### A.     Google Develops Android As An Open Alternative To Compete Against Apple.

Google and Apple have long been locked in fierce competition over mobile devices and operating systems, including competing to ensure their consumers have access to the apps they want on those devices.  In 2008, Google launched its Android mobile operating system.  5-ER-1061.  Google believed the future of smart devices required an operating system that was not only powerful, but also "open and could help inspire innovation."  6-ER-1302.  It made Android publicly available and free for anyone to access, modify, and distribute.  5-ER-1060.  Android's open system

7

has spurred innovation: Android phones were the first to feature innovations like large screen displays, waterproofing, and wireless chargers. 5-ER-1064. Android phones are also available for every budget, starting with $50 models. 5-ER-1065-66.

Apple has taken a very different approach. Its mobile operating system, known as "iOS," is a "walled garden"—a self-contained ecosystem that gives Apple complete control over every aspect of its devices. 5-ER-1082-84; 5-ER-1154-55. Apple does not license iOS to any other original equipment manufacturer (OEM), and its iPhones and iPads are among the higher price options for consumers.

Google and Apple each realized early on that a high-quality app store would be critical to competing in the emerging market for mobile devices. 5-ER-1078; 6-ER-1370-71. Google's first store, Android Market, was "very basic" and "didn't stack up well" against Apple's App Store. 6-ER-1309-11. As a result, many users chose iPhones over Android, prompting Google to re-invest in and relaunch its store as Google Play. *Id.*

Today, the different philosophies that Google and Apple bring to their operating systems are reflected in the two companies' competing approaches to app stores. Consistent with Android's open ecosystem, Google allows Android's OEMs and mobile carriers to pre-install third-party app stores on Android devices. For example, Samsung, the largest Android OEM, operates the Galaxy Store, which it

8

preinstalls on the home screen of all of its devices.  5-ER-1010.  Through a process called "sideloading," Android users can also download apps, app stores, and other content directly from the internet.  5-ER-983.  Apple, by contrast, has a single proprietary store for all its devices, the App Store, and has not permitted sideloading or rival app stores on iOS.

To stay competitive, Google has invested tens of billions of dollars to make the Play store safe, accessible, and reliable.  7-ER-1639; *see also* 6-ER-1241-42; 6-ER-1256; 5-ER-1097.  But Apple's closed system gives it certain competitive advantages.  *See* 6-ER-1369-71.  Apple exercises full control over user security: Users can download apps only from Apple's App Store and cannot sideload apps. 5-ER-1082-83.  Apple decides which apps are preloaded on every iPhone, ensuring that users have access to certain apps right out of the box and allowing Apple to promote its own apps (like Apple Maps and Apple News).  *See* 5-ER-1073-74. Apple's requirement to use the App Store also reduces the investment required from developers because they only need to create one version of their app across all iPhones.  *See* 5-ER-1069.  To compete, Google also reviews all apps on Play for malware before they are published and strictly enforces privacy, security, and content policies.  5-ER-1138-50; 5-ER-1233.  And to ensure users can securely enjoy Android's greater flexibility, Google uses security warnings to notify users of the

9

risk when users choose to download content from an online source outside Google's control.  5-ER-1010.

Google's in-app payment solution, Google Play Billing, gives users a safe and secure way to purchase digital goods and provides developers with a range of payment, billing, and security features.  6-ER-1393-1401.  Ninety-seven percent of developers offer only free apps on Play, 5-ER-1096; those developers pay only a $25 registration fee, 6-ER-1405.  For apps that charge users, Google generally collects a 15-30% fee for sales of digital goods, which pays for the significant range of services that Play provides from pre-release development through improving performance and user engagement.  6-ER-1404.  This is the same general fee Apple collects for in-app purchases in the App Store.  6-ER-1274.  Android's business model enables Google to provide Play's services for all apps, and encourages the availability of free apps that help make Android more attractive and drive traffic to the entire Android ecosystem.  5-ER-1173; 6-ER-1296.

Consistent with its open approach, Google encourages other manufacturers and carriers to use Android.  That means that Google had to negotiate with many parties to forge a thriving ecosystem on Android and minimize app compatibility issues across devices.  Google's contractual agreements and incentives help ensure that apps are compatible on all Android devices, that users receive the latest security updates for the Android software, and that all Android devices come equipped with

a set of high quality apps offering essential functionality as well as at least one trusted app store: Play. *See infra* pp. 19-20 (describing these contracts in detail). But, unlike Apple and its App Store, Google has never required any OEM or carrier to feature Play as the *exclusive* pre-installed app store on any Android device as a condition of using Android. As of 2021, over 65% of Android devices arrived with both Play *and* an alternative app store pre-installed. 7-ER-1640.

## B. Epic Games Seeks To Gain Billions Through A "Highly Choreographed Attack on Apple and Google."

Epic Games is a billion-dollar gaming app developer and operator of a competing app store. 5-ER-1182; 5-ER-975; 5-ER-1199.

Epic created a mobile version of its popular game *Fortnite* that it wanted to distribute to users who download apps through Google Play and the Apple App Store. 5-ER-1183; 5-ER-1201. Like other digital platforms where Epic distributes its games—including Microsoft's Xbox, Sony's Playstation, and Nintendo's Switch—the Play store and Apple's App Store at the time collected a 30% service fee on digital gaming transactions like those in Epic's games. 5-ER-1195-97. Epic wanted access to users through Play and the App Store without paying that service fee to either Google or Apple. 5-ER-1169; 5-ER-1171-72; 5-ER-1214-16. Google, like Apple, refused Epic's requests.

In response, Epic launched a "highly choreographed attack on Apple and Google," dubbed "Project Liberty," seeking to impose "systematic change[s]" on

11

each company that would result in "tremendous monetary gain and wealth" for Epic. *Apple I*, 559 F. Supp. 3d at 935[1]; *see also* 5-ER-1216.

Epic misled Google in 2020 by claiming it would launch *Fortnite* on Play in compliance with Play's policies. 5-ER-987-88; 5-ER-1178-81. At Epic's request (and at no additional cost to Epic), Google provided Epic "24-hour support" to expedite the process. 6-ER-1346-48. Shortly after *Fortnite*'s successful launch, Epic released a secret code circumventing Play's payment policies. 5-ER-985-986; 5-ER-991-992; 5-ER-1203-08. Epic executed the same scheme against Apple. 5-ER-1213. Each company removed *Fortnite* after learning that Epic violated the store's terms of service. 5-ER-991; 6-ER-1288.

## II. Procedural Background

Epic responded to the removal of *Fortnite* by filing two parallel lawsuits on the same day in the Northern District of California—one against Google and one against Apple—raising claims under the Sherman Act, the California Cartwright Act, and California's Unfair Competition Law (UCL). *Apple I*, 559 F. Supp. 3d at 921-922, 940; 7-ER-1728. These lawsuits were accompanied by an extensive (and expensive) public relations campaign designed to portray Epic as "sympathetic" and

---

[1] Judge Gonzalez Rogers made detailed findings regarding Project Liberty. *See Apple I*, 559 F. Supp. 3d at 935-941.

to mask that Epic was trying to avoid compensating Google and Apple for future services. 6-ER-1325-37. In each case, Epic sought purely injunctive relief.

Epic filed separate suits because it needed to isolate the two competitors from each other by asserting they were not in the same product market. If both companies were in the relevant market, each company's market share would be significantly lower, undercutting Epic's antitrust claims. *See Apple I*, 559 F. Supp. 3d at 988-999, 1029. Epic's case against Apple thus alleged markets for app distribution and in-app purchases that excluded Google, and its case against Google alleged the same markets but excluded Apple. *Apple II*, 67 F.4th at 970; 4-ER-928-929. Epic has never claimed that Google has monopoly power if Apple is included in the relevant markets.

### A. Epic's Lawsuit Against Apple

In its case against Apple, Epic challenged a variety of alleged restraints including tying between the iOS app distribution platform and in-app payment processing system, *Apple I*, 559 F. Supp. 3d at 1044, and provisions prohibiting developers from steering users to payment options off the App Store, *id.* at 993. Epic advanced two "single-brand markets": "iOS app distribution and iOS in-app payment solutions." *Apple II*, 67 F.4th at 970 (emphasis omitted). According to Epic, Apple's App Store competed in its own market, not with Android app stores like Play. *See id.* Apple argued against these markets, citing evidence that it actively

13

competes with Android for developers and users. *See, e.g.*, *Apple I*, No. 4:20-cv-5640-YGR (N.D. Cal.) ("*Apple I* Docket"), Dkt. 410 at 55 ¶ 229, 56 ¶¶ 235-238, 81 ¶¶ 334-335. Because Epic sought only injunctive relief, the district court held a bench trial. *Apple II*, 67 F.4th at 969-970.

The *Apple* district court ruled against Epic on each of its antitrust claims. In findings of fact and conclusions of law spanning 249 pages, the court rejected Epic's claim that the relevant markets were Apple-only markets and explained (several times) that Google and Apple compete for users in a market for mobile gaming transactions—a market that includes mobile gaming apps and in-app purchases on those apps. *Apple I*, 559 F. Supp. 3d at 977-978; *see id.* at 955-956, 958-959, 976-977. In fact, the court found Google Play to be Apple's "main competitor" in the relevant market. *Id.* at 922, 987, 1021 & n.580, 1023-26, 1030. The court entered judgment against Epic on all antitrust claims. *Id.* at 1068-69.[2]

Epic appealed, again arguing that Apple-only markets for "iOS app distribution and iOS in-app payment solutions" should apply. *Apple II*, 67 F.4th at 973. This Court rejected Epic's proposed markets, holding that the district court's finding of a mobile-games transactions market "stands on appeal." *Id.* at 981; *see id.* at 966, 980-981.

---

[2] The court held that Apple's anti-steering provisions violated the UCL and enjoined Apple from enforcing them. *Apple I*, 559 F. Supp. 3d at 1056. This Court affirmed. *Apple II*, 67 F.4th at 999.

### B.     Epic's Lawsuit Against Google

Epic's parallel suit against Google likewise asserted that Apple and Google do not compete in the relevant markets for app distribution and in-app purchases. 4-ER-928-929. Epic alleged that certain provisions of Google's agreements with OEMs and app developers permitted Google to unlawfully maintain monopoly power and unreasonably restrained trade in both markets. 4-ER-935-948. Epic further alleged that Google had unlawfully tied Play to Google Play Billing. 4-ER-942-943; 4-ER-949-951.[3]

A putative developer class and a putative class of consumers filed suits around the same time raising similar antitrust and competition challenges based on Google's contracts with OEMs and developers. The Judicial Panel on Multidistrict Litigation consolidated those cases and Epic's into a single MDL. *See* 4-ER-953-956. Subsequently, a group of States and another developer asserting similar claims joined the MDL.

In each of the other suits, the plaintiffs sought damages and a jury trial. The District Court decided and then repeatedly stressed that all antitrust claims—including Epic's—would be tried together in a single trial. 4-ER-919-920; 4-ER-

---

[3] Google countersued for breach of contract based on Epic's violation of Google's terms of service. Epic raised an illegality defense. After trial, Epic ultimately stipulated that it was liable, claiming it wanted to avoid "delay" on "the entry of a final judgment." 2-ER-216-218.

15

897-898.  Because Epic's liability theories were virtually identical to these other plaintiffs who had demanded and were indisputably entitled to a jury for their damages claims, Google's view was that all plaintiffs' claims could be tried in a single combined jury trial.  4-ER-902.

As the trial approached, however, all of the suits besides Epic's settled.  The putative developer class settled with Google on May 25, 2022, 4-ER-915, and the States and putative consumer class settled on October 12, 2023, 4-ER-865.  On October 12, 2023, Google notified the Court that if Google and the remaining developer (Match) reached a settlement, "there is no jury."  4-ER-862-863.  Google and Match then settled on October 31, 2023, *see* 4-ER-859, leaving only Epic's injunctive-relief claims against Google.  The next day, Google filed a motion requesting a bench trial on Epic's injunctive-only claims, the only remaining claims. 4-ER-850-856.

Google also timely filed a motion in limine to preclude Epic from arguing that Google does not compete with Apple, citing *Apple I*'s market definition ruling.  4-ER-873-875.  By then, this Court had affirmed the *Apple* district court's finding that Google Play and the Apple App Store compete in the market for mobile gaming transactions as well as the judgment against Epic on its parallel antitrust claims against Apple.  *See Apple II*, 67 F.4th at 973-981.

16

The District Court denied both motions, concluding that Google had "consented" to a jury trial on Epic's injunctive-relief claims in a submission filed jointly with all the MDL plaintiffs almost six months earlier, 1-ER-146-147, and that Google had improperly raised preclusion in a motion in limine instead of its summary judgment motion argued at the same hearing. 1-ER-158-159.[4] The District Court also stated, without explanation, that Google had not demonstrated "the elements of collateral estoppel." *Id.*

The District Court generally denied the parties' summary judgment motions, with one notable exception: After Epic conceded that it was not seeking to hold Google liable for its policy of refusing to distribute competing app stores through Play, the District Court held that Google could not be liable for its refusal to deal directly with its competitors. 1-ER-156; *see Verizon Commc'ns Inc v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).

## C. Jury Trial

The District Court held a jury trial over Google's objection. Epic's theory at trial was that Google had impaired competition by other Android app stores and in-app billing service providers through its use of security warnings and its contracts with OEMs, carriers, and developers. *See, e.g.*, 6-ER-1464-67; 6-ER-1469-72.

---

[4] *But see Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1095-96 (9th Cir. 1990) (affirming preclusion argument raised in motion in limine).

