Nos. 24-6256, 24-6274

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

---

**EXCERPTS OF RECORD
VOLUME I OF IX (ER1-161) (Public Volume)**

---

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
Natalie Salmanowitz
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

November 27, 2024                    *Counsel for Defendants-Appellants*

---

*(Additional Counsel Listed on Inside Cover)*

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Leigha Beckman
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Johannah Cassel-Walker
HOGAN LOVELLS US LLP
4 Embarcadero Center
Suite 3500
San Francisco, CA 94111
Telephone: (479) 719-2930

Mackenzie Dulay Austin
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Justin P. Raphael
Dane P. Shikman
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants-Appellants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | MDL Case No. 21-md-02981-JD |
| | Member Case No. 20-cv-05671-JD |
| | **PERMANENT INJUNCTION** |

This permanent injunction is entered in MDL member case *Epic Games, Inc. v. Google LLC et al.*, Case No. 20-cv-05671-JD, on the jury verdict against Google under Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1, 2, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq., and the Court's finding that Google violated the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

1.      This injunction applies to Google LLC and each of its parent, affiliated, and subsidiary entities, officers, agents, employees, and any person in active concert or participation with them, who receive actual notice of this order by personal service or otherwise (together, Google).

2.      Unless otherwise stated, the effective date of the injunction is November 1, 2024.

3.      The geographic scope of the injunction is the United States of America.

4.      For a period of three years ending on November 1, 2027, Google may not share revenue generated by the Google Play Store with any person or entity that distributes Android apps, or has stated that it will launch or is considering launching an Android app distribution platform or store.

5.      For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer to launch an app first or exclusively in the Google Play Store.

United States District Court
Northern District of California

**ER-3**

United States District Court
Northern District of California

6. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement by an app developer not to launch on a third-party Android app distribution platform or store a version of an app that includes features not available in, or is otherwise different from, the version of the app offered on the Google Play Store.

7. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an original equipment manufacturer (OEM) or carrier to preinstall the Google Play Store on any specific location on an Android device.

8. For a period of three years ending on November 1, 2027, Google may not condition a payment, revenue share, or access to any Google product or service, on an agreement with an OEM or carrier not to preinstall an Android app distribution platform or store other than the Google Play Store.

9. For a period of three years ending on November 1, 2027, Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing. Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing. Google may not require a developer to set a price based on whether Google Play Billing is used.

10. For a period of three years ending on November 1, 2027, Google may not prohibit a developer from communicating with users about the availability or pricing of an app outside the Google Play Store, and may not prohibit a developer from providing a link to download the app outside the Google Play Store.

11. For a period of three years, Google will permit third-party Android app stores to access the Google Play Store's catalog of apps so that they may offer the Play Store apps to users. For apps available only in the Google Play Store (*i.e.*, that are not independently available through the third-party Android app store), Google will permit users to complete the download of the app through the Google Play Store on the same terms as any other download that is made directly

2

**ER-4**

through the Google Play Store.  Google may keep all revenues associated with such downloads. Google will provide developers with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store.  Google will have up to eight months from the date of this order to implement the technology necessary to comply with this provision, and the three-year time period will start once the technology is fully functional.

12.     For a period of three years, Google may not prohibit the distribution of third-party Android app distribution platforms or stores through the Google Play Store.  Google is entitled to take reasonable measures to ensure that the platforms or stores, and the apps they offer, are safe from a computer systems and security standpoint, and do not offer illegal goods or services under federal or state law within the United States, or violate Google's content standards.  The review measures must be comparable to the measures Google is currently taking for apps proposed to be listed in the Google Play Store.  If challenged, Google will bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored. Google may require app developers and app store owners to pay a reasonable fee for these services, which must be based on Google's actual costs.  Google will have up to eight months from the date of this order to implement the technology and procedures necessary to comply with this provision, and the three-year time period will start once the technology and procedures are fully functional.  For the duration of this time period, the Technical Committee described in paragraph 13 below will in the first instance decide challenges to Google's review decisions, with the Court serving as the final word when necessary.

13.     Within thirty days of the date of this order, the parties will recommend to the Court a three-person Technical Committee.  Epic and Google will each select one member of the Technical Committee, and those two members will select the third member.  After appointment by the Court, the Technical Committee will review disputes or issues relating to the technology and processes required by the preceding provisions.  If the Technical Committee cannot resolve a dispute or issue, a party may ask the Court for a resolution.  The Technical Committee may not extend any deadline set in this order, but may recommend that the Court accept or deny a request to extend.  Each party will bear the cost of compensating their respective party-designated

United States District Court
Northern District of California

3

**ER-5**

1  committee member for their work on the committee.  The third member's fees will be paid by the

2  parties in equal share.

3       14.    The Court will retain jurisdiction over the injunction for all purposes.  Google or

4  Epic may request a modification of the injunction for good cause.

5      **IT IS SO ORDERED.**

6  Dated:  October 7, 2024

7

8  _____

9  JAMES DONATO
   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | MDL Case No.  21-md-02981-JD |
| | Member Case No. 20-cv-05671-JD |
| | **ORDER RE UCL CLAIM AND INJUNCTIVE RELIEF** |

This order gives the reasons for the permanent injunction to be entered in *Epic Games, Inc. v. Google LLC et al.*, Member Case No. 20-cv-05671-JD.  It also resolves Epic's equitable claims against Google under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

### BACKGROUND

In the order denying Google's post-verdict motion for judgment as a matter of law or a new trial, Dkt. No. 984 (JMOL Order),[1] the Court discussed in detail the jury's unanimous verdict against Google and the trial evidence that supported the verdict.  In summary, after testimony by forty-five witnesses about Google's Play Store practices presented over fifteen days of trial, the jury found in favor of Epic on: (1) monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.; and (3) tying under Section 1 of the Sherman Act and the Cartwright Act.  *Id.* at 3-4; Dkt. No. 866 (Jury Verdict).  Epic's

---

[1] Unless otherwise noted, all docket number references are to the ECF docket for *In re Google Play Store Antitrust Litigation*, Case No. 21-md-02981-JD.

United States District Court
Northern District of California

1    equitable claim under the California Unfair Competition Law is for the Court to decide.[2]

2        Epic seeks an injunction as the remedy on the jury verdict.  To help determine an

3    appropriate injunction, the Court held extensive post-verdict hearings on what an injunction

4    should seek to accomplish, and where it should refrain from acting.  Epic kicked off the

5    proceedings by filing a proposed injunction.  Dkt. No. 952.  Google responded with more than 90

6    pages of objections.  Dkt. No. 958.  To ensure a fully developed record on the remedy, the Court

7    invited each side's experts to present their views in concurrent expert evidentiary hearings.  One

8    hearing involved testimony by four economists, two for each side of the case.  Dkt. No. 978.  A

9    second hearing involved technology experts sponsored by Epic, and three Google engineers.  Dkt.

10   No. 1001.  In each hearing, the witnesses were directed to focus their comments on issues specific

11   to the jury verdict and the facts in evidence at trial.  *See* Dkt. Nos. 977, 1000.  In conjunction with

12   the hearings, the parties filed statements by the economists, Dkt. Nos. 952, 957, and the

13   technology experts and engineers.  Dkt. Nos. 981, 985.  The Federal Trade Commission filed an

14   amicus brief, which the Court accepted.  Case No. 20-cv-05671-JD, Dkt. No. 686-1.  After the

15   evidentiary hearings concluded, the Court heard closing arguments from the parties on the issue of

16   the remedy.  Dkt. No. 1000 at 95:18-155:1.

17       Overall, each side had a virtually unlimited opportunity to present its views about the

18   scope and content of an injunction.  Google's request for even more discussion is not well taken.

19   *See*, *e.g.*, Dkt. No. 958 at 11.  Google took full advantage of the Court's open-ended procedures,

20   as the voluminous post-verdict docket entries readily attest.  As the Court noted in the JMOL

21   Order, it bears mention that Google has, on several occasions, fired a blunderbuss of comments

22   and complaints that are underdeveloped and consequently unhelpful in deciding the issues.  *See*

23   Dkt. No. 984 at 4.  More of the same is not warranted at this closing stage of the case.

**DISCUSSION**

25   **I.    THE UCL CLAIM**

26       Before turning to the injunction, Epic's final claim under the California Unfair

27

28   _____

[2] The Court is advised that the parties have resolved Google's breach of contract counterclaim and
there are no remaining counterclaims or defenses for resolution.  Dkt. No. 1002.

**ER-8**

Competition Law (UCL) must be resolved.  The UCL prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Epic has alleged that Google violated the unlawful and unfair prongs of the UCL.  Dkt. No. 378 ¶¶ 295-96.  These are equitable claims entrusted to the Court's sound discretion.  *See Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cnty.*, 9 Cal. 5th 279, 292 (2020) ("the causes of action established by the UCL . . . are equitable in nature and are properly tried by the court rather than a jury").

The disposition of the unlawful prong is straightforward.  The jury concluded that Google's Play Store conduct violated the Sherman Act and Cartwright Act.  *See* Dkt. No. 866.  As Google has rightly said, this means that Google necessarily violated the unlawful prong of the UCL.  *See* Dkt. No. 1000 at 152:2-21; *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable.") (citation omitted).

The unfair prong is more nuanced because it is "intentionally framed in . . . broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive."  *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 1000 (9th Cir. 2023) (internal quotations and citations omitted).  California state courts have formulated two tests relevant here.  To support "any finding of unfairness to competitors," the Court decides whether the defendant's conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-Tech*, 20 Cal. 4th at 186-87.  To support a finding of unfairness to consumers, the Court balances "the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Progressive W. Ins. Co. v. Yolo Cnty. Superior Court*, 135 Cal. App. 4th 263, 285-86 (2005) (citation omitted).  The inquiries are not "mutually exclusive" and will have some

1    substantive overlap.  *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007)

2    (citing *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144 (2000)).[3]

3          Whether Epic is characterized as a competitor (such as the provider of a competing in-app

4    billing service) or a customer (such as a developer and distributor of Android apps, including for a

5    time on the Google Play Store), the unfairness prong has been violated.  The jury found that

6    Google's conduct violated the antitrust laws and substantially harmed competition in the relevant

7    markets, and directly injured Epic.  The jury rejected Google's proffered procompetitive

8    justifications for its conduct.  Consequently, the Court concludes that Epic has prevailed on the

9    UCL claim against Google under the unlawful and unfair prongs.  Judgment will be entered in

10   favor of Epic.

## II.      THE INJUNCTION

### A.      Legal Standards

#### 1.      The Federal Antitrust Laws

14         An injunction on the federal antitrust verdict is governed by Section 16 of the Clayton Act,

15   15 U.S.C. § 26.  Under Section 16, "[a]ny person, firm, corporation, or association" is entitled to

16   "injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws, . . . ,

17   when and under the same conditions and principles as injunctive relief against threatened conduct

18   that will cause loss or damage is granted by courts of equity."  To warrant an injunction, a plaintiff

19   "need only demonstrate a significant threat of injury from an impending violation of the antitrust

20   laws or from a contemporary violation likely to continue or recur."  *Zenith Radio Corp. v.*

21   *Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969).  Injunctive relief is "wholly proper" when

22   there is "nothing indicating that" a clear violation of the antitrust laws that has already been found

23

---

[3] In *Lozano*, our circuit acknowledged that the question of "how to define 'unfair'" in the consumer action context after *Cel-Tech*" has not been completely settled by the California courts.  504 F.3d at 736 (emphasis omitted).  More recently, our circuit stated that "[u]nder the UCL's unfairness prong, courts consider either: (1) whether the challenged conduct is 'tethered to any underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law,' or violates the policy or spirit of an antitrust law,'; (2) whether the practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers,'; or (3) whether the practice's impact on the victim outweighs 'the reasons, justifications and motives of the alleged wrongdoer.'"  *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020) (internal citations omitted).

United States District Court
Northern District of California

1    "had terminated or that the threat to [plaintiff] inherent in the conduct would cease in the

2    foreseeable future." *Id.* at 131-32.

3         The plain words of Section 16 must be read with the purpose of the antitrust laws in mind.

4    "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free

5    enterprise. They are as important to the preservation of economic freedom and our free-enterprise

6    system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United*

7    *States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also North Carolina State Bd. of*

8    *Dental Examiners v. F.T.C.*, 574 U.S. 494, 502 (2015) ("Federal antitrust law is a central

9    safeguard for the Nation's free market structures.") (citing *Topco*, 405 U.S. at 610). The question

10   has been asked whether our tech-based economy has outgrown the federal antitrust laws, which

11   date back to 1890 when the Sherman Act was signed into law. In the Court's view, it has not.

12   The broad provisions of the Sherman Act provide all of the tools needed to address the issues

13   presented in this case, as they have for over a century in a constantly changing national economy.

14   Google has not suggested otherwise.

15        The tools available for a remedy are powerful. As the Supreme Court has emphasized,

16   injunctive relief under Section 16 is meant to restore economic freedom in the relevant markets

17   and break the shackles of anticompetitive conduct. "In exercising its equitable jurisdiction, a

18   federal court has broad power to restrain acts which are of the same type or class as unlawful acts

19   which the court has found to have been committed or whose commission in the future unless

20   enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith*, 395 U.S. at

21   132 (cleaned up); *see also United States v. Loew's, Inc.*, 371 U.S. 38, 52 (1962) (relief should be

22   "adequate to prevent the recurrence of the illegality which brought on the given litigation."). "The

23   relief in an antitrust case must be effective to redress the violations and to restore competition.

24   The District Court is clothed with large discretion to fit the decree to the special needs of the

25   individual case." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (quotations and

26   citations omitted). "Antitrust relief should unfetter a market from anticompetitive conduct and

27   'pry open to competition a market that has been closed by defendants' illegal restraints.'" *Id.* at

28   577-78 (citation omitted); *see also United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir.

United States District Court
Northern District of California

2001) ("remedies decree in an antitrust case must seek to unfetter a market from anticompetitive conduct, to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.") (quotations and citations omitted).

To these ends, the Court is charged with making "a reasonable judgment on the means needed to restore and encourage the competition adversely affected by" the anticompetitive conduct. *Ford Motor*, 405 U.S. at 578; *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (district court is "empowered to fashion appropriate restraints on the [defendant's] future activities both to avoid a recurrence of the violation and to eliminate its consequences."). A remedy is not limited simply to prohibiting conduct found to be anticompetitive. Rather, the Court has discretion to fashion a remedy directed to the effect of the anticompetitive conduct. *See Mass. v. Microsoft Corp.*, 373 F.3d 1199, 1209 (D.C. Cir. 2004). As our circuit has concluded, "[i]f the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 486 (9th Cir. 2021) (quotations and citation omitted).[4]

### 2. UCL

The UCL provides an independent state-law basis for an injunction. "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. For Google's UCL violations, the Court may make "such orders . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition." *Id.* To be sure, "[e]ven where the UCL authorizes injunctive relief pursuant to state law, a federal court must also ensure that the

---

[4] The California Cartwright Act also provides for an antitrust injunction. *See* Cal. Bus. & Prof. Code Section 16750(a). The parties have treated Epic's Cartwright Act claims as being coterminous with the Sherman Act claims for purposes of both liability and remedy, and so no additional discussion of the Cartwright Act is needed here.

6

ER-12

United States District Court
Northern District of California

United States District Court
Northern District of California

1    relief comports with 'the traditional principles governing equitable remedies in federal courts.'  To

2    issue an injunction, the court must find: '(1) that [the plaintiff] has suffered an irreparable injury;

3    (2) that remedies available at law, such as monetary damages, are inadequate to compensate for

4    that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

5    remedy in equity is warranted; and (4) that the public interest would not be disserved by a

6    permanent injunction.  Injunctive relief should be no 'more burdensome to the defendant than

7    necessary to provide complete relief to the plaintiff[].'"  *Epic Games*, 67 F.4th at 1002 (citations

8    omitted).

9        Epic did not need to spell out this four-factor test in post-verdict briefing, for good reason.

10    All of the elements were thoroughly established by the jury verdict and the evidence at trial.  In

11    pertinent part, Epic established that it suffered an irreparable injury.  It was, in the language of the

12    UCL, illegally and unfairly foreclosed from using its own in-app billing services while distributing

13    its Fortnite app through the Google Play Store because of Google's anticompetitive practices.

14    Epic was also illegally and unfairly foreclosed from competing in the market for Android in-app

15    billing services for digital goods and services transactions, again because of Google's

16    anticompetitive conduct.  These harms are ongoing and cannot be made right simply by Google

17    writing Epic a large check.  Considering the balance of hardships between Epic and Google, a

18    remedy in equity is warranted, and the public interest, which is perfectly aligned with the

19    restoration of free and unfettered competition, would be well served by a permanent injunction.

20        Consequently, injunctive relief on the UCL claim is warranted, and the scope of that relief

21    is coterminous with the injunction for the violations of the antitrust statutes.  In setting the scope

22    of the injunction, the Court has been mindful that Google must not be unduly inhibited in its

23    ability to compete in legitimate ways by, for example, improving its products or its pricing.

24       **B.**      **Geographic Scope**

25        The initial question for the injunction is where it will apply geographically.  The jury

26    found a relevant geographic market of worldwide except for China for both of the product

27    markets, which was a conclusion that was amply supported by the evidence at trial.  *See* JMOL

28    Order at 14-15.  Even so, the permanent injunction is limited to the United States.

7

1    This is due mainly to principles of comity and deference to the rights of other countries to

2    address anticompetitive conduct under their own laws and regulations.  The record indicates that

3    enforcement agencies around the world are investigating Google's conduct with respect to the

4    Play Store.  *See*, *e.g.*, Dkt. No. 700 at 3 (granting Google's motion in limine to "exclude evidence

5    or argument re foreign proceedings and investigations"); Dkt. No. 644-2 at ECF pp. 61-68

6    (discussing foreign investigations and regulatory reports); *see also* Dkt. No. 958 (Google's

7    Objections) at 87-89 (describing extensive legal, investigative, regulatory, and other informal

8    proceedings underway in foreign jurisdictions).  It is neither the right nor the duty of a United

9    States court to preempt the enforcement powers of other nations by imposing an injunction that

10   would operate within their borders.  Consequently, the Court elects, as a prudential matter, not to

11   interfere in the administration of antitrust laws outside the United States.  *See Mujica v. AirScan*

12   *Inc.*, 771 F.3d 580, 598 (9th Cir. 2014) ("International comity is a doctrine of prudential

13   abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate

14   claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction

15   under principles of international law.'") (citation omitted).

16       **C.**       **Specific Provisions On Anticompetitive Conduct**

17   "When it comes to fashioning an antitrust remedy, we acknowledge that caution is key."

18   *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021).  Epic's proposed injunction

19   made many good points, as did its economists in the post-verdict proceedings.  But Epic's

20   proposal also threatened a degree of judicial oversight that would amount to micromanagement of

21   Google's business.  It is not for the Court to decide the day-to-day business issues of Android app

22   distribution and in-app billing.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*

23   *LLP*, 540 U.S. 398, 415 (2004) (Court should not "assume the day-to-day controls characteristic of

24   a regulatory agency") (quotations and citation omitted).  Consequently, the Court declines to

25   impose several of the injunction terms urged by Epic.

26   Even so, important remedial measures can be imposed that do not demand excessive

27   judicial oversight.  The trial made this determination a straightforward task.  For example, in light

28   of the jury verdict and supporting evidence, it is perfectly appropriate that Google be enjoined

United States District Court
Northern District of California

8

ER-14

1    from sharing Play Store revenues with current or potential Android app store rivals, and from

2    imposing contractual terms that condition benefits on promises intended to guarantee Play Store

3    exclusivity.  Google itself agreed with these conduct remedies.  *See* Dkt. No. 1000 at 120:16-19

4    (Google's counsel agreeing that "the two prohibitions . . . that Dr. Bernheim discussed, those can

5    be a part of the injunction with certain modifications"); *id*. at 98:21-105:9 (Epic's counsel

6    discussing Dr. Bernheim's two prohibitions).  The prohibitions along these lines are stated in

7    paragraphs 4 through 8 of the injunction, and they closely track the evidence of anticompetitive

8    conduct at trial as summarized in the JMOL Order.  *See* Dkt. No. 984 at 17-20.

9         The revenue share and contractual prohibitions will be in effect for a period of three years.

10   This is because the provisions are designed to level the playing field for the entry and growth of

11   rivals, without burdening Google excessively.  *See Mass. v. Microsoft*, 373 F.3d at 1231-32

12   (Court's task is to redress the harm done to competition "by restoring conditions in which the

13   competitive process is revived and any number of competitors may flourish (or not) based upon

14   the merits of their offerings.").  As competition comes into play and the network effects that

15   Google Play unfairly enjoys are abated, Google should not be unduly constrained as a competitor.

16   Some of the prohibited conduct might be legitimate when done by a company without monopoly

17   power.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) (Scalia, J.,

18   dissenting) ("Where a defendant maintains substantial market power, his activities are examined

19   through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or

20   that might even be viewed as procompetitive -- can take on exclusionary connotations when

21   practiced by a monopolist.") (citation omitted); *see also McWane, Inc., v. F.T.C.*, 783 F.3d 814,

22   836-37 (11th Cir. 2015) (same).

23        The injunction also includes provisions to remediate the anticompetitive "consequences"

24   of Google's illegal conduct.  *See Prof'l Eng'rs*, 435 U.S. at 697; *see also Optronic Techs*., 20

25   F.4th at 486 (Court may order relief that represents a "reasonable method of eliminating the

26   consequences of the illegal conduct."); *U.S. v. Microsoft*, 253 F.3d at 103 (injunction should "deny

27   to the defendant the fruits of its statutory violation.").

28

United States District Court
Northern District of California

9

ER-15

1    The consequences to be remediated are intertwined with the network effects of Google's

2  dominant position in the relevant markets.  The Court instructed the jury, without objection by

3  either side, that the Google Play Store is a "two-sided platform market" that "offers products or

4  services to two different groups who both depend on the platform to intermediate between them."

5  Dkt. No. 850 (Final Jury Instructions) at ECF p. 22 (No. 18).  For the Play Store, "developers who

6  wish to sell their apps" are on one side of the market and "consumers that wish to buy those apps"

7  are on the other.  *Id.*  "Network effects" in this context means that the greater the number of

8  developers, the greater the number of users, and vice versa.  As Google put it in an internal slide

9  that was introduced at trial, Google understood that "Users come to Play because we have by far

10  the most compelling catalog of apps/games," and "Developers come to Play because that's where

11  the users are."  Trial Tr. at 1211:23-1212:1.

12    Senior Google executive Jamie Rosenberg testified about network effects in connection

13  with the slide deck entitled, "Amazon competitor deep dive," which was presented to Rosenberg's

14  team in 2017.  Trial Tr. at 1207:13-22; Dkt. No. 886-50 (Trial Ex. 682).  The slides discussed the

15  threat posed by the Amazon app store, a potential competitor of the Google Play Store.  Trial Tr.

16  at 1207:24-1208:1.  Under the heading, "Good News," Google said that "Amazon is yet to

17  establish critical mass" and noted that "Play benefits from network effects."  *Id.* at 1211:7-22.  As

18  Google acknowledged in the slides, "Amazon will struggle to break those network effects": "Users

19  won't go to Amazon because their catalog of apps/games is very limited"; and "Developers won't

20  focus on Amazon because they don't have users."  Trial Tr. at 1212:5-9.  Other evidence along

21  these lines was also presented to the jury.

22    The picture drawn by this evidence is telling.  Even a corporate behemoth like Amazon

23  could not compete with the Google Play Store due to network effects.  Consequently, the

24  injunction must overcome the effects by providing access to the catalog of Play Store apps for a

25  period of time sufficient to give rival stores a fair opportunity to establish themselves.  This will

26  be three years on the terms stated in the injunction.

27    Google's main objection to catalog access is that the anticompetitive conduct found by the

28  jury was not proven to be a significant cause of these network effects.  *See* Dkt. No. 1000 at 122:9-

United States District Court
Northern District of California

10

ER-16

11. Google says that any network effects in the relevant market are attributable to its role as a first mover in the markets, and so are not subject to remediation.

The point is not well taken. The network effects presented during trial are a feature of any two-sided market such as the Google Play Store. Although Google may legitimately claim some early mover advantage, it was not entitled to maintain and magnify network effects, and thereby entrench its dominant position, through the anticompetitive conduct found by the jury. It bears emphasis that Rosenberg's testimony and the Amazon slides concerned events in 2017, well after the original launch of the Play Store and the start of the relevant time period in August 2016. Eight months into the time period in which Google engaged in anticompetitive conduct, it was well aware that "to get more developers, Amazon needs more users." *Id*. at 1213:18-20. This frank admission was made precisely while Google was erecting barriers to insulate the Play Store from competition.

Consequently, the salient question is not whether Google's anticompetitive conduct caused the network effects. Rather, the question is whether Google engaged in anticompetitive conduct that had the consequence of entrenching and maintaining its monopoly power in a two-sided market. The jury answered that question in the affirmative. In effect, Google unfairly enhanced its network effects in a way that would not have happened but for its anticompetitive conduct.

This is why the injunction must not only prohibit the specific anticompetitive conduct that Google engaged in, but also undo the consequence of Google's ill-gotten gains. As the FTC aptly said in an amicus brief, "[n]etwork effects can confer a powerful incumbency advantage to dominant digital platforms, creating barriers to entry and to competition. . . . The incumbent platform operator -- which had been motivated to attract both users and developers by offering innovative, low-cost services before establishing dominance -- may become less incentivized to compete after it achieves market power and builds a moat insulating itself from competition." Dkt. No. 686-1 at 9. The injunction must bridge the moat.

Even so, the catalog access provision is narrowly tailored to remediate the unfairly enhanced network effects Google reaped without unfairly penalizing its success as a first mover. To that end, if a rival app store does not have a relationship with a developer and so cannot fulfill

**ER-17**

1    a download request by a user, the rival will direct the download request to the Google Play Store.

2    In that case, the Google Play Store will fulfill the download request and keep the associated

3    revenue, if any, and the download will be made pursuant to the Google Play Store's policies.  All

4    that the catalog access does is level the playing field for a discrete period of time so that rival app

5    stores have a fighting chance of getting off the ground despite network effects and the

6    disadvantage of offering a "catalog of app/games" that is too "limited" to attract users and

7    developers in a two-sided market.  Trial Tr. at 1212:6-7.

8         So too for the injunction provision that prevents Google from excluding rival app stores

9    from the Play Store.  Witness Rosenberg testified that another barrier faced by the Amazon app

10   store was a "significant hurdle to switching to Amazon APK."  Trial Tr. at 1214:18.  This referred

11   to the fact that, to get the Amazon store on their Android device, a user would need to "sideload"

12   it (*i.e.*, download it from a website or platform other than the Play Store), which subjected the user

13   to a "quite complex" process imposed by Google that "involve[d] 14 steps."  *Id.* at 1214:21-

14   1216:22.  Rosenberg agreed that "Google recognized at the time that as a result of the unknown

15   source warning [resulting in at least 14 steps], the hurdles [to download] were too high for most

16   users."  *Id.* at 1216:23-1217:2.  Rosenberg also agreed that, because the "Google Play Store is

17   preloaded on the home screen of virtually every Android phone through the MADA," and rival

18   stores were excluded, a user trying to download a rival app store outside the Play Store would

19   almost always face the barrier of the "unknown sources install flow."  *Id.* at 1206:9-22.  Other

20   witnesses at trial including other Google executives testified that the "friction" Google built into

21   acquiring apps outside the Play Store was highly effective in discouraging users from even trying.

22   *See*, *e.g.*, Trial Tr. at 762:20-763:2, 1361:11-13.  So for a limited period of time, the injunction

23   will lower the barriers for rival app stores to get onto users' phones by enjoining Google from

24   prohibiting the presence of rival app stores in the Google Play Store.

25        As Google has suggested, there are potential security and technical risks involved in

26   making third-party apps available, including rival app stores.  The Court is in no position to

27   anticipate what those might be, or how to solve them.  Consequently, Google will have room to

28   engage in its normal security and safety processes.  To the extent Google imposes requirements

along these lines on rival app stores, it will be bear the burden when challenged of establishing that the requirements were strictly necessary to achieve safety and security for users and developers.

Google has said on many occasions that catalog access and hosting rival store apps amount to forcing it to do business with rivals, in contradiction of "the general rule" that "even monopolists 'are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.'" *Viamedia, Inc., v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) (quoting *Pacific Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)). Not so. The Court has fully agreed for the duration of this case that a refusal to deal with a potential rival may not be the basis of antitrust liability. The jury was expressly instructed on that point. Dkt. No. 850 at ECF p. 33 (No. 24). Nothing in the verdict or the evidence at trial condemned Google for not extending a helping hand to a rival.

The problem for Google is that the case is now in the remedy phase, not the liability phase. The question at hand is not whether Google violated the antitrust laws by failing to aid rivals, but what measures are necessary to restore fair competition in the face of the barriers found by the jury. The jury heard abundant evidence that Google used a variety of means to ensure that the Play Store was the only fully developed Android app marketplace for users and developers. This evidence included the MADA and RSA agreements and Google's conditioning of access by OEMs to Google's Android services on preinstallation of the Google Play Store on the home screen of Android devices. The use of burdensome "scare screens" to discourage sideloading of apps is another example of evidence heard by the jury. Requiring Google to allow other app stores to be distributed through the Play Store for a discrete period is a modest step to correct the consequence of unlawfully preventing rival stores from reaching users and developers.

