## Nos. 24-6256 & 24-6274

---

# United States Court of Appeals for the Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, *et al.*,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD (Hon. James Donato)

---

## BRIEF OF FORMER FEDERAL ANTITRUST ENFORCERS AS *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY

---

Kelly Holt Rodriguez
JONES DAY
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
Telephone: (612) 217-8855

David C. Kiernan
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 875-5745
dkiernan@jonesday.com

Koren W. Wong-Ervin
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3622

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. ii

INTEREST OF *AMICI CURIAE* ................................................. 1

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT .................................................................................. 6

    I.      In Crafting Antitrust Remedies, the Court Should Take into Consideration *Trinko*'s Concerns with Compulsory Sharing ................... 6

    II.    Injunctive Relief Must Be Tailored to the Violation, Which Is Particularly Critical Here Given the Risks of Compulsory Sharing Remedies ................................................................................... 14

CONCLUSION ............................................................................... 18

CERTIFICATE OF SERVICE ...................................................... 19

CERTIFICATE OF COMPLIANCE .............................................. 20

ADDENDUM .................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

CASES

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
480 U.S. 531 (1987) ............................................................ 17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) ............................................................ 4

*AT & T Corp. v. Iowa Utilities Bd.,*
525 U.S. 366 (1999) ............................................................ 8

*Authenticom, Inc. v. CDK Global, LLC,*
874 F.3d 1019 (7th Cir. 2017) ...................................... 3, 12

*Califano v. Yamasaki,*
442 U.S. 682 (1979) .......................................................... 15

*In re Microsoft Corp. Antitrust Litig.,*
333 F.3d 517 (4th Cir. 2003) ........................................... 14

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
512 U.S. 821 (1994) .......................................................... 17

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
941 F.2d 970 (9th Cir. 1991) ...................................... 4, 14

*Lord & Taylor, LLC v. White Flint, LP,*
780 F.3d 211 (4th Cir. 2015) ........................................... 17

*M.S. v. Brown,*
902 F.3d 1076 (9th Cir. 2018) ......................................... 14

*MetroNet Servs. Corp. v. Qwest Corp.,*
383 F.3d 1124 (9th Cir. 2004) ................................ 9, 13, 14

*Nat'l Collegiate Athletic Ass'n v. Alston*,
　594 U.S. 69 (2021) ................................................. 3, 11

*Novell v. Microsoft Corp.*,
　731 F.3d 1064 (10th Cir. 2013) ............................... 9, 10

*Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*,
　144 S. Ct. 1588 (2024) .............................................. 14

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
　20 F.4th 466 (9th Cir. 2021) .............................. 4, 13, 17

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
　555 U.S. 438 (2009) ..................................................... 2

*United States v. Glaxo Grp. Ltd.*,
　410 U.S. 52 (1973) ..................................................... 13

*United States v. Microsoft Corp.*,
　253 F.3d 34 (D.C. Cir. 2001) (en banc).................. 4, 5, 16

*Verizon Communications v. Trinko*,
　540 U.S. 398 (2004) ...........................................*passim*

*Weinberger v. v. Romero-Barcelo*,
　456 U.S. 305 (1982) .................................................. 17

*Winter v. NRDC*,
　555 U.S. 7 (2008)...................................................... 17

## OTHER AUTHORITIES

Abbott B. Lipsky, Jr., "Ohio v. American Express: *The Supreme Court Still
　Passes the Test*," CPI Antitrust Chronicle (June 2019) ................................ 12

Douglas H. Ginsburg, *Originalism and Economic Analysis: Two Case Studies of
　Consistency and Coherence in Supreme Court Decision Making*, 33 HARV. J.L.
　& PUB. POL'Y 217 (2010) ........................................... 12

Jorge Padilla, Douglas H. Ginsburg, & Koren W. Wong-Ervin, *Antitrust Analysis Involving Intellectual Property Rights and Standards: Implications from the Economics*, 33 HARV. J. LAW & TECHN. No. 1 (Fall 2019) ...................................... 7

Press Release, Nobel Prize, The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel (Oct. 21, 1987), https://perma.cc/Z2B4-HR67................................................................................. 7

Thomas O. Barnett, "Section 2 Remedies:  What to Do After Catching the Tiger by the Tail," Presentation at the American Bar Association Conference on Monopolization Remedies (June 4, 2008), available at https://www.justice.gov/atr/file/519591/dl ...............................................4, 5, 11, 15

## INTEREST OF *AMICI CURIAE*

Amici curiae are former government officials with extensive experience enforcing federal antitrust laws on behalf of the United States Department of Justice ("DOJ") and/or Federal Trade Commission ("FTC"). Amici include the former head of the FTC, former DOJ Deputy Assistant Attorneys General in charge of civil antitrust enforcement, former FTC Chief Economist, former head of the FTC's Bureau of Competition, and other former senior officials who, combined, have hundreds of years of experience enforcing or otherwise applying federal antitrust laws. Amici are among the most well-respected thought leaders in antitrust; they have testified as experts in Congress; taught at Columbia, Cornell, Duke, Harvard, Johns Hopkins, George Mason, Georgetown, and Vanderbilt; and published dozens of articles on various antitrust topics.

As former enforcement officials and as antitrust practitioners, academics, and economists, amici have a strong interest in the consistent enforcement and predictable construction of the Sherman Act and other core antitrust statutes to promote competition and innovation throughout the U.S. economy. Amici submit this brief in their individual capacities. Information concerning each of the amici is set forth in an Addendum to this brief.[1]

---

[1] No party, or counsel for a party, authored the brief in whole or in part. No one other than amici and their counsel contributed money to fund this brief. Jones Day represents Google in other matters unconnected to this brief. Some of the amici are affiliated with firms that represent Google in other matters unconnected to this brief.

## SUMMARY OF ARGUMENT

The injunction entered by the court below includes two compulsory sharing obligations. (Dkt. 1017.) The first requires Google, for a period of three years, to create functionality that permits competitors to offer the Google Play Store catalog of apps through their own stores—i.e., catalog sharing requirements. The second requires Google, also for a period of three years, to offer downloads of competing app stores through its Play Store—i.e., compulsory third-party app store distribution. The injunction specifies the terms of Google's compulsory dealing obligations, including price, instructing that Google may charge only a "reasonable fee … based on Google's actual costs" for its app store distribution services related to security and privacy checks. (*Id.*)

Courts and antitrust enforcers have long recognized the dangers and administrability problems raised by forced sharing obligations. As the Supreme Court explained in *Verizon Communications v. Trinko*, forced sharing risks "lessen[ing] the incentive for the monopolist, the rival, or both to invest in . . . economically beneficial facilities"; "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing"; and risks "facilitat[ing] the supreme evil of antitrust: collusion." 540 U.S. 398, 407–08 (2004); *accord Pacific Bell Telephone Co. v.*

---

Two amici are affiliated with universities that have in the past received funding from Google unconnected to this brief.

2

*linkLine Communications, Inc.*, 555 U.S. 438, 452 (2009). While *Trinko* arose within the context of a liability determination, the underlying logic of the Court's decision was based on concerns about the types of remedies an antitrust duty to deal would entail. Thus, not only are these concerns directly relevant at the remedies stage, but they should serve as the guiding principles when considering the appropriateness of injunctive relief that would impose duties to deal. Among other things, forced sharing remedies require a district court to regulate the prices, terms, and other conditions of services to be provided, possibly for an extended period of time, during which costs, demand, available technology, and other relevant economic considerations may shift substantially.

As the Supreme Court made clear in a subsequent decision, "[s]imilar considerations [as those expressed in *Trinko*] apply when it comes to the remedy." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102 (2021). Relying on *Trinko*, the Court instructed that:

> Judges must be sensitive to the possibility that the "continuing supervision of a highly detailed decree" could wind up impairing rather than enhancing competition. Costs associated with ensuring compliance with judicial decrees may exceed efficiencies gained; the decrees themselves may unintentionally suppress procompetitive innovation and even facilitate collusion. Judges must be wary, too, of the temptation to specify "the proper price, quantity, and other terms of dealing"—cognizant that they are neither economic nor industry experts.

*Id.* at 102 (citing *Trinko*, 540 U.S. at 415); *see also Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1026 (7th Cir. 2017) (rejecting a compulsory sharing injunction as

"inconsistent with *Trinko*, which cautioned that an order to continue to do business with a firm is proper only if the case fits 'within the limited exception recognized in *Aspen Skiing* [*Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, . . . (1985)]'" (quoting *Trinko*, 540 U.S. at 409)).[2]

Another central tenet of antitrust law is that "[a] court . . . must base its relief on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc) (vacating the remedies decree in its entirety) (internal citation omitted). Accordingly, the "[m]ere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." *Id.* at 106; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (adopting *Microsoft*'s "causal connection" requirement). *Microsoft* reflects the general principle governing equitable relief that "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). As the then-head of the DOJ Antitrust Division Thomas Barnett explained, a finding of antitrust liability "does not open the door to wholesale restructuring of a market." Thomas O.

---

[2] As the Court in *Trinko* explained, the critical facts supporting liability in *Aspen Skiing* were the "defendant's decision to cease participation in a cooperative venture" and "refuse to provide to its competitor . . . a product that it already sold at retail" (i.e., discriminatory dealing). 540 U.S. at 409 ("*Aspen Skiing* is at or near the outer boundary of §2 liability.").

4

Barnett, "Section 2 Remedies: What to Do After Catching the Tiger by the Tail," Presentation at the American Bar Association Conference on Monopolization Remedies (June 4, 2008), available at https://www.justice.gov/atr/file/519591/dl. "Instead, the remedy needs to be tied closely to the anticompetitive conduct occasioning it." *Id.*

Because remedies must be tailored, not every Section 2 violation justifies an injunction "designed to eliminate the monopoly altogether." *Microsoft*, 253 F.3d at 106. After all, it is settled law that the Sherman Act does not punish the "mere possession of monopoly power," and that an "offense requires . . . the willful acquisition or maintenance of [monopoly] power distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Trinko*, 540 U.S. at 407. Thus, as *Microsoft* instructs, an injunction that is "'designed to eliminate the monopoly altogether . . . require[s] a clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power.' Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'" 253 F.3d at 106 (internal citations omitted) (alterations in original).

These two principles—*Trinko's* concerns about forced sharing remedies and the "causal connection" requirement—properly govern the determination of the appropriateness of the remedies imposed in this case, and counsel toward caution before any forced sharing or price regulation remedy is adopted.

## ARGUMENT

## I.  IN CRAFTING ANTITRUST REMEDIES, THE COURT SHOULD TAKE INTO CONSIDERATION *TRINKO*'S CONCERNS WITH COMPULSORY SHARING

**A.**  The Supreme Court in *Trinko* cautioned against judicially imposed compulsory sharing obligations, explaining that the Court has "been very cautious in recognizing … exceptions [to the general rule that there is no antitrust duty to deal], because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."  540 U.S. at 408.  The Court provided three main reasons for its caution.

*First*, "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."  *Id.* at 407–08.  The creation and introduction of new products and services typically requires upfront investments and, particularly in technology markets, may require significant engineering and research and development costs in order to create products and other innovations that benefit consumers.  Forcing firms to share in the fruits of their labor risks harming incentives to engage in the type of "risk taking that produces innovation and economic growth."  *Id.* at 407.

As D.C. Circuit Judge Douglas H. Ginsburg and co-authors have explained:

> Though some individuals and firms may invest resources in innovation projects for philanthropic reasons, there is a wide consensus in economics that profits are the key driver of innovation.  Firms and investors are generally willing to incur the large costs needed to obtain meaningful

6

innovations only because they expect to obtain a significant return on those investments. Investors in innovation may expect to open new markets and thus appropriate part of the value generated for consumers. They may try to reduce their costs or improve their offerings in order to obtain a competitive advantage vis-à-vis their rivals, increasing both their market share and their profits. Innovation is also used to mitigate the rigors of head-to-head competition; but unlike other ways of softening competition, such as collusion, innovation enhances social welfare. It allows society to produce the same quantity of goods at lower costs and increases the gains from trade by bringing new products and services to meet the needs of consumers.

Jorge Padilla, Douglas H. Ginsburg, & Koren W. Wong-Ervin, *Antitrust Analysis Involving Intellectual Property Rights and Standards: Implications from the Economics*, 33 HARV. J. LAW & TECHN. No. 1, 2-22 (Fall 2019) (internal citations omitted) (explaining the economics of innovation and compulsory sharing obligations).

A compulsory sharing obligation "has two main and opposing effects on welfare." *Id.* at 12. On one hand, it "reduces the incentives to innovate both in the first place and in creating competing alternative technologies. Indeed, those who advocate forced sharing often underestimate the abilities of rivals to create workarounds or other competing products." *Id.* "Working in the other direction, compulsory [sharing] may increase [static] competition in the short term." *Id.* at 3. While consumers gain from increases in static efficiency, "economics teaches us that the gains from dynamic efficiency, including innovation . . . are an even greater driver of consumer welfare." *Id.* at 3. Indeed, Robert Solow won the Nobel Prize in economics for demonstrating that gains in wealth are due primarily to innovation—not to marginal improvements in the efficiency of what already exists. *See* Press Release,

Nobel Prize, The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred
Nobel (Oct. 21, 1987), https://perma.cc/Z2B4-HR67.

  The lower court's compulsory sharing remedies require Google to not only share
in the fruits of its labor but also impose duties to create new functionality to facilitate
that sharing.  The injunction requires Google to provide products and services (e.g.,
catalog sharing) that are "not otherwise marketed or available to the public" and
requires the creation of "'something brand new'" (e.g., essentially a wholesale market
for Google's Play catalog of apps).  *Trinko*, 540 U.S. at 410 (citation omitted).  The
Court in *Trinko* limited its prior precedent (in *Aspen Skiing*) that allowed for antitrust
liability for a refusal to deal by distinguishing between a refusal "to provide . . . a product
that it already sold at retail" and withholding services that "are not otherwise marketed
or available to the public," pointing to the "considerable expense and effort" that would
be required from having to "design[] and implement[]" "[n]ew systems . . . simply to
make that access possible." *Id.*  And, as Justice Breyer explained, "as one moves beyond
the sharing of readily separable and administrable physical facilities . . . these problems
can become more severe.  One would not ordinarily believe it practical, for example, to
require a railroad to share its locomotives, fuel, or work force." *AT & T Corp. v. Iowa
Utilities Bd.,* 525 U.S. 366, 429 (1999) (Breyer, J., concurring in part and dissenting in
part) (explaining the dangers of forced sharing, including the risk that firms will not
"undertake the investment necessary to produce complex technological innovations

8

knowing that any competitive advantage deriving from those innovations will be dissipated by the sharing requirement.").

In determining the appropriateness of the lower court's compulsory sharing remedies, these considerations should be carefully weighed. In considering the harm to incentives to innovate, it is important to consider not only the incentives of Google and its rivals, but those of industry more broadly given the chilling effect court orders can have on the marketplace as a whole.

*Second*, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Trinko*, 540 U.S. at 408; *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004) (relying on "concern[s] about the administrability of a judicial remedy" to reject a refusal to deal claim). Given that forced sharing alone (without specific terms of dealing) does not necessarily make a market more competitive, it would require courts to act as central planners setting prices and other terms. *See, e.g.*, *Novell v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) ("Administrability considerations are also at play here. If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions.").

Recognizing this fact, the lower court's injunction sets the terms of its compulsory dealing obligation, although without specificity, which risks embroiling the court in setting the specific terms going forward. (Dkt. 1017) The injunction also regulates the price Google may charge for its security and privacy-related services,

9

limiting the costs for third parties to a "reasonable fee . . . based on Google's actual costs." (*Id.*) That the court's remedy sets the price and other terms of dealing and requires ongoing monitoring should be taken into consideration when determining the appropriateness of the relief.

And *third*, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 408. "If the law were to make a habit of forcing monopolists to help competitors by keeping prices high, sharing their property, or declining to expand their own operations, courts would paradoxically risk encouraging collusion between rivals." *Novell*, 731 F.3d at 1073.

Federal antitrust enforcers have long recognized these concerns. Indeed, in *Trinko* itself, the United States filed an amicus brief explaining that imposing forced sharing through antitrust law "would rarely enhance consumer welfare and would threaten to impair the competition the antitrust laws are designed to promote." Brief for the United States and FTC as Amici Curiae Supporting Petitioner, *Verizon Communications v. Trinko*, Dkt. No. 02-682, at 7 (U.S.).[3] Similarly, the Court in *Trinko*

---

[3] Similarly, in the United States's 2007 submission to the Organisation for Economic Co-operation and Development's (OECD) roundtable on Refusals to Deal, the United States emphasized that "[r]ules mandating forced sharing on otherwise undesirable terms lowers the anticipated return from valuable assets, thereby decreasing the incentive of firms to make investments designed to create new valuable assets." Roundtable on Refusals to Deal – Note by the United States, at 6 (OECD Oct. 12, 2007); *see also* Deputy Assistant Attorney General Barry Nigro, Remarks at The Capitol Forum (Dec. 13, 2017) ("[F]orced sharing . . . is an inherently regulatory approach," which is a "reason to be skeptical of forced sharing" through antitrust law.).

noted the "uncertain virtue of forced sharing." 540 U.S. at 408.  This recognition is in line with modern economic learnings.  As discussed above, while compulsory sharing obligations may in certain circumstances result in static benefits, the tradeoff is the risk of sacrificing dynamic efficiencies, including societal gains from innovation.

**B.**      The DOJ and FTC have argued that *Trinko* is essentially irrelevant at the remedies stage.  (Amicus Br. in Support of Stay, Dkt. 24.1 at 6 ("But *Trinko* addresses antitrust liability, not remedies.").)  Such a suggestion fundamentally misunderstands *Trinko*.  As the then-head of the DOJ Antitrust Division Thomas Barnett explained, "the difficulty of providing an appropriate antitrust remedy was central to the *Trinko* Court's" holding.  Barnett, *supra* 4–5.

The DOJ-FTC brief also flouts recent caselaw.  Most notably, in *Alston*, the Supreme Court expressly and extensively relied on *Trinko's* concerns when explaining how courts should craft remedies.  594 U.S. at 102 ("[j]udges must be sensitive to the possibility that the 'continuing supervision of a highly detailed decree' could wind up impairing rather than enhancing competition," that "the decrees themselves may unintentionally suppress procompetitive innovation and even facilitate collusion," that "they are neither economic nor industry experts," and that there are "practical limits of judicial administration" (quoting *Trinko*, 540 U.S. at 415)).

Similarly, the Seventh Circuit has acknowledged the importance of *Trinko* at the remedial stage, rejecting an injunction because it went "well beyond the scope of the [antitrust] violation, and in so doing fail[ed] to adhere to the lessons of" *Trinko*.

11

*Authenticom*, 874 F.3d at 1021. In *Authenticom*, the district court had "ordered the defendants to enter into an entirely new arrangement with [the plaintiff] . . . , essentially forcing them to do business with [the plaintiff] on terms to which they did not agree." *Id.* at 1026. That order, the Seventh Circuit held, was "inconsistent with *Trinko*." *Id.* at 1026.

The DOJ-FTC brief further contends that "courts often impose affirmative duties to deal as remedies for antitrust violations." (Dkt. 24.1 at 6-7 (citing *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52 (1973); *Ford Motor Co. v. United States*, 405 U.S. 562 (1972).) But the cited support for this position is pre-*Trinko* case law decided during the period of overly aggressive enforcement approaches (1937–1973), which was characterized by *per se* rules. "At the point of 'peak per se' in 1972, the Supreme Court openly mocked the use of economic analysis." Abbott B. Lipsky, Jr., "Ohio v. American Express: *The Supreme Court Still Passes the Test*," at 3, CPI Antitrust Chronicle (June 2019) (citing *United States v. Topco Assocs.*, 405 U.S. 596, 609 n.10 (1972)); *see also* Douglas H. Ginsburg, *Originalism and Economic Analysis: Two Case Studies of Consistency and Coherence in Supreme Court Decision Making*, 33 Harv. J.L. & Pub. Pol'y 217 (2010). Since then, the Supreme Court has issued a number of landmark decisions—including *Trinko*—aimed at bringing antitrust law in line with modern economic learnings, including the Nobel Prize winning economic work discussed above about the welfare benefits to society that come from innovation.

*Glaxo* also involved entirely different facts and claims than those at issue in this case. *Glaxo* addressed *per se* illegal violations of Sherman Act Section 1 based on allegations of collusive conduct to pool patents and license them in an anticompetitive manner by imposing restrictions on licensor-distributors that prevented them from reselling the drug in bulk form to any independent third-party without the licensor's express consent. 410 U.S. at 54–55. But *Trinko* itself rejected an argument that cases "involv[ing] concerted action" support antitrust duties to deal, explaining that "concerted action . . . presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces: simply requiring that the outsider be granted nondiscriminatory admission to the club." 540 U.S. at 410 n.3.

Finally, the DOJ-FTC brief relies on this Court's decision in *Optronic Technologies, Inc. v. Ningbo Sunny Electronics Co., Ltd.*, 20 F.4th 466 (9th Cir. 2021). But *Optronic* involved a requirement to supply on non-discriminatory terms. *Id.* at 486. As this Court explained in *Metronet Services Corp. v. Qwest Corp.*:

> If the defendant already sells the product in an existing market to certain customers but merely refuses to sell to its competitors, the court can impose a judicial remedy that does not require the court to "assume the day-to-day controls characteristic of a regulatory agency." The court can simply order the defendant to deal with its competitors on the same terms that it already deals with others in the existing retail market, without setting the terms of dealing. In contrast, if the defendant does not already provide the product in an existing market or otherwise make it available to the public, the court will have to delineate the defendant's sharing obligations, and "[a]n antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations."

383 F.3d 1124, 1133 (9th Cir. 2004) (internal citations omitted). *Metronet* provides the necessary context for understanding the remedy upheld in *Optronic*.

In short, the dangers of compulsory sharing obligations articulated by the Court in *Trinko* should be accounted for before affirming a forced-sharing remedy.

## II. INJUNCTIVE RELIEF MUST BE TAILORED TO THE VIOLATION, WHICH IS PARTICULARLY CRITICAL HERE GIVEN THE RISKS OF COMPULSORY SHARING REMEDIES

The risk that well-intentioned judicial interventions will actually harm competition make it all the more critical that courts fashioning antitrust remedies hew to traditional limits on injunctions.

Most importantly, "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged." *Lamb-Weston*, 941 F.2d at 974. Across remedial contexts, "the nature of the violation determines the scope of the remedy." *Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*, 144 S. Ct. 1588, 1594 (2024) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971)).

While this does not mean that courts are necessarily limited to enjoining the anticompetitive conduct at issue, it does mean that injunctive relief cannot go beyond what is required to remedy the specific harm caused by that conduct and prevent its recurrence. *See, e.g., In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 533 (4th Cir. 2003) ("relief under the anti-trust laws 'must flow from *that conduct* which is proscribed by the antitrust laws'"); *M.S. v. Brown*, 902 F.3d 1076, 1089 (9th Cir. 2018) ("The scope of an equitable remedy must be 'tailor[ed] . . . to fit the nature and extent of the . . .

14

violation.”); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (“[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.”). For this reason, a finding of antitrust liability “does not open the door to wholesale restructuring of a market.” Barnett, *supra* 4–5. “Instead, the remedy needs to be tied closely to the anticompetitive conduct occasioning it.” *Id.*

Particularly relevant here, courts should not adopt remedies designed to dismantle a monopoly unless the court has first determined that the monopoly would not exist but-for the defendant's anticompetitive conduct. As Barnett, then-head of the DOJ's Antitrust Division explained, “unless you have established that the tiger should never have existed in the first instance [or should not have remained in existence], you have not established a basis for shooting it.” *Id.* After all, “possession of monopoly power, and the concomitant charging of monopoly prices is not only not unlawful; it is an important element of the free-market system,” because “[t]he opportunity to charge monopoly prices—at least for a short period—is what attracts ‘business acumen’ in the first place.” *Trinko*, 540 U.S. at 407. Thus, not every monopoly is the result of anticompetitive conduct—a monopoly may instead be achieved through “a superior product, business acumen, or historic accident.” *Id.* (internal citation omitted). In monopoly maintenance cases, in particular, it will often be far from clear, even after liability has been established, that the defendant would lack monopoly power absent anticompetitive conduct.

15

The D.C. Circuit's en banc opinion in *United States v. Microsoft* is the leading case on this point. The court reviewed conclusions of law holding that Microsoft had violated both Sections 1 and 2 of the Sherman Act, as well as a remedial judgment breaking up Microsoft. In relevant part, the court vacated the remedial judgment and remanded for the district court to "devis[e] an appropriate remedy." *Microsoft,* 253 F.3d at 106. On remand, the D.C. Circuit instructed, the district court "should consider whether plaintiffs have established a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position." *Id.* Ultimately, the remedy could not be an injunction "designed to eliminate the monopoly altogether" without proof of "a significant causal connection between the conduct and creation or maintenance of the market power." *Id.* In the absence of such proof, the "unlawful behavior should be remedied by an injunction against continuation of that conduct." *Id.* Because the district court "did not adopt the position that Microsoft would have lost its position . . . but for its anticompetitive behavior," it had not established a basis for such a broader injunction—and had to reconsider the proper remedy on remand to ensure the remedy was "tailored to fit the wrong creating the occasion for the remedy." *Id.* at 107.

In addition, *Trinko*'s concerns that forced sharing remedies are often "beyond the practical ability of a judicial tribunal to control" because they will "ordinarily require continuing supervision of a highly detailed decree," 540 U.S. at 414–15, mirror general remedial caution about imposing "complex decrees which involve [courts] in extended disputes and place them in continuing supervisory roles over parties and institutions."

16

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 841–42 (1994) (Scalia J., concurring); *see also Lord & Taylor, LLC v. White Flint, LP*, 780 F.3d 211, 217–18 (4th Cir. 2015) (injunctions should be structured to avoid "requir[ing] judicial oversight of compliance with [conditions] that control every facet of [a defendant's] operations").

Indeed, courts should be particularly wary of adopting a quasi-regulatory role in the forced-sharing context, where missteps risk causing the very harms the remedy is supposed to be addressing. *See Winter v. NRDC*, 555 U.S. 7, 32 (2008) (emphasizing that "the propriety of any injunctive relief" requires "consideration of the public interest"); *Weinberger v. v. Romero-Barcelo*, 456 U.S. 305, 314, 320 (1982) (holding that "[t]he purpose and language of the statute limited the remedies available to the District Court" because equitable discretion must further "the statutory scheme and purpose"); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 544 (1987) (injunctive relief for statutory violation should be evaluated based on statute's "underlying substantive policy"). Thus, in the forced sharing context, it is especially important to adhere to this Court's admonition in *Optronic* that remedial "relief must be based on a 'clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" 20 F.4th at 486 (citing *Microsoft*, 253 F.3d at 105). This is all the more important when— as here—the compulsory sharing obligation involves products and services (e.g., catalog sharing) that are "not otherwise marketed or available to the public" and

requires the creation of "'something brand new'" (e.g., essentially a wholesale market for Google's Play catalog of apps). *Trinko*, 540 U.S. at 410.

## CONCLUSION

For the above reasons, this Court should make clear that *Trinko*'s concerns with compulsory sharing must be considered when crafting antitrust remedies, and should reiterate that antitrust remedies must have a clear "causal connection" to the underlying anticompetitive harm.

Dated: December 3, 2024                     Respectfully Submitted,

                                            /s/ *David C. Kiernan*


Kelly Holt Rodriguez                        David C. Kiernan
JONES DAY                                   JONES DAY
90 South Seventh Street, Suite 4950         555 California Street, 26th Floor
Minneapolis, MN 55402                       San Francisco, CA 94104
Telephone: (612) 217-8855                   Telephone: (415) 875-5745
                                            dkiernan@jonesday.com

                                            Koren W. Wong-Ervin
                                            JONES DAY
                                            51 Louisiana Avenue, NW
                                            Washington, DC 20001
                                            Telephone: (202) 879-3622


*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2024, an electronic copy of the foregoing Amicus Curiae Brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM-ECF system and was served electronically by the Notice of Docket Activity upon registered CM-ECF participants.

Dated: December 3, 2024                Respectfully Submitted,

                                       */s/ David C. Kiernan*

                                       *Counsel for Amici Curiae*
                                       *Former Antitrust Enforcers*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it uses a proportionally spaced typeface (Garamond) in 14-point. I also certify that the foregoing brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i), because it contains 4,576 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted using the word-count function on Microsoft Word software.

Dated: December 3, 2024                    Respectfully Submitted,

                                           /s/ *David C. Kiernan*

                                           *Counsel for Amici Curiae*
                                           *Former Antitrust Enforcers*

## ADDENDUM

**Terry Calvani** served as the Acting Chairman of the FTC.  He also served as an FTC Commissioner and a Member of the Board of Directors of the Irish Competition Authority.

**Ethan Glass** served as the Assistant Chief of the DOJ Antitrust Division's Litigation III Section.

**Ginger Zhe Jin** served as Chief Economist at the FTC.

**Abbott ("Tad") Lipsky, Jr.,** served as Deputy Assistant Attorney General for the DOJ Antitrust Division.  He also served as Acting Director and Head of the Bureau of Competition at the FTC.

**Bruce McDonald** served as Deputy Assistant Attorney General for the DOJ Antitrust Division.

**Jeremy Sandford** served as an Economic Advisor to Commissioner Christine S. Wilson and an economist in the FTC's Bureau of Competition.

**Joe Sims** served as Deputy Assistant Attorney General for the DOJ Antitrust Division.

**Mark Whitener** served as Deputy Director of the Bureau of Competition at the FTC.

**Nathan Wilson** served as Deputy Assistant Director of the Bureau of Economics at the FTC.

21