Nos. 24-6256, 24-6274

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE, LTD.,
GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,

*Defendants-Appellants.*

————————

On Appeal from the United States District
Court for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

————————

**BRIEF OF WASHINGTON LEGAL FOUNDATION
AS AMICUS CURIAE SUPPORTING
DEFENDANTS-APPELLANTS AND REVERSAL**

————————

Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
candrews@wlf.org

December 4, 2024

## RULE 26.1 DISCLOSURE STATEMENT

Washington Legal Foundation has no parent company, issues no stock, and no publicly held company owns a ten percent or greater interest in it.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT.....................................................i

TABLE OF AUTHORITIES..............................................................iv

INTEREST OF AMICUS CURIAE........................................................1

INTRODUCTION & SUMMARY OF ARGUMENT................................1

ARGUMENT .............................................................................................5

I.    The District Court's Injunction Imposes A Duty To Deal That
      Exceeds The Bounds Of Antitrust Law ...........................................5

II.   Antitrust Policy Weighs Against The District Court's Novel,
      Sweeping Injunction.........................................................................10

CONCLUSION .........................................................................................17

CERTIFICATE OF COMPLIANCE.........................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) ............................................................ 2, 3, 4, 7, 13

*Brunswick Corp. v. Riegel Textile Corp.,*
  752 F.2d 261 (7th Cir. 1984) ................................................... 7

*Copperweld Corp. v. Indep. Tube Corp.,*
  467 U.S. 752 (1984) ............................................................ 16

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) ............................................... 1, 13

*FTC v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ............................................. 2, 6, 10

*Image Tech Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997) ................................................ 9

*Nat'l Collegiate Athletic Ass'n v. Alston,*
  594 U.S. 69 (2021) ............................................................ 4, 6

*New York v. Meta Platforms, Inc.,*
  66 F.4th 288 (D.C. Cir. 2023) ............................................... 1

*Novell, Inc. v. Microsoft Corp.,*
  731 F.3d 1064 (10th Cir. 2013) ............................................. 5, 9

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
  20 F.4th 466 (9th Cir. 2021) ................................................. 8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
  555 U.S. 438 (2009) ............................................................ 5

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2001) ............................................... 8, 15

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) ........................................... 2, 3, 4, 7, 8, 10, 11, 17

iii

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Other Sources:**

Phillip E. Areeda & Herbert Hovenkamp,
  *Antitrust Law* (1996) ...................................................................6, 8

Dennis W. Carlton, *A General Analysis of Exclusionary Conduct
  and Refusal to Deal—Why Aspen and Kodak are Misguided,*
  68 Antitrust L. J. 659 (2001)...........................................................7, 16

Frank H. Easterbrook, *Does Antitrust Have a Comparative
  Advantage?*, 23 7 Harv. J.L. & Pub. Pol'y 5 (1999)..............................11

Frank H. Easterbrook, *When is it Worthwhile to Use Courts to
  Search for Exclusionary Conduct?*, 2003 Colum. Bus. L. Rev.
  345 (2003) ........................................................................................5

Satta Sarmah Hightower, *How Startups Can Grow Faster With
  The Cloud*, Forbes (Sept. 29, 2021),
  https://perma.cc/59YK-PNEC............................................................12

Herbert Hovenkamp, *Antitrust and the Movement of Technology*,
  19 Geo. Mason L. Rev. 1119 (2012)...................................................15

Anna Hrushka, *EWS readies Paze to help banks take on digital
  wallet market*, Industry Dive (Apr. 3, 2023),
  https://perma.cc/7MAX-RGDN..........................................................13

Geoffrey A. Manne & Joshua D. Wright, *Google and the Limits
  of Antitrust: The Case Against the Case Against Google*,
  34 Harv. J.L. & Pub. Pol'y 171 (2011).................................................14

David McGowan, *Between Logic and Experience: Error Costs
  and* United States v. Microsoft Corp., 20 Berkeley Tech
  L.J. 1185 (2005) ...............................................................................11

Richard A. Posner, *Antitrust in the New Economy*, 68 Antitrust
  L.J. 925 (2001) ......................................................................11, 13, 15

Abdo Riani, *3 Big Factors That Influence The Quality And Cost
  Of Your Startup App*, Forbes (Feb. 6, 2020),
  https://perma.cc/6QD7-DLE2............................................................12

iv

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, 68 U. Chi. L. Rev. 1 (2001)................................9

U.S. Bureau of Economic Analysis, *How Big Is the Digital Economy?* (Dec. 6, 2023), https://perma.cc/PY93-E4PN ......................11

Angelos Vlazakis & Angeliki Varela, *Amazon's Antitrust Fair Play, A Transatlantic Evaluation*, 41 N. Ill. U. L. Rev. 64 (2020) ......14

Joshua D. Wright & Murat C. Mungan, *The Easterbrook Theorem: An Application to Digital Markets*, 130 Yale L.J. Forum 622 (2021) ................................................................14

## INTEREST OF AMICUS CURIAE[1]

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It often appears as an amicus curiae in important antitrust cases *See, e.g., Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023); *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023).

The central aim of antitrust law is to ensure free-market competition, thus providing consumers with better goods and services at lower prices. The District Court's verdict and far-reaching injunction undermine those venerable goals. If upheld on appeal, the decision below would erode the procompetitive aims of antitrust law and transform the courts into central planners for cutting-edge digital technology—a market for which they are least equipped to perform that role.

## INTRODUCTION & SUMMARY OF ARGUMENT

Antitrust law broadly honors a company's right to refuse to cooperate with its competitors. If anything, cooperation among competitors often

---

[1] No party's counsel authored any part of this brief. No one, apart from WLF and its counsel, contributed money intended to fund the brief's preparation or submission. All parties consented to WLF's filing this brief.

1

suggests collusion—the "supreme evil of antitrust." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). In our free-market system, a business—even an alleged monopolist—may choose with whom it transacts. Exceptions are rare.

True, antitrust law may prevent a monopolist from ending a preexisting and profitable relationship with a competitor when that decision makes sense *only* as a scheme to harm competition itself. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 607–09 (1985). But even that exception stands on shaky ground. In *Trinko*, the Supreme Court narrowly cabined *Aspen Skiing* as a "limited exception" that lies "at or near the outer boundary" of antitrust liability and that must be applied with "cautio[n]." 540 U.S. at 408–09. This Court has adhered to *Trinko* by rightly refusing to expand *Aspen Skiing* beyond its rarefied facts. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 994 (9th Cir. 2020) (emphasizing that "the *Aspen Skiing* exception should be applied only in rare circumstances").

Failing to heed those warnings, the District Court's sweeping injunction here goes far beyond what antitrust law allows. Among other things, it requires Google to build new features to aid its rivals. The District Court's "catalog sharing" requirement would allow competitors to

offer Google Play's entire catalog of apps through their own stores. Likewise, the District Court's "third-party app store distribution" requirement would force Google to offer downloads from competing app stores through Google Play. And while the District Court's injunction authorizes Google to perform some security and content screening for third-party stores it is forced to host, Google bears the added burden of proving that its screening processes are "strictly necessary and narrowly tailored."

But the Supreme Court has never endorsed a remedial duty to deal where there is no prior course of dealing—a critical element of the *Aspen Skiing* exception that cannot be ignored. Without a prior course of dealing, there can be no evidence that a particular course would be profitable, no reason to infer that the monopolist's otherwise lawful refusal was unjustified, and no prior terms to guide the court in determining what terms to impose on competitors. Not only would courts become "central planners"—something antitrust law seeks to avoid, *see Trinko*, 540 U.S. at 408—but worse, as here, they would be centrally planning on a blank slate.

The District Court justified its sweeping injunction by dismissing *Trinko* as relevant only at the liability phase. But the Supreme Court has

3

insisted that "similar considerations apply to the remedy." *See Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102 (2021). If a novel duty to deal cannot justify antitrust liability, then neither may it be deployed as an antitrust remedy. Nor should the District Court "'impose a duty . . . that it cannot explain or adequately and reasonably supervise.'" *Trinko*, 540 U.S. at 415.

At all events, the fast-moving and ever-changing digital apps market is especially unsuited for imposing novel duties to deal, further undermining the District Court's expansion of *Aspen Skiing* at the remedy stage. Forcing Google to deal with its rivals in this fast-changing and highly competitive industry threatens to harm competition and consumers alike. The antitrust laws do "not give judges carte blanche to insist that a monopolist alter its way of doing business" even when "some other approach might yield greater competition." *Trinko*, 540 U.S. at 415–16.

Affirming the District Court here would also discourage growth and investment while creating a powerful incentive to free ride on others' successes. And it would inject the judiciary into the role of central planner by crafting the terms on which competitors must deal with one another. Yet by the time the courts arrive at their preferred terms, fast-paced firms in the digital economy will already have morphed, rendering the intrusion

obsolete, wrongheaded, or worse. The Court should reject such unprecedented market intrusion by reversing the District Court's judgment and injunction.

## ARGUMENT

### I. The District Court's Injunction Imposes A Duty To Deal That Exceeds The Bounds Of Antitrust Law.

Businesses as a rule are "free to choose the parties with whom they will deal." *Pac. Bell Tel. Co. v. linkLine Commnc'ns, Inc.*, 555 U.S. 438, 448 (2009). It is always "better" to "err on the side of firm independence—given its demonstrated value to the competitive process and consumer welfare—than on the other side where we face the risk of inducing collusion and inviting judicial central planning." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.).

In our free-enterprise system, even an alleged monopolist may choose with whom it will transact. "The Sherman Act *discourages* cooperation among rivals and does not compel it, *even if* this means that a new entrant must build a new plant"—or digital apps store—"from scratch." Frank H. Easterbrook, *When is it Worthwhile to Use Courts to Search for Exclusionary Conduct?*, 2003 Colum. Bus. L. Rev. 345, 356 (2003) (second emphasis added).

5

Even so, the District Court entered a sweeping remedial order that imposes on Google extensive and unwarranted duties to deal. That injunction (1) requires Google to aid its competitors, (2) regulates the price of Google services, and (3) micromanages competition in the digital apps market—all at the behest of a single competitor. 1-ER-3-6. Nothing in antitrust law justifies this unprecedented intrusion into the free market.

Not only does the injunction require Google to create services that have never existed before, but Google must provide those services to anyone who is—or who wants to become—its competitor. For three years, Google must distribute third-party app stores through Google Play and allow any Android app store to offer Google Play's full catalog of apps to *that* store's users.

Bound by settled law, the District Court granted Google summary judgment as to liability for refusing to deal with Epic. But "similar considerations" should have guided the District Court at the remedies phase. *See Alston*, 594 U.S. at 102. Just as a prior course of dealing is a prerequisite to refusal-to-deal liability, *Qualcomm Inc.*, 969 F.3d at 993, the lack of any prior course of dealing between Google and Epic here is fatal to the injunction. Not even *Apsen Skiing* went that far. *See* 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 772e (1996) ("The

6

[*Aspen Skiing*] Court did not impose a prospective duty to deal where no such dealing had occurred previously, and there is no reason for thinking it would have done so.").

Put differently, "[t]he nature of the remedy sought in an antitrust case is often . . . an important clue to the soundness of the antitrust claim." *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984). Often "the only outcome to expect from court intervention" in a refusal-to-deal case "is inefficiency." Dennis W. Carlton, *A General Analysis of Exclusionary Conduct and Refusal to Deal—Why* Aspen *and* Kodak *are Misguided*, 68 Antitrust L. J. 659, 662 (2001). Indeed, the difficulty of providing an appropriate antitrust remedy was central to *Trinko*'s finding that no antitrust liability existed: "The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." *Trinko*, 540 U.S. at 415 (cleaned up). That is this case.

Yet having granted Google summary judgment as to liability on any duty to deal, the District Court entered an injunction that ignores the key purpose of *Trinko*'s prior-course-of-dealing requirement: to establish that the company had decided to embark on a specific course of dealing, and thus that halting that "presumably profitable" arrangement could reveal

7

a willingness to sacrifice short-term profits for anticompetitive ends. *Trinko*, 540 U.S. at 409. The record here contains none of that.

Nor is that all. An antitrust injunction eliminating a competitive advantage requires a finding of a "significant causal connection" between the relief ordered and any violation found. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021); Areeda & Hovenkamp, § 653(b) (antitrust courts require some clear "indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended"). Yet neither the jury nor the District Court found any facts showing a causal connection between the District Court's far-reaching duty-to-deal remedies and Google's alleged anticompetitive conduct.

On the contrary, the District Court's own jury instructions precluded any causal connection between Google's refusal to deal and Epic's antitrust harm. *See* 6-ER-1437 ("It is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way."). Given this lack of causation, the Court should "vacate the remedy." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001).

8

The District Court's injunction also imposes unlawful conditions by requiring Google to charge only a "reasonable fee" based on "actual costs" for its app-store distribution services. But this Court has roundly rejected antitrust remedies that "force[] sales at reasonable prices." *Image Tech Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997). If anything, Google "is entitled to monopoly prices on its patented and copyrighted parts." *Id.* By obliterating that distinction, the District Court's injunction "reduc[es] the incentives both sides have to innovate, invest, and expand." *Novell*, 731 F.3d at 1073.

The FTC, as amicus curiae, tried to justify this massive intrusion by emphasizing Google's "network effects," contending that they create high barriers to entry. But despite any network effects, the digital apps industry is more rapidly evolving than ever, making a three-year-long intervention unwise. *See* Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, 68 U. Chi. L. Rev. 1, 38 (2001) ("The [network effects] issue is particularly complex because, in network industries characterized by rapid innovation, both forces may be operating and can be difficult to isolate.").

Besides, the focus on network effects ignores that smaller networks can be attractive *precisely because* they are smaller and more exclusive—

9

or have different demographics. For example, Snapchat and then later TikTok both started by focusing on younger users and quickly expanded to become major competitors to Facebook, despite any advantages of "network effects." What has proven to be far more important is disruptive innovation.

If, as the District Court instructed the jury, Google has no duty to aid its rivals, any remedy imposing that same duty on Google makes no sense. This Court should reverse.

## II. Antitrust Policy Weighs Against The District Court's Novel, Sweeping Injunction.

The District Court's sweeping injunction raises serious concerns about antitrust policy in the fast-moving digital apps ecosystem. In this highly competitive space, firms are constantly innovating. Imposing new duties to deal with competitors here not only threatens innovation but will ultimately harm consumers. That is because the danger of antitrust error poses acute risks in high-tech industries. *Trinko*, 540 U.S. at 408, 414 (concerns about antitrust error are at their apex in "highly technical" and "constantly changing" industries); *Qualcomm*, 969 F.3d at 990–91 (courts should be "especially" slow to intervene "in technology markets" where "innovation" "is essential to economic growth").

10

Antitrust enforcement is uniquely prone to anticompetitive results in the hands of judges. The judiciary is simply not equipped to distinguish between "optimal" and "sub-optimal" business behavior. *Trinko*, 540 U.S. at 414; Frank H. Easterbrook, *Does Antitrust Have a Comparative Advantage?*, 23 7 Harv. J.L. & Pub. Pol'y 5, 8 (1999). The cost of false positives is especially unforgiving in the digital apps market, where "a mistaken condemnation of competitive conduct is costlier than mistaken acquittals of anticompetitive conduct." David McGowan, *Between Logic and Experience: Error Costs and* United States v. Microsoft Corp., 20 Berkeley Tech L.J. 1185, 1189–90 (2005).

Those risks are at their pinnacle here. According to the Bureau of Economic Analysis, America's "digital economy" accounted for $2.6 trillion of GDP in 2022. See U.S. Bureau of Economic Analysis, *How Big Is the Digital Economy?* (Dec. 6, 2023), https://perma.cc/PY93-E4PN. That investment—which comprised ten percent of U.S. GDP—accounted for 8.9 million jobs and $1.3 trillion in compensation. *Id*. The hallmarks of this "new economy" are "modest capital requirements" and "quick and frequent entry and exit." Richard A. Posner, *Antitrust in the New Economy*, 68 Antitrust L.J. 925, 925–26 (2001). The facility for entry—the internet—is effectively free and accessible to all. Indeed, the required investment to

11

design and code a new app tends to be far lower than the cost of entry into other industries. *See, e.g.,* Abdo Riani, *3 Big Factors That Influence The Quality And Cost Of Your Startup App*, Forbes (Feb. 6, 2020), https://perma.cc/6QD7-DLE2.

In fact, companies no longer even need to invest in purchasing and maintaining servers to host and operate their apps. They can simply rely on cloud-computing platforms like Amazon Web Services, further reducing the initial investment. *See* Satta Sarmah Hightower, *How Startups Can Grow Faster With The Cloud*, Forbes (Sept. 29, 2021), https://perma.cc/ 59YK-PNEC. "[S]everal services and tools are emerging—including Build on AWS, a new feature within the AWS Activate Console—that streamline the process [of app development] and help bring big ideas to market quickly." *Id.* And a startup can compete not only by directly competing with an incumbent, but also by developing a new and disruptive alternative that transforms the playing field. The enterprising app developer can construct new and different experiences that users prefer, drawing users away from an incumbent.

The market for digital apps, like other products in the digital ecosystem, is thus highly disruptive, with constant innovation and competition bringing rapid changes. For example, Google has long faced

competition from Apple. *See Apple*, 67 F.4th at 973–81. Both Microsoft and Meta have recently launched their own online app stores. And a consortium of banks, including Bank of America and JPMorgan Chase, have launched their own digital wallet, called Paze, to compete with Apple Pay and Google Pay. *See* Anna Hrushka, *EWS readies Paze to help banks take on digital wallet market,* Industry Dive (Apr. 3, 2023), https://perma.cc/7MAX-RGDN. In this lucrative space, competition is vigorous, disruptive, and only a click away.

These disruptive features make the digital apps market fundamentally different from the static market in *Aspen Skiing*. The market there was for "downhill skiing services in Aspen, Colorado," and comprised four local ski resorts. 472 U.S. at 587–88. Building a fifth resort was not an option because the supply of "appropriate topographical conditions" was inherently limited and any new development would face environmental "regulatory obstacles." *Id.* at 588. An app developer, however, can metaphorically build a new mountain (and another, and another) at virtually no cost, with no regulatory obstacles.

Any injunction that imposes, even temporarily, a sweeping duty to deal on this wide-open and ever-changing competitive landscape warrants considerable scrutiny. *See* Posner, *supra*, at 936, 943 (explaining that

13

"cases in the new economy present unusually difficult questions" due to "the technical complexity of the products and services produced by new-economy industries"). Antitrust intervention in "innovative companies in dynamic markets has always been a perilous proposition" despite "significant advances in economics and jurisprudence." Geoffrey A. Manne & Joshua D. Wright, *Google and the Limits of Antitrust: The Case Against the Case Against Google*, 34 Harv. J.L. & Pub. Pol'y 171, 173 (2011).

As this case highlights, it is especially difficult in the digital apps space to define the relevant market. Angelos Vlazakis & Angeliki Varela, *Amazon's Antitrust Fair Play, A Transatlantic Evaluation*, 41 N. Ill. U. L. Rev. 64, 71 (2020) ("[D]efining markets in the digital age is hardly an easy task."); Joshua D. Wright & Murat C. Mungan, *The Easterbrook Theorem: An Application to Digital Markets*, 130 Yale L.J. Forum 622, 646 (2021). The District Court's mistaken market definition here fails to adequately capture the many interconnected markets in which Google, Apple, and other app store owners operate. Above all, those markets are constantly in flux and subject to disruptive innovation at any time.

In such fast-changing environments, it is nearly impossible to know whether unilateral behavior is anticompetitive. For example, emerging companies often make a rational decision to forsake short-term profits

14

hoping to obtain far larger long-term gains. Apple, Amazon, Google, and Facebook are all prime examples. Firms often compete through innovation rather than by reducing the costs of production or lowering prices for consumers. That is why so many online apps and services are still offered for free. In short, "predicting and managing competitive processes in highly innovative industries" is much harder than in "markets where technology is very largely constant and most movements affect only the output and price set of unchanging products." Herbert Hovenkamp, *Antitrust and the Movement of Technology*, 19 Geo. Mason L. Rev. 1119, 1120 (2012).

The danger is especially high in a case for injunctive relief, as here, that a court will craft an antitrust remedy based on a world already in the rear-view mirror. That is because antitrust remedies in the fast-paced digital economy "may drag on for so long relative to the changing conditions of the industry as to become irrelevant, ineffectual." Posner, *supra*, at 939. Three years is like an eternity in the digital economy. *See Microsoft*, 253 F.3d at 49 ("[J]ust over six years have passed since Microsoft engaged in the first conduct plaintiffs allege to be anticompetitive. As the record in this case indicates, six years seems like an eternity in the computer industry.").

15

The problem with judicial "central planning" is not just deciding how long forced sharing will occur, but also determining what the terms of that sharing will be. Even if the District Court, aided by a "technical committee" (1-ER-5-6), could pinpoint the appropriate terms for a prospective remedy, future changes in technology would quickly render those terms obsolete.

The District Court should have been "wary of imposing an antitrust duty to deal where it might be imposing high costs by forcing firms to deal or by inventing price terms in a new setting." Carlton, 68 Antitrust L.J. at 677. Instead, the District Court's injunction invents new terms on a blank slate. Among other things, Google has never set a price for allowing its competitors to access its app platform to replicate its core functionality. The District Court's drastic intervention thus "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768–69 (1984). That is not a proper aim of antitrust law.

In short, if anyone takes up the difficult if not impossible task of remedying a magical exclusionary scheme that somehow harms consumers without raising prices or reducing quality, it should not be the judiciary. Even regulators recognize that the courts are ill-equipped to

16

"identify circumstances where it is economically efficient to require [an] incumbent to share its facilities under a system of price and access regulation." Brief of the United States and the FTC at 18, *Trinko* (No. 02-682). The judiciary should stick to the comparatively manageable task of remedying truly anticompetitive harms (lower outputs, higher prices, diminished quality, and the like) without crossing the line into central planning.

## CONCLUSION

This Court should reverse the District Court's judgment and accompanying injunction.

Respectfully submitted,

/s/ Cory L. Andrews
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
candrews@wlf.org

December 4, 2024

17

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,420 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses 14-point Century Schoolbook font.

<div style="margin-left:50%;">

/s/ Cory L. Andrews
CORY L. ANDREWS
*Counsel for Amicus Curiae*
*Washington Legal Foundation*

</div>

December 4, 2024