**Nos. 24-6256 & 24-6274**

# In the United States Court of Appeals for the Ninth Circuit

---

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

---

EPIC GAMES, INC.,
*Plaintiff-Appellee*

v.

GOOGLE LLC, ET AL.
*Defendants-Appellants*

---

*On Appeal from the*
*United States District Court for the Northern District of California*
*Nos. 21-md-02981 & 20-cv-05671 (Hon. James Donato)*

---

**BRIEF OF *AMICI CURIAE***
**GREGORY J. WERDEN & LUKE M. FROEB**
**IN SUPPORT OF APPELLANT**

---

AMY R. UPSHAW
CHRISTOPHER C. YOOK
JEFFREY S. SPIGEL

KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Suite 900
Washington, D.C. 20006
(202) 737-0500
aupshaw@kslaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ............................................................ ii

INTEREST OF *AMICI CURIAE* ...................................................... 1

STATEMENT ............................................................................ 1

SUMMARY OF ARGUMENT .......................................................... 4

ARGUMENT .............................................................................. 4

I.  Improper Instructions Undermine the Jury's Verdicts for the "Android In-App Payment Processing Market" ................................. 6

    A. The Jury Was Improperly Instructed on the Rule of Reason .............7

    B. The Jury Was Improperly Instructed on Tying ................................12

II. The Injunction Improperly Seeks to Eliminate a Lawful Monopoly ................................................................16

    A. Remedies in Monopoly Maintenance Cases Must Be Commensurate with the Harm to Competition Proved ....................17

    B. The *Ford Motor* and *Optronic Technologies* Decisions Do Not Support the Injunction .......................................... 20

CONCLUSION ........................................................................ 23

CERTIFICATE OF COMPLIANCE .............................................. 24

CERTIFICATE OF SERVICE....................................................... 25

i

# TABLE OF AUTHORITIES

Cases:                                                                  Page

*Bd. of Trade of the City of Chi. v. United States,*
    246 U.S. 231 (1918) ...............................................................7

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012)................................................12

*Chi. Pro. Sports Ltd. P'ship v. NBA,*
    961 F.2d 667 (7th Cir. 1992) .................................................14

*Chuman v. Wright,*
    76 F.3d 292 (9th Cir. 1996) .....................................................6

*Compañia General de Tabacos de Filipinas v.*
    *Collector of Internal Revenue,* 275 U.S. 87 (1927)............................ 5

*Cont'l T. V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977) .....................................................7, 11, 14

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023)..................................................8, 10, 15

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020)....................................................... 9

*Ford Motor Co. v. United States,*
    405 U.S. 562 (1972)..................................................................20–21

*Frost v. BNSF Ry. Co.,*
    914 F.3d 1189 (9th Cir. 2019)..................................................... 6

*Graves v. City of Coeur D'Alene,*
    339 F.3d 828 (9th Cir. 2003)....................................................... 5

*Hanagami v. Epic Games, Inc.,*
    85 F.4th 931 (9th Cir. 2023) ...................................................... 5

*Int'l Salt Co. v. United States,*
    332 U.S. 392 (1947)..................................................................16

Cases—Continued: Page

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ...............................................................12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)...........................................................14

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ........................................17

*Mozart Co. v. Mercedes-Benz of N. Am., Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ................................ 10–11, 14

*NCAA v. Alston*,
    594 U.S. 69 (2021) ......................................................15, 23

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978)...................................................16, 22

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .......................................... 7–8, 8–9

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021).......................................21–22

*O.S.C. Corp. v. Apple Comput., Inc.*,
    792 F.2d 1464 (9th Cir. 1986) ......................................14

*Pellegrino v. Epic Games, Inc.*,
    451 F. Supp. 3d 373 (E.D. Pa. 2020)................................ 5

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) .....................................14

*Town of Concord v. Boston Edison Co.*,
    915 F.2d 17 (1st Cir. 1990).............................................17

*United States v. Am. Express Co.*,
    88 F. Supp. 3d 143 (E.D.N.Y. 2015).................................. 8

iii

Cases—Continued:                                                                        Page

    *United States v. Dentsply Int'l, Inc.*,
       399 F.3d 181 (3d Cir. 2005) ............................................................. 17

    *United States v. Microsoft Corp.*,
       253 F.3d 34 (D.C. Cir. 2001) (*en banc*) .............. 17–18, 18–19, 21, 22

    *United States v. Microsoft Corp.*,
       231 F. Supp. 2d 144 (D.D.C. 2002) ................................................... 19

    *United States v. Microsoft Corp.*,
       97 F. Supp. 2d 59 (D.D.C. 2000) ....................................................... 18

    *United States v. Microsoft Corp.*,
       87 F. Supp. 2d 30 (D.D.C. 2000) ....................................................... 18

    *United States v. United Shoe Mach. Corp.*,
       391 U.S. 244 (1968) ........................................................................... 17

    *United States v. Warren*,
       984 F.2d 325 (9th Cir. 1993) .............................................................. 6

Miscellaneous:

Jacobides, Michael G., Carmelo Cennamo & Annabelle Gawer,
    *Towards a Theory of Ecosystems*,
    39 Strategic Mgmt. J. 2255 (2018) ..................................................... 11

Werden, Gregory J., *Cross-Market Balancing of Competitive Effects:*
    *What Is the Law, and What Should It Be*,
    43 J. Corp. L. 119 (2017) .................................................................... 8

## INTEREST OF *AMICI CURIAE*[1]

Gregory J. Werden has devoted his professional life to the application of antitrust law. From 1977 to 2019, he served in the Antitrust Division of the U.S. Department of Justice. His scholarly contributions have been cited in more than 20 antitrust decisions by U.S. federal courts.

Luke M. Froeb has devoted much of his professional life to the application of economics to antitrust. On leave from a position in the business school at Vanderbilt University, he did stints as chief economist at the Federal Trade Commission and at the Antitrust Division of the U.S. Department of Justice.

## STATEMENT

Google, LLC (Google) and Apple, Inc. (Apple) orchestrate the dominant mobile device ecosystems. These two ecosystems compete for users and app developers in a variety of ways, including through enhancements to the functionality and security of their Android and iOS platforms. Google and Apple—complemented by app developers, device manufacturers, and mobile carriers—enable communication, navigation, entertainment, and commerce using pocket-sized devices carried by the vast majority of Americans.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored any part of the brief, and no party, counsel, or any other person contributed funds for the preparation of the brief.

Epic Games, Inc. (Epic) is primarily a video game developer and is known for the game *Fortnite*, which is played on many platforms. Epic markets Fortnite on the "freemium" model: users download it without charge and many later make "in-app purchases." Epic also distributes games through the Epic Games Store.

Google and Apple finance platform enhancements, in part, by taking commissions when users pay app developers. Because many app developers adopted the freemium model, Google took steps to collect commissions on in-app purchases as well as on downloads.

Google developed Google Play Billing for processing in-app payments. And Google modified its Developer Distribution Agreement to require developers to use Google Play Billing. Nearly all of the revenue Google now garners from the Google Play Store comes from in-app purchases.

In response to complaints from app developers, Google and Apple lowered commissions generally and negotiated with some developers individually. Epic declined to negotiate and brought suit under the Sherman Act against both Google and Apple.

Epic objects to paying any platform costs, although it happily shares in the benefits. Epic's suit against Google alleged that many of its efforts to distribute apps and secure commissions violate antitrust law.

Epic alleged that Google violated the Sherman Act by paying makers and marketers of Android phones for placing the Google Play Store on mobile devices, and by including clauses in the Developer Distribution Agreement limiting the distribution of competing app stores and requiring the use of Google Play Billing. Although Android phone users can install apps without using the Google Play Store, Epic alleged that Google violated the Sherman Act by making the process (called "sideloading") unnecessarily complicated.

Although Epic did not seek damages, the case was tried to a jury. The jury found that Google violated Sections 1 and 2 of the Sherman Act in Android in-app billing services and Android app distribution. 1-ER-52–57. In subsequent remedy proceedings, the district court made no findings on what conduct was unlawful or on the market impact of unlawful conduct.

The injunction entered by the district court prohibits Google from: (1) requiring app developers to use Google Play Billing; (2) prohibiting app developers from steering users to other payment methods; (3) paying makers and marketers of mobile devices "to preinstall the Google Play Store on any specific location on an Android device." 1-ER-4. The injunction also requires Google to (4) redesign Android to accommodate alternative app stores and their distribution through the Google Play Store; and (5) hand over its catalog of apps to competing app stores. 1-ER-4–5.

3

## SUMMARY OF ARGUMENT

Epic is a free rider. It brought this suit to avoid paying Google for its work to enhance the Android platform and distribute apps to users.

I. The jury found that, in securing payments from app developers, Google unlawfully acquired a monopoly in "Android In-App Payment Processing." But this verdict must be set aside because the jury was improperly instructed on balancing under the rule of reason and on tying.

II. The jury also found that Google unlawfully maintained a monopoly in app distribution. But the consequent injunction is not supported by case law. It improperly seeks to deprive Google of revenue from app distribution without a finding that unlawful conduct materially contributed to the maintenance of its leading position.

## ARGUMENT

Google and Apple orchestrate the leading mobile device ecosystems and aggressively compete to attract users and app developers. They compete in part through enhancements to the functionality and security of the Android and iOS platforms. To help defray the cost of the enhancements, Google and Apple distribute apps only in exchange for commissions calculated as a share of the revenue the app developers get from users. Epic objects to paying any platform costs and even to paying for distribution. Epic feels entitled to use

the work of others without paying them. *Cf. Hanagami v. Epic Games, Inc.*, 85 F.4th 931 (9th Cir. 2023) (*Fortnite* dance moves); *Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373 (E.D. Pa. 2020) (same).

Epic's Sherman Act complaint described the commission Google collects for distributing apps as a "tax." The word is inaccurate because the commission compensates Google for a valuable distribution service, but the word is helpful nonetheless. Justice Holmes aptly observed that, "Taxes are what we pay for civilized society . . . ." *Compañia General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (dissenting opinion). And someone must pay if we are to have high-functioning mobile platforms. The revenue going to app developers is a logical source of funding.

A jury entrusted to decide how the Android ecosystem should be financed returned a verdict in favor of Epic. The district court's consequent injunction was designed to deprive Google of revenue garnered by distributing apps. This Court should "not lightly cast aside the solemnity of the jury's verdict." *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 844 (9th Cir. 2003). But the verdict here cannot stand because the jury instructions misstated the law and misled the jury.

## I. Improper Instructions Undermine the Jury's Verdicts for the "Android In-App Payment Processing Market"

The jury condemned Google's conduct relating to the "Android In-App Payment Processing Market" as an unreasonable trade restraint in violation of Section 1 of the Sherman Act and as monopolization in violation of Section 2 of the Sherman Act. 1-ER-52–56. The jury specifically found that Google unlawfully tied Google Play Billing to the Google Play Store. 1-ER-57. But the jury was improperly instructed on accounting for procompetitive effects under the rule of reason and on identifying unlawful tying.

"Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996). This Court reviews "de novo whether a jury instruction properly states the elements that must be proved at trial. An instruction is erroneous when, viewing the instructions as a whole, the substance of the applicable law was not fairly and correctly covered." *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1194 (9th Cir. 2019) (cleaned up). "Use of a model jury instruction does not preclude a finding of error." *United States v. Warren*, 984 F.2d 325, 327 n.3 (9th Cir. 1993).

## A. The Jury Was Improperly Instructed on the Rule of Reason

1. Under antitrust law's rule of reason, "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).

A circumstance central to this case is the competition between the Android ecosystem and iOS ecosystem, which benefits all users. No matter how relevant markets are defined, this competition cannot be ignored as a matter of economics or of law. But the jury was instructed to ignore it.

2. Rule-of-reason litigation entails burden shifting. In step one, the plaintiff must prove a "substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). In step two, the defendant must show a "procompetitive rationale for the restraint." *Id.* In step three, the plaintiff either must show that the "procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542. Or (in what sometimes is termed step

four), the plaintiff must show that anticompetitive effect predominates. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 994 (9th Cir. 2023).

"A restraint can be justified only on the ground that it promotes competition, but nothing in the logic or language of the Supreme Court's Sherman Act jurisprudence requires that the justification focus on the same competitive process as the plaintiff's prima facie case." Gregory J. Werden, *Cross-Market Balancing of Competitive Effects: What Is the Law, and What Should It Be*, 43 J. Corp. L. 119, 135 (2017). *See also id.* at 126–32 (reviewing case law), 132–40 (explaining burden-shifting with cross-market balancing).

The relevant market controls only step one of rule-of-reason litigation— the plaintiff's burden of proving an anticompetitive effect. This is illustrated by *American Express*, which involved two-sided credit card platforms. The district court held that competition on both sides mattered, but defined the relevant market as just the merchant side. *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 171–75 (E.D.N.Y. 2015). As a consequence, the government could discharge its step-one burden just by proving harm to competition on the merchant side of the platform. *Id.* at 168–69, 208–09.

The Supreme Court rendered the government's proof insufficient to discharge its step-one burden by holding that the relevant market encompassed both sides of the platform. *Am. Express*, 585 U.S. at 542, 546–

8

47. The defendant then prevailed without establishing a "procompetitive rationale" for its restraint. *Id.* at 552.

Similarly, in *FTC v. Qualcomm Inc.*, this Court held that the FTC failed to discharge "its initial burden under the rule of reason framework." 969 F.3d 974, 996 (9th Cir. 2020). In doing so, the Court discounted "alleged harms to customers and consumers outside the relevant market." *Id.* at 992–93. But the Court was open to giving "weight" to a "procompetitive justification" outside the relevant market. *Id.* at 996, 998.

3. The jury here should have been instructed on "cross-market balancing." It should have been instructed that a sufficient "procompetitive rationale for the restraint" could be that Google's conduct promotes competition between the Android and iOS ecosystems. And if the jury found that Google established this procompetitive rationale, the jury should have been instructed that the burden then shifted back to Epic.

The district court rejected Google's proposals to instruct the jury on cross-market balancing. 1-ER-102–03; 4-ER-837–38. Instead, the jury was instructed that Google could assert, in step two, only "competitive benefits for consumers in that relevant market" found by the jury in step one. 6-ER-1435. And in the end, the jury was permitted to consider only competitive benefits "in the market." 6-ER-1444.

The district court revisited the issue of cross-market balancing after trial. In denying Google's motion for judgment as a matter of law, the court stated that the law was unclear and left it at that. 1-ER-34. The district court failed to note that this Court had recognized that "the Supreme Court has considered cross-market rationales in Rule of Reason and monopolization cases," or that this Court observed that it had "considered cross-market rationales when applying the Rule of Reason." *Epic Games,* 67 F.4th at 989.

4. Cross-market balancing is routine with vertical restraints. An example is *Mozart Co. v. Mercedes-Benz of North America, Inc.*, 833 F.2d 1342 (9th Cir. 1987). Mercedes-Benz of North American (MBNA) required its dealers to sell only replacement parts that it supplied. Restraining competition in replacement parts enhanced competition in new and used cars. Thus, a jury found that MBNA engaged in tying but was amply justified in doing so in order to assure that "can customers confidently rely on the Mercedes name." *Id.* at 1343, 1348–51.

The *Mozart* jury found for MBNA after being instructed (*id.* at 1350 n.7.):

Defendant's claimed business justification is that the restraint protected the quality of the Mercedes automobile. In order to establish its business justification defense, defendant must show that the tying arrangement was necessary to protect the quality of the

10

automobiles, and that replacement parts of appropriate quality are unavailable from sellers other than defendant itself. In other words, defendant cannot prevail on its business justification defense unless it has sustained its burden of proving that its tying arrangement is the only way the safety and quality of [Mercedes-Benz] cars can be assured.

Coordinating vertical relationships within distribution chains promotes competition between chains, which "is the primary concern of antitrust law." *Sylvania*, 433 U.S. at 51–56 & n.19. In the world of mobile devices, competition between ecosystems is the primary concern of antitrust law, and coordination of complementary relationships promotes competition between ecosystems. *See* Michael G. Jacobides, Carmelo Cennamo & Annabelle Gawer, *Towards a Theory of Ecosystems*, 39 Strategic Mgmt. J. 2255, 2263 (2018) ("*[E]cosystems* are *groups* of firms that must deal with . . . complementarities . . . requiring the creation of a specific structure of relationships and alignment to create value.").

The judgment below must be reversed because of the district court's failure to empower the jury to find that Google's conduct was reasonable because it promoted competition between the Android ecosystem and iOS ecosystem, thereby benefiting users of mobile devices.

## B. The Jury Was Improperly Instructed on Tying

1. The jury also was improperly instructed on proof of unlawful tying. The plaintiff in a tying case must show that "competition on the merits in the market for the tied item is restrained." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). In particular, the plaintiff must show that "control over the tying product [is being used] to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.*

The district court, however, required Epic to show only that control over the Google play store was used

> to force Android app developers to use Google Play Billing when the app developers either did not want to use Google Play Billing at all or might have preferred to use Google Play Billing on different terms.

6-ER-1448. The final clause in this passage allowed Epic to satisfy its burden simply by showing that app developers "preferred to use Google Play Billing on [the] different term[]" of paying less. This permitted the jury to find Google liable for "merely enhancing the price of the tying product," which antitrust law does not condemn. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (quoting *Jefferson Parish*, 466 U.S. at 14).

The jury should have been asked whether app developers preferred to use a different payment solution while paying Google a commission for app distribution and maintenance of the Android ecosystem. Logically, and technologically, Google could collect a commission on in-app purchase revenue while a third party, of the developer's choosing, processed payments. Had a jury found Google liable for not adopting that scheme, the remedy would have been vastly different than what was imposed here.

2. The jury also was improperly instructed the jury on when tying is justified. The instructions stated:

> Google contends that the tying arrangement is justified because it enables Google efficiently to collect compensation for the use of its services and use of its intellectual property and ensures that Google can receive compensation for its services and intellectual property. In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Google.

6-ER-1450. This instruction allowed the jury to decide that collecting "compensation for the use of [Google's] services and . . . intellectual property" was not a "legitimate" justification. But the legitimacy of Google's justification is well established as a matter of law.

As described by the instructions, Google was securing "compensation for the use of its services and . . . intellectual property," and vertical restraints of trade, such as tying, are legitimate when they are reasonable efforts to control free riding. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890–91 (2007); *Sylvania*, 433 U.S. at 55; *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674–75 (7th Cir. 1992); *Mozart Co.*, 833 F.2d at 1348–49; *O.S.C. Corp. v. Apple Comput., Inc.*, 792 F.2d 1464, 1468–69 (9th Cir. 1986); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 212–13, 221–22 (D.C. Cir. 1986).

The actions condemned by the jury were means through which Google kept app developers from paying nothing for either app distribution or enhancements to the Android platform. Blocking free riding was legitimate, and a properly instructed jury likely would have seen the conduct condemned here as a reasonable means of achieving the legitimate objective of securing commissions for use of the Google Play Store.

The question the district court should have put to the jury was whether Epic established that Google had a reasonable, and significantly less restrictive, alternative way to collect "compensation for the use of its services and . . . intellectual property." The law imposes the burden of establishing such an alternative on the plaintiff. *See NCAA v. Alston*, 594 U.S. 69, 96–98

(2021); *Epic Games*, 67 F.4th at 990. And Google did request such an instruction. *See* 1-ER-120–22.

The instruction given, however, was:

> You must also consider whether Google's claimed objective could reasonably have been realized through substantially less restrictive means. If some type of constraint is necessary to promote a legitimate business interest, Google must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

6-ER-1450. The jury likely understood this instruction to place the burden on Google. Just a few sentences before the quoted passage, the jury was instructed that, "Google has the burden of proof on this issue." *Id.*

3. The jury was improperly instructed on when tying is unlawful, on what is a legitimate justification for tying, and which party has the burden on less restrictive alternatives to tying. Thus, the jury verdict on tying must be vacated. And jury's findings of violations of Section 1 and Section 2 of the Sherman Act also must be vacated because the jury's finding of unlawful tying might have been essential to those verdicts.

## II. The Injunction Improperly Seeks to Eliminate a Lawful Monopoly

District courts fashioning antitrust remedies "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947). But that discretion is bounded. The relief must represent a "reasonable method of eliminating the consequences of the illegal conduct." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978).

The district court abused its discretion by not focusing on the "consequences of the illegal conduct." The court took the jury verdict as a mandate to "grow a garden of competitor app stores," 2-ER-313, even though the verdict implied no significant causal connection between illegal conduct and the maintenance of an app distribution monopoly.

Paragraphs 11 and 12 of the injunction force Google to prop up rival app stores. Paragraph 11 forces Google to allow rival app stores "to access the Google Play Store's catalog of apps so that they may offer the Play Store apps to users." 1-ER-4–5. And Paragraph 12 bars Google from prohibiting "the distribution of third-party Android app distribution platforms or stores through the Google Play Store." 1-ER-5. These provisions were not reasonably designed to address demonstrated "consequences of the illegal conduct."

### A. Remedies in Monopoly Maintenance Cases Must Be Commensurate with the Harm to Competition Proved

"[I]n a § 2 case, upon appropriate findings of violation, it is the duty of the court to prescribe relief which will terminate the illegal monopoly." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). But the jury did not find an "illegal monopoly" in app distribution. The jury was instructed to "consider only Google's conduct that occurred after August 13th, 2016," 6-ER-1453, when the Google Play Store already held a leading position in app distribution.

Epic alleged that Google unlawfully maintained a monopoly in Android app distribution, and that is what the jury found. The offense does not entail an "illegal monopoly." Rather, it entails "anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (*en banc*) (per curiam) (cleaned up). *Accord McWane, Inc. v. FTC*, 783 F.3d 814, 833 (11th Cir. 2015); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005); *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990) (Breyer, C.J.).

The leading case on remedies for monopoly maintenance is the D.C. Circuit's *en banc* opinion in *Microsoft*, 253 F.3d 34. That opinion reviewed conclusions of law holding that Microsoft violated Sections 1 and 2 of the

Sherman Act, as well as a remedial judgment breaking up Microsoft. *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30 (D.D.C. 2000); *United States v. Microsoft Corp.*, 97 F. Supp. 2d 59 (D.D.C. 2000). Because the D.C. Circuit did not affirm all of the conclusions on which the remedial judgment rested, the court vacated the judgment and remanded the case.

The D.C. Circuit advised:

> In devising an appropriate remedy, the District Court also should consider whether plaintiffs have established a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position . . . . Mere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition. Rather, structural relief, which is designed to eliminate the monopoly altogether requires a clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power. Absent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct.

*Microsoft*, 253 F.3d at 106 (cleaned up) (citations omitted).

The D.C. Circuit observed that the district court had not found that "that Microsoft would have lost its position in the [relevant] market but for its anticompetitive behavior." *Id.* at 107. And the D.C. Circuit advised that the

remedy "should be tailored to fit the wrong creating the occasion for the remedy." *Id.*

In the end, the district court did not break up Microsoft. In approving the settlement reached by the United States and some state plaintiffs, the district court observed that "the court crafting a remedy must assess the strength of the causation evidence that established liability and 'tailor' the relief accordingly." *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 164 (D.D.C. 2002) (citing *Microsoft*, 253 F.3d at 107).

Here, the district court did not meaningfully assess the "strength of the causation evidence." The court took no briefing on causation and found the remedy it imposed sufficiently justified by the fact that the jury found that Google's conduct "had the consequence of entrenching and maintaining its monopoly power." 1-ER-17. But that is just another way of saying that the jury found unlawful maintenance of monopoly.

Absent a finding that the unlawful conduct materially contributed to the maintenance of Google's leading position in app distribution, the district court abused its discretion when it resolved: "What we are doing is leveling the playing field, lifting the barriers, and making sure that anybody who chooses to compete with Google in these two markets found by the jury has a free and unfettered opportunity to do so." 3-ER-440.

## B.  The *Ford Motor* and *Optronic Technologies* Decisions Do Not Support the Injunction

The district court was inspired by a sentence in the Supreme Court's *Ford Motor* decision: "Antitrust relief should unfetter a market from anti-competitive conduct and 'pry open to competition a market that has been closed by defendants' illegal restraints." 1-ER-11 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 577–78 (1972)). But the court's injunction ignored *Ford Motor*'s critical limiting principle that the remedy should pry open only what had been "closed by defendants' illegal restraints."

Moreover, *Ford Motor* was misguided as to both liability and remedy. In the mid-20th Century, U.S. car makers made some parts and sourced others. Chrysler's spark plugs came from Autolite's Fostoria, Ohio plant, the survival of which was threatened by Chrysler's 1957 announcement that it would begin making its own spark plugs, as General Motors did. Ford saved the plant by acquiring it in 1961. Ford had sourced its spark plugs but decided to make them and to sell replacement spark plugs.

The government successfully challenged the consummated acquisition. In fashioning relief, the district court prioritized the viability of the purchaser of the assets that Ford was ordered to divest. The decree required Ford to source at least half of its spark plugs from the Fostoria plant for five years, barred Ford from using its own trademarks on sourced spark plugs for five

years, and barred Ford from making its own spark plugs for ten years. *See Ford Motor*, 405 U.S. at 572. The decree harmed competition more than the merger by limiting competition to supply Ford and preventing Ford from becoming a spark plug producer.

Provisions in the injunction here also harm competition. Paragraph 4 prohibits Google from sharing "revenue generated by the Google Play Store with any person or entity that distributes Android apps," 1-ER-3, which means that Google must punish makers and marketers of Android mobile devices for distributing Android apps. And Paragraph 5 prohibits Google from competing with Apple in the most effective manner, by offering a benefit to a developer for launching an app on the Android platform. *Id.*

The district court also relied on this Court's decision in *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co.*, 20 F.4th 466, 486 (9th Cir. 2021). 1-ER-12; 3-ER-439. The court quoted a sentence setting out remedial goals: "[T]he available injunctive relief is broad, including to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" 20 F.4th at 486 (quoting *Microsoft*, 253 F.3d at 103). But the district court failed to appreciate that a defendant is entitled to retain the fruits of its foresight and industry.

The district court also failed to apply two principles set out by this Court in *Optronic Technologies*. First, this Court quoted the D.C. Circuit's *en banc Microsoft* opinion stating that the remedy in a Section 2 case "must be based on a 'clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" *Id.* (quoting *Microsoft*, 253 F.3d at 105). The district court gave no indication that it had considered the significance of that "causal connection."

Second, this Court quoted the Supreme Court indicating that a Sherman Act remedy could go "beyond a simple proscription against the precise conduct previously pursued" but must be a "reasonable method of eliminating the consequences of the illegal conduct." *Id.* (quoting *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. at 698). The district court did not adequately examine "the consequences of the illegal conduct."

The district court mistakenly presumed that the remedy for monopoly maintenance must be designed to eliminate the monopoly. But elimination of the monopoly is warranted only in the rare cases in which the monopoly likely would have substantially dissipated but for the unlawful conduct. The trial record here surely could not support such a finding.

22

In remanding the case, this Court should stress the Supreme Court's teaching: "When it comes to fashioning an antitrust remedy, . . . caution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. Judges must be mindful, too, of their limitations—as generalists, as lawyers, and as outsiders trying to understand intricate business relationships. Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare." *Alston*, 594 U.S. at 106–07.

## CONCLUSION

This Court should vacate the jury verdict and the injunction. With guidance from this Court, the parties could settle their differences.

Respectfully submitted,

December 4, 2024

/s/ *Amy R. Upshaw*

AMY R. UPSHAW
CHRISTOPHER C. YOOK
JEFFREY S. SPIGEL

KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Suite 900
Washington, D.C. 20006
(202) 737-0500
*aupshaw@kslaw.com*

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Numbers**  24-6256, 24-6274

    I am an attorney.

    **This brief contains**  4852  **words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

○  complies with the word limit of Cir. R. 32-1.

○  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⊗  is an **amicus brief** and complies with the word limit of FRAP 29(a)(5), Cir. R.29-2(c)(2), or Cir. R. 29-2(c)(3).

○  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○  complies with the length limit designated by court order dated    .

○  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/ Amy R. Upshaw*      **Date**  December 4, 2024

## CERTIFICATE OF SERVICE

I certify that on December 4, 2024, I caused the foregoing to be filed through this court's Appellate Case Management System, which will serve a notice of electronic filing on all registered users, including counsel of record for all parties.

December 4, 2024                    */s/ Amy R. Upshaw*
                                    Amy R. Upshaw