Nos. 24-6256, 24-6274

IN THE

# United States Court of Appeals for the Ninth Circuit

---

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

---

## BRIEF OF *AMICI CURIAE* THE INTERNATIONAL CENTER FOR LAW & ECONOMICS AND SCHOLARS OF LAW AND ECONOMICS IN SUPPORT OF APPELLANTS' OPENING BRIEF

---

WILLKIE FARR & GALLAGHER LLP
Jonathan A. Patchen
jpatchen@willkie.com
333 Bush Street
San Francisco, CA 94104
Telephone: (415) 858-7400
Facsimile: (415) 858-7599

Matthew Freimuth
mfreimuth@willkie.com
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

December 4, 2024

*Counsel for Amici Curiae The International Center for Law & Economics and Scholars of Law and Economics*

*(Additional Counsel Listed on Signature Page)*

## DISCLOSURE STATEMENT

*Amicus curiae* The International Center for Law & Economics is a nonprofit corporation, which has no parent corporation nor stock held by any publicly held corporation.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ..............................................................................4

    I.    THE DISTRICT COURT'S INJUNCTION IS BASED ON AN IMPROPER UNDERSTANDING OF THE RELEVANT MARKET AND IS INCONSISTENT WITH *EPIC V. APPLE* ..........4

        A.    Issue Preclusion Should Have Barred Epic from Relitigating the Question of a Single-Brand Market .................5

        B.    Google Play and Apple's App Store Compete in the Same Product Market ...................................................9

    II.    THE FRAMEWORK FOR ASSESSING COMPETITIVE EFFECTS IN A TWO-SIDED MARKET REQUIRES A BROAD EXAMINATION OF THE MARKET AS A WHOLE ......11

        A.    Google's Conduct Has Significant Pro-Competitive Justifications ..............................................................13

        B.    There Is No Evidence of Competitive Harm in a Properly Defined Two-Sided Market .......................................16

        C.    The Injunction Risks Harm to Consumers in a Functioning Two-Sided Market ...............................................18

    III.    ANTITRUST GENERALLY REPUDIATES A DUTY TO DEAL LIKE THAT IMPOSED BY THE INJUNCTION .................19

CONCLUSION ...........................................................................27

Appendix ...............................................................................29

CERTIFICATE OF COMPLIANCE ......................................................31

CERTIFICATE OF SERVICE ...........................................................32

# TABLE OF AUTHORITIES

## CASES

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)................................................................20

*Associated Press v. United States*,
   326 U.S. 1 (1945)................................................................22

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)................................................................4

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021), a decision affirmed
   by this Court. *Epic Games, Inc. v. Apple Inc.*,
   67 F.4th 946 (9th Cir. 2023)................................................*passim*

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ................................................6, 24

*Hilson v. Lopez*,
   No. 12-cv-06016-JD, 2014 WL 4380674 (N.D. Cal. Sept. 4, 2014) ..............7

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
   627 F.2d 919 (9th Cir. 1980) ................................................10

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................5

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)................................................................15

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ................................................22

*Newcal Indus. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ................................................26

*Ohio v. Am. Express Co.* ("*Amex*"),
   585 U.S. 529 (2018)................................................6, 9, 12, 14

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*,
    20 F.4th 466 (9th Cir. 2021) ...........................................................21

*Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*,
    526 F.2d 1196 (9th Cir. 1975) ......................................................10

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009).........................................................................24

*SEC v. Stein*,
    906 F.3d 823 (9th Cir. 2018) .......................................................5, 7

*Snoqualmie Indian Tribe v. Washington*,
    8 F.4th 853 (9th Cir. 2021) ..............................................................6

*Standard Oil Co. of N.J. v. United States*,
    221 U.S. 1 (1911).............................................................................16

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).........................................................................10

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).........................................................21

*United States* v. *Colgate & Co.*,
    250 U.S. 300 (1919).........................................................................20

*Verizon Commc'ns Inc. v. Law Offices of Curtis Trinko*,
    540 U.S. 398 (2004)...................................................................20, 23

## OTHER AUTHORITIES

50 C.J.S. Judgments § 1043 (May 2024 Update) ......................................7

Adam Smith's *The Wealth of Nations*. *See* Ronald H. Coase, *Lecture to the Memory of Alfred Nobel*, The Nobel Prize,
    https://www.nobelprize.org/prizes/economic-
    sciences/1991/coase/lecture/ (last visited Nov. 25, 2024)............23

*Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*,
    592 F.3d 991 (9th Cir. 2010) ..........................................................23

Benjamin Klein, *Market Power in Antitrust After Kodak*,
    3 Supreme Court Econ. Rev. 43 (1993) ....................................................26

Carl Shapiro & David J. Teece, *Systems Competition and Aftermarkets,
    An Economic Analysis of Kodak*, 39 The Antitrust Bulletin
    135 (1994)................................................................................................26

Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*,
    63 Antitrust L.J. 483 (1995)..................................................................26

Dennis Carlton, *A General Analysis of Exclusionary Conduct and Refusals
    to Deal: Why Aspen and Kodak are Misguided*, 68 Antitrust L.J.
    659 (2001)................................................................................................26

Geoffrey A. Manne, *In Defence of the Supreme Court's
    "Single Market" Definition in Ohio v. American Express*,
    7 J. of Antitrust Enf't 104 (2019) ......................................................12

Geoffrey Manne & Joshua Wright, *If Search Neutrality Is the Answer,
    What's the Question?*, 2012 Colum. Bus. L. Rev. 152 (2012) ..................24

Herbert Hovenkamp, *The Monopolization Offense*,
    61 Ohio State L.J. 1035 (2000)..........................................................23, 24

Herbert Hovenkamp, *Unilateral Refusals to Deal, Vertical Integration, and
    the Essential Facility Doctrine*, Univ. of Iowa Legal Studies Research
    Paper No. 08-31 (July 14, 2008), https://papers.ssrn.com
    /sol3/papers.cfm?abstract_id=1144675 ........................................................22

https://www.ftc.gov/news-events/news/press-releases/2022/12/fortnite-
    video-game-maker-epic-games-pay-more-half-billion-dollars-over-
    ftc-allegations ..........................................................................................19

Julian Wright, *One-sided Logic in Two-sided Markets*,
    3 Rev. of Network Econ. 44 (2004) ....................................................13, 14

Jury Instruction No. 24 ........................................................................................21

Lindsey Edwards, et al., *Section 2 Mangled: FTC v. Qualcomm on the Duty
    to Deal, Price Squeezes, and Exclusive Dealing*, 8 J. Antitrust
    Enf't 335 (2019)........................................................................................24

Michael Katz & Jonathan Sallet, *Multisided Platforms and Antitrust Enforcement*, 127 YALE L.J. 2142 (2018) ................................................... 13

Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 5.02 (4th ed. 2017) ..................................................................... 4, 5

Richard A. Epstein, *Judge Koh's Monopolization Mania: Her Novel Antitrust Assault Against Qualcomm Is an Abuse of Antitrust Theory*, 98 NEB. L. REV. 250 (2019) ............................................................... 24

## STATEMENT OF INTEREST

The International Center for Law & Economics ("ICLE") is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has long-standing expertise evaluating antitrust law and policy.

*Amici* also include 17 scholars of antitrust law and economics ("Scholars of Law and Economics") at leading universities and research institutions across the United States. Their names, titles, and academic affiliations are listed in the Appendix. All possess expertise in, and collectively have conducted extensive research on, antitrust law and economics.

ICLE and the Scholars of Law and Economics have an interest in ensuring that antitrust law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. That includes advising against decisions that impede competition between digital ecosystems and far-reaching injunctions that could deteriorate the quality of mobile ecosystems, thereby harming the interests of consumers and app developers.[1]

---

[1] The *amici* represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than *amici* and their counsel—contributed money that was intended to fund preparing or submitting the brief. *Amici* file this brief with the consent of Google LLC.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court issued an injunction that would alter agreements between Google LLC ("Google") and over 500,000 non-party U.S. app developers and require redesign of Google's app store, Google Play. It has purportedly done so to remediate the antitrust claims of a single competitor, Epic Games, Inc. ("Epic") which has no apps on Google Play; and it has done so notwithstanding that Epic lost a parallel antitrust challenge to Apple following a bench trial, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), a decision affirmed by this Court. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023). The decision and injunction pose risks to the safety, security, and reputation of Google Play—risks highly likely to harm competition between Google Play and its leading competitor, Apple's App Store. That harm to competition would, in turn, harm consumers on both sides of the Google Play platform: end-consumers of the apps available on the platform and the app developers who depend on the platform to reach those end-consumers.

The decision below should be reversed because of errors of law and fact, and because it is incompatible with the district court's decision in *Epic Games v. Apple*.

First, the decision and injunction below were based on an erroneous market definition that ought to have been precluded by the district court's decision in *Epic Games v. Apple*. Instead, the injunction is predicated on an improper market

2

definition that excludes Apple from the relevant market. That error obscures the nature of competition at issue in the case, and it supports a false ascription of market power to Google Play.

Second, having improperly permitted the jury to exclude Apple from the relevant market, the district court did not permit proper consideration of the pro-competitive justifications for Google's conduct, which are significant in a two-sided transaction market like the one in which Google competes. In fact, there is an absence of evidence demonstrating any competitive harm in the properly defined market. Compounding the problem, the injunction threatens to undermine many of the pro-competitive benefits of Google's conduct and harm consumers.

Finally, the injunction would impose a duty to deal that is generally repudiated under the antitrust laws. While a narrow duty to deal may be imposed as a remedy under special circumstances, the injunction issued below exceeds the bounds of established exceptions to the general rule.

Given the significant risks posed by the decision below and the district court's injunction, ICLE and the Scholars of Law and Economics urge this Court to reverse.

## ARGUMENT

## I. THE DISTRICT COURT'S INJUNCTION IS BASED ON AN IMPROPER UNDERSTANDING OF THE RELEVANT MARKET AND IS INCONSISTENT WITH *EPIC V. APPLE*.

This Court has repeatedly recognized the importance of market definition in antitrust cases: "A threshold step in any antitrust case is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) ("*Qualcomm*") (quoting *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 543 (2018).) While recognizing that there may be some cases that do not require courts to define "the exact contours of the relevant market," in most cases, "[c]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market." *Epic Games, Inc.*, 67 F.4th at 974 n.6 (quoting *Amex*, 585 U.S. at 543). Further, as this Court has observed, "[m]ost restraints . . . are subject to the Rule of Reason: a multi-step, burden-shifting framework that "requires courts to conduct a fact-specific assessment" to determine a restraint's "actual effect" on competition." *Id.*, quoting *Amex*, 585 U.S. at 541 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). Market definition typically is important because "[t]he relevant market for antitrust purposes is 'the area of effective competition'—i.e., 'the arena within which significant substitution in consumption or production occurs.'" *Epic Games, Inc.*, 67 F.4th at 975, quoting *Amex*, 585 U.S. at 543 (quoting *Phillip E. Areeda & Herbert Hovenkamp,*

Fundamentals of Antitrust Law § 5.02 (4th ed. 2017)). That is, the market definition provides the contours of the relevant market, "the field in which meaningful competition is said to exist," *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Correspondingly, the domain in which competition is alleged to be impaired by unlawful conduct is where the plaintiff must demonstrate actual or likely harm to competition and consumers.

### A. Issue Preclusion Should Have Barred Epic from Relitigating the Question of a Single-Brand Market.

At trial below, the jury found that Epic had proved two relevant single-brand product markets: "a market for the distribution of Android apps, and for Android in-app billing services for digital goods and services transactions." Order Den. J. as a Matter of Law ("JMOL"), ECF No. 652; *In re Google Play Store Antitrust Litigation*, 3:21-md-02981-JD, ECF No. 984, at 3 (N.D. Cal. July 3, 2024) (hereinafter "Order Den. JMOL"). This Court, however, had already sustained a finding that rightly rejected Epic's assertion of a single-brand market in parallel litigation, filed by the same plaintiff, on the same day, in the same court. *Epic Games, Inc.*, 67 F.4th at 980–81. Issue preclusion should have barred Epic from relitigating the question whether the relevant market for mobile gaming transactions is a single-brand market that is operating-system-specific. Issue preclusion "bars parties from relitigating an issue if the same issue was adjudicated in prior litigation." *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018). It applies if "(1) the issue

at stake was identical in both proceedings; (2) the issue was actually litigated and decided in prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (citation omitted).

All four elements are satisfied with respect to the question of whether Google competes with Apple in providing the allegedly monopolized services. This Court has already recognized parallels between Epic's antitrust and state law challenges to Google Play's policies and Apple's App Store policies, *Epic Games, Inc.*, 67 F.4th at 969 n.3, and it has rightly rejected Epic's assertion of a single-brand market. *Id.* at 980–81. Epic alleged and argued for a single-brand market in *Epic v. Apple*, and the district court in that matter rightly rejected Epic's proposed market definition following "a sixteen-day bench trial." *Id.* at 966. In each case, the underlying controversy had to do with the terms under which Epic could market a specific game, *Fortnite*, on an app store developed, maintained, and owned by a third party; namely, Apple in *Epic v. Apple* and Google in this matter.

The district court attempts to distinguish the issues in this matter, arguing that they are distinct because Epic (1) "took a very different approach to the markets in this case" and (2) did not "argue for aftermarkets for Android app distribution and Android in-app payment solutions, derived from a foremarket for Android devices."

JMOL at 7. Those assertions, however, do not alter the settled question of whether Google competes with Apple in providing the allegedly monopolized services.

That Epic "took a wholly different approach for the antitrust claims against Google, and offered wholly different evidence about relevant markets than that offered in the case against Apple," *id.* at 7, is immaterial. As this Court recognized in *SEC v. Stein*, 906 F.3d 823 (9th Cir. 2018), the *relitigation* of decided questions of fact is barred by issue preclusion, even when different evidence and arguments are proffered. *Id.* at 828; *see also Hilson v. Lopez*, No. 12-cv-06016-JD, 2014 WL 4380674, at *2 (N.D. Cal. Sept. 4, 2014) ("[O]nce an issue has been resolved in a prior proceeding, there is no further fact-finding to be performed.") (citation omitted); 50 C.J.S. Judgments § 1043 (May 2024 Update) ("Under the issue preclusion doctrine, a party may not be permitted to introduce new or different evidence to relitigate a factual issue which was presented and determined in a former action. Litigation of an issue necessarily encompasses all arguments and evidence that could be presented to resolve the issue . . . .").

Moreover, the district court is incorrect in stating that Epic did not here argue for Android-specific aftermarkets. To the contrary, the district court itself noted that Epic "took maximum advantage" of its freedom "to argue for Android-only relevant markets," Order Den. JMOL at 7, and "presented substantial evidence showing that Android-only product markets made factual and economic sense for this case." *Id.*

at 8. Those observations concede that Epic *did* "argue for aftermarkets for Android app distribution and Android in-app payment solutions, derived from a foremarket for Android devices." *Id.* at 7. Epic simply failed to establish what it argued.

The district court's claim to the contrary appears to rest on its observation that Epic did not use the phrase "single-brand aftermarket" in making its case here. *Id*. at 8 ("Epic never presented or even mentioned a 'single-brand aftermarket' in this case…."). But an allegation of a single-brand aftermarket does not depend on any incantation or specific phrasing. In *Epic v. Apple*, the district court rejected *Apple's* argument that Epic's failure to "explicitly use the terms 'foremarket' and 'aftermarket' in its complaint" precluded Epic from properly pleading an aftermarket theory. 67 F.4th at 955. There, the court rejected the elevation of "form over substance." *Id*. at 979. The same applies here. As the court below observed, Epic "took maximum advantage" of its opportunity "to argue for Android-only relevant markets." Order Den. JMOL at 7.

In fact, in *Epic v. Apple*, the district court found that the relevant markets were *not* operating-system-specific but instead featured competition between Google and Apple. This Court affirmed that finding. Inter-brand competition was underscored in that matter, with the district court's finding that Epic's *Fortnite* enabled *cross-platform* play, including not just players on mobile devices but those on, *inter alia*, Sony's PlayStation, Microsoft's Xbox, the Nintendo Switch, Windows

8

PCs, and Mac computers. *Epic Games, Inc.*, 559 F. Supp. at 927; *see also Epic Games, Inc.*, 67 F.4th 967. The relevant market is a multi-brand market in which Google and Apple engage in inter-brand competition, and issue preclusion should have barred Epic from relitigating the issue.

**B.** **Google Play and Apple's App Store Compete in the Same Product Market.**

As noted above, this Court has already sustained a finding that rightly rejected Epic's assertion of a single-brand market in parallel litigation, filed on the same day, in the same court. *Epic Games, Inc.*, 67 F.4th at 980–81. The finding of a multi-brand market in *Epic v. Apple* was correct and should apply here, even independent of a proper application of issue preclusion.

To be precise, the district court in *Epic Games Inc. v. Apple Inc.* found the relevant market to be "the smaller recognized mobile gaming transactions submarket . . . [which] does not include the Switch or game streaming services." F. Supp. 3d at 987. In that market, the court found that "the two dominant players are Apple (App Store) and Google (Google Play app store), [along] with several other Android OS players including the Samsung (Samsung Galaxy Store)." *Id.* at 976. To find a single-brand market in this case is not merely to differ on the "exact contours of the relevant market." *Epic Games, Inc.*, 67 F.4th at 974 n.6 (quoting *Amex*, 585 U.S. at 543). Rather, it is to fundamentally misunderstand who is competing in which "area of effective competition." *Epic Games, Inc.*, 559 F. Supp. 3d at 1014.

That error is fundamental to the Section 1 and Section 2 allegations that the district court put before a jury, which depend upon findings of market power or monopoly power. There are, for example, two elements to a monopolization claim under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Courts may, moreover, infer the requisite monopoly power from a "predominant share of the market." *Id.* at 571. Hence, to ignore the vigorous competition between Google and Apple leads not just to an erroneous assessment of Google's market share but suggests the requisite possession of monopoly power by a defendant, Google, that does not have a predominant—or even leading—share of the market, properly defined. Google and Apple compete for apps and, importantly, to have app developers develop apps for their platforms first.

Market share alone is not dispositive on the question of market power, as "[b]lind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980). It may, however, be "the most important factor," *Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975); and, in this

case, both market share and commercial reality indicate strong inter-brand competition, as the court found in *Epic v. Apple*.

Correspondingly, the erroneous finding of a single-brand market obscures the district court's finding, in *Epic v. Apple*, that while Apple does not possess market power in the relevant market, "the evidence does suggest that Apple is near the precipice of substantial market power, or monopoly power, with its considerable market share." 559 F. Supp. 3d at 1032. Hence, the costly remedies that the district court would impose upon Google in the instant case would impair Google's ability to compete with the market leader in mobile gaming transactions in the United States; they would also impair Google's ability to compete with its leading competitor in the broader app market. That is, the injunction ordered by the court below would benefit a single competitor, Epic, but not the competition or, in turn, the consumers who depend upon competition among Google, Apple, and others for app sales and purchases.

## II.    THE FRAMEWORK FOR ASSESSING COMPETITIVE EFFECTS IN A TWO-SIDED MARKET REQUIRES A BROAD EXAMINATION OF THE MARKET AS A WHOLE.

The district court correctly recognized that "the Google Play Store is a "two-sided platform market" that "offers products or services to two different groups who both depend on the platform to intermediate between them." *In re Google Play Store Antitrust Litig.*, 3:20-cv-05671-JD, Dkt. No. 850, at ECF p. 22 (N.D. Cal. Dec. 6,

2023) (Final Jury Instructions, Instruction No. 18). For Google Play, "developers who wish to sell their apps" are on one side of the market and "consumers that wish to buy those apps" are on the other. *Id.*

In *Amex*, the Supreme Court stressed that a unique analysis of anticompetitive effects is necessary when a plaintiff alleges an antitrust violation in a two-sided transaction market. *See* 585 U.S. at 542–45. Two-sided markets connect two distinct sets of users whose demands for the platform are interdependent—i.e., consumers' demand for a platform increases as more products are available and, conversely, product developers' demand for a platform increases as additional consumers use the platform, increasing the overall potential for transactions. Due to the complex dynamics of two-sided markets, conduct that is entirely consistent with—and actually promotes—healthy competition overall may appear anticompetitive when the effects on only one set of customers are considered. *See* Geoffrey A. Manne, *In Defence of the Supreme Court's "Single Market" Definition in Ohio v. American Express*, 7 J. OF ANTITRUST ENF'T 104, 110 (2019) ("[E]vidence of a price effect on only one side of a two-sided platform can be consistent with either neutral, anticompetitive, or procompetitive conduct.").

The Supreme Court thus recognized that it is improper to assess the presence of anticompetitive effects by focusing on only one side of a two-sided market. *Amex*, 585 U.S. at 547 ("Evidence of a price increase on one side of a two-sided

transaction platform cannot by itself demonstrate an anticompetitive exercise of market power.").

Indeed, even scholars critical of *Amex* recognize the importance of considering effects on both sides of a two-sided market. In their paper arguing strenuously against the Court's two-sided market definition in *Amex*, for example, Michael Katz and Jonathan Sallet acknowledge that "in assessing whether a hypothetical monopolist selling newspapers to readers would find a [small significant non-transitory increase in price ("SSNIP")] profitable, one would have to consider the effects on advertising revenues in addition to effects on subscription revenues . . . . In this regard, considering prices on both sides of a platform (even if the prices are in separate markets) is much less novel than it may appear." Michael Katz & Jonathan Sallet, *Multisided Platforms and Antitrust Enforcement*, 127 YALE L.J. 2142, 2160 (2018).

### A.    Google's Conduct Has Significant Pro-Competitive Justifications.

Firms in two-sided markets commonly use vertical restrictions like those challenged by Epic—including anti-steering provisions—to serve legitimate aims. The benefits of such vertical restrictions are conspicuous when app stores are correctly assessed holistically, as two-sided transaction markets; conversely, they are obscured if one applies "one sided logic to two sided markets." Julian Wright,

*One-sided Logic in Two-sided Markets*, 3 Rev. of Network Econ. 44 (2004). Just as in *Amex*, there are pro-competitive reasons for the provisions at issue.

Hence, at issue in *Epic v. Apple* were vertical restrictions, imposed by Apple, that required in-app purchases on iOS devices to use Apple's in-app payment processor and limited the ability of app developers using the platform to "steer" users to alternative payment options. Correspondingly, at issue below was "Epic's objection to Google's requirement that Epic use Google's billing system" Order Den. JMOL at 2, and, as the district court recognized, "anti-steering restrictions in [Google's] DDA agreements" that limited, among other things, "usage of a third-party payment method." *Id.* at 20. Notably, some of Google's restrictions, i.e., it's discouraging, but not barring, side-loading of apps purchased elsewhere, are less stringent than those found *not* to be anticompetitive in *Epic v. Apple*.

These legitimate aims include allowing for the recoupment of investments, and to provide tangible pro-competitive benefits such as increased privacy, security, and market-wide output. Given this, the Supreme Court, in *Amex*, 585 U.S. at 544–45, ruled that "there is nothing inherently anticompetitive about . . . antisteering provisions." *Id.* at 551.

Such vertical provisions can, among other things, prevent merchants from free-riding, thereby increasing the availability of "'tangible or intangible services or promotional efforts' that enhance competition and consumer welfare." *Id.* at 551

14

(quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890–91 (2007)). Free-riding, left untreated, would undermine Google's incentives to maintain and improve Google Play, thereby leading to diminished product quality and reduced output.

The problem of free-riding is front and center in the district court's injunction, and it was front and center in Epic's complaint below. As the district court noted, "[a] particular sticking point was Epic's objection to Google's requirement that Epic use Google's billing system and pay Google a 30% fee on all in-app purchases made by Fortnite users. Epic wanted to use its own in-app payment solution and not pay Google a 30% cut, which Google refused to allow." Order Den. JMOL at 2. That is, Epic sought to avoid paying Google a commission on in-app purchases made by Fortnite users who acquired Fortnite via Google's app store, Google Play.

The problem of free-riding is doubly conspicuous given Epic's business model. As this court recognized in *Epic v. Apple*, "Epic monetizes Fortnite using a 'freemium' model: The game is free to download, but a user can purchase certain content within the game, ranging from game modes to cosmetic upgrades for the user's character." 67 F.4th at 967. Hence, what Epic sought to do before its removal from Google Play and Apple's App store, was to build the installed base of Fortnite players, at a below-cost price of zero, by free-riding on the installed bases of both Google Play and Apple App Store consumers, and then direct those customers to

15

purchase improvements directly from Epic, with no commissions paid to the firms that developed and maintained the app stores that brought Epic its customers.

### B. There Is No Evidence of Competitive Harm in a Properly Defined Two-Sided Market.

Antitrust law has long recognized that increased prices, reduced output, and degraded product quality are key indicia of competitive harm. *See, e.g.*, *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 52 (1911) (citing the danger that a monopoly will "fix the price," impose a "limitation on production," or cause a "deterioration in quality of the monopolized article"); Sherman Act Section 2 Joint Hearing: Empirical Perspectives Session Hr'g Tr. 13, Sept. 26, 2006 (Scherer) (observing that reluctance to "cannibalize the rents that they are earning on the products that they already have marketed" may make monopolists "sluggish innovators"); Sherman Act Section 2 Joint Hearing: Welcome and Overview of Hearings Hr'g Tr. 25, June 20, 2006 (Barnett) (identifying as "a major harm of monopoly" the possibility that a monopolist may not feel pressure to innovate).

The order below recognizes that competitive harm comprises "the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality," and insists that the jury's findings of anticompetitive conduct and effects were "supported by substantial evidence," Order Den. JMOL at 16. Absent, however, from the record below and the district court's injunction is evidence of increased price, lower product quality (or increased quality-adjusted price), reduced

16

output, or a lack of innovation across the platform. There does not, moreover, appear to be any finding of supra-competitive pricing. No doubt Epic objected to Google's requirements and fee. That objection does not establish that Google charged supra-competitive prices; and it does not show that Google's fees were established or maintained by anticompetitive conduct. In Epic's parallel case, this court recognized that "a firm with market power is a price-*maker*, not a price-*taker*, that economic theory expects in a competitive market." 67 F.4th at 983. Evidence in this case suggests, however, that Google was a price *taker*, initially following Apple's lead on pricing, thus attempting to match pricing policies set by its larger—and main—competitor, and often lowering (rather than raising) prices for many app developers. *See* Transcript of Trial Proceedings Held On Nov. 27, 2023, Testimony of B. Douglas Bernheim, *In re Google Play Store Antitrust Litigation*, 3:21-md-02981-JD, ECF No. 845, at 2480:22–2481:20 (N.D. Cal. Dec. 6, 2023).

In brief, we do not see evidence of an output reduction or a decline in quality on *either* side of the two-sided market, much less when viewing the market as a whole. Certainly, output has increased steadily on both sides of Google Play (and on both sides of Apple's app store). And we do not see evidence, much less adequate evidence, that Google exploited market power to *raise* prices to supra competitive levels.

### C.     The Injunction Risks Harm to Consumers in a Functioning Two-Sided Market.

Google owns valuable resources that it has created and steadily improved, at considerable expense. These include Google Play, which provides users in the Android ecosystem with a convenient and secure means of acquiring the applications (Tr. 1141:2–17) that are "essential components of smartphones" (Tr. 2456:18–20). Among other things, the injunction would require Google to make its catalog of two-plus million apps appear in and distribute to competitors' app stores. Epic would also like *free* access to Android users and, specifically, Google Play. None of these parties would be in a position to maintain the Android ecosystem in the same way Google does. Given this, reducing the fees Epic pays to Google may benefit Epic while harming consumers, as Google would have less incentive to invest in its ecosystem.

Moreover, steering consumers to other payment systems, together with catalog sharing and third-party app store distribution, could expose Google Play users to privacy, security, and safety issues, among others.[2] These are moving targets

---

[2] For an example of potential privacy and security risks, among others, see, e.g., Compl. ¶¶ 61–71, *United States v. Epic Games, Inc.*, No. 5:22-CV-00518 (E.D.N.C. 2022) (alleging violations of the Children's Online Privacy Protection Act and Section 5 of the FTC Act for privacy violations and unfair billing practices through Fortnite); see also, Press Release, Fortnite Video Game Maker Epic Games to Pay More Than Half a Billion Dollars over FTC Allegations of Privacy Violations and Unwanted Charges, Fed. Trade Comm'n (Dec. 19, 2022),

18

online, but the injunction would limit Google's efforts to serve these critical consumer interests, as Google would have to prove that any measures it takes with respect to third-party app stores and their apps "are strictly necessary and narrowly tailored."

In brief, the injunction undercuts the pro-competitive rationale recognized by the Supreme Court in *Amex* and by this Court in *Epic v. Apple*. Absent intervention by this Court, Google will have to comply with a nationwide injunction that undercuts these benefits. That is directly relevant to the merits of the remedies decision below, as there is no credible argument that the broad sweep of the injunction—across all of Google's agreements with all app developers who do, or will, market their apps via Google Play—is necessary to remedy the alleged harm to the sole plaintiff in this case. It also is relevant to the question of liability where the district court's jury instructions precluded the jury's consideration of precisely the cross-market effects contemplated in *Amex*.

## III.  ANTITRUST GENERALLY REPUDIATES A DUTY TO DEAL LIKE THAT IMPOSED BY THE INJUNCTION.

Antitrust law largely repudiates the notion that firms have a "duty to deal." As the Supreme Court has observed, "as a general matter, the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely

---

https://www.ftc.gov/news-events/news/press-releases/2022/12/fortnite-video-game-maker-epic-games-pay-more-half-billion-dollars-over-ftc-allegations.

private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis Trinko*, 540 U.S. 398, 408 (2004) (quoting *United States* v. *Colgate & Co.*, 250 U.S. 300, 307 (1919)). That general antitrust principle is "not unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). However, as the *Trinko* Court made clear*, Aspen Skiing* "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. At that outer boundary, to terminate dealing with an established customer, when that decision makes no economic sense but for its anticompetitive effects, may be anticompetitive. *Id.*

The district court correctly observed this general principle in Jury Instruction No. 24: "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. . . . It is not unlawful for Google to prohibit the distribution of other app stores through the Google Play Store, and you should not infer or conclude that doing so is unlawful in any way."

Nonetheless*,* the district court has issued an injunction that would, *inter alia*, require Google to make its catalog of apps available in competitors' app stores and to distribute rival app stores through the Google Play Store. The district court reasoned that, "[i]f the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to terminate the

20

illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization." *In re Google Play Store Antitrust Litig.*, 3:20-cv-05671-JD, Dkt. No. 701, at 6 (N.D. Cal. Oct. 7, 2024) (quoting *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 486 (9th Cir. 2021)).

The case law does not, however, suggest that any and all remedies are warranted given a finding of antitrust liability. First, "relief must be based on a 'clear indication of a significant causal connection between the conduct enjoined or mandated and the violation.'" *Optronic Techs. v. Ningbo Sunny Electronic Co.*, 20 F.4th 446, 486 (9th Cir. 2021) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001)). In *Microsoft*, the causal connection between conduct and harm was merely inferred, not proven. At the remedy phase, that was deemed insufficient to sustain a remedy allegedly aimed at correcting anticompetitive harm. Here, however, the connection between the conduct to be remedied and the alleged harm is not even *alleged* (let alone inferred). Indeed, it was specifically *disclaimed* by the court in Jury Instruction No. 24.

Also, in *Optronic*, this Court sought to remediate *discriminatory* contract terms, providing that all similarly situated customers be provided access on similar terms. Analogous remedies may be feasible in circumstances where the antitrust

harm alleged stems from discriminatory treatment. *See also, e.g.*, *Associated Press v. United States*, 326 U.S. 1 (1945).

Imposing a duty to deal with new firms, on new terms, is a different matter entirely. In *Associated Press*, for example, "[t]he Court did not reach the question whether AP was obliged to admit any newcomers at all. Although Justice Frankfurter's concurring opinion agreed with the divided lower court that a business clothed in a public interest must deal with all, the Court expressly disclaimed any such 'public utility concept.'" Herbert Hovenkamp, *Unilateral Refusals to Deal, Vertical Integration, and the Essential Facility Doctrine*, Univ. of Iowa Legal Studies Research Paper No. 08-31 (July 14, 2008), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1144675. And in *MetroNet* this court recognized that *Trinko* does not require a defendant to provide access to a competitor if it isn't already providing access elsewhere. *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004).

A remedy mandating the distribution of app stores is equivalent to a determination that the failure to distribute constitutes a violation of the law—contradicting both the jury instruction and settled case law. Imposing a duty to deal without a showing of anticompetitive effect imposes liability by inference: in effect, it circumvents rule of reason analysis and assumes anticompetitive harm. *See*

22

Hovenkamp, *Unilateral Refusals*, at 28 ("[Unilateral refusal to deal under Sec. 2] comes dangerously close to being a form of 'no-fault' monopolization[.]").

As noted above, privacy, security, and platform management challenges are ubiquitous, moving targets from both technical and business standpoints, and the injunction would limit Google's ongoing efforts to serve critical consumer interests, as Google would have to prove that any measures it takes with respect to third-party app stores and their apps "are strictly necessary and narrowly tailored." That requirement is at odds with basic antitrust principles, as it assigns to an untested, court-created committee countless management decisions about both Google Play and the Android operating system. That is tantamount to central planning. Economics has, with increasing rigor and empirical evidence, documented the disadvantages of central planning since Adam Smith's *The Wealth of Nations*. *See* Ronald H. Coase, *Lecture to the Memory of Alfred Nobel*, The Nobel Prize, https://www.nobelprize.org/prizes/economic-sciences/1991/coase/lecture/ (last visited Nov. 25, 2024). Courts, too, have long recognized that they are ill-suited to balancing the "benefits of an improved product design against the resulting injuries to competitors." *See Allied Orthopedic Applicants Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010); *see also Trinko LLP*, 540 U.S. at 408.

It is no surprise that few cases have followed *Aspen Skiing*, especially in the wake of *Trinko*. 540 U.S. at 409; Herbert Hovenkamp, *The Monopolization Offense*,

61 Ohio State L.J. 1035, 1044–45 (2000) (noting that "the courts have generally responded" to "problems" in the doctrine "by construing the Aspen and [Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451 (1992)] cases narrowly"); Lindsey Edwards, et al., *Section 2 Mangled: FTC v. Qualcomm on the Duty to Deal, Price Squeezes, and Exclusive Dealing*, 8 J. ANTITRUST ENF'T 335, 337 (2019) ("[Trinko] . . . clarified and narrowed Aspen Skiing and reinforced the importance of a company's right freely to decide with whom to transact."); Geoffrey Manne & Joshua Wright, *If Search Neutrality Is the Answer, What's the Question?*, 2012 COLUM. BUS. L. REV. 152, 192–193 (2012) (noting that *Trinko* limited a competitor's duty to deal under *Aspen Skiing* to "an extremely narrow set of circumstances" and that courts and antitrust agencies "have been reluctant to expand the duty").

Indeed, commentators understandably concluded that *Aspen Skiing*'s liability theory was severely undermined after *Trinko* and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009). Easterbrook, supra p. 9, at 441–42; Richard A. Epstein*, Judge Koh's Monopolization Mania: Her Novel Antitrust Assault Against Qualcomm Is an Abuse of Antitrust Theory*, 98 NEB. L. REV. 250 (2019) (stating that *Trinko* held that a duty to deal exists only in "exceptional circumstances" and that "[m]odern antitrust law has established a strong safe harbor of per se legality against the claim of illegal techniques toward monopolization"); see also *Qualcomm*, 969 F.3d at 994 (emphasizing that the

Court in *Trinko* warned that "the *Aspen Skiing* exception should be applied only in rare circumstances").

Accordingly, because mainstream scholarship generally does not support compelled dealing, and *Aspen Skiing* provides, at best, the "outer boundary" for that doctrine, unilateral refusals to deal can give rise to liability only in very narrow circumstances that do not exist here. The connection between *Aspen Skiing* and *Kodak*—the Court's follow-on limited duty to deal case—is especially salient in this case, given the allegation of monopolization of an aftermarket by a firm with market power in a foremarket.

In *Epic v. Apple*, this Court recognized and applied the Supreme Court's skepticism of lock-in claims, and the heighted burden they impose on plaintiffs: "to establish a single-brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." 67 F.4th at 977. And specifically, "[w]here a plaintiff asserts a Kodak-style single-brand aftermarket, it bears the burden of 'rebut[ting] the economic presumption that . . . consumers make a knowing choice to restrict their aftermarket options when they decide in the initial

25

(competitive) market to enter a[] . . . contract.'" *Epic Games Inc.*, 67 F.4th at 978 (citing *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1050 (9th Cir. 2008)).

The Supreme Court's skepticism in *Kodak*, and this Court's holding in *Epic v. Apple*, are consonant with the economic learning on antitrust cases involving aftermarkets and lock-in, according to which monopolization is possible but uncommon. *See, e.g.*, Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*, 63 ANTITRUST L.J. 483, 485 (1995) (concluding that "significant or long-lived consumer injury based on monopolized aftermarkets is likely to be rare, especially if equipment markets are competitive"); *see also* Carl Shapiro & David J. Teece, *Systems Competition and Aftermarkets, An Economic Analysis of Kodak*, 39 THE ANTITRUST BULLETIN 135 (1994); Dennis Carlton, *A General Analysis of Exclusionary Conduct and Refusals to Deal: Why Aspen and Kodak are Misguided*, 68 ANTITRUST L.J. 659 (2001); *cf.* Benjamin Klein, *Market Power in Antitrust After Kodak*, 3 SUPREME COURT ECON. REV. 43 (1993).

Google, of course, has no market power in smartphones, smartphone operating systems, or mobile gaming app transaction markets. Apple is the U.S. market's leading smartphone manufacturer, and while Google does manufacture Android smartphones, it is not the sole or even leading manufacturer of Android phones. That is, Google lacks market power in a credible foremarket; and as this court noted in *Epic v. Apple*, Epic failed to demonstrate that smartphone consumers

26

are generally unaware of the ecosystems, including apps and app stores, within which smartphones operate. Moreover, Epic failed to demonstrate, and the jury below did not find, that purchasers of Android smartphones are unaware of Google Play or pertinent restrictions (either in Google Play or in competing app stores) when purchasing their smartphones. That goes, of course, to the question of liability, as the jury's findings were inadequate, as a matter of law, to their finding of monopolization of the relevant aftermarket. It also goes to the remedy, and the extraordinary duty to deal that the district court would impose on Google, but not on its main competitor, Apple, or other competitors.

## CONCLUSION

For the foregoing reasons, we urge this Court to vacate.

|  | WILLKIE FARR & GALLAGHER LLP |
|---|---|
| WILLKIE FARR & GALLAGHER LLP | By: /s/ Jonathan A. Patchen___ |
| Matthew Freimuth | Jonathan A. Patchen |
| mfreimuth@willkie.com | JPatchen@willkie.com |
| 787 Seventh Avenue | 333 Bush Street |
| New York, NY | San Francisco, CA 94104 |
| Telephone: (212) 728-8000 | Telephone: (415) 858-7400 |
| Facsimile: (212) 728-8111 | Facsimile: (415) 858-7599 |
|  | *Counsel for Amici Curiae International Center for Law and Economics and Scholars of Law and Economics* |

INTERNATIONAL CENTER FOR
LAW & ECONOMICS
Geoffrey A. Manne
Daniel J. Gilman
gmanne@laweconcenter.org
dgilman@laweconcenter.org

*Counsel for The International
Center for Law & Economics*

## Appendix

### *Amici* Scholars of Law and Economics

1. **Alden F. Abbott**, Senior Research Fellow, Mercatus Center, George Mason University

2. **Donald J. Boudreaux**, Professor of Economics, George Mason University

3. **Dirk Auer**, Director of Competition Policy, International Center for Law & Economics

4. **Robert W. Crandall**, Nonresident Senior Fellow, Technology Policy Institute

5. **Richard A. Epstein**, Laurence A. Tisch Professor of Law, New York University

6. **Vivek Ghosal**, Virginia and Lloyd W. Rittenhouse Professor of Economics, Rensselaer Polytechnic Institute

7. **Daniel J. Gilman**, Senior Scholar, International Center for Law & Economics

8. **Janice Hauge**, Professor, Department of Economics, University of North Texas

9. **Keith Hylton**, William Fairfield Warren Distinguished Professor, Boston University and Professor of Law, Boston University School of Law

10. **Justin (Gus) Hurwitz**, Senior Fellow, Penn Carey Law, University of Pennsylvania and Director, Law & Economics Program, International Center for Law & Economics

11. **Peter Klein**, W. W. Caruth Endowed Chair and Professor of Entrepreneurship, Baylor University

12. **Daniel Lyons**, Professor of Law, Boston College Law School

13. **Geoffrey A. Manne**, President and Founder, International Center for Law & Economics and Distinguished Fellow, Northwestern University Center on Law, Business & Economics

14. **Vernon L. Smith**, Nobel Laureate in Economics (2002) and the George L. Argyros Endowed Chair in Finance at Chapman University

29

15. **Michael Sykuta**, Associate Professor of Economics, University of Missouri

16. **Alexander Volokh**, Associate Professor of Law, Emory University

17. **Jonathan Williams**, Professor, Department of Economics, University of North Carolina, Chapel Hill

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-6256, 24-6274

     I am the attorney or self-represented party.

     **This brief contains 6,315 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[XX] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3). 1

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
     [  ] it is a joint brief submitted by separately represented parties.
     [  ] a party or parties are filing a single brief in response to multiple briefs.
     [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Jonathan A. Patchen     **Date** December 4, 2024

31

## CERTIFICATE OF SERVICE

I certify that on this 4th day of December 2024, the foregoing brief was filed using the Court's ACMS system.  All participants in the case are registered ACMS users and will be served electronically via that system.

Dated:  December 4, 2024                    */s/ Jonathan A. Patchen*
                                            Jonathan A. Patchen