**Nos. 24-6256, 24-6274**

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, ET AL.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for
the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Honorable James Donato

---

**BRIEF OF *AMICUS CURIAE* ACT | THE APP ASSOCIATION
IN SUPPORT OF DEFENDANTS-APPELLANTS**

---

Nicholas J. Giles
Joshua D. Wade
MCGUIREWOODS LLP
800 E. Canal St.
Richmond, VA 23219
(804) 775-4760
ngiles@mcguirewoods.com
jwade@mcguirewoods.com

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

December 4, 2024

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, ACT | The App Association certifies that is has no parent corporation, and that no publicly held company owns 10% or more of its stock.


Dated: December 4, 2024                    */s/ Jonathan Y. Ellis*
                                           Jonathan Y. Ellis

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ...............................................................ii

INTEREST OF *AMICUS CURIAE* .................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 4

ARGUMENT ................................................................................ 7

I.  The Trial Court's Liability Rulings Conflict with the Commercial
    Realities Faced by App Developers ................................................ 7

    A.  The District Court Erred with Respect to Market
        Definition ........................................................................ 8

    B.  The District Court Also Erred with Respect to "Cross-
        Market Rationales" ........................................................... 14

II. The District Court's Remedy Threatens the Value that
    Developers Receive from the Google Play Store ........................... 16

    A.  The District Court's Remedy Risks App Developers' IP
        and Reputations ................................................................ 17

    B.  Epic's Preferences Do Not Represent All App Developers
        and in Fact Distort Market Forces ...................................... 20

CONCLUSION ............................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962).........................................................................7, 11

*Commercial Data Servers, Inc. v. IBM Corp.,*
   262 F. Supp. 2d 50 (S.D.N.Y. 2003)...............................................11-12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992)..............................................................................12

*Epic Games, Inc. v. Apple, Inc.,*
   67 F.4th 946 (9th Cir. 2023) ...................................2, 7-8, 11-12, 13, 15

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC,*
   371 F.3d 1275 (10th Cir. 2004).............................................................11

*Kaiser Found. v. Abbott Labys,*
   No. 02-CV-2443, 2009 WL 3877513 (C.D. Cal. Oct. 8,
   2009)......................................................................................................11

*United States v. E. I. du Pont de Nemours & Co.,*
   351 U.S. 377 (1956)..............................................................................11

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001)...................................................................3

## Other Authorities

ACT | The App Association Letter to Acting Federal Trade
   Comm'n Chair R. Slaughter and Comm'r R. Chopra (Feb.
   5, 2021)...................................................................................................4

iii

Comments of ACT | The App Association to the Federal
    Trade Commission on Competition and Consumer
    Protection in the 21st Century (Question 3) (Aug. 20,
    2018), *available at* https://actonline.org/wp-
    content/uploads/Q3-ACT-Comments-re-FTC-2018-
    Consumer-Protection-Hearings-082018-FINAL.pdf .............. 1-2, 4, 20

State of the App Economy, ACT | The App Association
    (2023), *available at* https://actonline.org/wp-
    content/uploads/APP-Economy-Report-FINAL-1.pdf ......................... 1

Testimony of Morgan Reed, President ACT | The App
    Association, Before the U.S. House of Representatives
    Judiciary Committee, Subcommittee on Antitrust,
    Commercial and Administrative Law (2019), *available at*
    https://docs.house.gov/meetings/JU/JU05/20190716/10979
    3/HHRG-116-JU05-Wstate-ReedM-20190716.pdf ................. 1-2, 5, 18

iv

## INTEREST OF *AMICUS CURIAE*[1]

Founded in 1998, ACT │The App Association ("App Association") is a not-for-profit advocacy and education organization representing the small business developer, innovator, and entrepreneur community that creates countless software applications used on mobile devices and in enterprise systems. The software application economy represented by the App Association is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[2]

As the App Association has consistently explained—in comments to the Federal Trade Commission,[3] testimony before Congress,[4] and an

---

[1]    No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than the *amicus*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

[2]    State of the App Economy, ACT │ The App Association (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

[3]    Comments of ACT │ The App Association to the Federal Trade Commission on Competition and Consumer Protection in the 21st Century (Question 3) (Aug. 20, 2018), at 3-4 ("App Association FTC Comments"), *available at* https://actonline.org/wp-content/uploads/Q3-ACT-Comments-re-FTC-2018-Consumer-Protection-Hearings-082018-FINAL.pdf.

[4]    Testimony of Morgan Reed, President ACT │ The App Association, Before the U.S. House of Representatives Judiciary Committee,

amicus brief filed with this Court in *Epic Games v. Apple*—mobile platforms like the Google Play Store have created immense value for app developers and end users. Before mobile platforms, app developers engaged in time-consuming marketing campaigns to reach users. These costs imposed formidable barriers to entry, resulting in higher prices, less adoption, and fewer apps being developed in the first place. Now, mobile software platforms provide one-stop shops where developers and end users transact directly. This has significantly lowered barriers to entry and freed up capital that developers now use to improve their apps and expand their offerings.

The relationship between developers and platform companies, like Google and Apple, is mutually beneficial.[5] Developers provide digital content, which draws consumers to the platforms, while the platforms provide developers with low overhead costs, simplified market entry,

---

Subcommittee on Antitrust, Commercial and Administrative Law (2019), at 3-6 ("App Association Congressional Testimony"), *available at* https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ReedM-20190716.pdf.

[5]      *See* App Association FTC Comments, at 2.

consumer trust, dispute resolution, data analytics, flexible marketing and pricing models, and strengthened IP protections.

Because of its members' reliance on mobile platforms, the App Association has a deep interest in ensuring the antitrust laws are properly applied to these platforms to promote competition and increase output. This interest is longstanding. One of the first amicus briefs the App Association ever filed was in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), where the Department of Justice sought to break up Microsoft and the Court discussed Microsoft's "platform[] for software applications," *id.* at 53. More recently, the App Association closely followed Epic's litigation against Apple that parallels this case and filed an amicus brief before this Court that explained the ways in which Apple's App Store is important to developers and end users.

The App Association writes here to highlight the symbiotic relationship between its member developers and Google and to explain how the district court's remedy would harm the small app developers who use the Play Store to reach millions of users.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's judgment—both in its liability finding and remedy—conflicts with the commercial realities of the app market and threatens not only the App Association's small business app developer members, but also the app economy more broadly. Both the verdict and permanent injunction should be vacated.

The Play Store has created enormous value for small business app developers. App platforms like the Play Store provide small app companies with secure market access, consumer trust, developer autonomy, dispute resolution, and meaningful consumer analytics.[6] These benefits have enabled the app economy to prosper and transformed the economy as a whole by bringing new app-driven efficiencies to consumers and virtually all industries.[7] The Play Store is a central part of the massive disintermediation of apps to end users, which has made apps cheaper for the consumer, faster to create, and open to more developers of all sizes.[8]

---

[6]    App Association FTC Comments at 3-4.

[7]    ACT | The App Association Letter to Acting Federal Trade Comm'n Chair R. Slaughter and Comm'r R. Chopra (Feb. 5, 2021).

[8]    *Id.*

4

The Play Store also serves a critical role in ensuring that small app developers receive the benefit of competition between platforms.[9] Although the market for platforms is broader than just Google and Apple, those companies offer the two major app stores.[10]  The Play Store is thus the primary alternative to and competitive constraint on Apple's App Store, as well as other distribution options.  The competition between platforms has spurred competition on multiple vectors, including the services offered to developers, the safety and security of the platforms, and price.

The district court's order threatens all of this.  It asymmetrically pulls levers that will distort the market, harming app developers and ultimately end users.  The merits of the district court's decision are at odds with market realities in two fundamental ways.  First, Google and Apple clearly compete with one another.  The App Association's members have witnessed firsthand (and benefitted from) the extensive competition between these two companies' platforms.  It is alarming that the district court's consequential rulings were based on such a fundamental

---

[9]     App Association Congressional Testimony at 3.

[10]     *Id.* at 6-8.

misunderstanding of the competitive dynamics in the market. Second, app developers choose to develop and offer apps in the Play Store and App Store in large part because of the strengths of Google's and Apple's operating systems and devices. The trial court's refusal to consider the relationship between the app stores and these closely related products artificially constrains the relevant analysis.

The remedies ordered by the district court are even more concerning for app developers. First, the district court's order that Google share its "catalog" of apps with new app stores raises significant intellectual property, contractual, and safety concerns for app developers. App developers in the Google Play Store have agreed for their apps to be offered through Google's Play Store, not every app store. We have significant concerns about apps being offered (without the app developer's prior approval) in knock-off app stores that lack Google's support, reputation, and security infrastructure. Second, the district court's order gives Epic an outsized role in remaking the Play Store to its liking. Most prominently, Epic will appoint one of the three members on the technical committee, which member will (together with Google's appointee) appoint a third member. But Epic does not represent all app

6

developers—far from it—and its development and commercial preferences frequently diverge from the small and medium-sized developers represented by the App Association. If the Court is going to proceed with allowing the district court and technical committee to reconstruct a pillar of the app economy, there is (at the very least) no basis to elevate Epic's preferences over those of other app developers.

Because it is predicated on a market definition that is at odds with commercial realities, the App Association respectfully submits that the judgment should be vacated. If it is not vacated entirely, the App Association urges this Court to interrogate and limit the wide-ranging remedies ordered by the district court.

## ARGUMENT

### I. The Trial Court's Liability Rulings Conflict with the Commercial Realities Faced by App Developers.

It is black-letter law that market definition must correspond to the "commercial realities" of the marketplace. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 996 (9th Cir. 2023) (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) ("the definition of the relevant market" must "correspond to the commercial realities of the industry") (internal

7

quotation marks omitted). The App Association's member app developers have extensive experience with the marketplace discussed in the district court's rulings—their apps are widely distributed through the two major app stores, Google's Play Store and Apple's App Store. We thus speak from experience when we say that the district court's analysis of the relevant markets misapprehends the commercial realities in two fundamental ways: by defining the market too narrowly and by refusing to allow cross-market rationales to impact the analysis.

## A. The District Court Erred with Respect to Market Definition.

The district court erred both factually and legally in allowing Epic to argue that Google and Apple do not compete. Market realities faced by app developers show Google and Apple engage in non-stop close competition, and the district court's refusal to give preclusive effect to *Epic v. Apple*'s recognition of that competition was legal error. Those errors will have harmful practical consequences on competition.

Factually, app developers' daily experience demonstrates that the App Store is an alternative to and a key competitive restraint on the Play Store. App developers have repeatedly witnessed Apple and Google responding to innovations in the other's store. *See, e.g.*, 5-ER-1003-06; 5-

8

ER-1107-09; 6-ER-1313-18; 6-ER-1351-57; 6-ER-1411.    The clearest example of this competition may be Google's early and extensive investment to improve upon, rebrand, and ultimately relaunch its "Android Market" as the Play Store.  *See* 6-ER-1309-11.

Developers benefit from competition between the Play Store and the App Store on several vectors, including:

- **Developer support**:    Both Google and Apple have invested *billions* of dollars in their app stores to attract developers and their end user customers.    These investments come in the form of customer support services; secure payment processing; robust options for building, testing, and gathering pre-release feedback for apps; tools to manage updates and distribution; and game performance insights.  When working on improvements like these, Google is "very regularly speaking with developers" in order "to understand what developers [are] most looking for" and "to stay competitive relative to Apple's app store."  6-ER-1316.  The rationale for these investments is clear. Google and Apple provide and continuously improve their services because, if they did not, developers would gravitate to the other store.

9

- **Safety and security**:  Relatedly, Google and Apple also compete on the safety and security of their stores.  Google "deeply invested" in its parental controls as part of its efforts to compete against Apple.  5-ER-1107-08.  Also as part of its competition with Apple, Google reviews all apps on the Play Store for malware before they are published. 5-ER-1107-08; 5-ER-1233.  Google informs itself about Apple's security and privacy efforts and tries to make sure its security is as good or better than Apple's.  5-ER-1138-39.

- **Price**:  Google lowered service fees on subscriptions in response to a reduction made by Apple.  *See* 6-ER-1317-19.  More generally, both Google and Apple charge a 30% service fee on digital gaming transactions like those in Epic's games.  *See* 6-ER-1274.  Google and Apple pay close attention to the prices the other is charging and respond accordingly.  In other words, they compete on price.

In each of these ways, the Play Store and the App Store compete to attract developers, and thereby offer more content to consumers.  The district court's approach simply ignores this direct evidence of competition.

The district court's framing of an Android-only market is not only at odds with the facts, it is also at odds with the law.  Markets are defined

10

by "the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. In other words, "[t]he relevant market for antitrust purposes is 'the area of effective competition'—i.e., 'the arena within which significant substitution in consumption or production occurs.'" *Apple*, 67 F.4th at 975 (quoting *Am. Express*, 585 U.S. at 543).

Courts rarely limit that arena to a single brand because, in almost all cases, consumers can and do look to multiple brands as alternatives. *See United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) ("power that, let us say, automobile or soft-drink manufactures have over their trademarked products is not the power that makes an illegal monopoly").[11] That holds true in software platform cases. In *Commercial Data Servers, Inc. v. IBM Corp.*, 262 F. Supp. 2d 50 (S.D.N.Y. 2003), for instance, the court rejected the plaintiff's argument for a standalone market of computers running IBM's computer platform,

---

[11]    *See also Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("In general, a manufacturer's own products do not themselves comprise a relevant product market."); *Kaiser Found. v. Abbott Labys*, No. 02-CV-2443, 2009 WL 3877513, at *9 (C.D. Cal. Oct. 8, 2009) ("[c]ourts have consistently held that a brand name product cannot define a relevant market" (citation omitted)).

11

concluding instead that those IBM computers competed with computers running Windows and UNIX platforms. *Id.* at 64. So too here. Developers and end users look to the App Store and a range of other distribution options depending on the kind of software in question as alternatives to the Play Store.

To be sure, as discussed in *Apple*, the Supreme Court has recognized that there may be single brand markets for aftermarket products or services. *See Apple*, 67 F.4th at 976 (discussing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992)). But these cases impose specific requirements that must be met in order to establish the rare single-brand market. *See* Google Opening Br. at 40-45. Epic did not (and could not) meet the requirements to gerrymander a Play Store-only market here—as evidenced by the extensive direct evidence of head-to-head competition summarized above. The district court's failure to instruct the jury appropriately on these requirements requires vacatur.

In addition to these discrete errors, the district court's willingness to part ways from this Court's prior decision in *Epic v. Apple* puts app developers in a difficult and artificial place. In *Apple*, unlike here, the

12

district court found a wider market for "mobile-game transactions—i.e., game transactions on iOS and Android smartphones and tablets." 67 F.4th at 970. This market stood on appeal. *Id.* at 981. That market accounted for the commercial realities discussed above, acknowledging that Google and Apple are alternatives for both developers and consumers. As Google has explained (at 31-36), the conflicting holdings of this Court in *Apple* and the district court are inconsistent with the doctrine of issue preclusion.

More practically, however, the conflicting rulings also threaten to upend market dynamics that actually *enable* small and mid-sized app developers to compete. At bottom, app developers want vigorous competition between Google and Apple to develop ecosystems where the developers are able to efficiently distribute their apps. But the district court's preliminary injunction will divert Google from that competitive focus by requiring it to expend significant resources and time supporting cloned Google Play Stores that almost certainly will provide a weaker constraint on the App Store than Google Play itself. App developers do not want more, worse versions of the Play Store—they want intense competition between Google and Apple. The court's order not only gives

13

Apple a competitive leg up against Google (by allowing it to defend against Epic's suit against the backdrop of a larger market), it threatens to shift the balance of power in the market to the detriment of developers and the consuming public. This Court should rectify that result, which counterintuitively harms competition.

### B. The District Court Also Erred with Respect to "Cross-Market Rationales."

The district court further erred when it declined to instruct the jury that they could consider cross-market rationales when assessing the reasonableness of Google's conduct. This, again, failed to account for the commercial realities faced by market participants and app developers.

App platforms do not exist in a vacuum. Instead, they are closely connected to several other products offered by both Google and Apple, including their respective operating systems and mobile devices. Google's conduct here reflects that market reality. As Google rightly observes, the same agreements that purportedly limited competition in the app platform market increase competition in the operating system and device markets. *See* Google Opening Br. at 17-22, 50. Google's Revenue Sharing Agreements, for example, offered financial incentives for OEMs to invest in Android-based devices. 5-ER-1058-59. While

14

certain incentives were only available to OEMs who made Google Play the only preinstalled app store on the device, these agreements increased competition *for devices*.

App developers experience the relationship between these products. It is important to the long-term competitiveness of the Play Store *vis-à-vis* the App Store for Google to have a robust operating system and for there to be many Android devices. Put differently, the ultimate customers of apps are the end users who buy devices that run Android or iOS. But fewer of those users will use Google Play if Google does not continue its investments in the operating system and device markets. Competition in the app platform market is thus closely related to competition in the operating system and device markets, and it makes sense to consider the procompetitive benefits across these markets.

The district court's refusal to instruct the jury on this point flies in the face of Supreme Court precedent, which "has considered cross-market rationales in Rule of Reason and monopolization cases." *Apple*, 67 F.4th at 989 (collecting cases). And it risks further undermining competition in those closely related markets. A Play Store forced to compete with artificially propped-up new entrants, for instance, will not improve the

15

Android experience; instead, it potentially will drive more consumers away to iOS. When Google competes vigorously against Apple, by contrast, everybody wins. Put another way, other than Epic, no entity is likely more encouraged by the district court's ruling than Apple.

## II.   The District Court's Remedy Threatens the Value that Developers Receive from the Google Play Store.

While the district court's liability decision may threaten the long-term competitive balance between Google and Apple, its remedy will acutely harm app developers in the near term. First, the trial court's remedy *requires* Google to share the app developers' apps with other platforms or stores *without the app developers' prior approval*. This has the potential to cause material harm to app developers, placing at risk their IP, their reputation, and their users' security. Google has burnished a tremendous reputation in this field, precisely because it has invested in making the Play Store work for developers. That success cannot simply be cloned. Second, the trial court gifts Epic an outsized (and undeserved) role in the future of the Play Store. This is particularly concerning because Epic has demonstrated not only that it does not represent the developer community, but that many of its interests are actually adverse to other developers.

### A.    The District Court's Remedy Risks App Developers' IP and Reputations.

The default "catalog sharing" rule established by the district court is an egregious violation of App Association members' rights.  The court's remedial order directs Google to make the apps on the Play Store available to new, would-be competitors.  Developers who do not want their apps shared on the knock-off Play Stores must take yet-to-be-determined affirmative steps to "opt out" from that default rule.  This perversely disregards the wishes, interests, rights, role, and autonomy of app developers.

Currently, developers contract with Google to distribute their apps through the Play Store.  When they do so, they grant *Google* a nonexclusive license to use their intellectual property.  *See, e.g.*, 2-ER-399 (granting Google license to "display Developer Brand Features … for use solely within Google Play").  This license granted to Google neither provides parallel grants to other app platform operators nor grants Google the right to sublicense the developers' intellectual property out to others.  *See* 2-ER-397-399.  By instructing Google to make developers' apps available on other platforms, the district court's order entirely disregards developers' intellectual property and rights.

17

This is not a hollow concern. Even if some new application platforms are made by reputable platform operators, others will almost certainly have inadequate resources and lack the experience to screen for safety, security, and inappropriate content, or may even be used affirmatively by hackers to steal sensitive information. There is significant expense and effort required to continuously monitor for threats, which smaller upstart app stores may not be able to adequately resource.[12] These risks are exacerbated by the limits the Court imposed on Google's ability to screen the knock-off Play Stores.

These risks will no doubt be felt by Google, but also by the developers. A user whose security is compromised, or who is simply dissatisfied, when downloading an app from a knock-off Play Store may not know enough to assign blame to the platform, rather than the app

---

[12]    *See, e.g.*, App Association Congressional Testimony at 9 ("[T]he game of cat-and-mouse between cybersecurity professionals and hackers will never end, and security must continue to evolve to meet and beat the threats. . . . [D]evelopers want the platform's security features to work seamlessly with any relevant hardware and that they account for all attack vectors. Platforms should continue to improve their threat sharing and gathering capabilities to ensure they protect developers across the platform, regardless of where threats originate. Moreover, they should approve and deploy software updates with important security updates rapidly to protect consumers as well as developers and their clients and users.").

18

developer. Developers must retain the right to avoid these issues by choosing where, through whom, and on what terms they offer their apps in the first instance.

To be sure, the district court ordered Google to create a procedure whereby developers can opt out of the default rule established by the court. 1-ER-5. But this gets it backwards—no third-party Android app store should have access to developers' apps until the developer licenses their apps to that store. The court's order effectively requires developers to license their apps to *all* third-party Android app stores unless they take affirmative steps to prevent it. 1-ER-5. Practically, and importantly, many small developers that the App Association represents may not have the resources to monitor every new Android app store and then take the requisite steps to opt out.

The "catalog sharing" requirement should be excised from the district court's proposed remedy. App developers should be allowed to choose which stores they do (and do not) offer their apps through, and the district court's novel remedy ignores those rights.

### B. Epic's Preferences Do Not Represent All App Developers and in Fact Distort Market Forces.

Epic is an enterprising litigant, but it does not represent other app developers, and, in several ways, its interests are adverse to other app developers. Its outsized role in the trial court's remedy is thus likely to harm—not help—competition.

App developers largely have a mutually beneficial and symbiotic relationship with Google. On the one hand, developers provide digital content, which draws consumers to the Play Store, and pay a portion of in-app purchases to Google. On the other hand, Google provides developers with low overhead costs, simplified market entry, consumer trust, dispute resolution, data analytics, flexible marketing and pricing models, and strengthened IP protections.[13] App developers thus have largely found Google to be a responsive and collaborative business partner, who—like the developers—is incented to make sure end users can safely and securely access and use apps listed in the Play Store.

Epic does not share these incentives. As discussed, the decision whether to offer an app in a new app store must reside with the

---

[13] *See* App Association FTC Comments, at 2.

20

individual developer. But if or when those developers do want to distribute their apps on new third-party Android app stores that enter the market, their apps should be distributed in a fair and transparent manner. Epic is a large, self-interested app developer that is not directly incentivized to look out for these small, start-up developers. To the contrary, as an established, incumbent developer, it has every incentive to prevent nascent apps from developing into fully formed competitors.

Epic is significantly better capitalized than many of the small and mid-sized developers that are members of the App Association. If Google needs to increase prices to replace the lost revenue from in-app purchases (whether in the form of higher commissions, yearly licensing fees, or per-download fees), Epic would be able to absorb these increases much more easily than would small and mid-size developers.

Moreover, small developers rely on the trust that Google has created in its secure and stable Google Play ecosystem. Larger developers like Epic, with greater brand recognition and a reputation of its own, do not rely on Google Play in the same way. Epic's Fortnite, for example, has massive live events and is a household name. Up-and-coming apps do not have similar marketing power and so rely on users

21

finding them in a trusted marketplace, *e.g.*, the Play Store. Epic's large position means that it has different incentives concerning how to steer the app ecosystem than the overwhelming majority of app developers.

Despite these divergent interests, the district court's remedy elevates Epic from market participant to one of three stewards tasked with *steering* the app economy going forward. Epic will appoint one of the three members on the technical committee, who will liaise with Google's appointee to appoint a third member. This technical committee will then have power to affect not just Epic and Google, but any party that uses Google Play—namely, app developers. In particular, "the Technical Committee will review disputes or issues relating to the technology *and processes* required by" the provisions of the permanent injunction. 1-ER-5 (emphasis added). Thus, the technical committee's jurisdiction could extend to disputes concerning how knock-off Play Stores do or do not gain access to the Play Store's catalog of apps. *See* 1-ER-4. This directly impacts the developers that created those apps and retain IP in them.

In light of these problems, the Court should vacate the preliminary injunction's provision concerning the technical committee. To the extent

that the Court's mandate leaves room for the district court to reconsider a technical committee on remand, the Court should direct the trial court to ensure that any technical committee reflects the interest of a wider, more representative range of app developers, particularly smaller ones that more directly depend on the Play Store.

## CONCLUSION

For the foregoing reasons, the Court should vacate the judgment and direct the district court to enter judgment for Google. At a minimum, the Court should vacate the permanent injunction and remand for further proceedings on remedies that would acknowledge and protect app developers' rights.

Dated: December 4, 2024                Respectfully submitted,

Nicholas J. Giles                              */s/Jonathan Y. Ellis*
Joshua D. Wade                              Jonathan Y. Ellis
MCGUIREWOODS LLP                    MCGUIREWOODS LLP
800 E. Canal St.                               501 Fayetteville Street
Richmond, VA 23219                       Suite 500
(804) 775-4388                                Raleigh, NC 27601
ngiles@mcguirewoods.com            (919) 755-6688
jwade@mcguirewoods.com            jellis@mcguirewoods.com

*Counsel for Amicus Curiae*

23

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-6256, 24-6274

I am the attorney or self-represented party.

**This brief contains** | 4,384 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Jonathan Y. Ellis | **Date** | 12/04/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2024, I electronically filed the foregoing brief with the Clerk of this Court using the appellate CM/ECF system, which will also serve counsel of record.


Dated: December 4, 2024          */s/ Jonathan Y. Ellis*
                                 Jonathan Y. Ellis