**Nos. 24-6256, 24-6274**

# In the United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,
*Plaintiff-Appellee,*

*v.*

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE,
LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California,
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

**BRIEF OF AMICI CURIAE ANTITRUST LAW PROFESSORS
THOMAS A. LAMBERT AND JOHN M. YUN SUPPORTING
DEFENDANTS-APPELLANTS**

Scott A. Keller
Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

## TABLE OF CONTENTS

Table of Contents ...................................................................................i

Table of Authorities ............................................................................ iii

Interest of Amici Curiae ......................................................................1

Introduction .........................................................................................2

Argument .............................................................................................5

    I.   *Epic Games v. Apple* Precludes Google's Liability to Epic
        Here. ...........................................................................................5

        A.  Issue Preclusion Bars Epic from Relitigating Whether
            Google and Apple Compete in the Relevant Market....................6

           1.  Epic's Separate Lawsuits Against Apple and Google
              Raised an Identical Issue About Whether Apple and
              Google Compete in the Relevant Market. ...............................6

           2.  The Issue of the Relevant Market and Its
              Competitiveness was Actually Litigated and Decided
              in *Epic Games v. Apple.* .............................................................11

           3.  Epic had a Full and Fair Opportunity to Litigate the
              Relevant Market and Its Competitiveness. ............................12

           4.  Determination of the Relevant Market Was Necessary
              to Decide *Epic Games v. Apple.*..................................................13

          B.  Under Governing Precedent, Epic Did Not Prove the
            Aftermarkets Required to Sustain Liability Here.......................14

    II.  The District Court Improperly Precluded the Jury from
        Crediting Procompetitive Benefits that This Court
        Recognized in *Epic Games v. Apple.* .......................................17

    III.  The District Court's Injunction Impairs Competition
        Among Producers of Mobile Operating Systems and Entails
        the Sort of Judicial Central Planning that the Supreme
        Court Has Condemned.........................................................22

A.  The District Court's Injunction Will Reduce
Competition Among Producers of Mobile Operating
Systems................................................................................23

B.  The District Court's Injunction Requires It to Engage in
the Sort of Judicial Central Planning that the Supreme
Court Has Condemned....................................................26

Conclusion.............................................................................................29

Certificate of Service ...........................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)..................................................................27

*Cascade Health Sol'ns v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008)....................................................28

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)....................................................................22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)..................................................................20

*Epic Games, Inc. v. Apple, Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) .......... 5, 9, 10, 11, 12, 13, 14, 17, 18, 23

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)............. 1, 5, 6, 7, 11, 12, 13, 14, 15, 17, 18, 19, 23

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..................................................................20

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020)..................................................20

*NCAA v. Alston*,
  594 U.S. 69 (2021)...........................................................20, 23, 26

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)....................................................................20

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015)..................................................20

*SEC v. Stein,*
  906 F.3d 823 (9th Cir. 2018)................................................................6, 8

*Snowqualmie Indian Tribe v. Washington,*
  8 F.4th 853 (9th Cir. 2021)...................................................................6

*United States v. Grinnell Corp.,*
  384 U.S. 563 (1966).............................................................................7

*United States v. Phila. Nat'l Bank,*
  374 U.S. 321 (1963).........................................................................21, 22

*United States v. Topco Assocs., Inc.,*
  405 U.S. 596 (1972)............................................................................22

*Verizon Commc'ns. Inc. v. Law Offs. of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004).......................................................................27, 28

**Statutes**

15 U.S.C. § 18 (2024)..............................................................................21

**Other Authorities**

50 C.J.S. Judgments § 1043 (May 2024 Update) ..................................8

Andrew Lanxon, *Android v. iPhone: 15 Years of Innovation
  Through Rivalry*, CNET (April 24, 2024),
  https://perma.cc/EK6C-NXSW .........................................................23

John M. Yun, *Reevaluating Out of Market Efficiencies in Antitrust*,
  54 Ariz. St. L. J. 1261 (2022) ........................................................1, 21

Nico Grant, *Google Loses Antitrust Court Battle With Makers of
  Fortnite Video Game*, N.Y. Times (Dec. 11, 2023) ...........................4

Richard A. Posner, Antitrust Law (2d ed. 2001) ..............................2

iv

ROBERT H. BORK, THE ANTITRUST PARADOX: A POLICY AT WAR
    WITH ITSELF (1978) ............................................................................2

Thomas A. Lambert, *The Essence of an Antitrust Violation*, 76 UC
    L. J. __ (forthcoming 2025) ......................................................1

## INTEREST OF AMICI CURIAE

Amici are two professors of antitrust law and economics. Thomas A. Lambert is the Wall Family Chair and Professor of Law at the University of Missouri Law School. John M. Yun is Associate Professor of Law at Antonin Scalia Law School at George Mason University.[1] Amici submitted an amicus brief in the analogous appeal of *Epic Games v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023). They have published scholarship examining that case and this one, including the issue of "cross-market justifications," which is presented in both cases. *See, e.g.*, Thomas A. Lambert, *The Essence of an Antitrust Violation*, 76 UC L. J. __ (forthcoming 2025) (analyzing Epic's claims against Apple and Google); John M. Yun, *Reevaluating Out of Market Efficiencies in Antitrust*, 54 ARIZ. ST. L. J. 1261 (2022). Amici believe the liability judgment and Permanent Injunction entered below threaten to undermine effective antitrust enforcement.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for Appellants consent to the filing of this amicus brief. Counsel for Appellee has not consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

1

## INTRODUCTION

In the introduction to his 1978 book, *The Antitrust Paradox*, Judge Robert Bork recounted a speech to the American Bar Association by "a nationally prominent attorney, who subsequently became an Associate Justice of the Supreme Court." ROBERT H. BORK, THE ANTITRUST PARADOX: A POLICY AT WAR WITH ITSELF 6 (1978). The attorney, reputed to be future Justice John Paul Stevens, described then-prevailing antitrust doctrine as being in "the good old American tradition of the sheriff of a frontier town: he did not sift evidence, distinguish between suspects, and solve crimes, but merely walked the main street and every so often pistol-whipped a few people." *Id*.

Antitrust has improved dramatically since the time of that unfavorable comparison. Writing in 2001, Judge Richard Posner heralded the improvements, observing that while "[m]uch of antitrust law in 1976 was an intellectual disgrace[,] [t]oday, antitrust law is a body of economically rational principles…." RICHARD A. POSNER, ANTITRUST LAW vii (2d ed. 2001). Contemporary antitrust does "sift evidence" and "distinguish between suspects" on economically principled grounds when determining which defendants deserve antitrust liability.

The judgment below bucks this salutary trend. The district court concluded that the *less restrictive* policies of one of the two leading producers of mobile operating systems violate the U.S. antitrust laws, even though this Court had already held that analogous but *more restrictive* policies of the producer's chief rival do not. Based on that illogical conclusion, the district court

2

saddled the firm imposing less restrictive policies with obligations that will impair its ability to compete with its more restrictive rival. That is Old West sheriff stuff, and it should not stand.

Defendant-appellant Google produces and licenses—for free—the Android mobile operating system that is used in smartphones and digital tablets that are produced by original equipment manufacturers (OEMs) like Samsung and Motorola. Google is locked in an intense battle with another mobile operating system producer, Apple. Apple produces the iOS mobile operating system, which is used only in the smartphones and tablets that Apple itself produces (iPhones and iPads).

Google and Apple were sued on the same day, in the same court, and by the same plaintiff. *See* Complaint for Injunctive Relief, Epic Games, Inc. v. Apple Inc., Case 4:20-cv-05640 (N.D. Cal. Aug. 13, 2020) (hereinafter "Apple Complaint"); Complaint for Injunctive Relief, Epic Games, Inc. v. Google LLC, Case 3:20-cv-05671 (N.D. Cal. Aug. 13, 2020) (hereinafter "Google Complaint"). In both cases, that plaintiff—appellee Epic Games, producer of the Fortnite video game—alleged harm in two operating system-specific markets: the markets for (1) distribution of iOS/Android applications ("apps") and (2) payment processing services for iOS/Android in-app purchases. *See* Apple Complaint, ¶ 6; Google Complaint, ¶¶ 3, 80, 114. In both cases, Epic's alleged harm resulted from defendants' policies that limit the use of other service providers in the putative markets.

There are a couple of key differences between the two cases. Most notably, Apple's challenged policies are far more restrictive than Google's. Whereas Apple absolutely forbids distribution of iOS apps outside its proprietary app store, Google allows such distribution but warns users of the security risks it presents. Compare Apple Complaint, ¶ 66, with Google Complaint, ¶ 94-98. A second difference is that Google must enter contracts with OEMs and mobile service providers, who benefit from the free Android license Google provides, to ensure that its own app store—Google Play—is prominently featured on a user's device. As Apple produces its own mobile devices, it not need not enter contracts to assure prominent and exclusive placement of its proprietary app store, which is called the App Store.

The cases also differ in how they were adjudicated and in their outcomes. Epic's claims against Apple were tried before a judge, who issued a 185-page ruling that found for Apple on the federal antitrust claims and was largely affirmed in a 91-page ruling by this Court. Epic's challenges to Google's less restrictive policies were heard by a jury that deliberated for just over three hours before returning a simple verdict form declaring Google liable. Nico Grant, *Google Loses Antitrust Court Battle With Makers of Fortnite Video Game*, N.Y. TIMES (Dec. 11, 2023). Armed with that verdict, the district court has now subjected Google to a number of obligations that its rival—the one with the more restrictive policies—may avoid.

The illogic of the conflicting treatment of two similarly situated defendants is enough to make a frontier sheriff blush. Fortunately, there are ample

grounds for this Court to reverse the decision below and vacate the injunction that will otherwise dampen competition between two leading producers of mobile operating systems.

## ARGUMENT

### I. *Epic Games v. Apple* Precludes Google's Liability to Epic Here.

The judgment below depends on the district court's finding that the relevant markets are *Android-specific* app transaction services (app distribution and in-app payment processing). In Epic's earlier lawsuit against Apple, however, the district court found that the relevant markets for those services, at least in the multi-platform mobile gaming context relevant here, are *not* operating system-specific but feature competition between Google and Apple. *Epic Games, Inc. v. Apple, Inc.*, 559 F. Supp. 3d 898, 987, 1024-26 (N.D. Cal. 2021) ("*Apple I*"). This Court affirmed that finding. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981 (9th Cir. 2023) ("*Apple II*").

The doctrine of issue preclusion bars Epic from relitigating whether the relevant market for mobile gaming transactions is operating system-specific so that Google and Apple do not compete. Even if issue preclusion did not apply, *Apple II*'s reasoning controls and resolves this case. *Apple II* holds that a plaintiff complaining of aftermarket restrictions on services related to a durable good cannot establish a cognizable antitrust aftermarket in those services absent a finding that purchasers were unaware of the aftermarket

restrictions when they bought the good. *Apple II*, 67 F.4th at 977. The jury below made no such finding.

### A. Issue Preclusion Bars Epic from Relitigating Whether Google and Apple Compete in the Relevant Market.

Before the district court, Epic argued that Google does not compete with Apple in providing the allegedly monopolized services. But *Apple II* held that Google and Apple do compete in the relevant market. Under the doctrine of issue preclusion, that holding should have governed Epic's suit against Google.

Issue preclusion "bars parties from relitigating an issue if the same issue was adjudicated in prior litigation." *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018). Issue preclusion applies if "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Snowqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (citation omitted). On the issue whether Google competes with Apple in providing the allegedly monopolized services, all four elements are satisfied.

### 1. Epic's Separate Lawsuits Against Apple and Google Raised an Identical Issue About Whether Apple and Google Compete in the Relevant Market.

In *Epic Games v. Apple*, Epic asserted that Apple had monopolized app distribution and in-app payment processing services related to Epic's video

game, Fortnite. Apple Complaint, ¶¶ 35-111. Proving monopolization requires showing "the possession of monopoly power in the relevant market," *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966), a power that can exist only in the absence of significant competition. The *Apple I* court therefore had to answer a question: Are the markets for the allegedly monopolized services "operating system-specific," meaning that Apple's App Store and proprietary in-app payment processing service face no competition from Google, or are those services sold in a broader market in which Apple and Google compete? The court found that both Apple and Google compete in a broader market, and this Court affirmed. *Apple II*, 67 F.4th at 970 (observing that *Apple I* court found the relevant market was "mobile-game transactions—*i.e.*, game transactions on iOS and Android smartphones and tablets"); *id*. at 981 (holding that district court's definition of the relevant market "stands on appeal").

In *Epic Games v. Google*, Epic alleged that Google had monopolized the same Fortnite-related services at issue in the Apple case (app distribution and in-app payment processing). Google Complaint, ¶¶ 3, 80, 114. That is the very issue resolved in *Epic Games v. Apple*. After all, competition is reciprocal. If your service competes with mine, then my service competes with yours. Because *Epic Games v. Apple* found that Google competes with Apple in providing the Fortnite-related services at issue, it necessarily decided that Apple competes with Google in providing those services.

The district court here insisted otherwise. It said that the questions in Epic's Apple and Google cases were not identical because Epic (1) "took a very different approach to the markets in this case" and (2) did not "argue for aftermarkets for Android app distribution and Android in-app payment solutions, derived from a foremarket for Android devices." Order re Google's Renewed Motion for Judgment as a Matter of Law or for New Trial in *Epic* Case, ECF 984 at 7 (July 3, 2024) ("JMOL Order"). Neither assertion rescues Epic from issue preclusion.

Whether Epic "took a wholly different approach for the antitrust claims against Google, and offered wholly different evidence about relevant markets than that offered in the case against Apple," *id.*, is beside the point. The doctrine of issue preclusion bars *relitigation* of decided questions of fact, even if different evidence and arguments are proffered. *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018) ("[i]ssue preclusion bars parties from relitigating an issue if the same issue was adjudicated in prior litigation"); 50 C.J.S. Judgments § 1043 (May 2024 Update) ("Under the issue preclusion doctrine, a party may not be permitted to introduce new or different evidence to relitigate a factual issue which was presented and determined in a former action.").

The district court's further assertion that Epic did not argue for Android-specific aftermarkets is simply incorrect. The district court acknowledged that Epic "took maximum advantage" of its opportunity "to argue for Android-only relevant markets," JMOL Order at 7, and "presented substantial evidence showing that the Android-only product markets made factual and

economic sense for this case." *Id*. at 8. Those acknowledgments concede that Epic *did* "argue for aftermarkets for Android app distribution and Android in-app payment solutions, derived from a foremarket for Android devices." *Id*. at 7.

The district court's puzzling holding to the contrary appears to rest on Epic's avoidance of the words "single-brand aftermarket" in making its case here. *Id*. at 8 ("Epic never presented or even mentioned a 'single-brand aftermarket' in this case."). But a party need not invoke magic words to argue for a single-brand aftermarket. In fact, in *Apple I*, the district court rejected Apple's argument that Epic had failed to properly plead an aftermarket theory because it did not "explicitly use the terms 'foremarket' and 'aftermarket' in its complaint." *Apple I*, 559 F. Supp. 3d at 955. Requiring the words "foremarket" and "aftermarket" would have "elevate[d] form over substance." *Id*. The holding about the relevant market in *Apple I* therefore did not turn on whether Epic used the term "single-brand aftermarket." If anything, Epic's decision once again not to use the term "single-brand aftermarket" is further confirmation that the dispute over the relevant market was identical in both cases.

The district court also asserted that Epic is not relitigating the single-brand aftermarket issue it litigated and lost in the Apple case because "Android is a mobile operating system; it is not a brand." JMOL Order at 8. The district court said the parties *stipulated* that Android is not a brand. *Id*. at 8 (citing Dkt. No. 850 at 16 (Instructions No. 12 (Stipulations of Fact)) ¶ 15).

But the cited stipulation states merely that "Google acquired the Android mobile operating system in 2005." Dkt. No. 850 at 16 (Instructions No. 12 (Stipulations of Fact)) ¶ 15. That statement may stipulate that Android is a mobile operating system, but it in no way concedes that Android is not *also* a brand. In common usage, a reference to a trademarked brand frequently refers to both the thing and its brand. "Chick-fil-A" might refer to the restaurant down the street, but it is also a well-known brand. In the same way, "Android" refers both to an operating system and the Android brand.

The fact that different OEMs (Samsung, Motorola, etc.) produce and sell their own branded devices that utilize the Android operating system does not matter. Those producers select the Android brand of operating system over rival licensable brands, and purchasers of OEM-branded mobile devices understand that they come loaded with the Android brand of operating system and are subject to any policies and procedures applicable to that brand. When a consumer buys a Samsung smartphone, then, she knows she is acquiring the Android brand of operating system.

"A foremarket is a market in which there is competition for a long-lasting product from which demand for a second product derives. An aftermarket is the market for the second product." *Apple I*, 559 F. Supp. 3d at 954 n.244 (internal quotations and citations omitted). The markets Epic sought to establish below—markets for Android app distribution services and Android in-app payment processing services—derive from the purchase of "long-lasting product[s]" (Android mobile devices) that are sold in markets

10

featuring competition. They are precisely the sort of mobile operating system-specific aftermarkets at issue—and rejected—in *Epic Games v. Apple*.

### 2. The Issue of the Relevant Market and Its Competitiveness was Actually Litigated and Decided in *Epic Games v. Apple.*

In *Epic Games v. Apple*, Epic proposed two aftermarkets analogous to those it sought to establish in this case: "(i) an aftermarket for the distribution of iOS apps and (ii) an aftermarket for payment processing for iOS apps." *Id.* at 954. The *Apple I* court rejected Epic's proposed aftermarkets and instead concluded that the relevant market consists of "mobile gaming transactions." *Id.* at 1026. That finding recognized that "the continued rise and popularity of cross-platform games like [Epic's] *Fortnite* … offered on a variety of platforms, even beyond mobile gaming devices, are making switching between platforms seamless because a consumer can carry over rewards and progress between the diverse platforms." *Id.* at 1025-26. This means that "neither consumers nor developers are 'locked-in' to the App Store for digital mobile game transactions—they can and do pursue game transactions on a variety of other mobile platforms and increasingly other game platforms." *Id.* at 1026. This Court affirmed the *Apple I* court's market definition. *Apple II*, 67 F.4th at 981.

Within the relevant market of mobile gaming transactions, the *Apple I* court then concluded that Apple competes with Google. The court concluded that Apple's market share "appear[ed] to fluctuate anywhere from approximately 52% to 57% over the course of the three years in evidence,"

with "the more recent year reflect[ing] some stability in the market between Apple *and its main competitor, Google*." *Apple I*, 559 F. Supp. 3d at 1030 (emphasis added). The court observed that "[t]he evidence is further mixed on whether existing competitors [in the mobile gaming transactions market], *here Google*, could increase output in the short run in order to erode Apple's market share." *Id*. at 1032 (emphasis added). And the court highlighted evidence that "[w]ith respect to mobile gaming [transactions], the two dominant players are Apple (App Store) and Google (Google Play app store)." *Id*. at 976; *see also id*. at 992, n.454 ("Apple and Google compete with one another."); *id*. at 997, n.484 ("Google, of course, operates in the same market" as Apple).

Thus, the issue Epic has now raised twice—whether the markets for mobile gaming app distribution and in-app payment processing are operating system-specific, or whether Google and Apple compete in providing those services—was litigated and decided in *Epic Games v. Apple*. *See Apple II*, 67 F.4th at 970 (observing that *Apple I* court found the relevant market was "mobile-game transactions—i.e., game transactions on iOS and Android smartphones and tablets"); *id*. at 981 (holding that *Apple I* court's definition of the relevant market "stands on appeal").

### 3. Epic had a Full and Fair Opportunity to Litigate the Relevant Market and Its Competitiveness.

No party disputes that Epic had a full and fair opportunity in *Epic Games v. Apple* to litigate the definition of the relevant market and the degree of

competition within it. That case involved "a sixteen-day bench trial [featuring] dozens of witnesses and nine hundred exhibits." *Apple II*, 67 F.4th at 966. The district court's summary of the evidence and arguments Epic presented to establish its proposed operating system-specific markets comprised more than seventeen full pages in the Federal Supplement, with the court's analysis of Epic's arguments occupying another ten. *Apple I*, 559 F. Supp. 3d at 954-72, 1015-26. Seven pages of the Federal Reporter are devoted to this Court's assessment of Epic's market definition arguments on appeal. *Apple II*, 67 F.4th at 973-81. Epic is thus attempting to relitigate matters it addressed exhaustively in *Epic Games v. Apple*.

### 4. Determination of the Relevant Market Was Necessary to Decide *Epic Games v. Apple*.

Epic sued Apple for monopolization, an element of which is "'the possession of monopoly power in the relevant market.'" *Id.* at 998 (quoting *Grinnell*, 384 U.S. at 570-71). The district court thus recognized that "the appropriate determination of the 'relevant market'" was "[c]entral" to Epic's case. *Apple I*, 559 F. Supp. 3d at 921. The court further observed that "Epic Games structured its lawsuit to argue that Apple does not compete with anyone; it is a monopoly of one." *Id*.

Epic's suit therefore turned on the determination of the relevant market. If, as Epic argued, the relevant markets were for iOS app distribution and iOS in-app payment processing, Apple faced no competition. But if the evidence instead established a broader market in which services applicable to

other mobile operating systems compete, Apple and Google compete fiercely.

The district court rejected Epic's argument and found that the relevant market consisted of "mobile-game transactions—*i.e.*, game transactions on iOS and Android smartphones and tablets," *Apple II*, 67 F.4th at 970. That holding meant that Epic had not established the monopoly power element required to sustain its monopolization claim. *Apple I*, 559 F. Supp. 3d at 1032.

Resolution of whether the markets for mobile gaming app distribution and in-app payment processing are operating system-specific was therefore necessary to decide *Epic Games v. Apple*.[2]

## B. Under Governing Precedent, Epic Did Not Prove the Aftermarkets Required to Sustain Liability Here.

Even if issue preclusion did not prevent Epic from relitigating whether Google faces competition from Apple in the relevant market (and it does), binding precedent bars Epic's antitrust claims. Those claims depend on Epic's establishing Android-specific relevant markets. As explained above, those are *aftermarkets*—i.e., markets in which "demand for [the] good [or

---

[2] On appeal, this Court affirmed both the district court's market definition, *Apple II*, 67 F.4th at 981, and its consequent determination that Apple and Google compete in the relevant market so that Apple lacks monopoly power. *Id.* at 999 ("[Epic] argues … that the district court erred in rejecting its single-brand markets in which Apple would have a 100% market share—an argument we reject above.").

service] is entirely dependent on the prior purchase of a durable good in a *foremarket*." *Apple II*, 67 F.4th at 976.

In *Apple II*, this Court identified four requirements to establish a cognizable antitrust aftermarket:

> (1) the challenged aftermarket restrictions are "not generally known" when consumers make their foremarket purchase; (2) "significant" information costs prevent accurate life-cycle pricing; (3) "significant" monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market.

*Id*. at 977. In affirming the *Apple I* court's rejection of Epic's proposed aftermarkets, this Court emphasized that "*Epic had the burden* of showing a lack of consumer awareness" of aftermarket restrictions. *Id*. at 980 (emphasis added). Under *Apple II*, then, Epic could not here establish the Android-specific aftermarkets it alleged without proving that purchasers of Android mobile devices were not aware, when they bought their devices, that Google would warn them against the risks of side-loading, ensure pre-installation and prominent placement of Google Play on their device, and seek to have the best and latest versions of Android apps in Google Play.

There is no basis for concluding that Epic proved the requisite lack of consumer awareness. The verdict form contains no such finding. Nor was the jury instructed, as required by this Court's precedents, that they must find that foremarket consumers lacked awareness of aftermarket restrictions to find a cognizable aftermarket. In fact, Epic opposed Google's request to

have the district court instruct jurors on this requirement and give them a chance to make the findings necessary to establish cognizable aftermarkets. See Joint Set of Proposed Jury Instructions and Objections, ECF 806, at 41 ("Epic objects to Google's proposal to give a separate Instruction regarding 'Aftermarkets' in its entirety."). The district court sided with Epic and rejected Google's aftermarket instruction—an instruction that would have enabled the jury to make the findings Epic needed to establish its proposed aftermarkets—on the dubious ground, debunked above, that Epic was not asserting a single-brand aftermarket theory because consumers of Android devices purchase their durable goods from OEMs other than Google and under other brand names (Samsung, Motorola, etc.). JMOL Order at 7-8. At the charging conference, the district court even chided Google for persisting in its request that the jury be instructed on the requirements for cognizable aftermarkets. *See* Charging Conference Transcript at 3215-17, 3249.[3]

---

[3] The district court insisted that an aftermarket instruction would be "the quintessential definition of an inappropriate jury instruction" because Epic did not describe its proposed markets as aftermarkets at trial. Charging Conference Transcript at 3216-17. As explained above, whether a party is alleging an aftermarket turns on whether demand for the product or service being sold derives from a prior purchase of a durable good, not on whether the party uses the magic word "aftermarket." *Apple I*, 559 F. Supp. 3d at 955 (rejecting Apple's argument that Epic did not plead an aftermarket because it "did not explicitly use the terms 'foremarket' and 'aftermarket' in its complaint").

Because Epic bore the burden of proving foremarket consumers' lack of awareness of aftermarket restrictions, Epic's failure to ensure that the jury in fact found such a lack of awareness dooms its effort to prove Android-specific markets for app distribution and in-app payment processing. And absent proof of such markets, Epic's antitrust claims fail under controlling precedent.

## II. The District Court Improperly Precluded the Jury from Crediting Procompetitive Benefits that This Court Recognized in *Epic Games v. Apple.*

In *Epic Games v. Apple*, both the district court and this Court credited two procompetitive justifications for Apple's policies governing app distribution and in-app payment processing. The same procompetitive justifications exist with respect to Google's app distribution and payment processing policies. But the district court improperly precluded the jury from crediting those justifications.

In *Epic Games v. Apple*, the courts acknowledged that the challenged restrictions helped prevent the downloading of malicious apps and thereby ensured the security of Apple's mobile devices and the privacy of device users. *Apple I*, 559 F. Supp. 3d at 1002-09; *Apple II*, 67 F.4th at 986-90. The courts also agreed that the policies created an efficient way for Apple to receive compensation for its intellectual property—i.e., via non-evadable, easily collectible commissions on iOS app transactions. *Apple I*, 559 F. Supp. 3d at 1009-10; *Apple II*, 67 F.4th at 986. In light of those benefits, both the district

court and this Court concluded that Apple had satisfied its burden under the second step of the rule of reason to prove procompetitive justifications for the policies Epic challenged. *Apple II*, 67 F.4th at 985 ("The district court correctly held that Apple offered non-pretextual, legally cognizable procompetitive rationales for its app-distribution and [in-app payment processing] restrictions.").

The same procompetitive justifications exist here. Google's warnings about the risks of downloading apps outside Google Play protect users of Android devices from security and privacy risks and thereby make Android devices more attractive to consumers. By securing favored placement of Google Play on Android devices, ensuring that app developers distributing through Google Play always feature the latest and best versions of their apps within the Play store, and requiring the use of Google Play Billing for in-app purchases, Google maximizes its opportunity to collect commissions that compensate it for app developers' use of its valuable intellectual property. Indeed, having an efficient means of receiving compensation for its continued investments in its mobile operating system is arguably more important for Google than for Apple, which receives compensation for its iOS investments when it makes device sales. Because Google licenses Android to third-party OEMs for free, it collects no compensation from the sale of most Android devices and thus has a greater need to earn money from their use, including their use in mobile gaming transactions.

The district court here, though, refused to afford Google the treatment Apple received. It instructed the jury that if Epic "has proven that Google's conduct has caused substantial harm to competition in a relevant market" then Google must prove "that its conduct was reasonably necessary to achieve competitive benefits for consumers *in that relevant market*." Final Jury Instruction No. 23, ECF 850 at 31 (emphasis added). Because the district court disregarded the determination in *Epic Games v. Apple* that the relevant market here is mobile gaming transactions and instead permitted the jury to conclude that the relevant markets were Android app distribution and Android in-app payment processing services, the district court effectively instructed the jury that they could not credit procompetitive benefits in the related market for mobile operating systems.

In *Apple II*, this Court credited the procompetitive benefits Apple proved because it concluded that the relevant market was the broader market for mobile gaming transactions and that the procompetitive benefits Apple proved occurred in that market. *Apple II*, 67 F.4th at 989-90. Had the district court here properly acknowledged that *Epic Games v. Apple* had already settled the definition of the relevant market, the procompetitive benefits of Google's policies for that market would have been relevant to the jury's consideration.

But even though the district court concluded—incorrectly—that the procompetitive benefits from Google's policies occurred in a different market than any anticompetitive harms, it still should have instructed the jury to

count those benefits in assessing Google's liability under the rule of reason. The district court's asserted grounds for refusing to do so was that the Supreme Court's precedent on the cognizability of "cross-market justifications" was not clear. JMOL Order at 11.

The Supreme Court, however, has repeatedly considered cross-market justifications in rule of reason analyses under the Sherman Act. *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104-08, 115-17 (1984) (relevant market was college football television; procompetitive benefits in market for live college football); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-84 (1992) (relevant market was Kodak service and parts; procompetitive benefits in market for photocopiers); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-92 (2007) (restrained market was retail sales of one brand of product; procompetitive benefits in interbrand product market); *NCAA v. Alston*, 594 U.S. 69, 90, 97-101 (2021) (relevant market was student-athlete services; procompetitive benefits in market for athletic competitions).

This Court has followed suit. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1069-73 (9th Cir. 2015) (relevant market was market for student-athlete services; procompetitive benefits in market for athletic competitions); *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (M. Smith, J., concurring) (observing that "[s]ome [courts], including our court, have permitted defendants to offer procompetitive effects in a collateral market as justification for anticompetitive effects in the defined market").

Commentators, too, have persuasively argued for consideration of efficiencies in closely related markets when assessing the legality of restraints in other markets. *See* John M. Yun, *Reevaluating Out of Market Efficiencies in Antitrust*, 54 ARIZ. ST. L. J. 1261, 1293-96 (2022) (arguing that it is proper to consider efficiencies that are "interdependent" with the relevant market because, for example, they occur in markets within the same supply chain, as here).

Although some Supreme Court decisions have refused to credit cross-market efficiencies, they do not control here. In *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963), the Supreme Court refused to credit efficiencies outside the market in which competition would be reduced by *a merger*. *Id*. at 370-71. That holding follows from the text of Section 7 of the Clayton Act, which forbids mergers "where *in any line of commerce* … , the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18 (2024) (emphasis added). Under that language, the lessening of competition in any relevant market—i.e., "any line of commerce"—appears to be a sufficient condition for condemning a merger, regardless of the beneficial effects the merger produces in other markets. But that text is irrelevant when assessing the reasonableness of *non-merger* conduct under the *Sherman* Act.

Nor does *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), a Sherman Act case, bar consideration of cross-market efficiencies here. In *Topco*, the Court refused to consider the pro-competitive impacts of an increase in interbrand competition when assessing the legality of restraints on

intrabrand competition. *Id*. at 609-10. Five years later, though, the Court reversed course and held that an increase in interbrand competition *could* justify restraints on intrabrand competition under the rule of reason. *See Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54 (1977) (observing that "[v]ertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product competing for the business of a given group of buyers" but may "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products"); *id*. at 57-59 (reinstating rule of reason for vertical intrabrand non-price restraints in light of their potential to enhance interbrand competition). *Topco*, then, "is certainly not an expansion of [*Philadelphia Nat'l Bank*] beyond [Clayton Act] § 7." Yun, 54 ARIZ. ST. L. J. at 1275.

The court below should have afforded Google the same treatment Apple received when Epic attacked its analogous restrictions. But the court refused to instruct the jury to consider how Google's restraints enhanced its competition with Apple in mobile operating systems. The jury's verdict must therefore be reversed.

## III. The District Court's Injunction Impairs Competition Among Producers of Mobile Operating Systems and Entails the Sort of Judicial Central Planning that the Supreme Court Has Condemned.

In the market for mobile operating systems, Google and Apple are engaged in a "bitter rivalry" that "has helped each company improve." Andrew Lanxon, *Android v. iPhone: 15 Years of Innovation Through Rivalry*, CNET

(April 24, 2024), https://perma.cc/EK6C-NXSW. In *Epic Games v. Apple*, both the district court and this Court acknowledged the vigorous competition between the two companies. *See Apple I*, 559 F. Supp. 3d at 1024 (observing that the "main competitor" of Apple's iOS operating system is the "Android platform maintained by … Google"); *Apple II*, 67 F.4th at 969, n.3 (observing that Android is "the main-operating system alternative to [Apple's] iOS"). The district court's injunction here threatens to disrupt that consumer-friendly competition by putting a thumb on the scale in favor of Apple. The injunction also imposes the kind of centralized economic planning that the Supreme Court has warned antitrust adjudicators to avoid.

## A. The District Court's Injunction Will Reduce Competition Among Producers of Mobile Operating Systems.

Judicial decrees "may unintentionally suppress procompetitive innovation." *Alston*, 594 U.S. at 102. By reducing Google's incentive and ability to invest in its mobile operating system, the district court's injunction will do just that.

The significant revenues both Apple and Google earn off app transactions play an important role in assuring vigorous competition in the market for mobile operating systems. First, the prospect of increasing app transaction revenues *motivates* each producer to improve its operating system (so that consumers use their devices more and engage in additional app transactions). The revenues themselves then help *finance* innovations in the producers' mobile operating systems. By reducing *only Google's* ability to earn

revenue off app transactions, the district court's permanent injunction warps competition for users of mobile operating systems.

The district court's Permanent Injunction disadvantages Google relative to Apple. Because Apple's App Store is the exclusive way to reach users of iOS devices, app developers will always include there the latest and greatest versions of available iOS apps. The district court's Permanent Injunction precludes Google from taking steps to ensure that its proprietary store will similarly feature all available apps Android users might wish to download. Google may not condition a benefit on an app developer's agreement to launch first or exclusively in Google Play, Permanent Injunction ¶ 5, or to ensure that all versions of the developer's app, including any versions with enhanced features, are available in Google Play. *Id*. at ¶ 6. This means that Google, unlike Apple, cannot ensure that its proprietary app store is maximally attractive to users of its operating system.

Because Apple is the sole producer of hardware featuring its mobile operating system, it can assure *prominent* and *exclusive* placement of its App Store on iOS users' devices.[4] By contrast, under the Permanent Injunction, Google may not condition a benefit on an agreement with an OEM or mobile service carrier to preinstall Google Play on any specific location on an Android device. *Id*. at ¶ 7. Nor may Google condition a benefit on an OEM's or

---

[4] Apple—with this Court's blessing—has precluded the very existence of competing iOS app stores.

carrier's agreement not to install a competing app store on an Android device. *Id.* at ¶ 8.

Whereas Apple may require the use of its proprietary in-app payment processing service and collect associated commissions, the Permanent Injunction bars Google from requiring the use of Google Play Billing for apps distributed through the Play Store and from prohibiting other in-app payment methods. *Id.* ¶ 9. This will reduce the revenues Google earns off app transactions relative to those Apple collects.[5]

Finally, the Permanent Injunction effectively requires Google to subsidize its app store rivals, something that Apple—who has no such rivals because it has precluded their very existence—need not do. Google must distribute third-party Android app stores through Google Play. *Id.* at ¶12. And Google must share its catalog of apps with rival Android app stores so that their offerings will match those of Google Play. *Id.* at ¶ 11.[6]

Each requirement will reduce the revenues Google earns from app transactions. As a consequence, Google will have less incentive than Apple to

---

[5] In theory, Google could charge Android app developers a license fee tied to the volume of in-app purchases made on their apps, but it would then incur the costs of monitoring app transactions and collecting any amounts owed. Apple need not bear those costs.

[6] If a user visiting a rival store wishes to download an app that it available in Play but not in the rival store, Google must distribute the app to the user. Permanent Injunction, ¶ 11.

25

invest in its mobile operating system to encourage mobile app transactions, and it will have fewer resources to invest in operating system enhancements. The result will be a less competitive market for mobile operating systems.

## B. The District Court's Injunction Requires It to Engage in the Sort of Judicial Central Planning that the Supreme Court Has Condemned.

"[J]udges make for poor 'central planners' and should never aspire to the role." *Alston*, 594 U.S. at 103 (citing *Verizon Commc'ns. Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)). In particular, "[j]udges must be wary … of the temptation to specify 'the proper price, quantity, and other terms of dealing'—cognizant that they are neither economic nor industry experts." *Id.* at 102 (quoting *Trinko*, 540 U.S. at 408). The district court's Permanent Injunction flouts these instructions and disregards "the practical limits of judicial administration." *Id.*

Google has no antitrust duty to deal with its app store rivals. Google engaged in no prior course of dealing with those rivals, and its refusal to deal does not involve a sacrifice of immediate profits. Its situation thus lacks essential features that were present in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-11 (1985) (finding duty to deal with rivals when defendant had previously done so voluntarily and refusal to continue dealing involved sacrifice of immediate profit). *Aspen Skiing* represents the "outer boundary" of the antitrust duty to deal with rivals. *Trinko*, 540 U.S. at 409.

Despite that well-established principle, the Permanent Injunction forces Google to deal with its rivals and purports to specify the terms on which it must do so. The injunction requires Google to distribute third-party Android app stores through Google Play. Permanent Injunction, ¶ 12. Google may "take reasonable measures" to ensure the security, safety, and legality of rival app stores and their compliance with Google's content standards, but the measures it takes in reviewing app stores "must be comparable to the measures [it] is currently taking for apps proposed to be listed in the Google Play Store." *Id*. If its review of a third-party app store is challenged, "Google will bear the burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored." *Id*. A Technical Committee comprised of one Epic appointee, one Google appointee, and a third appointee selected by those two will first determine whether Google has justified its review decision. *Id*. at ¶¶ 12-13. The district court will "serv[e] as the final word when necessary." *Id*. at ¶ 12. Google may charge a "reasonable fee" for reviewing and distributing rival app stores, but the fee must be based on "Google's actual costs." *Id*.

This mandate presents a number of administrative difficulties. First, the court will likely be required to make many determinations about the security, safety, and legality of rival app stores and their compliance with Google's generally applicable content standards. Because the court will "serv[e] as the final word" when a rival app store challenges Google's decision to deny distribution through the Play Store, it will presumably act as an

appellate tribunal after the Technical Committee has evaluated Google's decision. The district court hardly has the expertise to assess the security and safety risks a rival app store creates, nor whether it complies with Google's generally applicable content standards.

The injunction also requires the district court to act as a price regulator, "a role for which [courts] are ill-suited." *Trinko,* 540 U.S. at 408. Although the injunction specifies that Google's fee for reviewing and distributing a rival app store will be "reasonable" if it is based on "Google's actual costs," the devil is in the details. Does this mean Google's *marginal* cost? That poses a difficulty because "'[t]he incremental cost of making and selling the last unit cannot readily be inferred from conventional business accounts, which typically go no further than showing observed average variable cost.'" *Cascade Health Sol'ns v. PeaceHealth*, 515 F.3d 883, 909 (9th Cir. 2008) (quoting Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 HARV. L. REV. 697, 716 (1975)). If the price cap is instead Google's average cost, is that average variable or average total cost? And when Google's many varied services involve joint costs, how are they to be allocated? Implementing the district court's price regulation is likely to strain its institutional competence.

For these reasons, the district court's Permanent Injunction should be reversed even if its liability ruling were sound (and it is not).

\*     \*     \*

28

Affirmance of the district court's liability judgment and remedial order would produce a set of precedents in this Court that illogically forbid one company's less restrictive policies while permitting its chief rival's analogous but more restrictive policies. The firm with the less restrictive policies would face judicially imposed hurdles that would impair its ability to compete with its more restrictive rival. This Court should prevent antitrust from backsliding into that sort of Old West "justice."

## CONCLUSION

This Court should reverse the district court's judgment of liability and vacate the Permanent Injunction.

Dated: December 4, 2024            Respectfully submitted.

*/s/ Scott A. Keller*
Scott A. Keller
Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

*Counsel for Amici Curiae*

29

### CERTIFICATE OF SERVICE

On December 4, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Scott A. Keller*
Scott A. Keller

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 24-6256 and 24-6274**

I am the attorney or self-represented party.

**This brief contains 6,980 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties;

    [  ] a party or parties are filing a single brief in response to multiple briefs; or

    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  _/s/ Scott A. Keller_      **Date** 12/4/2024

31