Nos. 24-6256, 24-6274

# In the United States Court of Appeals for the Ninth Circuit

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

Epic Games, Inc.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California Nos.
3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

## BRIEF OF *AMICUS CURIAE* COMPETITIVE ENTERPRISE INSTITUTE IN SUPPORT OF DEFENDANTS-APPELLANTS

Allison Wiseman Acker
  *Counsel of record*
BASS, BERRY & SIMS PLC
150 3rd Ave. S, Suite 2800
Nashville, TN 37201
allison.acker@bassberry.com

Devin Watkins
Dan Greenberg
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1,
Competitive Enterprise Institute states that it does not have a parent
corporation and that no publicly held corporation holds 10 percent or
more of its stock.

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES .................................................................iv

INTEREST OF *AMICUS CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ........................................................................................ 4

I.    The District Court Improperly Excluded a Broader Relevant
      Market Definition ................................................................... 4

II.   The District Court Issued a Remedy That Violates Traditional
      Equitable Principles ............................................................. 15

CONCLUSION ...................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Associated Press v. United States*, 326 U.S. 1 (1945)................................18

*E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019)......18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .1, 5

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
    92 F.3d 1486 (9th Cir. 1996) ................................................................18

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ........ passim

*Gregory v. Stetson*, 133 U.S. 579 (1890).....................................................17

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021)..................22

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008) .2, 12

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020)....15, 20

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ...............................................................................4, 5

*United States v. Nash*, 438 F.3d 1302 (11th Cir. 2006)...........................21

*United States v. Raddatz*, 447 U.S. 667 (1980) .......................................20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .......................................................................3, 16, 18

## Other Authorities

*In Re Google Play Store Antitrust Litigation*, *Epic Games, Inc. v. Google
    LLC, et al.*, ECF 845 (Nov. 27, 2024) ......................................................9

Justice Story, *Commentaries on Equity Jurisprudence* § 72 (1836) ......17

iv

## INTEREST OF *AMICUS CURIAE*[1]

The Competitive Enterprise Institute is a nonprofit organization headquartered in Washington, D.C., dedicated to promoting the principles of free markets and limited government. Since its founding in 1984, the institute has focused on raising public understanding of the problems of overregulation. It has done so through policy analysis, commentary, and litigation. One area of overregulation that CEI focuses on is antitrust law.

## SUMMARY OF ARGUMENT

This brief focuses on two of the major errors in the District Court opinion. *First,* it improperly analyzed the nature of the relevant market by excluding its foremarket/aftermarket components from consideration. *Second,* it issued an injunction that is inconsistent with the traditional principles of equitable relief.

*First,* the District Court refused to apply the precedent of *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this Amicus Brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this Brief.

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), that pertains to the single brand market to the facts of the case at hand—namely, the universe of Android phones. The court claimed that "Android is a mobile operating system; it is not a brand." 1-ER-31. That formulation overlooks the fact that Android is a brand of a mobile operating system. *Eastman Kodak*'s precedent applies a foremarket/aftermarket distinction that should have been applied in this case. In this case, the aftermarket in mobile application ("app") delivery is "entirely dependent on the prior purchase of a durable good in a foremarket," the mobile phone. *See Epic Games*, 67 F.4th at 976. Additionally, there was a second aftermarket for purchases within applications. Competition in the foremarket of mobile phones thus disciplines the aftermarket in app delivery. Ultimately, the lower court erred when it overlooked Epic's failure to respond appropriately to that line of argument; more precisely, Epic failed to shoulder its burden of "rebut[ting] the economic presumption that [] consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008).

*Second,* the injunction issued by the District Court goes beyond the traditional equitable principles that are ordinarily used to provide relief to the parties. The injunction purports to remedy the consequences of Google's anti-competitive conduct—a claim, without any factual basis, to the effect that Google's conduct allowed it to establish a dominant position in the relevant markets. The court's remedial injunction was designed to topple Google's dominant position. Its remedy limits Google's ability to lawfully deal or contract with nonparties; indeed, the remedy is, in effect, an attempt to reengineer the entire market. Remedies that force a company to deal with competitors have been limited by the Supreme Court only to "cases [that] involved *concerted* action, which presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces: simply requiring that the outsider be granted nondiscriminatory admission to the club." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 n.3 (2004). The remedy at issue here is so much broader than traditional equitable principles allow that it is flatly incompatible with them.

## ARGUMENT

### I.    The District Court Improperly Excluded a Broader Relevant Market Definition

The District Court improperly limited the definition of the relevant market to exclude a foremarket in mobile phones without a proper factual or legal basis. The relevant market under antitrust law includes all products that are substitutes for each other, which in this case—given the foremarket in mobile phones—should have included the Apple App Store as a substitute for the Google Play Store.

The market definition helps to describe when a "product is controlled by one interest, without substitutes available." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956). "[W]here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others." *Id.* "If it were not so, only physically identical products would be a part of the market." *Id.*

"Industrial activities cannot be confined to trim categories." *Id.* at 395. "In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control." *Id.* at 395–96. To determine if two products are in the same market, courts look to the

"cross-elasticity of demand between products." *Id.* at 400. Imagine if one product were set at a price that is too high; cross-elasticity of demand asks if consumers would switch to the other product.

In *Eastman Kodak*, 504 U.S. at 468, the Supreme Court recognized that "the relevant market for antitrust purposes can be an *aftermarket*—where demand for a good is entirely dependent on the prior purchase of a durable good in a *foremarket.*" *Epic Games,* 67 F.4th at 976. *Eastman Kodak* presented a classic case of a "foremarket (photocopier machines, generally)" and an "aftermarket (replacement parts for and servicing of Kodak-brand photocopiers)." *Id.* This is sometimes known as a "single brand market," where "Kodak" was the single brand inside the claimed antitrust market of "parts for Kodak photocopiers." The "Supreme Court [] folded aftermarkets into the framework for assessing markets generally, evaluating cross-elasticity of demand to determine whether a hypothetical monopolist could profitably charge a supracompetitive price." *Id.*

In *Eastman Kodak*, it was at least plausible that if Kodak set their prices for replacement parts of Kodak-brand photocopiers too high, then consumers would switch to using other types of photocopier

5

machines generally. But the Supreme Court also noted that such switching does not occur in the context of (1) information costs and (2) switching costs that "could create a less responsive connection between aftermarket prices and [foremarket] sales." *Id.* If "the percentage of 'sophisticated purchasers' able to accurately life-cycle price is low," *id.*, then "competition in the foremarket cannot 'discipline [competition in] the aftermarkets.'" *Id.*

Epic argued that the relevant antitrust market was the "Android app distribution market." But the lower court declined to apply the case law of *Kodak* and *Epic Games v. Apple* to evaluate whether Epic had correctly identified the relevant antitrust market; instead, it rejected the idea of a foremarket. The District Court asserted that the foremarket/aftermarket distinction did not apply because "there was no 'single brand' in play here." 1-ER-31. The District Court rested this faulty claim on the idea that "Android is a mobile operating system; it is not a brand." *Id.* But what the District Court improperly disregarded here is that Android is a brand of a mobile operating system made by Google. Likewise, iOS is a brand of a mobile operating system made by Apple.

6

When the District Court concluded that Android "is not a brand," it emphasized that Android phones are manufactured by many companies. *Id.* That is indisputably true; those companies license the branded operating system from Google. Each of those manufacturers also sells their own sub-brand type of Android phone. But these are incidental facts that are irrelevant to a larger reality: Android is a brand of a mobile operating system, and the relevant market here includes a foremarket in mobile phones for the aftermarket in Android app delivery.

This portrait of the relevant market follows from the stipulated facts in this case. "Entities that manufacture mobile devices—such as Samsung or Motorola—are referred to as original equipment manufacturers ('OEMs')." 6-ER-1421. There is a market in mobile devices made by OEMs. "Instead of developing their own OS, almost all OEMs today license a third party's OS for their devices." *Id.* "The Google Play Store is an app store owned by Google that distributes apps on devices running the Android OS." *Id.*

Even if it is assumed that the market in Android app delivery asserted by Epic exists, which is all that the District Court required

7

Epic to prove, that assumption would not settle the question of the relevant market for antitrust purposes. What is described in the stipulated facts and the market definition Epic proposed is a foremarket in purchasing mobile phones and an aftermarket in app distribution. The aftermarket in mobile app delivery is "entirely dependent on the prior purchase of a durable good in a foremarket," the mobile phone. *Epic Games*, 67 F.4th at 976.  If a consumer buys an iPhone, the only app delivery system available to them is the Apple App Store. Likewise, if the consumer buys an Android phone, the Apple App Store is not available to them at all, but the Google Play Store is. The case at hand is a classic example of a foremarket/aftermarket.

The existence of a foremarket and an aftermarket does not, by itself, demonstrate that both iPhone and Android app delivery services must be included in the relevant antitrust market. In order for Epic to prove that its claimed market is the relevant antitrust market, it would need to demonstrate both (1) that consumers purchasing a mobile phone are unaware that the Apple App Store is only available on iPhones and that the Google Play Store is only available on Android phones, and (2)

there is a large switching cost to switching between iPhones and Android phones. *See id.*

Unlike the District Court, Epic's expert Professor B. Douglas Bernheim seems to recognize that there is a foremarket/aftermarket here, although he rejects that the Apple App Store and the Google Play Store are competing on grounds incompatible with this Court's precedents, including *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023). Epic asked its expert, "So how would you determine whether or not Apple and the app store imposed a sufficient constraint on the Google Play Store?" *In Re Google Play Store Antitrust Litigation*, *Epic Games, Inc. v. Google LLC, et al.*, ECF 845 (Nov. 27, 2024) [hereafter "Trial Tr.] 2424:14-16. Prof. Bernheim responded, after some background, that he was looking at "[h]ow much substitution would there be in response to a 5 percent change in price[.]" Trial Tr. 2425:1-2. When asked if he was "talking about people moving from using the Google Play Store to using the Apple App Store," Prof. Bernheim responded, "Well, yes, but indirectly." Trial Tr. 2425:3-6. He explained that people's "ability to substitute is very indirect. You can't use the Apple App Store on the Android store, so you have to change phones."

9

Trial Tr. 2425:3-6. This is a concession that there *is* a foremarket in phones that allows a consumer to substitute any Android store with the Apple App Store. Epic's expert thus examined one of the relevant legal factors concerning such a foremarket/aftermarket, namely the burden of switching in the foremarket. Trial Tr. 2428:9-2429:20.

But although Prof. Bernheim examined switching costs, he also applied factors outside the scope of the law to the foremarket/aftermarket; furthermore, he failed to analyze factors that, under the law, are a required part of the analysis. One element that Prof. Bernheim claimed was relevant is the difference between the cost of a phone and the cost of the app delivery. Trial Tr. 2425:17-2429:20. He claimed that it was a "small price increase, it's just really tiny compared to what they're spending on their phones," Tr. 2426:20-21. On that basis, he concluded that while "it's entirely possible that consumers would substitute in the smartphone markets in response to such differences, [] it's hard to believe that they would substitute much in response to the differences that I'm describing that would come from the app distribution market." Trial Tr. 2427:15-16.

Historically, courts have not viewed such differences as relevant. Prof. Bernheim missed a critical part of the analysis: however small the substitution difference is, that must be compared to how much smaller the money at issue is in the app distribution market. For instance, imagine that app delivery is 1% the cost of a mobile phone—that is, the cost is tiny. Imagine further that doubling the price on app delivery causes 5% of people to change which phone they buy. In that instance, the cost to Google for doubling the price of app delivery (an aftermarket pricing change) may result in Google lose five times as much in reduced phone sales (a foremarket purchasing decision). This is why courts have not closely examined the price ratio of the foremarket to the aftermarket—it is irrelevant when all appropriate factors are taken into account. It was improper for Prof. Bernheim to pick two figures out and draw inferences from them while ignoring other relevant facts—and even more improper to provide such a slanted account of these matters to the jury.

Though Prof. Bernheim analyzed the legally relevant switching costs, he failed to analyze whether consumers who purchased a mobile phone are unaware that the Apple App Store is only available for

iPhones and Google Play Store is only available for Android phones. On cross examination, Prof. Bernheim conceded that first-time buyers have no switching costs. Trial Tr. 2468:20-23 (Q. "those first-time buyers, they don't have any switching costs; right?" A. "That's correct, although there are some issues if they already own devices."). That concession on consumer knowledge is important. Even if switching costs are high, as long as consumers are aware of the aftermarket and the costs associated with that aftermarket, they can rationally make substitutive choices in the foremarket based on that aftermarket. That makes Google Play Store a direct competitor to the Apple App Store under antitrust law.

Epic had the burden of "rebut[ting] the economic presumption that ... consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter a[ ] ... contract." *Newcal*, 513 F.3d at 1050. Thus, the District Court should have required Epic to rebut the presumption that consumers had knowledge that Apple App Store is only available on iPhones and Google Play Store is only available on Android phones. Instead, the District Court improperly relieved Epic of this evidentiary burden.

Indeed, the District Court allowed Epic to elicit testimony from its expert that essentially told the jury to ignore the Apple App Store as a relevant market—even though Bernheim's analysis was objectively defective. Prof. Bernheim failed to present legally required evidence concerning consumer knowledge—knowledge that the Apple App Store is only available on iPhones and Google Play Store is only available on Android phones—necessary to draw this conclusion. Bringing in an expert who tells the jury to ignore legally relevant distinctions makes it dangerously likely that the jury will be confused about what would properly be evaluated.

All of this produced a perverse result: in effect, the District Court's actions discourage competition. Compare Apple, which created a classic tie-in: the purchasing power of its customers with iOS mobile phones is locked into shopping for apps at the Apple Store. This Court resolved that such a tie existed, but "Applying the Rule of Reason to the tie involved here, it is clearly lawful." *Epic Games,* 67 F.4th at 998. In contrast to the classic tie that Apple created, Google opened up the application delivery market to competition on the Android platform. Android customers, unlike Apple's, are not forced to use the Google Play

13

Store for application delivery. But the District Court's opinion would render this increased competition unlawful under antitrust law—a conclusion that appears to be fundamentally irrational.

Google certainly intends to create the best application delivery system, hoping that its high quality causes customers to stick with that application delivery system rather than go elsewhere. In competitive markets, that is the way things are supposed to work. However, for Android phones, the market for app delivery is not limited just to the Google Play Store, which competes with the Apple Store through the foremarket. Instead, the Google Play Store also competes with all of the other application delivery systems available on the Android platform. This substantially increases the relevant market beyond the playing field on which Apple faces Google.

When the relevant market as a whole is examined, including the foremarket in mobile phones, the Google Play Store lacks the kind of market power required to set supracompetitive prices. The lower court's judgment should be reversed: it did not properly apply the case law concerning the foremarket in mobile phones.

## II.     The District Court Issued a Remedy That Violates Traditional Equitable Principles

The District Court's injunction is improper because (1) a monetary remedy would suffice to address the "consequences" of Google's conduct; (2) it mandates Google's actions toward nonparties, and (3) it improperly delegates judicial authority to a "Technical Committee."

*First*, the District Court improperly employed an injunctive remedy where a monetary remedy would suffice. This Court has found that "traditional principles governing equitable remedies in federal courts" apply even under California's Unfair Competition Law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).

The District Court recognized, but failed to properly apply, this Court's precedent that "[i]njunctive relief should be no 'more burdensome to the defendant than necessary to provide complete relief to the plaintiff[].'" 1-ER-13.

Injunctive relief can be used to prohibit anti-competitive actions. For instance, the lower court found that "scare screens" were designed to discourage competing app delivery platforms. That finding permitted the lower court to halt that harm to competition—although the lower court did not enjoin such screens in this case.

15

*Second*, the District Court improperly issued a nationwide injunction, which mandates Google's interactions with third parties, thus improperly altering the market. The lower court did not confine itself to an injunction prohibiting Google from any anticompetitive conduct. The lower court states that its injunction is meant to remediate the "consequences" of the anti-competitive conduct. But, without any grounding in the record, it claimed that "[t]he consequences to be remediated are intertwined with the network effects of Google's dominant position in the relevant markets." *Id.* at *5. The court then created injunctive relief designed to topple Google's dominant position in the relevant markets. The problem is that antitrust law "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Trinko,* 540 U.S. at 415–16.

The remedy issued by the District Court goes beyond traditional equitable relief: its purpose is to restructure the entire market, burdening Google with new obligations to third parties who are not parties to this lawsuit. The injunction (1) prohibits Google "from sharing Play Store revenues with" numerous nonparties, (2) prohibits

16

Google from entering into contracts that "condition benefits on promises intended to guarantee Play Store exclusivity," and (3) prohibits Google from refusing to deal in various ways with nonparty rival app stores. The court thus imposes restrictions on Google's lawful activities with third parties, even though those activities do not violate the antitrust laws.

Only out of comity and deference to other countries does the District Court limit the scope of its remedy to the United States. That demonstrates the extraordinarily expansive scope of the District Court's nationwide injunction—which is essentially an attempt to reengineer the entire marketplace.

" 'It is a general rule in equity … that all persons materially interested, either legally or beneficially, in the subject-matter of a suit, are to be made parties to it, either as plaintiffs or as defendants, however numerous they may be, so that there may be a complete decree, which shall bind them all.' " *Gregory v. Stetson*, 133 U.S. 579, 586 (1890) (quoting Justice Story, *Commentaries on Equity Jurisprudence* § 72 (1836)). For this reason, "injunctive relief generally should be limited to apply only to named plaintiffs where there is no

class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996).

There are very limited cases, like *Associated Press v. United States*, 326 U.S. 1 (1945), in which the Supreme Court has used an antitrust remedy to require the defendant to deal with nonparties. Such a remedy has been limited only those "cases [that] involved *concerted* action, which presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces: simply requiring that the outsider be granted nondiscriminatory admission to the club." *Trinko*, 540 U.S. at 410 n.3.

Even in the narrow circumstances when antitrust law allows such a remedy, the "district court must separately analyze whether nationwide relief is '*necessary* to give prevailing parties the relief to which they are entitled' before issuing such an injunction.'" *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1030 (9th Cir. 2019) (emphasis in original). The District Court would need to show that there was no way to provide relief to Epic other than enacting these injunctions. In this case, though, there is an appropriate alternative—a

damage remedy for past harm to Epic, and an injunction as to future anticompetitive actions.

The District Court asserted, without explanation, that "[t]hese harms are ongoing and cannot be made right simply by Google writing Epic a large check." 1-ER-13. Even if such claims were true, the court failed to explain why monetary damages for past harm to Epic, coupled with an injunction preventing future anti-competitive behavior, would be insufficient to remedy the harms to Epic. When monetary damages would satisfy the harm, an injunction simply should not be issued— whether or not monetary damages were requested. The appropriate question under traditional equitable principles is whether monetary damages are available, not whether they are requested; the fact that Epic did not seek monetary damages does not change the applicable standard.

California's Unfair Competition Law also does not serve as an independent basis for injunctive relief here, where a damage remedy for past harm would be adequate. "[W]hen an adequate legal remedy exists, such [equitable] relief may be unavailable in federal court because

19

equitable remedies are subject to traditional equitable principles unaffected by state law." *Sonner*, 971 F.3d at 841.

*Third*, the injunction improperly delegates judicial power to a panel that will control Google's future actions. The text of the injunction does not set forth its implementation; rather, the injunction sets up a "Technical Committee" to which the District Court delegated judicial power to control Google's behavior. The court reserved for itself the ability to "act only as needed to resolve issues that cannot be resolved by the committee." 1-ER-22.

The overbreadth of this type of delegation is apparent when analogizing the role of magistrate judges. As the Supreme Court discussed in *United States v. Raddatz*, 447 U.S. 667, 683 (1980), a delegation to a federal magistrate "does not violate Article III of the Constitution so long as the ultimate decision is made by the district court." Unlike that limited delegation, the injunction here strips power from the District Court. It gives the Technical Committee the ability to bind the future behavior of Google, leaving the District Court to "act only as needed to resolve issues that cannot be resolved by the committee." 1-ER-22. That division of authority is fundamentally

20

incompatible with the nature of judicial power set out by Article III of the federal Constitution. Entrusting the Technical Committee with the power to determine the future behavior of Google, with an appeal to the Court only when the Technical Committee cannot agree, violates basic principles of non-delegation because it strips power from the District Court and vests it in the Technical Committee, which is fundamentally improper.

A court may only delegate a "a ministerial act or support service" to a non-Article III judge; for example, it is improper for "Article III courts [to] delegate the 'ultimate responsibility' of judicial functions to probation officers." *United States v. Nash*, 438 F.3d 1302, 1304-05 (11th Cir. 2006). That is true even though probation officers are officers of the court and "statutorily mandated to 'perform any ... duty that the court may designate.' " *Id.* at 1305. Here, Technical Committee members are not even officers of the court and have not sworn an oath to uphold the Constitution.

Such delegation of control over the future behavior of private individuals is an improper expanse of authority that is not given by the antitrust laws, and is in violation of Article III.

> When it comes to fashioning an antitrust remedy, we[, the Supreme Court,] acknowledge that caution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. Judges must be mindful, too, of their limitations—as generalists, as lawyers, and as outsiders trying to understand intricate business relationships. Judges must remain aware that markets are often more effective than the heavy hand of judicial power when it comes to enhancing consumer welfare.

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 106 (2021). Here, the District Court fell into the temptation that the Supreme Court warned against. It attempts to reengineer the entire industry, to change how Google interacts with nonparties, and to delegate Art. III authority to private parties. Such a remedy is far too expansive for traditional equitable principles.

## CONCLUSION

For the foregoing reason, this Court should reverse the District Court's judgment.

Dated: December 4, 2024                    Respectfully submitted.

/s/ Allison Wiseman Acker
Allison Wiseman Acker
   *Counsel of record*
BASS, BERRY & SIMS PLC
150 3rd Ave. S., Suite 2800
Nashville, TN 37201
allison.acker@bassberry.com

22

Devin Watkins
Dan Greenberg
COMPETITIVE ENTERPRISE INSTITUTE
1310 L St. NW, 7th Floor
Washington, D.C. 20005
(202) 331-1010
Devin.Watkins@cei.org
Dan.Greenberg@cei.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(2)(A) because it contains 4299 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).

*/s/ Allison Wiseman Acker*
Allison Wiseman Acker

## CERTIFICATE OF SERVICE

I, Allison Wiseman Acker, hereby certify that this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Allison Wiseman Acker*
Allison Wiseman Acker