**Case No. 24-6256**

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

EPIC GAMES, INC.
*Plaintiff-Appellee,*

v.

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE, LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
The Honorable James Donato, Presiding
Case Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

**BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, AND CONSUMER TECHNOLOGY ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLANTS**

Ben Berkowitz, #244441
Steven Hirsch, #171825
Sara R. Fitzpatrick, #337360
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Amici Curiae Chamber of Progress, Computer & Communications Industry Association, NetChoice, and Consumer Technology Association

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, amicus curiae Chamber of Progress certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation, and that no publicly held company owns 10% or more of its stock; amicus curiae NetChoice certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation and that no publicly held company owns 10% or more of its stock; amicus curiae Computer & Communications Industry Association certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation, and that no publicly held company owns more 10% or more of its stock; and amicus curiae Consumer Technology Association certifies that it has no parent corporation, and that no publicly held company owns more 10% or more of its stock.

DATED:  December 4, 2024        */s/ Steven A. Hirsch*
                                 STEVEN A. HIRSCH

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................I

STATEMENT PURSUANT TO FED. R. APP. P. 29(A)(4)(E) ...............1

I.    INTEREST OF AMICI CURIAE ................................................2

II.   INTRODUCTION ........................................................5

III.  ARGUMENT ........................................................8

      A.   Allowing the injunction to stand would establish
           a dangerous precedent of expansive antitrust
           remedies. ........................................................8

           1.   The injunction warps antitrust law and
                forces Google to provide aid to direct
                competitors. ...............................................9

           2.   The injunction forces third-party app
                developers to provide valuable IP licenses
                by default, subject to a problematic opt-out
                provision...................................................16

           3.   The injunction cannot be administered
                effectively. ...............................................20

      B.   The injunction stifles—rather than promotes—
           competition, harming consumers and small
           developers.....................................................22

           1.   The injunction discourages innovation by
                enabling Google Play competitors to free-
                ride on Google's work. .................................22

           2.   The injunction impedes Google's ability to
                compete with Apple.....................................26

IV.   CONCLUSION ........................................................29

2838925

CERTIFICATE OF COMPLIANCE ......................................................31

CERTIFICATE OF SERVICE ...........................................................32

2838925

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ................................................................ 25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ........................................................................... 20

*CollegeNET, Inc. v. Common Application, Inc.*,
711 F. App'x 405 (9th Cir. 2017) ................................................... 6, 22

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ..................................... 26, 27, 29

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ....................................................... *passim*

*Fed. Trade Comm'n v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ............................................................. 10

*In re Google Play Store Antitrust Litig.*,
No. 3:21-md-02981-JD (N.D. Cal. Dec. 18, 2023), ECF No.
522-2 ............................................................................... 14, 21, 27

*In re Google Play Store Antitrust Litig.*,
No. 20-CV-05671-JD, 2024 WL 4438249 (N.D. Cal. Oct. 7,
2024) ................................................................................................ 26

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ........................................................... 15

*Nat'l Soc. of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ........................................................................... 27

*NCAA v. Alston*,
594 U.S. 69 (2021) ...................................................................... *passim*

iv

*New York v. Microsoft Corp.*,
 224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd sub nom.*
 *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir.
 2004) .................................................................................... 29

*Novell, Inc. v. Microsoft Corp.*,
 731 F.3d 1064 (10th Cir. 2013) .................................. 20, 24, 25

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
 555 U.S. 438 (2009) ...................................................... 10, 15

*United States v. Colgate & Co.*,
 250 U.S. 300 (1919) ............................................................. 9

*United States v. Syufy Enters.*,
 903 F.2d 659 (9th Cir. 1990) ................................................ 22

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004) ......................................... 8, 10, 11, 15

## Rules

Fed. R. App. P. 29 .................................................... 4, 31

Fed. R. App. P. 32 ....................................................... 31

Fed. R. Civ. P. 65 ....................................................... 19

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

1.      No party's counsel authored this brief in whole or in part.

2.      No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.

3.      No person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

1

## I.   INTEREST OF AMICI CURIAE

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress backs public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect Internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users. It has a direct interest in ensuring that antitrust remedies in the technology sector promote rather than inhibit innovation and that such remedies do not inadvertently harm consumer welfare by imposing overly restrictive obligations on digital platforms.

Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto power over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit trade association representing a broad

2838925

cross-section of communications, technology, and Internet-industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA believes that open, competitive markets are the best guarantors of consumer welfare and vibrant innovation. The issues presented in this case are of particular importance to CCIA because they directly affect the ability of technology companies to design, develop, and operate their platforms in ways that best serve consumers while maintaining security, privacy, and quality standards.

NetChoice is a national trade association of online businesses that share the goal of making the internet safe for free enterprise and free expression. NetChoice's members operate a variety of popular websites, apps, and online services, including Meta (formerly Facebook), YouTube, and Amazon.[1] NetChoice's guiding principles are (1) promoting consumer choice, (2) continuing the successful policy of "light

---

[1] A full list of NetChoice's members is available at https://netchoice.org/about/.

2838925

touch" internet regulation, and (3) fostering online competition to provide consumers with an abundance of services. NetChoice has a substantial interest in this case because the district court's injunction threatens to establish precedent that would fundamentally alter how digital platforms operate, potentially undermining the careful balance between openness and security that platforms must maintain to protect consumers and foster innovation.

The Consumer Technology Association ("CTA") represents the $505 billion U.S. consumer technology industry, which supports more than 18 million U.S. jobs. CTA's membership is over 1,300 American companies—80% of which are small businesses and startups. CTA also owns and produces CES®, the world's most powerful technology event. CTA has a direct interest in this case because the district court's injunction threatens to upend the app economy, which is a driver of innovation and economic success.

Amici have concurrently filed a motion for leave to file pursuant to Fed. R. App. P. 29(a)(3).

2838925

## II.   INTRODUCTION

Antitrust remedies must be crafted with caution. If not, they "wind up impairing rather than enhancing competition." *NCAA v. Alston*, 594 U.S. 69, 102 (2021). That is precisely what the district court's injunction would do. Rather than prohibit conduct that may hinder start-up app stores from competing, the court has defied antitrust precedent to reshape the app economy. The injunction would force Google to affirmatively distribute rival app stores through the Google Play store and to give those rival app stores access to Google's entire library of apps while simultaneously allowing them to advertise on Google's platform. It would restrict Google's ability to engage in content moderation and would expose app developers to a Wild West of new and untested app stores. Consequently, the district court's sweeping injunction would suppress competition not only between Google and smaller competitors, but also between Google and Apple. This remedy undermines the benefits that free app-economy competition confers on mobile-app consumers and developers alike.

2838925

The app economy is a thriving market encompassing an estimated 6.1 million jobs and an estimated 770,000 small businesses.[2] Consumers downloaded an estimated 255 billion apps in 2022 alone.[3] Two of the main competitors in the app-store market are the Google Play Store and the Apple App Store.[4] Competition between these and other app stores has allowed consumers to "mak[e] free choices between market alternatives."[5] For example, consumers can choose between closed platforms, which are more curated and secure, and open platforms that "provide marginally less security and privacy." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 987 (9th Cir. 2023) ("*Apple II*"). This Court has observed that the "heterogenous market for app-transaction

---

[2] The App Association, *State of the App Economy* at 6 (2022) (https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL.pdf) (last accessed Nov. 26, 2024).

[3] Abhineet Kaul, et al., *Powering the global app economy: Android and Google Play's contributions*, Access Partnership (April 9, 2024), https://cdn.accesspartnership.com/wp-content/uploads/2024/06/Powering-the-global-app-economy.pdf?hsCtaTracking=0f69357f-9228-4f87-84b8-724e5c7553ce%7C2f52ad8f-b3b0-4789-9ec0-bf22a595eead.

[4] *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023).

[5] *CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 406 (9th Cir. 2017) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003)).

6

platforms . . . increases interbrand competition." *Id.* But the district court in this case imposed extensive injunctive relief on Google at the behest of Epic, which is just one of Google's many competitors in the app-store market. The district court's order takes the unprecedented step of requiring one competitor in that market to grant its rivals nearly unfettered access to its services and to all the apps that it offers. As discussed below, the result will be to stymie competition between major competitors in the app-store market, reduce the incentive for other competitors to innovate, and entangle the court in administering an unwieldy and expansive order. Although the injunction is intended to promote competition, its practical effect is to reduce competition and warp the market.

Because antitrust injunctions often "wind up impairing rather than enhancing competition," courts must be cautious when crafting antitrust remedies. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 103 (2021). Here the district court threw caution to the wind. Its order should be reversed or substantially modified.

2838925

## III.    ARGUMENT[6]

### A.    Allowing the injunction to stand would establish a dangerous precedent of expansive antitrust remedies.

The district court's injunction flouts the principle that, "[w]hen it comes to fashioning an antitrust remedy . . . caution is key." *Alston*, 594 U.S. at 106. The injunction dangerously exceeds the scope of established antitrust remedies in three ways.

First, the injunction requires Google to dedicate space, opportunities, and resources to its direct competitors despite longstanding precedent that, with few exceptions, "there is no duty to aid competitors." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) ("*Trinko*"). Requiring Google to aid its competitors not only runs afoul of precedent but "unintentionally suppress[es] procompetitive innovation." *Alston*, 594 U.S. at 102. By forcing Google to share both its userbase and its app catalog with competitors, the injunction encourages other competitors to free-ride

---

[6] Throughout this brief, unless otherwise indicated, emphases were added to quotations while internal quotation marks, citations, footnotes, brackets, ellipses, and the like were omitted from them. Citations to "Dkt." refer to appellate filings in Nos. 24-6256 and 24-6274. Citations to "ECF" refer to the multidistrict litigation docket, No. 3:21-md-02981-JD (N.D. Cal.).

8

and discourages Google from innovating, to the detriment of consumers and app developers.

Second, the order forces third-party app developers to either provide their IP licenses to each new app store or run the risk that those stores will provide pirated and fake versions of their apps.

Third, the injunction is expansive and difficult to administer.

### 1. The injunction warps antitrust law and forces Google to provide aid to direct competitors.

The injunction forces Google to hamstring itself by providing unprecedented assistance to its direct competitors, contrary to established precedent that antitrust law "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Under the injunction, Google is required not only to distribute rival app stores through the Google Play Store, but also to grant those rivals access to its entire app library. The injunction also requires Google to create and administer a process for third-party app developers to opt out of inclusion in those rival app stores.

9

This is not what antitrust law requires. "[T]here is no duty to aid competitors." *Trinko,* 540 U.S. at 411; *see also Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("Competitors are not required to engage in a lovefest."). Instead, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). The Supreme Court has further instructed that "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Trinko,* 540 U.S. at 415.

The injunction flouts this principle by heavily restricting Google's ability to set its terms of dealing for a period of three years. The injunction bars Google from "prohibit[ing] the distribution of third-party Android app distribution platforms or stores through the Google Play Store."[7] Google must list its competitors in the Google Play Store, provide those competitors with access to all the apps listed on Google Play, and provide app developers with a means of choosing which app stores they wish to be included in.

---

[7] Inj. at ¶¶ 11–12, Dkt. 6.2, Ex. B.

As discussed further in Section B, *infra*, forcing Google to host its competitors creates free-riding problems and reduces competition. "[C]ompelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 408. The injunction should be vacated because it improperly imposes a duty to deal.

The injunction even forces Google to act as a back-end administrator for its competitors by facilitating downloads of rival app stores, moderating content, and running the system through which developers choose app stores. There is a narrow exception for Google to ensure that "platforms or stores, and the apps they offer, are safe from a computer systems and security standpoint, and do not offer illegal goods or services . . . or violate Google's content standards."[8] But Google must be prepared to prove that any measures it takes to ensure the security and legality of third-party platforms and their offerings "are strictly necessary and narrowly tailored."[9]

---

[8] *Id.* at ¶ 12.

[9] *Id.*

11

2838925

The injunction provides no guidance on any of these points. It does not address what security protections Google can provide for the new services it has been ordered to supply, what contractual terms will govern relationships between apps and third-party app stores, what data third-party app stores are permitted to collect, or who will provide customer support when things go wrong. All of these questions are left to Google to muddle through. Indeed, the injunction effectively jams Google between a rock and a hard place. The injunction requires Google to allow all comers to make use of its service without interference, but Google must ensure that the app stores that it is being forced to accommodate do not violate Google's safety, security, and content standards. How to harmonize these competing directives is left for Google to figure out.

For example, the injunction includes a vague provision allowing Google to take "reasonable measures to ensure" that the third-party stores and apps it is required to host are secure and do not violate applicable law or Google's content standards.[10] But the injunction does not define "reasonable measures." Further, if a dispute arises as to the

---

[10] *Id.*

2838925

"reasonableness" of Google's content and technical standards, Google bears the burden of proving that those standards "are strictly necessary and narrowly tailored"—terms likewise left undefined.[11] And the injunction allows third parties to dispute Google's security measures but does not explain how such a dispute will work or what will happen while disputes are pending.[12]

The injunction further limits Google's content and technology standards by requiring that review measures be "comparable to the measures Google is *currently* taking for apps proposed to be listed in the Google Play Store."[13] This requirement undermines Google's practice of constantly updating its policies and enforcement to achieve its content and security goals. For example, in 2024, Google required app developers to comply with multiple policy updates covering issues including photo and video permissions,[14] medical-app functionality,[15]

---

[11] *Id.*

[12] *See id.*

[13] *Id.*

[14] Play Console Help, *Policy Announcement: April 3, 2024*, https://support.google.com/googleplay/android-developer/answer/14594990 (last visited Nov. 18, 2024).

[15] Play Console Help, *Policy Announcement: October 30, 2024*, https://support.google.com/googleplay/android-

2838925

the use of third-party code, minimum functionality standards, and registration of developers that provide sensitive services relating to financial products and services, health, VPN, and the government.[16] Under the injunction, however, Google's policy updates could be challenged not only for being unreasonable or insufficiently tailored, but simply for being *too new*. In a rapidly evolving technological and legal landscape, requiring a technology company to effectively freeze its standards for three years not only places the company at a competitive disadvantage, but also exposes consumers to new cybersecurity risks.[17]

The injunction's limitations on Google's content and technology requirements would harm consumers. Google's Operations Manager has explained that Google is "constantly updating [its] Google Play policies to stay ahead of changes in the market or new types of abuse, and to help make sure that content is age-appropriate."[18] Among the content

---

developer/answer/15444680 (last visited Nov. 18, 2024).

[16] Play Console Help, *Policy Announcement: July 17, 2024*, https://support.google.com/googleplay/android-developer/answer/14993590 (last visited Nov. 18, 2024).

[17] *Epic vs. Google: What About Mobile Malware?*, Threat Fabric (Oct. 21, 2014), https://www.threatfabric.com/blogs/epic-versus-google-what-about-mobile-malware (last accessed Nov. 27, 2024).

[18] Google Safety Center, *How we help keep Google Play safe for users*

14

Google seeks to exclude are "apps that are deceptive, malicious, or intended to abuse or misuse any personal data"; "egregious content" such as hate speech, violence, or child endangerment; low-quality apps that crash frequently or fail to load; and apps that violate intellectual-property rights or impersonate other apps.[19] Consumers trust Google's moderation standards and assume that any app they download from the Play Store will be safe. By undermining Google's ability to exclude dangerous app stores (or the apps carried by those stores), the injunction puts consumers at risk.

Finally, the injunction violates precedent that courts should not "assume the day-to-day controls characteristic of a regulatory agency." *Trinko*, 540 U.S. at 415. Antitrust courts are instructed to "avoid direct price administration." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 453 (2009). This Court has struck down injunctive relief ordering that prices be "reasonable." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1226 (9th Cir. 1997). But the

---

*and developers*, https://safety.google/intl/en_us/stories/google-play-safety/ (last visited November 18, 2024).

[19] *Id.*

injunction disregards that guidance by ordering Google to provide services and then restricting the price of those services. For example, the injunction does not provide for Google to charge for its role in overseeing the process for third-party apps to opt out of inclusion in the catalog of other app stores. And while Google can charge for content moderation, such charges must be "reasonable" and "based on Google's actual costs." This is contrary to precedent and dangerously supplants the free-market system with a system in which the court dictates what services a company must offer and what prices it can charge.

### 2. The injunction forces third-party app developers to provide valuable IP licenses by default, subject to a problematic opt-out provision.

Besides requiring Google to make the Play Store's entire app catalog available to app-store rivals, the injunction forces app developers to license their apps to Google's app-store competitors by default, unless the developers opt out. In other words, the injunction requires Google to provide its entire catalog of apps to consumers and to provide third-party app developers "with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app

store."[20] This opt-out process is problematic because it replaces normal intellectual-property licensing negotiations with an undefined mechanism administered by Google, which did not ask for the job and arguably has a conflict of interest in any negotiation between app developers and Google's competitors. As a result, app developers will have to choose whether they want their apps to be offered in each and every Android app store.[21]

The injunction's opt-out provision, like many of its other provisions, is ill-conceived. The injunction leaves Google to figure out how the opt-out mechanism will function. App developers who were not parties to this case and had no say in the proceedings must now spend time and resources sifting through Play Store competitors to determine which ones to opt out of doing business with. Because app developers must affirmatively opt *out* of inclusion in other app stores, any app listed on the Google Play Store risks being added automatically to new app stores that may crop up over time. This creates risks for security and licensing—the district court never explains how app developers are

---

[20] Inj. at ¶11, Dkt. 6.2, Ex. B.

[21] *Id.*

17

expected to negotiate to give app stores licenses to list their apps if stores can do so automatically. Nor does the district court explain what contract terms will govern app developers when they are automatically included in new app stores. App developers who decide *not* to list their apps in new app stores run the risk that those app stores will instead list pirated and counterfeit versions of their apps. Because the injunction also limits Google's content-moderation powers, Google will have limited ability to help app developers address counterfeit content on other app stores.

The opt-out provision thus forces app developers to choose between involuntarily participating in a court-mandated licensing scheme on the one hand and exposing themselves to increased risks from pirated and counterfeit versions of their products on the other. The injunction will be especially harmful to small app developers, who may not have the resources to deal with the deluge of third-party app stores.

The injunction's requirement that Google create the mechanism for app developers to opt out of other stores itself raises concerns.[22] The injunction includes no guidelines for Google's design of the mechanism,

---

[22] Inj. at ¶11, Dkt. 6.2, Ex. B.

and Google has no incentive to optimize its performance in its unwanted role as administrator. Indeed, because Google will be creating the mechanism for app developers to opt out of inclusion in rival app stores, Google will have a conflict of interest in administering this mechanism. Google's economic interests discourage it from providing a smooth system for app developers to decide where to list their apps, because Google loses out any time a developer lists an app on a rival app store. The injunction thus subjects app developers to a system administered by a third party that does not want the job and has conflicts of interest.

Moreover, the application of this provision to app developers raises due-process concerns.[23] Injunctions bind only parties, their officers, agents, servants, employees, or attorneys, and those "act[ing] in active concert" with them. Fed. R. Civ. P. 65(d)(2). This injunction affects the rights of app developers who fit none of those categories. The

---

[23] Similar due-process concerns are created by the provision for a Technical Committee to preside over any challenge to Google's technical and content requirements, necessarily including any challenge by third parties. Inj. at ¶ 13, Dkt. 6.2, Ex. B. The injunction provides that the Technical Committee will be appointed and paid by Google and Epic and sets no guidelines for Technical Committee members' qualifications or neutrality. Third parties who wish to challenge Google's policies will be subject to a tribunal selected and paid by their competitors.

19

2838925

injunction thus privileges Epic's interests over the interests of developers who had no say in the case.

### 3. The injunction cannot be administered effectively.

The Supreme Court has cautioned against expansive antitrust remedies, admonishing judges to "be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." *Alston*, 594 U.S. at 102. Overreaching injunctions raise "[a]dministrability considerations" and "risk judicial complicity in collusion and dampened . . . competition." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013). In this case, the injunction substitutes Epic's demands for those of the market, contrary to the Supreme Court's instruction that "antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). The result is an expansive order containing ten paragraphs of detailed and far-reaching restrictions on Google's conduct—precisely the type of overreach that the Supreme Court has warned against.

The injunction's expansiveness is made even clearer when compared with the narrower relief reached in a settlement between

20

Google and 53 attorneys general.[24] That settlement—which was negotiated by attorneys general working in the public interest, rather than a market competitor—contains no provision as extreme as the injunction's requirement that Google host all its competitors on Google Play and open up its app library to them.[25] In contrast, the injunction grants Epic a "one firm to rule them all" framework. As NetChoice's Litigation Center Director, Chris Marchese, has explained, the injunction in this case "reshape[s] an entire market just to benefit Epic."[26] But the district court is "neither [an] economic nor industry expert[]"; and in this case, it has "impose[d] a duty that it cannot explain or adequately and reasonably supervise." *Alston*, 594 U.S. at 102–03.

---

[24] Settlement Agreement and Release, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 18, 2023), ECF No. 522-2. These attorneys general represented all 50 states, the District of Columbia, and the territories of Puerto Rico and the Virgin Islands.

[25] *Compare id. with* Inj., Dkt. 6.2, Ex. B.

[26] Krista Chavez, *Court's Misguided Ruling Forces Google to Undermine Play Store Security and Innovation*, NetChoice (Oct. 7, 2024), https://netchoice.org/courts-misguided-ruling-forces-google-to-undermine-play-store-security-and-innovation/ (last accessed Nov. 27, 2024).

**B.    The injunction stifles—rather than promotes—competition, harming consumers and small developers.**

The injunction may be intended to increase competition, but it will have the opposite effect. *Alston*, 594 U.S. at 102 (warning that "continuing supervision of a highly detailed [antitrust] decree could wind up impairing rather than enhancing competition"). As explained below, the injunction will impede competition in two ways. First, the injunction discourages innovation by enabling Google Play competitors to free-ride on Google's work. Second, the injunction warps competition by imposing strict requirements on Google while leaving its main competitor, Apple, unrestrained.

> **1.    The injunction discourages innovation by enabling Google Play competitors to free-ride on Google's work.**

The injunction disincentivizes competition by rewarding rival app stores that simply mimic the Google Play Store.

Competition benefits consumers by allowing them to "mak[e] free choices between market alternatives." *CollegeNET*, 711 F. App'x at 406 (9th Cir. 2017). Antitrust law is designed to "protect the integrity of the market system by assuring that competition reigns freely," resulting in product differentiation. *United States v. Syufy Enters.*, 903 F.2d 659,

663 (9th Cir. 1990). In a healthy marketplace, competitors are incentivized to differentiate themselves by providing lower prices, improved features, and specialized services.

Google differentiates itself from its competition in part by supporting app developers. Google provides tools and services to help developers "test, monitor, and iterate their apps and games"; free educational content to teach developers best practices; and digital payment infrastructure to enable developers to monetize their apps.[27] And as discussed above, Google engages in content moderation to weed out apps that are nonfunctional, illegal, insecure, or otherwise objectionable. In a healthy marketplace, Google Play and its competitors are incentivized to find their own ways to attract developers and consumers and to cultivate a positive environment for customers.

By forcing Google to carry its competitors on its platform and to make its app catalog available to them, the injunction eliminates the incentive for rival app stores to differentiate their content from that of

---

[27] Google Play, *Helping Developers Succeed*, https://support.google.com/googleplay/android-developer/answer/9969970?hl=en (last accessed Nov. 18, 2024).

23

the Google Play Store. Instead, they can take advantage of the services that Google provides without incurring any of the related costs. As the Tenth Circuit has observed, "[f]orcing firms to help one another . . . risk[s] reducing the incentive both sides have to innovate, invest, and expand—again results inconsistent with the goals of antitrust." *Novell,* 731 F.3d at 1073. Epic's own expert explained that the best way for a rival app store to compete with Google is to "offer distinctive content not available on the Google Play Store."[28]

Under the injunction, however, a rival app store need not bother to curate its own content—instead, it can simply "piggyback on its larger rival" by copying the Google Play Store's offerings at no cost. *Novell*, 731 F.3d at 1073. The result will replace meaningful competition with a homogenous app-store marketplace. Even the district court acknowledged that its injunction would likely result in a period of "reduced competition."[29] There is no consumer benefit to a market full of Play Store clones.

---

[28] Bernheim Statement, ¶ 48, ECF 952-1.

[29] May 23, 2024, Hearing Tr. at 51, ECF 977.

At the same time, the injunction diminishes Google's incentive to compete and innovate in the market by forcing it to support its rivals, which harms the consumers and app developers who benefit from free competition. Google will be "deterred from investing, innovating, or expanding . . . with the knowledge [that] anything it creates it could be forced to share." *Novell*, 731 F.3d at 1073. If Google must share the fruits of its labors with its rivals, it will lose at least some of the competitive advantage it could hope to gain by innovating. *See id.* Courts have acknowledged that "a firm that has engaged in the risks and expenses of research and development" loses incentive to innovate when forced to share the benefits of its work with rivals. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281 (2d Cir. 1979). Google's incentive to foster app development, moderate content, and provide a positive experience for consumers is severely impaired if its competitors can capitalize on the benefits of Google's work without sharing in the associated costs. This ultimately harms consumers and app developers, who rely on the improvements Google makes in a fully competitive market.

25

### 2. The injunction impedes Google's ability to compete with Apple.

Finally, the injunction warps competition by hobbling Google's ability to compete with Apple.

Although the injunction artificially focuses on the "Android app marketplace," *In re Google Play Store Antitrust Litig.*, No. 20-CV-05671-JD, 2024 WL 4438249, at \*7 (N.D. Cal. Oct. 7, 2024), in fact the Google Play Store competes with the iOS App Store. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 987, 1024-25 (N.D. Cal. 2021) ("*Apple I*") (finding that Apple is not a monopolist because the iOS App Store "competes against other platforms for both consumers and developers"), *aff'd on this ground, rev'd in part and remanded on other grounds*, *Apple II*, 67 F.4th 946 (9th Cir. 2023). In the second quarter of 2024, the Google Play Store generated approximately $11.2 billion in spending, while Apple's App Store generated approximately $24.6 billion.[30] This Court has described the Play Store as the App Store's "main competitor." *Apple II*, 67 F.4th at 987.

---

[30] *Worldwide consumer spending on mobile apps and games in Google Play and the Apple App Store as of 2nd quarter 2024* (Aug 30, 2024), https://www.statista.com/statistics/183469/app-stores-global-revenues/.

2838925

Competition between Google and Apple is good for consumers and app developers. Antitrust law is based on the principle that "competition will produce not only lower prices, but also better goods and services." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978). That's as true in the app-store market as anywhere else.[31] The Google-Apple rivalry has given consumers a choice between Apple's "walled garden" and Google's more open platform, and the two firms compete to provide a superior experience. *Apple II*, 67 F.4th at 987 (explaining consumer choice between Android's "open app-transaction platforms" and "Apple's closed platform"). The contrast between Apple's walled garden and Google's more open platform "increases interbrand competition—the primary goal of antitrust law." *Id.* Consumers who prefer a closed system can choose the walled garden of the App Store, while customers who prioritize openness and affordability may gravitate towards the Play Store.[32]

---

[31] *Apple I*, 559 F. Supp. 3d at 1025 (explaining that the market for digital mobile game transactions "is responding and evolving").

[32] The Play Store generates more than twice as many downloads as the App Store, but the App Store generates far more revenue. Priya Viswanathan, *iOS App Store vs. Google Play Store: Which Is Better for App Developers?*, Lifewire (Jul. 29, 2024), https://www.lifewire.com/ios-

Competition between the two platforms also has benefitted developers. Like consumers, app developers can evaluate tradeoffs between the systems when deciding what platform to develop their apps on. Apple's walled garden comes with higher startup costs but may lead to more revenue down the line, while the Play Store is friendlier to app developers but has a more price-conscious customer base.[33] And Google and Apple compete directly to appeal to developers. For example, after Apple announced that it was lowering its revenue-sharing fee for small app developers earning $1 million in revenue or less, Google responded with "more generous" cuts to its own revenue-sharing fees.[34]

This healthy competition, which benefits both consumers and small app developers, relies on a level playing field. But the injunction creates asymmetric regulatory burdens that disadvantage Google to Apple's benefit, contrary to antitrust law's goal of promoting competition on the merits. The injunction's restrictive terms apply only

app-store-vs-google-play-store-for-app-developers-2373130.

[33] *Id.*

[34] Samuel Axon, *Google undercuts Apple with new 15% revenue share for Play apps*, Ars Technica (Mar. 16, 2021), https://arstechnica.com/gadgets/2021/03/google-undercuts-apple-with-new-15-revenue-share-for-certain-play-apps/.

2838925

to Google, while Epic's claims for similar relief against Apple were largely denied. *See Apple I*, 559 F. Supp. 3d at 1068. By imposing heavy regulation on only one of two major competitors, the injunction restructures the app economy in Apple's favor. This "favoritism of one market participant over another in a remedy provision . . . exert[s] too much control over the market." *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 189 (D.D.C. 2002), *aff'd sub nom. Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004). Tilting the playing field in this way will result in reduced competition between Google and Apple, which harms consumers. The injunction risks "unintentionally suppress[ing] procompetitive innovation" by impeding one of the major competitors in the app-store market. *Alston*, 594 U.S. at 102. Indeed, under the injunction's terms, *Apple* could develop an Android app store, market it on Google Play, and fill it with apps from Google Play's catalog—all while barring Google from creating an app store for iOS. Because the injunction will distort rather than encourage competition, it should be vacated.

## IV.   CONCLUSION

The district court's injunction threatens to undermine rather than

promote competition. The order forces a digital-services company to support its rivals, eliminates incentives to innovate, and skews the free market in favor of one competitor. This Court should vacate or substantially modify the injunction to align with established antitrust principles.

DATED:  December 4, 2024          /s/ Steven A. Hirsch
                                  Benjamin Berkowitz
                                  (CA Bar. No. 244441)
                                  Steven A. Hirsch
                                  (CA Bar No. 171825)
                                  Sara R. Fitzpatrick
                                  (CA Bar. No. 337360))
                                  Keker, Van Nest & Peters LLP
                                  633 Battery Street
                                  San Francisco, CA  94111-1809
                                  (415) 391-5400
                                  bberkowitz@keker.com
                                  shirsch@keker.com
                                  sfitzpatrick@keker.com


                                  Attorneys for *Amici Curiae*
                                  Chamber of Progress
                                  Computer & Communications
                                  Industry Association
                                  NetChoice
                                  Consumer Technology Association

2838925

## CERTIFICATE OF COMPLIANCE

I hereby certify as follows:

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Federal Circuit Rule 29(b). The brief contains 5,231 words according to the word count of the word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a 14-point, proportionally spaced Century Schoolbook font.

Dated: December 4, 2024

*/s/Steven A. Hirsch*
STEVEN A. HIRSCH

2838925

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, AND CONSUMER TECHNOLOGY ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLANTS with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on December 4, 2024. All participants in the case are registered ACMS users, and service will be accomplished by the appellate ACMS system.


DATED:  December 4, 2024          */s/ Steven A. Hirsch*
                                 STEVEN A. HIRSCH

2838925