NOS. 24-6256, 24-6274

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———————— • ————————

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

EPIC GAMES, INC.,

*Plaintiff - Appellee,*

vs.

GOOGLE LLC, *et al.*,

*Defendants – Appellants.*

————————————

On Appeal from the United States District Court, for the Northern
District of California, Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
The Honorable James Donato

---

## BRIEF OF *AMICI CURIAE* FYOUTURE; FIRECRACKER SOFTWARE LLC; VISUAL BLASTERS, LLC; BETTERTIME, CO.; SPEEKO, INC. IN SUPPORT OF APPELLANTS AND REVERSAL

---

Anthony P. Schoenberg (State Bar No. 203714)
Christopher C. Wheeler (State Bar No. 224872)
Hilary C. Krase (State Bar No. 318762)
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400; Fax: (415) 954-4480
Attorneys for *Amicus Curiae*

## Corporate Disclosure Statement

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel certifies the following:

Fyouture has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Firecracker Software LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Visual Blasters, LLC has no parent corporation and no publicly held corporation owns 10% or more of its stock.

BetterTime, Co. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Speeko, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated:  December 4, 2024          Respectfully submitted,

FARELLA BRAUN + MARTEL LLP

By: _____

Anthony P. Schoenberg

Attorneys for *Amici Curiae*

## TABLE OF CONTENTS

I.    INTEREST OF *AMICI CURIAE* ...................................................................1

      A.    Fyouture .................................................................................1

      B.    Firecracker Software LLC .................................................................2

      C.    Visual Blasters, LLC .......................................................................3

      D.    BetterTime, Co. ...........................................................................4

      E.    Speeko, Inc. ..............................................................................5

II.   INTRODUCTION .......................................................................................7

III.  BACKGROUND ..........................................................................................9

IV.   ARGUMENT .............................................................................................10

      A.    Requiring Google to permit users to download competing app
            stores within Play and make Play's app catalog available to
            those competitors threatens security. ...............................................10

            1.    Distributing third-party app stores within Play
                  undermines safety and security and destroys users'
                  trust in apps downloaded from Play .............................................10

            2.    The requirement for "link-outs" from within Play creates
                  potential for bad actors and threatens security. ........................13

      B.    Offering Play's full catalog of apps to users of any Android app
            store takes away control from developers. ..........................................13

      C.    Stopping revenue sharing will raise prices and disincentivize
            small developers. .......................................................................15

V.    CONCLUSION .............................................................................................15

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### FEDERAL CASE

*Miller-Wohl Co. v. Comm'r of Labor & Indus.*,
   694 F.2d 203(9th Cir. 1982) ................................................................ 6

### FEDERAL RULE

Federal Rules of Appellate Procedure Rule 29(a)(4)(E) ........................................ 6

### OTHER AUTHORITIES

Adekotujo, A., et al., *A Comparative Study of Operating Systems:
Case of Windows, UNIX, Linux, Mac, Android and iOS*, International
Journal of Computer Applications (0975-8887), Vol. 176 - No. 39, 17-
24 at 18 (July 2020),
https://www.ijcaonline.org/archives/volume176/number39/adekotujo-
2020-ijca-920494.pdf ........................................................................ 9, 10

Android Open Source Project*, Android Compatibility Program
Overview* (Aug. 29, 2024),
https://source.android.com/docs/compatibility/overview ........................................ 9

*Apple App Store Connect: Gain Insights with
Analytics*, https://developer.apple.com/app-store-connect/analytics/ .................... 14

Arun, TK, *Google's Fees: Fact vs Fiction for App Developers,* Impact
& Policy Research Institute (Mar. 9, 2024),
https://www.impriindia.com/insights/googles-fees-fact-for-app-
developers/ ............................................................................ 9, 15

Barrett, S., et al., *Grief in the Gray Zone: Identifying and Analyzing
Vault Apps*,
https://alexsalontai.com/files/GRIEF___Aptoide_Analysis___NLP_ba
sed_Android_Grey_Market_App_Analysis.pdf ............................................ 10, 11

Bertona, J., *Beyond the App Store: The Hidden Risks of Sideloading
Apps,* Zimperium, (June 19, 2024),
https://www.zimperium.com/blog/the-hidden-risks-of-sideloading-
apps/ ................................................................................ 11

Doffman, Z., *Google Play Store Warning As Fake 'Modified' Apps Trick Users,* Forbes (Sept. 26, 2024), https://www.forbes.com/sites/zakdoffman/2024/09/26/google-play-store-new-app-warning-for-pixel-9-pro-samsung-galaxy-s24-android/. ................................................................................................ 11, 13

*Google Play Console: Statistics*, https://play.google.com/console/about/stats/ ....................................... 14

Lotarev, I., *Android vs iOS app Development: Benefits and Challenges,* Adapty (Oct. 11, 2024), https://adapty.io/blog/android-vs-ios-development/ ...................................................................... 14

Padliya, T., *SecuFone: Android Security Advisor,* TechRxiv (Apr. 1, 2024), https://www.techrxiv.org/doi/full/10.36227/techrxiv.171198145.51086311/v1. ............................................................................. 11

Peters, C., *Apple and Google App Stores v. Developers*, 22 Wash. U. Global Stud. L. Rev. 87 (2023), https://journals.library.wustl.edu/globalstudies/article/8868/galley/25651/view/............................................................................ 12

I.      **INTEREST OF *AMICI CURIAE***

The undersigned *amici* ("Developers") offer this *amicus* brief in support of Appellants and reversal.  Developers offer their perspective regarding the value of Google Play ("Play") as it pertains to their app businesses, respectively.

**A.      Fyouture**

*Amicus curiae* Fyouture is a mobile software application that lets users preserve messages and memories for loved ones and make predictions for the future.  Users write messages and upload media (*i.e.*, photos and audio and video recordings) that can be delivered to loved ones in up to 50 years' time.  The app also allows users to post and track their predictions.

Fyouture has been downloaded over 300,000 times, in total, from the Google Play Store and the Apple App Store.  It is available at no cost, with limited functionality, in both stores.  Fyouture users who want to send additional messages or make additional predictions can purchase credits through a $0.99 monthly subscription plan or make a one-time credit-purchase of approximately $1.99-$2.99.  Ninety-nine percent of Fyouture users download the app from the Google Play Store, and one percent download it from the Apple App Store.  Additionally, because teens and young adults constitute a significant portion of Fyouture's users and because users often divulge highly personal information, Fyouture benefits from Google's privacy and security capabilities.

###### B.    Firecracker Software LLC

*Amicus curiae* Firecracker Software LLC ("Firecracker") is a software company that makes a range of popular digital applications and games. The company specializes in word-game and word-puzzle-solving tools, and in 2011 developed the popular Scrabble-helper application "Word Breaker." Firecracker's games are enjoyed by millions of users worldwide and are available in Web versions, in the Google Play, Apple App, and Amazon App Stores. Approximately 55 percent of Firecracker customers access the company's apps through iOS-powered devices; 45 percent access the apps through Android-powered devices. The company's games appeal primarily to a youth audience; approximately 70 percent of Firecracker game users are under the age of 18. Firecracker's apps are typically available at no cost with advertisements, or for approximately $5.00 without advertisements.

Firecracker's first app, Word Breaker, was developed using Google's open-source Android operating system. Firecracker benefits from Google's stringent app-vetting and security and privacy capabilities, given that many of its games are enjoyed by minors. The company also benefits from Google's comprehensive analytic reports, which allow Firecracker to better understand and appropriately market its products.

### C.    Visual Blasters, LLC

*Amicus curiae* Visual Blasters, LLC is a developer of multimedia mobile apps.  Its most popular commercial offering, FlipaClip, allows users to quickly turn drawings into animated cartoons and share their animations with others.  FlipaClip has 6 million unique monthly users, a vast percentage of whom are minors. Individuals may access FlipaClip at no cost, or they can upgrade and subscribe to FlipaClip Plus, which has a 7-day free trial and then costs $5.99 a month or $29.99 a year on an annual plan.  U.S. schools can subscribe to the FlipaClip app at a discounted rate; affiliated students may access the app at no cost.  FlipaClip is available for trial access and purchase through the Apple, Google, Amazon, and AppGallery app stores, and is compatible with Android-, ChromeOS-, iOS-, maccOS-, and Windows-powered devices.

Visual Blasters' founders developed FlipaClip using Google's open-source Android platform, initially offering FlipaClip only in the Google Play Store. FlipaClip expanded to other platforms after establishing a foothold among Android-powered device users.  Because a significant number of FlipaClip users are minors, users' privacy and security are top concern.  Parents' and schools' trust in Google's app-screening and security capabilities are essential to FlipaClip's business.  Visual Blasters also benefits significantly from the Google Play Store's

low costs, which allow it to offer FlipaClip to users on a free trial basis — a key

component of its sales process — and at reduced rates to schools.

### D.    BetterTime, Co.

*Amicus curiae* BetterTime, Co. is the developer of BetterYou.ai

("BetterYou"), an AI-based digital health application that aims to help users

develop life-enhancing habits.  BetterYou tracks how users spend their time and

links its findings back to users' stated health and wellness goals.  BetterYou has

approximately 8,000 Android users.  It is available for free, with limited

capabilities, or for purchase, with enhanced capabilities, in the Google Play and

Apple App Stores.  Ten percent of BetterYou's users are individuals who choose to

download or purchase the app, paying a monthly subscription fee of approximately

$5.00.  An additional 90 percent of BetterYou's users are given access to the app

as part of an institutional wellness program or health benefits package.  Forty

percent of BetterYou users access the app through iOS-powered devices.  Sixty

percent of BetterYou users access the app through Android-powered devices.

BetterYou users share sensitive personal information about their physical

and mental health, as well as their daily habits, making the app's security and

privacy critically important.  Google's processes for reviewing, approving, and

ensuring the security of the apps in its store provide BetterYou with the legitimacy

required by its individual and institutional customers.  This guarantee of legitimacy is a critical asset for all developers offering products in the Google Play Store.

### E.      Speeko, Inc.

*Amicus curiae* Speeko, Inc. is the developer of Speeko, an AI-powered digital speech-coaching application intended to help users improve their public speaking and spoken communication skills.  Speeko tracks the pace and pitch of users' speech, as well as word choice and use of filler words, then offers personalized feedback and exercises for improvement.  The app is available for free, with limited capabilities, or on a monthly or annual subscription basis, with more extensive capabilities.  Speeko currently has 400,000 users.  Ninety-nine percent of its users are individuals who, on their own, find and install Speeko on a mobile device.  The remaining one percent of Speeko's users are granted access to the app through corporate, organizational, or educational training programs. Speeko is currently available only through Apple's App Store and can be accessed via iOS-powered devices.  An Android-compatible version of Speeko is in development, with expected availability January 1, 2025.

Speeko has spent one year developing an Android-compatible version of its app that can be accessed and purchased from Play.  Approximately 43 percent of Americans use Android-powered devices, making Speeko's availability in Play critical to the business's growth.  Speeko anticipates returns on its entry into the

Android-powered app market based on extrapolations from current levels of cost and functionality within the Google Play Store.

More broadly, Speeko — like other app developers providing services that rely on highly personalized information such as individuals' voice recordings — benefits from consumers' trust that the primary players in the app ecosystem have vetted available apps for legitimacy, and ensure apps' safety, security, and privacy.

* * *

Developers have moved this Court for permission to file this Brief; in doing so, Developers seek to fulfill the "classic role of amicus curiae by assisting in a case of general public interest, supplementing the efforts of counsel, and drawing the court's attention to law that escaped consideration." *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982). Developers offer this Brief to provide the Court with additional information and context from the perspective of small developers who distribute and, at times, sell their apps via the Play Store.

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the

6

*amici curiae*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

## II.  <u>INTRODUCTION</u>

It is not an overstatement to say that small developers are critical to the mobile app ecosystem.  Likewise, it is not an overstatement to say that Google Play is critical to the business and future of small developers.  The outcome of this case will no doubt impact small developers as they seek to grow their businesses. The question of whether the trial court's injunction was legally defective is of central importance: can the court require Google to (1) distribute third parties' app stores through Play and (2) allow any Android app store to offer Play's full catalog of apps to users of that store?  The answer to both must be no.

In reaching this conclusion, Developers acknowledge the fundamental principle that competitive practices benefit consumers and innovation.  However, this principle does not—and cannot—compel technology companies, like Google, to function as a common carrier.  If the trial court's injunction is affirmed, this would fundamentally reshape the app store ecosystem and create significant dangers for developers and users.

As Appellants' Opening Brief demonstrates, the trial court's decision was grounded in legal error, violating the limits of an antitrust court's authority. Developers need not duplicate those arguments.  Instead, Developers emphasize

three points which underscore the error in and troubling implications of the trial court's decision.

*First*, the injunction threatens safety and security and undermines users' trust in apps sold within the Play Store. Both distributing third-party app stores within Play and allowing third-party app stores to access Play's app catalog make it more difficult, if not impossible, for Google to ensure the privacy and security of apps available to Android users, thus undermining users' trust.

*Second*, the injunction removes control developers have over their apps. Developers would no longer be able to control where their apps are distributed or receive the data-driven insights currently provided by Google which are necessary to expand Developers' businesses.

*Third*, if the trial court's injunction were to remain, thus dismantling Google's revenue sharing structure, it would result in an increase in prices and disincentivize developers. Agreements, like the one that Google has with its developers, help to maintain prices, encourage development of more Android apps, and ensure the availability of apps for consumers across the globe.

For these reasons, and those advanced by Appellants, the injunction should be reversed.

## III.   **BACKGROUND**

Through Google's open-source Android operating system and Play,

developers are able to grow their businesses and reach new customers in a safe,

secure, and constantly innovating environment.  Unlike Apple's iPhone/iPad and

iOS, Android is not tied to a specific device, but rather can run on numerous

devices.  Adekotujo, A., et al., *A Comparative Study of Operating Systems: Case of*

*Windows, UNIX, Linux, Mac, Android and iOS*, International Journal of Computer

Applications (0975-8887), Vol. 176 - No. 39, 17-24 at 18 (July 2020),

https://www.ijcaonline.org/archives/volume176/number39/adekotujo-2020-ijca-

920494.pdf.  Android is an open-source operating system, meaning anyone can

view, download, modify, or share its code.  *Id.*  Google does not charge device

makers like Samsung licensing fees for the operating system.  Arun, TK, *Google's*

*Fees: Fact vs Fiction for App Developers,* Impact & Policy Research Institute

(Mar. 9, 2024), https://www.impriindia.com/insights/googles-fees-fact-for-app-

developers/.  Android is also designed to run on hundreds of devices, and Google

ensures compatibility across manufacturers.  Android Open Source Project*,*

*Android Compatibility Program Overview* (Aug. 29, 2024),

https://source.android.com/docs/compatibility/overview.

Android's open-source nature also empowers a robust community of

developers who provide troubleshooting, tips, and guidance about creating apps for

Android.  This community – unique among major operating systems – is one of the significant advantages of creating Android apps.

## IV.   ARGUMENT

### A.   Requiring Google to permit users to download competing app stores within Play and make Play's app catalog available to those competitors threatens security.

The trial court's injunction requiring Google to distribute third parties' app stores through Play and permitting any Android app store to offer Play's full catalog of apps to users of that store would undermine the current security protections that Play offers and lead to a decrease in users' confidence in both Play and the apps distributed via the Play Store.

#### 1.   Distributing third-party app stores within Play undermines safety and security and destroys users' trust in apps downloaded from Play.

The injunction issued by the trial court, if allowed to stand, would compromise confidence in the apps sold through Play.  Although Android currently allows users to download apps outside of Play, also known as "sideloading," most users download apps directly from Play.  Barrett, S., et al., *Grief in the Gray Zone: Identifying and Analyzing Vault Apps,* at 2, https://alexsalontai.com/files/GRIEF___Aptoide_Analysis___NLP_based_Android _Grey_Market_App_Analysis.pdf.  Users value Google's established track record of providing safe, secure apps — a critical component of the app ecosystem. Adekotujo, A., et al., *supra.*

Android users trust Google because it rigorously reviews every app in the Play Store.  Barrett, S., et al., *supra*.  This "stamp of approval" provides a backbone for the app ecosystem — the main reason over 80% of consumers globally download apps exclusively from Google Play, and only 18% use sideloading.  Bertona, J., *Beyond the App Store: The Hidden Risks of Sideloading Apps,* Zimperium, (June 19, 2024), https://www.zimperium.com/blog/the-hidden-risks-of-sideloading-apps/.  Consumers cannot consistently trust sideloading and feel safer downloading apps from Google Play.  Padliya, T., *SecuFone: Android Security Advisor,* TechRxiv (Apr. 1, 2024), at ¶1. Introduction, https://www.techrxiv.org/doi/full/10.36227/techrxiv.171198145.51086311/v1.

Flooding Play with third-party app stores will make it harder for Play to shield consumers from inappropriate content, protect their privacy and security, and weed out bad actors from the platform.  If these new app stores become available in Play, it would undermine security on Play because Google could not ensure these apps from third-party app stores meet its strict standards.  Doffman, Z., *Google Play Store Warning As Fake 'Modified' Apps Trick Users,* Forbes (Sept. 26, 2024), https://www.forbes.com/sites/zakdoffman/2024/09/26/google-play-store-new-app-warning-for-pixel-9-pro-samsung-galaxy-s24-android/.  These apps could be loaded with malware or harmful content, but because they are listed

on an app store available for download through Play, consumers would likely assume that the apps are safe and have Google's "stamp of approval."

These new security risks are likely to result in (1) decreased competition, and (2) changes to how Android operates. *First*, unable to trust Android and Play, more and more consumers would likely switch to Android's main competitor, Apple – which has far more restrictions on sideloading. *See* Peters, C., *Apple and Google App Stores v. Developers*, 22 Wash. U. Global Stud. L. Rev. 87, 96-97 (2023), https://journals.library.wustl.edu/globalstudies/article/8868/galley/ 25651/view/. As a result, competition in the mobile app market would significantly decrease, resulting in a massive boon for Apple at the expense of small app developers who will have fewer platforms to reach new customers. *Id.*

*Second*, increased security threats in Play could also change how Android operates. While Android is currently an open-source system that allows developers to share code, allowing unsecure and unmonitored apps within Play would hamper Android's ability to operate as an open-source system. Adekotujo, A., et al., *supra*. This, in turn, would make it more difficult for developers to gain access to Android and offer apps to consumers. *Id.* It would cripple smaller developers who lack the resources or experience to gain access to the platform, making it impossible for them to compete with larger developers. *Id.*

**2.    The requirement for "link-outs" from within Play creates potential for bad actors and threatens security.**

Android users can install apps without using Google Play by "sideloading" or downloading files directly from a website.  Under the trial court's injunction, however, Google would be required to allow third-party apps to link to a sideloading site ("link-outs") in their Play description.

Android users would likely, and understandably, assume that Google vetted these links given that they appear in the app's description.  That assumption, however, would be incorrect.  Accordingly, bad actors could use link-outs to launch "man-in-the-middle" attacks, rerouting consumers to deceptive websites to steal their personal and financial information.  Doffman, Z., *supra.*  As more and more consumers are threatened with or fall victim to malicious hacks, they will lose confidence in Play as a safe and secure platform, forcing more and more consumers over to Apple's iOS platform and negatively impacting small developers' ability to reach new customers through Play.

**B.    Offering Play's full catalog of apps to users of any Android app store takes away control from developers.**

If Google has to provide all app stores access to its app catalog, developers will lose control over where their apps are distributed and miss out on the data-driven insights they need to grow their businesses.  Play offers tools to help developers fix issues with their apps, powerful metrics that help developers

understand their audience, and keywords developers can use to find new customers and generate revenue. Lotarev, I., *Android vs iOS app Development: Benefits and Challenges*, Adapty (Oct. 11, 2024), https://adapty.io/blog/android-vs-ios-development/. Developers benefit from the powerful insights Google and Apple provide. *Id.* Developers who are on one or both platforms receive cutting-edge insights and analytics. *Id.*; *Google Play Console: Statistics*, https://play.google.com/console/about/stats/; *Apple App Store Connect: Gain Insights with Analytics*, https://developer.apple.com/app-store-connect/analytics/.

Forced sharing of Google's catalog will lead to developers seeing fewer users downloading their app from Play and a lack of information and metrics about where customers are downloading their app. Every user who downloads a developer's app from a third-party app store deprives that developer of the accompanying metrics they need. This will hurt developers' understanding of their audience and create an environment where other app stores charge developers for these metrics. Smaller developers, in particular, will be at an extreme disadvantage if their costs increase and they lose access to the powerful metrics Google provides.

Offering developers the option to opt out of sharing their apps on other app stores creates a lose-lose situation. Developers would have to hand over control of where their apps are listed, losing access to valuable metrics and potentially

increasing their costs.  Further, making apps available on additional stores requires additional time and resources from the developers.

The trial court's injunction would result in a loss of control by small developers, and a lack of access to key metrics, severely impacting business and limiting both growth and competition.

### C.    Stopping revenue sharing will raise prices and disincentivize small developers.

The Android ecosystem depends on Google's revenue-sharing agreements with developers, other app stores, and device makers.  Revenue-sharing agreements subsidize device innovation, mitigate risk for device manufacturers, and provide valuable partnerships between Android, app developers, and others in the ecosystem who are invested in their mutual success.  Arun, TK, *supra.*  In short, these agreements keep prices down and make more Android apps and devices available for consumers worldwide.

## V.    <u>CONCLUSION</u>

It is in the best interests of small developers for consumers to trust that Google distributes fun, engaging, or otherwise valuable and safe apps – not malware.  Forcing Play to include unregulated third-party app stores and unverified link-outs risks consumers' safety, security, and privacy.

When consumers lose confidence in Play, small developers will suffer.  With no control over where or how their apps are sold and a less complete picture of

their businesses, developers will have little incentive to create new apps. The trial court's injunction would stifle competition and reshape the app store ecosystem at the expense of, among others, small developers.

Dated: December 4, 2024                  Respectfully submitted,

                                         FARELLA BRAUN + MARTEL LLP

                                         By: _____
                                             Anthony P. Schoenberg

                                         Attorneys for *Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-6256; 24-6274

I am the attorney or self-represented party.

**This brief contains** | 3,117 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [       ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Anthony P. Schoenberg | **Date** | 12/04/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8**            17            *Rev. 12/01/22*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2024, I electronically filed the

foregoing **BRIEF OF *AMICI CURIAE* FYOUTURE; FIRECRACKER**

**SOFTWARE LLC; VISUAL BLASTERS, LLC; BETTERTIME, CO.;**

**SPEEKO, INC. IN SUPPORT OF APPELLANTS AND REVERSAL** with the

Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by

using the ACMS electronic filing system.

I certify that all participants in the case are registered ACMS users and that

service will be accomplished by the ACMS system.

_____

Gina Renteria

46079\20007369.2

18