Nos. 24-6256, 24-6274

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC, *et al.,*

*Defendants-Appellants,*

_____

On Appeal from the United States District Court
for the Northern District of California (Hon. James Donato)
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

_____

**MOTION OF INFORMATION TECHNOLOGY & INNOVATION
FOUNDATION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN
SUPPORT OF DEFENDANTS/APPELLANTS GOOGLE LLC**

_____

Marc R. Lewis
Rina Plotkin
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 800-0590

December 4, 2024

*Attorneys for* Amicus Curiae
*Information Technology & Innovation
Foundation*

## MOTION FOR LEAVE TO FILE AMICUS BRIEF

Pursuant to Federal Rule of Appellate Procedure 29(a)(3) and Circuit Rule 29-3, Information Technology & Innovation Foundation (ITIF) respectfully seeks leave to file the accompanying amicus curiae brief in support of Defendants-Appellants Google LLC.  Counsel sought consent from the parties to file this brief:  Defendants-Appellants consented; as described in more detail below, Plaintiff-Appellee did not consent but takes no position on the present request for leave to file amicus curiae brief.

*ITIF's interests and the proposed amicus brief.*  ITIF is an independent non-profit, non-partisan think tank whose mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity.  ITIF's core focus lies at the intersection of technological innovation and public policy, including economic issues related to innovation, productivity, antitrust law, and more.  ITIF has studied the mobile ecosystem at the heart of this appeal and has concluded that the requested relief and underlying arguments pressed by Epic in the name of fostering competition and innovation would have the opposite effect.

ITIF's brief is relevant and helpful to the disposition of the case because it provides legal and contextual information that explains the errors and oversights in the district court's rulings and injunction.  ITIF has endeavored not to repeat arguments made by Defendants-Appellants and instead focus on the broader policy

implications of the issues presented in this case, specifically for innovation and productivity.

*Consent to file ITIF's brief.* Plaintiff-Appellee does not oppose but has not consented to this filing. Plaintiff-Appellee conditioned its consent to the filing of an amicus brief on ITIF disclosing "the amount of any funding it has received from a party or amicus or its affiliates in the past 12 months." As counsel for ITIF explained, the Federal Rules of Appellate Procedure do not require such a disclosure. Rule 29(a)(4)(E) requires only the disclosure of whether a party's counsel authored the brief in whole or in part, or a party or a party's counsel contributed money that was intended to fund preparing or submitting the brief—and ITIF makes this disclosure in its brief. As the Rules do not require the funding disclosure that Plaintiff-Appellee requests, ITIF did not agree to this condition for Plaintiff-Appellee's consent to the filing of ITIF's brief.

Because neither party opposes the filing of this brief, and because the brief will assist the Court, ITIF respectfully requests that the Court grant leave to file the attached *amicus* brief.

Dated:  December 4, 2024         Respectfully submitted,

                                 */s/ Marc R. Lewis*
                                 Marc R. Lewis
                                 Rina Plotkin
                                 LEWIS & LLEWELLYN LLP
                                 601 Montgomery Street, Suite 2000
                                 San Francisco, California 94111
                                 Telephone: (415) 800-0590

                                 *Attorneys for* Amicus Curiae *Information
                                 Technology & Innovation Foundation*

## CERTIFICATE OF COMPLIANCE

I certify that this motion contains 406 words. It thus complies with the word limit of Federal Rules of Appellate Procedure 27(d)(2)(A).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word.


Dated: December 4, 2024      */s/ Marc R. Lewis*
                                       Marc R. Lewis
                                       *Attorney for* Amicus Curiae *Information Technology & Innovation Foundation*

## CERTIFICATE OF SERVICE

I certify that on December 4, 2024, I electronically filed the foregoing motion for leave to file a brief as amicus curiae with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated:  December 4, 2024          */s/ Marc R. Lewis*
                                  Marc R. Lewis
                                  *Attorney for* Amicus Curiae *Information Technology & Innovation Foundation*

Nos. 24-6256, 24-6274

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

EPIC GAMES, INC.,

*Plaintiff- Appellee,*

*v.*

GOOGLE LLC, *et al.*,

*Defendants-Appellants,*

_____

On Appeal from the United States District Court
for the Northern District of California (Hon. James Donato)
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

_____

## BRIEF OF INFORMATION TECHNOLOGY & INNOVATION FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS/APPELLANTS GOOGLE LLC

_____

Marc R. Lewis
Rina Plotkin
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 800-0590

December 4, 2024

*Attorney for* Amicus Curiae
*Information Technology & Innovation Foundation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Information Technology & Innovation Foundation, a nonprofit corporation, states

that it does not have parent companies, subsidiaries, or affiliates that have issued

shares to the public.


Dated:  December 4, 2024      Respectfully submitted,

*/s/  Marc R. Lewis*
Marc R. Lewis
Rina Plotkin
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE............................................1

ARGUMENT ................................................................................3

    I.     THE REMEDIES CONTEMPLATED BY THE DISTRICT COURT
            ARE ECONOMICALLY AND LEGALLY UNSOUND ...................3

           A.     Requiring Google to Share its Catalog of Apps with Third-Party
                  App Stores Will Dampen Innovation and Does Not Satisfy
                  Applicable Causation Requirements............................................3

           B.     The Technical Committee Risks Replacing Innovation with
                  Central Planning...........................................................5

    II.    GOOGLE DOES NOT HAVE MONOPOLY POWER IN MOBILE
            APP DISTRIBUTION OR IN-APP PAYMENT SOLUTIONS ..........8

           A.     The Mobile App Ecosystem Is Not Stifled by Dominance. .......9

           B.     Android App Distribution and Android In-App Billing Services
                  Are Not Relevant Aftermarkets. .............................................11

CONCLUSION...............................................................................13

CERTIFICATE OF COMPLIANCE......................................................15

# TABLE OF AUTHORITIES

## CASES

*Aerotec Int'l v. Honeywell Int'l*,
  836 F.3d 1171 (9th Cir. 2016)................................................................7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010)................................................................6

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999)............................................................11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ....................................................................8, 11

*Epic Games, Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023)............................................ 8, 9, 11, 13

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................... 9, 10, 12, 13

*Exp. Ass'n. v. Sunkist Growers, Inc.*,
  526 F.2d 1196 (9th Cir. 1975)..............................................................5

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020)................................................................3

*Hanover Shoe, Inc., v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ..........................................................................5

*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004) ..........................................................7

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004).............................................................7

*NCAA v. Alston*,
  594 U.S. 69 (2021) ..............................................................................6

*Newcal Indus., Inc. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008).............................................................................11

*O'Bannon v. NCAA,*
    802 F.3d 1049 (9th Cir. 2015)...............................................................................5

*Ohio v. Am. Express Co.,*
    585 U.S. 529 (2018) ..............................................................................................6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
    20 F.4th 466 (9th Cir. 2021)..................................................................................4

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995).................................................................... 8, 9, 11

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
    875 F.2d 1369 (9th Cir. 1989)...............................................................................9

*United States v. E.I. du Pont de Nemours and Co.,*
    351 U.S. 377 (1956) ..............................................................................................8

*United States v. Grinnell Corp. et al.,*
    384 U.S. 563 (1966) ..............................................................................................8

*United States v. Microsoft Corp.,*
    147 F.3d 935 (D.C. Cir. 1998) .............................................................................7

*United States v. Microsoft Corp.,*
    231 F. Supp. 2d 144 (D.D.C. 2002) .....................................................................7

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) .............................................................. 6, 10, 12

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
    540 U.S. 407 (2004)...........................................................................................3, 6

**FEDERAL RULES**

Federal Rules of Appellate Procedure Rule 29(a)(4)(E) .............................................1

iv

**OTHER AUTHORITIES**

Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58
    Antitrust L.J. 841 (1989) .................................................................................7

James G. McGann, *2020 Global Go To Think Tank Index Report*, Univ. of Pa.
    (2021) ............................................................................................................1

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Information Technology and Innovation Foundation (ITIF) is an independent non-profit, non-partisan think tank. ITIF's mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity to spur growth, opportunity, and progress. To that end, ITIF strives to provide policymakers around the world with high-quality information, analysis, and recommendations they can trust. ITIF adheres to the highest standards of research integrity, guided by an internal code of ethics grounded in analytical rigor, policy pragmatism, and independence from external direction or bias. The University of Pennsylvania has recognized ITIF as setting the global standard for excellence in science and technology policy, and as one of the top 40 U.S. think tanks overall.[2]

ITIF's core focus lies at the intersection of technological innovation and public policy—including economic issues related to innovation, productivity, and competitiveness, as well as technology policy issues in the areas of information technology, broadband telecommunications, antitrust law and competition policy,

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part, or contributed money to fund its preparation or submission, and no person other than amicus, its members, or its counsel have made a monetary contribution to this brief's preparation or submission.

[2] James G. McGann, *2020 Global Go To Think Tank Index Report*, Univ. of Pa. (2021), https://repository.upenn.edu/think_tanks/18/ (last visited Mar. 24, 2022).

and more.  ITIF engages in policy and legal debates, both directly and indirectly, by presenting policymakers, courts, and other policy influencers with compelling data, analysis, arguments, and proposals to advance effective innovation policies and oppose counterproductive ones.

ITIF's Schumpeter Project on Competition Policy promotes an understanding of antitrust law and economics that is designed to maximize dynamic competition and innovation, with a particular focus on promoting sound competition policy in the digital economy and other high-tech industries.  It draws heavily from the work of the Austrian-American economist Joseph A. Schumpeter, who famously described how competition takes the form of "creative destruction" by large firms who have the incentives and abilities to engage in the risk taking and research and development necessary to drive techno-economic progress.

As relevant here, ITIF has studied the mobile ecosystem at the heart of this appeal and has concluded that the requested relief and underlying arguments pressed by Epic in the name of fostering competition and innovation would have precisely the opposite effect.  Instead, they would impose upon Google unnecessary and punitive remedies based on the flawed premise that Google has substantial market power or dominance in mobile app distribution or in-app payment solutions.  ITIF submits that its extensive expertise in antitrust and innovation policy will aid the court in resolving this appeal.

2

## **ARGUMENT**

## I.     THE REMEDIES CONTEMPLATED BY THE DISTRICT COURT ARE ECONOMICALLY AND LEGALLY UNSOUND

To address Google's allegedly anticompetitive conduct, the district court put forward a series of highly problematic remedies.  In particular, the court's injunction would require Google to share its Play Store's catalog of apps with rival app stores.  1-ER-4–5 at ¶ 11.  To make sure that Google allows for sufficient interoperability, including the ability for rival app stores to be easily and fully accessible on its platform, the injunction also calls for the creation of a "Technical Committee" to "review disputes or issues relating to the technology and processes required by the preceding provisions."  *Id.* ¶ 13.  Both remedies, however, risk chilling the innovation that drives competition in the mobile space, and neither meets the legal standards that should apply to fashioning appropriate antitrust relief in this case.

### A.     Requiring Google to Share its Catalog of Apps with Third-Party App Stores Will Dampen Innovation and Does Not Satisfy Applicable Causation Requirements.

There is no general duty to deal under U.S. antitrust law.  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 407, 411, 415 (2004); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020).  Indeed, the "enforced sharing" envisioned by the injunction below is likely to undercut the very innovation competition it seeks to create.  *Trinko*, 540 U.S. at 407–08

3

("Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."). Indeed, Google has made considerable investments in its Play Store platform to acquire its extensive catalog of apps (and in turn created incentives for its rivals to engage in innovations of their own) which this remedy will stifle going forward—ultimately harming consumers by depriving them of this innovation competition.

What is more, the decision to require Google to provide third-party app stores with access to the full catalog of Play Store apps does not admit of any "causal connection between the conduct enjoined or mandated and the violation found," *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021), as the conduct deemed illegal in this case did not involve any claim that Google acted anticompetitively by failing to provide rivals with such access. Rather, and even according to the district court's own logic, Google's expansive catalog merely contributes to the network effects on Google's platform that purportedly make it harder for rival app stores to compete with Google, 1-ER-16 (Order re UCL Claim and Injunctive Relief), but which do not by themselves constitute anticompetitive conduct in need of a remedy.

Rather, for the district court, third-party catalog access serves the purpose of "undo[ing] the consequence of Google's ill-gotten gains" and "restor[ing] fair competition in the face of the barriers found by the jury." 1-ER-17, 1-ER-19. However, while monopolization remedies can function both to prevent monopolists from "retain[ing] the fruits of their illegality," *Hanover Shoe, Inc.*, *v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968), as well as "restor[ing] competition in the relevant market," *Pac. Coast Agr. Exp. Ass'n. v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1208 (9th Cir. 1975), they should be the least restrictive means of doing so to ensure that procompetitive and innovative behavior is not unduly chilled. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1075 (9th Cir. 2015) (noting that where "a restraint is *patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives, an antitrust court can and should invalidate it and order it replaced with a less restrictive alternative") (emphasis in original). But the district court did not address whether requiring Google to share its catalog is the least restrictive means to restore competition— especially when this remedy is in addition to the other extensive remedial provisions the court seeks to impose on Google.

### B. The Technical Committee Risks Replacing Innovation with Central Planning.

Antitrust remedies should be designed not just to avoid chilling innovation, but also to promote administrability and avoid a scenario which "requires

antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 at 407–08. As such, "[j]udges must be sensitive to the possibility that the 'continuing supervision of a highly detailed decree' could wind up impairing rather than enhancing competition." *NCAA v. Alston*, 594 U.S. 69, 103 (2021) (quoting *Trinko*, 540 U.S. at 415). These concerns are acute in fast-moving high-tech markets, where conduct remedies may involve "enormous practical difficulties for courts." *See United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001).

The contemplated relief of having a Technical Committee—and, by extension, this Court—determine whether Google is anticompetitively limiting interoperability, or alternatively whether it has taken "reasonable measures" to protect its platform in a way that is "strictly necessary and narrowly tailored," 1-ER-4–5 at ¶¶ 11–12, resembles the rule of reason that courts apply under Sherman Act §1. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). However, this Court has made clear that such a test is hardly conducive to creating an environment that fosters continued innovation by Google in the mobile space. "'Antitrust scholars have long recognized the undesirability of courts oversee product design, and any dampening of technological innovation would be at cross-purposes with antitrust law.'" *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d

6

991, 1000 (9th Cir. 2010) (quoting *United States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998)).

Importantly, this is a not situation where Google "already sells the product in an existing market to certain customers but merely refuses to sell to its competitors," such that "the court can impose a judicial remedy that does not require the court to 'assume the day-to-day controls characteristic of a regulatory agency.'" *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004) (quoting Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 ANTITRUST L.J. 841 (1989)). Rather, the district court is asking Google to offer access to its platform that it does not provide to consumers, and which thus creates precisely the kind of "central plann[ing]" role that courts are "ill-equipped to assume." *Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1183 (9th Cir. 2016).

To be sure, in *Microsoft*, the court did in fact establish a technical committee to, *inter alia*, ensure that Microsoft no longer engaged what were found to be anticompetitive integrations between its Windows operating system and its Internet Explorer browser. *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 196 (D.D.C. 2002), *aff'd sub nom*, *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004). However, unlike in *Microsoft*, the core of Epic's case in chief is not that Google engaged in "technological bundling." *Id.* at 161, n.17. Instead,

7

Epic's case is essentially objecting to a combination of contractual and anti-steering restrictions designed to promote the Play Store—all behavior that can and should be resolved without the creation of any technical committee.

## II. GOOGLE DOES NOT HAVE MONOPOLY POWER IN MOBILE APP DISTRIBUTION OR IN-APP PAYMENT SOLUTIONS

A threshold issue for any monopolization claim is the existence of monopoly power. *United States v. Grinnell Corp. et al.*, 384 U.S. 563, 570–71 (1966). This can be demonstrated through either "direct proof" or, more commonly, "circumstantial evidence pertaining to the structure of the market," *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995), which requires a plaintiff to define a relevant market that "is composed of products that have reasonable interchangeability for the purposes for which they are produced." *United States v. E.I. du Pont de Nemours and Co.*, 351 U.S. 377, 404 (1956). Epic's arguments fail in both respects: as this court has already confirmed in the matter of *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023), not only do Google and Apple intensely compete in a thriving and dynamic mobile space, but Epic's attempt to define relevant Android-specific aftermarkets is inconsistent with market realities and fails to satisfy the standard set forth in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).

### A.     The Mobile App Ecosystem Is Not Stifled by Dominance.

The mobile app ecosystem—and especially for gaming—exhibits anything but "restricted output and supracompetitive prices." *Rebel Oil Co.*, 51 F.3d at 1434. Rather, "[t]he market in mobile game transactions has grown dramatically over recent years due to growth in gaming generally, smartphone ownership, and digital transactions as a whole." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1036 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023).  And neither has this output growth been accompanied by a decline in quality or innovation. On the contrary, this "expansive market growth [has been] caused by innovation in the field." *Id.* at 1037.  Moreover, rather than increase prices to recoup these innovations, the commission rate charged by Google (and Apple) has remained relatively "static," typically 30%. *Id.* at 1036.  Without question, these market performance metrics belie any notion that the mobile gaming space is being suppressed by Google.

In fact, this strong market performance has been underpinned by vigorous competition between Apple and Google—"Apple's main competitor." *Id.*  "Apple has always viewed Google Play as a significant competitor, including with respect to games transactions." *Id.* at 977.  Given that the "field of competition" should capture "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business," *Thurman Indus.,*

*Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989), there is no basis for defining relevant app distribution or in-app payment services markets that include Google but exclude Apple.  Indeed, not only has Apple benchmarked its App Store against Google, *Epic Games*, 559 F. Supp. 3d at 985 n. 416, but even Epic's CEO Tim Sweeney has recognized that "Google, of course, operates in the same market [as Apple]."  *Id.* at 997, n. 484; *see also* Epic v Apple Trial Tr. (Sweeney) 310:1-17; PX-2392.003.

This sort of innovation competition by large firms—each of whom frustrates the monopoly prospects of the others—and which leads to overall market growth is common in high technology industries.  As the economist Joseph Schumpeter recognized long ago, unlike small firms competing in relatively unconcentrated markets, large firms often have the scale and appropriability incentives necessary to engage in the investments in research and development that empower innovation and dynamic competition.  *Microsoft*, 253 F.3d at 49–50 (noting how Schumpeterian competition by large firms spurs innovation in high-tech markets). In other words, the existence of large firms like Apple and Google in the mobile space is not at all an indicator of market failure, but in fact the very opposite— robust innovation competition that benefits consumers.

### B. Android App Distribution and Android In-App Billing Services Are Not Relevant Aftermarkets.

To make out a circumstantial case for monopoly power, "a plaintiff must [first] define the relevant market." *Rebel Oil*, 51 F.3d at 1434. This requires "properly defined geographic and product markets." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999). While a product market "must encompass the product at issue as well as all economic substitutes for the product," *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008), in certain cases "one brand of a product can constitute a separate market." *Eastman Kodak*, 504 U.S. at 482. Specifically, and as this Court has made clear, to demonstrate the existence of a product-specific relevant "aftermarket," four conditions must be satisfied: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games*, 67 F.4th at 977.

Defining an "Android app distribution market" and "a market for Android in-app billing services" is inconsistent with this standard. 1-ER-51–52 (Verdict Form). While mobile platforms (and their users) do regularly benefit from network effects, concerns about resultant "lock-in" or a "winner-takes-all" environment

11

which limit substitutability and might foster the exercise of market power in aftermarkets are regularly overstated. First, not only do developers generally "multi-home" across both Android and iOS, but both platforms generally provide consumers with the benefit of substantial positive network externalities—neither enjoys significant scale advantages over the other that would contribute to lock-in or winner-take-all dynamics. In other words, the lack of any substantial network barriers to entry that could prevent switching from Google to Apple more than dispels the notion of defining Android-specific aftermarkets.

This is borne out by the evidence. "Epic Games failed to prove that users are 'locked-in' or would not switch to Android devices in response to a significant change in [Apple's] game app prices, availability, or quality." *Epic Games*, 559 F. Supp. 3d at 960. In fact, "as many as 26% of smartphone users, including 7% of iPhone users, purchased a cellphone with a different operating system each cycle." *Id.* at 959. Furthermore, switching costs continue to fall given "the continued rise and popularity of cross-platform games" that "are making switching between platforms seamless." *Id.* at 1025–26. Indeed, such a phenomenon is typical of "technologically dynamic markets" where "entrenchment may be temporary, because innovation may alter the field altogether." *Microsoft*, 253 F.3d at 49.

To be sure, when it comes to the additional requirement for Epic to show that Google's restrictions are not "generally known," "a key distinguishing feature

12

of the iOS platform is its closed platform model, as compared to the open Android platform maintained by its main competitor Google." *Epic Games*, 559 F. Supp. 3d at 1024. However, that consumers expect iOS to have certain restrictions does not at all mean they believe Android does not. That is, while Android is as a *commercial* matter a more open platform *relative* to iOS, consumers are generally aware that, like Apple, Google must also take steps to ensure the privacy and security of its mobile platform, which as this Court has held constitute the core procompetitive rationale behind restrictions like those at issue in this case. *Epic Games Inc.*, 67 F.4th at 987–89.

## **CONCLUSION**

Accepting Epic's flawed arguments about Google's supposed anticompetitive dominance, as well as consequently imposing forced catalog-sharing and a Technical Committee to oversee Google's business decisions, risks condoning remedies that lack any causal connection to the violations found and are tantamount to central planning by courts—inhibiting the very innovation competition that the antitrust laws are designed to promote.

13

Dated:  December 4, 2024      Respectfully submitted,

*/s/  Marc R. Lewis*
Marc R. Lewis
Rina Plotkin
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590

## CERTIFICATE OF COMPLIANCE

I certify that this amicus brief contains 2,947 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It thus complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word.


Dated:  December 4, 2024          */s/ Marc R. Lewis*          
                                 Marc R. Lewis
                                 *Attorney for* Amicus Curiae
                                 *Information Technology & Innovation*
                                 *Foundation*

## CERTIFICATE OF SERVICE

I certify that on December 4, 2024, I electronically filed the foregoing amicus curiae brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated:  December 4, 2024                    */s/ Marc R. Lewis*
                                            Marc R. Lewis
                                            *Attorney for* Amicus Curiae
                                            *Information Technology & Innovation Foundation*