# Nos. 24-6256, 24-6274

*In the*

# United States Court of Appeals
### *for the*
# Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE, LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Northern District of California, Nos. 3:20-cv-05671-JD; 3:21-md-02981-JD

## BRIEF OF *AMICI CURIAE* LAW AND BUSINESS SCHOOL PROFESSORS IN SUPPORT OF APPELLANTS

JACK E. PACE III
GINA M. CHIAPPETTA
DANIEL J. GROSSBAUM
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
jpace@whitecase.com

MARK DAVIES
WHITE & CASE LLP
701 Thirteenth St. NW #600
Washington, D.C. 20005
Telephone: (202) 626-3600
mark.davies@whitecase.com

*Counsel for Amici Curiae*

December 4, 2024

# TABLE OF CONTENTS

INTEREST OF THE AMICI CURIAE ....................................................1

INTRODUCTION ...............................................................................2

ARGUMENT ....................................................................................3

I.  THE DISTRICT COURT'S REMEDY TARGETS A REFUSAL TO
    DEAL WHERE NO UNLAWFUL REFUSAL WAS FOUND ....................3

II. THE INJUNCTION INAPPROPRIATELY INSERTS THE DISTRICT
    COURT AS A CENTRAL PLANNER OF GOOGLE'S APP-STORE
    BUSINESS ..............................................................................9

CONCLUSION .................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)................................................................4

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) ...................................................7

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)................................................................6

*In re Generic Pharms. Pricing Antitrust Litig.*,
  605 F. Supp. 3d 672 (E.D. Pa. 2022).......................................8

*In re Google Play Store Antitrust Litig.*,
  No. 20-CV-05671-JD, 2024 WL 3302068 (N.D. Cal. July 3, 2024) ..................3

*Nat'l Soc. of Prof. Engineers v. United States*,
  435 U.S. 679 (1978)..............................................................12

*NCAA v. Alston*,
  594 U.S. 69 (2021)..................................................................9

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ...............................................9

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co. Ltd.*,
  20 F.4th 466 (9th Cir. 2021) ................................................6, 7

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009)................................................................4

*St. Luke's Hospital v. ProMedica Health Sys., Inc.*,
  8 F.4th 479 (6th Cir. 2021) .....................................................9

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919)................................................................4

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................5, 8

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................................4, 9

## STATUTES AND RULES

15 U.S.C. § 25 ...........................................................................................6

15 U.S.C. § 26 ........................................................................................6, 7

Fed. R. App. P. 29 ......................................................................................1

## OTHER AUTHORITIES

Alden Abbott, *A Tale of Two App Stores*, FORBES (Oct. 1, 2024),
    https://www.forbes.com/sites/aldenabbott/2024/10/
    10/a-tale-of-two-app-stores/..............................................................12

Alicia Hope, *NCSC Warns About Malicious Apps on App Stores, Chief Backs New
    Consumer Regulations*, CPO MAGAZINE (May 17, 2022), https://www.
    cpomagazine.com/cyber-security/ncsc-warns-about-malicious-apps-on-app-
    stores-chief-backs-new-consumer-regulations/ ..................................9

*Building a Trusted Ecosystem for Millions of Apps*, APPLE (Oct. 2021),
    www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of
    _Apps_A_Threat_Analysis_of_Sideloading.pdf..................................9

Esther Gal-Or, Ronen Gal-Or & Nabita Penmetsa, *The Role of User Privacy
    Concerns in Shaping Competition Among Platforms*, 29 INFO. SYS. RSCH. 698
    (2018), https://doi.org/10.1287/isre.2017.0730 ................................12

Gregory J. Werden, *Remedies for Exclusionary Conduct Should Protect and
    Preserve the Competitive Process*, 76 ANTITRUST L.J. 65 (2009) ....................12

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF
    ANTITRUST PRINCIPLES AND THEIR APPLICATION (5th ed. 2024) ....................5, 6

Susan Feng Lu & Lauren Xiaoyuan Lu, *Do Mandatory Overtime Laws Improve
    Quality? Staffing Decisions and Operational Flexibility of Nursing Homes*, 63
    MGMT. SCI. 3566 (2016) .................................................................13

Thomas C. Arthur, *The Costly Quest for Perfect Competition: Kodak and
    Nonstructural Market Power*, 69 N.Y.U. L. REV. 1 (1994) ..............................11

Thomas C. Arthur, *"Formalistic Line Drawing": Exclusion of Unauthorized Servicers From Single Brand Aftermarkets under* Kodak *and* Sylvania, 24 J. CORP. L. 603 (1999)...............................................................................................4

## INTEREST OF THE *AMICI CURIAE*

This brief is submitted on behalf of law school and business school professors with an interest in the proper application of antitrust principles to business conduct (the "Amici").[1]  Amici include leading professors and lecturers at some of the nation's top universities and colleges, with extensive experience analyzing the proper application of intellectual property issues, antitrust law, and economics in various industries around the world.

Amici submit this brief to provide the Court with their views on why the District Court's Injunction (1-ER-3) oversteps the proper application of the antitrust laws by imposing a duty to deal where no unlawful refusal to deal was found. Moreover, the District Court's Injunction inserts the District Court as a "central planner" positioned to operate a core, and complex, part of Google's app-store business, without due consideration for the potential complexities and liabilities that may result.  Given the importance of these issues to rapidly changing technology landscapes and antitrust jurisprudence generally, Amici submit this brief to offer their perspective on the District Court's Injunction and propose that this Court vacate the Injunction and order the District Court to reconsider its remedy decision with an

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), Amici represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person—other than Amici and their counsel—contributed money that was intended to fund preparing or submitting the brief.

eye toward addressing the actual antitrust harms found by the jury in a manner that is both economically sensible and judicially administrable.

## INTRODUCTION

The District Court's Injunction purports to reshape the Android app distribution ecosystem to "restore economic freedom . . . and break the shackles of anticompetitive conduct." 1-ER-7 (hereinafter "Injunction Order"). But in seeking to achieve those goals, the District Court strays beyond resolving the limited antitrust claims tried to the jury: Google's alleged monopolization and the harm caused to Epic Games, a single competitor offering its own app store to Android users. Instead of crafting injunctive relief that is narrowly tailored to address the harms found by the jury, the District Court forces Google to deal with its rivals when in fact no anticompetitive refusal to deal was found. The Injunction requires Google not only to offer Epic's app store in Google's Play Store, but also to deal with <u>any</u> competitor who desires to have Google distribute its competing store.

The Injunction allows Google to perform safety and security reviews of the third-party products it is now forced to distribute, but only under the direction and supervision of the District Court and a "Technology Committee" which includes Plaintiff-Appellee Epic. By requiring the District Court to be the final arbiter of Google's safety and security decisions, the District Court has inserted itself as a business manager and regulator. But as the Supreme Court and this Court have

2

recognized repeatedly, courts lack the institutional capacity to manage private businesses, particularly in an industry as dynamic and complex as app distribution.

As a result, the District Court erred in two ways requiring vacatur of its Injunction: First, it improperly ordered Google to deal with competing app stores when Google was not found to have engaged in an anticompetitive refusal to deal. Second, the District Court inserted itself as an arbiter of Google's safety and security processes, a role the District Court is ill-suited to play.

## ARGUMENT

## I. THE DISTRICT COURT'S REMEDY TARGETS A REFUSAL TO DEAL WHERE NO UNLAWFUL REFUSAL WAS FOUND

Before Epic's case was decided by a jury, the District Court held that "plaintiffs' claims that Google unlawfully prohibits the distribution of other app stores on Google Play" were without merit. *See In re Google Play Store Antitrust Litig.*, No. 20-CV-05671-JD, 2024 WL 3302068, at *6 (N.D. Cal. July 3, 2024) (summarizing decision on defendants' motion for summary judgment). In reaching this decision, the district court reasoned that "governing case law makes clear that Google had no duty to deal." *Id.* However, the District Court's post-trial Injunction (1-ER-3 (hereinafter the "Injunction")) forces Google to do the very thing the District Court previously concluded the antitrust laws did not require: to distribute rival app stores through Google's own Google Play Store. *See* Injunction ¶ 12.

Antitrust law has long recognized that, "[a]s a general rule, businesses are free

to choose the parties with whom they deal, as well as the prices, terms, and conditions of that dealing." *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).  While this right is certainly not "unqualified," the Supreme Court has been rightfully "cautious in recognizing" exceptions to this general rule, including "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (*quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)); *cf.* Thomas C. Arthur, *"Formalistic Line Drawing": Exclusion of Unauthorized Servicers From Single Brand Aftermarkets under* Kodak *and* Sylvania, 24 J. Corp. L. 603, 612 (1999) ("If the venture is likely to be more efficient than each partner's going it alone, the extra profits provide a powerful incentive to reach an agreement.  It is hard to believe that second-guessing antitrust courts and juries, unlearned in either economics or business, can provide a better measure.").

Here, the District Court seemingly has thrown the Supreme Court's caution to the wind, reasoning that, in the remedy phase, the legality of Google's refusal to deal with rivals is no longer relevant.  As the District Court explained:

> The problem for Google is that the case is now in the remedy phase, not the liability phase.  The question at hand is not whether Google violated the antitrust laws by failing to aid rivals, but what measures are necessary to restore fair competition in the

4

face of the barriers found by the jury.

*See* Injunction Order at 13. The District Court concludes that, even if Google had a right under the antitrust laws not to deal with rivals, Google nonetheless could be compelled to deal with—and in fact support—its rivals to "restore fair competition." *See id.*

The trouble is that the District Court already has held that Google's refusal to distribute rival app stores through its Google Play Store did not contribute to unfair market conditions. This apparent inconsistency between the liability and remedy phase thus raises the question whether the Injunction is as "narrowly tailored to remediate" competition as the District Court contends it is. *See id.* at 11. Amici argue it is not.

Antitrust remedies should be "tailored to fit the wrong creating the occasion for the remedy." *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001). Such tailoring is particularly important in a case like this one where (1) Epic is a private plaintiff—*not* a government enforcer—and (2) the District Court has stated that it sought to undo Google's "ill-gotten gains" through equitable relief.

As to the first point, while the Clayton Act affords the government broad authority to "prevent and restrain violations without any causal linkage of harm to any person," private plaintiffs are not so empowered. *See* PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES

AND THEIR APPLICATION ¶ 326 (5th ed. 2024) (hereinafter "ANTITRUST LAW")
(describing how the private plaintiff is entitled to "less extensive relief"); *see also*
15 U.S.C. §§ 25, 26; *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155,
170–71 (2004) ("A Government plaintiff, unlike a private plaintiff, must seek to
obtain the relief necessary to protect the public from further anticompetitive conduct
and to redress anticompetitive harm.  And a Government plaintiff has legal authority
broad enough to allow it to carry out this mission.  Private plaintiffs, by way of
contrast, are far less likely to be able to secure broad relief.").  Private plaintiffs are
entitled to injunctive relief only after carrying their burden of proof to show that a
defendant's anticompetitive conduct caused or will cause a threatened harm.  *See*
AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 326 ("the private plaintiff, unlike the
government, must make some showing of individualized injury and causation").  It
follows that any injunctive relief granted to a private plaintiff must be designed to
redress the threatened harm actually caused by the relevant antitrust violation;[2] it

---

[2] Epic contends that it is appropriate to force Google to deal with its rivals here
because an injunction does not need to "track and negate" the particular
anticompetitive conduct that the jury found at trial.  *See* Dkt. No 31.1 at 16 (adding
that the "district court has broad discretion in crafting injunctive provisions that
remedy the ongoing effects of anticompetitive conduct").  Epic relies principally on
*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co. Ltd.*, 20 F.4th 466 (9th Cir. 2021),
in support of this argument and the breadth of a district court's authority to craft
injunctive relief following a finding of any anticompetitive conduct.  But it is worth
noting that when the Ninth Circuit considered a district court's authority to grant
injunctive relief to the private plaintiff in *Optronic*, and the goals of such relief, it

does not follow that upon a finding of *any* antitrust violation, a private plaintiff is entitled to injunctive relief that indiscriminately addresses the effects of anticompetitive conduct (*i.e.*, unlawful monopolization) and lawful conduct (refusals to deal) alike.

As to the second point, in fashioning the Injunction, the District Court seemed intent not only on preventing the threatened loss or damages that Epic is likely to face, but also on "undo[ing] . . . Google's ill-gotten gains."  Injunction Order at 11. This latter objective casts further doubt on the propriety of the Injunction.  Section 16 of the Clayton Act allows a private plaintiff to pursue injunctive relief "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity" (15 U.S.C. § 26)—*i.e.*, when a remedy at law is not available.  *See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998) ("Inadequacy of a plaintiff's remedy at law, that is, his damages remedy, is normally

---

appears to have examined only cases litigated by the government.  *Optronic*, 20 F.4th at 486 (*citing Microsoft, Prof'l Eng'rs,* and *Ford Motor Co.*, all cases brought by the United States).  Government plaintiffs, such as those involved in the cases forming the basis for the decision in *Optronic*, are charged with protecting the public interest.  Thus, under Section 15 of the Clayton Act, the government is rightly afforded broader entitlement to injunctive relief than is afforded to self-interested private plaintiffs under Section 16.  Given the unique limitations of Section 16, courts should not offer private plaintiffs the same broad right to injunctive relief that the government enjoys.

(and so under section 16 of the Clayton Act . . . ) a prerequisite to the entry of an injunction.").  Compelling Google to deal with its competitors is not appropriate where monetary damages are available to redress any "ill-gotten" monetary gains under Section 4 of the Clayton Act, relief that Epic notably chose not to pursue here. *See In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 677 (E.D. Pa. 2022) (dismissing claim for disgorgement of defendant's purportedly ill-gotten gains under § 16 of the Clayton Act because § 4 provides avenue to obtain monetary relief).

Moreover, to the extent the District Court attempts to reduce Google's "ill-gotten" market power, close scrutiny of the causal connection between Google's conduct and the remedy fashioned is particularly important.  *Microsoft* counsels that equitable relief "designed to eliminate the monopoly altogether . . . requires a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power.  Absent such causation, the antitrust defendant's unlawful behavior should be remedied by 'an injunction against continuation of that conduct.'"  *See* 253 F.3d at 106 (emphasis in original).  Here, appropriate scrutiny would appear to reveal that a significant causal connection is missing, and for this and the above reasons this Court should vacate the Injunction.

## II.  THE INJUNCTION INAPPROPRIATELY INSERTS THE DISTRICT COURT AS A CENTRAL PLANNER OF GOOGLE'S APP-STORE BUSINESS

Running any business is notoriously complex.  Running a business—an app store—for billions of users that is consistently under attack from cyberthreats is magnitudes even more difficult.[3]  The sophistication and specialized expertise required to run a business are some of the reasons the Supreme Court has counseled for decades that courts are "ill suited" to act as "central planners, identifying the price, quantity, and other terms of dealing."  *Trinko*, 540 U.S. at 408.  And courts are even more circumspect when asked to force "rivals to share—to continue doing business together"—as such forced sharing "pushes the bounds of [court] expertise." *St. Luke's Hospital v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 489 (6th Cir. 2021). "When it comes to fashioning an antitrust remedy in this area, caution is key."  *Id.* (cleaned up) (quoting *NCAA v. Alston*, 594 U.S. 69, 106 (2021)); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) ("It would also require us to become 'central planners,' a role for which we judges lack many comparative advantages and a role in which we haven't always excelled in the past.").

---

[3] *Building a Trusted Ecosystem for Millions of Apps*, APPLE (Oct. 2021), https:// www.apple.com/privacy/docs/Building_a_Trusted_Ecosystem_for_Millions_of_ Apps_A_Threat_Analysis_of_Sideloading.pdf; Alicia Hope, *NCSC Warns About Malicious Apps on App Stores, Chief Backs New Consumer Regulations*, CPO MAGAZINE (May 17, 2022), https://www.cpomagazine.com/cyber-security/ncsc-warns-about-malicious-apps-on-app-stores-chief-backs-new-consumer-regulations/.

These principles are new neither to this Court nor to the District Court. Indeed, the District Court recognized the risks of "judicial oversight that would amount to micromanagement of Google's business" and, specifically, "decid[ing] the day-to-day business issues of Android app distribution and in-app billing." Injunction Order at 8; *see also id.* at 16 ("the Court has no intention of running Google's business as a 'central planner'"). Yet, in fashioning its remedy, the District Court went beyond resolving the alleged antitrust harms and stepped into the realm of a business executive.

For example, the District Court mandates that Google, with Epic's input, set up a "Technical Committee" to "review" the "reasonable[ness]" of Google's decisions about whether rival app stores to be distributed through its Play Store are "safe from a computer system and security standpoint, and do not offer illegal goods or services under federal or state law within the United States, or violate Google's content standards." Injunction ¶ 12. Where the "Technical Committee cannot resolve a dispute or issue, a party may ask the Court for a resolution," meaning that the District Court has placed itself as the ultimate arbiter of these complex security and content-standard concerns. *Id.* ¶ 13.

Paragraphs 12 and 13 of the Injunction illustrate the danger of judicial micromanagement, particularly in a dynamic industry. *Cf.* RICHARD EPSTEIN, ANTITRUST CONSENT DECREES IN THEORY AND PRACTICE 52 (2007) ("Antitrust

decrees will generally make less sense ten years after they are entered than at the time they were first put into place.").  As the District Court acknowledged, Google argued below that "there are potential security and technical risks involved in making third-party apps available, including rival app stores.  The Court is in no position to anticipate what those might be, or how to solve them."  Injunction Order at 12; *see also* Thomas C. Arthur, *The Costly Quest for Perfect Competition: Kodak and Nonstructural Market Power*, 69 N.Y.U. L. REV. 1, 18 (1994) ("[U]nlike any other system of economic regulation, antitrust is run by the judiciary. . . .  Federal judges . . . are generalists who are not selected because of their economic expertise.  Nor are they likely to acquire it on the job, in view of the low proportion of their busy dockets taken by antitrust cases.  They lack expert staff and must defer to jury factfinding in private cases.").

Yet, the Injunction requires Google to distribute through the Google Play Store third-party platforms, stores, and apps and imposes heavy limits on Google's ability to address the potential security and technical risks of doing so.  If, for example, Epic or any other competitor decides to challenge a security measure implemented by Google, then the Injunction provides that the measure will be reviewed with a strong presumption against Google, which "will bear the burden of proving that its technical and content requirements and determinations are *strictly necessary* and *narrowly tailored*."  Injunction Order at 12 (emphasis added).

In so ordering, the District Court has placed its thumb on the scale favoring access to competitors' apps over safety and security. The optimal balance between access and security doubtless can be a tricky question, but nonetheless one the competitive market has, thus far, been allowed to make without undue interference. Indeed, a key point of competition among app stores is not only the breadth of the apps they offer, but also the security of those offerings.[4] *See Nat'l Soc. of Prof. Engineers v. United States*, 435 U.S. 679, 695 (1978) ("The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers"). By distorting the current equilibrium between safety and access, the District Court has also—perhaps inadvertently—unsettled this competitive process. *See* Gregory J. Werden, *Remedies for Exclusionary Conduct Should Protect and Preserve the Competitive Process*, 76 Antitrust L.J. 65, 75-76 (2009) ("A remedy does not protect and preserve the competitive process if it entails extensive and continuing involvement by the court in the operations of the defendant.") *see also, e.g.*, Esther Gal-Or, Ronen Gal-Or & Nabita Penmetsa, *The Role of User Privacy Concerns in Shaping Competition Among Platforms*, 29 Info.

---

[4] *See also* Alden Abbott, *A Tale of Two App Stores*, Forbes (Oct. 1, 2024), https://www.forbes.com/sites/aldenabbott/2024/10/10/a-tale-of-two-app-stores/.

SYS. RSCH. 698, 699 (2018), https://doi.org/10.1287/isre.2017.0730 ("In addition to competing based on the attributes of the primary service, however, platforms can also gain competitive advantage by positioning their platform as being less intrusive or by limiting the amount of data that they use for targeting advertising messages").

Indeed, these requirements not only introduce delay in security-screening processes designed to provide customers with timely and high-quality apps, but they also put Google potentially in the precarious position of having to offer an app or app-store it does not believe to be safe. The implications from such forced dealing are broad: if the district court orders Google to distribute an app that turns out to be unsafe, is Google still legally responsible for distributing that app? It would seem unfair to hold Google responsible for its distribution—and the commercial consequences of a breach of consumer trust cannot be undone easily—but that may be the situation the District Court's Injunction creates. *Cf.* Susan Feng Lu & Lauren Xiaoyuan Lu, *Do Mandatory Overtime Laws Improve Quality? Staffing Decisions and Operational Flexibility of Nursing Homes*, 63 MGMT. SCI. 3566 (2016) (concluding that state laws banning mandatory overtime hours for nurses had unintentional consequence of constraining operational flexibility of nursing homes and ultimately quality of care).

This is not to say that courts should never have a role in policing their remedies. A district court can and should ensure all parties are abiding by the terms

of its injunction. And such oversight may involve a review of business or technical issues where, for example, clear guidelines exist and the court merely determines whether the guidelines were followed. But here the District Court's order fails that test by requiring Google, for example, to implement only "reasonable" security and safety screenings. Such an amorphous test appears to leave the parties without clear and direct guidance on what practices the Injunction permits—which could lead to substantial, ongoing involvement by the District Court.

Ultimately, Amici agree that the District Court has broad discretion to fashion an antitrust remedy. But that discretion must take more keen account of the actual antitrust harms found by the jury and the Supreme Court's edict that courts avoid acting as central planners. The District Court's Injunction runs afoul of these mandates.

## CONCLUSION

In seeking to "restore economic freedom" and disgorge Google's purported "ill-gotten gains," the District Court's Injunction strays beyond remedying the monopolization-based antitrust injury identified by the jury. Because the District Court incorrectly imposes a duty to deal on Google and inappropriately inserts itself as a day-to-day regulator of Google's business, Amici respectfully submit that the District Court's order should be vacated.

Dated:  December 4, 2024        Respectfully submitted,

WHITE & CASE LLP

By:   */s/ Jack E. Pace III*

Jack E. Pace III
Gina M. Chiappetta
Daniel J. Grossbaum
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
jpace@whitecase.com

Mark Davies
WHITE & CASE LLP
701 Thirteenth St. NW #600
Washington, D.C. 20005
Telephone: (202) 626-3600
mark.davies@whitecase.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,472 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated:     December 4, 2024               _____*/s/ Jack E. Pace III*_____

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated:        December 4, 2024                    _____ */s/ Jack E. Pace III*_____

17

**ADDENDUM A**
**List of Academic Signatories** [*]

Thomas C. Arthur
L.Q.C. Lamar Professor, Emory University School of Law

Amitai Aviram
Professor, Director of Corporate Law Program, University of Illinois College of Law

Hemant Bhargava
Distinguished Professor, Jerome and Elsie Suran Chair in Technology Management, Director, Center for Analytics and Technology in Society, University of California, Davis

Anthony Dukes
Robert E. Brooker Chair in Marketing, Professor of Marketing, Co-Director of the USC Marshall Initiative on Digital Competition, Chair of Marketing Department, University of Southern California, Marshall School of Business

Dokyun Lee
Kelli Questrom Associate Professor in Information Systems Management & Computing and Data Sciences, Digital Business Institute Fellow, Computing & Data Sciences Faculty Fellow, Questrom School of Business, Boston University

Daryl Lim
H. Laddie Montague Jr. Chair in Law, Associate Dean for Research and Innovation, Founding Director, Intellectual Property and Innovation Initiative, Acting Dean, Penn State Dickinson Law

Lauren Lu
Professor of Business Administration, Tuck School of Business at Dartmouth College

Nabita Penmetsa
Assistant Professor Department of Operations and Information Systems, David Eccles School of Business, University of Utah

---

[*] The brief presents the views of the individual signers. Institutions are listed for identification purposes only.

Brian Wu
Robert G. Rodkey Collegiate Professor of Business Administration, Professor of Strategy, Ross School of Business, University of Michigan

Yuqian Xu
Assistant Professor of Operations Management, Kenan-Flagler Business School, University of North Carolina, Chapel Hill

Bo Zhou
Associate Professor of Marketing, University of Maryland, Robert H. Smith School of Business

Feng Zhu
Professor of Business Administration, Harvard Business School