No. 24-6256, 24-6274

---

# In the United States Court of Appeals
# for the Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, *et al.,*

*Defendants-Appellants.*

---

**On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD; 3:21-md-02981-JD
Hon. James Donato**

---

**BRIEF OF AMICUS CURIAE
THE COMMITTEE FOR JUSTICE IN SUPPORT OF APPELLANTS**

---

Curt Levey
THE COMMITTEE FOR JUSTICE
1629 K Street, NW
Washington, DC 20006
(202) 270-7748

John M. Reeves
REEVES LAW LLC
7733 Forsyth Blvd.
Suite 1100-#1192
St. Louis, MO 63105
(314) 775-6985
reeves@appealsfirm.com

*Counsel for amicus curiae The Committee for Justice*

## TABLE OF CONTENTS

Table of Contents ...................................................................2

Table of Authorities...............................................................3

Interest of Amicus Curiae .....................................................5

Introduction and Summary of the Argument..........................7

Argument...............................................................................8

    I.   By imposing a duty to deal on Google, the district court wrongly helped Epic as a competitor at the expense of consumers, when antitrust law in fact serves to protect competition for the benefit of consumers. .....................8

        A.  From the beginning, antitrust law has served to protect competition, not competitors themselves. ............................10

        B.  A business's refusal to deal with its rivals is itself a legitimate form of competition that antitrust law protects....................................................................14

   II.  By excluding Apple from its market definition and by forcing Google to open its Play App store to Epic, the district court failed to satisfy this Court's requirements for meeting the essential facilities doctrine. .....................16

Conclusion ..........................................................................19

Certificate of Service ..........................................................20

Certificate of Compliance....................................................20

## TABLE OF AUTHORITIES

### Cases

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
    836 F.3d 1171 (9th Cir. 2016) .................................................. 9, 16, 17

*Alaska Airlines, Inc. v. United Airlines, Inc.,*
    948 F.3d 536 (9th Cir. 1991) ............................................................. 17

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ......................................................................... 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ........................................................................... 9

*City of Anaheim v. Southern California Edison Co.,*
    955 F.2d 1373 (1992) ........................................................................ 18

*FTC v. Qualcomm Inc.,*
    969 F.3d 974 (9th Cir. 2020) ...................................................... 8, 9, 15

*Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,*
    555 U.S. 438 (2009) ........................................................................... 9

*U.S. v. Terminal R.R. Ass'n of St. Louis,*
    224 U.S. 383 (1912) ......................................................................... 19

*United States v. Addyston Pipe & Steel Co.,*
    85 F. 271 (6th Cir. 1898) ........................................................ 12, 13, 14

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ......................................................................... 12

*Verizon Commc'ns, Inc v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) ................................................................. passim

### Rules

Fed. R. App. P. 29(a)(4)(E) ...................................................................... 5

## Other Authorities

*FTC Chair Lina Khan Maps Out her Wide-Ranging Antitrust Game Plan*, (Sept. 25, 2024), bit.ly/4imXgZR ................................................. 8

Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*,
58 Antitrust L.J. 841, 852 (1989) ....................................................... 19

Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* (2011 ed., 1978) .......................................................................... 11, 12

### INTEREST OF AMICUS CURIAE[1]

The Committee for Justice (CFJ) is a non-profit legal and policy organization founded in 2002. It is dedicated to promoting the rule of law and preserving the Constitution's limits on government power. CFJ is particularly concerned with the preservation of these principles at the intersection of law, technology and innovation. Consistent with this mission, CFJ files amicus briefs in key cases, supports constitutionalist nominees to the federal judiciary, and educates the American public and policymakers about the benefits of constitutionally limited government and the rule of law, including the need to ensure that antitrust law is properly interpreted such that it protects genuine competition that benefits consumers.

Therefore, CFJ has a critical interest in the outcome of this litigation. The district court has imposed a radical form of liability and a radical injunction upon Google that penalizes it for rising to the top of the market in selling smartphone apps using innovation and business acumen and forces it to open its Play Store to its competitors, something

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person—besides *amicus curiae* and its counsel—contributed money that was intended to fund preparing or submitting this brief.

5

the Supreme Court has repeatedly admonished against. If allowed to stand, the district court's ruling will create a change in antitrust law, warping it from a law that fosters competition for the benefit of consumers into a law that mandates businesses deal with their rivals, even when it is to consumers' detriment.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Antitrust law does not exist to eliminate monopolies as such. Rather, it exists to prevent the utilization of anticompetitive conduct that would harm consumers. If a business uses anticompetitive conduct to dominate a particular market, this is unlawful. But if instead a business uses ingenuity and business acumen to achieve such dominance, it has done nothing wrong—to the contrary, it has helped consumers through the competitive process. Business acumen can include a refusal to deal with rivals. The later is exactly what Google did with Play Store in the market for smartphone apps. Yet the district court has punished Google for these actions and forced it to open its Play Store to all of its rivals, without any conditions.

This cannot stand under antitrust law as is goes against the basic principle that, absent extenuating circumstances that do not exist here, that businesses owe no duty to deal with their rivals. The district court's injunction forcing Google to deal with its rivals is especially troubling when examined under the essential facilities doctrine, as app developers do not need to use Play Store to distribute their apps. Given this, the district court should be reversed.

7

ARGUMENT

I.  **By imposing a duty to deal on Google, the district court wrongly helped Epic as a competitor at the expense of consumers, when antitrust law in fact serves to protect competition for the benefit of consumers.**

Contrary to the belief of certain individuals today, *see, e.g.,* Brian

Contreras, *FTC Chair Lina Khan Maps Out her Wide-Ranging*

*Antitrust Game Plan*, (Sept. 25, 2024), bit.ly/4imXgZR, antitrust law

does not serve to punish businesses like Google for rising to the top of

their respective industries as a result of their innovation and legitimate

business decisions. So long as a business like Google has achieved its

market dominance through conduct that is not of itself anticompetitive

and that does not of itself violate the rule of reason, they may continue

to maintain this market dominance even if the result is that other

competitors are not able to achieve the same level of success, and even if

such competitors are eventually unable to continue their business at all.

*See FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).

Antitrust law protects *competition* for the benefit of consumers. *Id.*

It does not protect *competitors* from the natural difficulties and lack of

success that such competitors may experience in competing with a

business that has achieved market dominance through its innovation

8

and business acumen. *See id.* ("[A]ntitrust laws . . . 'were enacted for the protection of competition, not competitors.'" (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (emphasis omitted)). If a successful business's competitors are not able to achieve the same level of success, and if the business has not used anti-competitive means to block the competitors from achieving this success, then antitrust law is of no help to the competitors. Moreover, antitrust law for the most part cannot force a business that has achieved market dominance in a particular industry to deal with its competitors. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (holding that a business has "no duty to deal under the terms and conditions that rivals find commercially advantageous."). In other words, "[c]ompetitors are not required to engage in a lovefest." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1186 (9th Cir. 2016).

One would never know this from reading the district court's rulings. Instead, the district court gives the impression that the mere fact that Epic is struggling to achieve the same success as Google is somehow evidence that Google has engaged in anticompetitive conduct and must be forced to open up its app store to ensure that Epic can be put on the

9

same footing as Google. There is practically no discussion in the district court's rulings about how Google's conduct with regard to its Play Store has actually harmed consumers. Rather, the district court devotes its analysis almost entirely to the difficulties that Google's competitors seem to have in achieving the same level of success as Google itself. Hence, its conclusion that "[e]ven a corporate behemoth like Amazon could not compete with the Google Play Store due to network effects." (I-ER-16).

But this misses the point—an inability to compete effectively is not, by itself, sufficient evidence of an antitrust violation. Rather, the inability to compete must be the result of a business's anticompetitive conduct, such as erecting barriers to entry or restraining trade. Otherwise, antitrust law would hamper businesses' legitimate growth and development—things that benefit consumers. The district court's orders do not take account of the underlying purpose of antitrust law.

A. **From the beginning, antitrust law has served to protect competition, not competitors themselves.**

The notion that antitrust law protects competition so that consumers can enjoy the full benefits of a free market, as opposed to protecting businesses who may not have the same degree of business

success as a competitor with the largest market share, is nothing new. It has its foundations in the very policy reasons behind the enactment of the Sherman Act in the first place at the end of the nineteenth century. In passing the Sherman Act, "Congress and the courts [interpreting the act] believed that competition could be injured to the detriment of consumers by the *agreed* elimination of rivalry . . . or by a powerful firm's attack upon rivals with the purpose of driving them from the market . . . ." Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 13 (2011 ed., 1978) (emphasis added). Notably, antitrust law does not have as its ultimate goal the actual elimination of monopoly power as such. Rather, antitrust law has as its goal the elimination of *anticompetitive conduct* that could result in the acquisition of monopoly power. *See Verizon Commc'ns, Inc v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004).

There is nothing wrong with a business coming to dominate a particular market through its own innovation and acumen. "The integration of economic activities, which is indispensable to productive efficiency, always involves the implicit elimination of actual or potential competition." Bork, *supra* at 24. This "integration creates wealth for the

11

community." *Id.* As the Supreme Court would later put it, antitrust laws prohibit not monopoly power as such but rather "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). In other words, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407.

The future Chief Justice Taft recognized as much while sitting on the Sixth Circuit in one of the earliest antitrust cases following the passage of the Sherman Act—*United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898). While recognizing that anticompetitive conduct itself is unlawful under the act, Taft explicitly refused to condemn conduct that may indirectly result in the elimination of competitors—such as mergers between two competitors to become partners, or the selling of a business pursuant to an agreement that the seller would thereafter exit the market for the business—so long as they otherwise had a legitimate business purpose. Thus, while most types of conduct that resulted in the elimination of competitors had previously

12

been condemned under the common law, a new approach was necessary. *Id.* at 280. "It was of importance, as an incentive to industry and honest dealing in trade, that … [a man] should be able to sell his business and good will to the best advantage, and he could not do so unless he could bind himself by an enforceable contract not to engage in the same business in such a way as to prevent injury to that which he was about to sell." *Id.*

Along the same lines, Taft continued, "when two men became partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union … [which was] useful to the community." *Id.* In other words, practices such as mergers that may result in a decreased number of *competitors* do not necessarily amount to practices that unlawfully restrain *competition*. If a smaller rival to a larger, more successful business hopes to establish an antitrust violation, it must do more than merely demonstrate that the larger rival is "big" or "more powerful." It must show that its growth and its acquiring of that power was the result of actions that inherently restricted competition, as opposed to competitors.

13

### B. A business's refusal to deal with its rivals is itself a legitimate form of competition that antitrust law protects.

Just as antitrust law protects mergers that help consumers so long as such mergers are the result of legitimate competitive practices, so too antitrust law protects a business's refusal to deal with rivals. In the decades following Chief Justice Taft's observations in *Addyston*, the Supreme Court came to acknowledge this, culminating in its *Trinko* decision. Companies may legitimately acquire monopoly power not only by merging with their rivals, but also "by establishing an infrastructure that renders them uniquely suited to serve their customers." *Trinko*, 540 U.S. at 407. "Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407-08. Even worse, compelling one competitor to deal with other competitors may result in collusion, antitrust's "supreme evil." *Id.* at 408.

While the refusal to deal with a rival can in some instances amount to anticompetitive conduct, the Court has "been very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing . . . ." *Id.* at 408. The only instance in which the Court has found

14

a refusal to deal to be anticompetitive conduct is where a defendant, having previously and voluntarily engaged in a course of dealing with its rival, suddenly canceled that dealing with its rival in an attempt to drive it out of the market. *See id.* at 409-10. (discussing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). This "is at or near the outer boundary of [antitrust] liability." *Id.* at 409. This Court, in turn, faithfully interpreted *Trinko*'s holding about there being no duty to deal with a competitor in *Qualcomm*. *See Qualcomm*, 969 F.3d at 993-1005.

The district court's rulings ignore all of this. It wrongly presumed that by refusing to open Play Store to its competitors free of any conditions, Google engaged in anticompetitive conduct. In fact, Google's refusal to do so is the very basis of legitimate business conduct that serves to foster competition. What's more, as Google itself notes in its merits brief, its Play Store contracts help ensure compatibility so that a single version of any particular application works in a consistent way across Android's ecosystem. (Google Br. 19). Its policies for Play Store also provide users with the benefits of an open ecosystem in a way that

does not jeopardize user security and safety. (Google Br. 9-10). Given

this, the district court should be reversed.

## II. By excluding Apple from its market definition and by forcing Google to open its Play App store to Epic, the district court failed to satisfy this Court's requirements for meeting the essential facilities doctrine.

The district court's exclusion of Apple from the relevant market and

its imposition of a duty to deal on Google is particularly troubling when

viewed through the lens of the essential facilities doctrine. Under that

doctrine, the district court's rulings fail on the merits as a gross

misstatement of antitrust law.

The essential facilities doctrine "is a variation on a refusal to deal

claim." *Aerotec*, 836 F.3d at 1184. It "imposes liability where

competitors are denied access to an input that is deemed essential, or

critical, to competition." *Id*. While the Supreme Court has never

adopted it, *Trinko* 540 U.S. at 441, this Court has "treat[ed] it as having

a basis in § 2 of the Sherman Act. The doctrine is violated if a

monopolist is in control of an essential facility, its competitors are

unable to duplicate that facility, and the monopolist refuses to provide

its competitors access to that facility even though it is feasible for it to

provide such access. *Aerotec*, 836 F.3d at 1185. But critically, "[b]ecause mandating access . . . shares the same concerns as mandating dealing with a competitor, a facility is essential 'only if control of the facility carries with it the power to *eliminate* competition in the downstream market.'" *Id*. (quoting *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.3d 536, 544 (9th Cir. 1991)).

If the district court was trying to justify forcing Google to open up its services to its competitors under the essential facilities doctrine, it failed completely. The district court for all practical purposes deemed Play Store an essential facility when it defined the relevant market in a manner that excluded Apple. Despite Google presenting ample evidence that Apple and Google both operate stores that sell apps for smartphones—to say nothing of Epic's parallel lawsuit against Apple itself in which this Court concluded that Apple and Google were both part of the same market—the district court excluded Apple from this market. The district court's subsequent injunction requiring Google to open this store to all app owners, including Epic, effectively holds that the Play Store is an essential facility.

17

The Play Store can in no way be considered an essential facility. Certainly, Play Store is unique in that it offers consumers the chance to purchase far more apps on their smartphones than most other non-Apple app stores do, but this is not sufficient to make it essential such that Google must open it up to its competitors. "[U]nless it can be and is used to improperly interfere with competition, [the facility in question] cannot be called essential." *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1380 (1992). But the very fact that Apple offers its own app store shows that such stores cannot be considered essential. And even if one excludes Apple from the relevant market, app developers need not use Play Store to distribute their apps—they may distribute them through other third-party stores, or they may make them available online for users to download.

In other words, app developers like Epic are able to compete with Google through the other ways for them to distribute their apps outside of Play Store. This makes Play Store fundamentally different from a facility like a railroad bridge owned by a private railway company that forms the only route to transport goods to a certain part of the country. If the private railway company disallows its competitors from using the

bridge, by definition they cannot even compete in the first place, and the bridge must be opened to them. *See U.S. v. Terminal R.R. Ass'n of St. Louis*, 224 U.S. 383 (1912). But because Epic does not need to use Play Store to distribute its app, it cannot be deemed an essential facility.

At both the merits stage and at the injunction stage, the district court in effect treated Play Store as an essential facility, despite not explicitly using that term. "[c]ompulsory access, if it exists at all, is and should be very exceptional." Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 852 (1989). No exceptional circumstances justifying the essential facilities doctrine exist here. On the contrary, the evidence shows that Google's competitors can distribute apps without having to use Play Store. Therefore, the district court's holding cannot stand.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

*/s/ John M. Reeves*

John M. Reeves
REEVES LAW LLC

19

7733 Forsyth Blvd., Suite 1100–#1192
St. Louis, MO 63105
(314) 775-6985
reeves@appealsfirm.com

Curt Levey
THE COMMITTEE FOR JUSTICE
1629 K Street NW
Washington, DC 20006
(202) 270-7748

*Counsel for amicus curiae The Committee for Justice*

### CERTIFICATE OF SERVICE

I hereby certify that on **December 5, 2024**, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ John M. Reeves*

### CERTIFICATE OF COMPLIANCE

I certify that this brief contains **2,945** words, excluding those parts exempted by Fed. R. App. P. 32(f).

I further that certify this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style

20

requirements of Fed. R. App. P. 32(a)(6) as it is written in

proportionally-spaced, 14-point Century font using Microsoft Office

Word 2016.

*/s/ John M. Reeves*