Nos. 24-6256 & 24-6274

IN THE

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, *et al.*,

*Defendants-Appellants.*

————————————

Appeal from the U.S. District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

————————————

**SUPPLEMENTAL EXCERPTS OF RECORD**

**VOLUME IV OF VIII (SER-451-747) (PUBLIC VOLUME)**

————————————

Gary A. Bornstein
Antony L. Ryan
Yonatan Even
Lauren A. Moskowitz
Justin C. Clarke
Michael J. Zaken
M. Brent Byars
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

Paul J. Riehle
FAEGRE DRINKER BIDDLE & REATH
LLP
Four Embarcadero Center
San Francisco, CA 94111-4180
(415) 591-7500

*Counsel for Plaintiff-Appellee Epic Games, Inc.*

**SER-451**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE &
REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

Counsel for Plaintiff Epic Games, Inc.

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group,
LLC, et al.*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

[Additional counsel appear on signature page]

*Counsel for Defendants Google LLC et al*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*Epic Games, Inc. v. Google LLC et al.*,<br>Case No. 3:20-cv-05671-JD<br><br>*Match Group, LLC et al. v. Google LLC et al.*,<br>Case No. 3:22-cv-02746-JD | Case No. 3:21-md-02981-JD<br><br><br>**JOINT PROPOSED<br>JURY VERDICT FORM<br>AND OBJECTIONS**<br><br>Judge:  Hon. James Donato<br>Trial Date:  November 6, 2023<br>Time:  9:00 am<br>Place:  Courtroom 11, 19th Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Plaintiffs' Proposed Verdict Form ........................................................................................... 3

Defendants' Proposed Verdict Form ...................................................................................... 15

Plaintiffs' Argument Re Verdict Form .................................................................................. 44

Defendants' Argument Re Verdict Form ............................................................................... 46

1 | **Plaintiffs' Proposed Verdict Form**

2 | Please answer the following Questions in accordance with the Jury Instructions given to you by the

3 | Court.  Mark your answers by placing an X in the space provided.

4

5 | **Plaintiffs' Claims**

6

7 | **Monopolization—Section 2 of the Sherman Act**

8 | 1.    Have plaintiffs proven, by a preponderance of the evidence, that Google unlawfully acquired or
9 | maintained monopoly power in a relevant antitrust market that includes the Google Play Store?

10

11 |         YES____  NO ____

12

13 | ***Continue to Question No. 2.***

14

15 | 2.    Have plaintiffs proven, by a preponderance of the evidence, that Google unlawfully acquired or
16 | maintained monopoly power in a relevant antitrust market that includes Google Play Billing?

17

18 |         YES____  NO____

19

20 | ***Continue to Question No. 3.***

21

22

23

24

25

26

27

28

JOINT PROPOSED JURY VERDICT FORM AND OBJECTIONS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:22-cv-02746-JD
3

**SER-455**

**Attempted Monopolization—Section 2 of the Sherman Act**

3.    Have plaintiffs proven, by a preponderance of the evidence, that Google unlawfully attempted
to monopolize a relevant antitrust market that includes Google Play Billing?

    YES____ NO ____

*Continue to Question No. 4.*

### Unlawful Restraints of Trade—Section 1 of the Sherman Act
### and the California Cartwright Act

4. Have plaintiffs proven, by a preponderance of the evidence, that Google entered into an agreement not to compete with one or more of Activision, Riot, or Supercell?

        YES____ NO____

*Continue to Question No. 5.*

5. Have plaintiffs proven, by a preponderance of the evidence, that Google entered into one or more agreements that unreasonably restrained trade in a relevant antitrust market that includes the Google Play Store?

        YES____ NO____

*Continue to Question No. 6.*

6. Have plaintiffs proven, by a preponderance of the evidence, that Google entered into one or more agreements that unreasonably restrained trade in a relevant antitrust market that includes Google Play Billing?

        YES____ NO____

*Continue to Question No. 7.*

**Tying—Section 1 of the Sherman Act**
**and the California Cartwright Act**

7.   Have plaintiffs proven, by a preponderance of the evidence, that Google maintained a *per se*
     illegal tie of Google's Android app store (Google Play Store) and Google's payment processor
     (Google Play Billing)?


          YES____ NO____


***Continue to Question No. 8.***


8.   Have plaintiffs proven, by a preponderance of the evidence, that Google unlawfully tied use of
     its Android app store (Google Play Store) to use of Google's payment processor (Google Play
     Billing) under the rule of reason?


          YES____ NO____

1

## **Injury**

2

3   *If you answered Yes to **any** preceding Question, continue to Question No. 9. If you answered No to **all** preceding Questions, skip to Question No. 12.*

4

5   9.    Did any of Google's anti-competitive conduct you found unlawful in the previous questions
            cause injury to Epic in its business or property?

6

7                    YES____ NO____

8

9   *Continue to Question No. 10.*

10

11  10.   Did any of Google's anti-competitive conduct you found unlawful in the previous questions
            cause injury to Match in its business or property?

12

13                   YES____ NO____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>Damages</u>**

*If you answered Yes to Question No. 10, continue to Question No. 11. If you answered No to Question No. 10, skip to Question No. 12.*

11.     We award Match the following damages for Google's anti-competitive conduct:

$\$$ _____

*Continue to Question No. 12.*

### Match's Claims for Interference with Contractual Relations and Interference with Prospective Economic Relations

12.   Has Match proven, by a preponderance of the evidence, that Google intentionally interfered with one or more contracts between Match and its users?

YES_____ NO_____

*Continue to Question No. 13.*

13.   Has Match proven, by a preponderance of the evidence, that Google intentionally interfered with one or more prospective economic relationships between Match and its users?

YES_____ NO_____

### Google's Counterclaims

*If you answered Yes to __any__ of Questions No. 1, 2, 3, 7 or 8, __or__ you answered Yes to __either__ Question No. 5 or 6 (and you found that Google's Developer Distribution Agreement and/or its Payments Policy unreasonably restrained trade), then do not answer any other questions; sign and date this Verdict Form and inform the Court that the jury has reached a verdict. Otherwise, continue to Question No. 14.*

14. Has Google proven, by a preponderance of the evidence, that Epic breached the Google Play Payments Policy with Google by not exclusively using Google Play Billing in its app distributed through the Google Play Store, causing damage to Google?

       YES____ NO____

*Continue to Question No. 15.*

15. Has Google proven, by a preponderance of the evidence, that between September 21, 2021 and March 31, 2022, Match breached the Google Play Payments Policy with Google by not exclusively using Google Play Billing in its apps distributed through the Google Play Store?

       YES____ NO____

*Continue to Question No. 16.*

16. Has Google proven, by a preponderance of the evidence, that after March 31, 2022, Match breached the Google Play Payments Policy with Google by not exclusively using Google Play Billing in its apps distributed through the Google Play Store?

       YES____ NO____

*Continue to Question No. 17*

17.   Has Google proven, by a preponderance of the evidence, that Epic breached the implied covenant of good faith and fair dealing incorporated into the Developer Distribution Agreement with Google, causing damage to Google?

        YES____ NO____

*Continue to Question No. 18.*

18.   Has Google proven, by a preponderance of the evidence, that Match breached the implied covenant of good faith and fair dealing incorporated into the Developer Distribution Agreement with Google, causing damage to Google?

        YES____ NO____

*Continue to Question No. 19.*

19.   Has Google proven, by a preponderance of the evidence, that Epic was unjustly enriched by receiving benefits that it ought to have returned to Google, and that the unjust enrichment related to a different subject than the Developer Distribution Agreement between Google and Epic?

        YES____ NO____

*Continue to Question No. 20.*

20.  Has Google proven, by a preponderance of the evidence, that Match was unjustly enriched by receiving benefits that it ought to have returned to Google, and that the unjust enrichment related to a different subject than the Developer Distribution Agreement between Google and Match?

              YES____ NO____

*Continue to Question No. 21.*

21.  Has Google proven, by a preponderance of the evidence, that Match falsely promised to Google that it would comply with the Payments Policy by March 31, 2022?

              YES____ NO____

*If you answered Yes to __either__ of Questions No. 14 or 17, continue to Question No. 22. Otherwise, skip to Question No. 23.*

22.     We award Google the following damages for its breach of contract counterclaims against Epic:

$\$$_____

*(Award no more than $398,931.)*

*If you answered Yes to Question No. 19, continue to Question No. 23. Otherwise, skip to Question No. 24.*

23.     We award Google the following damages for its unjust enrichment counterclaim against Epic:

$\$$_____

*(Award no more than $240,652.)*

*If you answered Yes to <u>any</u> of Questions No. 15, 16, 18, 20, or 21, continue to Question No. 24. If you answered No to <u>all</u> of Questions No. 15, 16, 18, 20, and 21, then do not answer Question No. 24; sign and date this Verdict Form and inform the Court that the jury has reached a verdict.*

24.      We award Google the following damages for its counterclaim(s) against Match:

$_____

*Sign and date this Verdict Form and inform the Court that the jury has reached a verdict.*

Dated: _____

_____

                                                                              Foreperson

1      **Defendants' Proposed Verdict Form**

2      *When answering the following questions and filling out this Verdict Form, please follow the*
3      *directions provided throughout the form.  Your answer to each question must be unanimous.  Mark*
       *your answers by placing an X in the space provided.*

4      We, the jury, unanimously agree to the answers to the following questions submitted to us, and we
5      return them as our verdict in this case as follows:

6                          **Plaintiffs' Claims**

7      **Monopolization—Section 2 of the Sherman Act—Alleged App Distribution Market**

8      1.    Alleged Android App Distribution Market:

9            (a)    Have plaintiffs proven the existence of a product market that plaintiffs have defined as
10                  the Android App Distribution market?

11                  YES____ NO ____

12
13           (b)    If you answered "yes" to Question 1(a), have plaintiffs proven that the Android App
                    Distribution market includes the entire world except for China?

14
15                  YES____ NO ____

16     *If you answered "no" to either Question 1(a) or Question 1(b) then stop here and consider*
17     *the next claim.  If you answered "yes" to both Question 1(a) and Question 1(b), then*
       *continue to Question 2.*

18     2.    Have plaintiffs proven that Google has monopoly power in the Android App Distribution
19           Market?

20                  YES____ NO ____

21     *If you answered "no," then stop here and consider the next claim.  If you answered "yes,"*
22     *continue to Question 3.*

23     3.    Have plaintiffs proven that Google engaged in conduct that substantially harmed competition in
24           the market that you found when you answered Questions 1(a) and 1(b)?

25                  YES____ NO ____

26

27

28

*If you answered "no," then you should then stop your consideration of this claim here and move to the next claim.  If you answered "yes," continue to Question 4.*

4.  Has Google shown that its conduct had some procompetitive benefits?

   YES____ NO____

*If you answered "no," then skip Questions 5-6 and continue to Question 7.  If you answered "yes," then continue to Question 5.*

5.  Have plaintiffs proven that each and every procompetitive benefit could be achieved through substantially less restrictive means?

   YES____ NO____

*If you answered "yes," skip Question 6 and continue to Question 7.  If you answered "no," then continue to Question 6.*

6.  Have plaintiffs proven that the competitive harm substantially outweighs the procompetitive benefits?

   YES____ NO____

*If you answered "yes," continue to Question 7.  If you answered "no," then you must stop your consideration of this claim here and move to the next claim.*

7.  Have the following plaintiffs proven that they suffered injury to their business or property as a result of Google's conduct for which you answered YES in response to Questions 5 or 6?

   Epic:  YES____ NO____

   Match Group, LLC:  YES____ NO____

   Humor Rainbow, Inc.:  YES____ NO____

   PlentyofFish Media, ULC:  YES____ NO____

   People Media, Inc.:  YES____ NO____

**Monopolization—Section 2 of the Sherman Act—Alleged In-App Billing Services Market**

8.  Alleged Android In-App Billing Services Market:

    (a)    Have plaintiffs proven the existence of a product market that plaintiffs have defined as the Android In-App Billing Services Market?

          YES____ NO ____

    (b)    If you answered "yes" to Question 8(a), have plaintiffs proven that the Android In-App Billing Services market includes the entire world except for China?

          YES____ NO ____

*If you answered "no" to either Question 8(a) or Question 8(b), then stop your consideration of this claim here and move to the next claim.  If you answered "yes" to both Question 8(a) and Question 8(b), then continue to Question 9.*

9.  Have plaintiffs proven that Google has monopoly power in the Android In-App Billing Services Market?

          YES____ NO ____

*If you answered "no," then stop your consideration of this claim here and move to the next claim.  If you answered "yes," continue to Question 10.*

10.  Have plaintiffs proven that the Developer Distribution Agreement's Payments Policy substantially harmed competition in the relevant market that you found when you answered Questions 8(a) and 8(b)?

          YES____ NO ____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 11.*

11.  Has Google shown that the Developer Distribution Agreement's Payments Policy has some procompetitive benefits?

          YES____ NO____

*If you answered "no," then skip Questions 12-13 and continue to Question 14.  If you answered "yes," then continue to Question 12.*

12. Have plaintiffs proven that each and every procompetitive benefit could be achieved through substantially less restrictive means?

> YES_____ NO_____

*If you answered "yes," then skip Question 13 and continue to Question 14.  If you answered "no," then continue to Question 13.*

13. Have plaintiffs proven that the competitive harm substantially outweighs the procompetitive benefits?

> YES_____ NO_____

*If you answered "yes," continue to Question 14.  If you answered "no," then you must stop your consideration of this claim here and move to the next claim.*

14. Have the following plaintiffs proven that the suffered injury to its business or property as a result of Google's conduct for which you answered YES in response to Questions 12 or 13?

> Epic:  YES_____ NO_____
>
> Match Group, LLC:  YES_____ NO_____
>
> Humor Rainbow, Inc.:  YES_____ NO_____
>
> PlentyofFish Media, ULC:  YES_____ NO_____
>
> People Media, Inc.:  YES_____ NO_____

## Attempted Monopolization—Section 2 of the Sherman Act

*If you answered "no" to either Questions 8(a) or 8(b), then stop your consideration of this claim and move to the next claim. If you answered "yes" to both Questions 8(a) and 8(b), then consider this claim beginning with Question 15.*

15.   Have the Match Plaintiffs proven that Google adopted and implemented its Payments Policy with a specific intent to achieve monopoly power in the Android In-App Billing Services market?

        YES____ NO ____

*If you answered "no," then stop your consideration of this claim here and move to the next claim. If you answered "yes," continue to Question 16.*

16.   Have the Match Plaintiffs proven that there was a dangerous probability that Google would achieve its goal of monopoly power in the Android In-App Billing Services market?

        YES____ NO ____

*If you answered "No," then stop your consideration of this claim here and move to the next claim. If you answered "yes," continue to Question 17.*

17.   Has Google shown that its Payments Policy has some procompetitive benefits?

        YES____ NO____

*If you answered "no," then skip Questions 18-19 and continue to Question 20. If you answered "yes," then continue to Question 18.*

18.   Have plaintiffs proven that each and every procompetitive benefit could be achieved through substantially less restrictive means?

        YES____ NO____

*If you answered "yes," then skip Question 19 and continue to Question 20. If you answered "no," then continue to Question 19.*

19.   Have plaintiffs proven that the competitive harm substantially outweighs the procompetitive benefits?

        YES____ NO____

*If you answered "no," then you must stop your consideration of this claim here and move to the next claim. If you answered "yes," continue to Question 20.*

20.   Have the following plaintiffs proven that they suffered injury to their business or property as a result of Google's conduct for which you answered YES to Questions 18 or 19?

Match Group, LLC:  YES_____ NO_____

Humor Rainbow, Inc.:  YES_____ NO_____

PlentyofFish Media, ULC:  YES_____ NO_____

People Media, Inc.:  YES_____ NO_____

**_Per Se_ Unlawful Restraints of Trade—Section 1 of the Sherman Act and the California Cartwright Act—Games Velocity Program[1]**

21. Have plaintiffs proven that Activision, Riot, or Supercell were competitors with the Google Play store?

        Activision:  YES____  NO____

        Riot:    YES____  NO____

        Supercell:  YES____  NO____

*If you answered "no" to all three, then stop here and move to the next claim. If you answered "yes" to any of the three, then continue to Question 22, but only with regard to the developers for which you answered "yes," in response to Question 21.*

22. Have plaintiffs proven that Google entered into a contract not to compete with one or more of Activision, Riot, or Supercell in the market for Android app distribution services?

        Activision:  YES____  NO____

        Riot:    YES____  NO____

        Supercell:  YES____  NO____

*If you did not answer "yes" to any part of the previous question, then stop here and consider the next claim. If you answered "yes" to any of the three, then continue to Question 23, but only with regard to those developers for which you answered "yes" in response to Question 22.*

23. Have the following plaintiffs proven that they suffered injury to their business or property as a result of the agreements with the developers for which you answered YES in response to Question 22?

        Epic:  YES____  NO____

        Match Group, LLC:  YES____  NO____

        Humor Rainbow, Inc.:  YES____  NO____

---

[1] As explained in its position statements regarding disputed jury instructions, Google objects to the _per se_ Section 1 claims being submitted to the jury. Google proposes these questions in the event that its objection is overruled.

PlentyofFish Media, ULC:  YES\_\_\_\_ NO\_\_\_\_

People Media, Inc.:  YES\_\_\_\_ NO\_\_\_\_

**Unlawful Restraints of Trade—Rule of Reason—Section 1 of the Sherman Act and the California Cartwright Act—Alleged App Distribution Market**

*If you answered "no" to either Question 1(a) or 1(b), then you must stop here and consider the next claim. If you answered "yes" to both Questions 1(a) and 1(b), then you should consider this claim.*

24.   Have plaintiffs proven that Google has market power in a market that plaintiffs have defined as the Android App Distribution market for the entire world except for China?

              YES____ NO _____

*If you answered "no," then stop here and consider the next claim. If you answered "yes," then continue to Question 25.*

25.   Have plaintiffs proven that Google entered into agreements that substantially harmed competition in the market that you found in response to Questions 1(a) and 1(b)?

              YES____ NO _____

*If you answered "no," then stop here and consider the next claim. If you answered "yes," then continue to Question 26.*

26.   Has Google shown that the conduct for which you answered YES in response to Question 25 has some procompetitive benefits?

              YES____ NO _____

*If you answered "no," then skip Questions 27-28 and continue to Question 29. If you answered "yes" to any of these categories, then continue to Question 27.*

27.   Have plaintiffs proven that each and every procompetitive benefit could be achieved through substantially less restrictive means?

              YES____ NO____

*If you answered "yes," then skip Question 28 and continue to Question 29. If you answered "no," then continue to Question 28.*

28.   Have plaintiffs proven that the competitive harm substantially outweighs the procompetitive benefits?

              YES____ NO____

*If you answered "yes," continue to Question 29.  If you answered "no," then you must stop your consideration of this claim here and move to the next claim.*

29.  Have the following plaintiffs proven that they suffered injury to their business or property as a result of Google's conduct for which you answered YES to Questions 27 or 28?

Epic:  YES_____ NO_____

Match Group, LLC:  YES_____ NO_____

Humor Rainbow, Inc.:  YES_____ NO_____

PlentyofFish Media, ULC:  YES_____ NO_____

People Media, Inc.:  YES_____ NO_____

**Unlawful Restraints of Trade—Rule of Reason—Section 1 of the Sherman Act
and the California Cartwright Act—Alleged In-App Billing Services Market**

*If you answered "no" to either Question 8(a) or 8(b), then you must stop here and consider the next claim. If you answered "yes" to both Questions 8(a) and 8(b), then you should consider this claim.*

30. Have plaintiffs proven that Google has market power in a market that plaintiffs have defined as the market for In-App Billing Services on Android Devices for the entire world except for China?

       YES____ NO ____

*If you answered "no," then stop here and consider the next claim. If you answered "yes," then continue to Question 31.*

31. Have plaintiffs proven that Google's Payments Policy substantially harmed competition in the relevant market that you found in response to Questions 8(a) and 8(b)? If you did not find the Payments Policy to be unlawful when you considered plaintiffs' Section 2 claims, then you cannot find them to be unlawful here.

       YES____ NO____

*If you answered "no," then stop here and consider the next claim. If you answered "yes," continue to Question 32.*

32. Has Google shown that its Payments Policy has some procompetitive benefits?

       YES____ NO____

*If you answered "no," then skip Questions 33-34 and continue to Question 35. If you answered "yes," continue to Question 33.*

33. Have plaintiffs proven that each and every procompetitive benefit could be achieved through substantially less restrictive means?

       YES____ NO____

*If you answered "yes," then skip Question 34 and continue to Question 35. If you answered "no," then continue to Question 34.*

34. Have plaintiffs proven that the competitive harm substantially outweighs the procompetitive benefits?

       YES____ NO____

*If you answered "yes," continue to Question 35. If you answered "no," then you must stop your consideration of this claim here and move to the next claim.*

35. Have the following plaintiffs proven that they suffered injury to their business or property as a result of Google's conduct for which you answered YES in response to Questions 33 or 34?

      Epic:  YES_____  NO_____

      Match Group, LLC:  YES_____  NO_____

      Humor Rainbow, Inc.:  YES_____  NO_____

      PlentyofFish Media, ULC:  YES_____  NO_____

      People Media, Inc.:  YES_____  NO_____

**Tying—Section 1 of the Sherman Act**
**and the California Cartwright Act**

*Only answer these questions if you answered "yes" to Questions 8(a), 8(b) and 24. If you answered "no" to Questions 8(a), 8(b), or 24, then you should skip this claim and you should also skip Google's business justification defense that follows this claim.*

36.   Have plaintiffs proven that app distribution services and in-app billing services are separate and distinct products?

          YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 37.*

37.   Have plaintiffs proven that Google has sufficient market power with respect to the app distribution services to enable it to restrain competition as to an alleged market for in-app billing services?

          YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 38.*

38.   Have plaintiffs proven that Google coerced purchasers of app distribution services to also purchase Google Play Billing, or not to purchase in-app billing services from any other supplier?

          YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 39.*

39.   Have plaintiffs proven that the alleged tying arrangement has foreclosed a substantial volume of commerce as to an alleged market for in-app billing services?

          YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 40.*

40.   Have plaintiffs proven that the tying arrangement caused substantial harm to competition in the Android In-App Billing Services market?

          YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," then continue to Question 41.*

41.  Has Google shown that the tying arrangement has some procompetitive benefits?

YES_____ NO_____

*If you answered "no," then skip Questions 42-43 and continue to Question 44.  If you answered "yes," then continue to Question 42.*

42.  Have plaintiffs proven that each and every procompetitive benefit could be achieved through substantially less restrictive means?

YES_____ NO_____

*If you answered "yes," then skip Question 43 and continue to Question 44.  If you answered "no," then continue to Question 43.*

43.  Have plaintiffs proven that the competitive harm substantially outweighs the procompetitive benefits?

YES_____ NO_____

*If you answered "yes," continue to Question 44.  If you answered "no," then you must stop your consideration of this claim here and move to the next claim.*

44.  Have the following plaintiffs proven that they suffered injury to their business or property as a result of the tying arrangement?

Epic:  YES_____ NO_____

Match Group, LLC:  YES_____ NO_____

Humor Rainbow, Inc.:  YES_____ NO_____

PlentyofFish Media, ULC:  YES_____ NO_____

People Media, Inc.:  YES_____ NO_____

*Even if you answered YES to any with regard to any of the plaintiffs listed in Question 44, you must consider Google's business justification defense.  If Google has proven that defense, then you may not find Google liable for plaintiffs' tying claim, nor may you ultimately award damages to any Plaintiffs for their tying claim.  Accordingly, continue to the next question.*

## **Tying—Business Justification Defense**

45.     Has Google proven a business justification for the alleged tying arrangement?

       YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 46.*

46.     Have plaintiffs proven that Google's business justification could be achieved through substantially less restrictive means?

       YES____ NO____

*If you answered "no" to this question, you must find for Google and against plaintiffs on plaintiffs' tying claims, and you may not award any plaintiff any damages based on their tying claim.*

1

### **Damages**

2
3

*The Match Plaintiffs seek damages from Google under more than one legal theory.  However, each item of damages may be awarded only once, regardless of the number of legal theories alleged.*

4

47.     We award the following damages caused by Google's anti-competitive conduct:

5

Match Group, LLC:  $_____

6
7

PlentyofFish Media ULC:  $_____

8

Humor Rainbow, Inc:  $_____

9

People Media, Inc:  $_____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **Match Plaintiffs' Claims for Interference with Contractual Relations and Interference with Prospective Economic Relations**

*If for each of plaintiffs' claims on this verdict form your last answer to a question was "no," then you must skip this claim.*

48.   Have the Match Plaintiffs proven that there was a contract between the Match Plaintiffs and their users?

         YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 49.*

49.   Have the Match Plaintiffs proven that Google knew of the contract(s) between the Match Plaintiffs and their users?

         YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 50.*

50.   Have the Match Plaintiffs proven that Google's conduct prevented performance or made performance more expensive or difficult?

         YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 51.*

51.   Have the Match Plaintiffs proven that Google intended to disrupt the performance of the contract(s) at issue

         YES____ NO____

*If you answered "no," then stop here and consider the next claim.  If you answered "yes," continue to Question 52.*

52.   Was Google's conduct a substantial factor in causing harm to the Match Plaintiffs?

         YES____ NO____

*Even if you answered "yes" to all of the questions in this section, you must consider Google's defense that Google had a privilege to protect its own economic interest. If Google has proven that defense, then you may not find Google liable for the Match Plaintiffs' claims for Interference with Contractual Relations and Interference with Prospective Economic Relations, nor may you award damages to the Match Plaintiffs for those claims. Accordingly, continue to the next question.*

## **Google's Affirmative Defense - Privilege to Protect Own Economic Interest**

53. Has Google proven that it had a legitimate interest in the contractual relations because, among other things, the Match Plaintiffs distribute their apps by using Google's distribution services on the Google Play store?

> YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 54.*

54. Has Google shown that it acted only to protect its own economic interest?

> YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 55.*

55. Has Google shown that it acted reasonably and in good faith to protect its own economic interest?

> YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 56.*

56. Did Google act reasonably and in good faith to protect its own economic interest?

> YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 57.*

57. Did Google use appropriate means to protect its own economic interest?

> YES____ NO____

*If you answered "yes" to each of these questions, then you must find for Google and against the Match Plaintiffs' on their claims for Interference with Contractual Relations and Interference with Prospective Economic Relations.*

**Google's Counterclaims**

**Google's Breach of Contract Counterclaim Against Epic**

1. Did Google and Epic enter a contract (the Developer Distribution Agreement)?

    YES____ NO____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 2.*

2. Did Epic fail to do something that the Developer Distribution Agreement required it to do or do something that the contract prohibited it from doing?

    YES____ NO____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 3.*

3. Was Google harmed by Epic's breach of the Developer Distribution Agreement?

    YES____ NO____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 4.*

4. What are Google's damages from Epic's breach of the Developer Distribution Agreement?

    $ _____

### Google's Breach of Contract Counterclaim Against the Match Plaintiffs

5.   Did Google and the Match Plaintiffs enter a contract (the Developer Distribution Agreement)?

YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 6.*

6.   Did the Match Plaintiffs fail to do something that the Developer Distribution Agreement required them to do or do something that the contract prohibited them from doing?

YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 7.*

7.   Was Google harmed by the Match Plaintiffs' breach of the Developer Distribution Agreement?

YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 8.*

8.   What are Google's damages from the Match Plaintiffs' breach of the Developer Distribution Agreement?

$ _____

(38 of 297), Page 38 of 297 Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 38 of 297
Case 3:21-md-02981-JD   Document 678   Filed 10/16/23   Page 37 of 50

**Google's Breach of the Implied Covenant of Good Faith and Fair Dealing Counterclaim Against Epic**

*If you awarded damages against Epic on Google's breach of contract counterclaim against Epic, then you should skip this counterclaim.*

9.     Did Google and Epic enter a contract?

          YES____  NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 10.*

10.    Did Epic unfairly interfere with Google's right to receive the benefits of the contract?

          YES____  NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 11.*

11.    Was Google harmed by Epic's interference?

          YES____  NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 12.*

12.    What are Google's damages from Epic's breach of the implied covenant of good faith and fair dealing?

          $ _____

## Google's False Promise Counterclaim against the Match Plaintiffs

13. Did the Match Plaintiffs make a promise to Google?

       YES____ NO____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 14.*

14. Did the Match Plaintiffs intend to perform this promise when they made it?

       YES____ NO____

*If you answered "yes," then stop here and consider the next claim. If you answered "no," continue to Question 15.*

15. Did the Match Plaintiffs intend that Google rely on this promise?

       YES____ NO____

*If you answered "No," then stop and consider the next claim. If you answered "yes," continue to Question 16.*

16. Did Google reasonably rely on this promise?

       YES____ NO____

*If you answered "yes," then stop here and consider the next claim. If you answered "no," continue to Question 17.*

17. Did the Match Plaintiffs perform the promised act?

       YES____ NO____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 18.*

18. Was Google's reliance on the Match Plaintiffs' promise a substantial factor in causing harm to Google?

       YES____ NO____

1    ***If you answered "No," then stop here and consider the next claim.  If you answered "yes,"***
2    ***continue to Question 19.***

19.    What are Google's damages from the Match Plaintiffs' false promise?

$ _____

## **Google's Breach of the Implied Covenant of Good Faith and Fair Dealing Counterclaim Against the Match Plaintiffs**

*If you awarded damages against the Match Plaintiffs on Google's false promise counterclaim, then you should skip this counterclaim.*

20.     Did Google and the Match Plaintiffs enter a contract?

YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 21.*

21.     Did the Match Plaintiffs unfairly interfere with Google's right to receive the benefits of the contract?

YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 22.*

22.     Was Google harmed by the Match Plaintiffs' interference?

YES____ NO____

*If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 23.*

23.     What are Google's damages from the Match Plaintiffs' breach of the implied covenant of good faith and fair dealing?

$ _____

**Google's Quasi-Contract/Unjust Enrichment Counterclaim Against Epic**

24. Did Epic receive a benefit in connection with its use of the Google Play store?

       YES_____ NO_____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 25.*

25. Did Epic unjustly retain that benefit?

       YES_____ NO_____

*If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 26.*

26. What is the dollar value of the benefit that Epic retained?

       $ _____

**Google's Quasi-Contract/Unjust Enrichment Counterclaim Against the Match Plaintiffs**

*Only evaluate this counterclaim if you answered "no" to Question 5 on Google's counterclaim against the Match Plaintiffs for breach of contract and Question 20 on Google's counterclaim against the Match Plaintiffs for breach of the implied covenant of good faith and fair dealing. If you answered "yes" to those questions, then you must skip this counterclaim and move to Google's next counterclaim.*

27.    Did the Match Plaintiffs receive a benefit in connection with their use of the Google Play store?

          YES____ NO____

          *If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 28.*

28.    Did the Match Plaintiffs unjustly retain that benefit?

          YES____ NO____

          *If you answered "No," then stop here and consider the next claim. If you answered "yes," continue to Question 29.*

29.    What is the dollar value of the benefit that the Match Plaintiffs retained?

          $ _____

### Prejudgment Interest Against Epic and the Match Plaintiffs

*If you decide that Google is entitled to recover damages for past economic loss for its false promise counterclaim against the Match Plaintiffs, then you must decide whether Google should also receive prejudgment interest for its losses.*

30.   Is Google entitled to prejudgment interest for its false promise counterclaim against the Match Plaintiffs?

YES_____ NO_____

### Punitive Damages Against the Match Plaintiffs

*Only answer these questions if you found the Match Plaintiffs liable for Google's false promise counterclaim against the Match Plaintiffs.*

31.    Did the Match Plaintiffs engage in the conduct underlying Google's false promise claim with malice, oppression, or fraud?

        YES____ NO____

        *If you answered "No," then stop here and consider the next claim.  If you answered "yes," continue to Question 34.*

32.    What amount of punitive damages, if any, do you award Google against the Match Plaintiffs?

        $ _____

Sign and date this Verdict Form and inform the Court that the jury has reached a verdict.

Dated: _____

_____
Foreperson

## Plaintiffs' Argument Re Verdict Form

Google's Proposed Verdict Form is 32 pages long and would require the jury to agree unanimously on answers to over 100 questions (91 numbered questions plus additional subparts).  This proposal is unworkable, the questions are inaccurate as a matter of law, and Google improperly seeks to prevent the jury from fully considering Plaintiffs' claims.  Google's proposal is far more likely to result in a hung jury or an incomplete verdict than a final resolution of this case.  It should be rejected.

Rather than straightforwardly asking the jury whether the parties have proven each of their claims (as Plaintiffs' proposed form does), Google's form would require the jury to deliver unanimous answers to many dozens of confusing subsidiary factual questions.  In many instances, ***even when an answer to Google's proposed question is not dispositive***, Google's proposal instructs the jury that an answer in Google's favor requires the jury to stop its consideration of that claim.  For example, in the sections concerning Plaintiffs' monopolization claims, Google proposes asking "whether Plaintiffs have proven the existence of a product market that plaintiffs have defined as the Android App Distribution market" and whether that "market includes the entire world except for China".  If the jury answers "no" to either question, Google instructs the jury to skip to the next claim.  But even if a jury finds a different market than contended by Plaintiffs, the jury must still consider the remaining elements of Plaintiffs' monopolization claims.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023) (rejecting the "radical argument that . . . the case immediately ends if the district court finds the record supports the defendant's proposed market (or a third in-between market, as was the case here)").  For example, a finding that the markets implicated here are limited to the United States (as Google contends) would not end the case.  Google's form is replete with this type of error.

Google's proposed form is a recipe for a hung jury even where the jury could and should deliver a unanimous verdict in Plaintiffs' favor.  To take another example of error, Google's form requests that the jury separately assess Google's conduct under a slanted and at times inaccurate recitation of steps in the rule of reason.  *See, e.g.*, Google's Question Nos. 3-6, 25-28.  Per Google's form, the jury must deliver a unanimous answer to each subsidiary question, and failure to answer unanimously (in any direction) would result in a failure to resolve Plaintiffs' claims.  The law does not require that result.  *See Jazzabi v. Allstate Ins. Co.*, 278 F.3d 979, 985 (9th Cir. 2002) (juries are not

1  required to "reach unanimous agreement on all the 'preliminary factual issues that underlie the verdict"

2  only "the ultimate issues"). Google's proposal would prevent the jury from returning a verdict even

3  when they unanimously agree on the "ultimate issues", contrary to well established law and common

4  sense. For example, some jurors may decide that Google has not proven procompetitive benefits, other

5  jurors may decide that all proven benefits could be achieved through less restrictive alternatives, while

6  other jurors may decide that, regardless of the answer to the other questions, the harms outweigh any

7  benefits. Because all of these jurors would agree that Plaintiffs have proven their claims under the rule

8  of reason, such a jury could and should return a verdict in Plaintiffs' favor. Courts hearing antitrust

9  claims have simply asked juries whether Plaintiffs have proven their rule of reason claims by *any*

10  alternative method. *See, e.g.*, Verdict Form, *In re HIV Antitrust Litig.*, No. 19-cv-02573-EMC, Dkt.

11  No. 2057, at Question 4 (N.D. Cal. July 30, 2023) ("did the Plaintiffs do at least one of the following").

12  Google's proposed form also improperly narrows the claims. For example, Google instructs

13  jurors that they cannot find Google's Payments Policy to be unlawful under Plaintiffs' Section 1 claims

14  "[i]f you did not find the Payments Policy to be unlawful when you considered plaintiffs' Section 2

15  claims". That is wrong: the jury may properly find a Section 1 tying violation without finding that

16  Google engaged in illegal monopolization. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*,

17  504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than

18  market power under § 1."). Google also entirely omits Plaintiffs' *per se* tying claim.

19  The Court should therefore reject Google's proposed special jury findings. *See Floyd v. Laws*,

20  929 F.2d 1390, 1396 (9th Cir. 1991) ("[T]he [trial] court has complete discretion over whether to have

21  the jury return a special verdict or a general verdict."). Courts have used general verdict forms like

22  Plaintiffs' proposed form in antitrust jury trials. *See* Verdict Sheet, *Angiodynamics, Inc. v. C.R. Bard,*

23  *Inc.*, No. 17-cv-00598-BKS-CFH, Dkt. No. 474 (N.D.N.Y. Oct. 6, 2022). If, however, the Court

24  requests that the jury deliver special findings as proposed by Google, Google's form contains

25  numerous other legal errors that cannot be addressed in these two pages. Plaintiffs therefore

26  respectfully request an opportunity to address these other errors if the Court decides to use a special

27  verdict form according to the structure proposed by Google.

28

### Defendants' Argument Re Verdict Form

Both sides agree that the jury should return specific findings rather than render a general verdict.  But Plaintiffs' verdict form does not ask the jury to answer the specific questions that the Supreme Court and the Ninth Circuit have instructed must be answered before finding liability in an antitrust case.  Plaintiffs' form is incomplete, confusing, and would impede review.

A verdict form must be "adequate to obtain a jury determination of the factual issues essential to judgment." *Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1990); *Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir. 1999).  Courts should "submit questions or interrogatories covering all the issues raised by the pleadings," "especially when requested [] to do [so.]" *Tillman v. Great Am. Indem. Co. of N.Y.*, 207 F.2d 588, 593 (7th Cir. 1953).  Courts frequently opt for detailed forms in antitrust cases.  *E.g.*, *MCI Commc'ns Corp. v. Am. Tel. and Tel. Co.*, 708 F.2d 1081, 1093 (7th Cir. 1983) (upholding "special verdict form [that] required the jury to make a separate finding of liability as to each of the fifteen charges"); *Sidibe v. Sutter Health*, No. 3:12-cv-04584-LB, ECF No. 1530 (N.D. Cal. Mar. 11, 2022) (verdict form asking for element-by-element factual findings in antitrust case); *In re: HIV Antitrust Litig.*, No. 3:19-cv-02573-EMC, ECF No. 2057 (N.D. Cal. June 30, 2023) (same); *Costco v. Au Optronics*, No. 2:13-cv-01207-RAJ, ECF No. 628 (W.D. Wash. Oct. 23, 2014) (same).

Plaintiffs' form improperly permits the jury to find liability without answering predicate questions for liability recognized by Supreme Court and Ninth Circuit precedent.  For example, "[a] threshold step in any antitrust case is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  Google's verdict form asks a threshold question about the relevant market, but Plaintiffs' form does not.  Similarly, the Ninth Circuit has identified a "three-part burden-shifting test under the rule of reason," *id.* at 991, but Plaintiffs' verdict form collapses all three parts into a single question—along with the issue of market definition and monopoly power.  The form accordingly does not ensure that the jury will evaluate all "factual issues essential to judgment."

In addition, Plaintiffs' form will confuse the jury.  In Plaintiffs' words, the case involves a "complicated web of anticompetitive contractual and technological restrictions" spanning more than a decade against the background of a complicated legal framework.  3:21-md-02981-JD, ECF No. 548, at 2, 7.  But Plaintiffs' vague form will leave the jury to sort through hundreds of pages of jury instructions

**SER-498**

and match those instructions to Plaintiffs' ill-defined questions on their own.  Google's form, on the other hand, disentangles the "web" guides the jury through the required analysis in a way that comports with the jury instructions.

Further, by lumping together all of the issues and elements of Plaintiffs' antitrust claims, Plaintiffs' verdict form will obscure the jury's findings in ways that will impede appellate review.  "[I]n large and complex cases such as this, involving many novel legal issues, the better practice would [be] to require special verdicts or the submission of interrogatories to the jury pursuant to Fed. R. Civ. P. 49." *Pac. W. Cable Co. v. City of Sacramento*, 672 F. Supp. 1322, 1326-27 (E.D. Cal. 1987).  If this case is reviewed, "the already difficult task of reviewing a case of this magnitude [will be] eased" if the court "kn[ows] precisely what the jury's findings [are] on several specific factual issues." *Id.*  Plaintiffs' form will preclude any understanding of the jury's findings on particular and potentially dispositive issues such as the relevant product market—which was decisive in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)—or the lack of substantially less restrictive alternatives to the challenged conduct—which was important to the Ninth Circuit's decision in *Epic v. Apple*, 67 F.4th 946 (9th Cir. 2023).

Plaintiffs asserted that Google's form improperly suggested that jurors must be unanimous on the elements of the claim.  But Courts regularly require unanimity for all questions on a verdict form. *E.g. In re Capacitors Antitrust Litig.*, No. 3:17-cv-07046-JD, ECF No. 381 (N.D. Cal. May 22, 2023); *U.S. Airways, Inc. v. Sabre Holdings, Corp.*, 1:11-cv-02725, ECF No. 1208 (S.D.N.Y. May 19, 2022). Plaintiffs have not shown any reason to depart from that practice here.

Finally, Plaintiffs' verdict form suggests that the jury should not reach Google's contract-based counterclaims if it finds in favor of Plaintiffs on any of their antitrust claims. That is not the law.  *Kelly v. Kosuga*, 358 U.S. 516, 520 (1959); *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 699-700 (6th Cir. 2017).

| | | |
|---|---|---|
| 1 | DATED:  October 16, 2023 | CRAVATH, SWAINE & MOORE LLP |
| 2 | | Christine Varney *(pro hac vice)*<br>Gary A. Bornstein *(pro hac vice)* |
| 3 | | Timothy G. Cameron *(pro hac vice)*<br>Yonatan Even *(pro hac vice)* |
| 4 | | Lauren A. Moskowitz *(pro hac vice)*<br>Justin C. Clarke *(pro hac vice)* |
| 5 | | Michael J. Zaken *(pro hac vice)*<br>M. Brent Byars *(pro hac vice)* |

6    FAEGRE DRINKER BIDDLE & REATH LLP
       Paul J. Riehle (SBN 115199)

7
     Respectfully submitted,

8
     By:   *s/ Gary A. Bornstein*
9          Gary A. Bornstein

10         *Counsel for Plaintiff Epic Games, Inc.*

11   DATED:  October 16, 2023          HUESTON HENNIGAN LLP
                                       Douglas J. Dixon
12                                     Christine Woodin
                                       Joseph A. Reiter
13
                                       Respectfully submitted,
14
                                       By:  *s/ Douglas J. Dixon*
15                                          Douglas J. Dixon

16                                          *Counsel for Plaintiffs Match Group, LLC et al.*

17
     DATED:  October 16, 2023          MUNGER, TOLLES & OLSON LLP
18

19

20                                     By:   *s/ Glenn D. Pomerantz*
                                            Glenn D. Pomerantz
21                                          *Attorneys for Defendants Google LLC et al.*

22

23
     DATED:  October 16, 2023          MORGAN, LEWIS & BOCKIUS LLP
24

25

26                                     By:   *s/ Brian C. Rocca*
                                            Brian C. Rocca
27                                          *Attorneys for Defendants Google LLC et al.*

28

1

2

**E-FILING ATTESTATION**

3

   I, Rebecca L. Sciarrino, am the ECF User whose ID and password are being used to file this

4

document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the signatories

5

identified above has concurred in this filing.

6

7

      *s/ Rebecca L. Sciarrino*

      Rebecca L. Sciarrino

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC;*
*Humor Rainbow, Inc.; PlentyofFish Media*
*ULC; and People Media, Inc.*

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY**
**GENERAL**
160 E 300 S, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone: (801) 366-0260

*Counsel for the Plaintiff States*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al.*

Karma M. Giulianelli (SBN 184175)
karma.giulianelli@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Wewetta St., Suite 1200
Denver, CO 80202
Telephone: (303) 592-3100

Hae Sung Nam (*pro hac vice*)
hnam@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980

*Co-Lead Counsel for Consumer Plaintiffs in In*
*re Google Play Consumer Antitrust Litigation*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH**
**LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **JOINT PRETRIAL STATEMENT** |
| *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | Judge:   Honorable James Donato |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Date:        October 19, 2023<br>Time:        1:30 p.m.<br>Courtroom:  17 |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | |
| *Match Group, LLC, et al., v. Google LLC, et al., Case No. 3:22-cv-02746-JD* | |

- 2 -

**SER-503**

JOINT PRETRIAL STATEMENT
Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

1    In accordance with Paragraph 3 of this Court's Standing Order for Civil Jury Trials, the

2  Parties hereby submit this Joint Pretrial Statement.  Pending before the Court are:

3    • Google's Motion for Partial Summary Judgment (ECF 483[1])

4    • Match Plaintiffs' Motion for Partial Summary Judgment (ECF 486)

5  Also pending before the Court is Google's Motion to Exclude Merits Opinions of Dr. Marc

6  Rysman (ECF 484), but that motion should be held in abeyance and would be mooted by a final

7  settlement among States, Consumers, and Google.  Similarly, the issue raised in Google's summary

8  judgment motion relating to whether the Consumers and States have antitrust standing should be

9  held in abeyance and would be mooted by a final settlement among States, Consumers, and

10  Google.  Resolution of these motions may affect the nature and scope of the issues to be tried.  The

11  Parties do not intend to waive any rights or arguments by submitting this Joint Pretrial Statement.[2]

12  **I.    SUBSTANCE OF THE ACTIONS**

13    This multidistrict litigation involves claims brought by (i) 39 U.S. States, Commonwealths,

14  and Districts (by and through their respective Attorneys General), (ii) individual consumers,

15  (iii) Epic Games, Inc., and (iv) four dating app developers (Match Group, LLC, Humor Rainbow,

16  Inc., PlentyofFish Media ULC, and People Media, Inc. (collectively, the "Match Plaintiffs")).

17  Plaintiffs bring their claims against Google under the Sherman Act (15 U.S.C. § 1 *et seq.*),

18  California's Cartwright Act, and California's Unfair Competition Law and multiple other U.S.

19  states' laws.  All Plaintiffs seek injunctive relief, and Plaintiffs, other than Epic, seek damages

20  and/or equitable relief.  The States also seek civil penalties under their state laws as well.

21    Google asserts counterclaims against Epic and the Match Plaintiffs under California state

22  law and seeks declaratory relief, damages, and restitution.  Google's position in this submission

23  assumes that the claims of both Epic and the Match Plaintiffs will be tried together.  If that were to

24  _____

25  [1] Unless otherwise noted, docket citations refer to *In re: Google Play Store Antitrust Litigation*,
Case No. 21-md-02981-JD.

26  [2] The Parties reserve all rights, including to modify positions in this Joint Pretrial Statement and

27  remove any Parties or claims and defenses, as necessary, including after any of the pending
motions are decided or, for example, if the settlement in principle between the State Plaintiffs,

28  Consumers, and Google is finalized.

**SER-504**

change, then it is Google's position that the Court and the parties may need to revisit the question of which claims and defenses will be tried to a jury.

**A.    <u>The Parties</u>**

The Plaintiffs are:

- The States, Commonwealths, and Districts of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Idaho, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and West Virginia, by and through their respective Attorneys General (collectively, the "States");

- Matt Atkinson, Alex Iwamoto, Mary Carr, Daniel Egerter, Zach Palmer, and Serina Moglia (collectively the "Individual Consumers," or "Consumers");

- Epic Games, Inc. ("Epic"); and

- The Match Plaintiffs.

The Defendants are:

- Google LLC; Google Ireland Limited; Google Commerce Limited; Google Asia Pacific Pte. Limited; and Google Payment Corp. (collectively, "Google" or "Defendants").

The Counter-plaintiffs are:

- Google LLC; Google Ireland Limited; Google Commerce Limited; and Google Asia Pacific Pte. Limited (collectively, "Google" or Counter-Plaintiffs").

The Counter-defendants are:

- Epic; and

- The Match Plaintiffs.

- 4 -

**SER-505**

| | |
|---|---|
| Douglas J. Dixon (SBN 275389)<br>ddixon@hueston.com<br>**HUESTON HENNIGAN LLP**<br>620 Newport Center Drive, Suite 1300<br>Newport Beach, CA 92660<br>Telephone:     (949) 229-8640 | Karma M. Giulianelli (SBN 184175)<br>karma.giulianelli@bartlitbeck.com<br>**BARTLIT BECK LLP**<br>1801 Wewetta St., Suite 1200<br>Denver, Colorado 80202<br>Telephone: (303) 592-3100 |

*Counsel for Plaintiffs Match Group, LLC;
Humor Rainbow, Inc.; PlentyofFish Media
ULC; and People Media, Inc.*

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY
GENERAL**
160 E 300 S, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone: (801) 366-0260

*Counsel for the Plaintiff States*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al.*

Hae Sung Nam (*pro hac vice*)
hnam@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone.: (212) 687-1980


*Co-Lead Counsel for the Proposed Class in In
re Google Play Consumer Antitrust Litigation*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH
LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500


Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000


*Counsel for Plaintiff Epic Games, Inc. in Epic
Games, Inc. v. Google LLC et al.*

**SER-506**

JOINT STATEMENT REGARDING PARTIES' CLAIMS SET FOR TRIAL
U.S.D.C. Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | **JOINT STATEMENT REGARDING PARTIES' LIST OF CLAIMS SET FOR TRIAL** |
| *Epic Games, Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Judge:   Honorable James Donato<br>Trial Date:   November 6, 2023<br>Time:         9:00 a.m.<br>Courtroom:   17 |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | |
| *Match Group, LLC, et al., v. Google LLC, et al., Case No. 3:22-cv-02746-JD* | |

- 2 -

**SER-507**

1    The parties submit this joint statement of their respective claims that they intend to be tried

2 on November 6, 2023.

3    In its August 4, 2023 minute order, the Court "directed [the parties] to formulate a joint list

4 of the specific claims in each MDL member case that will be tried to the jury in the consolidated

5 trial." MDL Dkt. 571 at 2. The Court ordered the parties to file this list on October 2, 2023. *Id.*

6

7    All Plaintiffs assert claims under the California Unfair Competition Law (Cal. Bus. & Prof.

8 Code § 17200, *et seq*.)[1], which are purely equitable claims to be decided by the Court. Plaintiffs'

9 claims that are to be tried to the jury are addressed below.

10    Google's position in this submission assumes that the claims of both Epic and the Match

11 Plaintiffs will be tried together. If that were to change, then it is Google's position that the Court

12 and the parties may need to revisit the question of which claims and defenses will be tried to a

13 jury. Google reserves the right to revise this list after further meet and confer discussions.

14

15    ***Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD**

16 **Claims by Epic Against Google**

17    1.  COUNT 1: Sherman Act § 2 (Unlawful Monopoly Maintenance in the Android App

18        Distribution Market).

19    2.  COUNT 2: Sherman Act § 1 (Unreasonable restraints of trade concerning Android App

20        Distribution Market: OEMs).

21    3.  COUNT 3: Sherman Act § 1 (Unreasonable restraints of trade concerning Android App

22        Distribution Market: Developer Distribution Agreement).

23

24 ────────────

25 [1] *See* Count 13, Epic Games, Inc. Second Amended Complaint for Injunctive Relief (ECF
No. 378); Thirteenth Cause of Action, Match Group, LLC; Humor Rainbow, Inc.; PlentyOfFish

26 Media ULC; and People Media, Inc. First Amended Complaint (ECF No. 380); Count 11,
Consumer Plaintiffs Second Amended Class Action Complaint (ECF No. 172); Eighth Cause of

27 Action, State Plaintiffs' First Amended Complaint (3:21-cv-05227-JD ECF No. 188).

28

**SER-508**

- 3 -

4.  COUNT 4: Sherman Act § 1 (Per se unreasonable restraints of trade concerning Android App Distribution Market:  Project Hug (Games Velocity Program) and other Agreements with Developers).[2]

5.  COUNT 5: Sherman Act § 1 (Unreasonable restraints of trade concerning Android App Distribution Market:  Project Hug (Games Velocity Program) and Apps Velocity Program and other Agreements with Developers).

6.  COUNT 6: Sherman Act § 2 (Unlawful Monopolization and Monopoly Maintenance in the Android In-App Payment Processing Market).

7.  COUNT 7: Sherman Act § 1 (Unreasonable restraints of trade concerning Android In-App Payment Processing Market: Developer Distribution Agreement).

8.  COUNT 8: Sherman Act § 1 (Tying Google Play Store to Google Play Billing).

9.  COUNT 9: California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market: OEMs).

10. COUNT 10: California Cartwright Act (Unreasonable restraints of trade in Android App Distribution Market: Developer Distribution Agreement).

11. COUNT 11: California Cartwright Act (Unreasonable restraints of trade in Android In-App Payment Processing Market:  Developer Distribution Agreement).

12. COUNT 12: California Cartwright Act (Tying Google Play Store to Google Play Billing).

**Counterclaims by Google Against Epic**

1.  Breach of Contract

2.  Breach of Implied Covenant of Good Faith and Fair Dealing

3.  Quasi-Contract / Unjust Enrichment

4.  Declaratory Judgment[3]

SER-509

---

[2] As explained in the parties' forthcoming Joint Pretrial Statement, Google disputes that this claim is triable by jury.

[3] As explained in the parties' forthcoming Joint Pretrial Statement, Epic disputes that Google's counterclaim for a declaratory judgment against Epic is triable by jury.

1    ***Match Group, LLC, v. Google LLC*, No. 3:22-cv-02746-JD**

2    **Claims by the Match Plaintiffs Against Google**

3       1.  First Cause of Action:  Unlawful Tying of Google Play to Google Play Billing; Sherman

4           Act § 1.

5       2.  Second Cause of Action:  Unlawful Monopoly Maintenance in the Android App

6           Distribution Market or, Alternatively, the Dating App Distribution Market; Sherman Act

7           § 2.

8       3.  Third Cause of Action:  Unreasonable Restraints of Trade in the Android App Distribution

9           Market or, Alternatively, the Dating App Distribution Market: Sherman Act § 1.

10      4.  Fourth Cause of Action:  Unreasonable Restraint of Trade in the Android App IAP Market;

11          Sherman Act § 1.

12      5.  Sixth Cause of Action:  Per Se Unreasonable Restraints of Trade Concerning Android App

13          Distribution Market:  Project Hug (Games Velocity Program) and other Agreements with

14          Developers; Sherman Act § 1.[4]

15      6.  Seventh Cause of Action:  Unreasonable Restraints of Trade Concerning Android App

16          Distribution Market:  Project Hug (Games Velocity Program) and Apps Velocity Program

17          and other Agreements with Developers; Sherman Act § 1.

18      7.  Eighth Cause of Action:  Unlawful Monopoly Maintenance in the Android App IAP

19          Market; Sherman Act § 2.

20      8.  Ninth Cause of Action:  Attempted Monopolization of the Android App IAP Market;

21          Sherman Act § 2.

22      9.  Tenth Cause of Action:  Unlawful Tying of Google Play to Google Play Billing;

23          Cartwright Act.

24

25

_____

26   [4] As explained in the parties' forthcoming Joint Pretrial Statement, Google disputes that this claim
27   is triable by jury.

28
                                            - 5 -                       **SER-510**

1   10. Eleventh Cause of Action:  Unreasonable Restraints of Trade in the Android App

2      Distribution Market or, Alternatively, the Dating App Distribution Market; Cartwright Act.

3   11. Twelfth Cause of Action:  Unreasonable Restraints of Trade in the Android App IAP

4      Market; Cartwright Act.

5   12. Fourteenth Cause of Action:  Tortious Interference with Contract.[5]

6   13. Fifteenth Cause of Action:  Tortious Interference with Prospective Economic Advantage.[6]

7 **Counterclaims by Google Against the Match Plaintiffs**

8   1.  Breach of Contract

9   2.  Breach of Implied Covenant of Good Faith and Fair Dealing

10   3.  False Promise

11   4.  Quasi-Contract / Unjust Enrichment

12   5.  Declaratory Judgment[7]

13     ***In re Google Play Consumer Antitrust Litigation*, No. 3:20-cv-05761-JD**

14 **Claims by Consumer Plaintiffs Against Google**

15   1.  COUNT 1: Sherman Act § 2 Unlawful Monopolization in the Android Application

16      Distribution Market.

17   2.  COUNT 2: Sherman Act § 1 Unreasonable Restraints of Trade Concerning the Android

18      Application Distribution Market: OEMs.

19   3.  COUNT 3: Sherman Act § 1 Unreasonable Restraints of Trade Concerning the Android

20      Application Distribution Market: Developer Distribution Agreements.

21   4.  COUNT 4: Sherman Act § 2 Unlawful Monopolization in the In-App Aftermarket.

[5] As explained in the parties' forthcoming Joint Pretrial Statement, Google disputes that this claim is triable by jury.

[6] As explained in the parties' forthcoming Joint Pretrial Statement, Google disputes that this claim is triable by jury.

[7] As explained in the parties' forthcoming Joint Pretrial Statement, the Match Plaintiffs dispute that Google's counterclaim for a declaratory judgment against the Match Plaintiffs is triable by jury.

5.  COUNT 5: Sherman Act § 1 Unreasonable Restraints of Trade Concerning the In-App Aftermarket.

6.  COUNT 6: Sherman Act § 1 Tying In-App Distribution, Including Google Play Billing, to the Google Play Store.

7.  COUNT 7: California Cartwright Act Unreasonable Restraints of Trade in the Android Application Distribution Market: OEM Agreements.

8.  COUNT 8: California Cartwright Act Unreasonable Restraints of Trade in the Android Application Distribution Market: Developer Agreements.

9.  COUNT 9: California Cartwright Act Unreasonable Restraints of Trade in the In-App Aftermarket.

10. COUNT 10: California Cartwright Act Tying In-App Distribution, Including Google Play Billing, to the Google Play Store.

### *State of Utah v. Google LLC*. **3:21-cv-05227-JD**

**Claims by State Plaintiffs Against Google**

    1.  ***The States' Federal and California State Law Claims***

The States assert several Sherman Act and Cartwright Act claims against Google. For these claims, the jury will determine liability and the amount of monetary damages, if any. The Court will determine the appropriate injunctive relief, along with any award of fees, expenses, and costs of suit.

- Unreasonable Restraints of Trade in the Android In-App Billing Market Under § 1 of the Sherman Act and the Cartwright Act. *See* ECF[8] 188, States' First Am. Compl. ("States' FAC") (Counts 6, 8).

- Unlawful Restraints of Trade (*Per Se* and Rule of Reason) in the Android App Distribution Market Under § 1 of the Sherman Act and the Cartwright Act. *See* States' FAC (Counts 2, 3, 8).

---

[8] *State of Utah et al. v. Google LLC et al*., 21-cv-05227-JD.

**SER-512**

1     • Unlawful Tying of Google Play to Google Play Billing Under § 1 of the Sherman Act

2       and the Cartwright Act. *See* States' FAC (Counts 4, 8).

3     • Unlawful Exclusive Dealing in the Android In-App Billing Market Under the Sherman

4       Act § 1 and the Cartwright Act. *See* States' FAC (Counts 7, 8).

5     • Unlawful Monopolization/Monopoly Maintenance in the Android App Distribution

6       Market and in the Android In-App Billing Market Under the Sherman Act § 2. *See*

7       States' FAC (Counts 1, 5).

8         2.    ***The States' Non-California State Law Claims***

9       The States allege violations of the antitrust, consumer protection, and unfair trade practice

10 laws of various States, Commonwealths, and Districts.[9] The States also allege violations

11 (identified in States' FAC Section III) of the consumer protection and unfair trade practice laws of

12 various States, Commonwealths, and Districts.[10]

13       For these claims, the jury will determine liability and the amount of monetary damages, if

14 any, for these claims. The jury will make any assessment of whether the relevant conduct was

15

16 [9] *See, e.g.*, Alaska Stat. §§ 45.50.562, 45.50.564, 45.50.471; Ariz. Rev. Stat. §§ 44-1402, 44-1403,
44-1522; Ark. Code §§ 4-75-206, 4-75-302; Cal. Bus. & Prof. Code §§ 16720, 16726; Colo. Rev.

17 Stat. §§ 6-4-104, 6-4-105; Conn. Gen. Stat. §§ 35-26, 35-27, 42-110b; Del. Code tit. 6, § 2103;
D.C. Code §§ 28-3904, 28-4502, 28-4503; Fla. Stat. §§ 501.204. 542.18, 542.19; Idaho Code

18 §§ 48-104, 48-105; Ind. Code §§ 24-1-2-1, 24-1-2-2, 24-5-0.5-3; Iowa Code §§ 553.4-5, 714.16;
Ky. Rev. Stat. § 367.175; La. Rev. Stat. tit. 51, §§ 122-124; Md. Com. Law Code §11-204; Mass.

19 Gen. Laws ch. 93A, § 2; Minn. Stat. § 325D.51, 325D.52; Miss. Code §§ 75-21-1, 75-21-3, 75-24-
5; Mo. Rev. Stat. §§ 416.031, 407.020; Mont. Code §§ 30-14-205, 30-14-103; Neb. Rev. Stat.

20 §§ 59-801, 59-802, 59-1602, 59-1603, 59-1604; Nev. Rev. Stat. §§ 598A.060, 598.0923; N.H.
Rev. Stat. §§ 356:2, 356:3; N.J. Stat. §§ 56:9-3, 56:9-4, 56:8-2, 56:8-4; N.M. Stat. §§ 57-1-1, 57-

21 1-2; N.Y. Gen. Bus. Law § 340; N.Y. Exec. Law § 63(12); N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2,
75-2.1; N.D. Cent. Code §§ 51-08.1-02; 51-08.1-03; 79 Okla. Stat. § 203; Or. Rev. Stat.

22 §§ 646.725, 646.730; R.I. Gen. Law §§ 6-36-4, 6-36-5; S.D. Codified Laws §§ 37-1-3.1, 37-1-3.2;
Tex. Bus. & Com. Code § 15.05; Utah Code §§ 76-10-3104, 13-11-4; 9 Vt. Stat. § 2453; Va. Code

23 §§ 59.1-9.5, 59.1-9.6; Wash. Rev. Code §§ 19.86.020, 19.86.030, 19.86.040; W. Va. Code §§ 47-
18-3, 47-18-4.

24

25 [10] *See, e.g.*, Alaska Stat. § 45.50.471; Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107; Colo.

26 Rev. Stat. § 6-1-105; Conn. Gen. Stat. § 42-110b; D.C. Code § 28-3904; Fla. Stat. § 501.204; Ind.
Code 24-5-0.5-3; Iowa Code § 714.16; Ky. Rev. Stat. § 367.170; La. Rev. Stat. tit. 51, § 1405;

27 Mass. Gen. Laws ch. 93A, § 2; Miss. Code § 75-24-5; Mo. Rev. Stat. § 407.020; Mont. Code § 30-

28

- 8 -
JOINT STATEMENT REGARDING PARTIES' CLAIMS SET FOR TRIAL
U.S.D.C. Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

**SER-513**

1   knowing or willful. The Court will determine the injunctive relief, disgorgement and/or restitution,

2   civil penalties, fees, expenses, and costs, and other equitable relief, if any.[11]

3

4   DATED:  October 2, 2023                    HUESTON HENNIGAN LLP

5

6                                              By:  s/ *Douglas J. Dixon*
                                                    Douglas J. Dixon
7                                                   *Attorneys for Plaintiffs*
                                                    *Match Group, LLC, Humor Rainbow, Inc.,*
8                                                   *PlentyofFish Media ULC, and People Media, Inc.*

9

10  DATED:  October 2, 2023                    OFFICE OF THE UTAH ATTORNEY GENERAL

11

12

13                                             By:  s/ *Brendan P. Glackin*
                                                    Brendan P. Glackin
14                                                  *Attorneys for Plaintiff States*

15

16  DATED:  October 2, 2023                    BARTLIT BECK LLP

17

18                                             By:  s/ *Karma M. Giulianelli*
                                                    Karma M. Giulianelli
19                                                  *Lead Counsel for the Proposed Class*

20

21

22   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

23  14-103; Nev. Rev. Stat. §§ 598.0915, 598.0923; N.H. Rev. Stat. § 358-A:2; N.J. Stat. § 56:8-2;
    N.M. Stat. § 57-12-3; N.Y. Gen. Bus. Law § 349; N.Y. Exec. Law § 63(12); N.C. Gen. Stat. § 75-
24  1.1; N.D. Cent. Code § 51-15-02; 15 Okla. Stat. § 753; S.D. Codified Laws § 37-24-6; Tex. Bus.
    & Com. Code § 17.46; Utah Code § 13-11-4; 9 Vt. Stat. § 2453; Wash. Rev. Code § 19.86.020.

25
    [11] Google and the State Plaintiffs have met and conferred, and Google objects on the ground that
26  the State Plaintiffs have not provided a "list of the *specific* claims" that the States intend to assert
    against Google, as the Court requested.  MDL Dkt. 571 at 2 (emphasis added).  Google further
27  objects to the extent the State Plaintiffs are asserting any *per se* claim that was not pleaded in their
    complaint.
28                                                - 9 -

JOINT STATEMENT REGARDING PARTIES' CLAIMS SET FOR TRIAL
U.S.D.C. Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

**SER-514**

| 1  | DATED:  October 2, 2023 | KAPLAN FOX & KILSHEIMER LLP |
|----|----|----|
| 2  | | |
| 3  | | |
|    | | By:  s/ *Hae Sung Nam* |
| 4  | | Hae Sung Nam |
|    | | *Co-Lead Counsel for the Proposed Class* |
| 5  | | |
| 6  | DATED:  October 2, 2023 | FAEGRE DRINKER BIDDLE & REATH LLP |
| 7  | | |
| 8  | | |
|    | | By:  s/ *Paul J. Riehle* |
| 9  | | Paul J. Riehle |
|    | | *Counsel for Plaintiff Epic Games, Inc.* |
| 10 | | |
| 11 | | |
| 12 | DATED:  October 2, 2023 | CRAVATH, SWAINE & MOORE LLP |
| 13 | | |
| 14 | | |
|    | | By:  s/ *Christine A. Varney* |
| 15 | | Christine A. Varney (*pro hac vice*) |
|    | | *Counsel for Plaintiff Epic Games, Inc.* |
| 16 | | |
| 17 | | |
| 18 | DATED:  October 2, 2023 | MUNGER, TOLLES & OLSON LLP |
| 19 | | |
| 20 | | |
|    | | By:  s/ *Glenn D. Pomerantz* |
| 21 | | Glenn D. Pomerantz |
|    | | *Attorneys for Defendants Google LLC et al.* |
| 22 | | |
| 23 | | |
| 24 | DATED:  October 2, 2023 | MORGAN, LEWIS & BOCKIUS LLP |
| 25 | | |
| 26 | | |
|    | | By:  s/ *Brian C. Rocca* |
| 27 | | Brian C. Rocca |
|    | | *Attorneys for Defendants Google LLC et al.* |
| 28 | | |

- 10 -

JOINT STATEMENT REGARDING PARTIES' CLAIMS SET FOR TRIAL
U.S.D.C. Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

**SER-515**

1    **CIVIL L.R. 5-1(i)(3) ATTESTATION**

2        Pursuant to Civil L.R. 5-1(i)(3), the filer of this document attests that concurrence in the

3    filing of the document has been obtained from each of the other signatories.

4

5                        By:   *s/ Glenn D. Pomerantz*

6                             Glenn D. Pomerantz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 11 -

JOINT STATEMENT REGARDING PARTIES' CLAIMS SET FOR TRIAL
U.S.D.C. Case Nos. 3:21-md-02981-JD, 3:22-cv-02746-JD, 3:20-cv-05671-JD, 3:20-cv-05761-JD & 3:21-cv-05227-JD

**SER-516**

1    Karma M. Giulianelli (SBN 184175)
     karma.giulianelli@bartlitbeck.com
2    **BARTLIT BECK LLP**
     1801 Wewetta St., Suite 1200
3    Denver, Colorado 80202
     Telephone: (303) 592-3100
4
     Hae Sung Nam (*pro hac vice*)
5    hnam@kaplanfox.com
     **KAPLAN FOX & KILSHEIMER LLP**
6    850 Third Avenue
     New York, NY 10022
7    Telephone.: (212) 687-1980

8    *Co-Lead Counsel for the Proposed Class in In
     re Google Play Consumer Antitrust Litigation*
9
     Paul J. Riehle (SBN 115199)
10   paul.riehle@faegredrinker.com
     **FAEGRE DRINKER BIDDLE & REATH
11   LLP**
     Four Embarcadero Center, 27th Floor
12   San Francisco, CA 94111
     Telephone: (415) 591-7500
13
     Christine A. Varney (*pro hac vice*)
14   cvarney@cravath.com
     **CRAVATH, SWAINE & MOORE LLP**
15   825 Eighth Avenue
     New York, New York 10019
16   Telephone: (212) 474-1000

17   *Counsel for Plaintiff Epic Games, Inc. in Epic
     Games, Inc. v. Google LLC et al.*
18
     Brendan P. Glackin (SBN 199643)
19   bglackin@agutah.gov
     **OFFICE OF THE UTAH ATTORNEY
20   GENERAL**
     160 E 300 S, 5th Floor
21   PO Box 140872
     Salt Lake City, UT 84114-0872
22   Telephone: (801) 366-0260

23   *Counsel for Utah*

24

25   [Additional counsel appear on signature page]

26

27

28

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300
Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et
al.*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al.*

---

1

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-517**

1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

3
4

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |

5
6
7
8
9
10
11

| | |
|---|---|
| THIS DOCUMENT RELATES TO: | **JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRETRIAL CONFERENCE** |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | |
| *Match Group, LLC et al. v. Google LLC et al.*, Case No. 3:22-cv-02746-JD | |

12
13
14
15
16
17

Pursuant to the Court's Minute Entry for the August 3, 2023 Motion Hearing and Trial Planning Conference (Dkt. No. 571, 3:21-md-02981-JD ("MDL")) dated August 4, 2023, the parties in the above-captioned MDL (the "Parties") by and through their undersigned counsel, submit this Joint Statement regarding trial planning in advance of the September 7, 2023 pretrial conference.

18

I.    **Further Proceedings Regarding the Consumer Class**

19
20
21
22
23
24

On August 28, 2023, the Court granted Google's motion to exclude the injury and damages opinions of Dr. Hal Singer (*see* MDL ECF 588) and issued an order indicating that its "order granting certification should be vacated," noting that it lacked jurisdiction to do so while Google's appeal of the certification order was pending in the Court of Appeals, and directing the parties "to meet and confer, and be prepared to discuss proposed next steps with the Court at the September 7, 2023 status conference." (MDL ECF 589 at 1).

25
26
27

On August 31, 2023, the Ninth Circuit issued an order granting a limited remand stating: "Given the district court's indication that it would reconsider class certification, the Court grants the motion to vacate the scheduled oral argument in the appeal and to remand the case to the

28

2
JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-518**

district for further proceedings," while retaining jurisdiction over the appeal and directing the parties to notify the Court "when the district court has issued an order pertaining to the class certification." Below the parties set forth their positions regarding the implications of these developments.

**Consumer Plaintiffs' Position:** Consumers are considering "next steps" as instructed by the Court, including seeking leave to file a renewed class certification motion supported by amended expert disclosures. Consumers would like to be heard on these next steps, including discussion of a briefing schedule for a potential motion addressing these issues.

Protection of the interests of the 21 million class members warrants further proceedings on class certification. "[D]ecertification at a late stage is disfavored if it 'adversely and unfairly prejudices class members, who may be unable to protect their own interests." *Newberg and Rubenstein on Class Actions* § 7.37 (6th ed.) (cleaned up). As the court noted in its order, Google introduced merits expert testimony from a new expert after abandoning its class certification expert who "did not challenge the fundamental soundness of Dr. Singer's approach in light of the economic literature." MDL Dkt. 588 at 6. Even Dr. Leonard did not challenge Dr. Singer's methodology for conducting his regression analysis in his merits report, but introduced new economic and quantitative analysis doing so on August 14, 2023. *See* MDL Dkt. 578.1 ¶ 16. Protection of the interests of the class warrants further proceedings before the drastic remedy of decertification on the eve of trial.

Further proceedings on class certification should not impact the November 6 trial. Because of the pending Ninth Circuit appeal, the parties had already contemplated that the trial would continue without including the Class claims. That should not change now.

**Google's Position:** Consistent with the Ninth Circuit's August 31, 2023 order granting limited remand and the Court's August 28, 2023 Order, "the order granting certification should be vacated." ECF No. 589.

---

3

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-519

1

2

3

        Consumer Plaintiffs state that they are considering "next steps" regarding class certification once the Court vacates its class certification order, but they have not yet identified those steps.

4

5

6

7

8

9

10

11

        In any event, there should be no further proceedings regarding class certification at this late stage.  Consumer Plaintiffs' expert, Dr. Singer, disclosed three different injury and damage models.  And Consumer Plaintiffs had a full and fair opportunity to defend these three models through reports, depositions, *Daubert* briefing, the expert hot tub, and the supplemental declarations requested by the Court.  Consumer Plaintiffs should not be permitted to try and recertify a class by disclosing a new, fourth injury and damages model at this stage of the proceedings, after the expert disclosure deadlines and after the Court has already entertained the parties' *Daubert* and dispositive motions.

12

13

14

15

16

17

18

        Despite Consumer Plaintiffs position that decertification is a "disfavored" step, it is well recognized that a district court remains free to rescind a class certification order "in the light of subsequent developments in the litigation."  *Brown v. Wal-Mart Store, Inc*., No. 09-CV-03339-EJD, 2018 WL 1993434, at \*2 (N.D. Cal. Apr. 27, 2018) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  Indeed, the district court has an ongoing "duty of monitoring class decisions in light of the evidentiary development of the case."  Newberg and Rubenstein on Class Actions § 7.37 (6th ed.) (cleaned up).

19

20

21

22

23

24

25

26

27

        Nor have Consumer Plaintiffs explained why vacatur of the certification order would, in this case, "prejudice[] class members, who may be unable to protect their own interests."  The Court denied Consumer Plaintiffs' motion for class notice; accordingly putative class members were not told that they are part of a class.  And decertification in this case protects the interests of the putative class.  Otherwise, these putative class members would be bound to the Court's decision excluding Dr. Singer's testimony, and Google would be entitled to summary judgment (or directed verdict) against these class members on the issues of injury and damages—issues on which the Consumer Plaintiffs no longer have admissible evidence.

28

---

4

Consumer Plaintiffs' suggestion that there should be further proceedings regarding class certification will also jeopardize the Court's ability to hold a single trial of all claims on November 6. If further proceedings related to class certification are entertained over Google's objection, Google would object to a trial of any claims in this MDL proceeding until any remaining proposals by Consumer have been addressed such that all claims can be tried in a single trial.

## II.       Status of Individual Plaintiffs

Four individual consumer plaintiffs whom the Court ruled are not class members—Mary Carr, Daniel Egerter, Zack Palmer, and Serina Moglia—still have claims pending. Additionally, the two individuals whom the Court appointed as class representatives (Matthew Atkinson and Alex Iwamoto) also have claims pending. The parties' positions with respect to further proceedings involving the six individual consumer plaintiffs are set out below:

**Consumer Plaintiffs' Position:** Consumer Plaintiffs intend to present the claims of all remaining individual plaintiffs who are not class members—Mary Carr, Daniel Egerter, Zack Palmer, and Serina Moglia—at the trial on November 6. Whether Consumer Plaintiffs present the claims of the appointed named class representatives, Matthew Atkinson and Alex Iwamoto, depends upon the Court's resolution of the class certification issues identified above. In particular, if the Court decertifies the class and denies any requests to recertify a class, then the current class representatives, Matthew Atkinson and Alex Iwamoto, will seek to participate in the trial as well. Otherwise, they will remain as class representatives in further class proceedings.

If any of the individual plaintiffs choose not to opt out of the *parens patriae* action when notice is issued, Consumer Plaintiffs are prepared to file dismissal motions under Rule 41 and further address any issues Google would like to raise at that time.

**Google's Position:** With the exclusion of Dr. Singer, there is no evidentiary basis for any of the individual plaintiffs to present a damages claim at trial. But in any case, with just two

5

(72 of 297), Page 72 of 297
Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 72 of 297
Case 3:21-md-02981-JD   Document 595   Filed 09/05/23   Page 6 of 26

months before trial, Consumer Plaintiffs still cannot say who will be proceeding to trial and what claims for relief they will be pursuing.  According to Consumer Plaintiffs, now, six individuals will proceed to trial, unless four of them decide not to;[1] the four Consumer Plaintiffs whom the Court held were not part of the class still have not said whether they will be seeking to recover through the *parens patriae* claims of the Plaintiff States or whether they will proceed with their own claims.

There are only two months before trial.  Google deserves fair notice now of which Consumer Plaintiffs will be pursuing which claims at trial so that it can prepare for trial without further unfair prejudice.  It is time for Plaintiffs to make a once-and-for-all decision about which claims are proceeding on November 6.  But the right result is for the Court to require that they proceed with all or none of the individual claims.  Plaintiffs should not be able to pursue multiple lawsuits for years and then drop their weakest claims for relief on the eve of trial without consequence.  That would encourage the filing of duplicative lawsuits at a useless cost to the judicial system and defendants.  But that result is precisely what Plaintiffs are attempting to leave possible.  Counsel for the consumers seek the right to selectively prosecute some, but not all, of the individual claims they have pursued for years in this Court, and ask that those individuals whose claims will be abandoned–likely due to an unfavorable discovery record–still be permitted to fully recover should their State Attorney General recover in *parens patriae*.  The Court should not permit this result.

To the extent that individual plaintiffs intend to seek injunctive relief at trial for their individual claims while also reserving the right to recover through relief obtained by the Plaintiff States, Google further objects that this would be improper claim-splitting.  Plaintiffs cannot seek one form of relief through a lawsuit of their own while pursuing another form of relief based on

---

[1] Indeed, Consumer Plaintiffs have already revised their position regarding which individual plaintiffs will be pursuing their claims at trial multiple times during meet and confer communications.  First, they took the position that only individual plaintiff Mary Carr, who the Court held was not part of the class, would proceed to trial.  Then they asserted that Ms. Carr and the two class representatives would proceed to trial.  And now they are asserting that all six individual consumer plaintiffs will proceed to trial–maybe.

6
JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-522

the same causes of action regarding the same conduct in another lawsuit.  If individual Plaintiffs want to bring their own injunctive relief claim to trial, they must face the consequences of their damages claim failing on its merits and cannot recover damages through the Plaintiff States.

### III.        Cameras in the Courtroom Pilot Project

**Plaintiffs' Position**:  All Plaintiffs consent to participate in the Cameras in the Courtroom Pilot Project for the trial.  Alternatively, given Google's refusal to participate, Plaintiffs request that the Court provide the public with an audio feed of the trial.  Google objects to both a video and audio feed on the grounds that offering an audio feed "would risk disclosure" of "sensitive competitive evidence that has been designated as highly confidential by non-parties and the parties to the litigation" and "introduce unnecessary disruption."

Google's position that an audio feed "would risk disclosure" of sensitive information is irreconcilable with its recognition that "[t]he trial in this litigation will occur in an open courtroom and be accessible to the general public."  If Google believes, as it suggests it does, that the courtroom will be open to the public with few exceptions, offering the public a second access point to the trial (*e.g.*, an audio feed) should be of no concern.  Further, there is no risk that an audio feed would increase the likelihood that sensitive information will be disclosed to the public.  Plaintiffs understand that the Court is not permitted to broadcast the proceedings in real time over Google's objection (*see* Aug. 3, 2023 Hr'g Tr. 73:2-7) and therefore request a delayed audio feed of the public portions of the trial. In the unlikely event that confidential information is revealed in public session, there will still be an opportunity for the parties to resolve any legitimate remaining confidentiality concerns prior to the release of the audio.

Google provides no support for its second rationale for not wanting an audio feed of the trial: that it would "introduce unnecessary disruption."  As the Court explained at the August 3, 2023 hearing, having cameras in the courtroom is unobstructive.  (Aug. 3, 2023 Hr'g Tr. 74:2-5.)  "[Y]ou don't even see them . . . You just forget about it."  (*Id.*)  Using microphones, which are already in the courtroom, would be even less of an instrusion.  This was true in *Epic*

1   *Games, Inc. v. Apple Inc.*, No. 20-cv-05640-YGR, where almost the entire trial was available via

2   a *live* audio stream.[2]

3           As this Court stated in another recent antitrust trial, "[t]his is a public courtroom." *In re*

4   *Capacitors Antitrust Litigation*, No. 14-3264-JD, Dkt. 2562, Feb. 13, 2020 Hr'g Tr. at 51:10-12.

5   Indeed, the Court has acknowledged that this case is of "great interest to a lot of people."

6   (Aug. 3, 2023 Hr'g Tr. 73:21-22.) Making these proceedings available to the public through an

7   audio feed would increase public access beyond the limited number of people able to attend in

8   person. Given this public interest, and because Google has not identified legitimate

9   confidentiality or disruption concerns, Google's position should be rejected.

10          **Google's Position**: Google declines to participate in the Cameras in the Courtroom Pilot

11  Project. This trial will contain sensitive competitive evidence that has been designated as highly

12  confidential by non-parties and the parties to the litigation. The Cameras in the Courtroom Pilot

13  Program would risk disclosure of highly confidential competitive information and introduce

14  unnecessary disruption to the pleadings.

15          Google also declines to participate in a program that would enable an audio feed of the

16  trial, whether live-streamed or delayed, as Plaintiffs suggest.[3] The trial in this litigation will

17  occur in an open courtroom and be accessible to the general public. The audio feed of the trial in

18  *Epic Games, Inc. v. Apple Inc*., No. 20-cv-05640-YGR, a bench trial, was ordered because the

19  courtroom was otherwise closed to the public due to the COVID-19 pandemic. Plaintiffs have

20  not identified any such extraordinary circumstances that would warrant the addition of an audio-

21  feed here, when this trial will be already open to the general public. Contrary to Plaintiffs'

22

23  [2] Google is also wrong to suggest there needs to be "extraordinary circumstances" such as the COVID pandemic for
    this Court to order an audio stream. The fact is that COVID expanded public access to judicial proceedings in a
24  variety of ways, such as the holding of routine conferences through publicly available Zoom webinars. In any event,
    the significant public interest in this matter is a special circumstance warranting expanded public access.
25  [3] Google notes that the Northern District of California was selected for an Audio Streaming Pilot Program, but that
    program (1) ended in March 31, 2023, (2) still required consent of both parties, and (3) specifically excluded any
26  civil proceeding involving live witness testimony; sealed, confidential, or classified materials; or jurors or potential
    jurors, including voir dire and trial. *See* https://www.uscourts.gov/about-federal-courts/judicial-
27  administration/audio-streaming-pilot. As these restrictions reveal, an audio feed of the trial here would be
    inappropriate.

28

8

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-524**

suggestion, Google does not expect the courtroom to be closed to the public (except when the Court determines confidential information will be discussed).

## IV. Jury Questionnaires

The parties agree that including case-specific questions would be useful. The parties further agree that the COVID-vaccination questions (*i.e.*, "Are you fully vaccinated for COVID-19 (one dose of Johnson & Johnson or two doses of Moderna or Pfizer) and have you received a booster?") should remain in the jury questionnaire.

**Google's Position**: Google's position is that only those prospective jurors who are fully vaccinated against COVID-19 should be seated as members of the jury.

**Plaintiffs' Position**: Plaintiffs' position is that only jurors who have answered "Yes, fully vaccinated. No booster" or "Yes, fully vaccinated with booster" should be seated as members of the jury.

## V. Daily Trial Schedule

The parties request that trial be held from 9 a.m. to 2 p.m. (with no lunch break) each trial day, and to hold trial every other Friday, as the Court is available. With the Court's permission, the parties would like to jointly provide the jury with snacks, the costs for which the parties will split evenly.

## VI. Expert Disclosures

Google requests that the Court compel Plaintiffs to comply with the Court's February 1, 2023 and April 10, 2023 orders and provide to Google on a coordinated basis their revised list of experts and each expert's area of testimony by September 21, 2023.

Plaintiffs request that the Court deny Google's request, as Plaintiffs have already fully complied with the Court's orders pertaining to expert disclosures.

**Google's Position**: Seven months ago, the Court ordered Plaintiffs to provide Google with a streamlined list of experts to avoid duplication. MDL Dkt. 440 at 2. Plaintiffs still have not complied with the Court's order.

9

Joint Statement Regarding September 7, 2023 Pre-Trial Conference
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:20-cv-05792-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

SER-525

1   At a January 31, 2023 hearing, the Court explained that "there's a core of opinions about

2   the market, about exclusionary conduct, about barriers to entry, about all those things that there

3   should be one person speaking on" and instructed Plaintiffs to "trim down" their list of experts.

4   Jan. 31, 2023 Hr'g. Tr. at 302:25-303:2.  On February 1, 2023, the Court ordered Plaintiffs to

5   "confer on coordinating their experts so that the ***plaintiffs as a group will present one expert for***

6   ***each common issue***.  Individual issues may be addressed by separate experts."  Dkt. No. 440 at 2

7   (emphasis added).  The Court ordered Plaintiffs to "provide Google with their revised list of

8   experts."  In a subsequent order, the Court ordered Plaintiffs to "provide to Google on a

9   coordinated basis their revised list of experts and each expert's area of testimony by April 7,

10  2023."  Dkt. No. 456.

11  With Google's agreement to an extension, Plaintiffs served an expert disclosure on April

12  10, 2023.  That disclosure did not comply with the Court's orders.  It includes five different

13  economists and two different "technology and security" experts, and it designates multiple

14  experts to testify about the same matter.  For example, at the January 31, hearing, Plaintiffs

15  assured the Court that they "are not going to have four different experts reciting their opinions

16  which are all the same or different about market definition."  Jan. 31, 2023 Hr'g. Tr. at 303:8-10.

17  However, Plaintiffs' current expert disclosure designates four different economists to testify

18  about Google's alleged market power in a proposed market for Android app distribution.

19  Plaintiffs pointedly do not deny that their disclosures indicate that multiple experts would testify

20  regarding the same issues, contrary to the Court's order back in February "that the plaintiffs as a

21  group will present one expert for each common issue."  Dkt. No. 440 at 2.  Google would be

22  pleased to submit Plaintiffs' disclosure to the Court.

23  Plaintiffs' suggestion that Google has never asked Plaintiffs for more specificity is simply

24  false.  In a May 5, 2023 letter, Google objected that Plaintiffs' disclosure did not comply with the

25  Court's orders and provided Plaintiffs with a series of questions seeking to clarify why multiple

26  experts' testimony regarding the same issue would not overlap.  Plaintiffs never answered these

27

28

10

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-526

1  questions.  Instead, Plaintiffs responded with a May 12, 2023 letter assuring Google of "their

2  willingness to provide a revised Expert Disclosure once the Court resolves Google's request to

3  exclude the States and individual consumers from the November trial."  Plaintiffs now seem to

4  have reneged on that offer, refusing to provide any revised disclosure.  This reveals that

5  Plaintiffs' complaints about uncertainty over the trial structure were just stonewalling.  The

6  Court should not reward that gamesmanship.  It is not fair for Plaintiffs to say that it is too late to

7  comply with the Court's order when they assured Google in writing that they would comply with

8  the order at a later time.

9       Plaintiffs are incorrect that Google has disclosed duplicative experts.  Plaintiffs have

10  disclosed multiple experts on (1) market definition, (2) market power, (3) exclusionary conduct

11  and anticompetitive effects and (4) computer security.  Google disclosed only one expert on each

12  of those issues last November.  The fact that some of these experts may opine on some of the

13  same underlying facts does not mean that they are duplicative.

14       With just two months before trial, Plaintiffs must comply with the Court's orders and

15  serve a disclosure that identifies which expert will testify regarding which topic, without

16  duplication.  Google needs that information to have a fair opportunity to prepare for trial.

17  Google therefore respectfully requests that the Court order Plaintiffs to provide a disclosure by

18  September 21, 2023 that identifies which expert will testify regarding each of the following

19  topics:  (1) market definition, (2) market and/or monopoly power, (3) competitive effects, and (4)

20  security and technical issues.  To the extent that Plaintiffs are permitted to disclose more than

21  one expert on each of these issues, their disclosure should explain why the experts' testimony on

22  that issue will not overlap.

23       **Plaintiffs' Position**:  Plaintiffs have fully complied with the Court's orders pertaining to

24  expert disclosures.  The Court's January 31, 2023 minute order instructed Plaintiffs to "provide

25  Google with their revised list of experts so Google may consider which, if any, of the experts

26  Google will attempt to exclude from trial."  MDL Dkt. 440 at 2.  The Court's February 17, 2023

27

28

minute order instructed Plaintiffs "to provide to Google on a coordinated basis their revised list of experts and each expert's area of testimony." MDL Dkt. 456. On April 10, 2023, Plaintiffs provided Google with the information required by the Court's orders.

Specifically, Plaintiffs served a disclosure that eliminated some areas of complete duplication and specified other areas where experts might give non-duplicative testimony on the same topic. While Google only focuses on the broadest subject headings of Plaintiffs' disclosure, it wholly ignores the full scope of the disclosure, which, in some cases, specifies down to the level of subsections of the experts' reports the subjects on which those experts will and will not testify. The disclosure also reveals that certain experts, *e.g.*, Saul Solomon, will not testify in the jury trial at all.

This case is complex: It involves four plaintiff groups, multiple relevant markets, multiple related conducts and multiple types of harms, causing multiple types of injuries and damages. Plaintiffs' disclosure nevertheless proposed to eliminate whole swaths of expert opinions, totaling hundreds of pages of analysis and reflecting months of work and investment.

After serving the disclosure, Plaintiffs offered in writing and on three separate calls to give Google any additional information it needed to determine "which, if any, of the experts Google will attempt to exclude from trial." Google never requested, and to this day has not requested, any such information. Google then filed its *Daubert* motions, which were limited to damages issues. MDL Dkts. 484, 487. Google's own actions show that Plaintiffs complied with the Court's order. As Google was obviously able to determine "which, if any, of the experts Google will attempt to exclude from trial," MDL Dkt. 440 at 2, Plaintiffs' disclosure plainly complied with, and satisfied the purpose of, the Court's minute orders.

Google's position now appears to be that Plaintiffs can have only *one* expert for each of the four broadest possible topics of its own creation, namely, "(1) market definition, (2) market and/or monopoly power, (3) competitive effects, and (4) security and technical issues." Google's proposal is unworkable and substantively prejudicial: For each of the four topics, Google

12

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-528

requests that all but one Plaintiff group forfeit their experts' entire analysis with respect to that topic, without regard to unique sub-analyses or reliance on different facts or data. If Google's position were accepted, Plaintiffs would lose the benefit of significant, non-duplicative analysis.[4] Plaintiffs have developed their trial plan to date with their expert disclosure's limitations. To disrupt Plaintiffs' collective trial preparation and further limit their experts' proposed testimony would be unfair and prejudicial—particularly where Google has had Plaintiffs' experts' initial reports since October 2022, examined those experts at deposition, addressed those experts' analysis in Google's own experts' reports and otherwise has everything it needs to examine the experts at trial.

Furthermore, while seeking to limit Plaintiffs, Google reserves the right to do as it pleases with respect to its own experts. Google has disclosed *seven* experts, including three economists, each of whom have substantial, overlapping analysis that spans over 2,000 pages of reports, and two technology experts, whose reports span several hundred pages. For example, Google effectively concedes that both Drs. Gentzkow's and Tucker's reports provide overlapping analyses on alleged alternative distribution channels to Google Play, such as web apps, streaming, other Android app stores and peer-to-peer transfer. Further, Google does not dispute that each of Google's experts opines that Google's conduct has increased output and enhanced Android's quality; and each expert opines about Google's take rate and provides duplicative analyses in support of their position that the rate is not supracompetitive. Google's experts could not possibly testify to these thousands of pages of opinions at trial without duplication of the broad topics of market definition, market power and competitive effects. Yet Google has refused to provide any clarification or guidance as to which of its opinions Plaintiffs should prepare to

---

[4] Further, while all Plaintiff groups expect to be at trial with the experts they disclosed to Google, there are circumstances that, at least theoretically, could change these plans (*e.g.*, a settlement, a pending *Daubert* motion, etc.). Google's position fails to address these possibilities, which could substantially adversely affect the remaining Plaintiffs' cases. For example, if Plaintiffs decide to rely entirely on one expert per each broad topic that Google identifies, it is not clear what would happen if the party that retained a chosen expert is no longer in the case come trial. Aside from the expert's availability, it would raise a host of issues around the permissible scope of the expert's examination.

1   meet, and which they should not.  Ultimately, both sides have a limited time to present their

2   cases, and both sides have every incentive to present the most streamlined, efficient and

3   persuasive case they can.  Plaintiffs (like Google) have no reason to present unnecessary

4   duplication to the jury and do not intend to do so.

5       Finally, Google accuses Plaintiffs of gamesmanship.  To the contrary, Google let this

6   issue lie for months because *Google was requesting two* trials—one with states and consumers,

7   and one with Epic and Match.  Google's draft of this filing is the first Google has said of wanting

8   a single trial.  Far from "stonewalling" Google, Plaintiffs have already given Google a

9   substantial narrowing of expert testimony that served the purpose of enabling Google to file

10  motions to exclude.  Google now simply seeks an opportunistic and unfair litigation advantage

11  by mischaracterizing the terms and ignoring the intent of this Court's orders.

12      The Court should therefore deny Google's request for a further narrowed disclosure,

13  which would place needless restrictions on Plaintiffs' expert testimony and deny them the ability

14  to fully litigate their claims.

15  **VII.      Deposition of Third-Party Riot Games**

16      Google requests that the Court order that Riot's deposition take place no later than

17  September 29, 2023, as described in detail below.

18      **Google's Position**:  Contrary to Epic's assertion, at no point has Google improperly tried

19  to prevent Epic from obtaining document discovery from third-party Riot Games, Inc. ("Riot")

20  before Riot's deposition goes forward.  In fact, any delay in Epic's ability to obtain documents

21  from Riot is a problem of Epic's own creation.  As described below, Google has been more than

22  accommodating in allowing Epic sufficient time to negotiate with Riot regarding the documents

23  Epic seeks.  It is Epic that is impeding Google's ability to take a deposition, for which notice was

24  served nearly five months ago, to test Epic's own allegations, in what appears to be an attempt to

25  "run out the clock" before trial.

26

27

28

14

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-530

1    Nearly two years after the original complaints were filed in this litigation, Epic and

2    Match amended their complaints to add allegations that Google and third-party Riot Games, Inc.

3    ("Riot") entered into some agreement not to compete. Google contests these claims, and plainly

4    has the right to obtain discovery from Riot about Epic's allegation that it entered into a

5    conspiracy with Google. Prior to raising these amended allegations, Epic and Match did not seek

6    any discovery from Riot. Instead, Epic and Match's amended complaints with these new

7    allegations were filed as of November 17, 2022 (*see* MDL ECF Nos. 378 and 380), and the Court

8    extended the prior deposition cut-off to March 31, 2023, to allow the parties to seek testimony

9    regarding these new allegations. *See* MDL ECF No. 447.

10   Pursuant to the Court's order extending deposition discovery, Google timely served its

11   deposition subpoena on Riot on March 22, 2023 and noticed the deposition for March 29, 2023.

12   Google seeks to depose Riot regarding this alleged conspiracy, or rather, the absence of any such

13   conspiracy. At no point between November 17, 2022 (when the amended complaints were filed)

14   and March 31, 2023 (the extended deposition cut-off) did Epic or Match seek to take any

15   discovery from Riot. Instead, it was only after Google issued its deposition subpoena to Riot—

16   and after the deadline for third-party discovery passed—did Epic attempt to seek any discovery

17   from Riot. Now, Epic continues to obstruct Google's efforts to depose a Riot witness about

18   these late-added allegations, using their untimely filed document subpoena as an excuse for

19   doing so. First, in response to Google's deposition notice served on March 22, 2023, Epic

20   responded that plaintiffs' counsel were "unavailable" on the originally noticed date of March 29,

21   and requested that the deposition be rescheduled. Epic did not mention that it planned to serve

22   any discovery of its own on Riot. The parties agreed that the deposition of Riot would take place

23   after the March 31 discovery cut-off due to Epic's scheduling conflicts, as the Court's order

24   permitted.[5] Google promptly proposed rescheduling the Riot deposition on April 26 or April 28.

25   Rather than accept those dates, on April 12, Plaintiffs served a document subpoena on Riot. This

27   ─────────────
     [5] *See* MDL No. 447 (setting March 31, 2023 as the deadline to "complete third-party depositions re: Epic's and Match's amended complaints," "except as parties may agree otherwise for particular depositions.").

15

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-531

was two weeks after the March 31 deadline set by the Court for deposition discovery regarding Epic and Match's new allegations regarding Riot, and furthermore that deadline did not contemplate extending any document discovery deadlines.  After serving the belated document subpoena on Riot, Epic suggested that the parties agree to identify a date in May for the deposition to allow Riot time to respond to Plaintiffs' document subpoena.  In good faith, Google agreed to do so and proposed scheduling the deposition on May 4 or May 10.  In an abrupt about-face, instead of agreeing to proceed with Riot's deposition in May, as Epic itself had suggested, Epic then insisted that the parties should resume coordinating scheduling the deposition later while Epic and Riot met and conferred regarding Riot's response to their document subpoena.  Again, Google agreed to do so in good faith.

Riot produced documents in response to Plaintiffs' document subpoena on July 13.  Since then, Google has proposed eight dates to schedule Riot's deposition.  Epic, however, has not agreed to any of these dates, each time claiming that Riot's document production is deficient and that they are continuing to meet and confer with Riot to address those purported issues.  Google, however, has been prepared to proceed with the deposition since March.  In fact, Google most recently noticed Riot deposition for September 1, 2023.  On August 28, mere days before the deposition was to proceed, Epic informed Google that the deposition could not move forward because they had reached an "impasse" with Riot, and planned to "move promptly to compel Riot's compliance" with its subpoena.  To date, no such motion has been filed, nor has Epic provided a date certain by when they intend to file their motion to compel or move forward with a deposition.

Epic has had more than sufficient time to meet and confer with Riot regarding its document production and to file a motion to compel against Riot, if necessary.  Instead, Epic continues to frustrate Google's ability to schedule this deposition to test the very claims that Epic belatedly added to their complaints.  The parties are on the eve of trial, yet Epic refuses to allow Riot's deposition to go forward under the guise of the ongoing document negotiations with Riot,

documents that Epic never sought to obtain until after Google issued its deposition subpoena. This continued delay is prejudicial to Google; accordingly, Google respectfully requests that the Court order the following:

- An order that the deposition of Riot's witness must take place no later than September 29, 2023, and that Plaintiffs cannot object to the use of such deposition testimony by Google at trial on the basis of FRCP 32(a)(1)(A).

- To the extent that Plaintiffs file a motion to compel against Riot, but have not received a ruling regarding that motion or Riot has not completed any production in response to such a ruling by the date the deposition is to take place, the parties are ordered to proceed with the deposition no later than September 29, 2023. If Plaintiffs subsequently receive additional documents from Riot in response to any successful motion to compel, the parties will be permitted to take a further deposition of Riot's witness that is limited in scope to the documents that were produced as a result of such motion.

- Plaintiffs may not object to Google calling a Riot witness to testify live at trial or the designation of Riot's deposition testimony at trial on the basis of timeliness.

Finally, Epic repeatedly notes that Munger, Tolles & Olson LLP ("MTO") also represents Riot. But there is nothing improper about this, and Epic cannot show otherwise. In fact, as Epic knows from communications dating back to 2020 with the specific MTO lawyers representing Riot, MTO's representation of Riot long predates MTO's appearance in this case—with a different team of non-overlapping lawyers. Moreover, Google's other counsel in this litigation, Morgan, Lewis & Bockius LLP, to this day continues to handle discovery with respect to Riot.

**Epic's Position**: For months, Google has tried to gain an improper tactical advantage by forcing Epic to take the deposition of Riot without first obtaining basic document discovery from Riot—a party to whom Google has paid millions of dollars (pursuant to an agreement Plaintiffs allege was *per se* illegal) and that is represented by Munger, Tolles & Olson LLP ("Munger"), Google's own lead counsel in this case. Epic has worked diligently to obtain Riot's compliance

1   with a narrowly tailored document subpoena.  Despite months of negotiations, Epic still has not

2   received a meaningful production of documents responsive to its subpoena.  Nearing an impasse,

3   Epic is prepared to diligently move to compel Riot's compliance with its disclosure obligations

4   so that Epic can adequately prepare for the deposition.  But Epic cannot agree to arbitrary

5   deadlines when the timing of any production would depend on an order from another court[6] and

6   on Riot's compliance therewith.  The Court should reject Google's unreasonable demands to

7   force Epic to depose Riot before Epic receives the discovery to which it is entitled.

8          When Epic moved to amend its complaint in November 2022 to add *per se* claims related

9   to Google's Project Hug agreements, Google argued to the Court that permitting Epic to amend

10  would "wreck [the] schedule and jeopardize court deadlines" because Google would need to

11  obtain "documents and depositions from third parties to show why [Epic's per se] claims are

12  baseless."  MDL Dkt. 355 at 11.  But after the Court granted Epic leave to amend and extended

13  the discovery cut-off to address Google's concern about being prejudiced, Google failed to take

14  any third-party discovery for months.  On March 22, 2023, just nine days before the close of fact

15  discovery, Google served a deposition notice on Riot's Chief Financial Officer, Mr. Mark

16  Sottosanti, which set the deposition for just one week later, on March 29, 2023  Before that

17  point, Google had made no indication to Plaintiffs that it intended to depose any Riot witness;

18  Google had not, for example, served a document subpoena on Riot or informed Plaintiffs that it

19  was in communication with Riot regarding Mr. Sottosanti's availability for a deposition.  Instead,

20  at the eleventh-hour, Google attempted to give Plaintiffs less than a week to prepare for

21  Mr. Sottosanti's deposition.  With little time to prepare and no Riot documents about which to

22  question Mr. Sottosanti, Epic requested to reschedule Mr. Sottosanti's deposition for a later date,

23  after the March 31, 2023 fact discovery deadline, to allow Epic to subpoena and obtain document

24  discovery from Riot.  Google agreed.[7]

25

26  [6] Riot, a Los Angeles-based company, is within the Central District of California's jurisdiction.

27  [7] Until now, Google has not objected to Epic's subpoena.  In fact, on April 21, 2023, shortly after Epic served its
    subpoena, Google proposed a meet and confer "to discuss the appropriate allocation of deposition time ***once Riot***

28

1

2    Epic served a document subpoena on Riot on April 12, 2023.  With respect to that

3 subpoena, Riot has been represented exclusively by Munger.  Since April, Epic has faced

4 aggressive opposition from Riot that has, to this day, deprived Epic of relevant documents

5 needed to meaningfully depose Riot.  Indeed, Riot did not even agree to produce *any* documents

6 until two months after the subpoena was served, on June 14, 2023.

7        Nearly a month after that, after having agreed to conduct a reasonable search for

8 documents concerning a multi-million dollar deal it had struck with Google, Riot produced just

9 *five* unique documents, only *one* of which was an internal Riot document relating to the deal

10 (from the day Riot signed its Project Hug agreement with Google).  To assess the adequacy of

11 Riot's search, Epic requested the search terms that Riot had used, which turned out to be plainly

12 insufficient.  Epic proposed a modest, narrow set of more sensible search terms, which returned a

13 universe of 80,000 potentially relevant documents.  Riot (via Munger) has refused to review or

14 produce these documents unless and until Epic agrees to cover Riot's costs, which Riot estimates

15 will be between $100,000 and $125,000.  Riot also took the position that Epic should *first* take

16 the deposition of Mr. Sottosani and only then seek additional documents from Riot.  Epic

17 rejected both demands, but in a last attempt at resolution has agreed to substantially narrow the

18 search terms it proposed; Epic's most recent proposal hit on only 16,500 documents.

19        Contrary to Google's assertion that Epic has refused to agree to any of the deposition

20 dates Google has proposed, Epic agreed to take Mr. Sottosanti's deposition on September 1,

21 2023, contingent on Riot curing its production deficiencies before then.  When it became clear

22 that Riot would not produce documents ahead of the then-scheduled September 1 deposition,

23 Epic informed Google that the deposition could not go forward, which is the same position Epic

24 has repeatedly taken.  Google suggests that Epic should proceed to depose Riot on September 29,

25 _____

26 *has completed its document production*."  Apr. 21, 2023 Email from R. Satia to Plaintiffs (emphasis added).
Despite its failure to object then and its prior representations to the Court that it needed more time to obtain
27 "documents" in response to Epic's amended complaint, Google now contends that the March 31, 2023 deadline for
third-party depositions "did not extend document discovery deadlines".  This belated argument is untenable and
should be rejected.

28

1   2023 even if Riot has not produced documents by then because Epic could then *try* to re-open the

2   deposition if it "subsequently receive[s] additional documents from Riot." This would be

3   inefficient and burdensome on both Riot and the parties. Further, Google does not represent that

4   Riot would agree to reopen the deposition and given Riot's reluctance to cooperate with Epic

5   thus far, Epic has no basis to expect Riot would agree to a second deposition.

6       Epic hopes to reach an agreement with Riot in the coming days. If not, Epic will have no

7   choice but to move to compel Riot's compliance, which Epic intends to do promptly. Epic

8   respectfully requests that the Court reject Google's unreasonable demands to force an arbitrary

9   deposition deadline that may deny Epic the information to which it is entitled—information Epic

10  has sought for months, that Riot (through Munger) has resisted producing for months, and that is

11  necessary to adequately depose Riot.

12  **VIII.     Chats Remedy**

13      **Plaintiffs' Position:** Following the Chats hearing in January 2023, the Court found that

14  "sanctions are warranted" (MDL Dkt. 469 at 1) and that "[t]he remaining question is about the

15  remedy" (*id.* at 18-19). During the August 3, 2023 hearing, the Court instructed the Parties to

16  propose a process to help the Court determine the appropriate remedy related to Google's

17  destruction of Google Chats. (Aug. 3, 2023 Hr'g Tr. 70:13-71:2.)

18      Google asks the Court to defer deciding a remedy until all evidence is presented at trial,

19  at which point the Court would determine the "effect any lost chats may have on Plaintiffs'

20  ability to prove their case." In other words, Google envisions a world in which it can destroy

21  evidence with impunity, the jury is kept in the dark about Google's fully-adjudicated intentional

22  destruction of documents at least for the duration of trial, and Plaintiffs are given a Hobbesian

23  choice: either they put on a strong case, in which case they lose the right to an instruction—or

24  they *prove* to the jury that their case is weak (or at least severely weakened), by pointing to

25  evidence they know nothing about and could know nothing about because Google intentionally

26  destroyed it. That is not the law, nor should it be. The proportionality of a sanction should not

27

28

20

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-536**

1   be based on how well Plaintiffs overcome Google's misconduct; it should be based on the

2   egregious conduct in which Google engaged.  The Court has previously noted "plaintiffs'

3   dilemma of trying to prove the contents of what Google has deleted."  (MDL Dkt. 429 at 19.)

4   This led the Court to defer its decision on the appropriate remedy until the end of fact discovery.

5   There is no reason to now defer it further, let alone to hide from the jury the Court's findings

6   concerning Google's misconduct.

7          Further, if accepted, Google's position would prejudice Plaintiffs.  The Court has already

8   "obtained a thorough and highly detailed record with respect to Google's Chat preservation

9   conduct," which is supported by "substantial briefing by both sides," "including the filing of

10  declarations and other written evidence," and "an evidentiary hearing that featured witness

11  testimony and other evidence."  (MDL Dkt. 469 at 1, 2, 3.)  This evidence makes clear that

12  "Google intended to subvert the discovery process, and that Chat evidence was 'lost with the

13  intent to prevent its use in litigation' and 'with the intent to deprive another party of the

14  information's use in the litigation.'"  (*Id.* at 18 (quoting Comm. Notes, Subdivision (e)(2)).

15  Indeed, the Court concluded that "intentionality manifested at every level within Google to hide

16  the ball with respect to Chat."  (*Id.* at 17.)  Nevertheless, Google seeks to make Plaintiffs use

17  their valuable, limited trial time—and the time of the Court and the jury—to *re-prove* facts the

18  Court already found.[8]  This would be severely prejudicial to Plaintiffs, who have been preparing

19  for trial under the assumption that their time will primarily be used to prove the anticompetitive

20  harm at issue in this case (and that they will not be required to re-litigate an adjudicated issue).

21  Further, waiting until the end of trial to decide the appropriate remedy would deprive Plaintiffs

22  of part of the remedy they seek: a preliminary jury instruction at the outset of trial that explains

23  that certain internal Google Chats were deleted and therefore cannot be presented at trial.

24

25

26  _____
    [8] Google claims Plaintiffs would not have to re-prove facts and would instead have to "highlight any gaps in the
27  record that they believe are prejudicial."  As the Court "fully appreciates" (MDL Dkt. 469 at 19), this places an
    undue burden on Plaintiffs, who would need to figure out precisely what Google destroyed—an impossible task.
28

Moreover, Google has not identified any prejudice it would suffer if the remedy were decided before trial. Rather than "defer any briefing on the issue," as Google requests, Plaintiffs propose the following pretrial briefing schedule to advise the Court on the appropriate remedy, which will allow the Court to hear argument at the October 19, 2023 conference, if needed, and craft the appropriate remedy before trial. This proposal is consistent with the Court's suggestion that once *fact discovery* is complete—not once *trial* is complete—"plaintiffs will be better positioned to tell the Court what might have been lost in the Chat communications." (*Id.* at 19.)

| Event | Date | Page Limit |
|---|---|---|
| Plaintiffs' Opening Brief | September 21 | 25 pages |
| Google's Opposition Brief | October 5 | 25 pages |
| Plaintiffs' Reply Brief | October 12 | 15 pages |

**Google's Position:** The Court should decide the appropriate remedy related to chats after hearing the evidence presented by the parties at trial, as is customary for jury instructions concerning the jury's consideration of particular categories of evidence. As the Court noted in its Order, "[p]roportionality is the governing concept here," Dkt. 469, at 18, and the parties will be better positioned to assess proportionality at the close of the evidence. The Court recognized that the Advisory Committee Notes to Rule 37 "advise courts to 'exercise caution,'" and that "'severe measures,'" such as jury instructions, "'should not be used when the information lost was relatively unimportant or lesser measures…would be sufficient to redress the loss.'" *Id.* at 18-19 (quoting Comm. Notes, Subdivision (e)(2)). The parties will be best positioned to brief the Court on how these principles should apply in this case once the evidence has been presented at trial. The Court should defer any briefing on the issue until that time.

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-538

1   Contrary to Plaintiffs' contention, Google is not proposing that Plaintiffs be required to

2   "*re-prove* facts the Court already found" (emphasis in original).  The issue here is not Plaintiffs'

3   quantum of proof.  The issue is ensuring that the Court's factual findings are assessed in the

4   context of the entire case so that any remedy is proportional to whatever effect any lost chats

5   may have on Plaintiffs' ability to prove their case using the voluminous information otherwise

6   available to them.  The parties and the Court will be better prepared to evaluate that issue after

7   Plaintiffs have put on their proof.  Plaintiffs will have ample opportunity to put on their best case

8   based on the enormous record they do have, and highlight any gaps in the record that they

9   believe are prejudicial.  Plaintiffs' suggestion that the Court should instruct the jury on this issue

10  "at the outset of trial" before the jury has heard or been instructed on any other evidence in the

11  case is wholly disproportionate and risks an outcome this Court already determined is improper–

12  having this antitrust case "decided on the basis of lost Chat communications."  Order at 19.  The

13  Court will be better placed to guard against that risk by considering the proper remedy at the

14  close of the evidence.

15

16

17

18  Dated: September 5, 2023          **BARTLIT BECK LLP**
                                        Karma M. Giulianelli

19
                                      **KAPLAN FOX & KILSHEIMER LLP**
20                                      Hae Sung Nam

21                                            Respectfully submitted,

22
                                      By:    /s/ *Karma M. Giulianelli*
23                                           Karma M. Giulianelli

24                                    *Co-Lead Counsel for the Proposed Class in In re*
25                                    *Google Play Consumer Antitrust Litigation*

26  Dated: September 5, 2023          **PRITZKER LEVINE LLP**
                                        Elizabeth C. Pritzker
27

28
                                      23

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-539**

Respectfully submitted,

By:     /s/ *Elizabeth C. Pritzker*
        Elizabeth C. Pritzker

*Liaison Counsel for the Proposed Class in In re
Google Play Consumer Antitrust Litigation*

Dated: September 5, 2023         **CRAVATH, SWAINE & MOORE LLP**
                                   Christine Varney (pro hac vice)
                                   Gary A. Bornstein (pro hac vice)
                                   Timothy G. Cameron (pro hac vice)
                                   Yonatan Even (pro hac vice)
                                   Lauren A. Moskowitz (pro hac vice)
                                   Justin C. Clarke (pro hac vice)
                                   M. Brent Byars (pro hac vice)

                                 **FAEGRE DRINKER BIDDLE & REATH LLP**
                                   Paul J. Riehle (SBN 115199)

                                 Respectfully submitted,

By:     /s/ *Yonatan Even*
        Yonatan Even

*Counsel for Plaintiff Epic Games, Inc.*

Dated: September 5, 2023         **OFFICE OF THE UTAH ATTORNEY
                                   GENERAL**
                                   Brendan P. Glackin
                                   Lauren M. Weinstein

                                 Respectfully submitted,

By:     /s/ *Brendan P. Glackin*
        Brendan P. Glackin

*Counsel for Utah*

24

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-540**

| | |
|---|---|
| 1 | Dated: September 5, 2023 |
| 2 | |
| 3 | |

Dated: September 5, 2023

**HUESTON HENNIGAN LLP**
Douglas J. Dixon
Christine Woodin
Joseph A. Reiter

Respectfully submitted,

By: */s/ Douglas J. Dixon*
Douglas J. Dixon

*Counsel for Plaintiffs Match Group, LLC et al.*

Dated: September 5, 2023

**MORGAN, LEWIS & BOCKIUS LLP**
Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna L. Naranjo
Rishi P. Satia

Respectfully submitted,

By:     */s/ Michelle Park Chiu*
Michelle Park Chiu

*Counsel for Defendants Google LLC et al.*

Dated: September 5, 2023

**MUNGER, TOLLES & OLSON LLP**
Glenn D. Pomerantz
Kuruvilla Olasa
Emily C. Curran-Huberty
Jonathan I. Kravis
Justin P. Raphael
Kyle W. Mach

Respectfully submitted,

By:     */s/ Glenn D. Pomerantz*
Glenn D. Pomerantz

*Counsel for Defendants Google LLC et al.*

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

SER-541

**E-FILING ATTESTATION**

I, Michelle Park Chiu, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*s/ Michelle Park Chiu*
Michelle Park Chiu

DB2/ 46605844.1

JOINT STATEMENT REGARDING SEPTEMBER 7, 2023 PRE-TRIAL CONFERENCE
CASE NOS. 3:21-MD-02981-JD; 3:20-CV-05671-JD; 3:20-CV-05761-JD; 3:20-CV-05792-JD; 3:21-CV-05227-JD; 3:22-CV-02746-JD

**SER-542**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Karma M. Giulianelli (SBN 184175)
karma.giulianelli@bartlitbeck.com
**BARTLIT BECK LLP**
1801 Weaetta St., Suite 1200
Denver, Colorado 80202
Telephone: (303) 592-3100

Hae Sung Nam (*pro hac vice*)
hnam@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue
New York, NY 10022
Telephone: (212) 687-1980

*Co-Lead Counsel for the Consumer Class in In re Google Play Consumer Antitrust Litigation*

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc. in Epic Games, Inc. v. Google LLC et al.*

[Additional counsel appear on signature page]

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY GENERAL**
160 E 300 S, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone: 801-366-0260

*Counsel for the Plaintiff States in State of Utah et al. v. Google LLC et al.*

Douglas J. Dixon (SBN 275389)
ddixon@hueston.com
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite 1300 Newport Beach, CA 92660
Telephone: (949) 229-8640

*Counsel for Plaintiffs Match Group, LLC, et al. in Match Group, LLC et al. v. Google LLC et al.*

Glenn D. Pomerantz (SBN 97802)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

*Counsel for Defendants Google LLC et al.*

**SER-543**

JOINT SUBMISSION REGARDING TRIAL PROPOSAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746

1    **UNITED STATES DISTRICT COURT**

2    **NORTHERN DISTRICT OF CALIFORNIA**

3    **SAN FRANCISCO DIVISION**

4

5

6    **IN RE GOOGLE PLAY STORE**          Case No. 3:21-md-02981-JD
     **ANTITRUST LITIGATION**

7    THIS DOCUMENT RELATES TO:

8    *Epic Games, Inc. v. Google LLC et al.*, Case    **JOINT SUBMISSION REGARDING**
     No. 3:20-cv-05671-JD                              **TRIAL PROPOSAL IN RESPONSE TO**
9                                                      **COURT'S APRIL 21, 2023 ORDER**

     *In re Google Play Consumer Antitrust*
10   *Litigation*, Case No. 3:20-cv-05761-JD           Judge:  Hon. James Donato

11   *State of Utah et al. v. Google LLC et al.*, Case
     No. 3:21-cv-05227-JD
12
     *Match Group, LLC et al. v. Google LLC et al.*,
13   Case No. 3:22-cv-02746-JD

14

15        Pursuant to the Court's minute order dated April 21, 2023 (MDL ECF No. 499), the parties

16   in the above-captioned MDL action, by and through their undersigned counsel, submit this Joint

17   Submission Regarding Trial Proposal.  The parties held the in-person "trial summit" required by

18   the Court's order in San Francisco on April 27, 2023.  Lead trial counsel for all parties attended,

19   with the exception of Mr. Reiter appearing in place of Mr. Dixon for the Match Plaintiffs in

20   No. 22-cv-2746, as authorized by the Court.  Following the April 27, 2023 summit, the parties

21   have continued to meet and confer by telephone and e-mail with the involvement of lead trial

22   counsel for all parties.

23        The parties take seriously the Court's admonition to "work it out."  Apr. 20 Hr'g Tr. at

24   10:14.  To that end, the consumer plaintiffs and Google have agreed that the consumer plaintiffs'

25   class-capacity claims should not be tried until Google's pending 23(f) appeal is resolved.  Further,

26   Plaintiffs—who previously sought separate damages trials for the Match Plaintiffs and the

27   States/Consumers—have agreed to try in the same antitrust liability trial all antitrust and consumer

28   protection damages claims triable to the jury.  Despite extensive discussion among the parties, two

                                                   -2-                              **SER-544**
     JOINT SUBMISSION REGARDING TRIAL PROPOSAL
     Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1   disputes remain that the parties cannot resolve:  (1) whether the claims of the Plaintiff State AGs

2   and individual consumer plaintiffs should be tried in November along with the claims of Epic and

3   the Match Plaintiffs and (2) the timing of proceedings relating to equitable relief.  The parties'

4   respective positions on those issues follow after the parties' agreed proposals on trial structure and

5   other trial-related issues.

6   **I.        TRIAL STRUCTURE**

7          The Court directed the parties to meet and confer on the structure of the November 6 trial,

8   including which issues will be tried to the jury and which issues will be tried to the Court.  As

9   explained in Section III below, Google takes the position that the claims of the Plaintiff State AGs

10  and individual consumer plaintiffs should not be tried in November along with the claims of Epic

11  and the Match Plaintiffs.  Nevertheless, the parties have negotiated and here describe below their

12  agreed proposal for the structure of the trial if it includes Epic, the Match Plaintiffs, the States, and

13  the individual consumer plaintiffs (but not the class).  If the Court adopts Google's position, which

14  is disputed by Plaintiffs, that the States and consumers should not be part of the November trial,

15  then claims brought by the States and individual consumer plaintiffs can be removed from the

16  structure articulated in this Section.

17         **A.        Issues Triable to a Jury**

18         The parties agree that all claims by all Plaintiffs are triable to a jury, with the exception of

19  the claims brought under California's Unfair Competition Law, which are addressed below, and

20  claims that the States have brought under the laws of 38 states other than California.  With respect

21  to the States' state-law claims, the States and Google continue to discuss which aspects of the

22  claims that the States have brought under the laws of states other than California would be triable

23  to a jury and which would be triable to the Court.  The parties will continue to work on the issue

24  and will present a resolution to the Court (or a process for asking the Court to resolve any

25  disagreement) at an appropriate time.

26         The parties further agree that the damages claims of all Plaintiffs that seek damages should

27  be tried to the jury together with issues of liability.

28

**SER-545**

-3-

1    The parties further agree that Google's counterclaims against Epic and the Match

2  Plaintiffs, including any damages thereon, should be tried to the same jury that would decide

3  claims against Google. This is without prejudice to Plaintiffs' positions and reservation of rights

4  to file motions regarding the admissibility of certain evidence against certain Plaintiffs and the

5  sequencing of the presentation of Google's counterclaims, which the parties intend to address by

6  motion, if necessary, at a later time.

7        **B.    Issues Triable to the Court**

8    The parties agree that Plaintiffs' claims under California's Unfair Competition Law, which

9  are solely equitable in nature, must be tried to the Court. *Nationwide Biweekly Admin. v. Super.*

10  *Court of Alameda Cty.*, 9 Cal. 5th 279, 301 (2020) (holding that because "scores of decisions of

11  both this Court and the Courts of Appeal have uniformly recognized that the cause of action

12  established by [the UCL] is equitable in nature", UCL claims are to be tried by the Court rather

13  than by a jury); *CZ Servs. v. Express Scripts Holding Co.*, 2020 WL 4368212, at *8 (N.D. Cal.

14  July 30, 2020) (Donato, J.) ("UCL claims are equitable in nature and tried to the Court").

15    The parties further agree that the nature and scope of any injunctive or other equitable

16  relief that may be available as a remedy for any claim is for the Court to decide.

17  **II.    ADDITIONAL ISSUES RELATED TO TRIAL**

18        **A.    Trial Length**

19    The parties have noted the trial schedule set forth in Paragraph 33 of the Court's Standing

20  Order for Civil Jury Trials but recognize that the Court may adjust that schedule in appropriate

21  cases. In recognition of that flexibility, the parties hereby propose trial time by hours rather than

22  by trial days. The parties jointly propose a trial limit of 100 hours. For reference, the parties note

23  that the Court in *Epic v. Apple* allotted 90 hours for a bench trial involving one plaintiff and no

24  damages claims.

25        **B.    Allocation of Trial Time**

26    The parties agree that any trial time will be evenly divided between all Plaintiffs as a group

27  and the Google Defendants as a group. Trial time shall be kept pursuant to the procedures set

28  forth in Paragraph 34 of the Court's Standing Order for Civil Jury Trials.

**SER-546**

-4-

JOINT SUBMISSION REGARDING TRIAL PROPOSAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

**C.**     **Process for Exchanges of Pre-Trial Disclosures and Materials**

The parties have each identified specific counsel for each party who are working together to prepare a schedule and process for efficiently preparing, exchanging, and filing the pretrial materials required by the Court's Standing Order for Civil Jury Trials as well as for disclosures during trial, including demonstratives.  In due course, the parties may present some or all of these agreements to the Court for consideration and, if approved, entry as a Court order.

**III.     REMAINING DISPUTES**

**A.     Which Plaintiffs Should Participate in a November Trial**

The Court informed the parties that a trial involving at least some Plaintiffs would proceed on November 6, Apr. 20 Hr'g Tr. at 6:14-15, and the Court directed the parties to "discuss and come up with a plan for the sequencing of the member cases for trial."  MDL ECF No. 499 at 1.  In light of the Court's ruling, the parties agree that the claims of the Consumer Plaintiff class should not be tried at the trial scheduled for November 6 in light of Google's pending appeal of the Court's order certifying the class.  The parties disagree regarding whether the States and individual consumers should participate in the November trial.  Google proposes that the November 6 trial should proceed only as to Epic and the Match Plaintiffs.  Plaintiffs propose a joint trial of the claims of Epic, the Match Plaintiffs, the States, and the individual consumers, followed by a bench proceeding on equitable relief.  Below the parties set forth their positions regarding the sequencing of cases in this MDL for trial.

**1.     Google's Position**

Plaintiffs and Google agree that the Consumer Class's claims should not be tried until the Ninth Circuit resolves Google's Rule 23(f) appeal.[1]  In light of that agreement, if there is to be a trial in November 2023, then Google submits that the trial should include only Epic and the Match Plaintiffs; the Court should defer trial with respect to Plaintiff State AGs, any individual consumers, and the Consumer Class pending Google's 23(f) appeal.  Google has moved to expedite that appeal, asking the Ninth Circuit to deny any requests for extensions of the briefing

---

[1] Plaintiffs have not specified whether the representatives of the certified class will be pursuing claims at the November trial under their proposal and Google reserves all rights on that issue.

1   schedule and to set the appeal for argument during the August sitting.  Rather than seek a "repeat"

2   of its stay motion—where Google argued for a stay and single trial of *all* Plaintiffs' claims—

3   Google here submits its position in light of the Court's ruling that "definitely one, two, or three"

4   plaintiffs "are going to be in trial in November."  Apr. 20, 2023 Hr'g Tr. at 15:6-8.  As in

5   Plaintiffs' authority, *In re Suboxone Antitrust Litig.*, 2022 WL 3588024, at *12 (E.D. Pa. Aug. 22,

6   2022), the Plaintiff State AGs' claims should be tried with the class claims.

7         The issues raised in Google's Rule 23(f) appeal affect the claims of the Plaintiff State AGs

8   and individual consumers in a direct way that is different from how the appeal affects the claims

9   of Epic and the Match Plaintiffs.  Unlike Epic and the Match Plaintiffs, the State AGs and

10  individual Plaintiffs expressly rely on the very same expert testimony about injury and damages

11  that the Consumer Class relies on, namely, the pass-through model advanced by Dr. Hal J.

12  Singer.  The reliability of this pass-through model is at the core of the Rule 23(f) appeal.  Without

13  the Singer model, Plaintiffs have no way to certify a class.

14        If the Ninth Circuit agrees with Google that this model is unreliable, then neither the

15  Consumer Class nor the States should be allowed to offer this model into evidence.  Yet that is

16  precisely what the States say they intend to do if they are part of the November trial.  The Plaintiff

17  State AGs take the position that they can and will offer the Singer pass-through model to show

18  that the consumers in their states have been injured and have suffered the damages the States seek

19  in this case.  Although the Plaintiff State AGs do not have to certify a class, at trial they will still

20  need to present a method of computing damages for the residents of their states on an

21  individualized, not an aggregate basis; the Clayton Act provides that where States are pursuing

22  *parens patriae* claims, "damages may be proved and assessed in the aggregate" only where they

23  prove that "a defendant agreed to fix prices," 15 U.S.C. § 15d, which plaintiffs have not alleged

24  here.  It makes practical sense to await the Ninth Circuit's guidance regarding Dr. Singer's model

25  before permitting any Plaintiff to offer that model into evidence during the November trial.

26  Because Epic and the Match Plaintiffs do not rely on the Singer model, but the States and

27  individual plaintiffs do rely on that model, only the claims of Epic and Match should go forward

28  in November.

-6-                                    **SER-548**

1    In addition to the advantages of guidance from the Ninth Circuit, deferring trial of claims

2 by all Plaintiffs that seek to represent consumers—Plaintiff State AGs, individual consumers and

3 the Consumer Class—is the most fair and efficient course for several additional reasons as well.

4    *First*, proceeding to trial in November with Plaintiff State AGs and certain individual

5 consumers—but not the Consumer Class—is inefficient and risks multiple trials regarding the

6 existence of consumer harm and the measurement of consumer damages.  Given that all these

7 plaintiffs seek to prove injury and damages to consumers using the *same* pass-through model

8 advanced by Dr. Singer, there should be a single trial before a single jury that can assess whether

9 consumers were injured, the extent of damages, if any, and the validity of the Singer pass-through

10 model (assuming this Court and the Ninth Circuit permit that model to be presented to the

11 jury).  Under Plaintiffs' proposal, if Google persuades the jury in the November 6 trial to reject the

12 Singer overcharge model or to find no consumer damages, Google may have to repeat that

13 presentation all over again with a second jury in a trial against the Consumer Class.

14    *Second*, trying the claims of the Plaintiff State AGs along with the claims of Epic and the

15 Match Plaintiffs will introduce complexities that are not outweighed by any efficiency

16 benefits.  While Epic and the Match Plaintiffs have asserted claims only under federal and

17 California law, the Plaintiff State AGs have asserted myriad claims under the laws of 39 different

18 states—not just antitrust claims but a broad set of consumer protection claims that Epic and the

19 Match Plaintiffs have not asserted.  To the extent that Plaintiff State AGs' state law claims are

20 triable to the jury, the State AGs' position is that the jury may have to be instructed regarding

21 those claims under the laws of dozens of different states.  In that scenario, the jury also would

22 have to be instructed that these many different instructions do not apply to Epic's and the Match

23 Plaintiffs' claims.  Plaintiffs are wrong that this argument is inconsistent with Google's position in

24 its stay motion.  Google argued in that motion that *all* Plaintiffs' claims should be tried together

25 *after* Google's 23(f) appeal is resolved.  The challenges of instructing the jury if claims under

26 dozens of state laws are presented to the jury would have still existed, but they would have been

27 outweighed by the efficiencies of that single trial that Google requested.  No such countervailing

28

-7-

**SER-549**

1   efficiencies will be present if trial goes forward in November on the claims of some but not all

2   Plaintiffs.

3         Further, Plaintiff State AGs and individual consumers have argued that evidence related to

4   Google's counterclaims against Epic and the Match Plaintiffs should not be introduced in any trial

5   that also involves Plaintiff State AGs and consumers.  Google disagrees, and the parties have

6   agreed to brief that issue before trial.  But the Court would not have to decide this issue if it orders

7   a trial of only Epic's and the Match Plaintiffs' claims and Google's counterclaims against Epic

8   and the Match Plaintiffs.

9         *Third*, proceeding to trial in November on the claims of the Plaintiff State AGs but not the

10  claims of the Consumer Class could result in some consumers having claims tried in two separate

11  trials.  According to Plaintiffs, whether a consumer is represented by class counsel or the Plaintiff

12  State AGs depends upon their "legal address" in their Google payment profile at the time of a

13  particular purchase.  On that theory, as Google has explained (MDL ECF No. 430 at 4-5),

14  consumers whose address in their Google payment profile changed over time may be represented

15  by *both* class counsel and the Plaintiff State AGs as to different purchases.  Plaintiffs do not

16  dispute that those consumers would have claims tried in two separate trials if trial of the Plaintiff

17  State AGs' claims goes forward in November while trial of the Consumer Class claims is

18  deferred.  A trial of only Epic's and the Match Plaintiffs' claims would avoid that effective claim-

19  splitting.  In addition, separate trials of claims by the Plaintiff State AGs and the Consumer

20  Plaintiff Class would compound the significant challenges for the joint notice that Plaintiffs have

21  proposed.

22        Plaintiff State AGs have argued that they are somehow immune from ordinary case

23  management considerations because they act on behalf of sovereign states.  But under the Clayton

24  Act, Plaintiff State AGs pursuing claims as *parens patriae* have the status of private parties just

25  like the Consumer Class and the individual consumer plaintiffs.  *Cf. New York v. Meta Platforms,*

26  *Inc.*, --- F.4th ----, 2023 WL 3102921, at \*5-7 (D.C. Cir. Apr. 27, 2023) (rejecting argument that

27

28

**SER-550**

"the States should be treated as 'special persons'").[2]  Where the Court has rejected Google's proposal for a single trial of all Plaintiffs' claims, the next most efficient course would be for all private parties seeking relief for consumers to have their claims tried together.  The Consumer Class has agreed to have its claims tried after the resolution of Google's appeal of the Court's class certification order.  The claims of the Plaintiff State AGs and individual consumers should be tried then, too.

### 2.   Plaintiffs' Position

Plaintiffs' position, unlike Google's, follows Rule 39, precedent, and the "organizing principle" the Court recently reiterated: "We will try the jury cases first for all issues common to the legal and equitable claims," and the Court would take up equitable claims after that. Apr. 20, 2023 Hr'g Tr. at 7:19-22.  Google, by contrast, wants a second bite at the apple.

Google argues that because the Ninth Circuit may find that Dr. Singer's model cannot satisfy predominance under Rule 23, individual consumers and the States cannot have any trial of any kind until the appeal concludes.  That is the same argument the Court rejected less than three weeks ago when it denied Google's motion to stay, explaining that the "Rule 23(f) proceedings" are "irrelevant" to a common trial.  Apr. 20, Hr'g Tr. at 8:25-9:1.  Indeed, the Court identified the "state attorneys general" as parties "who have nothing to do with [the] class action petitions" underlying the Rule 23(f) appeal.  *Id.* at 8:18-20.

As set forth in Plaintiffs' oppositions to Google's motion to defer or stay the trial, Google has not met its burden to stay the State and individual consumer actions pending the Rule 23(f) appeal.  In particular, Google failed to show irreparable harm as required to justify a stay.  The Court should reject Google's repeat run at a stay for several reasons.

*First*, Google simply reiterates the argument that the appeal raises issues regarding the reliability of Dr. Singer's pass-on analysis that would affect its presentation by the States and individual consumers at trial.  But what the Ninth Circuit says about certification of a *class based*

---

[2] *United States v. B.F. Goodrich Co.*, 619 F.2d 798 800-01 (9th Cir. 1980) is not the contrary.  That case involved States' access to grand jury materials, which is not at issue here.

-9-   **SER-551**

JOINT SUBMISSION REGARDING TRIAL PROPOSAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1   on Dr. Singer's model, under the standards applicable to class certification, will not prevent a trial

2   of the *parens* claims of the States or the claims of individual consumers. Apr. 20, 2023 Hr'g Tr. at

3   8:25-9:1. Google based its Rule 23(f) petition on the argument that the Court did not apply a

4   sufficiently "rigorous analysis" under Rule 23. But neither *individual* consumers nor the States

5   need to satisfy Rule 23. *See Illinois v. Abbott & Assocs.*, 460 U.S. 557, 573 n.29 (1983).

6   Although Google claims the States will "need to present a method of computing damages for the

7   residents of their states on an individualized, not an aggregate basis," the only authority Google

8   cites does not support that assertion. 15 U.S.C. § 15(d) merely provides where "there has been a

9   determination that a defendant agreed to fix prices in violation of sections 1 to 7 of this title,

10  damages may be proved and assessed in the aggregate by statistical or sampling methods, by the

11  computation of illegal overcharges, or by such other reasonable system of estimating aggregate

12  damages as the court in its discretion may permit." It does not provide that proof of damages on

13  an aggregate basis is limited to price-fixing claims as Google states.

14        Nor can Google say the Ninth Circuit will rule on any "reliability" issues generally

15  because Google has not asked the Ninth Circuit to find that Dr. Singer's model does not satisfy

16  *Daubert* standards as a standalone basis for the appeal; the case does not appear in its statement of

17  issues for review or even in the table of authorities of its petition. Pet. for Permission to Appeal at

18  iv-vi, 1, *Carr v. Google*, No. 22-80140 (9th Cir. Dec. 9, 2022). To be sure, *Daubert* appears in

19  two sentences of the 23(f) petition, *id.* at 18-19, but an argument presented in such a cursory

20  manner waives that issue on appeal, *see United States v. Alameda Gateway Ltd.*, 213 F.3d 1161,

21  1168-69 (9th Cir. 2000). The thrust of Google's appeal is that Dr. Singer's model includes

22  unharmed class members so as to defeat predominance. To require governments or individuals to

23  show predominance would graft the strictures of Rule 23 onto *parens* and non-class claims and

24  subvert the judgment of Congress to bypass those requirements in enforcement actions. *See*

25  No. 3:21-CV-05227, Dkt. 364, at 3-4 (collecting authority).

26        Moreover, the States and individual consumer plaintiffs do not rely on Dr. Singer's pass-on

27  analysis alone; the States retained Dr. Marc Rysman who will testify on consumer damages using

28  a model that is completely different from Dr. Singer's. No. 3:21-CV-05227, Dkt. 364, at 6-7.

1   Google also ignores that Dr. Singer presents *other* damages models that were not a basis for class

2   certification and are not before the Ninth Circuit. *Id.* These other models are not implicated in the

3   appeal at all.

4        *Second*, Google complains that it "may have to repeat" its presentation with respect to

5   Dr. Singer's pass-on model if it secures a favorable jury verdict at the November 6 trial. But the

6   same is true for many other common issues even if the States and individual consumers do not

7   participate in the November 6 trial. Indeed, the States and individual consumers have alleged at

8   least eight antitrust and consumer protection claims in common with the Match Plaintiffs and

9   Epic. These claims involve the same underlying evidence, including many overlapping witnesses.

10  If Google achieves a favorable verdict against the Match Plaintiffs and Epic, Google would need

11  to present its expert and fact witnesses on liability again in a second trial regardless of the outcome

12  of the Rule 23(f) appeal. Severing the States' and individual consumer claims from the first trial

13  *increases* the chance that Google has to repeat its trial testimony.

14       *Third*, Google argues that Play customers that made purchases in different States might be

15  represented by both class counsel and the States as to different purchases, such that some

16  consumer claims would be "tried twice." That is wrong. Under Plaintiffs' proposal, all consumer

17  transactions that are covered by the *parens patriae* action will be adjudicated at the November 6

18  trial; meanwhile, consumer transactions not covered by the *parens patriae* action will be

19  adjudicated once the Rule 23(f) appeal is decided (setting aside any individuals who participate in

20  the November trial). In any event, Google's concern about the claims being "tried twice" provides

21  no reason to delay a common trial. It is just another flavor of pointing out that, if Google loses its

22  appeal, it will face the prospect of a second trial on class claims—a prospect the Court already

23  determined was proper. *See* Apr. 20 Hr'g Tr. at 12:14-13:6.

24       *Fourth*, Google argues that because there are 39 governments with unique non-federal

25  claims, it will be too complicated for the States to be in any trial with Epic and Match. In March,

26  Google argued just the opposite in seeking to stay trial: It claimed that the "most efficient" path

27  was to have claims by "all sides of the platform litigated at the same trial." No. 3:21-md-02981,

28  Dkt. 467, at 11. Breaking up consumer and developer claims, Google warned then, "risks both

**SER-553**

1  inconsistent results and 'duplicative damages awards.'" *Id.* Google's about-face would foreclose

2  any common liability trial, contrary to what the Court has been for years instructing would

3  happen. The presence of claims under the laws of many states is common in both nationwide

4  class actions and in multistate enforcement actions consensually tried with private parties. *See,*

5  *e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-

6  2445, 2022 WL 3588024, at *12 (E.D. Pa. Aug. 22, 2022) (multistate antitrust suit consolidated

7  with class action set for trial in September 2023).[3] This case is no different.

8       *Finally*, the strong public policy against delay of enforcement actions outweighs every

9  efficiency Google claims. *See* No. 3:21-CV-05227, Dkt. 364, at 3-6 (collecting legislative history

10  and cases). Google is wrong to claim that State Attorneys General "have the status of private

11  parties just like the Consumer Class." The *Meta* appeal simply held that equitable doctrines like

12  laches apply to *parens* claims. *See New York v. Meta Platforms, Inc.*, --- F.4th ----, 2023 WL

13  3102921, at *5-7 (D.C. Cir. Apr. 27, 2023). The law of this Circuit is that the Clayton Act puts

14  "the State attorneys general on a different footing than private parties seeking redress for antitrust

15  violations." *United States v. B.F. Goodrich Co.*, 619 F.2d 798, 800-01 (9th Cir. 1980). And that

16  is justified because "delays in antitrust enforcement are . . . undesirable when the antitrust laws are

17  enforced by a State." H.R. REP. 117-494, at 3 (Sept. 26, 2022). At best, Google's arguments are

18  reasons to try the enforcement action first, not last.

19       **B.**    **Proceedings Related to Equitable Relief (if Applicable)**

20       The parties agree to meet and confer immediately following a jury verdict regarding any

21  issues and evidence that may be necessary to resolve any requests for injunctive or equitable relief,

22  and submit a joint proposal or, if necessary, their respective positions regarding any dispute within

23  10 days of the jury verdict.

24       **Plaintiffs' Position:** Plaintiffs believe that if there is a liability finding against Google,

25  proceedings regarding equitable relief should proceed expeditiously in order to address the harm

26

27  [3] *Suboxone* merely illustrates that sometimes enforcement actions and private actions can be tried
together. It does not stand for the proposition, as Google suggests, that enforcement actions and

28  consumer class actions must be tried separately from related claims by other private parties.

1  being inflicted on competitors, developers, and consumers.  Accordingly, Plaintiffs propose that

2  the Court set aside time in late January or early February 2024 for any proceedings that may be

3  necessary regarding such relief.  Plaintiffs believe that the open-ended process that Google

4  proposes would risk too much delay in remedying the harms found by the jury.

5  **Google's Position:**  Google submits that the timing, length and format of any hearing on

6  injunction relief should be decided once the scope of the issues to be heard (if any) is known after

7  the jury trial.  Google notes that Plaintiffs have not yet identified the particular injunctive relief

8  that they will seek.

11  Dated:  May 12, 2023         CRAVATH, SWAINE & MOORE LLP
                            Christine Varney *(pro hac vice)*
12                              Gary A. Bornstein *(pro hac vice)*
                            Yonatan Even *(pro hac vice)*
13                              Lauren A. Moskowitz *(pro hac vice)*
                            Justin C. Clarke *(pro hac vice)*
14                              Michael J. Zaken *(pro hac vice)*
                            M. Brent Byars *(pro hac vice)*
15
                            FAEGRE DRINKER BIDDLE & REATH LLP
16                              Paul J. Riehle (SBN 115199)

17                            Respectfully submitted,

19
                            By:   */s/ Gary A. Bornstein*
20                                  Gary A. Bornstein

21                                  *Counsel for Plaintiff Epic Games, Inc.*

-13-                                           **SER-555**

1

Dated:  May 12, 2023                    BARTLIT BECK LLP
2                                            Karma M. Giulianelli

3                                        KAPLAN FOX & KILSHEIMER LLP
                                             Hae Sung Nam
4
                                         Respectfully submitted,
5

6                                        By:    */s/ Karma M. Giulianelli*
                                                Karma M. Giulianelli
7
                                                *Co-Lead Counsel for the Proposed Class in*
8                                               *In re Google Play Consumer Antitrust*
                                                *Litigation*
9

10   Dated:  May 12, 2023                 PRITZKER LEVINE LLP
                                             Elizabeth C. Pritzker
11
                                         Respectfully submitted,
12
                                         By:    */s/ Elizabeth C. Pritzker*
13                                              Elizabeth C. Pritzker

14                                              *Liaison Counsel for the Proposed Class in*
                                                *In re Google Play Consumer Antitrust*
15                                              *Litigation*

16   Dated:  May 12, 2023                 OFFICE OF THE UTAH ATTORNEY
                                         GENERAL
17                                           Brendan P. Glackin
                                             Lauren M. Weinstein
18                                           Brendan Benedict

19                                       Respectfully submitted,

20                                       By:    */s/ Brendan P. Glackin*
                                                Brendan P. Glackin
21
                                         *Counsel for Utah and the Plaintiff States*
22

23   Dated:  May 12, 2023                 HUESTON HENNIGAN LLP
                                             John C. Hueston
24                                           Douglas J. Dixon
                                             Joseph A. Reiter
25                                           Michael K. Acquah
                                             William M. Larsen
26                                           Julia L. Haines

27                                       Respectfully submitted,

28
                                                    -14-                    **SER-556**

By:    */s/ Douglas Dixon*
      Douglas J. Dixon

*Counsel for Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc.*

Dated: May 12, 2023

MORGAN, LEWIS & BOCKIUS LLP
   Brian C. Rocca
   Sujal J. Shah
   Michelle Park Chiu
   Minna L. Naranjo
   Rishi P. Satia

Respectfully Submitted,

By:    */s/ Brian C. Rocca*
      Brian C. Rocca

*Counsel for Defendants Google LLC et al.*

Dated: May 12, 2023

MUNGER, TOLLES & OLSON LLP
   Glenn D. Pomerantz
   Kuruvilla Olasa
   Emily C. Curran-Huberty
   Jonathan I. Kravis
   Justin P. Raphael
   Kyle W. Mach
   Dane P. Shikman
   Nicholas R. Sidney

Respectfully submitted,

By:    */s/ Glenn Pomerantz*
      Glenn Pomerantz

*Counsel for Defendants Google LLC et al.*

-15-

**SER-557**

(108 of 297), Page 108 of 297
Case 3:21-md-02981-JD   Document 505   Filed 05/12/23   Page 16 of 16
Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 108 of 297

## **E-FILING ATTESTATION**

I, Michael Altebrando, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Michael Altebrando*
Michael Altebrando

-16-

**SER-558**

JOINT SUBMISSION REGARDING TRIAL PROPOSAL
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| IN RE GOOGLE PLAY STORE<br>ANTITRUST LITIGATION<br>_____ | )<br>) **NO. 21-md-02981-JD**<br>)<br>) |
| THIS DOCUMENT RELATES TO: | )<br>) |
| Epic Games, Inc. vs. Google LLC,<br>et al., Case No. 3:20-cv-05671-JD | )<br>)<br>) |
| In Re Google Play Consumer Antitrust<br>Litigation, Case No. 3:20-cv-05761-JD | )<br>)<br>) |
| State of Utah, et al. v. Google LLC,<br>et al., Case No. 3:21-cv-05227-JD | )<br>)<br>) |
| Match Group, LLC, et al. vs. Google<br>LLC, et al., Case No. 3:22-cv-02746-JD<br>_____ | )<br>)<br>) |

San Francisco, California
Thursday, April 20, 2023

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

For Plaintiff Epic Games in C 20-05671 JD:
                            CRAVATH SWAINE AND MOORE LLP
                            Worldwide Plaza
                            825 Eighth Avenue
                            New York, New York 10019
           BY:  **GARY A. BORNSTEIN**
                **ATTORNEY AT LAW**

      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
               CSR No. 7445, Official United States Reporter

```
 1              THE COURT:  Which one?
 2              MR. REITER:  Houston Hennigan.
 3              THE COURT:  Houston Hennigan.
 4         Okay.  And who's going to be the lead lawyer for the
 5    consumer class?
 6              MS. GIULIANELLI:  Karma Giulianelli and Hae Sung Nam.
 7              THE COURT:  Both of you.
 8         All right.  Here's what you're going to do.  You, all of
 9    you who just appeared as lead trial lawyers are going to get
10    together in person -- in person; same room; no video hookups --
11    in the next two weeks.  You pick the location.  Doesn't matter
12    to me where.  You all pick a location.  And you're going to
13    hash out the schedule.  Okay?
14         It's happening.  You work it out.  You know the issues at
15    a much greater level of detail than I do.  You're all capable.
16    I know that from your pleadings.  You all can handle this.
17    You're all experienced.  You set the proposal.  All right?
18         So you'll file that a week after you meet.  You're going
19    to meet within two weeks.  One week after that, you're going to
20    file it.
21         I am going to take a jaundiced and dim view of dueling
22    propositions.  I'm expecting agreement.  This is -- I'm going
23    to do it myself, which says, there is an area where agreement
24    can be reached.  I'm not going to issue an order that is not
25    well grounded in fact and law, as you know.
```

```
1      You can do the same thing.  So get it done.  I want all of

2  the Rule 38, Rule 39 issues parsed out and allocated in some

3  kind of a decision tree, starting with the jury issues first,

4  as the law provides, cascading down to the equitable issues.

5      Now, I'm leaving it up to your discretion.  Run with it.

6  Make it happen.  Do what you need to do.  I'll just give you a

7  couple of thoughts.  I've already given you my organizing

8  principle:  Jury first.

9      Let's say for Epic, for example, there are common issues

10 of fact and law.  You should appear at the trial.  I know you

11 don't have claims that are subject to damages; but in any

12 event, you are going to have claims that a jury should decide.

13     So work all these things out.  Okay?  Now, that's your

14 task.

15     So in effect, the stay motion is denied because -- it's

16 denied in principle because we had to work all this out.  Okay?

17     Now, for the consumers, look, I'll just -- you all can sit

18 down.

19          MR. GLACKIN:  Thank you, Your Honor.

20          THE COURT:  Here's the thing.  I've actually tried a

21 class action as a lawyer, and I have presided over

22 class actions here.  You know what the difference is?  One jury

23 instruction.  There's literally one jury instruction you give

24 in a class action that you do not give in a named plaintiff

25 case.
```

1      And that one jury instruction, as you may know, just says:
2    This is a class action, and not everybody is required to be
3    here.  It really just explains to the jury -- if you're going
4    to come in and say, "Hello, I represent a class of a thousand
5    individuals," it just kind of tells the jury "They're not
6    expected to be here, so don't worry about it."

7      That's it.  The proof is the same.  The experts are the
8    same.  Of course, the damages are different because then you're
9    going to argue for different damages.  All right?  That's not a
10   negligible fact.  I understand that.

11     But 95 percent of a named individual plaintiff versus a
12   class trial, substantively and procedurally, there's no
13   difference.

14     So you two talk about:  Why do we have to wait?  Okay?  I
15   mean, this is a class certification thing.  So if you wanted to
16   go ahead with five named individuals, why not?  I mean, you can
17   do that and not worry about the 23(f).  And then if something
18   happens later, we'll do something.  I mean, who knows?

19     Worse that happens is for some reason the certification
20   decision is changed; you have five people.  And it may not be a
21   situation the defendant ultimately wants.  I've seen this
22   happen in other cases, where you're not going to do it by
23   class; it's going to be death by a thousand cuts.  You've got
24   five groups of five and ten people coming over and over and
25   over again with the same claims.  Not particularly efficient,

**SER-562**

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3            I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Wednesday, April 26, 2023

7

8

9                         *Ana Dub*

10   _____

11          Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
          CSR No. 7445, Official United States Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Brian C. Rocca, S.B. #221576
   brian.rocca@morganlewis.com
2  Sujal J. Shah, S.B. #215230
   sujal.shah@morganlewis.com
3  Michelle Park Chiu, S.B. #248421
   michelle.chiu@morganlewis.com
4  Minna Lo Naranjo, S.B. #259005
   minna.naranjo@morganlewis.com
5  Rishi P. Satia, S.B. #301958
   rishi.satia@morganlewis.com
6  **MORGAN, LEWIS & BOCKIUS LLP**
   One Market, Spear Street Tower
7  San Francisco, CA 94105
   Telephone: (415) 442-1000
8
   Richard S. Taffet, *pro hac vice*
9  richard.taffet@morganlewis.com
   **MORGAN, LEWIS & BOCKIUS LLP**
10 101 Park Avenue
   New York, NY 10178
11 Telephone: (212) 309-6000

12

13 *Counsel for Defendants Google LLC, et al.*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
Nicholas R. Sidney, S.B. #308080
nick.sidney@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Dane P. Shikman, S.B. #313656
dane.shikman@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SER-564**

1

# UNITED STATES DISTRICT COURT

2

## NORTHERN DISTRICT OF CALIFORNIA

3

### SAN FRANCISCO DIVISION

4

5

6

7 | **IN RE GOOGLE PLAY STORE**          Case No. 3:21-md-02981-JD
  | **ANTITRUST LITIGATION**

8

9 | This Document Relates To:          **DEFENDANTS' NOTICE OF**
  |                                    **MOTION AND MOTION FOR**
  | *Epic Games Inc. v. Google LLC et al.*, Case   **PARTIAL SUMMARY**
10 | No. 3:20-cv-05671-JD                **JUDGMENT**

11 | *In re Google Play Consumer Antitrust*   Judge:    Hon. James Donato
   | *Litigation*, Case No. 3:20-cv-05761-JD

12

13 | *State of Utah et al. v. Google LLC et al.*,
   | Case No. 3:21-cv-05227-JD

14 | *Match Group, LLC et al. v. Google LLC et al.*,
   | Case No. 3:22-cv-02746-JD

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER-565**

1

## **NOTICE OF MOTION & MOTION**

2 TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3      PLEASE TAKE NOTICE THAT, on a date to be set by the Court, in Courtroom 11, 19th

4 Floor, 450 Golden Gate Avenue, before the Honorable James Donato, Defendants Alphabet, Inc.,

5 Google LLC; Google Ireland Limited, Google Commerce Limited; Google Asia Pacific PTE.

6 Limited; and Google Payment Corp. (collectively, "Google"), will and hereby do move this Court

7 for partial summary judgment in *In re Google Play Store Antitrust Litigation*, No. 3:21-md-02981-

8 JD.

9      Google seeks a ruling under Federal Rule of Civil Procedure 56: (1) dismissing Plaintiffs'

10 claims related to the Developer Distribution Agreement's limitation on distributing competing app

11 stores through Google Play, (2) holding that Epic Games and Match Group's claims based on

12 certain agreements between Google and other developers (the "Games Velocity Program") are

13 subject to the rule of reason, (3) dismissing Plaintiffs' claims based on Google's revenue sharing

14 agreements with carriers as time-barred, (4) holding that Consumer and State Plaintiffs lack

15 standing because they have not suffered injury in any relevant market, and (5) dismissing

16 Plaintiffs' tying claims as a matter of law.

17      Google's motion is based on this notice of motion and motion, the memorandum of points

18 and authorities that follows, the concurrently filed Declaration of Glenn D. Pomerantz and exhibits

19 thereto, the concurrently filed Request for Judicial Notice, the pleadings, papers, and other

20 documents on file in this action, and such other evidence and argument presented to the Court at or

21 prior to any hearing in this matter.

22

23   DATED: April 20, 2023             Respectfully submitted,

24

25                       By:     */s/ Glenn D. Pomerantz*

26                         Glenn D. Pomerantz
                        *Counsel for Defendants Google LLC et al.*

27

28                                       **SER-566**

1

### TABLE OF CONTENTS

Page

I.    ISSUES TO BE DECIDED................................................................................1

II.   INTRODUCTION............................................................................................1

III.  BACKGROUND...............................................................................................3

IV.   ARGUMENT ....................................................................................................6

      A.    Legal Standard......................................................................................6

      B.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims that Google Unlawfully Prohibits the Distribution of Other App Stores on Google Play............6

      C.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims Challenging Three Agreements with Developers as a *Per Se* Violation of the Sherman Act ................9

      D.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims Related to Early-Android Carrier Agreements ....................................14

      E.    Consumer Plaintiffs and States Do Not Have Antitrust Standing to Recover Damages on IAPs and Subscriptions ........................17

      F.    Google Is Entitled to Summary Judgment on Plaintiffs' Tying Claims .................20

            1.    GPB is the mechanism by which Google collects its service fee for Google Play and not a distinct product ........................21

            2.    Even if viewed as separate products, Google Play and GPB are not tied ................23

V.    CONCLUSION ...............................................................................................24

1

## **<u>TABLE OF AUTHORITIES</u>**

2

<u>Page</u>

3

**FEDERAL CASES**

4

*20th Century Ins. Co. v. Liberty Mut. Ins. Co.*,
965 F.2d 747 (9th Cir. 1992).................................................................................................6

5

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999).................................................................................2, 17, 19

6

7

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010).................................................................................................................8

8

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...........................................................................14

9

10

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019)...............................................................................................19, 20

11

*In re ATM Fee Antitrust Litig.*,
554 F. Supp. 2d 1003 (N.D. Cal. 2008) ..........................................................................10

12

13

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
9 F.4th 1102 (9th Cir. 2021).............................................................................................11

14

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012)..........................................................................................20

15

16

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988)............................................................................................................12

17

*California ex rel. Harris v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011).......................................................................................9, 10

18

19

*Cascade Health Sols. v. PeaceHealth*,
515 F.3d 883 (9th Cir. 2008)................................................................................20, 21, 23

20

*Chamber of Com. of the U.S.A. v. City of Seattle*,
890 F.3d 769 (9th Cir. 2018)........................................................................................10, 11

21

22

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
433 U.S. 36 (1977) ............................................................................................................10

23

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) .............................................................................................................8

24

25

*Dimidowich v. Bell & Howell*,
803 F.2d 1473 (9th Cir. 1986)................................................................................11, 12, 13

26

27

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008) ..........................................................................19

28

**SER-568**

-ii-

1 | *Eichman v. Fotomat Corp.*,
      880 F.2d 149 (9th Cir. 1989) ................................................................................. 15
2
  | *Epic Games, Inc. v. Apple Inc.*,
3 |    559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................................ 3, 8, 21, 22
4 | *Feitelson v. Google Inc.*,
      80 F. Supp. 3d 1019 (N.D. Cal. 2015) ................................................................. 19
5
  | *Frame-Wilson v. Amazon.com, Inc.*,
6 |    591 F. Supp. 3d 975 (W.D. Wash. 2022) .............................................................. 11
7 | *FTC v. Actavis, Inc.*,
      570 U.S. 136 (2013) .............................................................................................. 13
8
  | *FTC v. Qualcomm Inc.*,
9 |    969 F.3d 974 (9th Cir. 2020) ........................................................................ 7, 10, 17
10 | *Glen Holly Ent., Inc. v. Tektronix Inc.*,
       343 F.3d 1000 (9th Cir. 2003), *amended on denial of reh'g*, 352 F.3d 367 (9th
11 |    Cir. 2003) ............................................................................................................... 18
12 | *In re Glumetza Antitrust Litig.*,
       611 F. Supp. 3d 848 (N.D. Cal. 2020) ................................................................. 16
13
   | *Hexcel Corp. v. Ineos Polymers, Inc.*,
14 |    681 F.3d 1055 (9th Cir. 2012) .............................................................................. 16
15 | *Kansas v. UtiliCorp United, Inc.*,
       497 U.S. 199 (1990) .............................................................................................. 17
16
   | *Klein v. Facebook, Inc.*,
17 |    580 F. Supp. 3d 743 (N.D. Cal. 2022) ................................................... 15, 16, 17, 18
18 | *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
       551 U.S. 877 (2007) ......................................................................................... 12, 13
19
   | *Metro Indus. Inc. v. Sammi Corp.*,
20 |    82 F.3d 839 (9th Cir. 1996) .................................................................................. 13
21 | *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
       269 F. Supp. 2d 1213 (C.D. Cal. 2003) ............................................................... 18
22
   | *Meyer v. Qualcomm Inc.*,
23 |    2009 WL 539902 (S.D. Cal. Mar. 3, 2009) ......................................................... 18
24 | *In re Musical Instruments & Equip. Antitrust Litig.*,
       798 F.3d 1186 (9th Cir. 2015) .............................................................................. 11
25
   | *National Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*,
26 |    782 F. Supp. 2d 1047 (C.D. Cal. 2011) ................................................................. 6
27 | *New York v. Facebook, Inc.*,
       549 F. Supp. 3d 6 (D.D.C. 2021) ........................................................................... 7
28

**SER-569**

-iii-

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ................................................................................................7

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ...............................................................................................2, 11, 12

*Oliver v. SD-3D LLC*,
  751 F.3d 1081 (9th Cir. 2014) .................................................................................................14

*Pace Indus. Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) ...........................................................................................13, 14

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) .............................................................................................3, 23

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
  173 F.3d 996 (6th Cir. 1999) ...................................................................................................15

*Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*,
  2022 WL 595696 (9th Cir. Feb. 28, 2022) .............................................................................16

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
  532 F.3d 963 (9th Cir. 2008) ...........................................................................3, 21, 22, 23

*Riley v. Bd. of Trustees of California State Univ.*,
  2015 WL 2198247 (N.D. Cal. May 11, 2015) .........................................................................6

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
  637 F.2d 1376 (9th Cir. 1981) .................................................................................................11

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) .................................................................................................15

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) .....................................................................................................10

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) .....................................................................................................................10

*Toscano v. Prof'l Golfers Ass'n*,
  258 F.3d 978 (9th Cir. 2001) .....................................................................................................8

*U.S. Airways v. Sabre Holdings Corp*,
  938 F.3d 43 (2d Cir. 2019) .......................................................................................................15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..............................................................................................................2, 7

*Virginia Vermiculite Ltd. v. Historic Green Springs*,
  307 F.3d 277 (4th Cir. 2002) .....................................................................................................8

*Wood v. Santa Barbara Chamber of Commerce, Inc.*,
  705 F.2d 1515 (9th Cir. 1983) .................................................................................................16

-iv-

**SER-570**

1  **STATE STATUTES**

2  Cal. Bus. & Prof. Code § 16750.1 ................................................................................................14

3  Cal. Bus. & Prof. Code § 17208 ..................................................................................................14

4  **STATUTES - OTHER**

5  N.C. Gen. Stat. § 75-16.2 .............................................................................................................14

6  N.Y. Gen. Bus. Law § 340 ...........................................................................................................14

7  N.Y. Gen. Bus. Law § 349 ...........................................................................................................14

8  Utah Code Ann. § 76-10-3117 ......................................................................................................14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER-571**

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

## I.      <u>ISSUES TO BE DECIDED</u>

*First*, whether Google has a duty to distribute its rivals' products or deal with its rivals on terms they prefer.

*Second*, whether the Games Velocity Program agreements between Google and its developer customers should be evaluated under the rule of reason or subject to *per se* invalidation.

*Third*, whether the statute of limitations bars Plaintiffs' claims related to Google's revenue-sharing agreements with cellular carriers.

*Fourth*, whether Consumer Plaintiffs and Plaintiff States lack antitrust standing to recover damages on subscriptions and in-app purchases.

*Fifth*, whether Google has unlawfully tied the distribution of apps through the Google Play store to the use of Google Play's billing service.

## II.      <u>INTRODUCTION</u>

Android is one of the most popular operating systems in the world.  Millions of consumers use Android devices every day, and thousands of developers offer millions of apps on Android. Android's success in the marketplace is no accident.  Google has invested billions of dollars in Android, creating competition with the iPhone while giving away Android for free.  As part of its efforts to build Android, Google built the Google Play store, a trusted place for consumers to obtain apps and in-app content and for developers to make apps and in-app content available to consumers.

Plaintiffs' lawsuits challenge fundamental features of Android and the Google Play store— design choices, investments, and platform rules that Google has implemented to make its products competitive.  Google looks forward to vindicating itself at trial and defending the innovation that made Android successful.  But several of Plaintiffs' claims contravene clear principles of law, and thus have no place before a trier of fact.  Google therefore brings this targeted motion for partial summary judgment, which will narrow this sprawling antitrust case for trial.

*First*, Plaintiffs claim that Google has violated the antitrust laws by refusing to distribute rival app stores within its own Google Play app store.  But the law is clear:  Google has no duty to

-1-

**SER-572**

1    act as a distributor for its rivals' products or to deal with its rivals on terms they may prefer.

2    *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

3         *Second*, Epic Games and Match Group (but not Consumers or States) claim that Google

4    entered into *per se* unlawful agreements with three developer customers of the Play store. But the

5    rule of reason, not the *per se* rule, applies to those agreements as a matter of law. To be clear,

6    Google is *not* challenging, at summary judgment, Epic and Match's separate rule of reason claim

7    that these same agreements harmed competition. Google will show at trial that these agreements

8    are pro-competitive efforts to satisfy its developer customers and compete with Apple. But the

9    mode of antitrust analysis—*per se* versus the rule of reason—is a pure issue of law that can and

10   should be decided before trial to avoid uncertainty regarding Plaintiffs' burden, the jury

11   instructions, and Google's available defenses. Here, the very nature of the challenged agreements

12   and the vertical relationship between Google and these developer customers foreclose application

13   of the *per se* rule, even if, as Plaintiffs contend, these agreements have a "horizontal" effect. *See*

14   *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (explaining that vertical restraints are

15   assessed under the rule of reason).

16        *Third*, the statute of limitations bars Plaintiffs' claims related to Google's agreements with

17   cellular carriers. In the early years of Android, when cellular carriers controlled what app stores

18   could be preinstalled on phones, Google paid carriers to distribute Google's app store. Plaintiffs'

19   claims that Google's nascent app store—which had virtually no market share at the time—

20   somehow exercised monopoly power over companies like AT&T and Verizon and forced them to

21   abandon their own app stores make no sense. But the Court need not reach that question because

22   the challenged carrier agreements all expired outside the limitations period.

23        *Fourth*, Consumer Plaintiffs and Plaintiff States (on behalf of the consumers in their states)

24   lack antitrust standing to recover damages on subscriptions and in-app purchases. "Antitrust

25   injury requires the plaintiff to have suffered its injury in the market where competition is being

26   restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir.

27   1999). Here, Consumers and States have asserted that Google restrained competition in two

28   distinct markets: (1) an "Android app distribution market" and (2) a market for "in-app billing

-2-                                                    **SER-573**

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1   services" sold to *developers*. But Consumer and State Plaintiffs' alleged injuries on in-app

2   purchases and subscriptions did not occur in either of these alleged markets. This is because, as

3   defined by Plaintiffs, neither market involves the retail sale to *consumers* of any in-app purchases

4   and subscriptions. Plaintiffs elected not to define *any* antitrust market involving the sale of in-app

5   purchases and subscriptions to consumers. Consumers and States therefore cannot demonstrate

6   that consumers suffered injury on those purchases in a "market where competition is being

7   restrained."

8        *Fifth*, Plaintiffs contend that Google unlawfully tied the distribution of apps through the

9   Google Play store to the use of Google Play's billing service ("GPB"). It is true that the very

10   small subset of Google Play developers that must pay Google a service fee on certain in-app

11   transactions must process those transactions and remit the service fee to Google using GPB. But,

12   as a matter of law, a product (here, app distribution on Google Play) and the means of collecting

13   payment for that product (here, GPB) are not distinct products that can be unlawfully tied. *See*

14   *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971, 974-75 (9th Cir. 2008)

15   (rejecting similar tying claim on the pleadings); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d

16   898, 968-70 (N.D. Cal. 2021) (applying *Rick-Mik* to Apple's requirement that developers use

17   Apple's billing service to process in-app transactions).

18        Plaintiffs' tying claims also fail for a second, independent reason. Coercion is an essential

19   element of a tying claim. *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th

20   Cir. 2003). But developers are not required to use the allegedly tied product (GPB) as a condition

21   of using the alleged tying product (app distribution on the Google Play store). To the contrary, the

22   vast majority of developers that use Google Play do not use GPB. The only Google Play

23   developers that use GPB are the small minority of developers who owe Google service fees.

24   **III.**    **BACKGROUND**[1]

25        Instead of using Android solely to build its own devices, like Apple does with iOS,

26

27   [1] This section provides background and context to this motion, and is supported by facts not
reasonably in dispute, but Defendants do not rely on the facts here for their motion. The

28   undisputed facts that form the basis for this motion are detailed in the Argument section.

-3-   **SER-574**

1    Google's innovative vision for Android was that it would enable mobile device manufacturers

2    (known as "OEMs") to develop a wide array of devices at different price points. *See, e.g.*, Match

3    FAC[2] ¶¶ 60, 64, 66; Ex. 1, Merits Report of Hal J. Singer, Ph.D. ("Singer Merits Rep.") ¶¶ 17, 47,

4    Oct. 19, 2022. Accordingly, Google has always licensed Android to OEMs for free.

5          Google also offers OEMs a free license to a suite of Google software, including products

6    such as Search, Google Maps, Gmail, and YouTube, as well as a series of Application

7    Programming Interfaces (APIs) that provide services to app developers. *See, e.g.*, Dkt. No. 279-

8    25, No. 20-cv-5761 (GOOG-PLAY-000808375) (2018 Motorola MADA). OEMs that choose this

9    free license get the ability to build devices that give consumers everything they expect from a

10    smartphone right out of the box—just like they would get with an iPhone. *Id.*

11          The first Android devices were launched in 2008, just after Apple unveiled the iPhone.

12    *See* Ex. 2, Expert Report of Dr. Marc Rysman ("Rysman Merits Rep.") ¶ 37. Since then, Google's

13    vision for Android has been an enormous consumer success story. Billions of consumers around

14    the world use a wide array of Android devices produced by numerous different OEMs—from

15    high-end Samsung Galaxy devices to more basic models available to users in the developing

16    world. *See* MDL Dkt. No. 325-1 Ex. A2 (Singer Class. Cert. Rep.) ¶ 55. Indeed, millions of

17    consumers worldwide who cannot afford an iPhone can access an Android smartphone. *Cf.* Ex. 1,

18    Singer Merits Rep. ¶ 47. This has dramatically expanded the potential set of users for mobile

19    apps, driving investment and innovation that has generated products and apps tailored to almost

20    every consumer need and taste.

21          In Google's view, Android could not have succeeded without a high-quality app store.

22    After all, apps greatly enhance the utility of a smartphone—facilitating access to a wide array of

23    functionality beyond making and receiving calls and texts. Ex. 3, Rosenberg Dep. 171:10-20, Feb.

24    10, 2022. And because a user's smartphone experience is so reliant on apps, every smartphone—

25    whether an iPhone or an Android phone—needs a quality app store to compete. The Google Play

26

27          ————————————
[2] First Amended Complaint, No. 3:22-cv-02746, Dkt. No. 95 (N.D. Cal. Nov. 17, 2022), MDL

28    Dkt. No. 380 ("Match FAC").

**SER-575**

1  store is Google's app store.  It brings together app developers and app users.  It provides a set of

2  services that enable developers to distribute apps and sell digital content to users—such as a

3  storefront where users can discover content, security features to keep transactions secure, and

4  billing services that enable developers to sell products in hundreds of countries and dozens of

5  currencies.  Epic SAC[3] ¶ 66; Ex. 2, Rysman Merits Rep. ¶ 48; Ex. 4, GOOG-PLAY-008166885;

6  Ex. 5, GOOG-PLAY-000057598; Ex. 6, GOOG-PLAY-000057609.

7  　　　　Google does not charge users anything to use the Play store, and most developers—more

8  than 90%—do not pay Google service fees to use the Play store, either.[4]  *See* Ex. 7, Samat Dep.

9  Ex. PX713, at 3 (Sameer Samat, *Listening to Developer Feedback to Improve Google Play*,

10  Android Blog (Sept. 28, 2020)) (in preceding twelve months, only 3% of developers had paid fees

11  to Play).  More than 90% of apps in the Play store are free and developers pay Google nothing

12  when users download them; they can acquire millions of new users without paying Google

13  anything.  *Id.*  Developers do not pay Google any money in service fees unless they make money

14  from (1) paid app downloads from the Play store or (2) selling subscriptions or digital goods in

15  apps downloaded from the Play store, the latter of which are known as in-app purchases ("IAPs").

16  *See* Ex. 8, GOOG-PLAY-000621470.  GPB is the mechanism that Google uses to collect payment

17  from the (relatively few) developers that incur service fees.[5]

18  　　　　Unlike iPhone users, who are required to use Apple's App Store, Android users can choose

19  between app stores.  Rule 52 Order After Trial on the Merits at 29, *Epic Games, Inc. v. Apple Inc.*,

20  No. 4:20-cv-05640-YGR (N.D. Cal. Sept. 10, 2021), Dkt. No. 812.  Indeed, most Android devices

21  come preloaded with multiple app stores.  For example, Samsung Galaxy devices come preloaded

22  with both the Samsung Galaxy Store and the Google Play store.  *See* Ex. 1, Singer Merits Rep.

23  n.463.  Android users can also choose to download app stores that are not preinstalled on their

24

25

26  [3] Second Amended Complaint for Injunctive Relief, No. 3:20-CV-05671, Dkt. No. 341 (N.D. Cal. Nov. 17, 2022), MDL Dkt. No. 378 ("Epic SAC").

27  [4] All developers pay a one-time $25 registration fee for the use of Google Play.  Ex. 1, Singer Merits Rep. ¶ 89.  Plaintiffs do not challenge this de minimis fee.

28  [5] Ex. 9, GOOG-PLAY-005031379; *see also* Ex. 1, Singer Merits Rep. ¶ 35; Match FAC ¶ 3.

-5-

**SER-576**

1   devices, or to download apps directly from other sources, such as a website.  *See* Match FAC ¶ 78;

2   States' FAC[6] ¶ 78; Epic SAC ¶ 22; Consumers' SAC[7] ¶ 10.

3   **IV.     ARGUMENT**

4           **A.     Legal Standard**

5           A court must grant a motion for summary judgment if "the pleadings and discovery, read

6   in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue as to

7   any material fact," and the "moving party is entitled to judgment as a matter of law."  *20th*

8   *Century Ins. Co. v. Liberty Mut. Ins. Co.*, 965 F.2d 747, 750 (9th Cir. 1992).  And as this Court has

9   explained, under the 2010 Amendments to Rule 56, a Court may grant "*partial* summary judgment

10  to dispose of less than the entire case and even just portions of a claim or defense."  *Riley v. Bd. of*

11  *Trustees of California State Univ.*, 2015 WL 2198247, at *2 (N.D. Cal. May 11, 2015) (Donato,

12  J.) (emphasis added).  Thus, this "Court can, when warranted, selectively fillet a claim or defense

13  without dismissing it entirely."  *Id.*  Indeed, the Rule makes clear that a "Court '*shall'* issue

14  summary judgment when warranted by the facts and the law."  *Id.* (emphasis added); *National*

15  *Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1052 (C.D.

16  Cal. 2011) (explaining that partial summary judgment is appropriate when "it will narrow the

17  issues for trial").

18          **B.     Google Is Entitled to Summary Judgment on Plaintiffs' Claims that Google**
            **Unlawfully Prohibits the Distribution of Other App Stores on Google Play**
19

20          Google spent over a decade building the Google Play store into a trusted source for apps.

21  That effort began in 2008, when Google first launched Android Marketplace, the predecessor to

22  the Google Play store.  *E.g.*, Ex. 1, Singer Merits Rep. n.45; Consumers' SAC ¶ 77.[8]  Plaintiffs

23  now seek to freeride on Google's investments in the Google Play store and to compel Google to

24  extend the benefits of the Google Play store to its competitors.  Specifically, they allege that

25  ───────────────────

26  [6] First Amended Complaint, No. 3:21-cv-05227, Dkt. No. 188 (N.D. Cal. Nov. 1, 2021) ("States' FAC").

27  [7] Consolidated Second Amended Class Action Complaint, No. 3:20-cv-05761, Dkt. No. 241 (N.D. Cal. Dec. 20, 2021), MDL Dkt. No. 172 ("Consumers' SAC").

28  [8] All expert reports cited in this motion were submitted on behalf of one or more Plaintiffs.

1    Google's policy of refusing to distribute other app stores through the Google Play store is

2    anticompetitive and violates Section 1 and 2 of the Sherman Act.  Match FAC ¶¶ 236, 245; Epic

3    SAC[9] ¶¶ 188-195; States' FAC ¶¶ 107, 260, 276-284; Consumers' SAC ¶¶ 145-147, 225, 239-

4    247, 262-263.  These claims fail as a matter of black letter antitrust law because Google has no

5    duty to distribute its competitors' products.

6         Under Section 2 of the Sherman Act, "[a]s the Supreme Court has repeatedly emphasized,

7    there is no duty to deal under the terms and conditions preferred by a competitor's rivals." *FTC v.*

8    *Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (internal quotation marks and alterations

9    omitted).  To the contrary, "the Sherman Act does not restrict the long recognized right of a trader

10   or manufacturer engaged in an entirely private business, freely to exercise his own independent

11   discretion as to parties with whom he will deal." *Trinko*, 540 U.S. at 408 (internal alterations and

12   quotation marks omitted).  "Even a monopolist generally has no duty to share (or continue to

13   share) its intellectual or physical property with a rival." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d

14   1064, 1074 (10th Cir. 2013) (Gorsuch, J.).  And "[t]his general no-duty-to-deal rule holds even

15   where a monopolist refuses to deal with its competitor merely 'in order to limit entry' — in other

16   words, because it wants to prevent that rival from competing with it." *New York v. Facebook,*

17   *Inc.*, 549 F. Supp. 3d 6, 24 (D.D.C. 2021) (quoting *Trinko*, 540 U.S. at 407).

18        Here, Google has elected not to use its own app store, resources, and investments to

19   distribute its rivals' app stores.  There is nothing surprising about that decision, which is fully

20   protected (and supported) under the antitrust laws.  The Supreme Court's decision in *Trinko* is

21   directly on point.  There, the Court held that Verizon had no obligation under the antitrust laws to

22   "share its network with competitors." *Trinko*, 540 U.S. at 401.

23        Plaintiffs may attempt to evade *Trinko* by resorting to Section 1 of the Sherman Act, but

24   any such effort would be unavailing.  Plaintiffs might point to the fact that Google's policy

25   forbidding other app stores on the Google Play store is also embodied in the Developer

26

27   _____

28   [9] Unlike other Plaintiffs, Epic does not appear to claim that Google's policy violates Section 2 of
     the Sherman Act.

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1  Distribution Agreement ("DDA"), the terms and conditions that developers must follow to use the

2  Google Play store.  They may argue that even if Google could unilaterally impose its no-app-store

3  policy under Section 2 of the Sherman Act, Section 1 proscribes entering into an "agreement" to

4  the same effect.  That argument would be incorrect, because Plaintiffs are ultimately challenging

5  Google's unilateral policy and design decision.

6       The Sherman Act recognizes the important distinction between unilateral and concerted

7  action.  Section 1 of the Sherman Act does not apply to "the entire body of private contract."  *Am.*

8  *Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010).  Rather, it "applies only to

9  *concerted* action that restrains trade."  *Id.* at 190 (emphasis added).  Concerted action exists only

10  when the challenged conduct "joins together 'independent centers of decisionmaking.'"  *Id.* at 196

11  (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984)).  By contrast,

12  unilateral conduct—such as a refusal to deal, whether embodied in a company's terms and

13  conditions or not—cannot form a claim under Section 1 of the Sherman Act.  In *Toscano v.*

14  *Professional Golfers Association*, for example, the Ninth Circuit held that Section 1 did not

15  encompass an agreement by local sponsors to adhere to the PGA Tour's rules and regulations.

16  The Ninth Circuit explained that where one party "merely agreed to purchase products or provide

17  a service under conditions set by the other party" there is no "conscious commitment to a common

18  scheme designed to achieve an unlawful objective."  *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d

19  978, 983-85 (9th Cir. 2001); *see also Virginia Vermiculite Ltd. v. Historic Green Springs*, 307

20  F.3d 277, 280-83 (4th Cir. 2002) (holding that acceptance of a gift deed containing restrictive

21  covenants did not satisfy Section 1 because it was not concerted activity).

22       The DDA is unilateral conduct and cannot give rise to a Section 1 claim.  Like the contract

23  at issue in *Epic Games, Inc. v. Apple Inc.*, the DDA "is a unilateral contract" under the antitrust

24  laws, and "a developer must accept its provisions (including the challenged restrictions) to

25  distribute [apps] on [Google Play]."  *Epic Games*, 559 F. Supp. 3d at 1035.  And as in *Toscano*,

26  Google "independently set the terms of the [DDA], and the [developers] merely accepted them."

27  258 F.3d at 984.  Plaintiffs themselves acknowledge that the DDA is the result of unilateral

28  conduct, alleging that Google "*forces* app developers to enter its standardized DDA[.]"  *E.g.*, Epic

-8-  **SER-579**

1    SAC ¶ 226 (emphasis added); *see also* Match FAC ¶ 102; Consumers' SAC ¶ 146; States' FAC

2    ¶ 278. That is unilateral, not concerted action.

3        In sum, Google's refusal to distribute its rivals' product cannot give rise to antitrust

4    liability, regardless of whether Plaintiffs challenge this refusal under Section 1 or Section 2.

5        **C.    Google Is Entitled to Summary Judgment on Plaintiffs' Claims Challenging**
         **Three Agreements with Developers as a *Per Se* Violation of the Sherman Act**

6

7        Google entered into "Games Velocity Program"[10] (GVP) agreements with top game

8    developers that provided incentives for those developers to invest in making their apps and digital

9    content available on the Google Play store. *See, e.g.,* Ex. 10, GOOG-PLAY-007273439; Ex. 11,

10   GOOG-PLAY-000929031. In exchange, the developers agreed to distribute their apps through the

11   Google Play store, maintain feature parity between their apps on the Google Play store and the

12   same apps on other stores, and release their apps on the Google Play store at the same time as they

13   released the same apps through other app stores. Epic SAC ¶ 198; Match FAC ¶ 273.

14       Google's view is that these agreements are highly pro-competitive: the agreements offered

15   valuable incentives to top game developers to keep them on the Google Play store and thereby

16   enhanced the attractiveness of the store to consumers. Plaintiffs disagree; their view is that the

17   purpose and effect of these incentive agreements was to prevent three particular developers from

18   opening competing app stores. Ex. 12, Epic Games, Inc. Responses and Objections to

19   Defendants' Amended Fifth Set of Interrogatories dated Jan. 19, 2023 ("Epic's R&Os to Google's

20   Fifth Amended Rogs") Nos. 26-28; Ex. 13, Plaintiff Match Group, LLC's' et al.'s Responses and

21   Objections to Defendants' Contention Interrogatories dated Jan. 19, 2023 ("Match's R&Os to

22   Google's Contention Rogs") Nos. 24-31; *see also* MDL Dkt. No. 479 (stipulating that Match and

23   Epic's *per se* claims apply only to three particular developers). The Court need not resolve this

24   disagreement, nor need it decide whether the agreements were procompetitive or anticompetitive.

25   Rather, to the extent this disagreement is submitted to a jury, it should be resolved under the rule

26

27   _____

28   [10] These agreements are also sometimes described as "Project Hug" agreements.

                                            -9-                        **SER-580**

1    of reason, the presumptive default standard for antitrust claims.  *See California ex rel. Harris v.*

2    *Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011).

3         Epic and Match (but not other Plaintiffs) have asserted both *per se* and rule of reason

4    claims.  For the purposes of summary judgment, Google challenges only the *per se* claims and

5    leaves the rule of reason claim for another day.[11]

6         Even if Epic and Match's characterizations of these GVP agreements were entirely correct

7    (which they are not), the agreements must be analyzed under the rule of reason as a matter of

8    black letter law.  The Court previously deferred addressing this question when it granted Epic and

9    Match's motion (over Google's objection) to amend their Complaints to add their new Section 1

10   claims.  *See* MDL Dkt. No. 374.  But this question is now ripe for summary judgment, and the

11   Court should not stay its hand.  Indeed, "the decision of what mode of analysis to apply—per se,

12   rule of reason, or otherwise—is entirely a question of law for the Court" that can be resolved on

13   summary judgment.  *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1007, 1010 (N.D. Cal.

14   2008) (granting partial summary judgment and holding that "application of the per se rule would

15   be inappropriate"); *see Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373

16   F.3d 57, 61 (1st Cir. 2004) ("Whether a plaintiff's alleged facts comprise a per se claim is

17   normally a question of legal characterization that can often be resolved by the judge on a motion

18   to dismiss or for summary judgment.").

19         Resolving the applicable mode of antitrust scrutiny will give the parties clarity regarding

20   the issues to be tried.  *Per se* and rule of reason claims have different elements and different

21   available defenses that will require different jury instructions.  The parties should know before

22   trial which burdens of proof apply and whether the trier of fact will be instructed on two different

23   theories regarding the same conduct, so that they can tailor their opening statements and

24   presentation of evidence accordingly.

25         As noted, the rule of reason "is the presumptive or default standard," *Safeway*, 651 F.3d at

26   1133, while "[p]er se liability is reserved for only those agreements that are so plainly

27

28   _____
     [11] Match and Epic's *per se* claims extend to only three developers.  MDL Dkt. No. 479.

anticompetitive that no elaborate study of the industry is needed to establish their illegality,"
*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quotations marks omitted).  The Ninth Circuit has
noted that *per se* treatment is particularly unsuited to dynamic markets, "*especially* in technology
markets."  *Qualcomm, Inc.*, 969 F.3d at 990-91; *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433
U.S. 36, 59 (1977) (holding that the rule of reason applied in case involving vertical nonprice
restraints); *cf. Chamber of Com. of the U.S.A. v. City of Seattle*, 890 F.3d 769, 787 (9th Cir. 2018)
(digital platforms "present novel challenges and contexts for regulation").  The GVP agreements
are not subject to *per se* invalidation.

   *First*, the GVP agreements are vertical in nature: they are "between firms at different levels
of distribution."  *Am. Express Co.*, 138 S. Ct. at 2284.  *Per se* treatment is reserved for horizontal
agreements, *i.e.*, those between competitors.  *See In re Musical Instruments & Equip. Antitrust
Litig.*, 798 F.3d 1186, 1191-92 (9th Cir. 2015).  By contrast, "nearly every [] vertical restraint" is
"assessed under the rule of reason."  *Am. Express Co.*, 138 S. Ct. at 2284; *accord Aya Healthcare
Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021).[12]  Plaintiffs do not and
cannot dispute that, with respect to the Google Play Store, developers are Google's customers.
*E.g.*, Ex. 14, Bernheim Dep. 66:24-67:10, Apr. 6, 2023; Ex. 15, Rysman Dep. 141:6-10, Mar. 10,
2023; Ex. 16, Singer Merits Dep. 196:21-197:4, Apr. 4, 2023.  Indeed, Plaintiffs themselves allege
that the agreements relate to the three developers as *customers* distributing apps on the Google
Play store.  Epic SAC ¶ 198; Match FAC ¶ 273.

   Plaintiffs contend that the GVP agreements have horizontal elements, too.  *E.g.*, Epic SAC
¶ 198.  But that contention is immaterial[13] because hybrid agreements—agreements with both

---

[12] Indeed, not even all horizontal agreements are treated as *per se* unlawful.  *See, e.g.*, *Aya
Healthcare Servs., Inc.*, 9 F.4th at 1108 (analyzing horizontal agreements under rule of reason and
finding them lawful).

[13] Although the Court need not resolve this issue, Google disputes that the agreements have
horizontal elements:  The written agreements themselves do not prohibit developers from
operating competing app stores, and the mere fact that developers that buy Google's services will
be less inclined to build their own app store does not distinguish these agreements from the myriad
other agreements entered by businesses making ordinary procurement decisions regarding whether
they will make an input or buy it.

-11-     **SER-582**

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1   horizontal and vertical elements—are also evaluated under the rule of reason. *Frame-Wilson v.*

2   *Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022); *see also Dimidowich v. Bell &*

3   *Howell*, 803 F.2d 1473, 1481 (9th Cir. 1986); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs.,*

4   *Inc.*, 637 F.2d 1376, 1385 (9th Cir. 1981) ("[T]he presence of a horizontal element does not

5   require the use of a per se rule.").

6        *Second*, Epic's and Match's own interrogatory responses confirm that the GVP agreements

7   should be analyzed under the rule of reason. When asked to identify *all* the terms of the alleged

8   agreements not to launch competing Android app stores, Epic and Match merely pointed to the

9   written GVP contracts.[14] Epic and Match do not, because they cannot, point to any provision of

10  those contracts that prohibits any developer from launching an app store. Rather, Epic and Match

11  resort to arguing that the contracts' incentives had the "effect" of causing the developers not to

12  launch competing stores. *See* Ex. 12, Epic's R&Os to Google's Fifth Amended Rogs Nos. 26-28;

13  Ex. 13, Match's R&Os to Google's Contention Rogs Nos. 24-26; Epic SAC ¶ 198 (alleging that

14  the agreements "had the *actual and intended effect* of inducing the developer not to launch an app

15  store") (emphasis added). That does not make the agreements horizontal: "a restraint is horizontal

16  not because it has horizontal effects, but because it is the product of a horizontal agreement." *Bus.*

17  *Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988). By invoking the contracts'

18  "effects," Epic and Match demonstrate that the rule of reason should apply. After all, the "goal"

19  of the rule of reason is to "distinguish[] between restraints with anticompetitive effect that are

20  harmful to the consumer and restraints stimulating competition that are in the consumer's best

21  interest," and it thus "requires courts to conduct a fact-specific assessment of 'market power and

22  market structure . . . to assess the [restraint]'s *actual effect*' on competition." *Am. Express Co.*,

23  138 S. Ct. at 2284 (citation omitted and emphasis added). Match and Epic's assertion that it is not

24  the agreements themselves that are illegal, but the agreements' effects, confirms that the alleged

25  effects–and the procompetitive benefits–must be weighed under the rule of reason.

26

27  _____

    [14] *See* Ex. 12, Epic's R&Os to Google's Fifth Amended Rogs Nos. 26-28; Ex. 13, Match's R&Os

28  to Google's Contention Rogs Nos. 24-26.

-12-   **SER-583**

1        *Third*, *per se* treatment cannot apply to the GVP agreements because they involve multi-

2   faceted incentives from Google to its customers.  A court can apply *per se* condemnation only

3   where there is ample judicial precedent regarding similar agreements such that courts "can predict

4   with confidence that it would be invalidated in all or almost all instances under the rule of reason."

5   *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007); *see also*

6   *Dimidowich*, 803 F.2d at 1481 (holding that rule of reason applied because "[w]e do not have

7   enough experience with this type of arrangement to say with any confidence that [the restraint] . . .

8   almost always will be anticompetitive"); *Metro Indus. Inc. v. Sammi Corp.*, 82 F.3d 839, 844 (9th

9   Cir. 1996) ("Where the conduct at issue is not a garden-variety horizontal division of a market,

10   [courts] have eschewed a *per se* rule and instead have utilized rule of reason analysis.").  *Cf. FTC*

11   *v. Actavis, Inc.*, 570 U.S. 136, 159 (2013) (abandoning rule of reason "is appropriate only where

12   'an observer with even a rudimentary understanding of economics could conclude that the

13   arrangements in question would have an anticompetitive effect on customers and markets.'"

14   (citation omitted)).  There is simply no tradition of courts condemning agreements in which a firm

15   offers incentives to customers willing to make investments in the firm's product.

16        To the contrary, the Supreme Court has held that the "complexities" of multi-faceted value

17   exchanges require rule of reason treatment.  *Id.*  In *Actavis*, for example, the FTC challenged as

18   anticompetitive multi-faceted agreements between a brand pharmaceutical company and generic

19   drug companies.  *Id.* at 145-46.  The FTC alleged that those agreements eliminated competition

20   between the brand and generic companies.  *Id.*  The Supreme Court rejected the FTC's argument

21   that such agreements should be treated as presumptively unlawful and instead instructed courts to

22   apply the rule of reason.  *Id.* at 158-159.  The Court explained that the "likelihood" of such

23   payments "bringing about anticompetitive effects" depended on, among other things, their

24   "independence from other services for which [they] might represent payment."  *Id.* at 159.  Here,

25   too, Plaintiffs allege that the GVP agreements that provided on their face for certain incentives to

26   developers to prioritize Play were, in fact, payoffs not to compete.  Here, too, the "complexities"

27   of disentangling the business arrangements on the face of the agreements from the alleged hidden

28   payments not to compete require application of the rule of reason.  *Id.*

-13-

**SER-584**

D.     **Google Is Entitled to Summary Judgment on Plaintiffs' Claims Related to Early-Android Carrier Agreements**

Plaintiffs' claims challenging Google's long-expired revenue-sharing deals with cellular carriers such as T-Mobile and AT&T are barred by the four-year statute of limitations and the doctrine of laches. *See* 15 U.S.C. § 15a (setting out four-year statute of limitations); *accord Pace Indus. Inc. v. Three Phoenix Co.*, 813 F.2d 234, 236 (9th Cir. 1987) (four-year statute of limitations for federal antitrust claims); *Oliver v. SD-3D LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("[I]n applying laches, we look to the same legal rules that animate the four-year statute of limitations under [the Clayton Act]."). Plaintiffs' parallel state law claims are similarly time-barred.[15] Plaintiffs thus cannot hold Google liable on any claim based on these early-Android carrier agreements.

When Google launched Google Play (then known as "Android Market"), cellular carriers controlled which app stores could be preloaded on devices on their networks. *See, e.g.*, Consumers' SAC ¶ 132; Ex. 3, Rosenberg Dep. 168:16-169:5. Google entered into contracts in which carriers agreed to preinstall Google Play on devices on their network, and Google agreed to provide the carriers with a share of revenue earned via credit card purchases on the Play Store ("carrier RSAs").[16] *See, e.g.*, Ex. 17, GOOG-PLAY4-006402390 (AT&T Carrier RSA). Plaintiffs allege that Google's revenue sharing was an exercise of monopoly power over the major cellular carriers that gave them no choice but to abandon their own app stores or forgo installing other third-party app stores. *See* Consumers' SAC ¶¶ 131-135; States' FAC ¶¶ 131-135; *id.* ¶¶ 237-243; Epic SAC ¶¶ 117-118; Match FAC ¶¶ 107-110, 236.

---

[15] California's Cartwright Act has a statute of limitations "functionally identical" to the Sherman Act's, and California's UCL "similarly provides for a four-year statute of limitations." *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208 (N.D. Cal. 2015) (citing Cal. Bus. & Prof. Code §§ 16750.1, 17208). Plaintiffs' other state law claims are also time-barred. *See, e.g.*, N.C. Gen. Stat. § 75-16.2 (four years); Utah Code Ann. § 76-10-3117 (four years); N.Y. Gen. Bus. Law § 340 (four years); N.Y. Gen. Bus. Law § 349 (three years).

[16] These early carrier RSAs are distinct from other agreements Google has entered into with carriers concerning revenue sharing from Google's search business. Those latter agreements are not at issue in this litigation.

-14-        **SER-585**

1      Even setting aside that these claims make no sense, they are time-barred. As Plaintiffs

2  concede, Google entered into carrier RSAs beginning in 2009, more than a decade before

3  Plaintiffs filed suit. *See, e.g.*, States' FAC ¶ 128; Epic SAC ¶ 118; Consumers' SAC ¶ 132; *cf.*

4  Match FAC ¶ 108.[17] Plaintiffs have not disputed that all of these agreements expired by July of

5  2016, more than four years before Plaintiffs first filed suit in August 2020, and five years before

6  State Plaintiffs filed suit in July 2021.[18] *See, e.g.*, Ex. 16, Singer Merits Dep. 286:9-14 (noting

7  Google reduced carrier revenue-shares in "about 2012."); Dkt. 213, Epic's Mot. for a Preliminary

8  Injunction, at 8 (indicating that Google had "slashed" most carrier revenue shares by 2012); Ex. 2,

9  Rysman Merits Rep. ¶ 98 (citing a 2015 presentation for the proposition that Google "eliminated

10  carrier revenue share from the sale of apps and in-app content on Google Play"). Accordingly, the

11  statute of limitations on these claims has run.

12      No exception to the default limitations period applies. *First*, Plaintiffs cannot invoke the

13  "continuing violation" doctrine. That exception to the four-year limitations period requires an

14  "overt act" within the limitations period that is "new and independent." *See Samsung Elecs. Co.,*

15  *Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (internal quotation marks omitted).

16  Plaintiffs have not identified any "overt acts" within the limitations period that can restart the

17  clock. It is irrelevant as a matter of law whether the carrier revenue-sharing contracts had some

18  effect that lingered into the limitations period. That is because courts "look to a defendant's overt

19  acts, rather than the effect of those acts." *See, e.g.*, *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d

20  996, 1021 (6th Cir. 1999). Thus, profiting from a contract entered into before the limitations

21  period is not a "new and independent act" sufficient to create a continuing violation. *See Eichman*

22  *v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (even passive receipt of profits from an

23

---

24  [17] *See Epic Games v. Google*, No. 20-cv-05671, Dkt. No. 1 (Aug. 13, 2020); *Carr v. Google*, No.

25  20-cv-5761, Dkt. No. 1 (Aug. 16, 2020); *Utah v. Google*, No. 21-cv-05227, Dkt. No. 1 (July 7, 2021); *Match v. Google*, No. 22-cv-02746, Dkt. No. 1 (May 9, 2022).

26  [18] Google continued to pay some revenue share to carriers after this date, but those agreements are limited to instances where a transaction occurs via "direct carrier billing" ("DCB"), wherein users

27  are billed directly by their carrier for Play purchases—an option that is popular largely in international markets. *E.g.*, Ex. 2, Rysman Merits Rep. ¶ 98. Plaintiffs have no claim or

28  allegation relating to DCB revenue-sharing agreements.

-15-               **SER-586**

illegal contract does not restart the statute of limitations for federal antitrust claims); *accord U.S. Airways v. Sabre Holdings Corp*, 938 F.3d 43, 68 (2d Cir. 2019) ("US Airways has failed to identify, and we are not otherwise aware of, authority to support the proposition that each act taken in performance of a contract necessarily constitutes an overt act for purposes of the continuing-violation rule.").  *Cf. e.g., Klein v. Facebook*, *Inc.*, 580 F. Supp. 3d 743, 822 (N.D. Cal. 2022) (no affirmative act where Plaintiffs had not pleaded that Facebook entered into a relevant agreement in the limitations period).

*Second*, Plaintiffs cannot establish that Google "fraudulently concealed" the carrier RSAs. To prove fraudulent concealment, Plaintiffs must prove that Google "*affirmatively misled*" them and that plaintiffs lacked actual or constructive knowledge of the relevant facts.  *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (emphasis added); *see also Reveal Chat HoldCo LLC v. Meta Platforms, Inc.*, 2022 WL 595696, at *2 (9th Cir. Feb. 28, 2022) (mem.) ("To show fraudulent concealment, plaintiffs must plead facts showing that the defendant affirmatively misled it.").  Absent a duty to disclose a deal, a business does not fraudulently conceal a deal by keeping details private.  *Reveal Chat HoldCo LLC*, 2022 WL 595696, at *2 ("Developers claim that Meta's statements about the scope and reasons for its 2015 actions mislead them, but the antitrust laws do not obligate Meta to share its motivations for its business decisions with the Developers."); *see also id.* (citing cases); *see also In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 863 (N.D. Cal. 2020) ("Failure to disclose information does not constitute affirmative concealment absent a duty to disclose," or a prior misleading statement).

Plaintiffs cannot show any misleading statement or conduct by Google, nor can they show that they lacked knowledge of the RSA deals or of their expiration.  *Hexcel Corp.*, 681 F.3d at 1060 (quoting *Wood v. Santa Barbara Chamber of Commerce, Inc.*, 705 F.2d 1515, 1521 (9th Cir. 1983).  Details regarding the carrier RSAs have been public since at least August 2014.  *E.g.*, Ex. 18, Amir Efrati, *Verizon Preps Challenge to Google's App Store,* The Information (Aug. 20, 2014), https://www.theinformation.com/articles/verizon-preps-challenge-to-google-s-app-store.

Plaintiffs have alleged that Google initially represented that revenue sharing with the carriers would make the Play store revenue neutral, before it later eliminated the revenue share and

-16-

**SER-587**

1  began earning a profit.  *See, e.g.*, Match FAC ¶¶ 3, 82.  To the extent that Plaintiffs' claim is that

2  Google misled the carriers, that could not constitute fraudulent concealment as to *Plaintiffs*, who

3  are not carriers.[19]

4  **E.     Consumer Plaintiffs and States Do Not Have Antitrust Standing to Recover Damages on IAPs and Subscriptions**

5

6  Consumer Plaintiffs and Plaintiff States lack standing to recover antitrust damages for

7  purchases of subscriptions and in-app purchases.  Plaintiffs elected not to define any antitrust

8  market involving the sale of in-app purchases and subscriptions *to consumers*, let alone alleged

9  that Google restrained competition in such a market.  Consumers and States thus cannot

10  demonstrate that *they* suffered any injury in a "market where competition is restrained," and lack

11  standing to recover damages on in-app purchases and subscriptions.

12  "To state a claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must

13  allege causal antitrust injury."  *Klein*, 580 F. Supp. 3d at 826.  The States, too, must prove antitrust

14  injury to consumers whose injuries they seek to recover via *parens patriae* claims.  *Kansas v.*

15  *UtiliCorp United, Inc.*, 497 U.S. 199, 218–19 (1990) (*parens patriae* claims require proof of

16  antitrust injury to consumers).  Under Ninth Circuit law, "[a]ntitrust injury requires the plaintiff to

17  have suffered its injury in the market where competition is being restrained.  Parties whose

18  injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced

19  in another market do not suffer antitrust injury."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190

20

21  [19] Accordingly, the Court need not decide whether Google in fact misled carriers—it can grant partial summary judgment without reaching that question.  At any rate, any theory that Google's statements about its revenue sharing with carriers were themselves anticompetitive would fail as a matter of law because Plaintiffs cannot prove that Google made any "intentionally false promise." *Qualcomm Inc.*, 969 F.3d at 996 (citation omitted).  Plaintiffs cannot point to any statement by Google in which it promised to anyone—carriers, developers or consumers—that it would continue its revenue sharing arrangement with carriers indefinitely, or would never earn a profit on Android Market (which later became Play).  *See* Ex. 15, Rysman Dep. 308:3-16; Ex. 20, Schwartz Dep. 285:23-286:7; Ex. 16, Singer Merits Dep. 342:18-22.  Nor could such an inference be reasonable where Google's revenue share agreements with carriers had fixed terms, providing that the revenue sharing would end absent a renewal of the agreement. *See, e.g.*, Ex. 17, GOOG-PLAY4-006402390 (AT&T Carrier RSA, specifying fixed term and no renewals).  In those circumstances, general statements about Google's early expectations for its nascent app store cannot be actionable misrepresentations or establish fraudulent concealment.

22

23

24

25

26

27

28

-17-     **SER-588**

1   F.3d 1051, 1057 (9th Cir. 1999).  Accordingly, a plaintiff must be "in the restrained market,"

2   either as "a consumer of the alleged violator's goods or services or a competitor of the alleged

3   violator."  *Klein*, 580 F. Supp. 3d at 827 (citation omitted); *see also Glen Holly Ent., Inc. v.*

4   *Tektronix Inc*., 343 F.3d 1000, 1008 (9th Cir. 2003) ("Consumers *in the market where trade is*

5   *allegedly restrained* are presumptively the proper plaintiffs to allege antitrust injury." (emphasis

6   added) (citation omitted), *amended on denial of reh'g*, 352 F.3d 367 (9th Cir. 2003)).  Likewise,

7   California's Cartwright Act, under which Consumer Plaintiffs bring parallel claims, requires a

8   plaintiff to demonstrate that their injuries occurred in the same market as the allegedly

9   anticompetitive conduct.  *Meyer v. Qualcomm Inc.*, 2009 WL 539902, at *9 (S.D. Cal. Mar. 3,

10  2009); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224

11  (C.D. Cal. 2003) (requiring "that the party be a participant in the restrained market" in order to

12  have antitrust standing).  Put simply, Plaintiffs must show that they suffered injury in a market

13  where competition was restrained.

14        Consumers' and States' experts have defined two markets: (1) an "Android app

15  distribution market" and (2) a market for "in-app billing services."  Neither involves the retail sale

16  of IAPs or subscriptions to consumers.  Ex. 16, Singer Merits Dep. 51:10-22; Ex. 15, Rysman

17  Dep. 137:18-21.  As to the first, Plaintiffs' experts have conceded that their alleged Android app

18  distribution market does not involve IAPs or subscriptions at all.  Ex. 1, Singer Merits Rep. ¶ 33

19  (noting that "In-App Content on the user's phone" is "not present in the Android App Distribution

20  Market").

21        As to the second market—the alleged market for "in-app billing services"—Plaintiffs do

22  claim that this market involves IAPs, but their experts are clear that the participants in this market

23  are Google and *developers*, rather than *consumers*.  According to Plaintiffs' experts, in this

24  market, Google sells in-app billing services to developers, which the developers then use to sell

25  IAPs and subscriptions to consumers.  In other words, the product in the in-app billing market—

26  payment processing through GPB—is not for sales of IAPs or subscriptions, but for an *input* into

27  developers' sales of IAPs and subscriptions.  The States' expert Dr. Rysman states this clearly:

28  "Google provides billing services directly to developers, who use billing services as an input to

-18-                                    **SER-589**

sell the in-app content product to users." Ex. 2, Rysman Merits Rep. ¶ 137.  In his words, the In-App Billing Market "focus[es] on developers choosing between competing in-app billing service providers"; the "developers are the customers of these services." *Id.* ¶ 138; *see also id.* ¶ 269 ("Consumers do not buy in-app billing APIs or receive transaction tokens.").  Consumers' expert, Dr. Singer, agrees:  "The In-App Aftermarket involves transactions between developers and sellers of services, including payment processing, record keeping, and unlocking of content, *needed to consummate a purchase* of In-App Content." Ex. 1, Singer Merits Rep. ¶ 33.  Dr. Singer thus testified that developers, not Google, sell subscriptions and IAPs.  *See* Ex. 19, Singer Class Cert. Dep. 46:2-22, May 12, 2022 (Q. And developers are the sellers of the apps and the subscriptions and the in-app purchases. THE WITNESS: I think it's fair to say the developers are the sellers of those -- those three items, yes.").

Consumer Plaintiffs and State Plaintiffs thus have not defined any market for the sale of IAPs and subscriptions to consumers.  There is therefore no market in which they have antitrust standing to recover for damages on IAPs and subscriptions. *Am. Ad Mgmt*, 190 F.3d at 1057; *see In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1136 (N.D. Cal. 2008) ("[T]he law requires that plaintiffs be participants in the relevant market alleged."); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027-28 (N.D. Cal. 2015) ("Plaintiffs have failed to allege that they have suffered 'antitrust injury' in the same market as and sufficiently close to the alleged anticompetitive conduct to allow them to pursue private antitrust remedies against Defendant.").  Plaintiffs could have attempted to define a market in which consumers purchase IAPs and subscriptions from Google, but chose not to do so—that is fatal from the perspective of antitrust standing.[20]

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), is not to the contrary.  In that case, the plaintiffs *did* expressly allege a market for the sale of apps to consumers.  Specifically, the

---

[20] It is true that Dr. Singer offers an alternative damages model in which he assumes that both app distribution and in-app payment services are part of the same market.  However, Dr. Singer testified that "you couldn't have a tie" in the combined market that forms the basis of his alternative damages model. Ex. 16, Singer Merits Dep. 53:13-54:2.  Accordingly, to the extent that Consumer Plaintiffs and States rely on that model, their tying claim must be dismissed.

1   plaintiffs alleged "that Apple has monopolized the *retail market for the sale of apps* and has

2   unlawfully used its monopolistic power to charge consumers higher-than-competitive prices." *Id.*

3   at 1518 (emphasis added).  Apple therefore did not argue in the Supreme Court, as Google does

4   here, that the plaintiffs' injury did not occur in the market that allegedly had been restrained.

5   Apple instead argued that federal law "allows consumers to sue only the party who sets the retail

6   price, whether or not that party sells the good or service directly to the complaining party." *Id.* at

7   1521.  That is not Google's argument here.  The Supreme Court in *Pepper* held that the plaintiffs

8   there had standing because they alleged "that a monopolistic *retailer* ([]Apple) has used its

9   monopoly to overcharge consumers." *Id.* at 1519 (emphasis added).  Plaintiffs here do not allege

10   any market in which Google is a retailer to consumers of IAPs or subscriptions.  Because

11   Consumer and State Plaintiffs have failed to allege that consumers suffered an injury in the market

12   in which Google's allegedly anticompetitive conduct occurred, they lack standing to bring these

13   claims.

14           **F.     Google Is Entitled to Summary Judgment on Plaintiffs' Tying Claims**

15        Plaintiffs each assert a tying claim under Section 1 of the Sherman Act, alleging that

16   Google engages in unlawful tying by requiring developers who distribute apps via Google Play

17   (the tying product) to use GPB (the allegedly tied product).  *See* States' FAC ¶ 211; Consumers'

18   SAC ¶ 271; Epic SAC ¶ 234, Match FAC ¶ 153.  This claim fails as a matter of law for two

19   reasons.  First, Plaintiffs cannot get past the first, essential element of any tying claim: that Google

20   "tied together the sale of *two distinct products* or services." *Cascade Health Sols. v. PeaceHealth*,

21   515 F.3d 883, 913 (9th Cir. 2008) (elements of a *per se* tying claim) (emphasis added); *see*

22   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-1200 (9th Cir. 2012) (elements of a rule of

23   reason tying claim).  Google Play and GPB are not "two distinct products or services," *id.* at 1197

24   & n.7, as a matter of law.  Second, Plaintiffs cannot show, based on the undisputed facts and under

25   Ninth Circuit precedent, that Google Play and GPB are tied.  Indeed, most developers that use

26   Google Play do not and are not required to use GPB.

27

28

      **SER-591**

1      **1.    GPB is the mechanism by which Google collects its service fee for**
       **Google Play and not a distinct product**
2

3          To establish that a defendant has unlawfully tied two products, a plaintiff must first prove

4   that there are, in fact, "two distinct products" at issue.  *PeaceHealth*, 515 F.3d at 913.  But a

5   product and the means of collecting payment for that product are not distinct products.  *See Rick-*

6   *Mik Enters.*, 532 F.3d at 971, 974-75; *Epic Games, Inc.*, 559 F. Supp. 3d at 968-70.

7          The Ninth Circuit's decision in *Rick-Mik*, which was decided on the pleadings, is

8   controlling on this common-sense point.  *Rick-Mik*, 532 F.3d at 974-75.  The plaintiffs were gas

9   station operators that purchased franchises from Equilon.  *Id.* at 966.  Equilon's franchise

10  agreements required the plaintiffs (1) to use Equilon to process credit card payments at the gas

11  stations and (2) to pay transaction fees to Equilon on the sales of gas at their stations.  *See id.* at

12  966, 968, 972.  Equilon used the "credit card proceeds" to recover the "money the franchisee

13  owe[d] Equilon for the gasoline Equilon deliver[ed] to the franchisee" and to collect a transaction

14  fee; Equilon then remitted the balance to the gas station franchisees.  *Id.* at 974.  The *Rick-Mik*

15  plaintiffs alleged that Equilon had unlawfully tied two distinct products: "the franchises and the

16  credit-card processing services."  *Id*. at 966.  According to the plaintiffs, absent the alleged tie,

17  they could obtain "lower transaction fees from others for credit-card processing."  *Id.*  The district

18  court dismissed that claim on the pleadings, and the Ninth Circuit affirmed.

19         The Ninth Circuit held that Equilon's credit card processing services were not a "separate

20  and distinct product" from the gas franchise itself but were "an essential part of [the] franchise."

21  *See id.* at 974.  The requirement that franchisees use Equilon for credit card processing allowed

22  Equilon to directly collect money the franchisees owed it, assess a transaction fee, and refund

23  unauthorized transactions.  "Th[is] arrangement gives Equilon some ability to ensure the quality

24  and reliability of credit card processing and helps guard against franchise default and unauthorized

25  transactions."  *Id.*  In these circumstances, the "franchise and the method of processing credit

26  transactions are not separate products, but part of a single product (the franchise)."  *Id.*

27         *Rick-Mik* demonstrates why Google Play and GPB are not separate products, but part of a

28  single product.  Just like Equilon provided a product (Equilon franchises) to its franchisee

-21-                                    **SER-592**

1    customers, Google provides a product (Google Play) to its developer customers.  Like Equilon,

2    Google charges for the value of this product by assessing a service fee on certain transactions.

3    Epic SAC ¶ 160; States' FAC ¶ 195; Consumers' SAC ¶ 14; Match FAC ¶ 1.  And just like

4    Equilon required franchisees to use its own credit-card processing services, Google requires its

5    developer customers to use Google's own billing service, GPB.  *Id*.  This enables Google to

6    efficiently collect its fee for the services it offers via the Google Play store, including app

7    distribution.  *See* Ex. 20, Schwartz Dep. 44:13-19, 49:17-23, Mar. 28, 2023 (acknowledging that

8    the service fee is for a bundle of services provided by the Google Play store, including app

9    distribution); *see also* Ex. 15, Rysman Dep. 223:14-18 (acknowledging that the service fee funds

10   distribution as well as billing).  Using GPB to collect its fee also gives Google "some ability to

11   ensure the quality and reliability of" transactions in the Play store.  *Rick-Mik*, 532 F.3d at 974.

12         Another court in this district applied *Rick-Mik* to reject a tying claim in materially identical

13   circumstances.  In *Epic Games, Inc. v. Apple Inc.*, Epic Games made the same argument it makes

14   here: it alleged that Apple had unlawfully tied app distribution to its in-app payments system

15   ("IAP").  *Epic Games*, 559 F. Supp. 3d at 1044.  Just like in this case, Epic claimed that Apple

16   engaged in an unlawful tie when it required developers that sell digital goods in apps downloaded

17   from the Apple App Store to use IAP.  *See id.* at 1046.  Applying *Rick-Mik*, Judge Gonzalez

18   Rogers rejected Epic's tying claim because Apple's IAP is not a separate, tied product, but, rather,

19   is integrated with Apple's App Store.  As Judge Gonzalez Rogers explained, IAP is "a

20   comprehensive system to collect commission and manage in-app payments" that is "not bought or

21   sold."  *Id.* at 1046.  Judge Gonzales Rogers accordingly concluded:  *"*Here, as [in *Rick-Mik*], IAP

22   is but one component of the full suite of services offered by iOS and the App Store."  *Id.*  That

23   conclusion regarding Apple's App Store and billing system applies equally to Google's Play store

24   and GPB.  GPB is one of many services offered by the Google Play store, and Google uses GPB to

25   manage in-app payments and collect its fee for the services the Google Play store provides.  *See*

26   Ex. 20, Schwartz Dep. 44:13-19, 49:17-23.

27         Plaintiffs may argue that GPB is not technologically necessary for Google Play to function

28   or that various payment processors might offer payment processing services for a lower fee.  Such

**SER-593**

1   facts are immaterial.  The plaintiffs in *Rick-Mik* similarly alleged that if Equilon did not require

2   payment to be made through its billing system, the franchisees "would be able to purchase credit

3   and debit card processing services through many other credit and debit card processing service

4   providers on more favorable terms and conditions." *Rick-Mik*, 532 F.3d at 968.  That allegation,

5   taken as true on a motion to dismiss, did not change the Court's conclusion.  Thus, it is immaterial

6   whether Google *could* allow developers to use different platforms for collecting its fee, or that

7   Plaintiffs believe they would obtain more favorable terms and conditions on a different platform.

8       GPB is Google's preferred method of collecting its fee for the services it provides with

9   Google Play.  Under applicable precedent, the mechanism for collecting a fee for a product is not,

10  as a matter of law, a "distinct product" that is capable of being tied.  Accordingly, Google is

11  entitled to summary judgment on Plaintiffs' claim that it tied GPB to Google Play.

12          **2.      Even if viewed as separate products, Google Play and GPB are not tied**

13      Even if the Court were to determine that GPB may be treated as a separate product from

14  Google Play, Plaintiffs must establish that Google Play and GPB are "tied together." *Peace*

15  *Health*, 515 F.3d at 913.  To do so, Plaintiffs must show that Google has "coerced or forced its

16  customer to buy the tied product in order to obtain the tying product." *Paladin Assocs., Inc. v.*

17  *Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).  Plaintiffs cannot do so.  Developers

18  can use Google Play without using GPB.  In fact, the vast majority do.

19      Google does not condition access to Google Play on the use of GPB and most developers

20  that use Google Play do not use GPB.  *See* Ex. 7, Samat Dep. Ex. PX713, at 3 (Sameer Samat,

21  *Listening to Developer Feedback to Improve Google Play*, Android Blog (Sept. 28. 2020)) (in

22  preceding twelve months, only 3% of developers had paid fees to Play).  Many developers are able

23  to use Google Play even though they do not monetize their apps at all—that is, they make their

24  apps available for free and do not monetize in-app activity.  *See, e.g.*, States' FAC ¶ 189; *cf.*

25  Consumers' SAC ¶ 60.  That includes, for example, apps made available for banking services, real

26  estate services, public safety services, and basic utility apps (*e.g.*, calculators).  Those developers

27  provide valuable services and indisputably benefit from the Play store's platform, but they do not

28  use GPB and owe Google no service fees.  *See* States' FAC ¶ 185 (listing examples of "very

-23-                                    **SER-594**

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1  valuable commercial apps" that "benefit from being on the Google Play Store" but do not

2  monetize by selling digital goods).

3         Even developers that choose to monetize their apps are not required to use GPB.  Plaintiffs

4  themselves "admit that Google does not require that developers choose a particular monetization

5  strategy," and developers can pursue many monetization strategies beyond the sale of in-app

6  purchases.  Match Answer ¶ 18, MDL Dkt. 335.  As Plaintiffs concede, some developers that

7  choose to monetize do so with advertising in the apps they distribute via the Play Store.  *Id.*  This

8  includes, for example, ads in a banner at the top of the screen, full screen ads for a few seconds, or

9  ads that offer consumer rewards for interactions with the ad.  These developers use Google Play

10  but do not pay Google any service fees and thus do not use GPB.

11        It is true that a concededly "small subset" of developers who *choose* to monetize through

12  *in-app* purchases of digital goods on Google Play—and thus must pay Google service fees on such

13  transactions—are generally required to use GPB.  *See* States' FAC ¶ 189.  Plaintiffs' tying claim

14  reflects the theory that they have the right to decide how they will pay for what they owe.  The

15  antitrust laws confer no such entitlement.  Plaintiffs' tying claim fails as a matter of law and

16  should be dismissed.

17  **V.**      **CONCLUSION**

18        The Court should grant Google's motion for partial summary judgment.

19

20

21

22

23

24

25

26

27

28

-24-                                   **SER-595**

1    DATED: April 20, 2023                    Respectfully submitted,

2

3                                             By:              /s/ *Glenn D. Pomerantz*
                                                  Glenn D. Pomerantz
4
                                                  Glenn D. Pomerantz, S.B. #112503
5                                                 glenn.pomerantz@mto.com
                                                  Kuruvilla Olasa, S.B. #281509
6                                                 kuruvilla.olasa@mto.com
                                                  Nicholas R. Sidney, S.B. #308080
7                                                 nick.sidney@mto.com
                                                  **MUNGER, TOLLES & OLSON LLP**
8                                                 350 South Grand Avenue, Fiftieth Floor
                                                  Los Angeles, California 90071
9                                                 Telephone: (213) 683-9100

10                                                Kyle W. Mach, S.B. #282090
                                                  kyle.mach@mto.com
11                                                Justin P. Raphael, S.B. #292380
                                                  justin.raphael@mto.com
12                                                Emily C. Curran-Huberty, S.B. #293065
                                                  emily.curran-huberty@mto.com
13                                                Dane P. Shikman, S.B. #313656
                                                  dane.shikman@mto.com
14                                                **MUNGER TOLLES & OLSON LLP**
                                                  560 Mission St., Suite 2700
15                                                San Francisco, CA 94105
                                                  Telephone: (415) 512-4000
16                                                Facsimile: (415) 512-4077

17                                                Jonathan I. Kravis, *pro hac vice*
                                                  jonathan.kravis@mto.com
18                                                **MUNGER, TOLLES & OLSON LLP**
                                                  601 Massachusetts Avenue NW, Suite 500E
19                                                Washington, D.C. 20001
                                                  Telephone: (202) 220-1100
20

21

22

23

24

25

26

27

28
                                                          -25-                      **SER-596**

Brian C. Rocca, S.B #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendants Google LLC, et al.*

-26- **SER-597**

1

## **E-FILING ATTESTATION**

2      I, Glenn D. Pomerantz, am the ECF User whose ID and password are being used to file

3 this document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that counsel for

4 Defendants have concurred in this filing.

5

6                            */s/ Glenn D. Pomerantz*

7                            Glenn D. Pomerantz

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER-598**

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:21-cv-05227-JD; 3:22-cv-02746-JD

1
2
3
4                           UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7   IN RE GOOGLE PLAY STORE                    Case No. 21-md-02981-JD
    ANTITRUST LITIGATION
8
                                               FINDINGS OF FACT AND
9                                              CONCLUSIONS OF LAW RE
                                               CHAT PRESERVATION
10
11
12
13          During discovery in this multidistrict litigation (MDL) case, plaintiffs obtained information

14   indicating that Google did not adequately preserve communications that were exchanged

15   internally on its Chat message system. Plaintiffs say that this shortfall was intentional and

16   deprived them of material evidence. They have requested sanctions under Federal Rule of Civil

17   Procedure 37(e). Dkt. No. 349.[1] After substantial briefing by both sides, and an evidentiary

18   hearing that featured witness testimony and other evidence, the Court concludes that sanctions are

19   warranted.

20                                     **BACKGROUND**

21          The MDL action involves multiple antitrust cases challenging Google's Play Store

22   practices as anticompetitive. The plaintiffs are Epic Games, Inc., Case No. 20-cv-05671-JD; the

23   consumer plaintiffs, Case No. 20-cv-05761-JD; the Attorneys General of 38 states and the District

24   of Columbia, Case No. 21-cv-05227-JD; and the Match Group plaintiffs, Case No. 22-cv-02746-

25

26   _____

     [1] Unless otherwise stated, all docket number references are to the ECF docket for the multidistrict
27   litigation case, Case No. 21-md-02981-JD. This order will be filed in unredacted form on the
     public docket, except for certain employee names which are redacted below. Other sealing
28   requests made in connection with these proceedings will be resolved by a separate order.

United States District Court
Northern District of California

JD.[2] An action by software developers was filed and is in the process of settling on a class basis, Case No. 20-cv-05792-JD, and the developer plaintiffs are not part of these proceedings. Plaintiffs allege that Google illegally monopolized the Android app distribution market by engaging in exclusionary conduct, which has harmed the different plaintiff groups in various ways.

Even before the MDL was instituted, the Court directed the parties to coordinate discovery with an eye toward containing costs and burdens. This was largely successful and the parties have managed to work things out, with one major exception. In April 2021, plaintiffs asked Google about a curious lack of Chat messages in its document productions. In October 2021, Google said that Google Chats are typically deleted after 24 hours, and that Google had not suspended this auto-deletion even after this litigation began. Google chose instead to let employees make their own personal choices about preserving chats.

This decision raised obvious questions that were presented to the Court in a joint statement in May 2022. Dkt. No. 258. With the Court's consent, plaintiffs filed a motion for sanctions under Rule 37 in October 2022, which resulted in substantial briefing by each side, including the filing of declarations and other written evidence. *See* Dkt. Nos. 340, 349, 367, 373.

The parties disagreed about a number of factual issues, and the Court was unwilling to resolve the disputes on a dry record. Consequently, the Court held an evidentiary hearing over two days in January 2023. Dkt. Nos. 375, 384, 420. The Court received documentary evidence, heard testimony by Google employees Genaro Lopez, Jamie Rosenberg, and Andrew Rope, and took closing arguments by the parties. Dkt. Nos. 415, 440. This record was supplemented by a transcript of the deposition of former Google employee Tian Lim, Dkt. No. 449, and many follow-up submissions, *see*, *e.g.*, Dkt. Nos. 428, 429, 431, 432. At the Court's direction, Google produced to plaintiffs in February 2023 approximately 52,271 additional chats, after which both sides filed supplemental briefs addressing this new evidence. Dkt. Nos. 454, 463, 464. Overall,

---

[2] The Match Group plaintiffs are Match Group, LLC; Humor Rainbow, Inc.; PlentyofFish Media ULC; and People Media, Inc.

United States District Court
Northern District of California

2

the Court has obtained a thorough and highly detailed record with respect to Google's Chat preservation conduct.

The Court makes the ensuing findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The findings and conclusions are based on the evidence admitted at the hearing and filed on the docket by the parties; the Court's observation of the demeanor, credibility, and candor of the witnesses; and the arguments of the parties at the hearing and in their post-hearing filings.

**FINDINGS OF FACT**

## I.     GOOGLE IS A FREQUENT AND SOPHISTICATED LITIGATION PARTY

1.     Google is a well-known and "really big" company that is "in the public eye." It is frequently a party to government proceedings and private litigation. Dkt. Nos. 418 & 446 (Hrg. Tr.) at 70:9, 102:11-22.

2.     Google employees are no strangers to document production and discovery obligations. At any given time, Google has thousands of employees who are under a litigation hold for document preservation. Hrg. Tr. at 60:23-61:2, 102:17-22.

3.     Google employee Jamie Rosenberg testified that he had been "placed under many litigation holds over [his] time at Google," and he did not recall a time in his last five or six years there when he personally was not under at least one litigation hold. Hrg. Tr. at 99:4-10.

4.     Former employee Tian Lim, who worked at Google for over five years through early January 2023, testified that the litigation hold he received for this case "was probably one of at least ten or more other litigation holds that I was on." Dkt. No. 449-1 (Lim Depo. Tr.) at 6:25-7:9, 20:22-21:3.

## II.     GOOGLE TRAINS EMPLOYEES TO "COMMUNICATE WITH CARE"

5.     Google employees receive training to "Communicate with Care." Hrg. Tr. at 101:23-25. These are live group trainings to teach Google employees how to handle written communications. The trainings are presented by lawyers, with presentation slides. *Id*. at 99:24-100:13.

United States District Court
Northern District of California

3

6.  One set of training slides was received into evidence. Hrg. Exh. PX-120. The interactive training was titled, "You Said What?!: 10 Things to Ensure You Are Communicating With Care." The first slide stated, "At Google, We are constantly in the public eye . . . and the courthouse. We often have to produce employee communications as evidence, which means your communications can become public at any time. Our communications can hurt or embarrass us as a company, or as individuals. We need to be cautious in our communications to avoid unnecessary harm. [¶] This is not about 'hiding stuff' or not pointing out something that may need fixing. Speaking up is a core company value. This is about being thoughtful in your communication in order to reduce the risk of unintended harm to Google and/or you." *Id*. at GOOG-PLAY-005029850.

7.  "Rule 03" in the training was to "Avoid Communicating When Angry or Tired." *Id*. at GOOG-PLAY-005029855. It gives the example of a fictional Google employee, Echo, who, after "working all night" on a new product, has decided to write an email to the team lead "before calling it a night[,] and wants you to take a look at it before sending it." *Id*. at GOOG-PLAY-005029856. The team lead "took the night off to attend a basketball game," and Echo's draft email ends with the line, "Could have really used your help tonight. Hope you enjoyed the game." *Id*. The training asks, "What do you think you should tell Echo to do?" It gives four possible options: (1) "Send the email"; (2) "Don't send the email now. Send it in the morning"; (3) "Talk to the team lead in the morning"; and (4) "Don't send the email. Chat 'off the record' via Hangouts instead." *Id*.

8.  In a later slide, Option 4 ("Don't send the email. Chat 'off the record' via Hangouts instead.") is marked red as a discouraged option, rather than green, like Options 2 and 3. *See id*. at GOOG-PLAY-005029858. A pop-up box provides this commentary about Option 4: "Better than sending the email, but not without risk. While 'off the record' Hangout chats between individual corporate accounts are not retained by Google as emails are, any chat participant may save the conversation by simply copying and pasting it into a doc or email - something Echo's team lead might choose to do in order to discuss the appropriateness of that middle-of-the-night chat with Echo and HR in the morning." *Id*. at GOOG-PLAY-005029860.

**SER-602**

United States District Court
Northern District of California

The apparent concern is that the chat might then be retained for a much longer period of time than off-the-record chat messages usually are.

9.      The "Communicate with Care" training gave specific instructions to Google employees about strategies for seeking to make their emails and other communications "protected by the attorney-client privilege." *Id*. at GOOG-PLAY-005029877. Employees were advised that "You must include an attorney in the address" of an email, and, "In addition to addressing it to an attorney and labeling it as such, for the email to be attorney-client privileged, it must be for the purposes of getting legal advice." *Id*. at GOOG-PLAY-005029882.

10.     To complete the training, Google employees were required to certify that "you have fully reviewed, understand and are responsible for applying the advice and guidelines provided in this training to your interactions, responsibilities, and work at and for Google." *Id*. at GOOG-PLAY-005029900.

11.     Google employees took the Care training to heart. In multiple instances, internal communications actively expressed concerns about the possibility of disclosure in litigation and the risks of preserving Chats. *See*, *e.g.*, Hrg. Exh. PX-9 at GOOG-PLAY-007653956 ("Comment freely but please be aware that this doc is not privileged. For anything sensitive, please move to Chat / video call."); Dkt. No. 468, Ex. 8 ("are we allowed to talk about Runway here?," "that's a good question. i would say, if you talk about it, communicate with care - assume anything you say here will be subject to discovery if there are any regulatory or legal proceedings at some point in the future. group chats (like this one) aren't transient and you can't turn off history (unlike 1:1 chat threads where you can turn off history and they disappear in 24 hours)"); *id.*, Ex. 19 ("should we have history off for this? . . . I think our chats about google products are more likely to come up in court"; "Right now it doesn't _feel_ risky. But just communicate with care."); *id.*, Ex. 20 ("Since history is turned on, be mindful of putting anything discoverable here"); *id.*, Ex. 23 ("just a reminder if you use privileged and confidential in emails an attorney must be in the To line"; "wondering what is the best way to update the team about confidential topics without having to include an attorney in all comms"; "History has to be off I believe"; "yes with history off everything gets wiped . . . but it does exist for 24-48 hrs so if super sensitive you need to use GVC

SER-603

United States District Court
Northern District of California

1  because they could look at your recent ping history and that could go into court[,] also hopefully it

2  won't come to this for any of us."); *id*., Ex. 27 ("please do not share sensitive information here

3  where possible . . . Until we fix the room architecture, content here is searchable/discoverable

4  within the corp."). At Google, the terms "history on" and "on the record" were used

5  interchangeably to mean the same thing. Hrg. Tr. at 29:8-12.

6  ### III. GOOGLE CHAT

7  12. Google Chat is a "communications instant messaging tool" that allows users to

8  send each other text messages. Hrg Tr. at 18:23-19:3. In effect, it is Google's in-house IM

9  platform. This order focuses on Google's internal use of Chat, and its preservation practices for

10  Chat messages sent on the platform by Google employees.

11  13. Google Chats can take the form of one-on-one chats, Hrg. Tr. at 20:8-11; group

12  chats involving three or more people, *id*. at 21:14-16; or "rooms and spaces," which are "topic- or

13  project-based type[s] of conversations that are specifically oriented around a particular item or

14  subject matter," *id*. at 23:5-11. A "threaded room" is a room with a general topic, where its

15  members can have "threaded" conversations about various sub-topics. *Id*. at 23:17-24:3; Hrg.

16  Exh. DXCH-106.

17  14. Google Chat is an essential tool used daily by Google employees. Jamie

18  Rosenberg testified that he "use[s] Chat every day." Hrg. Tr. at 99:23. Tian Lim also testified that

19  he used Chat "probably every working day." Lim Depo. Tr. at 8:22-25.

20  15. There are no restrictions on the content and topics on Chat. Hrg. Tr. at 47:2-10

21  (Chat can be used for "[a]nything under the sun that [employees] want to communicate.").

22  Messages are not limited by size or number of characters. Chat is a versatile tool that allows users

23  to attach lengthy documents to a message. *Id*. at 63:19-23.

24  16. "History" can be turned "on" or "off" by users for a particular Chat. *See*, *e.g.*, Hrg.

25  Exh. DXCH-107. History is off by default for all Chats among Google employees with the sole

26  exception of threaded rooms. Hrg. Tr. at 53:21-23.

27  17. Different types of Chats have different default retention periods. Under Google's

28  standard retention policy, one-on-one Google Chats with history off are retained for 24 hours only.

United States District Court
Northern District of California

1   Hrg. Tr. at 26:21-27:8; Hrg. Exh. DXCH-1.  After the 24 hours, the Chats are deleted forever and

2   cannot be recovered.  Hrg. Tr. at 52:25-53:6.  One-on-one chats with history on are retained for 30

3   days.  *Id*. at 27:9-17; Hrg. Exh. DXCH-1.  History-on chats in a group conversation or "flat (non-

4   threaded) room" are retained for 18 months.  *Id*.; Hrg. Tr. at 31:11-13.  For chats in a threaded

5   room, history is "always on and can't be turned off," and these messages are also retained for a

6   period of 18 months.  Hrg. Tr. at 31:14-23; Hrg. Exh. DXCH-1.

7          18.     Each Google employee has a corporate Gmail account for email, and if a litigation

8   hold is not in place, emails in an employee's Gmail account are retained for 18 months unless the

9   user has tagged them for "Indefinite" retention.  Hrg. Tr. at 17:22-18:22.

10         19.     An employee has several options to preserve a Chat for longer than its default

11  retention period.  She can "turn on history" for a Chat in a menu option.  The "history on" setting

12  applies to all messages sent in a Chat after the history button has been toggled, and that Chat's

13  history will stay on until manually turned off.  Hrg. Tr. at 28:11-29:21; Hrg. Exh. DXCH-107.

14         20.     A Google employee can also retain Chat messages with the "Forward to inbox"

15  feature.  The feature "allows a user to select an individual message and up to four preceding

16  messages and send those to their e-mail inboxes for longer-term archiving."  Once in the user's

17  personal Gmail inbox, the chats would be "subject to the 18-month default retention period."  Hrg.

18  Tr. at 29:23-31:2; Hrg. Exh. DXCH-108.

19         21.     Another preservation option entails copying and pasting the chat into a document

20  saved to the employee's Google Drive.  Items in an employee's Google Drive remain on Google's

21  systems "indefinitely unless removed by the Googler themselves."  Hrg. Tr. at 17:3-8, 55:16-21.

22         22.     Google's information governance lead, Genaro Lopez, testified that the retention

23  policy for Google Chats is animated by the goals of protecting privacy, reducing the cost of

24  storage, guarding against cybersecurity risks, and promoting employee productivity and

25  efficiency.  Hrg. Tr. at 25:17-26:20.  But with respect to storage, Lopez was not aware of "any

26  kind of an analysis or study to figure out how expensive it would be or how burdensome it would

27  be to preserve chats," even just for this case.  *Id*. at 76:25-77:8.

28

7

23.     Lopez testified that Google Chat was "typically" used for "quick, one-off" questions like an invitation to grab coffee, or for "sensitive," personal topics like "birth announcements" or "promotion[s]."  Hrg. Tr. at 19:8-25.  Google has generally pressed the suggestion in its briefs that Chat was primarily a social outlet akin to an electronic break room.

24.     The record demonstrates otherwise.  An abundance of evidence establishes that Google employees routinely used Chat to discuss substantive business topics, including matters relevant to this antitrust litigation.  *See*, *e.g.*, Hrg. Tr. at 92:19-93:4 (Rosenberg email stating to another Google employee, "You mentioned in our IM chat yesterday that Samsung broached the topic of asking for rev share on the Play Store."); Hrg. Exh. PX-16 (Rosenberg chat thread with other Google employees discussing, vis-à-vis- Samsung, issues such as "get[ting] sample builds for all the configurations contemplated in our waiver so we can validate placement," "start[ing] the [MADA] signing process" with Samsung; and "CTS approval and device approval"); Hrg. Tr. at 97:16-18 (Rosenberg acknowledging that the conversation he had over Google Chat in Exhibit PX-16 "includes discussions about business topics"); Lim Depo. Tr. at 9:2-10:11 ("[o]ccasionally there were some more substantive conversations" over Google Chat); *id*. at 26:22-25 (Lim "most likely" personally used Google Chat for "substantive business communications"); *id*. at 27:22-29:4 ("many of the colleagues that [Lim] discussed business with over chat had responsibility over Google Play and Android"); *see also* Dkt. No. 468 (plaintiffs' supplemental brief) at 2-5 (providing numerous examples of Chats discussing "topics at the heart of this case," such as Revenue Share Agreements, Mobile App Distribution Agreements (MADAs), and Google Play Billing and Google's supracompetitive commission).[3]

## IV.   GOOGLE'S CHAT PRESERVATION PRACTICES IN THIS CASE

25.     When Google becomes involved in a lawsuit, it undertakes "an investigation to understand what the case generally deals with and identify individuals that may possess potentially relevant information," and then it "issue[s] a legal hold."  Hrg. Tr. at 109:11-18.

---

[3] MADAs and their importance to the claims in the MDL are discussed in Paragraph 34.

**SER-606**

United States District Court
Northern District of California

26.     While a legal hold is in place, "email data or Gmail data is preserved," as are "Google Workspace files, which includes Docs, Sheets, Slides; and also Google Drive content, which can include other file types." Hrg. Tr. at 110:3-8.

27.     For this case, the "initial notice and hold was put in place in September of 2020," and four reminders have been sent since then. Hrg. Tr. at 113:9-15. It is Google's standard practice to "send reminders about every six months." *Id*.

28.     Approximately 360 individuals are subject to the legal hold for this case, about 40 of whom have been designated as custodians. Hrg. Tr. at 113:16-21.

29.     Google has the technical ability to set Chat history to "on" as the default for all employees who are subject to a legal hold, but it chooses not to. Hrg. Tr. at 43:22-43:4, 58:19-24. Google has preserved all Chat messages that had history toggled on, *id*. at 44:12-17, 55:2-4, but for any Chat where history was off, Google left it up to each individual hold recipient to decide which, if any, of those one-on-one or group chats should be preserved, *id*. at 45:20-46:7, 55:11-15.

30.     The litigation hold recipients were (1) instructed not to use Google Chat to "discuss any topics that are related to their legal hold," and (2) told that "if they do find themselves in a conversation that strays into a topic related to the legal hold, they're asked to turn history on at that point to make sure that those messages are properly preserved." Hrg. Tr. at 43:4-20.

31.     A "Google Chat Retention FAQs" document that is internally available to all Google employees also advises that the "History ON setting" should be used "[w]hen you are discussing a topic identified in any legal hold notice you've received." Hrg. Exh. DXCH-2; Hrg. Tr. at 34:7-35:1.

32.     Google did not check to see if custodians were actually preserving relevant Chats as directed by the hold notice, and did nothing in the way of auditing or monitoring Chat preservation. Hrg. Tr. at 46:8-17. There is no evidence establishing that Google did any individualized follow-up on Chat preservation with the hold recipients, including those designated as custodians. *See*, *e.g.*, *id*. at 121:17-20.

9

**V.    HOW EMPLOYEES RESPONDED**

33.    Overall, the record demonstrates that Google employees who received a litigation hold in this case were unable or unwilling to follow the Chat preservation instructions, and sometimes disregarded the instructions altogether.

34.    Jamie Rosenberg is now a part-time advisor at Google but was previously a vice president "running a strategy team for [Google's] platforms and ecosystems organization." Hrg. Tr. at 78:20-79:3. He received a hold notice for this case and was deposed. *Id*. at 103:11-21. He testified that he had Chat history off during his entire time at Google, including when he was deposed, and has "not done anything to preserve chats for this litigation." *Id*. at 103:8-17. When asked if he knew if "MADAs are at issue in this case or not," he responded that he is "not familiar with the specific details of the case," and he cannot say "in detail" "what topics are and are not relevant to this case." *Id*. at 89:18-23. A MADA is a Mobile App Distribution Agreement, and it is, according to plaintiffs, a "principal subject" of their claims. Dkt. No. 468 at 3. "The MADAs are contracts that Google requires OEMs to enter into to license Google Mobile Services, a suite of proprietary Google applications and APIs that includes the Google Play Store, Google Search, Gmail, YouTube, and Google Maps, among others." *Id*. Epic's complaint alleges, for example, that "[t]hrough its MADAs with Android OEMs, Google requires OEMs to locate the Google Play Store on the 'home screen' of each mobile device. Android OEMs must further pre-install up to 30 Google mandatory apps and must locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services. These requirements ensure that the Google Play Store is the most visible app store any user encounters and place any other app store at a significant disadvantage." Case No. 20-cv-05671-JD, Dkt. No. 166 ¶ 91.

35.    Rosenberg's testimony highlighted a fundamental problem with Google's approach to Chat preservation. Google left employees largely on their own to determine what Chat communications might be relevant to the many critical legal and factual issues in this complex antitrust litigation. A lawyer working on this case would know that MADAs are relevant. Jamie Rosenberg did not.

10

36.     Tian Lim, who worked in the Google Play product area during the entire period of his 5-year employment with Google, also received a legal hold notice for this litigation.  Lim Depo. Tr. at 20:9-16, 25:21-24.  Lim believed that he understood the document preservation instructions in the hold notice, and his "interpretation was that if there was substantive information in chat that I should ensure the information was preserved."  *Id*. at 20:17-21:18.  He thought that he had complied with this instruction by cutting and pasting chat messages into his own personal document, "but probably more often I would make sure that the information was funneled into the right documents, the right comments in other documents, to make sure that the right stakeholders would actually see it, integrate those thoughts, and action on them."  *Id*. at 21:19-22:8.  In effect, Lim believed that he could comply with Google's document preservation obligations by creating and preserving a summary of a substantive business communication rather than preserving the actual communication itself.  *Id*. at 36:5-19, 37:25-38:15.

37.     Lim knew that his chats were not going to be automatically preserved because Google employees "were generally aware that chats would disappear after 24 hours," but he did not "ever turn history on in the chat program to save any chat conversations."  *Id*. at 22:9-12, 38:16-39:6.  Lim testified that the thought process that he might need to save something that was said because he was subject to a legal hold simply "doesn't occur because, as I said, I'm under so many legal holds, it's impossible to think that way."  *Id*. at 40:23-41:6.

38.     Chats produced by Google in February 2023 pursuant to the Court's order provided additional evidence of highly spotty practices in response to the litigation hold notices.  The ensuing Chat exchange between two Google employees, Dkt. No. 468, Ex. 4, is representative.  The Court has anonymized the exchange to spare the employees undue attention.  It is Google's preservation obligation and conduct that is the focus here.

United States District Court
Northern District of California

11

1    **Sent:**    Thu 3/17/2022 3:26:31 PM (UTC)
**From:**    ████@google.com
**To:**      ████@google.com, ████████@google.com
2    **Subject:**   AAAA4RKG7pM-MBI-FLAT:2022-03-16T20:26:30.092879

3     eth ████ @**google.com** 2022-03-17T15:26:30.092Z

4     As we are talking about RSA, I have turned on history as per policy.

5     mar ████ @**google.com** 2022-03-17T15:33:15.718Z

6     Hi Ethan, can you let me know what the policy you're referring to?

7     mar ████ @**google.com** 2022-03-17T15:33:23.807Z

8     I'd prefer to have history off

9     eth ████ @**google.com** 2022-03-17T15:33:45.555Z

10     legal/comp can confirm but anything convo regarding RSA i have to have history on

11     mar ████ @**google.com** 2022-03-17T15:33:45.830Z

12     I talk about RSA related things all day and I don't have history on for all my chats :)

13     eth ████ @**google.com** 2022-03-17T15:33:58.371Z

14     we cannot delete it. I am also on multiple legal hold

15     mar ████ @**google.com** 2022-03-17T15:34:02.578Z

16     Ok maybe I take you off this convo 😅

17     mar ████ @**google.com** 2022-03-17T15:34:08.567Z

18     As am I...

19     eth ████ @**google.com** 2022-03-17T15:35:12.807Z

20     sry why do you prefer to have history off? i think we should have record of our convo so there are no miscomm/understanding no?

21     mar ████ @**google.com** 2022-03-17T15:35:26.447Z

22     I can ping Marie and Michael separately. Included you for visibility

23     mar ████ @**google.com** 2022-03-17T15:35:41.445Z

24     Yes I do prefer history off

25     eth ████ @**google.com** 2022-03-17T15:37:01.904Z

26     pls keep BD team (me) included on any convo regarding Nothing RSA planning

27     eth ████ @**google.com** 2022-03-17T15:37:32.226Z

28     i can send an official email to confirm regarding history but that was the training i had received

mar ████ @**google.com** 2022-03-17T15:39:11.475Z

United States District Court
Northern District of California

**SER-610**

1   Of course I'll keep you included. But sounds like we have to keep history on in this convo specifically. But not in our 1:1 chats about RSAs or my 1:1 chats with Marie/Michael about RSAs

2   mar████@google.com 2022-03-17T15:39:18.856Z

3   So that's why I'd prefer to move away from this group chat

4   mar████@google.com 2022-03-17T15:39:42.832Z

5   It's just causing more touchpoints on my end but I respect you following your training

6   eth████@google.com 2022-03-17T15:40:36.082Z

7   ty :) if you feel uncomfortable with history being on here, i understand.

8   eth████@google.com 2022-03-17T15:41:01.592Z

9   but even if history is off here, these are all saved on servers anyway

10  mar████@google.com 2022-03-17T15:44:15.150Z

11  Thanks ████!

12

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

United States District Court
Northern District of California

13

**SER-611**

39.     In another chat, an employee said he or she was "on legal hold" but that they

preferred to keep chat history off, Dkt. No. 468, Ex. 24:

**Sent:**     Thur 12/8/2022 5:52:34 PM (UTC)
**From:**     ████████@google.com
**To:**       ████████@google.com, ████████@google.com
**Subject:**  ITAObEAAAAE-MBI-FLAT:2022-12-07T22:52:33.612671

ott██ @google.com 2022-12-08T17:52:33.612Z

Sounds good!

ott██ @google.com 2022-12-08T17:52:36.138Z

I'll keep Jan in mind

div██████ @google.com 2022-12-08T17:52:49.955Z

I am on legal hold

ott██ @google.com 2022-12-08T17:52:56.632Z

(making a note via turning on history)

div██████ @google.com 2022-12-08T17:52:56.898Z

Prefer to keep chat history off

ott██ @google.com 2022-12-08T17:53:01.560Z

i'll turn off

## VI.   GOOGLE IS NOW PRESERVING GOOGLE CHATS FOR THIS ACTION

40.     Google represented to the Court in a filing on February 7, 2023, that it "will turn

the history setting to 'on' for Google Chat, on an interim basis, for all 383 employees who have

received a legal hold in this case.  These employees will not have the ability to change history to

'off.'  Google will meet and confer with Plaintiffs regarding which of these 383 legal hold

recipients are the 'core set of relevant custodians' for which this setting should remain and then

report back to the Court."  Dkt. No. 448 at 1.

**SER-612**

United States District Court
Northern District of California

1          **CONCLUSIONS OF LAW**

2          The new version of Rule 37(e), which was added to the Federal Rules of Civil Procedure in

3    2015, and the Advisory Committee Notes to the 2015 Amendment (Comm. Notes), are the

4    touchstones guiding the Court's conclusions.  Rule 37(e) provides:

5              **(e) Failure to Preserve Electronically Stored Information.**  If
              electronically stored information that should have been preserved in the
6              anticipation or conduct of litigation is lost because a party failed to take
              reasonable steps to preserve it, and it cannot be restored or replaced through
7              additional discovery, the court:

8                  (1) upon finding prejudice to another party from loss of the information,
                      may order measures no greater than necessary to cure the prejudice;
9                      or

10                  (2) only upon finding that the party acted with the intent to deprive
                      another party of the information's use in the litigation may:
11
                      (A) presume that the lost information was unfavorable to the party;
12
                      (B) instruct the jury that it may or must presume the information was
13                          unfavorable to the party; or

14                      (C) dismiss the action or enter a default judgment.

15    Fed. R. Civ. P. 37(e).

16          The Committee Notes for Subdivision (e) state that the rule embodies the "common-law

17    duty" of "potential litigants . . . to preserve relevant information when litigation is reasonably

18    foreseeable."  The parties do not dispute that Google bore that duty as of August 2020, when the

19    first constituent lawsuit in the MDL was filed by Epic Games.  *See* Case No. 20-cv-05671-JD,

20    Dkt. No. 1.[4]

21          At the heart of this dispute is a simple question:  did Google do the right thing with respect

22    to preserving Chat communications in this case?  There is no doubt that Google was perfectly free

23    to set up an internal IM service with any retention period of its choosing for employees to use for

24

25    ─────────────────
      [4] Plaintiffs made some effort at the evidentiary hearing to move this date forward by referencing
26    document requests issued in other cases that are not a part of this MDL.  *See* Hrg. Tr. at 127:17-
      128:4.  The Committee Notes advise that "[t]he fact that a party had an independent obligation to
27    preserve information does not necessarily mean that it had such a duty with respect to the
      litigation, and the fact that the party failed to observe some other preservation obligation does not
28    itself prove that its efforts to preserve were not reasonable with respect to a particular case."  The
      Court focuses on the August 2020 time period for this MDL.

                                    15

                                                    **SER-613**

United States District Court
Northern District of California

1    whatever purposes they liked.  The overall propriety of Chat is not in issue here.  What matters is

2    how Google responded after the lawsuits were filed, and whether it honored the evidence

3    preservation duties it was abundantly familiar with from countless prior cases.

4         The record establishes that Google fell strikingly short on that score.  Several aspects of

5    Google's conduct are troubling.  As Rule 37 indicates, the duty to preserve relevant evidence is an

6    unqualified obligation in all cases.  The Court's Standing Order for Civil Cases expressly spells

7    out the expectation that "as soon as any party reasonably anticipates or knows of litigation, it will

8    take the necessary, affirmative steps to preserve evidence related to the issues presented by the

9    action, including, without limitation, interdiction of any document destruction programs and any

10   ongoing erasures of e-mails, voice mails, and other electronically-recorded material."  Standing

11   Order for Civil Cases Before Judge James Donato ¶ 8.

12        Google clearly had different intentions with respect to Chat, but it did not reveal those

13   intentions with candor or directness to the Court or counsel for plaintiffs.  Instead, Google falsely

14   assured the Court in a case management statement in October 2020 that it had "taken appropriate

15   steps to preserve all evidence relevant to the issues reasonably evident in this action," without

16   saying a word about Chats or its decision not to pause the 24-hour default deletion.  Case No. 20-

17   5761, Dkt. No. 45 at 11.  Google did not reveal the Chat practices to plaintiffs until October 2021,

18   many months after plaintiffs first asked about them.  *See* Dkt. No. 429 (Google's response to

19   Court's questions) at 3 ("Google informed Plaintiffs on October 21, 2021, that it had not

20   suspended the 24-hour retention policy for history 'off' chats.").  The Court has since had to spend

21   a substantial amount of resources to get to the truth of the matter, including several hearings, a

22   two-day evidentiary proceeding, and countless hours reviewing voluminous briefs.  All the while,

23   Google has tried to downplay the problem and displayed a dismissive attitude ill tuned to the

24   gravity of its conduct.  Its initial defense was that it had no "ability to change default settings for

25   individual custodians with respect to the chat history setting," Dkt. No. 427-3 ¶ 25, but evidence at

26   the hearing plainly established that this representation was not truthful.

27        Why this situation has come to pass is a mystery.  From the start of this case, Google has

28   had every opportunity to flag the handling of Chat and air concerns about potential burden, costs,

16

United States District Court
Northern District of California

1    and related factors.  At the very least, Google should have advised plaintiffs about its preservation

2    approach early in the litigation, and engaged in a discussion with them.  It chose to stay silent until

3    compelled to speak by the filing of the Rule 37 motion and the Court's intervention.  The Court

4    has repeatedly asked Google why it never mentioned Chat until the issue became a substantial

5    problem.  It has not provided an explanation, which is worrisome, especially in light of its

6    unlimited access to accomplished legal counsel, and its long experience with the duty of evidence

7    preservation.

8         Another major concern is the intentionality manifested at every level within Google to hide

9    the ball with respect to Chat.  As discussed, individual users were conscious of litigation risks and

10   valued the "off the record" functionality of Chat.  Google as an enterprise had the capacity of

11   preserving all Chat communications systemwide once litigation had commenced but elected not

12   do so, without any assessment of financial costs or other factors that might help to justify that

13   decision.

14        This is in sharp contrast to Google's handling of email.  When a litigation hold is in place,

15   Google automatically preserves all emails from relevant custodians without requiring any

16   individual action.  Custodians cannot override the automated preservation of their emails.  *See*

17   Hrg. Tr. at 54:12-55:1.  Google took the opposite course with Chat, and gave each employee carte

18   blanche to make his or her own call about what might be relevant in this complex antitrust case,

19   and whether a Chat communication should be preserved.  The obvious danger of this approach

20   was captured in Rosenberg's testimony about not really knowing the issues in this litigation, and

21   not preserving his communications.  Google aggravated the situation by intentionally deciding not

22   to check up on employee decisions to ensure that relevant evidence was being preserved.  In

23   effect, Google adopted a "don't ask, don't tell" policy for Chat preservation, at the expense of its

24   preservation duties.

25        Consequently, on the record as a whole, the Court concludes that Google did not take

26   reasonable steps to preserve electronically stored information that should have been preserved in

27   the anticipation or conduct of litigation.  Fed. R. Civ. P. 37(e).  The record demonstrates that the

28   deleted Chat evidence "cannot be restored or replaced through additional discovery."  *Id*.  The

17

**SER-615**

United States District Court
Northern District of California

1    record also establishes intentionality for purposes of Rule 37(e)(2).  The Court concludes that

2    Google intended to subvert the discovery process, and that Chat evidence was "lost with the intent

3    to prevent its use in litigation" and "with the intent to deprive another party of the information's

4    use in the litigation."  Comm. Notes, Subdivision (e)(2).

5         A prejudice finding under Rule 37(e)(1) is not strictly necessary because the finding of

6    intent under subdivision (e)(2) supports "not only an inference that the lost information was

7    unfavorable to the party that intentionally destroyed it, but also an inference that the opposing

8    party was prejudiced by the loss of information that would have favored its position."  Comm.

9    Notes, Subdivision (e)(2).  It is clear in the record that relevant, substantive business

10   communications were made on Chat that plaintiffs will never see, to the potential detriment of

11   their case.  Google says that the prejudice is limited because there are only "21 custodians for

12   which the parties agreed to conduct limited post-Complaint discovery," and "[f]or only 21 of the

13   total 44 custodians, the parties agreed that Google would search for documents dated *after* August

14   13, 2020.  With respect to the remaining 23 custodians, the cut-off date was on or before August

15   13, 2020."  Dkt. No. 429 at 5-6 (emphasis in original; internal citation omitted).  The point is not

16   well taken.  The agreements between the parties were made while plaintiffs were completely in the

17   dark about Google's Chat practices, and the Court declines to give Google any benefit from deals

18   made on incomplete information.  In addition, prejudice for Rule 37 purposes is a matter of

19   fairness and equity, which is why Rule 37(e) "leaves judges with discretion to determine how best

20   to assess prejudice in particular cases."  Comm. Notes, Subdivision (e)(1).  It is also not plaintiffs'

21   burden to prove prejudice, *see id*., but the plaintiffs' supplemental briefs and evidence, Dkt.

22   No. 468, certainly did so.

23        The remaining question is about the remedy.  Proportionality is the governing concept

24   here.  To that end, the Committee Notes advise courts to "exercise caution," and state that

25   "[f]inding an intent to deprive another party of the lost information's use in the litigation does not

26   require a court to adopt any of the measures listed in subdivision(e)(2).  The remedy should fit the

27   wrong, and the severe measures authorized by this subdivision should not be used when the

28

Case 3:21-md-02981-JD   Document 469   Filed 03/28/23   Page 19 of 19

1    information lost was relatively unimportant or lesser measures such as those specified in

2    subdivision (e)(1) would be sufficient to redress the loss."  Comm. Notes, Subdivision (e)(2).

3          The Court has already declined to issue terminating sanctions against Google.  This

4    antitrust case will not be decided on the basis of lost Chat communications.  The determination of

5    an appropriate non-monetary sanction requires further proceedings.  The Court fully appreciates

6    plaintiffs' dilemma of trying to prove the contents of what Google has deleted.  Even so, the

7    principle of proportionality demands that the remedy fit the wrong, and the Court would like to see

8    the state of play of the evidence at the end of fact discovery.  At that time, plaintiffs will be better

9    positioned to tell the Court what might have been lost in the Chat communications.

10         For monetary sanctions, it is entirely appropriate for Google to cover plaintiffs' reasonable

11   attorneys' fees and costs in bringing the Rule 37 motion, including the joint statement that

12   preceded the motion and the evidentiary hearing and related events.  Plaintiffs are directed to file

13   by April 21, 2023, a statement of proposed attorneys' fees and costs with adequate

14   documentation.[5]  The parties will meet and confer on the proposal, and file a statement by May 12,

15   2023, indicating an agreement or identifying specific areas of disagreement for the Court to

16   resolve.

17         **IT IS SO ORDERED.**

18   Dated:  March 28, 2023

19

20                                                    _____

21                                                    JAMES DONATO
                                                     United States District Judge
22

23

24

25

26   _____

27   [5] As with counsel fee requests in the class settlement context, declarations of counsel as to the
     number of hours spent on various categories of activities related to the proceedings by each biller,
     together with hourly billing rate information may be sufficient, provided that the declarations are
28   adequately detailed.  The same goes for costs.  Counsel should be prepared to submit copies of
     detailed billing and costs records if the Court orders.

19

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### Civil Minutes

Date:  January 31, 2023                          Judge:  Hon. James Donato

Time:  3 Hours & 24 Minutes

Case No.       **3:21-md-02981-JD In re Google Play Store Antitrust Litigation**
               **3:20-cv-05671-JD Epic Games, Inc. v. Google LLC et al**
               **3:20-cv-05761-JD In re Google Play Consumer Antitrust Litigation**
               **3:21-cv-05227-JD State of Utah et al v. Google LLC et al**
               **3:22-cv-02746-JD Match Group, LLC et al v. Google LLC et al**


Attorney(s) for Plaintiff(s):        Glen Summers/Karma Giulianelli/John Byars/Gary Bornstein/
                                     Hae Sung Nam/Lauren Moskowitz/Elizabeth Pritzker/
                                     Nancy Nishimura/Aaron Schwartz/Lauren Weinstein/
                                     Paul Riehle/Brendan Glackin/Doug Dixon/Lee Mason
Attorney(s) for Defendant(s):        Glen Pomerantz/Brian Rocca/Michelle Park Chiu/
                                     Justin Raphael

Court Reporter:  Ana Dub

Deputy Clerk:  Lisa Clark


### PROCEEDINGS

Evidentiary Hearing -- Held


### NOTES AND ORDERS

The Court takes further argument on plaintiffs' motion for sanctions.  MDL Dkt. No. 349.  For
the Tian Lim deposition transcript and exhibits that were lodged in chambers, the parties will
resubmit a copy that has the relevant portions highlighted (or file a version that collates only the
relevant excerpts and exhibits).

The parties are directed to take these steps before the Court issues its ruling on the motion:

- Google will produce to plaintiffs within 14 days the chats that were preserved for
  Custodians 22 through 383 listed in Exhibit A to the Declaration of Duy Ho, Dkt.
  No. 429-2.  The parties will meet and confer on whether Google will conduct a
  responsiveness review prior to production of these chats.

1

**SER-618**

- Google will produce to plaintiffs the "system-wide backend log" referenced in the Declaration of Devin Chen, Dkt. No. 429-4. Plaintiffs may depose Devin Chen and/or other Google employees as reasonably needed for an understanding of the log and its data.

- The parties will meet and confer about which of the relevant custodians still have their history setting turned to "off" for any of their chats, and whether Google should now change those default history settings to "on" for the core set of relevant custodians as the parties agree.

- The parties will formulate a plan to execute the above steps, and submit by February 6, 2023, a joint statement confirming they have done so.

The proposed case schedule, Dkt. No. 434 at 2-3, is approved. A jury trial is set for November 6, 2023. The four plaintiffs' groups will confer on coordinating their experts so that the plaintiffs as a group will present one expert for each common issue. Individual issues may be addressed by separate experts. Plaintiffs will provide Google with their revised list of experts so Google may consider which, if any, of the experts Google will attempt to exclude from trial.

The parties will report back to the Court after this has been done, and the Court will then take up the issue of how many, and when, any concurrent expert proceedings will be held in connection with any anticipated *Daubert* motions.

SER-619

*Google Evid. Hrg. Exhibits*
*C-20-5671-JD   C-21-5227-JD*
*C-20-5761-JD   21-MD-2981-JD*
*C-22-2746-JD*

**Table of Contents**

| Binder Number | Bates Number / Description |
|---|---|
| **DXCH Exhibits** | |
| DXCH-1 | Google Chat Retention Policy |
| DXCH-2 | Google Chat Retention FAQs |
| DXCH-8 | GOOG-PLAY-003683919 |
| DXCH-96 | GOOG-PLAY-001161126 |
| DXCH-104 | Generic sample of 1:1 chat |
| DXCH-105 | Generic sample of group chat |
| DXCH-106 | Generic sample of Threaded Room |
| DXCH-107 | Screenshot showing ease of using "history on" button |
| DXCH-108 | Screenshot showing ease of using "forward to email" button |
| **PX Exhibits** | |
| PX-67 | GOOG-PLAY-009911168 |
| PX-92 | GOOG-PLAY-009992736 |
| PX-163 | Declaration of Andrew Rope, dated November 3, 2022, In re Google Play Store Antitrust Litigation, Dkt. No. 299-3, Case No. 3:21-md-02981 (N.D. Cal.) |

ORDER. As requested by the parties, MDL Dkt. No. 419, the evidentiary hearing on the chat data dispute will resume, and closing arguments will be heard, on January 31, 2023, at 1:30 p.m. in Courtroom 11, San Francisco. The parties' proposal for the submissions of written responses in advance of the hearing, MDL Dkt. No. 419 at 2, is approved. Signed by Judge James Donato on 1/18/2023. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jdlc2, COURT STAFF) (Filed on 1/18/2023)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### Civil Minutes

Date:  January 12, 2023                                   Judge:  Hon. James Donato

Time:  2 Hours & 30 Minutes

Case No.    **3:21-md-02981-JD In re Google Play Store Antitrust Litigation**
            **3:20-cv-05671-JD Epic Games, Inc. v. Google LLC et al**
            **3:20-cv-05761-JD In re Google Play Consumer Antitrust Litigation**
            **3:20-cv-05792-JD In re Google Play Developer Antitrust Litigation**
            **3:21-cv-05227-JD State of Utah et al v. Google LLC et al**
            **3:22-cv-02746-JD Match Group, LLC et al v. Google LLC et al**

Attorney(s) for Plaintiff(s):     Karma Giulianelli/John Byars/Gary Bornstein/
                                  Hae Sung Nam/Lauren Moskowitz/Elizabeth C Pritzker/
                                  Nancy Nishimura/Aaron Schwartz/Lauren Weinstein/
                                  Paul Riehle/Brendan Glackin/Doug Dixon/Glen Summers
Attorney(s) for Defendant(s):     Glen Pomerantz/Brian Rocca/Michelle Park Chiu/
                                  Jonathan Kravis

Court Reporter:  Ana Dub

Deputy Clerk:  Lisa Clark

## PROCEEDINGS

Evidentiary Hearing & Status Conference -- Held

## NOTES AND ORDERS

The Court holds an evidentiary hearing on plaintiffs' motion for sanctions, MDL Dkt. No. 349, in Case Nos. 20-5671, 20-5761, 21-5227, and 22-2746.  *See* attached Exhibit and Witness List.

The parties will jointly propose by January 17, 2023, a date and time for closing arguments.  The parties will also propose a plan for responding to these questions, whether by further witness examination or written submissions under oath:

- How many recipients of the litigation hold notice in this case personally elected to turn the history to "on" for any of their Google Chats?
  - On what dates did the hold notice recipients do so?
  - If they later turned the chat history back to "off," when did they do that?

1

**SER-622**

- In any case filed in the United States in the past five years, did Google preserve all Google Chats for relevant individuals (with Google turning the history to "on" for all of those individuals' Google Chats, rather than leaving the preservation decision to the discretion of each individual employee)?
- When did this issue first come up in this case and how?
- Did Google take "appropriate steps to preserve all evidence relevant to the issues reasonably evident in this action" as it represented to the Court in a case management statement on October 1, 2020?  *See* Case No. 20-5761, Dkt. No. 45 at 11.
- Did Google plainly advise plaintiffs' counsel or the Court that it was choosing an approach to the preservation of Google Chats that could lead to the loss of potentially relevant evidence if an individual employee decided not to preserve a relevant chat?
- If the Court concludes that Google did not meet its preservation obligations, what is the appropriate remedy?  The parties are advised that proposed remedies must be specific and proportionate.  Terminating sanctions will not be considered and may not be proposed.

The Court expects that all proceedings relating to the chat preservation issue will be completed by the end of January 2023.

For the case schedule, the Court will extend all remaining dates and is contemplating a trial in September or October 2023.  The parties' joint submission on January 17, 2023, should also include the parties' joint proposals on this issue.

2

SER-623

1   Karma M. Giulianelli (SBN 184175)          Brendan P. Glackin (SBN 199643)
2   **BARTLIT BECK LLP**                        **OFFICE OF THE UTAH ATTY.**
                                                **GENERAL**
3   1801 Wewetta St., Suite 1200               160 E 300 S, 5th Floor, PO Box 140872
    Denver, Colorado 80202                      Salt Lake City, UT 84114-0872
4
5   *Counsel for the Proposed Consumer Class*   *Counsel for the States*

6   Paul J. Riehle (SBN 115199)                 Douglas J. Dixon (SBN 275389)
    **FAEGRE DRINKER BIDDLE & REATH**           **HUESTON HENNIGAN LLP**
7   **LLP**                                      620 Newport Center Drive, Suite 1300
    Four Embarcadero Center, 27th Floor         Newport Beach, CA 92660
8   San Francisco, CA 94111
9   *Counsel for Epic Games, Inc. in Epic Games,*   *Counsel for Match Group, LLC, et al.*
    *Inc. v. Google LLC et al.*
10
    [Additional counsel appear on signature page]
11
12                    UNITED STATES DISTRICT COURT
13                   NORTHERN DISTRICT OF CALIFORNIA
14                        SAN FRANCISCO DIVISION
15
16  **IN RE GOOGLE PLAY STORE**               Case No. 3:21-md-02981-JD
    **ANTITRUST LITIGATION**
17
    THIS DOCUMENT RELATES TO:                 **NOTICE OF LODGING**
18
19  *Epic Games, Inc. v. Google LLC et al.*,   Judge:  Hon. James Donato
    Case No. 3:20-cv-05671-JD
20
    *In re Google Play Consumer Antitrust*
21  *Litigation*, Case No. 3:20-cv-05761-JD

22  *State of Utah et al. v. Google LLC et al.*,
    Case No. 3:21-cv-05227-JD
23
    *Match Group, LLC et al. v. Google LLC et al.*,
24  Case No. 3:22-cv-02746-JD

25
26
27
28

NOTICE OF LODGING
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD;
3:21-cv-05227-JD, 3:22-cv-02746-JD

**SER-624**

Plaintiff Epic Games, Inc., Plaintiffs Match Group LLC, et al., Consumer Plaintiffs, State Attorneys General Plaintiffs, by and through their undersigned counsel, and following a discussion with the Court's clerk, hereby lodge with the Court the following exhibits admitted during the evidentiary hearing held on January 12, 2023 before the Honorable James Donato:

| Exhibit | Description | Bates |
|---------|-------------|-------|
| PX-9 | Document titled Play Apps BD Updates: Mar 2021 | GOOG-PLAY-007653956 |
| PX-11 | Chat between Ornella Indonie and Ashish Pimplapure | GOOG-PLAY-007943814 |
| PX-16 | Chat between Jamie Rosenberg and Ashish Pimplapure | GOOG-PLAY-007216709 |
| PX-25 | Chat between Bob Borchers and Jamie Rosenberg | GOOG-PLAY-000087767 |
| PX-31 | Document titled Roundtable Breakfast with Don Harrison | GOOG-PLAY4-003752440 |
| PX-37 | Chat between Jim Kolotouros, Jamie Rosenberg and others | GOOG-PLAY-001974461 |
| PX-67 | Chat between Adrienne McCallister, Supriya Gurjal and others | GOOG-PLAY-009911168 |
| PX-68 | Chat between Susan Wojcicki and Hiroshi Lockheimer | GOOG-PLAY-004455818 |
| PX-92 | Chat between Jonathan Nagao and Jamie Rosenberg | GOOG-PLAY-009992736 |
| PX-96 | Email including Sarah Karam, Mike Marchak and others | GOOG-PLAY-003884433 |
| PX-103 | Chat between Sagar Kamdar and Sameer Samat | GOOG-PLAY-010510815 |
| PX-106 | Chat between Karan Gambhir and Mike Marchak | GOOG-PLAY-003894444 |
| PX-120 | Untitled document | GOOG-PLAY-005029848 |
| DXCH-1 | Google Chat Retention Policy | N/A |
| DXCH-2 | Google Chat Retention FAQs | N/A |

1

NOTICE OF LODGING
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD;
3:21-cv-05227-JD, 3:22-cv-02746-JD

SER-625

(176 of 297), Page 176 of 297
Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 176 of 297
Case 3:21-md-02981-JD  Document 414  Filed 01/13/23  Page 3 of 6

| Exhibit | Description | Bates |
|---------|-------------|-------|
| DXCH-8 | Chat between Katherine Wood and Jamie Rosenberg | GOOG-PLAY-003683919 |
| DXCH-104 | Example of 1:1 chat | N/A |
| DXCH-105 | Example of group chat | N/A |
| DXCH-106 | Example of threaded room | N/A |
| DXCH-107 | Turning history "on" in a Google Chat | N/A |
| DXCH-108 | Forwarding a Google Chat to email inbox | N/A |

NOTICE OF LODGING
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD;
3:21-cv-05227-JD, 3:22-cv-02746-JD

SER-626

Dated: January 13, 2023                CRAVATH, SWAINE & MOORE LLP
                                           Christine Varney *(pro hac vice)*
                                           Gary A. Bornstein *(pro hac vice)*
                                           Timothy G. Cameron *(pro hac vice)*
                                           Yonatan Even *(pro hac vice)*
                                           Lauren A. Moskowitz *(pro hac vice)*
                                           Justin C. Clarke *(pro hac vice)*
                                           Michael J. Zaken *(pro hac vice)*
                                           M. Brent Byars *(pro hac vice)*


                                       FAEGRE DRINKER BIDDLE & REATH LLP
                                           Paul J. Riehle (SBN 115199)

                                       Respectfully submitted,

                                       By: */s/ Lauren A. Moskowitz*
                                           Lauren A. Moskowitz

                                           *Counsel for Plaintiff Epic Games, Inc.*


Dated:  January 13, 2023               BARTLIT BECK LLP
                                           Karma M. Giulianelli

                                       KAPLAN FOX & KILSHEIMER LLP
                                           Hae Sung Nam

                                       Respectfully submitted,

                                       By: */s/ Karma M. Giulianelli*
                                           Karma M. Giulianelli

                                           *Co-Lead Counsel for the Proposed Class in In
                                           re Google Play Consumer Antitrust Litigation*

---

3

NOTICE OF LODGING
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD;
3:21-cv-05227-JD, 3:22-cv-02746-JD                    **SER-627**

Dated:  January 13, 2023            PRITZKER LEVINE LLP
                                      Elizabeth C. Pritzker

                                    Respectfully submitted,

                                    By: */s/ Elizabeth C. Pritzker*
                                      Elizabeth C. Pritzker

                                    *Liaison Counsel for the Proposed Class in In re
                                    Google Play Consumer Antitrust Litigation*

Dated:  January 13, 2023            OFFICE OF THE UTAH ATTORNEY GENERAL
                                      Brendan P. Glackin
                                      Lauren Weinstein

                                    Respectfully submitted,

                                    By: */s/ Brendan P. Glackin*
                                      Brendan P. Glackin

                                    *Counsel for the Plaintiff States*

Dated:  January 13, 2023            HUESTON HENNIGAN LLP
                                      Douglas J. Dixon
                                      Christine Woodin
                                      Joseph A. Reiter

                                    Respectfully submitted,

                                    By: */s/ Douglas J. Dixon*
                                      Douglas J. Dixon

                                    *Counsel for Plaintiffs Match Group, LLC et al.*

---

4

---

NOTICE OF LODGING
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD;
3:21-cv-05227-JD, 3:22-cv-02746-JD

**SER-628**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **E-FILING ATTESTATION**

I, Lauren A. Moskowitz, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the signatories identified above has concurred in this filing.

*/s/ Lauren A. Moskowitz*
Lauren A. Moskowitz

5

NOTICE OF LODGING
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD;
3:21-cv-05227-JD, 3:22-cv-02746-JD

**SER-629**

(180 of 297), Page 180 of 297
Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 180 of 297
Case 3:21-md-02981-JD   Document 386   Filed 12/01/22   Page 1 of 44

1    Brian C. Rocca, S.B. #221576
     brian.rocca@morganlewis.com
2    Sujal J. Shah, S.B. #215230
     sujal.shah@morganlewis.com
3    Michelle Park Chiu, S.B. #248421
     michelle.chiu@morganlewis.com
4    Minna Lo Naranjo, S.B. #259005
     minna.naranjo@morganlewis.com
5    Rishi P. Satia, S.B. #301958
     rishi.satia@morganlewis.com
6    **MORGAN, LEWIS & BOCKIUS LLP**
     One Market, Spear Street Tower
7    San Francisco, CA 94105
     Telephone: (415) 442-1000
8
     Richard S. Taffet, *pro hac vice*
9    richard.taffet@morganlewis.com
     **MORGAN, LEWIS & BOCKIUS LLP**
10   101 Park Avenue
     New York, NY 10178
11   Telephone: (212) 309-6000

12

13   *Counsel for Defendants Google LLC et al.*

     Glenn D. Pomerantz, S.B. #112503
     glenn.pomerantz@mto.com
     Kuruvilla Olasa, S.B. #281509
     kuruvilla.olasa@mto.com
     **MUNGER, TOLLES & OLSON LLP**
     350 South Grand Avenue, Fiftieth Floor
     Los Angeles, California 90071
     Telephone: (213) 683-9100

     Kyle W. Mach, S.B. #282090
     kyle.mach@mto.com
     Justin P. Raphael, S.B. #292380
     justin.raphael@mto.com
     Emily C. Curran-Huberty, S.B. #293065
     emily.curran-huberty@mto.com
     **MUNGER, TOLLES & OLSON LLP**
     560 Mission Street, Twenty Seventh Floor
     San Francisco, California 94105
     Telephone: (415) 512-4000

     Jonathan I. Kravis, *pro hac vice*
     jonathan.kravis@mto.com
     **MUNGER, TOLLES & OLSON LLP**
     601 Massachusetts Avenue NW, Suite 500E
     Washington, D.C. 20001
     Telephone: (202) 220-1100

14

15

16                   **UNITED STATES DISTRICT COURT**

17                 **NORTHERN DISTRICT OF CALIFORNIA**

18                     **SAN FRANCISCO DIVISION**

19

20   **IN RE GOOGLE PLAY STORE**            Case No. 3:21-md-02981-JD
     **ANTITRUST LITIGATION**
21
                                            **DEFENDANTS' ANSWER,**
22   This Document Relates To:             **DEFENSES, AND COUNTERCLAIMS**
                                            **TO EPIC GAMES, INC.'S SECOND**
23   *Epic Games Inc. v. Google LLC et al.*,  **AMENDED COMPLAINT FOR**
     Case No. 3:20-cv-05671-JD              **INJUNCTIVE RELIEF**
24
                                            **DEMAND FOR JURY TRIAL**
25
                                            Judge:  Hon. James Donato
26

27

28
                                            **SER-630**

─────────────────────────────────────────────

1    **Sixth Defense**

2    **(Foreign Trade Antitrust Improvements Act)**

3    Plaintiff's claims are barred, in whole or in part, by the Foreign Trade Antitrust

4    Improvements Act, 15 U.S.C. § 6a, insofar as Plaintiff makes claims concerning transactions or

5    alleged conduct involving trade or commerce with foreign nations outside U.S. jurisdiction.

6    **Seventh Defense**

7    **(*Noerr-Pennington* Doctrine)**

8    Plaintiff's causes of action are barred, in whole or in part, by the *Noerr-Pennington*

9    doctrine.

10    **Eighth Defense**

11    **(Unclean Hands)**

12    Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands for the

13    reasons asserted below in Google's Counterclaims.

14    **Ninth Defense**

15    **(*In Pari Delicto*)**

16    Plaintiff's claims are barred, in whole or in part, by the doctrine of *in pari delicto* and/or

17    Plaintiff's equal involvement in the alleged antitrust violation.

18    **Tenth Defense**

19    **(Estoppel)**

20    Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

21    **Eleventh Defense**

22    **(Collateral Estoppel)**

23    Plaintiff is collaterally estopped based on the Rule 52 Order After Trial on the Merits in

24    *Epic v. Apple* (N.D. Cal. Case No. 4:20-cv-05640-YGR), Dkt. 812, from asserting, among other

25    things, an Android App Distribution Market.

26    **Twelfth Defense**

27    **(Dormant Commerce Clause)**

28    Plaintiffs' claims are barred in whole or in part by the Dormant Commerce Clause.

-25-    **SER-631**

DEFENDANTS' ANSWER TO EPIC'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD

(182 of 297), Page 182 of 297
Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 182 of 297
Case 3:21-md-02981-JD   Document 386   Filed 12/01/22   Page 27 of 44

**RESERVATION OF DEFENSES**

Google reserves the right to assert additional defenses when it determines the particulars of Epic's claims, which are not apparent on the face of the Second Amended Complaint. Google reserves the right to amend this Answer to add, delete, or modify defenses based upon legal theories that may be or will be divulged through clarification of Epic's Second Amended Complaint, through discovery, or through further legal analysis of Epic's position in this litigation.

**JURY DEMAND**

Google demands a trial by jury on all issues so triable.

**GOOGLE'S COUNTERCLAIMS IN REPLY**

Defendants and Counter-plaintiffs Google LLC, Google Ireland Limited, Google Commerce Ltd., and Google Asia Pacific Pte. Ltd., (collectively, "Google"), on personal knowledge as to their own acts, and on information and belief as to all others based on their own and their attorneys' investigation, allege the following Counterclaims against Plaintiff and Counter-defendant Epic Games, Inc. ("Epic").

Epic, a multibillion dollar company backed by two of the world's largest video game developers, has profited immensely from the safe, secure platform provided by Google Play, a platform for which it pays a fee equivalent or less than that charged by other major platform providers. Not satisfied with those immense profits, it entered into a legal agreement with Google with which it never intended to comply, deceiving Google and concealing its true intentions to provoke a legal and public relations confrontation that continues to this day. Its actions have put its own users at risk, have harmed Google, and are deserving of relief from this Court.

I.      **JURISDICTIONAL STATEMENT**

A.      **Jurisdiction**

1.      The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship between Epic and Google. The amount in controversy exceeds $75,000. The Court also has jurisdiction over Google's counterclaims pursuant to 28 U.S.C. § 1367, because each of Google's counterclaims arises out of the same factual nucleus as Epic's claims brought under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337.

**SER-632**

2.      Epic has subjected itself to personal jurisdiction by filing its Second Amended

Complaint in the Northern District of California. In any event, Epic has subjected itself to personal

jurisdiction in this District because it has engaged in minimum sufficient contacts with this

District and has purposefully availed itself of the benefits and protections of both United States

and California law such that the exercise of jurisdiction over Epic would comport with due process

requirements.

**B.     Venue**

3.      Venue is proper in this District because Epic brought this action and thereby

consented to venue. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)

because a substantial part of the events or omissions giving rise to Epic's claims occurred in this

District.

## II.      THE PARTIES

4.      Google LLC is a limited liability company organized and existing under the laws of

the State of Delaware, and has its principal place of business in Mountain View, California.

5.      Google Ireland Limited is a company incorporated in Ireland with its principal

place of business in Dublin, Ireland.

6.      Google Commerce Ltd. is a company incorporated in Ireland with its principal

place of business in Dublin, Ireland.

7.      Google Asia Pacific Pte. Ltd. is a company incorporated in Singapore with its

principal place of business in Mapletree Business City, Singapore.

8.      Epic Games, Inc. is a Maryland corporation with its principal place of business in

Cary, North Carolina.

## III.      BACKGROUND

**A.     Android App Distribution and Google Play**

9.      Started in a Silicon Valley garage in 1998, Google is one of the most innovative

technology companies on the planet. In 2008, Google introduced the open-source Android

operating system. To this day, Google licenses Android for free.

-27-                                          **SER-633**

DEFENDANTS' ANSWER TO EPIC'S SECOND AMENDED COMPLAINT AND COUNTERCLAIMS
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD

ORDER. The parties have jointly selected January 12, 2023, at 1:30 p.m. in Courtroom 11, San Francisco, 19th Floor, for the evidentiary hearing on the Google chat data dispute, MDL Dkt. No. 349. A joint proposed witness list with testimony topics is due by January 5, 2023. See MDL Dkt. No. 375. Signed by Judge James Donato on 11/29/2022. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jdlc2, COURT STAFF) (Filed on 11/29/2022) (Entered: 11/29/2022)

ORDER. For the discovery dispute over Google's electronic chat data, MDL Dkt. No. 349, the Court will hold an evidentiary hearing. The parties are directed to choose one of these dates for the hearing, which the Court anticipates will go for no more than 3 hours, and advise the Court of their preferred date by November 28, 2022: (1) January 10, 2023, at 10:00 a.m.; (2) January 11, 2023, at 10:00 a.m.; (3) January 12, 2023, at 1:30 p.m. The parties will file a joint proposed witness list with testimony topics seven court days before the hearing date. In addition to anything else the parties would like to present at the hearing, the Court anticipates testimony by Google witnesses about the use and operation of the electronic chat system, including storage and deletion policies, guidelines for chat content, and examples of typical chat communications. Google will present this information through direct examinations of the witnesses, and plaintiffs will cross-examine. The Court will hear argument on the discovery dispute immediately after the close of evidence. Signed by Judge James Donato on 11/16/2022. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jdlc2, COURT STAFF) (Filed on 11/16/2022) (Entered: 11/16/2022)

1   Brian C. Rocca, S.B. #221576                Glenn D. Pomerantz, S.B. #112503
    brian.rocca@morganlewis.com                 glenn.pomerantz@mto.com
2   Sujal J. Shah, S.B. #215230                 Kuruvilla Olasa, S.B. #281509
    sujal.shah@morganlewis.com                  kuruvilla.olasa@mto.com
3   Michelle Park Chiu, S.B. #248421            **MUNGER, TOLLES & OLSON LLP**
    michelle.chiu@morganlewis.com               350 South Grand Avenue, Fiftieth Floor
4   Minna Lo Naranjo, S.B. #259005              Los Angeles, California 90071
    minna.naranjo@morganlewis.com               Telephone: (213) 683-9100
5   Rishi P. Satia, S.B. #301958
    rishi.satia@morganlewis.com                 Kyle W. Mach, S.B. #282090
6   **MORGAN, LEWIS & BOCKIUS LLP**             kyle.mach@mto.com
    One Market, Spear Street Tower              Justin P. Raphael, S.B. #292380
7   San Francisco, CA 94105                     justin.raphael@mto.com
    Telephone: (415) 442-1000                   Emily C. Curran-Huberty, S.B. #293065
8                                               emily.curran-huberty@mto.com
    Richard S. Taffet, *pro hac vice*           **MUNGER, TOLLES & OLSON LLP**
9   richard.taffet@morganlewis.com              560 Mission Street, Twenty Seventh Floor
    **MORGAN, LEWIS & BOCKIUS LLP**             San Francisco, California 94105
10  101 Park Avenue                             Telephone: (415) 512-4000
    New York, NY 10178
11  Telephone: (212) 309-6000                   Jonathan I. Kravis, *pro hac vice*
                                                jonathan.kravis@mto.com
12                                              **MUNGER, TOLLES & OLSON LLP**
                                                601 Massachusetts Avenue NW, Suite 500E
13  *Counsel for Defendants Google LLC et al.*  Washington, D.C. 20001
                                                Telephone: (202) 220-1100

14

15

16              **UNITED STATES DISTRICT COURT**

17             **NORTHERN DISTRICT OF CALIFORNIA**

18                **SAN FRANCISCO DIVISION**

19

20  **IN RE GOOGLE PLAY STORE**            Case No. 3:21-md-02981-JD
    **ANTITRUST LITIGATION**
21
                                           **DEFENDANTS' ANSWER,**
22  This Document Relates To:              **DEFENSES, AND COUNTERCLAIMS**
                                           **TO EPIC GAMES, INC.'S SECOND**
23  *Epic Games Inc. v. Google LLC et al.*,**AMENDED COMPLAINT FOR**
    Case No. 3:20-cv-05671-JD              **INJUNCTIVE RELIEF**
24
                                           **DEMAND FOR JURY TRIAL**
25
                                           Judge: Hon. James Donato
26

27

28

---

Case 3:20-cv-05671-JD   Document 345   Filed 12/01/22   Page 24 of 44

1    285.    Google denies the allegations in Paragraph 285.

2    286.    Google denies the allegations in Paragraph 286.

3    287.    Google denies the allegations in Paragraph 287.

4    288.    Google denies the allegations in Paragraph 288.

5    289.    Google denies the allegations in Paragraph 289.

6    290.    Google denies the allegations in Paragraph 290, except admits that Google LLC's

7    and Google Payment Corp.'s principal place of business is in California.

8    291.    Google denies the allegations in Paragraph 291.

9    292.    Google reasserts and hereby incorporates by reference its responses to each

10   Paragraph of Plaintiff's Second Amended Complaint, as though fully set forth herein.

11   293.    Google denies the allegations in Paragraph 293.

12   294.    Google denies the allegations in Paragraph 294.

13   295.    Google denies the allegations in Paragraph 295.

14   296.    Google denies the allegations in Paragraph 296.

15   297.    Google denies the allegations in Paragraph 297.

16   298.    Google denies the allegations in Paragraph 298.

17   **Answer to Plaintiff's Prayer for Relief:**  To the extent that an answer is required to the

18   Prayer for Relief, Google denies the allegations contained therein.  Google further states that

19   Plaintiff is not entitled to any remedies sought in the Second Amended Complaint.

20   ## AFFIRMATIVE OR ALTERNATIVE DEFENSES

21   In addition to the reasons stated above, Plaintiff is not entitled to relief, and Google is

22   entitled to judgment in its favor and against Plaintiff, on the basis of the following Affirmative or

23   Alternative Defenses, pleaded in the alternative to the extent they may be found to be inconsistent.

24   Google further states that Epic is not entitled to injunctive relief, including any injunctive relief

25   that is worldwide in scope or that would extend beyond Epic. In asserting these defenses, Google

26   does not assume the burden of proof on any issue that would otherwise rest on Plaintiff. Further,

27   Google reserves all affirmative defenses under Federal Rule of Civil Procedure 8(c) and any other

28

-23-

1   defenses, at law or in equity, that may now exist or in the future be available based on discovery

2   and further factual investigation in this case.

## First Defense

### (Failure to State a Cause of Action)

5   The Second Amended Complaint fails to state a claim upon which relief can be granted.

## Second Defense

### (Legitimate Business Justifications)

8   Any and all of Google's actions alleged by Plaintiff were lawful, justified, procompetitive,

9   and carried out in Google's legitimate business interests and constitute bona fide competitive

10  activity, the benefits of which significantly outweigh any alleged anticompetitive effects.

## Third Defense

### (Relief Contrary to Public Interest, Inequitable, Impractical, and Unworkable)

13  The relief sought by Plaintiff would be contrary to the public interest, harm consumers,

14  and is otherwise inequitable, impractical, and unworkable.

## Fourth Defense

### (International Comity)

17  Plaintiff's claims are barred, in whole or in part, by the doctrine of international comity,

18  insofar as Plaintiff seeks injunctive relief affecting transactions and conduct occurring outside U.S.

19  jurisdiction.

## Fifth Defense

### (Failure to Join an Indispensable Party)

22  The Second Amended Complaint fails to join necessary and indispensable parties,

23  including, but not limited to, consumers and developers of apps distributed for free on Google

24  Play.

25

26

27

28

## Sixth Defense

### (Foreign Trade Antitrust Improvements Act)

Plaintiff's claims are barred, in whole or in part, by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, insofar as Plaintiff makes claims concerning transactions or alleged conduct involving trade or commerce with foreign nations outside U.S. jurisdiction.

## Seventh Defense

### (*Noerr-Pennington* Doctrine)

Plaintiff's causes of action are barred, in whole or in part, by the *Noerr-Pennington* doctrine.

## Eighth Defense

### (Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands for the reasons asserted below in Google's Counterclaims.

## Ninth Defense

### (*In Pari Delicto*)

Plaintiff's claims are barred, in whole or in part, by the doctrine of *in pari delicto* and/or Plaintiff's equal involvement in the alleged antitrust violation.

## Tenth Defense

### (Estoppel)

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

## Eleventh Defense

### (Collateral Estoppel)

Plaintiff is collaterally estopped based on the Rule 52 Order After Trial on the Merits in *Epic v. Apple* (N.D. Cal. Case No. 4:20-cv-05640-YGR), Dkt. 812, from asserting, among other things, an Android App Distribution Market.

## Twelfth Defense

### (Dormant Commerce Clause)

Plaintiffs' claims are barred in whole or in part by the Dormant Commerce Clause.

1 | Respectfully submitted,

2

3 | Dated:  December 1, 2022 ............ MUNGER, TOLLES & OLSON LLP
                                            Glenn D. Pomerantz
4                                           Kuruvilla Olasa
                                            Emily C. Curran-Huberty
5                                           Jonathan I. Kravis
                                            Justin P. Raphael
6                                           Kyle W. Mach
                                            Dane P. Shikman
7                                           Nicholas R. Sidney

8
                                      By:    /s/ Glenn Pomerantz
9                                            Glenn D. Pomerantz

10                                    Counsel for Defendants Google LLC et al.

11

12 | Dated:  December 1, 2022 ............ MORGAN, LEWIS & BOCKIUS LLP
                                            Brian C. Rocca
13                                          Sujal J. Shah
                                            Michelle Park Chiu
14                                          Minna L. Naranjo
                                            Rishi P. Satia

15

16
                                      By:     /s/ Brian Rocca
17                                            Brian C. Rocca

18                                    Counsel for Defendants Google LLC et al.

19

20

21

22

23

24

25

26

27

28

-42-

1

## **E-FILING ATTESTATION**

2

I, Glenn Pomerantz, am the ECF User whose ID and password are being used to

3

file this document.  In compliance with Civil Local Rule 5-1(h)(3), I hereby attest that each of the

4

signatories identified above has concurred in this filing.

5

6

                            */s/ Glenn Pomerantz*
                            Glenn Pomerantz

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-43-

| | |
|---|---|
| 1 | Karma M. Guilianelli (SBN 184175)<br>karma.giulianelli@bartlitbeck.com |
| 2 | **BARTLIT BECK LLP**<br>1801 Wewatta St., Suite 1200 |
| 3 | Denver, Colorado 80202<br>Telephone: (303) 592-3100 |
| 4 | |
| 5 | Hae Sung Nam (*pro hac vice*)<br>hnam@kaplanfox.com |
| 6 | **KAPLAN FOX & KILSHEIMER LLP**<br>850 Third Avenue |
| 7 | New York, NY 10022<br>Tel.: (212) 687-1980 |
| 8 | *Co-Lead Counsel for the Proposed Class* |
| 9 | *in In re Google Play Consumer Antitrust*<br>*Litigation* |
| 10 | Steve W. Berman (*pro hac vice*) |
| 11 | steve@hbsslaw.com<br>**HAGENS BERMAN SOBOL SHAPIRO LLP** |
| 12 | 1301 Second Ave., Suite 2000<br>Seattle, WA 98101 |
| 13 | Telephone: (206) 623-7292 |
| 14 | Eamon P. Kelly (*pro hac vice*) |
| 15 | ekelly@sperling-law.com<br>**SPERLING & SLATER P.C.** |
| 16 | 55 W. Monroe, Suite 3200<br>Chicago, IL 60603 |
| 17 | Telephone: 312-641-3200 |
| 18 | *Co-Lead Counsel for the Proposed Class in In re*<br>*Google Play Developer Antitrust Litigation and* |
| 19 | *Attorneys for Pure Sweat Basketball, Inc.* |
| 20 | Bonny E. Sweeney (SBN 176174)<br>bsweeney@hausfeld.com |
| 21 | **HAUSFELD LLP**<br>600 Montgomery Street, Suite 3200 |
| 22 | San Francisco, CA 94104<br>Telephone: (415) 633-1908 |
| 23 | |
| 24 | *Co-Lead Counsel for the Proposed Class in In re*<br>*Google Play Developer Antitrust Litigation and*<br>*Attorneys for Peekya App Services, Inc.* |
| 25 | [Additional counsel appear on signature page] |
| 26 | |
| 27 | |
| 28 | |

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE &
REATH LLP**
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111
Telephone: (415) 591-7500

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000

*Counsel for Plaintiff Epic Games, Inc. in*
*Epic Games, Inc. v. Google LLC et al.*

Brendan P. Glackin (SBN 199643)
bglackin@agutah.gov
**OFFICE OF THE UTAH ATTORNEY
GENERAL**
160 E 300 S, 5th Floor
PO Box 140872
Salt Lake City, UT 84114-0872
Telephone:  801-366-0260

*Counsel for Utah*

Glenn D. Pomerantz (SBN 112503)
glenn.pomerantz@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Brian C. Rocca (SBN 221576)
brian.rocca@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Daniel M. Petrocelli, Bar No. 97802
dpetrocelli@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 7th Fl.
Los Angeles, CA 90067-6035
Telephone:  (310) 553-6700

*Counsel for Defendants Google LLC et al.*

**SER-642**

1

2

3

4

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

5

6

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION** | Case No. 3:21-md-02981-JD |
| THIS DOCUMENT RELATES TO: | |
| *Epic Games Inc. v. Google LLC et al.*, Case No. 3:20-cv-05671-JD | **JOINT STATEMENT RE: CASE SCHEDULE AND TRIAL STRUCTURE** |
| *In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Judge: Hon. James Donato |
| *In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD | |
| *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD | |

7

8

9

10

11

12

13

14

15    Pursuant to this Court's instruction at the conclusion of the December 16, 2021

16    status conference, the parties in the above-captioned MDL action ("the Parties"), by and through

17    their undersigned counsel, submit this Joint Statement Regarding Case Schedule and Trial

18    Structure.

19    I.    <u>CASE SCHEDULE</u>

20    Based on the guidance provided by the Court at the last status conference, the

21    Parties have met and conferred regarding a modified schedule for this MDL.  The Parties jointly

22    propose the case schedule attached as Exhibit A and set forth in the proposed order accompanying

23    this filing based on a proposed trial date of January 30, 2023.  As advised by the Court, this

24    proposed schedule separates the *Daubert* and class certification motion hearings, separates the

25    *Daubert* and dispositive motion hearings, sets deadlines for joint filings in advance of the

26    concurrent expert proceedings and sets the hearing for dispositive motions two months before the

27    final pretrial conference.

28

-2-

**SER-643**

## II.   <u>TRIAL STRUCTURE</u>

The Parties have met and conferred regarding the structure of any trials.  As the Court has previously noted, 7/22/21 Tr. 7:22-8:7, the Complaints assert substantially similar theories of antitrust liability.  Given the Court's guidance that the "optimal result" would be to have "one jury decide[] in one sitting the core antitrust issues," *see* 7/22/21 Tr. 29:03-24, the Parties are planning to proceed accordingly with a combined jury trial on the core antitrust liability issues common to the four cases.

With respect to the issue of damages, the Consumer Plaintiffs, Developer Plaintiffs, State Plaintiffs, and Google Defendants respectfully suggest that the Court defer ruling further on trial structure until after the close of expert discovery on August 19, 2022.[1]  Whether there should be a separate damages phase, and the structure of that phase, will be informed by factual evidence still to be obtained in discovery, expert reports and depositions, motions practice, and other developments that may occur over the next several months.

Likewise, with respect to Google's counterclaims against Epic, Epic and Google respectfully suggest that the Court defer ruling further on trial structure.  Whether evidence and arguments about Google's counterclaims against Epic should be part of a liability trial in which all Plaintiffs are present, or should instead be addressed during a separate phase or trial, will be informed by factual evidence still to be obtained in discovery, expert reports and depositions, motions practice, and other developments that may occur over the next several months.

The Parties jointly propose that they meet and confer on these issues promptly following the close of expert discovery (which is set for August 19, 2022 under the schedule jointly proposed by the Parties), and then meet with the Court to further discuss trial structure and the length of any trials[2] with the benefit of a more developed record.

---

[1] Plaintiff Epic has not asserted any claim for damages against Google and has no objection to the other Parties' suggestion that the Court defer ruling on the trial structure as it relates to the other Plaintiffs' damages claims.

[2] At the December 16, 2021 status conference, the Court indicated that its preliminary view was that the core antitrust liability issues could be tried over a three-week period with approximately 20-25 hours allotted to Plaintiffs and 20-25 hours allotted to Google.  At this stage, Plaintiffs anticipate needing more than three weeks to try the core antitrust liability issues due to the

| | |
|---|---|
| 1 | Dated:  January 14, 2022 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

Dated:  January 14, 2022

CRAVATH, SWAINE & MOORE LLP
    Christine Varney *(pro hac vice)*
    Katherine B. Forrest *(pro hac vice)*
    Gary A. Bornstein *(pro hac vice)*
    Timothy G. Cameron *(pro hac vice)*
    Yonatan Even *(pro hac vice)*
    Lauren A. Moskowitz *(pro hac vice)*
    Justin C. Clarke *(pro hac vice)*
    M. Brent Byars *(pro hac vice)*

FAEGRE DRINKER BIDDLE & REATH LLP
    Paul J. Riehle (SBN 115199)

Respectfully submitted,

By:   */s/ Yonatan Even*
     Yonatan Even

     *Counsel for Plaintiff Epic Games, Inc.*

Dated:  January 14, 2022

BARTLIT BECK LLP
    Karma M. Giulianelli

KAPLAN FOX & KILSHEIMER LLP
    Hae Sung Nam

Respectfully submitted,

By:   */s/ Karma M. Giulianelli*
     Karma M. Giulianelli

     *Co-Lead Counsel for the Proposed Class in*
     *In re Google Play Consumer Antitrust*
     *Litigation*

Dated:  January 14, 2022

PRITZKER LEVINE LLP
    Elizabeth C. Pritzker

Respectfully submitted,

By:   */s/ Elizabeth C. Pritzker*
     Elizabeth C. Pritzker

     *Liaison Counsel for the Proposed Class in*
     *In re Google Play Consumer Antitrust*
     *Litigation*

**SER-645**

complexity and scope of the issues and the anticipated number of fact and expert witnesses.
Accordingly, Plaintiffs respectfully request that the Court revisit the appropriate length of trial at a
later stage of the case.

-4-

1

2    Dated:  January 14, 2022                    HAGENS BERMAN SOBOL SHAPIRO LLP
                                                      Steve W. Berman
                                                      Robert F. Lopez
3                                                     Benjamin J. Siegel

4                                                 SPERLING & SLATER PC
                                                      Joseph M. Vanek
5                                                     Eamon P. Kelly
                                                      Alberto Rodriguez

6                                                 Respectfully submitted,

7                                                 By:    /s/ Steve W. Berman
                                                         Steve W. Berman
8
                                                         *Co-Lead Interim Class Counsel for the*
9                                                        *Developer Class and Attorneys for Plaintiff*
                                                         *Pure Sweat Basketball*
10

11

12   Dated:  January 14, 2022                    HAUSFELD LLP
                                                      Bonny E. Sweeney
13                                                    Melinda R. Coolidge
                                                      Katie R. Beran
14                                                    Scott A. Martin
                                                      Irving Scher

15                                                Respectfully submitted,

16                                                By:    /s/ Bonny E. Sweeney
                                                         Bonny E. Sweeney
17
                                                         *Co-Lead Interim Class Counsel for the*
18                                                       *Developer Class and Attorneys for Plaintiff*
                                                         *Peekya App Services, Inc.*
19

20

21   Dated:  January 14, 2022                    OFFICE OF THE UTAH ATTORNEY
                                                 GENERAL
22                                                    Brendan P. Glackin

23                                                Respectfully submitted,

24                                                By:    /s/ Brendan P. Glackin
                                                         Brendan P. Glackin
25
                                                         *Counsel for Utah*
26

27

28

                                                          -5-                    **SER-646**

Dated:  January 14, 2022          MORGAN, LEWIS & BOCKIUS LLP
                                                Brian C. Rocca
                                                Sujal J. Shah
                                                Michelle Park Chiu
                                                Minna L. Naranjo
                                                Rishi P. Satia

                                  Respectfully submitted,

                                  By:   */s/ Brian C. Rocca*
                                            Brian C. Rocca

                                            *Counsel for Defendants Google LLC et al.*


Dated:  January 14, 2022          O'MELVENY & MYERS LLP
                                                Daniel M. Petrocelli
                                                Ian Simmons
                                                Benjamin G. Bradshaw
                                                Stephen J. McIntyre

                                  Respectfully submitted,

                                  By:   */s/ Daniel M. Petrocelli*
                                            Daniel M. Petrocelli

                                            *Counsel for Defendants Google LLC et al.*


Dated:  January 14, 2022          MUNGER, TOLLES & OLSON LLP
                                                Glenn D. Pomerantz
                                                Kyle W. Mach
                                                Kuruvilla Olasa
                                                Justin P. Raphael
                                                Emily C. Curran-Huberty
                                                Jonathan I. Kravis
                                                Marianna Y. Mao

                                  Respectfully submitted,

                                  By:   */s/ Glenn D. Pomerantz*
                                            Glenn D. Pomerantz

                                            *Counsel for Defendants Google LLC et al.*

**SER-647**

1

**E-FILING ATTESTATION**

2    I, Kuruvilla Olasa, am the ECF User whose ID and password are being used to file

3  this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

4  signatories identified above has concurred in this filing.

5

6                                                     /s/ Kuruvilla Olasa
                                                     Kuruvilla Olasa
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SER-648**

**Exhibit A**

| ACTIVITY | DATE |
|---|---|
| **Status Conferences** | |
| Joint status conference | March 17, 2022, at 11 a.m. (by remote access) |
| Joint status conference | June 16, 2022, at 11 a.m. (by remote access) |
| **Fact Discovery Cut-off** | April 18, 2022 |
| **Class Certification** | |
| Plaintiffs' Class Certification Motion | March 3, 2022 |
| Plaintiffs' Class Certification expert report | March 3, 2022 |
| Google's Class Certification Opposition | April 5, 2022 |
| Google's Class Certification Expert Report | April 5, 2022 |
| Google's *Daubert* Motion(s) re Class Certification Report | April 5, 2022 |
| Plaintiffs' Class Certification Reply and *Daubert* Motion | April 29, 2022 |
| Plaintiffs' Class Certification Reply Expert Report | April 29, 2022 |
| Plaintiffs' Opposition to *Daubert* Motion | April 29, 2022 |
| Google's *Daubert* Reply | May 6, 2022 |
| Google's Motion re any Class Certification Reply Expert Report | May 6, 2022 |
| Plaintiffs' Response to Google's Motion re Reply Expert Report | May 13, 2022 |
| Concurrent Expert Proceeding Joint Submission | May 13, 2022 |
| Concurrent Expert Proceedings/*Daubert* Hearing | May 19, 2022 |
| Class Certification Hearing | May 26, 2022 |
| **Merits Experts** | |
| Plaintiffs' Merits Expert Reports | May 27, 2022 |

-8-

**SER-649**

JOINT STATEMENT RE CASE SCHEDULE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:20-cv-05792-JD; 3:21-cv-05227-JD

| ACTIVITY | DATE |
|---|---|
| Google's Merits Expert Reports | July 1, 2022 |
| Plaintiffs' Merits Replies | July 29, 2022 |
| Expert Discovery Cut-Off | August 19, 2022 |
| **Dispositive/*Daubert* Motions** | |
| Dispositive/*Daubert* Motions | August 26, 2022 |
| Dispositive/*Daubert* Motion Responses | September 23, 2022 |
| Dispositive/*Daubert* Motion Replies | October 14, 2022 |
| Concurrent Expert Proceeding Joint Statement | October 21, 2022 |
| Concurrent Expert Proceeding/*Daubert* Hearing | November 4, 2022 |
| Dispositive Motion Hearing | November 17, 2022 |
| **Trial** | |
| Serve (but not file) Motions in Limine | November 23, 2022 |
| Serve (but not file) opposition to Motions in Limine | December 12, 2022 |
| Pretrial Filings Due Date | December 16, 2022 |
| Pre-Trial Conference | January 19, 2023 |
| Trial Date | January 30, 2023 |

**SER-650**

-9-

JOINT STATEMENT RE CASE SCHEDULE
Case Nos. 3:21-md-02981-JD; 3:20-cv-05671-JD; 3:20-cv-05761-JD; 3:20-cv-05792-JD; 3:21-cv-05227-JD

1   Paul J. Riehle (SBN 115199)
    paul.riehle@faegredrinker.com
2   **FAEGRE DRINKER BIDDLE & REATH**
      **LLP**
3   Four Embarcadero Center
    San Francisco, California 94111
4   Telephone: (415) 591-7500
    Facsimile: (415) 591-7510
5

6

7

8

9

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Darin P. McAtee (*pro hac vice*)
dmcatee@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
**C**RAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Plaintiff and Counter-Defendant
Epic Games, Inc.*

10              **UNITED STATES DISTRICT COURT**

11             **NORTHERN DISTRICT OF CALIFORNIA**

12                **SAN FRANCISCO DIVISION**

13  EPIC GAMES, INC., a Maryland
14  Corporation,

15                                   Plaintiff,      Case No. 3:20-CV-05671-JD

16                v.                                 **EPIC GAMES, INC.'S ANSWER AND
                                                     DEFENSES TO GOOGLE'S
17  GOOGLE LLC; GOOGLE IRELAND                       COUNTERCLAIMS**
    LIMITED; GOOGLE COMMERCE
18  LIMITED; GOOGLE ASIA PACIFIC PTE.
    LIMITED; and GOOGLE PAYMENT
19  CORP.,

20                                Defendants.

21  GOOGLE LLC; GOOGLE IRELAND
    LIMITED; GOOGLE COMMERCE
22  LIMITED; GOOGLE ASIA PACIFIC PTE.
    LIMITED; and GOOGLE PAYMENT
23  CORP.,

24                              Counterclaimants,

25                v.

26  EPIC GAMES, INC., a Maryland
27  Corporation,

28                            Counter-Defendant.

EPIC'S ANSWER TO                    1           Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

1         Plaintiff and Counter-Defendant Epic Games, Inc. ("Epic"), by and through its

2 undersigned counsel, hereby answers the Counterclaims of Defendants Google LLC, Google

3 Ireland Limited, Google Commerce Ltd., and Google Asia Pacific Pte. Ltd., (collectively,

4 "Google"), filed October 11, 2021 (the "Counterclaims") and asserts its defenses.

5                                      **ANSWER**

6         Except as otherwise expressly set forth below, Epic denies each and every

7 allegation contained in the Counterclaims including, without limitation, the section headings

8 of the Counterclaims.  Epic expressly reserves the right to amend and/or supplement its

9 answer and defenses.  Epic states that no response is necessary to the unnumbered paragraphs

10 in the Counterclaims.  To the extent a response is required, Epic denies the allegations.  For

11 the avoidance of doubt, Epic is not responding to Google's Answer or to the introductory

12 materials contained in the unnumbered paragraphs preceding Google's Answer.  Subject to

13 the foregoing, as and for its Answer to Google's Counterclaims, Epic pleads as follows:

14         1.      Epic states that the allegations in Paragraph 1 state a legal conclusion to

15 which no response is required.  To the extent a response is required, Epic denies the

16 allegations in Paragraph 1, except admits that there is diversity of citizenship between Epic

17 and Google, that the amount in controversy exceeds \$75,000, that Google's counterclaims

18 arise out of the same factual nucleus as Epic's claims, and that Google purports to invoke the

19 jurisdiction of this Court pursuant to the statutes cited therein.

20         2.      Epic states that the allegations in Paragraph 2 state a legal conclusion to

21 which no response is required.  To the extent a response is required, Epic denies the

22 allegations in Paragraph 2, except admits that it filed a Complaint against Google in this

23 District.

24         3.      Epic states that the allegations in Paragraph 3 state a legal conclusion to

25 which no response is required.  To the extent a response is required, Epic denies the

26 allegations in Paragraph 3, except admits that it brought an action against Google in this Court

27 and that a substantial part of the events or omissions giving rise to Epic's claims occurred in

28 this District.

EPIC'S ANSWER TO             2           Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

1           4.     Epic admits, on information and belief, the allegations of Paragraph 4.

2           5.     Epic admits, on information and belief, the allegations of Paragraph 5.

3           6.     Epic admits, on information and belief, the allegations of Paragraph 6.

4           7.     Epic admits, on information and belief, the allegations of Paragraph 7.

5           8.     Epic admits the allegations of Paragraph 8.

6           9.     Epic denies the allegations of Paragraph 9, except that it admits, on

7    information and belief, that (i) Google was founded in a Silicon Valley garage, (ii) Google

8    made Android available on a purportedly open-source basis in 2008 and (iii) Google licenses

9    Android.

10          10.     Epic denies the allegations of Paragraph 10, except admits that Google

11   operates Google Play, an online store where Android users must often go to find Android

12   apps.

13          11.     Epic denies the allegations of Paragraph 11, except admits that Google

14   Play is not the only source from which consumers are technically able to acquire Android

15   apps.

16          12.     Epic denies the allegations of Paragraph 12, except admits, on

17   information and belief, that for a developer to distribute apps through Google Play, Google

18   requires (i) that the developer enter into the Google Play Developer Distribution Agreement

19   ("DDA"), and refers to that agreement for its contents, and (ii) that the developer adhere to

20   Google's policies, and refers to those policies for their contents.  By referring to the DDA, a

21   contract of adhesion that contains anti-competitive terms, Epic does not admit that the

22   agreement or all provisions therein are lawful and/or enforceable.  By referring to Google's

23   anti-competitive policies, Epic does not admit that those policies constitute or form part of a

24   lawful and/or enforceable contract.

25          13.     Epic denies the allegations of Paragraph 13, except admits (i) that the

26   DDA contains terms that Google purports to be binding on developers, and refers to that

27   agreement for its contents, (ii) that developers must use Google Play in order to reach a

28   worldwide audience of billions and (iii) admits, on information and belief, that Google

EPIC'S ANSWER TO          3          Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

charges developers a fee to set up a Google Play developer account.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  Epic further states that it is without knowledge or information sufficient to form a belief as to the percentage of apps available on Google Play from which Google does not collect a "service fee".

14.     Epic denies the allegations of Paragraph 14, except admits the existence of the DDA and refers to that agreement for its contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

15.     Epic denies the allegations of Paragraph 15, except admits (i) the existence of the DDA and refers to that agreement for its contents, and (ii) that Google imposes a supra-competitive tax of up to 30% of the price charged by the developer for content distributed through apps distributed through Google Play.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  Epic further states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the proportion of developers eligible for any reduced service fees that Google purports to offer.

16.     Epic denies the allegations of Paragraph 16, except admits (i) the existence of the DDA and refers to that agreement for its contents, and (ii) that Google mandates, through anti-competitive contracts of adhesion, that developers must use Google Play Billing in circumstances where developers charge for downloads of apps or for in-app purchases of, or subscriptions to, content sold within apps distributed through Google Play. By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

17.     Epic denies the allegations of Paragraph 17, except admits (i) the existence of the DDA and refers to that agreement for its contents, and (ii) that certain provisions of the DDA purport to prohibit app developers like Epic from distributing apps

EPIC'S ANSWER TO                          4               Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

that, in turn, facilitate the download of other apps.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

18.     Epic denies the allegations of Paragraph 18, except admits (i) the existence of the DDA and refers to that agreement for its contents, and (ii) the existence of Google's policies, and refers to those policies for their contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  By referring to Google's anti-competitive policies, Epic does not admit that those policies constitute or form part of a lawful and/or enforceable contract.

19.     Epic denies the allegations of Paragraph 19, except admits the existence of the DDA and refers to that agreement for its contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

20.     Epic denies the allegations of Paragraph 20, except admits (i) the existence of the DDA and refers to that agreement for its contents, and (ii) the existence of Google's policies, and refers to those policies for their contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  By referring to Google's anti-competitive policies, Epic does not admit that those policies constitute or form part of a lawful and/or enforceable contract.

21.     Epic denies the allegations of Paragraph 21, except admits (i) that Epic is, among other things, a developer of games and other apps, (ii) that Epic was founded in 1991 by Timothy Sweeney, (iii) that Timothy Sweeney is Epic's controlling shareholder, CEO, and board chairman, (iv) that Tencent Holdings, Ltd. and Sony Corporation are non-controlling shareholders in Epic and (v) that Epic's most recent equity valuation was $28.7 billion.

22.    Epic denies the allegations of Paragraph 22, except admits (i) that Epic develops *Fortnite*, (ii) that *Fortnite* is free for everyone to download and experience, (iii) that Epic offers users various in-app purchases of content for use within *Fortnite*, (iv) that *Fortnite* has topped 400 million users and (v) that *Fortnite* supports "cross-play", which allows users of certain platforms to experience *Fortnite* with one another.

23.    Epic denies the allegations of Paragraph 23, except admits (i) that Epic develops Unreal Engine, a software suite available for license by third-party developers that allows them to create and distribute three-dimensional digital content and apps, and (ii) that Epic offers Epic Online Services, an open and modular set of online services for game development.

24.    Epic denies the allegations of Paragraph 24.

25.    Epic denies the allegations of Paragraph 25, except admits (i) that Epic began distributing *Fortnite* on Google Play in April 2020, (ii) that Epic entered into a DDA with Google and refers to that agreement for its contents and (iii) that Timothy Sweeney sent an email to Google executives with the subject line "Consumer Choice & Competition" on June 30, 2020, and refers to that communication for its contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

26.    Epic denies the allegations of Paragraph 26, except admits (i) that Epic entered into a DDA with Google and refers to that agreement for its contents, (ii) that *Fortnite* is free to download and experience, (iii) that Epic offers users various in-app purchases of content for use within *Fortnite* and (iv) that Google imposed a supra-competitive fee on purchases of *Fortnite* in-app content made on apps downloaded through Google Play; and states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the profits or revenues of other developers.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

Case 3:21-md-02981-JD   Document 144   Filed 11/15/21   Page 7 of 21

27.     Epic denies the allegations of Paragraph 27, except admits (i) that Epic entered into a DDA with Google, and refers to the DDA for its contents, and (ii) the existence of Google's policies, and refers to those policies for their contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  By referring to Google's anti-competitive policies, Epic does not admit that those policies constitute or form part of a lawful and/or enforceable contract.

28.     Epic denies the allegations of Paragraph 28, except admits (i) that in August 2018, Epic began to distribute the Android version of *Fortnite* through Samsung's Galaxy Store and as a direct download from Epic's website and (ii) the existence of a blog post describing Epic's initial experiences distributing the Android version of *Fortnite*, and refers to that blog post for its contents.

29.     Epic denies the allegations of Paragraph 29, except admits (i) that Google requires users to enable the ability to install from "unknown sources" in order to download apps outside of Google Play, whether directly from third-party developers or from non-OEM third-party app stores and (ii) that Google identified a theoretical vulnerability in the *Fortnite* installer launched on Android in August 2018, which Epic promptly fixed within 36 hours.

Epic further states, on information and belief, that Google purposefully, and with anti-competitive intent, made this theoretical vulnerability public before many users had downloaded the patch that Epic had made available.  Despite Google's public position that Android is an "open" platform, when Google faced a serious attempt by a developer to distribute a popular application outside of Google Play, Google executives took urgent steps to maintain Google's monopoly over Android App distribution.  Specifically, to address Epic's decision to launch *Fortnite* outside of Google Play, Google assembled an internal "*Fortnite* Task Force".  A collection of running notes from meetings of the task force, which met daily in early August 2018, reflect Google's anti-competitive aim:  "Ultimately we want Samsung to stop this kind of stuff (enabling the FN installer)".

1        Google seized on the theoretical vulnerability in the *Fortnite* installer as a

2 means to deter users from obtaining Android apps outside Google Play and to deter

3 developers from distributing Android apps outside Google Play.  Meeting notes of the

4 *Fortnite* Task Force reflect that Google planned to publicize the vulnerability in a blog post

5 within 15 days "regardless of whether Samsung or *Fortnite* has taken action" to address it.  In

6 fact, just nine days after identifying the vulnerability to Epic, Google "flipped the bug public"

7 to media outlets it regarded as "friendlies" including by "tipp[ing] off Android Central and the

8 Security reporter at Wired".  Google did this despite knowing that many users were still

9 exposed to the vulnerability.  Epic had promptly remedied the vulnerability with a patch that

10 took effect the next time a user launched the *Fortnite* app, so consistent with typical industry

11 practice, Google should have waited up to 90 days to allow more users to launch the app and

12 become protected before making the bug public.  Instead, disregarding the security of users,

13 Google rushed to "get the word out [about the vulnerability] on the PR side" in order to deter

14 developers from launching outside of Google Play and maintain Google's monopoly over

15 Android app distribution.

16        Contrary to Google's allegations that this theoretical vulnerability was an

17 "extremely serious security flaw", Google personnel internally observed at the time that "[t]he

18 *Fortnite* example is also not a critical security (or even high) vulnerability".  Google

19 personnel recognized that the vulnerability posed no risk unless a user's device was already

20 compromised by a different potentially harmful app: "[e]xploitation of the *Fortnite*

21 vulnerability requires that already another PHA [Potentially Harmful App] is installed on the

22 device that places the PHA into the crafted location for *Fortnite* to install".  In this discussion,

23 the same Google engineer revealed the pretextual nature of Google's security warnings: "I'm

24 OK with showing a warn vulnerability warning on apps opportunistically but I don't think

25 we're actually protecting users with it.  Exploitation of app-level vulnerabilities has been

26 basically non-existent in 10 years of Android security history."  Likewise, Google's Head of

27 Security for Android further admitted, with respect to Google's use of warnings generally: "I

28

EPIC'S ANSWER TO        8        Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

1 looked at our typical privesc warning and it really does seem inappropriately dire for many of

2 the kinds of vulns we're seeing from OEMs and other developers."

3         30.    Epic denies the allegations of Paragraph 30, except admits (i) that Epic

4 entered into a DDA with Google, and refers to the DDA for its content, (ii) that "V-Bucks" is

5 the name of the digital currency used to obtain certain items within *Fortnite* and (iii) that V-

6 Bucks purchased through the Xbox and iOS versions of *Fortnite*, the Epic website and

7 through retail gift cards may be redeemed for digital content in *Fortnite* on Android.  By

8 referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does

9 not admit that the agreement or all provisions therein are lawful and/or enforceable.

10         31.    Epic denies the allegations of Paragraph 31.

11         32.    Epic denies the allegations of Paragraph 32, except admits (i) that Epic

12 referred internally to its ongoing response to Apple's and Google's anti-competitive and

13 unlawful policies and practices as "Project Liberty" and (ii) that Epic sought systematic

14 change in Apple's and Google's policies, rather than changes that might benefit only Epic.

15         33.    Epic denies the allegations of Paragraph 33, except admits (i) that Epic

16 seeks to share profits with creators and (ii) that Epic initially launched *Fortnite* on Android

17 outside of Google Play.

18         34.    Epic denies the allegations of Paragraph 34, except admits that on

19 December 5, 2019 Timothy Sweeney sent an email to Google executives with the subject line

20 "*Fortnite* on Google Play" and refers to that communication for its contents.

21         35.    Epic denies the allegations of Paragraph 35, except admits that Epic

22 submitted a build of *Fortnite* to Google in December 2019 that contained Epic's own payment

23 processing solution and without Google Play Billing, which Google rejected.

24         36.    Epic denies the allegations of Paragraph 36, except admits (i) that

25 *Fortnite* became available for download through Google Play in April 2020 and (ii) that the

26 referenced Epic employee sent two Google representatives an email on April 21, 2020 and

27 refers to that communication for its contents.

28

EPIC'S ANSWER TO           9         Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

1          37.     Epic denies the allegations of Paragraph 37, except admits (i) that

2  beginning on the morning of August 13, 2020, when the *Fortnite* app on Android devices

3  queried Epic's servers regarding how many payment processing options were available, the

4  servers informed the app that there were two options, including Epic's own payment

5  processing solution, (ii) that trial testimony was given by Timothy Sweeney in the May 2021

6  trial of Epic's claims against Apple Inc., and refers to that testimony for its contents, and (iii)

7  that a May 11, 2020 email with the subject line "Apple/Google Approach []" exists, and refers

8  to that communication for its contents.

9          38.     Epic denies the allegations of Paragraph 38, except admits that its

10  actions in response to Google's unlawful and anti-competitive policies and practices required

11  planning.

12          39.     Epic denies the allegations of Paragraph 39, except admits that Epic

13  retained a public relations firm to help communicate Apple's and Google's anti-competitive

14  policies and practices to the public.

15          40.     Epic denies the allegations of Paragraph 40, except admits the existence

16  of (i) a May 11, 2020 internal email with the subject line "Project Liberty" and refers to that

17  communication for its contents, and (ii) a slide deck titled "Project Liberty Comm's" and

18  dated May 2020, and refers to that document for its contents.

19          41.     Epic denies the allegations of Paragraph 41, except admits the existence

20  of a slide deck titled "Project Liberty Update to the Board of Directors" dated July 27, 2020,

21  and refers to that document for its contents.

22          42.     Epic denies the allegations of Paragraph 42, except admits the existence

23  of (i) an email from Timothy Sweeney to a Microsoft employee on August 5, 2020, and refers

24  to that communication for its contents, and (ii) trial testimony given by Timothy Sweeney in

25  the May 2021 trial of Epic's claims against Apple, Inc., and refers to that testimony for its

26  contents.

27

28

EPIC'S ANSWER TO           10         Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

1            43.     Epic denies the allegations of Paragraph 43, except admits that Timothy

2 Sweeney sent an email to Google executives on the morning of August 13, 2020, and refers to

3 that communication for its contents.

4            44.     Epic denies the allegations of Paragraph 44, except admits (i) that

5 beginning on the morning of August 13, 2020, when the *Fortnite* app on Android devices

6 queried Epic's servers regarding how many payment processing options were available, the

7 servers informed the app that there were two options, including Epic's own payment

8 processing solution, and (ii) the existence of an internal May 11, 2020 email chain with the

9 subject line "Apple/Google Approach []", and refers to that communication for its contents.

10            45.     Epic denies the allegations of Paragraph 45.

11            46.     Epic denies the allegations of Paragraph 46, except admits that Google

12 sent Epic a notice dated August 13, 2020 about *Fortnite* and refers to that communication for

13 its contents.

14            47.     Epic denies the allegations of Paragraph 47, except admits that Android

15 *Fortnite* users who downloaded the app from Google Play prior to the hotfix did not lose

16 access to *Fortnite* or their purchased in-app content after the hotfix was implemented.

17            48.     Epic denies the allegations of Paragraph 48, except admits that Android

18 *Fortnite* users who downloaded or updated to *Fortnite* version 13.40 through Google Play and

19 have not uninstalled the app continue to have the option to use Epic's payment processing

20 solution.

21            49.     Epic denies the allegations of Paragraph 49, except admits (i) that Epic

22 initiated this action on August 13, 2020 and (ii) that Epic communicated with consumers

23 about savings that were available if the consumer used Epic's direct payment option, and

24 refers to that communication for its contents.

25            50.     Epic restates and incorporates by reference each of its responses to

26 Google's allegations that Google purports to reallege and incorporate in Paragraph 50.

27            51.     Epic states that the allegations in Paragraph 51 state a legal conclusion

28 to which no response is required.  To the extent a response is required, Epic denies the

1   allegations in Paragraph 51, except admits the existence of the DDA and refers to that

2   agreement for its contents.  By referring to the DDA, a contract of adhesion that contains anti-

3   competitive terms, Epic does not admit that the agreement or all provisions therein are lawful

4   and/or enforceable.

5            52.    Epic states that the allegations in Paragraph 52 state a legal conclusion

6   to which no response is required.  To the extent a response is required, Epic denies the

7   allegations in Paragraph 52.

8            53.    Epic denies the allegations of Paragraph 53, except admits the existence

9   of (i) the DDA and refers to that agreement for its contents, and (ii) Google's policies, and

10  refers to those policies for their contents.  By referring to the DDA, a contract of adhesion that

11  contains anti-competitive terms, Epic does not admit that the agreement or all provisions

12  therein are lawful and/or enforceable.  By referring to Google's anti-competitive policies,

13  Epic does not admit that those policies constitute or form part of a lawful and/or enforceable

14  contract.

15           54.    Epic states that the allegations of Paragraph 54 state a legal conclusion

16  to which no response is required.  To the extent a response is required, Epic denies the

17  allegations of Paragraph 54, except admits (i) that beginning on the morning of August 13,

18  2020, when the *Fortnite* app on Android devices queried Epic's servers regarding how many

19  payment processing options were available, the servers informed the app that there were two

20  options, including Epic's own payment processing solution, and (ii) the existence of the DDA

21  and refers to that document for its contents.  By referring to the DDA, a contract of adhesion

22  that contains anti-competitive terms, Epic does not admit that the agreement or all provisions

23  therein are lawful and/or enforceable.

24           55.    Epic denies the allegations of Paragraph 55, except admits the existence

25  of the DDA and refers to that document for its contents.  By referring to the DDA, a contract

26  of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all

27  provisions therein are lawful and/or enforceable.

28

EPIC'S ANSWER TO                         12            Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

56.     Epic states that the allegations of Paragraph 56 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 56 except admits the existence of (i) the DDA and refers to that document for its contents, and (ii) Google's polices, and refers to those policies for their contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  By referring to Google's anti-competitive policies, Epic does not admit that those policies constitute or form part of a lawful and/or enforceable contract.

57.     Epic states that the allegations of Paragraph 57 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 57.

58.     Epic states that the allegations of Paragraph 58 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 58, except admits that Android *Fortnite* users who downloaded or updated to *Fortnite* version 13.40 through Google Play and have not uninstalled the app continue to have the option to use Epic's payment processing solution.

59.     Epic states that the allegations of Paragraph 59 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 59.

60.     Epic restates and incorporates by reference each of its responses to Google's allegations that Google purports to reallege and incorporate in Paragraph 60.

61.     Epic states that the allegations of Paragraph 61 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 61, except admits that Epic entered into a DDA with Google and refers to that document for its contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

EPIC'S ANSWER TO
GOOGLE'S COUNTERCLAIMS

13

Case No. 3:20-cv-05671-JD

62.     Epic states that the allegations of Paragraph 62 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 62, except admits the existence of (i) the DDA, and refers to that document for its contents and (ii) Google's policies and refers to those policies for their contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.  By referring to Google's anti-competitive policies, Epic does not admit that those policies constitute or form part of a lawful and/or enforceable contract.

63.     Epic states that the allegations of Paragraph 63 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 63, except admits the existence of the DDA, and refers to that document for its contents.  By referring to the DDA, a contract of adhesion that contains anti-competitive terms, Epic does not admit that the agreement or all provisions therein are lawful and/or enforceable.

64.     Epic states that the allegations of Paragraph 64 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 64.

65.     Epic restates and incorporates by reference each of its responses to Google's allegations that Google purports to reallege and incorporate in Paragraph 65.

66.     Epic states that the allegations of Paragraph 66 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 66.

67.     Epic states that the allegations of Paragraph 67 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 67.

68.     Epic states that the allegations of Paragraph 68 state a legal conclusion to which no response is required.  To the extent a response is required, Epic denies the allegations of Paragraph 68.

EPIC'S ANSWER TO                          14              Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

1              69.     Epic restates and incorporates by reference each of its responses to

2  Google's allegations that Google purports to reallege and incorporate in Paragraph 69.

3              70.     Epic states that the allegations of Paragraph 70 state a legal conclusion

4  to which no response is required.  To the extent a response is required, Epic denies the

5  allegations of Paragraph 70.

6              71.     Epic states that the allegations of Paragraph 71 state a legal conclusion

7  to which no response is required.  To the extent a response is required, Epic denies the

8  allegations of Paragraph 71.

9              72.     Epic denies the allegations of Paragraph 72, except admits that Google

10  communicated with Epic regarding the status of *Fortnite* on Google Play and refers to that

11  communication for its contents.

12              73.     Epic states that the allegations of Paragraph 73 state a legal conclusion

13  to which no response is required.  To the extent a response is required, Epic denies the

14  allegations of Paragraph 73.

15              74.     Epic states that the allegations of Paragraph 74 state a legal conclusion

16  to which no response is required.  To the extent a response is required, Epic denies the

17  allegations of Paragraph 74.

18              75.     Epic states that Paragraph 75 is a request for jury trial to which no

19  response is required.  To the extent a response is required, Epic denies that Google is entitled

20  to a jury trial.

21              Epic states that the unnumbered wherefore clause and the paragraphs following

22  Paragraph 74 of the Counterclaims are a request for jury trial and a prayer for relief to which

23  no response is required. To the extent a response is required, Epic denies that Google is

24  entitled to a jury trial, to the relief sought in the counterclaims, or to any relief whatsoever.

25

26

27

28

EPIC'S ANSWER TO               15           Case No. 3:20-cv-05671-JD
GOOGLE'S COUNTERCLAIMS

# EPIC'S DEFENSES

Epic asserts the following defenses. In asserting these defenses, Epic does not assume the burden of proof with respect to any issue as to which applicable law places the burden of proof on Google.

## First Defense

### (Google's Violations of the Antitrust Laws)

Google's claims are barred, in whole or in part, because the contracts on which Google's Counterclaims are based are illegal and unenforceable on the basis that they violate the antitrust and unfair competition laws, including the Sherman Act, 15 U.S.C. §§ 1, 2, the Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, as Epic respectfully requests the Court to determine on the basis of Epic's claims against Google (First Amended Complaint for Injunctive Relief, Dkt. No. 157-4), which are hereby incorporated into and restated in this First Defense as if set forth fully herein.

## Second Defense

### (Google's Contracts Are Illegal and Unenforceable)

Google's claims are barred, in whole or in part, by the doctrine of illegality because the contracts on which Google's Counterclaims are based are illegal and unenforceable pursuant to the antitrust and unfair competition laws, as Epic respectfully requests the Court to determine on the basis of Epic's claims against Google (First Amended Complaint for Injunctive Relief, Dkt. No. 157-4), which are hereby incorporated into and restated in this Second Defense as if set forth fully herein.

## Third Defense

### (Google's Contracts Are Void as Against Public Policy)

Google's claims are barred, in whole or in part, because the contracts on which Google's Counterclaims are based are void as against public policy pursuant to the antitrust laws and unfair competition laws, as Epic respectfully requests this Court to determine on the basis of Epic's claims against Google (First Amended Complaint for Injunctive Relief, Dkt.

EPIC'S ANSWER TO
GOOGLE'S COUNTERCLAIMS

16

Case No. 3:20-cv-05671-JD

**SER-666**

No. 157-4), which are hereby incorporated into and restated in this Third Defense as if set forth fully herein.

### Fourth Defense

### (Google's Contracts Are Unconscionable)

Google's claims are barred, in whole or in part, because the contracts on which Google's Counterclaims are based are unconscionable on the basis that they are contrary to the antitrust laws and unfair competition laws, as Epic respectfully requests this Court to determine on the basis of Epic's claims against Google (First Amended Complaint for Injunctive Relief, Dkt. No. 157-4), which are hereby incorporated into and restated in this Fourth Defense as if set forth fully herein.

### Fifth Defense

### (Epic's Actions Are Justified and Privileged by the Antitrust Laws)

Google's claims are barred, in whole or in part, because Epic's actions were justified or privileged pursuant to the antitrust and unfair competition laws, as Epic respectfully requests this Court to determine on the basis of Epic's claims against Google (First Amended Complaint for Injunctive Relief, Dkt. No. 157-4), which are hereby incorporated into and restated in this Fifth Defense as if set forth fully herein.

### Sixth Defense

### (Unlawful Duress)

Google's claims are barred, in whole or in part, because the Developer Distribution Agreement on which Google seeks to rely is unenforceable by reason of duress. Epic did not act freely and voluntarily in executing the Agreement, but instead under the duress and compulsion wrongfully and illegally created by Google, as Epic respectfully requests this Court to determine on the basis of Epic's claims against Google (First Amended Complaint for Injunctive Relief, Dkt. No. 157-4), which are hereby incorporated into and restated in this Seventh Defense as if set forth fully herein.

**Seventh Defense**

**(Failure To State a Claim)**

Google fails to state a claim on which relief can be granted.

**Eighth Defense**

**(Google's Unclean Hands)**

Google's claims are barred, in whole or in part, by the doctrine of unclean hands.

**Ninth Defense**

**(Google Is *In Pari Delicto*)**

Google's claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

**Tenth Defense**

**(Lack of Injury-in-Fact)**

Google's claims are barred, in whole or in part, because it has sustained no injury in fact by any act or omission of Epic.

**Eleventh Defense**

**(Unjust Enrichment))**

Google's claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Google.

**Twelfth Defense**

**(Lack of Causation)**

Google's claims are barred, in whole or in part, because of a lack of causation, including, without limitation, because any injuries or damages that may have been suffered were not caused solely or proximately by any act or omission of Epic.

Case 3:21-md-02981-JD   Document 144   Filed 11/15/21   Page 19 of 21

**Thirteenth Defense**

**(Speculative Damages)**

Google's claims are barred, in whole or in part, because any damages that Google purports to have suffered are too remote or speculative to allow recovery, and it is impossible to ascertain and allocate such alleged damages with reasonable certainty.

**Fourteenth Defense**

**(Adequate Remedy at Law)**

Google is not entitled to seek equitable relief because the injury or damage Google alleges and would be entitled to recover following resolution of Epic's antitrust claims, if there is any, would be adequately compensated pursuant to Epic's conditional admission of liability for breach of contract if the contract is lawful and enforceable or would otherwise be recoverable in an action at law for damages.

**Fifteenth Defense**

**(Good Faith)**

Google's claims are barred, in whole or in part, because Epic's acts and conduct complained of in the Counterclaims were taken in good faith.

**Sixteenth Defense**

**(Acts of Claimant)**

Google is not entitled to recover damages from Epic because Google's damages, if any, were caused by Google's own conduct, for which Epic has no liability.

**Seventeenth Defense**

**(Acts of Third Parties)**

Without conceding that any act of Epic's caused damage to Google, Epic alleges that Google's damages, if any, were caused by the conduct of third parties, for which Epic has no liability.

EPIC'S ANSWER TO
GOOGLE'S COUNTERCLAIMS

19

Case No. 3:20-cv-05671-JD

**SER-669**

Case 3:21-md-02981-JD   Document 144   Filed 11/15/21   Page 20 of 21

**<u>Eighteenth Defense</u>**

**(Judicial Admission)**

Google's claims are barred, in whole or in part, insofar as Google is bound by its admissions in prior court actions, and cannot take contrary positions in this litigation.

Dated:  November 1, 2021

Respectfully submitted,

By */s/ Gary A. Bornstein*_____

Gary A. Bornstein

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice*)
kforrest@cravath.com
Darin P. McAtee (*pro hac vice*)
dmcatee@cravath.com
Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Timothy G. Cameron (*pro hac vice*)
tcameron@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Omid H. Nasab (*pro hac vice*)
onasab@cravath.com
Justin C. Clarke (*pro hac vice*)
jclarke@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

**Attorneys for Plaintiff and Counter-Defendant**
**EPIC GAMES, INC.**

EPIC'S ANSWER TO
GOOGLE'S COUNTERCLAIMS

21

Case No. 3:20-cv-05671-JD

Case 3:21-md-02981-JD   Document 111   Filed 10/11/21   Page 1 of 43

*** REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED ***

Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000

Ian Simmons, *pro hac vice*
isimmons@omm.com
Benjamin G. Bradshaw, S.B. #189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300

*Attorneys for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa. S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
Marianna Y. Mao, S.B. #318070
marianna.mao@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

Daniel M. Petrocelli, S.B. #97802
dpetrocelli@omm.com
Stephen J. McIntyre, S.B. #274481
smcintyre@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 553-6700

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**IN RE GOOGLE PLAY STORE
ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*Epic Games, Inc. v. Google LLC, et al.*, Case
No. 3:20-cv-05671-JD

Case No. 3:21-md-02981-JD

**DEFENDANTS' ANSWERS,
DEFENSES, AND COUNTERCLAIMS
TO EPIC GAMES, INC.'S FIRST
AMENDED COMPLAINT FOR
INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

## COUNT III

### Quasi-Contract / Unjust Enrichment

65.    Google realleges and incorporates by reference each of the allegations set forth above.

66.    Epic has alternatively been unjustly enriched at Google's expense through the conduct described in the preceding paragraphs, including by diverting to itself through the hotfix service fees that Google was entitled to as compensation under the DDA for app distribution, and other services provided to Epic.

67.    Epic has unjustly retained these benefits, and continues to do so, without compensating Google.

68.    Google seeks restitution of any such amounts by which Epic has been unjustly enriched at Google's expense.

## COUNT IV

### Declaratory Judgment

69.    Google realleges and incorporates by reference each of the allegations set forth above.

70.    There is an actual, substantial, continuing, and justiciable controversy between Google and Epic regarding their respective rights under the DDA.

71.    Google has the right to terminate Epic as a registered Google Developer and to remove an app from Google Play.

72.    In light of Epic's breach of its contractual obligations ████████████ ████████████████████████████████████████████████████ Google made clear that Epic could not distribute *Fortnite* on Google Play if Epic did not cure its breaches.

73.    Google therefore has standing to seek declaratory judgment of its rights under its contracts with Epic, including the DDA.

74.    Google seeks and is entitled to a declaratory judgment that: (a) the DDA is a valid, lawful, and enforceable contract; (b) Epic breached that agreement; and (c) Google has the

- 40 -

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

1    contractual right under the DDA to remove *Fortnite* from Google Play and terminate Epic as a

2    registered Google Developer due to its breach.

3                             **V.**    **JURY DEMAND**

4      75.     Google demands a trial by jury on all issues so triable.

5                             **VI.**    **PRAYER**

6    Wherefore, Counterclaimant Google respectfully requests that the Court:

7      A.     Decree that Epic is liable for breach of its contractual obligations under the DDA;

8      B.     Decree that Epic is liable for breach of its implied covenant of good faith and fair

9            dealing;

10      C.     Decree that Epic was unjustly enriched;

11      D.     Award Google compensatory damages, punitive damages, attorney's fees, and

12            interest;

13      E.     Award restitution and disgorgement of all earnings, profits, compensation,

14            benefits, and other ill-gotten gains obtained by Epic as a result of its conduct;

15      F.     Enter a permanent injunction enjoining Epic, and all persons and entities in active

16            concert or participation with Epic, from facilitating, assisting, or participating in

17            (a) the continued operation of Epic's unauthorized external payment mechanism in

18            its apps, including *Fortnite*; (b) the introduction of any further unauthorized

19            external payment mechanisms into any apps, including *Fortnite*, on Google Play;

20            and (c) the removal of Epic's payment system as an available payment mechanism

21            for in-app purchases through any Google Play apps, including *Fortnite*;

22      G.     Award such other and further relief as the Court deems just and proper.

23

24

25

26

27

28

ANSWER AND COUNTERCLAIMS
Case Nos. 3:20-cv-05671-JD; 3:21-md-02981-JD    **SER-674**

***REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED***

1    Respectfully submitted,

2    Dated: October 11, 2021        **O'MELVENY & MYERS LLP**

3                                  Ian Simmons (*pro hac vice*[1])
                                 Daniel M. Petrocelli
                                 Benjamin G. Bradshaw

4                                  Stephen J. McIntyre

5                                  By:     /s/ *Ian Simmons*
                                              Ian Simmons

6

7                                  **MORGAN, LEWIS & BOCKIUS LLP**
                                 Brian C. Rocca

8                                  Richard S. Taffet
                                 Sujal J. Shah

9                                  Michelle Park Chiu
                                 Minna Lo Naranjo

10                                 Rishi P. Satia

11                                 By:     /s/ *Brian C. Rocca*
                                              Brian C. Rocca

12

13                                 **MUNGER, TOLLES & OLSON LLP**
                                 Glenn D. Pomerantz

14                                 Kuruvilla Olasa
                                 Kyle W. Mach

15                                 Justin P. Raphael
                                 Emily C. Curran-Huberty

16                                 Jonathan I. Kravis
                                 Marianna Y. Mao

17                                 By:     /s/ *Glenn D. Pomerantz*
                                           Glenn D. Pomerantz

18

19                                 *Counsel for Defendants and Counter-plaintiffs*

20

21

22

23

24

25

26

27    _____

28    [1] *Pro hac vice* pending in Case No. 3:21-md-02981-JD.

- 42 -

**SER-675**

**Pages 1 - 14**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
EPIC GAMES, INC.,                )
                                 )
          Plaintiff,             )
                                 )
   VS.                           )    NO. C 20-05671 JD
                                 )
GOOGLE LLC, et al.,              )
                                 )
          Defendants.            )
_____)
MARY CARR,                       )
                                 )
          Plaintiff,             )
                                 )
   VS.                           )    NO. C 20-05761 JD
                                 )
GOOGLE LLC, et al.,              )
                                 )
          Defendants.            )
_____)
```

San Francisco, California
Thursday, October 8, 2020

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**(CAPTION AND APPEARANCES CONTINUED ON NEXT PAGE)**

Reported By:        Marla F. Knox, RPR, CRR, RMR
                    Official Reporter

SER-676

1          **MR. ROCCA:**  Not from Google, Your Honor.

2          **THE COURT:**  Okay.  All right.  Well, I may just end up

3    doing it sooner rather than later because it's time to get the

4    trains out of the station.

5       Okay.  Now, I am concerned.  I see the seeds of chaos.

6    I'm not saying they have germinated or flowered yet, but I do

7    see the seeds of chaos.

8       Now, I don't want to get into a -- I'm not going to single

9    anybody out or do anything that would be perceived as

10   disciplinary.  You know, it was pretty clear that this was a

11   case management conference, and so people need to file joint

12   statements.

13      This is not the time to do talmudic readings, text orders.

14   This is the time to pitch in and get things done.  So don't let

15   this happen again.

16      When I ask for a joint statement, it needs to be joint.

17   And that means that everybody needs to participate.

18      The second thing is I'm a little mystified about how one

19   group of people can think you had a Rule 26(f) conference and

20   the other group of people could think that you didn't.

21      In my experience -- and this goes back to -- I'm not going

22   to tell you how far back it goes.  It goes back more than a

23   couple of decades -- I have never been in a situation or heard

24   of a situation where two parties were confused about whether

25   they had a Rule 26(f) conference or not.

1    So here is what I want to do:  I'm going to turn it over

2    to you.  You-all are going to get together by this Friday and

3    come up with a master plan on how we are going to go forward.

4    I'm not going to order full consolidation at this time.  I

5    do think there is enough difference among the Plaintiff groups

6    that -- and it doesn't necessarily make sense.

7    As I would do in typical, for example, Section 1 antitrust

8    case, I almost always would consolidate.  I think that is less

9    sensible here.

10    So I'm not saying that day won't happen, but for now we

11    are not going to formally consolidate; but we are going to come

12    up with a very tight coordinated schedule and discovery

13    practices and briefing practices to the extent we can.

14    Now, I'm as I said, you-all are going to make that happen.

15    So you-all get together by this Friday and come up with a

16    master plan on how we are going to make discovery efficient but

17    not burdensome.  You know, no multiple depositions.  No

18    producing the same document five times.  All of that.  You

19    know, your ESI and protective orders, make sure you get those

20    in place.

21    If there is any dispute, my default is the standard form

22    orders on the website.  All right.  Just a word to the wise --

23    and you all are qualified for that -- I'm not going to

24    adjudicate disputes over ESI orders or protective orders.  If

25    you reach an agreement, that's great.  If you don't, I will

```
 1    just enter the form order on the website.  All right.

 2         And, by the way, on that note, please, please, do me the

 3    favor and yourself the favor of reading my last several orders

 4    on motions to seal.  I follow the rules that I have let out --

 5    set out in those motions.

 6         This is a courtroom of the people of the United States.

 7    This is not a private arbitration where everything is swept

 8    under the rug and kept out of the public eye.

 9         Now, there is no question that a very small handful of

10    things may be subject to sealing.  Those are typically trade

11    secrets; commercially sensitive information that would have a

12    damaging or detrimental impact on the party if disclosed.

13    Short of that, you have an uphill road to walk under governing

14    precedent and my orders on sealing.

15         So before you submit -- I'm just projecting this based on

16    other cases -- before you submit a request to seal 50 or 60

17    documents, read my orders because I will not -- we are not

18    going to -- if you don't follow my orders from the get-go, it

19    is just going to come right back to you.  Okay.

20         And so you will save yourself a lot of time, and you will

21    save me some work too if you just adhere to those closely.

22    Just go on Westlaw and you will find them.  I have had a couple

23    in the last six months in particular where I have put a finer

24    point on the sealing process that I want parties to follow.

25         Outside of that, I'm looking forward to hearing from you
```

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          We certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Thursday, October 8, 2020

7

8

9

                        _Marla Knox_
10   _____

11                    Marla F. Knox, RPR, CRR
                        U.S. Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | THEODORE J. BOUTROUS JR., SBN 132099 |
| | tboutrous@gibsondunn.com |
| 2 | RICHARD J. DOREN, SBN 124666 |
| | rdoren@gibsondunn.com |
| 3 | DANIEL G. SWANSON, SBN 116556 |
| | dswanson@gibsondunn.com |
| 4 | JAY P. SRINIVASAN, SBN 181471 |

PAUL R. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center
San Francisco, CA  94111
Telephone: (415) 591-7500
Facsimile:  (415) 591-7510

CHRISTINE A. VARNEY (*pro hac vice*)
cvarney@cravath.com
KATHERINE B. FORREST (*pro hac vice*)
kforrest@cravath.com
GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

**Attorneys for Plaintiff and Counter-Defendant EPIC GAMES, INC.**

jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. LEWIS (Texas Bar No. 24000092; *pro hac vice*)
vlewis@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: 202.955.8500
Facsimile: 202.467.0539

E. JOSHUA ROSENKRANZ (*pro hac vice*)
jrosenkranz@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone: 212.506.5000
Facsimile: 212.506.5151

WILLIAM F. STUTE (*pro hac vice*)
wstute@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005-1706
Telephone: 202.339.8400
Facsimile: 202.339.8500

**Attorneys for Defendant and Counterclaimant APPLE INC.**

Gibson, Dunn & Crutcher LLP

JOINT STATEMENT CONCERNING TRIAL
CASE NO. 4:20-cv-05640-YGR   **SER-681**

1

2

3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

4

5

6

7

8

9

10

EPIC GAMES, INC.,

               Plaintiff and Counter-Defendant,

vs.

APPLE INC.,

               Defendant and Counterclaimant.

CASE NO. 4:20-cv-05640-YGR

**JOINT STATEMENT CONCERNING TRIAL**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to Federal Rule of Civil Procedure 38(d), Defendant Apple Inc. ("Apple") and Epic Games, Inc. ("Epic") by and through their respective counsel, hereby state as follows:

On August 13, 2020, Epic filed a Complaint for Injunctive Relief against Apple under federal antitrust and California competition law (Dkt. 1), in which Epic seeks only equitable relief and will not amend to seek monetary damages.

On September 8, 2020, Apple filed its Answer and Defenses to Epic's Complaint for Injunctive Relief, set forth several Counterclaims, including claims for alleged breach of contract and tortious interference by Epic, and "demand[ed] a trial by jury on all issues so triable." (*See* Dkt. 66 at 64.)

During the September 28, 2020, hearing on Epic's Motion for a Preliminary Injunction, the Court indicated that it "[did not] want to try two cases" and was "inclined to try both cases at once," and asked the parties to inform the Court by 5:00 PM PT on September 29, 2020, whether either party demands a jury trial. (Tr. at 91:25-93:13, 100:19-22.)

Epic and Apple have met and conferred, and the parties agree that Epic's claims and Apple's counterclaims should be tried by the Court, and not by a jury. Therefore, with Epic's consent, Apple hereby withdraws its demand for a jury trial pursuant to Federal Rule of Civil Procedure 38(d). The

Case 4:20-cv-05640-YGR   Document 105   Filed 09/29/20   Page 3 of 3

1    parties respectfully request that the case (including any claims and counterclaims) proceed to a bench

2    trial on a schedule determined by the Court.

3

4    DATED:  September 29, 2020              GIBSON, DUNN & CRUTCHER LLP

5

6                                           By:    /s/ Richard Doren

7                                                  Richard J. Doren

8                                                  *Attorney for Defendant and Counterclaimant*
                                                   *Apple Inc.*
9

10   DATED: September 29, 2020               CRAVATH, SWAINE & MOORE LLP

11

12                                          By:    /s/ Katherine Forrest

13                                                 Katherine B. Forrest

14                                                 *Attorney for Plaintiff and Counter-Defendant*
15                                                 *Epic Games., Inc.*

16

17

18

19

20                     **DECLARATION REGARDING CONCURRENCE**

21           I, Richard Doren, am the ECF user whose identification and password are being used to file

     this JOINT STATEMENT CONCERNING TRIAL OF COUNTERCLAIMS. In compliance with
22
     Civil Local Rule 5-1(i)(3), I hereby attest that all of the signatories listed above have concurred in
23
     this filing.
24

25

26   DATED: September 29, 2020               GIBSON, DUNN & CRUTCHER LLP

27                                           /s/ Richard Doren

28                                           Richard J. Doren

Gibson, Dunn &
Crutcher LLP

(234 of 297), Page 234 of 297
Page 234 of 297
Case: 24-6256, 12/28/2024, DktEntry: 137.5, Page 234 of 297
Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 1 of 63

1  Paul J. Riehle (SBN 115199)
   paul.riehle@faegredrinker.com
2  **FAEGRE DRINKER BIDDLE & REATH LLP**
   Four Embarcadero Center
3  San Francisco, California 94111
   Telephone: (415) 591-7500
4  Facsimile: (415) 591-7510

5  Christine A. Varney (*pro hac vice pending*)
   cvarney@cravath.com
6  Katherine B. Forrest (*pro hac vice pending*)
   kforrest@cravath.com
7  Gary A. Bornstein (*pro hac vice pending*)
   gbornstein@cravath.com
8  Yonatan Even (*pro hac vice pending*)
   yeven@cravath.com
9  M. Brent Byars (*pro hac vice pending*)
   mbyars@cravath.com
10 **CRAVATH, SWAINE & MOORE LLP**
   825 Eighth Avenue
11 New York, New York 10019
   Telephone: (212) 474-1000
12 Facsimile: (212) 474-3700

13 *Attorneys for Plaintiff Epic Games, Inc.*

14

            **UNITED STATES DISTRICT COURT**
15
          **NORTHERN DISTRICT OF CALIFORNIA**
16

17

18 EPIC GAMES, INC., a Maryland
   Corporation,
19
                            Plaintiff,        Case No. _____
20
21                v.

22 GOOGLE LLC; GOOGLE IRELAND
   LIMITED; GOOGLE COMMERCE          **COMPLAINT FOR
23 LIMITED; GOOGLE ASIA PACIFIC      INJUNCTIVE RELIEF**
   PTE. LIMITED; and GOOGLE
24 PAYMENT CORP.,

25
                            Defendants.
26

27

28

                                                   **SER-684**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................ 1

PARTIES............................................................................................................ 10

JURISDICTION AND VENUE ....................................................................... 11

INTRADISTRICT ASSIGNMENT ................................................................ 13

RELEVANT FACTS ........................................................................................ 13

I.     Google Dominates the Merchant Market for Mobile Operating Systems. ......... 13

       A.     The Merchant Market for Mobile Operating Systems ............................. 14

              i.      Product Market Definition ................................................. 14

              ii.     Geographic Market Definition ........................................... 16

       B.     Google's Monopoly Power in the Merchant Market for Mobile OSs ...... 16

II.    Google Unlawfully Maintains a Monopoly in the Android Mobile App

       Distribution Market. ........................................................................................ 19

       A.     The Android App Distribution Market ..................................................... 20

              i.      Product Market Definition ................................................. 20

              ii.     Geographic Market Definition ........................................... 22

       B.     Google's Monopoly Power in the Android App Distribution Market...... 22

       C.     Google's Anti-Competitive Conduct Concerning the Android App

              Distribution Market ............................................................................. 26

              i.      Google's Conduct Toward OEMs .................................... 26

              ii.     Google's Conduct Toward App Distributors and Developers........ 28

              iii.    Google's Conduct Toward Consumers............................. 30

       D.     Anti-Competitive Effects in the Android App Distribution Market......... 35

III.   Google Unlawfully Acquired and Maintains a Monopoly in the Android In-

       App Payment Processing Market. ................................................................... 36

       A.     The Android In-App Payment Processing Market................................... 37

              i.      Product Market Definition ................................................. 37

              ii.     Geographic Market Definition........................................... 39

Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 3 of 63

B. Google's Monopoly Power in the Android In-App Payment

Processing Market ..................................................................... 39

C. Google's Anti-Competitive Conduct Concerning the Android In-App

Payment Processing Market........................................................ 40

D. Anti-Competitive Effects in the Android In-App Payment Processing

Market........................................................................................ 41

COUNT 1: Sherman Act § 2 (Unlawful Monopoly Maintenance in the  Android

App Distribution Market) .................................................................. 43

COUNT 2: Sherman Act § 1  (Unreasonable restraints of trade concerning

Android App Distribution Market:  OEMs) ........................................ 44

COUNT 3: Sherman Act § 1  (Unreasonable restraints of trade concerning

Android App Distribution Market:  DDA)........................................... 45

COUNT 4: Sherman Act § 2 (Unlawful Monopolization and Monopoly

Maintenance in the  Android In-App Payment Processing Market) .................. 46

COUNT 5: Sherman Act § 1   (Unreasonable restraints of trade concerning

Android In-App Payment Processing Market)..................................... 47

COUNT 6: Sherman Act § 1  (Tying Google Play Store to Google Play Billing)....... 49

COUNT 7: California Cartwright Act (Unreasonable restraints of trade in

Android App Distribution Market)..................................................... 50

COUNT 8: California Cartwright Act (Unreasonable restraints of trade in

Android App Distribution Market)..................................................... 51

COUNT 9: California Cartwright Act (Unreasonable restraints of trade in

Android In-App Payment Processing Market)..................................... 53

COUNT 10: California Cartwright Act (Tying Google Play Store to Google Play

Billing)....................................................................................... 55

COUNT 11: California Unfair Competition Law........................................ 58

PRAYER FOR RELIEF ................................................................. 59

Plaintiff Epic Games, Inc. ("Epic"), by its undersigned counsel, alleges, with knowledge with respect to its own acts and on information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.    In 1998, Google was founded as an exciting young company with a unique motto: "Don't Be Evil".  Google's Code of Conduct explained that this admonishment was about "how we serve our users" and "much more than that . . . it's also about doing the right thing more generally".[1]  Twenty-two years later, Google has relegated its motto to nearly an afterthought, and is using its size to do evil upon competitors, innovators, customers, and users in a slew of markets it has grown to monopolize.  This case is about doing the right thing in one important area, the Android mobile ecosystem, where Google unlawfully maintains monopolies in multiple related markets, denying consumers the freedom to enjoy their mobile devices—freedom that Google always promised Android users would have.

2.    Google acquired the Android mobile operating system more than a decade ago, promising repeatedly over time that Android would be the basis for an "open" ecosystem in which industry participants could freely innovate and compete without unnecessary restrictions.[2]  Google's CEO, Sundar Pichai, represented in 2014

---

[1] Kate Conger, *Google Removes 'Don't Be Evil' Clause from Its Code of Conduct*, Gizmodo (May 18, 2018), https://gizmodo.com/google-removes-nearly-all-mentions-of-dont-be-evil-from-1826153393.

[2] Google Blog, News and notes from Android team, *The Benefits & Importance of Compatibility*, (Sept. 14, 2012), https://android.googleblog.com/2012/09/the-benefits-importance-of-compatibility.html ("We built Android to be an open source mobile platform freely available to anyone wishing to use it . . . . This openness allows device manufacturers to customize Android and enable new user experiences, driving innovation and consumer choice."); Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw ("Android is one of the most open systems that I've ever seen"); Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog ("At its core, Android has always been about openness").

Complaint for Injunctive Relief                    1                    **SER-687**

1    that Android "is one of the most open systems that I've ever seen".[3]  And Andy Rubin,

2    an Android founder who is described by some as the "Father of Android", said when he

3    departed Google in 2013 that "at its core, Android has always been about openness".[4]

4    Since then, Google has deliberately and systematically closed the Android ecosystem to

5    competition, breaking the promises it made.  Google's anti-competitive conduct has

6    now been condemned by regulators the world over.

7         3.    Epic brings claims under Sections 1 and 2 of the Sherman Act and

8    under California law to end Google's unlawful monopolization and anti-competitive

9    restraints in two separate markets:  (1) the market for the distribution of mobile apps to

10   Android users and (2) the market for processing payments for digital content within

11   Android mobile apps.  Epic seeks to end Google's unfair, monopolistic and anti-

12   competitive actions in each of these markets, which harm device makers, app

13   developers, app distributors, payment processors, and consumers.

14        4.    **Epic does not seek monetary compensation from this Court for

15   the injuries it has suffered**.  Epic likewise does not seek a side deal or favorable

16   treatment from Google for itself.  Instead, Epic seeks injunctive relief that would deliver

17   Google's broken promise:  an open, competitive Android ecosystem for all users and

18   industry participants.  Such injunctive relief is sorely needed.

19        5.    Google has eliminated competition in the distribution of Android

20   apps using myriad contractual and technical barriers.  Google's actions force app

21   developers and consumers into Google's own monopolized "app store"—the Google

22   Play Store.  Google has thus installed itself as an unavoidable middleman for app

23   developers who wish to reach Android users and vice versa.  Google uses this monopoly

24   power to impose a tax that siphons monopoly profits for itself every time an app

25

26       [3] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

27

28       [4] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

Complaint for Injunctive Relief                    2                    **SER-688**

1    developer transacts with a consumer for the sale of an app or in-app digital content.

2    And Google further siphons off all user data exchanged in such transactions, to benefit

3    its own app designs and advertising business.

4          6.     If not for Google's anti-competitive behavior, the Android

5    ecosystem could live up to Google's promise of open competition, providing Android

6    users and developers with competing app stores that offer more innovation, significantly

7    lower prices and a choice of payment processors. Such an open system is not hard to

8    imagine. Two decades ago, through the actions of courts and regulators, Microsoft was

9    forced to open up the Windows for PC ecosystem. As a result, PC users have multiple

10    options for downloading software unto their computers, either directly from developers'

11    websites or from several competing stores. No single entity controls the ecosystem or

12    imposes a tax on all transactions. And Google, as the developer of software such as the

13    Chrome browser, is a direct beneficiary of this competitive landscape. Android users

14    and developers likewise deserve free and fair competition.

15                      *       *       *

16          7.     In today's world, virtually all consumers and businesses stay

17    connected, informed, and entertained through smart mobile computing devices such as

18    smartphones and tablets. Mobile applications ("apps") are innovative software products

19    that greatly contribute to those devices' value. Consumers the world over use smart

20    mobile devices and mobile apps to video chat with friends, pay bills, stay current with

21    the news, listen to music, watch videos, play games, and more.

22          8.     Epic develops and distributes entertainment apps for personal

23    computers, gaming consoles, and smart mobile devices. The most popular game Epic

24    currently makes is *Fortnite*, which has connected hundreds of millions of people in a

25    colorful virtual world where they meet, play, talk, compete, dance, and even attend

26    concerts and other cultural events.

27

28

Complaint for Injunctive Relief                3                          **SER-689**

Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 7 of 63



9. *Fortnite* is free for everyone to download and play. To generate revenue, Epic offers users various in-app purchases of content for use within the app, such as digital avatars, costumes, dances, or other cosmetic enhancements.



10. In the first year after *Fortnite* was released in 2017, the game attracted over 125 million players; in the years since, *Fortnite* has topped 350 million players and has become a global cultural phenomenon.

Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 8 of 63

11.     Similar to a PC or a Mac personal computer, smart mobile devices use an "operating system" or "OS" to provide core device functionality and to enable the operation of compatible programs. As with PCs, the commercial viability of an OS for mobile devices (a "mobile OS") depends on the availability of a large number of compatible apps that cater to the preferences and needs of users.

12.     Google controls the most ubiquitous OS used in mobile devices, the Android OS. Android OS is used by billions of users the world over, and boasts nearly 3 million compatible apps.

13.     Android is the only commercially viable OS that is widely available to license by companies that design and sell smart mobile devices, known as original equipment manufacturers ("OEMs"). Accordingly, when OEMs select a mobile OS to install on their devices, they have only one option: Google's Android OS. Google therefore has monopoly power in the market for mobile operating systems that are available for license by OEMs (the Merchant Market for Mobile Operating Systems (*infra* Part I)).

14.     Google has not been satisfied with its control of the Android OS. Notwithstanding its promises to make Android devices open to competition, Google has erected contractual and technological barriers that foreclose competing ways of distributing apps to Android users, ensuring that the Google Play Store accounts for nearly all the downloads of apps from app stores on Android devices. Google thus maintains a monopoly over the market for distributing mobile apps to Android users, referred to herein as the "Android App Distribution Market" (*infra* Part II).

15.     For example, Google bundles the Google Play Store with a set of other Google services that Android OEMs must have on their devices (such as Gmail, Google Search, Google Maps, and YouTube) and conditions the licensing of those services on an OEM's agreement to pre-install the Google Play Store and to prominently display it. Google then interferes with OEMs' ability to make third-party app stores or apps available on the devices they make. These restrictions effectively

1  foreclose competing app stores—and even single apps—from what could be a primary
2  distribution channel.

3  16.  Epic's experience with one OEM, OnePlus, is illustrative.  Epic
4  struck a deal with OnePlus to make Epic games available on its phones through an Epic
5  Games app.  The Epic Games app would have allowed users to seamlessly install and
6  update Epic games, including *Fortnite*, without obstacles imposed by Google's Android
7  OS.  But Google forced OnePlus to renege on the deal, citing Google's "particular[]"
8  concern" about Epic having the ability to install and update mobile games while
9  "bypassing the Google Play Store".

10  17.  Another OEM, LG, told Epic that its contract with Google did not
11  allow it to enable the direct distribution of apps, and that the OEM could not offer any
12  functionality that would install and update Epic games except through the Google Play
13  Store.

14  18.  Google also enforces anti-competitive restrictions against app
15  developers.  Specifically, Google contractually prohibits app developers from offering
16  on the Google Play Store any app that could be used to download other apps, *i.e.*, any
17  app that could compete with the Google Play Store in app distribution.  And Google
18  further requires app developers to distribute their apps through the Google Play Store if
19  they wish to advertise their apps through valuable advertising channels controlled by
20  Google, such as ad placements on Google Search or on YouTube that are specially
21  optimized to advertise mobile apps.

22  19.  Finally, Google stifles or blocks consumers' ability to download app
23  stores and apps directly from developers' websites.  As anyone who has tried to
24  download directly on an Android device knows, it is significantly different than the
25  simple process available on a personal computer:  directly downloading *Fortnite* on an
26  Android device can involve a dozen steps, requiring the user to change default settings
27  and bravely click through multiple dire warnings.  And even if a persistent user manages
28  to install a competing app store, Google prevents such stores from competing on equal

Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 10 of 63

1    footing with the Google Play Store by blocking them from offering basic functions,

2    such as automatic updating of apps in the background, which is available for apps

3    downloaded from the Google Play Store.

4    20. Google engages in these anticompetitive acts to eliminate consumer

5    choice and competition in mobile app distribution. Google has no legitimate

6    justification for these restrictions. Google therefore has broken its promises that

7    Android would be an "open" ecosystem in which other participants could participate

8    fairly.

9    21. But Google does not stop at app distribution. Google also imposes

10   anti-competitive restrictions in the separate Market for Android In-app Payment

11   Processing (*infra* Part III).

12   22. App developers who sell digital content for consumption within the

13   app itself require seamless payment processing tools to execute purchases. App

14   developers, including Epic, may develop such payment processing tools internally or

15   use a host of payment processing tools offered by multiple competing third parties.

16   23. Google, however, ties distribution through its Google Play Store

17   with developers' exclusive use of Google's own payment processing tool, called

18   Google Play Billing, to process in-app purchases of digital content. Indeed, app

19   developers that distribute through the Google Play Store are even prohibited from

20   offering Android users the *choice* of additional payment processing options alongside

21   Google's for digital content. And because Google has a monopoly in the Android App

22   Distribution Market, app developers cannot practically avoid this anti-competitive tie by

23   electing app distribution through an alternative channel.

24   24. The result is that in every in-app transaction for digital content, it is

25   Google, not the app developer, that collects the payment in the first instance. Google

26   then taxes the transaction at an exorbitant 30% rate, remitting the remaining 70% to the

27   developer who actually made the sale. This 30% commission is often **ten times** higher

28   than the price typically paid for the use of other electronic payment solutions.

25.     Moreover, through this tie, Google inserts itself as an intermediary between each seller and each buyer for every purchase of digital content within the Android ecosystem, collecting for itself the personal information of users, which Google then uses to give an anti-competitive edge to its own advertising services and mobile app development business.

26.     But for Google's monopolistic conduct, competing stores could offer consumers and developers choice in distribution and payment processing.  Indeed, Epic, which distributes gaming apps through its own store to users of personal computers, would open a store to compete with Google's and offer developers more innovation and more choice, including in payment processing.  App developers would not have to pay Google's supra-competitive tax of 30%, as the price of distribution and payment processing alike would be set by market forces rather than by Google's fiat.  Developers could address any payment-related issues (such as refunds) directly with their own customers rather than through Google.  And users and developers, jointly, would get to decide whether users' data should be utilized for other purposes.

27.     Google's anti-competitive conduct has injured Epic, both as an app developer and as a potential competitor in app distribution and payment processing. Epic has repeatedly approached Google and asked to negotiate relief that would stop Google's unlawful and anti-competitive restrictions on app developers and consumers. But Google would not budge.

28.     Because of Google's refusal to stop its ongoing anti-competitive and unlawful conduct, on August 13, 2020, Epic began providing *Fortnite* players the choice of using Epic's own direct payment tool as an alternative to Google's overpriced Billing tool, sharing with players who chose to use Epic's payment tool the resulting savings.



29.     In retribution, Google removed *Fortnite* from Google Play Store listings, preventing new players from obtaining the game.  Google also prevented Android users who acquired *Fortnite* from the Google Play Store from obtaining app updates they will need to continue playing with their friends and family.

30.     Epic has publicly advocated for years that Google cease the anti-competitive conduct addressed in this Complaint.  Google refused to change its industry-impacting conduct.  Instead, Google offered to placate Epic by offering it preferential terms on side deals, such as YouTube sponsorships and cloud services, if Epic agreed to distribute *Fortnite* in the Google Play Store and acceded to Google's 30% tax.  Google has reached at least one preferential deal with another mobile game developer, Activision Blizzard, and Epic believes that Google is using similar deals with other companies to allow Google to keep its monopolistic behavior publicly unchallenged.  But Epic is not interested in any side deals that might benefit Epic alone while leaving Google's anti-competitive restraints intact; instead, Epic is focused on opening up the Android ecosystem for the benefit of ***all*** developers and consumers.

31.     Accordingly, Epic seeks injunctive relief in court.  Google's conduct has caused and continues to cause Epic financial harm, but Epic is ***not*** bringing this case to recover these damages; Epic is not seeking any monetary relief, but rather only an order enjoining Google from continuing to impose its anti-competitive conduct on the Android ecosystem.

## **PARTIES**

32.     Plaintiff Epic Games, Inc. is a Maryland corporation with its principal place of business in Cary, North Carolina.  Epic's mission is "to create fun games we want to play and to build the art and tools needed to bring those games to life".  Epic was founded in 1991 by a college student named Tim Sweeney.  Mr. Sweeney ran Epic out of his parents' basement and distributed, by mail, Epic's first commercial personal computer software, a game named *ZZT*.  Since then, Epic has developed several popular entertainment software products that can be played on an array of platforms—such as personal computers, gaming consoles, and smart mobile devices.  Epic also creates and distributes the *Unreal Engine*, a powerful software suite that allows competing game developers and others to create realistic three-dimensional content, including video games, architectural recreations, television shows, and movies. An Epic subsidiary also develops and distributes the popular *Houseparty* app, which enables video chatting and social gaming on smart mobile devices and personal computers.  Worldwide, approximately 400 million users have signed up to play Epic games, and each day 30 to 40 million individuals log into an Epic game.

33.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California.  Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc.  The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is

Case 3:20-cv-05671   Document 1   Filed 08/13/20   Page 14 of 63

1    therefore a party to the anti-competitive contractual restrictions at issue in this

2    Complaint.

3         34.    Defendant Google Ireland Limited ("Google Ireland") is a limited

4    company organized under the laws of Ireland with its principal place of business in

5    Dublin, Ireland, and a subsidiary of Google LLC.  Google Ireland contracts with all app

6    developers that distribute their apps through the Google Play Store and is therefore a

7    party to the anti-competitive contractual restrictions at issue in this Complaint.

8         35.    Defendant Google Commerce Limited ("Google Commerce") is a

9    limited company organized under the laws of Ireland with its principal place of business

10   in Dublin, Ireland, and a subsidiary of Google LLC.  Google Commerce contracts with

11   all app developers that distribute their apps through the Google Play Store and is

12   therefore a party to the anti-competitive contractual restrictions at issue in this

13   Complaint.

14        36.    Defendant Google Asia Pacific Pte. Limited ("Google Asia Pacific")

15   is a private limited company organized under the laws of Singapore with its principal

16   place of business in Mapletree Business City, Singapore, and a subsidiary of Google

17   LLC.  Google Asia Pacific contracts with all app developers that distribute their apps

18   through the Google Play Store and is therefore a party to the anti-competitive

19   contractual restrictions at issue in this Complaint.

20        37.    Defendant Google Payment Corp. ("Google Payment") is a

21   Delaware corporation with its principal place of business in Mountain View, California,

22   and a subsidiary of Google LLC.  Google Payment provides in-app payment processing

23   services to Android app developers and Android users and collects a 30% commission

24   on many types of processed payments, including payments for apps sold through the

25   Google Play Store and in-app purchases made within such apps.

26                      **JURISDICTION AND VENUE**

27        38.    This Court has subject-matter jurisdiction over Epic's federal

28   antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C.

1   §§ 1331 and 1337.  The Court has supplemental jurisdiction over Epic's state law claims

2   pursuant to 28 U.S.C. § 1367.  The Court also has subject-matter jurisdiction over the

3   state-law claims pursuant to 28 U.S.C. § 1332 based on the diversity of citizenships of

4   Plaintiff, on the one hand, and of Defendants, on the other, and the amount in

5   controversy exceeding $75,000.

6           39.     This Court has personal jurisdiction over the Defendants.  Google

7   LLC and Google Payment are headquartered in this District.  All Defendants have

8   engaged in sufficient minimum contacts with the United States and have purposefully

9   availed themselves of the benefits and protections of United States and California law,

10  such that the exercise of jurisdiction over them would comport with due process

11  requirements.  Further, the Defendants have consented to the exercise of personal

12  jurisdiction by this Court.

13          40.     Each of the Defendants except Google Payment is party to a Google

14  Play Developer Distribution Agreement (the "DDA") with Epic.  Section 16.8 of the

15  DDA provides that the parties "agree to submit to the exclusive jurisdiction of the

16  federal or state courts located within the county of Santa Clara, California, to resolve

17  any legal matter arising from or relating to this Agreement".  Section 16.8 further

18  provides that "[a]ll claims arising out of or relating to this Agreement or Your

19  relationship with Google under this Agreement will be governed by the laws of the State

20  of California, excluding California's conflict of laws provisions."  The claims addressed

21  in this Complaint relate to the DDA or to Epic's relationship with Google under the

22  DDA, or in the alternative such claims arise out of the same nucleus of operative facts

23  as other claims as to which the Court may exercise personal jurisdiction over each

24  Defendant, so that the exercise of pendent personal jurisdiction would be proper.

25          41.     Google Payment is party to a Google Payments—Terms of

26  Service—Seller Agreement with Epic.  Section 11.3 of that Agreement provides that

27  "[t]he exclusive venue for any dispute related to this Agreement will be the state or

28  federal courts located in Santa Clara County, California, and each party consents to

1   personal jurisdiction in these courts." Section 11.3 further provides that "The laws of

2   California, excluding California's choice of law rules, and applicable federal United

3   States laws will govern this Agreement." The dispute between Google Payment and

4   Epic relates to the parties' Agreement, or in the alternative Epic's claims arise out of the

5   same nucleus of operative facts as other claims as to which the Court may exercise

6   personal jurisdiction over Google Payment, so that the exercise of pendent personal

7   jurisdiction would be proper.

8           42.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)

9   because Google LLC and Google Payment maintain their principal places of business in

10  the State of California and in this District, because a substantial part of the events or

11  omissions giving rise to Epic's claims occurred in this District, and because, pursuant to

12  28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in

13  any judicial district and their joinder with others shall be disregarded in determining

14  proper venue. In the alternative, personal jurisdiction and venue also may be deemed

15  proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because

16  Defendants may be found in or transact business in this District.

17                          **INTRADISTRICT ASSIGNMENT**

18          43.    Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be

19  assigned to a particular Division of this District, but shall be assigned on a District-wide

20  basis.

21                              **RELEVANT FACTS**

22  **I.     Google Dominates the Merchant Market for Mobile Operating Systems.**

23          44.    To understand how Google effectively monopolizes the Android

24  App Distribution and Android In-App Payment Processing Markets, as described below

25  in Parts II and III, it is helpful to understand the background of smart mobile devices

26  and how Google effectively dominates the related Merchant Market for Mobile

27  Operating Systems through its control over the Android operating system.

28

Complaint for Injunctive Relief                13                        **SER-699**

**A.** **The Merchant Market for Mobile Operating Systems**

      i.   <u>Product Market Definition</u>

45.    Smart mobile devices are handheld, portable electronic devices that can connect wirelessly to the internet and are capable of multi-purpose computing functions, including, among other things, Internet browsing, using social media, streaming video, listening to music, or playing games. Smart mobile devices include smartphones and tablet computers. Many consumers may *only* have a smart mobile device and no other computer. Such consumers are particularly hard-hit by Google's unlawful conduct in mobile-related markets.

46.    Like laptop and desktop personal computers, mobile devices require an operating system or "OS" that enables multi-purpose computing functionality. A mobile OS, just like the OS of any computer, is a piece of software that provides basic functionality to users of mobile devices such as button controls, touch commands, motion commands, and the basic "graphical user interface", which includes "icons" and other visual elements representing actions that the user can take. A mobile OS also manages the basic operations of a smart mobile device, such as cellular or WiFi connectivity, GPS positioning, camera and video recording, speech recognition, and other features. In addition, a mobile OS permits the installation and operation of mobile apps that are compatible with the particular OS and facilitates their use of the device's OS-managed core functionality.

47.    To ensure that every user can access the basic functions of a mobile device "out of the box", that is at the time he/she purchases the device, an OEM must pre-install an OS on each device prior to its sale. This is similar to a personal computer that comes pre-installed with Microsoft Windows for PC or Apple's macOS for a Mac computer. OEMs design mobile devices to ensure the device's compatibility with a particular OS the OEM chooses for a particular model of mobile device, so that the device may utilize the capabilities of that OS. For OEMs, the process of implementing

1    a mobile OS requires significant time and investment, making switching to another

2    mobile OS difficult, expensive, and time-consuming.

3        48.    The vast majority of OEMs do not develop their own OS and must

4    choose an OS that can be licensed for installation on smart mobile devices they design.

5    There is therefore a relevant <u>Merchant Market for Mobile OSs</u> comprising mobile OSs

6    that OEMs can license for installation on the smart mobile devices they manufacture.

7    The market does not include proprietary OSs that are not available for licensing, such as

8    Apple's mobile OS, called iOS.  Historically, the Merchant Market for Mobile OSs has

9    included the Android OS, developed by Google; the Tizen mobile OS, a partially open-

10   source mobile OS that is developed by the Linux Foundation and Samsung; and the

11   Windows Phone OS developed by Microsoft.

12       49.    Some consumers continue to use cellular phones that do not have

13   multi-purpose, computing functions.  These simple phones resemble older "flip

14   phones", for example; they are not part of the smart mobile device category.  These

15   phones do not support mobile apps such as *Fortnite* and are instead typically limited to

16   basic cellular functionality like voice calls and texting.  The simple operating systems

17   on these phones, to the extent they exist, cannot support the wide array of features

18   supplied by the OSs on smart mobile devices and are not part of the Merchant Market

19   for Mobile OSs defined herein.

20       50.    To the extent that electronic devices other than smart mobile devices

21   use operating systems, those OSs are not compatible with mobile devices, and therefore

22   are not included in the Merchant Market for Mobile OSs defined herein.  For example,

23   computing devices that are not handheld and portable, that are not capable of multi-

24   purpose computing functions and/or that lack cellular connectivity—such as desktop

25   computers, laptops, or gaming consoles—are not considered to be "smart mobile

26   devices".  Gaming devices like Sony's PlayStation 4 ("PS4") and Microsoft's Xbox are

27   physically difficult to transport, require a stable WiFi or wired connection to operate

28   smoothly, and require an external screen for the user to engage in game play.  Thus,

Complaint for Injunctive Relief                15                    **SER-701**

1   even if a gamer owns, for example, a dedicated, non-portable gaming console such as a

2   PS4, which connects to and enables gaming via his/her TV, he/she will not consider that

3   PS4 a reasonable substitute for a mobile device like a smartphone, nor would he/she

4   consider the version of any game created for his/her PS4 to substitute for the mobile app

5   version of such a game. That is because the portability (and typically for smartphones

6   the cellular connectivity) of the mobile devices enable the consumer to play mobile

7   games away from home or anywhere in the home. Indeed, for this reason, game

8   developers often distribute multiple versions of a game, each of which is programmed

9   for compatibility with a particular type of device and its operating system.

10                  ii.   Geographic Market Definition

11          51.    OEMs license mobile OSs for installation on mobile devices

12   globally, excluding China. Google's operations in China are limited, and it does not

13   make available many of its products for mobile devices sold within China. This is

14   based in part on legal and regulatory barriers to the distribution of mobile OS-related

15   software imposed by China. Further, while Google contractually requires OEMs

16   licensing Android outside of China not to sell any devices with competing Android-

17   compatible mobile OSs, it imposes no such restriction on devices sold within China.

18   Because the OEMs that sell Android mobile devices both within and outside China have

19   committed to this contractual restriction, such OEMs must sell, outside of China,

20   devices with Google's Android OS. The geographic scope of the relevant Merchant

21   Market for Mobile OSs is therefore worldwide, excluding China.

22       **B.   Google's Monopoly Power in the Merchant Market for Mobile OSs**

23          52.    Google has monopoly power in the Merchant Market for Mobile

24   OSs through its Android OS. As determined by the European Commission during the

25   course of its investigation of Android, the Android OS, licensed to OEMs in relevant

26   respects by Google, is installed on over 95% of all mobile devices sold by OEMs

27   utilizing a merchant mobile OS. Indeed, Android OS is installed on nearly 75% of all

28   smart mobile devices sold by *all* OEMs, including even those OEMs that use a

Case 3:20-cv-05671  Document 1  Filed 08/13/20  Page 20 of 63

1   proprietary mobile OS they developed exclusively for their own use (such as Apple's

2   iOS).

3       53.   A mobile ecosystem typically develops around one or more mobile

4   OSs, such as the Android OS.  The "Android ecosystem" is a system of mobile products

5   (such as devices, apps and accessories) designed to be inter-dependent and compatible

6   with each other and the Android OS.  Ecosystem participants include an array of

7   participating stakeholders, such as Google, OEMs that make Android-compatible

8   devices, developers of Android-compatible apps, Android app distribution platforms,

9   including app stores, the makers of ancillary hardware such as headphones or speakers,

10  cellular carriers, and others.

11      54.   Mobile ecosystems benefit from substantial network effects—that is,

12  the more developers that design useful apps for a specific mobile OS, the more

13  consumers will be drawn to use the relevant OS for which those apps are designed; the

14  more consumers that use an OS, the more developers want to develop even more apps

15  for that OS.  As determined in *United States v. Microsoft, Inc.*, No. 98-1232 (D.D.C.),

16  new entrants into an operating system market thus face an "applications barrier to

17  entry".  An applications barrier to entry arises because a new operating system will be

18  desirable to consumers only if a broad array of software applications can run on it, but

19  software developers will find it profitable to create applications that run on an operating

20  system only if there is a large existing base of users.

21      55.   To overcome this challenge and to attract app developers and users,

22  Google has continuously represented that Android is an "open" ecosystem and that any

23  ecosystem participant could create Android-compatible products without unnecessary

24  restrictions.  Indeed, Google LLC's CEO, Sundar Pichai, represented in 2014 that

25  Android "is one of the most open systems that I've ever seen".[5]  And Andy Rubin, an

26

27

28  [5] Stuart Dredge, *Google's Sundar Pichai on wearable tech: 'We're just scratching the surface'*, The Guardian (Mar. 9, 2014), https://www.theguardian.com/technology/2014/mar/09/google-sundar-pichai-android-chrome-sxsw.

1   Android founder who is described by some as the "Father of Android", said when he

2   departed Google in 2013 that "at its core, Android has always been about openness".[6]

3          56.     But the reality is quite different.  Despite these claims of openness,

4   Google has now effectively closed the Android ecosystem through its tight control of

5   the Android OS.  And, as the dominant OS licensor, Google now benefits from these

6   substantial network effects which makes participation on its platform a "must-have"

7   market for developers.

8          57.     As further described below, Google uses the Android OS to restrict

9   which apps and app stores OEMs are permitted to pre-install on the devices they make

10  and to impose deterrents to the direct distribution of competing app stores and apps to

11  Android users, all at the expense of competition in the Android ecosystem.

12         58.     Because of Google's monopoly power in the Merchant Market for

13  Mobile OSs, OEMs, developers and users cannot avoid such effects by choosing

14  another mobile OS.  OEMs such as ZTE and Nokia have stated that other non-

15  proprietary OSs are poor substitutes for the Android OS and are not a reasonable

16  alternative to licensing the Android OS.  One important reason is that other mobile OSs

17  presently do not support many high-quality and successful mobile apps, which

18  consumers find essential or valuable when choosing a mobile device.  These

19  circumstances have biased consumers against the purchase of mobile devices with non-

20  proprietary mobile OSs other than Android OS.  OEMs thus have no choice but to agree

21  to Google's demands because it is critical that they be able to offer a popular mobile OS

22  and corresponding ecosystem to consumers who are choosing which mobile device to

23  purchase.

24

25

26

27
       ---
28     [6] Andy Rubin, *Andy Rubin's Email to Android Partners*, The Wall Street Journal (Mar. 13, 2013), *available at* https://blogs.wsj.com/digits/2013/03/13/andy-rubins-email-to-android-partners/?mod=WSJBlog.

Complaint for Injunctive Relief                    18                     **SER-704**

**II.** **Google Unlawfully Maintains a Monopoly in the Android Mobile App Distribution Market.**

59.    Mobile apps make mobile devices more useful and valuable because they add functionality to the mobile device that caters to the specific interests of each mobile device user.  For example, they facilitate video chats with friends and family, banking online, shopping, job hunting, photo editing, reading digital news sources, editing documents, or playing a game like *Fortnite*.  Many workers use their smart mobile device to check work schedules, access company email, or use other employer software while outside the workplace.  For many consumers, a smartphone or tablet is the only way to access these functions, because the consumer does not own a personal computer or because the consumer can only access the Internet using a cellular connection.  But even when a consumer can perform the same or similar functions on a personal computer, the ability to access apps "on the go" using a handheld, portable device remains valuable and important.

60.    Whereas some apps may be pre-installed by OEMs, OEMs cannot anticipate all the various apps a specific consumer may desire to use.  Moreover, many consumers have different preferences as to which apps they want, and it would be undesirable for OEMs to load the devices they sell with unwanted apps that take up valuable space on the mobile device.  And many apps that consumers may ultimately use on their device will be developed after they buy the device.  Accordingly, consumers who seek to add new functionalities to a mobile device and customize the device for their own use need to obtain and install mobile apps themselves after purchasing their device.  Currently, on Android devices, this is done most often through the Google Play Store, Google's own "app store".  The Google Play Store is a digital portal set up by Google and through which mobile apps can be browsed, searched for, purchased (if necessary), and downloaded by a consumer.  App stores such as the Google Play Store, alongside several other ways by which apps can be distributed to the hundreds of millions of consumers using Android-based mobile devices, comprise the Android App Distribution Market, defined below.

1   61.   Through various anti-competitive acts and unlawful restraints on

2   competition, Google has maintained a monopoly in the Android Mobile App

3   Distribution market, causing ongoing harm to competition and injury to OEMs, app

4   distributors, app developers, and consumers.  Google's restraints of trade belie

5   representations Google currently makes to developers that "as an open platform,

6   Android is about choice" and that app developers "can distribute [their] Android apps to

7   users in any way [they] want, using any distribution approach or combination of

8   approaches that meets [their] needs", including by allowing users to directly download

9   apps "from a website" or even by "emailing them directly to consumers".[7]

10  **A.    The Android App Distribution Market**

11         i.   Product Market Definition

12  62.   There is a relevant market for the distribution of apps compatible

13  with the Android OS to users of mobile devices (the "Android App Distribution

14  Market").  This Market is comprised of all the channels by which mobile apps may be

15  distributed to the hundreds of millions of users of mobile devices running the Android

16  OS.  The Market primarily includes Google's dominant Google Play Store, with smaller

17  stores, such as Samsung's Galaxy Store and Aptoide, trailing far behind.  Nominally

18  only, the direct downloading of apps without using an app store (which Google

19  pejoratively describes as "sideloading") is also within this market.

20  63.   App stores allow consumers to easily browse, search for, access

21  reviews on, purchase (if necessary), download, and install mobile apps, using the mobile

22  device itself and an Internet connection.  OEMs find it commercially unreasonable to

23  ship a smart mobile device to a consumer without at least one app store installed, as a

24  consumer's ability to obtain new mobile apps is an important part of the value provided

25  by smart mobile devices.

26

27  _____

28  [7] Google Play Developers Page, *Alternative distribution options*,
https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7,
2020).

Complaint for Injunctive Relief             20              **SER-706**

64.     App stores are OS-specific, meaning they distribute only apps that are compatible with the specific mobile OS on which the app store is used.  A consumer who has a mobile device running the Android OS cannot use apps created for a different mobile operating system.  An owner of an Android OS device will use an Android compatible app store, and such app stores distribute only Android-compatible mobile apps.  That consumer may not substitute an Android app store with, for example, Apple's App Store, as that app store is not available on Android devices, is not compatible with the Android OS, and does not offer apps that are compatible with the Android OS.  Non-Android mobile app distribution platforms—such as the Windows Mobile Store used on Microsoft's Windows Mobile OS or the Apple App Store used on Apple iOS devices—cannot substitute for Android-specific app distribution platforms, and they are therefore not part of the Android App Distribution Market defined herein.

65.     Likewise, stores distributing personal computer or gaming console software are not compatible with the Android OS and do not offer Android-compatible apps:  the Epic Games Store distributes software compatible with personal computers, the Microsoft Store for Xbox distributes software compatible with the Xbox game consoles, and the PlayStation Store distributes software compatible with the PlayStation game consoles.  A user cannot download mobile apps for use on his/her Android device by using such non-Android OS, non-mobile software distribution platforms.  They therefore are not part of the Android App Distribution Market.

66.     The same is true even when an app or game, like *Fortnite*, is available for different types of platforms running different operating systems, because only the OS-compatible version of that software can run on a specific type of device or computer.  Accordingly, as a commercial reality, an app developer that wishes to distribute mobile apps for Android mobile devices must develop an Android-specific version of the app and avail itself of the Android App Distribution Market.

67.     In the alternative only, the Android App Distribution Market is a relevant, economically distinct sub-market of a hypothetical broader antitrust market for

1   the distribution of mobile apps to users of all mobile devices, whether Android or

2   Apple's iOS.

3               ii.    Geographic Market Definition

4               68.    The geographic scope of the Android App Distribution Market is

5   worldwide, excluding China. Outside of China, app distribution channels, including app

6   stores, are developed and distributed on a global basis; OEMs, in turn, make app stores,

7   such as the Google Play Store, available on Android devices on a worldwide basis

8   (except in China). China is excluded from the relevant market because legal and

9   regulatory barriers prevent the operation of many global app stores, including the

10  Google Play Store, within China. Additionally, app stores prevalent in China are not

11  available, or have little presence, outside of China.

12      **B.    Google's Monopoly Power in the Android App Distribution Market**

13              69.    Google has monopoly power in the Android App Distribution

14  Market.

15              70.    Google's monopoly power can be demonstrated by, among other

16  things, Google's massive market share in terms of apps downloaded. The European

17  Commission determined that, within the Market, more than 90% of app downloads

18  through app stores have been done through the Google Play Store. Indeed, although app

19  stores for merchant mobile OSs other than Android are not included in the Android App

20  Distribution Market, the European Commission found that the only such app store with

21  any appreciable presence was the Windows Mobile Store, which was compatible with

22  the Windows Mobile OS. The Commission determined that even if the Windows

23  Mobile Store share was included in the market, the Google Play Store would still have

24  had a market share greater than 90%.

25              71.    Other existing Android mobile app stores do not discipline Google's

26  exercise of monopoly power in the Android App Distribution Market. No other app

27  store is able to reach nearly as many Android users as the Google Play Store.

28  According to the European Commission, the Google Play Store is pre-installed by

Complaint for Injunctive Relief                      22                    **SER-708**

1   OEMs on practically all Android mobile devices sold outside of China.  As a result, no

2   other Android app store comes close to that number of pre-installed users.  With the

3   exception of app stores designed for and installed only on mobile devices sold by those

4   respective OEMs, such as Samsung Galaxy Apps and the LG Electronics App Store, no

5   other Android app store is pre-installed on more than 10% of Android devices, and

6   many have no appreciable market penetration at all.  Aptoide, for example, is an

7   Android app store that claims to be the largest "independent" app store outside of China,

8   but it comes pre-installed on no more than 5% of Android mobile devices.

9          72.    Because of Google's success in maintaining its monopoly in Android

10   app distribution, there is no viable substitute to distributing Android apps through the

11   Google Play Store.  As a result, the Google Play Store offers over 3 million apps,

12   including all of the most popular Android apps, compared to just 700,000 apps offered

13   by Aptoide, the Android app store with the next largest listing.  The Google Play Store

14   thereby benefits from ongoing network effects based on the large number of

15   participating app developers and users.  The large number of apps attracts large numbers

16   of users, who value access to a broad range of apps, and the large number of users

17   attract app developers who wish to access more Android users.  Android OEMs too find

18   it commercially unreasonable to make and sell phones without the Google Play Store,

19   and they view other app stores as poor substitutes for the Google Play Store because of

20   the lower number and lesser quality of apps they offer.

21          73.    As further proof of its monopoly power, Google imposes a supra-

22   competitive commission of 30% on the price of apps purchased through the Google Play

23   Store, which is a far higher commission than would exist under competitive conditions.

24          74.    Furthermore, Google's monopoly power in app distribution is not

25   constrained by competition at the smart mobile device level because Android device

26   users face significant switching costs and lock-in to the Android ecosystems that serves

27   to protect Google's monopoly power, and consumers are unable to account for Google's

28   anticompetitive conduct when they purchase a smart mobile device.

Case 3:20-cv-05671   Document 1   Filed 08/13/20   Page 27 of 63

1    75.   *First*, consumers are deterred from leaving the Android ecosystem

2    due to the difficulty and costs of switching.  Consumers choose a smartphone based in

3    part on the OS that comes pre-installed on that device and the ecosystem in which the

4    device participates (in addition to a bundle of other features, such as price, battery life,

5    design, storage space, and the range of available apps and accessories).  Once a

6    consumer has selected a smartphone, the consumer cannot replace the mobile OS that

7    comes pre-installed on it with an alternative mobile OS.  Rather, a consumer who

8    wishes to change the OS must purchase a new smartphone entirely.  In addition, mobile

9    OSs have different designs, controls, and functions that consumers must learn to

10   navigate.  Over time, consumers who use Android devices learn to operate efficiently on

11   the Android OS.  For example, the Android OS layout differs from iOS in a wide range

12   of functions, including key features such as searching and installing "widgets" on the

13   phone, organizing and searching the phone's digital content, configuring control center

14   settings, and organizing photos.  The cost of learning to use a different mobile OS is

15   part of consumers' switching costs.

16   76.   *Second*, switching from Android devices may also result in a

17   significant loss of personal and financial investment that consumers put into the

18   Android ecosystem.  Because apps, in-app content and many other products are

19   designed for or are only compatible with a particular mobile OS, switching to a new

20   mobile OS may mean losing access to such products or to data.  Even if versions of such

21   apps and products are available within the new ecosystem chosen by the consumer, the

22   consumer would have to go through the process of downloading them again onto the

23   new devices and may have to purchase them anew.  As a result, the consumer may be

24   forced to abandon his or her investment in at least some of those apps, along with any

25   purchased in-app content and consumer-generated data on those apps.

26   77.   *Third*, consumers are not able to avoid the switching costs and lock-

27   in to the Android OS ecosystem by acquiring more information prior to the purchase of

28   the Android device.  The vast majority of mobile device consumers have no reason to

Complaint for Injunctive Relief                 24                    **SER-710**

1   inquire, and therefore do not know about, Google's anticompetitive contractual

2   restraints and policies.  Furthermore, these consumers rationally do not give much

3   weight to Google's anticompetitive conduct and anticompetitive fees when deciding

4   whether to switch from an Android device.  Consumers consider many features when

5   deciding which smartphone or tablet to purchase, including design, brand, processing

6   power, battery life, functionality and cellular plan.  These features are likely to play a

7   substantially larger role in a consumer's decision as to which smart mobile device to

8   purchase than Google's anticompetitive conduct in the relevant markets, particularly

9   given that a consumer may consider the direct monetary cost of Google's conduct to be

10  small relative to the price of smart mobile devices, if the consumer is even aware of the

11  conduct or assigns it such a cost at all.  For example, over time a typical Android user

12  may make multiple small purchases of paid apps and in-app digital content—

13  accumulating to $100 or less annually—but may spend several hundreds of dollars at

14  once to purchase an Android smart mobile device.

15          78.    Consumers are also unable to determine the "lifecycle price" of

16  devices—*i.e.*, to accurately assess at the point of purchase how much they will end up

17  spending in total (including on the device and all apps and in-app purchases) for the

18  duration of their ownership of the device.  Consumers cannot know in advance of

19  purchasing a device all of the apps or in-app content that they may want to purchase

20  during the usable lifetime of the device.  Consumers' circumstances may change.

21  Consumers may develop new interests.  They may learn about new apps or in-app

22  content that becomes available only after purchasing a device.  New apps and in-app

23  content will continue to be developed and marketed after a consumer purchases a

24  smartphone or tablet.  All of these factors may influence the amount of consumers' app

25  and in-app purchases.  Because they cannot know or predict all such factors when

26  purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the

27  devices.  This prevents consumers from effectively taking Google's anticompetitive

28  conduct into account when making mobile device purchasing decisions.

79.     Because consumers face substantial switching costs and lock-in to the Android OS, developers can only gain access to these users by also participating in the Android ecosystem.  Thus, developers face an even greater cost in not participating in the Android ecosystem—loss of access to hundreds of millions of Android OS users.

**C.     Google's Anti-Competitive Conduct Concerning the Android App Distribution Market**

80.     Google has willfully and unlawfully maintained its monopoly in the Android App Distribution Market through a series of related anti-competitive acts that have foreclosed competing ways of distributing apps to Android users.

i.     Google's Conduct Toward OEMs

81.     Google imposes anti-competitive constraints on Android OEMs based on their need for access to a viable Android app store and other important services provided by Google.

82.     *First*, Google conditions OEMs' licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreements to provide the Google Play Store with preferential treatment compared to any other competing app store.  Specifically, to access the Google Play Store, Android OEMs (which, as noted above, comprise virtually all OEMs that obtain an OS on the merchant market) have signed a Mobile Application Distribution Agreement ("MADA") with Google.  A MADA confers a license to a bundle of products comprising proprietary Google apps, Google-supplied services necessary for functioning of mobile apps, and the Android trademark.  Through its MADAs with Android OEMs, Google requires OEMs to locate the Google Play Store on the "home screen"[8] of each mobile device.  Android OEMs must further pre-install up to 30 Google mandatory apps and must locate these apps on the home screen or on the next screen, occupying valuable space on each user's mobile device that otherwise could be occupied by competing app stores and other services.  These requirements ensure that

---

[8] The default "home screen" is the default display, prior to any changes made by users, that appears without scrolling when the device is in active idle mode (*i.e.*, is not turned off or in sleep mode).

Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 30 of 63

1   the Google Play Store is the most visible app store any user encounters and place any

2   other app store at a significant disadvantage.

3   83.   Absent this restraint, OEMs could pre-install and prominently

4   display alternative app stores to the purchasers of some or all of their mobile devices,

5   allowing competing app stores the ability to vie for prominent placement on Android

6   devices, increased exposure to consumers and, as a result, increased ability to attract app

7   developers to their store.  As an app distributor, Epic could and would negotiate with

8   OEMs to offer a prominently displayed app store containing *Fortnite* and other games,

9   allowing Epic to reach more mobile users.

10   84.   *Second*, Google interferes with OEMs' ability to distribute Android

11   app stores and apps directly to consumers outside the Google Play Store.  Some OEMs

12   may choose to compete for buyers by offering mobile devices that provide easy access

13   to additional mobile app stores and apps.  For example, an OEM may pre-install an icon

14   corresponding to an app store or app on the device before it is sold to consumers.  Even

15   when an OEM would want to make mobile apps available to consumers in this way,

16   Google imposes unjustified and pretextual warnings about the security of installing the

17   app, even though the consumer is choosing to install the app in full awareness of its

18   source.

19   85.   Epic recently reached an agreement with OnePlus, an OEM, to allow

20   users of OnePlus mobile devices to seamlessly install *Fortnite* and other Epic games by

21   touching an Epic Games app on their devices—without encountering any obstacles

22   imposed by the Android OS.  In conjunction with this agreement, Epic designed a

23   version of *Fortnite* for certain OnePlus devices that delivers a state-of-the-art framerate

24   (the frequency at which consecutive images appear on the device's screen), providing an

25   even better gameplay experience for *Fortnite* players.  Although the original agreement

26   between Epic and OnePlus contemplated making this installation method available

27   worldwide, Google demanded that OnePlus not implement its agreement with Epic with

28   the limited exception of mobile devices sold in India.  OnePlus informed Epic that

1    Google was "particularly concerned that the Epic Games app would have ability to

2    potentially install and update multiple games with a silent install bypassing the Google

3    Play Store".[9] Further, any waiver of Google's restriction "would be rejected due to the

4    Epic Games app serving as a potential portfolio of games and game updates". As a

5    result, OnePlus mobile device users in India can install Epic games seamlessly without

6    using the Google Play Store, while users outside India cannot.

7           86.    Another OEM, LG, also told Epic that it had a contract with Google

8    "to block side downloading off Google Play Store this year", but that the OEM could

9    "surely" make Epic games available to consumers if the Google Play Store were used.

10    Google prevented LG from pre-installing the Epic Games app on LG devices.

11           87.    In the absence of this conduct, Epic could and would negotiate with

12    OEMs to make *Fortnite* and other Epic games directly available to consumers, free from

13    Google's anti-competitive restraints. OEMs could then compete for the sale of mobile

14    devices based in part on the set of apps offered on the OEMs' devices. But Google

15    forecloses alternative ways of distributing Android apps other than through its own

16    monopolized app store, harming competition among OEMs and among app developers,

17    to the detriment of consumers.

18           ii.    <u>Google's Conduct Toward App Distributors and Developers</u>

19           88.    Google imposes anti-competitive restrictions on competing app

20    distributors and developers that further entrench its monopoly in Android App

21    Distribution.

22           89.    *First*, Google prevents app distributors from providing Android users

23    ready access to competing app stores. Specifically, even though competitive app stores

24    themselves are mobile apps that could easily be distributed through the Google Play

25    Store, Google prohibits the distribution of any competing app store through the Google

26    Play Store, without any technological or other justification.

27

28       [9] A "silent install" is an installation process free of the dire security warnings that Google triggers when apps are directly downloaded, such as the "one touch" process on which Epic and OnePlus had agreed.

Complaint for Injunctive Relief        28

Case 3:20-cv-05671   Document 1   Filed 08/13/20   Page 32 of 63

90.     Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Google Play Store.  Each of the Defendants, except Google Payment, is a party to the DDA.

91.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play."  The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement.  The DDA is non-negotiable, and developers that seek access to Android users through the Google Play Store must accept Google's standardized contract of adhesion.

92.     In the absence of these unlawful restraints, competing app distributors could allow users to replace or supplement the Google Play Store on their devices with competing app stores, which users could easily download and install through the Google Play Store.  App stores could compete and benefit consumers by offering lower prices and innovative app store models, such as app stores that are curated to specific consumers' interests—*e.g.*, an app store that specializes in games or an app store that only offers apps that increase productivity.  Without Google's unlawful restraints, additional app stores would provide additional platforms on which more apps could be featured, and thereby, discovered by consumers.  Epic has been damaged through its inability to provide a competing app store (as it does on personal computers) and by the loss of the opportunity to reach more Android users directly in the ways that personal computers allow developers to reach consumers without artificial constraints.

93.     *Second,* Google conditions app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store. Specifically, Google markets an App Campaigns program that, as Google says, allows app developers to "get your app into the hands of more paying users" by "streamlin[ing] the process for you, making it easy to promote your apps across Google's largest

**SER-715**

Case 3:20-cv-05671  Document 1  Filed 08/13/20  Page 33 of 63

properties". This includes certain ad placements on Google Search, YouTube, Discover on Google Search, and the Google Display Network, and with Google's "search partners", that are specially optimized for the advertising of mobile apps. However, in order to access this valuable advertising space through the App Campaigns program, Google requires that app developers list their app in either the Google Play Store (to reach Android users) or in the Apple App Store (to reach Apple iOS users). This conduct further entrenches Google's monopoly in Android App Distribution by coercing Android app developers to list their apps in the Google Play Store or risk losing access to a great many Android users they could otherwise advertise to but for Google's restrictions.

### iii.  Google's Conduct Toward Consumers

94. Google directly and anti-competitively restricts the manner in which consumers can discover, download and install mobile apps and app stores. Although Google nominally allows consumers to directly download and install Android apps and app stores—a process that Google pejoratively describes as "sideloading"—Google has ensured, through a series of technological impediments imposed by the Android OS, that direct downloading remains untenable for most consumers.

95. But for Google's anticompetitive acts, Android users could freely download apps from developers' websites, rather than through an app store, just as they might do on a personal computer. There is no reason that downloading and installing an app on a mobile device should differ from downloading and installing software on a personal computer. Millions of personal computer users download and install software directly every day, such as Google's own Chrome browser or Adobe's Acrobat Reader. Personal computer users do this easily and safely.

96. Direct downloading on Android mobile devices, however, differs dramatically. Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. For example, depending on the version of Android

Complaint for Injunctive Relief 30

**SER-716**

running on a mobile device, downloading and installing *Fortnite* on an Android device could take as many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.  Below are the myriad steps an average Android user has to go through in order to download and install *Fortnite* directly from Epic's secure servers.



97.    Below are two of the intimidating messages and warnings about the supposed danger of directly downloading and installing apps that consumers encounter during this process.




98.     As if this slog through warnings and threats were not enough to ensure the inferiority of direct downloading as a distribution method for Android apps, Google denies downloaded apps the permissions necessary to be seamlessly updated in the background—instead allows such updates only for apps downloaded via Google Play Store.  The result is that consumers must manually approve every update of a "sideloaded" app.  In addition, depending on the OS version and selected settings, such updates may require users to go through many of the steps in the downloading process repeatedly, again triggering many of the same warnings.  This imposes onerous obstacles on consumers who wish to keep the most current version of an app on their mobile device and further drives consumers away from direct downloading and toward Google's monopolized app store.

99.     Further, under the guise of offering protection from malware, Google further restricts direct downloading.  When Google deems an app "harmful", Google may prevent the installation of, prompt a consumer to uninstall, or forcibly remove the

Case 3:20-cv-05671 Document 1 Filed 08/13/20 Page 36 of 63

1    app from a consumer's device.  And direct downloading has been prevented entirely on

2    the Android devices that are part of Google's so-called Advanced Protection Program

3    ("APP").  Consumers who have enrolled in APP are unable to directly download apps;

4    their Android device can only download apps distributed in the Google Play Store or in

5    another pre-installed app store that Google has pre-approved for an OEM to offer on its

6    devices.  App developers therefore cannot reach APP users unless they first agree to

7    distribute their apps through the Google Play Store or through a separate Google-

8    approved, OEM-offered app store, where available.  Google's invocation of security is

9    an excuse to further strangle an app developer's ability to reach Android users, as shown

10   by a comparison to personal computers, where users can securely purchase and

11   download new software without being limited to a single software store owned or

12   approved by the user's anti-virus software vendor.

13          100.   Direct downloading is also nominally available to competing app

14   distributors who seek to distribute competing Android app stores directly to consumers.

15   However, the same restrictions Google imposes on the direct downloading of apps apply

16   to the direct downloading of app stores.  Indeed, Google Play Protect has flagged at

17   least one competing Android app store, Aptoide, as "harmful", further hindering

18   consumers' ability to access a competing app store.

19          101.   And apps downloaded from "sideloaded" app stores, like apps

20   directly downloaded from a developer's website, may not be automatically uploaded in

21   the background.  Thus, direct downloading is not a viable way for app stores to reach

22   Android users, any more than it is a viable alternative for single apps; the only

23   difference is that the former do not have *any* alternative, ensuring the latter are forced

24   into the Google Play Store.

25          102.   But for Google's restrictions on direct downloading, Epic and other

26   app distributors and developers could try to directly distribute their stores and apps to

27   those consumers who would be open to a process outside an established app store.  But

28   as explained above, Google makes direct downloading substantially and unnecessarily

1  difficult, and in some cases prevents it entirely, further narrowing this already narrow
2  alternative distribution channel.

3       103.  There is no legitimate reason for Google's conduct.  Indeed, for
4  decades the users of personal computers have been able to install software acquired
5  from various sources without being deterred by anything like the obstacles erected by
6  Google.  Now, a user can navigate to the Internet webpage sponsored by the developer
7  of software he/she desires, click once or twice to download and install an application,
8  and be up and running, often in a matter of minutes.  The operating systems used by
9  personal computers efficiently facilitate this download and installation (unlike Android),
10 and security screening is conducted by a neutral security software operating in the
11 background, allowing users to download software from any source they choose (unlike
12 Android).

13      104.  Google's anti-competitive and unjustified restrictions on distributing
14 apps through any means other than its own app store contradict its own claims that
15 Android app developers can "us[e] any distribution approach or combination of
16 approaches that meets your needs", and that developers can even provide consumers
17 "apps from a website or [by] emailing them directly to users."[10]  In reality, Google
18 specifically prevents app developers from effectively availing themselves of alternative
19 distribution channels that it touts today.

20      105.  Through these anti-competitive acts, including contractual provisions
21 and exclusionary obstacles, Google has willfully obtained a near-absolute monopoly
22 over Android mobile app distribution.  Google Play Store downloads have accounted for
23 more than 90% of downloads through Android app stores, dwarfing other available
24 distribution channels.

[10] Google Play Developers Page, *Alternative distribution options,*
https://developer.android.com/distribute/marketing-tools/alternative-distribution (last accessed June 7, 2020).

Complaint for Injunctive Relief     34     **SER-720**

**D.  Anti-Competitive Effects in the Android App Distribution Market**

106.    Google's anti-competitive conduct forecloses competition in the Android App Distribution Market, affects a substantial volume of commerce in this Market and causes anti-competitive harms to OEMs, competing mobile app distributors, mobile app developers, and consumers.

107.    Google's conduct harms OEMs by forcing them to dedicate to the Google Play Store and other mandatory Google applications valuable space on their devices' "home screen", even if they would rather use that real estate for other purposes, including to offer alternative app stores.  Individually and together, these requirements limit OEMs' ability to innovate and compete with each other by offering innovative and more appealing (in terms of price and quality) distribution platforms for mobile apps. Google's restrictions also interfere with OEMs' ability to compete with each other by offering Android devices with tailored combinations of pre-installed apps that would appeal to particular subsets of mobile device consumers.

108.    Google's conduct harms would-be competitor app distributors, such as Epic, which could otherwise innovate new models of app distribution and provide OEMs, app developers, and consumers choice beyond Google's own app store.

109.    Google's anti-competitive conduct harms app developers, such as Epic, which are forced to agree to Google's anti-competitive terms and conditions if they wish to reach many Android users, such as through advertising on Google's valuable advertising properties.  Google's restrictions prevent developers from experimenting with alternative app distribution models, such as providing apps directly to consumers, selling apps through curated app stores, creating their own competing app stores, or forming business relationships with OEMs who can pre-install apps.  By restricting developers in such a way, Google ensures that the developer's apps will be distributed on the Google Play Store, and that Google is then able to monitor and collect a variety of information on the apps' usage, which it can then use to develop and offer

**SER-721**

1   its own competing apps that are, of course, not subject to Google's supra-competitive

2   taxes.

3          110.   Both developers and consumers are harmed by Google's supra-

4   competitive taxes of 30% on the purchase price of apps distributed through the Google

5   Play Store, which is a much higher transaction fee than would exist in a competitive

6   market.  Google's supra-competitive taxes raise prices for app developers and

7   consumers and reduce the output of mobile apps and related content by depriving app

8   developers incentive and capital to develop new apps and content.

9          111.   Consumers are further harmed because Google's control of app

10  distribution reduces developers' ability and incentive to distribute apps to consumers in

11  different and innovative ways—for example, through genre-specific app stores.  Google,

12  by restraining the distribution market and eliminating the ability and incentive for

13  competing app stores, also limits consumers' ability to discover new apps of interest to

14  them.  More competing app stores would permit additional platforms to feature diverse

15  collections of apps.  Instead, consumers are left to sift through millions of apps in one

16  monopolized app store, where Google controls which apps are featured and which apps

17  are identified or prioritized in user searches.

**III.   Google Unlawfully Acquired and Maintains a Monopoly in the Android In-**
18  **App Payment Processing Market.**

19         112.   By selling digital content within a mobile app rather than (or in

20  addition to) charging a price for the app itself, app developers can make an app widely

21  accessible to all users, then charge users for additional digital content or features, thus

22  still generating revenue from their investment in developing new apps and content.  This

23  is especially true for mobile game developers.  By allowing users to play without up-

24  front costs, developers permit more players try a game "risk free" and only pay for what

25  they want to access.  *Fortnite*, for example, is free to download and play, but makes

26  additional content available for in-app purchasing on an à la carte basis or via a

27  subscription-based Battle Pass.  App developers who sell digital content rely on in-app

28

Complaint for Injunctive Relief                    36                    **SER-722**

payment processing tools to process consumers' purchases in a seamless and efficient manner.

113.   When selling digital content, Android app developers are unable to utilize the multitude of electronic payment processing solutions generally available on the market to process other types of transactions.  Instead, through contractual restrictions and its monopoly in app distribution, Google coerces developers into using its own in-app payment processing by conditioning developers' use of Google's dominant Google Play Store on the use of Google's payment processor, Google Play Billing, for digital content, thereby acquiring and maintaining monopoly power in the Android In-App Payment Processing Market.  Google thus ties its Google Play Store to its own proprietary payment processing tool.

### A.   The Android In-App Payment Processing Market

#### i.   Product Market Definition

114.   There is a relevant antitrust market for the processing of payments for the purchase of digital content, including virtual gaming products, that is consumed within Android apps (the "Android In-App Payment Processing Market").  The Android In-App Payment Processing Market is comprised of the payment processing solutions that Android developers could turn to and integrate into their Android apps to process the purchase of such in-app digital content.

115.   Absent Google's unlawful conduct, app developers could integrate compatible payment processor into their apps to facilitate the purchase of in-app digital content.  Developers also would have the capability to develop their own in-app payment processing functionality.  And developers could offer users a choice among multiple payment processors for each purchase, just like a website or brick-and-mortar store can offer a customer the option of using Visa, MasterCard, Amex, Google Pay, and more.

116.   Google offers separate payment solutions for the purchase of digital content than it does for other types of purchases, even within mobile apps.  Google Play

1   Billing can be used for the purchase of digital content and virtual gaming products,

2   while Google offers a separate tool, Google Pay, to facilitate the purchase of physical

3   products and services within apps.

4        117.   It is particularly important that app developers who sell in-app digital

5   content be able to offer in-app transactions that are seamless, engrossing, quick, and fun.

6   For example, a gamer who encounters a desirable "skin" within *Fortnite*, such as a

7   Marvel superhero, may purchase it nearly instantly for a small price without leaving the

8   app.  Although *Fortnite* does not offer content that extends gameplay or gives players

9   competitive advantages, other game developers offer such products—for example,

10  "boosts" and "extra lives"—that extend and enhance gameplay.  It is critical that such

11  purchases can be made during gameplay itself, rather than in another manner.  If a

12  player were required to purchase game-extending extra lives outside of the app, the

13  player may simply stop playing instead.

14       118.   As another example, if a user of a mobile dating app encounters a

15  particularly desirable potential dating partner, he/she can do more than "swipe right" or

16  "like" that person, but can also purchase a digital item that increases the likelihood that

17  the potential partner will notice his/her profile.  If the user could not make that purchase

18  quickly and seamlessly, he/she would likely abandon the purchase and may even stop

19  "swiping" in the app altogether.

20       119.   It is therefore essential that developers who offer digital content be

21  able to seamlessly integrate a payment processing solution into the app, rather than

22  requiring a consumer to go elsewhere, such as to a separate website, to process a

23  transaction.  Indeed, if an app user were directed to process a purchase of digital content

24  outside of a mobile app, the user might abandon the purchase or stop interacting with

25  the mobile app altogether.

26       120.   Mobile game developers particularly value the ability to allow users

27  to make purchases that extend or enhance gameplay without disrupting or delaying that

28  gameplay or a gamer's engagement with the mobile app.  For these reasons, and in the

Complaint for Injunctive Relief        38        **SER-724**

alternative, there is a relevant antitrust sub-market for the processing of payments for the purchase of virtual gaming products within mobile Android games (the "Android Games Payment Processing Market").

ii. Geographic Market Definition

121. The geographic scope of the Android In-App Payment Processing Market is worldwide, excluding China. Outside China, in-app payment processing tools, such as Google Play Billing, are available on a worldwide basis. By contrast, in-app payment processing tools available in China are not available outside of China, including because Google prevents the use of non-Google payment processing tools for all apps distributed through the Google Play Store, which as noted above dominates distribution of apps outside of China.

**B.  Google's Monopoly Power in the Android In-App Payment Processing Market**

122. Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

123. For apps distributed through the Google Play Store, Google requires that the apps use *only* its own in-app payment processor, Google Play Billing, to process in-app purchases of digital content and for all purchases within Android games. And because 90% or more of Android-compatible mobile app downloads conducted through an app stores have been done through the Google Play Store, Google has a monopoly in these Markets. .

124. Google charges a 30% commission for Google Play Billing. This rate reflects Google's market power, which allows it to charge supra-competitive prices for payment processing within the market. Indeed, the cost of alternative electronic payment processing tools, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be ***one tenth*** of the 30% cost of Google Play Billing.

SER-725

Case 3:20-cv-05671   Document 1   Filed 08/13/20   Page 43 of 63

| Electronic Payment Processing Tool | Base U.S. Rate |
| --- | --- |
| PayPal | 2.9% |
| Stripe | 2.9% |
| Square | 2.6%-3.5% |
| Braintree | 2.9% |

### C. Google's Anti-Competitive Conduct Concerning the Android In-App Payment Processing Market

125.   Through provisions of the DDA that Google imposes on all developers who seek to access Android users, Google unlawfully ties its Google Play Store, through which it has a monopoly in the Android App Distribution Market, to its own in-app payment processing tool, Google Play Billing.  Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and in-app digital content.

126.   Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require in relevant part that:

- Developers offering products within a game downloaded on Google Play or providing access to game content must use Google Play In-app Billing as the method of payment.
- Developers offering products within another category of app downloaded on Google Play must use Google Play In-app Billing as the method of payment, except for the following cases:
  - o Payment is solely for physical products,
  - o Payment is for digital content that may be consumed outside of the app itself (*e.g.*, songs that can be played on other music players).

127.   Google's unlawful restraints in the DDA prevent app developers from integrating alternative, even multiple, payment processing solutions into their

Complaint for Injunctive Relief                    40                    **SER-726**

1   mobile apps, depriving app developers and consumers alike a choice of competing

2   payment processors.  For example, Epic offers its own in-app payment processing tool

3   that it could integrate, alongside Google's and others, into Epic mobile games.  Epic

4   consumers could then choose to process their payment using Google's tool, Epic's tool,

5   or another tool altogether.

6           128.   In December of 2019, Epic submitted a build of *Fortnite* to Google

7   Play that enabled users to make in-app purchases through Epic's own payment

8   processor.  Upon review of the submission, Google Play rejected the application, citing

9   its violation of Google's Payments policy as well as an unrelated issue raised by

10  Google.  In January 2020, Epic again submitted a *Fortnite* build that resolved the

11  unrelated issue but again enabled users to use Epic's own payment processor.  Google

12  again rejected Epic's submission.

13          129.   Epic was prevented from offering *Fortnite* on the Google Play Store,

14  and therefore unable to reach many Android users, until it submitted a new version of

15  *Fortnite* that only offered Google Play Billing.  Google has damaged Epic by

16  foreclosing it from the Android in-app payment processing market.

17          130.   Google has no legitimate justifications for its tie.  If it were

18  concerned, for example, about the security of its users' payment information, then it

19  would not permit alternative payment processing for certain transactions made on

20  Android phones for physical products or digital content consumed outside an app.  But

21  Google does allow alternative payment processing tools in that context, with no

22  diminution in security.

23  **D.    Anti-Competitive Effects in the Android In-App Payment Processing
        Market**

24

25          131.   Google's conduct harms competition in the Android In-app Payment

26  Processing Market (and, in the alternative, in the Android Games Payment Processing

27  Market) and injures app developers, consumers, and competing in-app payment

28  processors.

Complaint for Injunctive Relief            41            **SER-727**

Case 3:20-cv-05671  Document 1  Filed 08/13/20  Page 45 of 63

1    132.   Google's conduct harms would-be competitor in-app payment

2  processors, who would otherwise have the ability to innovate and offer consumers

3  alternative payment processing tools that offer better functionality, lower prices, and

4  better security.  For example, in the absence of Google's Developer Program Policies,

5  Epic could offer consumers a choice of in-app payment processor for each purchase

6  made by the consumer, including a choice of Epic's own payment processor at a lower

7  cost and with better customer service.

8    133.   Google also harms app developers and consumers by inserting itself

9  as a mandatory middleman in every in-app transaction.  When Google acts as payment

10  processor, Epic is unable to provide users comprehensive customer service relating to

11  in-app payments without Google's involvement.  Google has little incentive to compete

12  through improved customer service because Google faces no competition and

13  consumers often blame Epic for payment-related problems.  In addition, Google is able

14  to obtain information concerning Epic's transactions with its own customers, which it

15  could use to give its ads and Search businesses an anti-competitive edge, even when

16  Epic and its own customers would prefer not to share their information with Google.  In

17  these ways and in others, Google directly harms app developers' relationships with the

18  users of their apps.

19    134.   Finally, Google raises app developers' costs and consumer prices

20  through its supra-competitive 30% tax on in-app purchases, a price it could not maintain

21  if it had not foreclosed competition for such transactions.  The resulting increase in

22  prices for in-app content likely deters some consumers from making purchases and

23  deprives app developers of resources they could use to develop new apps and content.

24  The supra-competitive tax rate also reduces developers' incentive to invest in and create

25  additional apps and related in-app content.

26

27

28

Complaint for Injunctive Relief                    42                    **SER-728**

## COUNT 1:  Sherman Act § 2
## (Unlawful Monopoly Maintenance in the
## Android App Distribution Market)
## (against all Defendants except Google Payment)

135.   Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

136.   Google's conduct violates Section 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations".  15 U.S.C. § 2.

137.   The Android App Distribution Market is a valid antitrust market.

138.   Google holds monopoly power in the Android App Distribution Market.

139.   Google has unlawfully maintained monopoly power in the Android App Distribution Market through the anti-competitive acts described herein, including conditioning the licensing of the Google Play Store, as well as other essential Google services and the Android trademark, on OEMs' agreement to provide the Google Play Store with preferential treatment, imposing technical restrictions and obstacles on both OEMs and developers, which prevent the distribution of Android apps through means other than the Google Play Store, and conditioning app developers' ability to effectively advertise their apps to Android users on being listed in the Google Play Store.

140.   Google's conduct affects a substantial volume of interstate as well as foreign commerce.

141.   Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

142.   As a potential competing app distributor and as an app developer, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered and continues to suffer

**SER-729**

1    damages and irreparable injury, and such damages and injury will not abate until an

2    injunction ending Google's anti-competitive conduct issues.

### COUNT 2:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android App Distribution Market:  OEMs)
### (against all Defendants except Google Payment)

6        143.    Epic restates, re-alleges and incorporates by reference each of the

7    allegations set forth in the rest of this Complaint as if fully set forth herein.

8        144.    Defendants' conduct violates Section 1 of the Sherman Act, which

9    prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

10   in restraint of trade or commerce among the several States, or with foreign nations".

11   15 U.S.C. § 1.

12       145.    Google has entered into agreements with OEMs that unreasonably

13   restrict competition in the Android App Distribution Market.  These include MADAs

14   with OEMs that condition their access to the Google Play Store and other "must have"

15   Google services on the OEM offering the Google Play Store as the primary and often

16   the only viable app store on Android mobile devices.

17       146.    These agreements serve no legitimate or pro-competitive purpose

18   that could justify their anti-competitive effects, and thus unreasonably restrain

19   competition in the Android App Distribution Market.

20       147.    Google's conduct affects a substantial volume of interstate as well as

21   foreign commerce.

22       148.    Google's conduct has substantial anti-competitive effects, including

23   increased prices and costs, reduced innovation and quality of service, and lowered

24   output.

25       149.    As a potential competing app distributor and as an app developer that

26   consumes app distribution services, Epic has been harmed by Defendants' anti-

27   competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic

28   has suffered and continues to suffer damages and irreparable injury, and such damages

Complaint for Injunctive Relief                    44                    **SER-730**

1  and injury will not abate until an injunction ending Google's anti-competitive conduct
2  issues.

### COUNT 3:  Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android App Distribution Market:  DDA)
### (against all Defendants except Google Payment)

6  150.  Epic restates, re-alleges, and incorporates by reference each of the
7  allegations set forth in the rest of this Complaint as if fully set forth herein.

8  151.  Defendants' conduct violates Section 1 of the Sherman Act, which
9  prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,
10  in restraint of trade or commerce among the several States, or with foreign nations".
11  15 U.S.C. § 1.

12  152.  Google forces app developers to enter its standardized DDA,
13  including Developer Program Policies integrated into that Agreement, as a condition of
14  being distributed through Google's app store, the Google Play Store.  The relevant
15  provisions of these agreements unreasonably restrain competition in the Android App
16  Distribution Market.

17  153.  Section 4.5 of the DDA provides that developers "may not use
18  Google Play to distribute or make available any Product that has a purpose that
19  facilitates the distribution of software applications and games for use on Android
20  devices outside of Google Play".  Section 4.1 of the DDA requires that all developers
21  "adhere" to Google's Developer Program Policies.  Under the guise of its so-called
22  "Malicious Behavior" Policy, Google prohibits developers from distributing apps that
23  "download executable code [*i.e.*, code that would execute an app] from a source other
24  than Google Play".  The DDA further reserves to Google the right to remove and
25  disable any Android app that it determines violates either the DDA or its Developer
26  Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These
27  provisions prevent app developers from offering competing app stores through the

28

Complaint for Injunctive Relief                45                    **SER-731**

1  Google Play Store, even though there is no legitimate technological or other impediment
2  to distributing a competing app store through the Google Play Store.

3       154.   These agreements serve no legitimate or pro-competitive purpose
4  that could justify their anti-competitive effects, and thus unreasonably restrain
5  competition in the Android App Distribution Market.

6       155.   Google's conduct affects a substantial volume of interstate as well as
7  foreign commerce.

8       156.   Google's conduct has substantial anti-competitive effects, including
9  increased prices and costs, reduced innovation and quality of service, and lowered
10  output.

11       157.   As a potential competing app distributor and as an app developer that
12  consumes app distribution services, Epic has been harmed by Defendants' anti-
13  competitive conduct in a manner that the antitrust laws were intended to prevent.  Epic
14  has suffered and continues to suffer damages and irreparable injury, and such damages
15  and injury will not abate until an injunction ending Google's anti-competitive conduct
16  issues.

**COUNT 4:  Sherman Act § 2**
**(Unlawful Monopolization and Monopoly Maintenance in the**
**Android In-App Payment Processing Market)**
**(against all Defendants)**

20       158.   Epic restates, re-alleges, and incorporates by reference each of the
21  allegations set forth in the rest of this Complaint as if fully set forth herein.

22       159.   Google's conduct violates Section 2 of the Sherman Act, which
23  prohibits the "monopoliz[ation of] any part of the trade or commerce among the several
24  States, or with foreign nations".  15 U.S.C. § 2.

25       160.   The Android In-App Payment Processing Market is a valid antitrust
26  market.  In the alternative, the Android Games Payment Processing Market is a valid
27  antitrust market.

28

Complaint for Injunctive Relief                    46                    **SER-732**

161. Google holds monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

162. Google has unlawfully acquired monopoly power in these Markets, including through the anti-competitive acts described herein. And however Google initially acquired its monopoly, it has unlawfully maintained its monopoly, including through the anti-competitive acts described herein.

163. Google's conduct affects a substantial volume of interstate as well as foreign commerce.

164. Google's conduct has substantial anti-competitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

165. As an app developer and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent. Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 5: Sherman Act § 1
### (Unreasonable restraints of trade concerning
### Android In-App Payment Processing Market)
### (against all Defendants)

166. Epic restates, re-alleges, and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

167. Defendants' conduct violates Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations". 15 U.S.C. § 1.

168. Google, except Google Payment, forces app developers to enter its standardized DDA, including Developer Program Policies integrated into that

1  Agreement, as a condition of having their apps distributed through Google's

2  monopolized app store, Google Play Store.  The relevant provisions of these agreements

3  unreasonably restrain competition in the Android In-App Payment Processing Market.

4  169.  Section 3.2 of the DDA requires that Android app developers enter

5  into a separate agreement with Google's payment processor, Defendant Google

6  Payment, in order to receive payment for apps and content distributed through the

7  Google Play Store.  This includes payments related to in-app purchases of digital

8  content.  Further, Google's Developer Program Policies, compliance with which Section

9  4.1 of the DDA makes obligatory, require that apps distributed through the Google Play

10 Store "must use Google Play In-app Billing [offered by Google Payment] as the method

11 of payment" for such in-app purchases.  While Google's Policies exclude certain types

12 of transactions from this requirement, such as the purchase of "solely physical products"

13 or of "digital content that may be consumed outside of the app itself", Google expressly

14 applies its anti-competitive mandate to every "game downloaded on Google Play" and

15 to all purchased "game content", such as purchases made within *Fortnite*.

16 170.  The challenged provisions serve no sufficient legitimate or pro-

17 competitive purpose and unreasonably restrain competition in the Android In-App

18 Payment Processing Market and, in the alternative, the Android Games Payment

19 Processing Market.

20 171.  Defendants' conduct affects a substantial volume of interstate as well

21 as foreign commerce.

22 172.  Defendants' conduct has substantial anti-competitive effects,

23 including increased prices and costs, reduced innovation and quality of service, and

24 lowered output.

25 173.  As an app developer and as the developer of a competing in-app

26 payment processing tool, Epic has been harmed by Defendants' anti-competitive

27 conduct in a manner that the antitrust laws were intended to prevent.  Epic has suffered

28

1   and continues to suffer damages and irreparable injury, and such damages and injury

2   will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 6:  Sherman Act § 1
#### (Tying Google Play Store to Google Play Billing)
#### (against all Defendants)

5   174.    Epic restates, re-alleges and incorporates by reference each of the

6   allegations set forth in the rest of this Complaint as if fully set forth herein.

7   175.    Defendants' conduct violates Section 1 of the Sherman Act, which

8   prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy,

9   in restraint of trade or commerce among the several States, or with foreign nations."

10   15 U.S.C. § 1.

11   176.    Google has unlawfully tied the Google Play Store to its in-app

12   payment processor, Google Play Billing, through its DDAs with app developers and its

13   Developer Program Policies.

14   177.    Google has sufficient economic power in the tying market, the

15   Android App Distribution Market.  With Google Play Store installed on nearly all

16   Android OS devices and over 90% of downloads on Android OS devices being

17   performed by the Google Play Store, Google has overwhelming market power.

18   Google's market power is further evidenced by its ability to extract supra-competitive

19   taxes on the sale of apps through the Google Play Store.

20   178.    The availability of the Google Play Store for app distribution is

21   conditioned on the app developer accepting a second product, Google's in-app payment

22   processing services.  Google's foreclosure of alternative app distribution channels forces

23   developers like Epic to use Google's in-app payment processing services, which Google

24   has expressly made a condition of reaching Android users through its dominant Google

25   Play Store.

26   179.    The tying product, Android app distribution, is distinct from the tied

27   product, Android in-app payment processing, because app developers such as Epic have

28   alternative in-app payment processing options and would prefer to choose among them

1   independently of how an Android app is distributed.  Google's unlawful tying

2   arrangement thus ties two separate products that are in separate markets.

3          180.   Google's conduct forecloses competition in the Android In-App

4   Payment Processing Market, and, in the alternative, in the Android Games Payment

5   Processing Market, affecting a substantial volume of commerce in these Markets.

6          181.   Google has thus engaged in a *per se* illegal tying arrangement and

7   the Court does not need to engage in a detailed assessment of the anti-competitive

8   effects of Google's conduct or its purported justifications.

9          182.   In the alternative only, even if Google's conduct does not constitute

10  a *per se* illegal tie, a detailed analysis of Google's tying arrangement would demonstrate

11  that this arrangement violates the rule of reason and is illegal.

12         183.   As an app developer which consumes in-app payment processing

13  services and as the developer of a competing in-app payment processing tool, Epic has

14  been harmed by Defendants' anti-competitive conduct in a manner that the antitrust

15  laws were intended to prevent.  Epic has suffered and continues to suffer damages and

16  irreparable injury, and such damages and injury will not abate until an injunction ending

17  Google's anti-competitive conduct issues.

18         **COUNT 7:  California Cartwright Act**
    **(Unreasonable restraints of trade in Android App Distribution Market)**

19         **(against all Defendants except Google Payment)**

20         184.   Epic restates, re-alleges and incorporates by reference each of the

21  allegations set forth in the rest of this Complaint as if fully set forth herein.

22         185.   Google's acts and practices detailed above violate the Cartwright

23  Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination

24  of resources by two or more persons to restrain trade or commerce or to prevent market

25  competition.  *See* §§ 16720, 16726.

26         186.   Under the Cartwright Act, a "combination" is formed when the anti-

27  competitive conduct of a single firm coerces other market participants to involuntarily

28  adhere to the anti-competitive scheme.

Complaint for Injunctive Relief       50       **SER-736**

187.   The Android App Distribution Market is a valid antitrust market.

188.   Google has executed agreements with OEMs that unreasonably restrict competition in the Android App Distribution Market.  Namely, Google has entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices.  These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

189.   Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

190.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

191.   It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

192.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

### COUNT 8:  California Cartwright Act
### (Unreasonable restraints of trade in Android App Distribution Market)
### (against all Defendants except Google Payment)

193.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

194.   Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*,  the

1  combination of resources by two or more persons to restrain trade or commerce or to

2  prevent market competition. *See* §§ 16720, 16726.

3       195.   Under the Cartwright Act, a "combination" is formed when the anti-

4  competitive conduct of a single firm coerces other market participants to involuntarily

5  adhere to the anti-competitive scheme.

6       196.   The Android App Distribution Market is a valid antitrust market.

7       197.   Google conditions distribution through the Google Play Store on

8  entering into the standardized DDA described above, including the Developer Program

9  Policies integrated therein.  Through certain provisions in these agreements, Google

10  forces app developers to submit to conditions that unreasonably restrain competition in

11  the Android App Distribution Market.

12       198.   Section 4.5 of the DDA provides that developers "may not use

13  Google Play to distribute or make available any Product that has a purpose that

14  facilitates the distribution of software applications and games for use on Android

15  devices outside of Google Play."  Section 4.1 of the DDA requires that all developers

16  "adhere" to Google's Developer Program Policies.  Under the guise of its so-called

17  "Malicious Behavior" Policy, Google prohibits developers from distributing apps that

18  "download executable code [*i.e.*, code that would execute an app] from a source other

19  than Google Play."  The DDA further reserves to Google the right to remove and

20  disable any Android app that it determines violates either the DDA or its Developer

21  Program Policies and to terminate the DDA on these bases.  (§§ 8.3, 10.3.)  These

22  provisions prevent app developers from offering competing app stores through the

23  Google Play Store, even though there is no legitimate technological or other impediment

24  to distributing a competing app store through the Google Play Store.

25       199.   These provisions have no legitimate or pro-competitive purpose or

26  effect, and unreasonably restrain competition in the Android App Distribution Market.

27

28

Complaint for Injunctive Relief         52         **SER-738**

200. Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service, and lowered output.

201. Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute its Android applications, including *Fortnite*, and to market a competing app store to the Google Play Store.

202. It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

203. Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

<u>**COUNT 9: California Cartwright Act**</u>
<u>**(Unreasonable restraints of trade in Android In-App Payment Processing Market)**</u>
<u>**(against all Defendants)**</u>

204. Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

205. Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

206. Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

207.   The Android App Distribution Market and Android In-App Payment Processing Market, and, in the alternative, the Android Games Payment Processing Market, are valid antitrust markets.

208.   Google has monopoly power in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

209.   Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein.  Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android In-App Payment Processing Market.

210.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store.  This includes payments related to in-app purchases.  Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases.  While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself", Google expressly and discriminatorily applies its anti-competitive mandate to every "game downloaded on Google Play" and to all purchased "game content", such as purchases made within *Fortnite*.

211.   These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market, and, in the alternative, in the Android Games Payment Processing Market.

Complaint for Injunctive Relief                    54                    **SER-740**

212.    Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

213.    Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, has been unreasonably restricted in its ability to distribute and use its own in-app payment processor.

214.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California and overt acts in furtherance of Google's anti-competitive scheme took place in California.

215.    Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

**COUNT 10:  California Cartwright Act**
**(Tying Google Play Store to Google Play Billing)**
**(against all Defendants)**

216.    Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

217.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition.  *See* §§ 16720, 16726.

218.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

219.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount

Case 3:20-cv-05671  Document 1  Filed 08/13/20  Page 59 of 63

1   from, or rebate upon, such price, on the condition, agreement or understanding that the

2   lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery,

3   supplies, commodities, or services of a competitor or competitors of the lessor or seller,

4   where the effect of such lease, sale, or contract for sale or such condition, agreement or

5   understanding may be to substantially lessen competition or tend to create a monopoly

6   in any line of trade or commerce in any section of the State." § 16727.

7        220.   As detailed above, Google has unlawfully tied its in-app payment

8   processor, Google Play Billing, to the Google Play Store through its DDAs with app

9   developers and its Developer Program Policies.

10       221.   Google has sufficient economic power in the tying market, the

11  Android App Distribution Market, to affect competition in the tied market, the Android

12  In-App Payment Distribution Market.  With Google Play Store installed on nearly all

13  Android OS devices and over 90% of downloads on Android OS devices being

14  performed by the Google Play Store, Google has overwhelming market power.

15  Google's market power is further evidenced by its ability to extract supra-competitive

16  taxes on the sale of apps through the Google Play Store.

17       222.   The availability of the Google Play Store for app distribution is

18  conditioned on the app developer accepting a second product, Google's in-app payment

19  processing services.  Google's foreclosure of alternative app distribution channels forces

20  developers like Epic to use Google's in-app payment processing services, which Google

21  has expressly made a condition of reaching Android users through its dominant Google

22  Play Store.

23       223.   The tying product, Android app distribution, is separate and distinct

24  from the tied product, Android in-app payment processing, because app developers such

25  as Epic have alternative in-app payment processing options and would prefer to choose

26  among them independently of how an Android app is distributed.  Google's unlawful

27  tying arrangement thus ties two separate products that are in separate markets.

28

Complaint for Injunctive Relief                56                    **SER-742**

224.    Google's conduct forecloses competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market, affecting a substantial volume of commerce in these Markets.

225.    Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

226.    Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

227.    Google's acts and practices detailed above unreasonably restrain competition in the Android In-App Payment Processing Market and, in the alternative, in the Android Games Payment Processing Market.

228.    Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is paying a supra-competitive commission rate on in-app purchases processed through Google's payment processor and has forgone commission revenue it would be able to generate if its own in-app payment processor were not unreasonably restricted from the market.

229.    As an app developer which consumes in-app payment processing services and as the developer of a competing in-app payment processing tool, Epic has been harmed by Defendants' anti-competitive conduct in a manner that the antitrust laws were intended to prevent.

230.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, many affected consumers reside in California, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

231.   Epic has suffered and continues to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Google's anti-competitive conduct issues.

## COUNT 11:  California Unfair Competition Law
### (against all Defendants)

232.   Epic restates, re-alleges and incorporates by reference each of the allegations set forth in the rest of this Complaint as if fully set forth herein.

233.   Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

234.   Epic has standing to bring this claim because it has suffered injury in fact and lost money as a result of Google's unfair competition.  Specifically, it develops and distributes apps for the Android mobile platform, and has developed and distributes a processor for in-app purchases, and Google's conduct has unreasonably restricted Epic's ability to fairly compete in the relevant markets with these products.

235.   Google's conduct violates the Sherman Act and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

236.   Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

237.   Google's conduct harms Epic which, as a direct result of Google's anti-competitive conduct, is unreasonably prevented from freely distributing mobile apps or its in-app payment processing tool, and forfeits a higher commission rate on the in-app purchases than it would pay absent Google's conduct.

238.   Epic seeks injunctive relief under the Unfair Competition Law.

1

## **PRAYER FOR RELIEF**

2       WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in

3  favor of Epic and against Defendants:

4        A.     Issuing an injunction prohibiting Google's anti-competitive and unfair

5                conduct and mandating that Google take all necessary steps to cease such

6                conduct and to restore competition;

7        B.     Awarding a declaration that the contractual restraints complained of herein

8                are unlawful and unenforceable;

9        C.     Awarding any other equitable relief necessary to prevent and remedy

10              Google's anti-competitive conduct; and

11        D.     Granting such other and further relief as the Court deems just and proper.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: August 13, 2020

Respectfully submitted,

By:   /s/ Paul J. Riehle

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Christine A. Varney (*pro hac vice pending*)
cvarney@cravath.com
Katherine B. Forrest (*pro hac vice pending*)
kforrest@cravath.com
Gary A. Bornstein (*pro hac vice pending*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice pending*)
yeven@cravath.com
M. Brent Byars (*pro hac vice pending*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on December 27, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ Gary A. Bornstein
Gary A. Bornstein