Nos. 24-6256, 24-6274
.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

EPIC GAMES, INC.
*Plaintiff-Appellee,*

v.

GOOGLE LLC, et al.
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
The Honorable James Donato
Case Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

## *BRIEF OF AMICUS CURIAE PROFESSOR PAUL M. COLLINS, JR., IN SUPPORT OF PLAINTIFF-APPELLEE*

ALEXANDER ARONSON
Court Accountability Action
33 Bradford St.
Concord, MA, 01742
(978) 371-3200
alex@courtaccountability.org

*Counsel for Amicus Curiae*

January 7, 2025

# TABLE OF CONTENTS

Table of Contents ..................................................................i

Table of Authorities.............................................................ii

Interest of Amicus Curiae ................................................... 1

Summary of Argument........................................................ 4

Argument............................................................................ 6

    I.    Current Federal Amicus Funding Disclosure Rules Are Vulnerable to Manipulation by Parties, Undermining the Integrity of the Judicial Process. ............................. 6

        A.    From "Friends of the Court" to Judicial Lobbyists .......... 6

        B.    The "Amicus Machine"........................................ 9

        C.    Pending Changes to Rule 29's Amicus Disclosure Requirements ................................................ 12

    II.    Google Has Deployed the "Amicus Machine" in Other Cases— And Has Apparently Done So Here. ..................................... 16

        A.    Google's Pattern of Undisclosed Funding Ties to Amici 16

        B.    Epic's Requested Disclosures from Google's Amici ........20

        C.    Many Amici in This Appeal Have Financial Ties to Google. ........................................................22

        D.    Numerous of Amici's Counsel Have Financial Ties to Google, and Amici Rely on Google-funded Authorities. 30

        E.    Google's Briefing Relies on The Untested Assertions of Google-Funded Amici. ...................................... 33

Conclusion ...................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014)..................................8

*NAACP v. Alabama,* 357 U.S. 449 (1958).............................................24

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995)............21

## OTHER AUTHORITIES

Allison Orr Larsen & Neal Devins, *The Amicus Machine*, 102 VA. L. REV. 1901 (2016) ......................................................... 9, 10, 12

Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 VA. L. REV. 1757 (2014).........................................................................11

Anthony J. Franze & R. Reeves Anderson, *Amicus Curiae at the Supreme Court: Last Term and the Decade in Review*, NAT'L L.J. (Nov. 18, 2020) ............................................................................7

Brianne J. Gorod, *The Adversarial Myth: Appellate Court Extra-Record Factfinding*, 61 DUKE L.J. 1 (2011) ............................................ 10, 11

Comm. on Rules of Practice and Procedure, Judicial Conference of the United States, Proposed Amendments to the Federal Rules of Appellate and Bankruptcy Procedure, and the Federal Rules of Evidence (Aug. 2024) .........................................................15

*Google Activates D.C. Influence Machine for Pivotal Supreme Court Case*, TECH TRANSPARENCY PROJECT (Feb. 17, 2023), https://www.techtransparencyproject.org/articles/google-activates-dc-influence-machine-pivotal-supreme-court-case ...........................17, 18

Halimah DeLaine Prado, *Gonzalez v Google and the Future of an Open, Free and Safe Internet*, GOOGLE BLOG: THE KEYWORD (Jan. 12, 2023), https://blog.google/outreach-initiatives/public-policy/gonzalez-v-google-and-the-future-of-an-open-free-and-safe-internet .................17

Janet M. Box-Steffensmeier, Dino P. Christenson & Matthew P. Hitt, *Quality Over Quantity: Amici Influence and Judicial Decision Making*, 107 AM. POL. SCI. REV. 446 (2013)..........................................9

Jimmy Hoover, *How Do You Make Amicus Briefs a True Friend of the Supreme Court?*, NAT'L L.J., Sept. 5, 2023. ........................................................... 8

Joseph D. Kearney & Thomas W. Merrill, *Influence of Amicus Curiae Briefs on the Supreme Court*, 148 U. PA. L. REV. 743 (1999) ................ 8

Kelly J. Lynch, *Best Friends: Supreme Court Law Clerks on Effective Amicus Curiae Briefs*, 20 J.L. & POL. 33 (2004). .................................... 9

Letter from Scott S. Harris to David G. Campbell & John D. Bates (Sept. 18, 2020) ......................................................................... 16

Letter from Sheldon Whitehouse & Hank Johnson, Jr., to John G. Roberts, Jr., & Scott S. Harris (May 13, 2020) .................................... 16

Memorandum Re: Report of the Advisory Committee on Appellate Rules from Jay S. Bybee to John D. Bates (May 13, 2024) ........................... 25

Michael Rustad & Thomas Koenig, *The Supreme Court and Junk Social Science: Selective Distortion in Amicus Briefs*, 72 N.C. L. REV. 91 (1993)......................................................................................... 11

Morgan L.W. Hazelton & Rachael K. Hinkle, PERSUADING THE SUPREME COURT: THE SIGNIFICANCE OF BRIEFS IN JUDICIAL DECISION-MAKING (Univ. Press of Kan. 2022). ....................................................... 7, 8, 9

Naomi Nix & Joe Light, *Oracle Reveals Funding of Dark Money Group Fighting Big Tech*, BLOOMBERG (Feb. 25, 2020) .................................... 16

Paul Collins, Jr. & Wendy L. Martinek, *Judges and Friends: The Influence of Amici Curiae on U.S. Court of Appeals Judges*, 43 AM. POL. RES. 255 (2015).................................................................... 2

Paul Collins, Jr. & Wendy L. Martinek, *Who Participates As Amici Curiae in the U.S. Courts of Appeals?*, 94 JUDICATURE 128 (2010)......... 2

Paul Collins, Jr., Pamela C. Corley & Jesse Hamner, *The Influence of Amicus Curiae Briefs on U.S. Supreme Court Opinion Content*, 49 L. & SOC'Y REV. 917 (2015)..............................................................2, 8

Paul Collins, Jr., *The Use of Amicus Curiae Briefs*, 14 ANN. REV. L. & SOC. SCI. 219 (2018)...................................................................2, 6

Paul M. Collins, Jr. & Wendy L. Martinek, *Friends of the Circuits: Interest Group Influence on Decision Making in the U.S. Courts of Appeals*, 91 SOC. SCI. Q. 397 (2010). ..................................................... 8

iii

Paul M. Collins, Jr., FRIENDS OF THE SUPREME COURT: INTEREST GROUPS AND JUDICIAL DECISION MAKING (Oxford Univ. Press 2008) ................7

Paul M. Collins, Jr., *Lobbyists Before the U.S. Supreme Court: Investigating the Influence of Amicus Curiae Briefs*, 60 POL. RES. Q. 55 (2007)....................................................................................................8

Paul M. Collins, Jr., Pamela C. Corley & Jesse Hamner, *Me Too: An Investigation of Repetition in U.S. Supreme Court Amicus Curiae Briefs*, 97 JUDICATURE 228 (2013) ...........................................................7

Samuel Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy*, 72 YALE L.J. 694, 694 (1962).......................................6

Sheldon Whitehouse, *A Flood of Judicial Lobbying: Amicus Influence and Funding Transparency*, 131 YALE L.J.F. 141 (2021). ............13, 14

Stuart Banner, *The Myth of the Neutral Amicus: American Courts and Their Friends, 1790-1890*, 20 CONST. COMMENT. 111 (2003).....................7

Subcomm. on Fed. Cts., Oversight, Agency Action & Fed. Rts., *Answers to Senator Whitehouse's Questions Hearing: What's Wrong with the Supreme Court: The Big-Money Assault on Our Judiciary*, SENATE COMM. ON JUDICIARY (2021)..................................................... 11

**RULES**

Fed. R. App. P. 29........................................................................... passim

iv

## INTEREST OF AMICUS CURIAE[1]

Paul Collins, Jr., Professor of Legal Studies and Political Science at the University of Massachusetts Amherst, respectfully submits this brief in support of plaintiff-appellee Epic Games, Inc. This brief is limited to issues raised by Epic conditioning its consent to amicus participation in this case on amici disclosing whether they have received funding in the previous 12 months from a party or amicus or their affiliates.

Professor Collins ("Amicus") is a leading scholar on amicus practice and the role of amicus briefs in judicial decision-making. His 2008 book, *Friends of the Supreme Court: Interest Groups and Judicial Decision Making*, was published by Oxford University Press and won the 2009 C. Herman Pritchett Award from the Law and Courts Section of the American Political Science Association. Amicus has published

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel represents that no party's counsel authored this brief in whole or in part and no party, party's counsel, or other person—other than amicus curiae and its counsel—contributed money that was intended to fund preparing or submitting this brief. Counsel further represents that amicus has not received funding from a party to or amicus in this case, or from any of their affiliates. Both parties have consented to the filing of this amicus brief.

1

numerous articles on the influence of amicus briefs, using empirical evidence to demonstrate the significant impact they can have on judicial reasoning and case outcomes.[2]

Amicus's research is particularly relevant to the briefs filed in this case by the many amici with undisclosed financial ties to Google, raising questions about whether the filings reflect independent viewpoints or, instead, a coordinated effort to reinforce Google's position and circumvent rules limiting the length of party submissions. As Amicus's scholarship has shown, undisclosed amicus funding can mean that so-called "friends of the court" effectively serve as undeclared agents of parties to a case, undermining the integrity of the amicus process, the spirit of the rules of appellate procedure, and the fairness of the judicial system.

---

[2] *See, e.g.*, Paul Collins, Jr., *The Use of Amicus Curiae Briefs*, 14 ANN. REV. L. & SOC. SCI. 219 (2018); Paul Collins, Jr., Pamela C. Corley & Jesse Hamner, *The Influence of Amicus Curiae Briefs on U.S. Supreme Court Opinion Content*, 49 L. & SOC'Y REV. 917 (2015); Paul Collins, Jr. & Wendy L. Martinek, *Judges and Friends: The Influence of Amici Curiae on U.S. Court of Appeals Judges*, 43 AM. POL. RES. 255 (2015); Paul Collins, Jr. & Wendy L. Martinek, *Who Participates As Amici Curiae in the U.S. Courts of Appeals?*, 94 JUDICATURE 128 (2010).

2

Amicus's interest here, as in his scholarship, is the transparency and fairness of the judicial process. As a scholar who has dedicated his career to studying amicus practice and judicial behavior, he believes a robust disclosure regime for amicus funding is essential to maintaining the integrity of judicial proceedings. Amicus submits this brief to inform the Court about relevant history and current developments in amicus practice and Rule 29 disclosures, to alert the Court to Google's undisclosed funding of amici in this appeal, to comment on how Epic's conditions on Rule 29 consent further a public interest in judicial transparency and integrity, and to provide the Court with insights grounded in his expertise on amicus practice.

## SUMMARY OF ARGUMENT

Although amicus briefs were originally intended to provide neutral assistance to courts, they are now primarily used to reinforce opposing sides of a case. The measurable impact of amicus participation on litigation outcomes has led to the rise of the "amicus machine," whereby parties and their allies coordinate to produce briefs designed to influence case outcomes, law, and public policy. Yet the current federal rules governing disclosure of amicus funding allow parties to evade disclosure of their financial connections to amici. Proposed changes to Rule 29 intended to address these deficiencies are pending before the Judicial Conference of the United States.

Such changes are urgently needed. Like other powerful parties, Google has deployed the "amicus machine" in numerous high-profile cases, using amici with financial ties to Google to amplify its arguments without disclosing those relationships. Google's apparent use of these tactics is evident in this case, where many of its amici have a history of receiving substantial funding from Google.

Undisclosed financial ties between parties and amici can undermine the credibility of amici and damage the fairness and

4

transparency of the judicial process. This Court should, therefore, take briefs submitted by Google-funded amici with a heavy grain of salt—particularly to the extent Google relies on them to support assertions of fact that were untested during the adversary process below.

## ARGUMENT

### I. Current Federal Amicus Funding Disclosure Rules Are Vulnerable to Manipulation by Parties, Undermining the Integrity of the Judicial Process.

#### A. From "Friends of the Court" to Judicial Lobbyists

The "amicus curiae" has a long and rich history in American jurisprudence. Traditionally, the term was "applied to a bystander, who without having an interest in the cause, of his own knowledge makes suggestion on a point of law or of fact for the information of the presiding judge."[3] From this discrete function of "oral 'Shepardizing,' the bringing up of cases not known to the judge," amicus briefs have evolved to offer courts a variety of potentially relevant information.[4] At their best, amicus briefs can improve the quality of judicial decision-making by raising issues of which a court might otherwise not be aware,

---

[3] Samuel Krislov, *The Amicus Curiae Brief: From Friendship to Advocacy*, 72 YALE L.J. 694, 694 (1962) (quoting Abbott's *Dictionary of Terms and Phrases Used in American or English Jurisprudence*).

[4] *Id.* at 695; *see* Collins, *The Use of Amicus Briefs*, *supra* n.2.

6

introducing novel legal arguments, discussing the broader implications of a potential decision, and adding relevant context.[5]

In modern practice, amicus briefs are used primarily to support a party to litigation, rather than—as their name would imply—serve as neutral aids to judges.[6]  Today, almost all amicus briefs are filed in support of one of the parties to litigation.[7]  Amicus participation is also increasingly common.  At the U.S. Supreme Court, it is the rare case that does not involve significant amicus activity.  During the 2019 October Term, for example, amici filed an average of 16 briefs in each argued case,[8] and recent high-profile cases have attracted more than

---

[5] *See, e.g.*, Paul M. Collins, Jr., FRIENDS OF THE SUPREME COURT: INTEREST GROUPS AND JUDICIAL DECISION MAKING at 90 (Oxford Univ. Press 2008); Paul M. Collins, Jr., Pamela C. Corley & Jesse Hamner, *Me Too: An Investigation of Repetition in U.S. Supreme Court Amicus Curiae Briefs*, 97 JUDICATURE 228, 229 (2013); Morgan L.W. Hazelton & Rachael K. Hinkle, PERSUADING THE SUPREME COURT: THE SIGNIFICANCE OF BRIEFS IN JUDICIAL DECISION-MAKING at 6-7 (Univ. Press of Kan. 2022).

[6] Stuart Banner, *The Myth of the Neutral Amicus: American Courts and Their Friends, 1790-1890*, 20 CONST. COMMENT. 111 (2003).

[7] Collins, Jr., FRIENDS OF THE SUPREME COURT, *supra* n.5, at 40, 190.

[8] Anthony J. Franze & R. Reeves Anderson, *Amicus Curiae at the Supreme Court: Last Term and the Decade in Review*, NAT'L L.J. (Nov. 18, 2020), https://www.law.com/supremecourtbrief/2020/11/18/amicus-curiae-at-the-supreme-court-last-term-and-the-decade-in-review.

7

100 amicus filings apiece.[9]  Particularly in noteworthy cases, amici now frequently participate in cases before the federal courts of appeal as well.[10]

This is no surprise.  Empirical research has shown that Supreme Court justices are more likely to decide cases in favor of the litigant supported by the largest number of amicus briefs,[11] and they often incorporate into their opinions legal arguments and empirical points appearing in amicus briefs.[12]  Judges also tend to give more weight to

---

[9] Jimmy Hoover, *How Do You Make Amicus Briefs a True Friend of the Supreme Court?*, NAT'L L.J., Sept. 5, 2023, https://www.law.com/nationallawjournal/2023/09/05/how-do-you-make-amicus-briefs-a-true-friend-of-the-supreme-court.

[10] *See, e.g.*, *Kitchen v. Herbert*, 755 F.3d 1193, 1240-1253 (10th Cir. 2014) (listing amici); Paul M. Collins, Jr. & Wendy L. Martinek, *Friends of the Circuits: Interest Group Influence on Decision Making in the U.S. Courts of Appeals*, 91 SOC. SCI. Q. 397, 414 (2010).

[11] Paul M. Collins, Jr., *Lobbyists Before the U.S. Supreme Court: Investigating the Influence of Amicus Curiae Briefs*, 60 POL. RES. Q. 55, 70 (2007).

[12] *See* Hazelton & Hinkle, PERSUADING THE SUPREME COURT, *supra* n.5, at 203; Joseph D. Kearney & Thomas W. Merrill, *Influence of Amicus Curiae Briefs on the Supreme Court*, 148 U. PA. L. REV. 743, 758-759 (1999); Collins, et al., *The Influence of Amicus Curiae Briefs on U.S. Supreme Court Opinion Content*, *supra* n.2, at 938.

amicus briefs filed by elite counsel, academics, advocacy organizations, and businesses.[13]

## B. The "Amicus Machine"

With an increasingly specialized Supreme Court and appellate bar, and ever-savvier litigants mindful of the benefits of sophisticated amicus participation, a new phenomenon emerged in recent decades: the "amicus machine."[14]  The term refers to the highly coordinated and professionalized system by which parties-in-interest, interest groups, advocacy organizations, and specialized appellate practitioners collaborate to produce amicus campaigns to shape and influence litigation outcomes.[15]

These repeat players share resources, recruit "elite" counsel, deploy "amicus whisperers" and "wranglers," and tailor factual and

---

[13] *See* Janet M. Box-Steffensmeier, Dino P. Christenson & Matthew P. Hitt, *Quality Over Quantity: Amici Influence and Judicial Decision Making*, 107 AM. POL. SCI. REV. 446 (2013); Morgan L.W. Hazelton & Rachael K. Hinkle, PERSUADING THE SUPREME COURT, *supra* n.5; Allison Orr Larsen & Neal Devins, *The Amicus Machine*, 102 VA. L. REV. 1901, 1946, 1952-57 (2016); Kelly J. Lynch, *Best Friends: Supreme Court Law Clerks on Effective Amicus Curiae Briefs*, 20 J.L. & POL. 33 (2004).

[14] *See* Larsen & Devins, *supra* n.13.

[15] *Id.*

9

legal narratives for judges and justices.[16]  The result is dockets filled with meticulously prepared outside input, often packaged as objective expertise but strategically designed by the litigants to influence outcomes.  This networked process ensures that certain well-funded viewpoints, data, and policy arguments are presented in a compelling, rehearsed chorus. Though the federal appellate rules encourage coordination among litigants and their amici "to the extent that it helps to avoid duplicative arguments,"[17] this highly orchestrated influence apparatus goes well beyond avoiding duplication.

Exploiting the Supreme Court's "new hunger for information outside the record," the amicus machine routinely asserts "legislative facts" to support a favored party's position.[18]  In some instances, facts

---

[16] *Id.* at 1921.  The authors describe how an "amicus wrangler" works to ensure that a party's "chosen expert voices (as opposed to the many competing ones) are appropriately highlighted" among a sea of amicus briefs and an "amicus whisperer" "keep[s] those amici in line" by coordinating messages and arguments.  *Id.* at 1919, 1924.

[17] Fed. R. App. P. 29 advisory committee's note to 2010 amendment.

[18] Larsen & Devins, *Amicus Machine*, *supra* n.13, at 1906; Brianne J. Gorod, *The Adversarial Myth: Appellate Court Extra-Record Factfinding*, 61 DUKE L.J. 1, 9-10 (2011) (describing legislative facts as "general facts about the state of the world that are not particularly

10

submitted by expert amici can "alleviate costly information gathering" and help educate a court.[19]  But the appellate stage of litigation is ill-suited to appraising the reliability of extra-record "facts," which are untested in the adversary process and often supported by weak or no authority.[20]

The amicus machine costs far more than most ordinary litigants can afford.  In planning amicus brief campaigns for two cases during the 2014-2015 Supreme Court term, for example, one private foundation estimated that "each of the two amicus-brief efforts cost[] approximately $250,000, for a total of $500,000."[21]  In another Supreme Court case, attorneys billed $531,000 for "soliciting and coordinating

---

within the knowledge of the parties with standing to appear before the Court"); *see also* Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 VA. L. REV. 1757 (2014); Michael Rustad & Thomas Koenig, *The Supreme Court and Junk Social Science: Selective Distortion in Amicus Briefs*, 72 N.C. L. REV. 91 (1993).

[19] Larsen, *The Trouble with Amicus Facts*, *supra*, at 1760 (quoting Omari Scott Simmons, *Picking Friends from the Crowd: Amicus Participation as Political Symbolism*, 42 CONN. L. REV. 185, 207 (2009)).

[20] *See id.* at 1784-1789; Rustad & Koenig, *The Supreme Court and Junk Social Science*, *supra*; Gorod, *The Adversarial Myth, supra* n.18.

[21] Subcomm. on Fed. Cts., Oversight, Agency Action & Fed. Rts., *Answers to Senator Whitehouse's Questions Hearing: What's Wrong with the Supreme Court: The Big-Money Assault on Our Judiciary*, SENATE COMM. ON JUDICIARY (2021), https://perma.cc/APK4-WJZP (appendix).

11

amici support."[22]  In high-profile cases like this one, these costs are de minimis relative to the financial and policy implications of the outcome, easy to justify as a cost of doing business.

### C. Pending Changes to Rule 29's Amicus Disclosure Requirements

Under Rule 29, non-government amici must provide "a statement that indicates whether": "a party's counsel authored the brief in whole or in part"; "a party or a party's counsel contributed money that was intended to fund preparing or submitting the brief"; and "a person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief."[23] If a person other than the amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief, the amicus must identify that person in the brief.[24]

Modeled on Rule 37.6 of the U.S. Supreme Court, the funding disclosure requirements for amicus briefs were added to Federal Rule of

---

[22] Larsen & Devins, *Amicus Machine*, *supra* n.13, at 1922-1924.

[23] Fed. R. App. P. 29(a)(2).

[24] *Id.*

12

Appellate Procedure 29 in the 2010 amendments to the Rules.[25]  The

committee notes for the 2010 amendments indicate that the disclosure

regime was intended "to deter counsel from using an amicus brief to

circumvent page limits on the parties' briefs" and "may help judges to

assess whether the amicus itself considers the issue important enough

to sustain the cost and effort of filing an amicus brief."[26]  The notes

clarify that a "party's or counsel's payment of general membership dues

to an amicus need not be disclosed."[27]

There are clear shortcomings in both the Rule 29 disclosure

scheme and the parallel Supreme Court disclosure provision, and the

amicus machine can easily evade the spirit of the disclosure

requirements without violating the rules.[28]  For example, if a party-in-

interest donates to the amicus's general operating fund, the amicus

---

[25] *See* Fed. R. App. P. 29 advisory committee's note to 2010 amendment. After the disclosure requirements were added in 2010, Rule 29 was reorganized, and the requirements were moved, unchanged, from paragraph (c)(5) of Rule 29 to subparagraph (a)(4)(E) of the rule.

[26] Fed. R. App. P. 29 committee's note to 2010 amendment.

[27] *Id.*

[28] *See, e.g.*, Sheldon Whitehouse, *A Flood of Judicial Lobbying: Amicus Influence and Funding Transparency*, 131 YALE L.J.F. 141, 159-162 (2021).

could use the general operating fund to finance its amicus efforts, then assert to the court that no party contributed money that was intended specifically to fund preparing or submitting the brief, since the donation was made to a general operating fund. This arrangement is permissible under existing rules and often occurs in high-profile litigation.[29]

Undisclosed financial connections between amici and parties can reduce independence, facilitating coordination that can allow parties to circumvent page limits and other procedural controls on briefing.[30] By coordinating with amici who are beholden to it, a party can indirectly advance arguments that, whether due to length limitations or other considerations, it chooses not to make directly.

At the urging of the U.S. Supreme Court, the Judicial Conference is promulgating amendments to Rule 29(a)(4)(E) to address these shortcomings.[31] Among other changes to the rule, the proposed

---

[29] *Id.*

[30] *Cf.* Fed. R. App. P. 29 advisory committee's note to 2010 amendment.

[31] *See* Comm. on Rules of Practice and Procedure, Judicial Conference of the United States, Proposed Amendments to the Federal Rules of Appellate and Bankruptcy Procedure, and the Federal Rules of Evidence at 10-25 (Aug. 2024),

14

amendments would add requirements for amicus briefs to disclose whether "a party, its counsel, or any combination of parties, their counsel, or both has a majority ownership interest in or majority control of a legal entity submitting the brief" and, as relevant to nonprofit organizations, "a party, its counsel, or any combination of parties, their counsel, or both has, during the 12 months before the brief was filed, contributed or pledged to contribute an amount equal to 25% or more of the total revenue of the amicus curiae for its prior fiscal year."[32]  The updated rule would also provide that an "amicus brief must name any person—other than the amicus or its counsel—who contributed or pledged to contribute more than $100 intended to pay for preparing, drafting, or submitting the brief, unless the person has been a member of the amicus for the prior 12 months."[33]  Although these changes would not entirely resolve the concerns raised by the amicus machine, they could appreciably ameliorate them.

---

https://www.uscourts.gov/sites/default/files/preliminary_draft_of_proposed_amendments_2024.pdf.

[32] *Id.* at 35.

[33] *Id.*

15

## II. Google Has Deployed the "Amicus Machine" in Other Cases—And Has Apparently Done So Here.

### A. Google's Pattern of Undisclosed Funding Ties to Amici

Google has a history of financial ties to its supportive amici in previous cases.  Indeed, it was after receiving concerns about the proliferation of party-funded amicus briefs supporting both parties in *Google LLC. v. Oracle America Inc.* (No. 18-956) that the Supreme Court suggested the Judicial Conference "may wish to consider whether an amendment to Rule 29 is in order."[34]  In that case, *Bloomberg* reported, Google had "donated money to at least 10 groups that . . . filed briefs on its behalf."[35]

---

[34] Letter from Scott S. Harris to David G. Campbell & John D. Bates (Sept. 18, 2020), https://www.whitehouse.senate.gov/wp-content/uploads/imo/media/doc/2020-09-18%20SCOTUS%20Letter%20to%20JC.pdf; Letter from Sheldon Whitehouse & Hank Johnson, Jr., to John G. Roberts, Jr., & Scott S. Harris (May 13, 2020), https://www.whitehouse.senate.gov/wp-content/uploads/imo/media/doc/2020-05-13%20SW%20HJ%20Letter%20to%20SCOTUS.pdf.

[35] Naomi Nix & Joe Light, *Oracle Reveals Funding of Dark Money Group Fighting Big Tech*, BLOOMBERG (Feb. 25, 2020), https://www.bloomberg.com/news/articles/2020-02-25/oracle-reveals-it-s-funding-dark-money-group-fighting-big-tech?.

16

In *Reynaldo Gonzalez, et al., v. Google LLC*, a recent Supreme Court case implicating the validity of liability protections under Section 230 of the Communications Decency Act, Google again deployed the amicus machine to amplify its arguments and shape public opinion. Warning that changes to Section 230 liability would "impede access to information, limit free expression, hurt the economy, and leave consumers more vulnerable to harmful online content," Google pointed to a "broad cross-section of experts, academics, organizations and businesses from across America [who] also recognize[d] the importance of" the law.[36]  But a review by the nonprofit Tech Transparency Project "found that 44 parties that signed amicus briefs in support of Google's position in the Supreme Court case [were] funded by or linked to Google."[37]  This "army of paid allies" included industry groups that count Google among their dues-paying membership, purportedly

---

[36] Halimah DeLaine Prado, *Gonzalez v Google and the Future of an Open, Free and Safe Internet*, GOOGLE BLOG: THE KEYWORD (Jan. 12, 2023), https://blog.google/outreach-initiatives/public-policy/gonzalez-v-google-and-the-future-of-an-open-free-and-safe-internet/.

[37] *Google Activates D.C. Influence Machine for Pivotal Supreme Court Case*, TECH TRANSPARENCY PROJECT (Feb. 17, 2023), https://www.techtransparencyproject.org/articles/google-activates-dc-influence-machine-pivotal-supreme-court-case.

independent scholars with longstanding Google ties, "public interest" organizations that receive donations from Google, and content creators who profit from Google's platforms and were "recruited" by YouTube, a Google subsidiary, to sign amicus briefs.[38]

Amici with documented financial ties to Google—including numerous amici in this appeal[39]—have regularly filed briefs supporting Google on a range of legal issues.  Over the past five years, Google-funded amici in this appeal—each of which asserts a discrete interest in the questions presented here—have also supported Google's positions on:

- whether Google Search should be considered a "common carrier" under Ohio law;[40]

_____

[38] *Id.*

[39] *See infra* Part II.C.

[40] Amicus Mem. of the International Center for Law & Economics in Supp. of Defendants' Mot. for Summ. J., *Ohio v. Google LLC*, No. 21-CV-H-06-0274 (Ct. of Common Pleas, Delaware Cnty., Ohio Jan. 30, 2024).

18

- whether class members had standing to allege Google's monopolization of the market for distribution of applications to Android mobile device users through the Google Play Store;[41]

- the exclusion of expert testimony in a patent infringement suit;[42] and

- whether the Children's Online Privacy Protection Act preempts state private causes of action.[43]

These examples provide just a snapshot of how Google leverages a sprawling network of public policy groups, trade associations,

---

[41] Br. of International Center for Law & Economics as Amicus Curiae in Supp. of Defs.-Appellants & Reversal of Class Cert. Order, *In re Google Play Store Antitrust Litig.*, No. 23-15285 (9th Cir. June 15, 2023), ECF No. 48; Br. for NetChoice & Chamber of Progress as Amici Curiae Supporting Appellants, *In re Google Play Store Antitrust Litig.*, No. 23-15285 (9th Cir. June 15, 2023), ECF No. 33; Br. of Washington Legal Foundation as Amicus Curiae Supporting Appellants & Reversal, *In re Google Play Store Antitrust Litig.*, No. 23-15285 (9th Cir. June 15, 2023), ECF No. 28.

[42] Corrected Br. of US*Made, National Retail Federation, Computer & Communications Industry Association, & Public Interest Patent Law Institute as Amici Curiae in Supp. of Google & Reversal, *Ecofactor, Inc. v. Google*, No. 23-1101 (Fed. Cir. Nov. 26, 2024), ECF No. 133.

[43] Br. for Chamber of Commerce of the United States as Amicus Curiae in Supp. of Reh'g En Banc, *Jones v. Google LLC*, No. 21-16281 (9th Cir. Feb. 2, 2023), ECF No. 29.

19

academics, and foundations to amplify and lend credibility to its positions in litigation. Although Google's financial support for many of these amici is publicly available information, this funding is typically obscured in litigation, as amici can exploit the rules' shortcomings to obfuscate their financial ties.

### B. Epic's Requested Disclosures from Google's Amici

Under Rule 29, non-government amici curiae may file a brief in a federal appeals court's initial consideration of a case on the merits only by leave of the court or if all parties have consented to the brief's filing.[44] Nothing in the rule prohibits a party from putting conditions on its consent.

In this case, likely aware of Google's repeated use of amicus machine tactics, Epic sought disclosures from amici beyond what Rule 29 requires. When counsel for amici supporting Google sought Epic's consent to file a brief, Epic's counsel consented contingent on "each amicus disclos[ing] any money he or she has received in the past 12

---

[44] Fed. R. App. P. 29(a)(4)(E).

months from a party or amicus or their affiliates."[45]  The vast majority

of amici supporting Google—sixteen out of eighteen briefs—declined to

make these disclosures and instead sought leave of the Court.  Several

raised objections to Epic's requested disclosures, including on the

grounds that the disclosures would exceed the requirements of Rule

29,[46] that Epic's conditions were "impossible to satisfy,"[47] and that the

amicus "maintains the confidentiality of its membership."[48]

---

[45] Email from Gary Bornstein to Robert T. Smith (Nov. 25, 2024), Dkt. 49.2.

[46] *See, e.g.*, Mot. of Washington Legal Foundation for Leave to File Br. as Amicus Curiae Supporting Defs.-Appellants and Reversal at 3, Dkt. 46.2.

[47] Mot. of Computer Security Experts for Leave to File Br. as Amici Curiae in Supp. of Defs.-Appellants and Reversal at 2, 10-12, Dkt. 49.1; *see* Mot. of International Center for Law & Economics and Scholars of Law & Economics to File Br. as Amici Curiae in Supp. of Appellants' Opening Br. at 3, Dkt. 51.2; Prospective Amici Curiae Chamber of Progress, Computer & Communications Industry Association, NetChoice, & Consumer Technology Association's Mot. for Leave to File Brief at 1 n.1, Dkt. 65.1.

[48] Mot. of the Chamber of Commerce of the United States for Leave to File Br. Amicus Curiae in Supp. of Defs.-Appellants at 2, Dkt. 58.2; *see also* Mot. of Competitive Enterprise Institute for Leave to File an Amicus Br. in Supp. of Defs.-Appellants at 2, Dkt. 61.2 ("CEI receives support from thousands of contributors worldwide and respects the privacy of all its donors[.]"); *cf. United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) (finding that a lower court erred in granting the "'rare dispensation' of anonymity against the world" when

### C. Many Amici in This Appeal Have Financial Ties to Google.

Most of the amicus briefs supporting Google in this appeal include amici that, in various ways, receive or have received funding from Google. The following eleven amici appear on recent versions of Google's published list of "politically-engaged trade associations, independent third-party organizations and other tax-exempt groups that receive the most substantial contributions from Google's U.S. Government Affairs and Public Policy team":

- Washington Legal Foundation;

- U.S. Chamber of Commerce ("the Chamber");

- Competitive Enterprise Institute ("CEI");

- Chamber of Progress, Computer & Communications Industry Association ("CCIA"), NetChoice, and Consumer Technology Association ("CTA") (filing jointly);

- Information Technology & Innovation Foundation;

- The Committee for Justice;

---

it allowed an amicus to file a brief anonymously, concluding that "the court has 'a judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted.'").

- International Center for Law and Economics ("ICLE"); and

- The Center for Cybersecurity Policy and Law ("CCPL").[49]

Despite their financial support from Google being publicly available information, all but one of these amici declined to acknowledge that fact to the Court.[50]  For example, even as Google elsewhere acknowledges its membership in the Chamber (which strenuously opposes the pending proposed Rule 29 amendments[51]), the

---

[49] Google, 2023 Memberships for Google Public Policy Transparency Page, https://kstatic.googleusercontent.com/files/35ee172fd9df5dedc8af240df6ce5b4ae687845c237a1f88f5bafe8062d40bc24eff2209686249303fc2aba0368d1959ec52e069dce6609ad7de658e996da374 (last visited Jan. 7, 2025) (linked to from Google, GAPP Transparency Page, https://www.google.com/publicpolicy/transparency); Google, 2019 Trade Associations and Third-Party Groups, https://web.archive.org/web/20190125161051/http:/www.google.com/publicpolicy/transparency.html (last visited Jan. 7, 2025).

[50] CCPL agreed to "disclose to the Court that Google is a member of the Center and has paid general dues for such membership but that Google has not contributed any money intended to fund the preparation or submission of this brief." CPPL Mot. for Leave to File Br. as Amicus Curiae in Supp. of Defs.-Appellants at 1-2, Dkt. 55.2. It declined Epic's request to "fully disclose to the Court Google's direct or indirect contribution(s) to [the Center] over the last 12 months." *Id.* at 2.

[51] U.S. Chamber of Commerce Litigation Center, Letter Re: Requests for Comments on Proposed Amendments to Rule 29 (Dec. 19, 2024), https://www.uschamber.com/assets/documents/Chamber-Comment.pdf.  Amicus Washington Legal Foundation has also filed

23

Chamber declared that it is "unable to provide information beyond what is required" by Rule 29 because it "maintains the confidentiality of its membership."[52]  CEI similarly rebuffed Epic's disclosure request, invoking its corporate members' "privacy" interests under "the 1958 landmark Supreme Court ruling in *NAACP v. Alabama*," which, CEI insists, "upheld the constitutional right of the people to donate anonymously to nonprofit groups."[53]

---

comments opposing the proposed Rule 29 amendments.  Washington Legal Foundation, Letter Re: Proposed Amendments to Federal Rule of Appellate Procedure 29 (Aug. 19, 2024), https://downloads.regulations.gov/USC-RULES-AP-2024-0001-0004/attachment_1.pdf.

[52] Mot. of the Chamber of Commerce of the United States for Leave to File Br. Amicus Curiae in Supp. of Defs.-Appellants at 2.

[53] Mot. of Washington Legal Foundation for Leave to File Br. as Amicus Curiae Supporting Defs.-Appellants and Reversal at 1. In *NAACP*, the Supreme Court rejected Alabama's efforts to compel disclosure of the NAACP's rank-and-file membership lists during the height of the Jim Crow South. *See NAACP v. Alabama,* 357 U.S. 449 (1958).  The Court held that Alabama failed to demonstrate "a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have," *id.* at 466, in light of the NAACP's "uncontroverted showing that, on past occasions, revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," *id.* at 463.  Addressing similar free speech and associational anonymity objections raised by the Chamber and others during its consideration of

24

Likewise, many of Google's individual amici scholars and experts have significant past or present financial ties to Google as consultants, grantees, or award recipients.  Numerous of Google's other individual amici, meanwhile, currently work or have previously worked at organizations or institutes funded by Google:

- At least four of amici Computer Security Experts[54] have received research awards from Google.[55]  At least two more work for or

_____

amendments to Rule 29, the Advisory Committee on Appellate Rules concluded that "[l]imitations on filing amicus briefs, whether direct prohibitions or indirect incentives caused by disclosure requirements, do not prevent anyone from speaking out—in books, articles, podcasts, blogs, advertisements, social media, etc.—about how a court should decide a case." Memorandum Re: Report of the Advisory Committee on Appellate Rules from Jay S. Bybee to John D. Bates at 144 (May 13, 2024), https://www.uscourts.gov/sites/default/files/advisory_committee_on_app ellate_rules_-_may_2024.pdf.

[54] Br. of Computer Security Experts in Supp. of Defs.-Appellants & Reversal at 1-6 (listing amici), Dkt. 49.3.

[55] *See* Kathy Flores, *Dr. Guofei Gu Receives Google Research Award*, Texas A&M Univ. Coll. of Eng'g News (Mar. 3, 2014), https://engineering.tamu.edu/news/2014/03/dr-guofei-gu-gets-google-research-award.html; University of Illinois, *Illinois Teams with Google to Develop More Secure Smartphones*, Design World (April 11, 2015), https://www.designworldonline.com/illinois-teams-with-google-to-develop-more-secure-smartphones (documenting a 2015 grant of $52,250 from Google to amicus Nikita Borisov) (last visited Jan 2., 2025); Resume, Serge Egelman,

25

have been associated with organizations that have received

funding from Google.[56] Amici Computer Security Experts declined

to provide the disclosures requested by Epic, asserting that the

request would be "impossible to satisfy."[57]

- At least three of amici Law and Business School Professors[58]—

  who object to what they deem the "gratuitous disclosures" sought

_____

https://www.guanotronic.com/~serge/resume/resume.pdf (listing a
$60,000 "research grant" to amicus Serge Egelman) (last visited Jan. 2,
2025); Google, Faculty research awards program (2005-2019),
https://research.google/programs-and-events/past-programs/faculty-
research-awards/?filtertab=2009 (listing amicus Sharad Mehrotra as
2009 award recipient under "Social") (last visited Jan. 2, 2025).

[56] *See* National Institute of Standards and Technology, Biography
of Dr. Amit Elazari, https://www.nist.gov/blogs/cybersecurity-
insights/authors/dr-amit-elazari (noting that amicus Dr. Elazari "chairs
the Cybersecurity Policy Committees for the Information Technology
Industry Council") (last visited Jan. 2, 2025); Google, 2023
Memberships for Google Public Policy Transparency Page, *supra* n.49
(listing "Information Technology Industry"); Faculty, Florida Institute
for Cybersecurity Research, University of Florida,
https://fics.institute.ufl.edu/index.php/about/faculty (listing amicus
Kevin Butler as Research Director) (last visited Jan. 2, 2025); Past and
Present Sponsors, Florida Institute for Cybersecurity Research,
University of Florida, https://fics.institute.ufl.edu/index.php/sponsors
(including Google logo) (last visited Jan. 2, 2025).

[57] Mot. of Computer Security Experts for Leave to File Br. as
Amici Curiae in Supp. of Defs.-Appellants and Reversal at 2, 10-12,
Dkt. 49.1.

[58] Br. of Amici Curiae Law & Business School Professors in Supp.
of Appellants, Addendum A at 18-19 (listing amici), Dkt. 71.2.

26

by Epic[59]—have received research awards or gifts from, or

provided consulting services to, Google.[60]

- At least two of amici Former National Security Officials and

  Scholars[61] have received Google research awards.[62]  At least two

  more of these amici are or have been associated with

---

[59] Mot. of Amici Curiae Law & Business School Professors to File Br. as Amici Curiae in Supp. of Appellants at 1, Dkt. 71.1.

[60] Profile of Feng Zhu, Harvard Business School https://www.hbs.edu/faculty/Pages/profile.aspx?facId=14938 ("Professor Zhu has consulted for many tech firms such as [Google's parent] Alphabet") (last visited Jan. 2, 2025); Profile of Dokyun (DK) Lee, Boston University Questrom School of Business, https://www.bu.edu/questrom/profiles/dokyun-dk-lee ("His work is supported by organizations such as . . . Google") (last visited Jan. 2, 2025); Resume, Hemant K. Bhargava, https://my.gsm.ucdavis.edu/sites/default/files/2024-08/Bhargava_CV.pdf (listing a 2018 "$150,000 gift from Google.com to support 'Research and Educational Activities in Platforms and Ecosystems'") (last visited Jan. 2, 2025).

[61] Br. of Amici Curiae Former National Security Officials & Scholars in Supp. of Defs.-Appellants at Appendix at 25, Dkt. 48.2 (listing amici).

[62] Google, Faculty research awards program (2005-2019), *supra* n.55 (listing amicus Gene Tsudik as 2009 award recipient under "Security"); Google, Faculty research awards program (2005 - 2019), https://research.google/programs-and-events/past-programs/faculty-research-awards/?filtertab=2014 (listing amicus Steven Bellovin as 2014 award recipient under "Privacy") (last visited Jan. 2, 2025).

27

organizations funded by Google or work at a company that counts Google as a client.[63]

- Amicus Gregory J. Werden[64] was a visiting scholar at the Google-funded Mercatus Center at George Mason University ("GMU"),[65]

---

[63] Amicus Paul Lekas serves as Senior Vice President for Global Public Policy at the Software & Information Industry Association. *See* Software & Information Industry Association, https://www.siia.net/team/paul-lekas (last visited Jan. 2, 2025), which receives Google funding, *see* Google, 2023 Memberships for Google Public Policy Transparency Page, *supra* n.49. Amicus Lieutenant General Joseph Anderson is a Senior Advisor at Beacon Global Strategies. *See* Our Team, Beacon Global Strategies, https://bgsdc.com/team/lieutenant-general-joseph-anderson-ret. Google has reportedly been a client of Beacon Global Strategies. *See* Emily Birnbaum, *12 Former Security Officials Who Warned Against Antitrust Crackdown Have Tech Ties*, POLITICO, Sept. 22, 2021, https://www.politico.com/news/2021/09/22/former-security-officials-antitrust-tech-ties-513657.

[64] *See* Br. of Amici Curiae Gregory J. Werden & Luke M. Froeb in Supp. of Appellant, Dkt. 47.1.

[65] *See* Profile of Gregory J. Werden, Mercatus Center, George Mason University, https://www.mercatus.org/people/gregory-j-werden (last visited Jan. 2, 2025); Google, 2023 Memberships for Google Public Policy Transparency Page, *supra* n.49 (listing "Mercatus Center at George Mason").

28

and amicus Luke M. Froeb is an "Academic Affiliate"[66] of Google-funded amicus ICLE.[67]

- Amicus Thomas A. Lambert[68] is also an ICLE "academic affiliate,"[69] and amicus John M. Yun was Executive Director at the Google-funded Global Antitrust Institute ("GAI") at George Mason Antonin Scalia Law School.[70]

---

[66] *See, e.g.*, Luke M. Froeb & Michael Vita, *Advice for New FTC Leadership*, ICLE (Nov. 26, 2024), https://laweconcenter.org/resources/advice-for-new-ftc-leadership (noting that amicus "Luke Froeb is an ICLE Academic Affiliate").

[67] Google, 2019 Trade Associations and Third-Party Groups, *supra* n.49.

[68] *See* Br. of Amici Curiae Antitrust Law Professors Thomas A. Lambert & John M. Yun Supp. Defs.-Appellants, Dkt. 57.2.

[69] *See, e.g.*, Thomas A. Lambert, *The Essence of an Antitrust Violation*, ICLE (Nov. 7, 2025), https://laweconcenter.org/resources/the-essence-of-an-antitrust-violation (noting that "Thomas A. Lambert is an ICLE Academic Affiliate").

[70] Resume, John M. Yun, https://www.law.gmu.edu/assets/files/faculty/cv/yun.pdf (last visited Jan. 3, 2025); David McLaughlin, *One Tech-Funded University Helped Shape FTC's Hands-Off Approach*, Bloomberg Businessweek, March 12, 2021, https://www.bloomberg.com/news/articles/2021-03-12/how-george-mason-university-shaped-ftc-s-hands-off-approach-to-tech; Daisuke Wakabayashi, *Big Tech Funds a Think Tank Pushing for Fewer Rules. For Big Tech*, N.Y. Times, July 24, 2020, https://www.nytimes.com/2020/07/24/technology/global-antitrust-institute-google-amazon-qualcomm.html.

Additional amici have recently entered business relationships with Google[71] or received financial support from Google's "Founders Fund."[72]  All told, of the eighteen merits-stage amicus briefs filed in support of Google in this appeal, sixteen include amici with documented financial ties to Google.

### D. Numerous of Amici's Counsel Have Financial Ties to Google, and Amici Rely on Google-funded Authorities.

A closer look at amici's submissions reveals additional connections between Google and amici.  Counsel to many amici, for example, have longstanding client relationships with Google, having collectively

---

[71] Br. of Roblox Corporation as Amicus Curiae in Supp. of Defs./Appellants Google LLC, Dkt. 56.1; Lawrence Bonk, *Google and Roblox Teamed Up on a Weird Game to Teach Kids About Internet Safety*, ENDGADGET (Sept. 25, 2024), https://www.engadget.com/gaming/google-and-roblox-teamed-up-on-a-weird-game-to-teach-kids-about-internet-safety-190007350.html.

[72] *See* Br. of Amici Curiae Fyouture; Firecracker Software LLC; Visual Blasters, LLC; Bettertime, Co.; & Speeko, Inc. in Supp. of Appellants & Reversal, Dkt. 69.2; CBS CHICAGO, *Google Pours Millions into Chicago Black, Brown-Owned Businesses* (June 20, 2023), https://www.cbsnews.com/chicago/news/google-donates-money-businesses-chicago (reporting that the Speeko CEO was "one of 14 Chicago business owners who were presented with $150,000 checks from Google").

represented Google in over 200 distinct cases in federal district court alone:[73]

- o **Bryan Cave Leighton Paisner,** Counsel for the Chamber (34 matters).

- o **Cooley**, Counsel for Stephen Vladeck (99 matters).

- o **Farella, Braun & Martel**, Counsel for Fyoutre, Firecracker Software LLC, Visual Blasters, LLC, BetterTime, Co., and Speeko, Inc (21 matters).

- o **Keker, Van Nest & Peters**, Counsel for NetChoice, Chamber of Progress, CCIA, CTA (81 matters).

- o **King & Spalding**, Counsel for Greg Werden and Luke Froeb (33 matters).

- o **White & Case**, Counsel for Law and Business School Professors (33 matters).

- o **Wilkie Farr & Gallagher**, Counsel for ICLE and Scholars of Law and Economics (28 matters).

---

[73] These figures were generated by running a Parties Report on the Lex Machina database for each firm and tallying the "cases represented" for Google Inc. and Google LLC. Lex Machina provides data for cases filed on or after January 1, 2000.

31

- o **Lehotsky, Keller & Cohn,** Counsel for Thomas A. Lambert and John M. Yun, and NetChoice and Chamber of Progress (on stay proceedings), has represented amici supporting Google in 13 different matters.

Google's amici cite authorities published by Google-funded centers or scholars. In their brief on Google's motion for stay pending appeal, for instance, amici Chamber of Progress and NetChoice cite supporting authorities from the Information Technology and Innovation Foundation and American Enterprise Institute, each of which, like amici, receive Google funding.[74]

Amici Former Federal Antitrust Law Enforcers submitted a brief in support of neither party (but substantially in support of Google's position) that relies heavily on scholarship by Senior D.C. Circuit Judge Douglas H. Ginsburg. Ginsburg, whose status as a long-tenured federal Circuit Judge signals additional legitimacy and credibility, is highly compensated for his role at the Antonin Scalia Law School at GMU,

---

[74] *See* Br. of NetChoice & Chamber of Progress Supp. Defs.-Appellants' Mot. for Stay Pending Appeal at 4-6, Dkt. 19.2; Google, 2023 Memberships for Google Public Policy Transparency Page, *supra* n.49.

32

where he is Chairman of the International Advisory Board of the GAI.[75]

GMU's and GAI's extensive ties to Google have raised controversy over

the appearance of "academic capture"—the concern that corporate

funding is shaping research output intended to influence law and public

policy.[76]

### E. Google's Briefing Relies on the Untested Assertions of Google-Funded Amici.

Google's briefing shows how it intends to ensure that its

orchestrated chorus does not sing to an empty auditorium.  In its reply

brief in support of a partial stay, for example, Google repeatedly offered

the untested assertions of Google-funded amici to support its

arguments.  It leaned most heavily on amici Computer Security

Experts, almost all of whom have documented financial ties to Google.[77]

---

[75] *See* Financial Disclosures for J. Douglas Howard Ginsburg, 2011-2019, https://www.courtlistener.com/person/1212/disclosure/31830/douglas-howard-ginsburg (disclosing over $2.3 million in income from GMU over the period between the publication dates of the two cited articles).

[76] *See, e.g.*, Tom Hamburger & Matea Gold, *Google, Once Disdainful of Lobbying, Now a Master of Washington Influence*, WASH. POST, Apr. 12, 2014 (describing Google's funding of and involvement in GMU's operations); Wakabayashi, *supra* n.71.

[77] *Supra* nn.53-55.

Relying on the contentions of these experts, Google argued that the District Court's injunction "injects 'extensive security, privacy, and safety risks' into . . . users' devices" and "takes what was formerly a 'trusted environment' and forces Google to introduce new risks that can 'trick users into installing malware . . . , direct users to provide credit card and other sensitive financial and personal information, steal users' data, track users' activities,' and more."[78]  Arguing that Epic "bizarrely faults Google for citing no evidence to support" asserted threats to its "brand reputation for safety and security," Google turns around to cite these experts' amicus brief as countervailing evidence.[79]

---

[78] Google's Reply in Supp. of Emergency Mot. Pending Appeal at 11-12, Dkt. 34.1. Amici Computer Security Experts expound on these arguments in their merits-stage brief, pointing to "one study" that "found that globally, alternative markets are 'on average five times riskier . . . than the Play market." Comput. Sec. Experts Br. at 11 (citing Platon Kotzias, et al., *How Did That Get In My Phone? Unwanted App Distribution on Android Devices*, 2021 IEEE Symposium on Security and Privacy 53, 54 (2021)).  Although amici rely on the Kotzias study to provide an "amicus fact" about the purported comparative safety of the Google Play Store, they fail to note the study's finding that, "despite its defenses," the Google Play market "remains by far the largest unwanted app distribution vector."  Kotzias, *supra*, at 53.

[79] Google's Reply in Supp. of Emergency Mot. Pending Appeal at 11-12.

34

Google likewise leans on briefs of entities it funds to give voice to the purported concerns of small developers.  For instance, Google quotes NetChoice and Chamber of Progress, both of which it funds, to assert that the injunction results in a "homogenized app store landscape" that is "the opposite of meaningful competition."[80]

*       *       *

Amicus does not wish to impugn the integrity or motivations of any of the organizations, lawyers, scholars, judges, or experts named above.  But taken together, this veritable nesting doll of Google influence demonstrates the extent to which a deep-pocketed party can use its wealth to shape not only case outcomes but law and public policy generally.

## CONCLUSION

For the foregoing reasons, courts should welcome efforts like those made by Epic to ensure greater transparency in the amicus process, and this Court should hesitate to rely on facts and arguments submitted by party-funded amici.

---

[80] *Id.* at 1.

35

Respectfully Submitted,

January 7, 2025                          _/s/ Alexander Aronson_

ALEXANDER ARONSON
Court Accountability Action
33 Bradford St.
Concord, MA, 01742
(978) 371-3200
alex@courtaccountability.org

_Counsel for Amicus Curiae_

36

## CERTIFICATE OF SERVICE

I certify that on January 7, 2025, I caused the foregoing brief to be filed and served using this court's Appellate Case Management System.

January 7, 2025                                    /s/ *Alexander Aronson*

ALEXANDER ARONSON

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | Nos. 24-6256, 24-6274

I am the attorney or self-represented party.

**This brief contains** | 6,720 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated | | .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Alexander Aronson | **Date** | January 7, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

---

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*