**Nos. 24-6256 & 24-6274**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

**BRIEF OF MICROSOFT CORP. AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE EPIC GAMES, INC.**

Aaron M. Panner
Alex A. Parkinson
Shunhe Wang
Jarrod A. Nagurka
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*

January 7, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Microsoft Corporation states that it does not have a parent corporation and that no publicly held corporation holds 10 percent or more of its stock.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF *AMICUS CURIAE*..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

BACKGROUND .......................................................................................4

ARGUMENT ...........................................................................................7

CONCLUSION ......................................................................................11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

**CASES**

*National Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978) ....................10

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. § 1 *et seq.* ...................................................................8, 10

§ 1, 15 U.S.C. § 1 ..........................................................................................8

Fed. R. App. P. 29(a)(4)(E) ......................................................................................1

**OTHER MATERIALS**

Google:

*Payments*, https://support.google.com/googleplay/android-developer/answer/9858738 (last visited Jan. 6, 2025) .....................................5

*Understanding Google Play's payments policy*, https://support.google.com/googleplay/android-developer/answer/10281818 ................................................................................................. 4-5

Sarah Bond (@BondSarah_Bond), X (Oct. 10, 2024, 6:31 PM), https://x.com/BondSarah_Bond/status/1844506029599707255 .....................6

Settlement Agreement and Release, *Utah v. Google LLC*, No. 3:21-cv-5227-JD, ECF No. 522-2 (N.D. Cal. Dec. 18, 2023) .....................................10

## INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer hardware, software, and security features; it has been creating software platforms and application programming interfaces for application developers for more than 40 years. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing, in addition to a variety of commercial and enterprise technologies powered by artificial intelligence. Microsoft invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic technology markets.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues in this case. As part of its business, Microsoft sells hardware devices and one of the leading operating systems for personal computers. Microsoft also provides online stores for applications that run on its consumer

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this *amicus* brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this brief. All parties consented to its filing.

operating systems. In other parts of its business, Microsoft sells applications, software, and services that run on mobile operating systems produced by Google LLC ("Google") and Apple Inc. ("Apple"). Microsoft offers products that compete with Google, including – like Epic Games, Inc. ("Epic") – games for distribution on Android devices. Microsoft also is a global leader in digital, online, and computer security, protecting a significant amount of critical internet and computing infrastructure throughout the United States and the world.

Among its other provisions, the injunction challenged in this appeal would prevent Google from requiring consumers and app developers (like Microsoft) to use Google's in-app payment processing system (Google Play Billing) for the purchase of digital goods or services within Android apps that are available for download on the Google Play Store. In response to the district court's injunction, Microsoft has undertaken significant work to prepare new consumer offerings, as described in its earlier submission urging this Court to deny Google's request for a stay of the injunction. *See generally* Br. of Microsoft Corp. as *Amicus Curiae* in Support of Plaintiff-Appellee Epic Games, Inc.'s Opp. to Emergency Mot. for Partial Stay, ECF No. 32.2 ("Microsoft Stay *Amicus* Br."). Microsoft has a keen interest in the implementation of that and other provisions of the injunction, which will enable innovation, spur technological development, and promote competition, thereby benefitting consumers.

2

## INTRODUCTION AND SUMMARY OF ARGUMENT

This brief explains why the provision of the district court's injunction requiring Google to permit developers to use in-app payment systems of their choosing for the sale of digital goods or services consumed within an Android app downloaded from the Google Play Store appropriately remedies Google's unlawful conduct and poses no unique security risk. The brief further explains why that provision grants necessary relief beyond that to which Google agreed in its settlement with the States.

The provisions of the injunction that remedy the harmful effects of Google's policies requiring app developers and consumers to use Google Play Billing for in-app purchases of digital goods or services on apps available through the Google Play Store are lawful and should be allowed to take effect. Google makes no argument that enjoining certain Google Play Billing policies presents any security or privacy concerns for consumers, nor could it credibly do so, given that alternative in-app payment solutions are widely used without problems.

Google instead posits (at 79-80) that a separate, pending settlement it reached with the States provides an effective remedy for Google's restrictions on in-app purchases. This suggestion overlooks Google's ongoing ability – even after tentatively resolving its litigation with the States – to exploit the terms of that proposed settlement to continue to obstruct competition. The injunction is thus

3

necessary to prevent Google from impeding the development of new, innovative, and consumer-benefitting apps and services.

## BACKGROUND

1. ***Effects of Google's Status Quo Restrictions*:** Google's restraints on the Android mobile operating system – including billing requirements, in particular – limit the products and services that app developers can offer consumers. For example, Microsoft currently can offer consumers only two ways to play Xbox games on an Android device: first, a consumer can use the native Android Xbox app to remote stream gameplay from the consumer's Xbox console to a mobile device to play games the consumer purchased using a valid Microsoft or Xbox account outside of the Android Xbox app; second, a consumer can use the native Android Game Pass app to stream a library of games over the cloud supported by Microsoft's data and cloud-storage centers.

Google's current restrictive Play Store policies degrade even these experiences. It requires the use of Google Play Billing in apps distributed on the Play Store for the purchase of digital goods or services and prohibits links from those apps to non-Google alternatives for in-app purchases.[2] And it bars app

---

[2] *See* Google, *Understanding Google Play's payments policy* (explaining that "purchases that require use of Google Play's billing system include . . . [d]igital items . . . [and] [c]loud software and services"), https://support.google.com/

4

developers from including in their apps links that would allow users to access websites where alternative purchase options would be available.[3] As a result of these restrictions:

- Consumers cannot use a Microsoft sign-in account or Xbox account to purchase and play games within these Android apps.

- Microsoft must disable in-game purchases for both remote and cloud-streaming gameplay – on the Android Xbox app and the Android Game Pass app, respectively – preventing consumers from paying to unlock new levels, avatar outfits, upgraded features, and more.

- Microsoft cannot include in its Android apps links that direct consumers to Microsoft's websites where they can play games (via streaming) and make game-based purchases using their secure Microsoft account.

2.  ***The Injunction Unlocks Innovation***:  The district court's injunction – imposed following a jury verdict finding Google liable for violating federal and state antitrust law – prohibits Google from forcing app developers and consumers to use its costly and restrictive mobile in-app payment processing system (Google

---

googleplay/android-developer/answer/10281818 (last visited Jan. 6, 2025); Google, *Payments* (prohibiting developers from "leading users to other payment methods via . . . links . . . [and other] user interface flows"), https://support.google.com/googleplay/android-developer/answer/9858738 (last visited Jan. 6, 2025).

[3] *See* Google, *Payments*, https://support.google.com/googleplay/android-developer/answer/9858738 (last visited Jan. 6, 2025).

5

Play Billing) for digital transactions. *See* 1-ER-4 (Permanent Injunction ¶ 9). In response, Microsoft updated the Xbox app for Android – ready to launch, now – to enable cross-device gaming and in-game purchases, significantly improving the mobile gaming experience:[4]

- Customers will be able to buy Xbox games in the app and then click a link from that Android native app to a website (Xbox.com/Play) to stream the gameplay (both from Microsoft's data and cloud-storage centers and via remote access to the user's console) – just as if they had purchased the game on an Xbox console.

- That linked website will allow customers to make additional purchases, including in-game purchases – new levels, tools, upgrades, and more – for immediate use without disrupting game flow, just as in-game purchases work on an Xbox console or PC.

All of these transactions will take place using Microsoft's trusted and secure commerce system, which Microsoft customers use today when making purchases on an Xbox console, on a PC, on the web, and even, in some circumstances, on an

---

[4] *See* Sarah Bond (@BondSarah_Bond), X (Oct. 10, 2024, 6:31 PM) (Xbox president explaining that, as a result of the district court's injunction, Microsoft will unveil new features where "players will be able to play and purchase Xbox games directly from the Xbox App on Android"), https://x.com/BondSarah_Bond/status/1844506029599707255.

Android device (albeit only on the Samsung Galaxy Store but not through the Play Store). Microsoft's innovative updates will enable cross-play; gaming on Android mobile will provide the same experiences as gaming on an Xbox console, enabling customers to start a game on an Xbox console or PC and then continue the same gaming experience on the go with the updated Android Xbox app or vice versa.

## ARGUMENT

Google raises a variety of challenges to the injunction, which Epic fully addresses in its merits brief. Google hardly challenges, however, the provision of the injunction that requires Google to allow app developers to implement alternatives to Google Play Billing. Likewise, none of the four separate security *amici* supporting Google contends that allowing alternative in-app payment methods poses a security risk to consumers.[5] That provision of the injunction is warranted; indeed, it is critical to remedying conduct that the jury specifically found to be unlawful – and it will unleash innovation, including from Microsoft. Further, that critical provision raises no security concerns; on the contrary, untold numbers of apps have already implemented alternative billing arrangements for

---

[5] *See generally* Br. of *Amicus Curiae* Former Nat'l Sec. Offs. & Scholars in Support of Defendants-Appellants, ECF No. 48.2; Br. of Comput. Sec. Experts John Mitchell et al. as *Amici Curiae* in Support of Defendants-Appellants and Reversal, ECF No. 49.3; Br. of *Amicus Curiae* the Ctr. for Cybersecurity Pol'y & L. in Support of Defendants-Appellants, ECF No. 55.1; Br. of Roblox Corp. as *Amicus Curiae* in Support of Defendants/Appellants, ECF No. 56.1.

7

in-app purchases.⁶  And Google's suggestion that an existing (pending) settlement will address this issue adequately – even if the argument were relevant – is incorrect.

*First*, the relevant provision of the injunction is necessary to remedy conduct that the jury specifically found to be unlawful.  In particular, the jury found that Google engaged in illegal tying in violation of Section 1 of the Sherman Act by requiring app developers to use Google Play Billing for in-app purchases of digital goods or services on apps downloaded through the Play Store.  *See* 1-ER-57.  To remedy that conduct, the district court entered a permanent injunction providing:

> Google may not require the use of Google Play Billing in apps distributed on the Google Play Store, or prohibit the use of in-app payment methods other than Google Play Billing.  Google may not prohibit a developer from communicating with users about the availability of a payment method other than Google Play Billing.  Google may not require a developer to set a price based on whether Google Play Billing is used.

1-ER-4 (Permanent Injunction ¶ 9).  This provision directly addresses – and prohibits – Google's unlawful tying conduct with respect to its Google Play Billing policies.⁷

---

⁶ For example, consumers can buy books on Amazon's app or reserve rides on Uber's app, all without having to use Google Play Billing, even when the users download the Amazon or Uber app from the Google Play Store.

⁷ Google accuses Microsoft of "free-rid[ing]" on the success of the Play Store, Reply in Support of Emergency Mot. for Partial Stay of Permanent

8

***Second***, as Microsoft explained in its *amicus* brief opposing Google's request for a stay of the injunction, this provision of the injunction creates no unique security or privacy issues, and Google has forfeited any contrary claim by failing to raise it in its opening brief. In fact, Google already allows for alternative payment methods for non-digital goods or services, and even digital content so long as developers do not allow consumers to use the content in an app downloaded from the Google Play Store. Thousands of app developers – but not those offering digital goods or services – already use these alternative billing methods today.

Google does not suggest that its existing billing policy is necessary for user or device security; its sole purpose is to prevent developers from offering lower-cost alternatives to the 30-percent commissions charged by Google Play Billing.[8] Microsoft typically already has a billing relationship with its Xbox users; it is security-enhancing for users to be able to continue to rely on that relationship. Indeed, the innovation and competition that the injunction enables could *improve*

---

Injunction Pending Appeal Under Cir. R. 27-3 at 12 n.3, ECF No. 34.1, but the opposite is the case: Microsoft seeks to use its own billing mechanism, rather than being forced to use Google's; and the Play Store benefits from the presence of developers like Microsoft, which attracts users to it.

[8] Moreover, as detailed below, by agreeing in its tentative settlement with States to permit additional in-app payment methods – albeit alongside Google Play Billing – Google belied any notion that offering alternative in-app payment methods (like the one Microsoft developed) presents a unique or heightened security risk.

9

user security and privacy vis-à-vis billing technology, as alternatives vie for developer and consumer adoption. *See National Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (explaining that the Sherman Act reflects a considered "legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services").[9]

**Third**, Google argues (at 79-80) that it has already reached a settlement with the States that remedies its anticompetitive conduct. But the settlement with the States has not been approved; and, even if it is, it does not address the harm that Google's conduct creates because it allows Google to *require* app developers to offer Google Play Billing alongside alternative payment mechanisms. *See* Settlement Agreement and Release § 6.3.1, *Utah v. Google LLC*, No. 3:21-cv-5227-JD, ECF No. 522-2 (N.D. Cal. Dec. 18, 2023) (requiring Google to give developers "the option to add an alternative in-app billing system *alongside* Google Play's billing system") (emphasis added).

Such a provision does little or nothing to help developers, like Microsoft, that do not want to (and, in many cases, as a practical matter cannot) implement Google Play Billing at all. *See* Microsoft Stay *Amicus* Br. 7-8. As a result of

---

[9] *See also* Br. of *Amicus Curiae* the Ctr. for Cybersecurity Pol'y & L. in Support of Defendants-Appellants at 15, ECF No. 55.1 (*amicus* in support of Google, acknowledging that "[c]reating more secure and trusted ecosystems is a way for app stores to differentiate themselves and compete").

10

Google's billing policies, developers are prevented from bringing their full suite of products to market, thereby reducing competition and harming consumers. For example, as Microsoft explained in its previous submission, its Xbox mobile offerings are not engineered at the code level to use Google Play Billing, and rewriting existing code to add an option for Google Play Billing – alongside the payment systems for which those games are already coded – would be prohibitively expensive and pose substantial compatibility, performance, and integration challenges. Additionally, many popular Xbox games are third-party titles, and Microsoft cannot rewrite their source code to integrate Google Play Billing for in-game purchases on Android.

For all these reasons, the district court did not abuse its discretion in imposing an injunction that remedies Google's unlawful billing policies.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ *Aaron M. Panner*

Aaron M. Panner
Alex A. Parkinson
Shunhe Wang
Jarrod A. Nagurka
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae Microsoft Corp.*

January 7, 2025

12

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-6256, 24-6274

I am the attorney or self-represented party.

**This brief contains 2,477 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the lengths limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Aaron M. Panner            **Date** January 7, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on January 7, 2025, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

/s/ *Aaron M. Panner*
Aaron M. Panner