Nos. 24-6256 & 24-6274

---

*In the*
# United States Court of Appeals
*For the*
# Ninth Circuit

---

Epic Games, Inc.,
*Plaintiff-Appellee,*

v.

Google LLC, et al.,
*Defendants-Appellants.*

---

*On Appeal From the United States District Court*
*for the Northern District of California*
*Hon. James Donato, District Judge*
*Case Nos. 3:20-cv-05671-JD and 3:21-md-02981-JD*

---

## BRIEF OF *AMICI CURIAE* PROFESSORS OF LAW AND ECONOMICS AND THE AMERICAN ANTITRUST INSTITUTE IN SUPPORT OF APPELLEE EPIC GAMES, INC.

---

*Filed Unopposed by All Parties Pursuant to Ninth Circuit Rule 29-2(a)*

DAVID W. KESSELMAN, ESQ.
WESLEY A. SWEGER, ESQ.
KESSELMAN BRANTLY STOCKINGER LLP
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, California 90266
(310) 307-4555 Telephone | (310) 307-4570 Facsimile
*dkesselman@kbslaw.com*
*wsweger@kbslaw.com*

Attorneys for *Amici Curiae*
Professors of Law and Economics and the American Antitrust Institute

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae state that the professors identified are individuals, and therefore do not issue stock or have a parent corporation. The American Antitrust Institute states that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

# TABLE OF CONTENTS

<u>Page</u>

DISCLOSURE STATEMENT ................................................................ i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES................................................................. iv

IDENTITIES AND INTEREST OF AMICI CURIAE............................................1

STATEMENT OF AUTHORSHIP AND CONSENT ................................................2

ARGUMENT ................................................................................2

I.     SECTION 2 OF THE SHERMAN ACT DOES NOT AUTHORIZE DEFENDANTS TO MONOPOLIZE A RELEVANT MARKET BECAUSE OF SIDE EFFECTS ELSEWHERE IN THE ECONOMY. ........................................................3

     A.     The Statutory Text Is Clear: Monopolizing "Any Part" of the U.S. Economy Violates Section 2. ......................................4

     B.     The U.S. Supreme Court Has Been Consistently Clear. ......................5

     C.     Circuit Courts—Including This Court—Have Been Consistently Clear...............................................................12

     D.     Out-of-Market Effects Are Cognizable Only to the Extent That They Cause Beneficial In-Market Effects...........................15

II.     THIS LEGAL PRINCIPLE ARISES FROM SOUND POLICY CONSIDERATIONS. .......19

     A.     Permitting Monopolization of a Relevant Market Based on Benefits Elsewhere Would Convert Courts Into Central Planners. ...............................................................19

B.  Permitting Monopolization of a Relevant Market Based on Benefits Elsewhere Would Compound Already-Substantial Administrative Costs. ...........................................................21

C.  Permitting Monopolization of a Relevant Market Based on Benefits Elsewhere Would Unduly Increase Error Costs. .................23

CONCLUSION .................................................................................26

CERTIFICATE OF COMPLIANCE ......................................................28

ADDENDUM A.............................................................................1

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................22

*Chi. Bd. of Trade v. United States*,
  246 U.S. 231 (1918) ..........................................................................5

*Chi. Prof'l Sports Ltd. P'ship v. NBA*,
  95 F.3d 593 (7th Cir. 1996) ............................................................11

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977) ..........................................................................19

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984) ........................................................................10

*Deslandes v. McDonald's USA, LLC*,
  81 F.4th 699 (7th Cir. 2023), *cert. denied*,
  144 S. Ct. 1057 (2024) ....................................................................13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) .................................................................7, 8, 15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  903 F.2d 612 (9th Cir. 1990) .............................................................8

*FTC v. Meta Platforms, Inc.*,
  No. CV 20-3590, 2024 WL 4772423 (D.D.C. Nov. 13, 2024) ...................14, 15

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
  714 F.2d 1384 (5th Cir. 1983) .................................................13, 19, 25

# TABLE OF AUTHORITIES *(cont.)*

Page(s)

**Cases** *(cont.)*

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
  375 F. Supp. 3d 1058 (N.D. Cal. 2019),
  *aff'd*, 958 F.3d 1239 (9th Cir. 2020).....................................................................11

*Ind. Farmer's Guide Publ'g Co. v. Prairie Farmer Publ'g Co.*,
  293 U.S. 268 (1934)............................................................................................4

*Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*,
  670 F.2d 421 (3d Cir. 1982) .............................................................................14

*Law v. NCAA*,
  902 F. Supp. 1394 (D. Kan. 1995),
  *aff'd*, 134 F.3d 1010 (10th Cir. 1998),
  *cert denied sub nom.*, 525 U.S. 822 (1998) ............................................... 14, 25

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)........................................................................................8, 9

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
  726 F.2d 1381 (9th Cir. 1984)........................................................ 3, 13, 17, 19

*NCAA v. Alston*,
  594 U.S. 69 (2021)..................................................................................*passim*

*NCAA v. Bd. of Regents*,
  468 U.S. 85 (1984)........................................................................ 3, 6, 7, 15, 18

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015)................................................................ 16, 18

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)........................................................................................9, 10

## TABLE OF AUTHORITIES *(cont.)*

Page(s)

**Cases** *(cont.)*

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
No. CV 2:03 CV 107(TJW), 2009 WL938561 (E.D. Tex. Apr. 6, 2009)............9

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)................................................................................. 4, 15, 26

*RSR Corp. v. FTC*,
602 F.2d 1317 (9th Cir. 1979)...............................................................14

*Smith v. Pro Football, Inc.*,
593 F.2d 1173 (D.C. Cir. 1978) ............................................................14

*Standard Oil Co. v. United States*,
221 U.S. 1 (1911)....................................................................................4

*Sullivan v. NFL*,
34 F.3d 1091 (1st Cir. 1994)........................................................... 18, 24

*United States v. Addyston Pipe & Steel Co.*,
85 F. 271 (6th Cir. 1898)...................................................................2, 26

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) .............................................................14

*United States v. Google LLC*,
No. 20-CV-3010, 2024 WL 3647498 (D.D.C. Aug. 5, 2024)................. 7, 14, 15

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)...........................................................................3, 12

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ...............................................................22

## TABLE OF AUTHORITIES *(cont.)*

Page(s)

**Cases** *(cont.)*

*United States v. Phila. Nat'l Bank,*
    374 U.S. 321 (1963)..................................................................... 12, 14

*United States v. Topco Assocs., Inc.,*
    405 U.S. 596 (1972)..................................................................... *passim*

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004).....................................................................3, 23

**Statutes**

15 U.S.C. § 1 .....................................................................................5, 13

15 U.S.C. § 2 ............................................................................... 2, 3, 4, 26

15 U.S.C. § 18 ..................................................................................11, 14

**Other Authorities**

Daniel Kahneman & Amos Tversky, *Prospect Theory,*
47 ECONOMETRICA 263 (1979) .........................................................21

Frank H. Easterbrook, *The Limits of Antitrust*, 63 TEX. L. REV. 1 (1984) .............23

GREGORY N. MANKIW, PRINCIPLES OF MACROECONOMICS 70 (2012).....................25

Herbert Hovenkamp, *A Miser's Rule of Reason,*
    78 N.Y.U. Ann. Surv. Am. L. 1, 1 (2022) .........................................24

John B. Kirkwood, *The Essence of Antitrust,*
    81 FORDHAM L. REV. 2425, 2429–30 (2013) .......................................5

# TABLE OF AUTHORITIES *(cont.)*

Page(s)

**Other Authorities** *(cont.)*

John M. Newman, *Procompetitive Justifications in Antitrust Law*,
    94 IND. L.J. 501 (2019)............................................................. 5, 12, 22

JONATHAN B. BAKER, THE ANTITRUST PARADIGM 190 (2019)................................12

Michael A. Carrier, *The Real Rule of Reason*, 1999 BYU L. Rev. 1265 (1999).....24

Michael A. Carrier, *The Rule of Reason*, 16 Geo. Mason L. Rev. 827 (2009) ........24

Michael Katz & Jonathan Sallet, *Multisided Platforms and Antitrust
    Enforcement*, 127 YALE L.J. 2142 (2018) ............................................20

Rebecca Haw Allensworth, *The Commensurability Myth in Antitrust*,
    69 VAND. L. REV. 1 (2016)..................................................................20

ROBERT H. BORK, THE ANTITRUST PARADOX  (1978) (2021 ed.) ............................20

## IDENTITIES AND INTEREST OF AMICI CURIAE

The academic amici are professors of law and of economics.  A list of signatories and corresponding professional titles is attached as Addendum A.[1]  We have researched and published widely on antitrust law and economics.  Our sole interest in this case is to ensure that section 2 of the Sherman Act continues to serve the public interest by preventing harmful monopolization.  Although the academic amici may differ in our political viewpoints, we are united in our agreement that this Court should not depart from the Sherman Act's statutory text and applicable Supreme Court precedent, which reflect sound policy reasons and align with modern economics.

Amicus the American Antitrust Institute (AAI) is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy.  AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. See http://www.antitrustinstitute.org.[2]

---

[1]  Titles appear only for purposes of identification and do not imply either endorsement of any positions of the listed institutions or by those institutions of the analysis presented herein.
[2]  Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

1

## STATEMENT OF AUTHORSHIP AND CONSENT

Pursuant to Fed. R. App. P. 29(a)(4)(E), amici declare that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than the amici, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.  Epic Games, Inc., and Google, LLC, et al. consent to *Amici Curiae* filing this brief.

## ARGUMENT

Today, the antitrust community generally agrees on the structure of analysis for cases brought under section 2 of the Sherman Act.  If a plaintiff establishes that the defendant has engaged in anticompetitive conduct that maintained or increased monopoly power in a relevant market, the burden shifts to the defendant to try to justify that conduct.  For decades, the consensus was that defendants could not do so by pointing toward side effects occurring outside the relevant market.  We write to explain the current state of antitrust law on this point, to identify the sound economic principles underlying this longstanding principle, and to urge this Court to decline Appellants' invitation to depart from it.  *NCAA v. Alston*, 594 U.S. 69, 107 (2021) ("Courts reviewing complex business arrangements should . . . be wary about invitations to 'set sail on a sea of doubt.'" (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898) (Taft, J.))).

2

I.    **SECTION 2 OF THE SHERMAN ACT DOES NOT AUTHORIZE DEFENDANTS TO MONOPOLIZE A RELEVANT MARKET BECAUSE OF SIDE EFFECTS ELSEWHERE IN THE ECONOMY.**

Section 2 of the Sherman Act outlaws monopolizing "any part" of U.S. "trade or commerce." 15 U.S.C. § 2. To carry its burden of proof, a plaintiff must establish the defendant's "monopoly power in the relevant market" and identify anticompetitive conduct that let the defendant acquire or maintain "that power" in the relevant market. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (internal quotation marks omitted) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Defendants, for their part, may carry their responsive burden by establishing a valid procompetitive justification for the challenged conduct in that relevant market. *See, e.g.*, *NCAA v. Bd. of Regents*, 468 U.S. 85, 114 (1984); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392 (9th Cir. 1984).

This focused mode of analysis is mandated by the statutory text and a century of consistent Supreme Court authority. Appellants and some academic commentators suggest that the Court has recently departed from this longstanding tradition. As a careful reading shows, however, the Court has taken a consistent stance: the Sherman Act does not permit defendants who have monopolized a relevant market to evade liability because of side effects elsewhere in the economy. And, as we explain, this principle reflects modern economics and sound policy.

3

### A.    The Statutory Text Is Clear: Monopolizing "Any Part" of the U.S. Economy Violates Section 2.

When applying the antitrust laws, "our starting point must be the language employed by Congress." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979). The text of section 2 prohibits monopolization of "any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. The Supreme Court has clarified that the statute therefore "appl[ies] to *any part* of the United States *as distinguished from the whole* and to *any part* of the classes of things forming a part of interstate commerce." *Ind. Farmer's Guide Publ'g Co. v. Prairie Farmer Publ'g Co.*, 293 U.S. 268, 279 (1934) (emphases added) (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 61 (1911)).

Where a plaintiff has established monopolization of a relevant market "as distinguished from the whole" U.S. economy, the defendant cannot carry its responsive burden by pointing to side benefits occurring somewhere else in the economy. The statutory text is clear. That is why "[i]f a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion[,] this . . . is a decision that must be made by Congress and not by private forces or by the courts." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 611–12 (1972). Unless and until Congress amends the statute, monopolizing a

4

relevant market violates the Sherman Act—even if the conduct also happens to benefit someone else, somewhere else.[3]

## B.    The U.S. Supreme Court Has Been Consistently Clear.

A century of unbroken Supreme Court decisional law aligns with this statutory text. The now-classic formulation of burden-shifting analysis under section 1 of the Sherman Act first appeared in a 1918 decision penned by Justice Brandeis:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the *facts peculiar to the business to which the restraint is applied*; [and] *its condition* before and after the restraint was imposed . . . .

*Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (emphases added).[4] Today, courts and scholars would refer to "the business to which the restraint is applied" as a "relevant market," but the analytical focus remains on the "facts peculiar to" that market, not some other market.

---

[3] Legislative history confirms the clear meaning of the statutory text. When passing the antitrust laws, members of Congress repeatedly expressed concern about conduct that harms consumers or vulnerable small suppliers. Nowhere in the voluminous legislative record is there any suggestion that monopolistic conduct that causes such harm can be excused because of side benefits outside a relevant market. *See* John B. Kirkwood, *The Essence of Antitrust*, 81 FORDHAM L. REV. 2425, 2429–30 (2013).

[4] Courts have generally analyzed procompetitive justifications similarly in cases applying both section 1 and section 2 of the Sherman Act. *See* Newman, *supra*, at 502 & n.2.

Several decades later, the Court reiterated this principle in *Topco*, another case involving conduct challenged under section 1 of the Sherman Act.  The Court flatly declared that competition "cannot be foreclosed with respect to one sector of the economy because . . . such foreclosure might promote greater competition in a more important sector of the economy."  *Topco*, 405 U.S. at 610.

*Board of Regents*, decided in 1984, kept to this tradition.  Appellants' Opening Brief portrays it as having "consider[ed] procompetitive effects in [the] market for college football tickets when [the] relevant market was college football television."  Opening Br. of Appellants' at 47, Epic Games, Inc. v. Google LLC, Nos. 24-6256, 24-6274 (9th Cir. Nov. 27, 2024), ECF Nos. 36.1; *see also* Br. for Professors Thomas A. Lambert & John M. Yun as Amici Curiae in Supp. of Defs.-Appellants at 20, Epic Games, Inc. v. Google LLC, Nos. 24-6256, 24-6274 (9th Cir. Dec. 4, 2024), ECF No. 57.2 ("Lambert & Yun").  But that is a misreading of the Court's decision.  First, when addressing the NCAA's primary justification, the Court reasoned that "[i]f the NCAA's [challenged agreement] produced procompetitive efficiencies, [it] would increase output and reduce the price *of televised games*."  *Bd. of Regents*, 468 U.S. at 114 (emphasis added).  Second, the Court emphatically rejected the NCAA's asserted out-of-market benefits to live-game ticket sales as not even potentially cognizable, condemning the NCAA's out-of-market argument as "inconsistent with the basic policy of the Sherman Act."  *Id.*

6

at 117.  *Board of Regents* was yet another continuation of the Court's longstanding approach.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), has similarly been misunderstood.  *See United States v. Google LLC*, No. 20-CV-3010, 2024 WL 3647498, at *123 (D.D.C. Aug. 5, 2024) (describing *Kodak* as having "consider[ed] with little discussion whether procompetitive benefits in one market [for all photocopiers] justified anticompetitive conduct in a related one [Kodak photocopier parts and/or repairs]"); Lambert & Yun, at 20 (similar).  In *Kodak*, the plaintiffs proffered evidence of anticompetitive conduct and defined relevant markets for "parts" and "service" for Kodak photocopiers.  The Court's section 2 analysis discussed three of Kodak's asserted procompetitive justifications.  First, Kodak argued that preventing customers from using independent service providers let Kodak "maintain high quality service."  *Kodak*, 504 U.S. at 483.  But because the plaintiffs offered evidence that independent providers "provide quality service," the district court's grant of summary judgment for Kodak was improper.  *Id.* at 483–84.  Second, Kodak asserted that its policy let it "control[] inventory costs," a justification involving the parts market.  *Id.* at 484.  Third, Kodak claimed that its policy stopped independent service providers from free-riding on Kodak's investments.  This last justification appears to have triggered the misunderstandings noted above.  *Google LLC*, 2024 WL 3647498, at *123 (citing

7

*Kodak*, 504 U.S. at 482–84); Lambert & Yun, at *20 (citing *Kodak*, 504 U.S. at 482–84). But, as the Supreme Court explained, Kodak's argument was that independent service providers would free ride "in order to take away Kodak's *service revenues*." 504 U.S. at 485 (emphasis added) (internal quotation marks omitted). This Court, in the decision affirmed by the Supreme Court, had explained further: Kodak was essentially arguing that an *anticompetitive* effect (forcing service providers to enter both the "parts market" and the "service market") was procompetitive. *Kodak*, 903 F.2d 612, 619 (9th Cir. 1990), *aff'd*, 504 U.S. 451. Kodak's last justification—using revenues in a relevant market to cross-subsidize out-of-market benefits—was invalid "[a]s a matter of law." *Id.* Thus, *Kodak* was not an example of courts opening the floodgates to out-of-market justifications. Kodak's only claimed out-of-market justification was not even potentially valid.

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), was yet another case in which the Court focused burden-shifting analysis on in-market effects. Appellants depict *Leegin* as endorsing out-of-market justifications. Br. at 47 (describing *Leegin* as "recognizing that interbrand competition may offset anticompetitive effects in intrabrand market.")[5]; *see also* Lambert & Yun, at 20

---

[5]   It bears noting that Appellants here depict interbrand competition as occurring outside of relevant intrabrand markets—a depiction at odds with Appellants' own

(stating that "restrained market was retail sales of one brand of product; procompetitive benefits in interbrand product market"). But there was no relevant intrabrand market involved in that litigation. *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, No. CV 2:03 CV 107(TJW), 2009 WL938561, at *3 (E.D. Tex. Apr. 6, 2009). Instead, the Court's justification discussion contemplated a market for "different brands of the *same type of product*." *Leegin*, 551 U.S. at 890 (emphasis added). In other words, *Leegin* was not envisioning out-of-market justifications, but rather two dimensions of competition in a given product market. Moreover, *Leegin* described the overall goal of burden-shifting analyses in such cases as distinguishing "between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* at 886. The focal point is "the consumer," not consumers of one product in a defined relevant market versus consumers of another "related" product in a distinct relevant market. *See* BAKER, *supra*, at 292 n.51 ("In [such a] case, harms and benefits are in the same market—a downstream retail market.").

The Supreme Court's decision in *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ("*AmEx*"), yet again focused on in-market justifications. *AmEx* involved a

---

argument elsewhere that the relevant market in this case must necessarily include all "mobile-gaming transactions." Br. at 40.

restraint imposed by one of the four U.S. credit-card companies on merchants. The Court began its discussion by explaining that "[t]he rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s actual effect' on competition." *Id.* at 541 (alterations in original) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). Letting defendants avoid liability by asserting out-of-market side effects would not be a "fact-specific assessment" of market power, structure, and effects. Even more tellingly, the *AmEx* Court identified what it viewed as valid procompetitive justifications as follows: "These agreements actually stem negative externalities *in the credit-card market* and promote interbrand competition [among the four relevant market participants]." *Id.* at 551 (emphasis added). The *AmEx* Court's market definition has attracted considerable scholarly criticism. But, given the market as defined by the Court, the justification analysis focused exclusively on in-market effects.

*NCAA v. Alston*, 594 U.S. 69 (2021), is the Supreme Court's most recent Sherman Act burden-shifting case. *Alston*, a section 1 case, affirmed the trial court's factual analysis of the NCAA's proffered justifications. 594 U.S. at 100–01. The trial court had begun its analysis as follows:

> As a threshold matter, it is important to recognize that the challenged limits on compensation cannot be deemed procompetitive simply because they promote or are consistent with amateurism. To be

10

procompetitive, the challenged rules *must have some procompetitive effect on the relevant market*.

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1098 (N.D. Cal. 2019), *aff'd*, 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom.*, 594 U.S. 69 (2021) (emphasis added). Thus, although *Alston* expressly declined to weigh in on the legal principle, 594 U.S. at 87, its affirmation of the trial court's factual finding was a continuation of the Court's longstanding position disapproving of out-of-market analysis, not a radical departure therefrom as some commentators claim. *See* Lambert & Yun, at 20. The Court also approvingly quoted, in an explanatory parenthetical, the following: "Just as the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers, so the ability of sports teams to agree on a TV contract need not imply an ability to set wages for players." *Alston*, 564 U.S. at 90–91 (internal quotation marks omitted) (quoting *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996) (Easterbrook, J.)). Justice Kavanaugh, concurring, put it as follows: "All of the restaurants in a region cannot come together to cut cooks' wages on the theory that 'customers prefer' to eat food from low-paid cooks." *Id.* at 109 (Kavanaugh, J., concurring).

Finally, when interpreting section 7 of the Clayton Act, the Supreme Court has also been clear. Section 7 prohibits mergers and acquisitions that "may . . . substantially lessen competition or tend to create a monopoly." 15 U.S.C. § 18. In

11

*Philadelphia National Bank*, the Court rejected the notion that "anticompetitive effects in one market" could be "justified by procompetitive consequences in another." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963). And there is "no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." *Grinnell*, 384 U.S. at 573.

### C. Circuit Courts—Including This Court—Have Been Consistently Clear.

Federal appellate courts have likewise been consistently clear: antitrust justification analysis focuses on in-market effects. *See* JONATHAN B. BAKER, THE ANTITRUST PARADIGM 190 (2019) ("Courts may look to both benefits and costs within the same market when evaluating the reasonableness of challenged conduct, but they may not count benefits in one market against harms in another.") & 292 n.51 ("*Topco* has been treated by lower courts as precluding cross-market welfare trade-offs in non-merger litigation."). In cases where justifications are permitted at all, defendants can carry their responsive burden by establishing a cognizable, substantiated justification. *See* John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 IND. L.J. 501, 541 (2019) (identifying the three steps of a proper justification analysis). But defendants cannot carry that burden by pointing to side effects outside an already-defined valid relevant market.

12

This Court's first statement on the issue appeared in *Los Angeles Memorial Coliseum*. Applying section 1 of the Sherman Act, this Court stated, "The *relevant market provides the basis* on which to balance competitive harms *and benefits* of the restraint at issue." 726 F.2d at 1392 (emphases added). Other circuits have agreed. Most recently, in *Deslandes*, the Seventh Circuit reversed a district court's dismissal of a complaint filed by a class of workers. *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 1057 (2024). Judge Easterbrook explained:

> The [district] court deemed the restraint ancillary because it appeared in franchise agreements—and each agreement expands the output of burgers and fries. . . . One problem with this approach is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing). That's not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise.

*Id.* at 703. Likewise, the Fifth Circuit has stated, "Under the rule [of reason], the anticompetitive evils of a restrictive practice must be balanced against any procompetitive benefits or justifications *within the confines of the relevant market*." *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1392 (5th Cir. 1983) (emphasis added). In *Law v. NCAA*, the district court, in a decision affirmed by the Tenth Circuit, explained that "[t]he market for coaching services is different from the market for intercollegiate sports. . . . Procompetitive justifications for price-fixing must apply *to the same market* in which the restraint

13

is found, *not to some other market*." *Law v. NCAA*, 902 F. Supp. 1394, 1406 (D.

Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998), *cert denied sub nom.*, 525 U.S.

822 (1998) (emphases added).  The D.C. Circuit is also in accord with this view.

*Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1187 (D.C. Cir. 1978) ("[T]here is

nothing of [cognizable] procompetitive virtue to balance.").[6]

To be sure, some courts have strayed from the statutory text and Supreme

Court guidance.  In a 1982 decision, for example, the Third Circuit (albeit in a single

sentence) recognized "procompetitive effects" in a restaurant market from a restraint

that excluded a building contractor.  *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr.*

*Trades Council*, 670 F.2d 421, 432 (3d Cir. 1982).  A district court has recently

declined to weigh in one way or another, *Google LLC*, 2024 WL 3647498, at *123–

24, and another has allowed a defendant to present evidence at trial of out-of-market

effects, albeit only "[o]ut of an abundance of caution."  *FTC v. Meta Platforms, Inc.*,

No. CV 20-3590, 2024 WL 4772423, at *37 (D.D.C. Nov. 13, 2024).

---

[6]  In the context of section 7 of the Clayton Act, circuit courts—including this
Court—have aligned with this principle.  The defendants in *RSR Corp.* argued that,
"even if some anticompetitive effects [in localized areas] are felt as a result of the
merger, competition in the overall secondary lead market will increase." *RSR
Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979).  Relying on *Philadelphia
National Bank*, this Court "similarly reject[ed] RSR's attempt to justify the . . .
merger on such grounds." *Id.*; *see also United States v. Anthem, Inc.*, 855 F.3d 345,
368 (D.C. Cir. 2017) (holding that harm to one relevant market supported finding
violation and granting nationwide injunction).

But none of those cases addressed the statutory text, despite the Supreme Court's instruction that textualism must be the "starting point" for antitrust analysis. *Reiter*, 442 U.S. at 337. And both recent district-court opinions misread the Supreme Court's substantive precedents on this issue. *Meta*, 2024 WL 4772423, at *36 (misreading *Board of Regents*); *Google LLC*, 2024 WL 3647498, at *123 (misreading *Kodak* and *Board of Regents*). Some academic commentators have similarly missed the mark. *See* Lambert & Yun, at *20. It seems that, despite the clarity of the Sherman Act's text and the consistency of the Supreme Court's guidance, additional guidance from this Court would be beneficial.

### D.    Out-of-Market Effects Are Cognizable Only to the Extent That They Cause Beneficial In-Market Effects.

In general, the law on this issue is clear. And at least some of the remaining confusion can be easily cleared up. Out-of-market beneficial effects can sometimes be cognizable—but only to the extent that they cause *in-market* beneficial effects. Of course, this will hold only in highly unusual circumstances. Such a defendant is contending that the harmed group is actually better off in a world with harmful exclusionary conduct than they would be in a world without it. But if the defendant can actually prove that this is true, then the justification may be cognizable.

Understood in this way, *Alston* (and the similar *O'Bannon* case) align with the statutory text and longstanding Supreme Court precedent. This Court did not address this legal issue in the *Alston* litigation, instead assessing only the district

15

court's factual findings. *In re NCAA*, 958 F.3d at 1257 n.14. This Court affirmed the district court's analysis of the NCAA's proffered justifications. Again, the district court had clearly stated that, "[a]s a threshold matter, . . . [t]o be procompetitive, the challenged rules must have some *procompetitive effect on the relevant market*." 375 F. Supp. 3d at 1098 (emphasis added). The district court then found that the NCAA's conduct had a (limited) beneficial effect: it "preserve[d] demand" for collegiate sports, a finding affirmed by this Court. 958 F.3d at 1260.

There are two possibilities. The first is that the district court's opinion was self-contradictory on a "threshold" matter, a fundamental flaw that then went uncorrected on appeal. This seems exceedingly unlikely. The second is that the effect on viewer demand was legally cognizable, but only insofar as it beneficially affected the relevant market for student–athlete labor. Importantly, this Court identified the NCAA's only valid procompetitive purpose as "preserv[ing] consumer demand *for college athletics*." *Id.* (emphasis added); *see also O'Bannon v. NCAA*, 802 F.3d 1049, 1072 (9th Cir. 2015) (referring to "increasing consumer demand *for college sports*" (emphasis added)). Had the NCAA argued that its conduct preserved demand for, say, campus theater performances, its justification would have been rejected out-of-hand. It was crucial that the NCAA's justification at least theoretically redounded to the benefit of the actual relevant market

16

participants.  Again, such justifications will bear factual weight only in highly unusual settings, and this Court correctly affirmed the district court's holding that any limited benefits from the conduct could have been achieved via less-restrictive alternatives.  *In re NCAA*, 958 F.3d at 1260.

This Court's prior decision in *Los Angeles Memorial Coliseum* also aligns with this understanding.  There, the challenged conduct at issue was an NFL rule requiring a three-quarters' vote by existing team owners to approve any team location transfers.  726 F.2d at 1395. The relevant markets were for "NFL football . . . in the Southern California area" and "stadia offering their facilities to NFL teams . . . in the United States."  *Id.* at 1393.  One of the NFL's proffered justifications involved an out-of-market effect: "preventing transfers from areas before local governments, which have made a substantial investment in stadia and other facilities, can recover their expenditures."  *Id.* at 1396.  This Court recognized "some legitimacy to the NFL's argument"—but only inasmuch as eroding "local confidence in the NFL" "result[ed] *in a decline in interest*" in NFL football, the primary relevant product market.  *Id.* (emphasis added).  In other words, just identifying out-of-market benefits to local governments would have been insufficient.

In *Sullivan v. NFL*, the First Circuit confronted a similar NFL rule that required a three-fourths' majority vote to approve any transfer of team ownership.

17

34 F.3d 1091, 1095 (1st Cir. 1994). The relevant market was the "nationwide market for the sale and purchase of ownership interests in [NFL teams], in general, and in the New England Patriots, in particular." *Id.* at 1097. Defending its rule, the NFL pointed to an out-of-market effect: increased popularity of NFL football among viewing audiences. *Id.* at 1112–13. The court held that this justification "should have been considered by the jury"—but only because, "to the extent the NFL's policy strengthens and improves the league, [it could] result[] in increased competition *in the market for ownership interests in NFL clubs* through, for example, more valuable teams." *Id.* at 1113 (emphasis added). Out-of-market beneficial effects were cognizable, but only insofar as they demonstrably "ultimately ha[d] a beneficial impact on competition in the relevant market itself." *Id.*

This type of justification can theoretically be cognizable, but will factually be quite rare. As a matter of economics, it is not enough, for example, to demonstrate that conduct harms suppliers in a relevant market but makes the monopsonist's downstream product more attractive to customers. That fact alone would not indicate that the conduct benefits the harmed suppliers at all. *Cf. O'Bannon*, 802 F.3d at 1072–73 ("[W]e fail to see how the restraint at issue in this particular case . . . widens recruits' spectrum of choices in the sense that *Board of Regents* suggested.").

## II.    THIS LEGAL PRINCIPLE ARISES FROM SOUND POLICY CONSIDERATIONS.

The principle that the "relevant market provides the basis on which to balance competitive harms and benefits," as this Court put it in *Los Angeles Memorial Coliseum*, 726 F.2d at 1392, is not only good law, but also good policy. Permitting monopolization of an antitrust relevant market based on purported benefits to other participants in a different market would require courts to become central planners, picking winners and losers in the economy without objective benchmarks. Antitrust analysis, already notoriously lengthy and resource-consuming, would become exponentially more so. And such a departure from the statutory text and Supreme Court precedent would create an undue risk of false negatives. American consumers, workers, and businesses would bear that risk.

### A.    Permitting Monopolization of a Relevant Market Based on Benefits Elsewhere Would Convert Courts Into Central Planners.

Assessing competitive harms and benefits within a well-defined relevant market relies on "[m]arket considerations . . . [to] provide the 'objective benchmarks'" for antitrust burden-shifting analysis. *Hornsby Oil Co.*, 714 F.2d at 1393 (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54 n.21 (1977)). Letting defendants carry their responsive burden by pointing toward a benefit for someone outside the relevant market, however, would require courts to try to compare the relative magnitudes of that benefit to that person and the already-proven harms to relevant-market participants. There is no economic or

mathematically defensible method for conducting such comparisons. *See, e.g.*, Michael Katz & Jonathan Sallet, *Multisided Platforms and Antitrust Enforcement*, 127 YALE L.J. 2142, 2171 (2018). *See generally* ROBERT H. BORK, THE ANTITRUST PARADOX 77–80 (1978) (2021 ed.) (describing "value trade-offs," like those required when comparing one group and another, as "the very essence of politics").

Burden-shifting antitrust analysis does often require comparisons. For example, a court might need to compare an increase in convenience (one aspect of product quality) to a decrease in comfort (a different aspect of product quality). *See* Rebecca Haw Allensworth, *The Commensurability Myth in Antitrust*, 69 VAND. L. REV. 1, 44 (2016). That is no easy task. Indeed, it is an apples-to-oranges comparison: two different sub-types of the same type, fruit. But quantitatively comparing harms to market participant group $X$ against benefits to group $Y$ is exponentially harder. The two different groups of market participants will invariably include at least some different entities. Because their preferences and utility from a given unit of money will differ, even comparing pecuniary effects across different groups is impossible using any objective, economic tools. For instance, suppose monopsonistic conduct lowers wages to workers and also lowers prices to customers. It may be tempting to think that a dollar in the hands of a worker equals a dollar in the hands of a customer. But unless the two groups comprise the *exact same* individuals, the analyst cannot reach that conclusion with

20

any degree of confidence. A dollar in the hands of one person is not the same as a dollar in the hands of another—for example, a dollar usually matters more to a low-wage worker than it does to a billionaire. *See generally* Daniel Kahneman & Amos Tversky, *Prospect Theory*, 47 ECONOMETRICA 263 (1979). And, of course, this problem becomes deeper still whenever the harms and benefits involve different aspects of competition—for example, one type of quality benefit to one group of consumers versus a different type of quality benefit to a different (even if overlapping) group. No economic toolkit exists for quantitatively making any of these comparisons.

Making normative judgments based on moral beliefs or political values is a task that properly falls to the legislature. As the Supreme Court has instructed, "If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion[,] this too is a decision that must be made by Congress and not by private forces or by the courts." *Topco*, 405 U.S. at 611. "[T]o make the delicate judgment on the relative values to society of [different] competitive areas of the economy," the Court continued, "the judgment of the elected representatives of the people is required." *Id.* at 612.

### B. Permitting Monopolization of a Relevant Market Based on Benefits Elsewhere Would Compound Already-Substantial Administrative Costs.

Antitrust litigation is already notoriously time- and resource-intensive. *See,*

*e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558–59 (2007) (collecting sources). Evaluating the proposed relevant market(s), assessing monopoly power, and deciding whether the defendant has engaged in one or more of the "myriad" means of exclusionary conduct, *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc), often consumes outsized amounts of judicial resources. And defendants already offer an "ever-expanding plethora of justifications for their conduct," further increasing administrative costs. Newman, *supra*, at 503 (collecting examples).

Assessing out-of-market justifications as such would severely compound administrative costs. By definition, an out-of-market effect occurs in a different relevant market that would presumably need to be defined, with different market participants who would need to be identified, different structural characteristics (e.g., barriers to entry) that would need to be assessed, and in some cases different harms in the different market and/or additional harms in the relevant market that would first need to be accounted for before deciding whether the defendant has actually carried its burden. In other words, departing from the statutory text and Supreme Court precedent in this way would double—or more—the amount of resources required for each affected case.

Of course, defendants would bear the burden of defining the additional market(s), identifying the market participants, proving the structural characteristics

like barriers to entry are consistent with the purported benefits, and demonstrating that the benefits are greater than any additional harm(s) in the additional market(s). Defendants may be happy to open this Pandora's box—especially defendants who enjoy monopoly power and can therefore devote (some of) their surplus financial resources to the litigation. But plaintiffs will undoubtedly respond with their own discovery demands, witnesses, expert reports, etc. And it is the court system that would ultimately bear the brunt of "analyz[ing], interpret[ing], and evaluat[ing] the myriad of competing interests and the endless data that would surely be brought to bear on such decisions." *Topco*, 405 U.S. at 61112. As the Supreme Court warned, "[p]rivate forces are too keenly aware of their own interests in making such decisions and courts are ill-equipped and ill-situated for such decision making." *Id.* at 611.

### C.   Permitting Monopolization of a Relevant Market Based on Benefits Elsewhere Would Unduly Increase Error Costs.

The Supreme Court has considered the relative frequency and magnitude of error costs when applying the Sherman Act. *Trinko*, 540 U.S. at 413–14. Both false positives and false negatives are harmful to society. *See generally* Frank H. Easterbrook, *The Limits of Antitrust*, 63 TEX. L. REV. 1 (1984) (outlining error-cost framework). Antitrust analysis should, within the confines of the statutory text and applicable Supreme Court precedent, seek to minimize those harms.

In modern burden-shifting antitrust cases, plaintiffs almost always lose. It is not impossible to win, of course, as the case before this Court underscores. But surveys of all Sherman Act § 1 burden-shifting cases decided from 1999 to 2021, for example, reveal that plaintiffs lost 97% of the time. *See* Br. for 65 Professors of L., Bus., Econ., and Sports Mgmt. as Amici Curiae in Supp. of Resp'ts at 21 n.9, *Alston*, 594 U.S. 69 (2021) (Nos. 20-512, 20-520); Michael A. Carrier, *The Rule of Reason*, 16 Geo. Mason L. Rev. 827 (2009); Michael A. Carrier, *The Real Rule of Reason*, 1999 BYU L. Rev. 1265 (1999). Leading antitrust scholars have concluded that the balance is skewed too heavily in favor of defendants. *See, e.g.*, Herbert Hovenkamp, *A Miser's Rule of Reason*, 78 N.Y.U. Ann. Surv. Am. L. 1, 1 (2022) (decrying "just how narrow the rule of reason path to victory has become").

Letting defendants justify harmful conduct in a well-defined relevant market by claiming benefits to someone else, somewhere else would further increase the frequency of harmful false negatives. These are, as one circuit put it, "dangerous waters" to enter. *Sullivan*, 34 F.3d at 1112. Another court illustrated one of the dangers, using price-fixing as an example:

> If price-fixing buyers were allowed to justify their actions by claiming procompetitive benefits in the product market, they would almost always be able to do so by arguing that the restraint was designed to reduce their costs and thereby make them collectively more competitive sellers. To permit such a justification would be to give businesses a blanket exemption from the antitrust laws and a practically limitless license to engage in horizontal price-fixing aimed at suppliers.

*Law*, 902 F. Supp. at 1406, *aff'd*, 134 F.3d 1010.  This concern is not limited to price-fixing.  Again, any analysis that would require making tradeoffs between harm to one group and benefits to a different group requires abandoning any defensible economic methodology.  Proceeding without any "objective benchmarks," *Hornsby Oil Co.*, 714 F.2d at 1393, will necessarily yield a high number of incorrect decisions.  As a result, it would unduly tip the balance even further in favor of defendants—and put the cost onto American consumers, workers, and businesses.

To illustrate yet another danger that lurks in these waters, suppose that an antitrust plaintiff proves that a defendant has engaged in exclusionary conduct to maintain monopoly power in a relevant market, decreasing price competition for relevant product *A*.  The defendant, in turn, argues that its conduct also led to a price decrease in what it calls a "related" market for complementary product *B*.  It may be tempting to try to trade off effects in such a case.  But again, the two groups of consumers will almost never overlap perfectly, meaning that at least some distinct individuals are affected.  Worse yet, though, if the price of product *B* did in fact decrease, that seemingly beneficial dynamic would tend to ricochet *back* into the relevant market, where it may *further increase* prices of product *A*.  Prices of complements tend to move inversely to each other.  *See* GREGORY N. MANKIW, PRINCIPLES OF MACROECONOMICS 70 (2012).

25

The examples are nearly limitless.  Departing from the Sherman Act's statutory text and applicable Supreme Court precedent would cause serious, cascading problems.  And the resulting increased costs of false negatives would fall on the public.  We urge this Court to stay the course and decline calls to embark on such dangerous waters.  *See Alston*, 594 U.S. at 107 ("Courts reviewing complex business arrangements should . . . be wary about invitations to 'set sail on a sea of doubt.' (quoting *Addyston Pipe & Steel Co.*, 85 F. at 284 (Taft, J.)).  And what could be gained by opening the floodgates to out-of-market analysis?  It is quite telling that even the proponents of doing so cannot point to a single case where a court has actually found a valid, cognizable justification based on out-of-market effects.

## CONCLUSION

The "starting point" for deciding principles of Sherman Act section 2 jurisprudence "must be the language employed by Congress."  *Reiter*, 442 U.S. at 337.  The text of section 2 prohibits monopolizing "any part" of the U.S. economy. 15 U.S.C. § 2.  It does not permit harmful monopolization of a relevant market because of side benefits that may accrue in a different part of the economy.  "If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion[,] this . . . is a decision that must be made by Congress and not by private forces or by the courts."  *Topco*, 405 U.S. at 611.

The Supreme Court has not strayed from the statutory text. Nor has this Court. This case should not be the first such departure in this Circuit. The resulting antitrust enterprise would be more unworkable, more unwieldy, and more prone to harming the consumers, workers, and businesses that the Sherman Act is meant to protect.

DATED:   January 7, 2025         Respectfully submitted,

                                 KESSELMAN BRANTLY STOCKINGER LLP


                                 By:  _____*s/ David W. Kesselman*_____
                                      DAVID W. KESSELMAN
                                      WESLEY A. SWEGER


                                 Attorneys for *Amici Curiae*
                                 PROFESSORS OF LAW AND ECONOMICS
                                 and the AMERICAN ANTITRUST INSTITUTE

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 6046 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman. I certify that this brief is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5).

DATED:  January 7, 2025

*s/ David W. Kesselman*

David W. Kesselman

# ADDENDUM A

## List of Academic Signatories

Rebecca Haw Allensworth
David Daniels Allen Professor of Law
Vanderbilt Law School

Elettra Bietti
Assistant Professor of Law & Computer Science
Northeastern University

Darren Bush
Leonard B. Rosenberg Professor of Law
University of Houston Law Center

Peter C. Carstensen
Fred W. & Vi Miller Chair in Law Emeritus
University of Wisconsin Law School

Javier Donna
Associate Professor of Economics
University of Miami Herbert Business School

Harry First
Charles L. Denison Professor of Law Emeritus
New York University School of Law

Shubha Ghosh
Crandall Melvin Professor of Law
Syracuse University College of Law

Warren Grimes
Irving D. & Florence Rosenberg Professor of Law
Southwestern Law School

Nikolas Guggenberger
Assistant Professor of Law
University of Houston Law Center

1

George A. Hay
Charles Frank Reavis Sr. Professor of Law & Professor of Economics
Cornell Law School

John D. Kirkwood
William C. Oltman Professor of Teaching Excellence
Seattle University School of Law

John Kwoka
Neal F. Finnegan Distinguished Professor of Economics
Northeastern University

Robert H. Lande
Venable Professor of Law Emeritus
University of Baltimore School of Law

Christopher R. Leslie
Chancellor's Professor of Law
University of California, Irvine – School of Law

John M. Newman
Professor of Law
University of Miami School of Law

Chris Sagers
Emerick-Calfee Halter Professor of Law
Cleveland State University College of Law

Theodosia Stavroulaki
Assistant Professor
St. Louis University School of Law

Marshall Steinbaum
Assistant Professor of Economics
University of Utah

Jennifer E. Sturiale
Associate Professor of Law
Widener University Delaware Law School

Zephyr Teachout
Professor of Law
Fordham Law School

Spencer Weber Waller
John Paul Stevens Chair in Competition Law School
Loyola University Chicago School of Law

Samuel N. Weinstein
Professor of Law
Benjamin N. Cardozo School of Law