Nos. 24-6256, 24-6274

IN THE
# United States Court of Appeals
# for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Northern District of
California
Hon. James Donato, Nos. 3:20-cv-5671-JD, 3:21-md-02981-JD

**BRIEF OF THE UNITED STATES OF AMERICA AND THE FEDERAL TRADE
COMMISSION AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE**

ANISHA S. DASGUPTA
 *General Counsel*
HENRY LIU
 *Director*
SHAOUL SUSSMAN
 *Associate Director*
KELLY SIGNS
 *Assistant Director*
SYNDA MARK
 *Deputy Assistant Director*
MARK HEGEDUS
 *Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2115

DOHA MEKKI
 *Acting Assistant Attorney General*
JOHN W. ELIAS
 *Deputy Assistant Attorney General*
DAVID B. LAWRENCE
 *Policy Director*
SPENCER D. SMITH
 *Counsel*
DANIEL E. HAAR
NICKOLAI G. LEVIN
PATRICK M. KUHLMANN
 *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W. #3224
Washington, D.C. 20530-0001
(202) 305-4639

*Counsel for the United States & the Federal Trade Commission*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................ii

INTERESTS OF AMICI ........................................................................1

STATEMENT ......................................................................................2

ARGUMENT .......................................................................................4

  I.  Google Would Improperly Narrow District Courts' Remedial
     Authority .....................................................................................5

    A.  District Courts Have Broad Authority to Remedy
       Monopolization .......................................................................6

    B.  *Trinko* Addresses Liability, Not Remedies for Monopoly
       Maintenance ............................................................................8

    C.  The App-Store-Distribution and Catalog-Access Remedies Are
       Reasonable Methods of Eliminating the Consequences of
       Google's Unlawful Conduct .....................................................16

    D.  Google Misstates Remedies Law in Other Ways........................22

  II.  Google Makes Legally Unsound Liability Arguments .................26

    A.  Google's Issue-Preclusion Argument Disregards Key Market-
       Definition Principles ...............................................................26

    B.  The Jury Was Not Required To Consider Proffered Out-of-
       Market Benefits.......................................................................30

CONCLUSION .................................................................................36

CERTIFICATE OF COMPLIANCE.......................................................37

CERTIFICATE OF SERVICE...............................................................38

i

## TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Aerotech International v. Honeywell International*,
    836 F.3d 1171 (9th Cir. 2016)................................................................9

*American Tobacco Co. v. United States*,
    328 U.S. 781 (1946)..............................................................................32

*Associated Press v. United States,*
    326 U.S. 1 (1945)..................................................................................19

*Authenticom, Inc. v. CDK Global, LLC*,
    874 F.3d 1019 (7th Cir. 2017)..............................................................13

*Besser Manufacturing Co. v. United States*,
    343 U.S. 444 (1952).............................................................. 16, 24, 25

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)........................................................................27, 28

*Chicago Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008)................................................................24

*Deslandes v. McDonald's USA LLC*,
    81 F.4th 699 (7th Cir. 2023) ................................................................34

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
    504 U.S. 451 (1992).......................................................................27, 35

*Epic Games v. Apple*,
    559 F. Supp. 3d 898 (E.D. Cal. 2021) .................................................26

*Epic Games v. Apple*,
    67 F.4th 946 (9th Cir. 2023), ........................................................26, 34

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ..................................................................... passim

*FTC v. National Lead Co.*,
    352 U.S. 419 (1957) ............................................................................. 10

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .................................................. 6, 22, 23

*Impax Labs. v. FTC*,
    994 F.3d 484 (5th Cir. 2021) .............................................................. 34

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*,
    958 F.3d 1239 (9th Cir. 2020) ............................................................ 33

*Intellectual Ventures I v. Capital One Financial*,
    937 F.3d 1359 (Fed. Cir. 2019) .......................................................... 30

*International Boxing Club of New York v. United States*,
    358 U.S. 242 (1959) ............................................................................. 22

*International Salt Co. v. United States*,
    332 U.S. 392 (1947) ..................................................................... passim

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................................... 21

*Lair v. Bullock*,
    798 F.3d 736 (9th Cir. 2015) .............................................................. 19

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ............................................................................. 35

*Massachusetts v. Microsoft*,
    373 F.3d 1199 (D.C. Cir. 2004) ................................................... passim

*Mozart Co. v. Mercedes-Benz of North America, Inc.*,
    833 F.2d 1342 (9th Cir. 1987) ............................................................ 35

iii

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) ....................................................................... passim

*NCAA v. Alston*,
  594 U.S. 69 (2021) ............................................................ 7, 12, 13, 33

*NCAA v. Board of Regents of University of Oklahoma*,
  468 U.S. 85 (1984) ....................................................................... 34

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ...................................................... 9

*O'Bannon v. NCAA.*,
  802 F.3d 1049 (9th Cir. 2015) ...................................................... 35

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ...................................................... 29

*Oltz v. St. Peter's Community Hospital*,
  861 F.2d 1440 (9th Cir. 1988) ................................................. 29, 30

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*,
  20 F.4th 466 (9th Cir. 2021) ....................................................... passim

*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973) ..................................................................... 18

*Pacific Bell Telephone. Co. v. linkLine Communications, Inc.*,
  555 U.S. 438 (2009) ....................................................................... 9

*Paladin Associates v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ...................................................... 33

*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health
  System, Ltd.*, 778 F.3d 775 (9th Cir. 2015) ................................... 4

iv

*Schine Chain Theaters, Inc. v. United States*,
  334 U.S. 110 (1948)................................................................8

*Smith v. Pro Football, Inc.*,
  593 F.2d 1173 (D.C. Cir. 1978)..........................................34

*Snoqualmie Indian Tribe v. Washington*,
  8 F.4th 853 (9th Cir. 2021) ................................................27

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) ...............................................35

*Teradata Corp. v. SAP SE*,
  -- F.4th --, 2024 WL 5163082 (9th Cir. Dec. 2024).............30

*United States v. Continental Can Co.*,
  378 U.S. 441 (1964)........................................................27, 28

*United States v. Crescent Amusement Co.*,
  323 U.S. 173 (1944)........................................................12, 15

*United States v. E.I. du Pont de Nemours & Co.*,
  366 U.S. 316 (1961)....................................................4, 5, 26

*United States v. Glaxo Group Ltd.*,
  410 U.S. 52 (1973)..............................................................22

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)........................................................31, 32

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ....................................... passim

*United States v. National Lead Co.*,
  332 U.S. 319 (1947)..........................................................7, 22

*United States v. Pabst Brewing Co.*,
  384 U.S. 546 (1966)............................................................28

*United States v. Philadelphia National Bank,*
    374 U.S. 321 (1963)................................................................31

*United States v. Phillipsburg National Bank & Trust Co.,*
    399 U.S. 350 (1970)................................................................30

*United States v. Topco Associates*
    405 U.S. 596 (1972)................................................................32

*United States v. U.S. Gypsum Co.,*
    340 U.S. 76 (1950)..........................................................11, 12

*United States v. United Shoe Machinery Corp.,*
    110 F. Supp. 295 (D. Mass. 1953)......................................18

*United States v. United Shoe Machinery Corp.,*
    391 U.S. 244 (1968)..........................................................4, 18

*US Airways, Inc. v. Sabre Holdings Corp.,*
    938 F.3d 43 (2d Cir. 2019) ..................................................28

*Verizon Communications Inc. v. Law Office of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)..........................................8, 10, 11, 14

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969)..................................................................6

## Statutes

15 U.S.C. § 1 ................................................................................2

15 U.S.C. § 2 ..........................................................................2, 31

15 U.S.C. § 4..............................................................................6

15 U.S.C. § 25.................................................................................6

15 U.S.C. § 26.................................................................................6

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) ..........................................1

**Other Authorities**

Department of Justice & Federal Trade Commission,
  *Merger Guidelines* (2023)................................................... 27, 28, 30, 31

vii

## INTERESTS OF AMICI

The United States, through the U.S. Department of Justice's Antitrust Division, and the Federal Trade Commission enforce the federal antitrust laws and have a strong interest in their correct application. The Commission submitted an amicus brief addressing antitrust remedies in the district court, and the agencies jointly submitted an amicus brief at the stay stage (Gov't Stay Am. Br.) addressing errors of law in defendants-appellants' filing. The agencies file this brief, pursuant to Federal Rule of Appellate Procedure 29(a)(2), to address Google's incorrect legal arguments that would improperly restrict a district court's broad authority to remedy antitrust violations, misapply market-definition principles, and improperly require the jury to consider proffered out-of-market benefits.[1]

---

[1] The United States has ongoing civil litigation against Google. The U.S. District Court for the District of Columbia is considering remedies for Google's maintenance of monopolies in search-related markets. *United States v. Google LLC*, 20-cv-3010-APM (D.D.C.). The U.S. District Court for the Eastern District of Virginia recently held a trial on claims that Google maintains monopolies digital-advertising-technology markets. *United States v. Google LLC*, No. 1:23-cv-00108-LMB-JFA (E.D. Va.).

1

## STATEMENT

Epic Games, Inc. develops video games, including the popular Fortnite. I-ER-24. Fortnite can be played on smartphones running Google's Android operating system. *Id.* Epic distributed a Fortnite Android app through Google Play—Google's app store— starting in April 2020, until Epic's relationship with Google broke down in August 2020 over restrictions Google imposed on apps distributed through Play. I-ER-24-25.

Epic sought injunctive relief, claiming that Google violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. *Id.* Epic alleged, *inter alia*, that Google employed an array of anticompetitive practices to monopolize and unreasonably restrain trade in markets for (1) the distribution of Android apps and (2) Android in-app billing services for digital transactions. I-ER-26-27. For example, Google paid app developers to not launch apps first or exclusively on app stores other than Play. I-ER-40. Additionally, Google entered into agreements with smartphone manufacturers requiring them to install Play on the home screen and paying them not to install any other app store on the device. I-ER-41-42. Further, Google took steps to impede users from "sideloading" competing

2

app stores—i.e., directly installing the store on a device rather than downloading it through Play. I-ER-42. Finally, agreements with app developers prevented use of third-party payment solutions. I-ER-43.

The jury returned a unanimous verdict that Google violated Sections 1 and 2. I-ER-52-57. Google moved for judgment as a matter of law, "firing a barrage of objections and allegations of error," which the court denied. I-ER-27.

After "extensive post-verdict hearings," I-ER-8, the district court granted a permanent injunction that, for three years, prohibits Google from engaging in practices found to be illegal; requires Google to distribute third-party app stores through Play (the app-store-distribution remedy); and requires Google to allow third-party app stores access to Google's app catalog (the catalog-access remedy). I-ER-3-5. The court "narrowly tailored" the app-store-distribution and catalog-access remedies "to remediate the unfairly enhanced network effects Google reaped without unfairly penalizing its success as a first mover." I-ER-17.

Google may take reasonable measures to ensure that third-party app stores are safe and charge a "reasonable fee" "based on Google's costs" for those services. I-ER-5. The injunction establishes a Technical

3

Committee to resolve disputes, with members appointed by Epic and Google. *Id.*

## ARGUMENT

"The key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 792 (9th Cir. 2015) (quoting *United States v. E.I. du Pont de Nemours & Co.,* 366 U.S. 316, 326 (1961)). Google, however, asks this Court to adopt rules that, in many cases, would prevent a district court from discharging its "duty" to prescribe relief sufficient to "restore workable competition in the market." *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 250 (1968). Google argues that the *liability* standard for unilateral refusals to deal with rivals—which addresses unique policy concerns arising in a narrow set of cases—should apply to *remedies* across the board. It misstates this Court's legal framework for remedies. And it disregards precedent establishing that a court may make an injunction more effective by requiring a defendant to provide services at a reasonable rate or establishing a technical committee.

Google likewise misstates rules of antitrust liability. In arguing for

4

issue preclusion, it ignores the basic principles that market definition is a fact-specific inquiry and that different circumstances lead to different relevant markets. And it wrongly argues that it was entitled to a jury instruction stating that it could justify its conduct by proffering procompetitive benefits outside the relevant market where competition was harmed. This Court should reject Google's misinterpretations of the Sherman Act.

## I.   Google Would Improperly Narrow District Courts' Remedial Authority

In challenging the app-store-distribution and catalog-access remedies, Google asks this Court to place unwarranted limitations on a district court's authority to remedy monopolization. Considered individually, Google's arguments are wrong. Taken as a whole, they could prevent district courts from devising effective remedies for monopolization in this case and others. Antitrust litigation is "a futile exercise if the [plaintiff] proves a violation but fails to secure a remedy adequate to redress it." *du Pont*, 366 U.S. at 323.

## A. District Courts Have Broad Authority to Remedy Monopolization

1. Congress authorized injunctions in private antitrust cases under 15 U.S.C. § 26 not "merely to provide private relief" but to "serve as well the high purpose of enforcing the antitrust laws."[2] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130-31 (1969). Remedies for Section 2 violations therefore must do more than end the offending conduct while leaving competition wanting. They must "unfetter a market from anticompetitive conduct *and* pry open to competition a market that has been closed by defendants' illegal restraints." *Ford Motor Co. v. United States*, 405 U.S. 562, 577-78 (1972) (emphasis added). Thus, "[i]f the jury finds that monopolization or attempted monopolization has occurred, the available injunctive relief is broad, including to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Optronic*, 20 F.4th at

---

[2] The United States brings suits for injunctive relief under 15 U.S.C. §§ 4 & 25. This Court has relied on precedent from federal enforcement actions when reviewing injunctions in private cases. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd*., 20 F.4th 466, 486-87 (9th Cir. 2021); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225-26 (9th Cir. 1997).

486 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001)).

District courts are "clothed with 'large discretion'" to meet these distinct ends. *Ford*, 405 U.S. at 573 (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). An injunction need not be limited to the specific means the defendant used to maintain its monopoly, *see Optronic*, 20 F.4th at 486, and can include "forward-looking provisions" to restore competitive conditions, *Massachusetts v. Microsoft*, 373 F.3d 1199, 1215-1225 (D.C. Cir. 2004). District courts should exercise "a healthy dose of judicial humility," *NCAA v. Alston*, 594 U.S. 69, 107 (2021), but it remains their "duty" to "make the remedy as effective as possible," *United States v. Nat'l Lead Co.*, 332 U.S. 319, 334 (1947).

2. In crafting an effective remedy for monopolization of digital markets, a district court should consider the particular characteristics of digital markets, which can allow monopolists that achieved or maintained dominance through exclusionary conduct to perpetuate entry barriers and maintain monopoly power long after that conduct has stopped. *See* I-ER-17. Network effects and data-feedback loops can amplify the effects of anticompetitive conduct in these markets,

7

entrenching monopoly power. *See Microsoft*, 253 F.3d at 55 (network effects create a "chicken-and-egg" situation in which the dominant platform becomes difficult to dislodge). Accordingly, remedies in digital markets will often need to do more than merely enjoin the specific exclusionary conduct to restore competition to the market effectively. Otherwise, a monopolist would not be adequately deterred from engaging in the conduct because it would know in advance that it could entrench its monopoly unlawfully and then keep its illegally obtained advantages after the conduct is enjoined. *See Schine Chain Theaters, Inc. v. United States*, 334 U.S. 110, 128 (1948) ("If all that was done was to forbid a repetition of the illegal conduct, those who had unlawfully built their empires could preserve them intact. They could retain the full dividends of their monopolistic practices and profit from the unlawful restraints of trade . . . .").

## B. *Trinko* Addresses Liability, Not Remedies for Monopoly Maintenance

At the stay stage, Google's attack on the district court's injunction relied heavily on *Verizon Communications Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). Google argued that *Trinko* bars the app-store-distribution and catalog-access remedies because Google was

8

not held liable for a unilateral refusal to deal with rivals.  Mot. 16-19.[3]
The agencies explained that Supreme Court and Ninth Circuit precedent
foreclose this argument.  Gov't Stay Am. Br. 6-8.

Google has retreated from its earlier position but still overreads
*Trinko*.  Google now suggests (also erroneously) that the app-store-
distribution and catalog-access remedies cannot stand because they
contravene alleged policy considerations underpinning *Trinko*'s liability
standard.  Google Br. 59-64.  But remedying monopolization raises
distinct considerations.

1.  *Trinko* addresses the narrow circumstances in which *liability* for
a unilateral refusal to deal with rivals violates Section 2.  The case does
not address the available *remedies* for monopolization.[4]  This is an
important difference.

---

[3] Amici supporting Google continue to argue wrongly that remedies
requiring dealing are limited to refusal-to-deal-with-rivals violations.
*E.g.*, WLF Am. Br. 3-4.

[4] Other cases cited by Google also address Section 2 liability for refusals
to deal, not remedies.  *Pac. Bell Tel. Co. v. linkLine Commc'ns Inc.*, 555
U.S. 438 (2009); *Aerotech Int'l v. Honeywell Int'l*, 836 F.3d 1171 (9th Cir.
2016); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013).
*Massachusetts*, Google Br. 60, simply remarked on the general
"undesirability of having courts oversee product design," 373 F.3d at
1208.

9

After monopolization has been found, "broad" injunctive relief is available—and often necessary—to end the illegal conduct, deprive the monopolist of the fruits of its violation, and restore competition. *See supra* pp. 5-8.  A violator does not "stand before the court in the same position as one who has never violated the law." *Int'l Salt*, 332 U.S. at 400.  To be effective, antitrust remedies often must extend beyond simply enjoining the conduct found unlawful. *See, e.g.*, *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 430 (1957) (court may restrict otherwise lawful conduct to "preclude the revival of the illegal practices").  That an injunction impinges upon "rights that would otherwise be . . . protected" does "not prevent [the court] from remedying the antitrust violations." *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 697-98 (1978).  Put simply, there are consequences for breaking the law.

The antitrust policy considerations identified in *Trinko* apply differently too. *Trinko* imposed a heightened liability standard for refusals to deal with rivals in the context of a comprehensive regulatory scheme requiring such dealing because of the "costs" of "antitrust intervention" in these circumstances. 540 U.S. at 414.  But in remedying an antitrust violation, a court is not weighing the "cost" and "benefits" of

10

antitrust liability. *Id.* There is a violation, and thus there needs to be "antitrust intervention." The court has the "duty" to impose a remedy "to cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950). There are significant public and private interests in "restor[ing] competition" to a monopolized market. *Optronic,* 20 F.4th at 486. And there is no more risk of "false positives," *Trinko*, 540 U.S. at 414—a *positive* liability determination has been made.

Additionally, the innovation incentives are quite different. In the liability context, the *Trinko* court worried that requiring firms to share their innovations with competitors would chill their incentives to innovate. 540 U.S. at 408. But requiring sharing as a Section 2 remedy does not affect innovation incentives across the economy; that remedy comes into play only if a firm has violated Section 2, and thus should not chill investment incentives of firms that do not plan to commit antitrust violations. Moreover, remedies for monopolization can facilitate innovation by lowering barriers to entry (which can be unlawfully raised or bolstered by anticompetitive conduct) and increasing incentives for entrants and entrepreneurs to invest and innovate. Accordingly, courts

11

have imposed dealing requirements to remedy Section 2 violations outside of refusal-to-deal-with-rivals cases. *Optronic*, 20 F.4th at 486.

Google points to *Alston*'s statement that "similar considerations" apply at the liability and remedies stage. Google Br. 63. But *Alston*— which did not involve monopolization—does not limit a district court's authority to issue forward-looking remedies, as Google suggests. There, the Supreme Court simply stated that courts "must be sensitive to the possibility that the continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." 594 U.S. at 102 (internal quotation omitted). This statement simply follows long-established precedent that cautions against remedies involving "cumbersome procedure[s]" but confirms the need for "effective," even if broader, injunctive relief. *United States v. Crescent Amusement Co.*, 323 U.S. 173, 186, 190 (1944).

Google overreads the Court's call for administrability as a prohibition on proceeding at all. In reminding district courts of the importance of "caution," *Alston*, 594 U.S. at 106, the Court did not limit the remedies available or abrogate the "duty" to "cure the ill effects of the illegal conduct," *Gypsum*, 340 U.S. at 88. It did not, as Google suggests,

12

lay down a rigid rule precluding particular remedies, including remedies requiring dealing.[5]  Rather, it reiterated the long-standing principle that a remedy should rest on a sufficient factual record, a legal analysis "consistent with established antitrust principles," and "a healthy dose of judicial skepticism." *Alston*, 594 U.S. at 107.  District courts retain "large discretion" to impose remedies sufficient to "restore competition," *Ford*, 405 U.S. at 573, including dealing remedies, *see infra* pp. 22-23.  Indeed, in *Alston*, the Court affirmed a decree of similar detail to the decree here. 594 U.S. at 84-85.

Here, the district court heeded *Alston*.  It afforded each side "a virtually unlimited opportunity to present its views," "narrowly tailored" the remedies, rejected proposals that "threatened a degree of judicial oversight that would amount to micromanagement of Google's business," enlisted the aid of technical experts, and explained that it would address issues arising during the remedy's implementation.  I-ER-8; I-ER-14; I-

---

[5] Nor does *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019 (7th Cir. 2017), support Google's position.  *Contra* Former Enforcers' Am. Br. 12. There, defendants were not monopolists, and the court reversed a preliminary injunction because the case "center[ed] on agreements" and under the circumstances the "proper remedy" for the alleged Section 1 violation was "to set the offending agreement aside." *Authenticom*, 874 F.3d at 1026.

ER-17.  In short, the district court exercised "'caution'" by adopting "a reasonable method of eliminating the consequences of the illegal conduct"—i.e., measures sufficient to restore competition that do not impose unnecessarily cumbersome procedures.  I-ER-14; I-ER-19; I-ER-21 (quoting *Alston*).

2.  Google also misreads *Trinko* in arguing that "[c]ourts should not require companies to create and offer 'something brand new' that is 'not otherwise marketed or available to the public'" as a remedy.  Google Br. 59 (quoting *Trinko*, 540 U.S. at 410).  *Trinko* does not speak to available remedies for monopolization—just to liability.  And what was "brand new" there was a sharing obligation for certain telephone network elements created by the 1996 Telecommunications Act.  *Trinko*, 540 U.S. at 410.  Since that regulatory structure existed to "deter and remedy anticompetitive harm," the Court saw little benefit in imposing antitrust liability on top for the defendant's refusal to provide those elements to competitors.  *Id.* at 412.  But here there is a jury verdict of monopolization (and no such regulatory structure), and the district court saw the need to impose the two provisions.

14

In any event, Google's argument fails on its own terms. Google already distributes apps and already makes its catalog of apps available for download, so the injunction does not require it to create any new services. If adding "new functionality" to distribute app stores alongside other apps and creating "new infrastructure" to make its catalog available in other app stores are "new services" (Br. 61) the same would be true of many other established remedies. For example, a defendant ordered to license patents for the first time likely will need to create "infrastructure" for that licensing (e.g., personnel for executing and administering the licenses). Or a manufacturer ordered to carry a rival's products in its retail outlets likely will need to establish infrastructure for stocking and selling those products. But that has not stopped courts from ordering such remedies.

Google complains that the remedy "carries a hefty price tag." Google Br. 62. But "[t]hose who violate the Act may not reap the benefits of their violations or avoid an undoing of their unlawful project on the plea of hardship or inconvenience." *Crescent*, 323 U.S. at 189. Google also complains that there is "no precedent" for the app-store-distribution and catalog-access remedies. Google Br. 64. But a remedy must "fit the

15

exigencies of the particular case," *Int'l Salt*, 332 U.S. at 401, and this unique case involves multiple practices in a high-tech industry. It is no surprise, then, that there may not be a prior remedy closely tracking these remedies. Sometimes "innovation" is required for effective relief, and "novelty is not synonymous with error." *Besser Mfg. Co. v. United States*, 343 U.S. 444, 449 (1952).

### C. The App-Store-Distribution and Catalog-Access Remedies Are Reasonable Methods of Eliminating the Consequences of Google's Unlawful Conduct

Google is wrong that the app-store-distribution and catalog-access provisions violate *Optronic*. Google Br. 64-67. Google argues that the district court could not adopt these provisions without finding "'a significant causal connection between the conduct enjoined or mandated and the violation found.'" Google Br. 64 (quoting *Optronic*, 20 F.4th at 486). But Google improperly disregards the next two sentences in *Optronic*: "But a district court may order an injunction 'beyond a simple proscription against the precise conduct previously pursued.'" 20 F.4th at 486 (quoting *Nat'l Soc'y*, 435 U.S. at 698). "The reviewing court only asks if 'the relief [is] a reasonable method of eliminating the consequences of the illegal conduct.'" *Id.*

16

*Optronic* makes clear that remedies for monopolization may go beyond a simple injunction of the conduct found unlawful. "[B]road" injunctive relief may be appropriate to "'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Id.* (quoting *Microsoft*, 253 F.3d at 103). The district court has a duty to restore competition to the monopolized market, including setting aside any competitive advantage the monopolist gained through its anticompetitive conduct. *Id.* ("[a]ntitrust relief must restore competition" (citing *Ford*, 405 U.S. at 573)).

The district court did exactly as *Optronic* requires, and more. The court noted that the jury heard extensive evidence of "barriers to insulate the Play Store from competition," including "network effects." I-ER-16-18. Further, it specifically found "that Google unfairly enhanced its network effects in a way that would not have happened *but for* its anticompetitive conduct,"[6] and that the anticompetitive conduct and

---

[6] The district court's finding of "but-for" causation went well beyond what is required in an antitrust case. Because of the difficulties in "reconstruct[ing] a product's hypothetical technological development in a world absent the defendant's exclusionary conduct," *Microsoft*, 253 F.3d

17

enhanced network effects together "had the consequence of entrenching and maintaining [Google's] monopoly power."  I-ER-16-17 (emphasis added).  The court concluded that, to restore competition, the remedy needed to "overcome" Google's "unfairly enhanced network effects" "by providing access to the catalog of Play Store apps for a period of time sufficient to give rival stores a fair opportunity to establish themselves." I-ER-16-17.  Accordingly, the court crafted the app-store-distribution and catalog-access provisions "to remediate the anticompetitive 'consequences' of Google's illegal conduct."  I-ER-15 (citing *Prof'l Eng'rs*,

---

at 79, it is often practically impossible for courts to find but-for-causation as the district court did here.  Proof of but-for causation is not necessary— even for relief more extensive than the injunction here.  The Supreme Court's opinion in *United Shoe* is illustrative.  There, the district court determined that the defendant was guilty of monopolization without finding that the challenged practices were the but-for cause of the defendant's monopoly.  *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295, 339-40 (D. Mass. 1953).  Nevertheless, the Supreme Court remanded the case for a determination whether divestiture was necessary "to assure the complete extirpation of the illegal monopoly." 391 U.S. 244, 251 (1968).  It explained that the "principal object[]" of a Section 2 remedy is to "extirpate practices that have caused or *may hereafter cause* monopolization."  *Id.* at 251-52 (emphasis added); *see Otter Tail Power Co. v. United States*, 410 U.S. 366, 369, 377 (1973) (affirming "fencing in" relief without any but-for-causation finding).

435 U.S. at 697; *Optronic*, 20 F.4th at 486; and *Microsoft*, 253 F.3d at 103).

Google does not argue that the district court's factual findings are clearly erroneous. *Lair v. Bullock*, 798 F.3d 736, 745 (9th Cir. 2015). And it ignores that the "fashioning of a decree in an antitrust case in such way as to prevent future violations and eradicate existing evils[] is a matter which rests largely in the discretion of the [district] court." *Associated Press v. United States,* 326 U.S. 1, 22 (1945).

Google likewise errs in suggesting that the district court had to do more and expressly find "a 'significant causal connection' between any conduct found to be anticompetitive and remedies that extend beyond that conduct." Google Br. 29. That makes little sense—a violation does not "cause" a remedy for that violation. Nor is such a requirement mandated by this Court's cases.

The language in *Optronic* which Google selectively quotes comes from *Microsoft* and simply reflects that a remedy must be grounded in the actual violation found. In *Microsoft*, the district court found violations of Sections 1 and 2 of the Sherman Act and ordered a divestiture remedy. The court of appeals reversed or remanded as to two

19

of the three violations on which the remedy was grounded and then held the narrowing of liability required vacatur of the remedy. It stated that a district court "must base its [equitable] relief on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" 253 F.3d at 105 (internal quotation marks omitted). Though "a district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful," *id.*, the relief must be tied to the violations found.

Stated differently, there must be a "reasonable" nexus between the remedy chosen and the remedial goals of eliminating the monopoly position caused by the conduct, depriving the defendant of any advantage gained through the violation, and preventing a recurrence of the violation. *Optronic*, 20 F.4th at 486. But Google is wrong to argue that the court must "determine whether and how the company's competitive advantage—here, network effects—would have existed even without the anticompetitive conduct." Google Br. 65. Although the court must choose a "reasonable method" of restoring competition to the monopolized market, *Optronic*, 20 F.4th at 486, it does not have to reverse the precise

20

way Google entrenched its monopoly, *see, e.g.*, *Int'l Salt*, 332 U.S. at 400 ("it is not necessary that all of the untraveled roads to the end be left open"). Thus, even if the district court had not found that Google's anticompetitive conduct enhanced network effects (it did) but strengthened barriers to entry or harmed competition in other ways, the district court could have adopted the two provisions as reasonable means of lowering those entry barriers or redressing the harm to competition.

Google protests that the provisions "deprive [it] of legitimately earned competitive advantages" and lessen its incentives to innovate. Google Br. 65; *see also id.* at 66 (contending that the remedy "improperly targeted [a] lawful advantage" and "extensive investments"). But Google disregards the greater incentives for other firms to innovate that come from prying open markets previously closed to competition. *See supra* pp. 11-12. Indeed, one of the main objectives of an antitrust remedy is to ensure that "[f]orces now at work in the marketplace may bring about a deconcentrated market structure" that allows rivals to compete effectively. *Ford*, 405 U.S. at 578. It is well established that network effects can "create high barriers to entry," *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 780 (N.D. Cal. 2022), and "lower[ing] a major barrier to

21

entry" is appropriate antitrust relief, *Ford*, 405 U.S. at 578. Thus, the court chose a reasonable means of undoing the barriers enhanced by Google's conduct. *Cf. Massachusetts*, 373 F.3d at 1218 (requiring Microsoft to disclose APIs to allow interoperation with its platform "represents a reasonable method of facilitating the entry of competitors into a market from which [defendant's] unlawful conduct previously excluded them" (internal quotation marks omitted)).

### D. Google Misstates Remedies Law in Other Ways

1. Google invents a "legal rule" that "'direct price administration' is beyond the judicial 'function'" except "in narrow circumstances." Google Br. 68 (quoting *Image Tech*, 125 F.3d at 1225). Courts have repeatedly required antitrust violators to provide goods or services at reasonable rates in order to ensure "effective" relief." *E.g.*, *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 62-64 (1973) (requiring "reasonable-royalty rates"); *see also Int'l Boxing Club of N.Y. v. United States*, 358 U.S. 242, 261 (1959) (requiring defendants to lease sports arenas to competitors for "reasonable" rents); *Nat'l Lead*, 332 U.S. at 349-50 (the term "reasonable" "frequently has been employed in Sherman Anti-trust case consent decrees"). *Image Technical* did not establish a general

22

prohibition against reasonable-pricing provisions, but struck a reasonableness requirement because there was a better way to remedy the violation there. 125 F.3d at 1225.

Google further errs in arguing that the reasonable-fee provision serves no purpose. Google Br. 68-69. It plainly prevents Google from undermining the decree by charging rival app stores exorbitant rates that could undermine their competitiveness. Google's proposed solution—non-discriminatory pricing—would not solve the problem as Google could charge all its rivals consistently high but non-discriminatory rates. Google attacks this provision because there is "no established history of Google abusing the pricing of this service." Google Br. 69. But the district court was "not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do." *Int'l Salt*, 332 U.S. at 400.

2. Google also errs in challenging the creation of the Technical Committee. A technical committee can "clearly strengthen[]" a decree. *Massachusetts*, 373 F.3d at 1244. It can provide "technical competence" to ensure effective enforcement and "facilitate the resolution of

23

potentially complex and technologically nuanced disputes between [the defendant] and others." *Id.* (internal quotation marks omitted). Indeed, following implementation of the remedy in *Microsoft*, the district court praised the technical committee as a "lynchpin in the successful effort," which proved "far more effective than the use of a special master." Tr. 29-30, *United States v. Microsoft Corp.*, No. 98-1232(CKK) (Apr. 27, 2011), ECF No. 930.

Google asserts that "no U.S. court has *ever* imposed a technical committee by judicial fiat." Google Br. 73. But courts have imposed similar arrangements in many cases. *E.g.*, *Besser*, 343 U.S. at 448 (committee to set the terms and reasonable rates for patent licenses); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 441-42 n.18 (5th Cir. 2008) (appointing a monitor to decide what assets will be divested a "superior" and "efficient" method to resolve the issue).

Google also argues that the Committee's structure offends "basic principles of Article III adjudication." Google Br. 73. But *Besser* blessed a similar arrangement. Under both arrangements, the parties select members for a committee, and those members in turn select an additional member. I-ER-5; *Besser,* 343 U.S. at 448. In both cases, if the committee

24

cannot resolve a dispute, the court breaks the deadlock. *Id.* The Supreme Court deemed this structure "entirely reasonable and fair." *Besser,* 343 U.S. at 449.

Google offers no reason for this Court, at this stage, to reach a different conclusion. The injunction provides that either "Google or Epic may request a modification of the injunction for good cause." I-ER-6. It is not "good judicial administration to strike [a provision] when the District Court purposefully has left the way open to remedy any such situations if and when the need arises." *Int'l Salt*, 332 U.S. at 401. Instead, the "proper approach" is to place "the burden . . . upon the proved transgressor to bring any proper claims for relief to the court's attention." *Nat'l Soc'y*, 435 U.S. at 698-99.

3. Google's claim that the catalog-access remedy "fail[s] to address the intellectual property interests of non-parties" (Google Br. 86) is similarly incorrect and premature. The injunction requires Google to "provide developers with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store." I-ER-5. Google does not explain why it should be excused from a good-faith effort

to implement the catalog-access remedy in manner that adequately protects third-party IP rights.

Moreover, antitrust remedies can affect the rights of third parties. *E.g.*, *du Pont*, 366 U.S. at 316, 327-28 (that remedy would have tax consequences for holders of defendant's stock not a reason to deny an effective remedy). If there is any problem with third-party IP rights, it can be addressed later, with Google or the affected third parties bringing the specific problem to the district court's attention.

## II.    Google Makes Legally Unsound Liability Arguments

Google contends that (1) Epic is precluded from arguing for markets that do not include Apple and (2) the district court should have instructed the jury that it could consider proffered procompetitive benefits outside the relevant market. Google is wrong on both counts.

### A. Google's Issue-Preclusion Argument Disregards Key Market-Definition Principles

Google contends that the finding in *Epic Games v. Apple*, 559 F. Supp. 3d 898 (E.D. Cal. 2021), *aff'd in part and rev'd in part*, 67 F.4th 946 (9th Cir. 2023), that Apple and Google compete for mobile-gaming downloads and mobile-gaming in-app transactions precludes Android-

26

only markets for app distribution and in-app billing services in this case. Google Br. 31. But the legal standard for issue preclusion is not met here.

Issue preclusion requires that "the issue at stake was identical in both proceedings." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021). But the market-definition issues here were not *identical* to those in *Apple* because this case involves an array of exclusionary practices by Google that were not present in *Apple* and, accordingly, different evidence. *See* I-ER-30.

It is hornbook antitrust law that monopolization and rule-of-reason claims should be resolved "on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992). That includes "market definition,"[7] *id.* at 482, which necessitates "careful consideration based upon the entire record," *United States v. Cont'l Can Co.*, 378 U.S. 441, 449 (1964). Just because parties compete in one market does not mean,

---

[7] A relevant market is "an area of effective competition," the "outer boundaries" of which "are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines* § 4.3 (2023) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

27

as a matter of law, that there cannot be a narrower or overlapping market in which the parties do not compete. The Supreme Court has long recognized that, "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325; *accord US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64-67 (2d Cir. 2019) (plaintiff adequately alleged submarket limited to defendant's services). The Court likewise has held that overlapping markets can be appropriately defined relevant markets. *E.g., Cont'l Can*, 378 U.S. at 456-57 (markets for metal containers, glass containers, and metal and glass containers for certain uses); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550 (1966) (recognizing three concentric geographic markets).

Markets can overlap because "[t]here may be effective competition among a narrow group of products, and the loss of that competition may be harmful, making the narrow group a relevant market, even if competitive constraints from significant substitutes are outside the group." *Merger Guidelines*, *supra*, § 4.3. For example, "a merger to monopoly for food worldwide would lessen competition in well-defined relevant markets for, among others, food, baked goods, cookies, low-fat

28

cookies, and premium low-fat chocolate chip cookies." *Id.* n.77. Likewise, Amstel Light might belong to a light beer market that excludes other Dutch beers and may also belong to an imported Dutch beer market that excludes domestic light beers, with the *relevant* market depending upon the challenged conduct.

Thus, Google is simply wrong to call the markets here inconsistent with those in *Apple* because they "overlap. Google Br. 38; *see Olin Corp. v. FTC*, 986 F.2d 1295, 1301 (9th Cir. 1993) (rejecting the argument that it was "inconsistent to recognize a larger [] market once a relevant [narrower] market has been identified"). Google likewise is incorrect in arguing that the jury was "invited to decide anew whether Google and Apple compete for mobile gaming transactions." Google Br. 39. That was *not* the question put to the jury here. It was asked only to determine whether the markets *that Epic proposed* constituted "area[s] of effective competition" based on the factual record before it, *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447 (9th Cir. 1988), which it did.

It is of no moment that Epic presented some evidence pertaining to Play in *Apple*. Google Br. 35. Because market definition is a tool for understanding competitive dynamics, *Oltz*, 861 F.2d at 1448, which of

29

those overlapping markets is relevant can change when the challenged conduct changes, even if the same products are involved, *see, e.g.*, *United States v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350, 360 (1970) (submarkets that "would be clearly relevant" to "merger between a commercial bank and another type of financial institution" were no basis for ignoring "commercial banking" market in merger between two commercial banks); *Merger Guidelines*, *supra*, § 4.3.  Indeed, this Court recently rejected an argument that two markets were "inconsistent" because one included a party and the other did not, explaining that "market definition must be tied to the theory of harm at issue." *Teradata Corp. v. SAP SE*, -- F.4th --, 2024 WL 5163082, at *7 (9th Cir. Dec. 2024).[8]

## B. The Jury Was Not Required To Consider Proffered Out-of-Market Benefits

Google errs in arguing that "the District Court improperly limited the jury's consideration of the procompetitive benefits of the challenged conduct to the 'relevant market[s].'"  Google Br. 47.  Specifically, Google incorrectly maintains that it could rebut Epic's prima facie showing of

---

[8] *Intellectual Ventures*, cited Google Br. 38, is distinguishable because there were no "material" differences in the antitrust counterclaims in both cases involving the same parties. *Intellectual Ventures I v. Cap. One Fin.*, 937 F.3d 1359, 1370, 1377 n.7 (Fed. Cir. 2019).

anticompetitive effects in the relevant market by demonstrating procompetitive benefits "outside of, but related to, the relevant product markets." *Id.*

Google concedes that out-of-market benefits cannot be considered under Section 7 of the Clayton Act's express prohibition of anticompetitive mergers "in any line of commerce." *Id.* at 48 (citing *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370 (1963) (*PNB*)). Google then asserts that, "[u]nlike the Clayton Act, "the Sherman Act contains no such restriction." *Id.* That is incorrect.

Section 2 prohibits monopolization of "*any part* of the trade or commerce among the several States." 15 U.S.C. § 2 (emphasis added). Thus, by its text, Section 2 bars monopolization of any relevant market. As the Supreme Court has held, the Section 2 language—"any part of the trade or commerce"—and the Section 7 language—"any line of commerce"—are equivalent: "We see no reason to differentiate between 'line' of commerce in the context of the Clayton Act and 'part' of commerce for purposes of the Sherman Act." *United States v. Grinnell Corp.*, 384 U.S. 563, 573 (1966).

31

Moreover, the Court identified two elements for monopolization, both referencing a relevant market: (1) "the possession of *monopoly power in the relevant market*" and (2) "the willful acquisition or maintenance of *that power* through exclusionary conduct." *Id.* at 570-71 (emphases added). Additionally, the Court distinguished exclusionary conduct from "growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 571. Purported benefits of the conduct outside the relevant market do not improve the superiority of a product or the business acumen with which it is sold. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 784-85, 809 (1946) (approving instructions that did not tell jurors they could consider out-of-market benefits).

While the text of Section 1 does not refer to a relevant market, *United States v. Topco Associates* laid down a general principal against considering out-of-market benefits in Section 1 cases. 405 U.S. 596 (1972). Citing *PNB*, *Topco* stated that competition "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote competition in a more important sector of the economy." *Id.* at 610. A decision "to sacrifice

32

competition in one portion of the economy for greater competition in another portion . . . must be made by Congress and not by private forces or the courts." *Id.* at 611.

Google incorrectly claims that more recent precedents entitle it to a jury instruction that out-of-market benefits may justify harm to competition in a relevant market. Google Br. 47-48. Consistent with *Topco*, in Sherman Act cases, both this Court and the Supreme Court have ordinarily considered only procompetitive benefits in the relevant market. While a few such cases have discussed proffered out-of-market benefits, they did not expressly endorse the cognizability of such benefits. *See, e.g.*, *Alston*, 594 U.S. at 87 (declining to consider whether a Section 1 defendant "may permissibly seek to justify its restraints in [one] market by pointing to procompetitive effects they produce in [another] market" because "the parties before us do not pursue this line"); *Paladin Assocs. v. Montana Power Co.*, 328 F.3d 1145, 1156 n.11 (9th Cir. 2003) (declining to reach the issue).

Allowing out-of-market benefits to override anticompetitive harm in a relevant market would undermine antitrust protections and is not "judicially administrable." *In re NCAA Grant-in-Aid Cap Antitrust Litig.*,

33

958 F.3d 1239, 1269 (9th Cir. 2020) (Smith, J., concurring); *cf. Deslandes v. McDonald's USA LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (Easterbrook, J.) ("One problem with this approach is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing). That's not right . . . ."); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1186 (D.C. Cir. 1978) (where harms and benefits are disparate, it can be "impossible to 'net them out' in the usual rule-of-reason balancing").[9]

Google overreaches in claiming that, "[f]or decades, the Supreme Court has 'considered cross-market rationales in Rule of Reason and monopolization cases.'" Google Br. 47 (quoting *Apple*, 67 F.4th at 989). *Apple* stated that "[t]he Supreme Court's precedent on this issue is not clear" and thus "decline[d] to decide the issue." 67 F.4th at 989. Nor do the other cases Google cites hold that, over plaintiffs' objection, out-of-market benefits are cognizable. *See NCAA v. Bd. of Regents of Univ. of*

---

[9] Google's argument (Br. 52) that balancing is inappropriate unless Epic proves a less restrictive alternative (LRA) is foreclosed by precedent, which Google admits, *id.*; *see also Impax Labs. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021) (if a plaintiff fails to establish a LRA, "the court must balance the anticompetitive and procompetitive effects of the restraint").

34

*Okla.*, 468 U.S. 85, 115-18 (1984) (rejecting two out-of-market justifications on other grounds); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889-92 (2007) (rejecting per se rule for resale price maintenance but not addressing scope of procompetitive benefits in rule-of-reason cases); *O'Bannon v. NCAA.*, 802 F.3d 1049, 1074-79 (9th Cir. 2015) (concluding challenged restraints violated Section 1 because an LRA achieved the same procompetitive effects); *Mozart Co. v. Mercedes-Benz of N. Am., Inc.,* 833 F.2d 1342, 1348-51 (9th Cir. 1987) (rejecting plaintiff's arguments that the justification was factually "without merit" and that an LRA existed).[10]  Indeed, at the stay stage, Google cited *Sullivan v. NFL*, 34 F.3d 1091 (1st Cir. 1994).  Mot. 14.  But *Sullivan* held only that the jury may consider out-of-market benefits to the extent they "ultimately have a beneficial impact on competition in the relevant market itself."  34 F.3d at 1113.

---

[10] In the district court, Google claimed that *Kodak* supported its proposed Section 2 instructions.  IV-ER-800.  But the proffered justifications in *Kodak*—maintaining the quality of its service; reducing inventory costs; and preventing free riding on investments—all self-evidently impacted competition *in the relevant markets* for service and parts.  *Kodak*, 504 U.S. at 482-86.  The Court did not address the specific issue of whether out-of-market benefits are cognizable, finding that factual disputes precluded summary judgment.  *Id.*

35

## CONCLUSION

The Court should reject Google's misstatements of law on antitrust remedies and liability.

Respectfully submitted,

/s/ Patrick M. Kuhlmann

ANISHA S. DASGUPTA
  *General Counsel*
HENRY LIU
  *Director*
SHAOUL SUSSMAN
  *Associate Director*
KELLY SIGNS
  *Assistant Director*
SYNDA MARK
  *Deputy Assistant Director*
MARK HEGEDUS
  *Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2115

January 7, 2025

DOHA MEKKI
  *Acting Assistant Attorney General*
JOHN W. ELIAS
  *Deputy Assistant Attorney General*
DAVID B. LAWRENCE
  *Policy Director*
SPENCER D. SMITH
  *Counsel*
DANIEL E. HAAR
NICKOLAI G. LEVIN
PATRICK M. KUHLMANN
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W. #3224
Washington, D.C. 20530-0001
(202) 305-4639
patrick.kuhlmann@usdoj.gov

36

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐  complies with the word limit of Cir. R. 32-1.

☐  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐  is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
      29-2(c)(2), or Cir. R. 29-2(c)(3).

☐  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
      only one)*:
      ☐ it is a joint brief submitted by separately represented parties.
      ☐ a party or parties are filing a single brief in response to multiple briefs.
      ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐  complies with the length limit designated by court order dated                          .

☐  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                                      **Date**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                      *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I, Patrick M. Kuhlmann, hereby certify that on January 7, 2025, I electronically filed the foregoing Brief of the United States of America and Federal Trade Commission as Amici Curiae in Support of Defendant-Appellee with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the ACMS electronic filing system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

January 7, 2025                     /s/ Patrick M. Kuhlmann
                                    *Attorney for the*
                                    *United States of America*