Nos. 24-6256, 24-6274

IN THE

# United States Court of Appeals
# for the Ninth Circuit

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, *et al*.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

**APPELLANTS' REPLY BRIEF**

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
Natalie Salmanowitz
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

January 17, 2025

*Counsel for Defendants-Appellants*

*(Additional Counsel Listed on Signature Page)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................3

   I.    The Liability Verdict Should Be Reversed ..................................3

       A.    Epic Is Precluded From Contradicting Preclusive
           Findings That Google And Apple Compete ...................................3

           1.    *Apple* Squarely Resolved That Google And
                Apple Compete For Transactions At Issue In
                This Case.................................................................4

           2.    Google's Preclusion Argument Is Fully
                Preserved.................................................................9

       B.    The District Court Erred By Refusing To Instruct The
           Jury On The Legal Requirements For Proving A
           Single-Brand Aftermarket............................................12

       C.    The District Court Improperly Instructed The Jury Not
           To Consider Google's Procompetitive Justifications
           In Related Markets ....................................................17

       D.    The District Court Erred By Holding A Jury Trial On
           Purely Equitable Claims...............................................22

   II.    The Injunction Should Be Vacated ........................................28

       A.    The Duty-To-Deal Remedies Are Legally
           Impermissible And Unsupported By The Record.........................28

           1.    The District Court Legally Erred By Forcing
                 Google To Create New Services For Its
                 Competitors............................................................28

## TABLE OF CONTENTS—Continued

Page

2. The District Court Failed To Find The Causal Connection Required To Impose A Duty-To-Deal Remedy ................................................32

3. The District Court's Price Regulation Is Error ...................36

4. The Duty-To-Deal Remedies Are Impermissibly Vague ........................................................37

B. The District Court Failed To Make Sufficient Findings Under Rule 65(d) ...........................................38

C. Epic Failed To Prove Standing To Seek The Relief It Obtained .......................................................43

CONCLUSION ...............................................................46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
836 F.3d 1171 (9th Cir. 2016) ....................................................................29, 30

*Besser Mfg. Co. v. United States,*
343 U.S. 444 (1952).................................................................................38

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962)................................................................................1

*California Scents v. Surco Prods., Inc.,*
406 F.3d 1102 (9th Cir. 2005) ..................................................................23

*De Saracho v. Custom Food Mach., Inc.,*
206 F.3d 874 (9th Cir. 2000) ....................................................................10

*Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.,*
890 F.2d 165 (9th Cir. 1989) ....................................................................23

*Dunmore v. United States,*
358 F.3d 1107 (9th Cir. 2004) ..................................................................26, 27

*Duran v. California Dep't of Forestry & Fire Prot.,*
No. 23-16155, 2024 WL 3565266 (9th Cir. July 29, 2024) ...............................44

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992)................................................................................13

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)................................................................................32

*EEOC v. BNSF Ry. Co.,*
902 F.3d 916 (9th Cir. 2018) ....................................................................38

*Epic Games, Inc. v. Apple Inc.,*
559 F. Supp. 3d 898 (N.D. Cal. 2021)......................................................*passim*

# TABLE OF AUTHORITIES—Continued

Page(s)

*Epic Games, Inc. v. Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023) ..................................................................*passim*

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972)............................................................................30

*FTC v. Enforma Nat. Prods., Inc.*,
  362 F.3d 1204 (9th Cir. 2004) ..........................................................38

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .............................................................18

*Gill v. Whitford*,
  585 U.S. 48 (2018)...............................................................................43

*Gonzales v. CarMax Auto Superstores, LLC*,
  840 F.3d 644 (9th Cir. 2016) .............................................................11

*Goodgame v. Am. Cast Iron Pipe Co.*,
  75 F.3d 1516 (11th Cir. 1996) ...........................................................23

*Hajro v. U.S. Citizenship & Immigr. Servs.*,
  811 F.3d 1086 (9th Cir. 2016) ...........................................................43

*Hildebrand v. Bd. of Trs. of Mich. State Univ.*,
  607 F.2d 705 (6th Cir. 1979) .............................................................25

*Howard v. City of Coos Bay*,
  871 F.3d 1032 (9th Cir. 2017) .............................................................7

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .....................................................30, 36

*In re Enewally*,
  368 F.3d 1165 (9th Cir. 2004) .............................................................8

*In re Westgate-California Corp.*,
  642 F.2d 1174 (9th Cir. 1981) .............................................................8

iv

# TABLE OF AUTHORITIES—Continued

Page(s)

*James v. Williams*,
  297 F.3d 930 (9th Cir. 2002) ...................................................15

*Lambrix v. Tesla, Inc.*,
  __ F. Supp. 3d __, 2024 WL 3403777 (N.D. Cal. 2024) ....................................13

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*,
  762 F.3d 867 (9th Cir. 2014) ...................................................42

*Love v. Villacana*,
  73 F.4th 751 (9th Cir. 2023) ...................................................4

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)...................................................44

*MetroNet Servs. Corp. v. Qwest Corp.*,
  383 F.3d 1124 (9th Cir. 2004) ...................................................28, 29

*Murthy v. Missouri*,
  603 U.S. 43 (2024)...................................................40, 43

*NCAA v. Alston*,
  594 U.S. 69 (2021)...................................................21, 29

*Newcal Indus., Inc. v. Ikon Office Sol'n*,
  513 F.3d 1038 (9th Cir. 2008) ...................................................13, 14, 15

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ...................................................32

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)...................................................3

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) ...................................................30, 32

*Pradier v. Elespuru*,
  641 F.2d 808 (9th Cir. 1981) ...................................................25

# TABLE OF AUTHORITIES—Continued

Page(s)

*Renee v. Duncan*,
    686 F.3d 1002 (9th Cir. 2012) ............................................................43

*Russian River Watershed Prot. Comm. v. City of Santa Rosa*,
    142 F.3d 1136 (9th Cir. 1998) ............................................................21

*SEC v. Stein*,
    906 F.3d 823 (9th Cir. 2018) ...............................................................4

*Sellers v. Nationwide Mut. Fire Ins. Co.*,
    968 F.3d 1267 (11th Cir. 2020) ..........................................................11

*Shaw v. Hahn*,
    56 F.3d 1128 (9th Cir. 1995) ..............................................................11

*Sidibe v. Sutter Health*,
    103 F.4th 675 (9th Cir. 2024) ..............................................15, 16, 18

*Skillsky v. Lucky Stores, Inc.*,
    893 F.2d 1088 (9th Cir. 1990) ...........................................................11

*Staley v. Gilead Sciences, Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ..................................................4

*Standard Oil Co. of Cal. v. Arizona*,
    738 F.2d 1021 (9th Cir. 1984) ...........................................................22

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) .............................................................................43

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. 318 (2015) ...........................................................................22

*Tomlinson Black North Idaho v. Kirk-Hughes*,
    361 F. App'x 712 (9th Cir. 2009) .......................................................26

*United States v. Glaxo Grp. Ltd.*,
    410 U.S. 52 (1973) .............................................................................30

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .................................................................21

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) (en banc) ..............................24

*United States v. Lewis*,
    67 F.3d 225 (9th Cir. 1995) ............................................18, 19

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ..........................32, 38

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972) .................................................................20

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) ....................................................4

*U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*,
    89 F.4th 1126 (9th Cir. 2023) ................................................35

*Verizon Commc'ns Inc v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .......................................................*passim*

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969) .................................................................36

**RULES:**

Fed. R. Civ. P. 50 .........................................................................11

Fed. R. Civ. P. 56(a) ....................................................................11

Fed. R. Civ. P. 65(d)(1) ...............................................................37

**OTHER AUTHORITIES:**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 653a (2024
    update) ...................................................................................40

*iPhone*, Best Buy, *available at* https://perma.cc/5UFD-GHZB ............................13

# TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

*iPhone*, Target, *available at* https://perma.cc/5YHX-HNTP ................................13

1B J. Moore, Federal Practice ¶ 0.443(5) (2d ed. 1974)..............................8

18 Moore's Federal Practice – Civil § 132.03[4][b][ii] (2024) ................................8

*Shop Apple smartphones*, Verizon, *available at* https://perma.cc/S297-Y89X................................................................................................13

Gregory J. Werden, *Four Suggestions on Market Delineation*,
37 Antitrust Bull. 107 (1992)................................................5

10A Charles Alan Wright & Arthur R. Miller, Federal Practice and
Procedure: Civil § 2713.1 (4th ed. 2024 update)................................11

## INTRODUCTION

This case is governed by the foundational principle that antitrust law exists for "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Epic prevailed on the merits only by ensuring that Google's fierce competition with Apple was excluded from the analysis, and now asks this Court to sanction an injunction requiring handouts to Google's rivals and hamstringing Google's ability to compete with Apple. Ultimately, it is consumers who lose out, as the injunction exposes users to "staggering" security risks, Computer Security Experts Br., Dkt. 49.3, at 12; "disregards" the "autonomy of app developers," ACT Br., Dkt. 54.1, at 17; and harms competition by encouraging "other app-stores to free-ride" on Google "rather than compete," Chamber of Commerce Br., Dkt. 58.1, at 19.

Epic's liability arguments ask this Court to blind itself to the intense competition between Google and Apple. To prevail, Epic must convince this Court to ignore the preclusive effect of Epic's companion litigation against Apple; disregard the legal framework this Court applied in that parallel suit; and overlook the wealth of evidence demonstrating that the challenged conduct promotes competition between Google and Apple. Epic claims (at 27) these issues are "technical and procedural," but that could not be further from the truth. These errors are fundamental, because they determine whether Google's conduct stifles

1

competition or promotes it. As the District Court recognized, whether Google's conduct is "of concern to the antitrust laws—or might even be viewed as procompetitive" depends on Google's market power. 1-ER-15 (quotation marks omitted). Critically, Epic *never disputes* that it cannot prevail if the relevant markets include Apple, because it could not show that Google had sufficient market power for its conduct to be anticompetitive.

Beyond the flawed finding of liability, the injunction here is unprecedented. Neither Epic nor its amici have cited *a single case*—ever—in which a party has been ordered to create new services for its rivals as an antitrust remedy, which is unsurprising because the Supreme Court and this Court have repeatedly disapproved such a remedy. Epic likewise fails to identify any precedent in which a lawsuit by a lone competitor led to market-wide relief affecting millions of non-parties. Epic's reliance on the District Court's remedial discretion cannot overcome these substantive errors.

Epic tries to plug the critical gaps in the District Court's analysis with handwaving references to the jury's verdict. But the jury never addressed vital issues the parties hotly disputed during the remedies phase—and Epic's arguments only underscore the District Court's error in trying claims for injunctive relief to a jury.

The District Court's multiplicity of errors should not be allowed to obscure the bottom line: If this Court affirms, Google's "less restrictive policies" will face

far greater "judicially imposed hurdles to competition" than those of "its more restrictive rival," Apple. Antitrust Law Professors Br., Dkt. 57.2, at 29. This Court should reject Epic's attempt to substitute judicial central planning for fierce competition.

## ARGUMENT

## I. The Liability Verdict Should Be Reversed.

### A. Epic Is Precluded From Contradicting Preclusive Findings That Google And Apple Compete.

Under bedrock preclusion principles, Epic should not have been permitted to relitigate an issue it already lost. *See* Opening Br. 27, 39-40. Epic's divide-and-conquer strategy for dealing with the intense competition between Google and Apple failed when, after a full trial on the merits, the *Apple* district court found that Apple and Google were within the same "area of effective competition" for digital mobile gaming transactions, which this Court affirmed. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1016, 1024-26 (N.D. Cal. 2021) (*Apple I*) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)), *aff'd* 67 F.4th 946, 980-981 (9th Cir. 2023) (*Apple II*). This case involves the same digital gaming transactions, during the same period of time, and, as Epic does not contest, those gaming transactions constitute a large majority of the markets the jury found here. *See* Opening Br. 32-33 (collecting evidence from both cases). That resolves this case: "[C]ompetition is reciprocal. If your service competes with mine, then my service competes with yours." Lambert

3

Br., Dkt. 57.2, at 7. Epic should have been precluded from contesting the competition found to exist in *Apple*, which Epic does not dispute would have been fatal to its antitrust claims.

### 1. *Apple* Squarely Resolved That Google And Apple Compete For Transactions At Issue In This Case.

Epic contends (at 37-40) the relevant "issue" is not identical, but its lengthy, abstract discussion fails to identify any material difference.[1] Epic's non-controlling authorities at most stand for the uncontroversial proposition that markets should be evaluated in light of the plaintiff's claims. *See, e.g.*, *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993) (affirming rejection of antitrust claims where plaintiff failed to prove relevant market); *Staley v. Gilead Sciences, Inc.*, 446 F. Supp. 3d 578, 616-617 (N.D. Cal. 2020) (finding one of two asserted markets inadequately pled).

That basic principle is no help to Epic here. Epic fails (at 39-40) to identify any difference between its claims in the two cases that would mean Apple competes with Google for mobile gaming transactions, but Google does not compete with Apple for those same transactions. On the contrary, Epic's attorney assured the

---

[1] Epic notes preclusion issues are sometimes reviewed for abuse of discretion but admits (at 36) whether issue preclusion was available is reviewed de novo. *See Love v. Villacana*, 73 F.4th 751, 754 (9th Cir. 2023). The District Court made a legal holding that issue preclusion was unavailable because the issue was not the same. 1-ER-30; *see SEC v. Stein*, 906 F.3d 823, 828-830 (9th Cir. 2018) (reviewing "same issue" requirement de novo).

4

*Apple* court that "Google Play" and the "App Store … engage in conduct that is *very similar* in restricting app distribution and in-app payments." *Apple I* Docket, Dkt. 760 at 4173:7-12 (emphasis added). Epic offers no justification for its change in position. And while Epic highlights (at 39) Apple's choice to engage in "vertical integration," Epic ignores that the *Apple* courts found this choice was part of Apple's competition against Google and other Android app stores including Samsung and Amazon. *See Apple I*, 559 F. Supp. 3d at 976-977, 1038-40; *Apple II*, 67 F.4th at 987-988.

To the extent Epic argues that a market must be defined solely by "the conduct" the plaintiff challenges, Epic Br. 37, none of Epic's cited sources set forth such a rule. If that were in fact the rule, the *Apple* court would have been required to define the relevant market as involving only Apple because Epic's complaint challenged only conduct by Apple. Instead, the *Apple* court evaluated "which *products* have a reasonable interchangeability of use or sufficient cross-elasticity of demand." *Apple II*, 67 F.4th at 975 (emphasis added and quotation marks omitted). Plaintiffs cannot use artful pleading to divorce the alleged conduct from real-world competition. Epic's position would eliminate the first step of most antitrust cases, which asks *what* the market is, before determining *who* "might exercise market power." Gregory J. Werden, *Four Suggestions on Market Delineation*, 37 Antitrust Bull. 107, 108 (1992).

5

The truism that successive cases may involve overlapping markets or submarkets also does not save Epic. The legal question in *Apple* was the same as the legal question here: whether Google and Apple are in the same "area of effective competition" for mobile digital gaming transactions. *Apple II*, 67 F.4th at 975 (quotation marks omitted); *see Apple I*, 559 F. Supp. 3d at 1016. The answer to that question cannot be "no" in one case and "yes" in the other.

Hypothetical markets for fast-food, fast-food burgers, and burgers bear no relationship to Epic's two cases. Epic Br. 41. If a plaintiff sued Taco Bell and McDonald's in separate courts claiming each monopolized real estate for fast food restaurants, and the first court found that Taco Bell competed against McDonald's for real estate, lacked monopoly power because of McDonald's, and engaged in conduct that promoted its competition against McDonald's, then the *same plaintiff* could not subsequently argue that McDonald's does not compete against Taco Bell for the same real estate. *Apple I* found—repeatedly—that Google and Apple are in the same area of effective competition for the same gaming transactions that are within—and the core of—Epic's asserted markets here. *See* Opening Br. 35-37; *accord* Lambert Br., Dkt. 57.2, at 11-12.

Epic also quibbles (at 40) about whether the evidence and arguments in this case were overlapping, noting only minor differences between the relevant markets proposed by Google and Apple. But Epic simply ignores that its *own* evidence and

argument about its proposed Apple-only and Android-only markets were highly similar in both cases, as detailed in Google's opening brief (at 34-36). *See also* Lambert Br., Dkt. 57.2, at 13. The "substantial overlap" in Epic's "evidence [and] argument" only confirms the identity of the issues in *Apple* and this case. *See Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017) (quotation marks omitted).[2]

Failing to apply issue preclusion fundamentally distorted the analysis of Epic's claims. That is because excluding the competition between Apple and Google results in "a false ascription of market power to Google Play." ICLE Br., Dkt. 51.1, at 2-3; *see Apple I*, 559 F. Supp. at 1030 (finding "Apple's market share in [a] mobile gaming transactions" market including Google and other Android stores is between "52% to 57%"); Chamber of Progress Br., Dkt. 58.2, at 26 (noting the App Store generated twice as much revenue as Google Play in 2024). Epic should not have been permitted to relitigate whether Google is Apple's chief rival for mobile gaming transactions.

Alternatively, Epic argues (at 42) that *Apple I*'s finding of competition between Google and Apple for mobile gaming transactions was unnecessary to the

---

[2] Epic notes (at 40) that Google did not invoke a local rule on related cases. But the Judicial Panel on Multidistrict Litigation ordered consolidated pretrial proceedings for Epic's case and other Play-related litigation, and there is no formalistic requirement that parties invoke a local rule to later argue that cases are "related" for preclusion purposes.

court's Rule of Reason analysis, and thus to the outcome of *Apple I*. This new argument on appeal is both forfeited and wrong. 4-ER-876-877; FER-5-8; *In re Enewally*, 368 F.3d 1165, 1173 (9th Cir. 2004) (discussing forfeiture). *Apple I*'s Rule of Reason analysis addressed whether Apple's conduct was procompetitive in light of Apple's competition with Google and other mobile gaming transaction providers. *See, e.g.*, 559 F. Supp. 3d at 1038 (explaining Apple's "app distribution restrictions promote interbrand competition" because they "differentiate[] Apple from Google"); *id.* at 1044 (rejecting monopolization claims on that basis). Epic's monopolization claim also failed due to Apple's lack of "monopoly power" in a market including Google. *Id.* at 1043-44. Epic does not dispute this finding depended on the competition between Apple and Google. So long as *either* alternative ground relies on the finding that Apple and Google compete, preclusion is triggered—and here *both* do. *See In re Westgate-California Corp.*, 642 F.2d 1174, 1176-77 (9th Cir. 1981) (existence of alternative holdings does not defeat preclusion, citing 1B J. Moore, Federal Practice ¶ 0.443(5) (2d ed. 1974)); *accord* 18 Moore's Federal Practice – Civil § 132.03[4][b][ii] (2024).

Epic is likewise wrong that the competition between Apple and Google was not at issue in *Apple II*. Epic argued "that the district court erred in rejecting its single-brand markets in which Apple would have a 100% market share," and this Court "reject[ed]" that argument. *Apple II*, 67 F.4th at 999. In so doing, this Court

necessarily affirmed *Apple I*'s finding that the App Store faced competition from *other* brands, including Google, for digital mobile gaming transactions. *Id.* at 981 (district court's "middle-ground market of mobile-games transaction thus stands on appeal"). That holding was unquestionably essential to this Court's judgment against Epic on its single-brand-iOS-market-based antitrust claim. *See id.* at 973. Nor was this Court's Rule of Reason analysis independent of market definition; it used the digital mobile gaming transaction market to "assess whether Apple's conduct is unlawful pursuant to the Sherman Act." *Id.* at 981; *see id.* at 984-985 (comparing Apple App Store's and Google Play store's commission rates); *id.* at 987-989 (crediting Apple's security and privacy rationales as procompetitive measures that distinguish Apple from its "open-platform competitors" in the relevant market).

### 2. Google's Preclusion Argument Is Fully Preserved.

Google preserved its preclusion argument. *Contra* Epic Br. 31-35. It expressly raised preclusion based on *Apple I* in its answer to Epic's complaint. After the Court denied Google's motion seeking to limit Epic's evidentiary presentation at trial based on preclusion, Google raised the issue again in its post-trial motion for judgment as a matter of law or a new trial. The District Court rejected Google's argument on the merits, finding preclusion inapplicable. This post-trial ruling is the one Google appeals, and its appeal is fully preserved.

Epic's admission (at 33) that Google expressly raised preclusion based on *Apple I* in its answer to Epic's complaint belies its claim of "unfair surprise." The answer said that Epic "is collaterally estopped based on the Rule 52 Order After Trial on the Merits in *Epic v. Apple* (N.D. Cal. Case No. 4:20-cv-05640-YGR), Dkt. 812." 4-SER-639 (Dec. 1, 2022); *accord* FER-87 (same in October 2021 answer to earlier version of complaint).

Nor did Google forfeit its preclusion argument by raising it in a motion in limine rather than its summary judgment motion. *Contra* Epic Br. 31-32.[3] Google's chosen *pre-trial* vehicle for seeking a pre-trial ruling limiting Epic's trial presentation is not at issue: Google appropriately raised preclusion in its *post-trial* motion seeking post-trial relief. *See* 1-ER-29-31. That is the relevant decision under review, and the District Court rightly did not deny Google's post-trial preclusion argument as untimely. *See De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 877-878 (9th Cir. 2000) (this Court generally reviews post-trial dispositive motions, rather than a "district court's denial of [a] motion in limine").

Moreover, Epic cites no precedent that declining to move for summary judgment on an issue waives a party's right to raise it post-trial. For good reason:

---

[3] Google moved for summary judgment before this Court affirmed *Apple I*'s finding that Apple and Google compete for digital mobile gaming transactions. *Apple II*, 67 F.4th 946 (opinion filed April 24, 2023); 8-ER-1970 (summary judgment motion filed April 20, 2023).

Rule 56 is a permissive, not mandatory, mechanism for obtaining judgment before trial. *See* Fed. R. Civ. P. 56(a); *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 654-655 (9th Cir. 2016). Rule 50 is the mechanism for obtaining judgment as a matter of law after trial. Fed. R. Civ. P. 50; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2713.1 (4th ed. 2024 update).[4] At any rate, Google's choice of pre-trial motion for raising preclusion could not possibly have prejudiced Epic, as the District Court heard and decided the motions in limine and the summary judgment motions on the same day. *See* FER-9-75.

Epic also hints that Google somehow forfeited its preclusion argument by proposing a market definition broader than the one in *Apple*. Epic Br. 33-34. But Google was not party to *Apple I*, and thus not subject to preclusion. *See Shaw v. Hahn*, 56 F.3d 1128, 1131 (9th Cir. 1995). Google was entitled to press a broader relevant market, even as it argued that *Apple* constrained Epic from pursuing a do-over.

---

[4] In any event, the District Court's given reason for denying Google's motion in limine—that Google was really seeking summary judgment—is inconsistent with the relief Google requested: that Epic be precluded from introducing "evidence or argument" contrary to the preclusive findings in *Apple*. 4-ER-873; *see, e.g.*, *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1096 (9th Cir. 1990) (affirming preclusion argument raised via motion in limine); *Sellers v. Nationwide Mut. Fire Ins. Co.*, 968 F.3d 1267, 1275-76 (11th Cir. 2020) (reversing denial of motion in limine raising preclusion). At the time Google moved for summary judgment, it did not know whether Epic would argue it could prevail *even if* preclusion applied, so Google did not know whether summary judgment would have been available.

**B.**    **The District Court Erred By Refusing To Instruct The Jury On The Legal Requirements For Proving A Single-Brand Aftermarket.**

Epic asserted single-brand aftermarkets for Android app distribution and Android in-app purchases, and the District Court erred by failing to instruct the jury on the requirements for proving such a market.  This Court has repeatedly held that contractual restrictions in such an aftermarket "are generally not a cognizable source of market power."  *Apple II*, 67 F.4th at 977 (quotation marks omitted).  Epic does not dispute that a party asserting a single-brand aftermarket must prove, among other things, that "the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase."  *Id.* (quotation marks omitted).  Nor does Epic defend the District Court's ruling that a party is *not* required to make that showing as long as the party does not utter the magic words "single-brand aftermarket" at trial.  *See* Epic Br. 45-52.  The District Court simply got this wrong.[5] Because in substance Epic's proposed relevant markets are single-brand aftermarkets, Epic was required to meet the governing legal requirements for such a market—just as this Court said Epic was required to do in its litigation against Apple. *Apple II*, 67 F.4th at 976-977.

---

[5] Although DOJ takes issue with other arguments Google raises, it does not defend the District Court on this issue or on the refusal to hold a bench trial.

Epic disputes that its proposed markets are single-brand aftermarkets by arguing (at 48-49) that multiple retailers sell Android phones, and single-brand aftermarkets exist only where the defendant is the *sole* retailer of the foremarket product. But Epic does not cite any precedent supporting its position. It contradicts *Apple II*, which found a single-brand aftermarket even though multiple retailers sell Apple devices. *See* 67 F.4th at 976-977.[6] And it is contrary to first principles of antitrust law.

*Newcal* and *Kodak* rest on the theory that competition in a foremarket presumptively disciplines the defendant's conduct in the aftermarket, where the aftermarket includes only a single brand. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477 n.24 (1992); *Newcal Indus., Inc. v. Ikon Office Sol'n*, 513 F.3d 1038, 1050 (9th Cir. 2008). To overcome that presumption, a plaintiff must make specific evidentiary showings about consumer knowledge and behavior. These showings address reasons why competition in the foremarket might not discipline the aftermarket—not whether the defendant is the sole foremarket retailer. *See Newcal*, 513 F.3d at 1049-50 (analyzing foremarket-aftermarket relationship); *Lambrix v. Tesla, Inc.*, __ F. Supp. 3d __, 2024 WL 3403777, at *7 (N.D. Cal. 2024)

---

[6] Consumers can purchase iPhones at retailers including Target, Verizon, and BestBuy. *iPhone*, Target, *available at* https://perma.cc/5YHX-HNTP; *Shop Apple smartphones*, Verizon, *available at* https://perma.cc/S297-Y89X; *iPhone*, Best Buy, *available at* https://perma.cc/5UFD-GHZB.

("The Ninth Circuit, in *Newcal* and *Epic Games*" analyzed "whether competition in the foremarket would be able to 'discipline' a defendant's conduct in the aftermarket.").

Epic turns this core principle on its head by arguing that *more* competition in the foremarket—which in this case, means additional companies selling Android devices—means the single-brand aftermarket test does not apply. Epic Br. 48. But as a matter of common sense, *more competition* in the foremarket means a *greater disciplining* effect on the aftermarket. That is presumably why Epic cannot cite any case adopting its completely novel position that a defendant must be the sole retailer for the single-brand aftermarket test to apply. To the extent Epic is arguing that Android is not a "brand," that is just as wrong: Android is a single-brand operating system, just like iOS in *Apple II*. *See* 67 F.4th at 966-967; 5-ER-1049-52; 5-SER-859.

Epic also contends that the requirements for a single-brand aftermarket are not met here, because "[c]onsumers cannot be presumed to knowingly accept" Google's policies regarding app distribution and in-app purchases when they purchase Android devices. Epic Br. 49. But antitrust law starts from the presumption that participants in the competitive foremarket *are* informed. It was up to *Epic* to rebut that presumption with evidence of consumers' unawareness. *Apple II*, 67 F.4th at 979; *Newcal*, 513 F.3d at 1050. By refusing to give an instruction on

14

the requirements for single-brand aftermarkets, the District Court refused to hold Epic to this burden.

Epic claims (at 44-47) that the District Court was permitted to refuse Google's proposed single-brand aftermarket instruction because it was unsupported by evidence. But the only foundation needed to apply a single-brand aftermarket framework is to show that a plaintiff's asserted market is limited "to a single brand of the product" and that "demand for [that product] is entirely dependent on the prior purchase of a durable good in a foremarket." *Apple II*, 67 F.4th at 976 (emphasis omitted); *see also Newcal*, 513 F.3d at 1048. Epic's asserted markets—*Android* app distribution and *Android* in-app billing—satisfy this requirement on their face. 6-ER-1423; 6-ER-1425. And Epic itself presented evidence and argument showing that its proposed markets were derivative of a device with the Google-branded Android operating system. 5-ER-1049-52; 5-SER-859; 6-SER-1023-24; 6-ER-1460; FER-102-104; *see also Apple II*, 67 F.4th at 976. Given this undisputed evidence, the District Court committed legal error by declining to instruct the jury on the applicable legal framework. *See James v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).

Epic's cursory lack-of-prejudice argument does not come close to demonstrating that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Sidibe v. Sutter Health*, 103 F.4th

675, 688 (9th Cir. 2024) (quotation marks omitted). Epic claims (at 51-52) the record shows that Google's aftermarket restrictions are not "generally known" because "users are not told of … agreements like the MADA, RSA 3.0, or Project Hug" and "users are not even aware of what a payment processor is." But single-brand aftermarkets do not require consumers to know about specific legal agreements; the question is whether consumers are aware of the restrictions on their aftermarket choices based on their foremarket choice. In *Apple II*, for example, the consumer-knowledge requirement did not ask whether consumers knew that Apple required iOS developers to adhere to Apple's Developer Program Licensing Agreement or use Apple's payment processor, but whether consumers knew—more broadly—"of Apple's app-distribution and [in-app purchase] restrictions." 67 F.4th at 979.

At trial, Epic did not argue it satisfied the consumer-knowledge element of a single-brand aftermarket; instead Epic's counsel insisted it *did not need* to show that consumers lacked awareness of aftermarket restrictions for Android devices at all. FER-98-99. Epic presumably did not attempt to make this showing because it cannot: Consumers are well aware that when they purchase an Android device, they are opting into the Android ecosystem, and will not, for example, be able to use the Apple App Store.

16

Epic points (at 52) to a single exchange between Epic's counsel and a Google employee about a developer's interest in allowing a user to "choose his or her preferred payment processor[]." 5-SER-937. That the Google employee said she "d[id]n't know" whether "users know what a payment processor is" does not remotely establish the consumer-knowledge requirement. *Id.*; *see, e.g.*, *Apple I*, 559 F. Supp. 3d at 958 ("Without a consumer survey, there is no evidence that consumers are *un*aware of [Apple's] walled garden before purchasing the smartphone."). Moreover, this fleeting comment involves only one aftermarket restriction at issue, and at *most* establishes that this was an issue for the factfinder to resolve applying the correct legal framework.

### C. The District Court Improperly Instructed The Jury Not To Consider Google's Procompetitive Justifications In Related Markets.

At Step 2 of the Rule of Reason, the District Court impermissibly limited the jury's consideration of Google's procompetitive justifications solely to the product markets the jury found. 6-ER-1435; 6-ER-1439-40. Under Supreme Court and Ninth Circuit precedent, Google was entitled to offer—and the jury was entitled to consider—those justifications in related product markets. Opening Br. 47-51. But the District Court twice rejected Google's request to remedy the jury instructions on this issue. 4-ER-831; 1-ER-103. Epic's arguments do not salvage this error.

17

1. Epic says (at 52) the error limited only the jury's consideration of cross-market justifications for Epic's "monopolization claim" under Section 2, "not its restraint of trade claim" under Section 1. But the District Court articulated the *same* Rule of Reason framework for both claims. 6-ER-1435 (monopolization claim); 6-ER-1439-40, 6-ER-1444 (restraint-of-trade claim); *see FTC v. Qualcomm Inc*., 969 F.3d 974, 991 (9th Cir. 2020) (explaining Rule of Reason analysis is "essentially the same" for the two claims). As Epic admits (at 52), the restraint-of-trade instructions did not clarify that the jury could consider procompetitive rationales in related markets. 6-ER-1439-40. On the contrary, summarizing the restraint-of-trade Rule of Reason analysis, the court included the same language that appears in the Section 2 instruction directing the jury to consider whether "a challenged restraint resulted in competitive benefits *in a relevant market*." 6-ER-1444 (emphasis added). There is thus no basis to assume the jury understood that it could treat the restraint-of-trade justifications differently. 6-ER-1435-40.

At most, Epic's argument means the instructions were contradictory—confirming the District Court erred. Where there is legal error in the jury instructions, this Court "presume[s] prejudice," and the opposing party must show that it is "more probable than not that the jury would have reached the same verdict had it been properly instructed." *Sidibe*, 103 F.4th at 687 (quotation marks omitted). Because Epic cannot meet that burden, a new trial is required. *See United States v.*

*Lewis*, 67 F.3d 225, 234 (9th Cir. 1995) (ordering a new trial based on conflicting jury instructions).

Epic argues (at 53) Google failed to preserve a challenge to the instruction on the restraint-of-trade claim. Google's objection during the charge conference, however, focused on the wording of the monopolization instruction because that is where the affirmative misstatement of the law first occurred. 1-ER-108-113. The District Court's response to that objection made clear it believed that the limitation was *correct* as a matter of law—meaning that merely repeating the challenge was unnecessary—and the court directed Google to "move on." 1-ER-103. Google also objected to Epic's effort to include an instruction telling the jury even more clearly that it could not consider procompetitive benefits in related markets. 4-ER-837-838. All this more than preserves the issue—particularly given that the District Court repeatedly cut Google's efforts to preserve objections, insisting Google was "not going to waive anything." 1-ER-115.

2. Epic contends (at 53-55) any error is "harmless" because the District Court did not restrict Google's evidence of cross-market justifications, which Epic speculates means the jury "considered—and rejected as insufficient—the full range of justifications that Google offered." Not so.

As Epic recognizes (at 54), throughout trial, one of Google's "primary defense[s]" was that its conduct enhanced competition with Apple. The centrality

19

of this argument to Google's case amplifies the prejudice caused by the District Court's error in instructing the jury not to consider this evidence. Moreover, by acknowledging this evidence was critical to Google's case, Epic undercuts its contradictory claim (at 57) that Google "failed to lay an evidentiary foundation" for the procompetitive justifications it offered. Epic's suggestion (at 58) that the jury agreed Google's conduct made Android "less desirable" is unsupported by the verdict; the jury was not instructed to specify the anticompetitive effects it found. *See* Opening Br. 67; *infra* pp. 34-35. And faulting Google for not defining a market "in which procompetitive benefits supposedly could arise," as Epic does (at 58-59), is all form over substance; no case holds that a formal market-definition exercise must precede consideration of procompetitive justifications, and Google consistently explained that "competition between [Android and iPhones] has also been a competition between … the Apple App store and the Google Play store." 6-ER-1480 (Google's closing arguments); Opening Br. 9-10, 17-20 (collecting additional examples).

3. Epic briefly contends that the District Court's instructions were correct on the merits, but the cases it cites do not support its position. *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), Epic's leading authority, involved a *per se* violation of Section 1 where "the rule of reason … [wa]s irrelevant." *Id.* at 608-609.

20

*Topco* thus does not bear on the question whether cross-market justifications may be considered as part of the Rule of Reason analysis.

The Rule of Reason examines whether conduct that might look anticompetitive—for example, "vertical restrictions like those challenged by Epic [] including anti-steering provisions"—serves "legitimate aims." ICLE Br., Dkt. 51.1, at 13; *see also* Werden Br., Dkt. 47.1, at 14 (same regarding tying arrangements). That is why Rule of Reason cases in the Supreme Court and this Court have consistently taken into account cross-market justifications. *See* Opening Br. 47-48 (collecting cases). Epic claims (at 55) that because courts do not consider cross-market justifications in the merger context, they should not consider such justifications in monopolization cases. But, as *Apple II* explained, the Supreme Court and Ninth Circuit have regularly considered such procompetitive benefits in related markets in monopolization cases under the Sherman Act, and the District Court erred by refusing to instruct the jury on that issue. 67 F.4th at 989 (collecting cases); *see also* Opening Br. 47-52 (same).[7]

---

[7] Two *amici* contend the text of Section 2 prohibits considering cross-market benefits. DOJ and FTC Br., Dkt. 151.1, at 31 ("DOJ Br."); Law & Economics Professors Br., Dkt. 152.1, at 11-12. Epic did not make that argument below or here, so it is not properly before the Court. *See Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998). *Amici*'s argument is also wrong. *United States v. Grinnell Corp.* did not address procompetitive justifications, 384 U.S. 563, 573 (1966), and the Supreme Court has recently indicated that the question remains open, *NCAA v. Alston*, 594 U.S. 69, 87 (2021).

### D. The District Court Erred By Holding A Jury Trial On Purely Equitable Claims.

"[J]udges, not juries, determine equitable claims, such as requests for injunctions," *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015), except where the Constitution, a federal statute, or Rule 39(c) requires or permits a jury trial. *See Standard Oil Co. of Cal. v. Arizona*, 738 F.2d 1021, 1022 n.1, 1053 (9th Cir. 1984). But none of those exceptions applies here. *See* Opening Br. 52-53. Epic's attempts to resist this straightforward conclusion are all meritless.

1. Google did not expressly or impliedly consent to a jury trial on Epic's standalone claims for injunctive relief. *Id.* at 53-54. Google only ever consented to a jury trial when *other* plaintiffs' right to a jury trial effectively forced a jury trial on *Epic's* antitrust claims. *Id.* That is why neither the District Court, nor Epic on appeal, have identified a single instance where Google agreed to a jury trial on standalone equitable claims. Epic Br. 61-62; 1-ER-149-150.

Epic also mischaracterizes Google's initial consent to a jury trial on the collective claims of the MDL plaintiffs, all of whom except Epic had a *right* to a jury trial. Epic fixates (at 62) on whether the MDL plaintiffs' cases were formally

---

Nor do *amici*'s cases concern a situation (like this one) of highly complementary markets. Strikingly, DOJ ignores its prior position that procompetitive justifications in "closely related and interdependent market[s]" can "serve valid procompetitive purposes." U.S. Br. at 50-52, *Ohio v. Am. Express Co.*, No. 16-1454 (U.S. Dec. 2017).

consolidated, but this ignores the real effect of the MDL on Google's consent. When legal and equitable claims share common issues, those issues must be tried to a jury first, and preclusion applies to the result. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 170 (9th Cir. 1989). The District Court *repeatedly* made clear it would only hold one trial on all MDL plaintiffs' antitrust claims. *See, e.g.*, FER-77-78 ("I can't have two separate trials on the same antitrust claims"); FER-81 ("[W]e will try the jury cases first for all issues common to the legal and equitable claims"); *accord* FER-89. It is pure fancy to suggest that Google had a meaningful option to "segregate Epic's claims for a bench proceeding." Epic Br. 63.

Google promptly noted the limits of its initial consent when the possibility of a single trial on Epic's standalone claims became apparent. 4-ER-862-863. As even Epic acknowledges (at 64), Google stated that the "parties may need to revisit the question of which claims and defenses will be tried to a jury" if everyone else settled. 4-SER-505.

Epic asks (at 61) this Court to review whether Google consented to a jury trial on Epic's standalone injunctive claims only for abuse of discretion. But whether Rule 39(c) authorized a jury trial in this case is a legal issue, reviewed de novo. *Goodgame v. Am. Cast Iron Pipe Co.*, 75 F.3d 1516, 1520 (11th Cir. 1996); *accord California Scents v. Surco Prods., Inc.*, 406 F.3d 1102, 1105 (9th Cir. 2005) (reviewing de novo district court's interpretation of Federal Rules of Civil

Procedure). Even assuming the District Court had some discretion to determine whether Google consented to a jury trial on Epic's standalone claims, the court abused it. A court abuses its discretion when its factual findings are "without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

2. Even if Google had consented, it was entitled to withdraw that consent given that Epic articulated no prejudice from having a judge serve as factfinder rather than a jury. Opening Br. 55-56. In defending the District Court's ruling that Google could not withdraw consent, Epic merely repeats the District Court's errors. Epic argues that withdrawal was inappropriate because of the "timing of the withdrawal" and because Epic and the court had spent time preparing for a jury trial. Epic Br. 64. But Google cited (at 55-56) precedent establishing that a district court cannot deny a party's withdrawal of consent to a jury trial based only on timing, and if it were correct that time spent preparing for a jury trial were sufficient to preclude the withdrawal of consent, that would mean a party could never withdraw consent to a jury trial in the leadup to trial. Neither Epic nor the District Court have any support for this hardline position, and other courts have rejected it. Opening Br. 56-57; *see also* Vladeck Br., Dkt. 60.2, at 18-21.

Epic's invocation (at 65) of cases addressing the opposite situation—when converting from a jury trial to a bench trial could be prejudicial—misses the mark:

24

Epic bore the burden of showing how permitting Google to withdraw any consent to a jury trial would be prejudicial to Epic. Opening Br. 55-56; *see also* Vladeck Br., Dkt. 60.2, at 21-23 (explaining that a need to "shift strategy is not itself a reason to forbid withdrawal of consent").[8] Relying on rhetoric over substance, Epic contends that a bench trial would have required "rework[ing] its evidentiary presentations, just a few days before trial." Epic Br. 65. But Epic offers no explanation for why those changes were needed, what those changes would have been, or how making them would have harmed Epic.

Epic's backup position—that withdrawal would have required the District Court to schedule two trials instead of one—is also incorrect. It is based on Epic having a right to a jury trial on its illegality defense to Google's breach of contract counterclaim. *See id.* at 65-66. But as the District Court correctly concluded, that affirmative defense had to be tried to the bench. 6-ER-1340-41.[9]

---

[8] It is Epic's cases that are "doubly distinguishable," Epic Br. 66 n.13, as they discuss prejudice resulting from not knowing *before trial* who will determine liability. *Pradier v. Elespuru*, 641 F.2d 808, 811 (9th Cir. 1981) ("parties are entitled to know at the outset of the trial whether the decision will be made by the judge or the jury"); *Hildebrand v. Bd. of Trs. of Mich. State Univ.*, 607 F.2d 705, 710 (6th Cir. 1979) ("In this case, however, the district court let the case be tried before a jury and then withdrew it from them.").

[9] The District Court's conclusion that Epic's affirmative defense had to be tried to the bench similarly dooms Epic's argument (at 67) that the Court may affirm on the alternative ground that the Seventh Amendment entitled Epic to a jury trial.

3.   Epic is mistaken that the novelty of the District Court's error means this Court should not vacate the District Court's decision.  Epic faults Google for not identifying "precedent vacating a judgment because a district court conducted a jury trial rather than a bench trial."  Epic Br. 60.  But that just highlights how unprecedented the District Court's decision is, because Epic does not identify a single case *affirming* a decision to hold a jury trial on equitable claims over a party's express, pretrial objection.  *See id.* at 60-67.  Epic's reliance on *Tomlinson Black North Idaho v. Kirk-Hughes*, 361 F. App'x 712 (9th Cir. 2009), is misguided: There, the defendant's "last-minute" withdrawal of consent occurred at the charge conference, not pre-trial.  Appellee Br. 28-31, *Tomlinson Black North Idaho v. Kirk-Hughes*, No. 08-35900 (9th Cir.).

Epic mischaracterizes Google's reliance on *Dunmore v. United States*, 358 F.3d 1107 (9th Cir. 2004).  Google did not, as Epic argues (at 60), "claim[]" that *Dunmore* "vacat[ed] a judgment because a district court conducted a jury trial rather than a bench trial."  Google maintained that "*Dunmore* is instructive" because it illustrated that consent in one context does not necessarily constitute consent in another context:  Dunmore's consent to a jury trial in the district court proceedings, followed by a stipulation to transfer the case to bankruptcy court, did not provide consent to any trial in bankruptcy.  Opening Br. 54-55; *see also Dunmore*, 358 F.3d at 1116-17.  Epic's focus (at 60-61) on whether the bankruptcy court's error was to insist on

26

a jury trial or bench trial ignores that the error *Dunmore* corrected was the decision to move forward with *any* trial when the stipulation consenting to transfer the case to the bankruptcy court "was silent with regard to any consent to a jury trial." 358 F.3d at 1116-17. The principle that consent is contextual holds regardless of whether the *Dunmore* bankruptcy court insisted on holding a bench trial or a jury trial.

4. Epic cannot overcome the prejudice *to Google* that occurred because Epic's equitable claims were tried to a jury. On multiple occasions, the District Court treated the jury's general verdict as a resolution of every disputed fact entirely in Epic's favor. 2-ER-343; 3-ER-437. Thus, the error that began with the District Court's decision to hold a jury trial infected the District Court's assessment of the appropriate remedy. Opening Br. 57-58.

Epic seems to argue that any deficiency in the factual findings supporting the injunction is distinct from the District Court's decision to hold a jury trial. Epic Br. 66-67. But the problems are mutually reinforcing, not mutually exclusive: The District Court justified its refusal to determine basic issues like the metes and bounds of any effects caused by conduct found to be anticompetitive, *see infra* pp. 34-35, by falling back on the notion that the jury's verdict was "carved in stone" at the remedies stage, 3-ER-437. But without making findings as to the consequences of the conduct the jury found anticompetitive, the District Court conducted the ensuing

27

remedies proceeding untethered to addressing any such consequence, instead insisting its job was to blindly "pry open" the market.[10]

## II. The Injunction Should Be Vacated.

### A. The Duty-To-Deal Remedies Are Legally Impermissible And Unsupported By The Record.

#### 1. The District Court Legally Erred By Forcing Google To Create New Services For Its Competitors.

Epic does not—and cannot—deny that the Supreme Court and this Court have repeatedly condemned antitrust remedies requiring a customer to create "something brand new" that is "not otherwise marketed or available to the public." *Verizon Commc'ns Inc v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 (2004) (quotation marks omitted); *accord MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004) (rejecting "detailed sharing obligations" where "the defendant does not already provide the product in an existing market" (quotation marks omitted)).

Epic's primary response (at 71) is to echo the District Court's dismissal of these precedents as constraining only "the standards for liability" without affecting "the scope of available remedies." *See* 1-ER-19-20; DOJ Br. 9-10. But the Supreme Court and this Court's precedents limit liability *precisely because* courts cannot

---

[10] Epic does not dispute that if the liability verdict is vacated, the UCL verdict must be vacated too. Epic Br. 67-68.

administer a remedy without becoming a central planner.  *See* Opening Br. 62-63; *Trinko*, 540 U.S. at 414-415; *MetroNet*, 383 F.3d at 1133.

As the Former Antitrust Enforcers' brief explains, "the difficulty of providing an appropriate antitrust remedy was central to the *Trinko* Court's holding." Dkt. 44.1, at 16.  That there may be *additional* reasons that courts may not impose liability in this context, *see* DOJ Br. 10-12, does not change that courts' inability to supervise "compelled sharing" is *one of* the "core reasons" for *Trinko*'s limitations, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016). Even Epic cannot consistently maintain its artificial distinction between the remedies and liability phases, ultimately admitting (as it must) that "[s]imilar considerations" govern both.  Epic Br. 73 (quoting *Alston*, 594 U.S. at 102); *accord* DOJ Br. 12.  The precedents highlighted by Epic and DOJ generically stating that remedial discretion is "broad," *see* Epic Br. 68; DOJ Br. 5-8, do not suggest that authority is *unlimited*.[11]

Epic (at 76) and DOJ (at 15) attempt to confine *Trinko* to situations involving "a detailed statutory scheme overseen by a regulatory agency."  But *Trinko* makes clear that the statute at issue there did not "'modify … the applicability of any of the antitrust laws'" and that the Court was assessing "pre-existing antitrust standards." 540 U.S. at 406 (quoting 110 Stat. 143).  This Court, moreover, has applied *Trinko*

---

[11] DOJ incorrectly asserts (at 9) that Google has "retreated" from its stay-stage argument.  Google's argument is the same.  *Compare* Opening Br. 59-68, *with* Stay Mot. 16-19, *and* Stay Reply 7.

in cases unrelated to the statute at issue in that case.  *See, e.g.*, *Aerotec*, 836 F.3d at 1183-84.

Google did not cite a case involving an injunction requiring a defendant to develop and offer a new product—and share it with competitors—as a remedy because to Google's knowledge, *it has never happened before*.  No party or amicus has identified a single antitrust injunction involving such a requirement.  The cases Epic cites (at 71-73) involve parties ordered to provide *existing* products or services to competitors.  *See Ford Motor Co. v. United States*, 405 U.S. 562, 572 (1972) (merger defendant ordered to purchase spark plugs from divested spark plug manufacturer); *United States v. Glaxo Grp. Ltd.*, 410 U.S. 52, 56 (1973) (defendant ordered to engage in "nondiscriminatory sales" of existing drug and to license associated existing patents); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 474, 486 (9th Cir. 2021) (telescope manufacturer required to supply telescopes to rivals); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1201 (9th Cir. 1997) (defendant ordered to sell replacement parts to rivals).

Epic's fallback claim (at 74) that the injunction only requires "Google to make existing resources available" is untethered to reality.  Even the District Court recognized it would take many months of engineering and testing work—and a technical committee—to make Play's catalog of millions of apps appear in other app stores, create infrastructure to download and service apps for users of other app

stores, and develop policies and mechanisms to review and distribute app stores through Play. Forcing a party to make something available to rivals that has never been offered to anyone on any terms impermissibly "requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing." *Trinko*, 540 U.S. at 408. Epic appears to mean it may be technologically *feasible* for Google to create these new services. But the key question is not feasibility; it is whether a court will determine the design, manner, and terms of these new services.

Epic cannot seriously dispute that the District Court would have to play that oversight role: During the remedies phase, Epic objected to virtually every aspect of Google's proffered design plan, from the data to be included and the frequency with which it is refreshed, 2-SER-78-79, to the design of the user interface, 2-SER-79, to under-the-hood details about how third-party stores are installed, 2-SER-92-93. Epic's focus on only one step associated with the third-party store distribution requirement, Epic Br. 74, entirely ignores the rest of the implementation process, including the development and operation of a complex system for screening third-party stores and the apps they carry.

Epic cites no support for its last-ditch assertion (at 75) that "[w]here there is unlawful conduct, there must be a remedy." Indeed, the Supreme Court has "consistently rejected" that "an injunction automatically follows" a liability

31

determination. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-393 (2006). The Court should reject Epic's effort to "demand the right to piggyback" on Google's innovations and investments in the Play store. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.).

### 2. The District Court Failed To Find The Causal Connection Required To Impose A Duty-To-Deal Remedy.

This Court has squarely held that, to impose relief going beyond a restraint of unlawful conduct, a district court must find a "significant causal connection" between the "violation found" and the "remedial goal intended." *Optronic*, 20 F.4th at 486 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc) (per curiam) (*Microsoft I*)). "Absent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct." *Microsoft I*, 253 F.3d at 106 (quotation marks omitted).

The District Court abdicated its responsibility to undertake the required causation analysis. It issued an injunction targeting Google's "network effects" *without* making any record-based finding that the conduct found to be anticompetitive had any impact on those network effects. *See* 1-ER-15-23. And it dismissed causation as not "salient"—a direct repudiation of controlling precedent. 1-ER-15.

Epic does not contest this causation requirement. *See* Epic Br. 76-78. On the contrary, Epic and its amici acknowledge that antitrust remedies should target the anticompetitive conduct and the "effects" of that conduct. *See, e.g., id.* at 68; DOJ Br. 16 (relief must be "a reasonable method of eliminating *the consequences* of the *illegal* conduct" (emphasis added and quotation marks omitted)). Yet Epic is unable to identify any findings or evidence that would satisfy this requirement.

Epic begins (at 76-77) by describing Google's network effects and pointing to evidence that they provide Google a competitive advantage. The problem is that the District Court did not determine whether or to what extent Google's anticompetitive conduct was responsible for maintaining that fairly earned advantage. This causation problem is particularly thorny in "monopoly maintenance cases," like this one, where "it will often be far from clear … that the defendant would lack monopoly power absent anticompetitive conduct." Former Antitrust Enforcers Br., Dkt. 44.1, at 15.

When Epic at last tries to identify the necessary causal link, its *best* effort is a single sentence from the remedies opinion stating, in full, "that 'Google unfairly enhanced its network effects in a way that would not have happened but for its anticompetitive conduct.'" Epic Br. 77 (quoting 1-ER-17). That sentence cites nothing in the record, *see* 1-ER-17, and falls woefully short of the required record-based finding of a "significant causal connection." The court does not identify which

anticompetitive conduct it thinks had this effect; it does not explain the supposed "way" that any conduct enhanced network effects; and it does not address *any* alternative explanations for Google's network effects.

Epic cites nothing to fill these gaps. Epic does not identify any evidence, for example, comparing Google's user base and number of apps at the time of suit to the *status quo* in 2016—which, Epic does not dispute, is the beginning of the period for analyzing whether Google's conduct was anticompetitive. *See* 6-ER-1454; Opening Br. 67. Tellingly, Epic relegates to a footnote (at 78 n.18) the only record evidence the District Court cited: the discussion of Amazon, which confirms that Google *already* benefitted from network effects near the beginning of the relevant time period. *See* Opening Br. 66-67. Epic's attempt to spin that evidence in its favor instead confirms that Google's "goals" were to compete against Amazon by improving quality, "[m]ak[ing] it attractive for users to stay on Play" and "more compelling for developers to focus on Play." 7-ER-1271.[12]

Like the District Court, Epic ultimately falls back on the jury's verdict, claiming (at 77) it "establishes" causation. But the jury was not asked to make findings on what anticompetitive effects were attributable to Google's conduct, and

---

[12] It is perhaps unsurprising the District Court's only citation for "network effects" evidence is evidence concerning Amazon, as that is the only hit for a word search of "network effects" in the nearly 3500-page trial transcript.

Epic does not dispute that where a jury does not make specific findings necessary to support an injunction, the district court must do so. *See U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1145 (9th Cir. 2023).[13]

Ultimately, Epic all but concedes it cannot make the necessary causal showing, contending that "lawfully obtained network effects *from the prior decade* can no longer be disentangled from the market structure that Google illegally preserved." Epic Br. 78 (emphasis added). But if the status quo before the relevant period began meant Google *already had* the relevant network effects based on lawful competition, that is even more reason to insist Epic shoulder its burden of proving Google's conduct caused the network effects the injunction is designed to address. Epic did not even try to do so.

---

[13] Epic's selective and misleading account of the trial record (at 1, 11-17) only highlights the District Court's error. For instance, Epic stresses Google's revenue-sharing agreements with an exclusivity provision, but those agreements began in December 2019, *see* 6-ER-1284—years after the network-effects evidence cited by the District Court—and covered just 16% of devices sold outside China, 6-ER-1286. Epic also ignores that Samsung, the largest Android OEM, *always* preinstalls its own app store, meaning two-thirds of Android devices come with a preinstalled competitor. 6-ER-1286; FER-93. Epic's complaint about Google's security warnings omits that sideloaded apps increased 58% between 2019 and 2021, FER-94-95, and that Google agreed to sideloading changes in the State Settlement, State Settlement § 6.10.1. The District Court's network-effects discussion accounted for none of this.

### 3.   The District Court's Price Regulation Is Error.

"[D]irect price administration" is generally "beyond [a court's] function." *Kodak*, 125 F.3d at 1225.  Yet the District Court adopted a price control here, holding that Google's pricing for new security services associated with app-store distribution must be "reasonable" and "based on Google's actual costs."  1-ER-5.

Epic claims (at 30) that the price control is "a reasonable measure to avoid circumvention of the injunction."  But the District Court did not justify the injunction in these terms—or, indeed, offer any explanation for price controls, *see* 1-ER-18-19—and Epic cites no precedent imposing a price control as an anticircumvention measure.  Although the Supreme Court has recognized that courts have limited authority to restrain "other *related* unlawful acts" as a remedy for anticompetitive conduct, Epic does not even cite that standard here, much less argue it has been satisfied.  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 133 (1969) (emphasis added and quotation marks omitted).

Finally, Epic agrees (at 80) there is no "benchmark" against which the District Court could judge whether the pricing is "reasonable."  And, as the U.S. Chamber of Commerce warns, "[e]xperience shows that determining a company's actual costs is" likewise "a lengthy, challenging task to perform with any accuracy," much less on an ongoing basis for years in a highly dynamic market.  Dkt. 58.1, at 20.  This Court should reject prophylactic price controls that the District Court "cannot

explain or adequately and reasonably supervise." *Trinko*, 540 U.S. at 415 (quotation marks omitted).

### 4. The Duty-To-Deal Remedies Are Impermissibly Vague.

Epic misunderstands the thrust of Google's vagueness argument. The critical problem is the District Court's refusal to decide fundamental *policy* questions, hotly litigated below, about what the duty-to-deal remedies entail. The injunction is simply silent about these important aspects of Google's obligations, flunking Rule 65(d)(1)'s requirements to state the injunction's "terms specifically" and "in reasonable detail."

As for the catalog-access provision, the court did not even resolve the parties' divergent views as to what app data Google must provide or what constitutes an authentic "app store," even though those issues were contested throughout the remedies phase. *See* Opening Br. 70. The app-store distribution provision is silent on the eligibility criteria Google may apply and imposes an inscrutable restriction on Google's ability to engage in security screening of participating app stores that "effectively jams Google between a rock and a hard place." Chamber of Progress Br., Dkt. 65.2, at 12.

The creation of a "technical" committee (charged with resolving both technical and non-technical matters) is no substitute for providing Google notice in

the injunction of its obligations, as Rule 65 requires.[14]  Appointing a committee is essentially an admission that the court did not (contrary to Rule 65) adequately define Google's obligations *in advance*.  Indeed, by assigning "to an untested, court-created committee countless management decisions about both Google Play and the Android operating system," the court is ultimately engaging in precisely the sort of "central planning" that the Supreme Court has repeatedly condemned.  ICLE Br., Dkt. 51.1, at 23; *see, e.g.*, *Trinko*, 540 U.S. at 408.

### B.    The District Court Failed To Make Sufficient Findings Under Rule 65(d).

In issuing an injunction, a court must explain and justify its reasoning; failure to do so is reversible error.[15]  Google's argument is not that the District Court failed to provide a "detailed" response to each of Google's objections.  Epic Br. 85-89.  Put

---

[14] Despite Epic's effort (at 84) to portray the technical committee as "routine[]," Epic fails to cite *any* case where a court granted a self-interested competitor voting membership on a court-appointed technical committee.  DOJ, for its part, notes that once, in 1952, a court directed the United States—not a competitor—to select two members of a committee to set fair patent-license royalty terms as part of an antitrust remedy where the court ultimately cast a tiebreaking vote.  DOJ Br. 24 (citing *Besser Mfg. Co. v. United States*, 343 U.S. 444 (1952)).

[15] *See, e.g.*, Opening Br. 75 (citing cases vacating injunction for failure to provide sufficient reasoning or findings or to properly consider relevant factors); *Microsoft I*, 253 F.3d at 103 (vacating in part for failure "to provide an adequate explanation" for relief); *EEOC v. BNSF Ry. Co.*, 902 F.3d 916, 929 (9th Cir. 2018) (vacating for failure to make factual findings or explain reasoning, even though appellate court could identify "some reasons" to support injunction); *FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1215-17 (9th Cir. 2004) (vacating where impossible to discern basis for district court's rejection of evidence without speculating).

simply: The District Court undertook *no* analysis on four issues fundamental to its exercise of discretion. Opening Br. 74-87.

1. The District Court chose *more* restrictive contractual remedies than either party offered, with no explanation or justification. *See* Opening Br. 76-77 (describing Google's proposed modifications to the restrictions Epic's expert agreed would suffice); Epic Br. 87-88 (offering no justification in the record for these aspects of the injunction).

As Epic appears to acknowledge (at 80), courts *must* ensure that injunctions are no more burdensome than necessary. *See Apple II*, 67 F.4th at 1002. Going *beyond* what the parties propose thus plainly requires explanation. Epic's expert told the court that a prohibition on contracts conditioned on dealings with rivals would be sufficient; he did not argue that a blanket prohibition on Play placement was necessary. *See* 3-ER-447-448. And Epic expressly confirmed that it only sought to prevent Google from sharing *percentages* of Play revenue with rivals— not to prevent *all* revenue sharing agreements. 2-ER-321-324. Google explained that it could agree to a modified version of these terms. *See, e.g.*, Epic Br. 88 n.24; 2-ER-359-360; 2-ER-362.

Given that the injunction exceeds what Epic's own expert represented was sufficient to address its alleged injuries, the District Court was obliged to explain why the injunction includes *broader* remedies. Without such explanation, this Court

cannot decipher the court's rationale or even whether it intentionally exceeded Epic's request.

2. Google agreed to extensive conduct changes in the State Settlement over a year ago, yet the District Court refused to acknowledge or explain why those changes did not sufficiently remediate future injury from the challenged conduct or serve the public interest. Epic justifies this lack of analysis by noting the Settlement was a pre-trial compromise. Epic Br. 89. That is true, but irrelevant. The question was whether any record evidence showed *additional* injunctive relief was required, given that Epic and the States challenged the same conduct. The States had represented the Settlement would restore competition and improve developer and user choice. 3-ER-697-699 (States representing Settlement will "allow competing app stores access to Android devices," "give consumers a reason to use those competing app stores," and "force[] [Google] to compete on price, quality, or both" to "the benefit of consumers").

Epic's view that it *must* be entitled to more than the States simply because it proceeded to trial has no basis in the law governing antitrust injunctions. "No particular type of relief is 'automatic' in a [monopolization] case." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 653a (2024 update). To obtain a forward-looking injunction, Epic must show future injury—not past injury. *See, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 69 (2024). And because Google expressly committed to

40

substantially changing the conduct Epic challenged as part of the Settlement, those agreed-to Settlement terms were plainly relevant to whether Epic faced any ongoing injury from the challenged conduct.

Epic's backup view that the court *implicitly* found the Settlement "fell short of the complete relief warranted," Epic Br. 89, has no record support. Far from resolving disputed testimony regarding the Settlement's sufficiency, the court expressly refused to consider it. 2-ER-363; 2-ER-338-339.

3. The District Court failed to account for the substantial security interests of non-parties. The injunction hamstrings Google's ability to address significant security concerns with app store distribution and fails to account for security issues related to linkouts and catalog sharing, which Epic does not deny. Epic Br. 90-91; Computer Security Experts Br., Dkt. 49.3, at 13, 15-17 (emphasizing security risks); Former Nat'l Security Officials Br., Dkt. 48.2, at 19-21 (same). That Epic's expert offered disputed testimony about the lack of legitimate security implications does not equate to a reasoned adoption of those disputed assertions by the District Court. *See, e.g.*, 1-ER-15-23 (providing no resolution of relevant disputed facts). If anything, at the hearing, the court refused to adopt Epic's broad-brush claim that Google's security arguments were meritless. *See* 2-ER-296-298; 2-ER-308-311.

And Epic's hypothesized justification for the court's actions appears nowhere in the injunction or opinion. *See* 1-ER-3-23.[16]

4. The District Court failed to address the injunction's impact on the intellectual property rights of non-party developers. *See* ACT Br., Dkt. 54.1, at 6, 17; Chamber of Commerce Br., Dkt. 56.1, at 16 (emphasizing injunction's serious implications for intellectual property). Without citing any analysis of intellectual property rights, Epic claims that the court "correctly found" that virtually every rational developer would "want to be in every possible store." Epic Br. 92 (quotation marks omitted). But Epic offered no record evidence that would support that remarkable assertion, and the District Court made no record-based finding. To the contrary, the record highlighted developers' substantial concerns with certain third-party stores, *see, e.g.*, 2-ER-380-381; 2-ER-426—concerns that multiple *amici* confirm, *see* Small Developers Br., Dkt. 68.2, at 14-15; Chamber of Progress Br., Dkt. 65.2, at 17; Roblox Br., Dkt. 56.1, at 8.

Failure to provide a meaningful explanation as to any of these four issues warrants vacatur. *See, e.g.*, *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014).

---

[16] Epic manufactures a justification for the eight-month compliance deadline for the duty-to-deal remedies as "between the parties' proposals," Epic Br. 91 n.26, but cites no analysis by the court and ignores that Epic's expert admitted his proffered timeline ignored "roll out" and "field testing," 2-ER-242, making it fairly useless as an anchor.

### C.     Epic Failed To Prove Standing To Seek The Relief It Obtained.

To establish Article III standing to obtain the catalog access, app-store distribution, and payment-related remedies, Epic had to show that the "relief sought" would "likely remedy" an ongoing or threatened injury *to Epic*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109-110 (1998), and that it was "tailored to redress [Epic's] particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018).  Epic's failure to prove these elements—and the District Court's lack of findings on them—means no jurisdiction existed to enter these remedies for Epic, much less on a nationwide scale.  *See Murthy*, 603 U.S. at 49-50.

1. Epic characterizes this as a merits question and argues Google waived it. But redressability is a non-waivable Article III jurisdictional prerequisite.  *Renee v. Duncan*, 686 F.3d 1002, 1012 (9th Cir. 2012).  *Murthy* assessed the relationship between the plaintiffs' injury and the "requested judicial relief" as a jurisdictional inquiry.  603 U.S. at 73; *see Steel Co.*, 523 U.S. at 105-110 (jurisdictional inquiry whether each specific remedy requested by plaintiff would redress its asserted injury).  This caselaw contradicts Epic's claim that "the specific relief sought" has "nothing to do with the standing analysis."  Epic Br. 94.  As this Court recognizes, "some issues pertaining to [a plaintiff's] standing in seeking injunctive relief may also be relevant to the merits." *Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1102 n.11 (9th Cir. 2016).

In any event, Google preserved this argument. 3-ER-577 ("Epic has not even tried to explain how Epic faces a significant threat of irreparable antitrust injury that would warrant the wide-ranging remedies it asks the Court to impose."); 3-ER-622-623 (noting catalog-access remedy contradicted Epic's theory at trial about what was necessary to redress its claimed injury); 3-ER-634-635 (arguing app-store distribution "would harm OEMs, consumers and competition"). Google further disputed Epic's standing to enjoin Google's billing and anti-steering policies when no Epic app is on the Play store and Epic offered no payment service outside its own store. 3-ER-584-585; 3-ER-639. Epic cannot evade its own failure to meet its burden of proving Article III standing. *See, e.g.*, 2-ER-220-374; 3-ER-434-572.

2. Epic insists it did not need to offer evidence substantiating how "market participants" would react to the remedies it sought. Epic Br. 95-97. The Supreme Court disagrees. When the "existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts," it is the plaintiff's burden to "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quotation marks omitted); *Duran v. California Dep't of Forestry & Fire Prot.*, No. 23-16155, 2024 WL 3565266, at *1 (9th Cir. July 29, 2024) (under *Murthy*, "redressability

cannot rest on the independent actions of third parties, whose actions the court can neither control nor reliably predict").

Here, Epic cannot show that the injunction will prompt a critical mass of consumers who use Play to download another app store containing the same apps *already available* on Play and begin using that app store regularly instead of Play. *See* Opening Br. 88-91. Epic identifies no evidence (based on "economic principles" or otherwise, Epic Br. 96) rational consumers are likely to behave this way.[17]

3. No record evidence substantiates an ongoing injury to Epic from payment policies for apps *distributed through Play*. Epic introduced no evidence it was distributing apps (directly or through subsidiaries) on Play. Epic Br. 98 & n.28. Google raised this issue and Epic failed to respond. 3-ER-584-585 (Google arguing that "Epic's apps are not listed in the Play store"); 3-ER-640 (Google noting that unlike *Apple II*'s finding that an Epic "subsidiary company still had apps in the Apple App Store," "[t]here is no evidence of the same being true with respect to the Play store"). It was not Google's burden to *dis*prove Epic's standing. And while Epic insinuates developers would use Epic's payment solution on Play, Epic cites no *evidence* to support that claim. Epic Br. 98. Nor does Epic point to *any* evidence

---

[17] Epic now says it may directly benefit from these remedies as a competing app store. Epic Br. 95-97. That argument is new on appeal—below, Epic avoided taking a position on whether it would avail itself of these remedies. Nor does it solve the problem here, where Epic presented no evidence regarding how third parties will act. Opening Br. 88-91.

(or finding) that developers on Play were likely to steer users to Epic's store to use Epic's billing system but-for Google's anti-steering policy. *Id.*

Absent findings or evidence supporting the claim that catalog sharing, store distribution, or payment remedies would likely redress ongoing injury to Epic, awarding them was reversible error.

## CONCLUSION

The liability verdict and permanent injunction should be vacated.

Dated: January 17, 2025

Respectfully submitted,

/s/ Neal Kumar Katyal

Neal Kumar Katyal
Jessica L. Ellsworth
Reedy C. Swanson
Natalie Salmanowitz
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Leigha Beckman
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Johannah Cassel-Walker
HOGAN LOVELLS US LLP
4 Embarcadero Center
Suite 3500

San Francisco, CA 94111
Telephone: (479) 719-2930

Mackenzie Dulay Austin
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600

Justin P. Raphael
Dane P. Shikman
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Jonathan I. Kravis
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 10,994 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f), and is accompanied by a motion to exceed the page or type-volume limits pursuant to Circuit Court Rule 32-2(a).

This motion complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on January 17, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal