Nos. 24-6256, 24-6274, 25-303

IN THE

# United States Court of Appeals
# for the Ninth Circuit

———————————

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

———————————

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

GOOGLE LLC, *et al*.,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Hon. James Donato

———————————

## MOTION FOR A STAY OF PERMANENT INJUNCTION PENDING GOOGLE'S FORTHCOMING PETITIONS FOR REHEARING AND, IF NECESSARY, CERTIORARI

———————————

Neal Kumar Katyal
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7505
nkatyal@milbank.com

Jessica L. Ellsworth
Reedy C. Swanson
Natalie Salmanowitz
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5886
jessica.ellsworth@hoganlovells.com

August 8, 2025

*Counsel for Defendants-Appellants*

———————————

*(Additional Counsel Listed on Signature Page)*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies the following:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Commerce Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Ireland Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Asia Pacific Pte. Ltd. is an indirect subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc.,

a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Date: August 8, 2025          <u>/s/ Neal Kumar Katyal</u>
                                     Neal Kumar Katyal

# TABLE OF CONTENTS

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES ...................................................v

INTRODUCTION ...........................................................1

BACKGROUND ............................................................4

    A.   Google Develops Android To Compete With Apple's iOS.................4

    B.   Epic Games Seeks To Redesign Google's And Apple's App Stores ...........................................................5

    C.   The District Court Upholds A Liability Verdict That Conflicts With *Epic v. Apple*, Then Issues Unprecedented Relief ......................6

    D.   A Panel Of This Court Affirms .........................................7

LEGAL STANDARD......................................................8

ARGUMENT ............................................................10

I.    GOOGLE HAS A REASONABLE PROBABILITY OF PREVAILING ON EN BANC OR CERTIORARI REVIEW ..................10

    A.   The Liability Opinion Conflicts With Governing Precedent And Fundamental Antitrust Law.......................................10

        1.   The Issue Preclusion Ruling Conflicts With *Epic v. Apple* And Punishes Google For Pro-Competitive Behavior........................................................10

        2.   This Court's Rule Of Reason Framework Conflicts With Supreme Court And Other Circuit Precedent............................14

    B.   Forcing Play To Share Its Catalog With Competitors And To Distribute Competitors' App Stores Contravenes Supreme Court, Ninth Circuit, And D.C. Circuit Precedent .............................17

# TABLE OF CONTENTS—Continued

Page

II.  THE INJUNCTION WILL INFLICT IRREPARABLE HARM
     ON GOOGLE.................................................................................22

     A.  Security Risks Threaten Severe And Irreversible Harm To
         Users And Reputational Harm For Google.........................................22

     B.  Google Faces Irreparable Harm To Its Business Model And
         Ability To Compete.............................................................25

III. THE EQUITIES STRONGLY FAVOR A STAY ....................................26

CONCLUSION ....................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

Page(s)

CASES:

*1-800 Contacts, Inc. v. FTC,*
  1 F.4th 102 (2d Cir. 2021) ................................................................15, 16

*Aerotec Int'l v. Honeywell Int'l,*
  836 F.3d 1171 (9th Cir. 2016) ...........................................................17

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) ..............................................................9

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ...........................................................26

*Copperweld Corp. v. Independence Tube Corp.,*
  467 U.S. 752 (1984) ..........................................................................13

*Disney Enters., Inc. v. VidAngel, Inc.,*
  869 F.3d 848 (9th Cir. 2017) .............................................................22

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) ...........................................................................16

*Epic Games, Inc. v. Apple, Inc.,*
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................5, 6, 11

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) ....................................................*passim*

*Epic Games, Inc. v. Apple, Inc.,*
  73 F.4th 785 (9th Cir. 2023) ...........................................................3, 9

*FTC v. Qualcomm Inc.,*
  935 F.3d 752 (9th Cir. 2019) ...............................................9, 17, 26

*FTC v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ............................................................10

## TABLE OF AUTHORITIES—Continued

Page(s)

*Hollingsworth v. Perry*,
  558 U.S. 183 (2010)........................................................................9

*Innovation Law Lab. v. Mayorkas*,
  No. 19-15716 (9th Cir. 2020) ........................................................8

*In re Victor Techs. Sec. Litig.*,
  792 F.2d 862 (9th Cir. 1986) .......................................................26

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) .......................................................25

*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004)...................................................20

*NCAA v. Alston*,
  594 U.S. 69 (2021)....................................................15, 16, 17, 18

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ...................................................19

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)..............................................................11, 15

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) ..................................................19, 20

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)......................................................................14

*Snoqualmie Indian Tribe v. Washington*,
  8 F.4th 853 (9th Cir. 2021) ..........................................................12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) .......................................................22

*Teva Branded Pharm. Prod. R&D, Inc. v. Amneal Pharms. of New York, LLC*,
  No. 24-01936 (Fed. Cir. Jan. 22, 2025) .........................................8

## TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Abbott*,
No. 23-50632 (5th Cir. Jan. 29, 2024)............................................................8, 9

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) (en banc)...............................................18, 20, 21

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*,
540 U.S. 398 (2004)...............................................................................18, 19, 20

**RULES:**

Fed. R. App. P. 40(b) .............................................................................10

Sup. Ct. R. 10 ...........................................................................................10

## INTRODUCTION

The opinion in this case upheld an antitrust verdict and unprecedented injunction entered at the request of a single plaintiff, Epic Games, which lost its parallel suit against Apple, Google's "main competitor," before this Court just two years ago. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023) (*Apple II*). That result leaves two of our nation's leading (and competing) technology companies, Google and Apple, subject to fundamentally different regulatory regimes imposed by two different panels of this Court. Moreover, the current panel's reasoning conflicts with Supreme Court precedent and decisions from other circuits on multiple important issues of law.

A stay is warranted to permit further review of these weighty conflicts given the extensive irreparable harms the injunction will inflict on the entire Android ecosystem, including Play's over 100 million U.S. users and over 500,000 developers. Experts and former national security officials agree that the injunction will make it easier for scammers, foreign adversaries, and other malicious actors to take advantage of Android users. And as numerous trade groups and others confirm, the injunction will also hobble Google's ability to effectively compete with Apple in the United States—where Apple already has the largest share.

Google has a reasonable probability of successful en banc or Supreme Court review because the panel's reasoning split from precedent of the Supreme Court, this

1

Court, and other circuits. *First*, the panel's conclusion that "Epic's claims against Apple involved meaningfully different commercial realities and theories of harm," Op. 20, conflicts with this Court's decision in Epic's parallel suit against Apple, which should have doomed Epic's attempt to relitigate whether Google and Apple compete for the same gaming transactions that were at issue in *Apple*. The panel concluded that because Google's approach is more open than Apple's, issue preclusion could not apply. But this rationale would turn antitrust law on its head by *punishing* Google for allowing other app stores on Android, in contrast to Apple's entirely closed ecosystem. The result would impede, not encourage, competition by having Apple and its "main competitor" Google operate under different legal rules from two conflicting decisions of this Court. *Cf. Apple II*, 67 F.4th at 985.

*Second*, applying controlling circuit precedent, the panel upheld jury instructions that failed to hold Epic to its burden at the third step of the Rule of Reason analysis, stating that Google could be liable *even if* it had legitimate, procompetitive justifications that could not have been accomplished through substantially less restrictive means. This Court has questioned the wisdom of its precedent on that issue, which is at odds with both Supreme Court law and common sense. This case presents an ideal vehicle for this Court to reconsider this precedent where, as the panel recognized, the core of Google's liability defense was that its conduct was critical to competing with Apple.

2

*Third*, the panel's affirmance of unprecedented remedies requiring that Google make its app catalog available to stock the shelves of competing app stores and that Play start offering other app stores for download to Play's customers is squarely at odds with Supreme Court precedent and the D.C. Circuit's seminal decisions in *Microsoft*. The panel's holding would mean Google could be deprived of successes flowing from competition on the merits, a result that defies precedent and logic.

Google will file a petition for rehearing on August 14. While the Court is considering this matter, it should stay the District Court's sweeping injunction for the balance of the appellate process. The panel allowed the stay to continue during consideration of the appeal. Maintaining the status quo for a brief additional period while Google seeks further appellate relief will allow this Court and, if necessary, the Supreme Court to assess these critical issues. That result would also align with this Court's approach in *Apple II*, where it stayed a far more modest injunction against Apple through the disposition of Apple's certiorari petition. *See Epic Games, Inc. v. Apple, Inc.*, 73 F.4th 785, 785 (9th Cir. 2023) (*Apple III*).

Google respectfully requests that the Court stay the District Court's injunction, except for ¶ 8 (a contractual change that Google already made with carriers and phone manufacturers), pending this Court's resolution of Google's forthcoming rehearing petition and, if the Court denies rehearing, the disposition of

Google's certiorari petition. If the panel votes to deny this motion, Google respectfully requests that it be circulated to the en banc Court.

## BACKGROUND

### A. Google Develops Android To Compete With Apple's iOS.

Google and Apple fiercely compete over mobile devices, operating systems, and app stores. In that competition for consumers and developers, the companies have taken different approaches. Apple's operating system, iOS, is a self-contained ecosystem that gives Apple complete control over every aspect of its devices. 5-ER-1082-84; 5-ER-1154-55. Consumers who want an iOS phone have one choice, the iPhone, and must only use Apple's proprietary App Store.

Google took a different approach: It offered the Android operating system for free for anyone to access, modify, and distribute. 5-ER-1060. The resulting open ecosystem means that consumers can choose from numerous Android mobile devices, and that anyone can create an Android app store. To compete against Apple and other app stores, Google has invested billions into the Google Play Store and nurtured countless partnerships with developers and original equipment manufacturers (OEMs). Google enters into agreements with OEMs, specifically, the Mobile App Distribution Agreement and Revenue Sharing Agreement, which ensure all Android devices can receive safety and security updates and provide a seamless and consistent out-of-the box experience, to better compete with iPhones. 7-ER-

1640; 5-ER-1058-59; 5-ER-1086. Google also made deals with developers through the Games Velocity Program to provide incentives for developers to launch on Play at the same time as on other app stores. 5-ER-1000-01; 5-ER-1165-66.

Play developers also sign the Developer Distribution Agreement, which requires developers who charge users for digital goods and services to use Google Play Billing—guaranteeing a secure way to facilitate those purchases. 6-ER-1393-1401. Google Play Billing's service fee also helped sustain the larger Play business model. It enables Google to offer free services to the many more developers who distribute free apps, which constitute 96% of apps in Play. 5-ER-1173; 6-ER-1295. Google also undertakes rigorous safety measures to ensure that Android provides users with a secure experience, including reviewing for malware and warning users about downloading content directly from the Internet that is not subject to security reviews. 5-ER-1010; 5-ER-1138-50; 5-ER-1233.

### B.   Epic Games Seeks To Redesign Google's And Apple's App Stores.

Epic Games, a multi-billion-dollar gaming developer, wanted to distribute *Fortnite* on iOS and Play without paying a service fee. 5-ER-1182; 5-ER-975; 5-ER-1199; 5-ER-1214-16; *see* 5-ER-1169; 5-ER-1171-72. Epic thus launched a "highly choreographed attack" on the two companies. *Epic Games, Inc. v. Apple, Inc.*, 559 F. Supp. 3d 898, 935 (N.D. Cal. 2021) ("*Apple I*"); *see also* 5-ER-1216.

Epic embedded secret code in *Fortnite* to circumvent Apple's and Google's policies. Op. 9. Both companies immediately removed *Fortnite* from their stores. Op. 10.

Epic sued Google and Apple in the same court on the same day, asserting claims under the Sherman Act and California's Cartwright Act and Unfair Competition Law (UCL). *Apple I*, 559 F. Supp. 3d at 921-922, 940; 7-ER-1728. Epic filed separate suits because its antitrust claims depended on analyzing each company's market share with blinders on to the competition between Apple and Google. *See Apple I*, 559 F. Supp. 3d at 988-999, 1029. In *Apple*, the district court saw through this ruse. The court's 249-page decision explained (several times) that Google and Apple compete for users in a market for mobile gaming transactions—including mobile gaming apps and in-app purchases on those apps. *Id.* at 977-978; *see id.* at 955-956, 958-959, 976-977. This Court rejected Epic's effort to reverse those findings and concluded that the district court's market "stands on appeal." 67 F.4th at 966, 980-981.

### C. The District Court Upholds A Liability Verdict That Conflicts With *Epic v. Apple*, Then Issues Unprecedented Relief.

While Epic's suit against Apple was on appeal, Epic's suit against Google proceeded to trial. Epic argued that Google was in an Android-only market and encouraged the jury to ignore the reality of Google's competition with Apple. Google's defense focused on its competition with Apple, including extensive evidence about the procompetitive benefits of the challenged conduct for Apple-

6

Android competition.  *See* Opening Br. 17-20.  Over Google's objection, the District Court instructed the jury that it was required to "balance" those  procompetitive benefits against "any competitive harms [the jury] found."  4-ER-831.  The jury accepted Epic's Android-only market and found in favor of Epic.  1-ER-52-57. Google argued in a timely motion for judgment as a matter of law or a new trial that Epic's loss in *Apple* precluded its Android-only markets, 4-ER-784-785; 4-ER-793-797, and the District Court denied the motion, 1-ER-24; 1-ER-29-31.

After remedial proceedings, the District Court entered an injunction requiring Google to substantially redesign Play and, most relevant here, to give other Android app stores access to Play's entire catalog and to distribute other Android app stores to Play's users through Play itself.  1-ER-3-6; 1-ER-7-23.  The District Court held that these remedies were justified by Google's "network effects," but never attempted to analyze whether, or to what extent, the conduct Epic had challenged *caused* any network effects.  1-ER-17-20.

Google promptly appealed.  The District Court administratively stayed its injunction pending resolution of Google's stay request to this Court.  2-ER-181.

### D.   A Panel Of This Court Affirms.

In expedited proceedings, a panel of this Court affirmed the judgment and denied Google's stay request as moot.  Op. 10, 16 n.4, 17.  Regarding liability, in relevant part, the panel found that the District Court was not required to give *Apple*

*II* preclusive effect, Op. 17-25, and that Circuit precedent required the balancing instruction, Op. 37 n.10. Regarding the injunction, the panel held that the District Court did not err in ordering Google to give its competitors access to Play's catalog or to distribute third parties' stores (rather than just developers' apps) through Play, even though the District Court never made any findings that the content of other store's catalogs or user base was causally connected to the conduct the jury found was anticompetitive. Op. 48-50, 52. On the contrary, the term "network effects" was used exactly once during the six-week trial. Google Reply Br. 34 n.12.

The Court granted an administrative stay through resolution of this motion. ECF No. 203. [1]

## LEGAL STANDARD

Federal Rule of Appellate Procedure 8(a) authorizes appellate courts to stay an injunction pending appeal, including pending rehearing en banc, panel rehearing, and certiorari review. *See, e.g.*, *United States v. Abbott*, No. 23-50632 (5th Cir. Jan. 29, 2024), ECF No. 134; *Teva Branded Pharm. Prod. R&D, Inc. v. Amneal Pharms. of New York, LLC*, No. 24-01936 (Fed. Cir. Jan. 22, 2025), ECF No. 116; *Innovation Law Lab. v. Mayorkas*, No. 19-15716 (9th Cir. 2020), ECF No. 93.

---

[1] Unless otherwise specified, "ECF" refers to this Ninth Circuit docket and "D. Ct. Dkt." refers to the multidistrict litigation docket, No. 3:21-md-02981-JD (N.D. Cal.).

In assessing a stay request, this Court considers four factors: whether the movant "has made a strong showing that [it] is likely to succeed on the merits," whether the movant "will be irreparably injured absent a stay," the public interest, and whether a stay "will substantially injure the other parties." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006-07 (9th Cir. 2020) (quotation marks omitted); *Abbott*, No. 23-50632, ECF No. 134 (applying same test for a stay pending en banc review). "[A] stronger showing of one element may offset a weaker showing of another." *Al Otro Lado*, 952 F.3d at 1006-07. "An applicant for a stay need not demonstrate that it is more likely than not they will win on the merits, but rather must show a reasonable probability or fair prospect of success." *FTC v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (per curiam).

When considering whether to grant a stay pending certiorari, the Court also considers whether there is a "reasonable probability that four Justices will consider the issue[s] sufficiently meritorious to grant certiorari." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010). This Court's "general practice" in the analogous context of staying the mandate pending certiorari is to grant a stay "if the arguments presented therein are not frivolous." *Apple III*, 73 F.4th at 785 (M. Smith, J., concurring).

9

## ARGUMENT

## I.  GOOGLE HAS A REASONABLE PROBABILITY OF PREVAILING ON EN BANC OR CERTIORARI REVIEW.

En banc review is warranted where a panel decision conflicts with law from the Ninth Circuit, other circuits, or the Supreme Court, or presents a legal issue of exceptional importance.  Fed. R. App. P. 40(b).  Certiorari review is appropriate where the lower court decision departs from other circuits or Supreme Court precedent and presents a recurring issue or one of national concern.  Sup. Ct. R. 10. Multiple aspects of the panel opinion qualify for further review.

### A.  The Liability Opinion Conflicts With Governing Precedent And Fundamental Antitrust Law.

#### 1.  The Issue Preclusion Ruling Conflicts With *Epic v. Apple* And Punishes Google For Pro-Competitive Behavior.

The panel's preclusion holding warrants en banc review because it creates a square conflict with *Apple I* about the "area of effective competition" for mobile-gaming transactions, have vast consequences for the American economy where this Court plays an outsized role.  In antitrust cases, "the relevant market … refers to 'the area of effective competition.'"  *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  That area constitutes "the field in which meaningful competition is said to exist," such that the firms within that area face meaningful constraints from competitive pressure.  *Id.* (quotation marks omitted).  It is the benchmark that allows

a Court "to measure [the defendant's] ability to lessen or destroy competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) ("*Amex*") (quotation marks omitted).

In *Apple II*, this Court affirmed an area of effective competition for "mobile gaming transactions" that included Apple, Google, and other Android app stores like Samsung and Amazon. *Apple II*, 67 F.4th at 981. That market definition was decisive in Epic's antitrust claims against Apple: Because Apple faced meaningful competition from Google and others in that "area of effective competition," Epic could not show Apple had sufficient market power to prevail. Although Apple had a majority market share for the transactions at issue, its share was not high enough to threaten competition. *Apple I*, 559 F. Supp. 3d at 1030-32.

Epic's claims against Google centered on the exact same mobile gaming transactions from the exact same time period. Setting aside whatever other, non-mobile-gaming transactions Epic *additionally* sought to litigate in its claims against Google, there is no way to avoid a conflict in the findings about *the same mobile gaming transactions in both cases*. Either Apple and Google were in the same area of effective competition to complete those transactions, as *Apple I & II* held, or they were not, as Epic argued in its case against Google. Both cannot be true at the same time—which is exactly the problem issue preclusion is meant to address.

Because a large portion of Epic's asserted market here comprised *the same mobile gaming transactions* addressed in *Apple I & II*, issue preclusion should have

11

prevented Epic from seeking a different "area of effective competition" *for those transactions*. And because those transactions comprise such a large portion of Epic's asserted market, Epic has *never* argued it can prevail if preclusion applies as to those transactions. *See* 5-ER-999 ("[Games] … constitute at least 80 percent of Google Play transaction revenues."). This issue is tailor made for preclusion. Once an issue has been fully litigated and decided on the merits, and the party against whom preclusion is asserted had a full and fair opportunity to litigate, there is no redo. *See Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021).

The panel nevertheless concluded the "issue" in the two cases was different and allowed Epic to dodge the preclusive consequences of *Apple* by focusing on the fact that the "market definition question" was not identical in the two cases and that Epic claimed different harms from the two company's different business models. Op. 20-21. Google's argument is not that Epic was limited to precisely the markets it argued in *Apple*, but that it could not seek markets in this case that *conflicted* with those found and affirmed in *Apple*. Regardless of whether the entire market or entire set of asserted harms were identical, uncontroverted data in the record established that this case concerns the area of effective competition for many of the same transactions that *Apple I and II* already found were transactions that Apple and Google (and others) competed to complete. 5-ER-999.

12

Moreover, the supposed differences the panel identified were not only immaterial, they conflict with the fundamental purpose of antitrust law, which exists to foster "competition that promotes … consumer interests." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984). None of the differences the panel identified—which are all variations on the fact that Apple has a "'walled garden'" approach while Google has an "'open distribution'" approach (Op. 20-21)—alter the fact that *Apple I & II* found Apple and Google are each other's "main" competitor for mobile gaming transactions. *Apple II*, 67 F.4th at 985. How each company competes for those transactions may differ, but the fact of the competition is the same. And that is the issue to which preclusion attached once *Apple* was decided.

Moreover, the panel's approach gets things backwards and creates perverse incentives. It effectively punishes Google with increased antitrust exposure *precisely because* it made a competitive choice to offer more openness than Apple and to allow competing stores and sideloading on Android. The signal to digital platform operators could not be clearer: A closed ecosystem protects you from antitrust liability; openness exposes you to it. As the Nation's leading court on technology issues, this Court should grant rehearing to consider the extraordinary implications of diverging from *Apple*.

13

The panel also expressed concern that "a court's definition of a given market" in one case could become "a universal ban on antitrust action in any market within or overlapping that market." Op. 24. That is simply not the case. Preclusion only applies against the party who had a full and fair opportunity to litigate the issue; there is no risk it would preclude liability for others. Nor would preclusion necessarily prevent a party from asserting "submarket" theories in other contexts involving a different set of transactions. Here, however, there is not a meaningful difference from the market found in *Apple*, which addressed app transactions through Apple, Google, and other Android stores.[2]

### 2. This Court's Rule Of Reason Framework Conflicts With Supreme Court And Other Circuit Precedent.

The panel's treatment of Epic's burden under the Rule of Reason framework conflicts with Supreme Court and at least Second Circuit precedent and is ripe for further appellate review.

The Supreme Court has explained that the Rule of Reason framework for assessing monopolization and unreasonable restraint claims under the Sherman Act proceeds in three steps: The plaintiff first must "prove that the challenged restraint

---

[2] In a footnote, the panel also suggested the District Court could have refused to apply preclusion based on timing. But any discretionary component of preclusion is exercised by the *trial* court, not the court of appeals. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). The District Court did not purport to reject Google's post-trial argument for preclusion on timeliness grounds—as the panel recognized. *See* Op. 17 n.5.

has a substantial anticompetitive effect." *Amex*, 585 U.S. at 541. The "burden then shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If the defendant makes that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542; *accord NCCA v. Alston*, 594 U.S. 69, 96-97 (2021). A plaintiff's inability to meet its burden at the third step spells the end of its case. *See, e.g.*, *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 114, 120-122 (2d Cir. 2021).

This Circuit's precedent, however, relieved Epic of its burden at step three. Op. 37 n.10. The jury was allowed to find a Sherman Act violation so long as it determined that competitive harms outweighed the procompetitive benefits of the challenged conduct, even if Epic failed to prove that the procompetitive benefits could be reasonably achieved through less restrictive means. *Id.* The panel acknowledged it was bound by *Apple II*, which determined that "where a plaintiff's case comes up short at step three, the [factfinder] must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits." 67 F.4th at 994.

*Apple II*'s holding conflicts with Supreme Court and at least Second Circuit law. *Amex*, 585 U.S. at 542; *accord 1-800 Contacts*, 1 F.4th at 114, 120-122. "In this suit, *as in any*, the [factfinder] had to determine … *whether any procompetitive*

15

benefits … could be achieved by 'substantially less restrictive alternative' means." *Alston*, 594 U.S. at 101 (emphasis added); *1-800 Contacts*, 1 F.4th at 121 (similar). This "less restrictive alternative" requirement ensures courts "give wide berth to business judgments." *See Alston*, 594 U.S. at 102-103; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 453 (1992) ("Liability *turns*, then, on whether 'valid business reasons' *can explain* [the defendant's] actions." (emphasis added)).

This Circuit's free-for-all balancing approach effectively relieves the plaintiff of their burden under step three. Indeed, the *Apple II* court itself expressed substantial misgivings about its approach. 67 F.4th at 994 ("We are skeptical … of superimposing a totality-of-the-circumstances balancing step onto a three-part test that is already intended to assess a restraint's overall effect"); *see also id.* at 993 (noting "inconsisten[cy]" in Ninth Circuit precedent).

This case presents an ideal vehicle for the en banc court to revisit *Apple II*'s treatment of the plaintiff's burden under the Rule of Reason and resolve the substantial tension that *Apple II* sows. Intervention is especially warranted given the sheer amount of antitrust suits brought in the Ninth Circuit against companies building novel technologies. By crafting a workaround for plaintiffs who fail to

meet their burden at the third step of the Rule of Reason, this Court risks kneecapping procompetitive innovations that have no less restrictive alternative.[3]

**B. Forcing Play To Share Its Catalog With Competitors And To Distribute Competitors' App Stores Contravenes Supreme Court, Ninth Circuit, And D.C. Circuit Precedent.**

The panel's affirmance of the injunction's catalog-access and app store distribution remedies cannot be right as a matter of law: It ignores binding Supreme Court precedent, contravenes prior Ninth Circuit precedent, and creates a split with the D.C. Circuit.

Compelled sharing is a highly disfavored remedy under antitrust law. *See, e.g.*, *Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1183 (9th Cir. 2016); *see also Qualcomm*, 935 F.3d at 756 (describing the only recognized forced-dealing exception as "at or near the outer boundary of [Sherman Act] liability") (quotation marks omitted). As the Supreme Court explained, "judges make for poor central planners" and "must be wary, too, of the temptation to specify the proper price, quantity, and other terms of dealing." *Alston*, 594 U.S. at 102-103 (quotation marks

_____

[3] Because the District Court based its UCL verdict entirely on the antitrust verdict, the UCL verdict must necessarily also be reversed. As the panel correctly observed, UCL claims are not automatically foreclosed when there is a failure to prove an antitrust violation because UCL claims involving "unfair" competition entail a test distinct from antitrust law. Op. 16 n.3; *see also Apple II*, 67 F.4th at 1000. But the District Court exclusively tethered its analysis of Epic's UCL claim to the liability verdict without applying that separate test. 1-ER-9-10. Even Epic did not argue otherwise. *See* Epic Br. 67-68.

omitted).  As a result, such remedies cannot be imposed absent a finding of a "significant causal connection" between the conduct found unlawful and the defendant's "dominant position" in the market.  *United States v. Microsoft Corp.*, 253 F.3d 34, 106 (D.C. Cir. 2001) (en banc) (per curiam) ("*Microsoft I*").

The injunction's catalog-access and app-store distribution remedies flout both rules.  The remedies foist the District Court into a central planning role of setting and supervising the novel terms, price, and mechanics of these forced distribution arrangements. 1-ER-4-5; *but see Alston*, 594 U.S. at 102-103.  The District Court also imposed these remedies to redress "network effects," without making any record-based finding that the remedies targeted network effects *caused* by Google's anticompetitive conduct rather than those Google legitimately acquired as a first-mover in the Android app-distribution space.  *See* 1-ER-17-20.

The panel's decision upholding these remedies departs from existing precedent in two key ways.  *First*, the panel dismissed the Supreme Court's concerns about imposing duties to deal in *Verizon Communications Inc v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004), as a case about "whether a unilateral refusal to deal with rivals violates Section 2 of the Sherman Act—*not* the legality of compelling a defendant already found liable under that statute to deal with its competitors."  Op. 45-46.  But the Supreme Court has squarely held that "[s]imilar considerations apply" at the liability and remedy stages.  *Alston*, 594 U.S. at 102.  A

18

critical reason antitrust law does not generally prohibit "unilateral refusal[s] to deal with rivals" is because they create substantial problems at the remedy stage. *Id.* Forced sharing "lessen[s] the [investment] incentive[s] for the monopolist, the rival, or both," facilitates collusion, and requires "antitrust courts to act as central planners," a role for which they are "ill" equipped. *Trinko*, 540 U.S. at 411; *accord Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013) (Gorsuch, J.). Indeed, *Trinko* admonished courts not to "impose a duty to deal" remedy that requires them to "assume the day-to-day controls characteristic of a regulatory agency." 540 U.S. at 415 (quotation marks omitted). The panel did not dispute that the injunction's duty-to-deal remedies required central planning. Op. 45-47.[4]

*Second*, the panel held that a district court need not tailor "an injunction [to] only touch the consequences of a defendant's conduct." Op. 48. This Court's decision in *Optronic* and the D.C. Circuit's decision on which *Optronic* relied say exactly the opposite. When a court seeks to impose an injunction going "beyond a simple proscription against the precise conduct previously pursued," *Optronic*, 20 F.4th at 486 (quotation marks omitted), the relief imposed must be a "'reasonable

---

[4] The only cases the panel cited to support compelled sharing either predated *Trinko* by over three decades, *see Ford Motor Co. v. United States*, 405 U.S. 562 (1972), or did not implicate central planning concerns, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (upholding duty-to-deal remedy requiring company to supply rivals existing products on same terms as other market participants).

method of eliminating the *consequences* of the *illegal conduct*,'" *id.* (quoting *Microsoft I*, 253 F.3d at 105 (emphasis added)).

Requiring careful delineation of those consequences and their magnitude implements important policies: Antitrust laws serve to promote competition, not to deprive companies of "returns" earned from legitimate "innovation," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1219 (D.C. Cir. 2004) (*Microsoft II*), nor reduce "the incentive" of a monopolist to "invest," *Trinko*, 540 U.S. at 407. By requiring courts to measure the extent of the consequences of a defendant's unlawful conduct and tailor remedies to that extent, antitrust law targets the results of anticompetitive behavior without stripping companies of their fairly earned investments or harming consumers through decreased competition. *See, e.g.*, *Microsoft II*, 373 F.3d at 1226 (remedy must be tailored to liability "[i]f the court is not to risk harming consumers"); *Optronic*, 20 F. 4th at 486 (describing courts' power to "terminate the illegal monopoly [and] deny to the defendant the *fruits* of its statutory *violation*" (quotation marks omitted) (emphasis added)).

That is especially important in monopoly maintenance cases like this one, where a company legitimately acquires the alleged monopoly and then later supposedly entrenches its market position through anticompetitive behavior. *See, e.g.*, *Microsoft I*, 253 F.3d at 58; ECF No. 47.1 at 17-19. In such cases, courts must distinguish between consequences resulting from the anticompetitive entrenchment

and consequences resulting from "vigorous competition." *Microsoft I*, 253 F.3d at 58, 1219.

The panel made no effort to separate the two here. The *only* causal finding identified by the panel was a single line that "Google unfairly enhanced its network effects in a way that would not have happened but for its anticompetitive conduct." Op. 49. That finding does not speak to the extent to which network effects were attributable to anticompetitive versus legitimate first-mover conduct. The *only* record evidence on which this broad-brush finding was based showed that Google already enjoyed network effects by the beginning of the relevant time period. *See, e.g.*, Op. 49; 1-ER-16; 6-ER-1264. And Epic did not even attempt to present evidence showing the extent of network effects before and after Google's antitrust violation. The panel's opinion relieves the District Court of the need to tailor the injunction to the consequences of Google's conduct. 1-ER-17-20.

Unless corrected, the panel's holding will entangle Google with its competitors and require judicial micromanagement of business decisions, all of which will ultimately hinder incentives to innovate. That is precisely what the antitrust laws aim to prevent.

## II.   THE INJUNCTION WILL INFLICT IRREPARABLE HARM ON GOOGLE.

Absent a stay, Google will suffer immediate irreparable harm.  If this unprecedented injunction is to take effect, it should be only after Google's appellate options are exhausted.  Preserving the status quo is a prudent step.

### A.   Security Risks Threaten Severe And Irreversible Harm To Users And Reputational Harm For Google.

The injunction threatens immense reputational harm via immediate increased security concerns on the Android ecosystem.  This Court has repeatedly recognized that "loss of goodwill" constitutes irreparable harm for purposes of a stay motion. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017); *accord Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill" is "irreparable harm.").

The injunction's provisions related to providing users links to download apps are a particularly stark example of the security risks imposed by the injunction.  As the Android head of security has explained, "[s]ophisticated malicious actors" will "engage in bait-and-switch strategies to gain users' trust before exposing them to harmful content via links."  2-ER-206.  Former national security officials agree: malicious "state and non-state actors are continually developing ever more effective methods of persuading these users to click on malware."  ECF No. 48.2 at 18. "Proactive measures are crucial because … trying to undo compromised data is like

22

putting toothpaste back in the tube." 2-ER-206. And beyond just stolen data, users can be subject to blackmail and surveillance that has irrevocable and damaging consequences on their careers or personal lives. ECF No. 48.2 at 12; ECF No. 55.1 at 14. As cybersecurity experts explained, these problems are even more severe for the links ordered here because "users would encounter these links in a previously trusted environment" precisely because "Google has spent years cultivating a secure user experience within the Play Store and the applications available on Play." ECF No. 49.3 at 21.

The catalog-access requirement substantially compounds these problems. There are hundreds of Android app stores, many of which contain content that is scammy at best and malicious at worst. *See, e.g.*, ECF No. 49.3 at 29 (example of app that spoofed streaming service to steal sensitive data). If millions of apps suddenly appear available in those stores, the stores will look legitimate regardless of whether they are and without having to compete in the market *at all*. 2-ER-427-429; 2-ER-208. Developers too will be saddled with constantly monitoring dozens or hundreds of stores that might suddenly carry their apps without their knowledge. *See, e.g.*, ECF No. 68.2 at 13-15 (small developers explaining burdens from injunction). And opting out cannot protect developers from pirated versions of developers' apps appearing alongside the millions of Play's legitimate apps.

23

The store-distribution requirement goes even further, effectively requiring Google to put its stamp of approval on stores that might be full of harmful content, which can range from malware that can scam or extort users to pornography to hate speech. 2-ER-209-213. Although the injunction allows Google to engage in at least *some* vetting of the stores it must distribute, it hobbles Google's ability to *effectively* screen those stores by permitting only screening measures that are "strictly necessary and narrowly tailored." That standard is antithetical to the purpose of security screening, which is "prophylactic" and therefore "err[s] on the side of protecting users from potentially dangerous content and risky features in order to prevent security breaches *before* they occur." 2-ER-211 (emphasis added). Moreover, even applying Google's "normal vetting procedures to third-party stores and the apps they offer … would not fully mitigate the risk because Google" will not maintain full "visibility and signals from third-party store interactions" and stores may change or monitor their content after launch on the Play store. 2-ER-212.

These enormous vulnerabilities will harm both Google and its users. They "will deteriorate user trust in the broader Android ecosystem and erode Google's reputation," making users "likely to stop using the Play store and … even switch away from Android devices to iPhones." D. Ct. Dkt. 1020-2 at 4. And some users will blame the source of the app that caused them problems—the Play store—for failing to keep them safe. *Id.*

24

The panel opinion states that these security problems were adequately addressed by the District Court because "the court had before it a robust record on the potential security risks attendant to the catalog-access and app-store distribution remedies." Op. 64. But the robustness of the record stands in stark contrast to the District Court's utter lack of *findings*. It is no answer to observe, as the panel did, that the court allowed Google to address security concerns for app-store distribution, *see id.* at 64-65, particularly when the court sharply curtailed Google's ability to effectively do so through the tailoring requirement.

### B. Google Faces Irreparable Harm To Its Business Model And Ability To Compete.

The injunction irreparably threatens Google's ability to effectively compete, including and especially with Apple. "[C]ompetitive disadvantage" likewise "constitutes irreparable harm." *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015). Apple already portrays Android as less safe than iOS. 5-ER-1230-32. This injunction will fuel that narrative. Google also faces the loss of its legitimately derived comparative advantages over other Android app stores because the panel greenlighted dismantling Google's network effects without any meaningful effort to isolate whether or how much of the network effects are *consequences* of anticompetitive conduct. *Supra* pp. 19-21; Op. 48-49. There is also no dispute that implementing the injunction will cost Google many millions in unrecoverable business expenses. Those losses—which represent money Google

25

could be reinvesting in improving Play and the Android ecosystem at large—likewise constitute irreparable harm. *See In re Victor Techs. Sec. Litig.*, 792 F.2d 862, 864 (9th Cir. 1986).

Finally, by design, the injunction commands Google to make "fundamental business changes that … cannot be easily undone" if it is later vacated. *Qualcomm*, 935 F.3d at 756. Google's contracts with hundreds of thousands of developers, OEMs, carriers, and millions of users will have been rewritten. This Court has recognized that such changes constitute irreparable harm where, as here, they will "disrupt and change the whole nature of its business, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009), and require "renegotiat[ion] [of] existing [contractual relationships] on a large scale," *Qualcomm*, 935 F.3d at 756.

## III.   THE EQUITIES STRONGLY FAVOR A STAY.

The public will also benefit from a stay. The major security risks outlined above will directly impact Play's hundred-million U.S. users and hundreds of thousands of developers. *Supra* pp. 22-24; *accord* ECF No. 55.1 at 3 (Center for Cybersecurity Policy and Law explaining that the injunction "[d]oes a serious disservice to the public interest" by creating "a more dangerous mobile ecosystem"). As former national security officials explain, "our Nation's adversaries—China, Russia, Iran, and others—have expended substantial resources on launching

cyberattacks in the U.S., often targeting mobile devices and mobile apps." ECF No. 48.2 at 5. Indeed, "a state-sponsored hacking group" built "a seemingly legitimate third-party app store, with the sole purpose of concealing spyware." *Id.* at 19. The injunction makes it harder for Google to protect users from these threats.

Additionally, users will be harmed by instability in their mobile ecosystem. Given the size of the Android and Play user base, it disserves the public for Google's policies to be subject to extensive revision or reversion while the appellate process plays out. The panel opinion also creates deeply perverse incentives by warning platform owners that by opening up their platform to competition they are putting themselves at *greater* risk of antitrust liability. *Supra* p. 13. A stay would allow the en banc Court to fully consider the implications of the panel opinion for competition on two-sided platforms.

Epic cannot reasonably claim it will be substantially harmed. Epic chose to relaunch its Android store before it even *knew* what injunction the District Court planned to issue, and it has maintained its store on Android while the injunction has been paused pending the panel's appellate review. To further mitigate any harms to Epic, Google commits to filing its rehearing petition without seeking an extension— meaning it will be filed next week, before this motion is even fully briefed. Moreover, if this Court grants a stay and ultimately denies rehearing, Google will

file its certiorari petition no later than 45 days after this Court's rehearing order—half the time allotted by Supreme Court rules.

## CONCLUSION

For the foregoing reasons, the Court should stay the District Court's injunction, except for ¶ 8 (a contractual change that Google already made and did not seek to stay pending appeal), until resolution of Google's forthcoming petition for rehearing and, if rehearing is denied, through disposition of Google's certiorari petition.  Additionally, Google respectfully requests that if the panel votes to deny this motion, that the motion be circulated to the en banc Court for consideration.

Dated:  August 8, 2025

Respectfully submitted,

/s/ Neal Kumar Katyal

Neal Kumar Katyal
MILBANK LLP
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7505
nkatyal@milbank.com

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Telephone: (617) 371-1000

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Leigha Beckman

Jessica L. Ellsworth
Reedy C. Swanson
Natalie Salmanowitz
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5886
jessica.ellsworth@hoganlovells.com

Johannah Cassel-Walker
HOGAN LOVELLS US LLP
4 Embarcadero Ctr., Suite 3500
San Francisco, CA
Telephone: (415) 374-2334

Glenn D. Pomerantz
Kuruvilla Olasa

MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000

Jonathan I. Kravis
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Justin P. Raphael
Dane P. Shikman
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to this Court's order of _____, 2025, I certify that this motion complies with applicable type-volume and length limitations because it contains 6,393 words, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on August 8, 2025.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

<u>/s/ Neal Kumar Katyal</u>
Neal Kumar Katyal