**Nos. 24-6256 & 24-6274**

IN THE

# United States Court of Appeals
# for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

— v. —

GOOGLE LLC, *et al.*,

*Defendants-Appellants.*

On Appeal from a Final Judgment of the United States
District Court for the Northern District of California (Donato, J.),
Nos. 3:20-cv-05671 & 3:21-md-02981

**BRIEF OF COMPUTER SECURITY EXPERTS
JOHN MITCHELL, SERGE EGELMAN, KEVIN BUTLER,
AMIT ELAZARI, GUOFEI GU, AND SHARAD MEHROTRA AS
*AMICI CURIAE* IN SUPPORT OF DEFENDANTS-
APPELLANTS' PETITION FOR REHEARING**

Robert T. Smith
Neal S. Mehrotra
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.,
Suite 800
Washington, D.C. 20006-3404
robert.smith1@katten.com
neal.mehrotra@katten.com
202-625-3500

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Table of Authorities......................................................................ii

Statement of Interest of *Amici Curiae*..................................... 1

Argument...................................................................................... 5

I.    The District Court's Injunction Raises Unprecedented Security Issues for Over One Hundred Million Android Users..................... 7

    A.    The Injunction Will Lead to a Proliferation of Scam Links, Exposing Millions of Users of Google's Play Store to Extensive Security Risks ........................................ 9

    B.    The Injunction Will Lead to an Explosion of Scam App Stores and Weaken Android's Security Ecosystem Worldwide............................................................... 12

II.    No Court Has Considered the Costs and Benefits of the Remedies the District Court Ordered Here, Warranting Rehearing ........................................................................ 16

Conclusion .................................................................................. 19

Certificate of Compliance......................................................... 20

Certificate of Service ................................................................ 21

# TABLE OF AUTHORITIES

**CASES:**

*La Quinta Worldwide LLC v. Q.R.T.M. S.A. DE C.V.*,
762 F.3d 867 (9th Cir. 2014) ...................................................... 6, 16

**OTHER AUTHORITIES:**

Admin. Office of the U.S. Courts, *Electronic Filing Scam Targets
Attorneys* (Nov. 6, 2024) .................................................................. 8

Bitdefender, *Unveiling Mobile App Secrets: A 6-Month Deep Dive
into Surprising Behavior Patterns*, Jan. 8, 2024 .................... 10, 14

Eduardo Blázquez, *et al.*, *Trouble Over-The-Air: An Analysis of
FOTA Apps in the Android Ecosystem*, 2021 IEEE
Symposium on Security and Privacy 1606 (2021) ......................... 15

Epic Games Store,
*Browse* ........................................................................................ 18

Google,
*Device and network abuse* ........................................................... 10

Platon Kotzias, *et al.*, *How Did That Get In My Phone? Unwanted
App Distribution on Android Devices*, 2021 IEEE Symposium
on Security and Privacy 53 (2021) ................................................. 11

Silviu Stahie, *Google Blocked More than 2 Million Apps from
Being Published in Google Play*, Bitdefender, May 2, 2024 .......... 15

## STATEMENT OF INTEREST OF *AMICI CURIAE**

*Amici curiae* are current and former academics who have studied and researched in the areas of computer security and privacy, and who have extensive experience analyzing the security and privacy risks of mobile applications. They have a substantial interest in ensuring that policymakers and courts make informed, rational decisions about data security and privacy.**

John Mitchell is the Mary and Gordon Crary Family Professor, professor of computer science, and by courtesy professor of electrical engineering and professor of education at Stanford University. He was previously chair of the Computer Science Department. Professor Mitchell's research focuses on programming languages, computer security and privacy, blockchain, machine learning, and technology for education. With over 250 publications and over 30,000 citations, he has

---

* No party or counsel for any party in this case authored this brief in whole or in part. No person or entity—other than *amici* and their counsel—made a monetary contribution specifically for the preparation or submission of this brief.

** Although *amici* are affiliated with various academic and business institutions, they lend their support to this brief in their individual capacities only. Nothing in this brief should be construed as the position of the academic institutions and businesses with which they are affiliated.

led research projects on a range of topics, been a consultant or advisor to many companies, and served as editor-in-chief of the Journal of Computer Security.

Serge Egelman is the Research Director of the Usable Security and Privacy group at the International Computer Science Institute, which is an independent research institute affiliated with the University of California, Berkeley. He also holds a position as a research scientist within the Electrical Engineering and Computer Sciences Department at the University of California, Berkeley. He is a co-founder and Chief Scientist of AppCensus, Inc., which builds tools to test the privacy behaviors of mobile applications. He received his Ph.D. from Carnegie Mellon University's School of Computer Science; his research has been cited over 14,000 times; and he has testified before Congress on issues relating to the privacy and security of mobile applications.

Kevin Butler is the director of the Florida Institute for Cybersecurity and a professor of computer and information science and engineering at the University of Florida. Professor Butler's research focuses on the security of computers—from embedded and mobile devices to cloud computing systems—and the data they generate. He has led a

research team that uncovered smartphone vulnerabilities that would allow hackers to take control of phones and extract private information without user knowledge. In response to his groundbreaking findings, LG and Samsung promptly developed a security patch. Professor Butler is a Senior Member of ACM and the Institute of Electrical and Electronics Engineers (IEEE), and he serves on the Computing Research Association Computing Community Consortium as an expert in computer security and privacy. According to Google Scholar, his work has been cited over 6,000 times, and he has received the National Science Foundation's prestigious CAREER Award. He received his Ph.D. in Computer Science and Engineering from the Pennsylvania State University.

Amit Elazari is a co-founder and the chief executive officer of OpenPolicy, the world's first tech-enabled policy intelligence and engagement platform, which aims to democratize access to policy to entities of all sizes. Dr. Elazari teaches at the School of Information and Cybersecurity at the University of California, Berkeley, and at Reichman University, and serves as a member of the External Advisory Committee for the UC Berkeley Center of Long-Term Cybersecurity. Prior to OpenPolicy, she was Head of Global Cybersecurity Policy at Intel

Corporation, responsible for shaping and executing Intel's global security policy and government affairs engagement across all of Intel Technologies. She holds a Doctoral Degree in the Law (J.S.D.) from the University of California Berkeley School of Law.

Guofei Gu is a professor, the holder of the Eppright Professorship in Engineering, and the Director of the Secure Communication and Computer Systems (SUCCESS) Lab in the Department of Computer Science and Engineering at Texas A&M University. His research interests are in network and systems security, including software-defined programmable security, malware and intrusion detection, Artificial Intelligence security, and security related to mobile devices. Professor Gu is also an IEEE Fellow and an ACM Distinguished Member. According to Google Scholar, his work has been cited over 20,000 times. He received his Ph.D. in Computer Science from the College of Computing at the Georgia Institute of Technology.

Sharad Mehrotra is a Distinguished Professor of Computer Science at the University of California, Irvine. He is a fellow of ACM and of IEEE. Professor Mehrotra's research expertise spans database management, distributed systems, and secure databases, including computer and cloud

- 4 -

security, data privacy, cryptography, software engineering, and machine learning. He has received numerous awards and honors, including the 2011 SIGMOD Best Paper Award, the 2007 DASFAA Best Paper Award, DASFAA ten-year best paper award for 2013, the 1998 CAREER Award from the National Science Foundation, ACM ICMR Best Paper Award for 2013, IEEE SRDS Best paper award 2018, IEEE NCA best paper award 2019, and IEEE Percom 2022 Best Paper Award. His over 500 articles have been cited over 28,000 times according to Google Scholar. His pioneering contributions to the field include his work on encrypted search on database as a service that was recognized through the prestigious SIGMOD Test of Time award in 2012 and DASFAA ten-year best paper award in 2014. Prior to entering academia, Professor Mehrotra was a Scientist at Panasonic Technologies. He received his Ph.D. from the University of Texas at Austin in Computer Science.

## ARGUMENT

Injunctions are supposed to be about balancing. In this case, the District Court should have balanced the jury's findings of alleged anticompetitive conduct, Epic Games' claimed need for the various remedies that were on the table, and the potential benefit and harm

associated with each of those remedies—particularly to the consuming public.

But that balancing never occurred. Instead, when it came to the security interests of over one hundred million Android users, the District Court threw up its hands: "As Google has suggested, there are potential security and technical risks involved in making third-party apps available, including rival app stores. The Court is in no position to anticipate what those might be, or how to solve them." 1-ER-18. Punting, it left some of these issues to a technical committee to sort out on the backend. 1-ER-18-19. And a panel of this Court blessed that approach in contravention of circuit precedent, Op. 64-65, which required the District Court to make findings of fact "relevant to weighing the equities in this case"—not leave those tasks to someone else, *La Quinta Worldwide LLC v. Q.R.T.M. S.A. DE C.V.*, 762 F.3d 867, 879 (9th Cir. 2014).

As *amici* explain, there are two aspects of the injunction that do not survive any reasonable balancing inquiry: (1) requiring Google to allow external links within apps and listings available on Google's Play Store and (2) mandating that Google provide its full catalog of apps available on the Play Store to anyone who wishes to run a rival app store and

compelling Google to list on the Play Store the third-party-app-store app of anyone who runs a third-party app store. The benefits to Epic and consumers are not obvious, and the harms to the security of Android users are drastic and cannot reasonably be limited through risk-mitigation strategies.

The Court should grant Google's petition for rehearing to address the critical security flaws in the District Court's injunction order.

## I.    The District Court's Injunction Raises Unprecedented Security Issues for Over One Hundred Million Android Users.

The District Court's injunction poses serious security risks, which can be illustrated by a recent scam that plagued the CM/ECF system used by federal courts. Lawyers and parties who signed up for ECF notifications started receiving seemingly legitimate e-mail notifications with links to access case documents on court websites. As it turned out, scammers were behind the e-mails; the websites they were directing people to were malicious; and some of those people unwittingly surrendered sensitive personal information and installed malware on

their computers. Admin. Office of the U.S. Courts, *Electronic Filing Scam Targets Attorneys* (Nov. 6, 2024).[1]

To avoid being a victim of the scam, the federal judiciary advised users to "[n]ever download attachments or click on links from unofficial or questionable sources." *Id.* And users were instructed to validate e-mails and "case documentation directly through [their] local federal court's CM/ECF system." *Id.*

The Administrative Office of the United States Courts drew upon two sound practices when it comes to computer and information security. First, downloading questionable attachments or clicking on unverified links can present a serious security risk. Second, where there is a legitimate, centralized repository of information, users can use that source to verify that a particular communication is not a scam.

In this case, however, the District Court issued a permanent injunction that violates these principles as applied to the more than one hundred million users whose devices run on Google's Android operating system. As explained below, the injunction will lead to an explosion of

---

[1] https://www.uscourts.gov/data-news/judiciary-news/2024/11/06/electronic-filing-scam-targets-attorneys.

- 8 -

external links displayed within apps downloaded on Google's Play Store or through Play Store listings, increasing the likelihood that users will be directed to websites where they might inadvertently install malware onto their devices or surrender highly sensitive personal and financial information. And the injunction will lead to the proliferation of scam app stores, which will increase the prevalence of pirated and malicious apps on Android devices and impair the ability of users to verify the legitimacy of apps that they might wish to download.

**A.    The Injunction Will Lead to a Proliferation of Scam Links, Exposing Millions of Users of Google's Play Store to Extensive Security Risks.**

Under paragraph 10 of the injunction, Google may not prohibit developers from embedding within the apps they distribute through the Play Store external links to download apps outside the Play Store. *See* 1-ER-4. This is a recipe for disaster.

Google currently prohibits developers from including external links to download apps in any app the developer distributes through the Play

- 9 -

Store because such links pose a serious security risk. *See* Google, *Device and network abuse.*[2] Links can direct users to anywhere on the Internet.

As the federal judiciary now knows all too well, if the links direct users to sites that are malicious but appear legitimate, they could lead to a variety of security risks. On Android devices, that could include tricking users into installing malware, directing users to provide sensitive financial and personal information, stealing users' data, tracking users' activities on the Internet, and even accessing a device's location, text messages, microphone, and camera, or initiating and answering phone calls. *See* Bitdefender, *Unveiling Mobile App Secrets: A 6-Month Deep Dive into Surprising Behavior Patterns*, Jan. 8, 2024.[3]

The dangers of the District Court's injunction are particularly significant because users would encounter these links in a previously trusted environment. Because Google has spent years cultivating a secure user experience within the Play Store and apps available on Play, users will be more prone to trust these links, exposing them to all the

---

[2] https://support.google.com/googleplay/android-developer/answer/16273414?hl=en&sjid=11373020642207796491-NA#.

[3] https://www.bitdefender.com/en-us/blog/labs/unveiling-mobile-app-secrets-a-6-month-deep-dive-into-surprising-behavior-patterns/.

risks outlined above. *E.g.*, Platon Kotzias, *et al.*, *How Did That Get In My Phone? Unwanted App Distribution on Android Devices*, 2021 IEEE Symposium on Security and Privacy 53, 61 (2021).[4] And whereas Google can vet the apps that it makes available through the Play Store, mitigating the risk of malware and quickly removing malicious and unwanted apps from the Play Store and users' devices through centralized mechanisms, Google cannot possibly track every app available for download on the Internet that would be accessible through the kinds of external links mandated by the District Court.

Notably, Google does not force Android users to download apps through Google's Play Store; they are free to download apps from external sources, including from third-party app stores. But for those users who elect to use Google's Play Store, many prefer Play's security features. Indeed, academic research suggests that, outside of Google Play and a handful of other well-run app stores, "users of other top alternative markets have up to 19 times higher probability of encountering an unwanted app," and the risks posed by web-downloads are "significantly higher" still. *How Did That Get In My Phone?*, *supra*, at 54.

---

[4] https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=9519429.

Allowing malicious actors to communicate through links posted on Google's Play Store will only exacerbate these problems, reducing those few regions of the Internet that users can generally trust.

**B.   The Injunction Will Lead to an Explosion of Scam App Stores and Weaken Android's Security Ecosystem Worldwide.**

Under paragraphs 11 and 12 of the injunction, Google must distribute competitor app stores through Google's Play Store and provide those competitors with access to Play's entire catalog of apps. *See* 1-ER-4-5. These paragraphs present a host of problems that threaten to weaken Android's app ecosystem worldwide.

To start, paragraphs 11 and 12 will lead to the proliferation of scam and substandard app stores that can rely upon Google's backend work to hawk their wares. An app store with a sizeable catalog of apps requires investment and technical know-how to attract users and gain legitimacy. The injunction makes it too easy for malicious and shoddy app stores to pose as legitimate. Under the injunction, Google must provide its full catalog of apps to any applicant who requests access. Although Google may attempt to impose security and safety standards on the third-party-app-store *apps* it is forced to carry on the Play Store, it will "bear the

burden of proving that its technical and content requirements and determinations are strictly necessary and narrowly tailored." 1-ER-5. And as discussed below, there are a variety of technical limitations on Google's ability to police the contents of third-party app stores.

The risks associated with scam and substandard app stores are already very real, and the District Court's injunction threatens to make the problem worse. Scam app stores lure users by appearing legitimate, but they can fake and clone apps that wreak havoc on unsuspecting users. For example, one app disguised itself as a movie streaming service:

 

Bitdefender, *supra*, at note 3. This app was actually malware that "can access contacts data, calendar data, sensor data, send and receive [text messages], read and write on external storage, access the device['s] location, read or write [telephone] call logs or even redirect [calls] to a different number, initiate or answer phone calls, record audio [using the device's microphone], recognize physical activity [from the device's proximity and other sensors], and access the camera" on the device. *Id.* Although this app was removed by Google from the Play Store, it is "still likely available to download from other sources." *Id.*

Moreover, criminals specifically target unsuspecting users by cloning "popular apps" like Netflix, Instagram, Spotify, and others to pry users of their passwords, infect their devices with malware, and obtain access to sensitive personal and financial information, *id.*—an unfortunate practice that occurs within the Android ecosystem. Paragraphs 11 and 12 would hand cybercriminals the tools needed to make more effective storefronts for listing such reverse-engineered apps, and Google would have to expand its resources to try to take them down.

Even benevolent but substandard app stores pose security and safety risks for consumers. Operating systems and apps require frequent

updates to ensure that they run properly and to eliminate security and safety vulnerabilities. Substandard stores—the kinds propped up by the District Court's injunction—risk disseminating out-of-date apps with critical security deficiencies. *See* Eduardo Blázquez, *et al.*, *Trouble Over-The-Air: An Analysis of FOTA Apps in the Android Ecosystem*, 2021 IEEE Symposium on Security and Privacy 1606, 1606 (2021).[5]

In contrast, well-run app stores improve the supply chain of apps by investing in the resources and technical know-how necessary to help block and remove malicious apps from the top down, benefitting millions upon millions of users quickly and efficiently. In 2023 alone, "Google stopped 2.28 million policy-violating apps from being published on Google Play," and it blocked 330,000 bad accounts for confirmed security violations. Silviu Stahie, *Google Blocked More than 2 Million Apps from Being Published in Google Play*, Bitdefender, May 2, 2024.[6]

The District Court's injunction would make it too easy for people to set up an app store who, quite frankly, have no business doing so. And

---

[5] https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=9519485.

[6] https://www.bitdefender.com/en-us/blog/hotforsecurity/google-blocked-more-than-2-million-apps-from-being-published-in-google-play.

the results are predictable: The Android ecosystem will become significantly less safe and secure for users worldwide if the District Court's injunction is implemented.

## II. No Court Has Considered the Costs and Benefits of the Remedies the District Court Ordered Here, Warranting Rehearing.

The District Court was required to evaluate the serious risks posed by paragraphs 10-12 of the injunction and weigh them against the potential benefits. It did neither.

When it came to evaluating the risks, the District Court threw up its hands. It proclaimed that it was in "no position to anticipate what those [risks] might be, or how to solve them." 1-ER-18. Instead, it purported to leave these issues to a technical committee.

Even if precedent would have allowed the District Court to defer a ruling on these important issues, *but see La Quinta*, 762 F.3d at 879, there are two practical problems with this approach:

*First*, the District Court did not make sufficient allowances for the technical committee to review the obvious risks posed by the injunction. The District Court did not include any express provision authorizing Google to attempt to screen links from the standpoint of security or

safety. *See* 1-ER-4 (Injunction ¶ 10). And the injunction provides no standards for vetting candidates who request access to Google's catalog of apps or demand that Google list their app-store app on the Play Store. *See* 1-ER-4-5 (Injunction ¶¶ 11-12).

*Second*, no amount of technical guidance can eliminate the risks posed by the injunction. For both links and apps hosted on third-party app stores, Google would need to vet content on external web servers (*e.g.*, developers' websites, third-party app stores, etc.), which would involve a nearly infinite amount of content at unknown locations. And even if Google could undertake this Herculean task, there's no reason to believe the web address behind a link or the third-party-app-store app vetted by Google will serve the same content when visited at a different time by someone else.

Against these real risks, the benefits of these provisions of the injunction are not obvious. Developers are free to communicate directly with potential consumers and make their apps available for download outside of Google's Play Store—without the need for them to embed external links in the apps they make available on the Play Store. And although *amici* are by no means experts on competition law, it is not

obvious how consumers are served by allowing anyone on the Internet to free-ride off Google's backend work to prop up an app store—particularly where there are already credible alternatives to the Play Store, including Amazon's Appstore, F-Droid, and Samsung's Galaxy Store (for those with a Samsung device).

Nor are the benefits obvious when the focus is limited to Epic. As *amici* understand it, Epic's principal beef with Google was its policy that all Play Store apps use Google Play Billing—a policy that the District Court remedied through other provisions of the injunction. Epic has not shown any need to embed links in apps downloaded on the Play Store or within its Play Store listing. Nor has Epic shown any need to access the entire catalog of Google's Play Store. To the contrary, Epic—one of the largest game developers on the planet—has launched an app store for Android focused on mobile games, not broader apps unaffiliated with gaming. *See* Epic Games Store, *Browse* (Filter by Android)[7]; *accord* 5-SER-974; 5-SER-1194.

---

[7] https://store.epicgames.com/en-US/browse?sortBy=releaseDate&sortDir=DESC&tag=Android&count=40&start=0

There was no discussion of any of this by the District Court. It threw its hands up at the security risks and never considered the need for these provisions in the first place. And a panel of this Court explicitly blessed the District Court's failure to make findings or conduct a balancing inquiry on critical issues of computer security affecting millions of users.

## CONCLUSION

The Court should grant Google's petition for rehearing.

Dated: August 22, 2025                    Respectfully submitted,


                                          /s/ Robert T. Smith
                                          Robert T. Smith
                                          Neal S. Mehrotra
                                          Katten Muchin Rosenman LLP
                                          1919 Pennsylvania Avenue, N.W.
                                          Suite 800
                                          Washington, D.C. 20006-3404
                                          robert.smith1@katten.com
                                          neal.mehrotra@katten.com
                                          202-625-3500

                                          *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-form and volume requirements. Specifically, the Brief of *Amici Curiae* is proportionately spaced; uses a Roman-style, serif typeface (Century Schoolbook) of 14-point; and contains 3,359 words, exclusive of the material not counted under Rule 32(f) of the Federal Rules of Appellate Procedure.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, I electronically transmitted a copy of the foregoing Brief of *Amici Curiae* to the Clerk of the Court using the Appellate Case Management System (ACMS) for filing. Service will be accomplished electronically through the ACMS for all registered participants.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Amici Curiae*