NOS. 24-6256, 24-6274, 25-303

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC., a Maryland Corporation,

*Plaintiff-Appellee,*

– v. –

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE, LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NOS. 3:20-CV-05671-JD, 3:21-MD-02981-JD
HON. JAMES DONATO

## BRIEF OF *AMICI CURIAE* INTERNATIONAL CENTER FOR LAW & ECONOMICS IN SUPPORT OF APPELLANTS' MOTION FOR REHEARING

MATTHEW FREIMUTH
WILLKIE, FARR & GALLAGHER
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile:  (212) 728-8111
mfreimuth@willkie.com

JONATHAN PATCHEN
COOLEY LLP
Three Embarcadero Center,
   20th Floor
San Francisco, California 94111
Telephone: (415) 693-2000
Facsimile:  (415) 693-2222
jpatchen@cooley.com

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

The International Center for Law & Economics ("ICLE"), asserts that there it has no parent corporation and no publicly held corporation owns ten percent of more of its stock.

# **<u>TABLE OF CONTENTS</u>**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTERESTS OF THE AMICI ................................................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ....................................................................................4

    I.     THE DECISION IS BASED ON AN INCORRECT MARKET DEFINITION AND MARKET POWER ASSESSMENT ................................................................4

    II.   THE INJUNCTION IS OVER-BROAD AND RISKS HARM TO CONSUMERS IN A COMPETITIVE TWO-SIDED MARKET ....................................................10

         A.    The Injunction Threatens Irreparable Harm to the Entire Mobile Ecosystem ...........................................10

         B.    The Panel's Holding Is Inconsistent with Supreme.................15

CONCLUSION...............................................................................18

CERTIFICATE OF COMPLIANCE.......................................................19

CERTIFICATE OF SERVICE .............................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020) ........................................................................15

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .............................................................................7

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...........................................................................16

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...................................................... *passim*

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972) ...........................................................................18

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ................................................................6

*Gill v. Whitford*,
  585 U.S. 48 (2018) .............................................................................16

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .......................................................7, 11

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...........................................................................15

*Montana v. United States*,
  440 U.S. 147 (1979) .............................................................................4

*NCAA v. Alston*,
  594 U.S. 69 (2021) .............................................................................10

*NLRB v. Express Publishing Co.*,
  312 U.S. 426 (1941) ...........................................................................17

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ................................................................... 6, 7, 11

*Trump v. CASA, Inc.*,
  606 U.S. __ (2025) ......................................................... 3, 15, 16, 17

*Trump v. Hawaii,*
  585 U.S. 667 (2018)................................................................. 15, 16

*United States v. E. I. du Pont de Nemours & Co.,*
  351 U.S. 377 (1956).......................................................................6

*United States v. Microsoft Corp.,*
  253 F.3d 34 (D.C. Cir. 2021)......................................................18

*United States v. Texas,*
  143 S. Ct. 1964 (2023).................................................................16

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)................................................................3, 10

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
  395 U.S. 100 (1960).....................................................................17

**Statutes and Other Authorities:**

*Gregory J. Werden, Why (Ever) Define Markets? An Answer to Professor
  Kaplow,* 78 ANTITRUST L.J. 729 (2013)...........................................5

Section 16 of the Clayton Act......................................................... 16, 17

## INTERESTS OF THE AMICI

ICLE is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has longstanding expertise evaluating antitrust law and policy.

ICLE has an interest in ensuring that antitrust law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. That includes advising against far-reaching legal remedies that could hinder competition between mobile ecosystems, thereby harming the interests of consumers and app developers[1].

## SUMMARY OF ARGUMENT

The antitrust laws provide a framework for protecting "competition, not competitors." They are neither a tool nor an excuse for judicial redesign of complex markets. As the Supreme Court has recognized time and again, two principles should guide their application: first, antitrust analysis must be grounded in economic reality; and second, remedies must be carefully calibrated to cure a proven harm without

---

[1] The *amici* represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person—other than *amici* and their counsel— contributed money that was intended to fund preparing or submitting the brief.

inflicting greater damage on competition than the conduct they seek to remedy. The panel's decision in this case violates both principles. The injunction it affirms is not designed to allow competition, to give a broad class of market actors the *opportunity* to compete —an opportunity they already have under the current terms and conditions of the Android OS and Google Play Store. Rather, it seeks to grant specific actors a certain market share and a "fair share" of revenue.

Rehearing would offer the opportunity to correct the perverse incentives created by the decision below, which risk transforming antitrust law from a shield for competition into a sword for competitors. This amicus brief makes two central arguments in support of rehearing.

First, the panel's decision creates an analytical paradox. In this Court's recent decision in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 981, 985 (9th Cir. 2023), recognition of vigorous competition from Google Play—"the App Store's 'main competitor,'" *id.* at 985—was a decisive factor in this Court's conclusion that Apple was not a monopolist. The Court recognized the commercial reality that these two app stores engage in fierce head-to-head competition for both users and developers. In the present case, by contrast, the panel affirmed a verdict premised on the fiction that Apple's app store and payment processing do not exert any meaningful competitive pressure on Google, thus creating an artificial "Google Play Store-only" market. While the panel noted that the doctrine of issue preclusion may not formally

apply, this procedural point cannot erase the underlying factual contradiction or the market definition principles that led the court to reject Epic's market definition in its suit against Apple. A legal framework that treats two companies as fierce rivals in one case and as occupants of separate universes in the next—despite parallel suits in which a common plaintiff pleads identical facts and market realities—is fundamentally incoherent.

Second, the injunction itself poses an extraordinary threat to the entire mobile ecosystem. It is not a remedy, but a radical restructuring that will harm competition, consumers, and developers. By forcing Google to host rival app stores and share its proprietary catalog, the injunction also impairs the security, privacy, and user trust that are cornerstones of the Android platform's value. Consumers will face greater risks of malware and fraud, while developers will face a fragmented and less reliable marketplace. Most troublingly, the injunction imposes an unprecedented "duty to deal" that runs contrary to the core principles of antitrust law articulated by the Supreme Court in *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).

The injunction also runs afoul of the Supreme Court's view of universal injunctions, affirmed most recently in *Trump v. CASA, Inc.*, 606 U.S. __ (2025). That decision makes clear the general impropriety of sweeping, system-wide relief affecting non-parties with heterogeneous interests and that courts should not use

3

universal injunctive "relief" to achieve *de facto* regulation. Yet the injunction would redesign Android for over 100 million non-party U.S. users and more than 500,000 non-party app developers, potentially exposing them to lax data security, ecosystem fragmentation, increased risks of fraud and piracy, and the degradation of platform value these entail.

## **ARGUMENT**

## I.   **THE DECISION IS BASED ON AN INCORRECT MARKET DEFINITION AND MARKET POWER ASSESSMENT**

A sound antitrust decision can spring only from a sound assessment of the competitive landscape alleged to be harmed. In this case, however, both the finding of liability and the remedy rest upon an inaccurate picture of the competitive landscape and an erroneous assessment of market power.

The panel's decision that issue preclusion does not apply—and, therefore, that the District Court *could* find a different relevant market in the case at hand than it did given essentially the same facts in *Epic v. Apple* undercuts a central purpose of issue preclusion ("minimizing the possibility of inconsistent decisions"). *Montana v. United States*, 440 U.S. 147 (1979).  It also ignores the central competitive dynamic of the mobile industry—a dynamic this very Court recognized in the Apple litigation. The *Epic v. Apple* litigation resulted in extensive judicial fact-finding—at both the trial and appellate level—that established the inter-brand competition

between the Google Play Store and Apple's App Store ecosystems as the central dynamic of the market.

Notwithstanding this prior analysis, the panel observed that "the market-definition issue in Epic's two lawsuits was not 'identical' for the purposes of issue preclusion, because Epic's claims against Apple involved meaningfully different commercial realities and theories of harm from its claims against Google," (Op. 20, Dkt. No. 200.1) and points out to different "commercial realities" highlighting Apple's and Google's different business models ("walled garden" vs. "open distribution") (*id*. at 20–21).

The panel's determination does nothing to illuminate these purportedly different "market realities." It was based, instead, on a formalistic adherence to market definition. *Id.* at 20. But market definition is not the end of antitrust analysis; it is the beginning and a means to determine the nature of competition at issue and the presence or extent of market power. "Alleging the relevant market in an antitrust case does not merely identify the portion of the economy most directly affected by the challenged conduct; it identifies the competitive process alleged to be harmed." Gregory J. Werden, *Why (Ever) Define Markets? An Answer to Professor Kaplow*, 78 ANTITRUST L.J. 729, 741 (2013).

The suggestion that "the commercial realities are different," Op. 20, is particularly puzzling given this Court's recognition that both cases were filed on the

5

same day, by the same plaintiff, marketing the same game, "to undermine Apple's control over software distribution and payment processing on iOS devices, as well as Google's influence over Android devices." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th at 969. As this Court recognized, Epic's complaint in this case was the twin of its complaint against Apple, targeting Google's "policies regarding the Google Play Store on Android devices—*i.e.,* smartphones and tablets that use *the main operating-system alternative to iOS.*" *Id.* at 969 n.3 (emphasis added) (citing Complaint for Injunctive Relief, *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671 (filed Aug. 13, 2020 N.D. Cal.).

The fact that Apple and Google have different business models does not illuminate a different set of choices for game or app consumers on one side of the market or app developers on the other. It does not mean their app stores are not in competition with each other. Product differentiation is a central and ubiquitous form of competition, not a departure from it. Antitrust law does not require that products be identical clones to be considered competitors; reasonable interchangeability suffices. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 400 (1956). Moreover, the relevant market for antitrust purposes is not limited to immediate substitutes, but must include "the area of effective competition," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)—*i.e.,* "the field in which meaningful competition is

6

said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Competitive constraints may arise from outside the narrowly-defined market in which challenged conduct takes place. But "'[t]he definition of the relevant market' must 'correspond to the commercial realities' of the industry." *Ohio*, 585 U.S. at 543–544 (quoting *Brown Shoe Co. v. United States*, 370 U. S. 294, 336–37 (1962).

This Court has already recognized parallels between Epic's antitrust and state law challenges to Google Play's policies and Apple's App Store policies. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th at 969 n.3 (9th Cir. 2023), and it has rightly rejected Epic's assertion of a single-brand market. *Id.* at 980–81. The finding of a multi-brand market in *Epic v. Apple* was correct. It should apply here, too. Ignoring the broader competition between the Apple App Store and Google Play (and other app stores available on Android phones) creates a false sense of Google's market share, as Google and Apple compete for apps and, importantly, to have app developers develop apps for their platforms.

The panel decision claims that "[i]t is of little consequence that Apple and Google were previously found to compete in the market for 'digital mobile gaming transactions' in the *Apple* litigation," Op. 23, because "[r]ecognizing distinctions between overlapping markets is not 'inherently contradictory.'" To support this, the panel quotes the DOJ and FTC's amicus brief stating that "'[j]ust because parties

7

compete in one market does not mean, as a matter of law, that there cannot be a narrower or overlapping market in which the parties do not compete.'" Op. 24 (quoting DOJ and FTC Br. 27–28, Dkt. 151.1).

That abstraction is of little help with the concrete facts of the matter, and the panel's analogy to hamburger versus chicken sandwich markets is inapt. Op. 23. Epic's complaints were about the conditions under which it could market a single game, Fortnite, via competing, differentiated platforms. The better analogy would be two fast-food chains that both sell hamburgers but compete using different business models—one as a franchise, the other as a corporate-owned chain. Their business models are different, and so, of course, are their hamburgers: Burger King doesn't sell its hamburgers at McDonald's restaurants, nor vice versa. But the fact of their competition remains. Just as a diner decides which hamburger to eat before choosing a restaurant, consumers decide which ecosystem they prefer—and which apps, at which prices, and under what terms they can acquire there—before buying a smartphone. So too, do developers decide which ecosystem (or ecosystems) they prefer to develop apps for—and at what cost and under what terms they may offer them—before offering their apps for sale there.

Moreover, each restaurant's choice of soda provider is an element of its competition with the other. McDonald's choice to offer Coke products and Burger King's (one-time) choice to offer Pepsi are not insulated from the broader

competition between the restaurants just because soda isn't a substitute for hamburgers. We would never assess the consequences of these choices solely in terms of a hypothetical restaurant-specific soda "submarket"; rather, we would understand them as elements of the overall competition between the restaurants.

The flaw in the district court's analysis is further underscored by the very origins of this litigation. Epic's campaign began with a single coordinated strategy ("Project Liberty") against *both* Google and Apple, deliberately breaching each platform's terms of service to provoke enforcement of contract terms by the platforms, with that enforcement providing a pretext for parallel antitrust lawsuits filed the very same day. *See supra* p. 7. This identical treatment reveals Epic's own market perception: for a major game developer seeking to reach a global audience on mobile devices, there are two leading, competing distribution channels: the Google Play Store and the Apple App Store. The claim that these two app stores do not compete is fundamentally incompatible with the real-world business strategy that precipitated this case.

The consequence of such contradictory jurisprudence is not merely academic. The panel's decision would, effectively, punish Google for its comparatively open business model. As the panel notes, Google allows multiple app stores on its platform and permits "sideloading." Op. 12. By deeming Google's ecosystem an "Android-only" market, the Court is sending a clear message: open ecosystems are

9

uniquely exposed to antitrust scrutiny. We do not suggest that "open" systems are necessarily better than "closed" systems: both involve tradeoffs for consumers and developers to analyze when choosing a system. But if more "openness" were necessary for competition, the decision below does not establish it and it is, in any event, inherently inconsistent with the court's finding in *Epic v. Apple* that Apple's comparatively more closed system does *not* violate the antitrust laws.

## II. THE INJUNCTION IS OVER-BROAD AND RISKS HARM TO CONSUMERS IN A COMPETITIVE TWO-SIDED MARKET

### A. The Injunction Threatens Irreparable Harm to the Entire Mobile Ecosystem

The Supreme Court has repeatedly cautioned courts to fashion remedies that avoid inadvertently impeding competition. *NCAA v. Alston*, 594 U.S. 69, 102 (2021). The objective is to restore the competitive process, not to engage in judicial central planning that may yield perverse and unintended consequences. *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. at 408 (noting that judges are ill-suited to act as "central planners" for complex industries). But the panel ignores this caution, as the injunction imposes uniquely burdensome and invasive obligations on Google's app store, threatening the quality and even viability of the platform.

The injunction mandate that Google fundamentally re-engineer its platform to actively assist its direct competitors, requiring it to share its proprietary app catalog

10

and host rival app stores directly on the Google Play Store. By imposing such *antitrust* obligations on Google Play Store, but none on Apple's App Store, the injunction effectively removes product differentiation as a source of competition, redesigning one of them via a haphazard judicial mandates.

The central concern here is competition, not competitors or, in particular, the defendant. The paradoxical import of the injunction is a remedy that purports to increase *intra*-platform competition (i.e., among app stores within the Android ecosystem), but is almost certain to *decrease* the more vital *inter*-platform (inter-brand) competition between app stores and their payment processing systems—and "it is 'the promotion of interbrand competition,' after all, that 'is the primary purpose of the antitrust laws.'" *Ohio* v. *American Express*, 585 U.S. at 552 (cleaned up). To ignore this principle risks doing more harm than good.

This Court has recognized that an injunction constitutes an abuse of discretion when it imposes a remedy that is itself anticompetitive. For example, in *Kodak*, this Court struck the part of an injunction that promoted "free-riding," noting that remedies must not inadvertently stifle competition. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d at 1225 (9th Cir. 1997). In this case, the injunction enables free-riding by allowing Epic Games (and other developers) to use Google's platform and catalog for less than their market value. Such free-riding introduces market distortions that go well beyond Google. The injunction's most pernicious

11

aspect is its assault on the incentives to create and sustain the very platforms that drive the digital economy. By severing—for one competitor—the link between the use of a platform and the means by which it is monetized, the remedy sets a dangerous precedent: it signals that returns on massive, long-term platform investments are subject to judicial confiscation and rent-shifting. This fundamentally misunderstands the nature of platform competition. Building a successful digital ecosystem is not a single act of creation but a continuous process of innovation and refinement—one that requires ongoing investment. Platform operators must remain perpetually attentive to users and developers on both sides of the market by investing in system maintenance and security, as well as new and improved features. A legal regime that allows the fruits of this ongoing investment to be siphoned off by free-riding competitors undercuts the incentive to make such investments. Market dynamism is thereby diminished.

The harms from this injunction will also be borne by non-parties whose interests the antitrust laws are designed to protect.

For consumers, the injunction introduces a host of security, privacy, and usability problems. A core, pro-competitive feature of a modern app store is its function as a trusted gatekeeper. That is no less true for a relatively open store, like Google's, than it is for a so-called "walled garden." Platforms like the Google Play Store invest enormous resources in vetting applications to protect users from

malware, fraudulent schemes, data theft, and other malicious content. This curation provides a safety baseline safety that encourages consumers to engage with the digital marketplace, just as this Court recognized in *Epic v. Apple*, 67 F.4th at 990 (upholding the district court's finding that "Apple's security-and privacy-related restrictions 'provide[ ] a safe and trusted user experience on iOS, which encourages both users and developers to transact freely.'").

The injunction systematically dismantles this protective function in two critical ways. First, the mandate that Google host third-party app stores creates what is, in effect, a forced endorsement. Consumers have been conditioned to see the Play Store as a safe and curated space. When they download an app store from the Play Store, they will reasonably assume it has met Google's standards of safety, privacy, and reliability. Yet the injunction requires Google to carry these rival stores even if they employ vastly different and potentially inferior security protocols and privacy protections. This creates a significant risk of consumer confusion and harm.

Second, the "catalog access" remedy exacerbates this danger by providing a powerful tool for malicious actors. It forces Google to allow rival stores to display and offer Google Play's entire catalog of millions of apps. A fraudulent app store could use this feature to create a veneer of legitimacy, populating its storefront with thousands of well-known, trusted applications from Google's catalog to appear credible. This would make it substantially more difficult for consumers to

13

distinguish a legitimate alternative store from a sophisticated trap designed to distribute malware or phish for sensitive information. As security experts and former national security officials have warned, these provisions create a "more dangerous mobile ecosystem" by lowering the barriers for bad actors to reach consumers. The panel's conclusion that the district court had a "robust record" on these risks, Op. 64, is cold comfort when the remedy it affirmed actively increases those risks for over 100 million U.S. users at the behest of an individual plaintiff.

For developers, the injunction introduces a new era of fragmentation, uncertainty, and cost. The current "centralized" model provides immense benefits to the developer community, particularly to small and independent creators. It offers a single, predictable set of rules, a secure and reliable global distribution channel, and a trusted monetization system. This lowers barriers to entry and allows developers to focus on their core competency: building innovative software. The injunction threatens to fragment this landscape.

Moreover, the injunction's "opt-out" mechanism for catalog sharing imposes a significant burden on the developer community. The remedy's default allows *any* third-party app store to list a developer's app from the Google Play catalog. To prevent this, a developer must affirmatively opt out. This shifts the burden of policing intellectual property from the platform owner to over 500,000 individual developers. A developer who does not want its application appearing in an unknown

14

or untrustworthy third-party store must constantly monitor the ecosystem and manage its distribution preferences on a store-by-store basis. This is a substantial new cost of doing business on the Android platform.

## B.    The Panel's Holding Is Inconsistent with Supreme Court Jurisprudence

A broad injunction may well be warranted when it is difficult to separate the parties affected by the enjoined conduct from those that are not. *See Trump v. CASA*, Slip Op. at 16 ("[W]hile the court's injunction might have the *practical effect* of benefiting nonparties, 'that benefit [is] merely incidental.'") (quoting *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).  But that is not the case here. The identity of the parties that have supposedly been harmed is clear—they are, at most, Epic and the approximately 100 developers that use the Epic Store. Even if the district court's conclusions regarding harm to Epic and other developers with apps on the Epic Store were correct, it would be easy—and necessary—to carve a much narrower remedy than the one the district court imposed. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2354–55 (2020).

Indeed, "[i]n no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries. *Trump v. CASA*, (Thomas, J. & Gorsuch, J. concurring), Slip Op. at 2. *See also Lewis v. Casey*, 518 U.S. 343, 360 (1996) ("[G]ranting a remedy beyond what [is] necessary to provide relief to [the plaintiff is] improper."). As several Justices have warned, doing so creates constitutional

15

concerns. *See, e.g.*, *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *Trump v. CASA*, (Thomas, J. & Gorsuch, J. concurring), Slip Op. at 2 ("This limitation follows from both Article III and traditional equitable practice. Because Article III limits courts to resolving specific 'Cases' and 'Controversies,' it requires that any remedy 'be tailored to redress the plaintiff's particular injury.'") (quoting *Gill v. Whitford*, 585 U.S. 48 at 73).

*Trump v. CASA* confirms that injunctive relief must be tailored to the parties before the court and may not be used to deliver *de facto*, class-wide remedies to non-parties.  In *CASA*, the court drew a sharp line between (i) injunctions that give plaintiffs "complete relief between the parties" even if they incidentally advantage others, and (ii) injunctions designed to confer direct relief on absent persons. *Trump*, Slip Op. 17 (citing *Califano v. Yamasaki*, 442 U.S. 682 at 702 ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (emphasis added by *CASA* Court)).

The existence of viable, less drastic alternatives in the form of the settlements between Google and the consumer plaintiffs, Match Group, and the states is compelling evidence that the district court's remedy is not equitably tailored and goes far beyond what is necessary to restore competition. Indeed, Section 16 of the Clayton Act authorizes injunctions to prevent "threatened loss or damage" to the

16

plaintiff, not to redesign an industry for the benefit of non-parties. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1960) ("[Section] 16 of the Clayton Act, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened' injury.").

*CASA* underscores that any injunction should be limited to eliminating the challenged restraints as to the named plaintiffs' proven antitrust injury. Market-wide relief for *all* app developers or *all* app store providers is improper. *See CASA*, Slip Op. 12–15 (rejecting attempts to use universal injunctions as a shortcut around class procedures). While an Epic-specific order here may properly yield *incidental* marketplace effects, equity forbids crafting an order for the purpose of conferring direct benefits on millions of non-parties. Yet that is precisely what the injunction does in mandating platform-wide entitlements for "all developers."

The panel's reliance on *Zenith* is misplaced. *Zenith* does not confer *carte blanche* to impose any remedy that *might* promote competition. While the remedy in *Zenith* went beyond the specific source of harm identified, it was applied to the same *locus* of harm—i.e., against likely conduct *by the same defendant against the same plaintiff*. *Zenith*, 395 U.S. at 131; *id.* at 132 (quoting *NLRB v. Express Publishing Co.*, 312 U.S. 426, 435 (1941)). But an injunction designed to prevent an end-run around the court's ruling *with respect to the specific plaintiff whose injury*

17

*had been adjudicated* is worlds apart from a market-wide injunction based on the claim of a single market participant.

Likewise, the claim that "district courts are 'clothed with "large discretion" to . . . pry open to competition a market that has been closed by defendants' illegal restraints'" is misapplied.  Op. 42 (quoting *Ford Motor Co. v. United States*, 405 U.S. 562, 573, 577–78 (1972)).  The Supreme Court has repeatedly distinguished between the *government's* role in obtaining broad, structural relief (as in *Ford Motor*) and the constraints on *private plaintiffs* who must show antitrust injury, and whose relief must be tethered to their threatened loss. And even the government faces limits.  *See United States v. Microsoft Corp.*, 253 F.3d 34 at 103, 106–07 (vacating remedy obtained by the U.S. Department of Justice).

## CONCLUSION

For the foregoing reasons, we urge the Court to grant's Google motion for rehearing.

Dated:  August 25, 2025                      COOLEY LLP


                                             By: /s/ Jonathan Patchen
                                                 Jonathan Patchen

                                             Attorney for *International Center for Law and Economics*

18

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 24-6256, 24-6274, 25-303 _____

I am the attorney or self-represented party.

**This brief contains 4199 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ X ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Jonathan A. Patchen _____    **Date** August 25, 2025 _____

## CERTIFICATE OF SERVICE

I certify that on this 25th day of August 2025, the foregoing brief was filed using the Court's ACMS system. All participants in the case are registered ACMS users and will be served electronically via that system.

Dated: August 25, 2025                     /s/ Jonathan A. Patchen
                                            Jonathan A. Patchen