**Nos. 24-6256, 24-6274, 25-303**

# In the United States Court of Appeals for the Ninth Circuit

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

*v.*

GOOGLE LLC; *et al.,*

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California,
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

**BRIEF OF AMICUS CURIAE
ANTITRUST LAW PROFESSOR THOMAS A. LAMBERT
SUPPORTING DEFENDANTS-APPELLANTS' PETITION FOR
REHEARING EN BANC AND/OR PANEL REHEARING**

Drew F. Waldbeser
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Scott A. Keller
Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

# TABLE OF CONTENTS

Table of Contents ...................................................................................i

Table of Authorities ............................................................................. ii

Interest of Amicus Curiae .....................................................................1

Introduction ..........................................................................................2

Argument ..............................................................................................4

    I.   The Panel Misapplied the Doctrine of Issue Preclusion, Which Bars Epic's Attempt to Exclude Apple from the Relevant Market......................................................................4

    II.  The Panel Failed to Recognize that Epic's Proposed Markets Are Single-Brand Aftermarkets. ...........................................11

Conclusion..........................................................................................18

Certificate of Service ..........................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
575 U.S. 138 (2015)..........................................................................11

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
716 F.3d 1020 (8th Cir. 2013)............................................................11

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)......................................................................3, 11

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................2, 5, 6, 9, 10, 14

*Epic Games v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023)................ 1, 2, 4, 5, 6, 9, 10, 11, 12, 13, 14, 16, 17

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)............................................................................3

*Love v. Villacana*,
73 F.4th 751 (9th Cir. 2023)..............................................................11

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
958 F.3d 1239 (9th Cir. 2020)............................................................3

*NCAA v. Alston*,
594 U.S. 69 (2021)..............................................................................3

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)..............................................................................3

*O'Bannon v. NCAA*,
802 F.3d 1049 (9th Cir. 2015).............................................................3

*SEC v. Stein*,
  906 F.3d 823 (9th Cir. 2018)................................................................4, 9

*Snoqualmie Indian Tribe v. Washington*,
  8 F.4th 853 (9th Cir. 2021)......................................................................4

**OTHER AUTHORITIES**

*Android Global Brand Redesign*, R/GA, https://perma.cc/SZ2T-QBW4 (last
  visited August 25, 2025) .....................................................................15

50 C.J.S. Judgments § 1043 (May 2025 Update) ..................................9

Fed. R. App. P. 29(a)(2).............................................................................1

Fed. R. App. P. 29(a)(4)(E).......................................................................1

Jason Fournier, *A new modern look for the Android brand* (Sept. 5, 2023),
  https://perma.cc/394S-QGQH ...........................................................15

Jmar Gambol, *Nespresso: Breville vs. De'Longhi*, Best Reviews (Feb. 20, 2024),
  https://perma.cc/5JBE-UNRU............................................................16

Peter Westen, *The Empty Idea of Equality*,
  95 HARV. L. REV. 537, 542-43 (1982) .................................................2

Thomas A. Lambert, *The Essence of an Antitrust Violation*, 76 UC L.J. 1155
  (2025) .......................................................................................................1

Thomas A. Lambert, *What's Behind the War on Big Tech?*, 44 REGULATION 30
  (Fall 2021) ..............................................................................................1

Toby Strong, *The Drawbacks of the Vertuo Nespresso System*, Urban Brew
  https://perma.cc/NJ79-VCPW (last visited August 25, 2025) ...................16

## INTEREST OF AMICUS CURIAE

Amicus Thomas A. Lambert is Wall Family Chair and Professor of Law at the University of Missouri Law School, where he teaches antitrust law and economics. Widely published in antitrust law, Professor Lambert has authored articles discussing both this case and the closely analogous case of *Epic Games v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ("*Apple II*"). *See* Thomas A. Lambert, *The Essence of an Antitrust Violation*, 76 UC L.J. 1155 (2025); Thomas A. Lambert, *What's Behind the War on Big Tech?*, 44 REGULATION 30 (Fall 2021). He was the primary author of amicus briefs submitted to this Court in *Apple II* and in the initial appeal of this case. He believes the panel decision unjustifiably treats similarly situated competitors differently, irrationally subjects less restrictive policies to harsher antitrust treatment than more restrictive ones, misapplies the doctrine of issue preclusion, and overly restricts the concept of "single-brand" aftermarkets.[1]

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from amici curiae, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Counsel for Appellants consent to the filing of this amicus brief. Counsel for Appellee has not consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2).

1

# INTRODUCTION

As Aristotle famously observed, justice requires treating equals equally and unequals unequally. *See* Peter Westen, *The Empty Idea of Equality*, 95 HARV. L. REV. 537, 542-43 (1982) (summarizing Aristotle's views of justice and equality). By that standard, the panel decision is unjust, for it results in two similarly situated defendants' receiving unequal treatment from this Court.

But it gets worse. The upshot of the panel decision is that the defendant with less restrictive policies (Google) is subject to harsher antitrust treatment than the one with more restrictive policies (Apple). Moreover, in the name of promoting fair competition, the panel and district court have unleveled the playing field between two vigorous competitors, favoring the one whose policies are more restrictive of competition.

Fortunately, there are ample grounds for vacating the panel decision and reversing the district court. This brief highlights two that relate to the definition of the relevant market(s).

First, both the panel and the district court erred by not applying issue preclusion. Both failed to recognize that a question that must be answered affirmatively to sustain the judgment below—*i.e.*, are the allegedly monopolized markets "operating system-specific"?—has already been answered in the negative in a judgment affirmed by this Court. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1026 (N.D. Cal. 2021) ("*Apple I*"); *Apple II*, 67 F.4th at 981. The doctrine of issue preclusion bars relitigation of that

2

outcome-determinative question *even if* the plaintiff presents different evidence and *even if* the initial decision was wrong.

Second, the panel and district court flouted this Court's requirements for finding cognizable antitrust aftermarkets by incorrectly concluding that plaintiff Epic Games was not attempting to define "single-brand aftermarkets." Android is a *brand* of mobile operating system that purchasers of Android mobile devices (smartphones and tablets) elect to purchase in "foremarket" transactions, thereby becoming subject to Android-specific aftermarket restrictions.[2]

---

[2] The tight word limit precludes discussion of all the panel's errors. The panel also erred in affirming the district court's decision to preclude the jury from considering cross-market justifications for Google's aftermarket restrictions when assessing Epic's Section 2 claims. Panel Op. 36-38. The Supreme Court has repeatedly permitted cross-market justifications in rule of reason analyses under the Sherman Act. *See NCAA v. Alston*, 594 U.S. 69, 90, 97-101 (2021); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-92 (2007); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-84 (1992); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104-08, 115-17 (1984). This Court has followed suit. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1069-73 (9th Cir. 2015); *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (M. Smith, J., concurring).

It was not "harmless" for the district court to deny Google the opportunity—afforded earlier to Apple—to show how its unilaterally-imposed policies enhance competition in the market for mobile operating systems. *See* Panel Op. 38. The appropriate remedy depends on a precise understanding of which behaviors broke the law, and it is impossible to assess the legality of Google's unilateral acts without consideration of their procompetitive

# ARGUMENT

## I. The Panel Misapplied the Doctrine of Issue Preclusion, Which Bars Epic's Attempt to Exclude Apple from the Relevant Market.

The doctrine of issue preclusion "bars parties from relitigating an issue if the same issue was adjudicated in prior litigation." *SEC v. Stein*, 906 F.3d 823, 828 (9th Cir. 2018). Issue preclusion applies if "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Snoqualmie Indian Tribe v. Washington*, 8 F.4th 853, 864 (9th Cir. 2021) (citation omitted). The panel wrongly concluded that the first two requirements for issue preclusion are not met in this case. Panel Op. 19-20.

In *Epic Games v. Apple*, plaintiff Epic claimed that the markets for certain transactions by users of its cross-platform video game Fortnite were specific to Apple's mobile operating system, iOS. Epic thus alleged relevant markets for "iOS App Distribution" and "iOS In-App Payment Processing." Compl. ¶¶ 51, 109, *Epic Games v. Apple Inc.*, No. 3:20-cv-5640, Dkt. 1 (N.D. Cal. August 13, 2020) ("Apple Compl."). Apple, by contrast, "proposed [a] market for all video game transactions, whether those transactions occur on a

---

justifications. *See* Panel Op. 19 (observing that it was "important[]" in *Epic v. Apple* that "'Apple offered non-pretextual, legally cognizable procompetitive rationales for its app-distribution and [billing] restrictions.'" (quoting *Apple II*, 67 F.4th at 985)).

smartphone, a gaming console, or elsewhere." *Apple II*, 67 F.4th at 970 (emphasis omitted). The district court thus had to decide whether the markets for the allegedly monopolized Fortnite-related services—the same services at issue here—were operating system-specific.

The district court determined that the markets for the allegedly monopolized Fortnite-related services are *not* operating system-specific; they are instead offered in a broader market for "mobile gaming transactions." *Apple I*, 559 F. Supp. 3d at 1026. This Court affirmed the *Apple I* district court's market definition. *Apple II*, 67 F.4th at 981. That district court recognized that "the continued rise and popularity of cross-platform games like [Epic's] *Fortnite* … offered on a variety of platforms, even beyond mobile gaming devices, are making switching between platforms seamless because a consumer can carry over rewards and progress between the diverse platforms." *Apple I*, 559 F. Supp. 3d at 1025-26. "As a result, neither consumers nor developers are 'locked-in' to [Apple's] App Store for digital mobile game transactions—they can and do pursue game transactions on a variety of other mobile platforms and increasingly other game platforms." *Id*. at 1026. Within that broader market, the district court found, Google competes with Apple. *Id*. at 1030 (observing that Apple's "main competitor" in the mobile gaming transactions market is Google); *see id*. at 976 ("With respect to mobile gaming [transactions], the two dominant players are Apple (App Store) and Google (Google Play app store)"); *id*. at 992 n.454 ("Apple and Google compete with one another."); *id*. at 997 n.484 ("Google, of course, operates in the same

market" as Apple); *id*. at 1032 (referring to Google as an "existing competitor[]" in the mobile gaming transactions market).

In the present case, Epic asserts that the very same Fortnite-related services that the *Apple I* court found were sold in a *non-operating system-specific* market, featuring competition between Apple and Google, are instead sold in *Android-specific* markets in which Apple does not compete. *See* First Am. Compl. ¶¶ 68, 150, *In re: Google Play Store Antitrust Litigation*, No. 3:21-md-02981, Dkt. 64 (N.D. Cal. 2020) ("Google Compl.") (alleging relevant markets for "Android App Distribution" and "Android In-App Payment Processing"). But competition is reciprocal in nature: If I compete with you in selling something, then you must compete with me. And if, as the *Apple I* court concluded and this Court affirmed, Google competes with Apple in the Fortnite-related services common to both cases, then Apple must compete with Google in providing those services. Epic is thus attempting to relitigate an issue that has already been resolved. Issue preclusion forbids this.

The panel asserted several reasons for denying the preclusive effect of *Epic v. Apple*, but none is persuasive. First, the panel claimed that "the market-definition issue in Epic's two lawsuits was not 'identical' for the purposes of issue preclusion, because Epic's claims against Apple involved meaningfully different commercial realities and theories of harm from its claims against Google." Panel Op. 20. But the cited differences in "commercial realities" and "theories of harm" have nothing to do with the contours of the relevant market. Each is a distinction without a difference. Moreover,

6

these differences show that Google's policies are *less restrictive* than Apple's and should certainly not result in harsher treatment for Google.

The first distinction the panel highlighted is that Apple uses a "walled garden" approach (forbidding sideloading)[3] whereas Google allows for "open distribution" of apps. Panel Op. 20-21. This is irrelevant to whether the allegedly monopolized services are operating system-specific. Because Fortnite is a cross-platform game, iOS users who want to purchase a "skin," "emote," or "Battle Pass" to enhance their Fortnite play can do so on multiple platforms, and so can Android users. Moreover, this difference shows that Google is *less* restrictive of the relevant Fortnite-related services than Apple is.

Next, the panel observed that "Epic articulated theories of harm against Apple that it did not bring against Google." Panel Op. 21. Because Apple vertically integrates its hardware, operating system, and app store and does not allow third-party app stores, Epic had claims against Apple that it did not have against Google, which allows alternative app stores for Android apps. Again, this difference (1) is not relevant to whether the allegedly monopolized services are operating system-specific and (2) shows that Apple's conduct is more restrictive than Google's.

---

[3] "Sideloading" is downloading an app from a source other than the platform's proprietary app store. Panel Op. 12.

Finally, the panel emphasized that Epic "articulate[d] theories of harm against Google that were not brought against Apple." Panel Op. 22. Those Google-only theories were that Google (1) made deals with original equipment manufacturers ("OEMs") to install Google Play on the home screen; (2) "made deals to keep other app stores off OEMs' home screens"; (3) entered "agreements with app developers to refrain from offering their apps on any other app store"; and (4) "manipulat[ed] its operating system to deter direct downloads." *Id*.

Once again these differences have nothing to do with whether the allegedly monopolized Fortnite-related services are operating system-specific. Plus, the theories of harm apply to Google but not Apple *because Apple's policies are more restrictive than Google's*. Apple refuses to license iOS to other device manufacturers, so it does not need commitments to include its App Store on the homescreen or to preclude rival app stores. Apple *bans* alternative iOS app stores, so it does not need to require app developers to withhold their apps from rival stores. Apple bars direct downloads outright, so it has no reason to "manipulat[e] its operating system to deter [them]." *Id*.

After identifying some inapposite distinctions between Epic's Apple and Google cases, the panel parroted the district court's observation that "[Epic] took a wholly different approach for the antitrust claims against Google, and offered wholly different evidence about relevant markets than that offered in the case against Apple." *Id*. But Epic took a "wholly different approach" only because Google's policies are *less restrictive* than Apple's. For example,

8

Epic could not complain that Google, like Apple, altogether *bars* sideloading and competing app stores, so Epic argued that Google attempts to *deter* sideloading and to *disadvantage* competing app stores. That is a difference, but not one relevant to defining the relevant market. And it should not result in a worse outcome for Google than for Apple, whose policies are more restrictive.

It is beside the point that Google "offered wholly different evidence about relevant markets." *Id.* Issue preclusion prevents the *relitigation*—even with different evidence—of a matter that has been decided. *SEC v. Stein*, 906 F.3d at 828 (issue preclusion "bars parties from relitigating an issue if the same issue was adjudicated in prior litigation"); 50 C.J.S. Judgments § 1043 (May 2025 Update) ("Under the issue preclusion doctrine, a party may not be permitted to introduce new or different evidence to relitigate a factual issue which was presented and determined in a former action."). The *Apple I* court decided that Apple vies against "its main competitor, Google" in providing the allegedly monopolized services. *Apple I*, 559 F. Supp. 3d at 1030.

Next, the panel asserted that *Epic v. Apple* is non-preclusive because "[t]he Google trial focused on gaming *within* the Android ecosystem." Panel Op. 23. That may be true, but the Apple trial similarly focused on gaming *within* the iOS ecosystem, and the relevant market in that case was not operating system-specific. *Apple II*, 67 F.4th at 970, 981 (holding that district court's "mobile-game transactions" market "stands on appeal").

9

Finally, the panel attempted to reconcile this Court's now-inconsistent *Epic v. Apple* and *Epic v. Google* cases by arguing that the Android-specific markets approved here are "submarkets" of the "mobile gaming transactions" market approved in *Apple*. Panel Op. 23.[4] The problem is that the *Apple* court did not simply find a market of "mobile gaming transactions" consisting of all the mobile platforms on which a Fortnite player could purchase amenities for cross-platform play; it *rejected* that the market for Fortnite-related transactions was operating system-specific. *Apple I*, 559 F. Supp. 3d at 1026. The decisions of the district court and panel here flout that conclusion.

The simplest way, then, for this Court to avoid playing favorites and treating less restrictive policies more harshly than more restrictive ones would be to recognize that *Epic v. Apple*—rightly or wrongly—settled the question of whether the markets for the Fortnite-related services at issue in Apple and Google cases are operating system-specific. After all, "issue preclusion prevent[s] relitigation of wrong decisions just as much as right ones."

––––––––––––––––––

[4] The panel draws an analogy to fast-food submarkets. Just as McDonald's and Chick-fil-A compete in the fast-food market but not in the *hamburger* fast-food submarket, the panel says, so too Apple and Google do not compete in submarkets for operating system-specific services. Panel Op. 23. But the analogy breaks down. Whereas Chick-fil-A and McDonald's sell different things, the only things Epic sells to Fortnite users—amenities to enhance game play—are the same across operating systems. Because Fortnite is a cross-platform game, the "skins," "emotes," "battle passes," and other amenities a user might purchase on an Apple platform can be used when the user plays Fortnite on an Android device, and vice-versa.

*B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 157 (2015) (quoting *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 716 F.3d 1020, 1029 (8th Cir. 2013) (Colloton, J., dissenting)); *see Love v. Villacana*, 73 F.4th 751, 755 (9th Cir. 2023) ("[T]hat the first district court's judgment is … erroneous … is of no moment when applying issue preclusion.").

## II. The Panel Failed to Recognize that Epic's Proposed Markets Are Single-Brand Aftermarkets.

Even putting aside issue preclusion about the relevant market, this Court should still vacate the panel's decision and reverse the district court because the jury did not make the findings required to sustain Epic's market definitions. The Android-specific markets Epic proposed are "single-brand aftermarkets," and the district court wrongly refused Google's request to instruct the jury on the requirements for finding such markets.

As the panel correctly observed, "[a] single-brand aftermarket is a market in which a consumer is 'locked in' with a single brand and 'demand for a good [or service] is entirely dependent on the prior purchase of a durable good in a foremarket.'" Panel Op. 34 (quoting *Apple II*, 67 F.4th at 976). In the famous *Kodak* case, for example, customers who purchased Kodak photocopiers in the foremarket were subject to restrictions that locked them into an aftermarket of Kodak-only parts and servicing. *See Eastman Kodak Co.*, 504 U.S. 451.

Aftermarket restrictions do not inevitably harm consumers. If, at the time of purchasing a durable good, consumers know or can easily estimate

11

the degree to which restrictions on their aftermarket purchases will increase their costs over time, they can demand a lower price, enhanced service, or other deal-sweeteners up front. If consumers can easily switch from one durable good that is subject to aftermarket restrictions to another that is not, they are not "locked in" to aftermarket restrictions. Aftermarket restrictions are unlikely to cause significant consumer harm, then, unless consumers (1) do not have a sense, when they purchase the durable good, how much extra they will spend on aftermarket goods or services because of the aftermarket restrictions; and (2) cannot avoid enhanced aftermarket costs by switching durable goods.

To ensure that antitrust liability reaches only those contexts in which significant consumer harm is likely to result from aftermarket restrictions, courts have imposed several requirements for cognizable antitrust aftermarkets. In *Apple II*, this Court identified four showings a plaintiff must make to establish such a market:

> (1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market.

67 F.4th at 977 (quotations omitted); *see id*. at 980 (observing that "Epic had the burden" of making these showings).

Google reasoned that the markets Epic proposed—"Android App Distribution" and "Android In-App Payment Processing"—were aftermarkets: markets for services, the demand for which "is entirely dependent on the prior purchase of a durable good [i.e., an Android mobile device] in a foremarket." *Id*. at 976 (emphasis omitted). Google therefore requested that the district court instruct jurors on this Court's requirements for cognizable antitrust aftermarkets. Epic "object[ed] to Google's proposal to give a separate Instruction regarding 'Aftermarkets' in its entirety." Joint Set of Proposed Jury Instructions and Objections at 41, *Epic Games v. Google LLC*, 3:21-md-02981, Dkt. 806 (Nov. 22, 2023). Siding with Epic, the district court refused to give an aftermarket instruction. So at Epic's behest, the district court prevented the jury from making the findings necessary to establish cognizable antitrust aftermarkets.

On appeal, the panel said it is "no surprise" that the district court refused to instruct the jury on the factual requirements for finding cognizable aftermarkets because "[t]his case was never framed by either party as involving single-brand aftermarkets." Panel Op. 33; *id*. at 34 ("[A] single-brand aftermarket theory was not presented at trial."); *id*. at 35 ("[T]he facts presented at trial do not meet the legal definition of a single-brand aftermarket so as to warrant Google's proposed instruction."). That is a curious assertion, given the panel's repeated contention that the markets at issue in this case are different than the "mobile gaming transactions market" found in *Epic v. Apple*, because they involve services utilized only by purchasers of Android mobile

13

devices. *See id*. at 23 (observing that "[t]he Google trial focused on gaming *within* the Android ecosystem" and involved markets "for Android app distribution and Android in-app billing"); *id*. (noting that "[a]lthough Google and Apple compete for mobile-gaming downloads and mobile-gaming in-app transactions, they do not compete in the Android-only app distribution and in-app billing markets").

The panel based its conclusion that markets for app-related services on Android mobile devices are not single-brand aftermarkets on the fact that Android devices are produced and sold by multiple manufacturers—"Google, Samsung, Motorola, OnePlus, Xiaomi, and other OEMs"—that have licensed the Android operating system from Google. Panel Op. 35. The existence of multiple licensed producers selling under their own names, the panel reasoned, prevents any aftermarkets from being "single-brand." *Id*.

But the "durable good" with aftermarket restrictions here is not branded smartphone hardware. It is the Android mobile operating system. This Court held as much in *Apple II*, where Epic argued for markets perfectly analogous to those asserted here. *See* Apple Compl. ¶¶ 51, 109 (identifying relevant markets as those for "iOS App Distribution" and "iOS In-App Payment Processing"). This Court observed that those putative markets involved a foremarket "product" of "smartphone operating systems." *Apple II*, 67 F.4th at 978. That was so even though Apple's mobile operating system was not licensed or sold directly to consumers but was instead incorporated into a technologically integrated final product. *See id*. (rejecting *Apple I* court's view

14

that an antitrust aftermarket "can *never* relate to a product that is not licensed or sold"). To reason consistently, then, this Court must conclude that the foremarket product in this case is the Android mobile operating system that is incorporated within the smartphones consumers purchase from various OEMs.

Android is unquestionably a brand of mobile operating system. *See* Jason Fournier, *A new modern look for the Android brand* (Sept. 5, 2023), https://perma.cc/394S-QGQH (blog post by the Director of Android Consumer Brand Management); *Android Global Brand Redesign*, R/GA, https://perma.cc/SZ2T-QBW4 (last visited August 25, 2025) (describing efforts to make Android brand more desirable to GenZ users). It is that *operating system* component of an OEM-branded Android device—not the hardware—that subjects consumers to Android-specific aftermarket restrictions. Those restrictions are thus imposed in "single-brand" aftermarkets.

The dynamic here—where the owner of a proprietary technology restricts products that may be used with it but licenses the technology to different OEMs who sell products featuring it (and its restrictions) under their own brand names—results in products that feature two brands. One brand is for the final product, and another is for the proprietary technology it implements. If aftermarket restrictions apply to all products implementing that branded technology, those restrictions occur in "single-brand aftermarkets."

For example, Nespresso single-cup coffeemakers utilize Nespresso's proprietary brewing technology, which for some formats (*e.g.*, the Vertuo

15

line) requires the use of only Nespresso's patented coffee pods. *See* Toby Strong, *The Drawbacks of the Vertuo Nespresso System*, Urban Brew https://perma.cc/NJ79-VCPW (last visited August 25, 2025). That requirement is an aftermarket restriction. And it is a "single-brand" aftermarket restriction—even though multiple licensed OEMs like Breville and DeLonghi produce Nespresso-branded machines, *see* Jmar Gambol, *Nespresso: Breville vs. De'Longhi*, Best Reviews (Feb. 20, 2024), https://perma.cc/5JBE-UNRU— because Nespresso is a brand of brewing technology. Those machines feature two brands: Nespresso's brewing technology and the OEM's hardware. But the aftermarket restrictions on pod usage are imposed by the former.

In like fashion, Android smartphones feature two brands: the Android operating system and the OEM's hardware. But the aftermarket restrictions on app distribution and in-app payment processing stem from the former. The markets for Android App Distribution and Android In-App Payment Processing are thus single-brand aftermarkets.

Under *Apple II*, then, Epic cannot establish the Android-specific aftermarkets it alleged without proving, among other things, that purchasers of Android mobile devices were not aware, when they bought their devices, that Google would warn them against the risks of side-loading, ensure pre-installation and prominent placement of Google Play on their device, and seek to have the best and latest versions of Android apps in Google Play. The district court erred in refusing Google's request to give an aftermarket instruction that could have elicited such findings. Because Epic had the burden

16

of proving cognizable antitrust aftermarkets, the verdict in its favor must be reversed.

*   *   *

The panel decision treats equals unequally and has perversely subjected Google's less restrictive policies to harsher antitrust treatment than this Court afforded Apple's more restrictive policies. This Court should grant en banc review, vacate the panel decision, and reverse the verdict below on the ground that Epic did not prove the Android-specific markets it alleged. Epic was precluded from relitigating the market definition this Court approved in *Apple II*. And besides, Epic did not elicit—and, in fact, blocked—jury findings necessary to support its alternative market definitions, which involve single-brand aftermarkets.

17

## CONCLUSION

This Court should grant rehearing.

Dated: August 25, 2025                Respectfully submitted.

                                       */s/ Scott A. Keller*
                                       Scott A. Keller
                                       Steven P. Lehotsky
                                       LEHOTSKY KELLER COHN LLP
                                       200 Massachusetts Ave. NW
                                       Washington, DC 20001
                                       (512) 693-8350
                                       scott@lkcfirm.com

                                       Drew F. Waldbeser
                                       LEHOTSKY KELLER COHN LLP
                                       3280 Peachtree Road NE
                                       Atlanta, GA 30305

                                       *Counsel for Amicus Curiae*

18

## CERTIFICATE OF SERVICE

On August 25, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ *Scott A. Keller*
Scott A. Keller

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Numbers 24-6256, 24-6274, and 25-303**

I am the attorney or self-represented party.

**This brief contains 4,073 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5) and Cir. R. 29-2(c)(2).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties;

[ ] a party or parties are filing a single brief in response to multiple briefs; or

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  _/s/ Scott A. Keller_     **Date** 08/25/2025

20