**Nos. 24-6256, 24-6274, 25-303**

IN THE

# United States Court of Appeals for the Ninth Circuit

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for
the Northern District of California
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD
Honorable James Donato

**BRIEF OF *AMICUS CURIAE* ACT | THE APP ASSOCIATION
IN SUPPORT OF THE PETITION FOR REHEARING EN BANC
AND/OR PANEL REHEARING**

Nicholas J. Giles
Joshua D. Wade
MCGUIREWOODS LLP
800 E. Canal St.
Richmond, VA 23219
(804) 775-4760
ngiles@mcguirewoods.com
jwade@mcguirewoods.com

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville St.
Suite 500
Raleigh, NC 27601
(919) 755-6688
jellis@mcguirewoods.com

August 25, 2025

*Counsel for Amicus Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, ACT | The App Association certifies that is has no parent corporation, and that no publicly held company owns 10% or more of its stock.

Dated: August 25, 2025                    */s/ Jonathan Y. Ellis*
                                          Jonathan Y. Ellis

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ...................................................................iii

INTEREST OF *AMICUS CURIAE* ....................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 4

ARGUMENT ....................................................................................... 5

I.     The Panel's Conflict with *Epic Games v. Apple* Harms App Developers. .................................................................................. 5

II.    The Extraordinary Remedy Affirmed by the Panel Has Significant Negative Implications for App Developers ................... 9

     A.    The Remedy Creates Security Risks .................................... 10

     B.    The Remedy Ignores App Developers' Contractual and Associational Rights ...................................................... 12

     C.    The Remedy Gives Epic an Unearned, Arbitrary, and Outsized Role in the Future of the App Economy ................ 15

CONCLUSION .................................................................................. 18

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ............................................................... 5

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021)............................................................................ 18

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)............................................................................ 5

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................................. 3

**Rules**

Fed. R. App. P. 40(b)(2)(A) ...................................................................... 6

Fed. R. App. P. 40(b)(2)(D) .................................................................... 10

**Other Authorities**

Comments of ACT | The App Association to the Federal
    Trade Commission on Competition and Consumer
    Protection in the 21st Century (Question 3) (Aug. 20,
    2018), ("App Association FTC Comments"), *available at*
    https://actonline.org/wp-content/uploads/Q3-ACT-
    Comments-re-FTC-2018-Consumer-Protection-Hearings-
    082018-FINAL.pdf ...................................................................... 2, 16

State of the App Economy, ACT | The App Association
    (2023), *available at* https://actonline.org/wp-
    content/uploads/APP-Economy-Report-FINAL-1.pdf ......................... 1

iii

Testimony of Morgan Reed, President, ACT | The App
    Association, Before the U.S. House of Representatives
    Judiciary Committee, Subcommittee on Antitrust,
    Commercial and Administrative Law (2019), ("App
    Association Congressional Testimony"), *available at*
    https://docs.house.gov/meetings/JU/JU05/20190716/10979
    3/HHRG-116-JU05-Wstate-ReedM-20190716.pdf. .............................2

## INTEREST OF *AMICUS CURIAE*[1]

Founded in 1998, ACT |The App Association ("App Association") is a not-for-profit advocacy and education organization representing the small business developer, innovator, and entrepreneur community that creates countless software applications used on mobile devices and in enterprise systems.  The U.S. software application economy represented by the App Association is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[2]

Curated online marketplaces like the Google Play store (Play store) have created immense value for app developers and end users, as the App Association has consistently explained—in comments to the Federal

---

[1]    No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than the *amicus*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

[2]    State of the App Economy, ACT | The App Association (2023), *available at* https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL-1.pdf.

Trade Commission,[3] testimony before Congress,[4] and in amicus briefs both in this appeal and in *Epic Games v. Apple*. Before online marketplaces, app developers engaged in time-consuming marketing campaigns to reach users. These costs imposed formidable barriers to entry, resulting in higher prices, less adoption, and fewer apps being developed in the first place. Now, online marketplaces provide one-stop shops where developers and end users transact directly. This has significantly lowered barriers to entry and freed up capital that developers now use to improve their apps and expand their offerings.

The relationship between developers and online marketplaces, like the Play store and Apple's App Store (App Store), is mutually beneficial.[5]

---

[3]     Comments of ACT | The App Association to the Federal Trade Commission on Competition and Consumer Protection in the 21st Century (Question 3) (Aug. 20, 2018), at 3–4 ("App Association FTC Comments"), *available at* https://actonline.org/wp-content/uploads/Q3-ACT-Comments-re-FTC-2018-Consumer-Protection-Hearings-082018-FINAL.pdf.

[4]     Testimony of Morgan Reed, President, ACT | The App Association, Before the U.S. House of Representatives Judiciary Committee, Subcommittee on Antitrust, Commercial and Administrative Law (2019), at 3–6 ("App Association Congressional Testimony"), *available at* https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-ReedM-20190716.pdf.

[5]     *See* App Association FTC Comments, at 2.

2

Developers provide digital content, which draws consumers to the online marketplaces, while the marketplaces provide developers with low overhead costs, simplified market entry, consumer trust, dispute resolution, data analytics, flexible marketing and pricing models, and strengthened intellectual property (IP) protections.

Because of its members' reliance on curated online marketplaces, the App Association has a deep interest in ensuring the antitrust laws are properly applied to these marketplaces to promote competition and increase output. This interest is longstanding. One of the first amicus briefs the App Association ever filed was in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc), where the Department of Justice sought to break up Microsoft and the court discussed Microsoft's "platform[] for software applications," *id.* at 53. More recently, the App Association closely followed Epic's litigation against Apple that parallels this case and filed an amicus brief before this Court that explained the ways in which the App Store is important to developers and end users. The App Association then also filed amicus briefs during the panel's consideration of the merits of this appeal and in support of a stay.

The App Association writes here to highlight the problematic implications for app developers of the conflict between the panel's opinion and *Epic Games v. Apple*, and to underscore the exceptional importance of the remedy affirmed by the panel, which will rewrite and centrally manage much of the app economy.

## INTRODUCTION AND SUMMARY OF ARGUMENT

En banc review is warranted for at least two fundamental reasons. *First*, the intractable conflict between the panel's opinion and *Epic Games v. Apple* will harm app developers and the app economy. Not only is the panel's refusal to give *Epic Games v. Apple* preclusive effect wrong as a matter of law, it will harm competition between Apple and Google that redounds to the benefit of app developers. The conflict has consequences that merit rehearing. *Second*, the panel's remedy will make the app ecosystem worse. In particular, the remedy introduces security risks into the app ecosystem; directs app developers into relationships with sketchy, knock-off Play stores, with which they want no business; and gives Epic an unearned and outsized role in the future of the app economy. Even if the Court ultimately is comfortable in principle with retaining the central planning role envisioned by the panel

4

(it should not be), planning such a large and important part of the economy merits careful consideration. If the panel declines to revisit its decision, the remedy's ill-planned and invasive mandates justify rehearing by the full Court.

## ARGUMENT

### I.     The Panel's Conflict with *Epic Games v. Apple* Harms App Developers.

The panel's conclusion that Google does not compete with Apple for mobile gaming transactions conflicts with *Epic Games v. Apple*'s conclusion that Apple competes with Google for those exact same transactions, as Google explains in the Petition. *See* Pet. for Rehearing, Dkt. No. 211, at 11–14. In the App Association's experience, Google and Apple are fierce competitors, *see* App Association Merits Amicus Br., Dkt. No. 54.2, at 7–8, and the panel's market definition should have corresponded to those "commercial realities." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 996 (9th Cir. 2023) (citing *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)). The App Association thus respectfully agrees with Google that the relevant market should include Google, Apple, and other curated online marketplaces; the conflicting treatment of competition between Google and Apple in this Court's different opinions

5

makes little sense; and the panel's refusal to honor this Court's decision in *Epic Games v. Apple* is at odds with the law of issue preclusion. The panel decision's conflict with *Epic Games v. Apple* warrants rehearing. *See* Fed. R. App. P. 40(b)(2)(A).

The App Association writes separately to underscore why that conflict threatens to upend market dynamics that enable small and mid-sized app developers to compete. At bottom, app developers want (and need) vigorous competition between marketplaces, like the Play store and the App Store, to develop ecosystems where the developers are able to efficiently distribute their apps. Google and Apple's non-stop close competition has led to huge benefits for app developers. Way back at the genesis of Play, Google was incented to make extensive investments to improve upon, rebrand, and relaunch its "Android Market" as the Play store as a direct result of this competition. *See* 6-ER-1309-11. That iron-sharpening-iron relationship continues—app developers repeatedly witness Apple and Google responding to innovations in the other's store, to the benefit of app developers. *See, e.g.*, 5-ER-1003-06; 5-ER-1107-09; 6-ER-1313-18; 6-ER-1351-57; 6-ER-1411.

6

Developers benefit from competition between the Play store and the App Store on several vectors, including:

- **Developer support**:  Both Google and Apple have invested billions of dollars in their app stores to attract developers and their end user customers.   These investments come in the form of customer support services; secure payment processing; robust options for building, testing, and gathering pre-release feedback for apps; tools to manage updates and distribution; and game performance insights.   When working on improvements like these, Google is "very regularly speaking with developers" in order "to understand what developers [are] most looking for" and "to stay competitive relative to Apple's app store."  6-ER-1316.  The rationale for these investments is clear.  Google and Apple provide and continuously improve their services because, if they did not, developers would gravitate to the other store.

- **Safety and security**:  Relatedly, Google and Apple also compete on the safety and security of their stores.  Google "deeply invested" in its parental controls as part of its efforts to compete against Apple.  5-ER-1107-08.  Also as part of its competition with Apple,

Google reviews all apps on the Play store for malware before they are published. 5-ER-1107-08; 5-ER-1233. Google informs itself about Apple's security and privacy efforts and tries to make sure its security is as good or better than Apple's. 5-ER-1138-39.

- **Price**: Google lowered service fees on subscriptions in response to a reduction made by Apple. *See* 6-ER-1317-19. More generally, both Google and Apple charge a 30% service fee on digital gaming transactions like those in Epic's games. *See* 6-ER-1274. Google and Apple pay close attention to the prices the other is charging and respond accordingly. In other words, they compete on price.

In each of these ways, the Play store and the App Store compete to attract developers and thereby offer more content to consumers.

The panel's conflicting treatment of Google and Apple threatens all of this. It asymmetrically pulls levers that will distort the market, harming app developers and ultimately end users. The panel's remedy, discussed *infra* in § II, will divert Google from this competition by requiring it to expend significant resources and time supporting what are essentially knock-off Play stores that almost certainly will provide a

8

weaker constraint on other curated online marketplaces, including the App Store, than the Play store itself.

The bottom line is this: app developers do not want more, worse versions of the Play store—they want the existing intense competition between curated online marketplaces to continue. The conflicting treatment of curated online marketplaces in this Court's decisions threatens to interfere with that competition to the detriment of developers and the consuming public. That widespread impact justifies rehearing.

## II. The Extraordinary Remedy Affirmed by the Panel Has Significant Negative Implications for App Developers.

The panel affirmed an unprecedented injunction requiring Google to give knock-off Play stores access to the Play store's entire catalog of apps and to otherwise redesign the Play store to benefit knock-off Play stores. Op. at 39–41. This remedy: (A) introduces security risks into the app ecosystem; (B) directs app developers into relationships with sketchy, knock-off Play stores, with which they want no business; and (C) gives Epic an unearned and outsized role in the future of the app economy. Rehearing is warranted because these harms jeopardize the

9

future of the app economy and thus are "questions of exceptional importance." Fed. R. App. P. 40(b)(2)(D).

## A.     The Remedy Creates Security Risks.

The panel's remedy will push app developers' apps to hundreds of knock-off Play stores. Some of these knock-off Play stores will almost certainly have inadequate resources and lack the experience to screen for safety, security, and inappropriate content. Indeed, in the past, entire knock-off Play stores have been created by hackers to steal sensitive information. *See, e.g.*, Dkt. No. 48.2, at 19 (citing example of "a state-sponsored hacking group" that built "a seemingly legitimate third-party app store, with the sole purpose of concealing spyware"). The panel's directives related to providing users links to downloads are likewise vulnerable to "experienced malicious actors" and malware. *Id.*

These risks inherent in the panel's remedy create real burdens and harms not only for Google but perhaps even more so for app developers and their customers. There is significant expense and effort required to continuously monitor for threats, which smaller upstart app stores may

not be able to adequately resource.[6]  These risks are exacerbated by the limits the Court imposed on Google's ability to screen the knock-off Play stores—app developers will now bear that screening burden.

If an app developer does not have the resources to monitor adequately the various knock-off Play stores for threats, they and their customers will likely suffer even more harm.  A user whose security is compromised will face the expensive and unsettling experience of trying to re-secure their digital identity.  App developers are also at risk because a user who is hacked or who is simply dissatisfied when downloading an app from a knock-off Play store may not know enough to assign blame to the store, rather than the app developer.  App developers will be harmed by these security risks.

---

[6]     *See, e.g.*, App Association Congressional Testimony at 9 ("[T]he game of cat-and-mouse between cybersecurity professionals and hackers will never end, and security must continue to evolve to meet and beat the threats. . . .  [D]evelopers want the platform's security features to work seamlessly with any relevant hardware and that they account for all attack vectors.  Platforms should continue to improve their threat sharing and gathering capabilities to ensure they protect developers across the platform, regardless of where threats originate.  Moreover, they should approve and deploy software updates with important security updates rapidly to protect consumers as well as developers and their clients and users.").

11

The panel's responses to these legitimate concerns are unpersuasive. The panel notes that Google may "charge a 'reasonable fee' for any security measures that are 'comparable to the measures Google is currently taking for apps proposed to be listed in the Google Play Store.'" Op. at 51. But the ability to charge fees to expand preexisting security measures provides at best limited protection against knock-off Play stores that are themselves aimed at hiding spyware, Dkt. No. 48.2, at 19, and no ability at all to protect against entirely new security risks created by the panel's new regime (which will require measures distinct from those Google is "currently taking").

The security risks created by the panel's remedy are exceptionally important and justify rehearing.

## B. The Remedy Ignores App Developers' Contractual and Associational Rights.

The remedy, and specifically its default "catalog sharing" rule, leads to an egregious violation of App Association members' rights. The court's remedial order directs Google to make the apps on the Play store available to new, would-be competitors. Developers who do not want their apps shared on the knock-off Play stores must take yet-to-be-determined affirmative steps to "opt out" from that default rule. This

12

perversely disregards the wishes, interests, rights, role, and autonomy of app developers.

Currently, developers contract with Google to distribute their apps through the Play store. When they do so, they grant *Google* a nonexclusive license to use their intellectual property. *See, e.g.*, 2-ER-399 (granting Google license to "display Developer Brand Features … for use solely within Google Play"). This license granted to Google neither provides parallel grants to other online marketplaces nor grants Google the right to sublicense the developers' intellectual property out to others. *See* 2-ER-397-399. By instructing Google to make developers' apps available on other stores, the district court's order entirely disregards developers' intellectual property and rights.

This is not a hollow concern. Even if some new online marketplaces are made by reputable operators, others will have inadequate resources or may even be used affirmatively by hackers to steal sensitive information. *See supra* § II.A. These risks will no doubt be felt by Google, but also by the developers. A user whose security is compromised, or who is simply dissatisfied, when downloading an app from a knock-off Play store may assign blame to the app developer. *Id.* Developers must retain

13

the right to avoid these issues by choosing where, through whom, and on what terms they offer their apps in the first instance.

To be sure, the district court ordered Google to create a procedure whereby developers can opt out of the default rule established by the court. 1-ER-5. But this gets it backwards—no knock-off Play store should have access to developers' apps until the developer licenses their apps to that store. The court's order effectively requires developers to license their apps to *all* knock-off Play stores unless they take affirmative steps to prevent it. 1-ER-5. Practically, and importantly, many small developers that the App Association represents may not have the resources to monitor every new knock-off Play store and then take the requisite steps to opt out.

App developers should be allowed to choose which stores they do (and do not) offer their apps through, and the panel's novel remedy ignores those rights. The remedy is half-baked and fails to realize that it invades non-party app developers' intellectual property and associational rights.

The panel gives the app developers' rights the back of the hand. Respectfully, it is not only a "one-in-a-million" chance that an app

14

developer will have concerns with their apps being included on knock-off Play stores. Op. at 63. The App Association represents many app developers with precisely that concern. And while the panel asserts that the opt-out mechanism "reflects due consideration of developers' intellectual property interests," *id.* at 64, the panel does not seriously engage with the fact that app developers will be defaulted into commercial arrangements they do not want—putting the onus and burden on them to review the different knock-off Play stores and then determine whether to opt out.

The harms to app developers' rights justify rehearing.

## C.    The Remedy Gives Epic an Unearned, Arbitrary, and Outsized Role in the Future of the App Economy.

Epic is an enterprising litigant, but it does not represent other app developers, and, in several ways, its interests are adverse to other app developers. Its outsized role in the panel's remedy is thus likely to harm—not help—competition.

App developers largely have a mutually beneficial and symbiotic relationship with Google. On the one hand, developers provide digital content, which draws consumers to the Play store, and pay a portion of digital in-app purchases to Google. On the other hand, Google provides

15

developers with low overhead costs, simplified market entry, consumer trust, dispute resolution, data analytics, flexible marketing and pricing models, and strengthened IP protections.[7]  App developers thus have largely found Google to be a responsive and collaborative business partner, who—like the developers—is incented to make sure end users can safely and securely access and use apps listed in the Play store.

Epic does not share these incentives.  As discussed, the decision whether to offer an app in a new curated online marketplace must reside with the individual developer.  But if or when those developers do want to distribute their apps on new knock-off Play stores that enter the market, their apps should be distributed in a fair and transparent manner.  Epic is a large, self-interested app developer that is not directly incentivized to look out for these small, start-up developers.  To the contrary, as an established, incumbent developer, it has every incentive to prevent nascent apps from developing into fully formed competitors.

Epic is significantly better capitalized than many of the small and mid-sized developers that are members of the App Association.  If Google needs to increase prices to replace the lost revenue from in-app purchases

---

[7]    *See* App Association FTC Comments, at 2.

16

(whether in the form of higher commissions, yearly licensing fees, or per-download fees), Epic would be able to absorb these increases much more easily than would small and mid-size developers.

Moreover, small developers rely on the trust that Google has created in its secure and stable Google Play ecosystem. Larger developers like Epic, with greater brand recognition and a reputation of its own, do not rely on the Play store in the same way. Epic's Fortnite, for example, has massive live events and is a household name. Up-and-coming apps do not have similar marketing power and so rely on users finding them in a trusted marketplace, *e.g.*, the Play store. Epic's large position means that it has different incentives concerning how to steer the app ecosystem than the overwhelming majority of app developers.

Despite these divergent interests, the panel's remedy elevates Epic from market participant to one of three stewards tasked with *steering* the app economy going forward. Epic will appoint one of the three members on the technical committee, who will liaise with Google's appointee to appoint a third member. This technical committee will then have power to affect not just Epic and Google, but any party that uses the Play store—namely, app developers. In particular, "the Technical Committee

will review disputes or issues relating to the technology *and processes required by*" the provisions of the permanent injunction. 1-ER-5 (emphasis added). Thus, the technical committee's jurisdiction could extend to disputes concerning how knock-off Play stores do or do not gain access to the Play store's catalog of apps. *See* 1-ER-4. This directly impacts the developers that created those apps and retain IP in them.

The Court should grant rehearing to reconsider the central planning misadventure of the "Technical Committee," and specifically the inclusion of Epic as one of its three members, because this novel remedy elevates Epic to a pivotal role in the app ecosystem that will have impact well beyond the scope of this dispute. *Cf. Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 103 (2021) ("[J]udges make for poor 'central planners' and should never aspire to the role.").

## CONCLUSION

Rehearing is warranted because the panel's decision conflicts with *Epic Games v. Apple* and the panel's remedy will rework the app economy, to the detriment of app developers.

18

Dated: August 25, 2025              Respectfully submitted,

Nicholas J. Giles                   */s/Jonathan Y. Ellis*
Joshua D. Wade                      Jonathan Y. Ellis
MCGUIREWOODS LLP                    MCGUIREWOODS LLP
800 E. Canal St.                    501 Fayetteville Street
Richmond, VA 23219                  Suite 500
(804) 775-4388                      Raleigh, NC 27601
ngiles@mcguirewoods.com             (919) 755-6688
jwade@mcguirewoods.com              jellis@mcguirewoods.com

*Counsel for Amicus Curiae*

19

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Cir. R. 29-2(c)(2) because it contains 3,434 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Century Schoolbook, 14-point font.

Dated: August 25, 2025                  */s/ Jonathan Y. Ellis*
                                        Jonathan Y. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025, I electronically filed the foregoing brief with the Clerk of this Court using the appellate ACMS system, which will also serve counsel of record.

Dated: August 25, 2025                    */s/ Jonathan Y. Ellis*
                                          Jonathan Y. Ellis

21