Nos. 24-6256, 24-6274, 25-303

———————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

IN RE: GOOGLE PLAY STORE ANTITRUST LITIGATION

———————————

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

*v.*

GOOGLE LLC, *et al.*,

*Defendants-Appellants,*

———————————

On Appeal from the United States District Court
for the Northern District of California (Hon. James Donato)
Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

———————————

**BRIEF OF INFORMATION TECHNOLOGY & INNOVATION
FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF
DEFENDANTS/APPELLANTS GOOGLE LLC**

———————————

|  |  |
|---|---|
|  | Marc R. Lewis |
|  | Rina Plotkin |
|  | LEWIS & LLEWELLYN LLP |
|  | 601 Montgomery Street, Suite 2000 |
|  | San Francisco, CA 94111 |
|  | Telephone: (415) 800-0590 |
| August 25, 2025 | *Attorney for* Amicus Curiae |
|  | *Information Technology & Innovation Foundation* |

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Information Technology & Innovation Foundation, a nonprofit corporation, states that it does not have parent companies, subsidiaries, or affiliates that have issued shares to the public.

Dated:  August 25, 2025               Respectfully submitted,

/s/  *Marc R. Lewis*
Marc R. Lewis
Rina Plotkin
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...............................................1

ARGUMENT .................................................................................................................3

    I.    THE *EPIC V. GOOGLE* DECISION TROUBLINGLY DEPARTS FROM THE NINTH CIRCUIT'S PRIOR ANALYSIS IN THE *EPIC V. APPLE* LITIGATION...................................................................3

        A.    Google and Apple Vigorously Compete in the Mobile Gaming Space. ........................................................................................3

        B.    Dynamic Competition Should Not Be Overlooked. ....................5

    II.    THE DISTRICT COURT'S CATALOG ACCESS REMEDY IS CONTRARY TO LAW AND THREATENS TO DAMAGE THE ENTIRE ANDROID ECOSYSTEM .....................................................7

        A.    The Catalog Access Remedy Is Legally Flawed. ........................7

        B.    The Injunction Risks Upending the Entire Android Ecosystem and Chilling Innovation. .........................................................10

CONCLUSION..........................................................................................................12

# TABLE OF AUTHORITIES

**CASES**

*Cal. Computer Prods., Inc. v. Int'l Bus. Mach. Corp.*,
    613 F.2d 727 (9th Cir. 1979) ............................................................................ 3

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898, 997 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023) ........................... 4, 6

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020) .............................................................................. 5

*Kyocera Corp. v. Prudential-Bache Trade Servs.*,
    341 F.3d 987 (9th Cir. 2003) ............................................................................ 10

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ..................................................................... 8, 9

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
    435 U.S. 679 (1978) ........................................................................................... 7

*O'Bannon v. NCAA*,
    802 F.3d 1049 (9th Cir. 2015) .......................................................................... 10

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
    838 F.2d 360 (9th Cir. 1988) .............................................................................. 5

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) ........................................................................... 7, 8

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974) ........................................................................................... 5

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .............................................................................. 9, 11, 12

**FEDERAL RULES**

Fed. R. App. P. 26.1 ................................................................................................ i
Fed. R. App. P. 29(a)(4)(E) .................................................................................... 1
Fed. R. App. P. 29(a)(5) ........................................................................................ 13
Fed. R. App. P. 32(a)(6) ........................................................................................ 13
Fed. R. App. P. 32(f) ............................................................................................. 13

**OTHER AUTHORITIES**

*Global Go To Think Tank Index Report*, Univ. of Pa. (2021),
    https://repository.upenn.edu/think_tanks/18/ ................................................. 1

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Information Technology and Innovation Foundation ("ITIF") is an independent, non-profit and non-partisan think tank. ITIF's mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity to spur growth. ITIF strives to provide policymakers around the world with high-quality information, analysis, and recommendations they can trust. ITIF adheres to the highest standards of research integrity and is guided by an internal code of ethics grounded in analytical rigor, pragmatism, and independence from external direction or bias. The University of Pennsylvania has recognized ITIF as setting the global standard for excellence in science and technology policy, and as one of the 40 overall "Top Think Tanks in [the] United States."[2]

ITIF's core focus lies at the intersection of technological innovation and public policy—including economic issues related to innovation, productivity, antitrust and competition policy, as well as technology policy issues in the areas of information technology, broadband telecommunications, mobile platforms, and more. ITIF engages in policy and legal debates, both directly and indirectly, by

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part, or contributed money to fund its preparation or submission, and no person other than amicus, its members, or its counsel have made a monetary contribution to this brief's preparation or submission.

[2] James G. McGann, *2020 Global Go To Think Tank Index Report*, Univ. of Pa. (2021), https://repository.upenn.edu/think_tanks/18/ (last visited May 12, 2025).

presenting policymakers, courts, and policy influencers with compelling data, analysis, and proposals to advance effective innovation policies.

ITIF's Schumpeter Project on Competition Policy promotes an understanding of antitrust law and economics that is designed to maximize dynamic competition and innovation, with a particular focus on promoting sound antitrust enforcement in the digital economy and other high-tech industries. ITIF draws heavily from the work of the Austrian-American economist Joseph A. Schumpeter, who famously described how competition takes the form of "creative destruction" by large firms who have the incentive and ability to engage in the risk taking and research and development that are necessary to drive innovation.

As relevant here, ITIF has studied the mobile ecosystem at the heart of this appeal and concluded that either a panel or *en banc* rehearing is essential to, ***first***, ensure consistency between this case and the *Epic v. Apple* litigation on the threshold matter of whether Google and Apple compete; ***second***, like in *Epic v. Apple*, acknowledge the dynamic and competitive forces that limit the ability for Google (or Apple) to enjoy monopoly power in mobile gaming; ***third***, set aside the unprecedented catalog access remedy which goes far beyond the scope of proper antitrust relief; and ***fourth***, prevent the district court's injunction from upending the Android ecosystem and harming millions of consumers, developers, and manufacturers.

2

# ARGUMENT

I. **THE *EPIC V. GOOGLE* DECISION TROUBLINGLY DEPARTS FROM THE NINTH CIRCUIT'S PRIOR ANALYSIS IN THE *EPIC V. APPLE* LITIGATION**

Rehearing is necessary to avoid inconsistencies between two important Ninth Circuit antitrust decisions, *Epic v. Apple* and *Epic v. Google*. Two years ago, in *Epic v. Apple*, this Court affirmed the existence of a mobile games transaction market and identified Google as Apple's "main competitor." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 985 (9th Cir. 2023) ("*Apple II*"). But in the instant case, this Court departed from that analysis and upheld a judgment with much narrower market definitions—Android app distribution and Android in-app billing—where Google and Apple do not compete. Dkt. 200.1 ("Order") at p.23. This warrants further review to ensure that the Court's antitrust cases consistently reflect the market reality of robust mobile competition between Google and Apple.

   A. **Google and Apple Vigorously Compete in the Mobile Gaming Space.**

The first element in a monopolization action is the "possession of monopoly power in the relevant market." *Cal. Computer Prods., Inc. v. Int'l Bus. Mach. Corp.*, 613 F.2d 727, 735 (9th Cir. 1979). In the *Epic v. Apple* litigation, the Court rejected Epic's proposed single-brand market definition in favor of a "broader" understanding of the market that "declined to focus exclusively on iOS" and included its chief competitor Google. *Apple II*, 67 F.4th at 970, 985. But in the

3

instant action, when presented with a parallel proposal by Epic to limit the relevant markets to Android app distribution and Android in-app billing, the district court adopted Epic's theory of market definition and this Court upheld it. Order at p.23.

Recognizing that these relevant markets exclude Apple's App Store, this Court ruled that "it is of no consequence that Apple and Google were previously found to compete in the market for 'digital mobile gaming transactions' in the *Epic v. Apple* litigation." Order at p.23. While it may be a possibility in some cases that one firm poses competitive constraint on another but not vice versa, that is simply not the market reality here. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 997 n. 484 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded on other grounds*, 67 F.4th 946 (9th Cir. 2023) ("*Apple I*") (Epic's CEO Tim Sweeney recognizing that "Google, of course, operates in the same market [as Apple]."); *see also Epic v. Apple* Trial Tr. (Sweeney) 310:1–17; PX-2392.003.

That "Apple's 'walled garden' is, as the district court in *Apple* noted, markedly different from Google's 'open distribution' approach," Order at pp.20–21 (citation omitted), does not mean Apple does not compete with Google. On the contrary, platform design is itself a primary dimensionality of competition between Google and Apple in the mobile space: Google's "open philosophy" attempts to gain market share by prioritizing developer engagement and choice, whereas Apple's "walled garden" approach focuses on winning over users with the most

4

secure and integrated mobile experience possible. *Id.* at p.21. And, although "[t]he theories of harm in the two cases are also different," *id.*—somewhat—these differences concern the element of anticompetitive conduct, not monopoly power. *See FTC v. Qualcomm*, 969 F.3d 974, 992 (9th Cir. 2020) (noting that "a plaintiff may not use *indirect evidence* to prove unlawful monopoly maintenance via anticompetitive conduct") (emphasis in original).

      **B.**     **Dynamic Competition Should Not Be Overlooked.**

Even if a *prima facie* circumstantial case of monopoly power can be shown, it is not necessarily dispositive: other evidence exists "establishing the kind of competitive marketplace necessary to rebut the inference of monopoly power raised by [a firm's] high market share." *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988). As the Supreme Court has recognized, one way to rebut such a *prima facie* case is by recognition of "fundamental changes in the structure of the market" driven by forces that include technological dynamism. *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 501 (1974); *cf. Qualcomm*, 969 F.3d at 1003. ("We decline to ascribe antitrust liability in these dynamic and rapidly changing technology markets without clearer proof of anticompetitive effect.").

The mobile space without question embodies the sort of innovation-driven technological dynamism that makes the existence of monopoly power unlikely

5

over time. As ITIF previously explained, the dramatic growth in mobile has not been "accompanied a decline in quality or innovation" but "[o]n the contrary, this 'expansive market growth [has been] caused by innovation in the field." Dkt. 105 (ITIF's Prior Amicus Brief supporting Defendant-Appellant Google's Opening Brief) at 9. Indeed, this Court explicitly acknowledged that a core reason why Apple lacked monopoly power stemmed from "the rapidly changing nature of the market." *Apple II*, 67 F.4th at 972. "[T]here are significant changes in both the wider gaming market *and* the mobile gaming market—both appear to be in flux. Indeed, the evidence reflects that the wider gaming market is both dynamic and evolving. Mobile gaming transactions do not appear to be immune to this dynamism." *Apple I*, 559 F. Supp. 3d at 1032 (emphasis in original).

To be sure, "that the markets in this case—for Android app distribution and Android in-app billing—overlap with or may constitute submarkets of the 'digital mobile gaming transactions' market does not make them identical markets." Order at p.23. But as it concerns the relevance of technological dynamism foreclosing the likelihood of substantial and entrenched market power in mobile gaming, there is no fallacy of decomposition: the same dynamic and innovative forces that in *Epic v. Apple* that precluded a finding of monopoly power in the mobile gaming transactions market are equally disruptive for the Android app distribution and Android in-app billing submarkets defined in *Epic v. Google*.

6

## II. THE DISTRICT COURT'S CATALOG ACCESS REMEDY IS CONTRARY TO LAW AND THREATENS TO DAMAGE THE ENTIRE ANDROID ECOSYSTEM

To address Google's allegedly anticompetitive conduct, this Court affirmed a series of highly problematic remedies proposed by the district court. These remedies, and in particular catalog sharing—which requires that Google engineers and implements mechanisms to give rival app stores a "three-year window" to access its catalog of apps, Order at pp.44–45—threaten to substantially damage the entire Android ecosystem and chill the innovation that drives competition in the mobile space. Such relief exceeds what is permissible under established antitrust principles by imposing an exceptional and unjustified duty to deal on Google.

### A. The Catalog Access Remedy Is Legally Flawed.

It is well established that the purposes of antitrust remedies are "to 'terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021). As to the former, courts may not just estop the unlawful monopolization but proscribe lawful behavior if it "represents a reasonable method of eliminating the consequences of the illegal conduct." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 698 (1978). However, such relief must admit of a "clear indication of a significant causal connection between

7

the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." *Optronic Techs.*, 20 F.4th at 486.

The catalog access remedy plainly fails to satisfy these principles. The conduct deemed illegal in this case did not involve any claim that Google acted anticompetitively by failing to provide rivals with catalog access. Rather, Google's expansive catalog is said to contribute to the "network effects" on its mobile platform that purportedly make it harder for rival app stores to compete. *See* 1-ER-16 (Order re UCL Claim and Injunctive Relief); Order at p.50 (reasoning that the catalog-access remedy is appropriate because it "ultimately offers a 'reasonable method' of counteracting the Play Store's dominance and reducing the network effects it enjoys").

But network effects may increase anytime a platform attracts more users, including through procompetitive conduct. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1226 (D.C. Cir. 2004) ("Recall the applications barrier to entry arose only in part because of Microsoft's unlawful practices; it was also the product of 'positive network effects.'"). As such, a causal connection between a catalog sharing remedy and reducing Google's network effects is not at all the same as a causal connection with the specific network effects that constitute the anticompetitive effects of Google's conduct—the latter connection being what is required but not shown in this case. In other words, even if it were true that

8

"Google unfairly enhanced its network effects in a way that would not have happened but for its anticompetitive conduct," Order at p.49, that does not mean that a catalog access remedy would "address the applications barrier to entry in a manner traceable" to the particular effects of the practices found to be unlawful. *See Massachusetts v. Microsoft*, 373 F.3d at 1226.

Neither is the catalog access remedy justified as a forward-looking provision designed to prevent future anticompetitive behavior by reducing barriers to entry nor, alternatively, as means to deprive Google of the "fruits of its statutory violation." Order at p.50 ("The network effects that resulted from Google's entrenchment of the Play Store in the two-sided app-distribution market are among those fruits."). First, the district court identified no grounds for concluding that Google refusing to provide catalog access is a type of behavior that might violate antitrust laws going forward, not least because courts routinely hold that refusals to deal are proper. *See infra* Section II.B (citing *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408, 411 (2004) for the proposition that there are only a few exceptions to the principle that there is no duty to aid a competitor). Second, the district court did not attempt to calibrate the network advantages that Google might lose from a catalog access remedy with the network benefits that could be construed as the "fruits of its statutory violation." *See* Order at p.50 (stating only that the district court found that "[t]he network effects that *resulted*

9

*from Google's entrenchment of the Play Store* in the two-sided app-distribution market are among those fruits [of Google's statutory violation]") (emphasis added).

### B. The Injunction Risks Upending the Entire Android Ecosystem and Chilling Innovation.

Antitrust remedies should also be the least restrictive means of accomplishing their objectives, to ensure that procompetitive behavior is not unduly limited. *See O'Bannon v. NCAA*, 802 F.3d 1049, 1075 (9th Cir. 2015) (noting that where "a restraint is *patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives, an antitrust court can and should invalidate it and order it replaced with a less restrictive alternative") (emphasis in original). Narrowly tailored relief is arguably especially necessary where there are multiple "question[s] of exceptional importance, . . . the answer[s] to which may well affect large numbers of parties with critical contractual and statutory rights and billions of dollars at stake." *See Kyocera Corp. v. Prudential-Bache Trade Servs.*, 341 F.3d 987, 996 (9th Cir. 2003). This is undoubtedly true here: not only is Google is one of the most valuable companies in the world and Epic a developer with billions in revenue each year, but Google Play is one of the most widely used digital platforms in America, with "over 100 million U.S. users and over 500,000 developers." *See* Dkt. 211.1 (Google's Petition for Rehearing) at p.1.

10

Forcing Google to directly aid competitors by sharing its catalog reflects a hugely consequential and unnecessary remedy that risks harming consumers and stifling innovation. "If millions of apps suddenly appear available in those stores, the stores will look legitimate regardless of whether they are and without having to compete in the market at all." Dkt. 206.1 (Google's Motion to Stay) at p.23. Bad actors will therefore be in a greater position to exploit consumers with harmful content. *See* Dkt. 211.1 (Google's Petition for Rehearing) at pp.24–25. What's more, Google has invested heavily into building its Play Store catalog and this sort of forced sharing would discourage incentives to innovate not just for Google, but also for the third-party app stores who are able to free ride off Google's catalog rather than pursue competitive advantage through competition on the merits. *See Trinko*, 540 U.S. at 407–408 ("Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.").

While it is true that the imposition of a duty to deal can in some circumstances constitute legitimate antitrust relief, *see* Order at p.46, that only confirms—not contradicts—the exceptional circumstances of this case and the need for this Court to be especially mindful of the precedent it may set. As the Supreme Court made clear, there are "few existing exceptions from the proposition

11

that there is no duty to aid a competitor." *Trinko*, 540 U.S. at 411. The Court has thus been "very cautious in recognizing such exceptions, because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.* at 408.

## CONCLUSION

Rehearing is not only permissible but warranted in this exceptionally important case. It is necessary to reconcile this Court's antitrust rulings on the robust nature of competition in the highly dynamic mobile gaming space and set aside unprecedented remedies that will destabilize the Android ecosystem, harm millions of users, and stifle innovation.

Dated: August 25, 2025

Respectfully submitted,

/s/ *Marc R. Lewis*
Marc R. Lewis
Rina Plotkin
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590

12

## **CERTIFICATE OF COMPLIANCE**

I certify that this amicus brief contains 2,730 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It thus complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word.

Dated: August 25, 2025

*/s/ Marc R. Lewis*
Marc R. Lewis
*Attorney for* Amicus Curiae
*Information Technology & Innovation Foundation*

## CERTIFICATE OF SERVICE

I certify that on August 25, 2025, I electronically filed the foregoing amicus curiae brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated:  August 25, 2025                     */s/ Marc R. Lewis*
                                                              Marc R. Lewis
                                                              *Attorney for* Amicus Curiae
                                                              *Information Technology & Innovation Foundation*