Nos. 24-6256 & 24-6274

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,
*Plaintiff-Appellee*,

*v.*

GOOGLE LLC, *ET AL.*,
*Defendants-Appellants*.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR*
*THE NORTHERN DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. 3:20-CV-05671-JD*

## BRIEF OF *AMICUS CURIAE* CHAMBER OF
## COMMERCE OF THE UNITED STATES OF AMERICA
## IN SUPPORT OF DEFENDANTS-APPELLANTS'
## PETITION FOR REHEARING

MARIA C. MONAGHAN
MATTHEW P. SAPPINGTON
Chamber of Commerce of the
United States of America
1615 H Street, N.W.
Washington, D.C. 20062

JEAN-CLAUDE ANDRE
Bryan Cave Leighton Paisner LLP
120 Broadway, Suite 300
Santa Monica, CA 90401
jc.andre@bclplaw.com
Tel. (310) 576-2148

BARBARA A. SMITH
SETH M. REID
Bryan Cave Leighton Paisner LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102

ERIC P. SCHROEDER
SLADE MENDENHALL
Bryan Cave Leighton Paisner LLP
1201 W. Peachtree St., N.W., 14th Fl.
Atlanta, GA 30309

DAVID B. SCHWARTZ
Bryan Cave Leighton Paisner LLP
1155 F Street NW, Suite 700
Washington, DC 20004

Counsel for the CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* the Chamber of Commerce of the United States of America (the Chamber) states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

DATED: August 25, 2025      Respectfully submitted,

Bryan Cave Leighton Paisner LLP

*/s/ Jean-Claude André*

JEAN-CLAUDE ANDRE
Counsel for CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA

i

# TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE**

CORPORATE DISCLOSURE STATEMENT ...........................................i

INTEREST OF *AMICUS CURIAE* ...........................................1

INTRODUCTION.........................................................3

ARGUMENT ............................................................6

    A.    Courts Should Craft Equitable Antitrust Relief
            Cautiously, Narrowly Tailoring Relief to Only
            Established Harms.................................................6

            1.    Antitrust Remedies Require Careful Constraint
                    to Remedy Harm Without Intruding on Lawful
                    Competition....................................................7

            2.    Narrowly Tailored Remedies Are Pro-Competitive
                    and Foster Economic Growth .......................................8

    B.    The Panel's Decision Erroneously Affirmed an
            Injunction that Was Not Narrowly Tailored to
            Established Harms...............................................10

            1.    Certain Requirements Are Not Narrowly Tailored
                      to the Alleged Anticompetitive Conduct.......................11

            2.    The Forced-Sharing Requirement Affirmed by the
                      Panel Ignores Downstream Consequences..................15

    C.    The Panel's Decision Warrants Rehearing or Rehearing
            En Banc. .....................................................21

CONCLUSION .........................................................23

ii

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                    **PAGE(S)**

## Cases

*Carpenter v. United States*,
    585 U.S. 296 (2018) ........................................................................18

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ..........................................................................20

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023)...........................................................7

*Ford Motor Co. v. United States*,
    405 U.S. 562 (1972) ........................................................................17

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ...................................................7, 20

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ..........................................................................9

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004)........................................8, 9, 13, 22

*NCAA v. Alston*,
    594 U.S. 69 (2021) ...........................................................3, 7, 9, 15

*New York Times Co. v. Tasini*,
    533 U.S. 483 (2001) ........................................................................18

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) .................................................................14, 20

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021)...............................................12, 17, 22

iii

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                    **PAGE(S)**

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898), *aff'd as modified*,
    175 U.S. 211 (1899) ......................................................................5, 9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................... 8, 12, 13, 21, 22

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .........................................................10

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................. 3, 14, 15, 21, 22

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969) ....................................................................7, 8

**Statutes**

15 U.S.C. § 26 ...........................................................................................7

**Rules**

Fed. R. App. P. 29(a)(4)(E) .......................................................................1

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW:
    AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR
    APPLICATION ¶ 653 .............................................................. 4, 10, 16

Nos. 24-6256 & 24-6274

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EPIC GAMES, INC., a Maryland
Corporation,
*Plaintiff-Appellee*,

*v.*

GOOGLE LLC, *ET AL.*,
*Defendants-Appellants.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF CALIFORNIA
DISTRICT COURT NO. 3:20-CV-05671-JD*

## BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS-APPELLANTS' PETITION FOR REHEARING

### INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America (the

Chamber) is the world's largest business federation. It represents

---

[1]     Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* states
that no counsel for any party authored this brief in whole or in part and
no entity or person, aside from amicus curiae, its members, or its counsel,
made any monetary contribution intended to fund the preparation or
submission of this brief.

approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber and its members have a strong interest in this Court rehearing this appeal for at least two reasons.

First, in the antitrust context, the Chamber's members rely on carefully crafted injunctions that do no more than necessary to remedy an actually proven antitrust harm. Although antitrust laws exist to preserve vibrant competition—an important value at the heart of America's economic success and continued growth—those laws also need to be applied with a scalpel, not a sledgehammer, to ensure they serve their important function without unduly punishing pro-competitive behavior and economic growth. The panel's reasoning departs from these

2

core antitrust principles and will allow for the proliferation of decidedly *in*cautious antitrust remedies.

Second, the district court's injunction, affirmed by the panel, threatens to create substantial unacknowledged effects. The challenged provisions will create significant negative downstream consequences that will affect the security of millions of app developers and users. The Chamber's members have a strong interest in the correct resolution of this dispute so that Google's alleged restraints can be lifted and competition in the relevant markets can resume.

## INTRODUCTION

The Supreme Court has instructed courts that, when fashioning an antitrust remedy, "caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). This is because judges "make for poor 'central planners' and should never aspire to the role." *Id.* at 103 (Gorsuch, J.) (quoting *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (Scalia, J.)). An antitrust remedy untethered to the specific violations found by the fact-finder risks creating unintended consequences on both courts and third parties. That is especially true with rarely used remedies that impose a duty to deal. Such forced-dealing

3

remedies are, in the words of the leading treatise, the "[m]ost difficult of all." Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 653b2.

These important remedial principles are at their apex here given the complex, ongoing two-sided network setting of this case. Google's Play platform connects, on one side, one million app developers of all sizes and sophistication, collectively producing over 3.3 million apps in Google's library for the benefit of, on the other side, hundreds of millions of individual users. These relationships are not one-offs. To the contrary, those who interact with Google's Play platform (Google Play itself, app developers, and app users) usually maintain an ongoing relationship via, *e.g.*, updates and technical fixes, extended use of the app over time, ongoing subscription payments, and other interactions.

Although parts of the injunction affirmed by the panel are routine, two provisions leave caution far behind. One provision imposes a forced-sharing requirement on Google, mandating that Google provide unfettered access to its catalog of Google Play apps for any other app store. Another imposes a forced-carrying requirement on Google,

4

requiring Google Play to carry third parties' app stores at court-imposed "reasonable fees."

These portions of the injunction led the district court into the "sea of doubt" that over 125 years of case law warn against. *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898) (Taft, J.), *aff'd as modified,* 175 U.S. 211 (1899). No analogous case has been cited—by the parties, the district court, or the panel—in which such provisions have been applied in a two-sided platform setting. And the problems from these provisions are as obvious as they are egregious.

*First*, these provisions are not narrowly tailored to the harm about which Epic complained, which the district court adequately addressed in the injunction's first ten paragraphs. And *second*, the forced-sharing provision, in particular, will harm app developers and app users, expropriating developers' intellectual property while exposing users' most sensitive data to all comers.

The panel's decision enshrines these concerns. It opens the door to district courts making themselves "central planners," albeit poor ones. It approves a plan that fails narrow tailoring and is unsupported by a significant causal connection between the remedies ordered and the

5

violation found. And along the way, it fails to account for secondary effects on app developers and users.

The Chamber recognizes the importance of antitrust remedies in protecting competition.[2] But when imposing the most difficult of all antitrust remedies, a court must account for the settings where those remedies will operate. This Court should grant rehearing and vacate, at minimum, these two provisions of the district court's injunction.

## ARGUMENT

### A. Courts Should Craft Equitable Antitrust Relief Cautiously, Narrowly Tailoring Relief to Only Established Harms

Longstanding principles of judicial restraint require courts to exercise caution when crafting injunctions. Both the Supreme Court and this Court have instructed district courts to craft injunctive relief to be only as broad as necessary to remedy the established harm. Antitrust cases require district courts to carefully consider the scope and purpose of any remedy employed to further the important goals of antitrust law— fostering competition and protecting consumers—while ensuring a vibrant, pro-competitive marketplace.

---

[2]    The Chamber takes no position on Google's arguments regarding liability.

6

1.    **Antitrust Remedies Require Careful Constraint to Remedy Harm Without Intruding on Lawful Competition**

Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes injunctive relief that is appropriate under "traditional principles of equity." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). Thus, "injunctive relief must be no more burdensome to the defendant than necessary to provide complete relief to the plaintiff." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023) (citation modified); *see Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1225 (9th Cir. 1997) ("If future harm may be prevented without eroding the value of [the defendant's property rights], less restrictive means need be pursued."). In "fashioning an antitrust remedy," moreover, district courts must "resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives." *NCAA v. Alston*, 594 U.S. 69, 106 (2021).

Antitrust injunctions must narrowly target the harm proven in a given case. In particular, an antitrust remedy must be fashioned to "restrain acts which *are of the same type or class*" as the unlawful acts that have been committed or may "fairly be anticipated." *Zenith Radio*

*Corp.*, 395 U.S. at 132 (citations modified). That is because courts are not at liberty to enjoin "all future violations of the antitrust laws, however unrelated to the violation found by the court." *Id.* at 132–33.

Furthermore, a court "must base its relief on some clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." *United States v. Microsoft Corp.*, 253 F.3d 34, 105 (D.C. Cir. 2001) (en banc) (per curiam) (citation modified); *see, e.g., Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1210 (D.C. Cir. 2004) (praising the district court for fashioning a limited remedy that "went to the heart of the problem . . . without intruding itself" into the defendant's business).

## 2.    Narrowly Tailored Remedies Are Pro-Competitive and Foster Economic Growth

Equitable antitrust remedies can promote consumer welfare by protecting the free market. But an antitrust case "cannot be used as a vehicle by which to fight every potential future violation of the antitrust laws . . . envisioned by [the defendant's] competitors." *Massachusetts*, 373 F.3d at 1218 n.9 (citation modified). That is particularly so here, where the injunction against Google contains more-tailored provisions that already address the relevant anticompetitive conduct. *E.g.*, 1-ER-4 ¶ 8.

8

Given these existing provisions, the district court "should [have] be[en] particularly disinclined to require more" in "adopting . . . forward-looking provision[s] addressing conduct not previously held to be anticompetitive." *Massachusetts*, 373 F.3d at 1218. But the district court did not do so here, and the panel's blessing of that failure invites future overreaches.

Courts face a delicate balance between remedying bad conduct and not tamping down competitive behavior. "[E]ven under the best of circumstances, applying the antitrust laws can be difficult." *Alston*, 594 U.S. at 99 (citation modified); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 895 (2007) (explaining that a proposed legal rule could "increase the total cost of the antitrust system by prohibiting procompetitive conduct the antitrust laws should encourage"). Indeed, since the time of then-Judge Taft, courts have been "wary" about interposing their judgment over complex business relationships, lest they "'set sail on a sea of doubt.'" *Alston*, 594 U.S. at 107 (quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 284 (6th Cir. 1898), *aff'd as modified,* 175 U.S. 211 (1899)).

9

The danger posed by overbroad antitrust rulings reaches its apex at the remedy stage. The further a remedy departs from repairing the established harm, the greater the risk that the equitable "relief" will constrict natural free-market efficiencies. In particular, a court fashioning an antitrust remedy must remember that "competition, not government intervention, is the touchstone of a healthy, vigorous economy." *United States v. Syufy Enters.*, 903 F.2d 659, 663–64 (9th Cir. 1990). To that end, a court must consider the specific and potentially novel business context that its injunction targets, as well as any downstream effects from that injunction. *See* Areeda & Hovenkamp, ANTITRUST LAW ¶ 653j ("[A]ny equitable decree must be attentive to the state of competition that results from the decree.").

## B. The Panel's Decision Erroneously Affirmed an Injunction that Was Not Narrowly Tailored to Established Harms

The panel's opinion creates an outlier precedent that conflicts with the above principles. The panel erroneously approved two insufficiently justified components: a forced-sharing requirement for all of the apps in Google's Play store (1-ER-4–5 ¶ 11) and a forced-carrying requirement for other app stores on Google's Play store at court-imposed "reasonable" fees (1-ER-5 ¶ 12). Both provisions go far beyond the conduct that Epic

10

initially complained about—fees charged for in-app transactions—or argued at trial.

The district court should have carefully assessed whether the forced-sharing and forced-carrying requirements were necessary to remedy the complained-of conduct in light of the above principles. It failed to do so, and the panel improperly affirmed. The harm that flows from the panel's decision will result in a binding precedent approving remedies that lack the necessary narrow tailoring and the significant causal relationship to the violation. These downstream consequences are particularly easy to anticipate from the forced-sharing requirement— consequences that neither the district court nor the panel meaningfully considered, much less justified.

### 1. Certain Requirements Are Not Narrowly Tailored to the Alleged Anticompetitive Conduct

Initially, these requirements go far beyond the conduct about which Epic complained. Epic challenged Google's imposed revenue-sharing and licensing restrictions on original equipment manufacturers (OEMs), prohibitions on app developers offering apps elsewhere or creating their own app stores, and requirements for app developers to use Google's in-

11

app payment processing solution. *See* Dkt. 82 at ¶¶ 18-26.[3] In other words, Epic wanted to access the Android operating system without having to pay Google.

In its injunction, the district court granted Epic the very relief Epic sought. Google can no longer condition revenue-sharing with OEMs (1-ER-4 ¶ 8), can no longer condition revenue-sharing with app developers (*id.* ¶¶ 4-7), and can no longer tie its in-app payment processing solution using Google Play (*id.* ¶ 9). Both the district court and the panel, however, failed to consider whether that relief, taken alone, was sufficient to cure the conduct complained of or whether further relief was justified by "'a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (quoting *Microsoft Corp.*, 253 F.3d at 105).

Having failed to consider whether the relief provided by its first ten paragraphs was sufficient, the district court and panel then compounded

---

[3]     First Amended Complaint (Dkt. 82), *Epic Games v. Google LLC*, No. 3:21-md-02981-JD (N.D. Cal.).

12

that error by exceeding the relief necessary to address Epic's complaint. The district court acknowledged significant evidence of harms caused by various Google agreements "conditioning . . . access by OEMs to Google's Android services on preinstallation of the Google Play Store." 1-ER-19. But the district court never explained why the other parts of its injunction, specifically targeted at ending those agreements, would be insufficient to resolve Epic's complaints. *See id.* To be sure, the district court was concerned about network effects (1-ER-17–18), but it never explained why Epic required the additional remedies beyond the ones narrowly tailored to the harms Epic experienced. This "fail[ure] to provide an adequate explanation for the relief it ordered" is an independent basis to vacate these requirements. *Microsoft Corp.*, 253 F.3d at 103. And both the forced-sharing and force-carrying requirements fail to heed the well-established caution against courts "adopting a forward-looking provision addressing conduct not previously held to be anticompetitive." *Massachusetts*, 373 F.3d at 1218.

The panel's opinion builds on that incomplete foundation and suffers from similar problems. Google's platform, by its very nature and in the absence of anticompetitive conduct, inherently benefits from

13

network effects. Yet the panel affirmed a sweeping remedy of forced access to the *entire* Play catalog because it purportedly would help "to overcome the Play Store's illegally amplified network effects by giving rival stores a fair opportunity to establish themselves." Panel Op. at 44 (citation modified); *see also id.* at 49–50.

Critically, however, that holding fails to distinguish the portion of network effects inherent to the platform from the portion attributable to the allegedly anticompetitive conduct that "unfairly enhanced" those network effects. *Id.* at 49. That distinction is crucial: to be appropriately narrowly tailored—to say nothing of a "significant causal connection"— the remedy must address Google's specific conduct, not Google's mere act of maintaining an app platform that benefits from network effects. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 544–47 (2018) (Thomas, J.) (explaining the sensitive interlocking effects of a two-sided transaction network). Accordingly, a remedy granting competitors access to the full breadth of that platform well exceeds any arguable connection to anticompetitive conduct, sweeping in the value and competitive offering of a network and thus "chill[ing] the very conduct the antitrust laws are designed to protect." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko,*

14

*LLP,* 540 U.S. 398, 414 (2004) (citation modified). And worse still, the panel's affirmance opens the gateway to improper remedies in future antitrust cases in this Circuit.

### 2. The Forced-Sharing Requirement Affirmed by the Panel Ignores Downstream Consequences

The panel again erred by affirming the district court's imposition of a forced-sharing provision without accounting for the unique nature of this two-sided network setting. A court must consider how its injunction will create downstream consequences. *See, e.g.*, *id.* (weighing the "slight benefits of antitrust intervention" against a "realistic assessment of its costs"). The district court never performed this analysis, and the panel never justified that failure. If left to stand, the panel's opinion will open the doors to litigation over whether district courts may forgo this crucial analysis in crafting injunctive relief in other cases, wasting limited judicial resources in the process. District judges might interpret the panel decision to give them permission to become the "poor 'central planners'" that the Supreme Court warns against. *Alston*, 594 U.S. at 103.

The panel's affirmance is particularly harmful here, where the district court issued a mandatory regulatory injunction compelling

15

Google to undertake sweeping and materially new conduct to deal with millions of other market participants. *See* Areeda & Hovenkamp ¶ 653b2 ("Most difficult of all are remedies that force defendants to deal with others. Invariably the court must then impose the terms of dealing and perhaps retain ongoing jurisdiction to regulate the price and terms of future sales.").

There is no indication that either the district court or the panel grappled with the many deleterious downstream consequences that the district court's injunction would cause in the novel markets it seeks to regulate. There is no dispute that the Google Play platform is a two-sided network that matches app developers and app users who both continue to rely on the network to facilitate their ongoing relationship. *See* 1-ER-16. This distinctive context involves multiple ongoing relationships between diverse groups of affected parties—the platform operator (Google), app developers, and app users. It was incumbent upon the panel, as it was upon the district court, to consider how the injunction would affect the various stakeholders' commercial relationships.

But the panel's opinion showed no appreciation for the simple fact that apps are not widgets, such as spark-plugs or telescopes—the

16

products at issue in the cases on which the panel relied. *See* Panel Op. at 46 (citing *Ford Motor Co. v. United States*, 405 U.S. 562, 572 (1972) and *Optronic Techs., Inc.*, 20 F.4th at 486–87). Google Play does not sell discrete products or engage in one-off transactions, but rather facilitates ongoing relationships between app developers and users. But the district court's forced-sharing requirement has no criteria for what counts as a "third-party Android app store[]." *See* 1-ER-4 ¶ 11. By requiring Google to share all apps in the Google Play store with any entity that purports to have its own app store, the district court's order demands forced sharing not just with one company, but with *millions* of developers, apps, and users. This will harm parties on both sides of the network.

On the app developer side, some may not want users to have that kind of uncontrolled, unsupervised access, whether because of scale issues (*e.g.*, not enough server space on the developer's end), channel management, reputation management, or separate exclusivity agreements, among other concerns. The forced-sharing remedy also likely harms app developers by additionally forcing them to publish their intellectual property in multiple channels without the developers' consent, in violation of Google's licensing agreements with those

17

developers. 3-ER-624–25; *cf. New York Times Co. v. Tasini*, 533 U.S. 483, 488 (2001) (authors maintained copyrights in digital works that were not covered by earlier licensing agreement). To be sure, a single sentence of the injunction requires Google to develop some kind of opt-out mechanism for developers who do not want their app hosted on another app store. 1-ER-5 ¶ 11. But this mechanism is more likely to cause confusion than clarity. The court gave no specific requirements for how or when this opt-out mechanism would work.

On the app user side, the ramifications are even more troubling. Google has no discretion to determine whether an app store is a bona fide third-party, a fraudulent designer trolling for user data, or an agent of a foreign power. 3-ER-626–27. If the district court's forced-sharing requirement comes into force, it will provide innumerable and unregulated "app stores" unfettered access to highly sensitive ongoing information about app users, such as health information, private communications, and political affiliations. 3-ER-626–27; *cf. Carpenter v. United States*, 585 U.S. 296, 311 (2018) (data generated by a smart phone "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political,

18

professional, religious, and sexual associations" (citation modified)). Yet neither the district court nor the panel addressed these downstream consequences. 1-ER-17–18; Panel Op. at 64 & n.19.

Given the vast scale of the Play store and its millions of users, security risks will almost inevitably turn into actual harms.[4] Despite recognizing the "robust record" and extensive amicus briefing on security risks of forced sharing, the panel sanguinely affirmed the district court's order on the basis that "allowing Google 'to ensure that the platforms or stores . . . are safe'" would be sufficient. Panel Op. at 64–65 & n.19. But it is far from clear that any company, even a sophisticated one, could investigate and monitor the safety and security of every possible online comer purporting to be an app store. As the Chamber and other amici have contended, the risks to users on this issue are considerable and merit far more than the cursory consideration given here.[5]

---

[4]    *See, e.g.*, Brief of *Amicus Curiae* Former National Security Officials and Scholars in Support of Defendants-Appellants (Dkt. 48.2) at 21.

[5]    *See, e.g.*, Brief of *Amicus Curiae* Chamber of Commerce of the United States of America in Support of Defendants-Appellants (Dkt. (continued  . . . .)

19

Nor did the panel ever address Google's concern that the court's forced-sharing requirement risks harming competition itself. As Google explained, "[e]liminating rivals' need to compete with Play for distribution," "'unnecessarily entrench[es]' Play as the primary source of distribution even for third-party app stores." 3-ER-634 (quoting *Image Tech. Servs.*, 125 F.3d at 1225–26). The forced-sharing remedy will encourage other app stores to free-ride on Google's app catalog rather than compete to develop their own offerings. 3-ER-630–31; *cf. Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) (discussing how the "'free rider' effect" reduces overall output in areas such as service and repair). Indeed, the interdependent nature of two-sided networks, *see Am. Express Co.*, 585 U.S. at 544–47, elevates this risk to its zenith, as

---

58.1) at 5, 11, 17–18; Brief of *Amici Curiae* Former National Security Officials and Scholars in Support of Defendants-Appellants' Motion for a Stay of Permanent Injunction (Dkt. 212.2) at 4 ("Because the injunction limits Google's ability to protect Android users, as soon as the injunction goes into effect, they will be more vulnerable to cyberattacks, threatening both their and the Nation's security."); Brief of *Amicus Curiae* ACT | The App Association in Support of Defendants-Appellants' Motion to Stay (Dkt. 214.1) at 5 ("[T]he trial court's novel remedy affirmed by the panel creates real security risks in the app ecosystem on which the app developers depend.").

app developers and users inevitably will gravitate toward the cheapest source of pre-written apps, *see Microsoft Corp.*, 253 F.3d at 55.

The district court needed to pay close attention to the relationships it sought to regulate—relationships that have not before been regulated by court decree. By failing to attend to these market realities, the district court prescribed a cure that is untethered to the supposed disease. And by affirming the district court's forced-sharing arrangement in a binding precedential opinion, the panel invited future district courts to do the same.

## C. The Panel's Decision Warrants Rehearing or Rehearing En Banc.

The remedies imposed here are unprecedented, requiring Google not only to engage in a new undertaking to bring competitors' services to market but forcing it to provide them access to the entire Play app catalog without a finding that the harms complained of extend nearly as far as the remedy imposed. Nor have these remedies ever been imposed in the unique context of a two-sided market. *Cf. Trinko*, 540 U.S. at 408 (highlighting concerns about "[e]nforced sharing" in a one-sided setting). The panel's failure to reckon with the downstream consequences, spanning from privacy risks and security to the dangers of courts as

21

central planners, demands rehearing en banc or, at minimum, reconsideration by the panel.

The panel's decision conflicts with decisions of the Supreme Court, the D.C. Circuit, and this Court's own precedent, which require antitrust remedies to be carefully aimed at eliminating the consequences of illegal conduct without placing courts in impossible administrative quagmires. *See Trinko*, 540 U.S. at 408; *Optronic Techs., Inc.*, 20 F.4th at 486; *Massachusetts*, 373 F.3d at 1218; *Microsoft Corp.*, 253 F.3d at 105. In this novel setting, the risks to the public are multiplied and the arguments for caution are even stronger. The panel's failure to consider those risks here portends enormous consequences for participants in markets for digital products and services.

## CONCLUSION

For the reasons above, rehearing or rehearing en banc should be granted. The Chamber takes no position on the other issues in this appeal.

DATED: August 25, 2025         Respectfully submitted,

Bryan Cave Leighton Paisner LLP

*/s/ Jean-Claude André*

JEAN-CLAUDE ANDRE
Counsel for CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, counsel is aware of no related

cases pending before this Court.

DATED: August 25, 2025          BRYAN CAVE LEIGHTON PAISNER LLP

                                    */s/ Jean-Claude André*

                                JEAN-CLAUDE ANDRÉ
                                Counsel for CHAMBER OF COMMERCE OF
                                THE UNITED STATES OF AMERICA

## CERTIFICATE OF COMPLIANCE

I certify that:

1.     This brief complies with the length limits permitted by Fed. R. App. P. 29(a)(5) and Ninth Circuit Rule 29-2(c)(2) because the brief contains 4,105 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: August 25, 2025          BRYAN CAVE LEIGHTON PAISNER LLP

                                 */s/ Jean-Claude André*

                                JEAN-CLAUDE ANDRÉ
                                Counsel for CHAMBER OF COMMERCE OF
                                THE UNITED STATES OF AMERICA