Case No. 24-6256

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

EPIC GAMES, INC.
*Plaintiff-Appellee,*

v.

GOOGLE LLC; GOOGLE IRELAND, LTD.; GOOGLE COMMERCE, LTD.; GOOGLE ASIA PACIFIC PTE, LTD.; GOOGLE PAYMENT CORP.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
The Honorable James Donato, Presiding
Case Nos. 3:20-cv-05671-JD, 3:21-md-02981-JD

## BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, AND CONSUMER TECHNOLOGY ASSOCIATION IN SUPPORT OF PETITION FOR REHEARING

Benjamin Berkowitz, #244441
Sara R. Fitzpatrick, #337360
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400 / Facsimile: 415 397 7188

Attorneys for Amici Curiae Chamber of Progress, Computer & Communications Industry Association, NetChoice, Software & Information Industry Association, and Consumer Technology Association

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, amicus curiae Chamber of Progress certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation, and that no publicly held company owns 10% or more of its stock; amicus curiae NetChoice certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation and that no publicly held company owns 10% or more of its stock; amicus curiae Computer & Communications Industry Association certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation, and that no publicly held company owns more 10% or more of its stock; amicus curiae Software & Information Industry Association certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it has no parent corporation, and that no publicly held company owns more 10% or more of its stock; and amicus curiae Consumer Technology Association certifies that it is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code, that it

has no parent corporation, and that no publicly held company owns

more 10% or more of its stock.

DATED: August 25, 2025          */s/ Benjamin Berkowitz*
                                BENJAMIN BERKOWITZ

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT.........................................i

STATEMENT PURSUANT TO FED. R. APP. P. 29(A)(4)(E) ..............1

I.      INTEREST OF AMICI CURIAE ................................................2

II.     INTRODUCTION ......................................................................6

III.    ARGUMENT ..............................................................................9

      A.    The panel's decision dangerously expands
           antitrust remedies beyond what is permitted by
           Supreme Court precedent. ................................................9

           1.    The injunction warps antitrust law and
                 forces Google to provide aid to direct
                 competitors................................................... 10

           2.    The injunction forces third-party app
                 developers to provide valuable IP licenses,
                 subject to a problematic opt-out provision. ........... 17

      B.    The injunction stifles competition, harming
           consumers and small developers....................................19

IV.    CONCLUSION..........................................................................24

CERTIFICATE OF COMPLIANCE .....................................................26

CERTIFICATE OF SERVICE..............................................................27

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U. S. 585 (1985) ............................................................... 11

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ................................................. 22

*CollegeNET, Inc. v. Common Application, Inc.*,
  711 F. App'x 405 (9th Cir. 2017) ........................................ 20

*Epic Games, Inc. v. Google LLC*,
  Nos. 24-6256, 24-6274 (9th Cir. Dec. 4, 2024) ................. 7, 15

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................... 10

*NCAA v. Alston*,
  594 U.S. 69 (2021) ...................................................... *passim*

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ...................................... 21, 22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ......................................................... 10, 16

*Standard Oil Co. of N.J. v. United States*,
  221 U.S. 1 (1911) ................................................................ 24

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ......................................................... 10, 11

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ............................................... 20

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) ............................................................ 16

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................. *passim*

**Federal Statutes**

Sherman Act ................................................................................ 11

**Rules**

Fed. R. App. P. 29 ................................................................. 5, 26

Fed. R. App. P. 32 ................................................................... 26

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

1.     No party's counsel authored this brief in whole or in part.

2.     No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.

3.     No person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

3029411

# I.   INTEREST OF AMICI CURIAE

Chamber of Progress is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. Chamber of Progress backs public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect Internet freedom and free speech, to promote innovation and economic growth, and to empower technology customers and users. It has a direct interest in ensuring that antitrust remedies in the technology sector promote rather than inhibit innovation and that such remedies do not inadvertently harm consumer welfare by imposing overly restrictive obligations on digital platforms.

Chamber of Progress's work is supported by its corporate partners, but its partners do not sit on its board of directors and do not have a vote on, or veto power over, its positions. Chamber of Progress does not speak for individual partner companies, and it remains true to its stated principles even when its partners disagree.

The Computer & Communications Industry Association ("CCIA") is an international, not-for-profit trade association representing a broad

2

cross-section of communications, technology, and Internet-industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA believes that open, competitive markets are the best guarantors of consumer welfare and vibrant innovation. The issues presented in this case are of particular importance to CCIA because they directly affect the ability of technology companies to design, develop, and operate their platforms in ways that best serve consumers while maintaining security, privacy, and quality standards.[1]

NetChoice is a national trade association of online businesses that share the goal of making the internet safe for free enterprise and free expression. NetChoice's members operate a variety of popular websites, apps, and online services, including Meta (formerly Facebook), YouTube, and Amazon.[2] NetChoice's guiding principles are (1)

---

[1] A full list of CCIA's members is available at www.ccianet.org/members.

[2] A full list of NetChoice's members is available at https://netchoice.org/about/.

3

promoting consumer choice, (2) continuing the successful policy of "light touch" internet regulation, and (3) fostering online competition to provide consumers with an abundance of services. NetChoice has a substantial interest in this case because the district court's injunction threatens to establish precedent that would fundamentally alter how digital platforms operate, potentially undermining the careful balance between openness and security that platforms must maintain to protect consumers and foster innovation.

The Software & Information Industry Association (SIIA) is the principal trade association for the software and digital information industries. SIIA's membership includes nearly 400 software companies, search engine providers, data and analytics firms, and digital publishers that serve nearly every segment of society, including business, education, government, healthcare, and consumers. SIIA is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information. SIIA has an interest in ensuring that government regulation, including enforcement of unfair competition laws, pays due respect to the contract, intellectual

property, and free speech rights of software and information companies that are SIIA members.

The Consumer Technology Association ("CTA") represents the $505 billion U.S. consumer technology industry, which supports more than 18 million U.S. jobs. CTA's membership is over 1,300 American companies—80% of which are small businesses and startups. CTA also owns and produces CES®, the world's most powerful technology event. CTA has a direct interest in this case because the district court's injunction threatens to upend the app economy, which is a driver of innovation and economic success.

Amici have concurrently filed a motion for leave to file pursuant to Fed. R. App. P. 29(a)(3).

## II.   INTRODUCTION[3]

Antitrust remedies must be crafted with caution. If not, they "wind up impairing rather than enhancing competition." *NCAA v. Alston*, 594 U.S. 69, 102 (2021). Imposing a duty to deal is particularly disfavored. *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004) ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise."). Yet the panel has defied antitrust precedent to impose a sweeping duty to deal that would reshape the app economy. The injunction upheld by the panel would force Google to affirmatively distribute rival app stores through its Google Play Store and to give those rival app stores access to Google's entire library of apps. It would restrict Google's ability to engage in content moderation and would expose app developers and consumers to a Wild West of untested and unmoderated app stores. The injunction would suppress competition in the mobile app store market,

---

[3] Throughout this brief, unless otherwise indicated, emphases were added to quotations while internal quotation marks, citations, footnotes, brackets, ellipses, and the like were omitted from them. Citations to "Dkt." refer to appellate filings in Nos. 24-6256 and 24-6274. Citations to "ECF" refer to the multidistrict litigation docket, No. 3:21-md-02981-JD (N.D. Cal.).

6

undermining the benefits that free competition confers on mobile-app consumers and developers alike.

The app economy is a thriving market encompassing an estimated 6.1 million jobs and an estimated 770,000 small businesses.[4] Consumers downloaded an estimated 255 billion apps in 2022 alone.[5] By offering standardized ecosystems for app development, mobile app stores like Google Play create immense value for app developers by reducing the barriers to entry and marketing, freeing capital that developers use to improve their apps and expand their offerings.[6]

But the panel in this case imposes extensive duties to deal only on Google. The injunction takes the unprecedented step of requiring one competitor in the market to grant its rivals nearly unfettered access to

---

[4] The App Association, *State of the App Economy* at 6 (2022) (https://actonline.org/wp-content/uploads/APP-Economy-Report-FINAL.pdf) (last accessed Aug. 19, 2025).

[5] Abhineet Kaul, et al., *Powering the global app economy: Android and Google Play's contributions*, Access Partnership (Apr. 9, 2024), https://cdn.accesspartnership.com/wp-content/uploads/2024/06/Powering-the-global-app-economy.pdf?hsCtaTracking=0f69357f-9228-4f87-84b8-724e5c7553ce%7C2f52ad8f-b3b0-4789-9ec0-bf22a595eead.

[6] Brief for the App Ass'n as Amicus Curiae Supporting Defendants-Appellants, *Epic Games, Inc. v. Google LLC*, Nos. 24-6256, 24-6274, at 2 (9th Cir. Dec. 4, 2024).

its services and to all the apps that it offers. The result will be to stymie competition between major competitors in the app store market and permit others to ride the coattails of Google's hard work, thereby reducing the incentive for those competitors to innovate. Though meant to promote competition, the injunction's practical effect is to reduce it and distort the market. The panel did not consider these anticompetitive effects when it affirmed the injunction.

Courts "make for poor central planners" and must be wary of orders that "unintentionally suppress procompetitive innovation." *Alston*, 594 U.S. at 102–03. The panel erred by affirming an injunction that requires Google to carry rival app stores in its app catalog, stock them with the apps from its own catalog, and serve as a back-end administrator for the whole arrangement. Rehearing should be granted to correct these errors both to ensure that the app market is not irreparably damaged and to prevent establishing defective antitrust precedent that will have far-reaching impact detrimental to competition.

## III.   ARGUMENT

### A.   The panel's decision dangerously expands antitrust remedies beyond what is permitted by Supreme Court precedent.

The injunction upheld by the panel flouts the principle that, "[w]hen it comes to fashioning an antitrust remedy . . . caution is key." *Alston*, 594 U.S. at 106. The injunction dangerously exceeds the scope of established antitrust remedies in two crucial ways.

First, the injunction requires Google to dedicate space, opportunities, and resources to its direct competitors despite longstanding precedent that, with limited exceptions, "there is no duty to aid competitors." *Trinko*, 540 U.S. 398, 411 (2004). Requiring Google to aid its competitors not only runs afoul of precedent but "unintentionally suppress[es] procompetitive innovation." *Alston*, 594 U.S. at 102.

Second, the order harms third-party app developers, forcing them to either provide their IP licenses to each new app store or run the risk that those stores will provide pirated and fake versions of their apps. The panel erred in brushing off this concern entirely.

## 1. The injunction warps antitrust law and forces Google to provide aid to direct competitors.

The injunction requires Google to provide unprecedented assistance to its direct competitors, contrary to established precedent that antitrust law "does not restrict the long recognized right of [a] trader or manufacturer . . . freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). Under the injunction, Google is required not only to distribute rival app stores through the Google Play Store, but also to grant those rivals access to its entire app library. The injunction also requires Google to invent, implement, and administer a new process for third-party app developers to opt out of inclusion in those rival app stores.

These obligations run contrary to antitrust precedent. "[T]here is no duty to aid competitors." *Trinko,* 540 U.S. at 411; *see also Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("Competitors are not required to engage in a lovefest."). Instead, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009);

*see Colgate*, 250 U.S. at 300. The Supreme Court has subsequently reaffirmed this, recognizing that the Sherman Act does not simply authorize judges to require a firm to "alter its way of doing business whenever some other approach might yield greater competition." *Trinko*, 540 U.S. at 415.

Subsequent courts have found only "limited exception[s]" to a firm's right to choose with whom to do business, in cases with a history of voluntary dealing between the parties. *See Trinko*, 540 U.S. at 409 (distinguishing from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U. S. 585, 601 (1985)).  As there is no history of voluntary dealing between the parties prior to Google's refusal to deal with Epic, this limited *Aspen Skiing* exception is not applicable to this case. *See id.* (distinguishing *Aspen* on the basis that *Aspen* defendant terminated a voluntary course of dealing with rivals). Hence, the injunction goes well beyond established precedent by imposing this duty to deal on Google. The panel and the district court incorrectly dismissed *Trinko*'s holding as applying only to liability determinations, not remedies, but the Supreme Court has made clear that *Trinko*'s reasoning "appl[ies] when it comes to the remedy." *Alston*, 594 U.S. at 102; see *Trinko*, 540 U.S. at

11

415 ("No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise."). Indeed, the Supreme Court has explicitly cautioned that the "continuing supervision of a highly detailed decree could wind up impairing rather than enhancing competition." *Alston*, 594 U.S. at 102 (quoting *Trinko*, 540 U.S. at 415).

Because the panel erroneously failed to apply *Trinko* at the remedy stage, it incorrectly upheld an injunction that flouts precedent by heavily restricting Google's ability to set its terms of dealing. The app store-distribution remedy bars Google from "prohibit[ing] the distribution of third-party Android app distribution platforms or stores through the Google Play Store."[7] In short, Google must list its competitors in the Google Play Store, provide those competitors with access to all the apps listed on Google Play, and provide app developers with a means of opting out if they choose to be excluded from other app stores.

The injunction even forces Google to act as a back-end administrator for its competitors by facilitating downloads of rival app stores, moderating content, and creating and running the system

---

[7] Inj. at ¶¶ 11–12, Dkt. 6.2, Ex. B.

through which developers choose app stores. Though the injunction includes a narrow exception for Google to take undefined "reasonable measures" to ensure that "platforms or stores, and the apps they offer, are safe from a computer systems and security standpoint, and do not offer illegal goods or services . . . or violate Google's content standards,"[8] Google must be prepared to prove that any measures it takes to ensure the security and legality of third-party platforms and their offerings "are strictly necessary and narrowly tailored"—terms likewise left undefined.[9] Such a high burden of proof limits Google's ability to respond to potential security risks and fraudulent activities. Further, the injunction contemplates challenges to Google's technical and content requirements but does not explain how such disputes will work or what will happen while disputes are pending.[10]

Worse yet, the injunction provides no guidance on any of these points. It does not address what security protections Google can provide for the new services it has been ordered to supply, what contractual

---

[8] *Id.* at ¶ 12.

[9] *Id.*

[10] *See id.*

13

terms will govern relationships between apps and third-party app
stores, what data third-party app stores are permitted to collect, or who
will provide customer support when things go wrong.

The injunction further limits Google's content and technology
standards by requiring that review measures be "comparable to the
measures Google is *currently* taking for apps proposed to be listed in the
Google Play Store."[11] This requirement undermines Google's practice of
constantly updating its policies and enforcement to achieve its content
and security goals. For example, in 2024, Google required app
developers to comply with multiple policy updates covering issues
including photo and video permissions,[12] medical-app functionality,[13]
the use of third-party code, minimum functionality standards, and
registration of developers that provide sensitive services relating to
financial products and services, health, virtual private networks

---

[11] *Id.*

[12] Play Console Help, *Policy Announcement: April 3, 2024*,
https://support.google.com/googleplay/android-
developer/answer/14594990 (last accessed Aug. 19, 2025).

[13] Play Console Help, *Policy Announcement: October 30, 2024*,
https://support.google.com/googleplay/android-
developer/answer/15444680 (last accessed Aug. 19, 2025).

14

(VPNs), and the government.[14] Under the injunction, however, Google's policy updates could be challenged not only for being "unreasonable" or "insufficiently tailored," but simply for being *too new*. This provision effectively requires Google to freeze its standards for three years; in a rapidly evolving technological and legal landscape, these restrictions not only place the company at a competitive disadvantage, but also potentially expose consumers to new cybersecurity risks.[15] The panel erred in failing to adequately address these security concerns.

The injunction's limitations on Google's content and technology requirements stand to harm consumers. Google's Operations Manager has explained that Google is "constantly updating [its] Google Play policies to stay ahead of changes in the market or new types of abuse, and to help make sure that content is age-appropriate."[16] Among the

---

[14] Play Console Help, *Policy Announcement: July 17, 2024*, https://support.google.com/googleplay/android-developer/answer/14993590 (last accessed Aug. 19, 2025).

[15] *Epic vs. Google: What About Mobile Malware?*, Threat Fabric (Oct. 21, 2014), https://www.threatfabric.com/blogs/epic-versus-google-what-about-mobile-malware (last accessed Aug. 19, 2025).

[16] Google Safety Center, *How we help keep Google Play safe for users and developers*, https://safety.google/intl/en_us/stories/google-play-safety/ (last accessed Aug. 19, 2025).

content Google seeks to exclude are "apps that are deceptive, malicious, or intended to abuse or misuse any personal data"; "egregious content" such as hate speech, violence, or child endangerment; low-quality apps that crash frequently or fail to load; and apps that violate intellectual-property rights or impersonate other apps.[17] Consumers trust Google's moderation standards; by undermining those standards, the injunction puts consumers' privacy and security at risk.

Finally, the injunction contravenes long-standing precedent that courts are "ill-equipped and ill-situated" in making decisions "to sacrifice competition in one portion of the economy for greater competition in another portion," which are decisions that must be made by Congress. *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972). Antitrust courts are instructed to "avoid direct price administration." *Pac. Bell Tel. Co.*, 555 U.S. at 453. The district court is "neither [an] economic nor industry expert[]"; and in this case, it has "impose[d] a duty that it cannot explain or adequately and reasonably supervise." *Alston*, 594 U.S. at 102–03.

---

[17] *Id.*

16

2.      **The injunction forces third-party app developers to provide valuable IP licenses, subject to a problematic opt-out provision.**

Besides requiring Google to make the Play Store's entire app catalog available to rival app stores, the injunction forces app developers to license their apps to Google's app store competitors by default, unless the developers opt out. In other words, the injunction requires Google to provide its entire catalog of apps to consumers and to provide third-party app developers "with a mechanism for opting out of inclusion in catalog access for any particular third-party Android app store."[18] This opt-out process is problematic because it replaces normal intellectual-property licensing negotiations with an undefined mechanism administered by Google. As a result, app developers will have to proactively seek to opt out of every Android app store where they do not want their apps to be offered.[19]

The injunction's opt-out provision, like many of its other provisions, is ill-conceived. The injunction leaves Google to figure out how the opt-out mechanism will function. App developers who were not

---

[18] Inj. at ¶11, Dkt. 6.2, Ex. B.

[19] *Id.*

parties to this case and had no say in the proceedings must now spend
time and resources sifting through Play Store competitors to determine
which ones to opt out of doing business with. Because app developers
must affirmatively opt *out* of inclusion in other app stores, any app
listed on the Google Play Store risks being added automatically to new
app stores that may crop up over time. This creates risks for security
and IP licensing.[20] It is unclear how app developers are expected to
negotiate to give app stores licenses to list their apps or what contract
terms will govern app developers when they are automatically included
in new app stores. App developers who decide *not* to list their apps in
new app stores run the risk that those app stores will instead list
pirated and counterfeit versions of their apps. Because the injunction
also limits Google's content-moderation powers, Google will have
limited ability to help app developers address counterfeit content.

The injunction's requirement that Google create the mechanism
for app developers to opt out of other stores itself raises concerns.[21] The
injunction includes no guidelines for Google's design of the mechanism,

---

[20] Brief for the App Ass'n, *supra* n. 5, at 17.

[21] Inj. at ¶11, Dkt. 6.2, Ex. B.

18

and Google has no incentive to optimize its performance in its unwanted role as administrator. Indeed, because Google will be creating the mechanism for app developers to opt out of inclusion in rival app stores, Google will have a conflict of interest in administering this mechanism. Google's economic interests discourage it from providing a smooth system for app developers to decide where to list their apps, because Google loses out any time a developer lists an app on a rival app store.

The panel's decision brushes off concerns about developers' intellectual property and security, breezily concluding that app developers would be unlikely to want to opt out of any stores and that the injunction's vague provision for Google to take security measures alleviates all security concerns. Op. 61–62.

## B.  The injunction stifles competition, harming consumers and small developers.

The injunction may be intended to increase competition, but it will have the opposite effect. *Alston*, 594 U.S. at 102 (warning that "continuing supervision of a highly detailed [antitrust] decree could wind up impairing rather than enhancing competition"). The injunction is likely to stifle innovation, making Google Play the sole ecosystem for disseminating apps and removing any incentive for firms to evolve their

19

products. The panel erred in failing to consider this consequence, in spite of the Supreme Court's admonition that forced sharing is in "tension with the underlying purpose of antitrust law, since it may lessen the incentive" of competitors to innovate. *Trinko*, 540 U.S. at 407–08.

Competition benefits consumers by allowing them to "mak[e] free choices between market alternatives." *CollegeNET, Inc. v. Common Application, Inc.*, 711 F. App'x 405, 406 (9th Cir. 2017). Antitrust law is designed to "protect the integrity of the market system by assuring that competition reigns freely," resulting in product differentiation. *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990). In a healthy marketplace, competitors are incentivized to differentiate themselves by providing lower prices, improved features, and specialized services.

One way that Google differentiates itself from its competition is by supporting app developers. Google provides tools and services to help developers "test, monitor, and iterate their apps and games"; free educational content for developers; and digital payment infrastructure to enable developers to monetize their apps.[22] In a healthy marketplace,

---

[22] Google Play, *Helping Developers Succeed*,

Google's competitors are incentivized to find their own ways to attract developers and consumers.

By forcing Google to carry its competitors on its Google Play and to provide its entire app catalog to them, the injunction eliminates all incentive for rival app stores to differentiate their content from that of the Google Play Store. Instead, they can take advantage of the services that Google provides without incurring any of the related costs. As the Tenth Circuit has observed, "[f]orcing firms to help one another . . . risk[s] reducing the incentive both sides have to innovate, invest, and expand—again results inconsistent with the goals of antitrust." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1073 (10th Cir. 2013). Epic's own expert explained that the best way for a rival app store to compete with Google is to "offer distinctive content not available on the Google Play Store."[23]

Under the injunction, however, a rival app store can simply "piggyback on its larger rival" by copying the Google Play Store's

---

https://support.google.com/googleplay/android-developer/answer/9969970?hl=en (last accessed Aug. 19, 2025).

[23] Bernheim Statement, ¶ 48, ECF 952-1.

offerings at no cost. *Novell*, 731 F.3d at 1073. The result will replace meaningful competition with a homogenous app store marketplace. Even the district court acknowledged that its injunction would likely result in a period of "reduced competition."[24] There is no consumer benefit to a market full of Play Store clones.

At the same time, the injunction diminishes Google's incentive to compete and innovate in the market by forcing it to support its rivals, which harms the consumers and app developers who benefit from free competition. Google will be "deterred from investing, innovating, or expanding . . . with the knowledge [that] anything it creates it could be forced to share." *Novell*, 731 F.3d at 1073. Courts have acknowledged that "a firm that has engaged in the risks and expenses of research and development" loses incentive to innovate when forced to share the benefits of its work with rivals. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281 (2d Cir. 1979).

The injunction will degrade the quality of the Android app ecosystem. As discussed *supra*, the injunction recognizes Google needs to take "reasonable measures" to ensure the safety and legality of apps

---

[24] May 23, 2024, Hearing Tr. at 51, ECF 977.

22

on third-party app stores, which effectively transforms Google into a guarantor of third-party conduct. Third-party app stores and developers can point to these parts of the injunction and disclaim responsibility for security breaches, content violations, or legal infractions by asserting that Google failed to take adequate "reasonable measures" to prevent such occurrences. This shifting of accountability is both inequitable and counterproductive, as it incentivizes third parties to externalize risk rather than implement robust internal safeguards.

The injunction simultaneously acknowledges that Google, as the owner of Android, bears ultimate responsibility for the security and content of the apps in the Android environment, while greatly restricting Google's ability to actually guarantee a user experience with safe and legal apps. The most effective method for Google to ensure comprehensive compliance with its security protocols and content standards would be to maintain centralized oversight through the Play Store's established review and approval processes–precisely the mechanism the injunction prohibits.

At bottom, illegal, dangerous, and insecure content will permeate the Android ecosystem as a result of the injunction. Third-party app

23

stores are incentivized to shift ultimate security and legal responsibility to Google, and decentralized distribution of apps will functionally impede Google's ability to enforce safety and content standards. The antitrust laws were designed to prevent consumer harm through product degradation, yet this remedy achieves the opposite result. *See, e.g.*, *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 52 (1911) ("[T]he evils which led to the public outcry against monopolies [include] . . . [t]he danger of deterioration in quality of the monopolized article….").

Decreased innovation and damaged user experience unquestionably harm consumers and app developers, creating a result that is exactly the opposite of what antitrust law is meant to achieve. For these additional reasons, the panel erred in affirming the injunction.

## IV.   CONCLUSION

For the foregoing reasons, rehearing should be granted.

24

DATED: August 25, 2025

*/s/ Benjamin Berkowitz*

Benjamin Berkowitz
(CA Bar. No. 244441)
Sara R. Fitzpatrick
(CA Bar. No. 337360))
Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400
bberkowitz@keker.com
sfitzpatrick@keker.com


Attorneys for *Amici Curiae*
Chamber of Progress
Computer & Communications
Industry Association
NetChoice
Software & Information Industry
Association
Consumer Technology Association

25

## CERTIFICATE OF COMPLIANCE

I hereby certify as follows:

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) and Ninth Circuit Rule 29-2(c)(2). The brief contains 4,119 words according to the word count of the word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Ninth Circuit Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a 14-point, proportionally spaced Century Schoolbook font.

DATED: August 25, 2025          */s/ Benjamin Berkowitz*
                                BENJAMIN BERKOWITZ

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, SOFTWARE & INFORMATION INDUSTRY ASSOCIATION, and CONSUMER TECHNOLOGY ASSOCIATION IN SUPPORT OF PETITION FOR REHEARING with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on August 25, 2025. All participants in the case are registered ACMS users, and service will be accomplished by the appellate ACMS system.


DATED: August 25, 2025          */s/ Benjamin Berkowitz*
                                 BENJAMIN BERKOWITZ