No. 24-6256, 24-6274, 25-303

---

# In the United States Court of Appeals for the Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

GOOGLE LLC, *et al.,*

*Defendants-Appellants.*

---

**On Appeal from the United States District Court
for the Northern District of California
Nos. 3:20-cv-05671-JD; 3:21-md-02981-JD
Hon. James Donato**

---

**BRIEF OF AMICUS CURIAE
THE COMMITTEE FOR JUSTICE IN SUPPORT OF APPELLANTS'
PETITION FOR REHEARING**

---

REEVES LAW LLC
John M. Reeves
7733 Forsyth Blvd., Suite 1100–#1192
St. Louis, MO 63105
(314) 775-6985
reeves@appealsfirm.com
*Attorney for Amicus Curiae
The Committee for Justice*

# TABLE OF CONTENTS

Table of Contents ...................................................................2

Table of Authorities................................................................4

Introduction and Interest of Amicus Curiae ...........................6

Argument.................................................................................7

   I.  This Circuit's caselaw eliminating Epic's burden under Step 3 of the rule of reason is contrary to Supreme Court precedent. .......................................................................7

      A.  The rule of reason mandates that the plaintiff prove the defendant could have achieved its procompetitive goals through less restrictive means. .................................7

      B.  This Court's precedent relieving plaintiffs of their burden at Step 3 turns the rule of reason from an objective test into a subjective imposition of judicial policy preferences.................................................10

   II.  The panel's imposition of a duty to deal conflicts with Supreme Court precedent. ..........................................14

      A.  Normally, a company has no duty to deal with its competitors. ...............................................................14

      B.  By imposing a duty to deal, the panel opinion punished Google for using its business acumen to achieve legitimate market dominance.................................17

   III. The panel opinion contravenes long-standing U.S. antitrust policy.........................................................................20

      A.  Antitrust law protects competition, not competitors. ............20

      B.  The panel decision removes the incentive for businesses to innovate..................................................................24

Conclusion ...................................................................................... 27

Certificate of Service ..................................................................... 27

Certificate of Compliance ............................................................ 27

TABLE OF AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. FTC,*
  1 F.4th 102 (2d Cir. 2021) ................................................................. 14

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) .................................................................. 18, 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .................................................................. 12, 20

*Buccanner Energy (USA) Inc. v. Gunnison Energy Corp.,*
  846 F.3d 1297 (10th Cir. 2017) ........................................................ 14

*California Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ....................................................................... 11

*County of Tuolumne v. Sonora Cmty. Hosp.,*
  236 F.3d 1148 (9th Cir. 2001) .............................................. 10, 11, 14

*Epic v. Apple,*
  67 F.4th 946 (9th Cir. 2023) ................................................. 10, 11, 14

*Expert Masonry, Inc. v. Boone County,*
  440 F.3d 336 (6th Cir. 2006) ........................................................... 14

*FTC v. Qualcomm, Inc.,*
  969 F.3d 974 (9th Cir. 2020) ......................................... 12, 15, 18, 19

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.,*
  551 U.S. 87 (2007) ........................................................................... 8

*NCAA v. Alston,*
  594 U.S. 69 (2021) ................................................................. 9, 11, 12

*Novell v. Microsoft Corp.,*
  731 F.3d 1064 (10th Cir. 2013) ................................................. 15, 19

4

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ........................................................................8

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) ..................................................22, 23

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .....................................................................22

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................. passim

**Statutes**

15 U.S.C. § 1 .......................................................................................8

**Rules**

Fed. R. App. P. 29(a)(4)(E) ...............................................................6

**Other Authorities**

Friedrich Hayek, *The Use of Knowledge in Society*,
    35 Am. Econ. Rev. 519 (1945) .................................................24

Philip Areeda and Herbert Hovenkamp, *Antitrust Law* (2017) .............9

Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 13
    (2011 ed., 1978) .........................................................................21

### INTRODUCTION AND INTEREST OF AMICUS CURIAE[1]

The Committee for Justice (CFJ) is a non-profit legal and policy organization founded in 2002. It is dedicated to promoting the rule of law and preserving the Constitution's protection of individual liberty. To that end, CFJ files amicus briefs in key cases, supports constitutionalist nominees to the federal judiciary, and educates the public and policymakers about the benefits of individual liberty and the need to ensure that antitrust and other laws are properly applied so as to promote genuine competition for the benefit of consumers.

CFJ has a critical interest in the outcome of this litigation. This Court's opinion affirms a radical form of liability and a radical injunction upon Google that penalizes it for rising to the top of the market in the area of selling smartphone apps using innovation and business acumen and forces it to open its Play Store to its competitors, something the Supreme Court has repeatedly admonished against in the antitrust context. This Circuit's precedent allows courts applying

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person—besides *amicus curiae* and its counsel—contributed money that was intended to fund preparing or submitting this brief.

the rule of reason to conduct a "balancing of the equities" even if a plaintiff fails to demonstrate that the defendant could have accomplished its legitimate, procompetitive goals through less restrictive means. This cannot be reconciled with Supreme Court precedent on the rule of reason, which holds that it must protect competition, not competitors. This Court's subjective "balancing of the equities" prong enables courts to put competitors before competition, the exact inverse of what antitrust law is supposed to do. Moreover, the opinion creates a watershed change in antitrust law, warping it from a law that fosters competition for the benefit of consumers into a law that threatens innovation and a functioning marketplace to the detriment of U.S. consumers and national security. Rehearing is warranted.

## ARGUMENT

### I. This Circuit's caselaw eliminating Epic's burden under Step 3 of the rule of reason is contrary to Supreme Court precedent.

#### A. The rule of reason mandates that the plaintiff prove the defendant could have achieved its procompetitive goals through less restrictive means.

The Sherman Act outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several States." 15 U.S.C. § 1. But restraints like the one at issue here—vertical restraints at different levels of distribution—are evaluated under the rule of reason. *Ohio v. American Express Co.*, 585 U.S. 529, 540-41 (2018) ("*Amex*"). The rule of reason's "goal is to 'distinguis[h] between restraints with anticompetitive effects that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *Id.* at 541 (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

Typically, the rule of reason involves a three-step, burden-shifting test. Under Step 1, "the plaintiff has the initial burden to prove the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If the plaintiff demonstrates this, the burden then "shifts to the defendant [under Step 2] to show a procompetitive rationale for the restraint." *Id.* If the defendant shows that a procompetitive rationale justified the restraint under Step 2, "the burden [then] shifts back to the plaintiff to demonstrate [under Step 3] that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

While the Court later clarified that "[t]hese three steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis," *NCAA v. Alston*, 594 U.S. 69, 97 (2021), it emphasized that "however framed and at whichever step, anticompetitive restraints of trade may wind up flunking the rule of reason to the extent the evidence shows that substantially less restrictive means exist to achieve any proven procompetitive benefits." *Id*. at 100. Thus, Steps 2 and Steps 3 could "be collapsed into one," given that a "legitimate objective that is not promoted by the challenged restraint can be equally served by simply abandoning the restraint, which is surely a less restrictive alternative." 7 Philip Areeda and Herbert Hovenkamp, *Antitrust Law*, ¶ 1505, at 428 (2017), *quoted in Alston*, 594 U.S. at 100. In other words, while the three-step analysis is not a "rote checklist," it is still essential that if the defendant demonstrates a pro-competitive rationale for the restraint, the plaintiff must demonstrate that less restrictive means are available to supply the identical pro-competitive rationale in order to eliminate the restraint.

9

**B. This Court's precedent relieving plaintiffs of their burden at Step 3 turns the rule of reason from an objective test into a subjective imposition of judicial policy preferences.**

Neither the panel opinion nor this Court's earlier precedent can be squared with this three-step analysis. The panel opinion rejected Google's argument that Epic should have been required to satisfy its burden under Step 3 after Google satisfied its burden under Step 2. (Op.at.37.n.10). The panel declared itself bound by its earlier decision in *Epic v. Apple*, 67 F.4th 946 (9th Cir. 2023) ("*Apple II*"). In *Apple II*, this eliminated the plaintiff's burden at Step 3. *Id*. at 993. It declared, *id*., that it was bound to follow the earlier precedent of *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001). In *County of Tuolumne*, this Court acknowledged that the plaintiffs had "failed to meet their burden of advancing viable less restrictive alternatives . . . ." *Id*. at 1160. But having acknowledged this fact, this Court nevertheless concluded that "[w]e must [still] balance the harms and benefits of the [restraint in question] to determine whether [it] is reasonable." *Id*.

This Court has expressed skepticism over this approach. *Apple II*, 67 F.4th at 994 ("We are skeptical of the wisdom of superimposing a totality-of-the-circumstances balancing step onto a three-part test that

10

is already intended to assess a restraint's overall effect."). But it concluded that it was nevertheless bound, as a panel, to follow *County of Tuolumne. Apple II*, 67 F.4th at 994. As further justification, this Court pointed to *Alston's* declaration that the three steps were not a "rote checklist." *Apple II*, 67 F.4th at 994. It emphasized that the Supreme Court has never characterized the three-step "test as the *exclusive* expression of the Rule of Reason." *Id.* at 993.

It is one thing to note—correctly—that the three-step formulation of the Rule of Reason cannot be reduced to a "rote checklist" substituting for a serious analysis of the restraint at issue and whether it violates the Sherman Act. "The whole point of the rule is reason is to furnish 'an enquiry meant for the case, looking to the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *Alston*, 594 U.S. at 97 (quoting *California Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999)). But it is quite another thing to conclude from this—as this Court's precedent does—that where a plaintiff has demonstrated the existence of a vertical restraint, and the defendant has put forth legitimate, procompetitive reasons for this restraint, courts may engage in some sort of "balancing of the equities"

11

to determine whether the restraint may survive without the plaintiff being required to meet its burden under Step 3. "[A]ntitrust laws . . . 'were enacted for the protection of competition, not competitors.'" *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (emphasis omitted)). Hence, a plaintiff who cannot show the availability of less-restrictive means of achieving the defendant's procompetitive goals will not satisfy the rule of reason. *See Alston*, 594 U.S. at 100.

This Court's precedent allowing a balancing of the equities even if the plaintiff fails to satisfy Step 3 enables the protection of competitors at the expense of competition. Allowing such a balancing test in the absence of Step 3 allows judges to inject their personal policy preferences and find in favor of plaintiff even when they have not shown the existence of less restrictive means. This enables courts, as opposed to the market, to determine the winner. This Court found arbitrarily that the harm to Epic outweighed the procompetitive effects of the Play Store despite vast evidence of commercial success and customer satisfaction.

12

The entire purpose of Step 3's mandate that the plaintiff demonstrate that the defendant could have achieved its procompetitive goals through less restrictive means is to ensure that antitrust law is not influenced by media narratives or ends up punishing companies for dominating a particular market through their own innovation, business acumen, and investment. Step 3's mandate is objective—if the plaintiff fails to demonstrate that the defendant could have used less restrictive means to achieve its procompetitive goals, the analysis ends and the restraint may continue. Without this objective guideline, courts will use a nebulous "balancing of the equities" test to enjoin conduct that arose legitimately and for which there may be no alternative. That is exactly what the panel did here when it held Epic was not required to prove Google could have achieved its procompetitive goals through means less restrictive than the ones they employed. Google was found liable and now faces a devastating injunction.

By contrast, the Second, Sixth, and Tenth Circuits mandate the plaintiff satisfy the objective requirements of Step 3 before possibly entertaining the balance of equities, ensuring that none of these courts can apply their subjective policy preferences to innovation and business

13

acumen that further competition. *See*, *e.g.*, *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 120-22 (2d Cir. 2021); *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 343 (6th Cir. 2006); *Buccanner Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1310 (10th Cir. 2017). *En banc* review is warranted to overrule both *County of Tuolumne* and *Apple II* and bring this Circuit into alignment with the Supreme Court's interpretation of the rule of reason.

## II. The panel's imposition of a duty to deal conflicts with Supreme Court precedent.

### A.  Normally, a company has no duty to deal with its competitors.

The panel opinion is quite striking in what it orders Google to do. It mandates that Google open up its app store—something that it created on its own, through ingenuity and business acumen—to its competitors. It also orders Google to distribute its entire Play Store catalogue to its competitors so that they may sell such apps on their own stores. And it even requires Google to make available, in its own app store, app stores developed by other rivals. Thus, the panel opinion mandates that Google establish dealings with its competitors. This is repugnant to the Supreme Court precedent that, absent the most extenuating of

14

circumstances, a company has no duty to deal with its competitors. *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). It is also repugnant to this Court's own precedent in *Qualcomm*, and also the Tenth Circuit's holding in *Novell v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.).

In *Trinko*, the Supreme Court clarified the ultimate purpose of antitrust law—its purpose is not to do away with monopoly power as such, but rather to ensure that firms only acquire or use that power in a manner that does not harm consumers. There, a Verizon phone customer brought suit against the company alleging that by failing to open its service area to its competitors as part of a new mandate under the Telecommunications Act, it had attempted to gain an unlawful monopoly in the telecommunications market. *Trinko*, 540 U.S. at 401-05. The Court disagreed. A monopoly, without more, does not violate antitrust law. It "requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior produce, business acumen, or historic accident." *Id*. at 407 (cleaned up).

15

Thus, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, it not only not unlawful; it is an important element of the free-market system." *Id.* And "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Id.* In language that seems tailor-made for Google's app store, the Court emphasized that "[f]irms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers." *Id.* That is exactly what Google did here—it developed a smartphone operating system capable of running any type of app not associated with Apple. This operating system has become highly successful and the only serious competitor to Apple in the smartphone market. Moreover, Google also developed its Play Store, which attracts consumers by enabling them to purchase any non-Apple app that they desire. It was perfectly within its rights not to share this success with others for free, because "[c]ompelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive

16

for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.*

### B. By imposing a duty to deal, the panel opinion punished Google for using its business acumen to achieve legitimate market dominance.

Google came to the dominance of the Android app market with its app store through its own ingenuity and business acumen. It did not do so as a result of any anticompetitive conduct, such as exclusive price discrimination or tying. As such, it had every right to leverage this dominance as a means of reaping the fruits of its labor. But instead of allowing Google to do this, the panel opinion has mandated it share the very app infrastructure it created and which formed the basis for its legitimate success in the first place. And even worse, the panel opinion mandates that a court-supervised commission be set up to monitor whether Google is, in fact, literally giving its app store away to its competitors. But such "[e]nforced sharing . . . requires antitrust courts to act as central planners . . . a role for which they are ill suited." *Trinko,* 540 U.S. at 408. This Court has no business in planning the operation of the  already-stable and consumer-friendly app market.

17

While the Court has also recognized that circumstances may exist where a business can be forced to deal with its competitors, such circumstances are "at or near the outer boundary of [Sherman Act] liability." *Id.* at 409 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). If a defendant unilaterally terminates from voluntarily dealing with its competitors, when up to that point it had been doing so at a profit, this could "suggest a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* But such circumstances are not present here—at no time did Google voluntarily withdraw itself from its previous dealings with any of its competitors.

This Court has recognized need to avoid weaponizing the Sherman Act to force businesses to deal with their competitors. *See Qualcomm*, 969 F.3d at 993. Qualcomm refused to license its essential patents to rival chip suppliers, and also refused to sell its modem chips to any manufacturers who lacked patent licensing agreements with it. *Id.* at 982-86. The district court entered an injunction forcing Qualcomm to do so. *Id.* at 986-87. This Court reversed. It emphasized that "the antitrust laws, including the Sherman Act, were enacted for the protection of competition, not competitors." *Id.* at 993 (cleaned up). Thus,

18

"[c]ompetitors are not required to engage in a lovefest." *Id*. It concluded that the district court had ignored the Supreme Court's warning in *Trinko* that imposing a duty to deal should only applied in rare circumstances. *Qualcomm*, 969 F.3d at 994. It found that Qualcomm's conduct was for the purpose of "greater profits in both the short and long term . . . ." *Id*.

The Tenth Circuit came to a similar conclusion in *Novell*. There, the future Justice Gorsuch noted that "[i]f the law were to make a habit of forcing monopolists to help competitors by . . . sharing their property . . . courts would paradoxically risk encouraging collusion between rivals and dampened price competition—themselves paradigmatic antitrust wrongs, injuries to consumers, and the competitive process alike." *Novell*, 731 F.3d at 1073. Nor is that all. "If forced sharing were the order of the day, courts would have to pick and choose the applicable terms and conditions." *Id*. This would require courts "to become 'central planners,' a role for which we judges lack many comparative advantages and a role in which we haven't always excelled in the past." *Id*.

Thus, the panel opinion mandates that Google deal with its competitors under circumstances far beyond the outer limits of *Aspen*

19

*Skiing*. This failure to adhere to Supreme Court precedent, as well as its conflict with both this Court's own caselaw and the caselaw of other circuits, makes rehearing *en banc* appropriate.

## III. The panel opinion contravenes long-standing U.S. antitrust policy.

### A. Antitrust law protects competition, not competitors.

Antitrust law and intellectual property law work in tandem for an all-important goal: the promotion of competition. They are not designed to insulate particular competitors from the discipline of the marketplace. Such laws are meant to protect the competitive process, not individual market players. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977). Promoting competition means setting the rules of the game—rules that establish incentives to innovate and to invest—and then permitting market participants to battle it out. Courts should not upset outcomes that reflect superior efficiency, creativity, or risk-taking. As Justice Scalia observed in *Trinko,* 540 U.S. at 407, the mere possession of market power, and the charging of monopoly prices, is not only lawful but an important element of the free-market system, providing incentives for innovation and entry. Allowing the victor to enjoy the spoils is precisely how the

20

system motivates firms to engage in the difficult, costly processes of innovating and competing.

In passing the Sherman Act, "Congress and the courts [interpreting the act] believed that competition could be injured to the detriment of consumers by the *agreed* elimination of rivalry . . . or by a powerful firm's attack upon rivals with the purpose of driving them from the market (*by predatory price wars or control of raw materials of transportation*)." Robert H. Bork, *The Antitrust Paradox: A Policy at War with Itself* 13 (2011 ed., 1978) (emphasis added). Notably, antitrust law does not have as its ultimate goal the actual elimination of monopoly power as such. Rather, antitrust law has as its goal the elimination of *anticompetitive conduct* that could result in the acquisition of monopoly power through improper means.

There is nothing wrong with a business dominating a particular marked through its own innovation and acumen—quite the contrary. "The integration of economic activities, which is indisputable to productive efficiency, always involves the implicit elimination of actual or potential competition." *Id.* at 24. This "integration creates wealth for the community." *Id.* As the Supreme Court would later put it, antitrust

21

laws prohibit not monopoly power as such but rather "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Thus, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Trinko,* 540 U.S. at 407.

The future Chief Justice Taft recognized the importance of competition in one of the earliest antitrust cases—*United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898). While condemning direct restraints on trade, Taft refused to condemn ancillary restraints of trade—such as mergers between two competitors, or the selling of a business pursuant to an agreement that the seller would thereafter exit the market for the business—so long as they had a legitimate business purpose. *Id.* at 280. "It was of importance, as an incentive to industry and honest dealing in trade, that, after a man had built up a business and good will to the best advantage, he should be able to sell his business and good will to the best advantage, and he could not do so unless he could bind himself by an enforceable contract not to engage in

22

the same business in such a way as to prevent injury to that which he was about to sell." *Id*.

Taft continued, "when two men became partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union of their capital enterprise, and energy to carry on a successful business, and one useful to the community." *Id*. Such restrictions on competition that partnerships inherently impose, "with a view of securing their entire effort in the common enterprise, were, of course, only ancillary to the main end of the union, and were to be encouraged." *Id*. Thus, practices such as mergers that may result in a decreased number of *competitors* do not necessarily amount to practices that unlawfully restrain *competition* as such. If a smaller rival to a larger, more successful business hopes to establish an antitrust violation, it must do more than merely demonstrate that the larger rival is "big" or "more powerful." It must show that its growth and its acquiring of that power was the result of actions that inherently restricted competition, as opposed to competitors.

The panel's decision departs from this foundational principle. By compelling Google to share its fruits of success with its rivals, the decision does not promote competition; it promotes competitors. The distinction is critical.

As Friedrich Hayek explained in his seminal essay, *The Use of Knowledge in Society*, 35 Am. Econ. Rev. 519 (1945), knowledge in an economy is diffuse, contextual, and not capable of being centralized in a regulator or court. Similarly, Ludwig von Mises and Israel Kirzner highlighted that entrepreneurial discovery depends on market signals that no centralized authority can replicate. Judges and regulators lack the knowledge required to pick winners; only markets can determine which products or platforms best serve consumer welfare. Yet here, after the market appeared to declare Google the winner—through innovation, technical superiority, and investment—this Court has undone that market result. Such interference undermines the very incentives antitrust law was meant to protect.

## B. The panel decision removes the incentive for businesses to innovate.

The consequences of this error extend well beyond app distribution. By nullifying the rewards of successful innovation, the decision removes

24

incentives to compete in the first place. If the lesson to firms is that building a better platform will result not in rewards but in forced sharing with rivals, rational actors will reduce investment in innovation. As Hayek and his successors warned, such intervention dulls entrepreneurial discovery and suppresses the trial-and-error process by which markets advance. That chilling effect could not come at a worse time for American technological leadership. The Trump Administration's "Winning the AI Race: America's AI Action Plan," unveiled July 23, 2025, emphasized that U.S. dominance in AI and related technologies is not only an economic imperative but a national security priority. Weakening the incentives of firms like Google to innovate directly threatens America's ability to maintain technological superiority in AI, cybersecurity, and other domains critical to national security. If allowed to spread, the logic of the panel's decision risks killing American innovation in toto.

It also bears emphasis that Google achieved its success legitimately. It did not steal the Play Store concept or copy another firm's technology. It built its ecosystem through hard-won innovation, technical and business know-how, and substantial financial investment. Google got in

on the ground floor of the app market—indeed, it practically created the market for apps in the first place. That is the quintessential path by which antitrust law permits a firm to achieve dominance. Compelling such a firm to share the fruits of its success reduces incentives for any firm to take risks and innovate. See *Trinko*, 540 U.S. at 408. Far from promoting the competitive process, forced sharing ensures that rivals need not compete vigorously; they can simply petition courts to reallocate what they failed to earn in the marketplace.

Thus, policy considerations strongly counsel against affirming the panel's decision. By transforming antitrust law into a tool for competitor protection, the decision undermines innovation, weakens incentives to invest, and jeopardizes America's technological edge in strategic industries. This Court should grant rehearing *en banc* and restore antitrust law to its proper role: fostering competition, not competitors.

## CONCLUSION

This Court should grant rehearing *en banc*.

Respectfully submitted,

*/s/ John M. Reeves*
John M. Reeves
REEVES LAW LLC
7733 Forsyth Blvd., Suite 1100–#1192
St. Louis, MO 63105
(314) 775-6985
reeves@appealsfirm.com
*Attorney for amicus curiae The*
*Committee for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on **August 25, 2025**, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ John M. Reeves*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains **4,186** words, excluding those parts exempted by Fed. R. App. P. 32(f).

27

I further that certify this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as it is written in proportionally-spaced, 14-point Century font using Microsoft Office Word 2016.

*/s/ John M. Reeves*