Google's case emphasized that it competes fiercely, especially with Apple, to ensure Play succeeds. The jury heard testimony from developers and from Apple itself about the competition between Google, Apple, and their app stores. *See, e.g.*, 6-ER-3072; 6-ER-1411. When either Apple or Google innovates in its app store, the other responds by modifying content, features, and pricing to prevent users and developers from switching from one platform to another. 5-ER-1003-06; 5-ER-1022-23; 5-ER-1107-09; 6-ER-1313-18; 6-ER-1351-57; 6-ER-1411-12. The trial showed that both companies use revenue from their in-app payment solutions to support app store innovation, 6-ER-1366-69; 6-ER-1404-07, and that app stores with fees under 15%—including Epic's—were unprofitable. 5-ER-978-980; 5-ER-995.

The jury also heard testimony that Google's commitment to maintaining an open ecosystem places Google at a disadvantage when competing with Apple because it means that an app created for one Android phone may be incompatible with another Android phone. 5-ER-1012; 5-ER-1065-66. An open system also creates more opportunities for users to inadvertently download malware and fraudulent or offensive conduct—as Apple repeatedly points out to users. 5-ER-1145-48; 5-ER-1152-55; *see also* 5-ER-1084 (testimony about Apple executives disparaging Android); 5-ER-1230-32 (Epic's expert conceding that Apple marketing depicts Android phones as being less safe than iPhones).

Undisputed evidence showed that some developers prioritize Apple's App Store when launching their apps by providing preferred timing or better features. *See* 5-ER-1005-06; 5-ER-1012-19; 5-ER-1115-20; 6-ER-1355-57. And Epic's own expert conceded Android's share of the United States phone market went down 10% between 2016 and 2021, while Apple's share went up the same amount. 6-ER-1259; *see also* 5-ER-1134-35.

Google explained how its challenged conduct and contracts help Google provide a strong response to this competition from Apple. Google's Mobile App Distribution Agreement (MADA), 7-ER-1612-34, offered financial and licensing incentives for OEMs and carriers to provide a seamless "out of the box" experience for users, including making devices compatible with apps distributed on other Android devices so a single version of an app works consistently across the Android ecosystem. 5-ER-1071-73; 5-ER-1066-68; 5-ER-1054-55. In exchange, the MADA required that Play be preinstalled on a device's home screen, but did not preclude preinstalling other app stores on the home screen as well. 5-ER-1076; 6-ER-1281.

Google's Revenue Sharing Agreements (RSAs) offered a financial incentive to help ensure OEMs and carriers invested in their devices and installed periodic security updates to keep Android as a competitive alternative to Apple's iOS. 5-ER-1058-59; 5-ER-1086. While certain RSA incentives were available only to OEMs or carriers who agreed to make Google Play the only preinstalled app store on a

19

device-by-device basis, they could choose not to enroll new devices in this program at any time, and these agreements affected only a small number of devices. 5-ER-1048; 6-ER-1285-86.

Finally, for developers who charged users for app downloads or in-app purchases of digital goods, Google's Developer Distribution Agreement (DDA) required payment via Google Play Billing and charged a 15-30% service fee. 6-ER-1392; 6-ER-1404. This model attracted developers and encouraged free content that made Android more attractive to users in its competition against Apple. 5-ER-1096; 5-ER-1168-69; 5-ER-1172. Some larger developers also entered into Games Velocity Agreements, which financially incentivized them to launch on Play at the same time as on other app stores. 5-ER-1000-01; 5-ER-1165-66.

When Google sought to preserve its appeal rights by filing a Rule 50(a) motion for judgment as a matter of law, the District Court told Google that it could file only two pages of bullet points and have a few minutes of argument. 6-ER-1299-1300; 1-ER-60-70. Google's attempt to comply with the requirements in the federal rules for objecting to instructional errors was met with similar hostility, as the court took issue with its counsel's efforts to preserve its objections. 1-ER-115 ("Don't tell me what the rules say. You're not going to waive anything.").[5]

---

[5] Over Google's objection, the District Court instructed the jury that it could make adverse inferences about conversations Google employees may have had using Google's instant messaging service, Google Chats. Google's normal document

Ultimately, the jury returned a verdict against Google on all of Epic's antitrust claims. 1-ER-52-57. Departing from *Apple*, the jury accepted Epic's argument that Apple and Google are not in competition in the relevant markets. 1-ER-52-53. The jury then applied its Android-only market definitions throughout the verdict. 1-ER-53-57. Specifically, the jury found that, in those markets, (1) Google willfully acquired or maintained monopoly power in violation of Section 2 of the Sherman Act; (2) Google unlawfully restrained trade through the DDAs, Games Velocity Program Agreements, MADAs, and RSAs in violation of Section 1 of the Sherman Act and the California Cartwright Act; (3) Google unlawfully tied the use of Play to Google Play Billing in violation of Section 1 of the Sherman Act and the Cartwright Act; and (4) that Epic "was injured" as a result of these "violation[s]." 1-ER-52-57.[6] The jury did not make any further findings. *See id.* Google filed a renewed motion

---

retention policy stores chats for 24 hours (under a "history off" setting), 4-ER-910, but Google instructs employees subject to a litigation hold to avoid using Chats for topics relevant to the hold and to preserve Chats if they do, 4-ER-910-911; 5-ER-1057. Google's litigation hold in this case applied its standard practices. 4-ER-911; *see also* 4-ER-905-907. Some Google employees did not switch their history to "on" after receiving the September 2020 litigation hold, 4-ER-881-891, but most of Epic's case involved *pre-August 2020 conduct*. Yet, the instruction permitted jurors to infer that missing chats may have supported Epic's claims. *E.g.*, 6-ER-1422. Google disagrees strongly with the District Court's ruling, but the Chats issue is not relevant to any legal argument Google makes in this appeal.

[6] The parties have consistently treated the Sherman Act and Cartwright Act claims as coterminous. *See* 6-ER-1413-58.

for judgment as a matter of law or a new trial, 4-ER-784-822, which the court denied, 1-ER-24-51.

### D. Remedial Proceedings

Because the District Court held a jury trial instead of a bench trial, the parties lacked specific findings of fact and conclusions of law to guide the remedial phase. Google requested that the parties submit legal briefing on the appropriate remedy. The District Court denied that request. *See* 8-ER-2009 (Dkt. 951); 3-ER-570. Instead, it directed Epic to just file a proposed injunction (without a legal brief), and instructed Google to raise "objections." 4-ER-825. At no point before the injunction issued did the District Court require Epic—the party bearing the burden of proof—to file a legal brief in support of its proposed injunction.

Epic filed a proposed injunction designed to substantially redesign the Google Play store globally, and the pricing model that sustains it. The sweeping changes that Epic sought included (1) offering the Play store's entire app catalog to *all* Android app stores, (2) distributing third-party app stores through Play, and (3) eliminating the requirement that developers use Google Play Billing. 4-ER-711-713; 4-ER-714-716.

Google objected, explaining that Epic's proposed remedies were unsafe, 3-ER-666-676, and would *impede* competition, not improve it, 3-ER-573-664. Equally important, Google pointed out that the proposed remedies were totally

22

unsupported by the trial record.  Epic's demand to commoditize app catalogs across rival stores contradicted a leading argument Epic advanced at trial, which was that the Epic Games Store needed *unique* content to compete with Play and had struggled to obtain such content because of Google's challenged contracts.  3-ER-582.

Google explained, moreover, that the injunction was unnecessary because Google had *already* entered into a settlement agreement (the State Settlement) with all 50 States agreeing to make substantial changes to the Play store that were more than sufficient to address any anticompetitive conduct found by the jury.  *State of Utah, et al. v. Google LLC, et al.*, No. 3:21-cv-05227-JD (N.D. Cal.) ("States Docket"), Dkt. 522-2 at 19-22.  The States maintained that this settlement would strike "an appropriate balance between the concerns the States and Consumer Counsel raised about Google's conduct without prohibiting Google from protecting the legitimate interests of consumers who use Android devices."  3-ER-691.

Ignoring the State Settlement, the District Court held two hearings.  First, it heard from Epic's and Google's expert economists, and second, it allowed Epic and Google to address the technical feasibility and cost of certain aspects of Epic's proposal and to present closing arguments.  *See* 3-ER-434-571; 2-ER-220-373.

In addressing feasibility and cost, Google again explained that Epic's proposed injunction would require a dramatic redesign of Play and Android that would harm users and developers, compromise trust and safety, and make Google a

forced dealer for its competitors. 9-ER-2025; *see also generally* 9-ER-2023-49. It noted that the proposed injunction's terms were theoretically technologically achievable, but would be extremely expensive to implement. 9-ER-2023-49 (under seal); 9-ER-2065-66 (under seal); 9-ER-2056-59 (under seal). And it emphasized the security risks would be even worse without allowing Google the time necessary to build, beta test, fix bugs, and roll out new functionality at the massive scale of Play's many millions of users. 2-ER-421-424; 2-ER-426-429; 2-ER-383-386; 2-ER-388-391.

On October 7, 2024, the District Court issued a modified version of Epic's proposed injunction. 1-ER-3-6; 1-ER-7-23. Despite no briefing from Epic on the four-factor test for injunctive relief, the District Court concluded an injunction was warranted, citing "the jury verdict and evidence at trial" as a whole—without further detail. 1-ER-4. The sweeping and intrusive changes in the District Court's injunction are detailed below.

**Contractual restrictions.** Paragraphs 4-6 prohibit Google from sharing Play revenue with entities that distribute or intend to distribute Android apps and from conditioning "payment, revenue share, or access to any Google product or service" on a developer's agreement to launch an app first or exclusively on Play, or not to launch a version with additional features elsewhere. 1-ER-3-4. Paragraph 7 bars Google from conditioning "payment, revenue share, or access to any Google product

or service" on an OEM's agreement to preinstall Play in a particular location on a device. 1-ER-4. Paragraph 8, largely replicating a prohibition in the State Settlement that Google already agreed to, bars Google from conditioning "payment, revenue share, or access to Google products or services" on Play being the sole app store preinstalled on a device. *Id*.

**Billing changes.** Although no Epic app is offered on Play or subject to the Play billing policy, the District Court nevertheless ordered Google to change Play's billing policies. Paragraphs 9-10 prohibit Google from requiring use of Google Play Billing for app or in-app purchases and from keeping developers from circumventing Play's business model by offering other payment methods or providing external links ("linkouts") for users to "download the app" somewhere else. *Id*.

**Forced creation of new services for competitors.** Paragraph 11 requires Google to share its *entire* app catalog with its competitors. And Paragraph 12 requires Google to permit users to download competing app stores through Play, despite the District Court's acknowledgment that distributing competing app stores might expose Play users to safety and security issues, illegal goods and services, and material violating Google's content standards (such as those against sexual content, hate speech, malware, or fraudulent material). The injunction limits Google to "strictly necessary and narrowly tailored" measures to protect users against those issues. 1-ER-5.

**Technical committee.** The injunction creates a three-member "technical committee"—with one of the three members representing Epic—for resolving disputes about the technology and processes arising from the injunction, thus overseeing significant elements of Google's business and technical operations. The technical committee was the District Court's own creation; Epic had not asked for it. 1-ER-5-6.

The injunction set two effective dates. Google was required to implement the contractual and billing restrictions in less than four weeks, without regard to associated security risks, and the remainder of the remedies in eight months—four months faster than the *fastest* time frame Google's witness said was necessary to safely and securely build, test, and roll out this new functionality at scale. 1-ER-4-5; 2-ER-386; 2-ER-391. The prohibitions apply for three years from their effective date.[7]

Google promptly appealed and requested a stay. The District Court granted an administrative stay. 2-ER-181. This Court ordered expedited briefing and referred Google's stay motion to this panel. CA9 Dkt. 18 at 1-2.

---

[7] When it issued the injunction, the court resolved Epic's UCL claim based entirely on the jury verdict in Epic's favor. 1-ER-8-10.

## SUMMARY OF ARGUMENT

**I.** The liability finding rests on a series of independent legal errors that badly distorted the resolution of this case. *First*, the District Court allowed Epic to argue that Google and Apple do not compete in app distribution and in-app billing markets, even though Epic already fully litigated and lost that issue in its case against Apple. *Apple I* found Google and Apple compete vigorously for app downloads and in-app transactions related to mobile gaming, *see, e.g.*, 559 F. Supp. 3d at 987, which this Court affirmed over Epic's objection, *Apple II*, 67 F.4th at 981. Refusing to treat that finding as preclusive was legal error; Epic could not relitigate whether Google and Apple compete over the *very same transactions*, which are a major portion of Epic's asserted markets. Indeed, Epic has never argued it can prevail if Apple is included in the relevant markets.

*Second*, even though this Court had already affirmed the legal framework applicable to Epic's claims against Apple's App Store, the District Court refused to apply that framework here. The Android-only markets that Epic asserted are "single-brand aftermarkets" as this Court has defined the term, just as the Apple-only markets were in Epic's case against Apple. *Id.* at 976-977. Epic's failure to meet the standard governing single brand aftermarkets is why its antitrust claims failed in *Apple*, *see id.* at 980, and Epic no more met that standard here than it did in *Apple*.

27

*Third*, the District Court misstated the Rule of Reason framework in two important ways, requiring a new trial as to the Section 1 and Section 2 claims governed by that framework. It improperly limited the jury's consideration of the procompetitive benefits of Google's challenged conduct at Step 2 of the Rule of Reason, even though the Supreme Court and this Court have repeatedly permitted defendants to rely on procompetitive benefits falling outside the relevant product markets. And then the District Court wrongly permitted the jury to hold Google liable by engaging in a free-for-all balancing exercise, without first concluding that Epic had proven that less-restrictive alternatives could achieve Google's pro-competitive rationales.

*Fourth*, the District Court erred by holding a jury trial on Epic's purely equitable claims over Google's objection. Google simply never consented to a jury trial on Epic's injunctive-relief claims alone. And in any event, consent can be withdrawn, and Google expressly moved for a bench trial here. The court's error prejudiced Google throughout the remedial proceedings because the court repeatedly invoked the jury's verdict as a substitute for making particularized findings of fact to support the injunction.

**II.** The injunction conflicts with antitrust precedent, Federal Rule of Civil Procedure 65(d), and Article III. *First*, it requires Google to build new infrastructure to provide new services to Google's competitors, contravening a well-established

28

antitrust principle: Businesses generally have no duty to deal with competitors, much less design new products to prop up their competitors. *See Trinko*, 540 U.S. at 408, 410. The court likewise erred by failing to find a "significant causal connection" between any conduct found to be anticompetitive and remedies that extend beyond that conduct. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (quotation marks omitted). The injunction also went against controlling precedent by directly regulating the price Google may charge for components of app-store distribution based on whatever the District Court may find "reasonable"; such "direct price administration" is "beyond [the judicial] function." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997). Finally, the injunction's imposition of duties to deal violate Rule 65(d), which requires courts to detail the precise acts required or proscribed by an injunction so that defendants have fair notice of their compliance obligations. The District Court's attempts to bypass these issues by installing a non-judicial technical committee is not just unprecedented; it is an end-run around the duty Rule 65(d) assigns to district courts.

*Second*, the District Court further abdicated its basic duties by failing to justify and explain the relief it ordered. Rule 65(d) requires stating the basis for an injunction so a reviewing court can determine whether a court considered all relevant factors, including imposing terms no more burdensome than necessary and

accounting for the public interest. Here, the District Court's injunction *exceeds* the remedies Epic proposed, with no explanation for why this was necessary. The court also never explained why it is in the public interest to impose additional remedies beyond those agreed to by the attorneys general of all fifty States, the District of Columbia, and two territories. And the court failed to grapple with the substantial security risks that linkouts, catalog access, and app-store distribution pose for millions of non-party consumers. Finally, the court disregarded the impact of catalog access on Play's over half-million developers' intellectual property interests.

*Third*, the District Court violated Article III by ordering injunctive provisions Epic had no standing to seek. The injunction's catalog sharing and app-store-distribution provisions indisputably rely on the independent behavior of third-party developers, consumers, and OEMs. But Epic offered no "factual evidence" showing that these parties would likely respond to the injunction in predictable ways. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024). Epic also lacked standing to seek changes to Play's billing and anti-steering policies because Epic, which has no apps available on Play, faces no risk of imminent injury from those policies. *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

## ARGUMENT

## I. The Liability Verdict Should Be Reversed.

### A. *Epic v. Apple* Established That Apple And Google Compete, And Issue Preclusion Prevented Epic From Relitigating That Finding.

Epic prevailed in this case only by gerrymandering the markets to exclude Google's "main competitor": Apple. *Apple II*, 67 F.4th at 985. Epic tried, unsuccessfully, to employ this same tactic in its parallel suit against Apple. The *Apple I* district court rejected Epic's gambit and found that Google and Apple compete for app downloads and in-app transactions related to mobile gaming. This Court affirmed. That should have settled the matter: At least as to mobile gaming transactions, Apple and Google compete for app downloads and in-app transactions. But the District Court allowed Epic to try this case as though Epic had not already lost that issue. Issue preclusion should have prevented exactly that sort of litigation do-over, and this error is fatal to Epic's case because Epic has not shown (and cannot show) that Google has sufficient market power in any market including Apple.

This Court reviews de novo the District Court's view that preclusion was not available here. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 993 (9th Cir. 2001).

### 1. The *Apple* Court's Finding That Google And Apple Compete Was Preclusive.

Issue preclusion "bars parties from relitigating an issue if the same issue was adjudicated in prior litigation." *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018).

31

Once an issue has been fully litigated and decided on the merits, and the party against whom preclusion is asserted had a full and fair opportunity to litigate, there is no redo. *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021).

Preclusion doctrine "relieves parties of the cost and vexation of multiple lawsuits, prevents inconsistent decisions, encourages reliance on adjudication by minimizing the possibility of inconsistent decisions, and conserves judicial resources." 18 Moore's Federal Practice – Civil § 132.01[3]. It also promotes fairness by preventing "a plaintiff from relitigating identical issues by merely switching adversaries." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979) (quotation marks omitted).

The only disputed element of preclusion here is whether the "same issue"— competition between Google and Apple within the asserted markets—was raised in both *Apple* and this case. *See* 4-ER-876-877; 4-ER-795-796; Stay Opp. 20-23. It was. The *Apple* court held that Google and Apple compete in the same product market for "mobile gaming transactions"—which includes both app downloads and in-app purchases related to gaming apps. *See, e.g.*, 559 F. Supp. 3d at 976-978, 985-987. The court recognized that both the App Store and Play are "built on gaming transactions and a narrow subset of high spending gaming consumers and game developers." *Id.* at 954 n.243; *see also id.* at 953 (finding that games accounted for 81% of all Apple app store billings and 80% of Google Play transaction revenues).

But here, Epic's proposed markets asserted that Google and Apple do not compete for those *same transactions*. *See* 5-ER-999 ("[Games] … constitute at least 80 percent of Google Play transaction revenues"); 6-ER-1270 (same); Microsoft Stay Amicus Br. 13 (emphasizing the importance of gaming transactions in mobile device market). Instead, Epic claimed that Google and Apple are not within the same area of effective competition for *any* Android app download or in-app transaction.

The four factors this Court has used to analyze whether an issue is the same for preclusion purposes all point decisively in Google's favor. Those factors are: (1) whether "there [was] a substantial overlap between the evidence or argument"; (2) whether the parties could "reasonably … expect[]" that "pretrial preparation and discovery" in the first action would "embrace[]" the contested matter; (3) whether "the same rule of law" applies; and (4) whether the claims in both proceedings are "closely related." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017) (citing Restatement (Second) of Judgments § 27 cmt. c (1982)). These factors are not applied "mechanistically." *Id.*

The latter two factors are straightforward. These "closely related" lawsuits were filed on the same day asserting the same federal causes of action under Sections 1 and 2 of the Sherman Act. *Howard*, 871 F.3d at 1032; *compare Apple I* Docket, Dkt. 1, Counts 1, 3, 4, 5, 6, *with Epic Games, Inc. v. Google LLC, et al.*, No. 3:20-cv-05671-JD (N.D. Cal.) ("*Epic* Docket"), Dkt. 1, Counts 1, 2, 4, 5, 6. Thus, the

33

factual question of Google and Apple's competition arose in the same legal context in both cases.

The first two factors point equally strongly in Google's favor. As for Epic's arguments and evidence, Epic's proposed markets in *Apple* were a mirror image of its proposed markets here. According to Epic, Apple should have been treated as "a monopoly of one" because it dominates its "*own* system of distributing apps" and "collecting payments and commissions of purchases made on Apple's *own devices* in the App Store." *Apple I*, 559 F. Supp. 3d at 921. Here, Epic made precisely the same argument—that Play dominates *Android* app distribution and does not compete with Apple. 5-ER-972-973. In fact, the complaint used the *very same language* to describe the proposed markets in both cases, merely swapping out "Apple" and "iOS" for "Google" and "Android" where appropriate. *Compare, e.g.*, *Apple I* Docket, Dkt. 1, Count 1 ("Sherman Act § 2 (Unlawful Monopoly Maintenance in the iOS App Distribution Market")), *with Epic* Docket, Dkt. 1, Count 1 ("Sherman Act § 2 (Unlawful Monopoly Maintenance in the Android App Distribution Market")).

Thus, the pivotal issue in *Apple*—as here—was whether Google and Apple were within the same "area of effective competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). Given that it was pursuing the two cases in tandem, Epic accordingly had every incentive in *Apple I* to seek discovery from both companies

related to competition between Google and Apple and to vigorously argue that the two companies do not compete. For instance, Epic contended that Apple does not compete with Google because "distribution of an app on an Android device … is not an economic substitute" for app distribution on the App store. *Apple I* Docket, Dkt. 760 at 4073:13-15. Epic repeatedly stressed that consumers who choose an Android device cannot use the App Store and consumers who choose an Apple device cannot use the Play store. *Apple I* Docket, Dkt. 777-3 at 72 ¶ 144, 93-95 ¶¶ 175-177, 131-132 ¶¶ 225-228.

So too here. Epic contended that "Apple is not in the relevant market," 6-ER-1475, because "[c]onsumers can't substitute from the Google Play Store to the Apple App Store unless they buy a new phone." 6-ER-1474. Echoing Apple, Google countered that "the relevant market is not limited to Android, but also includes Apple's iOS and other platforms" because Apple and Android devices are interchangeable for developers and users. 4-ER-829.

Both courts heard similar evidence regarding whether Apple and Google compete in the relevant markets. In *Apple I*, the court repeatedly discussed evidence of Google and Apple's competition for mobile gaming transactions. *See, e.g.*, 559 F. Supp. 3d at 955 n.250, 959, 965 n.298, 975 & n.356, 976-978, 985 & n.416, 997 n.484. For example, the court found that Apple and Google launched their respective app stores in the same year, *id.* at 976, and have since competed on a number of

35

dimensions including "quality of app review," *id.* at 1005, "approach to privacy and customer data security," *id.* at 955 n.250, and their "highly differentiated ecosystems around their respective operating systems," *id.* at 965 n.298. Epic and Apple also put on extensive evidence about how prone consumers are to switch between device brands. *Id.* at 957-958.

The trial record here is replete with comparable evidence, including that Google and Apple compete on "the quality of the apps," 6-ER-1482-85; *see also* 6-ER-1323-24; 7-ER-1595; 7-ER-1607; 5-ER-1013-19; 7-ER-1637-38; that "Android compete[s] with Apple's iOS operating system on security and privacy features," 5-ER-1138; *see also* 5-ER-1121-22; 5-ER-1140; 5-ER-1154-55; 5-ER-1136; 5-ER-1144; 5-ER-1085-88; and that Google specifically designed its "open source" ecosystem to compete with and differentiate itself from Apple's "walled garden" approach in the market, 5-ER-1155; 5-ER-1020; 5-ER-1063; 5-ER-1123. Further, both Google and Epic put on substantial evidence as to "switching rates" to develop the record on the relative interchangeability of Apple and Android devices. *See, e.g.*, 5-ER-1111-13; 7-ER-1504-06; 5-ER-1124-27; 6-ER-1320-22. The trial culminated with the parties examining an Apple corporate representative on these issues. *See* 6-ER-1350-89.

In short, Epic sought to relitigate whether Google and Apple compete for the same transactions, under the same legal framework, during the same time frame.

36

The *Apple I* court already resolved that issue against Epic after a full trial on the merits. That holding was integral to the *Apple I* court's conclusion that Epic failed to prove its Sherman Act claims against Apple. *See e.g.*, 559 F. Supp. 3d at 1030-33, 1036-37; *Apple II*, 67 F.4th at 981. Epic did not come to trial in this case writing on a blank slate. The *Apple I* finding should have been preclusive against Epic here.

### 2.   The District Court Wrongly Permitted Epic To Avoid Preclusion.

The District Court allowed the jury in this case to adopt market definitions that contradicted the settled findings in *Apple I* and *II*. Its explanation was that Epic "offered wholly different evidence about relevant markets than that offered in the case against Apple." 1-ER-30. The District Court could not and did not cite any evidence in support of that conclusion, which is belied by the record. The District Court also suggested that preclusion does not apply where a party's earlier loss on an issue is attributable to a lack of evidence. *Id.* This is also incorrect. It is hornbook civil procedure law that a preclusive "determination may be based on a failure of … proof." Restatement (Second) of Judgments § 27 cmt. d.

Epic asserted below that the issues are not the same because "the proper antitrust market" in *Apple I* was meant to "evaluate the effects of *Apple's* conduct," whereas the issue here was "the proper antitrust market in which to evaluate the effects of *Google's* conduct." 4-ER-876. This puts the cart before the horse. Before undertaking the Rule of Reason analysis, the first step "is to accurately define the

37

relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). Only thereafter may the court assess issues regarding "the defendant's ability to lessen or destroy competition." *Id.* (alteration omitted). And even if Epic's logic made sense, Epic conceded in *Apple I* that the Google Play store "engages in conduct that is *very similar*" to the Apple App Store "in restricting app distribution and in-app payments." *Apple I* Docket, Dkt. 760 at 4173:7-12 (emphasis added).

Before this Court, Epic appears to admit that the mobile-gaming market found in *Apple* "overlaps" with the markets it asserted here. *See* Stay Opp. 22. That admission makes sense: Epic cannot dispute that app-gaming transactions are a critical part of the markets that Epic—a gaming app developer—asserted against Google. *Supra* pp. 32-33. Epic cites no case refuting the commonsense principle that preclusion prohibits a party from seeking market definitions that conflict with those determined in a prior case brought by the same party. *See, e.g.*, *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 937 F.3d 1359, 1380 (Fed. Cir. 2019).

The District Court's refusal to apply issue preclusion here is particularly perverse given the stark consequences of the "inconsistent results" in this case and *Apple*. *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 330 (9th Cir. 1995). Apple's iOS operating system is a "walled-garden," 5-ER-1155, while Google's open-source platform is "available for free to anyone who wants to distribute it and use it," 5-ER-1060. But if the contradictory treatment of Google and Apple stands,

Apple will be free to continue its walled garden approach while Google has been ordered to cease practices that are central to its ability to compete with Apple on key concerns like security and convenience. Compounding the problem, Google will be required to affirmatively assist other competitors at the same time. *Supra* p. 25.

The jury should not have been invited to decide anew whether Google and Apple compete for mobile gaming transactions. Each of Epic's antitrust claims relied on being granted a do-over as to whether Google and Apple compete. 1-ER-53-54; 1-ER-56; 6-ER-1446; 6-ER-1448. To this day, Epic has never argued that it could prevail if it is stuck with the ruling that Apple is Google's "main competitor" in the relevant markets. And that's for good reason, since unrebutted trial testimony showed that Google's market share by app revenue against just Apple is under 40% in the United States, and just barely over 40% globally. 6-ER-1290-91.

Failure to prove a proposed market definition is fatal to Epic's case. *See Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 955-956 (9th Cir. 2023); *Qualcomm*, 969 F.3d at 992. Without the market definition, after all, "there is no way to measure" Google's "ability to lessen or destroy competition." *Am. Express*, 585 U.S. at 543 (quotation marks omitted). Epic's failure to offer evidence that it can succeed in a market with Apple means Google is entitled to judgment as a matter of law. *See In re Marshall*, 600 F.3d 1037, 1064 (9th Cir. 2010) (granting judgment as a matter of law where "[a]ll of the elements of issue preclusion have been met"),

*aff'd sub nom. Stern v. Marshall*, 564 U.S. 462 (2011).  At minimum, this Court should order a new trial where Epic is precluded from disputing that Google and Apple compete in digital mobile-gaming transactions.

### B. The District Court Erred By Refusing To Instruct The Jury On The Legal Requirements For A Single-Brand Aftermarket.

Even if Epic were not precluded from relitigating the market definitions based on *Apple*, the District Court erred by failing to instruct the jury on critical aspects of Epic's burden of proving the markets it asserted.  In doing so, the court departed from longstanding precedent of this Court—including *Apple* itself.  This error is an independent reason to reverse the liability verdict, and this Court reviews de novo whether the district court misstated the applicable law when instructing the jury. *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc).

This Court has recognized that an "aftermarket" exists "[w]here demand for a good is entirely dependent on the purchase of a durable good" in a "foremarket." *Apple II*, 67 F.4th at 976.  A classic example involves service contracts for photocopier machines. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).  Photocopiers constitute the "foremarket," and service contracts are a "derivative aftermarket[]." *See id.* at 455, 459.

Sometimes a party argues that an aftermarket comprising "one brand of a product" is an antitrust market unto itself. *Apple II*, 67 F.4th at 976 (quotation marks omitted).  In such cases, this Court has recognized an "economic presumption that …

40

consumers make a knowing choice to restrict their aftermarket options when they decide" which durable good to purchase. *Newcal Indus., Inc. v. Ikon Office Sol'n*, 513 F.3d 1038, 1050 (9th Cir. 2008). In other words, where consumers *know* that their choice of a durable good will restrict their options in an aftermarket, there is a presumption a firm will know that consumers are choosing a total package and that it must compete to present the best total package available. *See Apple II*, 67 F.4th at 977. That presumption supports pro-consumer interbrand "foremarket" competition like that between Google's Android and Apple's iOS.

This Court has recognized four elements that a plaintiff must satisfy to dispel that economic presumption and prove that a single-brand aftermarket constitutes a relevant antitrust market. *Id.* First, and most importantly, a plaintiff must show that "the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase." *Id.* This element "flow[s] directly" from the Supreme Court's explanation that aftermarket restrictions are dangerous when used "to exploit unsophisticated consumers." *Id.*[8] The plaintiff must also show that "significant information costs prevent" consumers from assessing the overall "life-cycle" cost of the durable good in light of the aftermarket restrictions, that switching

---

[8] Other circuits have similarly emphasized the importance of such a showing in an aftermarket case. *See, e.g.*, *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 783 (5th Cir. 1999).

between the relevant durable goods involves "significant monetary or non-monetary" costs, and that no other general "principles regarding cross-elasticity" "undermine the proposed single-brand market." *Id.* (quotation marks omitted).

Failure to prove any one of these "prerequisites" is fatal to proving a single-brand aftermarket. *Coronavirus Reporter*, 85 F.4th at 956. *Apple* illustrates these principles well. Epic's argument there was that "iOS app distribution" and "iOS in-app payment solutions" were "single-brand markets." *Apple II*, 67 F.4th at 970. Because these aftermarkets were limited to devices running iOS, this Court's single-brand aftermarket rules applied. *See id.* at 976-977. And Epic offered "*no evidence* … demonstrating that consumers are unaware that the App Store is the sole means of digital distribution on the iOS platform." *Id.* at 980 (quotation marks omitted). Thus, Epic's Apple-only markets failed and the Court did not "need [to] reach … the other factual grounds on which the district court rejected Epic's single-brand markets." *Id.*

In this case, Epic's market definition arguments paralleled those in *Apple*. Instead of arguing for iOS-only app distribution and in-app payment markets, Epic argued for Android-only app distribution and in-app payment markets. *Supra* p. 34. Thus, as in *Apple*, Epic argued for product markets where "demand for [the relevant] good[s] is entirely dependent on the prior purchase of a durable good in a foremarket"—namely, devices running Android. 67 F.4th at 976.

42

The District Court here refused to instruct the jury on these elements of Epic's burden, despite Google's repeated requests. *See* 4-ER-835-836; 1-ER-140-141; 1-ER-61-62.  The court's explanation during the charge conference was that Epic did not use the words "foremarket" and "aftermarket" in presenting its arguments to the jury. *See* 1-ER-142; 1-ER-62.  But a "party is entitled to an instruction … if it is supported by law and has some foundation in the evidence." *Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 210 (9th Cir. 1994).  Here, Epic's proposed markets fall within the *legal* definition of a "single-brand aftermarket" under this Court's precedents. *Apple II*, 67 F.4th at 976-977.  It makes no difference that Epic carefully avoided using those words at trial.  It is a district court's job in the instructions to provide the jury the legal labels that apply to concepts they have heard at trial.  Any other rule would encourage creative lawyers to bypass legal rules by simply avoiding magic words.  This Court has squarely rejected such "formalistic distinctions." *Id.* at 978; *see also Apple I*, 559 F. Supp. 3d at 955 (applying the foremarket/aftermarket framework even though "Epic Games did not explicitly use the terms … in its complaint").

In this case, there was undisputed evidence that Epic's proposed markets triggered this Court's single-brand aftermarket test.  Epic's leading economic expert at trial testified that demand for apps flows entirely from the purchase of a device, and thus that choosing a smartphone means "choosing the set of apps that are

43

available on that platform." 6-ER-1256. Thus, demand for Android app distribution (and thus, in-app transactions) depends entirely on the purchase of an Android device. In *Apple*, Epic's briefing recognized that this is the very definition of a foremarket-aftermarket dynamic. *Apple I* Docket, Dkt. 777-3 at 68 ¶ 139 ("[a] 'foremarket' is a market where there is competition for a long-lasting product and from which demand for a second product is derived"). Epic cannot seriously deny that the same legal test applies here, even if it attempted to avoid that result—to borrow the District Court's words—"because they didn't like the outcome in *Epic*." 1-ER-142.

When denying Google's post-trial motion, the District Court tried to shore up its reasoning. It first asserted that "Android is a mobile operating system; it is not a brand." 1-ER-31. But this Court treated "iOS" as a brand, and iOS is also an "operating system." *See Apple II*, 67 F.4th at 970, 976-977. This confirms that a brand of operating system *is* a brand in the relevant sense. *See, e.g.*, 7-ER-1546-48 (slides on "Android Brand Health"); 5-ER-1007. The District Court also noted certain factual differences between Android and iOS, noting that "Android devices are manufactured by many companies" and that "the Apple App Store is the only app store for iOS devices." 1-ER-31-32. But those distinctions do not matter to this Court's definition of an "aftermarket," which asks only whether "demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket*." *Apple*

44

*II*, 67 F.4th at 976. If anything, these factual distinctions support Google. After all, it makes no sense that Epic should face an *easier* burden in proving an antitrust case against Google precisely because there is *more* competition on Android. That Google faces competition from other manufacturers and app stores only makes it more likely that the competition in the device foremarket disciplines the competition in the app aftermarkets.

The prejudice to Google from the District Court's error is substantial. Failure to satisfy the consumer-knowledge element of this Court's aftermarket test is the very reason that Epic's single-brand markets in *Apple* failed. 67 F.4th at 976-981. Epic had no better evidence in this case on that element than it did there—despite having every opportunity and incentive to present evidence on this issue, as the court did not resolve this instructional dispute until just before closing arguments. *See* 1-ER-141-143. There is no reason to give Epic another opportunity to make the necessary showing. Google should be granted judgment as a matter of law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 513 (1988) ("If the evidence presented in the first trial would not suffice, as a matter of law, to support a jury verdict under the properly formulated [instruction], judgment could properly be entered … at once, without a new trial."). At minimum, a new trial is required in which Epic must meet its burden under this Court's precedents.

45

## C.    The District Court Improperly Instructed the Jury On The Rule of Reason Framework.

The District Court directed the jury to apply the Rule of Reason in evaluating Epic's Sherman Act Section 1 and 2 claims.  Under that burden-shifting framework, the plaintiff at Step 1 bears the initial burden of showing that the defendant's conduct "produces significant anticompetitive effects within a relevant market." *O'Bannon v. NCAA*, 802 F.3d 1049, 1070 (9th Cir. 2015) (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)).  If the plaintiff meets that burden, the defendant at Step 2 then bears the burden to show that its conduct has legitimate procompetitive rationales and effects.  *Id.*  Finally, the plaintiff at Step 3 must show that any "legitimate objectives can be achieved in a substantially less restrictive manner." *Id.*

The District Court's instructions misstated both Steps 2 and 3 of the legal framework.  This Court reviews de novo whether a jury instruction properly states the elements that must be proved at trial.  *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996).  If there is an error, this Court "presume[s] that the error was prejudicial[,] and the non-moving party bears the burden of establishing that it is more probable than not that a properly instructed jury would have reached the same verdict." *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1194 (9th Cir. 2019) (quotation marks omitted).  If the non-moving party fails to meet that burden, then a new trial is warranted.  *Id.* at 1199.

46

### 1. The Court Improperly Blocked The Jury From Considering Procompetitive Benefits In Related Product Markets.

At Step 2 of the Rule of Reason, the District Court improperly limited the jury's consideration of the procompetitive benefits of the challenged conduct to the "relevant market[s]," 6-ER-1435; 6-ER-1439-40—which it defined as the product markets the jury found at the outset of the verdict form, 6-ER-1435. Google objected to this formulation twice, explaining it would wrongly limit the jury's consideration of procompetitive effects outside of, but related to, the relevant product markets. 4-ER-837-838; 1-ER-102-103. The court rejected Google's arguments. 4-ER-831; 1-ER-103.

The court's instruction limiting the jury's consideration of cross-market justifications was legal error. For decades, the Supreme Court has "considered cross-market rationales in Rule of Reason and monopolization cases." *Apple II*, 67 F.4th at 989 (collecting cases); *see, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104-108, 115-117 (1984) (considering procompetitive effects in market for college football tickets when relevant market was college football television); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-892 (2007) (recognizing that interbrand competition may offset anticompetitive effects in intrabrand market).

This Court has followed suit. In *O'Bannon v. NCAA*, this Court considered the allegedly anticompetitive effect of the NCAA's compensation rules. There, this

Court defined the relevant market as the "college education market." 802 F.3d at 1070. But in conducting Step 2, it nonetheless considered the fact that preserving the "amateur nature of collegiate sports increases [the NCAA's] appeal to consumers." *Id.* at 1073. As a result, this Court concluded that the "NCAA's compensation rules serve … procompetitive purposes." *Id.* When conduct "truly serve[s] procompetitive purposes, courts should not hesitate to uphold" that conduct. *Id.* at 1079; *see In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1258 (9th Cir. 2020) (applying *O'Bannon* and affirming the consideration of procompetitive conduct in related markets at Step 2 of the Rule of Reason analysis), *aff'd sub nom. Alston*, 594 U.S. 69; *see also Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1348-51 (9th Cir. 1987) (restraints in automobile parts market justified by "quality control" in the overall automobile market).

These holdings are well grounded in the text of Congress's antitrust regime. Unlike the Clayton Act, which explicitly prohibits consideration of procompetitive conduct in related markets, the Sherman Act contains no such restriction. *See* Clayton Act § 7, 15 U.S.C. § 18 (barring anticompetitive mergers "in any line of commerce"); *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370 (1963) (holding that the Clayton Act's text bars consideration of procompetitive effects in another line of commerce as justification for merger).

Indeed, the driving principle behind the Rule of Reason analysis is to determine the competitive effects of the restraint. *See Bd. of Trade of the City of Chi. v. United States*, 246 U.S. 231, 238 (1918). Courts should consider "all of the circumstances" of that restraint. *Leegin*, 551 U.S. at 885. Under the District Court's approach, important effects are barred from consideration simply because they fall outside of the defined market, not because they are irrelevant to "the essential inquiry" of "whether or not the challenged restraint enhances competition." *Bd. of Regents*, 468 U.S. at 104.

In denying Google's request for an instruction, the court cited this Court's decision in *Qualcomm*. 1-ER-103. But, as Google explained, *Qualcomm* involved the *plaintiff's* burden at Step 1 of the Rule of Reason to prove harm to competition, which the District Court had erroneously allowed the FTC to satisfy by identifying harms outside of the relevant antitrust markets. 969 F.3d at 998. *Qualcomm* said nothing about a *defendant's* ability at Step 2 to identify procompetitive justifications. *See id.* at 996 (declining to consider "procompetitive justifications").

This distinction matters. "[T]he primary purpose of the antitrust laws is to protect *interbrand* competition." *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (emphasis added). Thus, anticompetitive effects on a market limited to a single brand may be justified when the challenged conduct stimulates competition between brands. *See supra* pp. 47-48. Prohibiting a factfinder from considering cross-market

49

justifications for anticompetitive effects is inconsistent with that fundamental principle.

Ruling on Google's post-trial motion, the District Court abandoned its reliance on *Qualcomm*, instead citing this Court's decision in *Apple II*. 1-ER-34. This reasoning is even more confounding. In *Apple II*, this Court "decline[d] to decide this issue" because Epic had forfeited it. 67 F.4th at 989. Thus, *Apple II* adds nothing to the precedent from the Supreme Court and this Court considering procompetitive justifications in related markets. *See supra* pp. 47-48.

In its stay opposition, Epic did not defend the District Court's reasoning. Stay Opp. 10. Instead, Epic picked out two instructions that did not place "limitation[s]" on when the jury could consider procompetitive conduct and suggested they remedied any error. *Id.* at 11. But this Court does not assume that jurors read between the lines of inconsistent instructions to divine the material legal rule and then apply it. *United States v. Lewis*, 67 F.3d 225, 234 (9th Cir. 1995) ("[W]here two instructions conflict, a reviewing court cannot presume that the jury followed the correct one."). Google repeatedly asked the District Court to clarify its instructions regarding whether and when the jury could consider procompetitive conduct in the Rule of Reason analysis. Each time, the court denied its requests.

There is ample evidence that the erroneous instructions were, in fact, prejudicial. Google's primary defense at trial focused on how the Play store helps

50

Google stay competitive in the markets for operating systems and smartphones, and many of Google's procompetitive justifications explained why its agreements were essential to help Google compete with Apple in those markets. 6-ER-1480; 6-ER-1486-93; *supra* pp. 17-22. Epic argued strenuously that the jury could disregard Google's efforts to compete with Apple and that Apple's App Store fell outside of the Android in-app distribution and Android in-app billing markets. *See, e.g.*, 5-ER-971; 6-ER-1246-49; 6-ER-1475; 6-ER-1477. The instructions' failure to explain the relevance of cross-market justifications left the jury with the mistaken belief that if it found relevant markets limited to Android, it did not have to consider Google's efforts to compete with Apple. *See Hunter v. County of Sacramento*, 652 F.3d 1225, 1235-36 (9th Cir. 2011).

Epic and the District Court have emphasized that, despite the erroneous instruction on this point, Google still argued that its procompetitive conduct in related markets justified any anticompetitive conduct in the relevant market. 4-ER-803; Stay Opp. 11. But that is exactly the point. Google's case was built in significant part around demonstrating that Google was competing with Apple, and the jury was told not to consider this crucial argument if it found that Apple was outside the relevant market. That was a highly prejudicial error. *See Jenkins*, 22 F.3d at 210 (a court should give an instruction when it has "some foundation in the evidence"). A new trial, under the correct legal framework, is warranted.

### 2. The Court Improperly Permitted The Jury To Engage In A Free-For-All Balancing.

At Step 3 of the Rule of Reason, the District Court improperly instructed the jury to balance the competitive harms and benefits, without requiring Epic to "prove the existence of a substantially less restrictive alternative to achieve Google's pro-competitive rationale." 6-ER-1435-36. Google acknowledges that *Apple II* forecloses this argument before a panel of this Court, *see* 67 F.4th at 993-994, but preserves its position that *Apple II*'s ruling on this issue is wrong. *See id.* at 994 (noting this Court was itself "skeptical of the wisdom" of its precedent on this issue). Granting Epic a free pass on advancing viable less-restrictive alternatives contravened Supreme Court precedent requiring courts to apply all three steps of the Rule of Reason analysis. *See Alston*, 594 U.S. at 98, 101, 106; *Am. Express*, 585 U.S. at 541-542.

### D. The District Court Erred By Holding A Jury Trial On Purely Equitable Claims.

Epic was not entitled to a jury trial on its antitrust claims—an issue this Court reviews de novo. *SEC v. Jensen*, 835 F.3d 1100, 1106 (9th Cir. 2016). The Seventh Amendment does not apply to parties, like Epic, who seek purely equitable relief. *Standard Oil Co. of Cal. v. Arizona*, 738 F.2d 1021, 1026 (9th Cir. 1984).[9] Instead,

---

[9] California law requires UCL claims to be tried by a court rather than a jury. *Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*, 462 P.3d 461, 473 (Cal. 2020).

"judges, not juries, determine equitable claims, such as requests for injunctions." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015). That is how Epic's standalone claims against Apple were tried, and it is how Epic's standalone claims against Google should have been tried as well.

Epic sought purely equitable relief from day one. *See Epic* Docket, Dkt. 1 at 59; *Epic* Docket, Dkt. 156 at 80; *Epic* Docket, Dkt. 341 at 36. Nothing in Epic's claims granted Epic a right to a jury trial. *Standard Oil*, 738 F.2d at 1025. Epic has never disputed as much, *see* 4-ER-840-848, and never expressed any concern about its parallel claims in *Apple* being tried to the bench.

The Judicial Panel on Multidistrict Litigation consolidated Epic's injunctive-relief claims with claims by other parties for damages, and the District Court subsequently ordered that a single trial would take place for all claims in the MDL. *See* 4-ER-953-956; *see also* 4-ER-925-926 (consumers); 4-ER-923 (developers); 4-ER-898 (discussing consolidated trial plan). The other parties seeking damages *were* entitled to a jury, and in cases involving both legal and equitable claims "the Supreme Court has cautioned against 'trying part to a judge and part to a jury.' " *Jensen*, 835 F.3d at 1111-12 (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959)). Those other parties' claims also had to be tried *before or alongside* Epic's claims, because it is generally error to adjudicate equitable claims prior to damages claims. *See Beacon Theatres*, 359 U.S. at 506-508.

Over the months leading up to trial, however, all the parties seeking damages against Google settled, leaving only Epic's injunctive-relief claims. Immediately after the last of those parties settled, Google requested a bench trial on what had become Epic's standalone injunctive-relief claims—consistent with Google's position three weeks before trial that if Match settled its damages claims, Epic's antitrust claims would be tried in a bench trial. 4-ER-849-856; *see also* 4-ER-862-863.

The District Court nevertheless refused to hold a bench trial. Its reason for this refusal was a single sentence from a joint filing offering a proposal for trial "*if it includes* Epic, the [developer] Plaintiffs, the States, and the individual consumer plaintiffs," *see* 4-ER-902 (emphasis added), a conditional statement that the District Court somehow concluded amounted to "consent" to a jury trial on Epic's claims alone. The court also pointed to one sentence in an opposition to a bifurcation motion—also filed when Epic's case was consolidated with other parties entitled to a jury trial. 4-ER-894.

The District Court committed legal error by concluding that this constituted consent to hold a jury trial against Epic alone. Courts cannot presume a party's consent to a jury trial based on consent given in related proceedings. *See Dunmore v. United States*, 358 F.3d 1107, 1116-17 (9th Cir. 2004). *Dunmore* is instructive. There, a plaintiff *demanded* a jury trial in a tax proceeding in district court, and then

54

stipulated to have his case transferred to a bankruptcy court, which had authority to conduct a jury trial upon both parties' consent. *Id.* at 1109, 1116; *see also* 28 U.S.C. § 157(e). The plaintiff refused to consent to a jury trial in bankruptcy, but the court held one anyway. *Dunmore*, 358 F.3d at 1116-17. This Court reversed, explaining that the plaintiff "never consented to a jury trial in the bankruptcy forum," and the bankruptcy court could not presume his consent from the jury demand in district court. *Id.*

Here, as in *Dunmore*, Google agreed to a jury trial in one context—when the case was proceeding to trial with multiple parties with a right to a jury trial. In that circumstance, a jury trial is *required* to proceed first under *Beacon Theatres*. 359 U.S. at 506. That does not mean Google consented to a standalone jury trial in a case brought by one party seeking only equitable relief. The District Court erred in holding otherwise. *See id.*[10]

Even assuming Google somehow consented to a jury trial on Epic's standalone injunctive-relief claims, Google plainly withdrew that consent prior to trial—and the court should have honored that withdrawal. Other Circuits have recognized that consent may be withdrawn even "days before trial" where the opposing party is not constitutionally entitled to a jury. *FN Herstal SA v. Clyde*

---

[10] Epic was not entitled to a jury trial based on Google's breach-of-contract counterclaim. As the District Court correctly concluded, the only disputed aspect of that claim, Epic's illegality defense, had to be tried to the bench. 6-ER-1340-41.

55

*Armory Inc.*, 838 F.3d 1071, 1089-90 (11th Cir. 2016); *accord Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 968 (7th Cir. 2004). These cases recognize that the timing of the withdrawal, standing alone, does not prejudice the opposing party such that a jury trial must proceed.

In *FN Herstal*, the Eleventh Circuit concluded that a party failed to show prejudice by invoking the timing of the withdrawal request or by contending that the relevant legal issues "involve[d] a number of considerations for which a jury would seem better suited than a judge." 838 F.3d at 1089-90. A party likewise failed to show prejudice in *Kramer* where the only objection to the withdrawal of consent to a jury trial was that it occurred too late in the proceedings. 335 F.3d at 968; *see Kramer v. Banc of Am. Sec., LLC*, No. 1:99-cv-6768 (N.D. Ill.), Dkt. 48 at 2 (prejudice argument in briefing).

As in those cases, Epic made no showing of prejudice from having a judge serve as the factfinder. 4-ER-841; 1-ER-50. In fact, neither the District Court nor Epic ever articulated any prejudice Epic faced that would not be inherent in *any* switch from a jury to a bench trial. *See* 4-ER-841 (Epic arguing that prejudice existed because the parties prepared witnesses, opening statements, and voir dire); 1-ER-150 (court stating that request was prejudicial because it was filed "too late").

It is particularly unclear why a bench trial would have been prejudicial when Epic framed its complaint specifically to exclude a damages claim that would have

56

triggered a jury right. Epic did not identify a single change it would have to make to its presentation of evidence or *any additional* work that would be required. Indeed, it already had experience with a bench trial from its parallel claims in *Apple I*. If anything, preparing for a bench trial requires *less* work than preparing for a jury trial. *See* Patrick E. Higginbotham, *Continuing the Dialogue: Civil Juries and the Allocation of Judicial Power*, 56 Tex. L. Rev. 47, 54 (1977). A bench trial also eliminates disputes that can arise over jury instructions, allows more leeway for evidentiary rulings by the court, and results in a fuller explanation of a decision.

By contrast, the District Court's error in pressing ahead with a jury trial was deeply prejudicial to Google. Because the jury's verdict lacked specific findings of fact, including (for example) on exactly what anticompetitive effects the jury found or how the jury applied the Rule of Reason framework, the court simply assumed that the jury resolved every factual dispute presented at trial in Epic's favor. This had an enormous impact on the remedies the court selected. The court acknowledged as much, stating that "[t]he facts and evidence behind the jury's verdict are now carved in stone"—and then using the jury's verdict to justify the remedies ordered, without the benefit of factfinding or legal conclusions that would have justified those remedies (or not). 3-ER-437; *see also* 2-ER-343. But absent specific findings of fact defining the contours of Google's liability, the District Court

lacked specific findings to guide the appropriate scope of relief—which, as Section II explains in greater detail, became a pervasive problem at the remedies stage.

### E. The UCL Verdict Must Be Vacated Because It Is Based On The Flawed Jury Verdict.

The District Court described the UCL claim as "an independent state-law basis for [the] injunction." 1-ER-12. But the court's UCL analysis derives entirely from the jury's verdict and is not independent of it. The opinion says Google's conduct was "unlawful" and "unfair" under the UCL because the jury found that Google violated the antitrust laws. 1-ER-9-10. If this Court reverses or vacates the antitrust verdict, it must do the same for the UCL claim.

## II. The Injunction Should Be Vacated.

### A. The Catalog-Access and App-Store-Distribution Remedies Should Be Struck From The Injunction.

Requiring Google to bring to market entirely new products *specifically for its competitors* defies Supreme Court antitrust precedent on duties to deal with competitors. Were this Court to permit the flawed liability finding to stand, it should strike these remedies from the injunction. Although this Court generally reviews an injunction for abuse of discretion, it considers de novo whether an injunction "relie[s] on an erroneous legal premise"—as this one does. *Klein v. City of San Clemente*, 584 F.3d 1196, 1200 (9th Cir. 2009) (quotation marks omitted).

1.    **The District Court Exceeded Its Authority By Requiring Google To Create And Offer New Services For Its Competitors.**

The Supreme Court has sharply limited the role of antitrust law in requiring companies to deal directly with competitors.  Businesses can "establish[] an infrastructure that renders them uniquely suited to serve their customers," and forced sharing of that infrastructure "is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407-408.

The primary flaw in forced sharing, as *Trinko* explains, is that it "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408.  Courts should not require companies to create and offer "something brand new" that is "not otherwise marketed or available to the public" as part of a duty to deal. *Id.* at 410. The limited situations justifying forced-sharing remedies are circumstances where "the defendant was already in the business of providing a service to certain customers … and refused to provide the same service to certain other customers." *Id.*  That narrow circumstance is a necessary—but far from sufficient—basis for imposing a duty to deal under antitrust law. *See id.*

It should therefore come as no surprise that neither Epic nor anyone else in this case has cited a single antitrust case in which a party was ordered to develop a

59

new product for its rivals. Not one. Extending duties to deal in this way would be inadministrable, because "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Id.* at 415 (quotation marks omitted). Instead "[t]he problem should be deemed *irremedia[ble]* by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." *Id.* (quotation marks omitted and emphasis added). The Court has repeatedly "emphasized the importance" of policing these "clear rules in antitrust law." *Pac. Bell Tel. Co. v. linkLine Commc'ns Inc.*, 555 U.S. 438, 452-453 (2009).

This Court and others have taken the cue, recognizing that duties to deal are forbidden when they would require a court to act as a central planner responsible for product design. That is because federal courts are "ill-equipped to assume this role." *Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1183 (9th Cir. 2016). The D.C. Circuit has likewise held that "it is not a proper task for the Court to undertake to redesign products." *Massachusetts v. Microsoft*, 373 F.3d 1199, 1208 (D.C. Cir. 2004) (quotation marks omitted) (*Microsoft II*). And the Tenth Circuit, in an opinion authored by then-Judge Gorsuch, condemned remedies requiring courts "to pick and choose the applicable terms and conditions" of dealing or compel courts "to become 'central planners.'" *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (quoting *Trinko*, 540 U.S. at 407-408).

60

The District Court committed legal error by ordering Google to design new products and services tailor-made for its competitors. Providing competitors access to the catalog of apps approved by Google for the Play store would require Google to create entirely new infrastructure to serve as the backend administrator for any number of third-party app stores, including developing and writing code to make millions of apps in Play's catalog *appear* to be available in those other stores (when in reality they are designed for, approved by, and available through Play), refreshing and regularly updating the metadata for these millions of apps as developers make changes (which is a common occurrence), and creating a technical capacity for Play to install and update apps via third-party storefronts. 2-ER-377-383.[11]

The app-store-distribution remedy would likewise require significant changes to Play. "The Play store as it exists today is designed to distribute apps, not app stores." 2-ER-386. To distribute third-party stores, Google would have to create new functionality allowing developers to list an app store, develop new terms of service for app stores, redesign the user interface, and put protocols, systems, and processes in place to assess the safety, security, and content of every app that is available through that third-party store. 2-ER-386-387; 1-ER-18-19 (recognizing

---

[11] Below, Epic suggested catalog sharing was "similar" to a promotional program Google had offered called "Alley Oop." *See* 4-ER-770-771 & n.45. Google explained that Epic's expert had "a misunderstanding of the Alley Oop product," and the District Court made no contrary finding. 3-ER-623-624.

that making third-party app stores available through Play introduces "security and technical risks" and that Google would have to create new protocols to "achieve safety and security"). Implementing this remedy carries a hefty price tag. 9-ER-2056-59 (under seal).

The problems with these forced-dealing remedies unsurprisingly track the precise concerns that led the Supreme Court to caution against imposing duties to deal. Both involve hundreds—if not thousands—of design choices, requiring the court to "oversee product design," *contra Microsoft II*, 373 F.3d at 1208, and entailing the creation of new infrastructure offered under entirely new terms of service to competitors, *contra Novell*, 731 F.3d at 1073. They would also require Google to work closely with its rivals, giving companies *more* insight into one another's operations and raising the specter of "the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 408. The District Court's attempted solution—the misguided delegation of all these issues to a "Technical Committee"—only confirms the need for a court to ultimately engage in central planning to implement these remedies. 1-ER-5-6; *see infra* pp. 69-74.

To get around the legal barrier to these remedies, the District Court had to cast *Trinko* and its reasoning aside as irrelevant to antitrust remedies. *See* 1-ER-19-20 (holding "Google's frequent mentions of *Trinko* are misplaced" "in the remedy phase"). That approach is flatly wrong. *Trinko* and subsequent cases are clear that

62

the very reason duties to deal are generally off limits is precisely because they create extensive problems *at the remedial stage*.  Thus, the Supreme Court has twice explained that refusals to deal are generally "irremedia[ble]."  *linkLine*, 555 U.S. at 453 (quoting *Trinko*, 540 U.S. at 415).  And it has expressly cautioned that "[s]imilar considerations" govern in both the liability *and remedy* phases of an antitrust case.  *Alston*, 594 U.S. at 102.  Anything else would create an end-run around *Trinko*'s "clear rule[]," *linkLine*, 555 U.S. at 452—enmeshing federal courts in the supervision of product design and terms of dealing between competitors.

To be sure, some cases have ordered a defendant to sell or license an *existing* product.  The defendant in *Optronic*, for example, was required to sell existing products to a competitor on the same terms as other market participants.  *Optronic*, 20 F.4th at 486.  But that did not entail creating or offering bespoke *new* products or services for competitors, much less a technical committee to oversee hundreds or thousands of related design choices and disputes.  The same is true of cases involving compulsory licensing of patents that a defendant has previously abused to restrain trade.  *Kodak*, 125 F.3d at 1226 (citing *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 62 (1997)).  This Court has recognized that this distinction matters, holding that a court should not undertake to "delineate the defendant's sharing obligations" by ordering duties to deal when "the defendant does not already provide the product in

an existing market or otherwise make it available to the public." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004).

There is, in short, no precedent for compelling Google to create and offer new services specifically for its competitors. This Court should thus modify the injunction to omit the duty to deal remedies based on the District Court's "application of erroneous legal principles," or remand for the District Court to do so. *Kodak*, 125 F.3d at 1224.

> **2. The District Court Violated *Optronic* By Imposing Duty-To-Deal Remedies Without Finding A Causal Connection To The Anticompetitive Conduct.**

The District Court committed a separate legal error in imposing the duty-to-deal remedies. The court thought it could impose duty-to-deal remedies if they would address "network effects" associated with Play—by which it meant that having more developers leads to more users "and vice versa"—without any analysis of whether the anticompetitive conduct caused those network effects. 1-ER-16. That is wrong. To impose an injunction that extends beyond restraining the specific conduct found to be anticompetitive, a court must make a finding, grounded in the record, of "a significant causal connection between the conduct enjoined or mandated and the violation found." *Optronic*, 20 F.4th at 486 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc) (*Microsoft I*)). This permits courts to "eliminat[e] the *consequences* of the illegal conduct," *id.* (emphasis

added and quotation marks omitted), without denying the defendant the legitimate "returns from its innovation and investment," *Microsoft II*, 373 F.3d at 1219 (quotation marks omitted).  It similarly ensures that courts do not deprive a defendant of legitimately earned competitive advantages, which would run afoul of "the underlying purpose of antitrust law" by "lessen[ing] the incentive for the monopolist … to invest." *Trinko*, 540 U.S. at 407.

This causation requirement is particularly important in a monopoly *maintenance* case, the theory Epic pursued here.  *See Epic* Docket, Dkt. 1, Counts 1, 4.[12]  In such cases, a company has legitimately acquired monopoly power, and harm resulting from the mere *existence* of a monopoly "cannot be taken as a given."  David McGowan, *Innovation, Uncertainty, and Stability in Antitrust Law*, 16 Berk. Tech. L.J. 729, 792 (2001); *see also Microsoft II*, 373 F.3d at 1226 ("If the court is not to risk harming consumers, then the remedy must address the … barrier to entry in a manner *traceable to our decision* [on the merits]." (emphasis added)).  The court must instead determine whether and how the company's competitive advantage— here, network effects—would have existed even without the anticompetitive conduct.

---

[12] Although the jury was instructed that it could find Google unlawfully acquired *or* maintained a monopoly, Epic's arguments were directed to a monopoly maintenance theory, *see, e.g.*, 5-ER-965; 4-ER-783, and the District Court plainly treated this as a monopoly maintenance case during the remedies phase, 1-ER-17.

65

The District Court did not even attempt to undertake that causation inquiry. It invoked the jury verdict as a blank check to eliminate "network effects" from playing a role in Play's continued success. But the court made no findings of fact that any specific conduct was both (a) anticompetitive and (b) contributed in a meaningful way to "network effects." *See* 1-ER-17-20.

The District Court discounted Google's argument about the need for causation findings by calling causation not "the salient question." 1-ER-17. That is irreconcilable with *Optronic*. The District Court recognized that Google "may legitimately claim some early mover advantage," yet it failed to analyze whether its chosen remedy improperly targeted that lawful advantage and Google's extensive investments and numerous innovations that have contributed to significant improvements in product quality, security, and safety. *Id.*

The only record evidence the District Court cited actually reveals the deep problems with its approach. The court pointed to an internal Google presentation from 2017 that described Play as "benefit[ing] from network effects" and Amazon's app store as "struggl[ing] to break those network effects" and lacking "critical mass." 1-ER-16. But if Google *already* enjoyed network effects *in 2017*, which is *just after the start of the relevant time period in this case*, then it was even more critical for the court to analyze whether network effects were causally linked to any conduct found to be anticompetitive. *See* 6-ER-1264 (Epic's expert acknowledging

66

that "evidence that Google has a significant market share … doesn't tell you whether or not that market share was gained through anticompetitive or competitive means"); 6-ER-1279-80 (undisputed evidence Google had a significant scale advantage "way back in 2011"). And the trial record makes clear the independent reasons why Amazon's app store struggled. 5-ER-1221-22; 5-ER-1217-18; 6-ER-1241 (describing Amazon's failure to make investments that would enable it to compete with Play); 7-ER-1642-43; 7-ER-1657-58; 5-ER-1223-27; 5-ER-1217-18 (describing quality issues with Amazon's app store).

Nor is the District Court's citation to the jury verdict a substitute for the required causation analysis. 1-ER-17. The jury was never asked to—and did not—make any findings linking anticompetitive conduct to network effects. And the jury was properly permitted to "consider only Google's conduct that occurred after August 13, 2016," which means the jury was *not allowed to consider* the period when Google was building network effects. 6-ER-1454.

The jury instructions, moreover, did not ask the jury to decide if any network effects were due to anticompetitive conduct. Instead, those instructions left open the types of anticompetitive effects that might serve as a predicate for liability, which included things like "increased prices" or "reduced quality" that are unrelated to network effects. 6-ER-1433 (Section 2); *see* 6-ER-1441 (Section 1). This Court has recognized that a court sitting in equity may not assume that a jury made findings

67

that "[do] not necessarily" flow from the verdict, but must make its own independent findings. *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1145 (9th Cir. 2023). The District Court erred by failing to do so. Because the District Court failed to analyze causation, the duty-to-deal remedies should be vacated.

### 3.    The District Court Erred By Engaging In Direct Price Regulation.

Except in narrow circumstances, "direct price administration" is "beyond" the judicial "function." *Kodak*, 125 F.3d at 1225. The District Court ran afoul of this legal rule by directly regulating the price Google may charge for security services related to Google's distribution of their app stores. Implementing that remedy while preserving Google's reputation for safety and security is enormously expensive, because it requires Google to analyze on an ongoing basis whether every app in a third-party store raises privacy or security risks for users or violates Google's content policies. Those investments, in turn, will provide a valuable service to the Play store's users, developers, and the participating third-party app stores. As it did in *Kodak*, this Court should strike the provision imposing a cost-based "reasonable" price for this service and permit Google to charge a market price on a non-discriminatory basis. 125 F.3d at 1226.

The District Court provided no reasoning to support its price control provision. *See* 1-ER-18-19. That alone is a sufficient basis to vacate it. *See infra*

68

pp. 74-75 (discussing court's obligation to explain the basis for an injunction and support it with adequate factfinding). Nor is there any basis for imposing such a price control. There is, for instance, no established history of Google abusing the pricing of this service to restrain trade; Google has never offered this service before. *Cf. Glaxo*, 410 U.S. at 59 (requiring "reasonable-royalty licensing" "where patents have provided the leverage for or have contributed to the antitrust violation adjudicated"). In fact, the District Court acknowledged that Google's refusal to deal with its rivals in the past was *not* anticompetitive. *See supra* p. 17. And the District Court provided no guidance for how to measure what pricing would be "reasonable" in the context of a product that is "not commercially available." DOJ Stay Amicus Br. 13. This Court should strike the price-control provision from the injunction.

### 4. The District Court Erred By Failing To Provide Specific Guidance Regarding The Duty-To-Deal Remedies.

Rule 65 requires that an injunction "state its terms specifically" and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "Challenges to an injunction pursuant to [R]ule 65(d) are reviewed de novo." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).

Rule 65's specificity requirements are not "mere technical requirements"; they are "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders." *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). To

that end, an injunction must be sufficiently clear to afford defendants "fair and precisely drawn notice of what the injunction actually prohibits." *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (quotation marks omitted) (similar). The District Court's injunction's description of the duty-to-deal remedies falls short of Rule 65's specificity requirements, requiring vacatur. *See, e.g.*, *Del Webb Communities*, 652 F.3d at 1150 (vacating provisions of injunction that were "too vague to be enforceable").

As Google predicted in its proffer and throughout the second remedial hearing, the duty-to-deal remedies leave open many, many questions about how to comply with the injunction. 3-ER-626-627; 2-ER-229-231. On catalog access, the text of the injunction is silent on crucial questions, such as what metadata associated with an app Google must make available, how often to refresh that data, and what eligibility criteria Google can use to determine if an entity requesting catalog access is indeed a legitimate app store. *See* 2-ER-378; 2-ER-381-382.

The app-store-distribution remedy is likewise impermissibly vague. It provides no real guidance on the eligibility criteria Google can set for app stores distributed through Play, nor does it define what constitutes an app store under the injunction, which could include a variety of app distributors that might attempt to avail themselves of the remedy without providing any of the services, clear policies, and security standards that users expect from reputable app stores. 2-ER-387.

70

Rather, the injunction cryptically requires Google's "technical and content requirements and determinations" to be "strictly necessary and narrowly tailored"— a standard never discussed, divined, or traced back to industry practice or standards of care. To the extent this language intends to invoke the standard for strict scrutiny applied to constitutional challenges, it will entail *extensive* second-guessing of every measure Google adopts to help ensure user safety. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-432 (2006) (requiring detailed, case-by-case examination of government interest asserted); *cf. Alston*, 594 U.S. at 106 (noting "markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare").

Google suggested a path for avoiding these ambiguities, proposing that the court permit the parties to review the injunction's wording and identify problems before the injunction issued. 3-ER-571. The District Court refused even that modest step and advised Google to "take it up on appeal." *Id*.

Even Epic seems to admit that resolving these questions would require repeated, ongoing judicial intervention. Stay Opp. 12 (maintaining that it is "commonplace" for an injunction to leave "unclear how [it] applies in a few particular respects"). But the level of judicial involvement this injunction requires would transform the District Court into a central planner, contrary to law. *See Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th

71

Cir. 2010). Notwithstanding its efforts to punt to a non-Article-III "technical committee" both technical and business model questions, the court will have to weigh the benefits of different product designs for distributing third-party app stores and resolve disputes about the price and terms of dealing for catalog access—the very sorts of tasks for which courts "are ill suited," demonstrating both that the injunction is impermissibly vague and that the District Court never should have imposed the duty-to-deal remedies in the first place. *Trinko*, 540 U.S. at 407-408; *see linkLine*, 55 U.S. at 452-453; *Novell*, 731 F.3d at 1073; *Allied Orthopedic*, 592 F.3d at 1000.

The District Court's creation of the technical committee to resolve disputes, subject to review by the court, only highlights that the injunction's text is too vague for Google to follow without extensive and ongoing input from the District Court. Indeed, it shows that even the District Court was unsure how to resolve in advance the many questions the injunction raises, yet again illustrating why the District Court should not have issued an injunction that requires it to act as a central planner.

The District Court did not identify, and Google has not found, any case allowing a district court to circumvent Rule 65(d)'s specificity requirements by passing the buck to a technical committee to take a first stab at resolving the flood of open questions raised by an injunction—many of which are not even technical in nature—on an ad hoc basis. This is not surprising. Appointing a technical

72

committee does nothing to advance "the strong policy of clarity behind rule 65(d)," *Holtzman*, 762 F.2d at 726-727; it tasks a committee, rather than a court, with taking the first steps toward filling in the injunction's many holes.  *See* 2-ER-326 (District Court stating that the injunction would lay out only "practical principles").

To Google's knowledge, no U.S. court has *ever* imposed a technical committee by judicial fiat.  *Cf. United States v. Microsoft*, No. 1:98-cv-01232-CKK (D.D.C.), Dkt. 746 at 9-13 (creating technical committee through consent decree). Nor has any court—let alone a court administering an antitrust remedy—assigned a single, self-interested competitor a one-third vote in resolving product-design disputes potentially affecting over a hundred million non-parties and impacting the safety and security of a rival's product.  *See id.*; *FTC v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1213 (9th Cir. 2004); *cf.* Fed. R. Civ. P. 53(a)(2) (court-appointed special masters "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge").  The appointment of the technical committee violates not just Rule 65, but basic principles of Article III adjudication, which provides that neutral courts—and not competitors—should make important decisions affecting whole industries.

The District Court also failed to identify any practical reason to defer to a "technical committee" the many non-technical questions that this injunction leaves open, including what eligibility criteria Google may adopt for participation in the

catalog-sharing program or whether a particular developer's method of distributing

their apps or apps of others qualifies as an app store that Play must distribute. These

questions are not really technical issues at all, but policy judgments about the scope

of the injunction's obligations. The District Court's refusal to resolve these issues

*before* issuing an injunction was an abdication of its responsibility to clearly define

Google's obligations in advance.

**B.    The District Court Failed To Make Findings Sufficient To Support Its Injunction.**

To issue an injunction, a court must make factual findings that are "[]logical,

[]plausible," and supported by "inferences that may be drawn from the facts in the

record." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir.

2013) (quotation marks omitted); *Yowell v. Abbey*, 532 F. App'x 708, 710 (9th Cir.

2013); *see* Fed. R. Civ. P. 65(d)(1). Where an injunction follows a jury verdict, the

court must make "its own factual determinations" regarding disputed issues the jury

did not resolve. *McCarthy v. Fuller*, 810 F.3d 456, 460-461 (7th Cir. 2015); *accord*

*U.S. Wholesale*, 89 F.4th at 1145; *Burton v. Armontrout*, 975 F.2d 543, 544-545 (8th

Cir. 1992). And the court must consider all relevant factors,[13] avoid restrictions

---

[13] *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014).

"more burdensome to the defendant than necessary,"[14] and avoid "disserv[ing]" the "public interest."[15]

Failure to comply with these requirements is an abuse of discretion warranting vacatur. *Columbia Pictures*, 710 F.3d at 1030; *La Quinta*, 762 F.3d at 779. Indeed, this Court has routinely vacated injunctions for failure to adequately explain and justify the relief ordered. *See, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1141-42 (9th Cir. 2009) (vacating injunction for failure to "properly consider" the "public interest" and need to narrowly "tailor" remedy to "the specific harm alleged"); *Yowell*, 532 F. App'x at 710 (vacating injunction for insufficient explanation and findings unsupported by record). The District Court fell short of those obligations by failing to explain why less burdensome restrictions were insufficient, refusing to consider the State Settlement, and failing to account for serious security and intellectual property concerns affecting millions of non-parties.

### 1. The District Court Did Not Explain Why Less Burdensome Contractual Restrictions Would Not Suffice.

The District Court's broadbrush approach to remedies turns on its head the Supreme Court's admonition that "[w]hen it comes to fashioning an antitrust remedy," "caution is key." *Alston*, 594 U.S. at 106. The District Court's failure to

---

[14] *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (quotation marks omitted).

[15] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

even engage with less burdensome alternatives was an abdication of its most elementary duties. *See, e.g.*, *Yowell*, 532 F. App'x at 710.

During the remedies phase, Epic's economic expert proposed that the District Court enjoin contract provisions similar to those Epic had challenged at trial. He proposed prohibiting Google from: (1) using contractual terms expressly imposing conditions on dealing with or acting as a rival—such as agreements with developers not to place apps on competing stores, 3-ER-445-446; 2-ER-318; and (2) entering into Play revenue-sharing agreements with actual or potential competitors for Android app distribution, 3-ER-450; 2-ER-323-324; 4-ER-773. According to Epic, those remedies were sufficient to "directly redress the contractual restrictions" the jury found to be anticompetitive, as well as any "similar conduct that could be used to accomplish the same objective." 3-ER-447-451.

Using Epic's proposals as a baseline, Google offered two basic modifications to ensure that these remedies would not create undue burden or hamstring competition. It asked the court to ensure that the first prohibition extended only to contractual terms pertaining to *Android* app distribution rivals so it would not hurt Google's ability to compete with Apple. 2-ER-359-360. It also asked the court to limit an injunction to prohibiting *catalog-wide* conditional agreements with developers, which is the type of agreement Epic had challenged at trial. 2-ER-362. This would allow Google to negotiate with a developer for first or equal access to

76

individual apps, which in turn would enable developers to receive a more competitive deal for distribution of their most popular products.  2-ER-362; 3-ER-598-599.

The injunction the District Court entered, however, imposes even more burdensome restrictions than Epic sought.  For instance, it prohibits certain incentives to OEMs regarding Play's specific placement on Android devices, even if the incentive places no condition on whether the OEM deals with Play's app distribution rivals or the OEM itself is an Android app distribution rival.  1-ER-4. This provision leaves Google without important tools to ensure that OEMs preinstall an easy, safe, and reliable app store for Android users to be able to download apps right out of the box—a key feature on which Android and Apple compete.  *See, e.g.*, 5-ER-1072-73.

The prohibition on sharing Play revenue with actual or potential Android app distributors in *any* form, 1-ER-3, again exceeds Epic's request, which was to limit agreements to sharing a *percentage* of Play revenue, 2-ER-323-324; *see also* 2-ER-323 (Epic explaining that it had no concerns with Google using revenue earned through Play to attract developers with a fixed sum, rather than a percentage).

The District Court offered no reasoned explanation for enjoining *even more* conduct than Epic proposed, or for rejecting Google's suggested modifications.  To the contrary, the order accompanying the injunction shows a profound lack of

attention to these crucial issues. For example, the court perplexingly asserted that "Google itself agreed" with the remedies at issue—a demonstrably inaccurate statement given the record just described. 1-ER-15. The court also characterized the provisions as simply enjoining Google "from sharing Play Store revenues with current or potential Android app store rivals, and from imposing contractual terms that condition benefits on promises intended to guarantee Play Store exclusivity." 1-ER-14-15. But the injunction's actual language goes well beyond that, as even the most cursory review of the injunction's text reveals. 1-ER-3-4.

The closest the District Court came to addressing the unwarranted burdens created by the injunction was its statement that the contractual prohibitions would be in effect for "three years" to "level the playing field for the entry and growth of rivals, without burdening Google excessively." 1-ER-15. That conclusory statement—addressed only to the remedies' duration—provides no insight into whether the court considered the parties' less restrictive proposals. Nor does it explain how the contractual restrictions the court imposed were "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]," *Los Angeles Haven Hospice*, 638 F.3d at 664, especially when even Epic's position was that less restrictive remedies sufficed. 3-ER-447-451; *see also Columbia Pictures*, 710 F.3d at 1049 (injunctive relief may not be "more burdensome than necessary").

78

2.      **The District Court Impermissibly Refused To Consider the State Settlement.**

Google entered into a settlement agreement with all fifty States, the District of Columbia, and two territories, which was filed with the District Court before trial. *See* States Docket, Dkt. 522-2 at 18-28 ("State Settlement"); States Docket, Dkt. 443 at 1.  As part of the State Settlement, Google agreed to make extensive changes to its business, including (a) not entering or enforcing agreements with OEMs to exclusively preload Google Play or secure home screen exclusivity; (b) not entering into deals that require developers to launch their app catalogs on Play "at the same time or earlier" than other Android app stores, or to offer "the same or better features" at an "equal [] or more favorable" price; (c) allowing developers who sell in-app digital goods or services to offer users an alternative in-app billing system other than Google Play Billing; (d) permitting users to complete transactions on alternative billing systems "in an embedded view within [the developer's] app"; and (e) limiting sideloading warnings to a single screen.  State Settlement §§ 6.3-6.6, 6.10-6.11.

These provisions are designed to expand developer and consumer choice while protecting people's privacy and safety.  3-ER-691; 3-ER-697-699.  And the attorneys general of all fifty States represented to the court—in no uncertain terms—that the Agreement is "fair, reasonable, and adequate."  3-ER-689.  The Agreement's "combination" of provisions, they explained, will "allow competing app stores

79

access to Android devices and give consumers a reason to use those competing app stores." 3-ER-699. Once that occurs, they concluded, "Google will be forced to compete on price, quality, or both, and those changes will redound to the benefit of consumers." *Id.*

Despite the fact that the State Settlement Agreement offered concrete ways of remedying the same harms Epic asserted, the District Court categorically refused to approve it—or even analyze whether Epic had proven any need for additional relief beyond those terms. *See, e.g.*, 2-ER-363 (dismissing Google's argument referring to the State Settlement); *see* 2-ER-338-339 (declining to engage in discussions with Google about the State Settlement's proposed remedies); 1-ER-7-23 (omitting any mention of State Settlement from the order accompanying the injunction). That refusal was error for two separate reasons.

*First*, the District Court was required to consider the public interest. *eBay*, 547 U.S. at 391. Here, all fifty States entered the Agreement pursuant to their authority as *parens patriae*, 3-ER-685, which allows States to seek relief on behalf of their citizens to protect their "physical and economic" well-being, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). And after carefully reviewing the Agreement's extensive provisions, the attorneys general determined that the terms were in their citizens' best interest and "strike[] an appropriate balance between the concerns … raised about Google's conduct" and

80

the need to protect "the legitimate interests of consumers who use Android devices." 3-ER-691. Epic's proposal, in contrast, was designed to benefit Epic, not the public interest, and will in fact burden the public interest to benefit Epic

*Second*, the District Court was required to ensure that its injunction was no "more burdensome than necessary." *Columbia Pictures*, 710 F.3d at 1049. Many provisions in the State Settlement were substantially less restrictive than the court's injunction. *See, e.g.*, State Settlement § 6.5.2 (permitting Google to compete for launch parity provisions on an app-by-app basis, unlike ¶¶ 5-6 of the injunction), § 6.3.1 (permitting Google Play Billing to be offered as a choice alongside alternative in-app payment solutions, unlike ¶ 9 of the injunction), § 6.8.2 (expressly allowing Google to enforce its content and functionality policies against OEMs who preload other Android app stores, unlike ¶ 7 of the injunction). The attorneys general nevertheless concluded that the provisions were fully adequate to restore competition and create meaningful choices for users and developers, 3-ER-697-699, yet the District Court *refused to even consider* whether Epic had proven those remedies were insufficient.

In fact, the District Court took the reverse approach, prioritizing the interests of a single plaintiff. At a hearing on November 14, 2024, the District Court directed the States and Google to analyze whether the terms of the 45-page Settlement Agreement were "completely consistent" with its Epic injunction. 2-ER-168; *see*

*also* 2-ER-171; 2-ER-174.  The Minute Order after the hearing stated that the court would "not approve a settlement that contradicts or dilutes the conduct remedies ordered in Epic."  2-ER-164.

It was an abuse of discretion to completely ignore the State Settlement, which was plainly "relevant to the [court's] exercise of its discretion," *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1011 (9th Cir. 2013)—let alone fail to provide any explanation for exceeding its provisions.  *See Stormans*, 586 F.3d at 1140 ("[T]he district court should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials").

### 3.    The District Court Failed To Reckon With The Serious Security Interests of Non-Parties.

The District Court failed to account for the harm its injunction would cause to the security interests of millions of non-parties.  *See Bernhardt v. Los Angeles County*, 339 F.3d 920, 931-932 (9th Cir. 2003) ("courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction") (quotation marks omitted)).

Google's experts explained that distribution of third-party app stores, catalog access, and linkouts—all required by the injunction—posed particular security threats to *more than a hundred million U.S. consumers*.  Requiring Google to distribute third-party app stores risks subjecting Play users to stores that distribute

"pirated, unsafe, or inappropriate content." 2-ER-427-429 (collecting examples of app stores that meet this description, in addition to "many thousands" of harmful apps that are "indistinguishable" from app stores "from a technical perspective"); 9-ER-2045. Catalog sharing makes it more difficult for users to distinguish between legitimate and illegitimate app stores, since any app store seeking to steal user data or peddle pirated content can now offer all of the same apps as a legitimate app store. 2-ER-429; 9-ER-2035; *see* 2-ER-355-356. And linkouts expose users to phishing scams and malware. 3-ER-649; 3-ER-668; *see generally* Computer Security Experts Stay Amicus Br. These concerns extend to national security as well, as foreign adversaries will be able to exploit these aspects of the injunction to target U.S. Android users. *See* 3-ER-607.

To minimize these risks, Google offered a number of solutions. For instance, it proposed allowing developers additional ways to inform users about alternative methods to pay without using linkouts that can take users directly to malware or other predatory content. 3-ER-648-649. Google further asked for the ability to prophylactically vet third-party app stores before distribution on Play, 9-ER-2045-47, and to restrict catalog access to stores that enforced bans against "malware, pirated apps, or other illegal content," 9-ER-2035-36.

Left unaddressed, these security risks will imperil over a hundred million Android users. 2-ER-183. But the court provided little to no safeguards in the

83

injunction. For instance, the injunction would expressly *allow* linkouts for app downloads. 1-ER-4. It also would require Google to provide catalog access without explaining the security measures Google may take to address the concerns it raised during the remedial hearings. 1-ER-4-5.

The *only* place the injunction acknowledges these security issues is with respect to third-party app distribution. The injunction would allow Google to "take reasonable measures to ensure" that third-party app stores distributed through Play are "safe," "do not offer illegal goods or services," and do not "violate Google's content standards." 1-ER-5. But the injunction simultaneously limits such measures to those that Google can prove are "strictly necessary and narrowly tailored," *id.*— an ill-defined standard that hamstrings Google's ability to robustly address the innumerable security issues that Google must address every year. *See* 2-ER-211 (explaining that this limitation "contravenes th[e] prophylactic purpose of vetting" and will lead to a "security policy that is entirely or primarily reactive to only demonstrated threats," which "is no security policy at all"). The court did not offer *any reason* for this limitation. 1-ER-18-19. Nor did its order provide any indication that it even considered the security risks of linkouts and catalog access. 1-ER-15-23.[16]

---

[16] The court also ignored the substantial security risks associated with rolling out the catalog sharing and third-party app store distribution remedies on a rushed timeline. Google's experts explained that pushing out these changes prematurely—without

In opposing Google's request for a stay pending appeal, Epic claimed that the jury "rejected" Google's security-based procompetitive justifications. 2-ER-180. In fact, the jury was not asked to opine on *any* of the remedies in the injunction, much less whether those remedies pose serious security and piracy risks. Nor did the District Court suggest its injunction was justified on that basis. *See* 1-ER-15-23; 1-ER-4-5; *United States v. First Nat'l Bank of Circle*, 732 F.2d 1444, 1448 (9th Cir. 1984) (an appellate court can "review [a district court's] exercise of discretion only by evaluating what [it] considered, not what the parties tell us").

Moreover, given that the jury was instructed to balance competitive harms against procompetitive benefits, 6-ER-1436, there is no basis to assume the jury rejected as illegitimate Google's arguments concerning the security risks associated with downloading content from external websites, 2-ER-180; *U.S. Wholesale*, 89 F.4th at 1145 (a court cannot assume the jury found facts not "necessarily" implied by the verdict). Moreover, the jury never heard *any* argument about the security risks of catalog access or third-party app store distribution—issues that arose for the first time after the jury was dismissed.

---

sufficient time to test for safety issues—would exacerbate the inherent security risks. *See, e.g.*, 2-ER-240 (real-life example of serious consequences stemming from premature software rollout). Google therefore asked for 12 to 16 months to come into compliance, 2-ER-386; 2-ER-391, but the court arbitrarily and without explanation imposed an 8-month deadline, 1-ER-4-5.

**4.      The District Court Failed To Address the Intellectual Property Interests of Non-Parties.**

The District Court also disregarded the legal and business ramifications of the catalog access provision for the half-million-plus developers who distribute through Play. 2-ER-183. As the creators and owners of apps, developers have intellectual property rights in their apps' software and brand features. When a developer contracts with Google to distribute its app through Play, it grants Google a nonexclusive license to use its intellectual property. *See, e.g.*, 2-ER-399 (granting Google license to "display Developer Brand Features … for use solely within Google Play"). That limited license does not permit Google to sublicense developers' content *to other parties*. 2-ER-397; 2-ER-399 (reserving to developers all intellectual property rights in their apps, with limited exceptions expressly provided for in the agreement); 2-ER-398-399 (authorizing sublicensing only for limited security purposes). But that is what the catalog access provision requires, by inherently forcing *non*-parties to grant Google a de facto right to sub-license *their* intellectual property. But this Court has held that a licensor should "be able to monitor the use" of its intellectual property, including by giving the licensor a "role" in "negotiat[ing]" who uses its intellectual property, and how they use it. *Gardner v. Nike, Inc.*, 279 F.3d 774, 781 (9th Cir. 2002) (copyrights); *see Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 993 (9th Cir. 2006) (per curiam) (trademarks). Contrary to this precedent, the catalog access provision puts the onus on the

86

developer to investigate and block any use it disapproves—without ever giving approval in the first place. *See, e.g.*, 2-ER-257 (providing example of developer that publishes children's content not wanting to be listed next to apps containing pornography). Since developers may *themselves* have sublicensed material from other parties, this remedy may effectively force them to violate their own contractual agreements. *See* 9-ER-2032.

Google repeatedly raised this problem with the District Court. 3-ER-624-625; 9-ER-2032-34. But once again, the record provides no indication that the court even considered these serious concerns, demonstrating that the court did not give meaningful consideration to the public interest. *See*, *e.g.*, 2-ER-258-261 (discussing benefits of an opt-out requirement from an economic standpoint without addressing intellectual property concerns). This error again requires vacatur. *See, e.g.*, *Stormans*, 586 F.3d at 1142 (vacating injunction for failure to properly consider effects on non-parties); *Galvez v. Jaddou*, 52 F.4th 821, 837-839 (9th Cir. 2022) (vacating provision of injunction where court failed to consider conflict with existing law).

## C. Epic Failed To Prove That It Has Article III Standing To Seek A Nationwide Injunction.

Epic is a single plaintiff. But the injunction does not impact just Epic; it seeks to regulate Google's interactions with over half a million developers, OEMs, mobile carriers, and Android app stores—*none* of whom are parties. To prove Article III

standing for such an injunction, Epic had to show a concrete future injury *to Epic* that would be redressable by the relief it seeks. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This Court reviews "the existence of Article III standing *de novo*." *California v. Trump*, 963 F.3d 926, 935 (9th Cir. 2020).

Here, the District Court made no findings concerning Epic's Article III standing before imposing this nationwide injunction. Because Epic cannot show Article III redressability with respect to the catalog-access, app-store-distribution, or any injury to Epic stemming from Play's billing and anti-steering policies, those provisions should be vacated.

*Catalog Sharing*. When a plaintiff's standing depends on the decisions of third parties, it is not enough to rely on "guesswork as to how [those] independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413-414. A plaintiff must offer "proof" that such independent actors "will likely react in predictable ways." *Murthy*, 144 S. Ct. at 1993, 1986 (quotation marks omitted).

Epic failed to meet that standard here with respect to whether catalog sharing would redress its claimed competitive injuries. It claims that the catalog access provision will help *other* app stores and generally improve competition. *See, e.g.*, 4-ER-771; 4-ER-775-776. But that depends on a questionable string of unsupported assumptions about third-party behavior: *First*, that once rival app stores can offer all of Play's apps, they will be more likely to attract users, 4-ER-771; *second*, that if

rival stores then present sufficiently desirable features, like lower prices or a better interface, they can start "acquiring" more users, *id.*; *third*, that rival stores will then be "well-positioned" to "persuade" developers to distribute their apps directly through their stores and will have the "opportunity to develop more robust preloading and placement relationships with OEMs," 4-ER-771; 4-ER-775; and *fourth*, that this will ultimately promote competition by mitigating Google's dominance "at least to some degree," 4-ER-771.

Epic failed to prove, with "specific facts," that third parties (including app stores, developers, OEMs, and users) will respond in a predictable way to the injunction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-562 (1992). In fact, Epic's leading theory at trial relied on the exact opposite premise: that rival stores needed to be able to *differentiate themselves by offering unique content unavailable on Play* to gain a foothold in the market. *See, e.g.*, 6-ER-1252-53; 6-ER-1469; *cf. Microsoft II*, 373 F.3d at 1219 (noting that a remedy giving "rivals the ability to clone Microsoft's software products" would not promote competition). Epic's remedies-phase experts did not provide any evidence to support Epic's theory of how the market would respond to catalog access; they provided only assumptions—with no facts, examples, or third-party testimony as support. *See, e.g.*, 4-ER-770-771; 4-ER-775-776; 3-ER-461-464; 3-ER-469-470. Epic has not demonstrated

Article III redressability under these circumstances. *See Murthy*, 144 S. Ct. at 1986, 1994.

  ***App Store Distribution.***  Epic's redressability theory for the app-store-distribution remedy is equally speculative. Before the injunction issued, Epic never said whether it would take advantage of an app-store distribution mandate; it claimed this remedy would help Epic *indirectly* by increasing competition.[17] But that conclusion is again based on speculation and depends on the actions of other third-party app stores, including whether those stores in fact distribute through Play, whether distribution through Play in fact allows them to gain users and better compete with Google, and whether that competition *ultimately benefits Epic*.

  Again, Epic provided only the unsupported assumptions of its economist to support this claim, not factual evidence in the record. *See* 4-ER-771; 4-ER-776-777; 3-ER-504-506. After all, Google gained users and market share by offering an innovative product; Epic has not demonstrated that other app stores will gain market share simply because they can be downloaded through Play. *See, e.g.*, 6-ER-1261 (Epic's expert agreeing that Play initially acquired users by offering an innovative product); 5-ER-1092; 5-ER-1107; 5-ER-1132; 6-ER-1309-12; 6-ER-1314-16

---

[17] After the injunction, Epic said it would distribute its store on Play, but that backfilling does not create standing for a remedy requiring Play to distribute *other* app stores. Those stores are not before the Court, and Epic lacks Article III standing to seek a remedy for them.

(multiple witnesses testifying about Google improving Play to meet users' evolving needs); 6-ER-1275 (users decline to switch to Samsung's store even though it is also preloaded on the home screen of all Samsung devices).

The District Court had "an obligation to assure" itself that Epic had Article III standing before ordering these remedies. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 180 (2000). But the court never made any relevant findings of fact on the issue, *see generally* 3-ER-434-572; 2-ER-220-374; 1-ER-7-23, and never inquired whether Epic had supported its causal chain of reasoning with sufficient evidence, as *Murthy* expressly requires. *See* 144 S. Ct. at 1981, 1986-95 (reversing issuance of injunction on standing grounds for lack of "factual evidence" supporting multi-step chain of causation and redressability).

***Billing and Anti-Steering Policies.*** Epic plainly lacks standing to seek an injunction affecting Play's billing and anti-steering policies. It faces no ongoing injury whatsoever from those policies.

Forward-looking relief requires "a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496; *accord Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). This ensures that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009) (quotation marks omitted).

Epic has not shown any such personal stake here, because Play's billing and anti-steering policies applied *only to apps distributed through Play*. Apps distributed through Play had to use Google Play Billing, and developers could not lead users to alternative payment options. *See, e.g.*, 5-ER-1008; 6-ER-1272-73. Epic failed to prove, however, that it would be harmed by these policies in the future.

Epic has not distributed apps on Play for years, and nothing requires Google to allow Epic to do so going forward. *See, e.g.*, 5-ER-991. Apps distributed through *Epic's* store are not subject to *Play's* billing or anti-steering policies. And Epic offered no evidence that its payment system is for use anywhere other than its own store. *See, e.g.*, 5-ER-976. Without "specific facts" showing Epic will be harmed by Play's policies, it lacked standing to challenge them—let alone obtain an injunction enjoining them.

Epic may lean into *Apple II*, but that decision does not address payment-processing provisions at all. And even as to the analysis of Epic's standing to challenge Apple's anti-steering policy, *Apple II*'s reasoning does not survive the Supreme Court's decision in *Murthy*. 144 S. Ct. at 1986-87, 1995. It is reversible error under *Murthy* to award injunctive relief when a plaintiff offers no factual evidence to establish that the necessary causal links in its theory of standing will likely occur. *See id.* at 1993, 1986. *Apple II* identified no factual evidence indicating that developers on iOS were likely to steer users to another app store (much less

92

Epic's) to re-access the app and make payments. 67 F. 4th at 1000. Likewise, for an injunction against anti-steering to benefit Epic here, developers other than Epic would need to steer Play users to Epic's game store to make purchases and also use Epic's billing system rather than another system. Epic proffered no factual evidence this would likely occur.

*Murthy* aside, there is also a glaring difference here from *Apple II*: that case involved an explicit finding about Epic's likely future injury that is absent here. *See* 67 F.4th at 1000. Instead, the District Court declined to address Epic's standing to obtain anti-steering (or other payment-related) remedies. 3-ER-434-572; 2-ER-220-374; 1-ER-7-23.

## CONCLUSION

For the foregoing reasons, the liability verdict and permanent injunction should be vacated.

Dated: November 27, 2024                    Respectfully submitted,

                                            /s/ Neal Kumar Katyal

                                            Neal Kumar Katyal
                                            Jessica L. Ellsworth
Katherine B. Wellington                     Reedy C. Swanson
HOGAN LOVELLS US LLP                        Natalie Salmanowitz
125 High Street, Suite 2010                 HOGAN LOVELLS US LLP
Boston, MA 02110                            555 Thirteenth Street NW
Telephone: (617) 371-1000                   Washington, D.C. 20004
                                            Telephone: (202) 637-5600

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Leigha Beckman
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Johannah Cassel-Walker
HOGAN LOVELLS US LLP
4 Embarcadero Center
Suite 3500
San Francisco, CA 94111
Telephone: (479) 719-2930

Mackenzie Dulay Austin
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600

Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael
Dane P. Shikman
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 21,827 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f), and is accompanied by a motion to exceed the page or type-volume limits pursuant to Circuit Court Rule 32-2(a).

This motion complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on November 27, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.


/s/ Neal Kumar Katyal
Neal Kumar Katyal