In this context, Google's frequent mentions of *Trinko* are misplaced. The Supreme Court affirmed the district court's dismissal of a complaint alleging monopolization under Section 2 against Verizon for not sharing access to its telephone network with competitors as required by Congress in the Telecommunications Act of 1996. *Trinko*, 540 U.S. at 401-02. The Supreme Court declined to extend the reach of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S.

585 (1985), with the famous remark that "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. But the Court also re-affirmed the holding of *Aspen Skiing* that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Id*. at 408 (quoting *Aspen Skiing*, 472 U.S. at 601). The Court added that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Id*.

The Court ultimately determined that the situation in *Trinko* did not rise to that level based on the specific characteristics of the telecom industry. As the Court instructed, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Id*. at 411. A factor of "particular importance" was that Congress had already created a regulatory structure in the Telecommunications Act "designed to deter and remedy anticompetitive harm." *Id*. at 412. The protective hand of such regulation meant that any additional benefit of antitrust enforcement would be "small," and that the "'regulation significantly diminishes the likelihood of major antitrust harm.'" *Id*. (quoting *Concord v. Boston Edison Co.*, 915 F.2d 17, 22 (1st Cir. 1990)). The Court also noted that the complaint did not allege facts indicating that Verizon's conduct was prompted by "anticompetitive malice" or "dreams of monopoly." *Id*. at 409.

None of this has anything to do with the injunction here. As discussed, this is not a case in which a refusal to deal with a rival was the basis of Section 2 liability. The facts, markets, and regulatory environment here are also starkly different. Google seems to find a "vibe" in *Trinko* to the effect that the remedy for a monopolist's anticompetitive conduct cannot involve affirmative conduct with respect to a rival. *Trinko* says nothing of the sort, and Google's frequent mention of the case is simply a red herring.

Google also overlooks the fact that an antitrust remedy may trump what might be deemed traditional boundaries of property rights. "Even constitutionally protected property rights such as patents may not be used as levers for obtaining objectives proscribed by the antitrust laws." *Ford Motor*, 405 U.S. at 576 n.11. Section 16 "states no restrictions or exceptions to the forms of injunctive relief a private plaintiff may seek, or that a court may order. Rather, the statutory

14

language indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." *California v. American Stores Co.*, 495 U.S. 271, 281 (1990) (cleaned up). Consequently, the "purpose of relief in an antitrust case is 'so far as practicable, (to) cure the ill effects of the illegal conduct, and assure the public freedom from its continuance.' Mandatory selling on specified terms and compulsory patent licensing at reasonable charges are recognized antitrust remedies." *United States v. Glaxo Group Ltd.*, 410 U.S. 52, 64 (U.S. 1973) (citations omitted). The Court may "consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations. [¶] The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." *Prof'l Eng'rs*, 435 U.S. at 697-98. It is "entirely appropriate" for an injunction to "go[] beyond a simple proscription against the precise conduct previously pursued." *Id*. at 698. If a well-grounded fear arises that the injunction is too broad, "the burden is upon the proved transgressor to bring any proper claims for relief to the court's attention." *Id*. (quotations omitted).

Our circuit's conclusions in *Optronic Technologies* further undermine Google's position. There, the jury "properly found that Orion had been forced to pay inflated prices as a result of the market power exerted by Sunny and Synta following the unlawful Meade acquisition," and so ordering Sunny to supply Orion on non-discriminatory terms was a "reasonable method of remedying the harm to [Orion]." *Optronic Techs.*, 20 F.4th at 486. This was true because the district court "can order conduct to 'avoid a recurrence of the [antitrust] violation and to eliminate its consequences.'" *Id*. (quoting *Prof'l Eng'rs*, 435 U.S. at 698). The same goes here.

During closing arguments on the remedy, Google also relied on *Image Technical Services, Inc. v. Eastman Kodak Co*., 125 F.3d 1195 (9th Cir. 1997), stating that "in that case, the Ninth Circuit said that the district court had erred when it ordered Kodak to sell parts that were manufactured by someone else." Dkt. No. 1000 at 127:21-25. In Google's view, "it's the same thing here. It's legal error to order Play to have to distribute someone else's app store. Same reasoning as in *Kodak*." *Id*. at 128:1-3.

1
2
3
4
5
6
7
8

United States District Court
Northern District of California

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This is an odd position to take.  The circuit's reasoning in *Kodak* had nothing to do with Kodak's freedom not to deal with its rivals.  The circuit modified the portion of the district court's injunction that "require[d] Kodak to sell all parts for Kodak equipment, whether or not Kodak manufactures those parts."  *Kodak*, 125 F.3d at 1225.  The circuit believed that the "'all parts' requirement creates barriers for non-Kodak original-equipment manufacturers by requiring them to price replacement parts at levels necessary to attract ISOs away from Kodak's parts counter.  It also unnecessarily entrenches Kodak as the only parts supplier to ISOs."  *Id*.  As was the case with Google's reliance on *Trinko*, none of this bears on the facts and issues in this case.

As discussed, the Court has no intention of running Google's business as a "central planner."  *Trinko*, 540 U.S. at 408; *see also* Dkt. No. 1000 at 127:8-10 ("I have no intention of having a highly detailed decree that ends up impairing competition or micromanaging as a central planner.").  The terms of the injunction are plainly worded and largely self-executing, and will not embroil the Court in day-to-day business operations.  To the extent technical issues about security and the like come up, the injunction establishes a Technical Committee made up of one person selected by each side, plus a third person to be selected by the parties' two nominees, to resolve the issue in the first instance.  The Court will act only as needed to resolve issues that cannot be resolved by the committee.

### D.    Tying

Overall, the injunction breaks the illegal tie by prohibiting Google from requiring that developers use Google Play Billing in apps distributed on the Google Play Store.  Epic asked the Court to also prohibit what it called an "economic" tie, *see*, *e.g.*, Dkt. No. 977 at 92:23-93:1, which would have ensnared the Court in a detailed rate-setting exercise beyond its proper role. *See Town of Concord, Mass. v. Boston Edison Co*., 915 F.2d 17, 25 (1st Cir. 1990).  There is no need for the Court to take on that task because the remedy for the monopoly violation under Section 2 will also resolve the tying violation found by the jury.  The restoration of free competition in the relevant markets is the best medicine for correcting fees and prices.

The Court has addressed Google's main contentions with respect to the injunction.  As noted, Google's modus operandi in this case has been to deluge the Court in an ocean of

16

comments, many of which were cursory and undeveloped.  The Court declines to take up Google's

objections that were not fully developed in their presentation to the Court.

## CONCLUSION

A permanent injunction will be entered against Google for Epic's Sherman Act, Cartwright

Act, and UCL claims.  The effective date of the injunction is November 1, 2024, to give Google

time to bring its current agreements and practices into compliance.  After Epic's attorney's fees

and costs are awarded, *see* 15 U.S.C. § 26, judgment will be entered for Epic on the Sherman Act,

Cartwright Act, and UCL claims, and this MDL member case, *Epic Games, Inc. v. Google LLC et

al.*, No. 20-cv-05671-JD, will be closed.

**IT IS SO ORDERED.**

Dated:  October 7, 2024

_____

JAMES DONATO
United States District Judge

United States District Court
Northern District of California

17

ER-23

1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    IN RE GOOGLE PLAY STORE            MDL Case No.  21-md-02981-JD
     ANTITRUST LITIGATION
8                                       Member Case No. 20-cv-05671-JD

9                                       **ORDER RE GOOGLE'S RENEWED**
                                        **MOTION FOR JUDGMENT AS**
10                                      **MATTER OF LAW OR FOR NEW**
                                        **TRIAL IN *EPIC* CASE**
11

12

13        After 15 days of trial, a jury found in favor of plaintiff Epic Games Inc. on its antitrust

14   claims against Google. *See* Dkt. No. 866.[1]  Google had moved for judgment as a matter of law at

15   an appropriate stage of the trial, which the Court denied.  Dkt. Nos. 825, 831.  Google renewed the

16   motion post-verdict under Federal Rule of Civil Procedure 50(b), with a motion in the alternative

17   for a new trial under Rule 59.  Dkt. No. 925.  The Court denied both motions.  Dkt. No. 951.  This

18   order provides a detailed explanation for that decision.

19                                   **BACKGROUND**

20        The Court presented the background of this multidistrict antitrust litigation in other orders.

21   *See*, *e.g.*, Dkt. Nos. 383, 588.  In pertinent part, Epic is a well-known video game and software

22   developer, and its apps include Fortnite, a popular online game.  Fortnite can be played on a

23   variety of consoles and devices, including smartphones running the Android mobile operating

24   system.

25        Epic distributed a Fortnite Android app through the Google Play Store for a handful of

26   months starting in April 2020, until Epic's relationship with Google broke down in August 2020.

27   _____

28   [1] All docket number references are to the ECF docket for *In re Google Play Store Antitrust
     Litigation*, Case No. 21-md-02981-JD.

United States District Court
Northern District of California

A particular sticking point was Epic's objection to Google's requirement that Epic use Google's billing system and pay Google a 30% fee on all in-app purchases made by Fortnite users. Epic wanted to use its own in-app payment solution and not pay Google a 30% cut, which Google refused to allow. Epic then deployed a "hotfix," which was in effect a covert app update that allowed Fortnite users to use Epic's payment system. Google responded by removing Fortnite from the Google Play Store.

On the day that Fortnite was removed from the Google Play Store, Epic filed this lawsuit against Google LLC and certain of its affiliates alleging that Google had engaged in anticompetitive conduct in violation of the antitrust laws in connection with the Google Play Store. Dkt. No. 1. As alleged in its second amended complaint (SAC), Epic presented claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq.; and the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq. Dkt. No. 378. Epic sought injunctive relief only, and no monetary damages. *Id*. Google filed counterclaims against Epic, including for breach of the Google Play Developer Distribution Agreement (DDA). Dkt. No. 386.

Epic's lawsuit was consolidated into a multidistrict litigation action along with similar antitrust complaints filed by Google Play Store users and developers, and the attorneys general of many states. A substantial period of litigation ensued for all of the member cases, and several important issues were resolved in the pretrial stage. One was a determination that Google had willfully failed to preserve relevant, substantive business communications that were made by employees on the Google Chat system. This determination required an extensive inquiry by the Court that culminated in an evidentiary hearing featuring witness testimony and documents, and extensive findings of fact. *See* Dkt. No. 469. Testimony at trial adduced even more troubling evidence of improper assertions of the attorney-client privilege by Google's employees, including its CEO, to keep communications secret, and a widespread understanding within the company that discussions of sensitive topics should be done in a way that evaded preservation. *See*, *e.g.*, Trial

United States District Court
Northern District of California

Tr. at 964:21-23, 991:16-992:8, 1075:20-1076:12, 1321:17-24.[2]  Another important pretrial

determination was whether Google could evade a jury altogether by asking for a bench trial at the

very last moment.  The Court concluded, based on Google's own conduct, that it had consented to

a jury trial.  *See id.* at 6:13-7:16.

In time, the other cases went into settlement proceedings.  Epic's case was tried by a jury

of nine citizens in November and December 2023.  The parties put on forty-five witnesses,

including nine expert witnesses, over the course of fifteen days of testimony.  More than three

hundred documents were admitted into evidence.  *See* Dkt. Nos. 622, 623, 624.  The final jury

instructions totaled fifty-five pages.  Dkt. No. 850.  The instructions were based on extensive

discussions with, and submissions by, the parties.  *See*, *e.g.*, Dkt. Nos. 487, 528, 554, 564, 847,

848, 849.

At the conclusion of deliberations, the jury returned a unanimous verdict in favor of Epic.

Dkt. No. 866.  For the monopolization claim under Section 2 of the Sherman Act, the jury found

that Epic had proved two relevant product markets:  a market for the distribution of Android apps,

and for Android in-app billing services for digital goods and services transactions.  The jury also

found that Epic had proved for both of these markets that the geographic scope was worldwide

excluding China.  The jury further concluded that Epic had proved that Google willfully acquired

or maintained monopoly power by engaging in anticompetitive conduct in each of the product

markets, and that Epic had proved it was injured as a result of Google's violation of the antitrust

laws.  *Id*. at 1-4.  For the unlawful restraint of trade claim under Section 1 of the Sherman Act and

California state law, the jury found that Epic had proved that Google entered into one or more

agreements that unreasonably restrained trade in the same two product markets as for the

---

[2] "Trial Tr." references are to the trial transcript, which consists of 17 volumes with 3,442 total pages that are consecutively numbered.  The transcript can be found at Dkt. No. 834 (Vol. 1; pages 1-116); Dkt. No. 835 (Vol. 2; pages 117-322); Dkt. No. 836 (Vol. 3; pages 323-578); Dkt. No. 837 (Vol. 4; pages 579-788); Dkt. No. 838 (Vol. 5; pages 789-1036); Dkt. No. 839 (Vol. 6; pages 1037-1302); Dkt. No. 840 (Vol. 7; pages 1303-1539); Dkt. No. 841 (Vol. 8; pages 1540-1785); Dkt. No. 842 (Vol. 9; pages 1786-1866); Dkt. No. 843 (Vol. 10; pages 1867-2103); Dkt. No. 844 (Vol. 11; pages 2104-2291); Dkt. No. 845 (Vol. 12; pages 2292-2518); Dkt. No. 846 (Vol. 13; pages 2519-2763); Dkt. No. 847 (Vol. 14; pages 2764-2854); Dkt. No. 848 (Vol. 15; pages 2855-3065); Dkt. No. 849 (Vol. 16; pages 3066-3293); and Dkt. No. 867 (Vol. 17; pages 3294-3442).

United States District Court
Northern District of California

1    monopolization claim.  The jury determined that the illegal agreements were Google's DDA

2    agreements; agreements with alleged competitors or potential competitors under Project Hug and

3    the Games Velocity Program; and agreements with original equipment manufacturers (OEMs) that

4    sell mobile devices, including the MADA and RSA agreements.  Epic was found to have proved

5    antitrust injury from these violations.  *Id*. at 5-6.  For the tying claim under Section 1 of the

6    Sherman Act and California law, the jury determined that Epic had proved that Google unlawfully

7    tied the use of the Google Play Store to the use of Google Play Billing, and that Epic again had

8    been injured by this conduct.  *Id*. at 7.

9        Epic's UCL claim was not presented to the jury and was reserved for the Court's decision.

10   Google's breach of contract counterclaim also was not presented to the jury pursuant to the

11   parties' agreement, and the Court will decide Epic's illegality defense, with the parties' stipulated

12   facts to be treated as proved.  *See* Dkt. No. 850 at 1.  Also reserved for the Court's decision is the

13   issue of an injunctive remedy under the Sherman Act and Cartwright Act in light of the jury's

14   verdict.  The remedy proceedings are currently underway.  *See* Dkt. No. 978.

15       Google has fired a barrage of objections and allegations of error in an effort to escape the

16   judgment of the jury.  This approach has been Google's modus operandi throughout the case, and

17   often results in headline-style arguments that lack useful development.  The 90 pages of objections

18   that Google filed to Epic's proposed injunction in the remedy proceedings are the latest

19   manifestation of this problem.  *See* Dkt. No. 958.  In the ensuing discussion, the Court addresses

20   Google's attacks on the verdict even when Google's argument was little more than a passing

21   comment or two.

22       As the Supreme Court has observed, the "[d]etermination of whether a new trial should be

23   granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the

24   judge who saw and heard the witnesses and has the feel of the case which no appellate printed

25   transcript can impart."  *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216 (1947)

26   (citation omitted).  It is on this basis, and the trial record as a whole, that the Court concludes

27   Google is not entitled to undo the jury's verdict under Rule 50(b) or Rule 59.

28

United States District Court
Northern District of California

4

ER-27

**LEGAL STANDARDS**

Under Rule 50(b), a party that has previously made a motion for judgment as a matter of law during a jury trial, as Google did, may "file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Judgment as a matter of law is appropriate when "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002) (citation omitted); *see also Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 803 (9th Cir. 2009) ("JMOL is . . . appropriate when the jury could have relied only on speculation to reach its verdict."). The "district court must uphold the jury's award if there was any 'legally sufficient basis' to support it." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (citation omitted); *see also Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017) ("A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible.") (citation omitted). In making this determination, the Court is to "consider[] all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party," and it "may not make any credibility determinations or reweigh the evidence." *Experience Hendrix*, 762 F.3d at 842. Put more plainly, the Court must "draw all inferences in favor of the verdict." *Id*. at 845.

Rule 59 permits the Court to grant a new trial on all or some of the issues, and to any party, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although for a Rule 59 motion, the Court is "not required to view the trial evidence in the light most favorable to the verdict," *Experience Hendrix*, 762 F.3d at 842, the Court "may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). Our circuit has stated that "[a] trial court may grant a new trial only if the verdict is against the clear weight of the evidence." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) (citing *Silver Sage*, 251 F.3d at 818-19).

United States District Court
Northern District of California

1       Google presented its JMOL and new trial arguments in a single, interwoven fashion.  *See*

2   Dkt. No. 925.  The Court will follow suit, while being mindful of the different standards that

3   govern each rule.

**DISCUSSION**

4

5   **I.   ANDROID-ONLY RELEVANT MARKETS**

6       For the monopolization claim, the jury found that Epic had proved the existence of two

7   relevant product markets:  (1) an "Android app distribution market," and (2) a market for

8   "Android in-app billing services for digital goods and services transactions."  Dkt. No. 866 at 3

9   (Question No. 2).  The jury found the same two relevant product markets for Epic's unlawful

10  restraint of trade claim.  *See id.* at 6 (Question No. 8).  Google proposes two reasons why, in its

11  view, Epic should not have been permitted to argue for these relevant markets that were "limited

12  to Android devices."  Dkt. No. 925 at 1-7.

13      **A.   Issue Preclusion**

14      To start, Google says that it is entitled to judgment as a matter of law on all claims

15  submitted to the jury because of the preclusive effect of *Epic Games, Inc. v. Apple Inc.* ("*Apple*

16  *I*"), 559 F. Supp. 3d 898 (N.D. Cal. 2021), and *Epic Games Inc. v. Apple Inc.* ("*Apple II*"), 67

17  F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 682 (2024).  *Apple II* affirmed in part and

18  reversed in part *Apple I*.  Google says that the *Apple I* court found a "market for mobile game

19  transactions in which both Google and Apple competed," which was a market definition the circuit

20  affirmed.  Dkt. No. 925 at 2-3.  Consequently, in Google's view, Epic had "already litigated and

21  lost" the issue of "competition between Apple's App Store and Google Play."  *Id.*  Because Epic

22  did not propose at trial a market that included Apple, Google contends that Epic failed to prove a

23  valid relevant market at all, which necessarily doomed all of its antitrust claims.  *Id.* at 4.

24      This is not the first time Google has tried to make this point.  It is in effect a re-do of the

25  same argument that the Court rejected in prior proceedings because Google had failed to establish

26  the elements of preclusion.  Dkt. No. 700 at 2.  Nothing has happened since to change the Court's

27  conclusion.

28

**ER-29**

United States District Court
Northern District of California

1    "Issue preclusion, which bars the relitigation of issues actually adjudicated in previous

2    litigation, applies where four conditions are met:  (1) the issue at stake was identical in both

3    proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was

4    a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the

5    merits." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (cleaned up).

6         The market definition issues that were litigated in *Apple I* and *Apple II* were plainly not the

7    same as the issues litigated here.  In the case against Apple, Epic "proposed two single-brand

8    markets: the aftermarkets for iOS app distribution and iOS in-app payment solutions, derived from

9    a foremarket for smartphone operating systems." *Apple II*, 67 F.4th at 970 (emphasis omitted).

10   The district court rejected Epic's proposed single-brand markets mainly because there was a

11   "failure of proof." *Id*.  Epic "presented no evidence regarding whether consumers unknowingly

12   lock themselves into Apple's app-distribution and IAP restrictions when they buy iOS devices."

13   *Id*.  On appeal, the circuit court determined that the district court "did not clearly err in rejecting

14   Epic's proposed relevant markets"; "[i]n particular, Epic failed to produce any evidence showing

15   -- as our precedent requires -- that consumers are generally unaware of Apple's app-distribution

16   and IAP restrictions when they purchase iOS devices." *Id*. at 973.

17        Epic took a very different approach to the markets in this case.  It did not, for obvious

18   reasons in a case that did not include Apple, advocate for "aftermarkets for iOS app distribution

19   and iOS in-app payment solutions, derived from a foremarket for" iOS devices. *Id*. at 970

20   (emphasis omitted).  Nor did it argue for aftermarkets for Android app distribution and Android

21   in-app payment solutions, derived from a foremarket for Android devices.  It took a wholly

22   different approach for the antitrust claims against Google, and offered wholly different evidence

23   about relevant markets than that offered in the case against Apple.  The holdings in *Apple I* and

24   *Apple II* about Epic's proposed foremarket/aftermarkets for Apple products, and Epic's deficient

25   evidentiary support for those markets, have no preclusive effect here.

26        Consequently, Epic was perfectly free at trial to argue for Android-only relevant markets,

27   just as Google was free to argue for a different result.  Each side took maximum advantage of this

28   freedom to hotly dispute the definition of the product markets for Epic's antitrust claims.  The jury

United States District Court
Northern District of California

7

ER-30

United States District Court
Northern District of California

1   was presented with evidence sponsored by each side, including witness testimony, documents, and

2   expert witness opinions, on the question of the relevant product markets. Google took every

3   opportunity to tell the jury that Google and Apple compete, and so should be considered to be in

4   the same relevant market. If there was one theme Google pressed relentlessly to the jury, it was

5   this one. Epic presented substantial evidence showing that the Android-only product markets

6   made factual and economic sense for this case. For example, Epic's economics expert, Professor

7   Douglas Bernheim, testified that the fact that Apple and Android compete in the market for

8   smartphones does not mean that they are in the same market for app distribution. Trial Tr. at

9   2423:23-2424:1. The jury also heard from Dr. Bernheim that, based on a SSNIP test and other

10  widely accepted analytical tools, his conclusion was that the Apple App Store does not compete in

11  the same relevant market as the Google Play Store. *Id.* at 2424:17-2427:16, 2462:2-16.

12       In the end, the jury did precisely what it was called upon to do by resolving the hotly

13  disputed evidence to define the product markets as stated in the verdict. The possibility that the

14  jury might have come out differently is no basis for judgment as a matter of law in Google's favor.

15  *See White*, 312 F.3d at 1010. Google also has not demonstrated that the product market verdicts

16  were clearly contrary to the weight of the evidence.

17       **B.    Aftermarket Theory**

18       Despite the plain record of what happened at trial, Google says that Epic was actually

19  proposing a "'single-brand aftermarket' theory of market definition" that it failed to prove. Dkt.

20  No. 925 at 5. This is a rather odd argument because Epic never presented or even mentioned a

21  "single-brand aftermarket" in this case, and Google's suggestion to the contrary is utterly bereft of

22  any evidence.

23       To start, there was no "single brand" in play here. As the parties stipulated in the final jury

24  instructions, Android is a mobile operating system; it is not a brand. *See* Dkt. No. 850 at ECF

25  p. 16 (Instruction No. 12 (Stipulations of Fact)) ¶ 15. The undisputed evidence showed at trial that

26  Android devices are manufactured by many companies, including Google, Samsung, Motorola,

27  OnePlus, Xiaomi, and other OEMs. This is in sharp contrast to iOS devices, which are

28  manufactured by Apple alone. *See Apple II*, 67 F.4th at 966. Epic expressly argued for a single-

1    brand aftermarket in the Apple case for iOS devices, and the circuit stated that, "in some instances

2    one brand of a product can constitute a separate market." *Id*. at 976 (cleaned up).  That

3    observation, and the discussion that followed it, are not relevant here because Epic never proposed

4    or argued for a market consisting of only "one brand of a product" with respect to Google.  *Id*.

5         Google says that it doesn't matter that there are multiple brands of Android devices

6    because "Google generates significant revenue from Android devices."  Dkt. No. 945 at 2.  Even

7    taking that as true for discussion purposes, it hardly explains why many different and competing

8    OEM brands should be treated as a single brand.  Google certainly did not present any evidence,

9    or case law or other authority, in support of that proposition.  There simply is no evidentiary or

10   legal reason to treat Epic as though it had pursued a foremarket/aftermarket theory that it did not

11   propose, or to penalize it for not proving that theory at trial.

12        This case also differs from the Apple case in that the Apple App Store is the only app store

13   for iOS devices, which is not true for Android devices.  Substantial evidence was presented at trial

14   that multiple Android app stores can be, and on occasion have been, available to consumers.

15   Google's efforts to suppress rival app stores was another key theme at trial.  To that end, an

16   internal Google document asked the "existential question":  "How do we continue to keep Play as

17   the preeminent distribution platform for Android?"  Trial Tr. at 920:24-921:14.  Other documents

18   referred to a "market" consisting of Android app developers only, *see id*. at 922:13-923:18, and

19   spoke of "store rivals" that were Android app stores.  *Id*. at 952:3-13.  Google's CEO, Sundar

20   Pichai, testified that each Android OEM "had the potential to have an app store" which "would

21   compete with Google Play."  *Id*. at 1343:1-5.

22        Overall, the evidence at trial demonstrated that the markets for Android app distribution

23   and in-app payment systems are different from the markets for Apple/iOS app distribution and in-

24   app payment systems that were at issue in *Apple II*.  Epic did not pursue a "single-brand

25   aftermarket" here.

26   **II.    JURY INSTRUCTIONS RE RULE OF REASON**

27        Google requests a new trial because of alleged legal errors in the jury instructions relating

28   to the Rule of Reason.  Dkt. No. 925 at 7-11.  Its arguments are not well taken.

United States District Court
Northern District of California

9

**A.      Step One**

On Step 1 of the Rule of Reason, Google says the jury was impermissibly allowed to "conclude that individually lawful acts are unlawful in the aggregate." Dkt. No. 925 at 10.

The record demonstrates otherwise. Before trial, the Court granted summary judgment for Google on "'plaintiffs' claims that Google unlawfully prohibits the distribution of other app stores on Google Play.'" Dkt. No. 700 at 1 (quoting Dkt. No. 483 at 6). Because governing case law makes clear that Google had no duty to deal, the Court stated that plaintiffs could reference § 4.5 of the Developer Distribution Agreement by way of background and context only, but they could not "argue or suggest that § 4.5 is unlawful either on its own *or in combination with other alleged practices.*" *Id.* (emphasis added) (citing *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398 (2004)).

The same guidance was stated in the jury instructions. The jury was instructed that "[i]t is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way." Dkt. No. 850 at ECF p. 33 (Instruction No. 24). For the anticompetitive conduct required for Epic's Section 2 claim, the jury was instructed that, "[i]n determining whether Google's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether *the conduct* is consistent with competition on the merits, whether *the conduct* provides benefits to consumers, and whether *the conduct* would make business sense apart from any effect it has on excluding competition or harming competitors." *Id.* at ECF p. 30 (Instruction No. 23) (emphases added). Nothing in the instructions invited the jury to consider Google's alleged conduct in the aggregate, or gave them permission to consider whether independently legitimate conduct may have combined to create an anticompetitive effect.

The verdict form underscored this by directing the jury to consider each type of conduct separately. For Epic's Section 1 claim, the jury was called upon to answer separately for three types of agreements -- (1) DDA agreements; (2) agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program; and (3) agreements with

United States District Court
Northern District of California

1    OEMs that sell mobile devices (including MADA and RSA agreements) -- whether each type of

2    agreement was an "unreasonable restraint(s) of trade." Dkt. No. 866 at 5 (Question No. 7).

3          As the record established, and contrary to Google's argument, the jury was in fact "guided

4    . . . to consider each category of conduct individually." Dkt. No. 925 at 10.

5          **B.    Step Two**

6          Google says that on Step 2 of the Rule of Reason analysis, "[t]he jury should have been

7    instructed to consider cross-market justifications," *i.e.*, procompetitive benefits not limited to the

8    relevant product markets at issue. Dkt. No. 925 at 7-8. But in *Apple II*, our circuit expressly took

9    up the issue of the "cognizability of cross-market rationales." 67 F.4th at 989. There, Epic had

10   argued that, "even if Apple's security and privacy restrictions are procompetitive, they increase

11   competition in a *different market* than the district court defined and in which Epic showed step-

12   one anticompetitive effects, and thus are not legally cognizable at step two." *Id*. (emphasis in

13   original).

14         Our circuit noted that the "Supreme Court's precedent on this issue is not clear," even

15   though on occasion it "has considered cross-market rationales in Rule of Reason and

16   monopolization cases." *Id*. The circuit "decline[d] to decide this issue here." *Id*. The circuit also

17   determined that Apple's procompetitive justifications related to the relevant market. *Id*. at 990.

18         Consequently, there was no legal mandate to expressly require the jury to consider cross-

19   market justifications, such as "Google's competition with Apple in smartphones," Dkt. No. 925 at

20   9, as Google urges. Contrary to Google's argument, this is not at all a situation where the circuit

21   has not yet "stated 'explicitly' a legal point that 'was implicit in [its] past decisions.'" Dkt.

22   No. 945 at 4 (citing *Dang v. Cross*, 422 F.3d 800, 807-08 (9th Cir. 2005)). It also bears repeating

23   that Google spared no opportunity at trial to tell the jury of its views about competition with

24   Apple.

25         **C.    Step Three**

26         Google makes another argument contrary to circuit law for Step 3 of the Rule of Reason

27   analysis by stating that the Court improperly invited the jury to balance competitive effects. Dkt.

28   No. 925 at 11. But as Google acknowledges, *Apple II* expressly "held that Ninth Circuit precedent

United States District Court
Northern District of California

requires balancing." *Id*.; *see Apple II*, 67 F.4th at 994 ("where a plaintiff's case comes up short at step three, the district court must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits.").  There was no error in the Court's balancing instruction to the jury.

## III.    SUFFICIENCY OF EVIDENCE SUPPORTING JURY VERDICT

Google's primary claim for judgment as a matter of law or a new trial is that the verdict is "unsupported by legally sufficient evidence." Dkt. No. 925 at 11-27.  True to form, Google objects to just about everything adduced at trial that impugned Google's conduct.  The Court has undertaken the laborious task of reviewing the record in light of Google's many complaints, as the ensuing discussion details.  Some prefatory observations are in order.  The true crux of Google's argument isn't that the verdict was not based on substantial evidence, but rather that the jury didn't see the evidence in the way Google wanted.  This is not a situation where the verdict was based on speculation or where the evidence would allow only one conclusion that is contrary to what the jury decided.

Another problem is that Google ignores in practice the standards for granting JMOL or a new trial.  For Rule 50, as discussed, all reasonable inferences are made in favor of the verdict and Epic, as the nonmoving party.  *See Experience Hendrix*, 762 F.3d at 842, 845.  This is so irrespective of whether the evidence might have supported a different result.  *See Pavao*, 307 F.3d at 918 ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.").  Google subverts this by asking in effect that all inferences be drawn for its benefit.  For Rule 59, where the review is free of inferences for either side, the jury verdict will stand unless it is "against the clear weight of the evidence." *Silver Sage*, 251 F.3d at 819.  Google slights this by insisting that a new trial is warranted simply because some evidence was disputed and the jury might have decided differently.

### A.    Relevant Market

#### 1.    Limitation to Android In-App Payments

The jury found a market consisting of "Android in-app billing services for digital goods

United States District Court
Northern District of California

and services transactions." Dkt. No. 866 at 3, 6 (Question Nos. 2, 8). Google says that "[t]he evidence does not support the jury's decision to exclude out-of-app payment systems from the relevant product market," highlighting websites in particular as a "reasonable substitute" that should have been included in the relevant market. Dkt. No. 925 at 11-12.

Not so. Epic's economics expert, Dr. Steven Tadelis, testified that the relevant product market was properly limited to "any product that could do what Google Play Billing does," *i.e.*, "any payment solution provider for digital content on Androids." Trial Tr. at 2553:1-4. He further testified that "web purchases are not a viable substitute for in-app purchases" because of "friction" -- whereas in-app purchases can be completed in two to three steps by the user, web store purchases required at least eight steps. *Id*. at 2554:4-2556:15. This increased friction was likely to lead to increased dropoff along the process, where users do not complete the purchase. *Id*. at 2556:19-2557:10. Google executive Purnima Kochikar was taken through the 18 steps a user would have had to go through "to have the Amazon App Store show up on the Home Page of their Android device." *Id*. at 746:3-752:8. Kochikar called the sideloading experience "abysmal," *id*. at 753:22-755:5, and agreed that "the number of steps makes for a bad user experience," and "where there's friction, people [often] fall out and don't complete purchases." *Id*. at 762:20-763:2. Witness Eric Chu testified that YouTube engineers worked to "reduce the number of clicks," asking themselves, "[f]rom the moment the user wants to buy something[,] what can we do to reduce [the] number of clicks and make it easier for them to purchase something[?]" *Id*. at 1441:2-1442:11; Dkt. No. 915-1 at ECF p. 85. The "[r]eason for that is obvious that the more friction there is[,] the more likely we lose users along the buy flow." *Id*.

The jury was instructed, without objection by Google, that "[i]n determining the product market, the basic idea is that the products within it are interchangeable as a practical matter from the buyer's point of view." Dkt. No. 850 at ECF p. 22 (Instruction No. 18). This means "they must be, as a matter of practical fact and the actual behavior of consumers (meaning users and developers), substantially or reasonably interchangeable to fill the same consumer needs or purposes. Two products are within a single market if one item could suit buyers' needs substantially as well as the other." *Id*. The jury reasonably relied on the testimony summarized

ER-36

1   above, and similar evidence at trial, to conclude that from the developers' and users' points of

2   view, out-of-app payment systems were not reasonable substitutes for in-app payment systems.

3          Google's citation to *Tanaka v. University of Southern California*, 252 F.3d 1059, 1063 (9th

4   Cir. 2001), is misdirected. Google cites it for the proposition that consumers' personal preferences

5   are not relevant. But *Tanaka* involved a highly unique personal preference -- literally the

6   preference of just plaintiff Tanaka, a "star high school soccer player" who wanted to "remain in

7   the Los Angeles area" so she could "be close to her family." 252 F.3d at 1061, 1063. Tanaka

8   challenged an intercollegiate athletic association rule that discouraged intra-conference transfers,

9   and although the association was national in scope, she alleged that the "relevant geographic

10  market is Los Angeles and the relevant product market is the 'UCLA women's soccer program,'"

11  based purely on her personal desires. *Id.* at 1063. The circuit concluded that Tanaka's personal

12  preference to be near her family could not be a proper basis for defining the "'area of effective

13  competition' for student-athletes competing for positions in women's intercollegiate soccer

14  programs." *Id.*

15         The facts here could not be more different. This is not a case of one person trying to define

16  a purely personal market. Substantial evidence was presented at trial to the effect that an out-of-

17  app payment solution would not meet a developer's or user's needs as well as an in-app payment

18  solution. The evidence showed that this was not a matter of mere preference or taste, but a

19  product of design and function. Out-of-app payment solutions are a cumbersome mechanism for

20  sales, and so are not likely to be viewed by developers or users as reasonable substitutes for in-app

21  payment systems. The jury's finding of an Android in-app payment solutions product market was

22  not against the great weight of the evidence.

23                            2.      **Geographic Scope**

24         Substantial evidence supported the jury's finding that the relevant geographic market was

25  "worldwide excluding China." Dkt. No. 866 at 3, 6 (Question Nos. 2, 8). The jury was instructed

26  that the "relevant geographic market is the area in which Google faces competition from other

27  firms that compete in the relevant product markets and to which customers can reasonably turn for

28  purchases." Dkt. No. 850 at ECF p. 23 (Instruction No. 19). The jury was further instructed that

United States District Court
Northern District of California

14

1    "[w]hen analyzing the relevant geographic market, you should consider whether changes in prices

2    or product quality in one geographic area have substantial effects on price or sales in another

3    geographic area, which would tend to show that both areas are in the same relevant geographic

4    market." *Id*. Contrary to Google's argument, there is no absolute "legal test" of "'consumer

5    substitution.'" Dkt. No. 945 at 6.

6    Epic's economics expert, Dr. Douglas Bernheim, testified that the appropriate geographic

7    boundary for the relevant market was "global, excluding China." Trial Tr. at 2445:16-24. This

8    was because "competitive conditions" in different countries "are largely similar," and Google's

9    challenged conduct in this case was "global, excluding China." *Id*. at 2446:1-11. It was

10   appropriate to carve out China because China was "very dissimilar" in that Google Android,

11   Google Play, and Google's challenged conduct, were "not in China." *Id*. at 2446:18-23.

12   Dr. Tadelis agreed with Dr. Bernheim's analysis, and also concluded that the geographic market

13   was "global excluding China." *Id*. at 2560:10-16.

14   Other witnesses at trial also testified to these facts. For example, Google witness James

15   Kolotouros testified that Google Play is not permitted in China and is not preinstalled on

16   smartphones distributed there. *See id*. at 1070:7-17. On the flip side, "every Android smartphone

17   outside of China comes preinstalled with Google Play." *Id*. at 1070:18-21. Kolotouros also

18   testified that Google faced competition from companies such as Samsung, Xiaomi, Oplus, and

19   Vivo, which "had the potential to have app stores that competed with Google Play in markets

20   outside of China." *Id*. at 1079:16-1080:24; *see also id*. at 1207:13-1210:11 (Google witness Jamie

21   Rosenberg's testimony re internal Google document discussing Amazon App Store's growing

22   popularity in Japan, and Google's concern that Amazon might "scal[e] up and go[] global,"

23   becoming a more global threat to Google Play). Similarly, for in-app payment solutions, there

24   was trial testimony that Google Play Billing is "not offered in China," and Google faces

25   competition from companies such as PayPal, Square, and Braintree outside of the United States.

26   *Id*. at 2586:21-2588:25. The jury's geographic market findings were supported by adequate

27   evidence and were not against the great weight of the evidence.

28

United States District Court
Northern District of California

15

ER-38

## B.    Anticompetitive Effect of Google's Conduct

For Epic's monopolization claim, the jury was instructed that "[a]nticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). For Epic's restraint of trade claim, the jury was instructed that "[a] harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality." *Id.* at ECF p. 37 (Instruction No. 28). The jury was further instructed to consider the following factors: "(1) the effect of the challenged restraint on prices, output, product quality, and service; (2) the purpose and nature of the challenged restraint; (3) the nature and structure of the relevant market; (4) the number of competitors in the relevant market and the level of competition among them, both before and after the challenged restraint was imposed; and (5) whether Google possesses market power." *Id.*

After considering the evidence in light of these instructions, the jury found that Google "willfully acquired or maintained monopoly power by engaging in anticompetitive conduct." Dkt. No. 866 at 3 (Question No. 3). The jury also found each of these agreements to have been unreasonable restraints of trade (and so impliedly to have had anticompetitive effects): (1) "DDA agreements"; (2) "Agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program"; and (3) "Agreements with OEMs that sell mobile devices (including MADA and RSA agreements)." *Id.* at 5 (Question No. 7).

Each of these findings was supported by substantial evidence, and was not against the great weight of the evidence. There was substantial evidence at trial that Google had engaged in conduct, "other than competition on the merits, that ha[d] the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF p. 30 (Instruction No. 23). It bears mention that Google does not contest that Epic presented sufficient evidence on Google's market power or the barriers to entry that existed in both of the relevant markets found by the jury. *See* Dkt. No. 932 at 15, n.11; *compare with* Dkt. No. 945.

16

**ER-39**

United States District Court
Northern District of California

1    The jury heard a great deal of testimony about Google's agreements with existing or

2    potential competitors in connection with Project Hug.[3]  Activision Blizzard King (ABK) was a

3    developer that signed a Project Hug deal.  The developer of mobile games such as Candy Crush

4    and Call of Duty, ABK "had the highest estimated spend by users of all of the Project Hug

5    developers."  Trial Tr. at 445:5-13.  ABK had been "quite vocal [in] complaining about Google

6    Play's 30 percent fee," and Google witness Koh testified that it had been communicated to Google

7    that ABK was considering the option of starting its own Android app store.  *Id*. at 445:14-22,

8    463:5-8.  Google estimated that it faced a risk of losing $243 million per year if ABK were to pull

9    its content from the Google Play Store.  *Id*. at 463:24-464:9.  Google internally discussed this risk,

10   as well as the possible "contagion risk" if ABK were to launch its own store and "attract[] more

11   content from other developers."  *Id*. at 463:5-464:24.[4]  Google then offered ABK a Project Hug

12   deal for $360 million.  *Id*. at 465:3-466:8.  Google witness Kochikar testified about Google's

13   concern that ABK might launch its own Android app store, and Google's hope that a Project Hug

14   deal would prevent that.  *See id*. at 804:7-807:12.  Riot Games was another developer that was

15   offered and took a Project Hug deal.  An internal Google document stated, "A year ago, we pulled

16   all the stops, promised them $10 million co-marketing for before they signed GVP, for example,

17   to get Riot Games to stop their in-house app store effort."  *Id*. at 811:6-812:12.

18   In exchange for significant payments from Google, developers who signed a Project Hug

19   agreement "could not launch [an app] either first or exclusively on any competing Android

20   distribution platform."  Trial Tr. at 442:23-443:2.  Developers who agreed to Project Hug also

21   could not "launch a materially different version of the game that it had on Google Play on a

22   competing Android app distribution platform."  *Id*. at 444:10-15.  Epic's expert, Dr. Bernheim,

23   testified to the anticompetitive effects of these provisions.  In his view, these provisions

24

25   _____

26   [3] The Games Velocity Program was a continuation of Project Hug.  *See* Trial Tr. at 491:13-14; *id*.
     at 410:13-15 (Google witness Lawrence Koh affirming that "Project Hug was later renamed the
     Games Velocity Program").

27   [4] Witness Koh testified that the "contagion risk" had to do with Google's concern that "once top
     developers took their gaming content off of Google Play, that other developers would potentially
28   follow suit."  Trial Tr. at 422:14-16.

17

**ER-40**

1    "prevent[ed] any significant differentiation," disincentivized developers from creating valuable

2    content, and would also have discouraged Project Hug developers from entering the app store

3    market themselves. *Id*. at 2403:7-2410:7.

4         There was also substantial evidence of the anticompetitive effects of Google's agreements

5    with OEMs, specifically the Mobile Application Distribution Agreement (MADA) and Revenue

6    Share Agreements (RSA). The MADA is an agreement that Google enters into with Android

7    OEMs. Pursuant to the MADA, OEMs must place Google Play on the default home screen of

8    their Android devices. Trial Tr. at 1351:14-21. Virtually all OEMs that manufacture Android

9    smartphones have entered into a MADA, and so Google Play is preinstalled on the default home

10   screen of nearly all Android smartphones. *Id*. at 1351:22-1352:8. Google's CEO, Sundar Pichai,

11   acknowledged that "[t]ypically," placement on the default home screen tends to lead to more

12   usage of an app. *Id*. at 1352:9-12. Preinstallation of Google Play on the default home screen is a

13   precondition for an OEM to have access to other key Google GMS apps and Android APIs

14   without which many Android applications cannot function. *Id*. at 1355:1-1356:4. Restrictions

15   like these made it difficult for competitors like Amazon to obtain "premium placement" for apps

16   such as its own app store, Dkt. No. 915-1 at ECF p. 107, and so it was difficult for alternative app

17   stores to get off the ground.

18         The terms of the Google Revenue Share Agreements with OEMs were even more

19   aggressive. The RSA 3.0 agreements are the third iteration of that contract, and they offer OEMs

20   the opportunity to enroll their devices in three different tiers. Trial Tr. at 1053:1-9. For the

21   "premier tier," which offers the highest revenue share, an OEM "may not install any app store on

22   their device other than Google Play." *Id*. at 1053:7-24. Epic's expert, Dr. Bernheim, testified that

23   this kind of profit-sharing with a competitor disincentivizes competition, and so is anticompetitive.

24   *Id*. at 3189:22-3190:14.

25         There was additional trial testimony to the same effect. Google witness Kolotouros

26   testified that, with the exception of Samsung, most of Google's major Android OEM partners

27   executed RSA 3.0 agreements. *Id*. at 1092:4-6. OnePlus was one such OEM, and outside of

28   China and India, OnePlus enrolled the vast majority of its devices in the premier tier. *Id*. at

United States District Court
Northern District of California

1094:3-17.  Although OnePlus wanted to enter into a partnership with Epic Games whereby the Epic Games Store app would be preloaded onto OnePlus devices, Google declined to grant a waiver to the premier tier restrictions.  After that, OnePlus decided to "take Google's revenue share payments and keep nearly all of its devices outside of India in the premier tier instead of preinstalling the Epic Game Store app."  *Id*. at 1094:18-25, 1098:24-1099:13.

The jury heard more evidence from which it could reasonably conclude that the RSA 3.0 agreements were anticompetitive.  This included an internal Google document in which Google employees discussed how "Google cannot stop OEMs from preloading the Amazon App Store due to anticompetitive concerns on the MADA 2.0 only," but "[w]e can do this through revenue share deals."  Trial Tr. at 1074:8-17.  The employees agreed that having "stricter placement restrictions through revenue share" was something that would "help stem the tide of emerging app stores."  *Id*. at 1074:22-1075:19.  In the course of this discussion, another Google executive inquired about why Google "doesn't put everything in the MADA" and asked, "Is it anticompetitive concerns or something more than that?"  Witness Kolotouros responded, "This might be better discussed in person as opposed to writing."  *Id*. at 1075:20-1076:12.  This and much other evidence supported a verdict against Google on the "purpose and nature of the challenged restraint," namely the RSA 3.0 agreements.

There was additional evidence at trial that Google worked to suppress competition by actively impeding users from "sideloading" competing app stores through increased "friction" and "scare screens."  "Sideloading" referred to a direct installation process whereby a user "find[s] an app via a mechanism that is not billing itself purely as an app store."  Trial Tr. at 2128:4-6.  "Friction" meant "the screens, the dialogues, the warnings that an operating system is going to put up and show to users and sort of force the user to click through or interact with before the user can actually accomplish the intended task."  *Id*. at 2113:21-25.  Google's CEO, Sundar Pichai, acknowledged that "the more friction there is, the less likely the user completes that flow," *id*. at 1361:11-13, and there was evidence that Google viewed friction as a means of impeding users from sideloading third-party app stores.  For example, a Google internal document titled, "Amazon competitor deep dive," noted that "Amazon [was] emerging as a major challenge to Play

United States District Court
Northern District of California

1    in gaming globally." Dkt. No. 886-50 (Trial Ex. 682) at ECF pp. 1-2. Another slide was titled,

2    "Amazon strongly promoting its 15%+ discount on IAPs available via Play, but for now switching

3    hurdle too high for most users." *Id.* at ECF p. 11. Under the heading, "Significant hurdle to

4    switching to Amazon apk," the Google document stated, "Process is quite complex, involves 14

5    steps (but motivated users will follow walkthroughs like this on YT)." *Id.*

6         For the DDA agreements, Google says that "Epic failed to prove, and no reasonable jury

7    could have found, that the anti-steering restrictions in the DDA were anticompetitive because they

8    merely prevent developers who choose to use valuable Google services and intellectual property in

9    the Play store from depriving Google of compensation for that value." Dkt. No. 925 at 22. But

10   this objection ignores the trial evidence about the anticompetitive nature of these anti-steering

11   restrictions and the DDA in general. For example, there was testimony that Paddle, a company

12   that offers to developers in-app payment solutions, was prevented from more effectively entering

13   the in-app payment services market because "Google Play's terms of services for developers [*i.e.*,

14   the DDA] expressly prohibit the usage of a third-party payment method." Trial Tr. at 653:3-11.

15        This and similar trial evidence demonstrate that the jury's findings on Google's

16   anticompetitive conduct were well supported. There was sufficient evidence for the jury to agree

17   with Dr. Bernheim that Google "impairs competition without preventing it entirely," Trial Tr. at

18   3181:1-3185:12, thereby satisfying the requirement that Google's conduct "frustrat[ed] the efforts

19   of other companies to compete for customers within the relevant market." Dkt. No. 850 at ECF

20   p. 30 (Instruction No. 23). Because the evidence discussed above is adequate to support the jury's

21   verdict, the Court declines to address Google's other arguments on the anticompetitive effect

22   element of Epic's antitrust claims.

23        **C.     Tying**

24        Substantial evidence supported the jury's finding in favor of Epic on its tying claim,

25   namely that "Google unlawfully tied the use of the Google Play Store to the use of Google Play

26   Billing." Dkt. No. 866 at 7 (Question No. 10).

27        The jury heard evidence that the Google Play Store and Google Play Billing are separate

28   products. It was not necessary for Epic to prove that there was separate demand for Google Play

**ER-43**

United States District Court
Northern District of California

Billing as a standalone product; rather, it was enough for Epic to prove that there was demand for in-app billing services separate from the demand for app distribution services. *See Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984) (a "tying arrangement cannot exist unless two separate product markets have been linked"; "in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services"). Epic presented substantial evidence on this element. Epic witness Steven Allison testified, for example, that in the case of the Epic Game Store, developers can use Epic Direct Pay, which is Epic's in-app payment solution, or "they can bring their own if they've set their game up to do so." Trial Tr. at 227:5-12. Down Dog's CEO, Benjamin Simon, testified that he would prefer Stripe or PayPal over Google Play Billing, and if he "had the ability at Down Dog to use PayPal or Stripe on [Down Dog's] Android app," he would do so. *Id*. at 303:2-10.

There was substantial evidence that Google coerced its customer -- here, developers -- to buy the tied product (Google Play Billing) in order to obtain the tying product (Google Play Store). Numerous witnesses testified that developers whose apps are on the Google Play Store are required through the DDA to use only Google Play Billing to sell any digital content that is to be used inside of the app. *See, e.g.*, Trial Tr. at 887:7-13, 889:9-21, 1185:18-21.

The jury had an ample evidentiary basis for rejecting Google's business justification defense as pretextual, and finding that Epic had successfully proven the existence of less restrictive alternatives. The trial testimony established, for example, that developers who sold digital content for use outside of the app were exempted from the requirement to use Google Play Billing, which weakened Google's business justification argument. *See* Trial Tr. at 1185:22-25. Similarly, developers who sold physical goods were also exempted. *See* Dkt. No. 886-94 (Trial Ex. 1436); *see also* Trial Tr. at 936:3-9.

Epic also adduced evidence that the Google Play Store was so profitable that Google did not need to tax developers a 30% fee through Google Play Billing to be fully compensated for its IP and other costs for the Google Play Store. For example, the jury saw an internal Google document showing that some developers paid "more than a hundred million dollars per year more than the value that they have obtained from Google"; and for the 100 most negative developers

United States District Court
Northern District of California

1  (whose payments to Google exceeded the estimated value they received from Google), Google

2  internally estimated that on average, they "receiv[ed] a value equivalent to 19 percent," but "still

3  were required to pay Google a 30 percent revenue share."  Trial Tr. at 608:6-611:22.  Based on

4  Google Play's revenue numbers, this worked out to $1.43 billion per year that the top 100 most

5  negative developers were overpaying to Google.  *See id*. at 612:3-613:11.  There was additional

6  evidence at trial that Google was concerned about public criticism calling out "Google's 30

7  percent fee on in-app purchases made on apps distributed through Google Play" as "highway

8  robbery."  *Id*. at 417:17-418:24; *see also*, *e.g.*, *id*. at 708:18-21 (internal Google document stating

9  that "the team estimates that if you compare the value of nonSearch-driven discovery versus

10  revenue share paid, Tinder is now deriving only 10 percent of the revenue share value versus the

11  30 percent share they pay.").  Overall, the jury had more than enough evidence at the balancing

12  step to conclude that any benefit from Google's tie was outweighed by its competitive harms.

13     It was not improper for the jury to consider the DDA as an unreasonable restraint of trade

14  and to additionally consider Epic's tying claim.  The tying claim focused on Google's coercive tie

15  of Google Play Billing to the Google Play Store, while Epic's challenge to the DDA also

16  encompassed the DDA's anti-steering provisions.  Multiple legal claims may be based on the same

17  underlying conduct, and Google has not presented any authority to the contrary.

18         **D.     Substantially Less Restrictive Alternatives**

19     Google challenges the jury's implicit finding in favor of Epic on Step 3 of the Rule of

20  Reason, and says that no reasonable jury could find that Epic satisfied its burden to identify

21  substantially less restrictive alternatives that would be virtually as effective in serving Google's

22  objectives without significantly increased cost.  Dkt. No. 925 at 24-27.

23     Google overlooks the fact that the jury might simply have rejected Google's proffered

24  justifications.  The jury had ample evidence to do so.  There was evidence at trial, for example, to

25  support Epic's theory that the exclusionary provisions in the MADA and RSA agreements were

26  put into those agreements for anti-competitive reasons, rather than any legitimate business reasons.

27  *See*, *e.g.*, Trial Tr. at 2920:19-2921:7 (Google witness Gennai testifying that RSA 3.0 premier tier

28  was developed "to respond to increasing app store competition from OEMs and large platforms

22

1   like Epic"); *id*. at 1078:3-1079:19 (changes to RSA proposed "to protect Google from key

2   strategic risks," including risks of revenue loss due to "Chinese OEMs and Samsung . . . actively

3   investing in creating own app and services ecosystems"); *id*. at 1073:6-1076:12 (internal Google

4   document stating that "Google cannot stop OEMs from preloading the Amazon App Store due to

5   anticompetitive concerns on the MADA 2.0 only," but could "prevent OEMs from preloading

6   competitive app stores" through "revenue share deals").

7          For the sideloading warnings, there was evidence at trial that the increased friction built in

8   by Google were not related to Google's assessment of the security risk posed by the material the

9   user was trying to sideload.  Google CEO Pichai agreed that "[s]ome websites, such as those from

10  reputable developers, actually present very low security risks," and yet "Google's unknown

11  sources flow does not distinguish between those trusted developers and every other website."

12  Trial Tr. at 1365:2-8; *see also id*. at 1693:11-1695:21 (sideloading / "unknown source" install

13  flows of 14 or 17 steps applied equally to apps from companies such as Microsoft or Adobe,

14  which are known to Google).  Epic's mobile security expert, Dr. James Mickens, testified that any

15  legitimate benefit of increased security protections for users could have been accomplished

16  through less restrictive means such as fewer screens, or a notarization process that differentiated

17  among the types of security risks presented by different apps or companies.  *See id*. at 2149:2-7,

18  2151:6-8, 2152:4-6, 2157:2-24.  His overall opinion, which the jury could reasonably have

19  credited and believed, was that the friction Google imposes is unwarranted and disproportionate,

20  and that Google could reduce the amount of friction while preserving the status quo on security.

21         For the parity provisions in Project Hug and the anti-steering provisions in the DDA, as

22  discussed above in Section III.B. *supra*, sufficient trial evidence supported a conclusion by the

23  jury that those were motivated by anticompetitive reasons, rather than legitimate business ones.

24  **IV.   EVIDENTIARY RULINGS AND ADVERSE INFERENCE INSTRUCTION**

25         Google says that three evidentiary rulings entitle it to a new trial.  Dkt. No. 925 at 27-29.

26  The record demonstrates otherwise.

27         **A.     Google Employees' Use of Attorney-Client Privilege**

28         To start, Google says the Court "permitted Epic to question witnesses about markings

1    related to attorney-client privilege on produced documents."  Dkt. No. 925 at 27.  Google also

2    claims, quite brazenly and wrongly in light of its willful conduct to hide material evidence, that it

3    had not "improperly withheld any document on the basis of privilege" and so "Epic's questioning

4    of Google witnesses regarding privilege markings on documents gave the jury the incorrect

5    impression that Google had improperly asserted the attorney-client privilege."  *Id*.

6          Google's remarks are ill made.  After the Court's findings of fact against Google for

7    willfully failing to preserve Google Chat evidence, *see* Dkt. No. 469, more evidence emerged at

8    trial of a frankly astonishing abuse of the attorney-client privilege designation to suppress

9    discovery.  CEO Pichai testified that there were occasions when he "marked e-mails privileged,

10   not because [he was] seeking legal advice but just to indicate that they were confidential," as he

11   put it.  Trial Tr. at 1321:17-24.  He knew this was a misuse of the privilege.  *Id*. at 1323:5-17.

12   Emily Garber, a Google in-house attorney, testified that there was a practice at Google of

13   "loop[ing] in" a lawyer based on a "misapprehension about the rules of privilege," and that Google

14   employees "believed that including [an in-house lawyer] would make it more likely that the email

15   would be considered privileged."  *Id*. at 964:21-966:5.  Garber called this "fake privilege," a

16   practice that she appears to have found amusing rather than something a lawyer should have put an

17   immediate and full stop to.  *Id*. at 964:21-23; Dkt. No. 887-86 (Trial Ex. 6487) at EXHIBIT

18   pp. 012-013.

19         On this record, there was no error in the Court's evidentiary ruling that Epic could "present

20   fake privilege" and make arguments to the jury about it.  *Id*. at 785:5-6.  The Court was crystal

21   clear that Epic could not "do anything else with privilege," and it commended the parties for not

22   saying "anything about" documents that had been "branded privileged" even though it should not

23   have been subject to an assertion of privilege.  *Id*. at 785:8-12.

24         **B.**     **Preclusion of Outcome of *Epic v. Apple***

25         Google repackages the prior preclusion argument as an ostensible evidentiary objection to

26   say:  "the Google Play store's primary competitor is free to use the same basic service fee model

27   explains why it is important for Google to use that same model.  The Court erred by preventing

28   Google from introducing evidence that Apple was unlikely to change its existing model in light of

United States District Court
Northern District of California

24

1    the outcome of *Epic v. Apple* -- a market fact that supports Google's procompetitive justifications

2    for that model and the alleged tie."  Dkt. No. 925 at 28.

3          The point fares no better as an evidentiary objection than it did in the prior version.  *See*

4    Section I.A., *supra*.  In addition, for the same reason that there was no error in the jury's decision

5    to exclude Apple from the relevant product markets it found, these outside facts about Apple are

6    not nearly as relevant and important as Google urges.

7         **C.**      **Adverse Inference Instruction**

8          Google's comments on the permissive inference instruction are even more poorly taken

9    that those about the attorney-client privilege.  The Court determined after an evidentiary hearing

10    held before trial that Google had willfully failed to preserve relevant Google Chat

11    communications, and allowed employees at all levels to hide material evidence.  Dkt. No. 469.

12    The evidence presented at trial added more fuel to this fire.  As discussed, Google in-house

13    attorney Garber testified about the company practice of asserting a fake privilege to shield

14    documents and communications from discovery.  Other witnesses also amplified the seriousness

15    and pervasiveness of Google's preservation abuses.  For example, Google employee Margaret

16    Lam, who worked on RSA issues, said in a Chat message that she didn't have a specific document

17    because "competition legal might not want us to have a doc like that at all :)."  Trial Tr. at 991:16-

18    992:8 (smiley face emoji in original).  She was a party to other Chats where, in a discussion about

19    MADA, she asked to turn history off because of "legal sensitivity"; she requested to turn history

20    off in a different conversation about RSAs, so there would be no "trail of us talking about waivers,

21    etc."  Dkt. No. 887-83 (Trial Ex. 6464), Dkt. No. 888-23 (Trial Ex. 8020).  Witness Lam also

22    testified that the decision of which Chats to preserve had been left in her hands, but she had "no

23    idea" what was or was not relevant.  Trial Tr. at 1012:6-1014:9.

24          Overall, there was an abundance of pretrial and trial evidence demonstrating "an ingrained

25    systemic culture of suppression of relevant evidence within Google."  *Id.* at 1044:15-17.  The

26    Court had advised the parties before trial that an appropriate sanction might include a permissive

27    inference instruction to the jury.  Dkt. No. 700 at 3-4.  After the additional evidence of

28    malfeasance emerged during trial, the Court raised the question of whether a mandatory adverse

25

1    inference instruction would be more fitting. Trial Tr. at 1044:4-22. Even then, despite the

2    mountain of evidence against Google, the Court held an evidentiary hearing on the question

3    outside of the presence of the jury.

4        The results of this hearing were disappointing. Google's chief legal officer, Kent Walker,

5    was the main witness. Despite the seriousness of these issues, and the likelihood that they could

6    affect other litigation matters where Google is a party, Walker showed little awareness of the

7    problems and had not investigated them in any way. Trial Tr. at 1834:18-1835:17. Much of his

8    testimony was in direct opposition to the facts established at the prior Google Chat hearing. *See*,

9    *e.g.*, *id*. at 1829:16-1830:3. Overall, Walker did nothing to assuage the Court's concerns.

10       In these circumstances, the salient question was not whether an adverse inference

11   instruction should be given at all, but whether the inference should be permissive or mandatory.

12   The Court would have been well within its discretion to order a mandatory inference, given the

13   volume of evidence of Google's misconduct. Even so, the Court took the conservative approach

14   of permitting the jury to make an adverse inference rather than requiring it to. The parties had a

15   fair and balanced opportunity during trial to present evidence and arguments about Google Chat

16   preservation and Google's conduct, and both sides took full advantage of that. The jury was free

17   to make or decline an inference as it saw fit. To further ensure fairness, the Court instructed Epic

18   that it could not make arguments about Google's conduct predating August 2020. *See* Trial Tr. at

19   3237:4-8. If Epic opened that door, Google would have been permitted to respond, *see id*., but

20   Epic followed that instruction in its closing argument. *See id*. at 3352:3-3386:14, 3430:19-3435:7.

21       In light of this record, Google's complaints about the inference instruction are wholly

22   misdirected. It has not provided anything close to a good reason to conclude otherwise.

23   **V.    ADVISORY JURY**

24       Google says, rather disingenuously, that the Court has not clarified "whether it was going

25   to treat the jury's verdict as binding or advisory," and requests that the Court treat the verdict as

26   advisory. Dkt. No. 925 at 29. It argues further that it "did not consent to a jury trial," and even if

27   it did, it withdrew that consent. *Id*. at 29-30.

28

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    Google again ignores that it already made these arguments to the Court prior to the start of

2    trial, and lost, for good reason.  The Court expressly denied Google's request to "abandon a jury

3    trial" on the eve of trial.  Trial Tr. at 6:13-7:16.  Google is in effect seeking reconsideration of that

4    ruling, for no good reason.

5          To summarize the prior proceedings on this issue, under Federal Rule of Civil Procedure

6    39(c)(2), "[i]n an action not triable of right by a jury, the court, on motion or on its own:  . . .

7    (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a

8    jury trial had been a matter of right, unless the action is against the United States and a federal

9    statute provides for a nonjury trial."  Google consented to a jury trial of Epic's antitrust claims

10   against it.  A party's consent under Rule 39(c)(2) can be express or implied.  *See*, *e.g.*, *Bereda v.*

11   *Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989); *Thompson v. Parkes*, 963 F.2d

12   885, 889 (6th Cir. 1992) (en banc); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96

13   (9th Cir. 1999); *Broadnax v. City of New Haven*, 415 F.3d 265, 271-72 (2d Cir. 2005); *Pals v.*

14   *Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000).

15         Google gave unambiguous express and implied consent to a jury trial.  The express consent

16   can be found in documents such as the parties' Joint Submission re Trial Proposal, which stated,

17   for "Issues Triable to a Jury":  "The parties agree that all claims by all Plaintiffs are triable to a

18   jury, with the exception of the claims brought under California's Unfair Competition Law, . . . ,

19   and claims that the States have brought under the laws of 38 states other than California."  Dkt.

20   No. 505 at 3.  The record also shows that the Court and the parties contemplated a jury trial for

21   Epic's antitrust claims for years, without objection by Google and with its active participation in

22   the filing and discussion of jury instructions, proposed voir dire, and motions in limine.

23         Google's filing on November 1, 2023, one day before jury selection and two court days

24   before the start of trial, was the first time it said it was "withdraw[ing] that consent."  *See* Dkt. No.

25   730 at 7.  That was far too late.  *See Bereda*, 865 F.2d at 55 ("Rule 39(c) does not permit the

26   district court to withdraw its prior consent to the litigants' request for a nonadvisory jury.");

27   *Thompson*, 963 F.2d at 889 ("Even if the court was correct that no jury trial right existed in this

28   case, F.R.Civ.Pro. 39(c) permits both sides to stipulate to a jury trial.  To be sure, a district court

27

**ER-50**

does not have to go along with the stipulation, but once that occurs, it does not have unbridled

discretion to change its mind."); *see also AMF Tuboscope, Inc. v. Cunningham*, 352 F.2d 150, 155

(10th Cir. 1965) (where parties had stipulated to a jury trial that was set to begin on March 1,

abuse of discretion for district court to vacate the jury trial on February 28 and re-set the case for a

bench trial, based on court's conclusion that the parties were not entitled to a jury trial as of right).

Allowing Google to withdraw its consent two court days before trial would have caused

immense prejudice to Epic, which had been awaiting its day before a factfinder since filing its case

years prior, and which had spent many months preparing for a jury trial. A jury trial was proper,

and the jury's verdict is properly treated as binding.

## CONCLUSION

Google's motion did not present good grounds for judgment as a matter of law or for a new

trial.

**IT IS SO ORDERED.**

Dated:  July 3, 2024

_____
JAMES DONATO
United States District Judge

1

2

3

4

5                       UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8   IN RE GOOGLE PLAY STORE          MDL Case No.  21-md-02981-JD
  ANTITRUST LITIGATION             Member Case No. 20-cv-05671-JD

9

10                               **VERDICT FORM**

11

12

13

14 When answering the following questions and filling out this Verdict Form, please follow the

15 directions provided throughout the form. Your verdict must be unanimous.

16

17 We, the jury, return these answers as our verdict in this case:

18

19                 **Monopolization (Sherman Act Section 2)**

20 **Question No. 1:**

21 Did Epic prove, by a preponderance of the evidence and in accordance with the instructions given

22 to you, the existence of a relevant antitrust market?

23

24

25             **X** YES       _____NO

26

27     **If you answered "Yes" to Question 1 then continue to Question 2.**

    **If you answered "No" to Question 1 then continue to Question 6.**

28

United States District Court
Northern District of California

**Question No. 2:**

If you answered "yes" to Question 1, please specify each relevant product market and associated

geographic market that Epic proved:

| Relevant Product Market | Relevant Geographic Market |
|---|---|
| 1) Android app distribution market | Worldwide excluding China |
| 2) Android in-app billing services for digital goods and services transactions | Worldwide excluding China |

**Continue to Question 3.**

**Question No. 3:**

Did Epic prove, by a preponderance of the evidence and in accordance with the instructions given

to you, that Google willfully acquired or maintained monopoly power by engaging in

anticompetitive conduct in any market that you specified in response to Question 2?

           X YES        NO

**If you answered "Yes" to Question 3 then continue to Question 4.**

**If you answered "No" to Question 3 then continue to Question 6.**

United States District Court
Northern District of California

3

**ER-53**

**United States District Court**
**Northern District of California**

## Question No. 4:

If you answered "yes" to Question 3, please specify each relevant product market and associated geographic market for your answer:

| Relevant Product Market | Relevant Geographic Market |
|---|---|
| 1) Android app distribution market | Worldwide excluding China |
| 2) Android in-app billing services for digital goods and services transactions | Worldwide excluding China |

**Continue to Question 5.**

## Question No. 5:

If you answered "yes" to Question 3, did Epic prove, by a preponderance of the evidence and in accordance with the instructions given to you, that it was injured as a result of Google's violation of the antitrust laws?

X YES          NO

**Continue to Question 6.**

4

ER-54

(55 of 161), Page 55 of 161
Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 55 of 161
Case 3:20-cv-05671-JD    Document 606    Filed 12/11/23    Page 4 of 6

**Unlawful Restraint of Trade (Sherman Act Section 1 and California State Law)**

**Question No. 6:**

Did Epic prove, by a preponderance of the evidence and in accordance with the instructions given to you, that Google entered into one or more agreements that unreasonably restrained trade in a relevant antitrust market?

X YES        ____ NO

**If you answered "Yes" to Question 6 then continue to Question 7.**

**If you answered "No" to Question 6 then continue to Question 10.**

**Question No. 7:**

If you answered "yes" to Question 6, which of these agreements did you find to be unreasonable restraint(s) of trade in accordance with the instructions given to you?

X        DDA agreements

X        Agreements with Google's alleged competitors or potential competitors under Project Hug or Games Velocity Program

X        Agreements with OEMs that sell mobile devices (including MADA and RSA agreements)

**Continue to Question 8.**

United States District Court
Northern District of California

5

**ER-55**

**Question No. 8:**

If you answered "yes" to Question 6, please specify each relevant product market and associated

geographic market for your answer:

| Relevant Product Market | Relevant Geographic Market |
|---|---|
| 1) Android app distribution market | Worldwide excluding China |
| 2) Android in-app billing services for digital goods and services transactions | Worldwide excluding China |

**Continue to Question 9.**

**Question No. 9:**

If you answered "yes" to Question 6, did Epic prove, by a preponderance of the evidence and in

accordance with the instructions given to you, that it was injured as a result of Google's violation

of the antitrust laws?

X YES        _____ NO

**Continue to Question 10.**

United States District Court
Northern District of California

6

**Tying (Sherman Act Section 1 and California State Law)**

**Question No. 10:**

Did Epic prove, by a preponderance of the evidence and in accordance with the instructions given to you, that Google unlawfully tied the use of the Google Play Store to the use of Google Play Billing?

X̷ YES      _____ NO

**If you answered "Yes" to Question 10 then continue to Question 11.**

**If you answered "No" to Question 10 then go to the bottom of the form.**

**Question No. 11:**

If you answered "yes" to Question 10, did Epic prove, by a preponderance of the evidence and in accordance with the instructions given to you, that it was injured as a result of Google's violation of the antitrust laws?

X̷ YES      _____ NO

---

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations. The Presiding Juror should then sign and date the verdict form in the spaces below and notify the courtroom deputy that you have reached a verdict. The Presiding Juror should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

---

DATED: 11 Dec 2023      Signed:

_____
Presiding Juror

7

ER-57

Volume 16

Pages 3066 - 3293

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )   **NO. 21-md-02981-JD**
_____  )
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )   **NO. 3:20-cv-05671-JD**
                                 )
GOOGLE, LLC., et al.,            )
                                 )
            Defendants.          )
_____  )

San Francisco, California

Friday, December 1, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

(59 of 161), Page 59 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 59 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 149 of 228   3214
CHARGING CONFERENCE

 1   December 11th until you reach a verdict.  So plan on that.  And

 2   lunch will be -- continue to be provided.  Typically we only

 3   provide lunch during this phase.  You've had it the whole time,

 4   and it will continue in the deliberations phase.

 5       Now, make sure you leave all your papers, your notes,

 6   anything about the case in the jury room.  Keep your badge with

 7   you.

 8       Don't do anything in the upcoming week that is in any way

 9   related to this case.  Don't think.  Don't ponder.  Don't fret.

10   Don't do any research.  Don't talk to anyone.  Don't do any

11   sleuthing, any Internet investigations, nothing whatsoever.

12       And we will see you on December 11th.

13           **THE CLERK:**  All rise.

14       (Proceedings were heard out of the presence of the jury:)

15           **THE COURT:**  All right.  We will come back at 2:15.

16   We'll spend 15 minutes on a Rule 50 motion and then we'll do

17   jury instructions.

18               (Recess taken at 1:51 p.m.)

19              (Proceedings resumed at 2:21 p.m.)

20       (Proceedings were heard out of the presence of the jury:)

21           **THE COURT:**  Okay.  Mr. Pomerantz.

22           **MR. OLASA:**  Mr. Pomerantz has elected me, Your Honor.

23           **THE COURT:**  All right.  Go ahead.

24           **MR. OLASA:**  Hi, Your Honor.  Kuru Olasa for Google.

25   Google moves under Rule 50(a) for judgment as a matter of

(60 of 161), Page 60 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 60 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 150 of 228   3215
CHARGING CONFERENCE

1    law.  Earlier today we filed the two-page document Your Honor

2    allowed us to file.  We understand we should use a different

3    filing event, so we'll refile it, but we have copies in the

4    interim for Your Honor and for counsel.

5              THE COURT:  Thank you.

6         Okay.  Go ahead.

7              MR. OLASA:  All right, Your Honor.  We're going to

8    begin with market definition.  Our first argument is that Epic

9    has not offered legally sufficient evidence to limit the

10   product markets to services for just Android devices, and this

11   applies to both its relevant markets.

12        Google submits that Epic is alleging a single-brand

13   market.  I understand Your Honor has expressed disagreement

14   with that.

15        In Google's view, Epic has restricted the markets to

16   services for one brand, Android-branded devices; and that Epic

17   has argued that once consumers choose an Android smartphone,

18   they cannot turn to the Apple App Store.  And that's Trial

19   Transcript 175, Epic's opening, and Professor Bernheim's

20   testimony about the choice between devices.

21        And we direct the Court to the law on this issue in

22   *Epic Games v. Apple*, 67 F.4th 946, and *Coronavirus Reporter v.*

23   *Apple*, 85 F.4th 948.

24             THE COURT:  You know, *Coronavirus* is completely

25   inapposite.  It didn't even have an adequately alleged --

**CHARGING CONFERENCE**

1    *Coronavirus* said the plaintiffs were so at sea they never even

2    alleged a relevant market.  So *Coronavirus* does nothing for

3    you.

4        In *Epic v. Apple*, Epic expressly represented to the

5    jury -- to the judge, it was not -- it was a bench trial, not a

6    jury trial -- represented to the judge that their theory of the

7    case was that there was a for market and an after market,

8    neither of which has happened here.

9        **MR. OLASA:**  Your Honor, I understand.  I think that

10    whether or not Epic has expressly alleged that it's pursuing a

11    for-market or after-market theory, *Epic v. Apple* does provide

12    the legal framework --

13        **THE COURT:**  That is not true.  You conform jury

14    instructions to the proof on a case-by-case, market-by-market

15    basis.  The market in the *Apple* case is completely different

16    from the market in this case.

17        The evidence in this case does not at all indicate an

18    after market/for market structure based on *Kodak* or *Epic v.*

19    *Apple* or anything else.

20        Nobody in this case, as I said yesterday, has said a word

21    about it, including your own experts.  Neither of your

22    experts -- I should say none of your experts, because you had

23    more than two, said a peep about a proposed relevant market

24    being based on a for-market and after-market theory.

25        So what you're asking me to do -- this is moving into the

CHARGING CONFERENCE

1    jury instructions now, so I don't have to repeat it later --

2    you're asking me to send a jury instruction on a concept to the

3    jury that they have not heard a word about until they're alone

4    in the jury room trying to figure out what to do.  That is the

5    quintessential definition of an inappropriate jury instruction

6    that is not based on the evidence in the case, and that's also

7    why this argument isn't good.

8            MR. OLASA:  Respectfully, Your Honor, if --

9            THE COURT:  Just go to your next point.  Okay?  Look,

10   all you're doing here -- look, you understand this is a 50(a)

11   motion.  Okay?

12           MR. OLASA:  I understand.

13           THE COURT:  I'm denying it subject to renewal at Rule

14   50(b), so just roll through it.

15           MR. OLASA:  Understood, Your Honor.

16       So I'll move on to our next argument.  This is on the

17   Android in-app billing market; and with respect to Epic's

18   in-app -- alleged in-app Android billing market, Epic has

19   failed to present legally sufficient evidence that out-of-app

20   payment systems are not reasonable substitutes for in-app

21   payment systems.

22       The law on this, of course, is numerous Ninth Circuit

23   cases, including *Optronic Techs*, 20 F.4th 466 at 482.  The

24   relevant market is defined as commodities reasonably

25   interchangeable by consumers for the same purpose.

CHARGING CONFERENCE

1    Epic's expert, Professor Tadelis, did not dispute that

2    developers are free to monetize their apps in several ways

3    beyond in-app billing, such as through a consumption-only model

4    or through advertising and other payment mechanisms.

5        Epic's CEO, Tim Sweeney, testified that Epic itself had --

6        **THE COURT:**  You're going to have the chance.  Just

7    make the point.  Preserve it.  You're going to have -- as long

8    as your point is there, you're good.  You can do the details

9    there later.  All right?

10       So next point.

11       **MR. OLASA:**  The next point is geographic markets,

12   Your Honor.  With respect to the geographic market, Epic failed

13   to present legally sufficient evidence for why the relevant

14   market is worldwide, excluding China.

15       With respect to the app distribution market, the evidence

16   does not support a conclusion that consumers can turn to

17   alternatives all across the world, excluding China.

18       And with respect to in-app billing, Epic's expert conceded

19   that payment processers vary by country, and that many payment

20   processers are only in particular limited countries.

21       I can elaborate further on the evidence, Your Honor.

22       **THE COURT:**  No, no.  You're just putting your

23   placeholder.

24       Next one.

25       **MR. OLASA:**  All right.  The next argument, Your Honor,

(64 of 161), Page 64 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 64 of 161
Case 3:21-md-02981-JD  Document 849  Filed 12/06/23  Page 154 of 228  3219
CHARGING CONFERENCE

1    is on market and monopoly power.  Our first argument, which I

2    think is probably already rejected, is that Epic's market

3    definition was inaccurate due to the *Kodak* issue and,

4    therefore, the market share analysis it provided was

5    inaccurate.

6         Separately, we would argue that even aside from the

7    after-market *Newcal* and *Kodak* issue, Epic has not defined the

8    markets accurately; and, therefore, its attempts to define

9    market or monopoly power here are legally insufficient.  And

10   the citation there is to *Ohio v. American Express*, 138 Supreme

11   Court 2274.

12        Epic has not shown legally sufficient indirect or direct

13   evidence of market power or monopoly power, and Epic failed to

14   show any reduction in output or quality.

15        **THE COURT:**  Okay.  Next.

16        **MR. OLASA:**  The per se tying claim, Your Honor, I know

17   we're going to get to the jury instruction later and we saw the

18   instructions the Court --

19        **THE COURT:**  There is no per se.

20        **MR. OLASA:**  Understood.

21        **THE COURT:**  All rule of reason.

22        **MR. OLASA:**  Okay.  For all claims including --

23        **THE COURT:**  Yes.  We'll talk about Activision in a

24   minute, ABK.  But, yes, it's rule of reason for everything.

25        **MR. OLASA:**  On anticompetitive conduct and effects,

1    each of Epic's rule-of-reason claims fails because a reasonable

2    jury would not have a legally sufficient evidentiary basis to

3    conclude that that conduct is anticompetitive.

4         I'll begin with the Games Velocity Program agreements.

5    The antitrust laws do not require a firm not to compete or to

6    provide discounts or incentives to its customers.

7         Epic has not offered legally sufficient evidence that this

8    program involved the below-cost pricing, decreased output,

9    increased prices, or decreased quality in any relevant market.

10   And to the contrary, above-cost competitive pricing is pro

11   competitive, as a matter of law, and I'd cite *Pacific Bell v.*

12   *Linkline* and *Weyerhaeuser*.

13        Moving to the MADA, epic has not offered legally

14   sufficient evidence that the MADA forecloses competition.  In

15   addition, Epic has not identified a substantially less

16   restrictive alternative to the MADA that Google could have used

17   to provide value to consumers and OEMs.

18        Next, on the RSA 3.0 premier tier, Google has not offered

19   legally -- sorry -- Epic has not offered legally sufficient

20   evidence that the RSA 3.0 premier tier forecloses competition.

21   A market is not foreclosed if suppliers can reach the ultimate

22   consumer through existing or alternative distribution channels.

23   That's *Omega Environmental*, 127 F.3d 1157.

24        The sheriff devices, either all devices or new devices

25   covered by RSA 3.0, does not demonstrate foreclosure.

ER-65

**CHARGING CONFERENCE**

1    Professor Bernheim also admitted that RSA 3.0 did not

2  apply to Samsung, and there is also the option for sideloading

3  an app store or an app on a device subject to the premier tier.

4    Finally, on the premier tier, the device-by-device nature

5  of RSA 3.0 also negates foreclosure.  A rival can compete with

6  Google on a device-by-device basis by making a better offer.

7  And, again, the citation is to *Omega Environmental*.

8    **THE COURT:** Okay.  Next.

9    **MR. OLASA:**  Turning to the sideloading warnings,

10  Your Honor, sideloading warnings are justified by the security

11  risk to users.  The evidence from Professor Mickens, also

12  Epic's expert, also acknowledged that malware is a real risk.

13  And Professor Mickens did not suggest that the sideloading

14  warnings should be removed but only compressed.

15    And on his less restrictive alternatives, Epic must show a

16  substantially less restrictive alternative.  This requires

17  showing an alternative that is virtually as effective in

18  serving the pro competitive purposes without significantly

19  increased cost.  That's *Epic Games*, 67 F.4th 990.

20    Epic's notarization proposal is not a less restrictive

21  alternative.  The Ninth Circuit rejected the same proposal in

22  *Epic Games v. Apple*.

23    Google has provided a pro competitive justification for

24  the warnings to protect users from security risks, and Epic

25  failed to show that the risks claimed by Google are nonexistent

(67 of 161), Page 67 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 67 of 161
Case 3:21-md-02981-JD Document 849 Filed 12/06/23 Page 157 of 228    3222
CHARGING CONFERENCE

1   or pretextual.

2       Professor Mickens' alternative would also impose a duty to

3   deal on Google and require Google to provide app review

4   services to apps outside -- and app stores outside the Google

5   Play Store; and, therefore, we think under *Trinko* that's not a

6   duty that can be imposed on Google.  And *Epic v. Apple* is also

7   a citation I would direct Your Honor to.

8       Epic also did not show an element of anticompetitive

9   conduct from the sideloading warnings.  Again,

10  Professor Mickens admitted there are malware risks, and that

11  the warning should only be compressed, not eliminated.

12      And Professor Bernheim admitted that Google first started

13  these warnings back in 2008 at the time Android was launched

14  and before it had --

15          **THE COURT:**  Okay.  Let's telegraph a little bit more.

16  Okay?  I got to get going on the jury instructions.  So just

17  make the main points on the substance about why you think

18  there's not enough evidence.  Remember, you're just keeping the

19  gate open for posttrial.  Okay?

20          **MR. OLASA:**  Moving on to Google Play Billing,

21  Your Honor.  Google Play Billing, it's not anticompetitive --

22          **THE COURT:**  Which section of your letter are we in

23  now?  What number is this?

24          **MR. OLASA:**  Sure.  We are in Section 5,

25  Anticompetitive Effects.

CHARGING CONFERENCE

```
1              THE COURT:  Go ahead.
2              MR. OLASA:  So on Google Play Billing, Your Honor, it
3   is not anticompetitive for Google to require developers to use
4   its billing system in order to be compensated for Google's
5   investments.  That's -- I'd cite Your Honor to Epic Games v.
6   Apple.
7         And as far as a less restrictive alternative goes, Epic
8   has failed to provide a less restrictive alternative to
9   Google Play Billing that is virtually as effective in serving
10  Google's business purposes without significantly increased
11  costs.
12        I'll go on to the Developer Distribution Agreement.  Epic
13  alleged two reasons that the Developer Distribution Agreement
14  was anticompetitive.  First, that it included Google's policy
15  of not distributing another app store.  The Court has already
16  granted summary judgment on that ground.
17        On the other ground, Epic has alleged the DDA requires the
18  use of Google Play Billing for certain in-app transactions.
19  And on that second allegation, it is not anticompetitive for
20  Google to require developers to use its billing system; and
21  I'll refer Your Honor back to the argument I just made on the
22  Google Play Billing tie.
23        On Project Banyan, Project Banyan had no market effect.
24  It was never implemented.  Epic's jury instructions still have
25  a reference to Facebook and wireless carrier agreements.  Epic
```

ER-68

**CHARGING CONFERENCE**

1    has not introduced sufficient evidence on agreements with

2    Facebook or with wireless carriers.  Epic's fact witnesses and

3    economists did not testify about these agreements or describe

4    their competitive effects or their terms.

5              THE COURT:  All right.  Number six now?

6              MR. OLASA:  One more, Your Honor, on this one very

7    briefly.

8              THE COURT:  Let's make it quick.  Okay?

9              MR. OLASA:  Yes, Your Honor.

10             THE COURT:  We're getting -- I wanted it in 15

11   minutes.  You're only on number five.  All right?

12             MR. OLASA:  The last point on anticompetitive conduct,

13   Your Honor, is that with respect to the conduct here, Epic

14   cannot aggregate conduct that is lawful under the antitrust

15   laws into a broth.  As the Supreme Court held in *Linkline*, two

16   wrong claims do not make one that's right.  So *Linkline*, *Masimo*

17   *Corp.*, and *United States v. Google*, 2003 Westlaw 4999901.

18        Turning to the rule of reason tying claim, putting aside

19   the rule of reason argument already covered with Your Honor, we

20   have a few other arguments here.

21        First is that, as a matter of law, Google Play and

22   Google Play Billing are not separate products.  We understand

23   Your Honor rejected that argument at summary judgment, but

24   we're raising it again to preserve it.

25        And then, in addition, we think the evidence at trial did

**CHARGING CONFERENCE**

1    not show that Google Play and Google Play Billing are separate

2    products.  There was not sufficient evidence on this issue.  In

3    particular, Epic has not shown the developers demand a product

4    by Google Play Billing that is separate from the Google Play

5    Store.

6       On the element of coercion, Epic has failed to offer

7    legally sufficient evidence of foreclosure because no developer

8    is coerced into using Google Play Billing over an alternative

9    monetization option, such as advertising or consumption-only

10   distribution.

11      Those are our arguments, Your Honor.

12      THE COURT:  Okay.  Epic, I'm prepared to rule.  If you

13   want to say thing, you certainly can.

14      MR. BORNSTEIN:  No, Your Honor, unless you're willing

15   to entertain some argument on the Activision issue.

16      THE COURT:  Well, maybe.  We'll get to that.

17      But with respect to the Rule 50(a) motion, it's denied.

18   As I've mentioned on previous occasions, I have paid great

19   attention to each and every word and document that has been

20   propounded into evidence during the trial, as has the jury.  I

21   really have been watching them closely.  They've been a superb

22   jury; and knock on wood, we haven't anybody really yet except

23   one person very early in the case with special circumstances

24   before any evidence started.

25      I am completely satisfied that there is more than enough

**CHARGING CONFERENCE**

1  evidence in the record for the jury to find in favor of

2  plaintiff on each and every one of their claims; and so for

3  that reason, the Rule 50(a) motion is denied.  That is, of

4  course, subject to renewal as warranted by circumstances under

5  Rule 50(b) -- B, as in boy -- postverdict.

6      That takes care of that.  Let's go to the jury

7  instructions.

8      So let me hit a couple of highlights, then we're going to

9  go through the individual ones in prompt fashion.  I don't

10  think it's going to take forever to get through it.

11      Okay.  So with respect to the ABK agreement, I've looked

12  carefully, Mr. Bornstein, at the evidence that you gave to me

13  the other day and the record as a whole, and I just cannot say

14  that that agreement is, quote, "so plainly anticompetitive and

15  so lacking in any redeeming value such that it can be

16  conclusively presumed illegal and treated as a per se

17  violation."  And I'm quoting from *Epic v. Apple*, 67 F.4th

18  946-997.  So it will be rule of reason.

19      Okay.  Now, with respect to permissive, the permissive

20  inference, it is deeply troubling to me as a judicial officer

21  of the United States, the record that I have seen by Google in

22  this case with respect to the willful and intentionally

23  suppression of relevant evidence.

24      You-all recall that I concluded after a prior evidentiary

25  hearing with testimony from -- and other evidence from Google

**CHARGING CONFERENCE**

1   and its employees, that Google had failed to preserve Chat

2   evidence with the intent of preventing its use in this

3   litigation and with the intent of depriving Epic of the use of

4   that evidence.  That's at Docket Number 469, page 18.

5        The evidence presented during trial most recently in the

6   testimony of Google employee Loew, L-O-E-W, just an hour or two

7   ago has strongly underscored this conclusion.

8        Google's witnesses at trial have testified about making

9   intentional decisions not to preserve Chats with potentially

10  relevant evidence.  Google's witnesses have also -- and I'm

11  referring here namely to in-house attorney Emily Garber -- have

12  also testified or given disturbing testimony about the use of,

13  quote, "fake privilege," close quote, claims with respect to

14  internal Google documents and communications.  As I said

15  previously, I found Attorney Garber's effort to explain this

16  away to be not credible and unpersuasive.

17       I have also noticed an unusually large number of

18  documents, Google documents, labeled "Privileged and

19  Confidential" by Google employees who prepared them.  These

20  documents, which I have looked at quite closely in the course

21  of their presentation in evidence, these documents on their

22  face have typically not included any indicia that the document

23  was, in fact, prepared in connection with an attorney-client

24  communication or with the goal of it soliciting attorney

25  advice.

**CHARGING CONFERENCE**

1    You will recall that I asked, I think it was yesterday --

2    was that Paul Gennai? -- yesterday I asked Google witness Paul

3    Gennai about this very point.  You will recall that he had

4    labeled as privileged and confidential a document that he,

5    himself, described as his own personal notes.  This document

6    lacked any indication that it was privileged in any way.  And

7    in response to my questions about his assertion of the

8    privilege, he did not establish any basis whatsoever for a

9    valid claim that these are privileged and confidential notes.

10    Now, the result of all this, I invited Google's chief

11    legal officer, Kent Walker, to come in and help me understand

12    why all of this was happening and why these evidence games were

13    so rampant at Google.

14    I found his testimony, which was taken outside the

15    presence of the jury, did not do anything to assuage my

16    concerns.  The testimony of Attorney Walker was evasive and was

17    materially inconsistent with testimony given by Google's

18    witnesses at the Chat hearing as described in Docket 469.

19    All of this presents the most serious and disturbing

20    evidence I have ever seen in my decade on the bench with

21    respect to a party intentionally suppressing potentially

22    relevant evidence in litigation.  I have just never seen

23    anything this egregious.

24    And my concern, as every judge's concern would be, is

25    motivated by the fact that this conduct is a frontal assault on

**CHARGING CONFERENCE**

1    the fair administration of justice.  It undercuts due process

2    and it calls into question the just resolution of legal

3    disputes.  It's antithetical to our system.

4         It also imposes tremendous taxes and costs, in terms of

5    time and effort money, on opposing parties.  Just getting

6    through bogus privilege assertions alone takes forever.

7    Somebody has to look at those documents, they have to evaluate

8    it, they have to make a claim, they have to fight about it, and

9    then they have to come to the judge to get it resolved.

10        In addition to that, it imposes completely untenable costs

11   on scarce federal judicial resources having to deal with all of

12   this.  There is nothing I would rather do than not deal with

13   this, but you have forced me to do it because of this rampant

14   and systemic culture of evidence suppression at Google.

15        Now, that's a long line of me saying I'm not going to give

16   a mandatory instruction, and I'm going to tell you why.  There

17   is no doubt in my mind a mandatory inference would be amply

18   warranted in this case given all the evidence we have.

19   However, I have concluded that the best course of action is for

20   the jury itself to decide whether it will make an inference,

21   and I am not going to constrain the jury's discretion by making

22   that inference for them or making that decision for them.  I

23   believe that is most faithful to the right to a jury trial, the

24   Seventh Amendment, and also the fair administration of justice.

25        So even though it would be well within bounds to issue a

**CHARGING CONFERENCE**

1   mandatory inference instruction, I'm going to decline to do

2   that and take the more conservative approach of letting the

3   jury decide for itself.

4        Another reason I'm going to do that is that I can pursue

5   these issues on my own outside of this trial in subsequent

6   proceedings, which I intend to do.  I am going to get to the

7   bottom of who is responsible among outside counsel for allowing

8   this to happen.  I'm going to get to the bottom of who is

9   responsible within Google for tolerating this culture

10  suppression.  That's going to be separate and apart from

11  anything that happens here, but that day is coming.

12       So that's the basis for the permissive inference.

13       Now, we've talked about the after market.  You wanted to

14  add something, Mr. Bornstein?

15       **MR. BORNSTEIN:**  I'm sorry, Your Honor.  I didn't hear

16  what the question was?

17       **THE COURT:**  We talked about after market, but you

18  wanted to add something?

19       **MR. BORNSTEIN:**  Oh, it was not about after market.  We

20  had a -- I absolutely heard the ruling that Your Honor just

21  gave and have no intention of rearguing it --

22       **THE COURT:**  Oh, okay.

23       **MR. BORNSTEIN:**  -- but we did have a proposal that we

24  had made to Google on this issue to pair with the permissive

25  adverse inference instruction, and I'm going to cede the floor

**ER-75**

(76 of 161), Page 76 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 76 of 161
Case 3:21-md-02981-JD  Document 849  Filed 12/06/23  Page 166 of 228   3231
CHARGING CONFERENCE

 1  to my colleague, Ms. Moskowitz.

 2          **THE COURT:**  Please, yes.

 3          **MS. MOSKOWITZ:**  Thank you, Your Honor, and I

 4  appreciate everything you just said.

 5      I think there are two parts to the instruction --

 6          **THE COURT:**  Let me get the instruction.  Just one

 7  second.

 8          **MS. MOSKOWITZ:**  Sure.  And I have it along with a

 9  redline if you'd like us to hand it up.

10          **THE COURT:**  Yeah, give that to Ms. Clark.

11          **MS. MOSKOWITZ:**  Your Honor, there are two sentences in

12  your instruction, there's two parts.  It's the setup and then

13  the inference portion of it.

14      In terms of --

15          **THE COURT:**  Let's be clear.  We're looking at Docket

16  Number 823 and Instruction Number 13.

17      Okay.  Go ahead.

18          **MS. MOSKOWITZ:**  Yes, Your Honor.

19      There are two sentences there.  I'd like to start with the

20  second because I think what Your Honor just said is very clear,

21  that it will be a permissive, and that's the "may."

22      One tweak we would ask to make is to use the word

23  "presume" instead of "infer," which tracks the language in

24  Rule 37.  So "You may presume" instead of "infer."

25      And I want to come back to the word "lost."  That's the

**CHARGING CONFERENCE**

1    only other word that I'd like to take up, and that's going to

2    come up in that first sentence as well.

3         THE COURT:  I don't want to limit this to these three

4    types of agreements.  I know I raised that idea.  I think

5    that's an unfair limitation in light of the abundance of

6    evidence just about how systemic this is.  That's why I

7    intentionally left that out.

8         MS. MOSKOWITZ:  I appreciate that, Your Honor, and --

9         THE COURT:  Now, with that in mind, though, what is it

10   you want to say?  "Google intentionally deleted Chat" --

11   "Google Chat," period.  "You may presume that the Chat messages

12   destroyed by Google contain evidence that would have been

13   unfavorable to Google in this case."

14        MS. MOSKOWITZ:  That is basically what we proposed.  I

15   think we would ask to keep what you said in here in yours, that

16   the intent to prevent their use in litigation.  The reason we

17   don't want the "you've seen evidence" is this really

18   shouldn't -- they shouldn't be deciding that question.  It's

19   written in -- or carved in stone.  It happened.

20        The thing they should decide, and that Your Honor just

21   said you wanted to leave to them, is what they should make of

22   that destruction and what they should presume about it is up to

23   them, but not whether it happened.

24        Google has not established and shouldn't be able to

25   establish, and that comes back to we want to request the Court

1  limit Google from making a single utter of a single word about

2  this in their closing.  They shouldn't be able to say "It

3  doesn't matter."  They shouldn't be able to say "It didn't

4  happen.  They got piles of documents."  All of that stuff is to

5  try to minimize what happened, and we don't think they should

6  be able to do that.

7      We think the jury should be told what happened, and then

8  they can -- may presume, up to them, what that means to them.

9          **THE COURT:**  Okay.

10          **MR. KRAVIS:**  Thank you, Your Honor.

11      First, just noting for preservation purposes and purely

12  for the record, that Google objects to the inference

13  instruction.

14      We do think that a preclusion on what we are allowed to

15  argue in closing is wholly unwarranted here.  No one intends to

16  argue leading that it's contrary to the Court's findings on

17  intent and prejudice, but we are allowed to argue to the jury

18  what to make of the evidence that they have heard and how to

19  weigh it in their deliberations.  That is the --

20          **THE COURT:**  Well, what are you going to say?  Just

21  give me an example.

22          **MR. KRAVIS:**  Well, for example --

23          **THE COURT:**  I am not going to accept any statements

24  that Google Chat was not used for business purposes.

25          **MR. KRAVIS:**  No, no.  That's not the argument.

CHARGING CONFERENCE

1          **THE COURT:**  I'm not going to accept any statements

2    that fake privileges were never an issue.

3          **MR. KRAVIS:**  That's not the argument either.

4          **THE COURT:**  Tell me what you're going to say.

5          **MR. KRAVIS:**  The jury has heard conflicting evidence

6    from the parties about the timing of the relevant events here,

7    and the Court's order on Chats was pegged to the date the

8    preservation obligation arose of August 13th of 2020.

9          Google has presented evidence to the jury that much of the

10   conduct challenged by Epic occurred before that date.  Epic has

11   presented contrary evidence to the jury about the ongoing

12   effect of that conduct, the subsequent negotiations with

13   Samsung, and so on and so forth.  That is a point of fair

14   dispute between the parties to argue to the jury about how the

15   timing plays into their consideration of the Chat.

16         **THE COURT:**  So, in effect, you want to say

17   Google cheated before the complaint was filed but you don't

18   have to worry about that?

19         **MR. KRAVIS:**  Well, I would disagree with that

20   characterization.

21         **THE COURT:**  I'm sure you would, but I've already made

22   that finding.  That's basically what you're saying to me, is

23   you want to say, "Okay.  Don't worry about anything before

24   2020.  We shredded and burned to our hearts content, but it's

25   irrelevant."  Okay?  Is that what you're going to say?

(80 of 161), Page 80 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 80 of 161
Case 3:21-md-02981-JD Document 849 Filed 12/06/23 Page 170 of 228    3235
CHARGING CONFERENCE

 1          MR. KRAVIS:  Google's preservation obligations arise

 2    with the filing of the lawsuit.  It is the lawsuit that

 3    triggers the -- that triggers the obligation, that triggers the

 4    findings that the Court made.  And to the extent that there

 5    were Chat communications that occurred prior to a preservation

 6    obligation, it is not appropriate to tell the jury that they

 7    can draw adverse inference --

 8          THE COURT:  No one has said anything about mentioning

 9    any Chats before August 2020.

10          MR. KRAVIS:  Right.  And so the only point I'm making

11    is that we should be allowed to argue to the jury that to the

12    extent there was conduct -- relevant conduct here that occurred

13    before that preservation obligation arose, that that is

14    something that the jury can take into account in deciding how

15    to weigh the Chats.

16          THE COURT:  I don't understand what that means.  Just

17    tell me what you're going to say.

18          MR. KRAVIS:  Well, for example, I would say

19    Project Banyan occurred in 2019.  So the idea that Google --

20    that Google's preservation obligations with respect to Chat

21    started on August 13, 2020, means that Chats from 2019 should

22    not affect the jury's consideration of the conduct in 2019.

23    That is an example.

24          MS. MOSKOWITZ:  Your Honor, I think that this is a bit

25    cute given the fact that every witness has testified they've

(81 of 161), Page 81 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 81 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 171 of 228   3236
CHARGING CONFERENCE

 1   been on holds for years and years and years about every aspect

 2   of their job.  Mr. Lim, who you actually heard about from

 3   Ms. Loew, testified -- in fact, we submitted it in the Chats

 4   hearing -- that he was on 10 holds for basically his entire

 5   time.

 6        So the notion that we're just talking about August 20th,

 7   2020, I get that in a technical matter; but given the scope of

 8   what you've heard about and how long it's been going on and how

 9   sustained it was, I don't think we should be splitting hairs

10   about whether a Chat would have existed or wouldn't have

11   existed if this were just happening just in this case just now.

12        I don't think we intend to talk about the date at all with

13   respect to the Chats.  I don't think there's any reason why

14   they need to.

15             MR. KRAVIS:  With all respect --

16             THE COURT:  Well, for Project Banyan, I mean, was

17   there any evidence of discussions after 2020?  Did it come up

18   in any Google documents, any references?  I know it didn't go

19   through, but --

20             MS. MOSKOWITZ:  Well, our position is that Banyan was

21   just an iteration of the entire evolution of Google's

22   attempt -- you saw 2016 yesterday all the way through later in

23   2020 when they actually signed the RSAs, which are continuing

24   to be enforced and renegotiated, everyone was trying to seal it

25   because they're still subject to negotiations.  This is a

**CHARGING CONFERENCE**

1  continuous story of how they're dealing with Samsung that

2  continues well past August 13th, 2020.

3       **THE COURT:** All right. I can't enforce litigation

4  holds in other cases. I just can't do that. So keep it to

5  August 2020 and after. All right? And you can do anything you

6  want with that.

7      And there will be no reference to pre-August 2020 unless

8  the door is opened by the plaintiffs. Okay?

9      All right. Now, I'm going to stick with my version of

10 this except you wanted -- rather than "lost," you want to say

11 "deleted"?

12      **MS. MOSKOWITZ:** Yes, Your Honor, certainly.

13      **THE COURT:** As a matter of fact, there's just no

14 question they were deleted.

15      **MS. MOSKOWITZ:** That's right, Your Honor.

16      **THE COURT:** Okay.

17      **MS. MOSKOWITZ:** And if we could, we would delete --

18      **THE COURT:** I will substitute "deleted" for "lost" in

19 Instruction Number 13 in Docket 823.

20      **MS. MOSKOWITZ:** And, Your Honor, the "potentially" we

21 would like to delete too. There's no doubt that Chats were

22 relevant -- contained relevant evidence. They were on RSAs.

23 They were people talking about Hug. That testimony is in.

24 These were not potentially relevant Chats.

25      **THE COURT:** I understand that, and I think that's a

(83 of 161), Page 83 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 83 of 161
Case 3:21-md-02981-JD Document 849 Filed 12/06/23 Page 173 of 228     3238
CHARGING CONFERENCE

1   fair point.  It's hard to say -- this is the Catch 22 that you

2   sadly are in as a result of Google's intentional misconduct,

3   which is you don't know what you lost.

4        **MS. MOSKOWITZ:**  What about deleting --

5        **THE COURT:**  I'm just -- I'm a little concerned about

6   going too far on the contents.

7        **MS. MOSKOWITZ:**  What about deleting --

8        **THE COURT:**  I know it seems unfair because it is, in a

9   sense, allowing a wrongdoer more room to run than that

10  wrongdoer should have.  I get that; however, in the interest of

11  a fair verdict, I don't think I can delete "potential."

12       **MS. MOSKOWITZ:**  I have an idea.  What about "Google

13  intentionally deleted Google Chat evidence."  We don't have to

14  say whether it was potentially relevant.  That's what they're

15  going to decide.  They're going to decide what to do with it,

16  whether they presume it was bad for them or not, which means it

17  was relevant.  They might decide it was or may decide it's not,

18  but maybe we don't need that at all.

19      But potentially relevant --

20       **THE COURT:**  So you want to change the first sentence

21  to "You've seen evidence that Google intentionally deleted

22  Chats with the intent to" -- you want to say "intent" twice?

23  How about --

24       **MS. MOSKOWITZ:**  "The intent to prevent their use in

25  litigation" from your instruction is fine, Your Honor.

**CHARGING CONFERENCE**

 1   "Deleted with the intent."  You don't need to say the first

 2   "intentionally."

 3          **THE COURT:**  I'm just going to keep it as it is.  Okay?

 4   You can go to town in arguing, but I'm going to keep it as it

 5   is.  You can say all that in argument, but I'm not going to

 6   change things now.

 7          **MS. MOSKOWITZ:**  Thank you, Your Honor.

 8          **MR. KRAVIS:**  Thank you, Your Honor.

 9          **THE COURT:**  All right.  Okay.  Let's just run through

10   these now.

11       I'm just going to go through the number.  If you have

12   anything you want to raise, you need to say something.

13       Number 1 seems fine.

14       Number 2, we need to update that to take out -- oh, I had

15   a -- I asked you a question.  Can we just drop the damages?

16   We're going to drop the contract; right?  You-all didn't put a

17   number in.

18          **MR. EVEN:**  No, we didn't put a number in.  All we did

19   was what happened today with Dr. Leonard.  I don't think we

20   have an issue with that.  If we can just do away with the

21   stipulation and do away with that part of the verdict, we're

22   fine with that and leave it up to Your Honor.

23          **THE COURT:**  Okay.  Well, I mean, there is a

24   counterclaim that the jury's been told about.  So, I mean, the

25   evidence has been quite direct.  Epic's been loud and proud in

**CHARGING CONFERENCE**

```
1    saying "We won't pay."  I get it.  So we might as well just --
2         MR. EVEN:  Correct.  The only thing that worries us
3    there is that if we are stipulating to anything, we want to at
4    least say that to the extent or if the contract is legal, then
5    we admit that we breached it.
6         THE COURT:  Well, you don't have to worry about -- I'm
7    going to take care of that later.
8         MR. EVEN:  Okay.
9         THE COURT:  Okay?
10        MR. EVEN:  Thank you.
11        THE COURT:  So we're just going to drop -- we're not
12   going to say a word about contracts or damages or any elements
13   or anything else.  All right?
14        MR. EVEN:  That's fine with us.
15        MR. POMERANTZ:  Your Honor, I don't think that's
16   right.  We've already told the jury we have this counterclaim.
17        THE COURT:  You're going to say -- it's going to be in
18   the stipulation.
19        MR. POMERANTZ:  Okay.  So there will be a stipulation
20   that there was a breach and the damages --
21        THE COURT:  Mr. Pomerantz, that's what I was just
22   saying.  I just said the jury heard this counterclaim so they
23   have to hear that.
24        MR. POMERANTZ:  I'm sorry.  I misunderstood,
25   Your Honor.  Thank you.
```

```
 1            THE COURT:  Okay.  Let's just follow along, please.
 2   All right?  I want to get this done.
 3       So, yes, so that's what's going to happen, but we're not
 4   going to give any instructions on any of this.
 5            MR. EVEN:  Understood, Your Honor.
 6            THE COURT:  All right.  Now, what that means for
 7   Number 2, we need to change that last paragraph.  So you two
 8   just work on a sentence for that.  Okay?
 9            MR. MACH:  We will do that.
10            THE COURT:  It's no longer alleged and all that.  It's
11   done.  And you can just say in the amount of 398,000 if you
12   just want to do that.  Okay?  So you just do that and send me
13   that on Monday.
14       3 --
15            MR. MACH:  Your Honor, I apologize.  If I may on 2, if
16   I may just propose one nit.
17            THE COURT:  Yeah.
18            MR. MACH:  This will change now, but you will see at
19   the bottom of the instruction it said "Google has the burden of
20   proving this counterclaim."  We noticed that the bottom of the
21   paragraph describing Epic's claims probably inadvertently
22   omitted the same line, which would have --
23            THE COURT:  We're taking out -- everything from
24   line 16 down is taken out.
25            MR. MACH:  Right.  I'm referring to line 10.  We were
```

**CHARGING CONFERENCE**

1  going to propose the sentence "Epic has the burden of proving

2  these claims" so that it is parallel and the jury understands

3  that.

4          **THE COURT:**  In line 10?

5          **MR. MACH:**  Yes, Your Honor, line 10 at the bottom of

6  the paragraph describing Epic's claims.

7          **MR. EVEN:**  Well, if we do that, we need --

8          **THE COURT:**  I'm looking at Number 2.

9          **MR. MACH:**  Yes, Your Honor.

10          **MR. EVEN:**  If we do that --

11          **THE COURT:**  My line 10 ends with two words, "and

12  innovation."

13          **MR. MACH:**  That's right, Your Honor.  So that

14  paragraph describes Epic's claims, and we were proposing a

15  sentence that would say "Epic has the burden of proving these

16  claims."

17          **MR. EVEN:**  Your Honor, this has not been done

18  throughout with one exception.  Obviously the next paragraph

19  ends with "Google contends that its conduct."  If we are

20  starting to add every time that somebody contends anything,

21  that who has the burden --

22          **THE COURT:**  You know, there's a three-, four-part

23  thing here.  We're just going to leave it as it is.  We're

24  going to get into great detail about all this later.

25      So just send me revised language for 16 to 18.  It should

(88 of 161), Page 88 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 88 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 178 of 228   3243
CHARGING CONFERENCE

  1    be one sentence I'm imagining.  Okay?

  2          MR. MACH:  Thank you, Your Honor.

  3          THE COURT:  All right.

  4       Okay.  Corporations are People Too, that's fine.

  5       What is evidence?  That's fine.

  6       Direct and Circumstantial, fine.

  7       Ruling on Objections, fine.

  8       Depositions, fine.

  9       Credibility, fine.

 10       Expert opinion, fine.

 11       Charts and Summaries in, fine.

 12       Oh, stipulations of fact.  So why don't you just add as a

 13    Number 22 or 23 -- I don't know how you want to order it, and

 14    I'll leave it up to you -- okay? -- just repeat.  Okay?

 15          MR. EVEN:  The same thing, Your Honor, yes.

 16          THE COURT:  Just repeat that.  Okay?  Get that to me

 17    on Monday, please.

 18       Number 13 will be modified to replace "lost" with

 19    "deleted."  That's supported by evidence in the record.

 20       Number 14, Burden of Evidence, Preponderance is fine.

 21       15, absolutely fine.

 22       16... 16 is fine.

 23          MR. EVEN:  Your Honor, on 16, if I may.

 24          THE COURT:  Yes.

 25          MR. EVEN:  The only thing on 16, and that's going to

**CHARGING CONFERENCE**

1    come back once we get -- if -- well, when we get to the verdict

2    form, but this now says on line 11 "To prevail on a claim that

3    Google has monopolized," it says "an alleged market."

4         **THE COURT:**  Yeah.

5         **MR. EVEN:**  We think it should be "a relevant market."

6         **THE COURT:**  Oh, okay.

7         **MR. EVEN:**  The market doesn't need to fully conform to

8    the allegations necessarily.

9         **THE COURT:**  "Monopolize a relevant market."  All

10   right.

11        **MR. RAPHAEL:**  Your Honor --

12        **MR. EVEN:**  The same I think happens in 1 and 2 below.

13        **THE COURT:**  How about "the alleged relevant market"?

14   You are alleging a relevant market.

15        **MR. EVEN:**  Correct, Your Honor, but our concern is if

16   the jury sits there and, for instance, Google has argued

17   that -- I don't remember, I think they said Iran, I think,

18   should be out of the geographic market, I don't want the jury

19   to start thinking, "Well, we haven't reached consensus on

20   whether the market is global, excluding China and Iran, and,

21   therefore, we can't reach a verdict now."  That's just wrong

22   under *Epic v.* --

23        **THE COURT:**  Why is that a concern here?

24        **MR. EVEN:**  It's just a concern because it suggests

25   that it has to be the alleged market with the exact same

**ER-89**

**CHARGING CONFERENCE**

1   contours; whereas, I think *Epic v. Apple* made very clear that

2   fine or effect can find permutations on that without that

3   undermining the claim.

4        MR. RAPHAEL:  Your Honor, I think Mr. Even's argument

5   highlights the issue from our point of view, which is they

6   alleged certain relevant markets.  They had a burden to prove

7   them to the jury.  If the jury rejects those markets, we think

8   that the case should be at an end with respect to that claim.

9        Mr. Even refers to --

10       THE COURT:  That was rejected in *Epic* -- I'm sorry --

11   in -- was it *Epic* or.

12       MR. EVEN:  It's *Epic v. Apple*.  That's what the Ninth

13   Circuit called a radical argument.

14       THE COURT:  That's not going to happen.

15       MR. RAPHAEL:  I understand, Your Honor.  If I just

16   could just make one point on that, which is, that I think as

17   Your Honor is aware of, of course, that is a bench trial and we

18   have concerns about the jury engaging in the same kind of --

19       THE COURT:  It's a point of law, which is the case

20   does not collapse on the relevant market definition.  Okay?

21       So, now, the only issue here is your colleague, Mr. Even,

22   has proposed -- what do you want to say?  "A relevant market"?

23       MR. EVEN:  Yeah.  I think we can say in line 11 "a

24   relevant market."

25       THE COURT:  As opposed to "an alleged market"?

**CHARGING CONFERENCE**

1    MR. EVEN:  Correct.

2    THE COURT:  It seems more precise.  Do you have any

3  problem with that?

4    MR. RAPHAEL:  We would say "the alleged relevant

5  markets," Your Honor, for the reasons I expressed.

6    MR. EVEN:  That's even more precise than it is now,

7  so --

8    THE COURT:  "An alleged relevant market."

9    MR. EVEN:  "An alleged relevant market --"

10    THE COURT:  That's what I said five minutes ago.

11    MR. EVEN:  No, that's back to the problem; right?

12  That reintroduces the problem that --

13    THE COURT:  It is alleged.  I mean, what's the problem

14  with that?

15    MR. EVEN:  The problem is just, as Your Honor just

16  said, it doesn't collapse if we have proof -- if the jury finds

17  that the market is not entirely on the contours of all fours of

18  what we have alleged.

19    THE COURT:  That's more of a verdict-form issue I

20  think and not an instruction issue.  It doesn't say here "Stop

21  your deliberations if X doesn't happen."

22    MR. EVEN:  I think it can be solved, and I don't know

23  where Your Honor is going to land --

24    THE COURT:  I'm going to solve it for you.  We're

25  going to say "an alleged relevant market."  Okay?

(92 of 161), Page 92 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 92 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 182 of 228   3247
CHARGING CONFERENCE

```
 1            MR. EVEN:  And the same issue happens in lines 13,

 2       14 --

 3            THE COURT:  So I will conform.  So that would be also

 4       line 13; right?

 5            MR. EVEN:  I think 13, 14, 15.

 6            THE COURT:  And 15.  And, yeah, we'll conform it.

 7            MR. EVEN:  And 19 and 22.

 8            THE COURT:  Oh, where?  19?

 9            MR. EVEN:  19 and 22.

10            THE COURT:  19.  It just says "with respect to either

11       market"?

12            MR. EVEN:  No.  Sorry.  19 is fine.  So, no, 19 and 22

13       we are fine.

14            THE COURT:  That should be okay; right?

15            MR. EVEN:  Yeah, either is fine.

16            THE COURT:  All right.

17         Okay.  So 16... 17 is fine.

18            MR. RAPHAEL:  Your Honor, just two quick points on 17,

19       if I could.

20            THE COURT:  Okay.

21            MR. RAPHAEL:  We would propose that the instruction be

22       modified to say that "monopoly power is the power to control

23       prices by restricting output" rather than comma "restricting

24       output or exclude competition."  And I just point the Court

25       quickly to the *Rebel Oil* case, which is 51 F.3d --
```

**CHARGING CONFERENCE**

1      **THE COURT:**  I use the ABA Model Instruction 3A2.

2      So what line are you looking at?

3      **MR. RAPHAEL:**  I am looking at line 4.  There's a list

4  where it says "Control prices, restrict output, or exclude

5  competition."  We think --

6      **THE COURT:**  It's "or."  It's disjunctive.

7      **MR. RAPHAEL:**  Yes, Your Honor.  I think we think it

8  should be conjunctive, "and."

9      **THE COURT:**  No, I disagree with that, so that's

10  rejected.

11      **MR. RAPHAEL:**  And the last --

12      **THE COURT:**  That is not faithful to the Ninth Circuit

13  or Supreme Court case law, and it doesn't conform to the ABA

14  Model Instruction which I think is faithful to Supreme Court

15  case law.

16      Okay.  What's your other point?

17      **MR. RAPHAEL:**  Yeah, so we would propose an instruction

18  that Google does not have monopoly power if it cannot maintain

19  quality below the competitive level.

20      **THE COURT:**  That's denied.

21      Okay.  Instruction 18.  For some reason you-all went to

22  the Federal Jury Practice Manual for this.  You okay with that?

23  I assume you are.

24      **MR. RAPHAEL:**  I do have several objections on my side.

25  I'm not sure about Mr. Even.

**CHARGING CONFERENCE**

1       I apologize to be repeating it, Your Honor, but just for

2   preservation purposes, we do believe that a relevant product

3   market instruction could include the after-market instruction

4   from *Epic vs. Apple*.

5       **THE COURT:**  You can just consider that denied for all

6   purposes.  You don't have to keep repeating it.

7       **MR. RAPHAEL:**  Thank you, Your Honor.

8       The second instruction we would propose would be a

9   sentence saying that Epic does not bring a claim that Google

10  has harmed competition in a licensable operating system market.

11  We believe there was a lot of discussion about that at the

12  trial.

13      **THE COURT:**  You can argue that.  You can argue that.

14  That's not appropriate for an instruction, but you can

15  certainly argue that.

16      **MR. RAPHAEL:**  Understood, Your Honor.

17      The third objection would be that -- or proposal I should

18  say -- is that we request an instruction that the relevant

19  market must reflect commercial realities, which is from *AmEx*,

20  138 Supreme Court 2285, and I think is consistent with the

21  testimony that Dr. Bernheim gave today.

22      **MR. EVEN:**  I think it's just redundant language,

23  Your Honor.  I think market is explained here.  It's consistent

24  with the ABA model.  I don't see why we need now to pick and

25  choose language from different cases.

(95 of 161), Page 95 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 95 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 185 of 228   3250
CHARGING CONFERENCE

1          THE COURT:  I agree with that.  That's denied.

2      Okay.  19.  Oh, this is just a tiny little word -- a tiny

3  little word thing.

4      By the way, the whole commercial realities language is not

5  in the ABA model instruction.

6      All right.  19.  Okay with that?

7          MR. MACH:  One small -- go ahead, Yonatan.

8          MR. EVEN:  Sorry.  I was just saying, yes, we are fine

9  with 19, Your Honor.

10          THE COURT:  Okay.

11          MR. MACH:  We have one small thing, Your Honor.

12          THE COURT:  Yes.

13          MR. MACH:  Line 20, it's item little four.

14          THE COURT:  20, yes.

15          MR. MACH:  We would propose to change "app developers"

16  to "Google's customers."  It makes it match the language of 1,

17  2, and 3 above.

18          THE COURT:  Oh.  Mr. Even?  It would be nice to have

19  some consistency.

20          MR. EVEN:  We are fine with that, Your Honor.

21          THE COURT:  Okay.  So we're going to say line 4,

22  "geographic areas that Google's customers view"; right?

23          MR. MACH:  That's right, Your Honor.

24          THE COURT:  Okay.  All right.  Got that one.

25      20.  Google, you had a ton of editorial comments that I'm

(96 of 161), Page 96 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 96 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 186 of 228   3251
CHARGING CONFERENCE

 1   not going use because they're not in the instruction and not

 2   supported by the evidence.

 3          **MR. MACH:**  Understood.

 4          **THE COURT:**  Okay.  So I'm going to give 20.

 5      You okay with that, Plaintiff?

 6          **MR. EVEN:**  Yes, Your Honor.

 7          **THE COURT:**  All right.  21.  I don't think you had too

 8   much different on 21.

 9          **MR. EVEN:**  We are fine with 21, Your Honor.

10          **MR. MACH:**  The one thing we would raise for

11   preservation purposes at minimum, Your Honor, is it raises the

12   same issue of the disjunctive -- what I think you called the

13   disjunctive language as 17.

14          **THE COURT:**  May I read to you from *Grinnell*,

15   G-R-I-N-N-E-L-L, 384 United States at page 571, quote (as

16   read):

17              "Monopoly power is the 'the power to control prices

18         or exclude competition," close quote.

19      That's the basis of my holding.

20      Okay.  Anything else on 21?

21          **MR. MACH:**  Yes, Your Honor.  If I could suggest one

22   other revision on line 12.

23          **THE COURT:**  12, yes.

24          **MR. MACH:**  At the end of the phrase "competitive

25   level," at the beginning of line 12, we would propose the

(97 of 161), Page 97 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 97 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 187 of 228   3252
CHARGING CONFERENCE

1  addition "by restricting output."  We would refer Your Honor to

2  the *Rebel Oil* case for that.

3      **THE COURT:**  So "Epic also has the burden of proving

4  that Google has the power to maintain prices above a

5  competitive level..."  And what do you want to add there?

6      **MR. MACH:**  "By restricting output," Your Honor.

7      **MR. EVEN:**  I think what my colleague is trying to do

8  is insert the same language that Your Honor just told him said

9  should be disjunctive and, therefore, wrong.

10      **THE COURT:**  I agree with that.  That's denied.

11      Okay.  22.  We're not going to include the 50 percent

12  language.  There's no evidence in the case that would warrant

13  that.

14      23 -- otherwise --

15      **MR. RAPHAEL:**  Your Honor, just a couple things on 22,

16  and I'll be brief because some of them you've already covered.

17  I'd just like to preserve them.

18      **THE COURT:**  Okay.

19      **MR. RAPHAEL:**  The first is the "by restricting output"

20  issue that Your Honor just discussed, and I understand you've

21  rejected that, but we would request it.

22      The second is the same sentence I mentioned earlier about

23  Google not having monopoly power if it cannot maintain quality

24  below the competitive level.

25      The third would be that we would request an instruction

**CHARGING CONFERENCE**

```
 1   that even if Epic proves that Google has a substantial share of

 2   the market, that it must prove that there are substantial

 3   barriers to entry.  There, again, we would propose -- point the

 4   Court to the Rebel Oil case, 51 F.3d at 1434, as well as the

 5   Coronavirus case, 85 F.4th 948.

 6        THE COURT:  Coronavirus, that case is not helpful to

 7   you.  That was a pleadings in shambles.  There was no adequate

 8   relevant market.  All the circuit did in Coronavirus was say

 9   "We don't know what the market is.  Here are 10 possible

10   definitions" -- I'm exaggerating slightly -- and they don't fit

11   any of them, but none of that is on point for what we're doing

12   here.

13        MR. RAPHAEL:  I understand Your Honor's ruling, but I

14   just would point on this issue I think setting aside the

15   particular facts and circumstances of that case, the Ninth

16   Circuit did say that a plaintiff must show that there are

17   significant barriers to entering the market, which is

18   consistent with the Rebel Oil case, which --

19        THE COURT:  Well, I think this adequately makes it

20   clear that they're going to have to do some barriers of entry.

21      Mr. Even, anything else to add on that?

22        MR. EVEN:  I just think, again, this is redundant

23   language to be added.  There's -- we have a thing about

24   barriers to entry in 22.  This is following the model, as far

25   as I can tell, although I don't have a redline before me.
```

(99 of 161), Page 99 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 99 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 189 of 228   3254
CHARGING CONFERENCE

 1          THE COURT:  It is following the model, yeah.

 2     Okay.  That's --

 3          MR. RAPHAEL:  Last one on this, Your Honor.

 4          THE COURT:  Yes.

 5          MR. RAPHAEL:  I apologize.

 6     There's a phrase -- let me find a line to point the Court

 7     to it.  It refers to the reputation of the companies already

 8     participating in the market.

 9          THE COURT:  Oh.  Which page?

10          MR. RAPHAEL:  This is on page 26 --

11          THE COURT:  26, yes.

12          MR. RAPHAEL:  -- at line 6 through 7, Your Honor.  It

13     indicates that the reputation of the companies already

14     participate in the market or the brand name recognition of

15     their products --

16          THE COURT:  Barriers to entry may include property

17     rights, financial investments, and the reputation of the

18     company.  What's the issue?

19          MR. RAPHAEL:  The issue is that, Your Honor, in the

20     *American Pro Testing Services* case, 108 F.3d 1147 at 1154, the

21     Ninth Circuit said that reputation alone does not constitute a

22     sufficient entry barrier in this circuit; and the Ninth Circuit

23     in the *United States vs.* --

24          THE COURT:  That may be if that's all they argue, but

25     we haven't heard that yet, and I have a strong suspicion

**CHARGING CONFERENCE**

1    they're not going to be arguing that the only barrier is Google

2    has a good name.  That's denied.

3        All right.  23.

4        **MR. RAPHAEL:**  Regrettably, Your Honor, I have a number

5    of proposals on this one as well.

6        Mr. Even, if you had any --

7        **THE COURT:**  Well, I've already rejected them.  Epic's

8    version was much more faithful to the ABA model instruction.  I

9    found Google's proposal to be completely incomprehensible and

10   way too long and improperly mixed Section 2 instructions with

11   Section 1 instructions.

12       I'm going to keep the rule of reason instruction separate

13   so that -- I know it's the same analysis, but it's going to be

14   easier for the jury to get this, and that's the disposition on

15   that one.

16       Anything to add, Mr. Even?

17       **MR. RAPHAEL:**  Your Honor, can I just raise a few

18   particular issues with the instruction that Your Honor has

19   proposed?

20       **THE COURT:**  As long as you don't argue what I just

21   said, yes.

22       **MR. RAPHAEL:**  Yes, I'm going to raise particular

23   issues, Your Honor.

24       First of all, I would just register our objection to

25   having different Section 2 and Section 1 instructions on the

**CHARGING CONFERENCE**

1  rule of reason under the *Qualcomm* case.

2      We would request an instruction that Epic must prove that

3  Google's challenged conduct has a substantial competitive

4  effect that harms consumers in the relevant market.

5          **THE COURT:**  Just where in this instruction?  What are

6  you -- which one?

7          **MR. RAPHAEL:**  Excuse me, let me find it here,

8  Your Honor.

9      This is an additional sentence we would propose.  I

10  would -- I could find --

11          **THE COURT:**  Tell me where.

12          **MR. RAPHAEL:**  We think that's from -- I mean, that

13  language is the from the *AmEx* case, and I think --

14          **THE COURT:**  I'm not asking the source.  Tell me where

15  you want to put it.

16          **MR. RAPHAEL:**  Oh.  I apologize, Your Honor.

17      I guess I would say I'd put it in the second sentence

18  right between the first two sentences there in the instruction.

19          **THE COURT:**  Number 23?

20          **MR. RAPHAEL:**  Yes, Your Honor.

21          **THE COURT:**  So first sentence is "To prove their

22  monopolization claims, Epic must prove that Google willfully

23  acquired or maintained monopoly power through anticompetitive

24  acts or practices."

25      And what do you want to put after that?

**ER-101**

CHARGING CONFERENCE

1          **MR. RAPHAEL:**  That "Epic proved substantial

2   competitive effect that harms consumers in the relevant

3   market," which comes from the *AmEx* case.  The harm to consumers

4   is the touchstone of anticompetitive conduct.

5          **THE COURT:**  Okay.  Please, this is not the first

6   antitrust case I've done.

7          **MR. RAPHAEL:**  I understand, Your Honor.

8          **THE COURT:**  I know what the touchstone is.

9       I think that's covered somewhere else, isn't it?

10         **MR. EVEN:**  Your Honor, A, I think it's covered

11  somewhere else; B, there are all kinds of -- whole pages of --

12         **THE COURT:**  In fact, it's actually on line 14 (as

13  read):

14          "You must determine whether Epic has proven that

15      Google's conduct has caused substantial harm to

16      competition in the market."

17         **MR. RAPHAEL:**  Your Honor, what we're requesting is

18  that that -- the instruction --

19         **THE COURT:**  I'm not going to do that.  That's

20  editorializing and that's not an adequate or proper statement

21  of the law for jury instruction purposes.  So that's denied.

22         **MR. RAPHAEL:**  The second proposal would be that the

23  instruction limits the competitive benefits for consumers in

24  that market.  That is on page 29, line 16.

25      We would propose the deletion of the phrase "in that

ER-102

1    relevant market."  The Supreme Court and the Ninth Circuit in a

2    number of cases have considered benefits in related markets,

3    and we would propose that that phrase be deleted to permit

4    that.

5         THE COURT:  Have you read *Qualcomm* recently in the

6    Ninth Circuit?

7         MR. RAPHAEL:  Your, yes Honor.  Our position --

8         THE COURT:  A former judge of this court got roundly

9    reversed for taking into account other markets.  I'm not going

10   to do that.  That's denied.

11        MR. RAPHAEL:  Understood, Your Honor.

12        THE COURT:  Okay.  Let's move on to --

13        MR. RAPHAEL:  Your Honor, there are a couple more

14   points on this.  I apologize.  I will move through them

15   quickly.  I just would like the opportunity to preserve them.

16      We would request an instruction --

17        THE COURT:  You know, you're wanting to win the case

18   by ginning up favorable instructions.  That's not going to

19   happen.

20        MR. RAPHAEL:  I understand.

21        THE COURT:  That is a standing denial of any effort to

22   sort of editorialize, sway, color, spin, which is all that

23   you're pitching.  These are not substantively accurate, correct

24   instructions based either on the law or the evidence in this

25   case.  So keep that in mind on your next set of comments.

CHARGING CONFERENCE

```
1          MR. RAPHAEL:  I understand, Your Honor.  I will do
2     that.
3          With respect to the less restrictive alternative, we would
4     request an instruction that to qualify as substantially less
5     restrictive, an alternative means must be virtually as
6     effective in serving the defendant's pro competitive purposes.
7          THE COURT:  Where are we?  What page?
8          MR. RAPHAEL:  This would be -- this would be added,
9     Your Honor, to the sentence that ends at the middle of line 19
10    on page 29.
11         The issue is that Epic vs. Apple following the O'Bannon
12    case has indicated that a less restrictive alternative must be
13    one without substantially increased costs and virtually as a --
14         THE COURT:  Line 19 on page 29?
15         MR. RAPHAEL:  Yes, Your Honor.  There's a reference
16    there to alternative means a less restrictive alternative.  The
17    sentence there ends at line 19, and we would request that some
18    language be added saying that a less restrictive alternative
19    must be virtually as effective in serving the pro competitive
20    purposes and without significantly increased costs, which is a
21    requirement that came from the Epic vs. Apple case.
22         THE COURT:  All right.  Mr. Even?
23         MR. EVEN:  Again, I think this is redundant.  I don't
24    think we need to explain each --
25         THE COURT:  Redundant of what?  Where is -- what's
```

ER-104

**CHARGING CONFERENCE**

 1   redundant?

 2          MR. EVEN:  I think there are places where this is

 3   explained where Your Honor goes to the actual explanation of

 4   the rule of reason.

 5          THE COURT:  Which one?

 6          MR. EVEN:  Let me get the right one.  It's certainly

 7   in the Section 1 claims.

 8       But here, as well, I'm not sure that --

 9          THE COURT:  What page are you looking at?

10          MR. EVEN:  I'm sorry.  I believe this is in page -- on

11   page 34.

12          THE COURT:  34, okay.

13          MR. EVEN:  It talks about line 17 through 19,

14   "Competitive benefits could be achieved through substantially

15   less restrictive alternatives," which explains the rule of

16   reason.

17          MR. RAPHAEL:  Your Honor, what we are requesting is

18   the reference to "substantially" -- "without substantially

19   increased costs."  That was, in fact, a decisive issue in the

20   *Epic vs. Apple* case.

21          THE COURT:  All right.  I will take a look at it.  I

22   don't -- I actually don't think that's right, but I will take a

23   look at it.

24          MR. RAPHAEL:  Thank you, Your Honor.

25          THE COURT:  All right.

**CHARGING CONFERENCE**

 1          MR. RAPHAEL:  We would then object -- I do apologize,

 2   Your Honor.  I'll move it through very quickly.

 3       We would just object to the reference that -- we would

 4   object to the reference that the jury must balance any

 5   competitive harms.  We understand the *Epic vs. Apple* decision.

 6   We're just preserving the objection to that.

 7          THE COURT:  *Epic* requires the balance.

 8          MR. RAPHAEL:  I understand, Your Honor.  We're

 9   preserving that for further appellate review.  The issues --

10          THE COURT:  That's overruled.

11       Okay.

12          MR. RAPHAEL:  And then we would respect -- we would

13   request that the jury be instructed at the end that "You must

14   determine that Epic has proven an anticompetitive effect for

15   each of the acts that Epic alleges were anticompetitive."  We

16   would cite the *Qualcomm* and *Microsoft* cases, as well as the

17   District Court --

18          THE COURT:  That's amply covered elsewhere.  So that's

19   denied.

20          MR. RAPHAEL:  And, finally, Your Honor, we request an

21   instruction that Google may not be held liable under Section 2

22   for design changes.  Your Honor, has referenced the *Allied*

23   case.  We --

24          THE COURT:  Design changes?

25          MR. RAPHAEL:  Yes, Your Honor, with respect to the

**CHARGING CONFERENCE**

1  sideloading.

2          **THE COURT:**  Is there an argument about design changes?

3          **MR. EVEN:**  We're not arguing that, Your Honor.

4          **THE COURT:**  That's not supported by the evidence, so

5  that will not going to be given.

6          **MR. RAPHAEL:**  We would point --

7          **THE COURT:**  There hasn't been a word about design

8  changes as anticompetitive conduct.

9          **MR. RAPHAEL:**  We would point the Court to Dr. Mickens'

10  testimony about redesigning the sideloading warning.

11          **THE COURT:**  He may have made a passing reference; but

12  if he did, it flew like a rocket over everybody's head.  Nobody

13  else has talked about it.  It's not supported by the evidence.

14  I will not give that instruction.

15          **MR. RAPHAEL:**  Thank you, Your Honor.

16          **THE COURT:**  Okay.  What do we have next?

17          **MR. EVEN:**  24, Your Honor.

18          **THE COURT:**  They get to have that one.  You-all

19  mentioned it.  It's just --

20          **MR. EVEN:**  I think the only request I would have on

21  that one, sir, is that -- sorry, Your Honor -- is that we

22  should not have it as a standalone.  There's a long list of

23  qualifications on -- within 23 --

24          **THE COURT:**  We're going to keep it.  Okay?

25      All right.

CHARGING CONFERENCE

1              MR. MACH:  Your Honor --

2              THE COURT:  25, Restraint of Trade.  That seems fine.

3              MR. MACH:  Your Honor, when you're ready, I have one

4       request on 24, if I may.

5              THE COURT:  On 24?

6              MR. MACH:  On the Duty to Deal, Your Honor.

7              THE COURT:  All right.

8              MR. MACH:  We think that it is important under the

9       circumstance of the case that the jury be given the legal

10      principle that under the antitrust laws, there is no duty to

11      aid competitors, and we would propose to put that at the top of

12      the instruction.

13             THE COURT:  That's denied.  This is more than enough

14      for this case.

15          Okay.  25, Restraint of Trade.  That's fine.

16          26.  That's right out of the ABA.

17          Okay.  I'm not going to give A Good Intent is not a

18      Defense.  We don't need it.  Okay?

19             MR. EVEN:  Okay, Your Honor.

20             THE COURT:  Yeah.  There's no per se agreement, so...

21          Okay.  27.

22             MR. RAPHAEL:  Just a few objections on this,

23      Your Honor.

24          The first is with respect to the first paragraph.  So

25      there are some references to agreements here that we don't

**CHARGING CONFERENCE**

 1    think are --

 2           **THE COURT:**  I've adopted ABA Model 1C3A, and that's

 3    what I used here.

 4           **MR. RAPHAEL:**  So with respect to the first paragraph,

 5    Your Honor, I think it's some language that's particular to

 6    this case.  There are reference to a number of agreements here

 7    that we don't think have actually been put at issue or not

 8    properly so.

 9           First there's a reference to the DDA agreements.  I think

10    the only agreements there, as my colleague, Mr. Olasa, said

11    earlier, are either, one, the restriction on dealing, which I

12    think we've already been granted summary judgment on; and,

13    second, the billing policy, which is also the subject of the

14    tying claim.

15           **THE COURT:**  Just, it's too much.  I don't even know

16    what you're talking about.  What is it that you want to change

17    in this?

18           **MR. RAPHAEL:**  We don't think that the DDA agreements

19    or the Facebook -- reference to a Facebook agreement or

20    agreements with cell phone carriers should be part of the

21    instruction.  I don't think there's any --

22           **THE COURT:**  These are the contracts that they're

23    saying are unreasonable restraints.

24           **MR. RAPHAEL:**  But they haven't -- I don't think

25    they've put in any evidence certainly about the last two, the

(110 of 161), Page 110 of 161    Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 110 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 200 of 228    3265
CHARGING CONFERENCE

1    Facebook and carrier agreements.

2        And with respect to the DDA, I think there are two

3    contractual provisions that have come up in the trial,

4    Your Honor.  The first has to do with the restriction on

5    dealing.  That has been the subject of Your Honor's summary

6    judgment order; and, therefore, we don't think that should be

7    in the instruction.

8        The second would be the billing policy, and that billing

9    policy is the subject of the tying claim.  We don't think that

10   Epic should be able to assert a claim for the same agreement

11   under Section 1 under a tying theory as well as under a general

12   rule of reason theory.

13            MR. EVEN:  Your Honor, I have a few on these as well

14   on the same language -- on the same sentence; but with respect

15   to the first proviso about the DDA, we do have claims on that.

16   We have raised, for instance, the antisteering.  That's --

17            THE COURT:  The DDA I'm fine with.  What about

18   Facebook?

19            MR. EVEN:  Then the next one, Your Honor, we think

20   that that one -- we don't -- I don't think we need Facebook.

21            THE COURT:  I didn't hear much about Facebook.

22            MR. EVEN:  No, I don't think we need Facebook.  I

23   think what we do need is to mention --

24            THE COURT:  All right.  Wait.  So hold on.

25            MR. EVEN:  Sorry.

CHARGING CONFERENCE

```
 1            THE COURT:  Facebook is out.  Okay.  I'm going to
 2   delete Facebook.
 3        Activision, Riot Games, Supercell, that's all fine.
 4            MR. EVEN:  Well, so those were identified specifically
 5   for per se.  I think what we need here is something more
 6   general that says -- the way I would frame it is "The
 7   Project Hug or Games Velocity Program agreements with certain
 8   app developers include" --
 9            THE COURT:  All right.  I'll tell you what, just
10   redraft it.  Okay?  You two work on a redraft for that, and
11   I'll look at that one on -- do that by Monday, though, please.
12   We'll take a look at it.  If you want to recast that one, we
13   can do that.
14            MR. EVEN:  Okay.  The other thing on this one,
15   Your Honor, is --
16            THE COURT:  But talk with each other and work
17   something out.
18            MR. EVEN:  Okay.  The other one I suspect is a point
19   that we'll not come to agreement on, so if I may raise that
20   one.  It's not about the first paragraph.  It's about the
21   second one.
22            THE COURT:  Which one?
23            MR. EVEN:  This is about lines 16 to 17.
24            THE COURT:  16, yes.
25            MR. EVEN:  16 and 17.
```

CHARGING CONFERENCE

```
1              THE COURT:  Okay.

2              MR. EVEN:  Which we think it currently says "You must

3    consider whether the restraints produce countervailing

4    competitive benefits."  We think it should say "You consider

5    whether Google has proven that the restraints..."

6         This is another place typically these say --

7              THE COURT:  Oh, I think that's fine.  All right.

8    "Whether Google has proven" -- so it parallels "whether Epic

9    has proven"; right?

10             MR. EVEN:  Correct, Your Honor.

11             MR. RAPHAEL:  Just two quick things I also suspect

12   Mr. Even won't agree with, if it's all right with Your Honor.

13             THE COURT:  Sure.

14             MR. RAPHAEL:  The first is, again, just our standing

15   objection to the balancing instruction.  I understand

16   Your Honor addressed that earlier.

17        And then in the very end of line 12 into line 13, it

18   refers to "the challenged restraints."  We think that it should

19   say "each challenged restraint has resulted."  I think the

20   current language could permit the jury to impose --

21             THE COURT:  How about "a challenged restraint"?

22             MR. RAPHAEL:  I think I would be okay with that,

23   Your Honor.

24             THE COURT:  Yeah, let's do that.  Let's do "a

25   challenged restraint," and then you can -- it doesn't put any
```

(113 of 161), Page 113 of 161
Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 113 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 203 of 228   3268

**CHARGING CONFERENCE**

 1    quantities on.  Okay?

 2         MR. RAPHAEL:  Thank you, Your Honor.

 3         THE COURT:  So just remember that one, "a challenged

 4    restraint."

 5         MR. RAPHAEL:  Yes, Your Honor.  Thank you.

 6         THE COURT:  And then you two are going to fiddle with

 7    that list of contracts.  Okay?

 8         MR. EVEN:  Okay.

 9         THE COURT:  All right.

10         MR. RAPHAEL:  On Number 28, Your Honor, I have a

11    number of requests that Your Honor has already disposed of, so

12    maybe I can list them quickly.

13         THE COURT:  Well, here's the disposition on those:  I

14    already have them.  I followed ABA Model Instruction 1C3 with a

15    couple of modifications supported by the evidence in this case.

16       The decision in *Epic v. Apple* that we've referenced many

17    times suggests strongly that Google's objection under the *NCAA*

18    case is not well taken.

19       At Step 2, the rule of reason analysis, the defendant must

20    offer, quote, "nonpretextual pro competitive rationales," close

21    quote; and Step 3, the plaintiff must prove -- must, quote,

22    "prove the existence of substantially less restrictive

23    alternatives, LRAs, to achieve defendant's pro competitive

24    rationales," close quote.

25       And then under our governing Ninth Circuit precedent,

(114 of 161), Page 114 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 114 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 204 of 228   3269
CHARGING CONFERENCE

 1   precedent, quote, "requires a court to proceed to this fourth

 2   step," close quote, namely, the, quote, "balancing the

 3   anticompetitive effects, the defendant's conduct against its

 4   pro competitive benefits," period.

 5       And if a plaintiff fails to carry its Step 3 burden --

 6   where the plaintiff fails to carry its Step 3 burden of

 7   establishing viable less restrictive alternatives.  That's all

 8   coming from *Apple*, 67 F.4th at pages 985 to 993, a lengthy

 9   quote but it's all abstracted from there.

10       So consider all your objections preserved and overruled.

11       All right.  Any word changes here?

12           **MR. RAPHAEL:**  Yes, Your Honor.  Again, I'm just going

13   to request the after-market instruction.  I know Your Honor has

14   indicated --

15       **THE COURT:**  It's denied for the previously stated

16   reasons.

17       What's next?

18           **MR. RAPHAEL:**  And then as with the Section 2 willful

19   acquisition instruction, we would request that Epic --

20       **THE COURT:**  Okay.  Is this Number 28?

21           **MR. RAPHAEL:**  It is.  I'm saying I'm just referencing

22   a discussion we had earlier, Your Honor.

23       **THE COURT:**  Oh.

24           **MR. RAPHAEL:**  We requested an instruction that Epic be

25   required to prove harm to consumers under the *AmEx* case, and

**CHARGING CONFERENCE**

1    Your Honor denied that earlier.  I'm just preserving it.

2           **THE COURT:**  Oh, okay.  All right. that's fine.

3           **MR. RAPHAEL:**  We would request again in the first

4    sentence of the first paragraph on page --

5           **THE COURT:**  This is all in your papers.  We don't need

6    to regurgitate all this.

7           **MR. RAPHAEL:**  Your Honor, I apologize, but I think

8    under the rule -- under Rule 50, we have to make it --

9           **THE COURT:**  Don't tell me what the rules say.  You're

10   not going to waive anything.  Okay?  It's here.  And when you

11   do your JMOL motion 50(b), you're going to be fine.  All right?

12   You can quote me on this.  All right?

13          **MR. RAPHAEL:**  If I could, I'd just like to list our --

14          **THE COURT:**  All right.  Just finish it up.  Let's get

15   going.  Come on.

16          **MR. RAPHAEL:**  I will get through it, Your Honor.

17          **THE COURT:**  This is taking too much time.

18          **MR. RAPHAEL:**  We would request that -- again, that

19   Epic be required to -- I'm sorry -- that we add "by restricting

20   output" in the first sentence of the first paragraph on

21   page 36.

22          **THE COURT:**  All right.  Denied.

23          **MR. RAPHAEL:**  We would request an instruction that

24   Epic does not bring a claim that Google harmed the competition

25   in a licensable OS market.

1    We would request an instruction, again, that the relevant

2    market must reflect commercial realities.

3         **THE COURT:**  What do you think a relevant market

4    reflects but commercial realities?  What's the noncommercial

5    realities reflected in any relevant market at issue in this

6    case?

7         **MR. RAPHAEL:**  Well, Your Honor, I think our position

8    might be that Professor Bernheim's market does not capture the

9    commercial realities.  I think that's an argument we would like

10   to make in the case.

11        **THE COURT:**  Okay.  Next one.  29.

12        **MR. RAPHAEL:**  On this one, Your Honor, we would

13   request the --

14        **THE COURT:**  We just did that one.  I just read my

15   disposition.

16        **MR. RAPHAEL:**  On 29, Your Honor?

17        **THE COURT:**  Yeah, Rule of Reason, Evidence of

18   Competitive Benefits.

19        **MR. RAPHAEL:**  Yes, Your Honor.  On this one, again, we

20   would request the instruction that to qualify as substantially

21   less restrictive, the alternative means must be virtually as

22   effective and without significantly increased costs.

23        **THE COURT:**  I will look at that.

24        **MR. RAPHAEL:**  Thank you, Your Honor.

25    I think that's all I had on 29.

CHARGING CONFERENCE

1        THE COURT:  All right.  30.

2        MR. RAPHAEL:  Again, on this one we object to the

3  balancing step, and I think we would request an instruction

4  that if there is to be a balancing step, that the jury should

5  not -- be instructed not to second-guess whether Google's

6  challenged conduct was reasonably necessary as a matter --

7        THE COURT:  Both are denied under the *Apple* case that

8  I've cited, 67 F.4th.

9        MR. RAPHAEL:  Thank you, Your Honor.

10        THE COURT:  Okay.  31.  No problem.

11     32.  No problem.

12     33, Rule of Reason.

13        MR. OLASA:  Your Honor, we have a small one on 33.

14        THE COURT:  Okay.

15        MR. OLASA:  So lines 9 to 10, after "Google Play

16  Billing," there's the language "for in-app transactions."  We

17  think that additional language isn't in the model rule.  Of

18  course, it isn't because it's case specific, but we also think

19  it's not necessary.  The tied -- the claim tied product here is

20  Google Play Billing.  We don't think additional language here

21  is necessary.

22        THE COURT:  Oh, I think it's important.  Look, this is

23  a hard-working jury, but they need some help understanding

24  things.  This is a clarifying concept, and I favor its

25  inclusion.

(118 of 161), Page 118 of 161  Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 118 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 208 of 228   3273
CHARGING CONFERENCE

1        Okay.  That's it for 33.

2        34, ABA Model 2E5.  Epic, you wanted to include a couple

3    things, but I don't think that's consistent with the model

4    instructions.

5           MR. EVEN:  We're not standing on them, Your Honor.

6    We're good with it.  Thank you.

7           THE COURT:  All right.  35.  That follows ABA Model

8    Instruction 2E7.

9           MR. OLASA:  Yes, Your Honor.  So this is a similar

10   issue, so I suspect we'll get the same result; but on lines 5

11   to 6 after "Google Play Billing," there is "to facilitate the

12   sale of digital goods or services in those apps."  We would ask

13   that language be removed, but I understand Your Honor's --

14          THE COURT:  Oh, no.  Listen, the jurors need some

15   plain English to make sure they understand what they're doing.

16   That's all that that is.  So that's perfectly fine guidance for

17   the jury.

18       36.  Oh, I didn't -- the 30 percent threshold, we don't

19   need that.  It's also not entirely clear to me that that's

20   accurate; but, more importantly, it's unnecessary in light of

21   the evidence in this case.  Okay?

22       37.  Let's see, just some tiny little changes and

23   harmonizing, that seems fine.

24          MR. OLASA:  Your Honor, we have a very minor one on

25   37.

ER-118

CHARGING CONFERENCE

```
1              THE COURT:  Which one?

2              MR. OLASA:  On 37.

3              THE COURT:  Yes.

4              MR. OLASA:  So at line 16, there's a phrase "market

5    for Android in-app billing services."  We just ask the word

6    "allege" to be put below it to be consistent with the rest of

7    the instructions.

8              THE COURT:  All right.  "Alleged."

9              MR. OLASA:  Thank you, Your Honor.

10             THE COURT:  Okay.  38.

11             MR. EVEN:  On 38, Your Honor --

12             THE COURT:  Yeah.

13             MR. EVEN:  -- we just think that we need on that one

14   the same balancing instruction as in other places.

15             THE COURT:  For business justification?

16             MR. EVEN:  Yes, Your Honor.  To say "If the business

17   justification has been found, the next step is you need to

18   balance the overall" --

19             THE COURT:  This is just one defense.  It's not tying

20   as a claim.  This is just one defense.  So why would you put

21   that in here?

22             MR. EVEN:  Well, I think the way it works, this is

23   sort of the specific application of rule of reason to tying, as

24   I understand it.  And so the question is:  What happens if the

25   jury finds that there is a tie, there is harm, there is
```

1    business justification, is that the final step or do we have a

2    final step after that of balancing?

3            THE COURT:  Google?

4            MR. OLASA:  Your Honor, we generally object to the

5    balancing instruction, and so we don't think it's appropriate,

6    but we do agree that this is a rule of reason statute.

7            THE COURT:  Well, I'm rejecting your objection under

8    that ground --

9            MR. OLASA:  Understood, Your Honor.

10           THE COURT:  -- under *Apple*, but it's all within the

11   rule -- the balancing is -- this is all rule of reason, and

12   that's sort of the -- this is the quilt over the entire bed.

13   So the balancing is already draped over.  You know what I mean?

14   Do you see what I'm saying?  It's already draped over

15   everything.

16           MR. EVEN:  I understand that, Your Honor.

17           THE COURT:  Okay.  All right.  I don't think we need

18   to say "balancing" again, so I'm going to decline that.

19       Okay.

20           MR. OLASA:  Your Honor, we have a few on this one.  We

21   have a few objections on this one.

22           THE COURT:  Oh, yes.  Yeah.

23           MR. OLASA:  So, first, Your Honor, this objection is

24   framed as Google's burden, which is appropriate.

25       But further down where it says that "You should consider

**CHARGING CONFERENCE**

1   whether there's less restrictive alternatives," we think it

2   should be Epic's burden on those consistent with other

3   instructions, and so --

4         **MR. EVEN:**  I'm sorry.  Can you give us a line?

5         **MR. OLASA:**  Sure.  So on line 17, we would add that

6   "Epic must prove the existence of substantially less

7   restrictive means" so it's clear where the burden lies.

8   Because on this instruction, Google generally otherwise has the

9   burden.

10        **THE COURT:**  I don't think that says that.  What are

11  you worried about?

12        **MR. OLASA:**  So this instruction, Your Honor, requires

13  Google to come forward with a business justification.  We think

14  that at line 17 it should be clear that once Google has come

15  forward with that, it's Epic's burden to offer a substantially

16  less restrictive means.

17        **THE COURT:**  This is your instruction.  I'm adopting

18  what you gave me.  What is it you want to do?

19        **MR. OLASA:**  We would add here, Your Honor, "Epic must

20  prove the existence of substantially less restrictive means" at

21  line 17 so it's clear it's not Google's burden.

22        **MR. EVEN:**  I actually think it says something

23  different, Your Honor.  I think this --

24        **THE COURT:**  It does, and what Google is proposing is

25  not consistent with the model instruction, so I'm going to

1   decline that.

2          **MR. OLASA:**  Your Honor, the second objection we have

3   to this is one that Mr. Raphael raised with you and you said

4   you'd take a look at.  We think that Epic must show that

5   substantially less restrictive means are virtually --

6          **THE COURT:**  Yes, I will look at the cost thing for

7   every invocation of that.  Okay?

8          **MR. OLASA:**  And then one last one on this, Your Honor.

9          **THE COURT:**  What line is that, by the way?

10         **MR. OLASA:**  This comes up in a number of places, but

11  it comes up --

12         **THE COURT:**  Oh, it's line 26.

13         **MR. OLASA:**  And the last objection on this one,

14  Your Honor, is on line 7.  It says "Google contends that the

15  tying arrangement is justified because it enables Google..."

16      We would ask that we add -- between "justified because"

17  and "it enables," we would add "among other things" because, as

18  Ms. Loew testified today, there are other justifications and we

19  don't want to be precluded from arguing them to the jury.

20         **THE COURT:**  Mr. Even?

21         **MR. EVEN:**  I don't have Ms. Loew's testimony resigned

22  to my memory, but I think this is the only justification I've

23  heard, but I don't -- I can't say that this is wrong.  So I

24  don't -- I just don't know off the top of my head.

25         **MR. OLASA:**  Your Honor --

(123 of 161), Page 123 of 161    Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 123 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 213 of 228   3278
CHARGING CONFERENCE

1          MR. EVEN:  This is certainly what we heard from the

2     economists, et cetera.

3          MR. OLASA:  We do agree it's a primary justification.

4     There are other justifications.  Ms. Loew testified about

5     shared wallets, tracking of purchase history, subscription

6     management, parental controls.

7          THE COURT:  I don't want to just say one.  It's not

8     useful to tell the jury there's just one and then just say "and

9     Anything else you can think of."  I mean, that's just not

10    useful.

11         MR. OLASA:  Understood, Your Honor.

12         THE COURT:  Look, this is a roadmap for the jury.

13    Okay?  This is helping a bunch of people who aren't lawyers who

14    are smart and hard working and paid attention to the evidence

15    figure out what to do in this case.  So I'm not going to just

16    say, "Well, here's one three-sentence long description, and

17    then here's a grab bag that you can stuff with anything you

18    want."  It's just not right.  That's confusing and misleading

19    for a jury.  So I'm not going to say that.

20         Now, if you two want to work out something that is more

21    structured, I'll consider it, but we're not just going to say,

22    "You know, here's an extremely specific example, and then go

23    nuts on anything else you can think of."  I'm not going to do

24    that.  All right?

25         MR. OLASA:  Appreciate that, Your Honor.

**CHARGING CONFERENCE**

```
 1              THE COURT:  Okay.

 2              MR. OLASA:  We will propose something.

 3              THE COURT:  All right.

 4         Okay.  Injury and Causation.

 5              MR. EVEN:  On that one, Your Honor --

 6              MR. MACH:  I'm sorry, Yonatan.  I did not hear you.

 7              THE COURT:  39.

 8              MR. EVEN:  Yeah.  So on this one, Your Honor, we still

 9    have some references here to damages that we think should be

10    removed.

11              THE COURT:  Oh.  Where is that?

12              MR. EVEN:  So this is on page 47 at line 13.

13              THE COURT:  Injury -- just say "injury, in fact, or

14    fact of damage"?

15              MR. EVEN:  It says that it is entitled to recover

16    damages.

17              THE COURT:  Oh, you're not doing that.  Okay.

18              MR. EVEN:  Correct.

19              THE COURT:  So how about for Epic to what?  To

20    prevail?  Well, what do you want to say?

21              MR. EVEN:  I think "For Epic to establish injury" --

22              THE COURT:  Oh, okay.

23              MR. EVEN:  -- "or the fact of damage or anything like

24    that..."

25              THE COURT:  Okay.  So "For Epic to establish injury,
```

**CHARGING CONFERENCE**

```
 1  in fact, or fact of damage."  We'll just repeat it.  How about
 2  that?
 3            MR. MACH:  We're fine with that one, Your Honor.
 4            THE COURT:  Okay.
 5            MR. EVEN:  And then on lines 27...
 6            THE COURT:  27.  Okay.
 7            MR. EVEN:  Yeah.  27, 28 we think the last sentence
 8  just should be stricken.
 9            THE COURT:  Oh, yeah, okay.  There's no -- we'll take
10  that out.
11            MR. MACH:  May I suggest on that, Your Honor, that
12  it's still a correct statement of law if we were to remove the
13  word "damages"?
14            THE COURT:  Well, no.  It's recover damages for
15  losses.  That's specific to damages.  It's not specific to
16  winning.  They can still win their antitrust claim without
17  proving losses.
18            MR. MACH:  Well, I think they have to prove injury,
19  but certainly don't need to prove damages, Your Honor.  We
20  agree with that.  However, we think it important that the jury
21  be told --
22            THE COURT:  It says right here that they must
23  establish that Epic was injured, in fact.
24            MR. MACH:  Yes.
25            THE COURT:  So we're fine with that.  I'm not going to
```

1   add anything else down there.  That's specific to money claims

2   I'm just going to take that out.

3        MR. MACH:  Your Honor, if I could be heard on that

4   sentence for a moment.

5        We think it important that the jury hear that the

6   antitrust laws would not prevent a verdict for the plaintiff

7   for any sort of injury that was caused by the competitive

8   process or conduct that benefits consumers.  We think that's an

9   important substantive element of the instruction.

10       THE COURT:  I don't understand what you're saying.

11       MR. MACH:  The last sentence that we're discussing

12  here, I'm referring largely to line 28, the end of line 27,

13  which refers to losses that were caused by the competitive

14  process or conduct that benefits consumers.  In a sense, it's

15  capturing an important aspect of the antitrust injury

16  requirement.  We think it important that the jury understand --

17       THE COURT:  What is it?  What is it you want it to

18  say?

19       MR. MACH:  Oh.  So we -- I'm not sure I totally

20  understand how that sentence has been modified by my

21  colleague's instruction or request, but I would have it say

22  something like "The antitrust laws do not permit recovery or a

23  verdict" -- or something of that nature -- "for losses that

24  were caused by the competitive process or conduct that benefits

25  consumers."

CHARGING CONFERENCE

1          THE COURT:  Well, the next page says that "Epic's

2    injuries were caused by a reduction in competition or acts that

3    would otherwise harm consumers.  Epic's injuries are antitrust

4    injuries."

5          MR. MACH:  That line is entirely consistent with the

6    proposal that I'm making, Your Honor.  I think this other

7    sentence --

8          THE COURT:  I know that, but why would we say it

9    twice?  That's my point.  We don't need to say it five lines

10   later twice.  We don't need that.  That's redundant.

11         MR. MACH:  I understand.  I don't view it as saying it

12   twice because I think that the prior sentence on the prior page

13   is an important element of it, which is the instruction that

14   injuries caused by competition are not injuries that the jury

15   should consider as sufficient to justify a verdict for Epic.

16      I think --

17         THE COURT:  "On the other hand, if Epic's injuries

18   were caused by competition, the competitive process, Epic's

19   injuries are not anti" -- it's all right there on page -- okay?

20   You don't need it.  That's redundant and confusing.

21         MR. EVEN:  Your Honor --

22         THE COURT:  Yeah, go ahead.

23         MR. EVEN:  -- maybe I can help with that because my

24   colleague jumped into it before --

25         THE COURT:  It's all there.

(128 of 161), Page 128 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 128 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 218 of 228   3283
CHARGING CONFERENCE

```
 1              MR. EVEN:  -- I got to the last change that we need.
 2              MR. MACH:  Let's see.
 3              THE COURT:  All right.  It's all there.  You just
 4     didn't turn the page far enough to read it.  Okay.
 5              MR. EVEN:  So the last change that we need is on
 6     page 48.
 7              THE COURT:  48.
 8              MR. EVEN:  Yes.  And that is in the penultimate
 9     paragraph or the top paragraph on the page.
10              THE COURT:  What is it?
11              MR. EVEN:  Then we have on line 6 "then Epic's
12     injuries are not antitrust injuries, and Epic may not recover
13     damages."
14              THE COURT:  "May not recover," how about that?  Just
15     delete "damages"?
16              MR. EVEN:  We think it should be "and Epic is not
17     entitled to a verdict that Google has violated the antitrust
18     laws," or something along those lines.  But anything --
19              THE COURT:  You want to say that?  "Not entitled to a
20     verdict," Google?
21              MR. MACH:  I'm afraid I'm not -- we're on line --
22              THE COURT:  Page 48.  The issue is replacing the word
23     "damages" with -- replacing the phrase "Epic may not recover
24     damages" with -- what?  "Epic may not" --
25              MR. EVEN:  We can just delete "recover damages" and
```

**CHARGING CONFERENCE**

1    "for injuries."  And then --

2             THE COURT:  Well, you said something about you're not

3    entitled to a verdict?

4             MR. EVEN:  Yeah, it's the same thing, Your Honor.  So

5    the sentence I added is "Epic is not entitled to a verdict that

6    Google has violated the antitrust laws."  That's the same.

7             THE COURT:  All right.  How does that sound, Google?

8             MR. MACH:  I think it's fine.  Let me make sure I'm

9    understanding, Your Honor.

10        The sentence would remain as it is now, and then at the

11   end of line 6 it would say "Epic may not" --

12            THE COURT:  "Epic is not entitled to a verdict," I

13   think, "for those injuries."

14            MR. MACH:  I'm fine with that, Your Honor.

15            THE COURT:  Okay.

16            MR. MACH:  We do have two other small changes that we

17   think are important to conform this to something closer to the

18   instruction, and it is actually consistent with my colleague's

19   earlier proposal, and that is line 6.

20            THE COURT:  On page?

21            MR. MACH:  On page 47.

22            THE COURT:  Page 47, all right.

23            MR. MACH:  We would change the phrase "Epic is

24   entitled to a verdict that Google is liable" to "Epic was

25   injured."  We think that's what the heart of this instruction

**CHARGING CONFERENCE**

 1    is about.

 2         THE COURT:  "Epic is entitled to a verdict that Google

 3    is liable if it can establish these elements of injury."  Why

 4    do you want to change that?

 5         MR. MACH:  Because we think the instruction is not

 6    intended to sort of encapsulate the entire summary of the

 7    liability and other standards found in other instructions.

 8    That's the implication of the sentence as is.  It is intended

 9    to determine --

10         THE COURT:  This is right out of the model.  What is

11    it you want to do in that sentence?  This is right out of the

12    model instruction?

13         MR. MACH:  Your Honor, I don't think this -- I think

14    that --

15         THE COURT:  It's out of ABA6.A.1.  Now what is it that

16    you want to say here in that sentence?

17         MR. MACH:  Your Honor, I don't think that that phrase

18    is out of the model instruction as drafted.  I think the model

19    instruction refers to damages there, which is, I assume, why it

20    was modified and that's logical, but the way that it was

21    modified sort of suggests that the entire instruction here

22    answers the question about liability in a way that we think

23    isn't right.

24         So we would propose that --

25         THE COURT:  It starts off by saying "If you find that

ER-130

**CHARGING CONFERENCE**

```
 1   Google violated the antitrust laws, then you must determine
 2   injury."  So it's already built in.  This is not saying, "Hey,
 3   find injury.  We're done."  That's not saying that.  It's
 4   saying "If, and only if, you already determined there's an
 5   antitrust violation, you have another step."  It's actually
 6   saying something favorable to you.  It's saying "Don't stop.
 7   You can't stop there.  You need to go another 50 yards and find
 8   injury."
 9        So that's wrong.  That's denied.
10        MR. MACH:  I would request, Your Honor, in the same
11   vein, at the bottom of the instruction on page 8, line 8 to 11,
12   you will find a similar principle repeated although this does
13   not contain the caveat that Your Honor pointed to.  Instead, it
14   starts with --
15        THE COURT:  It is.  It's all in the same instruction.
16   So it is by definition covered by the same conditional.  "If,
17   and only if, you find already that Google has violated the
18   antitrust law, don't stop.  Go on.  Find injury."  Okay?
19        I'm done with that one.
20        All right.  Statute of Limitations.
21        MR. EVEN:  So, Your Honor, on statute of limitations,
22   our understanding is that statute of limitations doesn't
23   actually apply to --
24        THE COURT:  I think it might help the jury.  They need
25   a start date, so...
```

(132 of 161), Page 132 of 161    Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 132 of 161    3287
Case 3:21-md-02981-JD    Document 849    Filed 12/06/23    Page 222 of 228
CHARGING CONFERENCE

1          **MR. EVEN:**  Okay.

2          **THE COURT:**  I mean, some of this stuff went back to

3     2008.  I mean, we have to help them understand "Here's the

4     period that matters."

5          Remember, this is all to help the jury.  We're trying to

6     help the jury.  Okay?  They don't know this case like you do

7     for the last, you know, how many years you've been litigating

8     it.  They need to know -- okay, they saw all this stuff from

9     '07, '08, '11.  They need to know that the time that counts is

10    2016 August on.  So they need to know that, so that one is

11    going to happen.

12         Okay.  Oh, Breach of Contract, out.

13         Damages, out.

14         Contract damages, out.

15         Duty to Deliberate, good.

16         **MR. MACH:**  Your Honor, we do have a couple of small

17    things to take up for instructions that we proposed but were

18    omitted.

19         **THE COURT:**  Which one?

20         **MR. MACH:**  And that was our Proposed Instruction

21    Number 20 concerning the relevant product market.

22         **THE COURT:**  Oh, how about this?  Sorry.  Would you

23    rather say "relevant time period" than "limitations"?  Maybe

24    "relevant time period" might be better.

25         **MR. EVEN:**  I think that would be more consistent with

CHARGING CONFERENCE

1  the law, and we'd be happy to adopt it.

2      THE COURT:  So "The relevant time period for the

3  antitrust laws preclude" -- "The relevant time period precludes

4  recovery."  "Statute of limitations" is a little clumsy for a

5  jury.  Let's say "relevant time period."

6      Okay with that, Google?

7      MR. MACH:  We are.  We think that captures it more

8  accurately, Your Honor.

9      THE COURT:  All right.  Okay.  Go ahead.  What were

10 you saying?

11     MR. MACH:  Sure.  We had proposed -- it was our

12 Proposed Instruction Number 20 -- an instruction that is based

13 off the model, though not verbatim, concerning supply

14 substitutability.

15     THE COURT:  Oh, yes.  That just is not going to work

16 in this case.

17     MR. MACH:  If I may, Your Honor, the type of supply

18 substitutability that we're talking about arose actually today

19 again in the testimony of Dr. Bernheim where Dr. Bernheim

20 acknowledged, as he had to, that his analysis of the RSA 3.0

21 agreements was based on the concern that the marketplace in

22 China put certain companies in the position to expand into the

23 marketplace in competition with Google.

24     Given that their own economist has the perspective that

25 that was the motivation for RSA 3.0, we think that there's an

(134 of 161), Page 134 of 161 Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 134 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 224 of 228   3289
CHARGING CONFERENCE

1  entirely solid basis for us to argue and for the jury to

2  conclude that such supply substitutability is possible.

3       THE COURT:  I mean, a one-sided supply instruction is

4  not appropriate for the evidence in this case.

5       Okay.  I think that does it.

6       So I do need -- do I have a verdict form?

7       MR. RAPHAEL:  Your Honor, I apologize.  Just one

8  thing.  You've already addressed it.  I just want to preserve

9  it, and I neglected to do so earlier so I apologize for that.

10      With respect to Instruction 30, I requested an instruction

11  on if there is to be balancing, that the jury be instructed not

12  to second-guess degrees of efficiency.  We would request the

13  same instruction for Instruction 23 on willful acquisition.  I

14  understand Your Honor's ruling before.

15      THE COURT:  23?

16      MR. RAPHAEL:  Yes, 23.  We object there to the

17  balancing instruction; however, we understand Your Honor's

18  rulings on that.  If there is to be a balancing instruction, we

19  would like the jury to be instructed that they should not

20  second-guess degrees of efficiency.

21      THE COURT:  Why would you tell the jury that?

22      MR. RAPHAEL:  Well, Your Honor, we don't --

23      THE COURT:  Why are you possibly thinking anyone is

24  going to second-guess anything they've heard in the evidence?

25  I don't even know what that means.

**CHARGING CONFERENCE**

1    They may not agree with you.  Is that what you're going to

2    consider be second-guessing?  They may say, "No, I don't think

3    that's right," and they're perfectly entitled to do that and

4    that is not second-guessing.  That's saying, "Google, you're

5    wrong.  We don't buy it.  You didn't persuade us."  That's not

6    second-guessing.

7          **MR. RAPHAEL:**  That comes from --

8          **THE COURT:**  How are you ever going to know that?  How

9    are you ever going to know whether the jury is doing that?

10   You're not.  So that's out.  I'm not going to do that.

11   This is all part of your -- you know, you don't win by

12   spin.  Okay?  In jury instructions, you don't win by spin.  You

13   win by the facts.  So this is spin.  This isn't faithful to the

14   evidence in the case.  So that's rejected on that grounds.

15         **MR. RAPHAEL:**  Thank you, Your Honor.

16         **THE COURT:**  Okay.  Now, you've got a big show on

17   Monday.  All right?  Are you going to be ready a week from

18   Monday, December 11th?

19         **MR. BORNSTEIN:**  Yes, Your Honor, of course.

20         **THE COURT:**  All right.  Google?

21         **MR. POMERANTZ:**  Yes, Your Honor, we'll be ready.

22   I just -- do you want to discuss the verdict forms at this

23   point?

24         **THE COURT:**  I don't because I have to spend a little

25   more time with them.  They're -- now, I just -- for the sake of

**CHARGING CONFERENCE**

```
 1   making sure I'm on top of everything, I'll do a little minute
 2   order separate and apart from the one I normally do just saying
 3   "Here's what we're going to do."  You owe me a couple things.
 4   I'm going to look at something.  And I want all of that by
 5   Monday.  Okay?  Because we don't have much time to get anything
 6   done.
 7        I'm going to look at the verdict form -- oh, do we need a
 8   new one without damages and all that?  I think now that damages
 9   are done --
10        MR. BORNSTEIN:  I do not remember if we took out the
11   damages yet.  No, they're still in there?  Okay.
12        THE COURT:  Because I think I raise that until -- we
13   didn't have that till today.
14        MR. BORNSTEIN:  Right.
15        THE COURT:  So one more time.  Okay?  And both of you.
16   And make sure you send me the Word thing, the Word version, you
17   know, to that box I have, e-mail address.
18        MR. POMERANTZ:  And you want us to get that to you by
19   Monday, is that --
20        THE COURT:  By Monday.  Like by noon on Monday.
21        Now, you have your demand done, settlement demand?
22        MR. BORNSTEIN:  We have sent it ahead of time,
23   Your Honor.  Mr. Pomerantz has it as of this morning.
24        THE COURT:  It's been delivered.
25        MR. BORNSTEIN:  Yes.
```

(137 of 161), Page 137 of 161    Case: 24-6256, 11/27/2024, DktEntry: 38.2, Page 137 of 161
Case 3:21-md-02981-JD   Document 849   Filed 12/06/23   Page 227 of 228   3292
CHARGING CONFERENCE

```
 1          THE COURT:  Okay.  And the counter is being prepared?

 2          MR. POMERANTZ:  While I've been here, I'm sure people

 3   have been working on it.

 4          THE COURT:  No, I know.  But the counter is being

 5   prepared?

 6          MR. POMERANTZ:  Yes.

 7          THE COURT:  And what deadline did I set for that?

 8          MR. POMERANTZ:  Monday morning.

 9          THE COURT:  All right.  And when are you going to

10   meet?

11          MR. POMERANTZ:  We've been discussing two dates next

12   week, but we're going to meet middle of the week probably.

13          THE COURT:  Okay.  In person?

14          MR. POMERANTZ:  In person.

15          THE COURT:  All right.

16          MR. BORNSTEIN:  We may precede that with a Zoom call,

17   but we will have the in-person meeting as well.

18          THE COURT:  Fine.  But I do want an in-person --

19          MR. BORNSTEIN:  Understood.

20          THE COURT:  -- you know, face to face.

21       Okay.  The dynamic is important.  Now, if you can't do it,

22   you can't do it, it's fine.  They're ready to rock, but you're

23   going to try.  I'm not going to accept no trying.  Okay?

24       All right.  Okay.  I'll see you then.

25          MR. BORNSTEIN:  Thank you, Your Honor.
```

CHARGING CONFERENCE

1          **THE CLERK:**  All rise.  Court's in recess.

2                   (Proceedings adjourned at 3:54 p.m.)

3                          ---oOo---

4

5              **CERTIFICATE OF REPORTER**

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8

9     DATE:   Friday, December 1, 2023

10

11

12

13   _Kelly Shainline_

14         Kelly Shainline, CSR No. 13476, RPR, CRR
               U.S. Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**Volume 15**

**Pages 2855 - 3065**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| IN RE GOOGLE PLAY STORE | ) | |
| ANTITRUST LITIGATION, | ) | |
| | ) | **NO. 21-md-02981-JD** |
| _____ | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | |
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. 3:20-cv-05671-JD** |
| | ) | |
| GOOGLE, LLC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California

Thursday, November 30, 2023

**TRANSCRIPT OF PROCEEDINGS**

STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**PROCEEDINGS**

1          **MR. MACH:**  I agree with that.

2          **MR. EVEN:**  It's a defense to that.  So if there is

3    nothing to defend against, we're happy to go.

4          **THE COURT:**  Excellent.  All that is out.  When I say

5    "out," I just mean for the jury.  All right?  So don't --

6          **MR. EVEN:**  Understood, Your Honor.

7          **THE COURT:**  Yeah.

8       Okay.  Now, let's see, actually that might be it for the

9    macro.  I'm going to give you my final set, but I think that's

10   probably all I need for right now.

11         **MR. RAPHAEL:**  Your Honor?

12         **THE COURT:**  Yes.

13         **MR. RAPHAEL:**  Could I be heard on the after-market

14   issue that you discussed yesterday?  I think that's a really

15   important instruction about --

16         **THE COURT:**  On which one?

17         **MR. RAPHAEL:**  The after-market issue.

18         **THE COURT:**  Oh.  There is no after market.  This is

19   not an after-market case.

20         **MR. RAPHAEL:**  I think that's why I'd like to be heard

21   on it, Your Honor, if you'll indulge me.

22         **THE COURT:**  Very briefly.

23         **MR. RAPHAEL:**  Well, Your Honor, I think --

24         **THE COURT:**  I'm sorry.  I will let you do that.  We

25   have other -- what is this breach of implied covenant?  Why do

**PROCEEDINGS**

```
1    we need that?

2         I don't see how it's different at all from the breach of

3    contract claim.  We're going to get rid of that too; right?

4              MR. MACH:  Yeah, if we have the stipulation.

5              THE COURT:  Okay.  Yeah, that's out too.

6         Okay.  After market.  I know you want to be within

7    Epic/Apple, you're not.  This is a different case.  So there is

8    no after market or fore market.  They have a totally different

9    theory, and there hasn't been a word -- the word "after market"

10   has not been use by a single witness, including the experts in

11   this case.  So what is it you want to say?

12             MR. RAPHAEL:  Well, that's the issue I'd like to

13   address, Your Honor, because I think I'd like to point out to

14   the Court, if I have just a few moments, that I think their

15   theory in this case is actually exactly the same, and I think

16   their own words from both cases actually demonstrate that.

17             THE COURT:  I think that's actually dead wrong.  Okay?

18        And, by the way, the jury instructions are not based on

19   theory.  It's based on the evidence in the case.  There has

20   been zero mention, let alone evidence, of fore market or after

21   market.  So after market will not be given.  Okay?

22        So I'm going to take it from here.  All right?

23             MR. POMERANTZ:  Your Honor, I'm sorry.

24             THE COURT:  Yeah.

25             MR. POMERANTZ:  That issue is not based on whether
```

**PROCEEDINGS**

1    those words were used.  The theory of this case by both sides,

2    what we have said over and over again is when you buy a phone,

3    you obviously consider what apps are available on that phone.

4    That is a classic after-market theory.

5        Their response --

6        **THE COURT:**  I don't think that's right.  There's been

7    a ton of evidence saying that people never even look at the app

8    store when they make their phone choice.

9        **MR. POMERANTZ:**  Well, obviously there's a dispute

10   about that because we just showed evidence today that that's

11   not true.

12       **THE COURT:**  In the *Apple* case, which I have looked at

13   quite extensively, the experts pitched it as fore market/after

14   market, some variation of *Kodak*.

15       Now, whether they decided to pursue that because they

16   didn't like the outcome in *Epic* or whatever, it doesn't matter.

17   It's not in this case.

18       **MR. POMERANTZ:**  But, Your Honor, you're talking --

19       **THE COURT:**  Am I -- are you doing that?  Is that your

20   theory?

21       **MR. EVEN:**  We haven't alleged it.  We're not pursuing

22   it.  It's not what our experts said, Your Honor.

23       **MR. POMERANTZ:**  Your Honor, the record is clear.  What

24   they came in here and argued was that once you buy a phone --

25   if you buy an iPhone, you can only go to the app store.  If

**PROCEEDINGS**

```
 1   you buy an Android phone, you can't go to the Apple App Store.

 2   That is at its core an after-market theory.

 3          THE COURT:  I do not agree with that in the least.

 4   Not in the least.

 5          MR. POMERANTZ:  The underlying economics are the --

 6          THE COURT:  That was front and center in the other

 7   case.  It has been a complete absentee presence and not even a

 8   ghost.  It's not even on the record here.

 9      So I -- it's okay.  I'm not doing the after market.  That

10   is just completely inconsistent with the evidence that has been

11   presented in this case.

12      All right.  I'll get this done, and we'll talk tomorrow at

13   3:30 for the final ones.

14      Now anything else before the morning?

15          MR. MACH:  Could I take up a very small issue?

16          THE COURT:  Sure.  Yeah.

17          MR. EVEN:  For this should I stay?

18          MR. MACH:  I don't know if it's your issue or not,

19   Yonatan.

20          MR. EVEN:  I don't either.

21          MR. MACH:  The parties have been working very hard to

22   eliminate disputes on depo designations.  We have one very

23   simple foundation issue.

24          THE COURT:  All right.  What is it?

25          MR. MACH:  Both Mr. Sussman and Mr. Gelber provide
```

1

2

3               **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Thursday, November 30, 2023

8

9

10

11     _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

ER-144

Volume 1

Pages 1 - 116

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE          )
ANTITRUST LITIGATION,            )
                                 )   **NO. 21-md-02981-JD**
_____  )
THIS DOCUMENT RELATES TO:        )
                                 )
EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )   **NO. 3:20-cv-05671-JD**
                                 )
GOOGLE, LLC., et al.,            )
                                 )
          Defendants.            )
_____  )


San Francisco, California
Thursday, November 2, 2023


**TRANSCRIPT OF PROCEEDINGS**



STENOGRAPHICALLY REPORTED BY:

Kelly Shainline, CSR 13476, RPR, CRR
Official United States Reporter

**PROCEEDINGS**

```
 1   be sure I understand, you mean after the folks come on you'd
 2   like to do that?
 3             THE COURT:  No, no.  Based on the written
 4   questionnaires.
 5             MR. BORNSTEIN:  I see.
 6             THE COURT:  If there's anything you specifically want
 7   to ask -- you know, you've had the questionnaires now for a
 8   while, so if there's anything you want to specifically -- for
 9   example, some of them, you know, expressed some mild opinions
10   on one side or the other.  If you have something you want me to
11   ask specifically, I'll be willing to consider that.  Okay?
12             MR. BORNSTEIN:  Great.
13             THE COURT:  All right.  Now, with respect to Google's
14   desire to abandon a jury trial at this point, which they stated
15   in the filing on November 1st, the request is denied.  I'll put
16   a little bit more of this in the minute order, but the salient
17   facts are that all the parties, including Google, agree that
18   Google's counterclaims against Epic are triable to a jury and
19   should be tried by a jury.
20        Google has also expressly agreed that the evidence for the
21   counterclaims against Epic is basically the same as the
22   evidence that will be produced in Epic's antitrust case.
23        And in addition to that Google, along with all the other
24   parties, has on several occasions in the case expressly agreed
25   that, quote, "all claims by all plaintiffs are triable to a
```

**PROCEEDINGS**

1    jury, with the exception of the claims brought under the

2    California unfair competition law and claims that the states

3    have brought under the laws of 38 other states other than

4    California," close quote.  That's from MDL Docket Number 505 at

5    page 3.  That's just an indicator of similar statements that

6    Google and the parties have made throughout the case.

7        Looking more broadly, I have discussed and urged a jury

8    trial on all issues from the very first day that we have walked

9    in here.  As I just indicated, all the parties reached a

10   consensus in favor of a jury trial.  My case management and my

11   scheduling orders have reflected a reliance on that

12   representation, and Epic and the other parties up to date, but

13   certainly Epic today, has also relied on the idea that we're

14   going to be having a jury trial.

15       So request to abandon a jury at this point is denied and

16   we're on our way to a jury trial.

17       Now, we'll take a break now.

18       What happens now, Ms. Clark?  Are they ready yet or 10

19   more minutes or --

20       **THE CLERK:**  I'm going to bring in the prospective

21   juror panel and seat them and take roll.

22       **THE COURT:**  Okay.  So there's going to be a little

23   roll taking thing.  You'll have about 15 minutes.  So I'm going

24   to leave and I'll come back, and then at that point before

25   Ms. Clark comes to get me, just let me know if you have any

**PROCEEDINGS**

1          I actually forgot Tuesday was Election Day.  So just think

2     about how you want to handle that.  Okay?  The polls are

3     usually open till 8:00 in California.

4          Okay.  All right.  I'll see you then.

5               **THE CLERK:**  All rise.

6          Court's in recess.

7                    (Proceedings adjourned at 12:11 p.m.)

8                         ---oOo---

9

10

11                    <u>CERTIFICATE OF REPORTER</u>

12          I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14

15     DATE:   Thursday, November 2, 2023

16

17

18

19     _____

20          Kelly Shainline, CSR No. 13476, RPR, CRR
                   U.S. Court Reporter

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### Civil Minutes

| | |
|---|---|
| Date:  November 2, 2023 | Judge:  Hon. James Donato |

Time:  3 Hours 15 Minutes

Cases and Nos.:     3:21-md-02981-JD  In re Google Play Store Antitrust Litigation
                    3:20-cv-05671-JD  Epic Games, Inc. v. Google LLC et al.

Attorney(s) for Plaintiff(s):   Lauren Moskowitz, Yonatan Even, Gary Bornstein, Brent Byars

Attorney(s) for               Lauren Bell, Jonathan Kravis, Michelle Chiu, Brian Rocca,
Defendant(s):                  Kuru Olasa, Kyle Mach, Justin Raphael, Jonathan Wiktor,
                               Glenn Pomerantz

Deputy Clerk:  Lisa R. Clark

Court Reporter:  Kelly Shainline

### PROCEEDINGS

Jury Selection -- Held

### NOTES AND ORDERS

## I.     Single Jury Trial on All Claims

Google's request to hold a jury trial on its counterclaims only, to be followed by a bench trial on
Epic's antitrust claims, Dkt. No. 730, is denied.

From the start of this MDL case, the Court has urged the parties to try their claims to a jury.  *See*,
*e.g.*, Dkt. No. 67.  Google fully embraced a jury trial on several occasions in the years leading up
to the trial starting on November 6, 2023.  Among other affirmations of a jury trial in this case,
Google demanded a jury trial on its counterclaims against Epic, which entail demands for
monetary damages.  *See* Dkt. Nos. 111, 386.  This demand is particularly significant because
Google expressly represented to the Court that the facts underlying plaintiffs' antitrust claims
and Google's counterclaims overlap in substantial measure, and that Google "will present much
of the same evidence in defending against plaintiffs' claims that it will present on its
counterclaims."  Dkt. No. 573 at 5.  Google called for a single jury trial on plaintiffs' antitrust
claims, including Epic's, and Google's counterclaims for this reason.  *Id.*  The Court agreed with
Google's position and denied plaintiffs' bifurcation motion.  Dkt. No. 603.  Google also affirmed
on another occasion that "[t]he parties agree that all claims by all Plaintiffs are triable to a jury,

with the exception of" plaintiffs' claims under California's Unfair Competition Law and other state law claims. Dkt. No. 505 at 3. On the basis of these and other representations manifesting Google's embrace of a jury trial on all claims in the case, the Court issued a number of case management and scheduling orders contemplating a jury trial on Epic's claims, which Google never objected to. Most recently, Epic's claims were expressly included in the parties' joint proposed jury instructions and verdict forms. *See* Dkt. Nos. 678, 679.

Overall, this case has long been organized on the understanding of a single jury trial of plaintiffs' antitrust claims and Google's counterclaims. The Court has proceeded for over a year on this understanding, and Epic has reasonably relied on it and expended substantial time and resources preparing for a jury trial. As the record demonstrates, Google expressly consented to a jury trial of all claims, and by its conduct impliedly consented as well. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 795-96 (5th Cir. 1999) (litigants may consent to nonadvisory juries "either expressly or implicitly"); Fed. R. Civ. P. 39(c)(2).

The only reason a jury trial issue has come up now is that Google abruptly stated in a filing on November 1, 2023, just one day before jury selection and two court days before the start of trial, that it wanted to "withdraw" its consent to a jury trial of Epic's claims. Dkt. No. 730 at 7. In light of the record discussed above, the request is entirely too late. To permit a withdrawal at this late stage would be gravely prejudicial to Epic. *See Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 53 (3d Cir. 1989) ("Any good trial lawyer will testify that there are significant tactical differences in presenting and arguing a case to a jury as opposed to a judge. To convert a trial from a jury trial to a bench trial (or vice versa) in the middle of the proceedings is to interfere with counsel's presentation of their case and, quite possibly, to prejudice one side or the other.") (quoting *Hildebrand v. Board of Trustees*, 607 F.2d 705, 710 (6th Cir. 1979)); *Thompson v. Parkes*, 963 F.2d 885, 889 (6th Cir. 1992) ("Defendant's argument, if sustained, would deprive the pretrial orders in this case of the force given them under the Rules. Defendant twice stipulated to a jury trial in pretrial orders entered in this case. Federal Rule of Civil Procedure 16(e) provides that a pretrial order 'shall control the subsequent course of the action unless modified by a subsequent order.' No such subsequent order was ever entered, verbally or otherwise, altering the jury trial stipulation."); *Onyx Pharms., Inc. v. Bayer Corp.*, No. C-09-2145 EMC, 2011 WL 4527402, at *2 (N.D. Cal. Sept. 21, 2011) ("bifurcation at this late hour would prejudice Onyx, which has prepared its evidence and witnesses for a single trial by jury."). Google's request is also fundamentally inconsistent with its representations to and conduct before the Court with respect to a jury trial, and would undermine the considerable case management work the Court undertook in anticipation of a jury trial.

Consequently, there will be a single jury trial of Epic's antitrust claims against Google and Google's counterclaims against Epic.

## II.    Trial Logistics and Details

Trial will be held on Monday, December 4, 2023. The Court will consider trial on Friday, November 17, 2023, and/or December 1, 2023, as warranted.

Each side will have 40 hours of trial time, excluding openings and closings.

Google will make witness Genaro Lopez available on Monday, November 6, 2023, unless the parties agree otherwise.

## III.    Jury Selection

66 prospective jurors are sworn, and the Court conducts voir dire.

10 jurors are seated and sworn.  The jurors are admonished not to research or discuss the case in any way, and to return to court for the beginning of trial on Monday, November 6, 2023, at 9:00 a.m.

ER-151

```
 1                  UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                        SAN FRANCISCO


 3
       IN RE GOOGLE PLAY STORE
 4     ANTITRUST LITIGATION
       _____    CASE NO.  MD 21-02981 JD
 5     THIS DOCUMENT RELATES TO:         RELATED CASES:
                                              CV 20-05671 JD
 6     EPIC GAMES, INC. VS. GOOGLE            CV 20-05761 JD
       LLC, ET AL.,                           CV 21-05227 JD
 7                                            CV 22-02746 JD
       IN RE GOOGLE PLAY CONSUMER
 8     ANTITRUST LITIGATION,            SAN FRANCISCO, CALIFORNIA

 9     STATE OF UTAH, ET AL. V. GOOGLE  OCTOBER 19, 2023
       LLC, ET AL.,
10                                      PAGES 1 - 66
       MATCH GROUP, LLC, ET AL. V.
11     GOOGLE LLC, ET AL.,

12
                        TRANSCRIPT OF PROCEEDINGS
13                BEFORE THE HONORABLE JAMES DONATO
                     UNITED STATES DISTRICT JUDGE
14

15     A-P-P-E-A-R-A-N-C-E-S

16       FOR THE PLAINTIFF    CRAVATH SWAINE AND MOORE LLP 825
         EPIC GAMES:          BY:  GARY A. BORNSTEIN
17                                 YONATAN EVEN
                                   LAUREN ANN MOSKOWITZ
18                            EIGHTH AVENUE
                              NEW YORK, NEW YORK 10019
19
                    (APPEARANCES CONTINUED ON THE NEXT PAGE.)
20

21
         OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, RMR, CRR
22                                  CERTIFICATE NUMBER 8074

23
           PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
24     TRANSCRIPT PRODUCED WITH COMPUTER.

25
```

```
 1      A P P E A R A N C E S:  (CONT'D)

 2

 3      FOR EPIC:                   HUESTON HENNIGAN
                                    BY:  DOUGLAS J. DIXON
 4                                       JOSEPH REITER
                                    620 NEWPORT CENTER DRIVE
 5                                  SUITE 1300
                                    NEWPORT BEACH, CALIFORNIA 92660
 6

 7      FOR GOOGLE:                 MUNGER, TOLLES & OLSON LLP
                                    BY:  GLENN D. POMERANTZ
 8                                  350 SOUTH GRAND AVENUE
                                    FIFTIETH FLOOR
 9                                  LOS ANGELES, CALIFORNIA 90071

10                                  BY:  JONATHAN I. KRAVIS
                                         LAUREN BELL
11                                  601 MASSACHUSETTS AVENUE NW
                                    SUITE 500E
12                                  WASHINGTON, DC 20001

13                                  BY:  JUSTIN P. RAPHAEL
                                         DANE P. SHIKMAN
14                                       KYLE W. MACH
                                    560 MISSION STREET
15                                  TWENTY-SEVENTH FLOOR
                                    SAN FRANCISCO, CALIFORNIA 94105
16
                                    MORGAN, LEWIS & BOCKIUS LLP
17                                  BY:  BRIAN C. ROCCA
                                         MICHELLE P. CHIU
18                                  ONE MARKET, SPEAR STREET TOWER
                                    SAN FRANCISCO, CALIFORNIA 94105
19

20

21

22

23

24

25
```

3

```
 1    SAN FRANCISCO, CALIFORNIA              OCTOBER 19, 2023

 2                    P R O C E E D I N G S

 3

 4        (COURT CONVENED AT 1:06 P.M.)

 5            THE CLERK:  NOW CALLING CIVIL MATTER 20-CV-5671,

 6    EPIC GAMES, INCORPORATED, VERSUS GOOGLE LLC; CASE NUMBER

 7    21-MD-02981, IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION; CASE

 8    NUMBER 22-CV-2746, MATCH GROUP LLC, ET AL., VERSUS GOOGLE LLC,

 9    ET AL.

10        COUNSEL, PLEASE GO TO THE PODIUMS AND STATE YOUR

11    APPEARANCES ON THE RECORD STARTING WITH THE PLAINTIFFS.

12            MR. BORNSTEIN:  GOOD AFTERNOON, YOUR HONOR.

13        GARY BORNSTEIN FOR EPIC, AND I'M HERE WITH MY PARTNERS,

14    YONATAN EVEN AND LAUREN MOSKOWITZ.

15            THE COURT:  GOOD AFTERNOON.

16            MR. DIXON:  GOOD AFTERNOON, YOUR HONOR.

17        DOUGLAS DIXON ON BEHALF OF THE MATCH PLAINTIFFS, AND I'M

18    ACCOMPANIED BY MY PARTNER, JOE REITER.

19            MR. POMERANTZ:  GOOD AFTERNOON, YOUR HONOR.

20        GLENN POMERANTZ ON BEHALF OF GOOGLE AND WITH ME ARE MY

21    COLLEAGUES, LAUREN BELL, JUSTIN RAPHAEL, AND JONATHAN KRAVIS.

22            MR. ROCCA:  YOUR HONOR, BRIAN ROCCA AND

23    MICHELLE PARK CHIU OF MORGAN LEWIS.  GOOD AFTERNOON.

24            THE COURT:  GOOD AFTERNOON.  OKAY.  COULD I GET THAT

25    SHEET?  ALL RIGHT.  HERE IS OUR DAY OF DESTINY, THE PRETRIAL
```

The timestamps in the left margin read: 01:06PM (lines 4–8), 01:07PM (lines 9–25).

| | | |
|---|---|---|
| 01:08PM | 1 | CONFERENCE. |
| 01:08PM | 2 | SO MATCH IS STILL HERE? |
| 01:08PM | 3 | MR. DIXON:  WE ARE, YOUR HONOR.  WE ARE LOOKING |
| 01:08PM | 4 | FORWARD TO TRIAL. |
| 01:08PM | 5 | THE COURT:  YOU ARE? |
| 01:08PM | 6 | MR. DIXON:  YES, YOUR HONOR. |
| 01:08PM | 7 | THE COURT:  SO WE'RE DONE NOW ON THE OTHER THING? |
| 01:08PM | 8 | MR. DIXON:  WE ARE DONE. |
| 01:08PM | 9 | THE COURT:  I KNOW IT'S NEVER DONE, BUT IT'S DONE. |
| 01:08PM | 10 | NOTHING EMINENT IS HAPPENING. |
| 01:08PM | 11 | MR. DIXON:  NOTHING TO REPORT, YOUR HONOR. |
| 01:08PM | 12 | THE COURT:  OKAY.  GOT IT.  ALL RIGHT. |
| 01:08PM | 13 | LET'S START WITH SUMMARY JUDGMENT.  LET'S GET THOSE OUT OF |
| 01:08PM | 14 | THE WAY.  WE'RE GOING TO DEAL WITH SUMMARY JUDGMENT, MOTIONS IN |
| 01:08PM | 15 | LIMINE, CHAT SANCTIONS, AND THEN GENERAL TRIAL PRACTICES AND |
| 01:08PM | 16 | PROCEDURES. |
| 01:08PM | 17 | SO LET US BEGIN WITH GOOGLE'S MOTION FOR PARTIAL SUMMARY |
| 01:08PM | 18 | JUDGMENT, DOCKET NUMBER 483. |
| 01:08PM | 19 | NOW, WITH RESPECT TO TIMELINESS HERE, HERE'S THE |
| 01:08PM | 20 | DISPOSITION, THERE WILL BE NO ADDITIONAL FOLLOWUP ORDERS.  THE |
| 01:08PM | 21 | COURT PREVIOUSLY DENIED GOOGLE'S SUMMARY JUDGMENT REQUEST FOR |
| 01:08PM | 22 | PLAINTIFFS' VERY EARLY COURIER AGREEMENT CLAIMS ON TIMELINESS |
| 01:09PM | 23 | GROUNDS, THAT'S DOCKET NUMBER 571 AND 1. |
| 01:09PM | 24 | WITH RESPECT TO THE SUMMARY JUDGMENT REQUEST BASED ON |
| 01:09PM | 25 | CONSUMER PLAINTIFFS AND THE PLAINTIFF STATES -- OKAY, WE'RE |

| | |
|---|---|
| 01:09PM | 1 |
| 01:09PM | 2 |
| 01:09PM | 3 |
| 01:09PM | 4 |
| 01:09PM | 5 |
| 01:09PM | 6 |
| 01:09PM | 7 |

DONE WITH THAT, SO WE DON'T HAVE TO DEAL WITH THAT.

NOW WE'RE GOING TO THE REMAINING ONES FOR EPIC AND MATCH.

STARTING WITH THE CLAIM THAT GOOGLE WANTS TO HAVE ME RULE

ON THE PLAINTIFFS' CLAIM THAT GOOGLE UNLAWFULLY PROHIBITS THE

DISTRIBUTION OF OTHER APP STORES ON GOOGLE PLAY, AND THIS GOES

TO THE DDA, THE DEVELOPER DISTRIBUTION AGREEMENTS.

GOOGLE ASSERTS THAT -- THE PLAINTIFFS ASSERT, THE

PLAINTIFFS STATE THAT THEY, QUOTE, "DO NOT ASSERT LIABILITY

AGAINST GOOGLE FOR SECTION 4.5 OF THE DDA ON ITS OWN," CLOSED

QUOTE, NOR ARE THEY CLAIMING AN INDEPENDENT DUTY TO DEAL.

THOSE ARE BOTH IN DOCKET NUMBER 511-1 AND 4-6.

SO BASED ON THAT IT'S MY UNDERSTANDING THAT THE PARTIES

ARE ACTUALLY IN SOME DEGREE OF AGREEMENT WHICH MAKES SENSE IN

LIGHT OF VERIZON COMMUNICATIONS V. TRINKO, T-R-I-N-K-O, 540

U.S. 398 AND A 2004 DECISION.  SO SUMMARY JUDGMENT IS GRANTED

FOR GOOGLE ON THAT ISSUE.

PLAINTIFFS MAY NOT ARGUE TO THE JURY THAT SECTION 4.5 OF

THE DDA IS INDEPENDENTLY UNLAWFUL OR IMPROPER, AND THEY ALSO

MAY NOT ARGUE THAT THE SAME CONTRACTUAL PROHIBITION IS SOMEHOW

TRANSFORMED INTO SOMETHING UNLAWFUL OR IMPROPER WHEN VIEWED IN

COMBINATION WITH OTHER ALLEGEDLY ANTICOMPETITIVE PRACTICES THAT

GOOGLE ENGAGED IN.

SO, IN OTHER WORDS, IF THE CARROT IS GOOD ON ITS OWN, THE

CARROT IS GOOD IN THE SOUP.  IT'S NOT GOING TO BE TRANSFORMED

INTO A BAD ELEMENT JUST UNDER SOME KIND OF MONOPOLY FRAUD

6

01:11PM 1    THEORY.  SO THAT'S THE DISPOSITION OF THE FIRST PORTION OF

01:11PM 2    GOOGLE'S MOTION.

01:11PM 3         GOOGLE NEXT REQUESTS SUMMARY JUDGMENT ON EPIC'S AND

01:11PM 4    MATCH'S CLAIMS CHALLENGING THE GAME VELOCITY PROGRAM

01:11PM 5    AGREEMENTS, THREE OF THOSE -- I WILL REFER TO THOSE AS THE GVP

01:11PM 6    AGREEMENTS -- ON THE GROUNDS THAT THEY ARE NOT PER SE

01:11PM 7    VIOLATIONS OF THE SHERMAN ACT.  REALLY THIS IS JUST KIND OF A

01:11PM 8    STANDARD ISSUE SHOULD THEY BE SEEN AS PER SE AS THE PLAINTIFFS

01:11PM 9    SUGGEST OR SHOULD THEY BE TREATED UNDER A RULE OF REASON

01:11PM 10   ANALYSIS AS GOOGLE REQUESTS.

01:11PM 11        I HAVE SOME QUESTIONS ABOUT THIS.  SO, MR. POMERANTZ, WHO

01:12PM 12   IS GOING TO TAKE THE LEAD ON YOUR SIDE?

01:12PM 13        MR. POMERANTZ:  I'LL DO MY BEST, YOUR HONOR.

01:12PM 14        THE COURT:  OKAY.  I JUST -- I'M HAVING TROUBLE

01:12PM 15   SEEING HOW THESE GVP AGREEMENTS ARE IN ANY WAY PROCOMPETITIVE?

01:12PM 16        MR. POMERANTZ:  THESE AGREEMENTS, YOUR HONOR, HAVE A

01:12PM 17   VERTICAL COMPONENT.  SO GOOGLE GOES TO GAME DEVELOPERS AND THEY

01:12PM 18   SAY TO THE GAME DEVELOPER, WE WANT YOU TO CONTINUE TO DO

01:12PM 19   BUSINESS WITH US.

01:12PM 20        AND SO THEY GO TO THE GAME DEVELOPER AND SAY IF YOU WILL

01:12PM 21   DO BUSINESS WITH US, WE WILL GIVE YOU A BETTER DEAL.  WE'LL

01:12PM 22   GIVE YOU A BETTER DEAL IF YOU STAY IN BUSINESS WITH US.

01:12PM 23        SO WHAT WE DO IS WE GIVE THEM ADDITIONAL CONSIDERATION FOR

01:12PM 24   STAYING IN BUSINESS WITH US.  AND IN EXCHANGE FOR THAT

01:12PM 25   CONSIDERATION -- THAT CONSIDERATION CAN BE ADVERTISING CREDITS

23

01:33PM 1    PROBLEM WAS THE STEREOTYPE WHICH, FRANKLY, THEY DON'T NEED TO

01:33PM 2    TELL THE JURY.

01:33PM 3         THE COURT:  WELL, THEY JUST RENOUNCED TRAFFICKING IN

01:33PM 4    STEREOTYPES AND THEY CAN ASK ONE PERSON ONCE.  TENCENT IS A

01:34PM 5    CHINESE COMPANY, ISN'T IT?  OR IT'S A COMPANY HEADQUARTERED IN

01:34PM 6    CHINA?  HOWEVER YOU WANT TO SAY.

01:34PM 7         MR. POMERANTZ:  THAT'S FINE.  AND THEN THERE WILL BE

01:34PM 8    OTHER ISSUES THAT WILL COME UP ABOUT HOW APP STORES WORK IN

01:34PM 9    CHINA AND THE REST OF THE WORLD.

01:34PM 10        THE COURT:  I DON'T THINK THAT CHINA IS SO

01:34PM 11   RADIOACTIVE THAT ONE MENTION IS GOING TO POISON THE CASE.

01:34PM 12        MR. POMERANTZ:  THAT'S FINE.  THANKS.

01:34PM 13        THE COURT:  OKAY.  ALL RIGHT.

01:34PM 14     GOOGLE'S MOTION IN LIMINE NUMBER 1, PRECLUDE EPIC FROM

01:34PM 15   OFFERING EVIDENCE THAT THE APPLE APP STORE AND GOOGLE PLAY

01:34PM 16   STORE ARE SEPARATE MARKETS.

01:34PM 17     THIS IS SUPPOSEDLY A COLLATERAL ESTOPPEL MARKET.  IT'S

01:34PM 18   DENIED ON MULTIPLE GROUNDS.  ONE IS IT IS ABSOLUTELY NOT AN

01:34PM 19   APPROPRIATE SUBJECT FOR A MOTION IN LIMINE.  THIS SHOULD HAVE

01:34PM 20   BEEN RAISED ON SUMMARY JUDGMENT.  IT INVOLVES AN ASSESSMENT OF

01:34PM 21   A NUMBER OF FACTORS THAT COLLATERAL ESTOPPEL REQUIRES WITH

01:34PM 22   RESPECT TO WHETHER AND TO WHAT EXTENT AN ISSUE WAS DECIDED IN

01:34PM 23   ANOTHER CASE, AND THAT IS THE SAME AS AN ISSUE IN THIS CASE,

01:35PM 24   WHETHER THAT ISSUE WAS ACTUALLY LITIGATED IN THE PRIOR CASE AND

01:35PM 25   WHETHER THEIR DECISION TURNED IN A MATERIAL RESPECT ON THE

01:35PM 1    LITIGATION IN THE OTHER CASE.

01:35PM 2        SO IT'S, ONE, PROCEDURALLY IMPROPER, NOT A SUITABLE

01:35PM 3    SUBJECT FOR A MOTION IN LIMINE.

01:35PM 4        MY STANDING ORDER EXPRESSLY STATES THAT YOU CANNOT BRING A

01:35PM 5    COVERT SUMMARY JUDGMENT MOTIONS IN THE MIL, WHICH IS

01:35PM 6    EFFECTIVELY WHAT GOOGLE IS DOING.

01:35PM 7        IT'S ALSO DENIED AS LATE.  IT SHOULD HAVE BEEN RAISED WAY

01:35PM 8    EARLIER IN THE CASE ON THE SUMMARY JUDGMENT.

01:35PM 9        AND THE THIRD BASIS IS THAT EVEN TO THE EXTENT THAT I HAVE

01:35PM 10   IT, IT JUST DOES NOT PROVIDE ANYTHING CLOSE TO A SUFFICIENTLY

01:35PM 11   CLEAR DEMONSTRATION OF THE ELEMENTS OF COLLATERAL ESTOPPEL,

01:35PM 12   INCLUDING SAYING THIS IS THE SUBJECT, ACTUAL LITIGATION, AND

01:35PM 13   ALL OF THE OTHER ELEMENTS BETWEEN THE PRIOR CASE AND THIS CASE.

01:35PM 14   SO THAT ONE IS DENIED.

01:35PM 15       NUMBER 2, GOOGLE'S MOTION NUMBER 2 IS TO EXCLUDE EVIDENCE

01:36PM 16   AND ARGUMENT RE PRIVILEGE DESIGNATIONS.  THIS IS GOING TO

01:36PM 17   FORESHADOW WHAT WE'RE GOING TO TALK ABOUT WITH RESPECT TO THE

01:36PM 18   CHAT SANCTION, BUT IT'S PERFECTLY FINE FOR PLAINTIFFS TO

01:36PM 19   PRESENT EVIDENCE ABOUT COMMUNICATE WITH CARE, OKAY?  I'M

01:36PM 20   ASSUMING THAT'S ALL THE LAWYERS ARE GOING TO TALK ABOUT.

01:36PM 21   YOU'RE SKILLED ENOUGH NOT TO ASK ANY ATTORNEY-CLIENT QUESTIONS.

01:36PM 22   IT'S JUST GOING TO BE HERE'S THE SLIDE SHOW THAT I LOOKED AT,

01:36PM 23   RIGHT, DURING THE CHAT HEARING AND MAYBE THAT SAME FELLOW WILL

01:36PM 24   WALK US THROUGH IT AGAIN, OR SOMETHING LIKE THAT?

01:36PM 25       MS. MOSKOWITZ:  YES, YOUR HONOR.  IT'S THE FACT OF

```
 1
 2
 3                    CERTIFICATE OF REPORTER
 4
 5
 6
 7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE
 8    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
 9    CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO
10    HEREBY CERTIFY:
11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS
12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE
13    ABOVE-ENTITLED MATTER.
14
15
16                    IRENE RODRIGUEZ, CSR, RMR, CRR
                      CERTIFICATE NUMBER 8074
17
18                    DATED:  OCTOBER 20, 2023
19
20
21
22
23
24
25
```

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on November 27, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal